**DRAFT** — April 3, 2008 – 1:33:53 PM – CW

1  COUGHLIN STOIA GELLER
   RUDMAN & ROBBINS LLP
2  JEFFREY W. LAWRENCE (166806)
   SHIRLEY H. HUANG (206854)
3  100 Pine Street, Suite 2600
   San Francisco, CA  94111
4  Telephone:  415/288-4545
   415/288-4534 (fax)
5  jeffreyl@csgrr.com
   shirleyh@csgrr.com
6       – and –
   DARREN J. ROBBINS (168593)
7  RAMZI ABADOU (222567)
   655 West Broadway, Suite 1900
8  San Diego, CA  92101-3301
   Telephone:  619/231-1058
9  619/231-7423 (fax)
   darrenr@csgrr.com
10 ramzia@csgrr.com

11 Lead Counsel for Plaintiffs

12 [Additional counsel appear on signature page.]

13           UNITED STATES DISTRICT COURT

14         NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| 15  DANNY McCASLAND, Individually and On  )<br>Behalf of All Others Similarly Situated,  )<br>16               )<br>17          Plaintiff,  )<br>             )<br>18     vs.  )<br>             )<br>19  FORMFACTOR, INC., IGOR Y.  )<br>KHANDROS, RONALD C. FOSTER,  )<br>20  RICHARD M. FREEMAN and JOSEPH  )<br>BRONSON,  )<br>             )<br>21         Defendants.  )<br>22  _____ ) | No. C-07-05545-SI<br><br>**(Consolidated)**<br><br><u>CLASS ACTION</u><br><br>PLAINTIFFS' FIRST AMENDED<br>COMPLAINT FOR VIOLATIONS OF<br>FEDERAL SECURITIES LAWS<br><br><u>DEMAND FOR JURY TRIAL</u> |

23

24

25

26

27

28

1

**TABLE OF CONTENTS**

2

**Page**

3  I.     INTRODUCTION ........................................................................................1

4  II.    JURISDICTION AND VENUE ..................................................................9

5  III.   PARTIES ..................................................................................................10

6  IV.    PLAINTIFFS' CONFIDENTIAL WITNESSES.......................................11

7  V.     BACKGROUND .......................................................................................15

8  VI.    FRAUDULENT SCHEME AND COURSE OF BUSINESS ...................19

9         A.   Defendants Misrepresented FormFactor's Progress with the Development
              and Ability to Manufacture Harmony Products.......................................20
10
              B.   FormFactor Suffered Chronic Yield Problems that Drastically Impeded the
11                 Manufacturing Process...............................................................................22

12            C.   FormFactor's Yield Problems Accumulated Worthless Scrap but the
                   Senior Executives Overvalued the Inventory and Directed Lower-Rank
13                 Personnel to Count Obsolete Inventory as Research and Development
                   Expense, Thereby Misstating the Company's Financials ...........................26
14
              D.   FormFactor Had Material Weakness in Its Primitive Internal Control
15                 Systems Which Permitted Defendants to Hide the Ramping Issues with
                   Harmony and Manipulate the Company's Reported Financials ...............29
16
17  VII.   DEFENDANTS' FALSE AND MISLEADING STATEMENTS ISSUED
             DURING THE CLASS PERIOD ...........................................................31

18  VIII.  THE TRUTH BEGINS TO EMERGE ......................................................69

19  IX.    ADDITIONAL INDICIA OF SCIENTER .................................................80

20  X.     FORMFACTOR'S FALSE FINANCIAL REPORTING DURING THE CLASS
             PERIOD ...............................................................................................84
21
              A.   Improper Accounting for its Inventory Valuation ...................................85
22
              B.   Improper Transfer of Scrap to Research and Development....................88
23
              C.   FormFactor's Restatement Is an Admission of Falsity..........................91
24
              D.   FormFactor's Financial Statements Violated Fundamental Concepts of
25                 GAAP..........................................................................................................92

26            E.   Defendants Certified False and Misleading Financial Results ..............93

27            F.   FormFactor's Violations of SEC Regulations Due to Inadequate Internal
                   Controls......................................................................................................94
28

1
2
**Page**

XI.    LOSS CAUSATION/ECONOMIC LOSS .................................................................98

XII.    COUNT I – For Violation of §10(b) of the 1934 Act and Rule 10b-5 Against All
Defendants ...........................................................................................................103

XIII.   COUNT II – For Violation of §20(a) of the 1934 Act Against All Defendants .............104

XIV.   NO SAFE HARBOR EXISTS FOR DEFENDANTS' STATEMENTS ........................104

XV.    CLASS ACTION ALLEGATIONS ...........................................................................105

XVI.   PRAYER FOR RELIEF .........................................................................................106

XVII.  JURY DEMAND ..................................................................................................106

3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## I.      INTRODUCTION

1.      This is a securities class action on behalf of all persons who purchased or otherwise acquired the common stock of FormFactor, Inc. ("FormFactor" or the "Company") between February 1, 2006 and February 5, 2008 (the "Class Period"), against FormFactor and certain of its officers and/or directors for violations of the Securities Exchange Act of 1934 ("1934 Act").

2.      FormFactor designs, manufactures and sells advanced wafer probe cards, which are used by manufacturers to electrically test integrated circuits for semiconductor chips in the front end of the manufacturing process. FormFactor's customers consist of dynamic random access memory (DRAM), Flash and microprocessor manufacturers who use the Company's products to test wafers. Each wafer probe card is a custom product that is specific to the chip and wafer design of the customer. Due to the custom nature of probe card products and the nature of the semiconductor industry, FormFactor's revenue growth is driven in significant part by the number of new semiconductor designs that its customers develop, the technology transitions involved in these designs and the customers' production volumes. In short, FormFactor operates in an industry characterized by short product life and rapid technological changes.

3.      Historically, the wafer probe card industry has been highly competitive. In a wafer probe test, the ability to test an increasing number of dies on the wafer at the same time (also known as "parallelism") provides significant cost savings. In particular, the benefit of increasing parallelism reduces the number of wafer probe test cells (wafer probers, test heads and testers), which translates to savings in capital expense and floor space. In addition to increasing the number of dies on the wafer, there is also a huge benefit to reduce the number of "touchdowns" in the testing process. A "touchdown" is the contact between the wafer probe card and the wafer, and a reduction in the number of touchdowns means a shorter lead time and testing process, thereby saving costs in the manufacturing process for the semiconductor customers. Prior to the Class Period, the industry had just transitioned from nine touchdown to four touchdown probe cards, with the next shift from four touchdown to one touchdown probe cards. In order to maintain its competitive edge, it was critical that FormFactor not only be able to deliver and execute the single touchdown technology, but

1   be the front runner to develop and define the industry's transition to one touchdown probe cards, as

2   it had been during the transition from nine to four touchdowns.

3           4.      In April 2005, FormFactor introduced its new, proprietary "Harmony" architecture

4   for wafer probe cards.  The market caught the enthusiasm, noting that FormFactor's one touchdown

5   Harmony probe card could very well reshape the integrated circuit test industry.  The Company

6   represented that the Harmony architecture would address the significant challenges presented by the

7   future demands of single touchdown wafer probing and very high parallelism wafer test, and will be

8   the key building block for FormFactor's future generations of Flash, DRAM, wafer level burn-in

9   ("WLBI") and high frequency probing solutions.  In previous versions, a probe card had to touch the

10  computer chip several times to complete all the tests necessary to ensure a chip was functional.

11  FormFactor's four touchdown probe cards were already a huge advance over competitor cards that

12  required 16 to 32 touchdowns, but there was still the potential to damage the card each time the

13  probe card touched the chip.  By reducing the number of times the card touched the chip to just one,

14  it substantially removed that concern.  The market reacted to Harmony well – paying close attention

15  to FormFactor's development of Harmony products, especially the Harmony technology purported

16  to revolutionize the wafer probe card industry by offering single touchdown cards.  In short,

17  Harmony was supposed to differentiate FormFactor from its competition, and FormFactor's growth

18  depended largely on the execution and delivery of Harmony products.

19          5.      Throughout 2005 and early 2006, as FormFactor tried to spend most of its effort in

20  developing this new technology, it also had to address its factory capacity issues to meet the strong

21  demand for its probe cards and the anticipated strong demand once Harmony products were ready to

22  be rolled out.  By early 2006, the Company moved into a new manufacturing facility in Livermore,

23  California, which was aimed to increase factory productivity, yields and on-time deliveries.  In a

24  February 1, 2006 press release, the Company represented its "Record Quarterly Revenues of $71.8

25  Million" with "Quarterly Bookings up 102% Year Over Year; 2005 Net Income Sets a Record."

26  Defendant Joseph Bronson ("Bronson") stated:

27          "We are pleased with the Company's results this quarter, as we made substantial
            progress ramping production at our new, industry-leading MEMS facility.  Our

28

1   ability to execute during a time of rapid growth enabled us to exceed our revenue and
    profit targets."

2   6.    On the same day, the Company held a conference call with securities analysts hosted

3   by defendants Bronson, Igor Y. Khandros ("Khandros") and Ronald C. Foster ("Foster"), in which

4   defendant Bronson represented:

5        *We have completed our first Harmony architecture probe card field trial,*
         *which began with an early adopter in the second half of '05. Product performance*
6        *exceeded expectations. We expect to see significant revenues for our probe card*
         *based on Harmony platform in the second half of '06, with everything centering*
7        *around 300 millimeter. Harmony will be the cornerstone of flash and then DRAM*
         *for the next several years.[1]*
8

9                                    *    *    *

10       We are planning an introduction this year of the first NAND flash-specific product,
         which is one touchdown 300 millimeter product based on our Harmony architecture.
11

12  7.    On the same conference call, defendants also represented that "*[a]ll production*

13  *processes are now fully functioning in our new facility, with output and yields improving steadily*"

14  and that "*we are planning to have that [Harmony NAND Flash] in place for volume production in*

15  *the second half of '06.*"  Upon this positive news, FormFactor stock jumped over 21% in one day,

16  from $30.46 per share to $36.95 per share.

17  8.    During the Class Period, defendants continued to issue materially false and

18  misleading statements regarding the Company's business and financial results.  As a result of

19  defendants' false statements and fraudulent scheme, FormFactor stock traded at artificially inflated

20  prices throughout the Class Period.  In June 2006, the Company introduced the Harmony OneTouch

21  probe card for 300-mm Flash memory production for wafer probing.  Following that announcement,

22  FormFactor's share price doubled by August 2006 from the beginning of the year, trading as high as

23  $49.45 per share on August 31, 2006.

24  9.    The true facts, which were known by defendants but concealed from the investing

25  public during the Class Period, were that throughout the Class Period, the Company was scrambling

26  with severe production constraints that impeded the actual production of the Harmony products.

27  [1]      Here, as elsewhere, all emphasis is added unless otherwise noted.

28

1    These production issues significantly increased the Company's costs and expenses, and raised the

2    risk that customers with older generation products would seek alternative sources from the

3    Company's competitors or seek to renegotiate their contracts with FormFactor, placing serious

4    pressure on the Company's future revenue.  To hide the Company's ramping issues with the

5    Harmony products, defendants employed an assortment of schemes to portray that it was on track in

6    leading the development, design and manufacturing of single touchdown wafer probe cards.  The

7    details of the fraudulent scheme is described in §VI below.

8         10.    On top of the pressure to deliver the Harmony products as defendants promised, the

9    Company was experiencing systematic poor yields in its manufacturing process, which in turn,

10   caused further delay in shipments to customers.  In fact, several witnesses who worked at

11   FormFactor indicated that the poor yields in the manufacturing process were chronic and widely

12   known among Company management, but the senior executives never publicly acknowledged it

13   when making projections or forecasts.  While the underlying poor yields had long been an issue at

14   FormFactor, the issues exponentially exploded as the Company tried to push out the Harmony

15   products that were much more complex than the Company's previous products.

16        11.    The chronic poor yields also led to the build-up of scrap, *i.e.* obsolete parts for wafer

17   probe cards.  Prior to and during the Class Period, defendants manipulated the Company's reported

18   gross margin by improperly accounting for excess and obsolete inventory as Research and

19   Development ("R&D") costs instead of as cost of revenues.  R&D costs are costs associated with

20   activities that a company engages in aimed at the discovery of new knowledge that can either lead to

21   the development of new products or procedures or to the improvement of existing products or

22   procedures.  Only costs associated with these types of activities should be classified as R&D costs.

23   R&D costs are required to be charged to expense when incurred.  As part of the fraudulent scheme,

24   defendants directed lower-ranked personnel to improperly transfer the costs associated with scrap

25   that accumulated from poor yields from engineering and production from the manufacturing

26   department to R&D.  Thereafter, the cost of scrap was written off as R&D.  As corroborated by

27   several witnesses who worked at FormFactor, the Company transferred scrap out of the engineering

28   department in order to avoid recognizing the costs as current period cost of revenues.  The R&D

1   group performed very limited testing, if any, on scrap inventory. As a result, the costs associated

2   with scrap did not qualify for R&D costs and should have been written off through the Company's

3   cost of revenues. This manipulation caused the Company's cost of revenues to be understated and

4   its gross margin to be overstated.

5         12.    To further smooth the appearance that the Company was successfully ramping its

6   Harmony products, defendants manipulated the Company's reported financials. Specifically, in

7   order to inflate the price of FormFactor's stock, defendants caused the Company to falsely report its

8   results for 2006 and the first half of 2007 through improperly accounting for its inventory valuation

9   and the related cost of revenue accounts, which misstated the Company's reported inventory, gross

10   margin, operating margin and net income. The Company has restated its previously issued financial

11   results due to these accounting violations. The Company is also in the process of completing its

12   remediation plan to address the design of controls over inventory valuation.

13         13.    While the Company was experiencing protracted Harmony ramp issues, defendants

14   took advantage of the inflated stock price to unload their stock. Defendant Bronson sold 36.83% of

15   his FormFactor holdings, selling 25,000 shares for over $1 million in illicit insider trading proceeds.

16   Defendant Foster sold 19,800 shares, or 87.29% of his FormFactor holdings, pocketing $864,144 in

17   insider trading proceeds. Defendant Khandros sold 723,079 shares, or 23.91% of his FormFactor

18   holdings, for insider trading proceeds of over $27.86 million. He also timed his insider trades well

19   by making 36 transactions between June and September 2007, all between $43.00 and $46.07 per

20   share, for insider trading proceeds of $4.77 million, right before the Company started disclosing the

21   true operating and financial conditions of the Company.

22         14.    On October 24, 2007, the Company announced that adjustments to inventory

23   valuations may be required with respect to periods prior to the third quarter of 2007 ("3Q 2007"). In

24   a press release entitled: "FormFactor, Inc. Announces Record Revenue Quarter of $125.3 Million,

25   Up 29% Year Over Year," the Company stated:

26            ***The Company said that it is unable at this time to release further income statement data with respect to the third quarter. The Company is currently

27         *reviewing its historic practices with respect to inventory valuation in light of issues identified by the Company in the course of preparation of financial statements for*

28         *the third quarter. Based on the review to date management believes that*

*adjustments to inventory valuations may be required with respect to periods prior to the third quarter of 2007. These potential adjustments could change inventory, gross margin, operating margin and net income from the amounts previously reported for the affected periods. The Company has not yet determined the magnitude of these adjustments or whether the adjustments will be reflected in the third quarter financial statements or in a restatement of the affected periods. The Company believes, however, that its third quarter operating margin and net income per share, without giving effect to adjustments in respect of prior periods, should be not less than the 20.5%-21% and $0.38-$0.40 per share, respectively, provided as management guidance in the Q2 earnings call conducted on July 25, 2007.*

15.    During the October 24, 2007 conference call, defendants disclosed that the Company's production of Harmony was behind schedule due to capacity constraints.  Upon these disclosures, FormFactor's stock declined $7.70 per share to close at $35.54 per share, a one-day plummet of nearly 20% on volume of 8.3 million shares, over eight times the average three-month volume.  The worst was yet to come, as the Company was still concealing the ramping issues with its Harmony products and the impact they already had on FormFactor's business and financial results.

16.    On November 9, 2007, the Company announced its preliminary financial results for 3Q 2007.  The Company also announced that it had substantially completed its review of its inventory valuation practices, as follows:

> That review indicates that during fiscal 2006 and the first half of fiscal 2007 the Company did not consistently follow its accounting policies for determining inventory valuation. As a result the Board of Directors determined on November 8, 2007 that the Company will restate its financial statements for the fiscal year ended December 30, 2006, for each of the fiscal quarters for that year, and for the fiscal quarters ended March 31 and June 30, 2007.

> Based on the work done to date, the Company estimates the effect of the restatement will be to change GAAP net income per share on a fully diluted basis from $1.29 to $1.21 for the fiscal year ended December 30, 2006, from $0.30 to $0.31 for the fiscal quarter ended March 31, 2007, and from $0.38 to $0.43 for the fiscal quarter ended June 30, 2007.

                              *       *       *

> The Company is evaluating management's report on internal controls contained in the Company's 2006 Form 10-K, and has determined that it is likely that it had a material weakness in internal controls over financial reporting as of December 30, 2006.

> As a result of the restatement, the Company's financial statements for the year ended December 30, 2006 contained in the Company's 2006 Form 10-K, and the financial statements contained in its Forms 10-Q for the quarters ended March 31, 2007 and June 30, 2007, should no longer be relied upon. Because of the time necessary to complete the restatement, the Company did not file its third quarter Form 10-Q when due on November 8, 2007.

17.     On November 11, 2007, the Company filed its amended Form 10-K and 10-Qs and restated its financials for fiscal year ("FY") 2006, 1Q 2007 and 2Q 2007.  In the Company's 2006 restated Form 10-K, the Company admitted that it "*did not consistently follow its accounting policies for valuing inventory resulting in material misstatement of inventory and cost of revenue.*"  This generally accepted accounting principles ("GAAP") violation resulted in a material overstatement of FormFactor's inventory on its balance sheet during the Class Period.  For FY 2006, 1Q 2007 and 2Q 2007, FormFactor's inventory was overstated by $5.9 million or 30.9%, by $5.3 million or 23.8% and by $1.6 million or 5.2%, respectively.  Additionally, this GAAP violation resulted in a material misstatement of FormFactor's cost of revenues, gross margin, net income and earnings per share ("EPS") during the Class Period.  For 2006, FormFactor's net income was overstated by $3.6 million or 6.2%.  For the first half of 2007, FormFactor's net income was misstated by $2.8 million or 7.8%.

18.     In the restated Form 10-K, the Company also admitted to a material weakness in its financial reporting, such that "*the Company did not maintain effective controls over the valuation of inventory and the related cost of revenues accounts.  Specifically, the Company did not maintain effective controls to ensure that the estimation process to value inventory complied with the Company's accounting policies*."

19.     In December 2007, while FormFactor was still scrambling to deal with the ramping issues with its Harmony products, a competitor, Advantest Corporation ("Advantest"), introduced a DRAM probe card that would be competitive with FormFactor's single touchdown DRAM probe card.  Even worse, an analyst reported that Elpida Memory, Inc. ("Elpida"), FormFactor's largest customer, was evaluating Advantest's new DRAM probe cards.  On the news that FormFactor had lost its technological edges, FormFactor's stock dropped over 12% from $38.87 per share to $33.90 per share, closing to six million shares traded in one day.  Another analyst immediately issued a report on December 10, 2007 noting: "We are particularly concerned over [FormFactor's] ability to deliver Harmony, as customers could seek alternative solutions or force potential price concessions due to delays in receiving product."

1    20.    On February 5, 2008, FormFactor disclosed what defendants had known all along.

2  FormFactor had severe operations issues in ramping up the production of Harmony, and was

3  therefore unable to ship Harmony to customers, causing a decline in revenue and bookings.  The

4  Company stated: "***Due to the protracted Harmony ramp issues we experienced in 2007,***

5  ***FormFactor was not the first full wafer contactor probe card company qualified at some DRAM***

6  ***suppliers.  This resulted in the loss of business in the fourth quarter.***"    The Company also

7  announced a bleak outlook for 2008, including reducing the guidance for FY 2008 as a result of lost

8  DRAM market share driven by DRAM industry weakness and Harmony DRAM production issues.

9  Additionally, the Company announced that it would take a restructuring charge of $4-$5 million in

10  2008 related to a cost-reduction plan, and would cut its workforce by 14% globally.  Upon these

11  disclosures, the market reacted with more than ten million shares traded in one day, causing the

12  stock to drop 11% on February 5, 2008, and another 9% on February 6, 2008, closing at $21.06 per

13  share.  On February 25, 2008, defendant Foster resigned as the Chief Financial Officer.  The stock

14  has been trading near $20.00 per share since then.

15    21.    The following chart illustrates how defendants' false and misleading statements and

16  omissions caused the price of FormFactor securities to be inflated and how class members were

17  damaged when the Company's relevant true financial condition began to be revealed to the market:

18

19

20

21

22

23

24

25

26

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19



20   **II.    JURISDICTION AND VENUE**

21       22.    Jurisdiction is conferred by §27 of the 1934 Act. The claims asserted herein arise

22   under §§10(b) and 20(a) of the 1934 Act and Securities and Exchange Commission ("SEC") Rule

23   10b-5.

24       23.    (a)    Venue is proper in this District pursuant to §27 of the 1934 Act. Many of the

25   false and misleading statements were made in or issued from this District.

26            (b)    FormFactor's principal executive offices are located at 7005 Southfront Road,

27   Livermore, California.

28

1  ### III.     PARTIES

2      24.      Lead Plaintiff, the City of Monroe Employees' Retirement System, purchased

3  FormFactor common stock at artificially inflated prices during the Class Period and was damaged

4  thereby.

5      25.      Defendant FormFactor designs, manufactures and sells advanced wafer probe cards,

6  which are used by semiconductor manufacturers to electrically test integrated circuits.    The

7  Company is headquartered in Livermore, California with operations in Europe, Asia and North

8  America.  Since it became a public company in June 2003, its stock has traded on the NASDAQ

9  market under the symbol FORM.

10      26.      Defendant Igor Y. Khandros ("Khandros") is, and at all relevant times was, Chief

11  Executive Officer ("CEO") and a director of FormFactor.  During the Class Period, Khandros sold

12  723,079 shares, or 23.91% of his FormFactor holdings, reaping over $27.86 million in insider

13  trading proceeds at an average of $38.54 per share.  In addition to his 2006 salary of $436,835, in

14  February 2007, Khandros received a cash bonus of $572,000 awarded for his FY 2006 performance.

15  For FY 2007, he received an 11% raise in base salary of $500,000.  During the Class Period,

16  defendant Khandros received 231,540 shares of option grants.

17      27.      Defendant Ronald C. Foster ("Foster") was, at all relevant times, Chief Financial

18  Officer ("CFO") of FormFactor.  During the Class Period, Foster sold 19,800 shares, or 82.29% of

19  his FormFactor holdings, pocketing $864,144 in insider trading proceeds, at an average of $43.64

20  per share.  In addition to his 2006 annual salary of $285,962, Foster received a cash bonus of

21  $261,993 awarded for his FY 2006 performance.  For FY 2007, Foster received a 6.9% raise in base

22  salary of $310,000.  He also received 115,580 shares of option grants during the Class Period.

23      28.      Defendant Joseph Bronson ("Bronson") served as the President of FormFactor at the

24  outset of the Class Period until he resigned on January 5, 2007.  During the Class Period, Bronson

25  sold 25,000 shares, or 36.83% of his FormFactor holdings, pocketing more than $1 million in insider

26  trading proceeds.  Bronson is liable for statements made by him and all other group-published

27  statements made by FormFactor during the Class Period  and prior to his departure.  Defendant

28  Bronson received 94,220 shares of option grants during the Class Period.

1    29.    Defendant Richard M. Freeman ("Freeman") has served as FormFactor's Senior Vice

2    President, Operations since September 2004.  In FY 2007, he received $330,000 in base salary.  He

3    also received 85,000 shares of option grants during the Class Period.  Freeman's executive

4    compensation information for FY 2006 is not publicly available.

5    30.    Defendants Khandros, Foster, Bronson and Freeman (collectively, the "Individual

6    Defendants"), because of their positions with the Company, possessed the power and authority to

7    control the contents of FormFactor's quarterly reports, press releases and presentations to the market,

8    including securities analysts, money and portfolio managers and institutional investors.  They were

9    provided with copies of the Company's reports and press releases alleged herein to be misleading

10    prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or

11    cause them to be corrected.  In addition to their roles as CEO, President and CFO, defendants

12    Khandros, Bronson and Foster were the chief spokespersons for the Company.  In each of the

13    Company's press releases issued and conference calls hosted during the Class Period, defendants

14    Khandros, Bronson and Foster were extensively quoted discussing the Company's business and

15    financial results.  Because of their positions within the Company, and their access to material non-

16    public information available to them but not to the public, the Individual Defendants knew that the

17    adverse facts specified herein had not been disclosed to and were being concealed from the public

18    and that the positive representations being made were then materially false and misleading.  The

19    Individual Defendants are liable for the false statements pleaded herein at ¶¶84-88, 90-96, 98-104,

20    107-112, 117-118, 121-124, 127-134, 137-143, 147, 149-150.

21    **IV.    PLAINTIFFS' CONFIDENTIAL WITNESSES**

22    31.    Several of the allegations included herein are based on information provided by

23    former FormFactor employees referred to as confidential witnesses ("CW").  The information

24    provided by the former employees is reliable and credible because (1) each witness worked at

25    FormFactor during the Class Period, (2) each witness has personal knowledge of the information

26    provided, (3) the witness' job title, position and responsibilities show he/she has personal knowledge

27    of the information provided, (4) many of the witness accounts corroborate one another and (5) the

28    witness accounts are corroborated by other information alleged herein.

32.    CW1 is a former FAB Coordinator and Administrative Assistant to FormFactor's production manager prior to the Class Period until November 2006. CW1 provided administrative assistance to as many as five production managers who reported to defendant Khandros over the course of CW1's employment at FormFactor's Livermore, California headquarters. In that capacity, CW1 had access to production-related data as CW1 was tasked with inputting data of various types related to FAB production into presentations and reports utilized by the production manager to the senior management at various periodic meetings. Because of CW1's position and access to production-related information, CW1 has knowledge about the production data available to the FormFactor management, including the costs of inventory and inventory valuation.

33.    CW2 is a former FormFactor Production Supervisor in Livermore, California during the Class Period until late December 2006. As a Production Supervisor, CW2 oversaw one of three production shifts. CW2's duties involved managing the production and testing processes of FormFactor's probe cards just before the cards went into the final manufacturing process in which ceramic components were mounted into the probe cards. CW2 reported to Vice President of Manufacturing Don Horst, who, in turn, reported to defendant Freeman. CW2 has knowledge about FormFactor's production operations, including the ramping issues and production problems with the Harmony products, and how scrap from the chronic low yields was transferred to R&D.

34.    CW3 is a former Senior Process Engineer who worked at FormFactor in Livermore, California for over ten years prior to his departure in early 2007. During the relevant period, CW3 reported to Vice President of New Product Development Saket Chada who also served on an interim basis as Vice President of Process Engineering. In that capacity, CW3 oversaw one out of about 15 total processes involved in manufacturing all of FormFactor's finished products. CW3 was also involved in the overall manufacturing and production process and other operations, including R&D. Because of CW3's long history of employment with FormFactor, CW3 has knowledge about the inner-workings of the Company in engineering and product development, including FormFactor's obstacles in manufacturing Harmony, and the Company's improper accounting for transfer of scrap from manufacturing to R&D.

35.    CW4 is a former FormFactor Customer Project Manager in Livermore, California for six months from mid-2007 until February 2008. CW4 was one of the nine or ten customer project managers who reported to the Director of Customer Project Management who, in turn, reported to Mete Bayyigit, a direct report under defendant Freeman. In that capacity, CW4's duties involved scheduling and planning production of FormFactor's products for Japanese customers. To do this, CW4 had access to the Company's global forecast system and extracted information for forecasted future orders, noting the shipping dates for these orders and ensuring that the orders were placed in the production cycle so that they would be shipped by that time. In the course of the production cycle, CW4 communicated to FormFactor's personnel and customers in Japan regarding the status of literally hundreds of products at any given time. When there were problems or delays in the production cycle, CW4 would coordinate with production personnel to see if production of the order could be expedited to meet the shipping dates, especially if the sales personnel in Japan indicated that the customer would not accept a later delivery date. Because of CW4's position and access to information and regular contacts with customers, CW4 has knowledge concerning FormFactor's chronic yield problems that directly impacted the delivery of products, including Harmony products to customers.

36.    CW5 worked at FormFactor as a Senior Cost Accountant for ten months, until November 2007. CW5 reported to Cost Accounting Manager Chris Krishna who reported to Controller Greg Alcarez ("Alcarez") who reported to defendant Foster. As a Senior Cost Accountant, CW5's duties included the preparation of Bills of Material related to the production of finished products. According to CW5, a Bill of Material basically provides "a recipe" for a given finished product in terms of the component inventory that go into producing a product. Furthermore, a Bill of Material includes "the material cost" of the components, as well as allocations of "overhead" and "labor" to result in the final "finished good cost" of a particular item. It was CW5's duty to add the overhead and labor rates, in addition to the component parts, to the Bills of Material in order to arrive at the final cost of the finished goods that would eventually be reported in the Company's general ledger. CW5 was responsible for the journal entries related to these matters, and

1   thus, has knowledge of FormFactor's process for evaluating the cost of goods sold, including

2   knowledge of other participants who were involved in the valuation process.

