SIGNATURE OF OPTIONEE

Source: FORMFACTOR INC, 10-K, February 27, 2008

EXHIBIT 1

SPOUSAL CONSENT

I have read the foregoing Stock Option Exercise Agreement (the "AGREEMENT") and I know its contents. I consent to and approve of the Agreement, and agree that the shares of the Common Stock of FormFactor, Inc. purchased pursuant to the Agreement (the "SHARES") including any interest I may have in the Shares, are subject to all the provisions of the Agreement. I will take no action at any time to hinder application of the Agreement to the Shares or to any interest I may have in the Shares.

Date: _____

_____

SIGNATURE OF OPTIONEE'S SPOUSE

_____

SPOUSE'S NAME—TYPED OR PRINTED

_____

OPTIONEE'S NAME—TYPED OR PRINTED

Source: FORMFACTOR INC, 10-K, February 27, 2008

EXHIBIT C

FORMFACTOR, INC.

2002 EQUITY INCENTIVE PLAN

Source: FORMFACTOR INC, 10-K, February 27, 2008

EXEMPT/IMMEDIATELY EXERCISABLE

NO.

## FORMFACTOR, INC.
### 2002 EQUITY INCENTIVE PLAN
### STOCK OPTION AGREEMENT

FormFactor, Inc., a Delaware corporation (the "COMPANY"), hereby grants an option (this "OPTION") to the Optionee named below ("OPTIONEE") as of the Date of Grant set forth below (the "DATE OF GRANT") pursuant to the Company's 2002 Equity Incentive Plan (the "PLAN") and this Stock Option Agreement (this "AGREEMENT"), which includes the Terms and Conditions (the "TERMS AND CONDITIONS") set forth on Exhibit A hereto. Capitalized terms not defined in this Agreement have the meanings ascribed to them in the Plan.

OPTIONEE:

SOCIAL SECURITY NUMBER:

OPTIONEE'S ADDRESS:

TOTAL OPTION SHARES:

EXERCISE PRICE PER SHARE:

DATE OF GRANT:

EXPIRATION DATE:                           (unless earlier terminated under Section 3 hereof or pursuant to Section 18 of the Plan)

FIRST VESTING DATE:

VESTING SCHEDULE:                          % of the Shares will vest on the First Vesting Date; then   % of the Shares will vest on each
                                           monthly anniversary of the First Vesting Date until 100% vested.

TYPE OF STOCK OPTION:        ☐ INCENTIVE STOCK OPTION

(CHECK ONE):                 ☐ NONQUALIFIED STOCK OPTION

The Company has signed this Agreement effective as of the Date of Grant and has caused it to be executed in duplicate by its duly authorized representative.

FORMFACTOR, INC.

By: _____

_____
(Please print name)

_____
(Please print title)

FormFactor, Inc.
Stock Option Agreement
2002 Equity Incentive Plan
No.

Optionee acknowledges receipt of this Agreement (including the Terms and Conditions), a copy of the Plan, attached hereto as Exhibit C, and the form of Exercise Agreement, attached hereto as Exhibit B. Optionee has read and understands these documents and accepts this Option subject to all the terms and conditions of the Plan and this Agreement. Optionee has executed this Agreement in duplicate as of the Date of Grant.

OPTIONEE

_____

(Signature)

_____

(Please print name)

2

Source: FORMFACTOR INC, 10-K, February 27, 2008

EXHIBIT A

STOCK OPTION AGREEMENT TERMS AND CONDITIONS

This Option is subject to the following Terms and Conditions and the terms and conditions of the Plan, which are incorporated herein by reference. This Agreement, the Plan and the Exercise Agreement constitute the entire agreement and understanding of the Company and the Optionee with respect to this Option and supersede all prior understandings and agreements with respect to such subject matter. If there is any discrepancy, conflict or omission between this Agreement and the provisions of the Plan as interpreted by the Committee, the provisions of the Plan shall apply.

1.   GRANT OF OPTION.   The Company hereby grants to Optionee this Option to purchase up to the total number of shares of Common Stock of the Company (the "SHARES") at the Exercise Price Per Share (the "EXERCISE PRICE"), each as set forth on the first page of this Agreement, subject to the terms and conditions of this Agreement and the Plan. If designated as an Incentive Stock Option, this Option is intended to qualify to the extent permitted as an "incentive stock option" ("ISO") within the meaning of Section 422 of the Internal Revenue Code of 1986, as amended (the "CODE").

2.   EXERCISE PERIOD.

2.1   Vesting of Shares.   This Option is immediately exercisable, although the Shares issued upon exercise of this Option will be subject to the restrictions on transfer and Repurchase Option set forth in this Agreement. Subject to the terms and conditions of the Plan and this Agreement, this Option shall vest as set forth on the first page of this Agreement if Optionee has continuously provided services to the Company, or any Parent or Subsidiary of the Company. Shares that are vested pursuant to the schedule set forth on the first page of this Agreement are "VESTED SHARES." Shares that are not vested pursuant to the schedule set forth on the first page of this Agreement are "UNVESTED SHARES." Notwithstanding any provision in the Plan or this Agreement to the contrary, Options for Unvested Shares will not be exercisable on or after an Optionee's Termination Date.

[2.2   Acceleration of Vesting in Certain Circumstances Following a Corporate Transaction.   In addition to the vesting provided herein, the Option and Shares subject to this Option shall become vested immediately prior to the occurrence of a Non-Justifiable Termination (as defined below) occurring during the period beginning on the date of consummation of a Corporate Transaction (as defined in the Plan) and ending twelve (12) months thereafter, as to an additional number of Shares equal to the number of Shares that would have vested during the twelve (12) months following the date of such Non-Justifiable Termination (which accelerated vesting is referred to herein as the "CORPORATE TRANSACTION VESTING"). "NON-JUSTIFIABLE

3

TERMINATION" means any Termination by the Company, or any Parent or Subsidiary of the Company or the successor-in-interest to the Company following a Corporate Transaction, other than for Cause (as defined below). "CAUSE" (for purposes of this paragraph only) means (i) any willful participation by Optionee in acts of either material fraud or material dishonesty against the Company or any Subsidiary or Parent of the Company or the successor-in-interest to the Company following a Corporate Transaction; (ii) any indictment or conviction of Optionee of any felony (excluding drunk driving); (iii) any willful act of gross misconduct by Optionee which is materially and demonstrably injurious to the Company or any Subsidiary or Parent of the Company or the successor-in-interest to the Company following a Corporate Transaction; or (iv) the death or Disability of Optionee. Notwithstanding anything to the contrary set forth in this Agreement, if a Corporate Transaction Vesting occurs by reason of a Non-Justifiable Termination, then this Option may be exercised by Optionee up to, but no later than, three (3) months after the date of such Non-Justifiable Termination, but in any event no later than the Expiration Date.]

[2.3     Acceleration of Vesting on Death or Disability.     In the event of Termination of Optionee as a result of his or her death or "permanent and total disability," as such term is defined in Section 22(e)(3) of the Code, then, in addition to the vesting provided herein, the Option and Shares subject to the Option shall become vested as to an additional number of Shares equal to the number of Shares that would have vested during the twelve (12) months following the Termination Date of Optionee; provided, however, such vested Option may be exercised no later than twelve (12) months after the Termination Date, but in any event no later than the Expiration Date.]

