future contribution and long-term retention of the executive and our performance compared to the "core" peer group; and

We have determined that one restricted stock unit equals an option to purchase 2.5 shares of our common stock for stock usage and dilution purposes.

Equity awards to our executive officers are generally made on an annual basis, along with the annual option grants made to all other employees of our company. For 2008, the Compensation Committee changed its annual grant date from May to February to assist with our company' talent retention program. All annual grants are made during an open trading window under our company's insider trading policy.

Our executive officers are also eligible to participate in our 2002 Employee Stock Purchase Plan on the same terms as all other employees of our company. The 2002 Employee Stock Purchase Plan permits our eligible employees (including officers) to purchase shares of our common stock at a discount on a periodic basis through payroll deductions of between 1% and 15% of their cash compensation. Each offering period under this plan is now for 12 months fixed duration and consists of two six-month purchase periods. The purchase price for shares of our common stock purchased under this plan is 85% of the lesser of the fair market value of our common stock on the first day of the applicable offering period or the last day of each purchase period. No participant may purchase shares under this plan having a fair market value of more than $25,000, which is determined as of the first day of the applicable offering period, for each calendar year.

We do not have stock ownership guidelines for our officers at this time. The Compensation Committee will periodically evaluate this matter, and implement changes where it deems necessary.

## Change of Control Benefits

In February 2008, we revised and renewed our change of control severance agreements with our executive officers based on a competitive review by FWC of similar agreements in the 2008 peer group, which agreements are described in this Proxy Statement under "Executive Compensation and Related Information—Change of Control, Severance, Separation and Indemnification Agreements." The Compensation Committee believes that these agreements protect the interests of our stockholders by providing a framework for avoiding the distraction and loss of key management personnel that may occur in connection with rumored or actual fundamental corporate changes. The uncertainty about future status of employment among management that can arise in the face of a potential change of control could result in the untimely departure or distraction of key officers. Change of control agreements provide support to officers to remain with our company despite uncertainties while a change of control is under consideration or pending and the Compensation Committee believes that the potential benefits under these agreements are reasonable based on the competitive review.

Under our Key Employee Bonus Plan, which provides for performance bonuses to our executive officers, if a change in control of our company occurs, all bonus awards will be deemed to have been earned at 100% of the bonus target percentage for the current plan measurement period (and for the subsequent consecutive measurement periods if they fall within the same fiscal year) and will be paid to the officer participants at that time.

## Other Benefits and Perquisites

Our executive officers, like our other employees, may participate in various employee benefit plans, including health, dental and vision care plans, life insurance and our company's 401(k) plan. Our company's 401(k) is a defined contribution plan and provides for a company match of 50% for the first 3% of an employee's contributions to the plan. Based on our company's profitability, we also contribute

Source: FORMFACTOR INC, DEF 14A, April 10, 2008

up to 7.5% of an employee's pay. Our company's contributions vest over four years from the employee's hire date for both the company match and profit-sharing portions.

We do not provide perquisites unless there is a company or job-related need. We annually review the perquisites that our officers receive.

## Other Considerations

### Equity Grant Practices

Our practice is to approve annual stock option grants at the February Compensation Committee meeting, and the grant price is the closing price on the day of the Compensation Committee meeting. The Compensation Committee approves all equity grants to our executive officers. Non-executive new hire grants are approved in the normal new hire offer process if within the pre-approved Committee guidelines for new hire grants. Any exceptions require Compensation Committee approval. The grant price and date is set by policy based on the new hire's start of employment.

### Tax Considerations

Section 162(m) of the Internal Revenue Code of 1986, as amended, establishes a limitation on the deductibility of compensation payable in any particular tax year to our Chief Executive Officer and the three other most highly compensated officers of our company excluding our Chief Financial Officer. Section 162(m) of the Code generally provides that publicly-held companies cannot deduct compensation paid to its top officers to the extent that such compensation exceeds $1 million per officer. Compensation that is "performance-based" compensation within the meaning of the Code is exempted from the $1 million deduction limit.

While the Compensation Committee attempts to maximize the deductibility of compensation paid to our Chief Executive Officer and the three other most highly compensated officers, the Committee retains the discretion and flexibility necessary to provide total compensation in line with competitive practice, our compensation philosophy and the interests of our stockholders. Accordingly, from time to time, the Compensation Committee may approve, and our company may pay, compensation to our officers that are not fully deductible under Section 162(m). For example, our Key Employee Bonus Plan does not meet the requirements for a "performance-based plan" under Section 162(m), and so if cash compensation for a covered executive officers exceeds $1 million, the excess would not be deductible. We are, however, asking stockholders to approve certain material terms of our company's 2002 Equity Incentive Plan so that the taxation of awards under the plan to covered executive officers can be exempt from Section 162(m). See "Proposal No. 3—Approval of Material Terms under FormFactor's 2002 Equity Incentive Plan with respect to Section 162(m) of the Internal Revenue Code" for additional information.

## Appointment of President

Effective January 7, 2008, our company appointed Dr. Mario Ruscev as President and as a member of our Board of Directors. Dr. Ruscev reports to our Chief Executive Officer, Dr. Khandros.

Under his employment letter agreement, Dr. Ruscev will be paid an annual base salary of $500,000 and is eligible to receive a bonus under our Key Employee Bonus Plan at a target rate of 100% of base salary with the opportunity to earn 200% of base salary based on achievement of certain objectives pursuant to his employment letter agreement. For 2008, his annual bonus is guaranteed at 100% of base salary. He will also be paid a sign-on bonus of $100,000. Our company also reimbursed Dr. Ruscev for his reasonable moving expenses from Paris, France and provided him with a relocation allowance not to exceed two months of his annual base salary.

Source: FORMFACTOR INC, DEF 14A, April 10, 2008

Under our company's 2002 Equity Incentive Plan, effective as of January 7, 2008, the Compensation Committee granted Dr. Ruscev a stock option to purchase 100,000 shares of our common stock and awarded restricted stock units that represent the right to receive 40,000 shares of our common stock upon vesting. The stock option and the restricted stock units are subject to vesting acceleration upon the occurrence of certain change in control events.

.Dr. Ruscev's employment letter agreement also provides that if his employment is terminated by our company without cause or by him for good reason (as these terms are defined in his employment letter agreement), he will receive a lump sum severance payment equal to one year of his then annual base salary, a pro-rata portion of his annual bonus based upon the calendar days of his employment in the year of his termination, accelerated vesting and extended exercisability of his granted equity awards for an additional twelve month period, and health benefits coverage for up to 12 months. These separation benefits are subject to Dr. Ruscev executing a release and waiver of claims in favor of our company.

Additional information regarding Dr. Ruscev's employment, including a copy of his employment letter agreement, are available in our company's Form 8-K, which we filed on January 7, 2008 with the Securities and Exchange Commission.

### Appointment of Chief Financial Officer

Effective March 31, 2008, our company appointed Jean Bernard Vernet as Chief Financial Officer and a Senior Vice President. Mr. Vernet reports to our President, Dr. Ruscev.

Under his employment letter agreement, Mr. Vernet will be paid an annual base salary of $325,000 and is eligible to receive a bonus under our Key Employee Bonus Plan at a target rate of 90% of base salary. For the 1st half of 2008, his semi-annual bonus is guaranteed at 100% of base salary. Mr. Vernet will receive a sign-on bonus of $100,000. Our company will reimburse his relocation expenses from Canada, including real estate agent commissions up to $40,000 and costs for moving his family and household goods, and pay him one month's base salary as a relocation allowance.

Under our company's 2002 Equity Incentive Plan, effective as of March 31, 2008, the Compensation Committee granted Mr. Vernet a stock option to purchase 50,000 shares of our common stock and awarded restricted stock units that represent the right to receive 20,000 shares of our common stock upon vesting. The stock option and the restricted stock units are subject to vesting acceleration upon the occurrence of certain change in control events.

Additional information regarding Mr. Vernet's employment, including a copy of his employment letter agreement, are available in our company's Form 8-K, which we filed on March 31, 2008 with the Securities and Exchange Commission.

Source: FORMFACTOR INC, DEF 14A, April 10, 2008

## REPORT OF THE COMPENSATION COMMITTEE

The Compensation Committee reviewed and discussed the "Compensation Discussion and Analysis" contained in this Proxy Statement with our company's management. Based on this review and discussions, the Compensation Committee has recommended to FormFactor's Board of Directors that the "Compensation Discussion and Analysis" be included in this Proxy Statement.

Submitted by the Compensation Committee

James A. Prestridge, Chairperson
Dr. Homa Bahrami
G. Carl Everett, Jr.
Lothar Maier

39

## EXECUTIVE COMPENSATION AND RELATED INFORMATION

**Summary Compensation**

The following table presents information regarding the compensation paid during fiscal years 2007 and 2006 to our Chief Executive Officer, our former Chief Financial Officer, our former President and the three other most highly compensated executive officers who served during fiscal 2007.

| Name and Principal Position | Year | Salary ($) | Bonus ($) | Stock Awards ($)(5) | Option Awards ($)(5) | Non-Equity Incentive Plan Compensation ($)(7) | All Other Compensation ($)(8) | Total ($) |
|---|---|---|---|---|---|---|---|---|
| Dr. Igor Y. Khandros | 2007 | $ 487,394 | — | $ 127,548 | $ 1,517,448 | $ 530,234 | $ 20,250 | $ 2,682,874 |
| Chief Executive Officer | 2006 | 436,835 | — | 127,548 | 1,324,428 | 571,981 | 23,022 | 2,483,814 |
| Joseph R. Bronson(1) | 2007 | 20,755 | — | 798,040 | 575,045(6) | — | 400,000 | 1,793,840 |
| Former President and Member of Office of Chief Executive | 2006 | 400,020 | — | 241,700 | 1,210,645 | 523,515 | 61,350 | 2,437,230 |
| Ronald C. Foster(2) | 2007 | 304,231 | — | — | 712,639 | 209,231 | 20,250 | 1,271,912 |
| Former Senior VP and Chief Financial Officer | 2006 | 285,962 | — | — | 484,310 | 261,993 | 18,606 | 1,050,871 |
| Richard M. Freeman | 2007 | 319,577 | — | — | 858,850 | 231,244 | 20,250 | 1,456,998 |
| Senior VP, Operations | 2006 | 285,962 | — | — | 624,875 | 285,811 | 15,797 | 1,212,445 |
| Stuart L. Merkadeau | 2007 | 259,896 | — | — | 751,093 | 193,487 | 20,250 | 1,390,325 |
| Senior VP, General Counsel and Secretary | 2006 | 259,896 | — | — | 727,434 | 216,416 | 15,371 | 1,219,117 |
| Jorge L. Titinger(3) | 2007 | 40,385 | 200,000(4) | 22,741 | 57,601 | — | — | 320,727 |
| Senior VP, Product Business Group | 2006 | | | | | | | |

(1)     Mr. Bronson resigned from our company effective as of January 5, 2007.

(2)     Mr. Foster resigned from our company effective as of March 21, 2008.

(3)     Mr. Titinger joined our company on November 12, 2007. In light of market and business conditions, our company and Mr. Titinger mutually agreed to eliminate his position as part of our company's restructuring activities that we announced in our first fiscal quarter of 2008. Mr. Titinger's last day of employment with our company is anticipated to be on or about June 7, 2008.

(4)     Represents Mr. Titinger's sign-on bonus, which we provided when he joined our company.

(5)     The amounts reflect the dollar amount recognized for the applicable fiscal year for financial statement reporting purposes in accordance with FAS123(R). Assumptions used in the calculation of these amounts are described in Note 6—Stock-Based Compensation to our company's consolidated financial statements in our Annual Report on Form 10-K for the fiscal year ended December 29, 2007.

