# TAB A





Atlantic Gypsum Co., Inc. v. Lloyds Intern. Corp.
S.D.N.Y.,1990.

United States District Court,S.D. New York.
ATLANTIC GYPSUM COMPANY, INC., GNK Enterprises, Inc., Kahn Lumber & Millwork Co., Inc., Polaris Properties, Inc., Gerhard Kahn and Regina Kahn, husband and wife, and Gerhard Kahn, individually, Plaintiffs,
v.
LLOYDS INTERNATIONAL CORPORATION, individually and as agent, United Jersey Bank, individually and as agent, Barclays Bank Plc, Lloyds Bank Plc, DnC America Banking Corporation, Woodward & Dickerson, Inc., Flakt, Inc., and Gary Riddell, Defendants.
**No. 89 Civ. 8113 (MBM).**

Dec. 20, 1990.

Borrowers and guarantors brought action against, inter alia, lenders, alleging various state law claims as well as violation of Racketeering Influenced and Corrupt Organizations Act (RICO). Defendants moved to dismiss. The District Court, Mukasey, J., held that predicate acts of mail and wire fraud charged in RICO claims were not alleged with sufficient particularity.

Dismissed.

West Headnotes

**[1] Racketeer Influenced and Corrupt Organizations 319H ⚷69**

319H Racketeer Influenced and Corrupt Organizations
319HI Federal Regulation
319HI(B) Civil Remedies and Proceedings
319Hk68 Pleading
319Hk69 k. In General. Most Cited Cases

Failure to plead specific statutory subsection may alone constitute grounds to dismiss Racketeering Influenced and Corrupt Organization Act (RICO) complaint for failure to inform defendants of unlawful conduct in which they allegedly engaged. 18 U.S.C.A. § 1962.

**[2] Racketeer Influenced and Corrupt Organizations 319H ⚷73**

319H Racketeer Influenced and Corrupt Organizations
319HI Federal Regulation
319HI(B) Civil Remedies and Proceedings
319Hk68 Pleading
319Hk73 k. Enterprise. Most Cited Cases

To establish civil Racketeering Influenced and Corrupt Organization Act (RICO) claim, plaintiff must plead conduct of enterprise through pattern of racketeering activity. 18 U.S.C.A. §§ 1961-1968.

**[3] Racketeer Influenced and Corrupt Organizations 319H ⚷28**

319H Racketeer Influenced and Corrupt Organizations
319HI Federal Regulation
319HI(A) In General
319Hk24 Pattern of Activity
319Hk28 k. Continuity or Relatedness; Ongoing Activity. Most Cited Cases

**Racketeer Influenced and Corrupt Organizations 319H ⚷29**

319H Racketeer Influenced and Corrupt Organizations
319HI Federal Regulation
319HI(A) In General
319Hk24 Pattern of Activity
319Hk29 k. Time and Duration. Most Cited Cases

"Pattern of racketeering activity" for purposes of Racketeering Influenced and Corrupt Organization Act (RICO) requires commission within ten-year

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

period of at least two predicate acts that violate listed laws; acts must be related and must amount to, or threaten continued likelihood of, continued criminal activity. 18 U.S.C.A. § 1961(1).

**[4] Federal Civil Procedure 170A ⚷636**

170A Federal Civil Procedure
170AVII Pleadings and Motions
170AVII(A) Pleadings in General
170Ak633 Certainty, Definiteness and Particularity
170Ak636 k. Fraud, Mistake and Condition of Mind. Most Cited Cases

As Racketeering Influenced and Corrupt Organization Act (RICO) defines "racketeering activity" to include, inter alia, violations of federal mail and wire fraud statutes, each allegation of predicate act must meet particularity standard of Rule 9(b). Fed.Rules Civ.Proc.Rule 9(b), 28 U.S.C.A.; 18 U.S.C.A. §§ 1341, 1343, 1961(1).

**[5] Federal Civil Procedure 170A ⚷636**

170A Federal Civil Procedure
170AVII Pleadings and Motions
170AVII(A) Pleadings in General
170Ak633 Certainty, Definiteness and Particularity
170Ak636 k. Fraud, Mistake and Condition of Mind. Most Cited Cases

Rule 9(b) standards for particularity applied to predicate acts in Racketeering Influenced and Corrupt Organization Act (RICO) conspiracy count. Fed.Rules Civ.Proc.Rule 9(b), 28 U.S.C.A.; 18 U.S.C.A. §§ 1961(1), 1962(b-d).