3       37.    CW6 worked at FormFactor as a Senior Financial Analyst from early 2005 until April

4   2007.  CW6 initially reported to Cost Accounting Manager Mark Villani ("Villani"), and then

5   reported to Senior Manager of Financial Operations Keith Matsumoto after Villani's departure from

6   FormFactor.  CW6 also reported to Controller Alcarez.  As a Senior Financial Analyst, CW6

7   primarily involved cost accounting duties, which included preparing monthly "reporting packages"

8   that were reviewed by various personnel in the finance organization, including Villani and Alcarez.

9   CW6 was also responsible, among other areas, for "direct labor reporting" and calculating inventory

10  reserves.  Because of his position and his/her duties at FormFactor, CW6 has personal knowledge of

11  the financial reporting process at FormFactor, including the manual and labor intensive Excel

12  spreadsheets that were used in the financial reporting processes, which provided the opportunity for

13  the senior financial personnel to make manual adjustments.

14      38.    CW7 is a former Senior Engineering Technician who worked at FormFactor for four

15  years before the Class Period until February 6, 2008.  In that capacity, CW7's role involved

16  monitoring the yield of FormFactor's probe-head products during and after manufacturing.  CW7

17  confirms that FormFactor was having problems related to being able to timely delivery products to

18  customers because of yield issues.  CW7 indicates that the Company also had problems in terms of

19  the quality of the final products that FormFactor actually shipped to customers.

20      39.    CW8 is a former Operator who was involved in the fabrication process of

21  FormFactor's probe-head products for two years until September 2007. In that capacity, CW8

22  reported to Production Supervisor Rich Campson, and has personal knowledge of FormFactor's

23  production of the probe-heads that get attached to the probe cards during the manufacturing process.

24  CW8 has personal knowledge of the manufacturing processes at FormFactor, including some of the

25  production issues that caused shipment delays to customers.

26      40.    CW9 is a former FormFactor Senior Information Technology ("IT") Director from

27  mid-2006 through December 2007 who reported to Chief Information Officer ("CIO") Richard

28  Diamond ("Diamond") who, in turn, reported to defendant Bronson initially and then to defendant

1  Khandros after Bronson's departure.  As Senior Director of IT, CW9 oversaw all enterprise software

2  applications and the associated supporting hardware necessary to support FormFactor's operations.

3  CW9 confirms that when he/she joined the Company, it was in severe need of upgrading and

4  improving its IT systems, processes and controls because the Company's IT systems to support

5  myriad business operations were "absolutely primitive."  For instance, despite having an Oracle

6  Financials and Enterprise Resource Planning ("ERP") application and a so-called PROMIS system

7  (made by Brooks), the Company remained hugely reliant throughout December 2007 on utilizing a

8  wide-array of Excel spreadsheets to handle various reporting functions related to manufacturing,

9  accounting, inventory control and finance.  Moreover, CW9 and Diamond were brought in to correct

10  issues in IT and implement new systems to bring the Company up to contemporary standards and

11  operating practices and Sarbanes-Oxley Act of 2002 ("Sarbanes-Oxley") compliance required of a

12  public company.  CW9 was also tasked with an on-going project to deal with scrap, *i.e.* obsolete

13  inventory accumulated from failed yields, throughout CW9's tenure at FormFactor and, thus, has

14  personal knowledge of the related matters concerning the scrap project.

15  **V.    BACKGROUND**

16      41.    FormFactor designs, manufactures and sells advanced wafer probe cards, which are

17  used by semiconductor manufacturers to electrically test integrated circuits.  Semiconductor

18  manufacturers use wafer probe cards to perform wafer probe tests on the whole semiconductor

19  wafer, prior to singulation, before the semiconductor manufacturing process.  After the fabrication of

20  a semiconductor wafer, the chips on the wafer are subject to a wafer probe test.  During the wafer

21  probe test, a wafer probe card is mounted in a prober, which is in turn connected electronically with

22  and tests individual chips on a wafer.  At the core of FormFactor's product offerings are its

23  proprietary technologies, including its patented MicroSpring and Harmony technologies.  In 2005,

24  FormFactor had 54% market share in advanced semiconductor wafer probe card technology.

25      42.    Historically, the wafer probe card industry has been highly competitive. In a wafer

26  probe test, the ability to test an increasing number of dies on the wafer at the same time provides

27  significant cost savings.  In particular, the benefit of increasing parallelism reduces the number of

28  wafer probe test cells (wafer probers, test heads and testers), which translate to savings in capital

1   expense and floor space.  In addition to increasing the number of dies on the wafer, there is also a

2   huge benefit to reduce the number of "touchdowns" in the testing process.  A "touchdown" is the

3   contact between the wafer probe card and the wafer, and a reduction in the number of touchdowns

4   means a shorter lead time and testing process, thereby saving costs in the manufacturing process for

5   the semiconductor customers.  Prior to the Class Period, the industry had just transitioned from nine

6   touchdown to four touchdown probe cards, with the next shift from four touchdown to one

7   touchdown cards.

8          43.    Coinciding with the industry and the Company's next transition to the single

9   touchdown capability, FormFactor was also undergoing internal personnel changes to address the

10  material weaknesses in internal control over financial reporting.  Prior to the Class Period, on

11  November 22, 2004, the Company restated its financials for FY 2001 through FY 2004 because "a

12  material weakness existed in its internal control over financial reporting."  In the prior restatements,

13  the material weakness was attributed to the Company having insufficient personnel resources and

14  technical accounting expertise within its accounting function.  The Company reported its prior

15  restatements as follows:

16          Amendment No. 1 to FormFactor's Annual Report on Form 10-K restated its
            financial results for fiscal year 2001, 2002 and 2003 to reflect a change in the
17          amortization schedule of deferred stock-based compensation recorded in connection
            with its June 2003 initial public offering and to reflect a portion of its stock-based
18          compensation amortization in cost of revenues.  This Amendment No. 2 to
            FormFactor's Annual Report of Form 10-K presents net income (loss) available to
19          common stockholders and restates its basic and diluted net income (loss) available to
            common stockholders per share for fiscal years 1999 through 2003 and its pro forma
20          net income (loss) calculation and the related per share amount disclosures under
            SFAS No. 123 "Accounting for Stock-based Compensation," but does not affect
21          FormFactor's reported net income, or its balance sheet or cash flow statements for
            any period.
22
            Under applicable rules, management may not conclude that a company's
23          internal control over financial reporting is effective if a material weakness exists.
            Given the nature of the two restatements, FormFactor believes that the material
24          weakness relates to insufficient personnel resources and technical accounting
            expertise within its accounting function.  FormFactor believes that it has already
25          taken substantial steps toward remediation of this material weakness and is taking
            additional steps to cure the weakness.
26

27

28

1      44.    As a result of the restatements in late 2004, FormFactor hired defendant Foster as the

2  new CFO.  In the press release announcing Foster's employment, the Company highlighted Foster's

3  more than 25 years of experience in financial management and operations.

4      45.    In April 2005, FormFactor introduced its new, proprietary "Harmony" architecture

5  for wafer probe cards.  The Company represented that the Harmony architecture would address the

6  significant challenges presented by the future demands of single touchdown wafer probing and very

7  high parallelism wafer test, and will be the key building block for FormFactor's future generations of

8  Flash, DRAM, WLBI and High Frequency probing solutions.  According to CW2, a former

9  Production Supervisor at FormFactor, while individual probe cards had as many as 15,000 micro-

10  springs, the Harmony product was supposed to combine as many as four individual probe cards into

11  a single board.  In short, Harmony was to offer semiconductor manufacturers a compact solution

12  with higher micro-spring density in single touchdown, thus shortening the lead time in the testing

13  process prior to manufacturing.

14      46.    The market reacted to Harmony well, noting that the new Harmony products would

15  revolutionize the probe card industry and drive revenue growth in the years to come, as the

16  semiconductor companies make the switch to the single touchdown testing process.  Following the

17  April 2005 announcement, several analysts upgraded FormFactor stock.  For example, Robert Maire

18  from Needham issued a note on April 21, 2005, upgrading the rating from a Hold to a Buy:

19        The company is a leader in the advanced wafer probe card market and is benefiting
         from the secular trend of low cost testing.  Advanced probe cards are taking over
20        from conventional probe cards as semiconductor pin counts rise, operating
         frequencies increase and more die are tested at one time as a means of reducing
21        overall test cost.

22                            *      *      *

23        **New Harmony Architecture Introduced** – FormFactor believes that the
         Harmony architecture will eventually enable its customers to get 300-mm wafers and
24        beyond in a single touchdown.  The company expects to leverage this new
         architecture as the basis for it's two touchdown and one touchdown wafer testing
25        product, which it plans to introduce over the next few years.  This new evolutionary
         architecture will be the key building block of the company's future DRAM, Flash,
26        wafer-level burn-in, and high-frequency product platform.

27

28

PLAINTIFFS' FIRST AMENDED COMPLAINT - C-07-05545-SI                                    - 17 -

47.    On July 15, 2005, Legg Mason initiated analyst research coverage on FormFactor with a report entitled: "A Shiny Diamond in the Rough; Initiating Coverage with Buy Rating." The report highlighted:

> We are initiating coverage of FormFactor with a Buy rating on the shares, based primarily on what we view as its dominant market share position, strong execution capabilities and a market growth rate that is likely to exceed the industry's rate of growth.

> *    *    *

> We believe that the wafer probe card market that FormFactor participates in will outgrow the overall semiconductor capital equipment, and based on FormFactor's leadership position, this should translate to higher-than-industry growth rates for the company.   The basis behind this superior growth rate is the value-added that FormFactor's products provide in lowering cost of test ownership for chipmakers. The company's strong technology portfolio should allow the company to maintain its leadership position over the foreseeable future.

48.    On January 9, 2006, Edwards also initiated analyst research coverage with a Buy rating on FormFactor through 2006 highlighting the impact of Harmony:

> NAND Flash and Logic Markets–FormFactor can use its leverage in DRAM to produce probe cards that will allow for greater parallelism in the fast growing NAND Flash market and the need for multi-DUT (device-under-test) in the logic market. . . . we see Worldwide NAND Flash Mb shipments are projected to grow 159% from 2005-2008.  With the company's Harmony OneTouch probe card for NAND flash that can start a complete wafer in one touchdown, is expected to ramp volume shipments starting in 2007.   FormFactor's logic products previously addressed only 10% of the logic market, but with its new wire bond flip-chip logic wafer probe card, they are able to address the remaining 90% that predominately uses conventional wafer probe cards.

49.    Indeed, based on FormFactor's representations about its development of the single touchdown technology and the great future revenue potential from the technology, the Company stock price jumped from $20.83 to $37.60, almost 81%, between April 19, 2005 to February 2, 2006, based on the exuberance created by defendants' representations about FormFactor's ability to develop, design and produce and ship its cutting edge single touchdown technology for wafer probe cards and the Company's ability to volume produce its Harmony line across all semiconductor industries based on this new technology.

50.    In March 2006, the Company also completed a follow-on offering for five million shares at $38.00 per share, which resulted in net proceeds of $182 million.  According to the Registration Statement, the net proceeds from the offering were intended to increase the Company's

1  manufacturing capacity so that it could meet its anticipated strong demand once Harmony products

2  were rolled out.

3  **VI.    FRAUDULENT SCHEME AND COURSE OF BUSINESS**

4    51.    Unable to efficiently or effectively manufacture its Harmony products, and being

5  plagued with both poor quality and low yields, defendants were desperate to avoid disclosing these

6  problems to the market for fear that its customers would migrate to other probe card manufacturers.

7  Because the products were customized for each customer, once a customer found a solution, it was

8  likely that it would continue using that supplier's products.  Thus, defendants were desperate to

9  convince the market that FormFactor was both able to manufacture Harmony and do so at significant

10  gross margins in the process – disclosure of poor yields would undermine the Company's ability to

11  convince the market that its Harmony product was viable and would capture significant market share

12  of the probe card market.  In order to conceal  FormFactor's manufacturing problems, defendants

13  engaged in a scheme and artifice to defraud and mislead investors by hiding its poor yields through

14  the overvaluation of FormFactor's inventory, hiding inventory expenses in R&D (*i.e.* treating

15  worthless 'scrap'- excess and obsolete inventory which resulted from the poor manufacturing

16  process as part of the Company's R&D) and attempting to convince the market that, even as it was

17  disclosing that it had overvalued its inventory, FormFactor's inability to deliver from its product was

18  from capacity constraints and not the poor yields from its manufacturing process.

19    52.    As alleged herein, class members who purchased FormFactor's publicly-traded

20  securities did so in reliance upon the accuracy of the publicly-available information about the

21  Company, including its financial statements and business prospects.  In particular, investors were

22  attracted to FormFactor because of its purported advantage in developing and manufacturing its new

23  Harmony products and technology. In fact, throughout the Class Period, defendants' false and

24  misleading statements concerning the Company caused its stock to trade at artificially inflated

25  prices. As the truth about FormFactor began to be revealed in late 2007 and at the end of the Class

26  Period, the artificial inflation was removed from the stock and class members suffered substantial

27  economic damages.

28

1

2

### A.  Defendants Misrepresented FormFactor's Progress with the Development and Ability to Manufacture Harmony Products

3

4

53.    During the Class Period, defendants represented that FormFactor was making significant progress in developing, testing and manufacturing its Harmony products.  The truth was, however, that from at least the beginning of the Class Period, FormFactor's development of Harmony was materially flawed such that it could not efficiently and effectively manufacture Harmony over the course of the Class Period.  Rather than disclose these problems, defendants covered up the yield problems by falsely overvaluing FormFactor's "scrap" – its obsolete inventory – thereby masking the poor manufacturing and low yields from Harmony and misleading the market into believing that Harmony was proceeding to volume production when in truth, FormFactor never had the manufacturing capability during the Class Period.

5

6

7

8

9

10

11

12

54.    According to CW3 who worked at the Company for over ten years, FormFactor typically began selling products to customers before the products were "fully developed."  This "marketing and selling before we built it" approach persisted throughout the Class Period, including FormFactor's strategy for selling and shipping its Harmony products.  This meant that when orders for the products came in, FormFactor struggled to actually build the products and produce them in a timely fashion.  Thus, while FormFactor's first probe card was "introduced" to the market in June 2006, the reality was that the Company was unable to produce and ship the Harmony probe card to any customer as of that time.

13

14

15

16

17

18

19

20

55.    According to CW9, "Harmony was different because so much was riding on Harmony," while at the same time Harmony itself required significantly different and difficult engineering and manufacturing processes compared to FormFactor's other products.  Harmony needed a wide-range of new and additional manufacturing and test equipment, and the physical constraints of the Company's Livermore facility represented a problem in this regard.  For instance, the technical specifications for Harmony was much more complex with dimensions and tolerances measured in microns.  The location in which Harmony was made had to be "extremely flat" and vibration-free so that "all the pins stay in the alignment and there was no twisting."  For example, in December 2006, CW2, a production supervisor, recalled that the Harmony product was still in its

21

22

23

24

25

26

27

28

1     "initial Beta" stage as of the end of 2006.  CW2 states that there may have been development

2     problems with Harmony, such as the board "flexing in the middle" and other matters, that were still

3     being resolved.

4          56.     Even as FormFactor was beginning to receive orders for the Harmony products after

5     they were introduced to the market, the Company faced other manufacturing constraints to get the

6     products out.  In fact, the Company was experiencing poor yields in the production process that

7     plagued the Company's ability to manufacture and deliver products, including the Harmony

8     products, to customers.  Several of plaintiffs' witnesses confirm that the chronic low yields in the

9     manufacturing process negatively affected FormFactor's ramp up of Harmony products.  CW1, the

10    former FAB Coordinator who had access to production – related data, states that FormFactor

11    frequently struggled to manufacture its products in time to meet customer demand.  CW4, a former

12    Customer Project Manager, confirms that, due to the slowness of the production process, "a lot of

13    Harmony shipments" were missed.  Based on CW4's access to the Company's scheduling and

14    planning system and his/her regular contacts with customers, CW4 estimates that 20% or less

15    Harmony orders actually went out on time, while the rest of them were shipped late.  During the

16    Class Period, however, the Company attributed the manufacturing constraints to capacity or

17    personnel issues, the real, underlying issue was, in fact, the manufacturing process itself.

18        57.     Moreover, CW7, a former Senior Engineering Technician, indicated that even if the

19    finished products "looked good" (*i.e.*, all of the parts were correctly assembled), they lacked the

20    quality necessary for them to work.  In fact, some parts were falling off at the customers' sites and

21    subsequently returned to the Company.  According to CW9, a former Senior IT Director, even

22    though FormFactor did manage to get a few Harmony products out the door during 2007, the

23    products had problems in the field once they were received by customers.  In fact, according to

24    CW9, some of the Harmony products ended up damaging the wafers they were designed to be

25    testing.

26        58.     Because of the chronic low yields, the Company could not and did not reasonably

27    control and manage its production to meet customer delivery deadlines.  CW4, who had to deal with

28    customers when there was a shipment delay, indicated that the Company "couldn't control the yield"

1   for their products and therefore could not fulfill customer shipping dates.  CW4 also stated that

2   during 2007 and early 2008, FormFactor consistently experienced problems with timely producing

3   and shipping the Harmony probe cards, including late shipments to its largest customer Elpida in

4   Japan.  According to CW4, Elpida was FormFactor's primary customer in Japan for Harmony and

5   Elpida was definitely "very angry" at FormFactor's inability to deliver Harmony according to

6   shipment dates.  The problems continued throughout the year.  By the end of December 2007, there

7   was clearly evidence of a slowdown at FormFactor, which CW4 believed was a combination of the

8   market and "our situation with Harmony."  Indeed, in early December 2007, because FormFactor

9   was unable to deliver the Harmony products required by Elpida, an analyst reported that Elpida

10  considered alternative wafer probe cards from FormFactor's competitor, Advantest.

     **B.**    **FormFactor Suffered Chronic Yield Problems that Drastically
Impeded the Manufacturing Process**

11

12

13      59.      While defendants were making representations to the market that FormFactor was

14  making significant process in ramping up its Harmony products, defendants did not disclose the

15  fundamental underlying problem in the Company's overall manufacturing process.  As several of

16  plaintiffs' witnesses state, FormFactor's biggest manufacturing problem was its inability to derive

17  very good or accurate yields.  While the poor yields had been an issue at FormFactor, the underlying

18  issues exponentially exploded as the Company tried to push out its Harmony products, which were

19  much more complex than FormFactor's previous products.

20      60.      Prior to and during the Class Period, FormFactor struggled to produce and

21  manufacture products because the "key processes" always yielded low.  Internally, the low yields

22  were a big hurdle at all times at FormFactor and were well known throughout the Company, but the

23  underlying causes giving rise to the low yields were never fixed.  CW3, a Senior Process Engineer

24  who had worked at FormFactor for over ten years until early 2007, explains that senior management

25  knew about the low yields but "never allowed us to fix problems causing the low yields" because to

26  do so would mean that production would have to be shut down, which FormFactor "could not

27  afford."  CW3 further states that although the low yields represented chronic, persistent and well-

28  known problems throughout CW3's tenure, FormFactor never acknowledged the reality of the low

1    yields when making production forecasts and other projections regarding the deliverability of

2    products to customers.  As such, problems arose when production schedules assumed unrealistically

3    optimistic yields that did not materialize – which was inevitably the case.  Despite that the problems

4    that associated poor yields were "widely known" to Company insiders and had been problems for

5    FormFactor at all times, FormFactor did not do anything other than apply "band-aid" solutions to the

6    yield problems, according to CW3.

7        61.    CW7, whose job during the Class Period was to monitor the yield during the

8    manufacturing process, states that one of the reasons for the poor yields was that the pins on the

9    probe-heads (which are mounted to the probe cards) constantly fell out.  In his/her position as a

10   Senior Engineering Technician, CW7 was involved in determining why the pins fell out, but that as

11   of the time of CW7's termination from FormFactor as part of the global workforce reduction in

12   February 2008, the exact reason why the pins fell out had not been determined, nor had a solution as

13   to how to prevent it been developed.  CW7 indicates that the situation represented a manufacturing

14   "process problem" and involved the manner in which the pins were soldered to the probe-head.  This

15   problem was one of the factors that resulted in FormFactor taking longer to produce certain products

16   and miss customer delivery dates.

17       62.    CW8, a technical operator who worked in the fabrication process for FormFactor's

18   probe-head products, also stated that the yield problems involved in the manufacturing of probe-

19   heads contributed to shipment delays.  For instance, at one point in the manufacturing process, the

20   probe-cards went to the so-called "wire-band" stage in which gold springs were attached to the

21   probe-head.  After the "wire-band" stage, they went on to the nickel bath stage, which was where

22   CW8 worked along with eight other operators.  The nickel bath phase was fourth in the total of ten

23   phases for probe-head manufacturing.  In this stage, the probe-heads were placed in a liquid nickel

24   bath for about two to four hours depending on the type of probe-head or probe card being processed.

25   The purpose of the nickel bath was to harden the gold springs on the probe-head.  CW8 states that in

26   the nickel bath phase, it was not an infrequent occurrence that "a lot of bubbles" formed in the liquid

27   nickel when the probe-head was dipped into the nickel bath.  Essentially, if bubbles occurred while

28   the probe-head was in the nickel bath, the probe-head could not be fixed or re-used.  Instead, it was

1  necessary to start over "from square one" of the manufacturing process.  In quantifying the number

2  of failures in the nickel bath phase, CW8 estimates that in a given week, the nickel bath phase

3  processed approximately 20 probe-heads, of which 10-15 probe-heads would be successfully

4  processed and FormFactor had a factor ratio of between 25%-50%.  Moreover, CW8 stated that if a

5  product failed in the nickel bath process and had to be started over, it might be at least a day or two

6  before that same product was ready for the nickel bath, resulting in FormFactor being unable to

7  timely ship finished products to customers.

8       63.    Due to the unpredictable and unreliable yield rates, FormFactor essentially could not

9  reasonably plan or project its output and delivery schedule, or truly determine the Company's real

10  margins.  As a general practice for this Company, the likelihood of a product failing during the

11  fabrication process necessitated building more than what was actually ordered in order to actually

12  meet a customer's required delivery date.  For instance, CW9 indicates that once FormFactor

13  received an order for one product, the Company "often started building two or three – and maybe a

14  fourth and fifth – knowing that at least one will fail."

15       64.    Because of the pervasiveness and chronic occurrence of scrap accumulated from poor

16  yields in the manufacturing process, senior management personally got involved in monitoring the

17  process.  CW2, a former Production Supervisor, was aware that defendant Khandros went to the

18  "production floor" and interacted with the lower-ranking personnel to assess the status of

19  manufacturing.  CW1, a former FAB Coordinator, indicated that defendant Khandros came to the

20  FAB production department on a fairly regular basis, often to conduct tours for visitors, but also "to

21  crunch numbers" and handle various issues in the FAB.  For instance, Khandros would get involved

22  if there were quality issues, such as "components not staying together."  As FormFactor grew, CW1

23  indicates that defendant Khandros' visits became less frequent as defendant Bronson was brought in

24  to deal with some issues previously handled by defendant Khandros.

25       65.    Moreover, senior management, including defendants Khandros, Foster, Freeman and

26  Bronson, was also apprised of the manufacturing issues through reports and meetings prepared by

27  the finance and operations departments.  At the weekly executives meeting, in which defendant

28  Khandros and other senior executives participated in, the Production Manager presented a status

1   report of the FAB production departments, including data on general numbers for the FAB

2   production department, in terms of headcount, inventory levels and production levels.  This status

3   report was prepared for the Production Managers by CW1, in conjunction with personnel from the

4   CFO's office.  Many attendees from finance and production were allotted a particular amount of

5   time to report on a particular matter after which they would depart.  This meeting, which took place

6   in the main executive conference room of the main FormFactor building, was held every Friday

7   morning and lasted for several hours.

8        66.    According to CW1 who served as the intermediary between the FAB production

9   office and the CFO's office by handling and passing inventory valuation reports, the Company's

10  CFO was the person responsible for overseeing inventory valuation.  Specifically, defendant Foster

11  had been responsible for disseminating a report to the FAB production department setting forth

12  inventory valuations.  The CFO's inventory report was derived from spreadsheets from numerous

13  sources throughout the Company.  The spreadsheet reports reflected "the headcount, the production

14  costs, and the materials that were needed," such as specific equipment (in addition to a separate

15  report showing component costs).  This inventory valuation report from the CFO's office was very

16  voluminous – easily more than 100 pages – containing thousands of line items for different inventory

17  types.  Each line item identified a specific product and the "actual cost" for each item, based on the

18  customized nature of FormFactor's products.  The report was generated by FormFactor's Oracle

19  system.  The Oracle system showed the inventory valuations and "anyone with inventory rights

20  [access] to the system" could see those valuations.  In this regard, CW1 by virtue of his/her position

21  assisting the FAB Production Manager had direct access to these reports and was then aware of the

22  contents.  Otherwise, only the FAB Production Manager and senior management had access to this

23  report that showed the inventory valuations and the costs that went into deriving those valuations.

24       67.    The Production Manager derived information from the CFO's inventory valuation to

25  generate a FAB status report or presentation to the management at the weekly executives meeting.

26  The production-related data was also used at the monthly meeting in which the Production Manager

27  reported to "the general populace" of Company employees regarding the performance of the FAB

28  production departments.

1

2

3

**C.    FormFactor's Yield Problems Accumulated Worthless Scrap but the Senior Executives Overvalued the Inventory and Directed Lower-Rank Personnel to Count Obsolete Inventory as Research and Development Expense, Thereby Misstating the Company's Financials**

4

5

6

7

8

9

10

11

12

13

68.    Throughout the Class Period, problems that arose from the poor yields further escalated as the Company tried to develop and manufacture Harmony.  In order to hide the underlying poor yield issues and the Company's inability to volume produce Harmony products as promised, defendants further perpetuated a fraudulent scheme so that the Company could continue to report strong financial results, while portraying a rosy picture that it was on track to ramp up its Harmony products.  To avoid having poor yields impacting the Company's financial bottom-line, defendants manipulated the Company's reported inventory by counting excess and obsolete inventory that should have been written off.  Defendants also manipulated the Company's reported gross margin by improperly accounting for excess and obsolete inventory and treating it as R&D costs instead of as cost of revenues.

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

69.    Several of plaintiffs' witnesses from finance and operation departments confirm the Company's deliberate accounting manipulation and defendants' participation in the fraudulent scheme. CW3 states that one way that FormFactor tried to preserve the margins of its finished goods was to shift over the cost of the scrap that accumulated because of the poor yields over to the R&D department and treat the scrap as R&D expense.  CW3 states "it was very common" throughout CW3's tenure to make an inter-Company transfer of the scrap from engineering to R&D.  The reason for transferring the scrap over to R&D was so that engineering/manufacturing "wouldn't look as bad" because the scrap costs did not get factored into the cost of the finished goods.  While CW3 could not quantify the amounts of such scrap that were shifted over in this manner in any given quarter, the amounts involved were not insignificant since "those ceramic pieces are several thousand dollars a pop."  According to both CW3 and CW8, because of the custom nature of FormFactor's products, the accumulated scrap from failed yields could not be and was not re-used. Accordingly, the R&D group did very limited, if any, for the transferred scrap from manufacturing to R&D.  It also meant that FormFactor's R&D expenditures were bigger, even though there was likely no, or very minimal, R&D work done on the transferred scrap.  Moreover, according to the

1    seasoned engineer CW3, the inability to derive consistent or good yields also meant that it was

2    difficult for FormFactor to predict or truly determine "what were our real margins." The poor and

3    inconsistent yields presented a persistent and chronic problem that was never rectified.

4          70.    Because of the pervasiveness and chronic occurrence of scrap accumulation from

5    poor yields in the manufacturing process, FormFactor management knew about scrap accumulation

6    but directed lower-ranked personnel to cover it up. CW6 states that the decision and directives to

7    allocate scrap as an R&D expense were "usually made in meetings with higher ups like Director of

8    R&D and Director of Financial Operations" on a quarterly basis. CW6 indicates that defendant

9    Foster would have known about the misallocation of scrap to R&D because the amount of scrap that

10   FormFactor had was "substantial." Indeed, CW9 noted that defendant Freeman had the ultimate

11   responsibility in deciding how to treat scrap and the manner in which it was disposed of from the

12   operations side.

13          71.    Indeed, given the magnitude of the accumulated scrap from failed yields, the

14   Company even had a task force of personnel from Finance, Operations and IT departments to work

15   on a "scrap project." When CW9 joined FormFactor, he/she became the designated IT personnel

16   tasked "to help with scrap," which involved "moving a few million dollars [of scrap] here and

17   there." In fact, throughout CW9's tenure, the scrap project was on-going. CW9 also states that

18   FormFactor had been allocating certain amounts of the scrap to the cost-of-goods-sold ("COGS") for

19   orders that had nothing to do with the orders that had led to the accumulation of scrap in the first

20   place. According to CW9, the scrap should have been distinguished from products that were being

21   sold and that FormFactor's allocation of the scrap to the COGS of other products was, at best,

22   improper. CW9 also understood that the Company allocated some of the scrap as a R&D expense.

23   Even though CW9 no longer works at the Company, CW9 still keeps in contact with a current

24   FormFactor finance employee who told CW9 that the same scrap project is still going on to the

25   present day.