2.[4]     Expiration.     This Option expires on the Expiration Date set forth on the first page of this Agreement and must be exercised, if at all, on or before the earlier of the Expiration Date or the date on which this Option is terminated in accordance with the provisions of this Section 2, Section 3 of this Agreement or Section 18 of the Plan.

3.     TERMINATION.

3.1     Termination for Any Reason Except Death, Disability or Cause.     If Optionee is Terminated for any reason except Optionee's death, Disability or Cause (as such terms are defined in the Plan), then this Option, to the extent (and only to the extent) that it is vested on the Termination Date in accordance with the schedule set forth on the first page of this Agreement, may be exercised by Optionee during the three (3) months following the Termination Date, but in any event must be exercised no later than the Expiration Date.

3.2     Termination Because of Death or Disability.     If Optionee is Terminated because of Optionee's death or Disability (or Optionee dies within three (3) months after Termination for any reason except Cause or Disability), then this Option, to the extent (and only to the extent) that it is vested on the Termination Date in accordance with the schedule set forth on the first page of this Agreement, may be exercised by Optionee (or Optionee's legal representative or authorized assignee) during the twelve (12) months following the Termination Date, but in any

4

Source: FORMFACTOR INC, 10-K, February 27, 2008

event must be exercised no later than the Expiration Date. Any exercise occurring more than three months following the Termination Date (when the Termination is for any reason other than Optionee's death or disability (as defined in the Code)), shall be deemed to be the exercise of a nonqualified stock option.

3.3   Termination for Cause.    If Optionee is Terminated for Cause, then this Option, to the extent (and only to the extent) that it is vested on the Termination Date in accordance with the schedule set forth on the first page of this Agreement, may be exercised by Optionee no later than one (1) month after the Termination Date, but in any event must be exercised no later than the Expiration Date.

3.4   No Obligation to Employ.    Nothing in the Plan or this Agreement confers on Optionee any right to continue in the employ of, or other relationship with, the Company or any Parent or Subsidiary of the Company (or any successor-in-interest to the Company), or limits in any way the right of the Company or any Parent or Subsidiary of the Company to terminate Optionee's employment or other relationship at any time, with or without Cause.

4.   MANNER OF EXERCISE.

4.1   Stock Option Exercise Agreement.    To exercise this Option, Optionee (or in the case of exercise after Optionee's death or Disability, Optionee's legal representative) must deliver to the Company an executed stock option exercise agreement in the form attached hereto as Exhibit B, or in such other form as may be approved by the Committee from time to time (the "EXERCISE AGREEMENT"). If someone other than Optionee exercises this Option, then such person must submit documentation reasonably acceptable to the Company that such person has the right to exercise this Option.

4.2   Limitations on Exercise.    This Option may not be exercised (a) unless such exercise is in compliance with all applicable federal and state securities laws and with all applicable requirements of any stock exchange on which the Company's Common Stock may be listed at the time of such issuance and (b) as to fewer than 100 Shares unless it is exercised as to all Shares as to which this Option is then exercisable. The Company is under no obligation to register or qualify the Shares with the SEC, any state securities commission or any stock exchange to effect such compliance.

4.3   Payment.    The Exercise Agreement shall be accompanied by full payment of the Exercise Price for the Shares being purchased in cash (by check), or, where permitted by law, by any method set forth in the Exercise Agreement or any additional method approved by the Committee from time to time.

4.4   Tax Withholding.    At the time of exercise, Optionee must pay or provide for any applicable federal or state withholding obligations of the Company associated with the exercise of this Option. If the Committee permits at the time of exercise, Optionee may provide for payment of withholding taxes upon exercise of this Option by requesting that the Company retain Shares with a Fair Market Value equal to the minimum amount of taxes required to be withheld,

5

Source: FORMFACTOR INC, 10-K, February 27, 2008

in which case, the Company shall issue the net number of Shares to Optionee after deducting the Shares retained from the Shares issuable upon exercise.

5.   COMPANY'S REPURCHASE OPTION FOR UNVESTED SHARES.

In the event Optionee is Terminated for any reason, the Company, or its assignee, shall have the option to repurchase Optionee's Unvested Shares (the "REPURCHASE OPTION") at any time within ninety (90) days after the later of Optionee's Termination Date and the date Optionee purchases the Shares by giving Optionee written notice of its election to exercise the Repurchase Option. The Company or its assignee may repurchase from Optionee (or from Optionee's legal representative, as the case may be) all or a portion of the Unvested Shares at Optionee's Exercise Price, proportionately adjusted for any stock split or similar change in the capital structure of the Company as set forth in Section 2.2 of the Plan, which repurchase price shall be paid, at the option of the Company or its assignee, by check or by cancellation of all or a portion of any outstanding indebtedness of Optionee to the Company or such assignee, or by any combination thereof. The repurchase price shall be paid without interest within the ninety (90) day time period set forth above.

6.   NONTRANSFERABILITY OF OPTION AND SHARES.

This Option may not be transferred in any manner other than under the terms and conditions of the Plan or by will or by the laws of descent and distribution and may be exercised during the lifetime of Optionee only by Optionee. The terms of this Option shall be binding upon the legal representatives and authorized executors and assignees of Optionee. Unvested Shares may not be sold or otherwise transferred without the Company's prior written consent.

7.   TAX CONSEQUENCES.

Optionee should refer to the prospectus for the Plan for a description of the federal tax consequences of exercising this Option, including the effects of filing an election under 83(b) of the Code in connection with the exercise of this Option for Unvested Shares, and disposing of the Shares. A copy of the Prospectus is available at the Finance/Stock Administration page of the Company's internal website, or upon request from the Company's Stock Administrator at (925) 456-7334.

8.   PRIVILEGES OF STOCK OWNERSHIP.

Optionee shall not have any of the rights of a stockholder with respect to any Shares until the Shares are issued to Optionee.

9.   NOTICES.

Any notice required to be given or delivered to the Company under the terms of this Agreement shall be in writing and addressed to the Corporate Secretary of the Company at its principal corporate offices. Any notice required to be given or delivered to Optionee shall be in

6

Source: FORMFACTOR INC, 10-K, February 27, 2008

writing and addressed to Optionee at the address indicated on the first page of this Agreement or to such other address as such party may designate in writing from time to time to the Company. All notices shall be deemed to have been given or delivered upon: personal delivery; three (3) days after deposit in the United States mail by certified or registered mail (return receipt requested); one (1) business day after deposit with any return receipt express courier (prepaid); or one (1) business day after transmission by facsimile or email.

10.   SUCCESSORS AND ASSIGNS.

The Company may assign any of its rights under this Agreement. This Agreement shall be binding upon and inure to the benefit of the successors and assigns of the Company. Subject to the restrictions on transfer set forth herein, this Agreement shall be binding upon Optionee and Optionee's legal representatives and authorized assignees.

11.   GOVERNING LAW.

This Agreement shall be governed by and construed in accordance with the internal laws of the State of California, without regard to that body of law pertaining to choice of law or conflicts of law.

7

---

Stock Option Agreement No.