(6)     The amount represents FAS123(R) option expense of $843,823 less forfeitures of $268,778.

(7)     Represents amounts earned for performance in the applicable year under our company's Key Employee Bonus Plan, which is described under "Compensation Discussion and Analysis" in this Proxy Statement.

(8)     The following table provides detail regarding "All Other Compensation."

Source: FORMFACTOR INC, DEF 14A, April 10, 2008

### All Other Compensation

| Name | Year | Severance Benefits | 401(k) Profit Sharing Contributions(b) | 401(k) Matching Contributions(c) | Housing Allowance | Vehicle Allowance |
|---|---|---|---|---|---|---|
| Dr. Igor Y. Khandros | 2007 | $        —    $ | 16,875 | $        3,375    $ | —    $ | — |
|  | 2006 |  | 14,550 | 1,272 | — | 7,200 |
| Joseph R. Bronson | 2007 | 400,000(a) |  | — | — |  |
|  | 2006 | — | 14,550 | — | 46,800 |  |
| Ronald C. Foster | 2007 | — | 16,875 | 3,375 | — | — |
|  | 2006 | — | 14,550 | 4,056 | — | — |
| Richard M. Freeman | 2007 | — | 16,875 | 3,375 | — | — |
|  | 2006 | — | 14,550 | 1,247 | — | — |
| Stuart L. Merkadeau | 2007 | — | 16,875 | 3,375 | — | — |
|  | 2006 | — | 14,550 | 821 | — | — |
| Jorge L. Titinger | 2007 | — | — | — | — | — |
|  | 2006 | — | — | — | — | — |

(a)    Represents severance payment of $400,000 to Mr. Bronson.

(b)    401(k) profit sharing contributions by our company, which contributions are subject to vesting.

(c)    401(k) matching contributions by our company, which contributions are subject to vesting.

**Grants of Plan-Based Awards in Fiscal 2007**

The following table presents information regarding stock options and restricted stock units granted during fiscal 2007 to our executive officers named in the summary compensation table above. We granted these equity awards to these officers under our 2002 Equity Incentive Plan. The options have an exercise price equal to the closing price of our company's common stock on the Nasdaq Global Market on the grant date and have a seven-year term. The vesting schedules for the stock options and restricted stock units are set forth below in the "Outstanding Equity Awards at Fiscal Year Ended December 29, 2007" table. There can be no assurance that the Grant Date Fair Value of Equity Awards will ever be realized. The following table also presents information regarding potential awards under our Key Employee Bonus Plan for 2007 under the "Non-Equity Incentive Plan Awards" columns.

41

Source: FORMFACTOR INC, DEF 14A, April 10, 2008

All awards presented in the table below are further described under "Compensation Discussion and Analysis—Compensation Decisions—Equity" in this Proxy Statement.

| Name | Estimated Future Payouts Under Non-Equity Incentive Plan Awards(1) | | | Grant Date For Equity Awards | All Other Equity Awards: Number of Securities Underlying Awards | Exercise or Base Price of Option Awards ($/sh) | Grant Date Fair Value of Equity Awards ($)(4) |
|------|------------|------------|------------|-------|-----------|-----------|-----------|
| | Threshold ($) | Target ($) | Maximum ($) | | | | |
| Dr. Igor Y. Khandros | 0 | 675,000 | 1,350,000 | 5/16/07 | 100,000(2) | 41.39 | 1,808,280 |
| Joseph R. Bronson | — | — | — | — | — | — | — |
| Ronald C. Foster | 0 | 310,000 | 573,500 | 5/16/07 | 50,000(2) | 41.39 | 904,140 |
| Richard M. Freeman | 0 | 297,000 | 549,450 | 5/16/07 | 60,000(2) | 41.39 | 1,084,968 |
| Stuart L. Merkadeau | 0 | 234,000 | 432,900 | 5/16/07 | 35,000(2) | 41.39 | 632,898 |
| Jorge L. Titinger | 0 | 385,000 | 712,250 | 11/12/07 | 100,000(2) | 38.46 | 1,790,540 |
| | — | — | — | 11/12/07 | 13,650(3) | — | 524,979 |

(1)  The threshold calculations assume that our company has not met the minimum corporate performance objectives for both semi-annual measurement periods in fiscal 2007 under our Key Employee Bonus Plan. The target and maximum calculations assume that the executive officer provides services to our company during both semi-annual measurement periods in fiscal 2007. Additional information regarding the actual awards to our executive officers in fiscal 2007 is provided under "Compensation Discussion and Analysis—Compensation Decisions—Equity" in this Proxy Statement.

(2)  Represents a stock option award.

(3)  Represents a restricted stock units award.

(4)  The amounts shown reflect the fair value of the award on the grant date used to determine the compensation expense under FAS 123(R) associated with the grant in our company's consolidated financial statements and has been calculated using the Black-Scholes valuation model. The valuations are based on the assumptions discussed in Note 6—Stock-Based Compensation to our company's consolidated financial statements in our Annual Report on Form 10-K for the fiscal year ended December 29, 2007. The Black-Scholes valuation model is only one of the methods available for valuing options, and our company's use of this model should not be interpreted as a prediction as to the actual value that may be realized on the award. The actual value of the award may be significantly different, and the value actually realized, if any, will depend upon the excess of the market value of the common stock over the exercise price at the time of exercise.

42

Source: FORMFACTOR INC, DEF 14A, April 10, 2008

**Outstanding Equity Awards at Fiscal Year Ended December 29, 2007**

The following table presents information regarding outstanding equity awards held by our executive officers named in the summary compensation table above at December 29, 2007.

| Name | Option Awards | | | | Stock Awards | |
|---|---|---|---|---|---|---|
| | Number of Securities Underlying Unexercised Options (#) Exercisable | Number of Securities Underlying Unexercised Options (#) Unexercisable | Option Exercise Price ($) | Option Expiration Date(1) | Number of Shares or Units of Stock That Have Not Vested (#) | Market Value of Shares or Units of Stock That Have Not Vested ($)(15) |
| Dr. Igor Y. Khandros | 104,228 | — | 14.00 | 6/11/2013 | 8,500(13) | 284,495 |
| | 100,000 | — | 19.50 | 8/14/2013 | — | — |
| | 19,999 | 10,001 | 19.50 | 8/14/2013(2) | — | — |
| | 29,000 | 29,000 | 23.56 | 2/15/2015(3) | — | — |
| | 50,000 | 50,000 | 25.39 | 11/4/2015(4) | — | — |
| | 32,885 | 98,655 | 39.84 | 5/11/2013(5) | — | — |
| | — | 100,000 | 41.39 | 5/16/2014(6) | — | — |
| Joseph R. Bronson | — | — | — | — | — | — |
| Ronald C. Foster | 55,825 | 34,375 | 22.83 | 3/2/2015(7) | — | — |
| | 16,395 | 49,185 | 39.84 | 5/11/2013(5) | — | — |
| | — | 50,000 | 41.39 | 5/16/2014(6) | — | — |
| Richard M. Freeman | 130,000 | 30,000 | 17.51 | 9/17/2014(8) | — | — |
| | 20,000 | 20,000 | 25.39 | 11/4/2015(9) | — | — |
| | 9,255 | 27,765 | 39.84 | 5/11/2013(5) | — | — |
| | 5,160 | 15,480 | 39.84 | 5/21/2013(5) | — | — |
| | — | 60,000 | 41.39 | 5/16/2014(6) | — | — |
| Stuart L. Merkadeau | 2,077 | — | 6.50 | 9/6/2011 | — | — |
| | 13,307 | — | 6.50 | 10/30/2011 | — | — |
| | 52,500 | — | 6.50 | 4/17/2012 | — | — |
| | 12,558 | — | 14.00 | 6/11/2013 | — | — |
| | 63,000 | — | 19.50 | 8/14/2013 | — | — |
| | 5,749 | 8,051 | 19.50 | 8/14/2013(10) | — | — |
| | 11,666 | 16,334 | 23.56 | 2/15/2015(10) | — | — |
| | 25,000 | 25,000 | 25.39 | 11/4/2015(11) | — | — |
| | 10,577 | 31,733 | 39.84 | 5/11/2013(5) | — | — |
| | 3,068 | 9,202 | 39.84 | 5/21/2013(5) | — | — |
| | — | 35,000 | 41.39 | 5/16/2014(6) | — | — |
| Jorge L. Titinger | — | 100,000 | 38.46 | 11/12/2013(12) | 13,650(14) | 456,866 |

(1)    Unless otherwise indicated, option is fully vested. Vesting information is based on the original grant.

(2)    Commenced vesting on April 15, 2007 in equal monthly installments over 12 months.

(3)    50% vested on April 3, 2006 and the remaining 50% vested on April 3, 2008.

(4)    25% vests on each April 3 commencing on April 3, 2006.

(5)    25% vests on each May 11 commencing on May 11, 2007.

(6)    25% vests on each May 16 commencing on May 16, 2008.

43

Source: FORMFACTOR INC, DEF 14A, April 10, 2008

(7)      25% vested on March 2, 2006 and the remaining vests ratably each month to March 2, 2009.

(8)      25% vested on September 7, 2005 and the remaining vests ratably each month to September 7, 2008.

(9)      25% vests on each September 7 commencing on September 7, 2005.

(10)     Commenced vesting on July 5, 2007 in equal monthly installments over 12 months.

(11)     25% vests on each July 5 commencing on July 5, 2006.

(12)     25% vests on November 12, 2008 and the remaining vests ratably each month to November 12, 2011.

(13)     Vested on April 3, 2008.

(14)     33 1/3% vests on each November 1 commencing on November 1, 2008.

(15)     Market value was determined by multiplying the price for a share of our company's common stock as of December 28, 2007 by the number of restricted stock units outstanding.

**Option Exercises and Stock Vested at Fiscal Year Ended December 29, 2007**

The following table presents information concerning the exercise of options during fiscal 2007 held by our executive officers named in the summary compensation table above, and the vested stock held by them at December 29, 2007.

| | Option Awards | | Stock Awards | |
|---|---|---|---|---|
| Name | Number of Shares Acquired on Exercise (#) | Value Realized on Exercise ($) | Number of Shares Acquired on Vesting (#) | Value Realized on Vesting ($) |
| Dr. Igor Y. Khandros | — | — | — | — |
| Joseph R. Bronson | 104,166 | 1,841,655(1) | 9,608 | 366,833 |
| | 25,000 | 464,478(2) | 19,216 | 828,210 |
| | 9,375 | 232,210(3) | — | — |
| | 25,000 | 430,750(4) | — | — |
| | 14,583 | 262,942(5) | — | — |
| | 3,125 | 75,690(6) | — | — |
| | 25,518 | 91,372(7) | — | — |
| Ronald C. Foster | 5,000 | 100,850(8) | — | — |
| | 4,000 | 80,680(9) | — | — |
| | 1,800 | 39,450(10) | — | — |
| | 1,800 | 36,306(11) | — | — |
| | 1,800 | 36,306(12) | — | — |
| Richard M. Freeman | — | — | — | — |
| Stuart L. Merkadeau | 5,000 | 187,500(13) | — | — |
| | 3,000 | 110,093(14) | — | — |
| | 7,000 | 276,500(15) | — | — |
| | 7,500 | 246,624(16) | — | — |
| Jorge L. Titinger | — | — | — | — |

(1)      On February 1, 2007, Mr. Bronson exercised 104,166 options. The exercise price of the options was $26.02 per share compared to the market price at the time of exercise of $43.70.