**[6] Federal Civil Procedure 170A ⚷636**

170A Federal Civil Procedure
170AVII Pleadings and Motions
170AVII(A) Pleadings in General
170Ak633 Certainty, Definiteness and Particularity
170Ak636 k. Fraud, Mistake and Condition of Mind. Most Cited Cases

To specify fraud with requisite particularity, plaintiffs must allege specifically circumstances of fraud claimed, including content of any alleged misrepresentation, and date, place and identity of persons making misrepresentations. Fed.Rules Civ.Proc.Rule 9(b), 28 U.S.C.A.

**[7] Federal Civil Procedure 170A ⚷1829**

170A Federal Civil Procedure
170AXI Dismissal
170AXI(B) Involuntary Dismissal
170AXI(B)5 Proceedings
170Ak1827 Determination
170Ak1829 k. Construction of Pleadings. Most Cited Cases

In motion to dismiss for failure to state fraud with requisite particularity, factual allegations in complaint must be accepted as true. Fed.Rules Civ.Proc.Rule 9(b), 28 U.S.C.A.

**[8] Federal Civil Procedure 170A ⚷636**

170A Federal Civil Procedure
170AVII Pleadings and Motions
170AVII(A) Pleadings in General
170Ak633 Certainty, Definiteness and Particularity
170Ak636 k. Fraud, Mistake and Condition of Mind. Most Cited Cases

Predicate acts of mail and wire fraud charged in civil Racketeering Influenced and Corrupt Organization Act (RICO) claims asserted by borrower and guarantors against lenders, for insisting on continued payments to project contractor despite dispute regarding contractor's performance, were not alleged with sufficient particularity; at best, amended complaint set forth bare, conclusory allegations to effect that entire loan transaction was part of scheme by lenders to gain control of venture, but complaint set forth no facts from which existence of such scheme could reasonably be inferred. 18 U.S.C.A. § 1962(b-d); Fed.Rules Civ.Proc.Rule 9(b), 28 U.S.C.A.

**[9] Postal Service 306 ⚷35(5)**

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

306 Postal Service
306III Offenses Against Postal Laws
306k35 Use of Mails to Defraud
306k35(5) k. Knowledge and Intent in General. Most Cited Cases

**Telecommunications 372 ⚷1014(3)**

372 Telecommunications
372III Telephones
372III(I) Offenses and Prosecutions
372k1011 Offenses
372k1014 Wire Fraud
372k1014(3) k. Knowledge and Intent in General. Most Cited Cases
(Formerly 372k362)
Showing of intentional fraud or reckless indifference to truth is necessary element of allegations under mail and wire fraud statutes; inference of scienter may be established either by facts showing motive for committing fraud and clear opportunity for doing so or, where motive is not apparent, by identifying circumstances indicating conscious behavior by defendant, though strength of circumstantial allegations must be correspondingly greater. 18 U.S.C.A. §§ 1341, 1343.

**[10] Racketeer Influenced and Corrupt Organizations 319H ⚷10**

319H Racketeer Influenced and Corrupt Organizations
319HI Federal Regulation
319HI(A) In General
319Hk4 Racketeering or Criminal Activity
319Hk10 k. Fraud in General. Most Cited Cases
Routine business communications that show only dispute between parties do not lead to reasonable inference of fraudulent intent so as to constitute predicate acts under civil Racketeering Influenced and Corrupt Organization Act (RICO). 18 U.S.C.A. § 1961(1).

**[11] Racketeer Influenced and Corrupt Organizations 319H ⚷22**

319H Racketeer Influenced and Corrupt Organizations
319HI Federal Regulation
319HI(A) In General
319Hk4 Racketeering or Criminal Activity
319Hk22 k. Financial or Economic Purpose. Most Cited Cases
Theory presented by borrower and guarantors of alleged fraudulent scheme by lenders defied economic reason and, thus, did not yield inference of fraudulent intent to support claims under Racketeering Influenced and Corrupt Organization Act (RICO); complaint alleged that lenders advanced substantial sum of money to new venture, then intentionally prevented successful completion of construction. 18 U.S.C.A. § 1961(1).

**[12] Federal Civil Procedure 170A ⚷1838**

170A Federal Civil Procedure
170AXI Dismissal
170AXI(B) Involuntary Dismissal
170AXI(B)5 Proceedings
170Ak1837 Effect
170Ak1838 k. Pleading Over. Most Cited Cases
In view of plaintiff's prior opportunity to amend Racketeering Influenced and Corrupt Organization Act (RICO) complaint after initial motion to dismiss for failure to plead fraud with requisite particularity, plaintiffs would not be granted further leave to amend following determination that fraud had not been plead with sufficient particularity. Fed.Rules Civ.Proc.Rule 9(b), 28 U.S.C.A.; 18 U.S.C.A. §§ 1961-1968.