26          72.    CW6, a former Senior Cost Accountant, also confirms the chronic poor yields and the

27   deliberate accounting manipulation to hide the accumulated scrap. CW6 confirms that FormFactor

28   improperly allocated its scrap as R&D expense. FormFactor's scrap was the result of its efforts to

1   produce a product that is already being sold to customers, and thus it was inappropriate to allocate

2   the scrap to R&D.  Instead, under GAAP, it should be counted as a part of COGS for that specific

3   customer order.

4          73.    By improperly transferring scrap inventory from the engineering department to the

5   R&D department and overvaluing its inventory, FormFactor was able to (i) overstate its gross

6   margin and hence make it appear that the Company was effectively managing its raw materials,

7   work-in-progress and finished goods, and (ii) overstate its R&D spending and, hence, make it appear

8   that the Company was engaging in extensive R&D in order to remain competitive in the high-tech

9   semiconductor industry as defendants repeatedly touted that the Company was focusing on

10  developing the single touchdown capability and ramping up its Harmony products across all

11  semiconductor industries.  The Company's R&D expenses were $46.6 million for FY 2006, $28.3

12  million for FY 2005 and $20.6 million for FY 2004.  In truth, the R&D expenses were far less than

13  reported given the Company's practice to counting scrap as R&D expenses.

14         74.    In addition to counting scrap as part of the R&D costs, the Company also

15  manipulated its costs of revenue by changing its inventory valuation.  CW6 was responsible for

16  deriving a "cost of quality procedures report," in which scrap was included.  CW6 prepared this

17  report for Controller Alcarez and the Quality Assurance ("QA") group.  After CW6 prepared this

18  inventory valuation report, it was forwarded to Agusto Aboab, Villani and Alcarez, who reviewed it,

19  made "adjustments" and actually made the journal and ledger entries regarding these particular

20  inventory valuation items.  CW6 primarily utilized a calculation that had been established by Villani

21  in determining how stock-based compensation was included in the inventory valuation.  Alcarez then

22  reviewed CW6's results, but also changed them prior to actually booking them.  CW6 said that the

23  numbers that he/she originally reported were adjusted.  "I know it happened.  I know they were

24  adjusted."  In particular, according to CW6, the numbers were adjusted by changing reserves.

25         75.    According to CW6, FormFactor fostered an "extremely cutthroat" corporate culture,

26  especially personified by senior management, including defendants Bronson and Foster.  This was

27  manifested by the intense pressure exerted on personnel to get projects completed by a particular

28  time, regardless of the amount of labor and time that it would take to do so.  CW6 was aware that

management "did something" with FormFactor's reported quarterly numbers because the numbers differed from what CW6 knew to be the Company's actual results.

### D. FormFactor Had Material Weakness in Its Primitive Internal Control Systems Which Permitted Defendants to Hide the Ramping Issues with Harmony and Manipulate the Company's Reported Financials

76.    Contrary to defendants' representations that FormFactor had adequate internal control systems in place, several of plaintiffs' witnesses who worked at the Company described FormFactor's systems as "primitive" and outdated for a publicly traded company.  These archaic systems paved the way for manual adjustments and manipulations that made it easier for defendants to carry out the scheme to hide the Company's problems in ramping up Harmony products and the poor yields issues that plagued FormFactors's manufacturing process.

77.    CW5 who worked as a Senior Cost Accountant at FormFactor during the relevant time period characterizes FormFactor's inventory accounting processes as "very hands on" and "time-consuming," requiring "a lot of Excel spreadsheets" to the point of being "primitive." According to CW6 who had worked in FormFactor's finance department for over two years until April 2007, virtually every element of FormFactor's financial reporting was handled on Excel spreadsheets.  CW6 also characterizes the reporting processes as "extremely primitive."

78.    CW9, the former Senior IT Director, also confirms that the Company did not have any adequate systems in place.  By not having such automated and facilitating systems and applications in place, the Company used "offline spreadsheets" to handle a wide array of operations. CW9 states that while a company can certainly utilize Excel spreadsheets and function effectively, FormFactor's problem was that they used so many spreadsheets which had "so many macros" that understanding how various matters were calculated was extremely complicated.  For example, a spreadsheet macro is basically "a code embedded" in the spreadsheet that performs a mathematical function "to manipulate raw data" to derive certain results.  According to CW9, a great deal of data utilized in the myriad spreadsheets was derived from both the Oracle application and the PROMIS application.  The Oracle system provided financial, manufacturing and inventory functions and the

1   PROMIS system was used for "management and control" and a number of inventory-related

2   functions, including FormFactor's "scrap inventory."

3        79.    Likewise, CW3, the former veteran engineer at FormFactor, characterizes virtually all

4   of FormFactor's systems, processes and controls as "inadequate" throughout CW3's tenure. The

5   inadequacies included no documentation of processes and procedures so that personnel in

6   manufacturing never seemed to perform their duties or accomplish specific tasks in a consistent

7   manner. This lack of consistency involved personnel at all levels of the manufacturing/production

8   process, including assemblers and engineers.

9        80.    According to CW5, when component parts were received from FormFactor's

10   suppliers, those parts were reported into FormFactor's Oracle-based system at the cost of a per-unit

11   basis that the Company had paid to the supplier to obtain the components. In the course of business,

12   CW5 got the labor cost data that he/she allocated to the Bills of Material from Controller Alcarez.

13   CW5, however, indicates that Alcarez and/or members of the IT department were actually

14   responsible for inputting stock-based compensation regarding "labor rates" as it pertained to

15   inventory valuations into the Oracle system.

16        81.    CW5 became aware in approximately September/October 2007 that personnel from

17   PricewaterhouseCoopers LLP had begun working with Alcarez and others in evaluating inventory

18   "reserve calculations" and other accounting matters that led to the restatement.

19        82.    As later admitted by the Company in the restated Form 10-K, the Company in fact did

20   not have an adequate system in place to track and account for scrap, as the Company admitted that it

21   did not consistently follow its accounting policies for valuing inventory, resulting in material

22   overstatement of inventory and cost of revenue. The Company also admitted that it did not maintain

23   effective controls, and had a material weakness in its financial reporting. Moreover, as a remedial

24   measure and as a result of the restatement, the Company is now purportedly taking the following

25   steps to address its processes:

26            Management is in the process of completing its plan to remediate the material
              weakness. The remediation plan addresses the design of controls over inventory
27           valuation and is expected to include:

28

- Completion of analysis of changes in the level of excess and obsolete inventory by category;

- Review of analysis of changes in the level of excess and obsolete inventory by category;

- Separate re-performance of excess and obsolete inventory calculation; and

- Hiring personnel with requisite cost accounting experience and providing ongoing training and supervision.

83.     Furthermore, as a result of the fraudulent scheme, the Company restated its inventory, gross margin, operating margin and net income for FY 2006, 1Q 2007 and 2Q 2007.  Defendant Foster and Controller Alcarez had also resigned from or left the Company since the restatement.  In the Company's 2007 Form 10-K filed on February 27, 2008, FormFactor disclosed that the Company had not maintained effective controls over the valuation of inventory and the related cost of revenue accounts as of December 29, 2007.

**VII.    DEFENDANTS' FALSE AND MISLEADING STATEMENTS ISSUED DURING THE CLASS PERIOD**

84.     On February 1, 2006, the first day of the Class Period, the Company issued a press release entitled: "Record Quarterly Revenues of $71.8 Million, up 56% Year Over Year; Quarterly Bookings up 102% Year Over Year; 2005 Net Income Sets a Record."  In the press release, Bronson, President of FormFactor, stated:

> "We are pleased with the Company's results this quarter, as we made substantial progress ramping production at our new, industry-leading MEMS facility.  Our ability to execute during a time of rapid growth enabled us to exceed our revenue and profit targets."

85.     On the same day, the Company held a conference call with analysts, hosted by defendants Bronson, Khandros and Foster, to discuss its FY 2005 financial and operating results and its progress with Harmony.  During the conference call, defendant Bronson stated:

> *We have completed our first Harmony architecture probe card field trial*, which began with an early adopter in the second half of '05.  *Product performance exceeded expectations.  We expect to see significant revenues for our probe card based on Harmony platform in the second half of '06, with everything centering around 300 millimeter.  Harmony will be the cornerstone of flash and then DRAM for the next several years.*

PLAINTIFFS' FIRST AMENDED COMPLAINT - C-07-05545-SI                                    - 31 -

1                              *       *       *

2          2006 will be a landmark year for FormFactor in terms of new product
   introductions. These products will address NAND flash and logic markets and
3  significant opportunities in DRAM. Market research indicates that DRAM growth
   was moderate over the last few years – approximately 35% bit growth per year –
4  compared to current market projections. For the first time we will see the
   coexistence of three types of DRAM architectures. (indiscernible) memory for PCs
5  and servers, brackets memory at 512 megabit, which is GDDR3, and mobile. We
   should be significant beneficiaries of this positive DRAM trend, and we are planning
6  to satisfy a significant portion of this demand.

7          Consumer market-driven growth, exemplified by the proliferation of 3G
   phones, will drive significant demand for performance, bit growth and density of
8  mobile RAM in 2006 and beyond. For FormFactor, this means faster transitions to
   KGD and wafer level burn-in testing, and faster adoption of our advanced UPstream
9  and (indiscernible) products. We are planning an introduction this year of the first
   NAND flash-specific product, which is one touchdown 300 millimeter product based
10 on our Harmony architecture.

11                             *       *       *

12         I believe the outlook for FormFactor is strong, as market demand for our
   products continues in all segments. Overall, the key areas of strategic focus are
13 growth opportunities in all market segments are even greater than previously
   anticipated. **With the ramp of our new facility, we are now in the planning stages
14 for the next level of capacity to ensure we meet this large and growing demand.**
   And we continue to develop industry-leading, cutting-edge products to meet the
15 advanced technology requirements of our customers, and we expect 2006 to be
   another record year.
16
17 86.    On the same conference call, defendant Foster stated:

18         GAAP gross margin for the quarter was 49%, up from 45.3% in Q3. Strong
   volume growth helped lift margin, as we continued to ramp capacity.
19 **Manufacturing has successfully transitioned through the most difficult phase of
   the production ramp. All production processes are now fully functioning in our
20 new facility, with output and yields improving steadily.** We continue to operate a
   few discrete processes in the old site to smooth the transition to higher-than-
21 anticipated revenue levels.

22 87.    On the same conference call, in response to an analyst's question concerning

   FormFactor's Flash business, defendant Khandros stated:
23
24         As you know, as Ron mentioned, we have significant market share in NOR
   flash and NOR flash seasonality such that (indiscernible) that you saw. What we are
25 doing now, we are in the process of developing a product which is – from ground up
   is designed for NAND flash. And as you know, NAND will grow 60% in terms of
26 bit growth this year. And we plan in the second half of this year to take advantage of
   NAND flash market with this product, which we believe will be a landmark product
27 for NAND flash. It will be one touchdown 300 millimeter product based on
   Harmony that will incorporate other elements that will make it very competitive in
28 many ways, including leadtimes.

PLAINTIFFS' FIRST AMENDED COMPLAINT - C-07-05545-SI                        - 32 -

1    88.    Defendant Foster also followed on and stated:

2        The thing I would add to that, what Igor is saying, is that **we are planning to
        have that in place for volume production in the second half of '06.  And we are
3        planning that into all our capacity activities.**

4    89.    The statements made in ¶¶84-88 above, concerning FormFactor's financial and

5    business results were false and misleading, and defendants knew that they were false and misleading

6    at the time they were made:

7        (a)    As described in ¶¶53-67 above, due to FormFactor's persistent chronic poor

8    yields, defendants knew there was no reasonable basis for representing that its production processes

9    were fully functioning, with output and yields improving steadily, and that the Company would be

10   able to have the ability and the capacity to volume produce the Harmony probe cards as promised;

11       (b)    As described in ¶¶53-67 above, defendants failed to disclose known trends

12   and uncertainties by not disclosing the Company's chronic poor yields that impeded FormFactor's

13   ability to bring new products into volume production efficiently and in a timely manner.  As

14   described in ¶¶68-75, defendants also failed to disclose their practice of overstating inventory and

15   improperly classifying obsolete inventory as R&D, and thereby not disclosing FormFactor's actual

16   financial performance and true operating margins;

17       (c)    As described in ¶¶68-75, 80-83 above, defendants also knew that the

18   Company failed to properly account for its obsolete inventory.  As part of the fraudulent scheme,

19   defendants knew about and directed lower-ranked personnel to improperly transfer the cost

20   associated with scrap that accumulated from poor yields from engineering and production from the

21   manufacturing department to R&D.  Thereafter, the cost of the scrap was written off as R&D.  As

22   corroborated by several witnesses who worked at FormFactor, including CW3 (former Senior

23   Process Engineer), CW6 (former Cost Financial Analyst), CW8 (former Operator in the fabrication

24   process) and CW9 (former Senior IT Director), the Company transferred the accumulated scrap from

25   failed yields out of the engineering department in order to avoid recognizing the costs as current

26   period cost of revenues.  The R&D group performed very limited testing, if any, on the scrap

27   inventory.  At least three witnesses from the manufacturing side (CW2, CW3 and CW8) indicated

28   that the scrap, in fact, could not be and was not re-used, due to the custom nature of FormFactor's

1   products.  As a result, the costs associated with the scrap did not qualify for R&D costs and should

2   have been written off through the Company's cost of revenues.  This manipulation caused the

3   Company's cost of revenues to be understated and its gross margin to be overstated;

4           (d)     Defendants also knew that the undisclosed production constraints would

5   significantly raise the risk that FormFactor's customers with older generation products would seek

6   alternative sources such as the Company's competitors or seek to renegotiate their contracts with

7   FormFactor placing serious pressure on the Company's future revenue;

8           (e)     Defendants improperly managed earnings through various accounting

9   manipulations which allowed them to hit security analysts' expectations including:

10                 (i)     improperly accounting for FormFactor's inventory valuation and the

11   related cost of revenue accounts which caused the Company's reported inventory, gross margin and

12   net income to be overstated; and

13                 (ii)     improperly causing FormFactor to overstate R&D;

14           (f)     By inflating the Company's R&D, defendants created a rosy picture that the

15   Company was engaging in extensive R&D in order to maintain its competitive edge in the high-tech

16   semiconductor industry;

17           (g)     As detailed in ¶¶76-79, 210-220, the Company lacked adequate internal

18   controls.  In fact, at least four of plaintiffs' witnesses, including two former employees in the finance

19   department (CW5 and CW6), one veteran engineer (CW3) and one former Senior IT Director

20   (CW9), describe FormFactor's systems as "primitive," manual and labor-intensive and outdated for a

21   publicly-traded company.

22         90.     On April 26, 2006, FormFactor issued a press release entitled: "FormFactor, Inc.

23   Announces 2006 First Quarter Financial Results; Record Quarterly Revenues of $81.3 Million; Net

24   Income up 119% Year Over Year."  The press release stated in part:

25           FormFactor, Inc. today announced its financial results for the first quarter of fiscal
            2006. Quarterly revenues were a record $81.3 million, up 13% from $71.8 million in
26           the fourth quarter of fiscal 2005, and up 60% from $50.9 million for the first quarter
            of fiscal 2005.

27

28

"Following 34% revenue growth in 2005, we achieved record revenues based on solid operating performance as we successfully ramped our industry-leading MEMS facility," said Joseph Bronson, President of FormFactor.

Net income for the first quarter of fiscal 2006 was $10.8 million or $0.25 per share on a fully diluted basis, which included $2.5 million or $0.05 of incremental FAS 123 ® stock option expense net of tax. This compares to $10.5 million or $0.25 per share on a fully diluted basis for the fourth quarter of fiscal year 2005, and $4.9 million or $0.12 per share on a fully diluted basis for the first quarter of fiscal year 2005, both of which exclude incremental stock-based compensation from the adoption of FAS 123 ®. The effective tax rate for the first quarter of fiscal 2006 was 35.9% compared to 29.1% for the fourth quarter of fiscal 2005 impacting net income by $1.1 million or $0.03 per fully diluted share.

Bookings of $95.9 million for the first quarter of fiscal 2006 also set a company record, with an increase of 17% from $82.2 million for the fourth quarter of fiscal 2005 and an increase of 89% from $50.9 million for the first quarter of fiscal 2005.

\*       \*       \*

"Growing demand for the Company's leading-edge advanced technology products continued this quarter. Our innovation continues to drive a strong product pipeline expanding our leadership position across multiple markets," said CEO Igor Khandros.

91.    During the April 26, 2006 conference call, defendants Bronson and Foster met with analysts and repeated the same financial information.   Moreover, defendant Bronson made representations about the development of the Harmony product:

We have designed our next-generation 1 Touchdown Harmony technology and cost structure specifically for the flash market.  Although there are a few 1 Touchdown 300 mm products rumored to be entering the market, we believe our Harmony product will provide a significant value-added proposition to customers in a similar way that we demonstrated in the DRAM market.  We plan to introduce the first production-worthy product with higher throughput, reliability, performance and uptime.  We believe this product positions us well to significantly impact and penetrate the NAND market, which will serve as a critical launch pad to our overall strategy of expanding our market share across all market segments.

Additionally, as customers begin to address their 300 mm 1 Touchdown challenges in markets such as DRAM and wafer-level burn-in, they are seeing the need for more of a platform solution.  We believe our standardized Harmony architecture will lay the foundation for FormFactor to become the only provider of complete testing solutions for our customers scalable to future roadmap requirements.

92.    When asked about how FormFactor projected a growth of $200 million in the Flash market by 2009, defendant Bronson again represented that Harmony would be a key driver of the Company's revenue growth:

PLAINTIFFS' FIRST AMENDED COMPLAINT - C-07-05545-SI                                    - 35 -

That's all predicated on the introduction of our new product in NAND flash. So, we expect to be able to achieve good market share performance with this product which we're going to introduce in the second half of 2006. So, we recognize this is a very good market, and it's one that we presently have a low share. And with the transition to 300 mm, 1 Touchdown applications, our product offering is designed to address that need.

*        *        *

In NAND flash, we've had some reasonably good business with our NF 150. That will provide some stream of revenue. And we do expect to get some revenue out of the Harmony-based architecture in the second half of 2006. But once again, these are two major drivers for revenue growth in 2007.

93.    In the Company's Form 10-Q for 1Q 2006 filed on May 11, 2006, the Company reported the same financial information. Furthermore, the Company stated how it accounted for inventories, as follows:

Note 4 - Inventories

Inventories are stated at the lower of cost (principally standard cost which approximates actual cost on a first-in, first-out basis) or market value. The Company provides inventory provisions based on excess and obsolete inventories determined primarily by future demand forecasts. The provision is measured as the difference between the cost of the inventory and market based upon assumptions about future demand and charged to the provision for inventory, which is a component of cost of sales. At the point of the loss recognition, a new, lower cost basis for that inventory is established, and subsequent changes in facts and circumstances do not result in the restoration or increase in that newly established cost basis.

Inventories consisted of the following:

|  | April 1, 2005 (In thousands) | December 31, 2005 |
|---|---|---|
| Raw materials | $7,656 | $7,686 |
| Work-in-progress | 12,061 | 9,971 |
| Finished goods | 1,381 | 747 |
|  | $21,098 | $18,404 |

94.    Additionally, the Company stated in its Form 10-Q how it accounted for its cost of revenues, as follows:

Cost of Revenues.  Cost of revenues consists primarily of manufacturing materials, payroll and manufacturing-related overhead. In addition, cost of revenues also includes costs related to the start up of our new manufacturing facility.  Our manufacturing operations rely upon a limited number of suppliers to provide key components and materials for our products, some of which are a sole source. . . . Tooling and setup costs related to changing manufacturing lots at our suppliers are also included in the costs of revenues. We expense all warranty costs and inventory provisions or write-offs of inventory as cost of revenues.

We record inventory write downs for estimated obsolete and non-saleable inventories equal to the difference between the cost of inventories and the estimated market value based upon assumptions about future demand and market conditions. If actual market conditions are less favorable than those projected by management, additional inventory reserve would be required. Once established, the original cost of our inventory less the related inventory reserve represents the new cost basis of such products. Reversal of these reserves is recognized only when the related inventory has been scrapped or sold.

95.    Additionally, the Company stated in its Form 10-Q its inventory write down policy, as follows:

We write down inventory for obsolete or non-saleable inventories equal to the difference between the cost of inventories and the estimated market value based upon assumptions about future demand and market conditions. If actual market conditions are less favorable than those projected by management, additional inventory write downs would be required. Once established, the original cost of our inventory less the related inventory write downs represents the new cost basis of such products.

96.    In the Form 10-Q, the Company also stated the stock compensation amounts capitalized as inventory, without disclosing how or why the amounts were capitalized rather than expensed. The Form 10-Q also disclosed an increase in R&D due to the Company's investment in the development of its product. Specially, the Company stated:

The increase in research and development expenses in absolute dollars was mainly due to an increase of approximately $2.0 million in personnel costs, an increase of approximately $953,000 in development related costs and an increase of $942,000 in stock-based compensation expense due to the adoption of SFAS 123 (R) in the first quarter of fiscal 2006. Through the first quarter of fiscal 2006, we continued the development of our next generation parallelism architecture and products, fine pitch memory and logic products, advanced MicroSpring interconnect technology and new process technologies. We are also making incremental investments in new technologies and products as we focus on new market opportunities.

97.    The statements made in ¶¶90-96 above, concerning FormFactor's financial and business results for 1Q 2006, were false and misleading, and defendants knew that they were false and misleading at the time they were made:

(a)    As described in ¶¶53-67 above, due to FormFactor's persistent chronic poor yields, defendants knew there was no reasonable basis for representing that its production processes were fully functioning, with output and yields improving steadily, and that the Company would be able to have the ability and the capacity to volume produce the Harmony probe cards as promised;

1      (b)      As described in ¶¶53-67 above, during 1Q 2006, defendants failed to disclose

2  known trends and uncertainties by not disclosing the Company's chronic poor yields that impeded

3  FormFactor's ability to bring new products into volume production efficiently and in a timely

4  manner.  As described in ¶¶68-75, defendants also failed to disclose their practice of overstating

5  inventory and improperly classifying obsolete inventory as R&D, and thereby not disclosing

6  FormFactor's actual financial performance and true operating margins;

7      (c)      As described in ¶¶68-75, 80-83 above, during 1Q 2006, defendants also knew

8  that the Company failed to properly account for its obsolete inventory.  As part of the fraudulent

9  scheme, defendants knew about and directed lower-ranked personnel to improperly transfer the cost

10  associated with scrap that accumulated from poor yields from engineering and production from the

11  manufacturing department to R&D.  Thereafter, the cost of the scrap was written off as R&D.  As

12  corroborated by several witnesses who worked at FormFactor, including CW3 (former Senior

13  Process Engineer), CW6 (former Cost Financial Analyst), CW8 (former Operator in the fabrication

14  process) and CW9 (former Senior IT Director), the Company transferred the accumulated scrap from

15  failed yields out of the engineering department in order to avoid recognizing the costs as current

16  period cost of revenues.  The R&D group performed very limited testing, if any, on the scrap

17  inventory.  At least three witnesses from the manufacturing side (CW2, CW3 and CW8) indicated

18  that the scrap, in fact, could not be and was not re-used, due to the custom nature of FormFactor's

19  products.  As a result, the costs associated with the scrap did not qualify for R&D costs and should

20  have been written off through the Company's cost of revenues.  This manipulation caused the

21  Company's cost of revenues to be understated and its gross margin to be overstated;

22      (d)      Defendants also knew that the undisclosed production constraints would

23  significantly raise the risk that FormFactor's customers with older generation products would seek

24  alternative sources such as the Company's competitors or seek to renegotiate their contracts with

25  FormFactor placing serious pressure on the Company's future revenue;

26      (e)      During 1Q 2006, defendants improperly managed earnings through various

27  accounting manipulations which allowed them to hit security analysts' expectations including:

28

PLAINTIFFS' FIRST AMENDED COMPLAINT - C-07-05545-SI                          - 38 -

1         (i)     improperly accounting for FormFactor's inventory valuation and the

2 related cost of revenue accounts which caused the Company's reported inventory, gross margin and

3 net income to be overstated; and

4         (ii)    improperly causing FormFactor to overstate R&D;

5       (f)    By inflating the Company's R&D, defendants created a rosy picture that the

6 Company was engaging in extensive R&D in order to maintain its competitive edge in the high-tech

7 semiconductor industry;

8       (g)    As detailed in ¶¶76-79, 210-220, the Company lacked adequate internal

9 controls. In fact, at least four of plaintiffs' witnesses, including two former employees in the finance

10 department (CW5 and CW6), one veteran engineer (CW3) and one former Senior IT Director

11 (CW9), describe FormFactor's systems as "primitive," manual and labor-intensive and outdated for a

12 publicly-traded company;

13       (h)    As detailed in ¶¶181-205, as a consequence of the aforementioned practices,

14 the Company's revenues and net income were artificially inflated and reported financial results were

15 in violation of GAAP. For 1Q 2006, FormFactor restated its reported financials as follows:

16

17

18

| | Total Inventory | Cost of Revenue | Gross Margin | Stock-based comp included in GM | Gross Margin % | Net Income | Diluted EPS |
|---|---|---|---|---|---|---|---|
| Reported | 21,098 | 40,500 | 40,830 | 580 | 50.20% | 10,768 | $0.25 |
| Restated | 20,041 | 41,557 | 39,773 | 686 | 48.90% | 10,077 | $0.23 |

19

20       (i)    The Company overstated its total inventory by 5.27% and net income by

21 6.86% for 1Q 2006. But for defendants' deliberate improper reporting of inventory valuation,

22 including counting obsolete inventory as R&D expense and misreporting of its stock-based

23 compensation to inventory, FormFactor would have only achieved a gross margin of 48.90%, rather

24 than 50.20%.

25       98.    On June 6, 2006, the Company introduced its Harmony based OneTouch probe card

26 used in 300-mm Flash memory production. The Company's press release highlighted:

27          FormFactor, Inc. today formally unveiled its Harmony OneTouch probe card

28         for 300-mm Flash memory production. The Harmony OneTouch solution is

engineered from the ground up to address the unique challenges associated with one-touchdown 300-mm Flash wafer probing at the lowest overall cost of test. The new solution utilizes the innovative Harmony architecture to maximize test cell uptime, ease-of-use and throughput.

"Our customers are looking for new ways to reduce their test costs and improve their yields," stated Igor Khandros, FormFactor's chief executive officer. "At 300 mm, simply scaling existing wafer probe solutions is not enough to deliver the most cost-effective testing. For one-touchdown testing, minimizing non-productive time in test cell operation is critical. FormFactor has succeeded in improving the productivity in the entire cell, and developed a one-touchdown solution that truly maximizes test cell output."

Reducing the number of touchdowns that a probe card must make to test all devices on a wafer is critical to improving test throughput and lowering the overall cost of test. To realize the benefits, however, test cell utilization must be optimized. Under normal operating conditions, setup and maintenance can lead to hours or even days of lost productivity or downtime. At one touchdown, this downtime represents a greater percentage of total test cell time and has the potential to erode productivity gains. This can equate to a loss of test throughput of several thousand die per hour. With the Harmony OneTouch product, FormFactor tackles test cell utilization from a total system approach – addressing issues that impact not only the probe card but also the prober and tester – to enable Flash manufacturers to achieve optimal productivity from one-touchdown 300-mm probing.

FormFactor's proprietary Harmony OneTouch wafer probe solution enables fast setup and low maintenance 300-mm testing in two ways. First, to optimize setup, an innovative bridge capability provides enhanced planarity to quickly adjust the tilt of the probe card relative to the wafer. In addition, the bridge reduces thermal setup time from hours to just minutes. This quick setup also enables system-to-system portability, providing more flexibility on the test floor. The Harmony OneTouch card also incorporates a new MicroSpring® contactor that is more robust and specifically designed for long-life in a high volume flash environment.

"Harmony OneTouch extends FormFactor's most advanced technology in a system approach that enables our NAND Flash customers to achieve high uptime and high productivity," Khandros said.

The Harmony OneTouch wafer probe solution is available now. First customer shipments are scheduled for June.

99.    On July 27, 2006, the Company issued a press release entitled: "FormFactor, Inc. Announces 2006 Second Quarter Financial Results; Record Quarterly Revenues of $92.4 Million, Up 77% Year Over Year." The press release stated in part:

FormFactor, Inc. today announced its financial results for the second quarter of fiscal 2006, ended July 1, 2006. Quarterly revenues were a record $92.4 million, up 14% from $81.3 million in the first quarter of fiscal 2006, and up 77% from $52.3 million for the second quarter of fiscal 2005.

"FormFactor had another record quarter, as we continued to make significant progress in addressing our target markets," said Joseph Bronson, President of FormFactor. ***We are very pleased with the performance of our manufacturing***

1  *operations and continue to make ongoing productivity and efficiency
2  improvements*."

3      Net income for the second quarter of fiscal 2006 was $15.3 million or $0.32
   per share on a fully diluted basis, which included $2.8 million or $0.06 per share of
   incremental FAS 123(R) stock option expense net of tax. This compares to $10.8
4  million or $0.25 per share on a fully diluted basis for the first quarter of fiscal 2006,
   which included $2.5 million or $0.05 [per share] of incremental FAS 123(R) stock
5  option expense net of tax. Net income for the second quarter of fiscal 2005 was $5.0
   million or $0.12 per share on a fully diluted basis, which was excluded incremental
6  stock-based compensation expense from the adoption of FAS 123(R).