EXHIBIT B

FORMFACTOR, INC.
2002 EQUITY INCENTIVE PLAN (THE "PLAN")
STOCK OPTION EXERCISE AGREEMENT

I ("OPTIONEE") hereby elect to purchase the number of shares of Common Stock of FormFactor, Inc. (the "Company") indicated below:

Optionee

Social Security Number:

Address:

Type of Option:        ☐ Incentive Stock Option
                       ☐ Nonqualified Stock Option

Number of Shares Purchased:

Purchase Price per Share:

Aggregate Purchase Price:

Date of Grant:

Exact Name of Title to Shares:

1.    DELIVERY OF PURCHASE PRICE. Optionee hereby delivers to the Company the Aggregate Purchase Price as follows (check as applicable and complete):

☐        in cash (by check) in the amount of $                        , receipt of which is acknowledged by the Company;

☐        [by cancellation of indebtedness of the Company to Optionee in the amount of $                    ;]

☐        [by delivery of                fully-paid, nonassessable and vested shares of the Common Stock of the Company owned by Optionee for at least six (6) months prior to the date hereof (and which have been paid for within the meaning of SEC Rule 144), or obtained by Optionee in the open public market, and owned free and clear of all liens, claims, encumbrances or security interests, valued at the current Fair Market Value of $                per share;]

☐        [by the waiver hereby of compensation due or accrued to Optionee for services rendered in the amount of $                    ;]

☐        through a "same-day-sale" commitment from Optionee and a broker-dealer that is a member of the National Association of Securities Dealers (an "NASD DEALER") whereby Optionee irrevocably elects to exercise the Option and to sell a portion of the Shares so purchased to pay for the Aggregate Purchase Price and whereby the NASD Dealer irrevocably commits upon receipt of such Shares to forward the Aggregate Purchase Price (along with any required tax withholding) directly to the Company; or

☐        [through a "margin" commitment from Optionee and the NASD Dealer named therein, whereby Optionee irrevocably elects to exercise the Option and to pledge the Shares so purchased to the NASD Dealer in a margin account as security for a loan from the NASD Dealer in the amount of the Exercise Price, and whereby the NASD Dealer irrevocably commits upon receipt of such Shares to forward the Aggregate Purchase Price (along with any required tax withholding) directly to the Company.]

2.    UNDERTAKINGS. Optionee acknowledges that any Unvested Shares remain subject to the Terms and Conditions of the Optionee's Stock Option Agreement. To the extent this Option is an ISO, if Optionee sells or otherwise disposes of any of the Shares acquired pursuant to the ISO on or before the later of (a) the date two (2) years after the Date of Grant, and (b) the date one (1) year after transfer of such Shares to Optionee upon exercise of this Option, then Optionee shall immediately notify the Company in writing of such disposition. If Optionee is married, the Spousal Consent, attached hereto as Exhibit 1, should be completed by Optionee's spouse and returned with this Agreement.

3.    TAX CONSEQUENCES. OPTIONEE UNDERSTANDS THAT OPTIONEE MAY SUFFER ADVERSE TAX CONSEQUENCES AS A RESULT OF OPTIONEE'S PURCHASE OR DISPOSITION OF THE SHARES. OPTIONEE REPRESENTS THAT OPTIONEE HAS CONSULTED WITH ANY TAX CONSULTANT(S) OPTIONEE DEEMS ADVISABLE IN CONNECTION WITH THE PURCHASE OR DISPOSITION OF THE SHARES AND THAT OPTIONEE IS NOT RELYING ON THE COMPANY FOR ANY TAX ADVICE.

4.    ENTIRE AGREEMENT. The Plan and the Stock Option Agreement are incorporated herein by reference. This Stock Option Exercise Agreement, the Plan and the Stock Option Agreement constitute the entire agreement and understanding and supersede in their entirety all prior understandings and agreements of the Company and Optionee with respect to the subject matter hereof, and are governed by California law except for that body of law pertaining to choice of law or conflicts of law.

Date:

SIGNATURE OF OPTIONEE

Source: FORMFACTOR INC, 10-K, February 27, 2008

EXHIBIT 1

SPOUSAL CONSENT

I have read the foregoing Stock Option Exercise Agreement (the "AGREEMENT") and I know its contents. I consent to and approve of the Agreement, and agree that the shares of the Common Stock of FormFactor, Inc. purchased pursuant to the Agreement (the "SHARES") including any interest I may have in the Shares, are subject to all the provisions of the Agreement. I will take no action at any time to hinder application of the Agreement to the Shares or to any interest I may have in the Shares.

Date: _____

_____
SIGNATURE OF OPTIONEE'S SPOUSE

_____
SPOUSE'S NAME—TYPED OR PRINTED

_____
OPTIONEE'S NAME—TYPED OR PRINTED

Source: FORMFACTOR INC, 10-K, February 27, 2008

EXHIBIT C

FORMFACTOR, INC.

2002 EQUITY INCENTIVE PLAN

Source: FORMFACTOR INC, 10-K, February 27, 2008

EXEMPT AND NON-EXEMPT/EXERCISABLE AS VESTS

NO.

FORMFACTOR, INC.
2002 EQUITY INCENTIVE PLAN
STOCK OPTION AGREEMENT

FormFactor, Inc., a Delaware corporation (the "COMPANY"), hereby grants an option (this "OPTION") to the Optionee named below ("OPTIONEE") as of the Date of Grant set forth below (the "DATE OF GRANT") pursuant to the Company's 2002 Equity Incentive Plan (the "PLAN") and this Stock Option Agreement (this "AGREEMENT"), which includes the Terms and Conditions (the "TERMS AND CONDITIONS") set forth on Exhibit A hereto. Capitalized terms not defined in this Agreement have the meanings ascribed to them in the Plan.

OPTIONEE:

SOCIAL SECURITY NUMBER:

OPTIONEE'S ADDRESS:

TOTAL OPTION SHARES:

EXERCISE PRICE PER SHARE:

DATE OF GRANT:

EXPIRATION DATE:                     (unless earlier terminated under Section 3 hereof or pursuant to Section 18 of the Plan)

FIRST VESTING DATE:

VESTING SCHEDULE:                    % of the Shares will vest on the First Vesting Date; then
                                     % of the Shares will vest on each monthly anniversary of the First Vesting Date until 100% vested.

TYPE OF STOCK OPTION:                ☐ INCENTIVE STOCK OPTION

(CHECK ONE):                         ☐ NONQUALIFIED STOCK OPTION

The Company has signed this Agreement effective as the Date of Grant and has caused it to be executed in duplicate by its duly authorized representative.

FORMFACTOR, INC.

By: _____

_____
(Please print name)

_____
(Please print title)

Source: FORMFACTOR INC, 10-K, February 27, 2008

FormFactor, Inc.
Stock Option Agreement
2002 Equity Incentive Plan
No.

Optionee acknowledges receipt of this Agreement (including the Terms and Conditions), a copy of the Plan, attached hereto as Exhibit C, and the form of Exercise Agreement, attached hereto as Exhibit B. Optionee has read and understands these documents and accepts this Option subject to all the terms and conditions of the Plan and this Agreement. Optionee has executed this Agreement in duplicate as of the Date of Grant.

OPTIONEE

_____

(Signature)

_____

(Please print name)

2

Source: FORMFACTOR INC, 10-K, February 27, 2008

EXHIBIT A

STOCK OPTION AGREEMENT TERMS AND CONDITIONS

This Option is subject to the following Terms and Conditions and the terms and conditions of the Plan, which are incorporated herein by reference. This Agreement, the Plan and the Exercise Agreement constitute the entire agreement and understanding of the Company and the Optionee with respect to this Option and supersede all prior understandings and agreements with respect to such subject matter. If there is any discrepancy, conflict or omission between this Agreement and the provisions of the Plan as interpreted by the Committee, the provisions of the Plan shall apply.