44

Source: FORMFACTOR INC, DEF 14A, April 10, 2008

(2)

On February 1, 2007, Mr. Bronson exercised 25,000 options. The exercise price of the options was $25.39 per share compared to the market price at the time of exercise of $43.97.

(3)

On February 1, 2007, Mr. Bronson exercised 9,375 options. The exercise price of the options was $19.20 per share compared to the market price at the time of exercise of $43.97.

(4)

On February 5, 2007, Mr. Bronson exercised 25,000 options. The exercise price of the options was $26.02 per share compared to the market price at the time of exercise of $43.25.

(5)

On February 6, 2007, Mr. Bronson exercised 14,583 options. The exercise price of the options was $25.39 per share compared to the market price at the time of exercise of $43.42.

(6)

On February 6, 2007, Mr. Bronson exercised 3,125 options. The exercise price of the options was $19.20 per share compared to the market price at the time of exercise of $43.42.

(7)

On February 6, 2007, Mr. Bronson exercised 25,518 options. The exercise price of the options was $39.84 per share compared to the market price at the time of exercise of $43.42.

(8)

On February 1, 2007, Mr. Foster exercised 5,000 options pursuant to his 10b5-1 trading plan. The exercise price of the options was $22.83 per share compared to the market price at the time of exercise of $43.00.

(9)

On March 1, 2007, Mr. Foster exercised 4,000 options pursuant to his 10b5-1 trading plan. The exercise price of the options was $22.83 per share compared to the market price at the time of exercise of $43.00.

(10)

On April 2, 2007, Mr. Foster exercised 1,800 options pursuant to his 10b5-1 trading plan. The exercise price of the options was $22.83 per share compared to the market price at the time of exercise of $44.75.

(11)

On May 2, 2007, Mr. Foster exercised 1,800 options pursuant to his 10b5-1 trading plan. The exercise price of the options was $22.83 per share compared to the market price at the time of exercise of $43.00.

(12)

On June 15, 2007, Mr. Foster exercised 1,800 options pursuant to his 10b5-1 trading plan. The exercise price of the options was $22.83 per share compared to the market price at the time of exercise of $43.00.

(13)

On February 1, 2007, Mr. Merkadeau exercised 5,000 options pursuant to his 10b5-1 trading plan. The exercise price of the options was $6.50 per share compared to the market price at the time of exercise of $44.00.

(14)

On February 13, 2007, Mr. Merkadeau exercised 3,000 options pursuant to his 10b5-1 trading plan. The exercise price of the options was $6.50 per share compared to the market price at the time of exercise of $43.19.

(15)

On February 26, 2007, Mr. Merkadeau exercised 7,000 options pursuant to his 10b5-1 trading plan. The exercise price of the options was $6.50 per share compared to the market price at the time of exercise of $46.00.

(16)

On July 31, 2007, Mr. Merkadeau exercised 7,500 options pursuant to his 10b5-1 trading plan. The exercise price of the options was $6.50 per share compared to the market price at the time of exercise of $39.38.

45

Source: FORMFACTOR INC, DEF 14A, April 10, 2008

**Change of Control, Severance, Separation and Indemnification Agreements**

*Change of Control, Severance.*    We have entered into change of control severance agreements with each of our executive officers and certain other officers. Each change of control severance agreement provides for the officer to receive the following severance benefits upon a qualifying termination of employment within one year following a change of control of our company, subject to the officer signing a release of claims in favor of our company:

- lump sum severance payment equal to one year's annual base salary and the greater of (a) the annual target bonus or (b) the annual target bonus multiplied by the average rate of annual bonus relative to target paid to executive officers covered by similar change of control severance agreements for the two most recently completed fiscal years,

- health benefits continuation for one year (subject to the participating officer's compliance with a confidentiality agreement and an agreement not to solicit employees of our company for one year after termination), and

- fully accelerated vesting of options or other equity awards, and unexercised stock options may be exercised for up to 18 months following a qualifying termination of employment.

Terminations of employment that entitle the officer to receive severance benefits under the change of control severance agreement consist of either termination by our company without "cause" or by resignation of the officer for "good reason" within one year following a "change of control". The change of control severance agreements provide the following definitions:

- "*change of control*" means the first to occur of any of the following events:

(i)
    the consummation of a merger or consolidation of our company with any other corporation, other than a merger or consolidation which would result in the voting securities of our company outstanding immediately prior thereto continuing to represent (either by remaining outstanding or by being converted into or exchanged for voting securities of the surviving entity) more than 60% of the total voting power represented by the voting securities of our company or such surviving entity outstanding immediately after such merger or consolidation; or

(ii)
    (A) any approval by our stockholders of a plan of complete liquidation of our company, other than as a result of insolvency or (B) the consummation of the sale or disposition (or the last in a series of sales or dispositions) by our company of all or substantially all of our company's assets, other than a sale or disposition to a wholly-owned direct or indirect subsidiary of our company and other than a sale or disposition which would result in the voting securities of our company outstanding immediately prior thereto continuing to represent (by being converted into or exchanged for voting securities of the entity to which such sale or disposition was made) more than 60% of the total voting power represented by the voting securities of the entity to which such sale or disposition was made after such sale or disposition; or

(iii)
    any "*person*" (as defined in Sections 13(d) and 14(d) of the Securities Exchange Act of 1934) becoming the "*beneficial owner*" (as defined in Rule 13d-3 under the Securities Exchange Act of 1934), directly or indirectly, of securities of our company representing 40% or more of the total voting power represented by our company's then outstanding voting securities; or

(iv)
    during any period of two consecutive years after the effective date of the change of control severance agreement, the incumbent directors cease for any reason to constitute a majority of our Board of Directors.

46

- "*cause*" means:

(i)

any act of personal dishonesty taken by the employee in connection with his or her responsibilities as an employee which is intended to result in substantial personal enrichment of the employee and is reasonably likely to result in material harm to our company,

(ii)

the employee's conviction of a felony,

(iii)

a willful act by the employee which constitutes misconduct and is materially injurious to our company, or

(iv)

continued willful violations by the employee of the employee's obligations to our company after the employee has received a written demand for performance from our company which describes the basis for our company's belief that the employee has not substantially performed his or her duties.

- "*good reason*" means the occurrence of any of the following:

(i)

without the employee's express written consent, a material reduction of the employee's duties, position or responsibilities relative to the employee's duties, position or responsibilities in effect immediately prior to the change of control;

(ii)

a reduction by our company of the employee's base salary or bonus opportunity as in effect immediately prior to such reduction;

(iii)

a material reduction by our company in the kind or level of employee benefits to which the employee is entitled immediately prior to such reduction with the result that the employee's overall benefits package is materially reduced;

(iv)

without the employee's express written consent, the relocation of the employee to a facility or a location more than five miles from his or her current facility and the new location is more than 50 miles the employee's current residence; or

(v)

the failure of our company to obtain the assumption of the change of control severance agreement by a successor.

The change of control severance agreements provide that if payments to an officer are subject to the excise tax imposed by Section 280G of the Internal Revenue Code, the severance benefits will be reduced to the extent that such reduction would increase the benefits received by the officer on an after-tax basis. The change of control severance agreements do not alter the at-will employment of the officers who have entered into them.

In addition to the benefits under the change of control severance agreements, our current stock option agreements under our stock option plans for our officers, including our 2002 Equity Incentive Plan, provide that in the event the officer's employment is terminated without cause within 12 months following a change in control, the officer will receive credit for an additional 12 months of service for purposes of calculating the number of shares of our common stock that are vested under such option.

Under our Key Employee Bonus Plan, which provides for performance bonuses to our officers, if a change in control of our company occurs, all bonus awards will be deemed to have been earned at 100% of the bonus target percentage for the current plan measurement period (and for the subsequent consecutive measurement periods if they fall within the same fiscal year) and will be paid to the officer participants at that time.

The following table presents information regarding change of control payment and benefits estimates for our executive officers named in the summary compensation table above, other than Messrs. Bronson and Foster who resigned from our company and received the separation benefits

47

Source: FORMFACTOR INC, DEF 14A, April 10, 2008

described below, and Mr. Titinger whose last day of employment is anticipated to be on or about June 7, 2008 and with whom we anticipate entering into a separation agreement. We prepared the table assuming that both a change of control occurred and the employment of our current executive officers was terminated without cause or by resignation of the officer for good reason on December 29, 2007, which is our company's last business day of fiscal 2007. For purposes of valuing the accelerated vesting of unvested equity awards, we have used the safe harbor valuation method based on the Black-Scholes valuation model permitted under Section 280G of the Internal Revenue Code and based on the closing share price of FormFactor common stock as of December 28, 2007. The various amounts listed are estimates only. The actual amounts to be paid can only be determined at the time of such change of control and such officer's separation from our company.

| | Dr. Igor Y. Khandros | Richard M. Freeman | Stuart L. Merkadeau |
|---|---|---|---|
| Base salary ($) | $ 500,000 | $ 330,000 | $ 260,000 |
| Short term incentive compensation ($) | 1,012,500 | 445,500 | 351,000 |
| Stock options ($) | 304,626 | 184,998 | 138,688 |
| Stock awards ($) | 11,925 | — | — |
| Health benefits ($) | 15,000 | 15,000 | 15,000 |
| Sub-Total: | 1,844,051 | 975,498 | 764,688 |
| 280G Reduction in Severance Benefits ($) | — | — | — |
| Total: | $ 1,844,051 | $ 975,498 | $ 764,688 |

*Separation.*   We entered into separation agreements with Joseph R. Bronson, our company's former President and Member of the Office of Chief Executive, and Ronald C. Foster, our company's former Senior Vice President, Chief Financial Officer. We anticipate that our company will enter into a separation agreement and general release with Jorge L. Titinger, our Senior Vice President, Product Business Group. Summaries of the separation agreements entered into with our former executive officers are presented below. In the summaries, the value of stock options presented reflects the fair value of the award as of the date of the separation agreement, which was used to determine the compensation expense under FAS 123(R) and was calculated using the Black-Scholes valuation model. The Black-Scholes valuation model is only one of the methods available for valuing options, and our company's use of this model should not be interpreted as a prediction as to the actual value that may be realized on the award. The actual value of the award may be significantly different, and the value actually realized, if any, will depend upon the excess of the market value of the common stock over the exercise price at the time of exercise. In the summaries, the value of restricted stock units presented reflects the fair value of the award as of the date of the separation agreement.

*Joseph R. Bronson.*   On January 30, 2007, we entered into a Separation Agreement and General Release with Mr. Bronson, who resigned from our company effective as of January 5, 2007. Mr. Bronson also resigned from our Board of Directors effective as of January 5, 2007. Mr. Bronson received severance of $400,000, which represents 12 months of his base salary, and his fiscal 2006 bonus of $523,515 under our company's Key Employee Bonus Plan. In addition, Mr. Bronson received accelerated vesting of a portion of his unvested stock options and all of his restricted stock units, representing options for an aggregate of 68,226 shares valued at $843,823 and restricted stock units for 19,216 shares valued at $798,040, with all vested shares under his options exercisable until May 1, 2007. The total amount of severance to Mr. Bronson is valued at $2,565,378. Mr. Bronson executed a general release and waiver of claims in favor of our company, and continues to be bound by the company's Employment, Confidential Information and Invention Assignment Agreement.

48

*Ronald C. Foster.*   On March 20, 2008, we entered into a Separation Agreement and General Release with Mr. Foster, who resigned from our company effective as of March 21, 2008. Mr. Foster received severance of $232,500. In addition, Mr. Foster received accelerated vesting of a portion of his unvested stock options, representing options for an aggregate of 66,027 shares valued at $118,468, with all vested shares under his options exercisable until September 21, 2009. The total amount of severance to Mr. Foster is valued at $350,968. Mr. Foster executed a general release and waiver of claims in favor of our company, and continues to be bound by the company's Employment, Confidential Information and Invention Assignment Agreement.