***507** Barry Golomb, Goddard and Blum, New York City, for plaintiffs.
Philip H. Schaefer, Richard J. Holwell, Kathryn L. Bedke, Andrew P. Langhoff, Robert R. Lucic, White & Case, New York City, for defendants LIC, UJB, Barclays, Lloyds, DNC and Gary Riddell.
Charles F. Schirmeister, John Paul Giacalone, Reid

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

& Priest, New York City, for defendant Flakt, Inc.
Donald Da Parma, New York City, for defendant Woodward & Dickerson.

OPINION AND ORDER

MUKASEY, District Judge.

This case is one of at least seven actions arising out of plaintiffs' inability to repay loans by defendants that financed construction of a gypsum wallboard manufacturing plant.[FN1] Plaintiffs have asserted various state law claims for breach of fiduciary duty, breach of contract, common law fraud, tortious interference with contracts, and usury, and have infused this apparently ordinary business dispute with overtones of criminality by invoking the Racketeering Influenced and Corrupt Organization Act, 18 U.S.C. §§ 1961-68 (1984 & Supp.), with allegations that the entire loan transaction was actually part of a fraudulent scheme by the lenders and others to gain control of the borrower. Defendants have moved to dismiss all claims pursuant to Fed.R.Civ.P. 9(b) and 12(b)(6). For the reasons set forth below, the RICO counts are dismissed against all defendants for failure to plead the predicate acts of mail and wire fraud with the particularity required by Rule 9(b). All state law claims are also dismissed against all defendants for lack of jurisdiction. As plaintiffs have already amended their complaint, the dismissal is without leave to replead.

> FN1. These actions include two foreclosure actions against plaintiffs' property and an involuntary petition for relief under Chapter 7 of the Bankruptcy Code against Atlantic Gypsum Company, Inc., filed by the lending banks. Plaintiffs have also filed claims against Woodward & Dickerson identical to the claims in this action under the New Jersey RICO statute. Defendants' Memorandum of Law, Exh. A.

The facts set forth below are based on the amended complaint.

I.

A. *Factual Allegations*

Plaintiff Atlantic Gypsum Company, Inc. ("AGC"), a New Jersey Corporation, is the borrower in the loan underlying this action, and plaintiffs GNK Enterprises, Inc., Kahn Lumber and Millwork Co., Inc., Polaris ***508** Properties, Inc., Gerhard Kahn and Regina Kahn are guarantors of that loan. All plaintiffs are related.

Defendants United Jersey Bank ("UJB"), Barclays Bank Plc. ("Barclays"), Lloyds Bank Plc. ("Lloyds"), and DnC America Banking Corporation ("DNC") were the principal lenders. Defendant Lloyds International Corporation ("LIC"), a New York corporation, helped arrange the loan and is referred to as an agent for plaintiff in some of the instruments governing the transaction. Together, LIC, UJB, Barclays, Lloyds, and DNC are referred to collectively as the "Consortium." Defendant Woodward & Dickerson, Inc. ("W & D"), is a supplier of gypsum ore. Defendant Flakt, Inc. was the general contractor supervising construction of the gypsum wallboard manufacturing plant. Flakt and W & D were also subordinated lenders in the transaction. Defendant Gary Riddell is an officer of LIC.

In 1985, AGC applied to LIC to arrange financing for the long-term lease of a plot of land under the control of the Port Authority of New York and New Jersey ("PA"), the construction of a modern gypsum wallboard manufacturing plant at the site, and start-up operation of the plant. (Complaint ¶¶ 17, 18).

The lender-borrower relationship soured after the lenders insisted on continued payments to the contractor, Flakt, notwithstanding a dispute between AGC and Flakt over the latter's performance. It is these efforts by the lenders to make AGC keep paying Flakt rather than withholding payment, as AGC apparently would have preferred to do, and the lenders' subsequent attempts to obtain repayment

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

from AGC, that give rise to the claims in this case. As is apparent even from this cursory description of how the disagreement started, this is at most a business dispute involving breach of contract [FN2] and, giving plaintiffs the benefit of several doubts about governing law, breach by LIC of a fiduciary duty to plaintiff. *But see Boley v. Pineloch Associates, Ltd.*, 700 F.Supp. 673, 681 (S.D.N.Y.1988) ("[a]llegations of reliance on another party with superior expertise, standing by themselves, will not suffice [to establish a fiduciary duty]"). Yet, as set forth in some detail below, the facts in the complaint consist mainly of the contents of various documents and other communications among the parties, to set up and effect the transaction, that passed through the mail and over the wires. Plaintiffs garnish this recitation with conclusory allegations that defendants' conduct was fraudulent and was designed to permit defendants to dominate plaintiffs' business, and then whip this bland mixture into a froth of RICO claims.