7      Bookings of $96.5 million for the second quarter of fiscal 2006 also set a
   company record. Bookings for the first quarter of fiscal 2006 and second quarter of
8  fiscal 2005 were $95.9 million and $58.0 million, respectively.

9      "*Key to our growth strategy is our ongoing focus on R&D, where our
   pipeline remains stronger than ever*," said Igor Khandros, CEO of FormFactor.
10 "*Innovative new products, manufacturing execution and world-wide infrastructure
   put FormFactor in a unique position to enable the ongoing reduction in the cost of
11 wafer test for our customers and for continuing long-term growth*."

12      100.    On the July 27, 2006 conference call, defendants Bronson, Foster and Khandros met

13 with the analysts and repeated the same financial information.  Defendant Bronson also commented

14 on FormFactor's delivery of Harmony products:

15      *We made a key new product announcement this quarter, including our
   Harmony one-touchdown, 300 millimeter Flash product in June.*  We also made
16 progress in find-pitch logic, shipping our new architecture to an early adopter during
   the quarter.

17                          *       *       *

18
19      We expect the next major growth driver of our NAND business to come from
   our newly-announced 300-millimeter Harmony one-touchdown wafer probe solution,
20 which we introduced in June.  This product will redefine productivity for Flash
   testing as our Harmony architecture enables high uptime, faster setup and rapid
21 repair.  It is based on the new NAND-specific spring technology designed for short
   cycle time and low maintenance.  *Our development of this product continued this
22 quarter as we shipped our first one-touchdown, 300-millimeter Harmony NAND
   product.*

23      We also had major design wins in NAND Flash for 200-millimeter, one-
   touchdown testing for which we expect volume orders in the fourth quarter.  We
24 believe that our solution, once released, will be a compelling, industry-leading
   product and provide significant value-added propositions to customers in a similar
25 way that we demonstrated in the DRAM market.  *Our ability to manufacture custom
   probe cards in volume and keep pace with customer roadmaps will reinforce our
26 industry leadership and allow us to successfully compete in the NAND Flash
   market and other one-touchdown, 300 millimeter markets*, such as DRAM and
27 wafer-level burn-in, where we've already begun development of derivative Harmony
   300-millimeter products.

28

PLAINTIFFS' FIRST AMENDED COMPLAINT - C-07-05545-SI                              - 41 -

1    101.    On the same conference call, defendant Foster also stated:

2        Flash revenues increased 151% versus the last quarter as both NAND or NOR
3    showed large increases.  Pending volume introduction of our new Harmony one-
     touchdown product family, we had a few key Flash customers place significant
4    orders this quarter and in Q1 for our NF150 product in order to support their tooling
     cycles.   Currently, we have significant design activity going on with new and
5    existing Flash customers that will generate revenue growth in the fourth quarter and
     beyond.  Although Q3 is experiencing healthy design momentum, Flash revenue will
6    likely be down from the second quarter.  ***Meaningful revenue growth will come in
     the fourth quarter and beyond as we move our one-touchdown product in volume
7    shipments***.

8                                   *        *        *

9        Net inventories increased by 3 million during the quarter to 24.1 million inventory
     turns declined from 9.3 to 8.6 quarter-to-quarter.  More linear shipments in the
10   quarter contributed to a higher inventory balance and with [NFGI] at the end of the
     quarter.

11   102.    On August 9, 2006, the Company filed its Form 10-Q for 2Q 2006, and reported the

12   same financial information.  Additionally, the Company stated how it accounted for inventories, as

13   follows:

14   Note 4 – Inventories

15       Inventories are stated at the lower of cost (principally standard cost which
16   approximates actual cost on a first-in, first-out basis) or market value. The Company
     provides inventory provisions based on excess and obsolete inventories determined
17   primarily by future demand forecasts.  The provision is measured as the difference
     between the cost of the inventory and market based upon assumptions about future
18   demand and charged to the provision for inventory, which is a component of cost of
     revenues.   At the point of the loss recognition, a new, lower cost basis for that
19   inventory is established, and subsequent changes in facts and circumstances do not
     result in the restoration or increase in that newly established cost basis.

20   Inventories consisted of the following:

21

|                   | July 1, 2006 (In thousands) | December 31, 2005 |
|-------------------|-----------------------------|-------------------|
22 | Raw materials     | $8,598                      | $7,686            |
   | Work-in-progress  | 11,379                      | 9,971             |
23 | Finished goods    | 4,080                       | 747               |
24 |                   | $24,057                     | $18,404           |

25   103.    Additionally, the Company stated in its Form 10-Q how it accounted for its cost of

26   revenues, as follows:

27       Cost of Revenues.  Cost of revenues consists primarily of manufacturing
28   materials, payroll and manufacturing-related overhead.  In addition, cost of revenues
     also includes costs related to the start up of our new manufacturing facility.  Our

PLAINTIFFS' FIRST AMENDED COMPLAINT - C-07-05545-SI                                    - 42 -

1

2

3

manufacturing operations rely upon a limited number of suppliers to provide key components and materials for our products, some of which are a sole source. . . . Tooling and setup costs related to changing manufacturing lots at our suppliers are also included in the cost of revenues.  We expense all warranty costs and inventory provisions or write-offs of inventory as cost of revenues.

4

5

6

7

We record inventory write downs for estimated obsolete and non-saleable inventories equal to the difference between the cost of inventories and the conditions.  If actual market conditions are less favorable than those projected by management, additional inventory reserve would be required.  Once established, the original cost of our inventory less the related inventory reserve represents the new cost basis of such products.  Reversal of these reserves is recognized only when the related inventory has been scrapped or sold.

8      104.     In the Form 10-Q, the Company also stated the stock compensation amounts

9    capitalized as inventory, without disclosing how or why the amounts were capitalized rather than

10    expensed.  The Form 10-Q also disclosed an increase in the R&D due to the Company's investment

11    in the development of its Harmony product.  Specially, the Company stated:

12

13

14

15

16

The increase in research and development expenses in absolute dollars was mainly due to an increase of approximately $4.8 million in personnel costs, an increase of approximately $3.2 million in development related costs and an increase of $1.9 million in stock-based compensation expense due to the adoption of SFAS 123(R) in the first quarter of fiscal 2006.  We plan to continue the development of our next generation Harmony architecture and products, fine pitch memory and logic products, advanced MicroSpring interconnect technology and new process technologies.  We are also making incremental investments in new technologies and products as we focus on new market opportunities.

17      105.     The statements made in ¶¶98-104 above, concerning FormFactor's financial and

18    business results for 2Q 2006, were false and misleading, and defendants knew that they were false

19    and misleading at the time they were made:

20           (a)     As described in ¶¶53-67 above, due to FormFactor's persistent chronic poor

21    yields, defendants knew there was no reasonable basis for representing that its production processes

22    were fully functioning, with output and yields improving steadily, and that the Company would be

23    able to have the ability and the capacity to volume produce the Harmony probe cards as promised;

24           (b)     As described in ¶¶53-67 above, during 2Q 2006, defendants failed to disclose

25    known trends and uncertainties by not disclosing the Company's chronic poor yields that impeded

26    FormFactor's ability to bring new products into volume production efficiently and in a timely

27    manner.  As described in ¶¶68-75, defendants also failed to disclose their practice of overstating

28

1  inventory and improperly classifying obsolete inventory as R&D, and thereby not disclosing

2  FormFactor's actual financial performance and true operating margins;

3          (c)     As described in ¶¶68-75, 80-83 above, during 2Q 2006, defendants also knew

4  that the Company failed to properly account for its obsolete inventory.  As part of the fraudulent

5  scheme, defendants knew about and directed lower-ranked personnel to improperly transfer the cost

6  associated with scrap that accumulated from poor yields from engineering and production from the

7  manufacturing department to R&D.  Thereafter, the cost of the scrap was written off as R&D.  As

8  corroborated by several witnesses who worked at FormFactor, including CW3 (former Senior

9  Process Engineer), CW6 (former Cost Financial Analyst), CW8 (former Operator in the fabrication

10 process) and CW9 (former Senior IT Director), the Company transferred the accumulated scrap from

11 failed yields out of the engineering department in order to avoid recognizing the costs as current

12 period cost of revenues.  The R&D group performed very limited testing, if any, on the scrap

13 inventory.  At least three witnesses from the manufacturing side (CW2, CW3 and CW8) indicated

14 that the scrap, in fact, could not be and was not re-used, due to the custom nature of FormFactor's

15 products.  As a result, the costs associated with the scrap did not qualify for R&D costs and should

16 have been written off through the Company's cost of revenues.  This manipulation caused the

17 Company's cost of revenues to be understated and its gross margin to be overstated;

18         (d)     Defendants also knew that the undisclosed production constraints would

19 significantly raise the risk that FormFactor's customers with older generation products would seek

20 alternative sources such as the Company's competitors or seek to renegotiate their contracts with

21 FormFactor placing serious pressure on the Company's future revenue;

22         (e)     During 2Q 2006, defendants improperly managed earnings through various

23 accounting manipulations which allowed them to hit security analysts' expectations including:

24              (i)      improperly accounting for FormFactor's inventory valuation and the

25 related cost of revenue accounts which caused the Company's reported inventory, gross margin and

26 net income to be overstated; and

27              (ii)     improperly causing FormFactor to overstate R&D;

28

PLAINTIFFS' FIRST AMENDED COMPLAINT - C-07-05545-SI                                    - 44 -

(f)    By inflating the Company's R&D, defendants created a rosy picture that the Company was engaging in extensive R&D in order to maintain its competitive edge in the high-tech semiconductor industry;

(g)    As detailed in ¶¶76-79, 210-220, the Company lacked adequate internal controls.  In fact, at least four of plaintiffs' witnesses, including two former employees in the finance department (CW5 and CW6), one veteran engineer (CW3) and one former Senior IT Director (CW9), describe FormFactor's systems as "primitive," manual and labor-intensive and outdated for a publicly-traded company;

(h)    As detailed in ¶¶181-205, as a consequence of the aforementioned practices, the Company's revenues and net income were artificially inflated and reported financial results were in violation of GAAP.  For 2Q 2006, FormFactor restated its reported financials as follows:

|  | Total Inventory | Cost of Revenue | Gross Margin | Stock-based comp included in GM | Gross Margin % | Net Income | Diluted EPS |
|---|---|---|---|---|---|---|---|
| Reported | 24,057 | 43,707 | 48,726 | 958 | 52.71% | 15,281 | $0.32 |
| Restated | 21,885 | 44,822 | 47,611 | 1,056 | 51.51% | 14,557 | $0.30 |

(i)    The Company overstated its total inventory by 9.92% and net income by 4.97% for 2Q 2006.  But for defendants' deliberate improper reporting of inventory valuation, including counting obsolete inventory as R&D expense and misreporting of its stock-based compensation to inventory, FormFactor would have only achieved a gross margin of 51.51%, rather than 52.71%.

106.    On September 20, 2006, following the disclosures regarding a competitor's announcement that the demand for advanced probe cards in the NAND and DRAM industries may not be as strong as previously projected, FormFactor's stock price took a hit, dropping over $5.00 per share in one day, 11.195%, and closing at $41.09 per share.  By comparison, the NASDAQ and the Russell 2000 Technology Index ("Russell Index") dropped only .672% and 1.52%, respectively, on the same day.

107.    On October 25, 2006, the Company issued a press release entitled: "FormFactor, Inc. Announces 2006 Third Quarter Financial Results."  The press release stated in part:

FormFactor, Inc. today announced its financial results for the third quarter of fiscal 2006, ended September 30, 2006. Quarterly revenues were $96.8 million, up 5% from $92.4 million in the second quarter of fiscal 2006, and up 55% from $62.4 million in the third quarter of fiscal 2005. FormFactor had another record quarter as revenue, production and net income reached historical highs. Demand for advanced probe cards in the third quarter continued to reflect the ongoing trends in the market including customers ramping production for memory and logic, the transition to advanced nodes, and the ongoing need for higher parallelism in wafer test, said Joseph Bronson, President of FormFactor. **Factory capacity continued to ramp, as production efficiencies and yields increased in many segments of our manufacturing operations.** Net income for the third quarter of fiscal 2006 was $15.8 million or $0.33 per share on a fully diluted basis, which included $3.9 million or $0.08 per share of incremental FAS 123(R) stock option expense, net of tax.

This compares to $15.3 million or $0.32 per share on a fully diluted basis for the second quarter of fiscal 2006, which included $2.8 million or $0.06 per share of incremental FAS 123(R) stock option expense, net of tax. Net income for the third quarter of fiscal 2005 was $9.8 million or $0.23 per share on a fully diluted basis, which was prior to the adoption of FAS 123(R). Bookings for the third quarter of fiscal 2006 were $90.5 million. Bookings for the second quarter of fiscal 2006 and third quarter of fiscal 2005 were $96.5 million and $62.9 million, respectively. We are pleased with our 63% revenue growth year-to-date, said Igor Khandros, Chief Executive Officer of FormFactor. We are encouraged by customers interest in our new Harmony NAND Flash product. We are confident in business growth opportunities in 2007 and beyond, driven by our robust product development pipeline, supporting multiple growth drivers in our customers.

108.    During the October 25, 2006 conference call, in addition to repeating the same financial information, defendant Bronson stated:

Design activity for advanced products continued to accelerate throughout the quarter. We began to penetrate the NAND Flash market with initial shipments of our Harmony one-touchdown Flash product. **We're making volume shipments for the fourth quarter, although less than previously anticipated as product development requirements and customer trials were completed later than anticipated with our early adopter customers.**

*        *        *

NAND Flash continues to be a key arena of focus, both for the market and FormFactor. We introduced our breakthrough Harmony OneTouch NAND Flash product this summer. Since then, we have begun the integration activities with multiple testers in the market with shipments of both our 200 millimeter and 300 millimeter one-touchdown products to early adopting customers.

*        *        *

**We're making initial volume shipments of our Harmony OneTouch NAND Flash product in Q4.**

In the NAND landscape, we see many trends that will drive increasing complexity of testing requirements, including node transitions, which are necessitating more electrical precision and higher degrees of complexity; the need for known good die; higher access speed, which is becoming a significant issue for many

consumer applications; and proliferation of designs to address specific needs of end-user applications.

As a result, the NAND market will become more complex and will develop in a similar fashion to the DRAM market. FormFactor's scalable Harmony platform is designed to deal with this broad set of requirements, including power delivery, electrical speed, high pin count, accurate probe to pad alignment over a wide temperature range.

\*          \*          \*

***The decline in bookings we experienced this quarter was due to two factors – strong DRAM pricing, which is deferring the DRAM transition to 70 nanometer into early 2007 for our major customers, and second, the delay we experienced reaching volume production of our Harmony OneTouch NAND product. We're currently starting to ship volume production and will begin market penetration in the fourth quarter.***

The transition to 70 nanometer begins in 2007 and we begin to penetrate the NAND Flash market with increased volume shipments in Q1 of our new NAND Flash product, we expect a resumption in FormFactor's strong growth rate.

109.     During the same conference call, defendant Foster explained the gross margin and the difference between GAAP and the pro forma numbers. He stated:

We also had an increase in inventory reserves this quarter; although, its not outside of the normal range of variation we've seen say over the last couple of years in inventory reserves. But there's sort of an almost reverse phenomenon that goes on that I probably should characterize here. That is that ***as a result of strong factory productivity, which I emphasized in that context, sometimes in a custom product marketplace, strong yields will outrun the planning yields we used to purchase materials. And when that happens, you can have higher inventory write-offs.***

***The good news is the factory is performing very well. And as we adjust the planning yields back in line with that, we will get our inventory write-offs improved and we will get the full benefit through the whole factory process of better yields.*** So that's part of the phenomenon that's going on there that we observed this quarter.

110.     On November 7, 2006, the Company filed its Form 10-Q for 3Q 2006 and repeated the same financial information. Moreover, the Company stated how it valued inventories, as follows:

Note 4 – Inventories

Inventories are stated at the lower of cost (principally standard cost which approximates actual cost on a first-in, first-out basis) or market value. The Company provides inventory provisions based on excess and obsolete inventories determined primarily by future demand forecasts. The provision is measured as the difference between the cost of the inventory and market based upon assumptions about future demand and charged to the provision for inventory, which is a component of cost of revenues. At the point of the loss recognition, a new, lower cost basis for that

inventory is established, and subsequent changes in facts and circumstances do not result in the restoration or increase in that newly established cost basis.

Inventories consisted of the following:

| | September 30, 2006 (In thousands) | December 31, 2005 |
|---|---|---|
| Raw materials | $10,640 | $7,686 |
| Work-in-progress | 12,563 | 9,971 |
| Finished goods | 3,114 | 747 |
| | $26,317 | $18,404 |

111.    Additionally, the Company stated in its Form 10-Q how it accounted for its cost of revenues, as follows:

Cost of Revenues.  Cost of revenues consists primarily of manufacturing materials, payroll and manufacturing-related overhead.  Our manufacturing operations rely upon a limited number of suppliers to provide key components and materials for our products, some of which are a sole source. . . . Tooling and setup costs related to changing manufacturing lots at our suppliers are also included in the cost of revenues.  We expense all warranty costs and inventory write downs or write-offs as cost of revenues.

We record inventory write downs for estimated obsolete and non-saleable inventories equal to the difference between the cost of inventories and the conditions.  If actual market conditions are less favorable than those projected by management, additional inventory write downs would be required.  Once established, the original cost of our inventory less the related inventory write downs represents the new cost basis of such products.  Reversal of these reserves is recognized only when the related inventory has been scrapped or sold.

112.    Additionally, the Company also stated the stock compensation amounts capitalized as inventory without explaining how and why it was capitalized.  Moreover, the Company disclosed an increase in R&D expenses, as follows:

1    Research and Development

2

|  | Three Months Ended, September 30, 2006 (In thousands) | % of Revenues | September 24, 2005 | % of Revenues |
|---|---|---|---|---|
| Research and development | $11,994 | 12.4% | $7,881 | 12.6% |
| Stock-based compensation expense | 1,433 | 1.5 | 181 | 0.3 |
| Research and development excluding stock-based compensation | $10,562 | 10.9% | $7,700 | 12.3% |

The increase in research and development expenses in absolute dollars was mainly due to an increase of approximately $2.3 million in personnel costs and an increase of $1.3 million in stock-based compensation expense due to the adoption of SFAS No. 123(R) in the first quarter of fiscal 2006. Research and development expenses increased mainly due to our investment in the development of our Harmony architecture, fine pitch memory and logic products, advanced MicroSpring interconnect technology and new process technologies. We are also making incremental investments in new technologies and products as we focus on new market opportunities.

113. Following the October 25, 2006 earnings release and conference call with the Company's disclosure that its volume shipments for NAND Flash market did not occur during 3Q 2006 as previously promised, FormFactor's shares dropped over 9%, from $42.91 per share to $38.95 per share, with four million shares traded in a single day. By comparison, the Russell Index increased 1.564% and the NASDAQ increased .955%. FormFactor's stock price remained mainly below $40.00 per share the next few months as the market closely watched FormFactor's development and bookings for Harmony products. Analysts took note of the market reaction to FormFactor's ability to ramp up and volume ship its Harmony products, and several analysts recommended investors to hold on the stock, pending FormFactor's ability to demonstrate that its Harmony products can, in fact, generate revenue for the Company.

114. On December 5, 2006, Mehdi Hosseini, an analyst from FBR Research, recommended that investors wait to buy FormFactor's stock:

First, we remain a bit concerned about the overall bookings in 4Q06, which could have a spill over impact into 1Q07. Specifically, although DRAM related bookings are still expected to rebound in 4Q06, we remain a bit concerned about the traction in NAND Flash and whether FormFactor has been able to secure volume orders for its

PLAINTIFFS' FIRST AMENDED COMPLAINT - C-07-05545-SI                                    - 49 -

new Harmony probe card. . . .  Secondly, given the uncertainties associated with bookings while the company is adding additional manufacturing capacity, we are also equally concerned about the overall fixed cost and its adverse impact on gross margins.

*　　　*　　　*

Although we are comfortable with our 4Q06 DRAM & Logic related bookings expectations, we remain a bit concerned about any shortfall to our Flash, particularly NAND Flash, related bookings.

115.    The statements made in ¶¶107-112 above, concerning FormFactor's financial and business results for 3Q 2006, were false and misleading, and defendants knew that they were false and misleading at the time they were made:

(a)    As described in ¶¶53-67 above, due to FormFactor's persistent chronic poor yields, defendants knew there was no reasonable basis for representing that its production processes were fully functioning, with output and yields improving steadily, and that the Company would be able to have the ability and the capacity to volume produce the Harmony probe cards as promised;

(b)    As described in ¶¶53-67 above, during 3Q 2006, defendants failed to disclose known trends and uncertainties by not disclosing the Company's chronic poor yields that impeded FormFactor's ability to bring new products into volume production efficiently and in a timely manner.  As described in ¶¶68-75, defendants also failed to disclose their practice of overstating inventory and improperly classifying obsolete inventory as R&D, and thereby not disclosing FormFactor's actual financial performance and true operating margins;

(c)    As described in ¶¶68-75, 80-83 above, during 3Q 2006, defendants also knew that the Company failed to properly account for its obsolete inventory.  As part of the fraudulent scheme, defendants knew about and directed lower-ranked personnel to improperly transfer the cost associated with scrap that accumulated from poor yields from engineering and production from the manufacturing department to R&D.  Thereafter, the cost of the scrap was written off as R&D.  As corroborated by several witnesses who worked at FormFactor, including CW3 (former Senior Process Engineer), CW6 (former Cost Financial Analyst), CW8 (former Operator in the fabrication process) and CW9 (former Senior IT Director), the Company transferred the accumulated scrap from failed yields out of the engineering department in order to avoid recognizing the costs as current

1   period cost of revenues.  The R&D group performed very limited testing, if any, on the scrap

2   inventory.  At least three witnesses from the manufacturing side (CW2, CW3 and CW8) indicated

3   that the scrap, in fact, could not be and was not re-used, due to the custom nature of FormFactor's

4   products.  As a result, the costs associated with the scrap did not qualify for R&D costs and should

5   have been written off through the Company's cost of revenues.  This manipulation caused the

6   Company's cost of revenues to be understated and its gross margin to be overstated;

7          (d)     Defendants also knew that the undisclosed production constraints would

8   significantly raise the risk that FormFactor's customers with older generation products would seek

9   alternative sources such as the Company's competitors or seek to renegotiate their contracts with

10  FormFactor placing serious pressure on the Company's future revenue;

11         (e)     During 3Q 2006, defendants improperly managed earnings through various

12  accounting manipulations which allowed them to hit security analysts' expectations including:

13                (i)     improperly accounting for FormFactor's inventory valuation and the

14  related cost of revenue accounts which caused the Company's reported inventory, gross margin and

15  net income to be overstated; and

16                (ii)    improperly causing FormFactor to overstate R&D;

17         (f)     By inflating the Company's R&D, defendants created a rosy picture that the

18  Company was engaging in extensive R&D in order to maintain its competitive edge in the high-tech

19  semiconductor industry;

20         (g)     As detailed in ¶¶76-79, 210-220, the Company lacked adequate internal

21  controls.  In fact, at least four of plaintiffs' witnesses, including two former employees in the finance

22  department (CW5 and CW6), one veteran engineer (CW3) and one former Senior IT Director

23  (CW9), describe FormFactor's systems as "primitive," manual and labor-intensive and outdated for a

24  publicly-traded company;

25         (h)     As detailed in ¶¶181-205, as a consequence of the aforementioned practices,

26  the Company's revenues and net income were artificially inflated and reported financial results were

27  in violation of GAAP.  For 3Q 2006, FormFactor restated its reported financials as follows:

28

PLAINTIFFS' FIRST AMENDED COMPLAINT - C-07-05545-SI                                    - 51 -

|  | Total Inventory | Cost of Revenue | Gross Margin | Stock-based comp included in GM | Gross Margin % | Net Income | Diluted EPS |
|---|---|---|---|---|---|---|---|
| Reported | 26,317 | 46,492 | 50,265 | 1,197 | 51.95% | 15,819 | $0.33 |
| Restated | 23,059 | 47,578 | 49,179 | 1,294 | 50.83% | 15,126 | $0.31 |

(i)     The Company overstated its total inventory by 14.13% and net income by 6.86% for 3Q 2006.  But for defendants' deliberate improper reporting of inventory valuation, including counting obsolete inventory as R&D expense and misreporting of its stock-based compensation to inventory, FormFactor would have only achieved a gross margin of 50.83%, rather than 51.95%.

116.    On January 29, 2007, FormFactor announced that it expanded its Harmony™ portfolio of full-area 300-mm wafer probe cards with the introduction of its Harmony XP probe card – an advanced wafer probing solution for high-density mobile, commodity and graphics DRAM devices that enables the lowest overall test cost per die.  The press release also stated:

> "Since its launch last year, our Harmony OneTouch solution has helped lower overall test costs for Flash manufacturers," said Khandros. "Now, we're bringing the same benefits associated with our Harmony system-level approach to advanced 300-mm DRAM manufacturing."

> FormFactor is now taking Harmony XP probe card orders.

117.    On January 31, 2007, the Company issued a press release entitled: "FormFactor, Inc. Announces 2006 Fourth Quarter and Year-End Financial Results."  The press release stated in part:

> FormFactor, Inc. today announced its financial results for the fourth quarter and fiscal year 2006, ended December 30, 2006.  Quarterly revenues were $98.7 million, up 2% from $96.8 million in the third quarter of fiscal 2006, and up 37% from $71.8 million in the fourth quarter of fiscal 2005. Revenues for the fiscal year ended December 30, 2006 were $369.2 million, up 55% from $237.5 million in fiscal year 2005.

> Net income for the fourth quarter of fiscal 2006 was $18.9 million or $0.39 per share on a fully diluted basis, which included $4.6 million or $0.09 per share of incremental FAS 123R stock option expense, net of tax. This compares to $15.8 million or $0.33 per share on a fully diluted basis for the third quarter of fiscal 2006, which included $3.9 million or $0.08 per share of incremental FAS 123R stock option expense, net of tax. Net income for the fourth quarter of fiscal 2005 was $10.5 million or $0.25 per share on a fully diluted basis, which was prior to the adoption of FAS 123R.

> Net income for fiscal year 2006 was $60.8 million or $1.29 per share on a fully diluted basis, which included $13.6 million, or $0.29 per share of incremental

FAS 123R stock option expense, net of tax, compared to $30.2 million or $0.73 per share on a fully diluted basis for fiscal year 2005.

"We finished 2006 with another record quarter as revenue and profit reached historical highs. 2006 was an exceptional year for FormFactor, with 55% annual revenue growth, fueled by strong contributions to growth from our Memory and Logic businesses. At the same time, we expanded our product offerings in multiple markets," said Igor Khandros, CEO of FormFactor. "We believe the market outlook for advanced probe cards remains strong as we enter 2007."

118.    During the conference call with analysts on January 31, 2007, which defendants Khandros and Foster participated, defendant Khandros stated:

Operationally, our factory performance vastly improved, as we increased on-time deliveries and reduced lead-times, culminating in better customer satisfaction and as a result, setting the stage for expanded business relationships with existing and new customers.

*        *        *

Most significantly, it took us longer than anticipated to reach volume shipments of our Harmony NAND Flash product.  Although currently, our product ramp is tracking with the migration plans of the early adopting customers.

*        *        *

Qualifications of our Harmony OneTouch NAND Flash product continued in the quarter with three customers, and *we began volume shipments to one early adopter.*

119.    Also on January 31, 2007, FormFactor announced that Hynix Semiconductor, Inc. ("Hynix") had placed a multi-million dollar order for FormFactor's Harmony OneTouch probe cards for Flash memory production.  The probe cards, which would be shipped to Hynix starting 1Q 2007, would be used in the testing of Hynix's latest-generation 60-nm NAND Flash wafers.  According to Hynix, FormFactor was chosen from among several probe card suppliers for this volume order due to the high quality, performance and reliability of its advanced wafer probe card solutions.

120.    The market reacted to the positive news on January 31, 2007, concerning the multi-million dollar order for FormFactor's Harmony OneTouch probe card and FormFactor's 4Q 2006 financial results, with FormFactor's stock jumping close to 9.8% in one day, closing at $44.65 per share with a trading volume close to 3.7 million shares.  By comparison, the Russell Index rose 1.289% and the NASDAQ rose .181%.

121.    On February 26, 2007, the Company filed its Form 10-K for FY 2006.  Defendants Khandros and Foster and the directors of FormFactor signed the Form 10-K.  Defendants Khandros and Foster also provided certification pursuant to 15 U.S.C. §7241, as adopted pursuant to §302 of Sarbanes-Oxley.  In addition to repeating the same financial information in the Form 10-K, the Company stated:

> In 2006, we delivered our first one touchdown NAND flash probe cards incorporating our proprietary "Harmony" architecture for wafer probe cards.  Our Harmony architecture addresses some of the significant challenges presented by the future demands of single touchdown wafer probing and very high parallelism wafer test, and we believe will be a key building block for our future generations of large area array flash, DRAM, wafer level burn-in and high frequency probing solutions.