1.   GRANT OF OPTION.   The Company hereby grants to Optionee this Option to purchase up to the total number of shares of Common Stock of the Company (the "SHARES") at the Exercise Price Per Share (the "EXERCISE PRICE"), each as set forth on the first page of this Agreement, subject to the terms and conditions of this Agreement and the Plan. If designated as an Incentive Stock Option, this Option is intended to qualify to the extent permitted as an "incentive stock option" ("ISO") within the meaning of Section 422 of the Internal Revenue Code of 1986, as amended (the "CODE").

2.   EXERCISE PERIOD.

2.1   Vesting of Shares.   This Option is exercisable as it vests. Subject to the terms and conditions of the Plan and this Agreement, this Option shall vest and become exercisable as set forth on the first page of this Agreement if Optionee has continuously provided services to the Company, or any Parent or Subsidiary of the Company.

[2.2   Acceleration of Vesting in Certain Circumstances Following a Corporate Transaction.   In addition to the vesting provided herein, the Option and Shares subject to this Option shall become vested and exercisable immediately prior to the occurrence of a Non-Justifiable Termination (as defined below) occurring during the period beginning on the date of consummation of a Corporate Transaction (as defined in the Plan) and ending twelve (12) months thereafter, as to an additional number of Shares equal to the number of Shares that would have vested and become exercisable during the twelve (12) months following the date of such Non-Justifiable Termination (which accelerated vesting and exercisability is referred to herein as the "CORPORATE TRANSACTION VESTING"). "NON-JUSTIFIABLE TERMINATION" means any Termination by the Company, or any Parent or Subsidiary of the Company or the successor-in-interest to the Company following a Corporate Transaction, other than for Cause (as defined below). "CAUSE" (for purposes of this paragraph only) means (i) any willful participation by Optionee in acts of either material fraud or material dishonesty against the Company or any Subsidiary or Parent of

3

the Company or the successor-in-interest to the Company following a Corporate Transaction; (ii) any indictment or conviction of Optionee of any felony (excluding drunk driving); (iii) any willful act of gross misconduct by Optionee which is materially and demonstrably injurious to the Company or any Subsidiary or Parent of the Company or the successor-in-interest to the Company following a Corporate Transaction; or (iv) the death or Disability of Optionee. Notwithstanding anything to the contrary set forth in this Agreement, if a Corporate Transaction Vesting occurs by reason of a Non-Justifiable Termination, then this Option may be exercised by Optionee up to, but no later than, three (3) months after the date of such Non-Justifiable Termination, but in any event no later than the Expiration Date.]

[2.3    Acceleration of Vesting on Death or Disability.    In the event of Termination of Optionee as a result of his or her death or "permanent and total disability," as such term is defined in Section 22(e)(3) of the Code, then, in addition to the vesting provided herein, the Option and Shares subject to the Option shall become vested and exercisable as to an additional number of Shares equal to the number of Shares that would have vested and become exercisable during the twelve (12) months following the Termination Date of Optionee; provided, however, such vested Option may be exercised no later than twelve (12) months after the Termination Date, but in any event no later than the Expiration Date.]

2.[4]    Expiration.    This Option expires on the Expiration Date set forth on the first page of this Agreement and must be exercised, if at all, on or before the earlier of the Expiration Date or the date on which this Option is terminated in accordance with the provisions of this Section 2, Section 3 of this Agreement or Section 18 of the Plan.

3.    TERMINATION.

3.1    Termination for Any Reason Except Death, Disability or Cause.    If Optionee is Terminated for any reason except Optionee's death, Disability or Cause (as such terms are defined in the Plan), then this Option, to the extent that it is vested on the Termination Date in accordance with the schedule set forth on the first page of this Agreement, may be exercised by Optionee during the three (3) months following the Termination Date, but in any event must be exercised no later than the Expiration Date.

3.2    Termination Because of Death or Disability.    If Optionee is Terminated because of Optionee's death or Disability (or Optionee dies within three (3) months after Termination for any reason except Cause or Disability), then this Option, to the extent (and only to the extent) that it is vested on the Termination Date in accordance with the schedule set forth on the first page of this Agreement, may be exercised by Optionee (or Optionee's legal representative or authorized assignee) during the twelve (12) months following the Termination Date, but in any event must be exercised no later than the Expiration Date. Any exercise occurring more than three months following the Termination Date (when the Termination is for any reason other than Optionee's death or disability (as defined in the Code)), shall be deemed to be the exercise of a nonqualified stock option.

4

3.3   Termination for Cause.   If Optionee is Terminated for Cause, then this Option, to the extent (and only to the extent) that it is vested on the Termination Date in accordance with the schedule set forth on the first page of this Agreement, may be exercised by Optionee no later than one (1) month after the Termination Date, but in any event must be exercised no later than the Expiration Date.

3.4   No Obligation to Employ.   Nothing in the Plan or this Agreement confers on Optionee any right to continue in the employ of, or other relationship with, the Company or any Parent or Subsidiary of the Company (or any successor-in-interest to the Company), or limits in any way the right of the Company or any Parent or Subsidiary of the Company to terminate Optionee's employment or other relationship at any time, with or without Cause.

4.   MANNER OF EXERCISE.

4.1   Stock Option Exercise Agreement.   To exercise this Option, Optionee (or in the case of exercise after Optionee's death or Disability, Optionee's legal representative) must deliver to the Company an executed stock option exercise agreement in the form attached hereto as Exhibit B, or in such other form as may be approved by the Committee from time to time (the "EXERCISE AGREEMENT"). If someone other than Optionee exercises this Option, then such person must submit documentation reasonably acceptable to the Company that such person has the right to exercise this Option.

4.2   Limitations on Exercise.   This Option may not be exercised (a) unless such exercise is in compliance with all applicable federal and state securities laws and with all applicable requirements of any stock exchange on which the Company's Common Stock may be listed at the time of such issuance and (b) as to fewer than 100 Shares unless it is exercised as to all Shares as to which this Option is then exercisable. The Company is under no obligation to register or qualify the Shares with the SEC, any state securities commission or any stock exchange to effect such compliance.

4.3   Payment.   The Exercise Agreement shall be accompanied by full payment of the Exercise Price for the Shares being purchased in cash (by check), or, where permitted by law, by any method set forth in the Exercise Agreement or any additional method approved by the Committee from time to time.

4.4   Tax Withholding.   At the time of exercise, Optionee must pay or provide for any applicable federal or state withholding obligations of the Company associated with the exercise of this Option. If the Committee permits at the time of exercise, Optionee may provide for payment of withholding taxes upon exercise of this Option by requesting that the Company retain Shares with a Fair Market Value equal to the minimum amount of taxes required to be withheld, in which case, the Company shall issue the net number of Shares to Optionee after deducting the Shares retained from the Shares issuable upon exercise.

5

Source: FORMFACTOR INC, 10-K, February 27, 2008

5.  NONTRANSFERABILITY OF OPTION AND SHARES.

This Option may not be transferred in any manner other than under the terms and conditions of the Plan or by will or by the laws of descent and distribution and may be exercised during the lifetime of Optionee only by Optionee. The terms of this Option shall be binding upon the legal representatives and authorized executors and assignees of Optionee.