*Jorge L. Titinger.*   We have mutually agreed with Mr. Titinger to eliminate his position as part of our company's restructuring that we announced in our first fiscal quarter of 2008. We anticipate that Mr. Titinger's last day of employment will be on or about June 7, 2008. We anticipate that our company will enter into a separation agreement and general release with him.

*Indemnification.*   We have entered into indemnification agreements with each of our current directors, executive officers and certain other officers. These agreements require us to indemnify these individuals to the fullest extent permitted under Delaware law against liabilities that may arise by reason of their service to our company, and to advance expenses incurred as a result of any proceeding against them as to which they could be indemnified. These indemnification agreements are in addition to the indemnity provisions in our company's certificate of incorporation and bylaws. We also intend to enter into indemnification agreements with our future directors and executive officers.

## CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS

Our Board of Directors recognizes that transactions between our company and persons or entities that may be deemed related persons can present potential or actual conflicts of interest and create the appearance of impropriety. Accordingly, our Board has delegated authority for the review and approval of all related person transactions to the Governance Committee. Pursuant to that authority, the Governance Committee has adopted the Statement of Policy Regarding Related Person Transactions to provide procedures for reviewing, approving and ratifying any transaction involving our company or any of its subsidiaries in which a 5% or greater stockholder, director, executive officer or members of their immediate family have or will have a material interest as determined by our Governance Committee. This policy is intended to supplement, and not to supersede, our company's other policies that may be applicable to or involve transactions with related persons, such as the Company's Statement of Corporate Code of Business Conduct. This policy is posted on our company's website at http://www.formfactor.com.

Other than the compensation arrangements that are described above in "Director Compensation," the option grants and exercises, restricted stock unit grants and exercises, stock purchases and other arrangements that are described in "Compensation Discussion and Analysis" and "Executive Compensation and Related Information," and the registration rights agreements described below, since December 31, 2006, we have not been a party to any transaction or series of similar transactions in which the amount involved exceeded or will exceed $120,000 and in which any current director, executive officer, holder of more than 5% of our common stock or entities affiliated with them had or will have a material interest.

Certain of our common stockholders, who own shares of our common stock that were issued upon the automatic conversion of their preferred stock upon the closing of our initial public offering, have registration rights under various agreements to which we are a party. These stockholders include Dr. Igor Y. Khandros, who is our Chief Executive Officer and a Director, Dr. Khandros' spouse, and Benjamin N. Eldridge, who is our Senior Vice President, Development and Chief Technology Officer.

49

Source: FORMFACTOR INC, DEF 14A, April 10, 2008

## PROPOSALS FOR THE 2009 ANNUAL MEETING OF STOCKHOLDERS

*Requirements for Stockholder Proposals to be Considered for Inclusion in Our Proxy Materials.*    Our stockholders may submit proposals on matters appropriate for stockholder action at our annual meetings of stockholders, including director nominations, in accordance with Rule 14a-8 promulgated under the Securities Exchange Act of 1934. For such proposals to be included in our proxy materials relating to our 2009 Annual Meeting of Stockholders, all applicable requirements of Rule 14a-8 must be satisfied, the information required by Rule 14a-8 and our bylaws must be timely submitted to us and such proposals must be received by us no later than December 8, 2008. Such proposals should be delivered or mailed to the attention of our Corporate Secretary at our principal executive offices, which are FormFactor, Inc., 7005 Southfront Road, Livermore, California 94551, and we also encourage you to send a copy via e-mail to corporatesecretary@formfactor.com.

*Requirements for Stockholder Proposals to be Brought Before Our Annual Meeting.*    Our bylaws provide that, except in the case of proposals made in accordance with Rule 14a-8, the stockholder must have given timely notice thereof in writing to the Corporate Secretary not less than 75 nor more than 105 days prior to the anniversary of the date of the immediately preceding annual meeting of stockholders. To be timely for the 2009 Annual Meeting of Stockholders, a stockholder's notice must be received by us between February 6, 2009 and March 8, 2009. Such proposals should be delivered or mailed to the attention of our Corporate Secretary at our principal executive offices, which are FormFactor, Inc., 7005 Southfront Road, Livermore, California 94551, and we also encourage you to send a copy via e-mail to corporatesecretary@formfactor.com. In no event will the public announcement of an adjournment or a postponement of our annual meeting of stockholders commence a new time period for the giving of a stockholder's notice as provided above. A stockholder's notice to the Corporate Secretary must set forth as to each matter the stockholder proposes to bring before the annual meeting the information required by our bylaws and applicable law.

## SECTION 16(a) BENEFICIAL OWNERSHIP REPORTING COMPLIANCE

Section 16(a) of the Securities Exchange Act of 1934 requires our directors and executive officers, and persons who own more than 10% of our common stock to file reports of ownership and reports of changes in ownership with the Securities and Exchange Commission. These persons are required by the rules and regulations of the Securities and Exchange Commission to furnish us with copies of all Section 16(a) forms that they file.

Based solely on our review of these forms furnished to us and written representations from our directors and executive officers, we believe that all Section 16(a) filing requirements for the year ended December 29, 2007 were met.

50

**OTHER BUSINESS**

Our Board of Directors does not presently intend to bring any other business before the Annual Meeting, and, so far as is known to the Board, no matters are to be brought before the Annual Meeting except as specified in the accompanying Notice of Annual Meeting of Stockholders. As to any business that may properly come before the Annual Meeting, however, it is intended that the proxies will be voted in respect thereof in accordance with the judgment of the designated proxy holder.

Whether or not you expect to attend the Annual Meeting, please complete, date, sign and promptly return the accompanying proxy in the enclosed postage-paid envelope (to which no postage need be affixed if mailed in the United States) so that your shares of FormFactor common stock may be represented at the meeting.

BY ORDER OF THE BOARD OF DIRECTORS

Stuart L. Merkadeau
*Secretary*

Livermore, California
April 10, 2008

51

FORMFACTOR, INC.

2002 EQUITY INCENTIVE PLAN

As Adopted April 18, 2002
As Amended February 9, 2006, May 18, 2006 and December 13, 2007

**1. PURPOSE.** The purpose of this Plan is to provide incentives to attract, retain and motivate eligible persons whose present and potential contributions are important to the success of the Company, its Parent and Subsidiaries, by offering them an opportunity to participate in the Company's future performance through awards of Options, Restricted Stock and Restricted Stock Units. Capitalized terms not defined in the text are defined in Section 24.

**2. SHARES SUBJECT TO THE PLAN.**

2.1 *Number of Shares Available.* Subject to Sections 2.2 and 18, the total number of Shares reserved and available for grant and issuance pursuant to this Plan will be 500,000 Shares plus Shares that are subject to: (a) issuance upon exercise of an Option but cease to be subject to such Option for any reason other than exercise of such Option; (b) an Award granted hereunder but are forfeited or are repurchased by the Company at the original issue price; and (c) an Award that otherwise terminates without Shares being issued. In addition, any authorized shares not issued or subject to outstanding grants under the Company's 1996 Stock Option Plan, Incentive Option Plan and Management Incentive Option Plan on the Effective Date (as defined below) and any shares issued under the Company's 1995 Stock Plan, 1996 Stock Option Plan, Incentive Option Plan and Management Incentive Option Plan (the "*Prior Plans*") that are forfeited or repurchased by the Company or that are issuable upon exercise of options granted pursuant to the Prior Plans that expire or become unexercisable for any reason without having been exercised in full, will no longer be available for grant and issuance under the Prior Plans, but will be available for grant and issuance under this Plan. In addition, on each January 1, the aggregate number of Shares reserved and available for grant and issuance pursuant to this Plan will be increased automatically by a number of Shares equal to 5% of the total outstanding shares of the Company as of the immediately preceding December 31; *provided*, that the Board may in its sole discretion reduce the amount of the increase in any particular year; and, provided further, provided that no more than 40,000,000 shares shall be issued as ISOs (as defined in Section 5 below). At all times the Company shall reserve and keep available a sufficient number of Shares as shall be required to satisfy the requirements of all outstanding Options granted under this Plan and all other outstanding but unvested Awards granted under this Plan.

2.2 *Adjustment of Shares.* In the event that the number of outstanding shares is changed by a stock dividend, recapitalization, stock split, reverse stock split, subdivision, combination, reclassification or similar change in the capital structure of the Company without consideration, then (a) the number of Shares reserved for issuance under this Plan, (b) the number of Shares that may be granted pursuant to Sections 3 and 9 below, (c) the Exercise Prices of and number of Shares subject to outstanding Options, and (d) the number of Shares subject to other outstanding Awards shall, upon approval of the Board in its discretion, be proportionately adjusted in compliance with applicable securities laws; *provided, however,* that fractions of a Share will not be issued but will either be replaced by a cash payment equal to the Fair Market Value of such fraction of a Share or will be rounded up to the nearest whole Share, as determined by the Committee.

**3. ELIGIBILITY.** ISOs (as defined in Section 5 below) may be granted only to employees (including officers and directors who are also employees) of the Company or of a Parent or Subsidiary of the Company. All other Awards may be granted to employees, officers, directors, consultants, independent contractors and advisors of the Company or any Parent or Subsidiary of the Company;

Source: FORMFACTOR INC, DEF 14A, April 10, 2008

provided such consultants, contractors and advisors render bona fide services not in connection with the offer and sale of securities in a capital-raising transaction. No person will be eligible to receive more than 1,000,000 Shares in any calendar year under this Plan pursuant to the grant of Awards hereunder, other than new employees of the Company or of a Parent or Subsidiary of the Company (including new employees who are also officers and directors of the Company or any Parent or Subsidiary of the Company), who are eligible to receive up to a maximum of 3,000,000 Shares in the calendar year in which they commence their employment. A person may be granted more than one Award under this Plan.

4.  *ADMINISTRATION.*

4.1  *Committee Authority.*    This Plan will be administered by the Committee or by the Board acting as the Committee. Except for automatic grants to Outside Directors pursuant to Section 9 hereof, and subject to the general purposes, terms and conditions of this Plan, and to the direction of the Board, the Committee will have full power to implement and carry out this Plan. Except for automatic grants to Outside Directors pursuant to Section 9 hereof, the Committee will have the authority to:

(a)

construe and interpret this Plan, any Award Agreement and any other agreement or document executed pursuant to this Plan;

(b)

prescribe, amend and rescind rules and regulations relating to this Plan or any Award;

(c)

select persons to receive Awards;

(d)

determine the form and terms of Awards;

(e)

determine the number of Shares or other consideration subject to Awards;

(f)

determine whether Awards will be granted singly, in combination with, in tandem with, in replacement of, or as alternatives to, other Awards under this Plan or any other incentive or compensation plan of the Company or any Parent or Subsidiary of the Company;

(g)

grant waivers of Plan or Award conditions;

(h)

determine the vesting, exercisability and payment of Awards;

(i)

correct any defect, supply any omission or reconcile any inconsistency in this Plan, any Award or any Award Agreement;

(j)

determine whether an Award has been earned; and

(k)

make all other determinations necessary or advisable for the administration of this Plan.

4.2  *Committee Discretion.*    Except for automatic grants to Outside Directors pursuant to Section 9 hereof, any determination made by the Committee with respect to any Award will be made in its sole discretion at the time of grant of the Award or, unless in contravention of any express term of this Plan or Award, at any later time, and such determination will be final and binding on the Company and on all persons having an interest in any Award under this Plan. The Committee may delegate to one or more officers of the Company the authority to grant an Award under this Plan to Participants who are not Insiders of the Company.