FN2. *See In re W.T. Grant Co.*, 699 F.2d 599, 609 (2d Cir.) (" 'A creditor is under no fiduciary obligation to its debtor or to other creditors of the debtor in the collection of its claim' ") (quoting 4 B.R. 53, 75 [Bkrtcy.S.D.N.Y.1980] ), *cert. denied*, 464 U.S. 822, 104 S.Ct. 89, 78 L.Ed.2d 97 (1983).

Thus, we are told that "defendants or some of them undertook to and did, directly or indirectly, represent and purport to protect the interests of plaintiffs," as allegedly evidenced by ten letters, all from LIC to certain of plaintiffs, offering initially to " 'act as sole and exclusive agent to arrange financing for the project,' " to " 'be available to assist Kahn Lumber in negotiating one or more key Project documents," and then to " 'engage local counsel to arrange the Project financing,' "" 'arrange satisfactory commercial bank financing for a portion of the referenced project,' " and the like. (Complaint ¶ 20).

AGC alleges that such "representations were false, in that defendants did not protect the interests of plaintiffs but, instead, acted contrary to the interests of the plaintiffs both during said negotiation, development and formulation of said financing and of the documentation in connection therewith, and thereafter...." (Complaint ¶ 27). Nowhere are we told the facts from which a reasonable person could conclude that the quoted statements, apparently made by LIC but attributed promiscuously to other unnamed defendants, were false when made, and known to be so.

***509** The complaint also alleges that prior to the incorporation of AGC, defendants recommended to AGC's promoter an attorney, Marcia H. Goodwillie, Esq., without disclosing that she was the wife of the partner in the law firm of White & Case who was representing both plaintiffs and defendants in the proposed financing transaction. (Complaint ¶ 29). However, we are not told how, if at all, that nondisclosure injured plaintiff.

Eventually, LIC arranged for the commitment of nearly $20 million from members of the Consortium to finance the project. In connection with that commitment, the Consortium "insisted" upon the procurement of additional contracts to which Consortium members were not parties, including a gypsum ore supply agreement between AGC and W & D, various subordinated financing and security agreements, and a "turn-key" construction agreement between AGC and Flakt. (Complaint ¶¶ 30, 31). The Consortium drafted the above agreements and participated substantially in drafting the lease of the construction site from PA to AGC. (Complaint ¶ 31). The complaint alleges no additional facts from which one can reasonably infer that the motive for these additional contracts was other than the Consortium's reasonable interest in assuring the success of the venture and repayment of the loan.

In numerous paragraphs, the complaint goes on to describe provisions in agreements among the parties, including conditions precedent to AGC's ability to exercise certain rights. (Complaint ¶¶

32-35, 42-44). Essentially, the agreements allowed the Consortium, *inter alia,* to exercise substantial power over the advancement of loans to Flakt in the event of a dispute between Flakt and AGC and also provided that any default by AGC in the agreements it had with Flakt, W & D, and PA would also constitute a default under the various loan and guaranty agreements.

The complaint further alleges that after the agreements were executed on September 15, 1986 and left in escrow with White & Case, attorneys for the Consortium, unnamed "defendants or their attorneys and agents" intentionally substituted pages in the gypsum ore supply agreement, prior to the closing on December 30 and 31, 1986 and without the knowledge or consent of AGC, so as to increase, by 12%, the price of gypsum to be supplied by W & D. (Complaint ¶ 38). During later negotiations between W & D and AGC concerning the allegedly substituted pages, W & D initially drafted a letter to AGC claiming that AGC had "authorized" the substitutions, but after phone consultations with the Consortium, the wording in the letter was changed to "approved." (Complaint ¶ 65). During these negotiations, W & D told AGC that steps AGC proposed to take would be regarded as defaults under various loan agreements, "thereby evidencing discussions with and disclosures by defendants to W & D to enable it to apply additional pressure upon AGC." (Complaint ¶ 66).

From the beginning of construction, AGC and Flakt apparently disputed the progress and quality of Flakt's performance. AGC sought to pressure Flakt by withholding or threatening to withhold progress payments, a right it allegedly had under the loan agreements. However, through various communications sent through the United States mails or telephone wires, the Consortium allegedly "prevented AGC from exercising the normal powers and authority of the owner of a construction project" by "intervening and applying pressure" against AGC to continue progress payments and eventually taking over the payment process so as to assure continued payments to Flakt. (Complaint ¶ 46). The complaint alleges that through these actions, effected by use of the United States mails and wires "and by diverse other means," none of which are alleged to contain any misrepresentation, "defendants prevented AGC from taking effective steps" to prevent "untimely and improper construction" of the plant. (Complaint ¶ 47). Allegedly as a result of these actions taken by defendants, the plant requires replacement and reconstruction, and plaintiffs suffered actual damages of $25 million. (Complaint ¶¶ 48-52).