122.    Moreover, the Company's Form 10-K for FY 2006 disclosed its inventory valuations policies, as follows:

> We record an adjustment of our inventory valuation for estimated obsolete and non-saleable inventories equal to the difference between the cost of inventories and the estimated market value based upon assumptions about future demand and market conditions.  If actual market conditions are less favorable than those projected by management, additional inventory write down would be required.  Once established, the original cost of our inventory less the related inventory reserve represents the new cost basis of such products.  Reversal of these write downs is recognized only when the related inventory has been scrapped or sold.

>                         *         *         *

> Inventory Valuation.   We state our inventories at the lower of cost (principally standard cost which approximates actual cost on a first in, first out basis) or market.   We record adjustments to our inventory valuation for estimated obsolescence or non-saleable inventories equal to the difference between the cost of inventories and the estimated market value based upon assumptions about future demand and market conditions.  If actual market conditions are less favorable than those projected by management, additional inventory reserves may be required. Inventory write downs once established are not reversed until the related inventory has been scrapped or sold.

123.    The Company's Form 10-K also disclosed its R&D for FY 2006, as follows:

Research, Development and Engineering

> The semiconductor industry is subject to rapid technological change and new product introductions and enhancements. We believe that our continued commitment to research and development and our timely introduction of new and enhanced wafer probe test solutions and other technologies related to our MicroSpring interconnect technology are integral to maintaining our competitive position. We continue to invest considerable time and resources in creating structured processes for undertaking, tracking and completing our development projects, and plan to implement those developments into new product or technology offerings. We continue to allocate significant resources to these efforts and to use automation and

information technology to provide additional efficiencies in our research and development activities.

We have historically devoted approximately 11% to 16% of our revenues to research and development programs. Research and development expenses were $46.6 million for fiscal 2006, $28.3 million for fiscal 2005, and $20.6 million for fiscal 2004.

Our research and development activities, including our product engineering activities, are directed by individuals with significant expertise and industry experience. As of December 30, 2006, we had 162 employees in research and development.

124.    Additionally, the Company's Form 10-K stated how its cost of revenues was derived:

Cost of Revenues. Cost of revenues consists primarily of manufacturing materials, payroll and manufacturing-related overhead. In addition, cost of revenues also includes costs related to the start up of our new manufacturing facility, which was completed in early 2006. Our manufacturing operations rely upon a limited number of suppliers to provide key components and materials for our products, some of which are a sole source. We order materials and supplies based on backlog and forecasted customer orders. Tooling and setup costs related to changing manufacturing lots at our suppliers are also included in the cost of revenues. We expense all warranty costs and inventory provisions or write-offs of inventory as cost of revenues.

We design, manufacture and sell a fully custom product into the semiconductor test market, which is subject to significant variability and demand fluctuations. Our wafer probe cards are complex products that are custom to a specific chip design and must be delivered on relatively short lead-times as compared to our overall manufacturing process. As our advanced wafer probe cards are manufactured in low volumes and must be delivered on relatively short lead-times, it is not uncommon for us to acquire production materials and start certain production activities based on estimated production yields and forecasted demand prior to or in excess of actual demand for our wafer probe cards. *We record an adjustment to our inventory valuation for estimated obsolete and non-saleable inventories equal to the difference between the cost of inventories and the estimated market value based upon assumptions about future demand and market conditions.* If actual market conditions are less favorable than those projected by management, additional inventory write down would be required. Once established, the original cost of our inventory less the related inventory reserve represents the new cost basis of such products. Reversal of these write downs is recognized only when the related inventory has been scrapped or sold.

125.    Following the Company's filing of Form 10-K reporting the Company's financial and business results for FY 2006, FormFactor's stock continued to trade at inflated levels above $40.00 per share, reaching as high as $47.78 per share on March 21, 2007.

126.    The statements made in ¶¶117-118, 121-124 above, concerning FormFactor's financial and business results for 4Q 2006 and FY 2006, were false and misleading, and defendants knew that they were false and misleading at the time they were made:

PLAINTIFFS' FIRST AMENDED COMPLAINT - C-07-05545-SI                              - 55 -

1    (a)  As described in ¶¶53-67 above, due to FormFactor's persistent chronic poor

2 yields, defendants knew there was no reasonable basis for representing that its production processes

3 were fully functioning, with output and yields improving steadily, and that the Company would be

4 able to have the ability and the capacity to volume produce the Harmony probe cards as promised;

5    (b)  As described in ¶¶53-67 above, during 4Q 2006 and FY 2006, defendants

6 failed to disclose known trends and uncertainties by not disclosing the Company's chronic poor

7 yields that impeded FormFactor's ability to bring new products into volume production efficiently

8 and in a timely manner.  As described in ¶¶68-75, defendants also failed to disclose their practice of

9 overvaluing inventory and improperly classifying obsolete inventory as R&D, and thereby not

10 disclosing FormFactor's actual financial performance and true operating margins;

11    (c)  As described in ¶¶68-75, 80-83, above, during 4Q 2006 and FY 2006,

12 defendants also knew that the Company failed to properly account for its obsolete inventory.  As part

13 of the fraudulent scheme, defendants knew about and directed lower-ranked personnel to improperly

14 transfer the cost associated with scrap that accumulated from poor yields from engineering and

15 production from the manufacturing department to R&D.  Thereafter, the cost of the scrap was

16 written off as R&D.  As corroborated by several witnesses who worked at FormFactor, including

17 CW3 (former Senior Process Engineer), CW6 (former Cost Financial Analyst), CW8 (former

18 Operator in the fabrication process) and CW9 (former Senior IT Director), the Company transferred

19 the accumulated scrap from failed yields out of the engineering department in order to avoid

20 recognizing the costs as current period cost of revenues.  The R&D group performed very limited

21 testing, if any, on the scrap inventory.  At least three witnesses from the manufacturing side (CW2,

22 CW3 and CW8) indicated that the scrap, in fact, could not be and was not re-used, due to the custom

23 nature of FormFactor's products.  As a result, the costs associated with the scrap did not qualify for

24 R&D costs and should have been written off through the Company's cost of revenues.  This

25 manipulation caused the Company's cost of revenues to be understated and its gross margin to be

26 overstated;

27    (d)  Defendants also knew that the undisclosed production constraints would

28 significantly raise the risk that FormFactor's customers with older generation products would seek

1    alternative sources such as the Company's competitors or seek to renegotiate their contracts with

2    FormFactor placing serious pressure on the Company's future revenue;

3          (e)    During 4Q 2006 and FY 2006, defendants improperly managed earnings

4    through various accounting manipulations which allowed them to hit security analysts' expectations

5    including:

6          (i)    improperly accounting for FormFactor's inventory valuation and the

7    related cost of revenue accounts which caused the Company's reported inventory, gross margin and

8    net income to be overstated; and

9          (ii)    improperly causing FormFactor to overstate R&D;

10          (f)    By inflating the Company's R&D, defendants created a rosy picture that the

11    Company was engaging in extensive R&D in order to maintain its competitive edge in the high-tech

12    semiconductor industry;

13          (g)    As detailed in ¶¶76-79, 210-220, the Company lacked adequate internal

14    controls.  In fact, at least four of plaintiffs' witnesses, including two former employees in the finance

15    department (CW5 and CW6), one veteran engineer (CW3) and one former Senior IT Director

16    (CW9), describe FormFactor's systems as "primitive," manual and labor-intensive and outdated for a

17    publicly-traded company;

18          (h)    As detailed in ¶¶181-205, as a consequence of the aforementioned practices,

19    the Company's revenues and net income were artificially inflated and reported financial results were

20    in violation of GAAP.  For 4Q 2006, FormFactor restated its reported financials as follows:

21
22

|  | Total Inventory | Cost of Revenue | Gross Margin | Stock-based comp included in GM | Gross Margin % | Net Income | Diluted EPS |
|---|---|---|---|---|---|---|---|
| Reported | 24,778 | 47,536 | 51,157 | 1,165 | 51.83% | 18,920 | $0.39 |
| Restated | 18,926 | 50,130 | 48,563 | 1,245 | 49.21% | 17,456 | $0.36 |

24    For FY 2006, the Company restated its financials as follows:
25
26

|  | Total Inventory | Cost of Revenue | Gross Margin | Stock-based comp included in GM | Gross Margin % | Net Income | Diluted EPS |
|---|---|---|---|---|---|---|---|
| Reported | 24,778 | 178,235 | 190,978 | 3,900 | 51.73% | 60,788 | $1.29 |
| Restated | 18,926 | 184,087 | 185,126 | 4,281 | 50.14% | 57,216 | $1.21 |

1        (i)        The Company overstated its total inventory by 30.92% and net income by

2  8.39% for 4Q 2006, and by 30.92% in total inventory and 6.24% in net income for FY 2006.  But for

3  defendants' deliberate improper reporting of inventory valuation, including counting obsolete

4  inventory as R&D expense and misreporting of its stock-based compensation to inventory,

5  FormFactor would have only achieved a gross margin of 50.14%, rather than 51.73%, in FY 2006.

6       127.    On April 25, 2007, the Company issued a press release entitled: "FormFactor

7  Announces First Quarter 2007 Financial Results."  The press release stated in part:

> FormFactor, Inc. today announced its financial results for the first quarter of fiscal 2007. Quarterly revenues were a record $102.3 million, up 26% from $81.3 million in the first quarter of fiscal 2006, and up 4% from $98.7 million in the fourth quarter of fiscal 2006.
>
> Net income for the first quarter of fiscal 2007 was $14.8 million or $0.30 per share on a fully diluted basis, which included $5.2 million or $0.11 per share of stock-based compensation expense, net of tax. This compares to $18.9 million or $0.39 per share on a fully diluted basis for the fourth quarter of fiscal 2006, which included $4.8 million or $0.10 per share of stock-based compensation expense, net of tax. Net income for the first quarter of fiscal 2006 was $10.8 million or $0.25 per share on a fully diluted basis, which included $2.8 million or $0.06 per share of stock-based compensation expense, net of tax.
>
> "We had yet another record quarter, as our customers are accelerating their transition to new technology nodes. This trend and our business momentum reaffirm FormFactor's opportunities in 2007 and beyond," said Igor Khandros, CEO of FormFactor.

128.    During the conference call on April 25, 2007, which defendants Khandros and Foster hosted, defendant Khandros stated:

> As the leader in the DRAM market, FormFactor is moving the industry to fewer touchdowns in high-yield, offering the industry the lowest cost of test.  We're also seeing more complex test requirements driven by more challenging device designs such as lower power, higher speed and higher pin counts and smaller pad sizes, in addition to operational challenges such as test sell uptime, faster time to volume and faster time to yield, which are increasingly more important to our customers.  FormFactor is uniquely capable of addressing this fundamental and increasingly complex customer requirement.
>
> With our latest product platform, Harmony DRAM XP, we continue to deliver product that performs to the limits of available test resources.  This platform is optimized for the industry move to 70 millimeter and 1 gigabit for high-density devices to enable two to three touchdown testing.  It is designed to address the larger device sizes typical in commodity and graphics DRAM.
>
> Additionally our recently announced PH150XP product is targeting primarily consumer markets, smaller density devices of 500 megabits or lower with smaller pad sizes and higher by die count per wafer, providing up to four touchdown testing.

1
2
3

We believe that PH150XP, combined with our Harmony XP platform, are the most technologically advanced solutions on the market, providing the lowest cost of test to our customers. ***We are currently in qualifications and expect volume shipments in second half '07 for both product platforms***.

\*       \*       \*

4
5
6
7

Development and qualification of our NAND Harmony OneTouch product continued in the quarter, though we did not make the progress we had hoped. We continue to encounter integration challenges with one of our Harmony NAND Flash applications. ***Although this has taken longer than expected, our technology has been validated as another customer to whom we are currently shipping in volume***.

8
9

We have also qualified our card at a third early adopting customer, though the card is not in volume production as the customer currently shifted their wafer starts to DRAM.

10
11
12

We are continuously investing in the Harmony Flash area to accelerate resolution of the issues and complete customer quotes. ***Our target with Harmony Flash products is to significantly exceed the performance and value proposition of other products in the NAND market.*** We believe our Harmony One Touch designed for high productivity, serviceability and technology scalability will afford FormFactor success in gaining revenue share in this market.

13

\*       \*       \*

14
15
16

In summary, first quarter of 2007 was yet another strong quarter for FormFactor. We're very pleased with the Company's performance of record revenues, expanded manufacturing capability and continued development on the breadth of the product portfolio that has set the stage for a successful 2007.

17

129.    On the same conference call, in response to an analyst's question regarding FormFactor's ability to address the NAND Flash market, defendant Khandros replied:

18
19
20

[A]s you look at the NAND markets right now, we believe that the Harmony Flash product we're bringing to market will have compelling advantages. They will mainly center around productivity improvement.

21
22

As NAND architecture progresses, you already have some high-grade NAND NOR devices where, indeed, performance is going up, and even more significantly you have a roadmap towards finer pitches and smaller pad sizes in the future.

23
24
25

So all of that should over time play to our strengths. ***But we believe that the product will introduce when it is in volume production, and you need to be in volume production to validate productivity improvement. When it is in volume production, multiple customers will still believe that there will be compelling advantages***.

26

130.    When another analyst asked: "Is there some concern here in terms of leadtimes maybe stretching out, some growing pains that you are experiencing with some of the infrastructure growth you are seeing?" Defendant Foster replied:

27
28

*[N]o, we don't have any leadtime stretching out issues.  In fact, our factory cycle time and leadtimes have been improving.  In the last 12 months, they have improved about 25%, and the factory is performing very well*.  It is simply a matter of scheduled customer deliveries and what our customers are looking to have delivered within the quarter based upon what we can see.  And, as you know, we have some visibility, but it is always somewhat limited because we book and turn 60% of our business in a quarter.  And that means that we get visibility of it as we go through the quarter.

131.    On May 7, 2007, the Company filed its Form 10-Q for 1Q 2007, and reported its 1Q 2007 financial reports.  Moreover, the Company stated how it valued inventories, as follows:

Note 4 - Inventories

Inventories are stated at the lower of cost (principally standard cost which approximates actual cost on a first-in, first-out basis) or market value.  Adjustments for potential excess and obsolete inventory are made based on management's analysis of inventory levels and future sales forecasts.  Once the value is adjusted, the original cost of the Company's inventory less the related inventory write-down represents the new cost basis of such products.  Reversal of these write-downs is recognized only when the related inventory has been scrapped or sold.

Inventories consist of the following:

|  | March 31, 2007<br>(In thousands) | December 30, 2006 |
|---|---|---|
| Raw materials | $13,628 | $11,975 |
| Work-in-progress | 10,866 | 10,465 |
| Finished goods | 2,969 | 2,338 |
|  | $27,463 | $24,778 |

132.    Additionally, the Company stated in its Form 10-Q how it accounted for its cost of revenues, as follows:

Cost of Revenues.  Cost of revenues consists primarily of manufacturing materials, payroll and manufacturing-related overhead.  In addition, cost of revenues also includes costs related to the start up of our new manufacturing facility.  Our manufacturing operations rely upon a limited number of suppliers to provide key components and materials for our products, some of which are sole source. . . . Tooling and setup costs related to changing manufacturing lots at our suppliers are also included in the cost of revenues.  We expense all warranty costs and inventory write-downs or write-offs as cost of revenues.

We record an adjustment to our inventory valuation for estimated obsolete and non-saleable inventories equal to the difference between the cost of inventories and the estimated market valve based upon assumptions about future demands and market conditions.  If actual market conditions are less favorable than those projected by management, additional inventory write downs would be required.  Once established, the original cost of our inventory less the related inventory write downs represents the new cost basis of such products.  Reversal of these write downs is recognized only when the related inventory has been scrapped or sold.

133.    With respect to cost of revenues, the Company stated:

Cost of Revenues.    Cost of revenues consists primarily of manufacturing materials, payroll and manufacturing-related overhead. In addition, cost of revenues also includes costs related to the start up of our new manufacturing facility, which we completed in early 2006. Our manufacturing operations rely upon a limited number of suppliers to provide key components and materials for our products, some of which are sole source. We order materials and supplies based on backlog and forecasted customer orders. Tooling and setup costs related to changing manufacturing lots at our suppliers are also included in the cost of revenues. We expense all warranty costs and inventory write-downs or write-offs as cost of revenues.

We design, manufacture and sell a fully custom product into the semiconductor test market, which is subject to significant variability and demand fluctuations. Our wafer probe cards are complex products that are custom to a specific chip design and must be delivered on relatively short lead-times as compared to our overall manufacturing process. As our advanced wafer probe cards are manufactured in low volumes and must be delivered on relatively short lead-times, it is not uncommon for us to acquire production materials and start certain production activities based on estimated production yields and forecasted demand prior to or in excess of actual demand for our wafer probe cards. We record an adjustment to our inventory valuation for estimated obsolete and non-saleable inventories equal to the difference between the cost of inventories and the estimated market value based upon assumptions about future demand and market conditions. If actual market conditions are less favorable than those projected by management, additional inventory write downs would be required. Once established, the original cost of our inventory less the related inventory reserve represents the new cost basis of such products. Reversal of these write downs is recognized only when the related inventory has been scrapped or sold.

134.    With respect to R&D, the Company stated:

Research and Development.    Research and development expenses include expenses related to product development, engineering and material costs. Almost all research and development costs are expensed as incurred. We plan to continue to invest a significant amount in research and development activities to develop new technologies for current and new markets and new applications in the future, and to improve or advance existing technologies. We expect these expenses to scale with revenue growth.

135.    Following the April 25, 2007 press release, conference call and the issuance of the Company's Form 10-Q for 1Q 2007, the stock price remained inflated at over $40.00 per share, while FormFactor continued to conceal the true operation and financial conditions of the Company.

136.    The statements made in ¶¶127-134 above, concerning FormFactor's financial and business results for 1Q 2007, were false and misleading, and defendants knew that they were false and misleading at the time they were made:

1        (a)      As described in ¶¶53-67 above, due to FormFactor's persistent chronic poor

2  yields, defendants knew there was no reasonable basis for representing that its production processes

3  were fully functioning, with output and yields improving steadily, and that the Company would be

4  able to have the ability and the capacity to volume produce the Harmony probe cards as promised;

5        (b)      As described in ¶¶53-67 above, during 1Q 2007, defendants failed to disclose

6  known trends and uncertainties by not disclosing the Company's chronic poor yields that impeded

7  FormFactor's ability to bring new products into volume production efficiently and in a timely

8  manner.  As described in ¶¶68-75, defendants also failed to disclose their practice of overvaluing

9  inventory and improperly classifying obsolete inventory as R&D, and thereby not disclosing

10  FormFactor's actual financial performance and true operating margins;

11        (c)      As described in ¶¶68-75, 80-83 above, during 1Q 2007, defendants also knew

12  that the Company failed to properly account for its obsolete inventory.  As part of the fraudulent

13  scheme, defendants knew about and directed lower-ranked personnel to improperly transfer the cost

14  associated with scrap that accumulated from poor yields from engineering and production from the

15  manufacturing department to R&D.  Thereafter, the cost of the scrap was written off as R&D.  As

16  corroborated by several witnesses who worked at FormFactor, including CW3 (former Senior

17  Process Engineer), CW6 (former Cost Financial Analyst), CW8 (former Operator in the fabrication

18  process) and CW9 (former Senior IT Director), the Company transferred the accumulated scrap from

19  failed yields out of the engineering department in order to avoid recognizing the costs as current

20  period cost of revenues.  The R&D group performed very limited testing, if any, on the scrap

21  inventory.  At least three witnesses from the manufacturing side (CW2, CW3 and CW8) indicated

22  that the scrap, in fact, could not be and was not re-used, due to the custom nature of FormFactor's

23  products.  As a result, the costs associated with the scrap did not qualify for R&D costs and should

24  have been written off through the Company's cost of revenues.  This manipulation caused the

25  Company's cost of revenues to be understated and its gross margin to be overstated;

26        (d)      Defendants also knew that the undisclosed production constraints would

27  significantly raise the risk that FormFactor's customers with older generation products would seek

28

1    alternative sources such as the Company's competitors or seek to renegotiate their contracts with

2    FormFactor placing serious pressure on the Company's future revenue;

3                    (e)    During 1Q 2007, defendants improperly managed earnings through various

4    accounting manipulations which allowed them to hit security analysts' expectations including:

5                            (i)    improperly accounting for FormFactor's inventory valuation and the

6    related cost of revenue accounts which caused the Company's reported inventory to be overstated,

7    and gross margin and net income to be misstated; and

8                            (ii)   improperly causing FormFactor to overstate R&D;

9                    (f)    By inflating the Company's R&D, defendants created a rosy picture that the

10   Company was engaging in extensive R&D in order to maintain its competitive edge in the high-tech

11   semiconductor industry;

12                   (g)    As detailed in ¶¶76-79, 210-220, the Company lacked adequate internal

13   controls.  In fact, at least four of plaintiffs' witnesses, including two former employees in the finance

14   department (CW5 and CW6), one veteran engineer (CW3) and one former Senior IT Director

15   (CW9), describe FormFactor's systems as "primitive," manual and labor-intensive and outdated for a

16   publicly-traded company;

17                   (h)    As detailed in ¶¶181-205, as a consequence of the aforementioned practices,

18   the Company's revenues and net income were artificially inflated and reported financial results were

19   in violation of GAAP.  For 1Q 2007, FormFactor restated its reported financials as follows:

20

21

|          | Total Inventory | Cost of Revenue | Gross Margin | Stock-based comp included in GM | Gross Margin % | Net Income | Diluted EPS |
|----------|-----------------|-----------------|--------------|---------------------------------|----------------|------------|-------------|
| Reported | 27,463          | 48,567          | 53,704       | 1,700                           | 52.51%         | 14,832     | $0.30       |
| Restated | 22,190          | 47,988          | 54,283       | 1,399                           | 53.08%         | 15,211     | $0.31       |

22

23

24                   (i)    The Company overstated its total inventory by 23.76% and misstated its net

25   income by 2.49% for 1Q 2007.

26           137.   On July 25, 2007, the Company issued a press release entitled: "FormFactor, Inc.

27   Announces Second Quarter 2007 Financial Results."  The press release stated in part:

28                   FormFactor, Inc. today announced its financial results for the second quarter
                     of fiscal year 2007, ended June 30, 2007. Quarterly revenues were a record $114.1

1    million, up 12% from $102.3 million in the first quarter of fiscal 2007, and up 24%
      from $92.4 million in the second quarter of fiscal 2006.

2
           Net income for the second quarter of fiscal 2007 was $18.6 million or $0.38
3    per share on a fully diluted basis, which included $4.2 million or $0.08 per share of
      stock-based compensation, net of tax. This compares to $14.8 million or $0.30 per
4    share on a fully diluted basis for the first quarter of fiscal 2007, which included $5.2
      million or $0.11 per share of stock-based compensation, net of tax. Net income for
5    the second quarter of fiscal 2006 was $15.3 million or $0.32 per share on a fully
      diluted basis, which included $3.1 million or $0.06 per share of stock-based
6    compensation, net of tax.

7           "FormFactor had another outstanding quarter - setting revenue, bookings, and
      operating income records. Our 24% year over year growth was fueled by the
8    particular strength of DRAM, as well as healthy NOR Flash and Logic segments. We
      continued to focus on the development and qualification of new products in Flash,
9    DRAM and Fine Pitch logic to expand our offerings in multiple applications and
      innovate to lead the market to the next generation of testing technology," said Igor
10   Khandros, CEO of FormFactor.

11          138.    During the conference call on July 25, 2007, defendants Khandros and Foster met

12   with analysts.  Defendant Khandros stated:

13          FormFactor delivered another record quarter with revenue bookings and operating
      performance all reaching historic highs.  Advanced protocol demand grew yet again
14   this quarter as multiple market drivers across segments propelled the market's
      growth.  Revenues increased 12% sequentially to $114.1 million, non-GAAP gross
15   margins were 54% and operating margins were 25.8%.

16          ***We improved our production performance by reducing lead times and
      continuing to invest in new technology and product development.***  Market demand
17   for DRAM remains strong in the second quarter driven by DRAM bit growth, the
      ongoing transition to 70 nanometers and 1 gigabit driven by Vista and seasonal
18   strength in the mobile business.

19                                 *       *       *

20          This FormFactor's proprietary TRE (Test Recourse Extension Technology),
      the Harmony XP platform can be expanded to test more devices in parallel and
21   accelerate the move to one touchdown in DRAM wafer testing in the near future.
      Harmony XP will also enable customers' road maps by scaling to and supporting
22   (inaudible) pitch, the smaller step size, highest probe density and highest probe
      columns in excess of 50,000 pins.  ***We will save in Harmony XP as customers make
23   the transition to 1 gigabit density over the next year and our product will enter the
      market in volume by year-end.***

24                                 *       *       *

25          ***We made progress in the development and qualification of our NAND
      Harmony OneTouch product this quarter and recently demonstrated superior
26   performance on our Harmony OneTouch probe cards in production at a customer.***
      These cards reduced their damage, improved electrical reliability and provided
27   higher up-time versus other full wafer contacted technologies.  We have also
      received new design wins for this product.

28

PLAINTIFFS' FIRST AMENDED COMPLAINT - C-07-05545-SI                                  - 64 -

1    ***Our overall design capacity has been constrained due to an increase in new
design demand and high design intensity associated with new product platforms
and our Harmony learning on various test platforms has continued.*** Though we
did not expect to see a significant increase in NAND Flash revenue in the third
quarter, given customer device two-end cycles and design constraints, we plan to
focus our efforts on improving design capacity and lead times and increasing our
Harmony penetration in the NAND market.

5                                    *        *        *

6    ***Our overall outlook for 2007 market for advanced wafer probe cards
remains unchanged from the view we provided in January.*** The advanced probe
card market remains on track to grow with a robust 25% in 2007 compared to
roughly flat growth expected for the entire semiconductor [category] an industry.
FormFactor is well positioned based on the strength of the DRAM market and
increasingly healthy NOR Flash market, continued emergence of the NAND
specialty market and the strength of our existing Logic SOC business.

10                                   *        *        *

11           In summary, the second quarter of 2007 was another strong quarter for
FormFactor.  We are very pleased with the Company's achievement of record and
profitability, expand the factory capability and continued new product development.

13           139.    During the conference call, defendant Foster stated that revenues increased for the
tenth consecutive time and reached record levels at $114 million, up 12% over 1Q 2007 and 24%
over 2Q 2006.  He also stated:

16           Our strong performance in Flash this quarter resulted from healthy growth in
NOR due to a significant customer's high volume ramp.  While we did receive some
revenue from our NAND Harmony OneTouch product in the quarter, overall NAND
revenue declined.   Production shipments and qualification at additional sites
continued with one customer while qualification efforts with additional customers
have been slower than expected.  The differentiating capability of our Harmony
platform has been demonstrated in production and qualification trials and we remain
confident that we can penetrate additional customers as we progress in our
qualification activities.

21           140.    Moreover, defendant Khandros represented that the NAND Flash Harmony product
was seeing high demand, and the Company faced design capacity challenges:

23           We have overall design constraints right now due to very, very high design
demand in general.  And as you can see we're growing our business at a healthy
chunk and that puts significant pressure on design resources.

25           141.    On August 7, 2007, the Company filed its Form 10-Q for 2Q 2007, and repeated the
same financial information.  The Company stated its inventory valuation policies, as follows:

27           Note 4 – Inventories

Inventories are stated at the lower of cost (principally standard cost which approximates actual cost on a first-in, first-out basis) or market value. Adjustments for potential excess and obsolete inventory are made based on management's analysis of inventory levels and future sales forecasts. Once the value is adjusted, the original cost of the Company's inventory less the related inventory write-down represents the new cost basis of such products. Reversal of these write-downs is recognized only when the related inventory has been scrapped or sold.

Inventories consisted of the following:

|  | June 30, 2007 (In thousands) | December 30, 2006 |
|---|---|---|
| Raw materials | $16,347 | $11,975 |
| Work-in-Progress | 11,301 | 10,465 |
| Finished goods | 4,356 | 2,338 |
|  | $32,004 | $24,778 |

142.    The Company also stated its cost of revenues as follows:

Cost of Revenues. Cost of revenues consists primarily of manufacturing materials, compensation and manufacturing-related overhead. In addition, cost of revenues also includes costs related to the start up of our new manufacturing facility, which we completed in early 2006. Our manufacturing operations rely upon a limited number of suppliers to provide key components and materials for our products, some of which are sole source. We order materials and supplies based on backlog and forecasted customer orders. Tooling and setup costs related to changing manufacturing lots at our suppliers are also included in the cost of revenues. We expense all warranty costs and inventory write-downs or write-offs as cost of revenues.

We design, manufacture and sell a fully custom product into the semiconductor test market, which is subject to significant variability and demand fluctuations.  Our wafer probe cards are complex products that are custom to a specific chip design and must be delivered on relatively short lead-times as compared to our overall manufacturing process.  As our advanced wafer probe cards are manufactured in low volumes and must be delivered on relatively short lead-times, it is not uncommon for us to acquire production materials and start certain production activities based on estimated production yields and forecasted demand prior to or in excess of actual demand for our wafer probe cards. We record an adjustment to our inventory valuation for estimated obsolete and non-saleable inventories equal to the difference between the cost of inventories and the estimated market value based upon assumptions about future demand.  If actual market conditions are less favorable than those projected by management, additional inventory write downs would be required. Once established, the original cost of our inventory less the related inventory reserve represents the new cost basis of such products.  Reversal of these write downs is recognized only when the related inventory has been scrapped or sold.