6.  TAX CONSEQUENCES.

Optionee should refer to the prospectus for the Plan for a description of the federal tax consequences of exercising this Option and disposing of the Shares. A copy of the Prospectus is available at the Finance/Stock Administration page of the Company's internal website, or upon request from the Company's Stock Administrator at (925) 456-7334.

7.  PRIVILEGES OF STOCK OWNERSHIP.

Optionee shall not have any of the rights of a stockholder with respect to any Shares until the Shares are issued to Optionee.

8.  NOTICES.

Any notice required to be given or delivered to the Company under the terms of this Agreement shall be in writing and addressed to the Corporate Secretary of the Company at its principal corporate offices. Any notice required to be given or delivered to Optionee shall be in writing and addressed to Optionee at the address indicated on the first page of this Agreement or to such other address as such party may designate in writing from time to time to the Company. All notices shall be deemed to have been given or delivered upon: personal delivery; three (3) days after deposit in the United States mail by certified or registered mail (return receipt requested); one (1) business day after deposit with any return receipt express courier (prepaid); or one (1) business day after transmission by facsimile or email.

9.  SUCCESSORS AND ASSIGNS.

The Company may assign any of its rights under this Agreement. This Agreement shall be binding upon and inure to the benefit of the successors and assigns of the Company. Subject to the restrictions on transfer set forth herein, this Agreement shall be binding upon Optionee and Optionee's legal representatives and authorized assignees.

10.  GOVERNING LAW.

This Agreement shall be governed by and construed in accordance with the internal laws of the State of California, without regard to that body of law pertaining to choice of law or conflicts of law.

6

Source: FORMFACTOR INC, 10-K, February 27, 2008

Stock Option Agreement No.

EXHIBIT B

FORMFACTOR, INC.
2002 EQUITY INCENTIVE PLAN (THE "PLAN")
STOCK OPTION EXERCISE AGREEMENT

I ("OPTIONEE") hereby elect to purchase the number of shares of Common Stock of FormFactor, Inc. (the "Company") indicated below:

Optionee

Social Security Number:

Address:

Type of Option:          ☐ Incentive Stock Option
                         ☐ Nonqualified Stock Option

Number of Shares Purchased:

Purchase Price per Share:

Aggregate Purchase Price:

Date of Grant:

Exact Name of Title to Shares:

1.    DELIVERY OF PURCHASE PRICE. Optionee hereby delivers to the Company the Aggregate Purchase Price as follows (check as applicable and complete):

☐         in cash (by check) in the amount of $                    , receipt of which is acknowledged by the Company;

☐         [by cancellation of indebtedness of the Company to Optionee in the amount of $                    ;]

☐         [by delivery of              fully-paid, nonassessable and vested shares of the Common Stock of the Company owned by Optionee for at least six (6) months prior to the date hereof (and which have been paid for within the meaning of SEC Rule 144), or obtained by Optionee in the open public market, and owned free and clear of all liens, claims, encumbrances or security interests, valuedat the current Fair Market Value of $              per share;]

☐         [by the waiver hereby of compensation due or accrued to Optionee for services rendered in the amount of $                    ;]

☐         through a "same-day-sale" commitment from Optionee and a broker-dealer that is a member of the National Association of Securities Dealers (an "NASD DEALER") whereby Optionee irrevocably elects to exercise the Option and to sell a portion of the Shares so purchased to pay for the Aggregate Purchase Price and whereby the NASD Dealer irrevocably commits upon receipt of such Shares to forward the Aggregate Purchase Price (along with any required tax withholding) directly to the Company; or

☐         [through a "margin" commitment from Optionee and the NASD Dealer named therein, whereby Optionee irrevocably elects to exercise the Option and to pledge the Shares so purchased to the NASD Dealer in a margin account as security for a loan from the NASD Dealer in the amount of the Exercise Price, and whereby the NASD Dealer irrevocably commits upon receipt of such Shares to forward the Aggregate Purchase Price (along with any required tax withholding) directly to the Company.]

2.    UNDERTAKINGS. To the extent this Option is an ISO, if Optionee sells or otherwise disposes of any of the Shares acquired pursuant to the ISO on or before the later of (a) the date two (2) years after the Date of Grant, and (b) the date one (1) year after transfer of such Shares to Optionee upon exercise of this Option, then Optionee shall immediately notify the Company in writing of such disposition. If Optionee is married, the Spousal Consent, attached hereto as Exhibit 1, should be completed by Optionee's spouse and returned with this Agreement.

3.    TAX CONSEQUENCES. OPTIONEE UNDERSTANDS THAT OPTIONEE MAY SUFFER ADVERSE TAX CONSEQUENCES AS A RESULT OF OPTIONEE'S PURCHASE OR DISPOSITION OF THE SHARES. OPTIONEE REPRESENTS THAT OPTIONEE HAS CONSULTED WITH ANY TAX CONSULTANT(S) OPTIONEE DEEMS ADVISABLE IN CONNECTION WITH THE PURCHASE OR DISPOSITION OF THE SHARES AND THAT OPTIONEE IS NOT RELYING ON THE COMPANY FOR ANY TAX ADVICE.

4.    ENTIRE AGREEMENT. The Plan and the Stock Option Agreement are incorporated herein by reference. This Stock Option Exercise Agreement, the Plan and the Stock Option Agreement constitute the entire agreement and understanding and supersede in their entirety all prior understandings and agreements of the Company and Optionee with respect to the subject matter hereof, and are governed by California law except for that body of law pertaining to choice of law or conflicts of law.

Date:

SIGNATURE OF OPTIONEE

Source: FORMFACTOR INC, 10-K, February 27, 2008

EXHIBIT 1

SPOUSAL CONSENT

I have read the foregoing Stock Option Exercise Agreement (the "AGREEMENT") and I know its contents. I consent to and approve of the Agreement, and agree that the shares of the Common Stock of FormFactor, Inc. purchased pursuant to the Agreement (the "SHARES") including any interest I may have in the Shares, are subject to all the provisions of the Agreement. I will take no action at any time to hinder application of the Agreement to the Shares or to any interest I may have in the Shares.

Date: _____

_____
SIGNATURE OF OPTIONEE'S SPOUSE

_____
SPOUSE'S NAME—TYPED OR PRINTED

_____
OPTIONEE'S NAME—TYPED OR PRINTED

Source: FORMFACTOR INC, 10-K, February 27, 2008

[FORMFACTOR LOGO]

## 2002 EQUITY INCENTIVE PLAN
## RESTRICTED STOCK UNIT AGREEMENT

FormFactor, Inc., a Delaware corporation (the "Company"), hereby awards Restricted Stock Units ("RSUs") to the Participant named below as of the Date of Award set forth below pursuant to the Company's 2002 Equity Incentive Plan, as amended (the "Plan"). The terms and conditions of the Award are set forth in this cover sheet, in the attached Restricted Stock Unit Agreement (the "Agreement") and in the Plan. Capitalized terms not defined in this Agreement have the meaning ascribed to them in the Plan.

Name of Participant: _____

Participant's Social Security or Global ID Number: _____

Participant's Address: _____

_____

Award Number: _____

Date of Award: _____

Number of Restricted Stock Units Awarded: _____

Amount Paid by Participant for the RSUs Awarded: _____

Vesting Schedule:       Provided the Participant renders continuous service to the Company, the RSUs will become incrementally vested as
                   to        % of the total number of RSUs awarded (rounded to nearest whole number), on each of the following dates:

The Company has signed this Agreement effective as of the Date of Award and has caused it to be executed in duplicate by its duly authorized representative.