5.  *OPTIONS.*    The Committee may grant Options to eligible persons and will determine whether such Options will be Incentive Stock Options within the meaning of the Code ("*ISO*") or Nonqualified Stock Options ("*NQSOs*"), the number of Shares subject to the Option, the Exercise Price of the

A-2

Source: FORMFACTOR INC, DEF 14A, April 10, 2008

Option, the period during which the Option may be exercised, and all other terms and conditions of the Option, subject to the following:

5.1    *Form of Option Grant.*    Each Option granted under this Plan will be evidenced by an Award Agreement which will expressly identify the Option as an ISO or an NQSO ("*Stock Option Agreement*"), and, except as otherwise required by the terms of Section 9 hereof, will be in such form and contain such provisions (which need not be the same for each Participant) as the Committee may from time to time approve, and which will comply with and be subject to the terms and conditions of this Plan.

5.2    *Date of Grant.*    The date of grant of an Option will be the date on which the Committee makes the determination to grant such Option, unless otherwise specified by the Committee. The Stock Option Agreement will be delivered, and a copy of this Plan will be made available, to the Participant within a reasonable time after the granting of the Option.

5.3    *Exercise Period.*    Options may be exercisable within the times or upon the events determined by the Committee as set forth in the Stock Option Agreement governing such Option; *provided, however,* that no Option granted on or before February 9, 2006 will be exercisable after the expiration of ten (10) years from the date the Option is granted and no Option granted after February 9, 2006 will be exercisable after the expiration of seven (7) years from the date the Option is granted; and *provided further* that no ISO granted to a person who directly or by attribution owns more than ten percent (10%) of the total combined voting power of all classes of stock of the Company or of any Parent or Subsidiary of the Company ("*Ten Percent Stockholder*") will be exercisable after the expiration of five (5) years from the date the ISO is granted. The Committee also may provide for Options to become exercisable at one time or from time to time, periodically or otherwise, in such number of Shares or percentage of Shares as the Committee determines.

5.4    *Exercise Price.*    The Exercise Price of an Option will be determined by the Committee when the Option is granted; provided that: (i) the Exercise Price of an ISO will be not less than 100% of the Fair Market Value of the Shares on the date of grant; and (ii) the Exercise Price of any ISO granted to a Ten Percent Stockholder will not be less than 110% of the Fair Market Value of the Shares on the date of grant. Payment for the Shares purchased may be made in accordance with Section 6 of this Plan.

5.5    *Termination.*    Notwithstanding the exercise periods set forth in the Stock Option Agreement, exercise of an Option will always be subject to the following:

(a)

If the Participant is Terminated for any reason except death or Disability, then the Participant may exercise such Participant's Options only to the extent that such Options would have been exercisable upon the Termination Date no later than three (3) months after the Termination Date (or such shorter or longer time period not exceeding five (5) years as may be determined by the Committee, with any exercise beyond three (3) months after the Termination Date deemed to be an NQSO), but in any event, no later than the expiration date of the Options.

(b)

If the Participant is Terminated because of Participant's death or Disability (or the Participant dies within three (3) months after a Termination other than for Cause or because of Participant's Disability), then Participant's Options may be exercised only to the extent that such Options would have been exercisable by Participant on the Termination Date and must be exercised by Participant (or Participant's legal representative or authorized assignee) no later than twelve (12) months after the Termination Date (or such shorter or longer time period not exceeding five (5) years as may be determined by the Committee, with any such exercise beyond (i) three (3) months

A-3

Source: FORMFACTOR INC, DEF 14A, April 10, 2008

after the Termination Date when the Termination is for any reason other than the Participant's death or disability, within the meaning of Section 22(e)(3) of the Code, or (ii) twelve (12) months after the Termination Date when the Termination is for Participant's disability, within the meaning of Section 22(e)(3) of the Code, deemed to be an NQSO), but in any event no later than the expiration date of the Options.

(c)

If the Participant is terminated for Cause, then the Participant may exercise such Participant's Options only to the extent that such Options would have been exercisable upon the Termination Date no later than one month after the Termination Date (or such shorter or longer time period not exceeding five (5) years as may be determined by the Committee, with any exercise beyond three (3) months after the Termination Date deemed to be an NQSO), but in any event, no later than the expiration date of the Options.

5.6    *Limitations on Exercise*.    The Committee may specify a reasonable minimum number of Shares that may be purchased on any exercise of an Option, provided that such minimum number will not prevent Participant from exercising the Option for the full number of Shares for which it is then exercisable.

5.7    *Limitations on ISO*.    The aggregate Fair Market Value (determined as of the date of grant) of Shares with respect to which ISO are exercisable for the first time by a Participant during any calendar year (under this Plan or under any other incentive stock option plan of the Company, Parent or Subsidiary of the Company) will not exceed $100,000. If the Fair Market Value of Shares on the date of grant with respect to which ISO are exercisable for the first time by a Participant during any calendar year exceeds $100,000, then the Options for the first $100,000 worth of Shares to become exercisable in such calendar year will be ISO and the Options for the amount in excess of $100,000 that become exercisable in that calendar year will be NQSOs. In the event that the Code or the regulations promulgated thereunder are amended after the Effective Date of this Plan to provide for a different limit on the Fair Market Value of Shares permitted to be subject to ISO, such different limit will be automatically incorporated herein and will apply to any Options granted after the effective date of such amendment.

5.8    *Modification, Extension or Renewal*.    The Committee may modify, extend or renew outstanding Options and authorize the grant of new Options in substitution therefor, provided that any such action may not, without the written consent of a Participant, impair any of such Participant's rights under any Option previously granted. Any outstanding ISO that is modified, extended, renewed or otherwise altered will be treated in accordance with Section 424(h) of the Code. The Committee may reduce the Exercise Price of outstanding Options without the consent of Participants affected by a written notice to them; provided, however, that the Exercise Price may not be reduced below the minimum Exercise Price that would be permitted under Section 5.4 of this Plan for Options granted on the date the action is taken to reduce the Exercise Price.

5.9    *No Disqualification*.    Notwithstanding any other provision in this Plan, no term of this Plan relating to ISO will be interpreted, amended or altered, nor will any discretion or authority granted under this Plan be exercised, so as to disqualify this Plan under Section 422 of the Code or, without the consent of the Participant affected, to disqualify any ISO under Section 422 of the Code.

**6.    *PAYMENT FOR OPTION SHARES*.    The entire Exercise Price of Shares issued upon exercise of Options and automatic grants to Outside Directors pursuant to Section 9 shall be payable in cash at

A-4

the time when such Shares are purchased, except as follows and if so provided for in an applicable Stock Option Agreement:

6.1   *Surrender of Stock.*   Payment for all or any part of the Exercise Price or Options may be made with shares of the Company's common stock which have already been owned by the Participant; provided that the Committee may, in its sole discretion, require that shares tendered for payment be previously held by the Participant for a minimum duration. Such shares shall be valued at their Fair Market Value.

6.2   *Cashless Exercise.*   Payment for all or any part of the Exercise Price may be made through Cashless Exercise at the Committee's sole discretion.

6.3   *Other Forms of Payment.*   Payment for all or any part of the Exercise Price may be made in any other form that is consistent with applicable laws, regulations and rules and approved by the Committee.

In the case of an ISO granted under the Plan, payment shall be made only pursuant to the express provisions of the applicable Stock Option Agreement. The Stock Option Agreement may specify that payment may be made in any form(s) described in this Section 6. In the case of an NQSO granted under the Plan, the Committee may, in its discretion at any time, accept payment in any form(s) described in this Section 6.

7.   *RESTRICTED STOCK AWARD.*

7.1   *Amount and Form of Restricted Stock Award.*   Awards under this Section 7 may be granted in the form of a Restricted Stock Award. Restricted Stock Awards made pursuant to this Plan will be evidenced by an Award Agreement ("*Restricted Stock Agreement*") that shall specify the number of Shares to which the Restricted Stock Award pertains and shall be subject to adjustment of such number in accordance with Section 2.2.

7.2   *Restricted Stock Agreement.*   Each Restricted Stock Award awarded under the Plan shall be evidenced and governed exclusively by a Restricted Stock Agreement between the Participant and the Company. Each Restricted Stock Award shall be subject to all applicable terms and conditions of the Plan and may be subject to any other terms and conditions that are not inconsistent with the Plan and that the Committee deems appropriate for inclusion in the applicable Restricted Stock Agreement (including without limitation any performance conditions). The provisions of the various Restricted Stock Agreements entered into under the Plan need not be identical.

7.3   *Payment of Restricted Stock Awards.*   Restricted Stock Awards may be issued with or without cash consideration or any other form of legally permissible consideration approved by the Committee.

7.4   *Vesting Conditions.*   Each Restricted Stock Award may or may not be subject to vesting. Any such vesting provision may provide that Shares shall vest based on service with the Company over time or shall vest, in full or in installments, upon satisfaction of performance goals specified in the Restricted Stock Agreement. A Restricted Stock Agreement may provide for accelerated vesting in the event of the Participant's death, Disability, or other events.

7.5   *Assignment or Transfer of Restricted Stock Awards.*   Except as provided in the applicable Restricted Stock Agreement, and then only to the extent permitted by applicable law, Restricted Stock Awards shall not be anticipated, assigned, attached, garnished, optioned, transferred or made subject to any creditor's process, whether voluntarily, involuntarily or by operation of law. Any act in violation of this Section 7.5 shall be void.

A-5

7.6 *Voting and Dividend Rights.* The holder of a Restricted Stock Award under the Plan shall have the same voting, dividend and other rights as the Company's other shareholders. A Restricted Stock Agreement, however, may require that the holder of such Restricted Stock Award invest any cash dividends received in additional Shares subject to the Restricted Stock Award. Such additional Shares subject to the Restricted Stock Award shall be subject to the same conditions and restrictions as the Restricted Stock Award with respect to which the dividends were paid. Such additional Shares subject to the Restricted Stock Award shall not reduce the number of Shares available for issuance under Section 2.1.

7.7 *Modification or Assumption of Restricted Stock Awards.* Within the limitations of the Plan, the Committee may modify or assume outstanding restricted stock awards or may accept the cancellation of outstanding restricted stock awards (including stock awards granted by another issuer) in return for the Award of new Restricted Stock Awards for the same or a different number of Shares and with the same or different vesting provisions. Notwithstanding the preceding sentence or anything to the contrary herein, no modification of a Restricted Stock Award shall, without the consent of the Participant, impair his or her rights or obligations under such Restricted Stock Award.

## 8. *RESTRICTED STOCK UNITS.*

8.1 *Restricted Stock Unit Agreement.* Each Award of Restricted Stock Units under the Plan shall be evidenced and governed exclusively by an Award Agreement ("*Restricted Stock Unit Agreement*") between the Participant and the Company. Such Restricted Stock Units shall be subject to all applicable terms and conditions of the Plan and may be subject to any other terms and conditions that are not inconsistent with the Plan and that the Committee deems appropriate for inclusion in the applicable Restricted Stock Unit Agreement (including without limitation any vesting and performance conditions). The provisions of the various Restricted Stock Unit Agreements entered into under the Plan need not be identical. Restricted Stock Units may be awarded in consideration of a reduction in the Participant's other compensation.

8.2 *Number of Shares.* Each Restricted Stock Unit Agreement shall specify the number of Shares to which the Restricted Stock Unit Award pertains and shall be subject to adjustment of such number in accordance with Section 2.2.