***510** The complaint describes assorted other communications through the mails or wires [FN3] which at most demonstrate that the Consortium prevented AGC from exercising certain of its contractual rights to withhold progress payments until Flakt performed satisfactorily. Apparently, the Consortium was concerned that a cutoff in payments might vitiate certain guarantees of Flakt's parent company and constitute an event of default under the loan agreements. (Complaint ¶¶ 56, 59).

> FN3. The phrase "through the United States mails," along with "over telephone wires" is repeated like a mantra at various points throughout the complaint, (Complaint ¶¶ 20, 25, 46, 47, 55, 57, 59, 61, 65, 67, 69, 77) and as many as seven times in one paragraph. (Complaint ¶ 20).

From all of the above allegations, the complaint concludes that commencing on or about December 31, 1986, defendants LIC, UJB, Barclays, Lloyds, and DNC:

"acquired or maintained directly or indirectly, an interest in or control over plaintiff, AGC, its business and affairs.... by applying relentless financial pressure, abusing fiduciary relationships, encouraging AGC and other plaintiffs to pledge security interests in and to surrender control of their assets and equity, coercing the payment of improper fees, acquiring liens and security interests in all of AGC's property and in property of other plaintiffs,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

interfering with relationships and negotiations with potential investors, partners and/or purchasers, disclosing to others information concerning plaintiffs, preventing and/or discouraging plaintiff from pursuing arbitration and other legal or contract remedies, and keeping AGC and other plaintiffs in perpetual apprehension of foreclosure and financial ruin."

(Complaint ¶ 68).

The complaint further alleges that "[i]n furtherance of defendants' scheme to acquire, exercise and maintain control over AGC," defendants utilized the mails and wires to interfere in negotiations between AGC and a potential purchaser, James Hardie Gypsum. This paragraph of the complaint does no more than list various meetings, correspondence, telephone conversations and telefaxes between or among AGC, James Hardie Gypsum and defendants Lloyds and LIC. (Complaint ¶ 69). How one can infer from this laundry list of communications between certain defendants and James Hardie Gypsum any interference by members of the Consortium in negotiations between James Hardie and AGC is nowhere explained.

With respect to all defendants including W & D and Flakt, the complaint alleges a similar scheme beginning in "about 1986" to control AGC and participate in the affairs of AGC or the consortium. (Complaint ¶ 70, 71, 72). The full text of these conclusory allegations is as follows:

70. Defendants used and/or attempted to use their control of AGC for personal financial gain and to strip it and its owners of all dominion over its affairs and assets, and for purposes of thwarting all AGC's attempts to exercise any control over construction on its premises & /or over its turn-key construction contractor, Flakt, and thwarting, plaintiff, AGC's attempts to enforce against defendant, Flakt, AGC's contract rights, specifications and/or provisions.

71. Commencing in about 1986, defendants conspired to obtain, or maintain or attempt to maintain, directly or indirectly, control over AGC, or to conduct or participate in the conduct, directly or indirectly, of the affairs of AGC or the Consortium.

72. Defendants conspired to control or to attempt to control AGC, or to maintain or attempt to maintain control of AGC, or to conduct or participate in the conduct of the affairs of AGC or of the Consortium, for personal financial gain and to strip AGC and its owners of valuable assets.

B. *Legal Claims*

[1] Based on the above allegations, plaintiffs have brought four civil RICO claims, denominated "counts," against all defendants, in addition to various state law claims against particular defendants. Count I alleges that each defendant acquired***511** and/or maintained control of AGC, the enterprise, through a "pattern of racketeering activity" in violation of 18 U.S.C. § 1962. Count II alleges that each defendant conducted or participated directly or indirectly in the conduct of AGC's affairs through a "pattern of racketeering activity" in violation of 18 U.S.C. § 1962. Count III alleges that each defendant conducted or participated directly or indirectly in the conduct of the affairs of the Consortium, the enterprise, through a "pattern of racketeering activity" in violation of 18 U.S.C. § 1962. Count IV alleges that the defendants collectively conspired to violate 18 U.S.C. § 1962(b) and 1962(c) in violation of § 1962(d). As relief for the alleged RICO violations, defendants seek an injunction essentially voiding all agreements involving the financing and construction of the plant, in addition to actual damages of $25 million trebled to $75 million.[FN4]

FN4. In Counts I, II and III, plaintiffs have not stated the particular subsection of 18 U.S.C. § 1962 upon which they are relying. Apparently, Count I relies on subsection (b) which makes it "unlawful for any person through a pattern of racketeering activity ... to acquire or maintain, directly

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce." Counts II and III appear to rely on subsection (c) which makes it "unlawful for any person employed by or associated with any enterprise engaged in ... interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprises affairs through a pattern of racketeering activity...."