143.    Additionally, the Company stated its R&D as follows:

Research and Development. Research and development expenses include expenses related to product development and design, engineering and material costs. Almost all research and development costs are expensed as incurred. We plan to continue to invest a significant amount in research and development activities to develop new technologies for current and new markets and new applications in the

future, and to improve or advance existing technologies. We expect these expenses to scale with revenue growth.

144. The statements made in ¶¶137-143 above, concerning FormFactor's financial and business results for 2Q 2007, were false and misleading, and defendants knew that they were false and misleading at the time they were made:

(a) As described in ¶¶53-67 above, due to FormFactor's persistent chronic poor yields, defendants knew there was no reasonable basis for representing that its production processes were fully functioning, with output and yields improving steadily, and that the Company would be able to have the ability and the capacity to volume produce the Harmony probe cards as promised;

(b) As described in ¶¶53-67 above, during 2Q 2007, defendants failed to disclose known trends and uncertainties by not disclosing the Company's chronic poor yields that impeded FormFactor's ability to bring new products into volume production efficiently and in a timely manner. As described in ¶¶68-75, defendants also failed to disclose their practice of overvaluing inventory, and thereby not disclosing FormFactor's actual financial performance and true operating margins;

(c) As described in ¶¶68-75, 80-83 above, during 2Q 2007, defendants also knew that the Company failed to properly account for its obsolete inventory. As part of the fraudulent scheme, defendants knew about and directed lower-ranked personnel to improperly transfer the cost associated with scrap that accumulated from poor yields from engineering and production from the manufacturing department to R&D. Thereafter, the cost of the scrap was written off as R&D. As corroborated by several witnesses who worked at FormFactor, including CW3 (former Senior Process Engineer), CW6 (former Cost Financial Analyst), CW8 (former Operator in the fabrication process) and CW9 (former Senior IT Director), the Company transferred the accumulated scrap from failed yields out of the engineering department in order to avoid recognizing the costs as current period cost of revenues. The R&D group performed very limited testing, if any, on the scrap inventory. At least three witnesses from the manufacturing side (CW2, CW3 and CW8) indicated that the scrap, in fact, could not be and was not re-used, due to the custom nature of FormFactor's products. As a result, the costs associated with the scrap did not qualify for R&D costs and should

1  have been written off through the Company's cost of revenues.  This manipulation caused the

2  Company's cost of revenues to be understated and its gross margin to be overstated;

3          (d)  Defendants also knew that the undisclosed production constraints would

4  significantly raise the risk that FormFactor's customers with older generation products would seek

5  alternative sources such as the Company's competitors or seek to renegotiate their contracts with

6  FormFactor placing serious pressure on the Company's future revenue;

7          (e)  During 2Q 2007, defendants improperly managed earnings through various

8  accounting manipulations which allowed them to hit security analysts' expectations including:

9            (i)  improperly accounting for FormFactor's inventory valuation and the

10  related cost of revenue accounts which caused the Company's reported inventory to be overstated,

11  and gross margin and net income to be misstated; and

12            (ii)  improperly causing FormFactor to overstate R&D;

13          (f)  By inflating the Company's R&D, defendants created a rosy picture that the

14  Company was engaging in extensive R&D in order to maintain its competitive edge in the high-tech

15  semiconductor industry;

16          (g)  As detailed in ¶¶76-79, 210-220, the Company lacked adequate internal

17  controls.  In fact, at least four of plaintiffs' witnesses, including two former employees in the finance

18  department (CW5 and CW6), one veteran engineer (CW3) and one former Senior IT Director

19  (CW9), describe FormFactor's systems as "primitive," manual and labor-intensive and outdated for a

20  publicly-traded company;

21          (h)  As detailed in ¶¶181-205, as a consequence of the aforementioned practices,

22  the Company's revenues and net income were artificially inflated and reported financial results were

23  in violation of GAAP.  For 2Q 2007, FormFactor restated its reported financials as follows:

|  | Total Inventory | Cost of Revenue | Gross Margin | Stock-based comp included in GM | Gross Margin % | Net Income | Diluted EPS |
|---|---|---|---|---|---|---|---|
| Reported | 32,004 | 53,663 | 60,461 | 1,258 | 52.98% | 18,650 | $0.38 |
| Restated | 30,429 | 49,966 | 64,158 | 1,296 | 56.22% | 21,105 | $0.43 |

PLAINTIFFS' FIRST AMENDED COMPLAINT - C-07-05545-SI      - 68 -

1      (i)    The Company overstated its total inventory by 5.18% and misstated its net

2  income by 11.63% for 2Q 2007.

3      145.    Following the issuance of the financial results for 2Q 2007, FormFactor's stock price

4  rose to more than $40.00 per share, reaching as high as $47.47 per share on September 19, 2007.

5  The stock continued to trade at an inflated price until the Company disclosed the intent to

6  restatement on October 24, 2007.

7      146.    In September 2007 alone, defendant Khandros rushed to make 31 insider transactions,

8  disposing of more than 65,050 shares, at no less than $45.11 per share, pocketing more than $2.98

9  million in insider proceeds within weeks of the Company's disclosures about the true operating and

10  financial conditions of the Company.

11  **VIII.   THE TRUTH BEGINS TO EMERGE**

12      147.    After the close of the market on October 24, 2007, the Company issued a press

13  release announcing accounting issues with respect to its pre-3Q 2007 results entitled: "FormFactor,

14  Inc. Announces Record Revenue Quarter of $125.3 Million, Up 29% Year Over Year." The press

15  release stated in part:

16        FormFactor, Inc. today announced revenue for the third quarter of fiscal year
17    2007, ended September 29, 2007. The Company posted record quarterly revenue of
        $125.3 million. These results compare to revenue of $114.1 million, a 10% increase
18    from the second quarter of fiscal 2007 and $96.8 million, a 29% increase from the
        third quarter of fiscal 2006. The company had a cash balance of $537 million as of
19    September 29, 2007.

20        "FormFactor delivered another record revenue quarter driven by strength in
        DRAM, NOR and KGD as we continued to lead the market for advanced probe
21    cards. As existing customers migrated to our new product platforms and we
        penetrated emerging markets such as Wire Bond Logic, design activity also
22    increased," said Igor Khandros, CEO of FormFactor.

23        The Company said that it is unable at this time to release further income
        statement data with respect to the third quarter. ***The Company is currently reviewing***
24    ***its historic practices with respect to inventory valuation in light of issues identified***
        ***by the Company in the course of preparation of financial statements for the third***
25    ***quarter. Based on the review to date management believes that adjustments to***
        ***inventory valuations may be required with respect to periods prior to the third***
26    ***quarter of 2007. These potential adjustments could change inventory, gross***
        ***margin, operating margin and net income from the amounts previously reported***
27    ***for the affected periods***. The Company has not yet determined the magnitude of
        these adjustments or whether the adjustments will be reflected in the third quarter
28    financial statements or in a restatement of the affected periods. The Company
        believes, however, that its third quarter operating margin and net income per share,

without giving effect to adjustments in respect of prior periods, should be not less than the 20.5%-21% and $0.38-$0.40 per share, respectively, provided as management guidance in the Q2 earnings call conducted on July 25, 2007.

The Company is working to complete the internal review as promptly as practicable.

148.    During the October 24, 2007 conference call, defendant Foster discussed why the Company had not issued its full customary financial information.  He stated:

As we were closing the books for the third quarter, we discovered an issue related to our inventory evaluation practices.  It appears that in certain prior periods, in the current fiscal year and prior years, the approach followed for evaluating inventory and establishing valuation reserves was inconsistent with our accounting policies.

In our business, where every product is custom for each customer's design, most of our inventory consists of custom parts.  We have a comprehensive process for assessing the value of that inventory in light of projected customer demand.  The failure to follow that process could mean that the previously-recorded inventory values would need to be adjusted up or down, with flow-through impacts on gross margin, operating margin, and net income.

*        *        *

Once we have determined the periods affected and the magnitude of the potential adjustments to inventory, gross margin, operating margin, and net income from the amounts previously reported, we will know whether we can simply do a one-time catch-up adjustment in our third quarter numbers, or whether a restatement of prior periods will be required.

149.    Even as the Company was disclosing its overstatement of inventory, it continued to mask the underlying problems in the manufacturing processes and the impact that they had on the Company's ability to volume produce Harmony products.  With respect to Harmony production ramp constraints, in response to an analyst's question regarding guidance, defendant Khandros acknowledged that "*we're guiding almost flat quarter-over-quarter, and the difference is the Harmony DRAM is behind what we then thought it would be today.*"  However, defendants continued to cover up the underlying poor yields by charactizing the Company's inability to volume produce as a capacity issue:

*As we continue to make strides in the qualification of our Harmony product, the volume ramp is not keeping pace with the combined strong demand for DRAM and NAND Harmony.  In order to meet this demand, we made a decision during the third quarter to add more production capacity for assembly and testing of Harmony cards, including clean room space, equipment and personnel.*

150.    Defendant Foster also commented:

1

2

3

As Igor commented, ***demand for full wafer contractors to support the ramp of our Harmony DRAM and Flash products is exceeding our production capacity. We plan to double Harmony capacity in the first quarter of 2008.  We expect the continuing Harmony production ramp to meet the demand in the second quarter of 2008.***

4

\*       \*       \*

5

6

7

8

As already mentioned, ***we have found it more difficult than planned to ramp Harmony to volume production, which is limiting our ability to meet increasing fully water contractor demand.***  Consequently, we have put more capacity in place sooner than planned to support the volume ramp.  This includes startup of a new clean room and associated manufacturing equipment and people in the fourth quarter.  This will increase our near-term manufacturing costs until Harmony ramps to higher volume and comes down the startup cost curve.

9

10

151.     In response to an analyst's inquiry regarding how FormFactor's inventory valuation slipped through the cracks for so long, defendant Foster acknowledged:

11

12

I want to acknowledge right up front we should have gotten this right quarter-by-quarter here, and while I can explain the problem, I'm not trying to excuse it.

13

And it specifically relates to the policy we have in place for valuation of inventory, and whether or not that has been properly applied period-by-period in the past, and that investigation I mentioned is ongoing.

14

15

16

17

And something that's important to understand is that our inventory business is quite a bit different from others.  It's unusual.  On the one hand, our risk is limited because the product for each customer is custom, and we therefore don't build products in advance of winning a design.  But once our design has been selected by a customer, we actually regularly order components and build sub-systems in advance of receiving a purchase order, so we'll be in a position to meet demand, and those complements and sub-systems are by their very nature custom.

18

19

20

We then have to value this inventory each quarter in light of anticipated customer demand, factory yields, which also affect how much we buy, and other factors.  It's actually a complex, multi-variable process, and in fact, better factory yields can end up generating unused and potentially un-needed material in our custom environment, even though it leads to lower product costs down the road.

21

22

23

So what I can tell you is that the problems (inaudible) relate to the valuation of the inventory.  There's no issue with the units or count; it's the valuation of the reserve methodology related to the custom nature of our product.  And we have not made any changes to our policy.  We're validating that out policy has been applied properly in the past.

24

25

152.     Upon these disclosures, FormFactor's stock dropped from $43.24 per share to $35.54 per share in one day, dropping more than 17.8% in one day and down 28% from their Class Period high, with its trading volume increased by more than nine times.  The October 24, 2007 disclosures, however, only partially revealed the true financial and operating conditions of FormFactor, as the

26

27

28

PLAINTIFFS' FIRST AMENDED COMPLAINT - C-07-05545-SI                                    - 71 -

1   Company continued to conceal production issues with Harmony – one of the key revenue drivers for

2   the Company.

3       153.    The true facts, which were known by defendants but still concealed from the

4   investing public, were as follows:

5           (a)    As described in ¶¶53-67 above, due to FormFactor's persistent chronic poor

6   yields, defendants knew there was no reasonable basis for representing that its production processes

7   were fully functioning, with output and yields improving steadily, and that the Company would be

8   able to have the ability and the capacity to volume produce Harmony probe cards as represented to

9   the market;

10          (b)    While acknowledging that the Company's inventory valuation practices were

11  being reviewed, defendants still failed to disclose known trends and uncertainties by not disclosing

12  the Company's chronic poor yields that impeded FormFactor's ability to bring new products into

13  volume production efficiently and in a timely manner.  As described in ¶¶68-75, defendants also

14  failed to disclose their practice of overvaluing inventory and improperly classifying obsolete

15  inventory as R&D, and thereby not disclosing FormFactor's actual financial performance and true

16  operating margins;

17          (c)    The partial disclosures also concealed the impact on the Company's on-going

18  financial and operations given the Company's inability to volume produce Harmony probe cards as

19  represented to the market.  Specifically, defendants also knew but did not disclose that the

20  production constraints would significantly raise the risk that FormFactor's customers with older

21  generation products would seek alternative sources such as the Company's competitors or seek to

22  renegotiate their contracts with FormFactor placing serious pressure on the Company's future

23  revenue;

24          (d)    As FormFactor later admitted, the Company lost its market share and

25  competitive edge because FormFactor was not the first full wafer contractor probe card company

26  qualified at some DRAM suppliers "***due to the protracted Harmony ramp issues we experienced in***

27  ***2007***" and that as many as 36% of the DRAM customers have delayed or canceled probe cards from

28  FormFactor due to the Company's inability to execute and deliver Harmony.

PLAINTIFFS' FIRST AMENDED COMPLAINT - C-07-05545-SI                                    - 72 -

1    154.    On November 9, 2007, FormFactor announced its preliminary 3Q 2007 results and its

2  intention to restate historical financial statements in light of revised inventory valuation estimates.

3  The Company disclosed, as follows:

4         The Company also announced that it has substantially completed its review of
          its historical practices with respect to inventory valuation.  That review indicates that

5         during fiscal 2006 and the first half of fiscal 2007 the Company did not consistently
          follow its accounting policies for determining inventory valuation.  As a result the

6         Board of Directors determined on November 8, 2007 that the Company will restate
          its financial statements for the fiscal year ended December 30, 2006, for each of the

7         fiscal quarters for that year, and for the fiscal quarters ended March 31 and June 30,
          2007.

8
          Based on the work done to date, the Company estimates the effect of the

9         restatement will be to change GAAP net income per share on a fully diluted basis
          from $1.29 to $1.21 for the fiscal year ended December 30, 2006, from $0.30 to

10        $0.31 for the fiscal quarter ended March 31, 2007, and from $0.38 to $0.43 for the
          fiscal quarter ended June 30, 2007.

11
                              *        *        *

12
          The Company is evaluating management's report on internal controls

13        contained in the Company's 2006 Form 10-K, and has determined that it is likely that
          it had a material weakness in internal controls over financial reporting as of

14        December 30, 2006.

15        As a result of the restatement, the Company's financial statements for the
          year ended December 30, 2006 contained in the Company's 2006 Form 10-K, and

16        the financial statements contained in its Forms 10-Q for the quarters ended March 31,
          2007 and June 30, 2007, should no longer be relied upon.  Because of the time

17        necessary to complete the restatement, the Company did not file its third quarter
          Form 10-Q when due on November 8, 2007.   The Company intends to file

18        amendments to the reports indicated above together with its third quarter fiscal 2007
          Form 10-Q later this month.

19
          155.    On November 11, 2007, the Company filed its Form 10K/A for FY 2006, Form 10-

20
   Q/A for 1Q 2007, and Form 10-Q/A for 2Q 2007 to reflect the restatement.  In the restated Form 10-

21
   K/A, the Company also admitted to a material weakness in its financial reporting, as follows:

22
          A material weakness is a deficiency, or a combination of deficiencies, in

23        internal control over financial reporting, such that there is a reasonable possibility
          that a material misstatement of the company's annual or interim financial statements

24        will not be prevented or detected on a timely basis.

25        The Company identified the following material weakness in internal control
          over financial reporting as of December 30, 2006.  The Company did not maintain

26        effective controls over the valuation of inventory and the related cost of revenues
          accounts.  ***Specifically, the Company did not maintain effective controls to ensure***

27        ***that the estimation process to value inventory complied with the Company's***
          ***accounting policies.***   This control deficiency resulted in the restatement of the

28        Company's annual and interim financial statements for 2006 and interim financial

1   statements for the first and second quarters of 2007. ***Additionally, this control
2   deficiency could result in a misstatement of the inventory and cost of revenues
    accounts that would result in a material misstatement of the Company's financial
3   statements that would not be prevented or detected.***

4          In the Company's original filing of its 2006 Annual Report on Form 10-K,
    management concluded that the Company maintained effective internal control over
5   financial reporting as of December 30, 2006. However, in connection with the
    restatement discussed in Note 2 to the consolidated financial statements,
6   management subsequently concluded that the material weakness in internal control
    over financial reporting described above existed as of December 30, 2006. As a
7   result of the material weakness, management has concluded that the Company did
    not maintain effective internal control over financial reporting as of December 30,
8   2006 based upon the criteria set forth in Internal Control-Integrated Framework
    issued by the COSO. Accordingly, management has restated its report on internal
9   control over financial reporting.

10         156.    In the restated Form 10-K/A, FormFactor also stated the Management's Plan for

11  Remediation, as follows:

12         Management is in the process of completing its plan to remediate the material
    weakness. The remediation plan addresses the design of controls over inventory
13  valuation and is expected to include:

14         •    Completion of analysis of changes in the level of excess and
                obsolete inventory by category;

15
16         •    Review of analysis of changes in the level of excess and
                obsolete inventory by category;

17         •    Separate re-performance of excess and obsolete inventory
                calculation; and

18
19         •    Hiring personnel with requisite cost accounting experience
                and providing ongoing training and supervision

20         157.    On December 6, 2007, FormFactor's competitor, Advantest, a DRAM test supplier,

21  introduced a DRAM probe card that would be competitive with FormFactor's probe card.  Investors

22  rushed to sell FormFactor stock, causing a 9% drop in stock price within a day, from $38.87 per

23  share to $33.90 per share, with more than 13%, or almost six million shares, of FormFactor's stock

24  sold.

25         158.    On the next day, December 7, 2007, Douglas Reid ("Reid"), an analyst with Thomas

26  Weisel Partners issued an analyst report that FormFactor could face increased margin pressure in

27  2008.  Reid further noted that checks at a recent Semicon Japan trade show found that Advantest had

28

1  an advanced probe card under evaluation at Elpida, a chipmaker which accounted for 27% of

2  FormFactor's 3Q 2007 revenue.  According to Reid, Advantest planned to price its product 20%

3  below FormFactor's comparable offering.  The same analyst also noted that another FormFactor

4  rival, Micronics Japan Company Ltd., known as MJC, asserted that FormFactor had been engaging

5  in aggressive price cutting.

6  159.    Investors remained concerned over FormFactor's near-term execution issues,

7  especially the Company's technical and engineering issues related to its Harmony product release

8  (both DRAM and NAND Flash).  An analyst from Stifel Nicolaus issued a report on December 10,

9  2007, noting: "We are particularly concerned over the company's ability to deliver Harmony, as

10  customers could seek alternative solutions or force potential price concessions due to delays in

11  receiving product."

12  160.    During the February 5, 2008 conference call, the Company announced its 4Q 2007

13  and FY 2007 financial results.  The Company stated:

14  Quarterly revenues were $120.5 million, down 4% from $125.3 million in the third
quarter of fiscal 2007, and up 22% from $98.7 million in the fourth quarter of fiscal
15  2006.  Revenues for the fiscal year ended December 29, 2007 were $462.2 million,
up 25% from $369.2 million in fiscal year 2006.
16
                                        *        *        *
17
"Overall, 2007 was a solid year for FormFactor, with 25% annual revenue
18  growth, fueled by strong contributions from our Memory business.  ***Market
conditions, particularly in DRAM, began to deteriorate in Q4 and that weakness***
19  ***has continued in Q1," said Igor Khandros, CEO of FormFactor.  "In light of this,***
***we are taking actions to restructure the company to better align with the market***
20  ***environment."***

21  The company announced a cost reduction plan that will include reducing its
global workforce by approximately 14%.  FormFactor expects to record charges in
22  the range of $4.0-$5.0 million related to the cost reduction plan, with the majority of
the charges being recorded in the first quarter of fiscal 2008.
23
161.    During the conference call on February 5, 2008, defendant Khandros stated:
24
The year ended on a challenging note for FormFactor with fourth quarter
25  revenues decreasing 4% sequentially to $120.5 million. The slower fourth quarter
was largely due to the weakening market conditions and the early execution issues
26  associated with Harmony DRAM. DRAM remained FormFactor's most significant
contributor in 2007, responsible for more than half of the Company's growth. In the
27  fourth quarter, 70 nanometer DDR2 and 1 gigabit were the major drivers behind the
increase in DRAM revenues. ***However, our new product ramp challenges with***
28  ***Harmony resulted in missed opportunities with a few customers causing the***

*majority of the overall revenue shortfall in the quarter. We made significant progress in the manufacturing readiness of our Harmony DRAM product during the quarter having reduced lead times by 30% and shipped volume orders of this product to several customers.*

\*        \*        \*

*Due primarily to the market conditions as well as the delay in the Harmony RAM, FormFactor's DRAM bookings declined significantly. Our focus going forward has shifted to demand generation side of the equation as we work to regain our loss position with DRAM customers who could not wait for our Harmony products.* Although we have made significant progress in manufacturing our Harmony product, the precise timing of the market recovery is still uncertain. The competitive pressure we're experiencing is in the lower end wafer contact applications which is affecting pricing and margins in the near-term. For more complex high-end applications, we believe our products are differentiated, able to work in a wide temperature range in the smallest test size and pitch with the highest pin count in the industry.

As the market moves to sub-70 nanometer and DDR3 in the second half of 2008, the requirements for full wafer contact will become even more stringent, requiring the differentiated capabilities of our Harmony-based products.

\*        \*        \*

*Due to the protracted Harmony ramp issues we experienced in 2007, FormFactor was not the first full wafer contactor probe card company qualified at some DRAM suppliers. This resulted in thre loss of business in the fourth quarter which we believe the competition picked up at lower end DRAM applications.* With the recent improvement in our Harmony execution, we demonstrated our ability to manufacture the industry's most advanced full wafer contactor for high-volume production environments. For example, FormFactor has already delivered 40,000-pin probe cards. With the fundamental advantage of our 3-D technology over 2-D MEMS technologies, we believe FormFactor product is scalable for finer geometries and more complex architectures, such as DDR3 which will drive the wafer contactor market to more than 60,000 pins by second half of 2008.

\*        \*        \*

In summary, we are with witnessing extraordinary conditions in our business, but the long-term advanced probe card market drivers continue to point to growth at a rate faster than the rest of the semiconductor industry. Our products and technology are on the leading-edge and though we have experienced significant difficulties with our Harmony product ramp, we have learned invaluable lessons and will be a much stronger company for it.

162.    During the same conference call, defendant Foster provided a summary of FY 2007 and a review of the Company's 4Q 2007 results.  In particular, he stated:

I will now provide specific comments on our Q4 results. Revenues were $120.5 million, down 4% over the third quarter and up 22% versus Q4 '06. Weaker than expected order flow in the quarter reduced the amount of business that we had expected to book and turn in the quarter. DRAM revenues, which accounted for 75% of revenues in the fourth quarter, increased 10% sequentially to $90.2 million. Flash

revenues declined 38% sequentially to $19.9 million, representing 17% of revenues in the fourth quarter coming off a strong tooling cycle for NOR in Q3.

*       *       *

Fourth quarter bookings were unexpectedly weak at $93.9 million, a decrease of 25% over the third quarter and an increase of only 3% over the same period last year. **Although Flash and SoC bookings were up sequentially, DRAM bookings dropped 36% as some customers have delayed or canceled the purchases of probe cards to deal with severe margin problems**. The weak bookings led to a lighter than normal loading in our factory in the last month of the quarter and generated the lowest level of beginning backlog for the upcoming quarter since Q4 2005. Good execution and shortening cycle time enabled us to turn 62% of the bookings in the fourth quarter.

163.    Analysts on the call were skeptical of defendants' explanations. Jim Covello, from Goldman Sachs, immediately questioned whether the reduced guidance was a reflection of FormFactor's business versus the DRAM industry overall.  In response, defendant Khandros conceded that at least a third of the reduction in guidance for DRAM was to that "FormFactor, especially at one customer, [Constellation], but it's when the full wafer contractor demand was there, we did not compete due to Harmony introduction problems."

164.    Another analyst Timothy Arcuri from Citigroup, was even more skeptical.  He asked:

Obviously the issues with Harmony seem like they were not really capacity related, so it was not a shortage of your capacity as I think you were suggesting last call. It seems like the issue was more or is more product specific with maybe an architectural or a technical issue with the actual product. Can you go back and can you really detail what the specific issue was? Because I know last quarter, you were saying you did not have enough capacity, but it sounds like it was a product-specific issue. Maybe you can detail exactly what it was and maybe that would help must be convinced that it's behind you.

165.    Analyst Arcuri further inquired:

[T]here has been a lot of concerns about the competitive gap between your product and other folks' product narrowing.  However, some of that sounds like it was due to your own inability to actually build the product. So I guess, are there any recent examples that you can maybe point to that the new card is in the marketplace competing against the competition's card and at least recently has won based upon your newly found ability to actually build the card?

166.    Analyst Patrick Ho ("Ho") of Stifel Nicolaus ("Stifel") outright asked for clarification with Harmony. He asked:

Can you provide some clarity on the issues with Harmony? And I think Ron you mentioned the R&D will continue to be the focus for the Company. Are there still R&D and engineering issues that you're still trying to work out? Because I guess going back into just looking back at some of the previous quarters, you mentioned

1  that there were production capacity constraints. I think one quarter before that, there
2  were customer integration issues. Have all of the engineering issues been resolved, or
   is this something that could still linger over the next couple of quarters?

3  [I]s the incremental gain going to come from the market turnaround or your
   execution on the Harmony?

4

5  167.    Following the conference call, Reuter News issued a press release entitled:

6  "FormFactor Q04 revenue below view, cuts jobs." The press release stated:

7  FormFactor Inc. posted quarterly revenue below analysts' estimate, hurt by a
   deteriorating market for memory chips used in personal computers, and forecast a
   surprise first-quarter loss, sending shares down 24 percent in after-hours trading.

8

9                              *       *       *

10     For the first quarter, the company sees a loss of 10 cents to breakeven per
   share, excluding items, and revenue of $70 million to $80 million.  Including items, it
   expects a loss of 15 cents to 25 cents a share.

11

12     Analysts on average were looking for earnings of 34 cents a share, before
   items, on revenue of $124.1 million, according to Reuters Estimates.

13     168.    Upon these announcements, FormFactor's stock price dropped 25% in after market

14  hours, from $23.19 per share to $17.50 per share, closing at $21.06 per share at the end of February

15  6, 2008.  The stock price continued to drop, trading below $20.00 per share following the February

16  5, 2008 announcement, and has not rebounded since.

17     169.    Several analysts expressed that they were surprised by the Company's latest

18  announcements.  Ho of Stifel, commenting on the situation at FormFactor as "a total train wreck,"

19  issued a report entitled: "The Harmony 'House' is Crumbling . . . Can it be Rebuilt?"

20     Based on management's discussion and its outlook for the March quarter, we
   believe the situation with Harmony is significantly worse than we anticipated and it
21  is now at a critical point where we believe the company's vision for long term
   outperformance could be dramatically altered.

22                              *       *       *

23     Investment Conclusion – It's Not Just the Market but Serious Self Evaluation
24  is Needed, Maintain Hold Rating:  When we lowered out estimates ahead of earnings
   (see our note, FormFactor:  First Step is Getting the House in Order; Lowering
25  Estimates, Maintain Hold, January 22, 2008), we expected the company to
   experience some near term weakness in its core DRAM probe card business, but
26  noted that the key for the company's growth still depended on getting its "house in
   order," particularly in terms of the ramp of its new Harmony product.  Based on
27  management's discussion and its outlook for the March quarter, *we believe the
   situation with Harmony is significantly worse than we anticipated and it is now at*
28  *a  critical  point  where  we  believe  the  company's  vision  for  long  term*

PLAINTIFFS' FIRST AMENDED COMPLAINT - C-07-05545-SI                              - 78 -

***outperformance could be dramatically altered***.  The company once again noted that it was experiencing manufacturing issues (following last quarter's capacity constraint reason and before that, customer integration problems) and that this was the cause for not only share loss but a decline in near term revenues.  Although the near term problems are exacerbated by a weak DRAM market, we are increasingly concerned that these Harmony issues will have long term negative implications for: 1) pricing, 2) margins, 3) revenues and 4) competitive positioning.  While these ramifications will not be apparent immediately, in our opinion, there is significant risk to the company's long term growth model.  ***In addition to the problems related to Harmony, after several quarters of management's commentary about these "issues" we admittedly have a low level of confidence in management's credibility and its ability to correct whatever it is that is hindering its volume ramp***.  We expect the stock to be under severe pressure in Wednesday trading (down 25%+ in Tuesday after market hours).  While we have deep concerns over the company's fundamentals (and its ability to recover at this point), we will maintain our Hold rating based solely on valuation (2.0x cash per share at the close; 1.5x in after hours).  We would generally avoid the name until we believe that there is some prospect that the company has these Harmony issues under control.