FORMFACTOR, INC.

[Name]

[Title]

1

Source: FORMFACTOR INC, 10-K, February 27, 2008

**FORMFACTOR, INC.**
**2002 EQUITY INCENTIVE PLAN**
**RESTRICTED STOCK UNIT AGREEMENT**
**TERMS AND CONDITIONS**

This Award is subject to the following Terms and Conditions and the terms and conditions of the Plan, which are incorporated herein by reference. The Participant and the Company agree to execute such further instruments and to take such further action as may reasonably be necessary to carry out the intent of this Agreement.

This Agreement, the Plan and the preceding cover sheet constitute the entire agreement and understanding of the Company and the Participant with respect to this Award and supersede all prior understandings and agreements with respect to such subject matter. If there is any discrepancy, conflict or omission between this Agreement and the provisions of the Plan as interpreted by the Committee, the provisions of the Plan shall apply.

1.  **EFFECT OF TERMINATION OF EMPLOYMENT.**   If the Participant's employment is terminated by the Participant or by the Company before an applicable vesting date for any reason, all of the RSUs which have not yet vested shall be forfeited without consideration.

2.  **SETTLEMENT.**   To the extent an RSU becomes vested, and subject to the Participant's satisfaction of any tax withholding obligations as discussed below, each vested RSU will be settled in Shares on the applicable vesting date(s) (or the first market trading day thereafter if the vesting date is not a market trading day) in exchange for such RSU. Issuance of Shares shall be in complete satisfaction of such vested RSUs. Such settled RSUs shall be immediately cancelled and no longer outstanding and you shall have no further rights or entitlements related to those settled RSUs.

3.  **RESTRICTIONS ON ISSUANCE.**   The Company will not issue any Shares if the issuance of such Shares at that time would violate any law or regulation.

4.  **TAX WITHHOLDING OBLIGATIONS.**   The Participant shall satisfy his or her withholding tax obligations, but no more than the minimum statutory withholding amounts, by having the Company withhold all or a portion of any Shares that otherwise would be issued to the Participant. The withholding tax obligations and the Shares to be withheld for such obligations shall be valued based on the Fair Market Value of the Shares as of the last market trading day immediately preceding the Vesting Date. Any payment of taxes by assigning Shares to the Company may be subject to restrictions, including, but not limited to, any restrictions required by rules of the Securities and Exchange Commission or the Financial Accounting Standards Board.

5.  **TAX ADVICE.**   The Participant represents, warrants and acknowledges that the Company has made no warranties or representations to the Participant with respect to the income tax consequences of the transactions contemplated by this Agreement, and the Participant is in no manner relying on the Company or the Company's representatives for an assessment of such tax consequences. THE PARTICIPANT UNDERSTANDS THAT THE TAX LAWS AND REGULATIONS ARE SUBJECT TO CHANGE. THE PARTICIPANT SHOULD CONSULT HIS OR HER OWN TAX ADVISOR REGARDING ANY RESTRICTED STOCK UNITS. NOTHING STATED HEREIN IS INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, FOR THE PURPOSE OF AVOIDING TAXPAYER PENALTIES.

6.  **NON-TRANSFERABILITY.**   The RSUs may not be anticipated, assigned, attached, garnished, optioned, transferred or made subject to any creditor's process, whether voluntarily or involuntarily or by operation of law other than under the terms and conditions of the Plan. The terms of the RSUs shall be binding upon the legal representatives and authorized executors and assignees of Participant.

2

7.    **RESTRICTION OF TRANSFER.**    Regardless of whether the transfer or issuance of the Shares to be issued pursuant to the vesting of RSUs has been registered under the Securities Act or has been registered or qualified under the securities laws of any state, the Company may impose additional restrictions upon the sale, pledge, or other transfer of the Shares (including the placement of appropriate legends on stock certificates and the issuance of stop-transfer instructions to the Company's transfer agent) if, in the judgment of the Company and the Company's counsel, such restrictions are necessary in order to achieve compliance with the provisions of the Securities Act, the securities laws of any state, or any other law.

8.    **RIGHTS AS SHAREHOLDER.**    The Participant holding RSUs shall have no rights other than those of a general creditor of the Company. Subject to the terms of this Agreement, the Participant holding outstanding RSUs has none of the rights and privileges of a shareholder of the Company, including no right to vote or to receive dividends (if any). Subject to the terms and conditions of this Agreement, RSUs create no fiduciary duty of the Company to the Participant and only represent an unfunded and unsecured contractual obligation of the Company. The RSUs shall not be treated as property or as a trust fund of any kind.

9.    **ADMINISTRATION.**    The Committee shall have the power to interpret the Plan and this Agreement and to adopt such rules for the administration, interpretation, and application of the Plan as are consistent therewith and to interpret or revoke any such rules. All actions taken and all interpretations and determinations made by the Committee shall be final and binding upon the Participant, the Company, and all other interested persons. No member of the Committee shall be personally liable for any action, determination, or interpretation made in good faith with respect to the Plan or this Agreement.

10.    **EFFECT ON OTHER EMPLOYEE BENEFIT PLANS.**    The value of the RSUs awarded pursuant to this Agreement shall not be included as compensation, earnings, salaries, or other similar terms used when calculating the Participant's benefits under any employee benefit plan sponsored by the Company except as such plan otherwise expressly provides. The Company expressly reserves its rights to amend, modify, or terminate any of the Company's employee benefit plans.

11.    **NO EMPLOYMENT RIGHTS.**    The award of the RSUs pursuant to this Agreement shall not give the Participant any right to remain employed by the Company or a Subsidiary. The Participant agrees that the Participants rights hereunder shall be subject to set-off by the Company for any valid debts the Participant owes the Company.

12.    **NOTICES.**    Any notice to be given under the terms of this Agreement to the Company shall be addressed to the Company in care of its Secretary. Any notice to be given to the Participant shall be addressed to the Participant at the address listed in the employer's records. By a notice given pursuant to this Section, either party may designate a different address for notices. Any notice shall have been deemed given when actually delivered.

13.    **SEVERABILITY.**    If all or any part of this Agreement or the Plan is declared by any court or governmental authority to be unlawful or invalid, such unlawfulness or invalidity shall not invalidate any portion of this Agreement or the Plan not declared to be unlawful or invalid. Any Section of this Agreement (or part of such a Section) so declared to be unlawful or invalid shall, if possible, be construed in a manner which will give effect to the terms of such Section or part of a Section to the fullest extent possible while remaining lawful and valid.

14.    **CONSTRUCTION.**    The RSUs are being issued pursuant to the Plan and are subject to the terms of the Plan. A copy of the Plan has been made available to the Participant, and additional copies of the Plan are available upon request during normal business hours at the principal executive offices of the Company. To the extent that any provision of this Agreement violates or is inconsistent with an express

3

Source: FORMFACTOR INC, 10-K, February 27, 2008

provision of the Plan, the Plan provision shall govern and any inconsistent provision in this Agreement shall be of no force or effect.

**15.    ADJUSTMENTS.**    In the event of a stock split, a stock dividend or a similar change in the Company stock, the number of outstanding RSUs covered under this Agreement may be adjusted pursuant to the Plan.