8.3 *Payment for Restricted Stock Units.* Restricted Stock Units shall be issued without consideration.

8.4 *Vesting Conditions.* Each Restricted Stock Unit may or may not be subject to vesting. Any such vesting provision may provide that Shares shall vest based on service with the Company over time or shall vest, in full or in installments, upon satisfaction of performance goals specified in the Restricted Stock Unit Agreement. A Restricted Stock Unit Agreement may provide for accelerated vesting in the event of the Participant's death, Disability, or other events.

8.5 *Voting and Dividend Rights.* The holders of Restricted Stock Units shall have no voting rights. Prior to settlement or forfeiture, any Restricted Stock Unit awarded under the Plan may, at the Committee's discretion, carry with it a right to dividend equivalents. Such right entitles the holder to be credited with an amount equal to all cash dividends paid on one Share while the Restricted Stock Unit is outstanding. Dividend equivalents may be converted into additional Restricted Stock Units. Settlement of dividend equivalents may be made in the form of cash, in the form of Shares, or in a combination of both. Prior to distribution, any dividend equivalents which are not paid shall be subject to the same conditions and restrictions as the Restricted Stock Units to which they attach.

8.6 *Form and Time of Settlement of Restricted Stock Units.* Settlement of vested Restricted Stock Units may be made in the form of (a) cash, (b) Shares or (c) any combination of both, as

A-6

determined by the Committee at the time of the grant of the Restricted Stock Units, in its sole discretion. Methods of converting Restricted Stock Units into cash may include (without limitation) a method based on the average Fair Market Value of Shares over a series of trading days. Vested Restricted Stock Units may be settled in a lump sum or in installments. The distribution may occur or commence when the vesting conditions applicable to the Restricted Stock Units have been satisfied or have lapsed, or it may be deferred, in accordance with applicable law, to any later date. The amount of a deferred distribution may be increased by an interest factor or by dividend equivalents. Until an Award of Restricted Stock Units is settled, the number of such Restricted Stock Units shall be subject to adjustment pursuant to Section 2.2.

8.7  *Creditor's Rights.*   A holder of Restricted Stock Units shall have no rights other than those of a general creditor of the Company. Restricted Stock Units represent an unfunded and unsecured obligation of the Company, subject to the terms and conditions of the applicable Restricted Stock Unit Agreement.

8.8  *Modification or Assumption of Restricted Stock Units.*   Within the limitations of the Plan, the Committee may modify or assume outstanding restricted stock units or may accept the cancellation of outstanding restricted stock units (including stock units granted by another issuer) in return for the Award of new Restricted Stock Units for the same or a different number of Shares and with the same or different vesting provisions. Notwithstanding the preceding sentence or anything to the contrary herein, no modification of a Restricted Stock Unit shall, without the consent of the Participant, impair his or her rights or obligations under such Restricted Stock Unit.

8.9  *Assignment or Transfer of Restricted Stock Units.*   Except as provided in the applicable Restricted Stock Unit Agreement, and then only to the extent permitted by applicable law, Restricted Stock Units shall not be anticipated, assigned, attached, garnished, optioned, transferred or made subject to any creditor's process, whether voluntarily, involuntarily or by operation of law. Any act in violation of this Section 8.9 shall be void.

9.  *AUTOMATIC GRANTS TO OUTSIDE DIRECTORS.*

9.1  *Types of Options and Shares.*   Options granted under this Plan and subject to this Section 9 shall be NQSOs.

9.2  *Eligibility.*   Options subject to this Section 9 shall be granted only to Outside Directors.

9.3  *Initial Grant.*   Each Outside Director who first becomes a member of the Board after the Effective Date will automatically be granted an option for 15,000 Shares (an "*Initial Grant*") on the date such Outside Director first becomes a member of the Board. Each Outside Director who became a member of the Board on or prior to the Effective Date and who did not receive a prior option grant (under this Plan or otherwise and from the Company or any of its corporate predecessors) will receive an Initial Grant on the Effective Date.

9.4  *Succeeding Grant.*   Immediately following each Annual Meeting of stockholders, each Outside Director will automatically be granted an option for 15,000 Shares (a "*Succeeding Grant*"), *provided*, that the Outside Director is a member of the Board on such date and has served continuously as a member of the Board for a period of at least twelve (12) months since the last option grant (whether an Initial Grant or a Succeeding Grant) to such Outside Director. If less than twelve (12) months has passed, then the number of shares subject to the Succeeding Grant will be pro-rated based on the number of days passed since the last option grant to such Outside Director, divided by 365 days.

9.5  *Vesting and Exercisability.*   The date an Outside Director receives an Initial Grant or a Succeeding Grant is referred to in this Plan as the "*Start Date*" for such option.

A-7

Source: FORMFACTOR INC, DEF 14A, April 10, 2008

(a)    *Initial Grant*. So long as the Outside Director continuously remains a director or a consultant of the Company, each Initial Grant will vest as to 1/12th of the Shares at the end of each full succeeding month from Start Date. Each Initial Grant will be immediately exercisable subject to the Company's right to repurchase unvested shares in the event the Outside Director does not remain a member of the Board or a consultant of the Company.

(b)    *Succeeding Grant*. So long as the Outside Director continuously remains a director or a consultant of the Company, each Succeeding Grant will vest as to 1/12th of the Shares at the end of each full succeeding month from the later of (i) the Start Date of such Succeeding Grant or (ii) the date when all outstanding stock options, and all outstanding shares issued upon exercise of any stock options granted by the Company to the Outside Director prior to the grant of such Succeeding Grant have fully vested. Each Succeeding Grant will be immediately exercisable subject to the Company's right to repurchase unvested shares in the event the Outside Director does not remain a member of the Board or a consultant of the Company.

(c)    *Pro-Rated Succeeding Grant*. Any Succeeding Grant that has been pro-rated is referred to in this Plan as a "*Pro-Rated Succeeding Grant*". Notwithstanding anything in this Plan to the contrary, so long as the Outside Director continuously remains a director or a consultant of the Company, each Pro-Rated Succeeding Grant will vest as to 1/12th of the Shares that would have been subject to a full Succeeding Grant (i.e., 15,000 shares) at the end of each full succeeding month from the later of:

(i)    the Start Date of such Pro-Rated Succeeding Grant, or

(ii)    the date when all outstanding stock options, and all outstanding shares issued upon exercise of any stock options granted by the Company to the Outside Director prior to the grant of such Pro-Rated Succeeding Grant have fully vested to the end of the full calendar month in which the twelve month anniversary of the Company's annual meeting of stockholders, immediately after which such Outside Director obtained such Pro-Rated Succeeding Grant, *provided*, that in the last month of the Pro-Rated Succeeding Grant's vesting term, any shares remaining shall vest. Each Succeeding Grant will be immediately exercisable subject to the Company's right to repurchase unvested shares in the event the Outside Director does not remain a member of the Board or a consultant of the Company.

Notwithstanding any provision to the contrary, in the event of a Corporate Transaction described in Section 18.1, the vesting of all options granted to Outside Directors pursuant to this Section 9 will accelerate and such options will become exercisable in full prior to the consummation of such event at such times and on such conditions as the Committee determines, and must be exercised, if at all, within three (3) months of the consummation of said event. Any options not exercised within such three-month period shall expire.

9.6    *Exercise Price*.    The exercise price of an option pursuant to an Initial Grant and Succeeding Grant shall be the Fair Market Value of the Shares, at the time that the option is granted.

9.7    *Director Fees*.    Each Outside Director may elect to receive a Restricted Stock Award or Restricted Stock Unit under the Plan in lieu of payment of a portion of his or her regular annual retainer based on the Fair Market Value of the Shares on the date any regular annual retainer would otherwise be paid. For purposes of the Plan, an Outside Director's regular annual retainer shall include any additional retainer paid in connection with service on any committee of the Board or paid for any other reason. Such an election may be for any dollar or percentage amount

A-8

Source: FORMFACTOR INC, DEF 14A, April 10, 2008

equal to at least 25% of the Outside Director's regular annual retainer (up to a limit of 100% of the Outside Director's regular annual retainer). The election must be made prior to the beginning of the annual board of directors cycle which shall be any twelve month continuous period designated by the Board. Any amount of the regular annual retainer not elected to be received as a Restricted Stock Award or Restricted Stock Unit shall be payable in cash in accordance with the Company's standard payment procedures.

**10.   *WITHHOLDING TAXES.***

10.1   *Withholding Generally.*   Whenever Shares are to be issued in satisfaction of Awards granted under this Plan, the Company may require the Participant to remit to the Company an amount sufficient to satisfy federal, state and local withholding tax requirements prior to the delivery of any certificate or certificates for such Shares. Whenever, under this Plan, payments in satisfaction of Awards are to be made in cash, such payment will be net of an amount sufficient to satisfy federal, state, and local withholding tax requirements.

10.2   *Stock Withholding.*   When, under applicable tax laws, a Participant incurs tax liability in connection with the exercise or vesting of any Award that is subject to tax withholding and the Participant is obligated to pay the Company the amount required to be withheld, the Committee may in its sole discretion allow the Participant to satisfy the minimum withholding tax obligation by electing to have the Company withhold from the Shares to be issued that number of Shares having a Fair Market Value equal to the minimum amount required to be withheld, determined on the date that the amount of tax to be withheld is to be determined. All elections by a Participant to have Shares withheld for this purpose will be made in accordance with the requirements established by the Committee and be in writing in a form acceptable to the Committee.

**11.   *TRANSFERABILITY.***

11.1 Except as otherwise provided in this Section 11, Awards granted under this Plan, and any interest therein, will not be transferable or assignable by Participant, and may not be made subject to execution, attachment or similar process, otherwise than by will or by the laws of descent and distribution or as determined by the Committee and set forth in the Award Agreement with respect to Awards that are not ISOs.

11.2   *All Awards other than NQSO's.*   All Awards other than NQSO's shall be exercisable: (i) during the Participant's lifetime, only by (A) the Participant, or (B) the Participant's guardian or legal representative; and (ii) after Participant's death, by the legal representative of the Participant's heirs or legatees.

11.3   *NQSOs.*   Unless otherwise restricted by the Committee, an NQSO shall be exercisable: (i) during the Participant's lifetime only by (A) the Participant, (B) the Participant's guardian or legal representative, (C) a Family Member of the Participant who has acquired the NQSO by "permitted transfer;" and (ii) after Participant's death, by the legal representative of the Participant's heirs or legatees. "Permitted transfer" means, as authorized by this Plan and the Committee in an NQSO, any transfer effected by the Participant during the Participant's lifetime of an interest in such NQSO but only such transfers which are by gift or domestic relations order. A permitted transfer does not include any transfer for value and neither of the following are transfers for value: (a) a transfer of under a domestic relations order in settlement of marital property rights or (b) a transfer to an entity in which more than fifty percent of the voting interests are owned by Family Members or the Participant in exchange for an interest in that entity.

A-9

Source: FORMFACTOR INC, DEF 14A, April 10, 2008

**12.   PRIVILEGES OF STOCK OWNERSHIP; RESTRICTIONS ON SHARES.**

   12.1   *Voting and Dividends.*   Unless otherwise provided under Section 7, no Participant will have any of the rights of a stockholder with respect to any Shares until the Shares are issued to the Participant. After Shares are issued to the Participant, the Participant will be a stockholder and have all the rights of a stockholder with respect to such Shares, including the right to vote and receive all dividends or other distributions made or paid with respect to such Shares; *provided,* that the Participant will have no right to retain such stock dividends or stock distributions with respect to Shares that are repurchased at the Participant's Purchase Price or Exercise Price pursuant to Section 12.