Failure to plead a specific subsection of § 1962 may alone constitute grounds to dismiss a RICO complaint, because it fails to inform defendants of the unlawful conduct in which they allegedly engaged. *See Reynolds v. East Dyer Development Co.,* 882 F.2d 1249, 1251 (7th Cir.1989). Because all plaintiffs' claims are dismissed under Rule 9(b), it is unnecessary to decide if their failure to properly plead a specific subsection or adequately allege the "pattern" or "enterprise" requirements also warrant dismissal of the RICO counts and pendent state law claims. However, it is noted that plaintiffs have failed to specify the specific subsections of § 1962 in their amended complaint despite objections in defendants' memoranda of law with respect to the original complaint. This omission is consistent with plaintiffs' failure to add anything substantial to the original complaint in response to initial objections on Rule 9(b) grounds.

II.

Plaintiffs filed their original complaint on December 7, 1989. On February 6, 1990, after all defendants had moved to dismiss under Fed R.Civ.P. 9(b) and 12(b)(6), a conference was held in which I suggested that plaintiffs amend the complaint if they thought such amendment could avoid dismissal under Fed.R.Civ.P. 9(b). Plaintiffs filed an amended complaint on July 9, 1990. All defendants renewed their motions and filed additional memoranda of law.

[2][3] To establish a civil RICO claim, plaintiff must plead (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity. *Sedima, S.P.R.L. v. Imrex Co.,* 473 U.S. 479, 496, 105 S.Ct. 3275, 3285, 87 L.Ed.2d 346 (1985). A pattern of racketeering activity requires the commission within a ten year period of at least two predicate acts that violate laws listed in 18 U.S.C. § 1961(1); these acts must be related and must amount to, or threaten the continued likelihood of, continued criminal activity. *H.J. Inc. v. Northwestern Bell Telephone Co.,* 492 U.S. 229, 109 S.Ct. 2893, 2899, 106 L.Ed.2d 195 (1989).

[4][5] Section 1961(1) of Title 18 defines "racketeering activity" to include, *inter alia,* violations of federal mail and wire fraud statutes, 18 U.S.C. §§ 1341 and 1343. *See O'Malley v. New York City Transit Authority,* 896 F.2d 704, 706 (2d Cir.1990) ("To be guilty of mail or wire fraud, defendants must have used the mail or wires as a means to obtain money or property by means of false or fraudulent pretenses, representations, or promises or for purposes of executing a scheme to defraud."). Therefore, each allegation of a predicate act must meet Rule 9(b)'s standards for particularity. *Hecht v. Commerce Clearing House, Inc.,* 897 F.2d 21, 26 n. 4 (2d Cir.1990); *Beauford v. Helmsley,* 865 F.2d 1386, 1392 (2d Cir.) (en banc), *vacated,*492 U.S. 914, 109 S.Ct. 3236, 106 L.Ed.2d 584,*adhered to upon further consideration,*893 F.2d 1433,*cert. denied,*493 U.S. 992, 110 S.Ct. 539, 107 L.Ed.2d 537 (1989). The ***512** same requirements of particularity apply to the predicate acts in Count IV, the RICO conspiracy count. *See United States v. Bonanno Organized Crime Family,* 683 F.Supp. 1411, 1439-40 (E.D.N.Y.1988), *aff'd,*879 F.2d 20 (2d Cir.1989).

Fed.R.Civ.P. 9(b) provides: "In all averments of

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

fraud ... the circumstances constituting fraud ... shall be stated with particularity. Malice, intent, knowledge, and other conditions of mind of a person may be averred generally."

[6] Rule 9(b)"is designed to provide the defendant fair notice of the plaintiff's claims, and to enable the defendant to prepare a suitable defense, protect his reputation or goodwill from harm, and reduce the number of strike suits." *O'Brien v. Price Waterhouse,* 740 F.Supp. 276, 279 (S.D.N.Y.1990). These concerns are even more immediate in civil RICO actions, because such suits "implicate the reputation interests of defendants accused of committing racketeering offenses." *Newman v. L.F. Rothschild, Unterberg, Towbin,* 651 F.Supp. 160, 162 (S.D.N.Y.1986) (citation omitted). *See also Beauford v. Helmsley,* 740 F.Supp. 201, 213 (S.D.N.Y.1990). To specify fraud with particularity, plaintiffs must allege specifically the circumstances of the fraud claimed, including the content of any alleged misrepresentation, and the date, place and identity of the persons making the misrepresentations. *Wexner v. First Manhattan Co.,* 902 F.2d 169, 172 (2d Cir.1990); *Divittorio v. Equidyne Extractive Industries, Inc.,* 822 F.2d 1242, 1247 (2d Cir.1987); *Luce v. Edelstein,* 802 F.2d 49, 54 (2d Cir.1986); *Dymm v. Cahill,* 730 F.Supp. 1245, 1250 (S.D.N.Y.1990).