*     *     *

Ramp of Harmony (of Lack Thereof) is the Crux of the Problem:  What we found as a major surprise was the continued missteps in its Harmony ramp, which we believe is a larger contributor to the weak outlook than the company detailed on its conference call.  Management noted that it missed a design with a DRAM supplier at the 70nm node, which was another reason for the slight shortfall in revenues for 4Q07 and its March quarter outlook.  However, we believe these issues have lingered for some time, and if anything, have become increasingly frustrated for investors.  In our opinion, there appears to be new issues that pop up every quarter related to Harmony (two quarters ago it was customer integration, last quarter capacity constraints, this quarter, manufacturing issues), and more importantly, no solution to these problems. . . we believe the difficulties in the ramp of its Harmony product is a larger contributor to the company's outlook than management's view (management cited that its weak outlook was 2/3rd related to the market and 1/3rd related to Harmony).  We believe that this issue (and its resolution) will be the crux for the company for both the near term and its long term growth strategy.

170.    Gary Hsueh, an analyst at Oppenheimer, also reported:

As feared, issues with Harmony have had less to do with supply-side dynamics (*i.e.* capacity shortages created by unexpected manufacturing issues) as suggested by management when it guided below Street consensus for Q4 (back in Oct. '07).  Now, with a slight miss ($120M) to Q4 revenue expectation of $123-$125M, and extremely grim outlook for Q1 ($70-$80M), ***it is becoming clear that FORM's chronic issues with its 300mm, full-contact wafer probe card, Harmony, have led to meaningful market share loss***. . . .  However, our checks suggest that manifestation of share loss is not entirely in the rear-view mirror for FORM: industry data points indicate FORM's supply contract with its largest customer, Elpida (20-30% of revenue in '07), expires at the end of March '08, opening the door for Mirconics Japan Corp. (MJC, 6871, ¥3,300) to sign on/gain share as a second-source supplier to FORM.

To compound FORM specific issues transitioning over to its Harmony platform, the memory industry, specifically DRAM, is facing numerous issues that are hampering Y/Y growth in wafer probe card growth.

1                                    *        *        *

2           In light of the dismaying guidance for Q1 (March), we are chopping our
    FY08 estimate on FORM down to $0.67 from $1.60 previously.  At this point, our
3   revenue forecast calls for a 15% Y/Y decline, despite management's comment that it
    sees the advanced wafer probe card market outgrowing the broader semiconductor
4   industry. . . . Given uncertainty regarding FORM's share in '08, we find it prudent to
    model a 15% Y/Y decline in revenue in '08, vs. +19% previously.

5

6           171.    Raj Seth, an analyst from Cowen and Company, also issued a report entitled: "Huge

7   miss-much worse than anyone dared guess:"

8           FORM missed badly last night and left many questions unanswered.  The stock will
    likely get killed.  FORM missed Q4 (no pre-announcement?) and guided Q1 revs
9   40% below expectations. . . .  FORM blamed "unusual/horrible" conditions in
    DRAM (70% of revs) for the outlook but acknowledged some shares loss with one
10  major customer as a result of continued issues with their Harmony next gen DRAM
    probe card. . . .  Barring a bounce off the bottom, FORM looks to be dead money till
11  they show evidence of renewed growth.  After hours, the stock was indicated around
    1.5x cash ($18)!  No reason to downgrade here but make no mistake, we think few
12  should bother ST till [sic] until we get better clarity on what's happened.

13          172.    On February 27, 2008, FormFactor filed its Form 10-K for FY 2007.  The Company

14  belatedly admitted:

15          In addition, while we have successfully qualified and delivered certain Harmony
    architecture-based wafer probe cards that are being used by some of our customers in
16  commercial volume for testing semiconductor devices and reduced manufacturing
    lead times, *we are continuing to experience the effects of the new product*
17  *execution challenges for our Harmony-based products that we experienced in*
    *fiscal 2007, which have contributed to a more difficult competitive environment*.
18  To better align our company with the market environment, we announced on
    February 5, 2008 our commitment to implement a cost reduction plan that will
19  include reducing our global workforce by approximately 14%.

20  IX.     **ADDITIONAL INDICIA OF SCIENTER**

21          173.    While defendants were issuing the fraudulent statements identified herein about

22  FormFactor's financial results and business, the Individual Defendants sold at least 767,879 shares

23  of FormFactor stock, pocketing more than $29.76 million in insider trading proceeds.

24  Notwithstanding the Individual Defendants' knowledge regarding the on-going fraud and their duties

25  as officers of the Company to disclose adverse material facts before trading in FormFactor stock, the

26  Individual Defendants personally profited from the artificial inflation in FormFactor's stock price

27  which their fraudulent scheme created.

28

174.    The Individual Defendants were remarkably successful in timing their trades, capturing peak prices when selling. The trading price for FormFactor stock since February 5, 2008, after defendants' fraud was revealed, has been below $20.00 per share.  In sharp contrast, the Individual Defendants unloaded their stock at prices as high as $46.05 per share. Both the timing and volume of their trades were suspicious.

175.    Defendant Bronson sold 25,000 shares, or 36.83% of his FormFactor holdings, at $41.33 per share, pocketing $1,033,250 in insider trading proceeds.  His reported insider trading during the Class Period is as follows:

| Last Name | First Name | Date | Shares | Price | Proceeds | Stock Holdings | % Sold |
|-----------|-----------|------|--------|-------|----------|----------------|--------|
| Bronson | Joseph | 5/1/2006 | 25,000 | $41.33 | $1,033,250 | 42,887 | 36.83% |

176.    Defendant Foster sold 19,800 shares, or 87.29% of his FormFactor holdings, averaging $43.64 per share, pocketing $864,144 in insider trading proceeds.  His reported insider trading during the Class Period is as follows:

| Last Name | First Name | Date | Shares | Price | Proceeds | Stock Holdings | % Sold |
|-----------|-----------|------|--------|-------|----------|----------------|--------|
| Foster | Ronald | 8/3/2006 | 1,800 | $43.00 | $77,400 | | |
| | | 9/1/2006 | 1,800 | $48.33 | $86,994 | | |
| | | 10/4/2006 | 1,800 | $43.00 | $77,400 | | |
| | | 2/1/2007 | 5,000 | $43.00 | $215,000 | | |
| | | 3/1/2007 | 4,000 | $43.00 | $172,000 | | |
| | | 4/2/2007 | 1,800 | $44.75 | $80,550 | | |
| | | 5/2/2007 | 1,800 | $43.00 | $77,400 | | |
| | | 6/15/2007 | 1,800 | $43.00 | $77,400 | | |
| | | **Total:** | 19,800 | | $864,144 | 2,883 | 87.29% |

177.    Defendant Khandros sold 723,079 shares of his FormFactor stock for insider trading proceeds of $27,866,751. Specifically, he made 32 transactions in September and October 2007, at no less than $43.00 per share, before the Company started to leak out bad news.  On average, his insider trading shares were sold for $38.54 per share during the Class Period.  His reported insider trading during the Class Period is as follows:

| Last Name | First Name | Date | Shares | Price | Proceeds | Stock Holdings | % Sold |
|---|---|---|---|---|---|---|---|
| Khandros | Igor | 2/1/2006 | 18,243 | $30.50 | $556,412 | | |
| | | 2/1/2006 | 100 | $30.56 | $3,056 | | |
| | | 2/2/2006 | 75,000 | $37.58 | $2,818,500 | | |
| | | 2/3/2006 | 71,800 | $35.78 | $2,569,004 | | |
| | | 2/3/2006 | 1,400 | $35.50 | $49,700 | | |
| | | 2/3/2006 | 1,000 | $35.75 | $35,750 | | |
| | | 2/3/2006 | 600 | $35.90 | $21,540 | | |
| | | 2/3/2006 | 100 | $35.52 | $3,552 | | |
| | | 2/3/2006 | 100 | $35.80 | $3,580 | | |
| | | 2/6/2006 | 28,286 | $35.50 | $1,004,153 | | |
| | | 2/15/2006 | 50,000 | $37.93 | $1,896,500 | | |
| | | 2/16/2006 | 40,000 | $37.43 | $1,497,200 | | |
| | | 2/16/2006 | 10,000 | $37.60 | $376,000 | | |
| | | 2/17/2006 | 15,000 | $38.86 | $582,900 | | |
| | | 2/17/2006 | 15,000 | $38.90 | $583,500 | | |
| | | 2/17/2006 | 10,000 | $39.00 | $390,000 | | |
| | | 2/17/2006 | 5,000 | $38.75 | $193,750 | | |
| | | 2/17/2006 | 5,000 | $38.80 | $194,000 | | |
| | | 2/21/2006 | 7,500 | $38.35 | $287,625 | | |
| | | 2/21/2006 | 5,000 | $38.36 | $191,800 | | |
| | | 2/21/2006 | 5,000 | $38.40 | $192,000 | | |
| | | 2/21/2006 | 5,000 | $38.47 | $192,350 | | |
| | | 2/21/2006 | 5,000 | $38.50 | $192,500 | | |
| | | 2/21/2006 | 2,500 | $38.46 | $96,150 | | |
| | | 3/15/2006 | 15,000 | $37.70 | $565,500 | | |
| | | 3/15/2006 | 15,000 | $37.72 | $565,800 | | |
| | | 3/15/2006 | 10,000 | $37.55 | $375,500 | | |
| | | 3/15/2006 | 10,000 | $37.62 | $376,200 | | |
| | | 3/16/2006 | 20,000 | $37.90 | $758,000 | | |
| | | 3/16/2006 | 10,000 | $37.00 | $370,000 | | |
| | | 3/16/2006 | 10,000 | $37.05 | $370,500 | | |
| | | 3/16/2006 | 5,000 | $37.15 | $185,750 | | |
| | | 3/16/2006 | 5,000 | $37.40 | $187,000 | | |
| | | 3/17/2006 | 50,000 | $35.22 | $1,761,000 | | |
| | | 3/20/2006 | 15,000 | $35.50 | $532,500 | | |
| | | 3/20/2006 | 5,000 | $35.52 | $177,600 | | |
| | | 3/20/2006 | 5,000 | $35.62 | $178,100 | | |
| | | 3/20/2006 | 5,000 | $35.72 | $178,600 | | |
| | | 4/17/2006 | 25,000 | $40.00 | $1,000,000 | | |
| | | 4/17/2006 | 5,000 | $39.90 | $199,500 | | |
| | | 4/17/2006 | 5,000 | $39.92 | $199,600 | | |
| | | 4/17/2006 | 5,000 | $40.22 | $201,100 | | |
| | | 8/30/2006 | 20,000 | $49.00 | $980,000 | | |
| | | 6/15/2007 | 10,000 | $43.00 | $430,000 | | |
| | | 6/18/2007 | 1,400 | $43.00 | $60,200 | | |
| | | 8/8/2007 | 10,000 | $43.00 | $430,000 | | |
| | | 8/17/2007 | 10,000 | $43.68 | $436,800 | | |
| | | 9/4/2007 | 40,000 | $46.00 | $1,840,000 | | |
| | | 9/17/2007 | 5,276 | $46.00 | $242,696 | | |

| Last Name | First Name | Date | Shares | Price | Proceeds | Stock Holdings | % Sold |
|---|---|---|---|---|---|---|---|
| | | 9/17/2007 | 4,414 | $46.03 | $203,176 | | |
| | | 9/17/2007 | 2,860 | $46.01 | $131,589 | | |
| | | 9/17/2007 | 1,900 | $46.02 | $87,438 | | |
| | | 9/17/2007 | 1,288 | $45.18 | $58,192 | | |
| | | 9/17/2007 | 1,000 | $45.20 | $45,200 | | |
| | | 9/17/2007 | 900 | $45.17 | $40,653 | | |
| | | 9/17/2007 | 800 | $45.15 | $36,120 | | |
| | | 9/17/2007 | 800 | $46.06 | $36,848 | | |
| | | 9/17/2007 | 700 | $45.28 | $31,696 | | |
| | | 9/17/2007 | 600 | $46.04 | $27,624 | | |
| | | 9/17/2007 | 500 | $45.28 | $22,640 | | |
| | | 9/17/2007 | 400 | $45.14 | $18,056 | | |
| | | 9/17/2007 | 400 | $46.05 | $18,420 | | |
| | | 9/17/2007 | 400 | $46.07 | $18,428 | | |
| | | 9/17/2007 | 300 | $45.13 | $13,539 | | |
| | | 9/17/2007 | 300 | $45.16 | $13,548 | | |
| | | 9/17/2007 | 300 | $45.22 | $13,566 | | |
| | | 9/17/2007 | 300 | $45.23 | $13,569 | | |
| | | 9/17/2007 | 200 | $45.12 | $9,024 | | |
| | | 9/17/2007 | 200 | $45.26 | $9,052 | | |
| | | 9/17/2007 | 200 | $45.29 | $9,058 | | |
| | | 9/17/2007 | 200 | $45.32 | $9,064 | | |
| | | 9/17/2007 | 200 | $45.35 | $9,070 | | |
| | | 9/17/2007 | 112 | $45.37 | $5,081 | | |
| | | 9/17/2007 | 100 | $45.11 | $4,511 | | |
| | | 9/17/2007 | 100 | $45.17 | $4,517 | | |
| | | 9/17/2007 | 100 | $45.31 | $4,531 | | |
| | | 9/17/2007 | 100 | $45.33 | $4,533 | | |
| | | 9/17/2007 | 100 | $45.40 | $4,540 | | |
| | | 10/16/2007 | 10,000 | $43.00 | $430,000 | | |
| | | **Total:** | **723,079** | | **$27,866,751** | 2,300,999 | 23.91% |

178.     In addition to the strong motivation provided by lucrative insider selling, the Individual Defendants were highly motivated by the terms of their employment agreements, which tied their compensation directly to FormFactor's reported financial results and the performance of the Company's stock.  A large portion of each of the Individual Defendants' compensation package was dependent upon FormFactor posting favorable financial results.  In addition to maintaining their employment positions, the personal wealth of each Individual Defendant was dramatically enhanced by the reported business and business performance of FormFactor, as well as the Company's stock price and market capitalization, all of which were inflated by defendants' misleading statements and material omissions.

| Name | Year Salary | Stock Awards | Option Awards | Non-Equity | All Other Incentive Plan Compensation | Compensation |
|---|---|---|---|---|---|---|
| Igor Y. Khandros | 2006 $436,835 | $127,548 | $1,324,428 | $572,000 | $27,326 | $2,488,137 |
| | 2007 $500,000 | | | | | |
| Joseph R. Bronson | 2006 $400,020 | $241,700 | $1,210,645 | $523,515 | $66,900 | $2,442,780 |
| Ronald C. Foster | 2006 $285,962 | | $484,310 | $261,993 | $22,869 | $1,055,134 |
| | 2007 $310,000 | | | | | |
| Richard Freeman | 2007[2] $330,000 | | | | | |

## X.    FORMFACTOR'S FALSE FINANCIAL REPORTING DURING THE CLASS PERIOD

179.    In order to inflate the price of FormFactor's stock, defendants caused the Company to falsely report its results for 2006 and the first half of 2007 through improperly accounting for its inventory, including its inventory valuation and the related cost of revenue accounts, which misstated the Company's reported inventory, gross margin and net income.  The Company has restated its previously issued financial results due to these accounting violations.

180.    The results for FY 2006 and for 1Q 2007 and 2Q 2007 were included in a Form 10-K and Form 10-Q's filed with the SEC.  The results were also included in press releases disseminated to the public.

181.    FormFactor has now admitted that its previous financial statements were not fair presentations of FormFactor's results and were presented in violation of GAAP and SEC rules.

182.    GAAP are the principles recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practices at a particular time.  SEC Regulation S-X (17 C.F.R. §210.4-01(a)(1)) states that financial statements filed with the SEC, which are not prepared in compliance with GAAP, are presumed to be misleading and inaccurate,

---

[2]    Defendant Freeman's other executive compensation was not reported.

1   despite footnotes or other disclosures.  SEC Regulation S-X requires that interim financial

2   statements must also comply with GAAP, with the exception that interim financial statements need

3   not include disclosures which would be duplicative of disclosures accompanying annual financial

4   statements.  17 C.F.R. §210.10-01(a).

5       **A.    Improper Accounting for its Inventory Valuation**

6       183.    During the Class Period, FormFactor improperly accounted for its inventory valuation

7   and the related cost of revenue accounts in violation of GAAP, causing its inventory to be overstated

8   and its gross margin and net income to be misstated.

9       184.    Inventory pricing is based upon acquisition and production costs.  A company's

10  inventory costs represent the expenses related to labor, raw materials and manufacturing overhead

11  involved in its production process.  As goods are sold, the inventory costs associated with those

12  goods are matched against the revenue and included as costs of revenue and written off in the period

13  the revenue is recognized.  Statement of Financial Accounting Standard ("SFAS") No. 151, ¶2,

14  *Inventory Costs*; Accounting Research Bulletin ("ARB") No. 43, Chapter 4, ¶¶1-6, *Inventory Costs*.

15      185.    The reported amount of inventory of a Company's balance sheet is also registered to

16  reflect diminishment in value due to obsolescence or excess inventory relative to sales.  Excess or

17  obsolete inventory is to be written off as a current period charge in the period in which it occurs

18  through cost of revenues.  SFAS No. 151, ¶2; ARB No. 43, Chapter 4, ¶¶1-6.

19      186.    During the Class Period, FormFactor improperly accounted for its inventory valuation

20  by failing to timely write off excess and obsolete inventory.  This GAAP violation resulted in a

21  material overstatement of FormFactor's inventory on its balance sheet and a material misstatement

22  of its provision for excess and obsolete inventory on its income statement during the Class Period.

23  FormFactor has restated its financial statements to correct for its improper accounting for excess and

24  obsolete inventory.

25      187.    For year end 2006 and for 1Q 2007 and 2Q 2007, FormFactor's inventory was

26  overstated by $5.9 million or 30.9%, by $5.3 million or 23.8% and by $1.6 million or 5.2%,

27  respectively.  Additionally, this GAAP violation resulted in a material misstatement of FormFactor's

28  cost of revenues, gross margin, net income and EPS during the Class Period.

188.    The following charts show the impact the inventory valuation issue had on FormFactor's reported financial results:

**Restatement**
(in thousands except for EPS)

| | 1Q 06 | 2Q 06 | 3Q 06 | 4Q 06 | FY 06 | 1Q 07 | 2Q 07 |
|---|---|---|---|---|---|---|---|
| **As Originally Reported** | | | | | | | |
| Inventory | 21,098 | 24,057 | 26,317 | 24,778 | 24,778 | 27,460 | 32,004 |
| Provision for excess and obsolete inventory | 3,433 | 2,651 | 3,138 | 3,217 | 12,439 | 2,725 | 3,054 |
| Inventory provision as a % of revenue | 4.22% | 2.87% | 3.24% | 3.26% | 3.37% | 2.66% | 2.68% |
| | | | | | | | |
| **As Restated** | | | | | | | |
| Inventory | 20,041 | 21,885 | 23,059 | 18,926 | 18,962 | 22,190 | 30,439 |
| Provision for excess and obsolete inventory | 4,535 | 3,337 | 4,145 | 5,581 | 17,598 | 2,527 | 2,707 |
| Inventory provision as a % of revenue | 5.58% | 3.61% | 4.28% | 5.65% | 4.77% | 2.47% | 2.37% |
| | | | | | | | |
| **Adjustments** | | | | | | | |
| Overstatement in Inventory | (1,057) | (2,172) | (3,258) | (5,852) | (5,852) | (5,273) | (1,575) |
| **% of Inventory Overstatement** | **5.27%** | **9.92%** | **14.13%** | **30.92%** | **30.92%** | **23.76%** | **5.18%** |
| Provision for excess and obsolete inventory | (1,102) | (686) | (1,007) | (2,364) | (5,159) | 198 | 347 |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15



16      189.    Additionally, as a result of the Company's failure to properly account for its

17 inventory valuation, the Company further failed to properly account for the amount of stock-based

18 compensation which should have been capitalized into inventory.  Defendants' failure to include

19 these costs misstated FormFactor's inventory value and the related cost of revenues accounts.

20      190.    In the case of stock-based compensation paid to employees who were engaged in the

21 manufacturing process, the costs associated with the stock-based compensation should be initially

22 capitalized into inventory and later recognized in the income statement as cost of revenues when the

23 associated inventory is disposed of or consumed.  SFAS No. 123R, ¶5, *Share-Based Payment*.

24 Certain fixed costs, such as labor and manufacturing overhead including stock-based compensation,

25 are allocated to inventory items based upon the value of the inventory produced in a given period.

26      191.    Nonetheless, in the Company's 2006 restated Form 10-K/A, the Company admitted

27 that it "did not consistently follow its accounting policies for valuing inventory resulting in ***material***

28 ***misstatement of inventory and cost of revenue***. The change in inventory valuation impacted the

1    amount of stock based compensation capitalized into inventory due to the change in inventory

2    turns." This GAAP violation resulted in a material misstatement of FormFactor's inventory, cost of

3    revenues, gross margins and net income during the Class Period.

4          **B.**      **Improper Transfer of Scrap to Research and Development**

5          192.    During the Class Period, defendants manipulated the Company's reported gross

6    margin by improperly accounting for excess and obsolete inventory as R&D costs instead of as cost

7    of revenues. This manipulation caused the Company's cost of revenues to be understated and its

8    gross margin to be overstated.

9          193.    Gross margin represents a company's revenue for a period minus the associated cost

10    of revenues. For a manufacturing type of company, such as FormFactor, gross margin is a key

11    performance indicator of a company's operations. It is a leading metric of profitability and is useful

12    in analyzing how efficiently a company is using its raw materials, labor and manufacturing-related

13    fixed assets to generate profit.

14          194.    R&D costs are costs associated with activities that a company engages in aimed at the

15    discovery of new knowledge that can either lead to the development of new products or procedures

16    or to the improvement of existing products or procedures. Only costs associated with these types of

17    activities should be classified as R&D costs. R&D costs are required to be charged to expense when

18    incurred. A company is required to disclose in its financial statements the amount of R&D that it

19    charges to expense. SFAS No. 2, ¶¶ 8-14, *Accounting for Research and Development Costs*.

20          195.    R&D is important as it is one of the metrics investors consider as far as evaluating the

21    likelihood of future growth in a company. While all expenses reduce reported income, R&D is

22    viewed differently than other expenses. For a high-tech company, such as FormFactor, R&D is

23    especially important for a company to be able to gain or maintain a competitive edge and succeed in

24    the industry. Indeed, throughout the Class Period, the Company touted the importance of its R&D

25    spending on maintaining a competitive edge. The Company's 2006 Form 10-K provided in pertinent

26    part the following concerning FormFactor's R&D spending;

27

28

Research, Development and Engineering

The semiconductor industry is subject to rapid technological change and new product introductions and enhancements. We believe that our continued commitment to research and development and our timely introduction of new and enhanced wafer probe test solutions and other technologies related to our MicroSpring interconnect technology are integral to maintaining our competitive position. We continue to invest considerable time and resources in creating structured processes for undertaking, tracking and completing our development projects, and plan to implement those developments into new product or technology offerings. We continue to allocate significant resources to these efforts and to use automation and information technology to provide additional efficiencies in our research and development activities.

We have historically devoted approximately 11% to 16% of our revenues to research and development programs. Research and development expenses were $46.6 million for fiscal 2006, $28.3 million for fiscal 2005, and $20.6 million for fiscal 2004.

196. The 2006 Form 10-K further disclosed the following as a risk factor concerning the Company's business, financial conditions and results of operations:

**If we do not innovate and keep pace with technological developments in the semiconductor industry, our products might not be competitive and our revenues and operating results could suffer.**

We must continue to innovate and to invest in research and development to improve our competitive position and to meet the needs of our customers. Our future growth depends, in significant part, upon our ability to work effectively with and anticipate the testing needs of our customers, and on our ability to develop and support new products and product enhancements to meet these needs on a timely and cost-effective basis. . . . Our customers expect that they will be able to integrate our wafer probe cards into any manufacturing process as soon as it is deployed. Therefore, to meet these expectations and remain competitive, we must continually design, develop and introduce on a timely basis new products and product enhancements with improved features. Successful product design, development and introduction on a timely basis require that we:

- design innovative and performance-enhancing product architectures, technologies and features that differentiate our products from those of our competitors;

- transition our products to new manufacturing technologies;

- identify emerging technological trends in our target markets;

- maintain effective marketing strategies;

- respond effectively to technological changes or product announcements by others; and

- adjust to changing market conditions quickly and cost-effectively.

PLAINTIFFS' FIRST AMENDED COMPLAINT - C-07-05545-SI                    - 89 -

1        We must devote significant research and development resources to keep up with the rapidly evolving technologies used in semiconductor manufacturing processes.

2

3       197.   In order to preserve the Company's gross margins and make it appear as if the Company was adequately spending its resources on R&D, defendants caused FormFactor to improperly transfer the cost associated with scrap that accumulated because of the poor yields from engineering, which is a part of the manufacturing department, to the R&D department and, thereafter, treat the scrap as a R&D expense.  According to GAAP, scrap material should have been treated as excess or obsolete inventory and written off through cost of revenues.  SFAS No. 151, ¶2; ARB No. 43, Ch. 4, ¶¶1-6.

4

5

6

7

8

9

10      198.   The Company transferred the scrap out of the engineering department in order to improve its margins on product sales by reducing its current period cost of revenues expense.  The scrap material transferred to R&D was derived from efforts to produce a product that was already being sold to customers and not related to the production of any new products.  This transfer of costs was improper as it was not related to an actual R&D expenditure.  Most of the scrap material was simply transferred to R&D and written off.  In limited circumstances, the Company performed a few experiments on the scrap in an effort to determine the reason for the failure.  Nonetheless, FormFactor gained little, if any, value or insight from the testing.  Moreover, the scrap material itself, and any costs associated with the limited testing, did not in any way lead to the development of a new product or procedure or even lead to the improvement of an existing product or procedure.  As a result, the costs associated with the scrap did not qualify as a R&D expense under GAAP, and should have been written off through the Company's cost of revenues.

11

12

13

14

15

16

17

18

19

20

21

22      199.   By improperly transferring scrap inventory from the engineering department to the R&D department, FormFactor was able to (i) overstate its gross margin and, hence, make it appear that the Company was effectively managing its raw materials and (ii) overstate its R&D spending and, hence, make it appear that the Company was engaging in extensive R&D in order to remain competitive in the high-tech semiconductor industry.

23

24

25

26

27

28

1

## C.    FormFactor's Restatement Is an Admission of Falsity

2       200.    As a result of FormFactor's improper accounting practices with respect to inventory,

3   the Company has restated its FY 2006 and 1Q 2007 and 2Q 2007 financial statements.  The fact that

4   FormFactor has restated its financial statements is an admission that:

5               (a)    the financial results originally issued prior to and during the Class Period and

6   its public statements regarding those results were materially false and misleading;

7               (b)    the financial statements reported prior to and during the Class Period were

8   incorrect based on information available to defendants at the time the results were originally

9   reported; and

10              (c)    the financial statements can no longer be relied upon as being accurate.

11      The SEC has reiterated its position regarding restatements:

12   [T]he Commission often seeks to enter into evidence restated financial statements,
     and the documentation behind those restatements, in its securities fraud enforcement
13   actions in order, *inter alia, to prove the falsity and materiality of the original
     financial statements [and] to demonstrate that persons responsible for the original
14   misstatements acted with scienter*.

15   *In re Sunbeam Sec. Litig.*, No. 98-8258-Civ.-Middlebrooks, Brief of the United States Securities and

16   Exchange Commission as *Amicus Curiae* Regarding Defendants' Motions *In Limine* to Exclude

17   Evidence of the Restatement and Restatement Report at 1 (S.D. Fla. Feb. 22, 2002).

18      201.    The fact that FormFactor has restated its financial statements is an admission that the

19   financial statements originally issued were false and that the misstatements of its income and assets

20   was material. Pursuant to GAAP, as set forth in APB No. 20, the type of restatement announced by

21   FormFactor was to correct material errors in its previously issued financial statements.  *See* APB No.

22   20, ¶¶7-13.  Moreover, SFAS No. 154, *Accounting Changes and Error Corrections*, states: "Any

23   error in the financial statements of a prior period discovered subsequent to their issuance shall be

24   reported as a prior-period adjustment by restating the prior-period financial statements."  SFAS No.

25   154, ¶25.  Thus, GAAP provides that financial statements should be restated in order to correct an

26   error in previously issued financial statements.  FormFactor's possible restatement is due to an error

27   with respect to accounting for inventory.  Thus, the restatement would be an admission by

28

FormFactor that its previously issued financial results and its public statements regarding those results were false.

**D.    FormFactor's Financial Statements Violated Fundamental Concepts of GAAP**

202.    Due to these accounting improprieties, the Company presented its financial results and statements in a manner which violated GAAP, including the following fundamental accounting principles:

(a)    The principle that interim financial reporting should be based upon the same accounting principles and practices used to prepare annual financial statements was violated (APB No. 28, ¶10);

(b)    The principle that financial reporting should provide information that is useful to present and potential investors and creditors and other users in making rational investments, credit and similar decisions was violated (SFAS No. 1, ¶34);

(c)    The principle that financial reporting should provide information about the economic resources of an enterprise, the claims to those resources and effects of transactions, events and circumstances that change those resources and claims to those resources was violated (SFAS No. 1, ¶40);

(d)    The principle that financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners (stockholders) for the use of enterprise resources entrusted to it was violated.  To the extent that management offers securities of the enterprise to the public, it voluntarily accepts wider responsibilities for accountability to prospective investors and to the public in general (SFAS No. 1, ¶50);

(e)    The principle that financial reporting should provide information about an enterprise's financial performance during a period was violated.  Investors and creditors often use information about the past to help in assessing the prospects of an enterprise.  Thus, although investment and credit decisions reflect investors' expectations about future enterprise performance, those expectations are commonly based, at least partly, on evaluations of past enterprise performance (SFAS No. 1, ¶42);

1    (f)    The principle that financial reporting should be reliable in that it represents

2  what it purports to represent was violated.  That financial information should be reliable as well as

3  relevant is a notion that is central to accounting (SFAS No. 2, ¶¶58-59);

4    (g)    The principle of completeness, which means that nothing is left out of the

5  information that may be necessary to ensure that it validly represents underlying events and

6  conditions was violated (SFAS No. 2, ¶79); and

7    (h)    The principle that conservatism be used as a prudent reaction to uncertainty to

8  try to ensure that uncertainties and risks inherent in business situations are adequately considered

9  was violated.  The best way to avoid injury to investors is to try to ensure that what is reported

10  represents what it purports to represent (SFAS No. 2, ¶¶95, 97).