**16.    LIABILITY.**    The Company (or members of the Board or Committee) shall not be liable to the Participant or other persons as to: (i) the non-issuance or sale of Shares as to which the Company has been unable to obtain from any regulatory body having jurisdiction the authority deemed by the Company's counsel to be necessary to the lawful issuance and sale of any Shares hereunder; and (ii) any unexpected or adverse tax consequence realized by the Participant or other person due to the award, receipt, or settlement of RSUs or Shares under this Agreement.

**17.    MISCELLANEOUS.**

17.1  This Agreement shall be subject to all applicable laws, rules, and regulations, and to such approvals by any governmental agencies or national securities exchanges as may be required.

17.2  The Company may assign any of its rights under this Agreement. This Agreement shall be binding upon and inure to the benefit of the successors and assigns of the Company. Subject to the restrictions on transfer set forth herein, this Agreement shall be binding upon the Participant and Participant's legal representatives and authorized assignees.

17.3  To the extent not preempted by federal law, this Agreement shall be governed by, and construed in accordance with, the laws of the State of California.

4

Source: FORMFACTOR INC, 10-K, February 27, 2008

QuickLinks

EXHIBIT 10.06
FORMFACTOR, INC. 2002 EQUITY INCENTIVE PLAN As Adopted April 18, 2002 As Amended February 9, 2006, May 18, 2006 and December 13, 2007
EXHIBIT A STOCK OPTION AGREEMENT TERMS AND CONDITIONS
EXHIBIT 1 SPOUSAL CONSENT
EXHIBIT C FORMFACTOR, INC. 2002 EQUITY INCENTIVE PLAN
EXHIBIT A STOCK OPTION AGREEMENT TERMS AND CONDITIONS
EXHIBIT 1 SPOUSAL CONSENT
EXHIBIT C FORMFACTOR, INC. 2002 EQUITY INCENTIVE PLAN
EXHIBIT A STOCK OPTION AGREEMENT TERMS AND CONDITIONS
EXHIBIT 1 SPOUSAL CONSENT
EXHIBIT C FORMFACTOR, INC. 2002 EQUITY INCENTIVE PLAN
EXHIBIT A STOCK OPTION AGREEMENT TERMS AND CONDITIONS
EXHIBIT C FORMFACTOR, INC. 2002 EQUITY INCENTIVE PLAN
EXHIBIT A STOCK OPTION AGREEMENT TERMS AND CONDITIONS
EXHIBIT 1 SPOUSAL CONSENT
2002 EQUITY INCENTIVE PLAN RESTRICTED STOCK UNIT AGREEMENT
FORMFACTOR, INC. 2002 EQUITY INCENTIVE PLAN RESTRICTED STOCK UNIT AGREEMENT TERMS AND CONDITIONS

<u>QuickLinks</u> -- Click here to rapidly navigate through this document

EXHIBIT 10.12

**[FORMFACTOR LETTERHEAD]**

September 25, 2007

Jorge Luis Titinger
[Home Address]

Dear Jorge,

We welcome the opportunity to offer you a salaried, exempt position with FormFactor, Inc. (the "Company") as Senior Vice President, Product Business Group, with a start date to be determined upon your acceptance. We look forward to having you join us at this exciting time for the Company. We are very impressed with your background, demonstrated abilities, and fundamental understanding of the challenges involved in a fast paced, growing company, and look forward to your participation in meeting the opportunities ahead.

In your capacity as Senior Vice President, Product Business Group, you will report to Igor Khandros CEO, and will receive an annual salary of $350,000, which will be paid bi-weekly in accordance with, and subject to, the Company's normal payroll procedures. Additionally, you will be eligible to participate in the key management bonus plan at a target rate of 110% of your earned annual salary. This bonus is conditioned upon the company's performance and your individual achievement of objectives, and will be prorated based upon your start date through the end of the bonus period. As long as you remain a regular full-time employee of the Company, you are eligible to receive certain employee benefits that are offered to our regular full-time employees which may from time to time change at the Company's discretion. These currently include:

- Medical, Dental and Vision Insurance Benefits
- Short-Term and Long-Term Disability Insurance Coverage
- Group Life Insurance
- Paid Time-Off
- 401k Plan
- 401(k) match
- 401(k) Variable Compensation Plan
- Section 125 Flex Spending Plan
- Employee Assistance Program
- Employee Stock Purchase Plan

Coverage for the above-mentioned medical, dental, vision, disability and life insurance benefits begin on your date of hire. Dependent coverage is also available through this plan. Employee and dependent contributions to the plan are outlined in our employee benefits guide ("Benefactor").

You will be entitled to fifteen days (15) of paid time-off annually. Paid time-off will accrue at the rate of 4.62 hours per pay period starting from your first day of employment. Paid time-off may be used for vacation or sick leave.

Following your employment commencement date, you will be granted a stock option, entitling you to purchase 100,000 shares of common stock of the Company. The exercise price of your option will be set at the fair market value of the Company's common stock as determined by the closing price on the Nasdaq National Market on the date of grant, which will be your date of hire. The "Vesting Commencement Date" will also be your date of hire. The option shall be subject to the terms and conditions of the Company's 2002 Equity Incentive Plan. The option vests over a four-year period. On the first anniversary of the Vesting Commencement Date, the option shall be vested as to twenty-five percent (25%) of the shares covered by the option. The remaining Shares subject to the option shall then vest on a monthly basis commencing one year after the Vesting Commencement Date in increments of $1/36$ of the remaining shares subject to the option.

Source: FORMFACTOR INC, 10-K, February 27, 2008

You will also be granted under the Plan, as of the date you commence employment with the Company, Restricted Stock Units ("RSUs") which represent the right to receive 13,650 shares of Company stock upon vesting. The RSUs shall vest in three equal installments on November 1st on each of 2008, 2009, and 2010.

Your agreement to accept this offer is contingent upon your ability to show proof of your legal right to work for the Company in the United States as well as successfully completing a background check required for all new hires.

The Company will pay you a one time "sign on" bonus of $200,000 which you will receive as a separate check, less applicable withholding taxes, included with your first paycheck.

Should your employment with FormFactor be terminated voluntarily at any time during the 12-month period after your start date, a pro-rated portion of the "sign on" bonus must be paid back to the Company within 30 days.

You should be aware that your employment with the Company is for no specified period and constitutes at will employment. As a result, you are free to resign at any time, for any reason or for no reason. Similarly, the Company is free to conclude its employment relationship with you at any time, with or without cause.

I have enclosed our standard Agreement Regarding Employment, Confidential Information, Invention Assignment, and Arbitration as a condition of your employment. We will not be able to commence your employment until we have received a signed copy of this document. If you accept this offer, please return a signed copy to me.

Additionally, you will be required to comply at all times with the Company's various rules, policies and procedures, including those set forth in our Employee Handbook, our Statement of Corporate Code of Business Conduct ("Corporate Code"), and our Statement of Policy regarding Insider Trading ("Insider Trading Policy"). Copies of these three documents, and all our policies and procedures will be available in hard copy and on inFORM—our internal intranet site. Within 30 days of the commencement of your employment, you will be required to provide the Company with signed acknowledgements relating to the Employee Handbook, the Corporate Code and the Insider Trading Policy. You should understand that, while referenced in this offer letter, the Company rules, policies and procedures are not incorporated by reference into this offer letter, and they can be changed, replaced or withdrawn at any time at the discretion of the Company.