   12.2   *Restrictions on Shares.*   At the discretion of the Committee, the Company may reserve to itself and/or its assignee(s) in the Award Agreement a right to repurchase a portion of or all Unvested Shares held by a Participant following such Participant's Termination at any time within ninety (90) days after the later of Participant's Termination Date and the date Participant purchases Shares under this Plan, for cash and/or cancellation of purchase money indebtedness, at the Participant's Exercise Price or Purchase Price, as the case may be.

**13.   CERTIFICATES.**   All certificates for Shares or other securities delivered under this Plan will be subject to such stock transfer orders, legends and other restrictions as the Committee may deem necessary or advisable, including restrictions under any applicable federal, state or foreign securities law, or any rules, regulations and other requirements of the SEC or any stock exchange or automated quotation system upon which the Shares may be listed or quoted.

**14.   ESCROW; PLEDGE OF SHARES.**   To enforce any restrictions on a Participant's Shares, the Committee may require the Participant to deposit all certificates representing Shares, together with stock powers or other instruments of transfer approved by the Committee, appropriately endorsed in blank, with the Company or an agent designated by the Company to hold in escrow until such restrictions have lapsed or terminated, and the Committee may cause a legend or legends referencing such restrictions to be placed on the certificates. Any Participant who is permitted to execute a promissory note as partial or full consideration for the purchase of Shares under this Plan will be required to pledge and deposit with the Company all or part of the Shares so purchased as collateral to secure the payment of Participant's obligation to the Company under the promissory note; *provided, however,* that the Committee may require or accept other or additional forms of collateral to secure the payment of such obligation and, in any event, the Company will have full recourse against the Participant under the promissory note notwithstanding any pledge of the Participant's Shares or other collateral. In connection with any pledge of the Shares, Participant will be required to execute and deliver a written pledge agreement in such form as the Committee will from time to time approve. The Shares purchased with the promissory note may be released from the pledge on a pro rata basis as the promissory note is paid.

**15.   EXCHANGE AND BUYOUT OF AWARDS.**   The Committee may, at any time or from time to time, authorize the Company, with the consent of the respective Participants, to issue new Awards in exchange for the surrender and cancellation of any or all outstanding Awards. The Committee may at any time buy from a Participant an Award previously granted with payment in cash, Shares (including Restricted Stock) or other consideration, based on such terms and conditions as the Committee and the Participant may agree.

**16.   SECURITIES LAW AND OTHER REGULATORY COMPLIANCE.**   An Award will not be effective unless such Award is in compliance with all applicable federal and state securities laws, rules and regulations of any governmental body, and the requirements of any stock exchange or automated quotation system upon which the Shares may then be listed or quoted, as they are in effect on the date of grant of the Award and also on the date of exercise or other issuance. Notwithstanding any other provision in this Plan, the Company will have no obligation to issue or deliver certificates for Shares

A-10

Source: FORMFACTOR INC, DEF 14A, April 10, 2008

under this Plan prior to: (a) obtaining any approvals from governmental agencies that the Company determines are necessary or advisable; and/or (b) completion of any registration or other qualification of such Shares under any state or federal law or ruling of any governmental body that the Company determines to be necessary or advisable. The Company will be under no obligation to register the Shares with the SEC or to effect compliance with the registration, qualification or listing requirements of any state securities laws, stock exchange or automated quotation system, and the Company will have no liability for any inability or failure to do so.

**17.  *NO OBLIGATION TO EMPLOY.***   Nothing in this Plan or any Award granted under this Plan will confer or be deemed to confer on any Participant any right to continue in the employ of, or to continue any other relationship with, the Company or any Parent or Subsidiary of the Company or limit in any way the right of the Company or any Parent or Subsidiary of the Company to terminate Participant's employment or other relationship at any time, with or without cause.

**18.  *CORPORATE TRANSACTIONS.***

18.1  *Assumption or Replacement of Awards by Successor.*   Except for automatic grants to Outside Directors pursuant to Section 9 hereof, in the event of (a) a dissolution or liquidation of the Company, (b) a merger or consolidation in which the Company is not the surviving corporation (other than a merger or consolidation with a wholly-owned subsidiary, a reincorporation of the Company in a different jurisdiction, or other transaction in which there is no substantial change in the stockholders of the Company or their relative stock holdings and the Awards granted under this Plan are assumed, converted or replaced by the successor corporation, which assumption will be binding on all Participants), (c) a merger in which the Company is the surviving corporation but after which the stockholders of the Company immediately prior to such merger (other than any stockholder that merges, or which owns or controls another corporation that merges, with the Company in such merger) cease to own their shares or other equity interest in the Company, (d) the sale of substantially all of the assets of the Company, or (e) the acquisition, sale, or transfer of more than 50% of the outstanding shares of the Company by tender offer or similar transaction (each, a "***Corporate Transaction***"), any or all outstanding Awards may be assumed, converted or replaced by the successor corporation (if any), which assumption, conversion or replacement will be binding on all Participants. In the alternative, the successor corporation may substitute equivalent Awards or provide substantially similar consideration to Participants as was provided to stockholders (after taking into account the existing provisions of the Awards). The successor corporation may also issue, in place of outstanding Shares of the Company held by the Participants, substantially similar shares or other property subject to repurchase restrictions no less favorable to the Participant. In the event such successor corporation (if any) refuses to assume or substitute Awards, as provided above, pursuant to a transaction described in this Subsection 18.1, such Awards will expire on such transaction at such time and on such conditions as the Committee will determine. Notwithstanding anything in this Plan to the contrary, the Committee may, in its sole discretion, provide that the vesting of any or all Awards granted pursuant to this Plan will accelerate upon a transaction described in this Section 18. If the Committee exercises such discretion with respect to Options, such Options will become exercisable in full prior to the consummation of such event at such time and on such conditions as the Committee determines, and if such Options are not exercised prior to the consummation of the corporate transaction, they shall terminate at such time as determined by the Committee.

18.2  *Other Treatment of Awards.*   Subject to any greater rights granted to Participants under the foregoing provisions of this Section 18, in the event of the occurrence of any Corporate Transaction described in Section 18.1, any outstanding Awards will be treated as provided in the applicable agreement or plan of merger, consolidation, dissolution, liquidation, or sale of assets.

A-11

Source: FORMFACTOR INC, DEF 14A, April 10, 2008

18.3    *Assumption of Awards by the Company.*    The Company, from time to time, also may substitute or assume outstanding awards granted by another company, whether in connection with an acquisition of such other company or otherwise, by either; (a) granting an Award under this Plan in substitution of such other company's award; or (b) assuming such award as if it had been granted under this Plan if the terms of such assumed award could be applied to an Award granted under this Plan. Such substitution or assumption will be permissible if the holder of the substituted or assumed award would have been eligible to be granted an Award under this Plan if the other company had applied the rules of this Plan to such grant. In the event the Company assumes an award granted by another company, the terms and conditions of such award will remain unchanged (*except* that the exercise price and the number and nature of Shares issuable upon exercise of any such option will be adjusted appropriately pursuant to Section 424(a) of the Code). In the event the Company elects to grant a new Option rather than assuming an existing option, such new Option may be granted with a similarly adjusted Exercise Price.

**19.    *ADOPTION AND STOCKHOLDER APPROVAL.***    This Plan will become effective on the date on which the registration statement filed by the Company with the SEC under the Securities Act registering the initial public offering of the Company's Common Stock is declared effective by the SEC (the "*Effective Date*"). This Plan shall be approved by the stockholders of the Company (excluding Shares issued pursuant to this Plan), consistent with applicable laws, within twelve (12) months before or after the date this Plan is adopted by the Board. Upon the Effective Date, the Committee may grant Awards pursuant to this Plan; *provided, however,* that: (a) no Option may be exercised prior to initial stockholder approval of this Plan; (b) no Option granted pursuant to an increase in the number of Shares subject to this Plan approved by the Board will be exercised prior to the time such increase has been approved by the stockholders of the Company; (c) in the event that initial stockholder approval is not obtained within the time period provided herein, all Awards granted hereunder shall be cancelled, any Shares issued pursuant to any Awards shall be cancelled and any purchase of Shares issued hereunder shall be rescinded; and (d) in the event that stockholder approval of such increase is not obtained within the time period provided herein, all Awards granted pursuant to such increase will be cancelled, any Shares issued pursuant to any Award granted pursuant to such increase will be cancelled, and any purchase of Shares pursuant to such increase will be rescinded.

**20.    *TERM OF PLAN/GOVERNING LAW.***    Unless earlier terminated as provided herein, this Plan will terminate ten (10) years from the date this Plan is adopted by the Board or, if earlier, the date of stockholder approval. This Plan and all agreements thereunder shall be governed by and construed in accordance with the laws of the State of California.

**21.    *AMENDMENT OR TERMINATION OF PLAN.***    The Board may at any time terminate or amend this Plan in any respect, including without limitation amendment of any form of Award Agreement or instrument to be executed pursuant to this Plan; *provided, however,* that the Board will not, without the approval of the stockholders of the Company, amend this Plan in any manner that requires such stockholder approval.

**22.    *NONEXCLUSIVITY OF THE PLAN.***    Neither the adoption of this Plan by the Board, the submission of this Plan to the stockholders of the Company for approval, nor any provision of this Plan will be construed as creating any limitations on the power of the Board to adopt such additional compensation arrangements as it may deem desirable, including, without limitation, the granting of stock options and bonuses otherwise than under this Plan, and such arrangements may be either generally applicable or applicable only in specific cases.

**23.    *INSIDER TRADING POLICY.***    Each Participant and Outsider Director who receives an Award shall comply with any policy, adopted by the Company from time to time covering transactions in the Company's securities by employees, officers and/or directors of the Company.

A-12

Source: FORMFACTOR INC, DEF 14A, April 10, 2008

24.  *DEFINITIONS.*   As used in this Plan, the following terms will have the following meanings:

"*Award*" means any award under this Plan, including any Option, Restricted Stock or Restricted Stock Unit.

"*Award Agreement*" means, with respect to each Award, the signed written agreement between the Company and the Participant setting forth the terms and conditions of the Award.

"*Board*" means the Board of Directors of the Company.

"*Cashless Exercise*" means, to the extent that a Stock Option Agreement so provides and as permitted by applicable law, a program approved by the Committee in which payment may be made all or in part by delivery (on a form prescribed by the Committee) of an irrevocable direction to a securities broker to sell Shares and to deliver all or part of the sale proceeds to the Company in payment of the aggregate Exercise Price and, if applicable, the amount necessary to satisfy the Company's withholding obligations at the minimum statutory withholding rates, including, but not limited to, U.S. federal and state income taxes, payroll taxes, and foreign taxes, if applicable.

"*Cause*" means (a) the commission of an act of theft, embezzlement, fraud, dishonesty, (b) a breach of fiduciary duty to the Company or a Parent or Subsidiary of the Company or (c) a failure to materially perform the customary duties of employee's employment.

"*Code*" means the Internal Revenue Code of 1986, as amended.

"*Committee*" means the Compensation Committee of the Board.

"*Company*" means FormFactor, Inc. or any successor corporation.

"*Disability*" means a disability, whether temporary or permanent, partial or total, as determined by the Committee.

"*Exchange Act*" means the Securities Exchange Act of 1934, as amended.

"*Exercise Price*" means the price at which a holder of an Option may purchase the Shares issuable upon exercise of the Option.