[7][8] In a motion to dismiss under Rule 9(b), factual allegations in the complaint must be a accepted as true. *Luce v. Edelstein,* 802 F.2d 49, 52 (2d Cir.1986). However, even accepting all pleaded facts as true, plaintiffs' amended complaint fails to plead mail and wire fraud with particularity. At best, the amended complaint sets forth bare, conclusory allegations in Paragraphs 27 and 68-72 to the effect that the entire loan transaction was part of a scheme by all defendants or some of them to gain "control" of the venture. However, the complaint sets forth no *facts* from which the existence of such a scheme reasonably can be inferred. *See A. Burton White, M.D., P.C. v. Beer,* 679 F.Supp. 207, 211 (E.D.N.Y.1988) (dismissing RICO counts alleging that "defendants obtained money and property of plaintiff by means of false representations ... and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon plaintiff" because "[n]owhere in the Complaint does plaintiff allege *specific* facts that support this broad, conclusory statement") (emphasis in original).

Individual paragraphs of the amended complaint consist of little more than string citations to business communications on particular dates, whose contents even as described in the complaint seem unremarkable when one considers that they deal with a troubled loan, and conclusory allegations of motives behind these communications by unspecified "defendants." Stripped to essentials, the alleged motives appear to be no more than the desire by defendants to have their loans repaid, a desire neither surprising nor sinister. At most, these paragraphs demonstrate possible breaches of contract or, as to LIC insofar as it acted as plaintiff's agent, of fiduciary duty. These paragraphs do not set forth the "content of any alleged misrepresentations" as required by Rule 9(b). *Divittorio,* 822 F.2d at 1242.

The only possible misrepresentations set forth in individual paragraphs are the alleged failure to disclose that an attorney recommended to AGC, Marcia Goodwillie, Esq., was the wife of a White & Case partner involved in the loan transaction (Complaint ¶ 29) [FN5] and the allegation that pages in the final documents were switched ***513** without AGC's knowledge. (Complaint ¶¶ 37-39). These particular misrepresentations cannot be RICO predicate acts because they include no allegations of any connection to the use of the mails or wires. Nor is any damage pleaded as having resulted from the failure to disclose Ms. Goodwillie's relationship to Mr. Goodwillie.

FN5. According to Defendants' Reply Memorandum of Law at p. 9, the name of the White & Case partner was Eugene W. Goodwillie, Jr. Thus, plaintiffs allege in Paragraph 29 of their amended complaint

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

that defendants failed to disclose that Marcia Goodwillie was the wife of Eugene Goodwillie, Jr., the partner with whom they were dealing. Plaintiffs omitted the name of the White & Case attorney from both their original and their amended complaint.

Nor are these alleged misrepresentations set forth with sufficient particularity to suggest the existence of a more general fraudulent scheme to control AGC, which involved use of the mails and wires. The time, place and speaker of the alleged misrepresentations are not set forth with particularity. The alleged failure to disclose Ms. Goodwillie's marital relationship took place at some undisclosed time "[p]rior to the incorporation of AGC" and was made by undisclosed "defendants." (Complaint ¶ 29). The alleged failure to disclose the replacement of documents placed in escrow with new pages prior to the loan closing was made by unnamed "defendants," while the alleged switch was done by undisclosed "defendants or their attorneys and agents" at some undisclosed time between September 15 and December 31, 1986. (Complaint ¶¶ 36-38). Both the allegation of a general fraudulent scheme to acquire control of AGC and these specific allegations, which, if true, may shed a bit of light on the possible existence of a general scheme, are fatally defective also for failing "to particularize the roles of individual defendants in perpetrating the allegedly fraudulent acts, as is required by Rule 9(b)." *Beaufore,* 740 F.Supp. at 213. *See also Divittorio,* 822 F.2d at 1247 ("[w]here multiple defendants are asked to respond to allegations of fraud, the complaint should inform each defendant of the nature of his alleged participation in the fraud."); *O'Brien v. National Property Analysts Partners,* 719 F.Supp. 222, 227 (S.D.N.Y.1989) ("repeated blanket references to 'defendants' are impermissible").