11    203.    Further, the undisclosed adverse information concealed by defendants during the

12  Class Period is the type of information which, because of SEC regulations, regulations of the

13  national stock exchanges and customary business practices, is expected by investors and securities

14  analysts to be disclosed and is known by corporate officials and their legal and financial advisors to

15  be the type of information which is expected to be and must be disclosed.

16    **E.    Defendants Certified False and Misleading Financial Results**

17    204.    Defendants Khandros and Foster knowingly certified the following false and

18  misleading financial statements during the Class Period:

19
20
21
22
23

| SCHEDULE OF CERTIFIED FINANCIAL STATEMENTS | | | | |
|---|---|---|---|---|
| Financial Statement Filed | Filing Period | Filing Date | Signed/Certified by | |
| | | | CEO | CFO |
| Form 10-Q | 3/31/06 | 5/11/06 | Khandros | Foster |
| Form 10-Q | 6/30/06 | 8/09/06 | Khandros | Foster |
| Form 10-Q | 9/30/06 | 11/07/06 | Khandros | Foster |
| Form 10-K | 12/31/06 | 2/26/07 | Khandros | Foster |
| Form 10-Q | 3/31/07 | 5/07/07 | Khandros | Foster |
| Form 10-Q | 6/30/07 | 8/07/07 | Khandros | Foster |

24    205.    These financial statements were not in accordance with GAAP and SEC rules.

25  Section 302 of Sarbanes-Oxley, SEC Rules 13a-14(a) and 15d-14(a) of the 1934 Act required

26  defendant Khandros as CEO and Foster as CFO to certify to the SEC and investors both the fairness

27  of the financial information in each quarterly and annual report.  Defendants Khandros and Foster

28

were required to certify that the financial statements and other financial information included in the reports were fairly presented in all material respects.  Defendants Khandros and Foster also stated that the reports did not contain any untrue statements of material fact or omit to state a material fact.  In addition, defendants Khandros and Foster stated that FormFactor has established and maintained disclosure controls and procedures sufficient to ensure that the financial and non-financial information required to be disclosed in SEC reports was recorded, processed, summarized and reported within the specified time periods.  *See* Exhibits 1-2, attached hereto.

206.    Defendants Khandros and Foster knowingly certified misleading and inaccurate financial statements that were not in accordance with GAAP and SEC rules.  In accordance with §906 of Sarbanes-Oxley and 18 U.S.C. §1350, defendants Khandros and Foster were required to certify each periodic report that includes financial statements.  Their signed certifications falsely stated that:  (i) the report fully complied with the requirements of §13(a) or §15(d) of the 1934 Act; and (ii) the information contained in the report fairly presented, in all material respects, the financial condition and results of operations of FormFactor.  *See* Exhibit 3, attached hereto.

207.    On the dates noted in the Schedule of Certified Financial Statements at ¶204 above, defendants Khandros and Foster signed and filed with the SEC certifications under SEC Rules 13a-14(a)/15d-14(a) of the 1934 Act and §906 of Sarbanes-Oxley attesting to the accuracy and truthfulness of the corresponding Forms 10-K and 10-Q for FormFactor.  At the time defendants Khandros and Foster signed these certifications, they knew or recklessly disregarded that they were false for the reasons alleged herein.

F.    **FormFactor's Violations of SEC Regulations Due to Inadequate Internal Controls**

208.    Throughout the Class Period, defendants were able to cause the Company to issue materially false and misleading financial statements by means of circumventing and failing to establish and maintain adequate internal accounting controls over financial reporting relating to its inventory valuation and accounting for its cost of revenues. Section 13(b)(2) of the 1934 Act states, in pertinent part, that every reporting company must:

1

    (A)    make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer;

2

3

    (B)    devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that –

4

    \*        \*        \*

5

    (ii)    transactions are recorded as necessary . . . to permit preparation of financial statements in conformity with [GAAP].

6

7

15 U.S.C. §78m(b)(2)(A)-(B).

8

    209.    These provisions require an issuer to employ and supervise reliable personnel, to

9

maintain reasonable assurances that transactions are executed as authorized, to properly record

10

transactions on an issuer's books and, at reasonable intervals, to compare accounting records with

11

physical assets. *SEC v. World-Wide Coin Inv.*, 567 F. Supp. 724, 746 (N.D. Ga. 1983).

12

    210.    Defendants caused FormFactor to violate §13(b)(2)(A) of the 1934 Act by failing to

13

maintain accurate records.  FormFactor's inaccurate and false records were not isolated or unique

14

instances because they were improperly maintained for multiple reporting periods.  Accordingly,

15

FormFactor violated §13(b)(2)(A) of the 1934 Act.

16

    211.    In addition, defendants caused FormFactor to violate §13(b)(2)(B) of the 1934 Act by

17

failing to implement procedures reasonably designed to prevent accounting irregularities.

18

FormFactor failed to ensure that proper review and checks were in place to ensure that it was

19

recording and properly reporting accounting for its inventory valuation and its related cost of

20

revenue accounts.  In fact, despite knowing the true dismal state of the Company's lack of adequate

21

controls, defendants regularly issued quarterly financial statements throughout the Class Period,

22

without ever disclosing the deficiencies in FormFactor's internal accounting controls and falsely

23

asserting that its financial statements complied with GAAP.

24

    212.    During the Class Period, defendants caused the Company to make representations that

25

FormFactor's internal disclosure and accounting controls were designed to be effective and detect

26

and prevent fraud and had been tested and found to be effective.

27

    213.    These representations were false as FormFactor's disclosure controls and procedures

28

were not effective and the Company's financial statements were not fairly presented in accordance

with GAAP.  During the Class Period, FormFactor violated §13(b)(2)(A) of the 1934 Act by failing to maintain adequate internal controls in order to ensure that its financial statements were prepared in conformity with GAAP and that its public filings were accurate.

214.    During the Class Period, the Company maintained inadequate finance and financial reporting processes and controls.  The Company had in place an Oracle financial accounting system and ERP applications and a PROMIS database system in order to support the Company's operations.  Nonetheless, the Company failed to utilize the full capability of both of these automated financial systems and instead opted to handle many of the Company's financial reporting processes manually using "offline" Excel spreadsheets.

215.    FormFactor's financial reporting processes and controls were highly manual in nature and very labor intensive.  The complexity of the Company's operations made using a manual process for its financial reporting difficult and time consuming.  Throughout the Class Period, the Company remained highly reliant on Excel for many of its financial reporting functions including manufacturing, accounting, inventory control and finance.  It involved the use of a significant number of spreadsheets and macros that needed to be properly linked to one another in order for the system to function properly.  It further made knowing how various items were calculated extremely complicated.  Furthermore, while the Oracle system did have a cost accounting module, the Company had not implemented the module and instead relied solely on offline Excel spreadsheets to handle its cost accounting operations including the Company's accounting for its inventory valuation and its related stock-based compensation.

216.    Due to the manual nature of the Company's financial accounting and reporting processes and controls, *the risk of human error and/or intentional manipulation was greatly increased* than if the Company utilized an automated financial software system.  The Company has now admitted that its disclosure controls and procedures through June 30, 2007 were inadequate.  In FormFactor's restated Form 10-K/A filed on November 13, 2007, it stated in part:

Restatement of Previously Issued Financial Statements

In connection with the preparation of the consolidated financial statements as of and for the quarter ended September 29, 2007, an error was discovered in the valuation of inventory and cost of revenues that affects the Company's financial

statements for fiscal 2006 and the interim periods in fiscal 2007. As a result, the Company has restated its previously issued interim and annual consolidated financial statements for fiscal 2006 and interim financial statements for the first and second quarters of fiscal 2007, as more fully described in Note 2, Restatement of Financial Statements, included in this Form 10-K/A. ***In reaching the conclusion that our disclosure controls and procedures and our internal control over financial reporting were not effective as of December 30, 2006 (as more fully described below within Evaluation of Disclosure Controls and Procedures and Management's Report on Internal Control over Financial Reporting), management considered, among other things, the control deficiency related to the valuation of inventory and cost of revenues which resulted in the need to restate our previously issued financial statements for fiscal 2006 and the interim periods in fiscal 2007.***

Evaluation of Disclosure Controls and Procedures

Our management, including our Chief Executive Officer and Chief Financial Officer, evaluated the effectiveness of our "disclosure controls and procedures" as defined in Exchange Act Rule 13a-15(e) as of December 30, 2006 in connection with the filing of this Annual Report on Form 10-K/A. Based on that evaluation, our Chief Executive Officer and Chief Financial Officer concluded that, as of December 30, 2006, in light of the material weakness described below, our disclosure controls and procedures were not effective to ensure that information we are required to disclose in reports that we file or submit under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in rules and forms of the SEC and is accumulated and communicated to our management as appropriate to allow timely decisions regarding required disclosure.

Notwithstanding the material weakness, the restated annual and interim financial statements fairly present, in all material respects, the financial condition, results of operations and cash flows of the Company as of and for the periods presented in accordance with generally accepted accounting principles.

Management's Report on Internal Control over Financial Reporting (Restated)

Our management is responsible for establishing and maintaining adequate internal control over financial reporting as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act. Our management, with the participation of our Chief Executive Officer and Chief Financial Officer, evaluates the effectiveness of our internal control over financial reporting. This evaluation is based on the framework established in Internal Control—Integrated Framework, issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO).

A material weakness is a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the company's annual or interim financial statements will not be prevented or detected on a timely basis.

The Company identified the following material weakness in internal control over financial reporting as of December 30, 2006. ***The Company did not maintain effective controls over the valuation of inventory and the related cost of revenues accounts. Specifically, the Company did not maintain effective controls to ensure that the estimation process to value inventory complied with the Company's accounting policies. This control deficiency resulted in the restatement of the Company's annual and interim financial statements for 2006 and interim financial***

*statements for the first and second quarters of 2007.* Additionally, this control deficiency could result in a misstatement of the inventory and cost of revenues accounts that would result in a material misstatement of the Company's financial statements that would not be prevented or detected.

*In the Company's original filing of its 2006 Annual Report on Form 10-K, management concluded that the Company maintained effective internal control over financial reporting as of December 30, 2006. However, in connection with the restatement discussed in Note 2 to the consolidated financial statements, management subsequently concluded that the material weakness in internal control over financial reporting described above existed as of December 30, 2006. As a result of the material weakness, management has concluded that the Company did not maintain effective internal control over financial reporting as of December 30, 2006 based upon the criteria set forth in Internal Control – Integrated Framework issued by the COSO. Accordingly, management has restated its report on internal control over financial reporting.*

217.    The Company made substantially similar admissions concerning its internal controls in its amended Form 10-Q's for 1Q 2007 and 2Q 2007 filed on November 13, 2007. The material weakness persisted thereafter throughout the end of FY 2007. In the Company's 2007 Form 10-K filed on February 27, 2008, FormFactor disclosed that the Company had not maintained effective controls over the valuation of inventory and the related cost of revenue accounts as of December 29, 2007.

218.    FormFactor's lack of adequate internal controls rendered FormFactor's Class Period financial reporting inherently unreliable and precluded the Company from preparing financial statements that complied with GAAP. Nonetheless, throughout the Class Period, the Company regularly issued quarterly and annual financial statements without disclosing the existence of all of the significant and material deficiencies in its internal accounting controls and falsely asserted that its financial statements complied with GAAP.

## XI.    LOSS CAUSATION/ECONOMIC LOSS

219.    During the Class Period, as detailed above, defendants engaged in a fraudulent scheme to deceive the market. The scheme included a course of conduct that artificially inflated FormFactor's stock price and operated as a fraud or deceit on Class Period purchasers of FormFactor securities by misrepresenting the Company's current operations, business success and future business prospects. Later, however, when defendants' prior misrepresentations and fraudulent conduct could no longer be explained away, or concealed, some but not all of FormFactor's true

1   condition began to be revealed to the market. FormFactor's stock price declined and the amount of

2   artificial inflation also began to come out of the Company's stock price. As a result, class members

3   who purchased FormFactor stock during the Class Period suffered economic loss, *i.e.*, damages,

4   under the federal securities laws.

5          220.    Defendants' false and misleading statements and omissions caused and maintained

6   the artificial inflation in FormFactor's stock price throughout the Class Period. As explained in

7   §VI.A above, defendants falsely represented that the Company was doing well in ramping up its

8   Harmony development and production when they knew that the Company was having severe

9   production issues, including the inability to manufacture and deliver volume Harmony products on

10  time. As explained in §VI.B above, defendants falsely represented that FormFactor would expect

11  significant revenue growth by selling Harmony products when they knew there were undisclosed

12  problems with the development of Harmony at every stage that delayed their production, including

13  chronic and persistent poor yields that led to delaying volume production and shipment to customers,

14  and accumulation of worthless scrap that increased the operating margin and cost of revenue. As

15  alleged in §VI.C above, defendants also falsely represented FormFactor's reported financials,

16  including improperly accounting for inventory valuation. They also knew FormFactor was not

17  counting scrap from the failed yields as obsolete inventory, not writing off obsolete inventory as

18  COGS and, thus, manipulating the Company's reported inventory, cost of revenue, gross margin and

19  net income. As detailed in §X above, during the Class Period, defendants caused FormFactor to

20  report materially false and misleading financial results and falsely represented that the Company's

21  financial reporting controls were effective when in fact there were numerous material weaknesses in

22  all aspects of the Company's operations that were causing FormFactor to report false and misleading

23  financial results. Defendants' false and misleading statements and omissions had the intended effect

24  and caused FormFactor's stock to trade at artificially inflated prices throughout the Class Period,

25  reaching as high as $49.45 per share.

26         221.    In February 2006, upon the Company's announcement that it had a stellar record in

27  2005 and its anticipates a greater year in 2006 with the ramp up of the Harmony products with the

28  volume production for the first Harmony probe card in second half of 2006, the market flocked to

1    buy FormFactor shares, causing the stock to jump over 20% in one-day volume.  By comparison, the

2    NASDAQ and the Russell Index dropped 1.255% and .980%, respectively, on the same day.

3        222.    On June 6, 2006, the Company introduced its Harmony based OneTouch probe card

4    used in 300-mm Flash memory production.  On July 27, 2006, the Company issued a press release

5    entitled: "FormFactor, Inc. Announces 2006 Second Quarter Financial Results; Record Quarterly

6    Revenues of $92.4 Million, Up Year Over Year."  Following the July 27, 2006 conference call and

7    the issuance of Form 10-Q for 2Q 2006, based on the representations made by defendants regarding

8    the Harmony products and the expected revenue growth expected from Harmony, FormFactor's

9    stock price jumped over 16%, from $35.40 per share to $42.25 per share, in one trading day, with

10    more than 2.8 million shares in trading volume.  Analysts highlighted FormFactor's purported strong

11    competitive edge, including its technology leadership and new product offerings, including the

12    Harmony line that would address the Flash memory market by offering one-touchdown testing

13    capability.  *See, e.g*, Needham's August 21, 2006 analyst report.  The stock continued to trade at

14    over $40.00 per share, with a Class Period high of $49.45 per share on August 30, 2006.  While

15    FormFactor's stock jumped from $37.48 per share to $49.45 per share between July 26, 2007 to

16    August 30, 2007, a 24.2% increase, by comparison the NASDAQ increased 5.29% while the Russell

17    Index increased 6.83% during the same time frame.

18        223.    On September 20, 2006, following the disclosures regarding a competitor's

19    announcement that the short term demand for advanced probe cards in the NAND and DRAM

20    industries may not be as strong as previously projected and increasing competitive evaluations at

21    major probe card customers, FormFactor's stock price took a hit, dropping over $5.00 per share in

22    one day, 11.195%, and closing at $41.09 per share.  By comparison, the NASDAQ and the Russell

23    Index dropped only .672% and 1.52%, respectively, on the same day.

24        224.    The next month, following an October 25, 2006 earnings release and conference call

25    with the Company's disclosure that its volume shipments for NAND Flash market did not occur

26    during 3Q 2006 as previously promised, FormFactor's shares dropped another 9% from $42.91 per

27    share to $38.95 per share, and four million shares were traded in a single day.  By comparison, the

28    NASDAQ increased .955% while the Russell Index increased 1.564% on the same day.

1    FormFactor's stock price remained mainly below $40.00 per share the next few months as the

2    market closely watched FormFactor's development and bookings for Harmony products.  Analysts

3    took note of the market's reaction to FormFactor's ability to ramp up and volume ship its Harmony

4    products, and several analysts recommended investors to hold on the stock, pending FormFactor's

5    ability to demonstrate that its Harmony products could, in fact, generate revenue for the Company.

6    Indeed, several analysts cautioned investors to take a "wait-and-see" attitude, pending FormFactor's

7    actual delivery of the Harmony product that it had promised.

8        225.    On January 31, 2007, in addition to releasing its 4Q 2006 and FY 2006 financial

9    results, FormFactor announced during a conference call that it started volume shipping its Harmony

10   NAND Flash product to customers.  The Company also issued a separate press release announcing

11   that Hynix placed a multi-million dollar order for FormFactor's Harmony OneTouch probe cards for

12   Flash memory production, to be shipped to Hynix starting in 1Q 2007.  According to the press

13   release, FormFactor was chosen from among several probe card suppliers for this volume order due

14   to the high quality, performance and reliability of FormFactor's advanced wafer probe card

15   solutions.  The announcement concerning the Hynix order removed some of the concerns that the

16   market had regarding whether FormFactor was capable of actually delivering a Harmony product.

17   The market reacted with more than 3.7 million shares exchanged in trading volume and with a 9.8%

18   jump in stock price in one day, closing at $44.65 per share on February 1, 2007.  The stock

19   continued to trade at an inflated price of over $40.00 per share for the next few months, and hovered

20   between $37.72 per share and $47.47 per share between February and October 24, 2007.

21       226.    On October 24, 2007, defendants were forced to publicly disclose that FormFactor

22   would be restating its financial statements, causing its stock to drop to $35.54 per share.  As a direct

23   result of defendants' admissions and the public revelations regarding the truth about FormFactor's

24   misstatement of its financial results, including its overvaluation of inventory and its actual business

25   prospects going forward, FormFactor's stock price plummeted 20%, falling from $46.72 per share

26   on October 2, 2007 to $35.54 per share on October 25, 2007 – a drop of $11.18 per share.  This drop

27   began to remove the inflation from FormFactor's stock price, causing real economic loss to investors

28   who had purchased the stock during the Class Period.

227. On February 5, 2008, the Company announced its 4Q 2007 and FY 2007 financial results, which widely missed its previous guidance. The Company also gave a bleak guidance for FY 2008, as a result of lost DRAM market share driven by DRAM industry weakness and Harmony DRAM production issues. Specially, the Company belatedly disclosed during the conference call that "our new product ramp challenges with Harmony resulted in missed opportunities with a few customers causing the majority of the overall revenue shortfall in the quarter. . . . Due primarily to the market conditions as well as the delay in the Harmony DRAM, FormFactor's RAM bookings declined significantly. . . . Our focus going forward has shifted to demand generation side of the equation as we work to regain our loss position with DRAM customers who could not wait for our Harmony products. . . ." The Company finally acknowledged that its problems were related to its longstanding manufacturing problems. "Due to the protracted Harmony ramp issues we experienced in 2007, FormFactor was not the first full wafer contactor probe card company qualified at some DRAM suppliers. This resulted in the loss of business in the fourth quarter which we believe the competition picked up at lower end DRAM applications." The Company announced a cost reduction plan to cut its global workforce by approximately 14%. FormFactor also announced that it would record charges in the range of $4-$5 million related to the cost reduction plan, with the majority of the charges being recorded in 1Q 2008. Upon these announcements, FormFactor's stock price dropped 11.59%, from $26.23 per share to close on February 5, 2008 at $23.19 per share, and continued to drop to $17.50 per share in the after market hours. The stock dropped another 9% the next day and closed at $21.06 per share at the end of February 6, 2008. The stock price continued to drop, trading below $20.00 per share following the February 5, 2008 announcement, and has not rebounded since. By comparison, the NASDAQ dropped only 4.409% and the Russell Index dropped 5.87% during the February 5-6, 2008 time frame.

228. These partial disclosures on October 24, 2007 and February 5, 2008, caused FormFactor's stock price to decline significantly more than the changes in the Russell Index and the NASDAQ. As a result, the price declines following the partial disclosures provide a measure of class members' economic losses.

1    229.    The declines in FormFactor's stock price following the partial disclosures compared

2    to the changes in the Russell Index and the NASDAQ negate any inference the losses suffered by

3    class members were caused by changed market or industry conditions or Company-specific facts

4    unrelated to defendants' fraudulent conduct. The following chart illustrates the changes in

5    FormFactor's stock price during the Class Period compared to the Russell Index and the NASDAQ:

6



7

8

9

10

11

12

13    

14

15

16

17

18

19

20

21

22    **XII.    COUNT I – For Violation of §10(b) of the 1934 Act and Rule 10b-5 Against All Defendants**

23    230.    Plaintiffs incorporate ¶¶1-229 by reference.

24    231.    During the Class Period, defendants disseminated or approved the false statements

25    specified above, which they knew or deliberately disregarded were misleading in that they contained

26    misrepresentations and failed to disclose material facts necessary in order to make the statements

27    made, in light of the circumstances under which they were made, not misleading.

28

1    232.    Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

2        (a)    employed devices, schemes and artifices to defraud;

3        (b)    made untrue statements of material facts or omitted to state material facts

4    necessary in order to make the statements made, in light of the circumstances under which they were

5    made, not misleading; or

6        (c)    engaged in acts, practices and a course of business that operated as a fraud or

7    deceit upon plaintiffs and others similarly situated in connection with their purchases of FormFactor

8    common stock during the Class Period.

9    233.    Plaintiffs and the class have suffered damages in that, in reliance on the integrity of

10    the market, they paid artificially inflated prices for FormFactor common stock.  Plaintiffs and the

11    class would not have purchased FormFactor common stock at the prices they paid, or at all, if they

12    had been aware that the market prices had been artificially and falsely inflated by defendants'

13    misleading statements.

14    **XIII.    COUNT II – For Violation of §20(a) of the 1934 Act Against All Defendants**

15    234.    Plaintiffs incorporate ¶¶1-233 by reference.

16    235.    The Individual Defendants acted as controlling persons of FormFactor within the

17    meaning of §20(a) of the 1934 Act.  By reason of their positions with the Company, and their

18    ownership of FormFactor stock, the Individual Defendants had the power and authority to cause

19    FormFactor to engage in the wrongful conduct complained of herein.  FormFactor controlled the

20    Individual Defendants and all of its employees.  By reason of such conduct, defendants are liable

21    pursuant to §20(a) of the 1934 Act.

22    **XIV.    NO SAFE HARBOR EXISTS FOR DEFENDANTS' STATEMENTS**

23    236.    The statutory safe harbor provided for forward-looking statements under certain

24    circumstances does not apply to any of the allegedly false statements pleaded in this complaint.  The

25    specific statements pleaded herein either were not identified as "forward-looking statements" when

26    made or were not accompanied by meaningful cautionary statements identifying important factors

27    that could cause actual results to differ materially from those in the purportedly forward-looking

28    statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-

1    looking statements pleaded herein, defendants are liable for those false forward-looking statements

2    because at the time each of those forward-looking statements were made, the particular speaker

3    knew that the forward-looking statements were false, and/or the forward-looking statements were

4    authorized and/or approved by an executive officer of FormFactor who knew that those statements

5    were false when made.

6    **XV.    CLASS ACTION ALLEGATIONS**

7        237.    Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules

8    of Civil Procedure on behalf of all persons who purchased or otherwise acquired FormFactor

9    common stock during the Class Period (the "Class").  Excluded from the Class are defendants.

10        238.    The members of the Class are so numerous that joinder of all members is

11    impracticable.  The disposition of their claims in a class action will provide substantial benefits to

12    the parties and the Court.  FormFactor has more than 48 million shares of stock outstanding, owned

13    by hundreds if not thousands of persons.

14        239.    There is a well-defined community of interest in the questions of law and fact

15    involved in this case.  Questions of law and fact common to the members of the Class which

16    predominate over questions which may affect individual Class members include:

17            (a)    whether the 1934 Act was violated by defendants;

18            (b)    whether defendants omitted and/or misrepresented material facts;

19            (c)    whether defendants' statements omitted material facts necessary to make the

20    statements made, in light of the circumstances under which they were made, not misleading;

21            (d)    whether defendants knew or deliberately disregarded that their statements

22    were false and misleading;

23            (e)    whether the price of FormFactor's common stock was artificially inflated; and

24            (f)    the extent of damages sustained by Class members and the appropriate

25    measure of damages.

26        240.    Plaintiffs' claims are typical of those of the Class because plaintiffs and the Class

27    sustained damages from defendants' wrongful conduct.

28

PLAINTIFFS' FIRST AMENDED COMPLAINT - C-07-05545-SI                                    - 105 -

1     241.    Plaintiffs will adequately protect the interests of the Class and have retained counsel

2  who are experienced in class action securities litigation.  Plaintiffs have no interests which conflict

3  with those of the Class.

4     242.    A class action is superior to other available methods for the fair and efficient

5  adjudication of this controversy.

6  **XVI.    PRAYER FOR RELIEF**

7     WHEREFORE, plaintiffs pray for judgment as follows:

8     A.    Declaring this action to be a proper class action pursuant to Fed. R. Civ. P. 23;

9     B.    Awarding plaintiffs and the members of the Class damages, including interest;

10     C.    Awarding plaintiffs reasonable costs and attorneys' fees; and

11     D.    Awarding such equitable/injunctive or other relief as the Court may deem just and

12  proper.

13  **XVII.  JURY DEMAND**

14     Plaintiffs demand a trial by jury.

15  DATED:  April 3, 2008                    COUGHLIN STOIA GELLER
                                              RUDMAN & ROBBINS LLP
16                                         JEFFREY W. LAWRENCE
                                            SHIRLEY H. HUANG
17

18
                                       _____/s/ Shirley H. Huang_____
19                                            SHIRLEY H. HUANG

20                                         100 Pine Street, Suite 2600
                                            San Francisco, CA  94111
21                                         Telephone:  415/288-4545
                                            415/288-4534 (fax)
22
                                            COUGHLIN STOIA GELLER
23                                            RUDMAN & ROBBINS LLP
                                            DARREN J. ROBBINS
24                                         RAMZI ABADOU
                                            655 West Broadway, Suite 1900
25                                         San Diego, CA  92101-3301
                                            Telephone:  619/231-1058
26                                         619/231-7423 (fax)

27                                         Lead Counsel for Plaintiffs

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

SULLIVAN, WARD, ASHER & PATTON, P.C.
CYNTHIA J. BILLINGS
25800 Northwestern Highway
1000 Maccabees Center
Southfield, MI  48075-1000
Telephone:  248/746-0700
248/746-2760 (fax)

Additional Counsel for Plaintiff

T:\CasesSF\FormFactor\Cpt FormFactor_First Amd.doc

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 3, 2008, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I have mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

I further certify that I caused this document to be forwarded to the following designated Internet site at:  http://securities.csgrr.com/.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on April 3, 2008.

/s/ Shirley H. Huang
SHIRLEY H. HUANG


COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
100 Pine Street, 26th Floor
San Francisco, CA  94111
Telephone:  415/288-4545
415/288-4534 (fax)

E-mail:ShirleyH@csgrr.com

# Mailing Information for a Case 3:07-cv-05545-SI

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Ramzi Abadou**
  ramzia@csgrr.com,debh@csgrr.com

- **Jeffrey W. Lawrence**
  jeffreyl@csgrr.com,e_file_sf@csgrr.com,e_file_sd@csgrr.com,GDarwish@csgrr.com

- **Alan R Plutzik**
  aplutzik@bramsonplutzik.com

- **Darren Jay Robbins**
  e_file_sd@csgrr.com

- **Arthur L. Shingler , III**
  ashingler@scott-scott.com,ssawyer@scott-scott.com

- **Robert P. Varian**
  rvarian@orrick.com

- **Shawn A. Williams**
  shawnw@csgrr.com,travisd@csgrr.com,moniquew@csgrr.com,e_file_sf@csgrr.com,cwood@csgr

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

```
Catherine J Kowalewski
Lerach Coughlin et al LLP
655 W Broadway #1900
San Diego, CA 92101

David C. Walton
Lerach Coughlin Stoia Geller Rudman & Robbins LLP
655 West Broadway
Suite 1900
San Diego, CA 92101-3301
```