In the event of any dispute or claim relating to or arising out of our employment relationship, you and the Company agree that all such disputes shall be fully and finally resolved by binding arbitration conducted by the American Arbitration Association in Alameda County, California. However, the parties shall continue to have the right to seek judicial relief in the form of injunctive and/or equitable relief, including but not limited to relief for threatened or actual misappropriation of trade secrets or other unfair competition.

To indicate your acceptance of the Company's offer, please sign and date this letter in the space provided below and return it to me. A duplicate original is enclosed for your records. This letter, along with the agreement relating to proprietary rights between you and the Company, set forth the terms of your employment with the Company and supersede any prior representations or agreements, whether written or oral. This letter may not be modified or amended except by a written agreement, signed by an officer of the Company and by you.

Source: FORMFACTOR INC, 10-K, February 27, 2008

Jorge, we look forward to your favorable reply and to a productive, fun and exciting work relationship. To confirm your acceptance of this offer, please sign and date one copy of this letter and return to me. The other copy is for you to retain for your records. This offer, if not accepted, will expire five (5) days from the offer date. Please call me if you have any questions.

Sincerely,

/s/ IGOR KHANDROS

Igor Khandros
CEO,
FormFactor, Inc

ACCEPTED AND AGREED TO this 3 $^{rd}$ day of OCTOBER, 2007

/s/ JORGE L. TITINGER

Anticipated start date: 11/5/2007

Jorge Luis Titinger

Source: FORMFACTOR INC, 10-K, February 27, 2008

QuickLinks

EXHIBIT 10.12

QuickLinks -- Click here to rapidly navigate through this document

**EXHIBIT 21.01**

### LIST OF REGISTRANT'S SUBSIDIARIES

| SUBSIDIARY NAME | JURISDICTION OF ORGANIZATION |
| --- | --- |
| FormFactor Europe Limited | United Kingdom |
| FormFactor Germany GmbH | Germany |
| FormFactor Hungary Licensing LLC | Hungary |
| FormFactor International, Inc. | Delaware, United States |
| FormFactor, KK | Japan |
| FormFactor Korea, Inc. | South Korea |
| FormFactor Singapore Pte. Ltd. | Singapore |

Source: FORMFACTOR INC, 10-K, February 27, 2008

QuickLinks

EXHIBIT 21.01
LIST OF REGISTRANT'S SUBSIDIARIES

Source: FORMFACTOR INC, 10-K, February 27, 2008

QuickLinks -- Click here to rapidly navigate through this document

EXHIBIT 23.01

**CONSENT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

We hereby consent to the incorporation by reference in the Registration Statements on Form S-8 (No. 333-148198, 333-106043, 333-115137, 333-125918, 333-139074 and 333-148198) of FormFactor, Inc. of our report dated February 20, 2008 relating to the financial statements and the effectiveness of internal control over financial reporting, which appears in this Form 10-K.

/s/ PricewaterhouseCoopers LLP

San Jose, California
February 27, 2008

Source: FORMFACTOR INC, 10-K, February 27, 2008

QuickLinks

EXHIBIT 23.01
CONSENT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

Source: FORMFACTOR INC, 10-K, February 27, 2008

QuickLinks -- Click here to rapidly navigate through this document

EXHIBIT 31.01

**CERTIFICATION OF CHIEF EXECUTIVE OFFICER**
**PURSUANT TO 15 U.S.C. SECTION 7241, AS**
**ADOPTED PURSUANT TO SECTION 302 OF THE SARBANES-OXLEY ACT OF 2002**

I, Igor Y. Khandros, certify that:

1.
> I have reviewed the annual report on Form 10-K of FormFactor, Inc., a Delaware corporation, for the period ended December 29, 2007, as filed with the Securities and Exchange Commission;

2.
> Based on my knowledge, the annual report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by the annual report;

3.
> Based on my knowledge, the financial statements, and other financial information included in the annual report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in the annual report;

4.
> The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

> (a)
>> Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which the annual report is being prepared;

> (b)
>> Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

> (c)
>> Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in the annual report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by the annual report based on such evaluation; and

> (d)
>> Disclosed in the annual report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.
> The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

> (a)
>> All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

> (b)
>> Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: February 27, 2008

/s/ IGOR Y. KHANDROS

Igor Y. Khandros
Chief Executive Officer

Source: FORMFACTOR INC, 10-K, February 27, 2008



QuickLinks

EXHIBIT 31.01
CERTIFICATION OF CHIEF EXECUTIVE OFFICER PURSUANT TO 15 U.S.C. SECTION 7241, AS ADOPTED PURSUANT TO SECTION 302 OF THE SARBANES-OXLEY ACT OF 2002

Source: FORMFACTOR INC, 10-K, February 27, 2008

QuickLinks -- Click here to rapidly navigate through this document

EXHIBIT 31.02

## CERTIFICATION OF CHIEF FINANCIAL OFFICER
### PURSUANT TO 15 U.S.C. SECTION 7241,
### AS ADOPTED PURSUANT TO SECTION 302 OF THE SARBANES-OXLEY ACT OF 2002

I, Ronald C. Foster, certify that:

1.      I have reviewed the annual report on Form 10-K of FormFactor, Inc., a Delaware corporation, for the period ended December 29, 2007, as filed with the Securities and Exchange Commission;

2.      Based on my knowledge, the annual report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by the annual report;

3.      Based on my knowledge, the financial statements, and other financial information included in the annual report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in the annual report;

4.      The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    (a)      Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which the annual report is being prepared;

    (b)      Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    (c)      Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in the annual report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by the annual report based on such evaluation; and

    (d)      Disclosed in the annual report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.      The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    (a)      All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    (b)      Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: February 27, 2008

/s/ RONALD C. FOSTER

Ronald C. Foster
Chief Financial Officer

Source: FORMFACTOR INC, 10-K, February 27, 2008



QuickLinks

EXHIBIT 31.02
CERTIFICATION OF CHIEF FINANCIAL OFFICER PURSUANT TO 15 U.S.C. SECTION 7241, AS ADOPTED PURSUANT TO SECTION 302 OF THE
SARBANES-OXLEY ACT OF 2002

QuickLinks -- Click here to rapidly navigate through this document

EXHIBIT 32.01

**CERTIFICATION OF
CHIEF EXECUTIVE OFFICER AND CHIEF FINANCIAL OFFICER
PURSUANT TO 18 U.S.C. SECTION 1350,
AS ADOPTED PURSUANT TO SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

In connection with the annual report on Form 10-K of FormFactor, Inc., a Delaware corporation, for the period ended December 29, 2007, as filed with the Securities and Exchange Commission, each of the undersigned officers of FormFactor, Inc. certifies pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that, to his respective knowledge:

(1)     the annual report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934, as amended; and

(2)     the information contained in the annual report fairly presents, in all material respects, the financial condition and results of operations of FormFactor, Inc. for the periods presented therein.

Date: February 27, 2008                     /s/  IGOR Y. KHANDROS

                                            Igor Y. Khandros
                                            Chief Executive Officer

Date: February 27, 2008                     /s/  RONALD C. FOSTER

                                            Ronald C. Foster
                                            Chief Financial Officer

Source: FORMFACTOR INC, 10-K, February 27, 2008

QuickLinks

EXHIBIT 32.01
CERTIFICATION OF CHIEF EXECUTIVE OFFICER AND CHIEF FINANCIAL OFFICER PURSUANT TO 18 U.S.C. SECTION 1350, AS ADOPTED
PURSUANT TO SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002

Created by 10KWizard    www.10KWizard.com