"*Fair Market Value*" means, as of any date, the value of a share of the Company's Common Stock determined as follows:

    (a)    if such Common Stock is then quoted on the Nasdaq Global Market, its closing price on the Nasdaq Global Market on the date of determination as reported in *The Wall Street Journal;*

    (b)    if such Common Stock is publicly traded and is then listed on a national securities exchange, its closing price on the date of determination on the principal national securities exchange on which the Common Stock is listed or admitted to trading as reported in *The Wall Street Journal;*

    (c)    if such Common Stock is publicly traded but is not quoted on the Nasdaq Global Market nor listed or admitted to trading on a national securities exchange, the average of the closing bid and asked prices on the date of determination as reported in *The Wall Street Journal;*

    (d)    in the case of an Award made on the Effective Date, the price per share at which shares of the Company's Common Stock are initially offered for sale to the public by the Company's underwriters in the initial public offering of the Company's Common Stock pursuant to a registration statement filed with the SEC under the Securities Act; or

A-13

Source: FORMFACTOR INC, DEF 14A, April 10, 2008

(e)

if none of the foregoing is applicable, by the Committee in good faith.

*"Family Member"* includes any of the following:

(a)

child, stepchild, grandchild, parent, stepparent, grandparent, spouse, former spouse, sibling, niece, nephew, mother-in-law, father-in-law, son-in-law, daughter-in-law, brother-in-law, or sister-in-law of the Participant, including any such person with such relationship to the Participant by adoption;

(b)

any person (other than a tenant or employee) sharing the Participant's household;

(c)

a trust in which the persons in (a) and (b) have more than fifty percent of the beneficial interest;

(d)

a foundation in which the persons in (a) and (b) or the Participant control the management of assets; or

(e)

any other entity in which the persons in (a) and (b) or the Participant own more than fifty percent of the voting interest.

*"Insider"* means an officer or director of the Company or any other person whose transactions in the Company's Common Stock are subject to Section 16 of the Exchange Act.

*"Option"* means an award of an option to purchase Shares pursuant to Section 5.

*"Outside Director"* means a member of the Board who is not an employee of the Company or any Parent or Subsidiary.

*"Parent"* means any corporation (other than the Company) in an unbroken chain of corporations ending with the Company if each of such corporations other than the Company owns stock possessing 50% or more of the total combined voting power of all classes of stock in one of the other corporations in such chain.

*"Participant"* means a person who receives an Award under this Plan.

*"Performance Factors"* means the factors selected by the Committee from among the following measures to determine whether the performance goals established by the Committee and applicable to Awards have been satisfied:

(a)

Net revenue and/or net revenue growth;

(b)

Earnings before income taxes and amortization and/or earnings before income taxes and amortization growth;

(c)

Operating income and/or operating income growth;

(d)

Net income and/or net income growth;

(e)

Earnings per share and/or earnings per share growth;

(f)

Total stockholder return and/or total stockholder return growth;

(g)

Return on equity;

(h)

Operating cash flow return on income;

(i)

Adjusted operating cash flow return on income;

(j)

Economic value added; and

(k)

Individual confidential business objectives.

A-14

Source: FORMFACTOR INC, DEF 14A, April 10, 2008

"*Performance Period*" means the period of service determined by the Committee, not to exceed five years, during which years of service or performance is to be measured for Restricted Stock Awards or Restricted Stock Units.

"*Plan*" means this FormFactor, Inc. 2002 Equity Incentive Plan, as amended from time to time.

"*Restricted Stock Award*" means an award of Shares pursuant to Section 7.

"*Restricted Stock Unit*" means a bookkeeping entry representing the equivalent of one Share, as awarded under the Plan pursuant to Section 8.

"*SEC*" means the Securities and Exchange Commission.

"*Securities Act*" means the Securities Act of 1933, as amended.

"*Shares*" means shares of the Company's Common Stock reserved for issuance under this Plan, as adjusted pursuant to Sections 2 and 18, and any successor security.

"*Subsidiary*" means any corporation (other than the Company) in an unbroken chain of corporations beginning with the Company if each of the corporations other than the last corporation in the unbroken chain owns stock possessing 50% or more of the total combined voting power of all classes of stock in one of the other corporations in such chain.

"*Termination*" or "*Terminated*" means, for purposes of this Plan with respect to a Participant, that the Participant has for any reason ceased to provide services as an employee, officer, director, consultant, independent contractor, or advisor to the Company or a Parent or Subsidiary of the Company. An employee will not be deemed to have ceased to provide services in the case of (i) sick leave, (ii) military leave, or (iii) any other leave of absence approved by the Committee, provided, that such leave is for a period of not more than 90 days, unless reemployment upon the expiration of such leave is guaranteed by contract or statute or unless provided otherwise pursuant to formal policy adopted from time to time by the Company and issued and promulgated to employees in writing. In the case of any employee on an approved leave of absence, the Committee may make such provisions respecting suspension of vesting of the Award while on leave from the employ of the Company or a Subsidiary as it may deem appropriate, except that in no event may an Option be exercised after the expiration of the term set forth in the Option agreement. The Committee will have sole discretion to determine whether a Participant has ceased to provide services and the effective date on which the Participant ceased to provide services (the "*Termination Date*").

"*Unvested Shares*" means "Unvested Shares" as defined in the Award Agreement.

"*Vested Shares*" means "Vested Shares" as defined in the Award Agreement.

A-15

Source: FORMFACTOR INC, DEF 14A, April 10, 2008

 **FORMFACTOR**

**Electronic Voting Instructions**
**You can vote by Internet!**
**Available 24 hours a day, 7 days a week!**
Instead of mailing your proxy, you may vote your proxy
through the Internet.
**VALIDATION DETAILS ARE LOCATED BELOW IN THE TITLE BAR.**
**Proxies submitted by the Internet must be received by**
**1:00 a.m., Central Time, on May 22, 2008.**



**Vote by Internet**
• Log on to the Internet and go to
  **www.envisionreports.com/FORM**
• Follow the steps outlined on the secured website.

Using a **black ink** pen, mark your votes with an X as shown in this     ☒
example. Please do not write outside the designated areas:

---

**2008 Annual Meeting Proxy Card**          ( 123456 )    C0123456789    | 12345 |

---

**IF YOU HAVE NOT VOTED VIA THE INTERNET, FOLD ALONG THE PERFORATION, DETACH AND RETURN THE BOTTOM PORTION IN THE ENCLOSED ENVELOPE.**

---

**A Proposals—The FormFactor Board of Directors recommends a vote FOR the election of the Class II director nominees listed below and FOR Proposals No. 2 and 3.**

1.   Election of the following nominees as Class II directors:

| | For | Withhold | | | For | Withhold | | | For | Withhold |
|---|---|---|---|---|---|---|---|---|---|---|
| 01—Dr. Homa Bahrami | ☐ | ☐ | | 02—G. Carl Everett, Jr. | ☐ | ☐ | | 03—Dr. Mario Ruscev | ☐ | ☐ |

| | | For | Against | Abstain |
|---|---|---|---|---|
| 2. | Ratification of the selection of PricewaterhouseCoopers LLP as FormFactor's independent registered public accounting firm for the fiscal year ending December 27, 2008. | ☐ | ☐ | ☐ |
| 3. | Approval of material terms under FormFactor's 2002 Equity Incentive Plan with respect to Section 162(m) of the Internal Revenue Code. | ☐ | ☐ | ☐ |

**B Non-Voting Items**

**Change of Address**—Please print your new
address below.

**Comments**—Please print your comments below.

**Meeting Attendance**

Please mark the box to the right if you plan to     ☐
attend the Annual Meeting.

---

**C Authorized Signatures—This section must be completed for your vote to be counted.—Date and Sign Below**

Please sign exactly as name(s) appears hereon. Joint owners should each sign. When signing as attorney, executor, administrator, corporate officer, trustee, guardian, or custodian, please give full title.

| Date (mm/dd/yyyy)—Please print date below. | Signature 1—Please keep signature within the box. | Signature 2—Please keep signature within the box. |
|---|---|---|
| / / | | |

Source: FORMFACTOR INC, DEF 14A, April 10, 2008

IF YOU HAVE NOT VOTED VIA THE INTERNET, FOLD ALONG THE PERFORATION, DETACH AND RETURN THE BOTTOM PORTION IN THE ENCLOSED ENVELOPE.

**Proxy—FormFactor, Inc.**

**PROXY FOR 2008 ANNUAL MEETING OF STOCKHOLDERS**

(This proxy is solicited on behalf of the Board of Directors of FormFactor, Inc.)

**Your vote is important. Whether or not you plan to attend the 2008 Annual Meeting of Stockholders of FormFactor, Inc. in person, we urge you to complete, date, sign and promptly mail this proxy in the enclosed postage-paid envelope (to which no postage need be affixed if mailed in the United States) so that your shares of our common stock may be represented at the Annual Meeting.**

The undersigned stockholder of FormFactor, Inc. hereby revokes all prior proxies, acknowledges receipt of the Notice of Annual Meeting of Stockholders to be held May 22, 2008, appoints Stuart L. Merkadeau, as proxy, with full power of substitution, and authorizes him to represent and to vote, as designated on the reverse side, all shares of common stock, par value $0.001 per share, of FormFactor, Inc. held of record by the undersigned stockholder at the close of business on March 31, 2008, at the 2008 Annual Meeting of Stockholders to be held at our corporate headquarters, located at 7005 Southfront Road in Livermore, California, on Thursday, May 22, 2008 at 3:00 p.m., Pacific Daylight Time, and at any adjournment or postponement thereof, with the same force and effect as the undersigned stockholder might or could do if personally present thereat.

**THIS PROXY, WHEN PROPERLY EXECUTED, WILL BE VOTED AS SPECIFIED. IF NO VOTING CHOICE IS SPECIFIED ON THE REVERSE SIDE OF THIS PROXY, THEN THIS PROXY WILL BE VOTED FOR THE ELECTION OF THE CLASS II NOMINEES TO THE BOARD OF DIRECTORS LISTED ON THE REVERSE SIDE AND FOR PROPOSALS NO. 2 AND 3.**

**IN THEIR DISCRETION, THE PROXIES ARE AUTHORIZED TO VOTE UPON SUCH OTHER BUSINESS AS MAY PROPERLY COME BEFORE THE ANNUAL MEETING OR ANY ADJOURNMENT OR POSTPONEMENT THEREOF.**

QuickLinks

2008 ANNUAL MEETING OF STOCKHOLDERS
NOTICE OF 2008 ANNUAL MEETING OF STOCKHOLDERS To Be Held May 22, 2008 At 3:00 p.m., Pacific Daylight Time
TABLE OF CONTENTS
GENERAL INFORMATION
PROPOSAL NO. 1 ELECTION OF DIRECTORS
PROPOSAL NO. 2 RATIFICATION OF SELECTION OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM
PROPOSAL NO. 3 APPROVAL OF MATERIAL TERMS UNDER FORMFACTOR'S 2002 EQUITY INCENTIVE PLAN WITH RESPECT TO SECTION 162(m) OF THE INTERNAL REVENUE CODE
SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT AND RELATED STOCKHOLDER MATTERS
REPORT OF THE AUDIT COMMITTEE
COMPENSATION DISCUSSION AND ANALYSIS
REPORT OF THE COMPENSATION COMMITTEE
EXECUTIVE COMPENSATION AND RELATED INFORMATION
All Other Compensation
CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS
PROPOSALS FOR THE 2009 ANNUAL MEETING OF STOCKHOLDERS
SECTION 16(a) BENEFICIAL OWNERSHIP REPORTING COMPLIANCE
OTHER BUSINESS

ANNEX A
FORMFACTOR, INC. 2002 EQUITY INCENTIVE PLAN As Adopted April 18, 2002 As Amended February 9, 2006, May 18, 2006 and December 13, 2007

Created by 10KWizard     www.10KWizard.com