[9] Plaintiffs also have failed to plead any facts that give rise to a strong inference of scienter. A showing of intentional fraud or reckless indifference to the truth is a necessary element of allegations under the mail and wire fraud statutes. *See O'Malley,* 896 F.2d at 706; *Beck v. Manufacturers Hanover Trust Co.,* 820 F.2d 46, 49 (2d Cir.1987), *cert. denied,*484 U.S. 1005, 108 S.Ct. 698, 98 L.Ed.2d 650 (1988). This inference of scienter may be established either by "facts showing a motive for committing fraud and a clear opportunity for doing so," or where a motive is not apparent, by "identifying circumstances indicating conscious behavior by the defendant ..., though the strength of the circumstantial allegations must be correspondingly greater." *Beck,* 820 F.2d at 50 (citations omitted). In sum, there must at least be a "factual basis for ... conclusory allegations of intent to defraud." *O'Malley,* 896 F.2d at 707.

[10] Plaintiffs have failed to plead scienter adequately. As already discussed, the complaint consists of little more than a description of routine business communications connected to the negotiation, consummation, and possible workout of a complex loan transaction, in addition to later communications which show only the existence of a dispute over the propriety of continued payments to Flakt. Routine business communications that show only a dispute between the parties do not lead to a reasonable inference of fraudulent intent. In *O'Malley,* plaintiff, a disgruntled former employee of the defendant municipal transit authority, set out five letters from defendant that were connected to its denial of medical benefits and subsequent termination of employment. The letters showed only a dispute between the employee and his employer over the employee's entitlement to certain benefits for allegedly service related injuries. The complaint treated these five letters as individual predicate acts of mail fraud in a civil RICO suit against defendants. Although the letters were allegedly used in furtherance of a scheme to defraud plaintiff, the Court held that they were "no more than routine, innocuous, business communications. Most of them were standard form letters used regularly by defendants in dealing with its employees.... there's no mail fraud or anything which would even remotely

resemble mail fraud based on these letters of ***514** the Transit Authority to O'Malley." 896 F.2d at 707.

[11] Plaintiffs' theory of an alleged scheme to defraud defies logic. The complaint alleges that members of the Consortium, established banking institutions, advanced a substantial sum of money to a new venture and then intentionally prevented the plaintiffs from successfully completing construction. The result of this "fraud" was that the plant was never able to operate and now requires reconstruction. The alleged motive for this scheme was to gain control of AGC and "strip AGC and its owners of valuable assets." (Complaint ¶ 72). Thus, on plaintiffs' view of the facts, defendants advanced money to the venture with the intention of driving it into the ground so that they could control the failed venture and then wait in line with other creditors in a bankruptcy proceeding. The same illogical reasoning undermines plaintiffs' claim that unnamed members of the Consortium or their attorneys or agents substituted pages in the ore supply agreement between AGC and W & D so as to increase the price of raw gypsum ore by 12%. While an increase in the price of ore may have benefited W & D, from the perspective of the lenders it would only increase the risk that AGC would be unprofitable and unable to repay its loans. Additionally, if the Consortium had intended to gain control of the gypsum manufacturing venture, presumably its members would object to paying any more for raw materials than necessary.

Plaintiffs' view of the facts defies economic reason, and therefore does not yield a reasonable inference of fraudulent intent. *Cf. Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 595, 106 S.Ct. 1348, 1360, 89 L.Ed.2d 538 (1986) (no motive for anti-trust conspiracy absent economically reasonable scheme; summary judgment for defendant).

III.

[12] Pursuant to Rule 9(b) counts I, II, III and IV of the amended complaint must be dismissed. In view of the prior opportunity to amend the complaint after defendants' initial motion to dismiss on Rule 9(b) grounds, plaintiffs will not be granted further leave to amend. I decline to accept plaintiffs' invitation to "accommodate" any remaining objections to the complaint. Plaintiffs' Opposition Memorandum at 21 n. 4. *See O'Brien v. Price Waterhouse,* 740 F.Supp. at 284 (dismissing amended complain without leave to replead where "the nature of plaintiffs' amendments-mere elaboration and increased verbiage concerning the same core allegations initially put forward-suggests to the Court that ... [further amendments] would merely duplicate these efforts"). Accordingly, the federal claims are dismissed without leave to replead.

With the dismissal of the only federal claims in this action, further jurisdiction over the pendent state claims asserted by plaintiffs is declined. *United Mine Workers v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966). All state law claims against all defendants are dismissed pursuant to Fed.R.Civ.P. 12(b)(1).

SO ORDERED.

S.D.N.Y.,1990.
Atlantic Gypsum Co., Inc. v. Lloyds Intern. Corp.
753 F.Supp. 505, RICO Bus.Disp.Guide 7643

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.