# TAB B



Not Reported in F.Supp.2d  Page 1
Not Reported in F.Supp.2d, 2002 WL 31093589 (N.D.Cal.), Fed. Sec. L. Rep. P 92,238
**(Cite as: Not Reported in F.Supp.2d, 2002 WL 31093589)**

C
Coble v. Broadvision Inc.
N.D.Cal.,2002.

United States District Court, N.D. California.
Bernard COBLE, et al., Plaintiffs,
v.
BROADVISION INC., et al., Defendants.
**No. C 01-01969 CRB.**

Sept. 11, 2002.

Class action securities fraud suit was brought against company. On company's motion to dismiss, the District Court, Breyer, J., held that: (1) complaint did not support strong inference that omissions were made with requisite scienter; and (2) overly optimistic earnings projections came within safe harbor provisions of Private Securities Litigation Reform Act (PSLRA).

Motion granted.

West Headnotes

**[1] Securities Regulation 349B ⇌60.54**

349B Securities Regulation
　349BI Federal Regulation
　　349BI(C) Trading and Markets
　　　349BI(C)7 Fraud and Manipulation
　　　　349Bk60.50 Pleading
　　　　　349Bk60.54 k. Nondisclosure. Most Cited Cases
Allegation that company omitted particular expenses when initially announcing quarterly results failed to allege fraud with specificity required by Private Securities Litigation Reform Act (PSLRA); complaint did not support strong inference of scienter. Securities Exchange Act of 1934, § 21D(b)(1, 2), as amended, 15 U.S.C.A. § 78u-4(b)(1, 2).

**[2] Securities Regulation 349B ⇌60.28(16)**

349B Securities Regulation
　349BI Federal Regulation
　　349BI(C) Trading and Markets
　　　349BI(C)7 Fraud and Manipulation
　　　　349Bk60.17 Manipulative, Deceptive or Fraudulent Conduct
　　　　　349Bk60.28 Nondisclosure; Insider Trading
　　　　　　349Bk60.28(10) Matters to Be Disclosed
　　　　　　　349Bk60.28(16) k. Correction or Confirmation of Prior Statements or Rumors. Most Cited Cases
Company which learned of expenses omitted from its quarterly earnings report satisfied duty to correct with requisite promptness; auditors signed corrected report on Friday, and press release was issued after close of market on following Monday.

**[3] Securities Regulation 349B ⇌60.53**

349B Securities Regulation
　349BI Federal Regulation
　　349BI(C) Trading and Markets
　　　349BI(C)7 Fraud and Manipulation
　　　　349Bk60.50 Pleading
　　　　　349Bk60.53 k. Misrepresentation. Most Cited Cases
Allegation that company had engaged in "channel stuffing" in order to be able to announce quarterly profit failed to allege fraud with specificity required by Private Securities Litigation Reform Act (PSLRA); complaint was too vague and nonspecific to support any reasonable inference of scienter. Securities Exchange Act of 1934, § 21D(b)(1, 2), as amended, 15 U.S.C.A. § 78u-4(b)(1, 2).

**[4] Securities Regulation 349B ⇌60.27(5)**

349B Securities Regulation
　349BI Federal Regulation
　　349BI(C) Trading and Markets
　　　349BI(C)7 Fraud and Manipulation

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 3:07-cv-05545-SI   Document 33-3   Filed 05/05/2008   Page 3 of 13

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 31093589 (N.D.Cal.), Fed. Sec. L. Rep. P 92,238
(Cite as: Not Reported in F.Supp.2d, 2002 WL 31093589)

Page 2

349Bk60.17 Manipulative, Deceptive or Fraudulent Conduct
    349Bk60.27 Misrepresentation
        349Bk60.27(5) k. Forecasts, Estimates, Predictions or Projections. Most Cited Cases

Cautionary warning at beginning of conference call with analysts and investors was sufficient to bring optimistic projections made by company during call within safe harbor provisions of Private Securities Litigation Reform Act (PSLRA), absent showing that company actually knew that projections were false. Securities Exchange Act of 1934, § 21E(c), as amended, 15 U.S.C.A. § 78u-5(c).

MEMORANDUM AND ORDER

BREYER, J.

*1 This is a Private Securities Litigation Reform Act ("PSLRA") consolidated class action. Now pending before the Court is defendants' motion to dismiss the Second Amended Consolidated Complaint. After carefully considering the papers filed by the parties, and having had the benefit of oral argument, the Court GRANTS the motion to dismiss the federal claims for the reasons stated below.

BACKGROUND

Broadvision is a software company that designs and sells software that enables companies to conduct electronic commerce and related services via the Internet. On January 25, 2001, Broadvision announced its financial results for the fourth quarter of 2000 ("4Q 2000") and the 2000 fiscal year ("FY 2000"), both of which ended on December 31, 2000. The Company reported, among other things, that pro-forma earnings per share for 4Q 2000 were $0.02 while earnings per share for FY 2000 were $0.13. Second Amended Consolidated Complaint ("SAC") ¶ 38. The press release announcing the financial results included the following statement from Broadvision's Chief Executive Officer ("CEO") Dr. Pehong Chen:

Q4 2000 was BroadVision's eleventh consecutive quarter of profitability, on a pro-forma basis. Our aggressive growth and enhanced presence in global markets did result in higher than anticipated expense levels in Q4, but we feel good about the market and believe we are well positioned for continued success.

*Id.* ¶ 38. That same day BroadVision hosted a conference call for analysts, media representatives and BroadVision investors. During the call Chen made several statements, including optimistic statements such as "[w]e are very excited about the opportunities that lay before us, and we believe we have put in-the pieces to take advantage of these opportunities," and "[w]e firmly believe BroadVision is currently very well positioned not just to survive in this challenging environment, but to thrive and emerge even a stronger player when this economic downturn is over." *Id.* ¶ 39.

On April 2, 2001, BroadVision issued a press release disclosing that it would revise its previously released unaudited financial results for 4Q 2000 to include approximately $4 million in additional expenses, reducing the Company's pro forma earnings per share by one half, from .02 per share to .01 per share, and reducing pro forma earnings per share for FY 2000 from $0.13 to $0.12. The stock price declined after the announcement.

PROCEDURAL HISTORY

A little more than two weeks after BroadVision announced the revision, the first of ten securities fraud class actions were initiated in this District. The Court consolidated the cases and appointed lead plaintiff who subsequently filed a Consolidated Class Action Complaint. The Complaint alleged BroadVision, Pehong Chen, its Chairman of the Board, CEO and President, and Randall C. Bolten, its Chief Financial Officer ("CFO") and Executive Vice-President, made false and misleading statements on January 25, 2001. In particular, the Complaint alleged defendants were aware of the ad-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 31093589 (N.D.Cal.), Fed. Sec. L. Rep. P 92,238
(Cite as: Not Reported in F.Supp.2d, 2002 WL 31093589)

Page 3

ditional $4 million in expenses when the FY 2000 and Q4 2000 results were initially released. Plaintiffs also alleged that other optimistic statements and projections made by defendants on January 25, 2001 were false and misleading because defendants were aware the Company was facing significant difficulties.

*2 The Court granted defendants' motion to dismiss on the ground that plaintiffs had not alleged facts sufficient to satisfy the pleading requirements of the PSLRA. At oral argument plaintiffs repeatedly stated that they had additional information which was not pled in the complaint. Accordingly, the Court granted plaintiffs leave to amend and advised them that they must include all information they want the Court to consider in the amended complaint.

Plaintiffs subsequently filed the amended complaint. In addition to restating their original claims, they have added BroadVision's Board of Directors as defendants, as well as state law claims for breach of fiduciary duty. Defendants have again moved to dismiss on various grounds. Because the Court did not issue a written opinion after it granted the original motion to dismiss, this Memorandum and Order addresses the arguments made by plaintiffs in opposition to both motions.

LEGAL STANDARD

The PSLRA raised the "pleading standards for private securities fraud plaintiffs."*In Re Silicon Graphics, Inc. Sec. Litig.,* 183 F.3d 970, 973 (9th Cir.1999); *see also Desaigoudar v. Meyercord,* 223 F.3d 1020, 1021 (9th Cir.2000) ("[T]he PSLRA ... modified the liberal, notice pleading standard found in the Federal Rules of Civil Procedure," such that the courts "now examine a securities fraud complaint to determine whether the plaintiff has complied with the more stringent pleading standards of the PSLRA."); *Heliotrope General, Inc. v. Ford Motor Co.,* 189 F.3d 971, 979 (9th Cir.1999) (characterizing the pleading requirements of the PSLRA as "rigorous"). In addition to complying with Federal Rule of Civil Procedure 9(b), "the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, ... [to] state with particularity all facts on which that belief is formed."15 U.S.C. § 78u4(b)(1).

The PSLRA also requires a plaintiff at the pleading stage "to state with particularity facts giving rise to a *strong* inference that the defendant acted with the required state of mind."15 U.S.C. § 78u-4(b)(2) (emphasis added). This requirement means that plaintiffs "must plead, in great detail, facts that constitute strong circumstantial evidence of deliberately reckless or conscious misconduct."*Silicon Graphics,* 183 F.3d at 973. To plead in great detail means a plaintiff "must provide a list of all relevant circumstances in great detail."*Id.* at 984.

The PSLRA does not define the required scienter, including the level of recklessness, that must be shown to constitute a 10(b) violation. The Ninth Circuit has held, however, that "recklessness" in the section 10(b) context is a form of intentional conduct. *See Silicon Graphics,* 183 F.3d at 977. It " 'may be defined as a highly unreasonable omission, involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it .' " *Howard v. Everex Systems,* 228 F.3d 1057, 1063 (9th Cir.2000) (quoting *Hollinger v. Titan Capital Corp.,* 914 F.2d 1564, 1569 (9th Cir.1990) (en banc). Thus, in order to plead a strong inference of recklessness, "plaintiffs must state facts that come closer to demonstrating intent, as opposed to mere motive and opportunity." *Silicon Graphics,* 183 F.3d at 974.

*3 On a motion to dismiss a court must accept a plaintiffs' allegations as true and construe them in

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

the light most favorable to the plaintiffs. *See id.* at 983. When a court is determining whether plaintiffs have pled a strong inference of scienter, "the court must consider *all* reasonable inferences to be drawn from the allegations, including inferences unfavorable to the plaintiffs."*Gompper v. Visx, Inc.*, 298 F.3d 893, 897 (9th Cir.2002). The Court "should consider all the allegations in their entirety, together with any reasonable inferences that can be drawn therefrom, in concluding whether, on balance, the plaintiffs' complaint gives rise to the requisite inference of scienter."*Id.*

## DISCUSSION

A. The 4Q 2000 and FY 2000 Results

[1] Plaintiffs' primary complaint is that defendants' January 25, 2001 announcement of the 4Q 2000 and FY 2000 results was false and misleading because at that time defendants knew an additional $4 million in expenses were not included in the results. Defendants contend this allegation fails as a matter of law because plaintiffs have not pled facts that give rise to a strong inference of scienter, that is, a strong inference that Chen, Bolten, or anyone at BroadVision was aware of, or recklessly disregarded, the additional expenses at the time the Q4 2000 results were initially released.

1. The original complaint

In defense of their original consolidated complaint, plaintiffs argued that the "significance" of the misstatement supports an inference of scienter, the missed expenses cut pro forma earnings per share in half from $.02 to $.01. While this fact supports some inference of scienter, it does not support a strong inference when considered in context. The previous quarter (Q3 2000) had pro forma earnings per share of $.05. Without the additional $4 million in expenses the earnings per share still dropped significantly, in fact, more significantly than the drop caused by the April 2, 2001 revision. There is less of an incentive to hide expenses when even if one includes the expenses the earnings per share decrease significantly. Moreover, the additional $4 million in expenses was on revenue of $136.9 million.

The case upon which plaintiffs rely, *Marksman Partners v. Chantal Pharm Corp.*, 927 F.Supp. 1297, 1314 (C.D.Cal.1996), is distinguishable. There the court found a strong inference of scienter based on several facts, including that the allegedly overstated revenues constituted a significant portion of Chantal's total revenues. *Id.* at 1314. There is no similar allegation here. The other facts that persuaded the *Marksman* court were that "the allegedly misleading financial and other public statements bore defendants' imprimatur," one of the defendants divested herself of a substantial portion of her shares at a considerable profit during the class period, and the company "completed a substantial private placement of its stock following the rise in Chantal's stock value, which was allegedly precipitated by the fraudulent disclosures."*Id.* None of these additional facts, or similar facts, are alleged here.

*4 Plaintiffs also contended the expenses were "missed" at a time when defendants, and in particular Bolton, were "carefully scrutinizing" the Company's expenses. The only "specifics" plaintiffs offered to support this conclusory statement were that according to an ex-employee "in December 2000, the Company started reducing its headcount and implemented dramatic cost controls including slashing funds for corporate events and travel in order to reduce operating expenses."Complaint ¶ 19. This "specific," however, is not specific at all; what were the dramatic cost controls and what does "slashing" funds mean? Adjectives are not substitutes for allegations of fact. Given the conclusory nature of this allegation, it does not support an inference that Bolten, Chen, or anyone else at BroadVision was aware on January 25, 2001 of the $4 million in additional expenses.

In sum, the only facts pled in the original consolid-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 3:07-cv-05545-SI   Document 33-3   Filed 05/05/2008   Page 6 of 13

Not Reported in F.Supp.2d                                                                                                          Page 5
Not Reported in F.Supp.2d, 2002 WL 31093589 (N.D.Cal.), Fed. Sec. L. Rep. P 92,238
(Cite as: Not Reported in F.Supp.2d, 2002 WL 31093589)

ated complaint which support an inference of scienter are the fact of the error itself and the lack of a public explanation for how the error occurred. This inference of scienter is not strong. It is particularly not strong given that Chen did not sell any shares during this period and Bolton sold only a small percentage of his shares (1.8%). While each received end-of-the-year bonuses ($25,000 and $45,000), the small amount of the bonuses coupled with the fact that the expenses were eventually disclosed negates an inference of scienter. Plaintiffs did not proffer any theory as to why defendants would make these false statements if they did not personally profit from them.

2. The SAC

Plaintiffs have added a plethora of allegations to support scienter. *See* SAC ¶¶ 46-56.

a. Motive

Plaintiffs argue that defendants had a motive to deliberately understate expenses. SAC ¶ 47. They allege defendants understated expenses

in order to announce a profitable quarter for 4Q 2000 and keep from falling out of compliance with its financial covenants with a commercial lender.... In 4Q 2000, having already missed forecasts for the Company due to increased expenses, defendants were reluctant to disclose that the Company's expenses in fact were even higher than that disclosed, so as to appear solidly profitable. Moreover, by withholding additional Company expenses, defendants were able to stay in compliance with its financial covenants with a commercial lender requiring the Company to maintain certain performance. By March 31, 2001, within only about two months of issuing their January 25, 2001 financial results, BroadVision fell out of compliance with its financial covenants due to its net operating loss for the three months then ended.

*Id.*

These alleged motives are weak. First, given that pro forma earnings dropped from $.05 per share to $.02 per share even before the restatement, defendants had little motive to intentionally withhold $4 million in expenses so that earnings per share would not be $.01 for the quarter. If defendants were motivated to give a false impression of profitability, why did they not withhold more than $4 million so that earnings per share would not drop at all, or only very little?

*5 The SAC also lacks sufficient specificity to support a motive regarding the loan covenants. Plaintiffs do not identify the covenants (or even the lender) or how withholding $4 million in expenses would cause BroadVision to violate those covenants. Nor does it explain why BroadVision fell out of compliance with those covenants in March 2001-before the restatement. In other words, plaintiffs do not plead any facts that suggest the loan covenants are related to the understatement of expenses.

b. Knowledge of missing expenses

Plaintiffs make new allegations to support their claim that defendants Bolton and Chen knew about the additional $4 million in expenses.

First, "[a]ccording to a former employee of the Company, based on his discussion with a member of upper management," in the fall of 2000 Bolton himself conducted an internal audit of expenses because " 'numbers were not adding up and approximately $4 million was missing from the company." ' SAC ¶ 48. Plaintiffs allege further that defendants accounted for the $4 million, but that in January BroadVision's independent accountant determined that BroadVision had really misplaced $8 million. *Id.* "According to another former employee of the Company, based on a senior management source at BroadVision, BroadVision had deferred recording such expenses in order to make its 4Q00 financial results 'look better." ' SAC ¶ 49.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 31093589 (N.D.Cal.), Fed. Sec. L. Rep. P 92,238
**(Cite as: Not Reported in F.Supp.2d, 2002 WL 31093589)**

Page 6

These allegations suggest, at best, that Bolton looked into expenses and satisfied himself that all expenses were accounted for. They do not reasonably support an inference that Bolton was aware of an additional $4 million in expenses. Indeed, they reasonably support the contrary inference: why would Bolton conduct an internal audit to discover additional expenses which would have to be reported against revenue, and then report only some of those expenses?

Moreover, the allegations do not even reasonably support an inference that Bolton in fact conducted an internal audit and uncovered $4 million in expenses. The allegation is based on an unnamed source who spoke to an unidentified member of "upper management" at some unspecified time. Plaintiffs do not plead any details to suggest that this unspecified member of upper management would have personal knowledge of Bolton conducting such an audit. Plaintiffs' claim that the independent auditor subsequently discovered that there were actually originally $8 million in missing expenses is also wholly unsupported by any allegations as to the basis for this claim. Such a bald assertion does not create more than a minimal inference of scienter.

c. Deviation from past practice

Plaintiffs also allege that in years prior to the close of FY 2000, BroadVision would obtain an audit report from its auditors prior to announcing its financial results for the fourth quarter and fiscal year. "However, on January 25, 2001, BroadVision purportedly announced its results for 4Q00 and fiscal 2000 *before* Arthur Anderson certified that it had completed its audit on March 30, 2001 ."SAC ¶ 50. Plaintiffs make this allegation based on Arthur Anderson's certificate dated March 30, 2001 attached to BroadVision's Form 10K filed April 2, 2001. *Id.* n. 3. Defendants contend that the certification date relates to the date the audit field work is completed, not the date the certified audit is provided to the client. Thus, in previous years, the field work was completed before the announcement, but BroadVision did not have completed audits. There is no evidence one way or the other before the Court; thus, the allegation supports an inference that things were done differently in January 2001. However, it only supports, at best, a slight inference of scienter since there is no allegation that defendants attempted to hide the missing expenses from their auditors. By announcing the results before receipt of the certified audit results, defendants could only hope to delay the disclosure of the additional expenses. Plaintiffs do not make any persuasive allegations as to why defendants would want to do so.

d. The new CFO

*6 Plaintiffs claim defendants unsuccessfully attempted to hire a new CFO to replace Bolton in January 2001. "The new CFO was hired-and chose not to accept the position-prior to the issuance of false financial results for BroadVision, and this strongly suggests that defendants knew, or were consciously reckless in not knowing, that the Company's internal financial controls, in fact, were unreliable and its financial results announced on January 25, 2001 were false."SAC ¶ 51. The Court disagrees. Plaintiffs imply that the new CFO chose not to join BroadVision because he learned of the false financials. Such an inference is unreasonable, or at least, there are many other far more reasonable inferences to be drawn from that fact. In their written opposition plaintiffs say something different: "The temporal proximity between BroadVision's attempts to hire a new CFO and BroadVision's announcement of false financial results for 4Q 2000 and FY 2000 is circumstantial evidence that defendants were aware that there were problems with BroadVision's financial controls or financial results."Plaintiffs' Opposition at 19. Again, any inference of scienter is slight. As plaintiffs acknowledge, Bolton remained as CFO throughout the class period and there is no allegation that BroadVision continued looking for a new CFO after January 2001. In any event, there are many reasons BroadVision may have been searching for a new CFO.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 31093589 (N.D.Cal.), Fed. Sec. L. Rep. P 92,238
(Cite as: Not Reported in F.Supp.2d, 2002 WL 31093589)

Page 7

e. "View Into 2001" marketing event

Plaintiffs contend that of the $4 million in additional expenses omitted from the January 2001 announcement of financial results, over $2 million was related to an early December 2000 marketing event titled "View Into 2001." Plaintiffs cite an unnamed source, a Marketing Department employee laid off in February 2001, who claims that as early as mid-December 2000, "employees in the Marketing Department were already discussing the fact that BroadVision's 4Q 2000 revenues were false in part because $2 million associated with the 'View Into 2001' marketing/public relations event was being hidden."The source claims Chen "learned through a meeting with marketing personnel that the marketing event went over budget by $2 million during the first or second week of January, 2001, *prior* to issuing the Company's false financial results on January 25, 2001."SAC ¶ 52.

Again, plaintiffs fail to provide detail sufficient to support an inference that the unnamed source would actually know if Chen was told in a marketing meeting about additional, unaccounted for expenses. *See*In re Northpoint Communications Group, Inc., Sec. Litig., 184 F.Supp.2d 991, 1000 (N.D.Cal.2001) ("Significantly, the complaint does not discuss what the specific duties of these individuals were, or how they came to learn of the information they provide in the complaint."). The SAC is silent as to what this unnamed source's allegation is based upon. As a result, the allegation is entitled to little weight. *See*Silicon Graphics, 183 F.3d at 984.

f. Hewlett-Packard royalty

*7 Plaintiffs again allege that another $750,000 of the omitted $4 million was related to royalty due to Hewlett-Packard on the sale of the jointly developed InfoExhange portal product. "Due to the importance of BroadVision's business relationship with HP, defendants Chen and Bolton closely scrutinized HP's transactions with BroadVision, and knew, or should have known, about these expenses."SAC ¶ 53. This allegation does not support a strong inference of scienter; plaintiffs do not allege any persuasive facts that suggest defendants could not have been unaware of the omission of the royalty expense.

g. Summary

In sum, the complaint lacks sufficient detail and particularity to give rise to a strong inference of scienter. *See*Silicon Graphics, 183 F.3d at 984. While some of the allegations may support some inference of scienter or deliberate recklessness, the complaint taken as a whole, does not, on balance, support a strong inference that defendants Bolton and Chen knew, or recklessly should have known, that the financials announced on January 25, 2001 omitted $4 million in expenses.

Plaintiffs' reliance on *In re Mercator Software, Inc. Sec. Litig.*, 161 F.Supp.2d 143 (D.Conn.2001) is unpersuasive. First, it was decided under Second Circuit law which, the court acknowledged, "is considered by some to now have the most lenient or 'plaintiff friendly' pleading requirements among the circuits."*Id.* at 148.Because the Court does not have a copy of the *Mercator* complaint it does not know whether the complaint would satisfy the more rigorous standards of the Ninth Circuit.

Second, the facts of *Mercator* are different from those alleged here. Financials for two quarters had to be restated and the magnitude of the restatements was greater than that here. *Id.* at 149.The Vice President of Finance and Administration was fired the day the restatements were announced, and the new Chief Financial Officer resigned that same day. *Id.* at 150.The Vice President of Finance was overheard to say on four or five occasions during a two-month period that "it doesn't look good," with regard to reporting earnings, and he was involved in a dramatic increase in a number of closed door meeting in the Controller's Office. *Id.* at 149.Moreover, the expenses that were not originally reported

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 3:07-cv-05545-SI   Document 33-3   Filed 05/05/2008   Page 9 of 13

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 31093589 (N.D.Cal.), Fed. Sec. L. Rep. P 92,238
(Cite as: Not Reported in F.Supp.2d, 2002 WL 31093589)

Page 8

"were either fixed or were recurring, normal operating expenses, tied directly to sales and, thus, where there was a dramatic increase in later quarter revenues, there should have been an attendant increase in expenses."*Id.* at 150.

3. The duty to correct

[2] In their opposition to the first motion to dismiss, plaintiffs argued that even if defendants were not aware of the additional $4 million in expenses on January 25, 2001, they had a duty to correct their statements as to the Q4 2000 and FY 2000 results as soon as they learned about the erroneously excluded expenses.

A duty to disclose may arise when a company makes a statement that it believes is true but later discovers that the statement was untrue or misleading when the statement was made. *SeeIn re Burlington Coat Factory Securities Litigation,* 114 F.3d 1410, 1431 (3rd Cir.1997) ("the error, albeit an honest one, was one that had to do with information available at the time [the statement] was made and that the error in the information was subsequently discovered"); *see alsoStransky v. Cummins Engine Co.,* 51 F.3d 1329, 1331 (7th Cir.1995) (a company has a duty to correct a prior statement within a reasonable time when the "company makes a historical statement that, at the time made, the company believed to be true, but as revealed by subsequently discovered information actually was not"). This duty of disclosure is known as the "duty to correct." *SeeBurlington Coat,* 113 F.3d at 1431;*Stransky,* 51 F.3d at 1331. Defendants arguably had a duty to correct the Q4 2000 and FY 2000 results when they learned of the additional expenses.

*8 The problem with plaintiffs' theory, however, is that defendants did correct the financials. Plaintiffs' auditors signed the audit report on March 30, a Friday, and defendants issued their press release after the close of the market on April 2, the following Monday. Plaintiffs do not cite any cases that suggest this was an unreasonable delay.

B. Channel Stuffing

[3] The SAC includes new allegations regarding "channel stuffing." Plaintiffs allege that "[a]ccording to a former employee of BroadVision familiar with channel partner accounts, in an effort to increase revenues, BroadVision persuaded its partners, including Hewlett-Packard, ... to take products without having sold them to end users."SAC ¶ 58. Further, BroadVision's Senior Vice President of Worldwide Channels, Gino Padua "was engaged in 'creative' revenue deals, and would even openly complain that he was having 'revenue recognition problems.' " *Id.* Plaintiffs allege further that "Chen and Bolten, through meetings and discussions with Padua, were aware of these revenue deals" and that if revenue had been correctly accounted for, BroadVision would have actually suffered a pro forma loss instead of a profit. SAC ¶ 57.

These allegations do not give rise to a strong inference of scienter. As a court in this District has noted:

Channel stuffing is defined as the oversupply of distributors in one quarter to artificially inflate sales, which will then drop in the next quarter as distributors no longer make orders while depleting their excess supply.... A number of courts have held that "channel stuffing" gives rise to a "very weak" inference of scienter-if any at all-in § 10(b) actions because there are 'a number of legitimate reasons for attempting to achieve sales earlier.

*In re Ramp Networks, Inc. Securities,* 201 F.Supp.2d 1051, 1077 (N.D.Cal.2002); *see also In re Splash Technology Holdings, Inc. Securities Litig.,* 160 F.Supp.2d 1059, 1076 (N.D.Cal.2001) ("[T]his Circuit has rejected 'channel stuffing' claims.") (citations and quotations omitted). The mere fact that BroadVision sold products to Hewlett-Packard which Hewlett-Packard had not already sold to end users is wholly insufficient to support a strong inference, or even anything more than a weak inference, of scienter.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 3:07-cv-05545-SI    Document 33-3    Filed 05/05/2008    Page 10 of 13

Not Reported in F.Supp.2d                                                                                                            Page 9
Not Reported in F.Supp.2d, 2002 WL 31093589 (N.D.Cal.), Fed. Sec. L. Rep. P 92,238
**(Cite as: Not Reported in F.Supp.2d, 2002 WL 31093589)**

The allegations as to "creative revenue deals" are too vague and non-specific to support any reasonable inference in favor of plaintiffs.

C. The Projections

[4] Plaintiffs also base their complaint on the projections made by defendants in the January 25 conference call. In particular, Bolton projected 1Q 2001 revenue to be essentially flat with 4Q 2000, at a range of $137 million to $140 million, and he stated that the Company expected revenue for FY 2001 to be in the range of $600 to $630 million. SAC ¶ 60. Plaintiffs claim these projections were false and misleading when made. Defendants move to dismiss these claims on the ground the projections are protected by the safe harbor provisions of the PSLRA and, in any event, plaintiffs have not alleged facts that show the statements were false when made and/or scienter.

*9 Under the safe harbor a defendant cannot be held liable for a forward-looking statement that is identified as a forward-looking statement and is accompanied by "meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward looking statement."15 U.S.C. § 78u-5 (c)(1)(A). A forward-looking statement means, among other things, "a statement containing a projection of revenues, income (including income loss), earnings ..." and "a statement of the plans and objectives of management," and "a statement of future economic performance."15 U.S.C. § 78u-5(i)(1)(A)-(C). The above projections are clearly forward-looking statements.

Moreover, with respect to oral forward-looking statements, which the above projections were, the safe harbor applies if the oral forward-looking statement is accompanied by a cautionary statement that provides that the particular oral statement is forward-looking and that the actual results might differ materially from those projected, and that information about the risks is contained in a readily available written document. 15 U.S.C. § 78u-5(c)(2).

At the beginning of the conference call in which the projections were announced, defendants made the following statement:

During the course of this conference call, BroadVision may make forward-looking statements. These are subject to various important factors including, without limitation, changes in the market, the competitive environment, and macroeconomic conditions. Additional information on potential factors that could affect the company's financial results from time to time is included in the company's prospectus, Forms 10-K and 1-Q, and other documents filed with the SEC.

Thus, section 78u-5(c)(2) applies.

Plaintiffs argue that the safe harbor does not apply to the projections because the cautionary language was not paired with any particular statement in the conference call, and, in particular, with the projections. The literal language of the safe harbor supports this argument. It provides that the safe harbor applies if "the oral forward-looking statement is accompanied by a cautionary statement-(i) that the *particular* oral statement is a forward-looking statement; and (ii) that the actual results might differ materially from those projected in the forward-looking statement."15 U.S.C. § 78u-5(c)(2) (emphasis added). The use of the word "particular" seems to exclude the use of boilerplate warnings at the beginning of conference calls. BroadVision's "warning" did not identify any particular statement as forward-looking; instead, BroadVision simply stated that during the conference call it "may" make forward-looking statements.

Defendants respond that the use of the word "particular" was meant to limit the safe harbor to particular forward-looking statements made during the oral presentation. In *Wenger v. Lumisys,* 2 F.Supp.2d 1231, 1242 (N.D.Cal.1998), the court considered this very issue. Based on the legislative

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 3:07-cv-05545-SI   Document 33-3   Filed 05/05/2008   Page 11 of 13

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 31093589 (N.D.Cal.), Fed. Sec. L. Rep. P 92,238
(Cite as: Not Reported in F.Supp.2d, 2002 WL 31093589)

Page 10

history, and the absurdity of requiring a company to identify every forward-looking statement as such every time one is made, and repeating the warning with every forward-looking statement, the court held that a cautionary warning at the beginning of a conference call is sufficient. The Court is persuaded by the *Wenger* court's reasoning and plaintiff does not cite any cases which have declined to apply the safe harbor in such a situation. Accordingly, the Court concludes that the projections are protected by the safe harbor.

*10 Since the projections are protected by the safe harbor, these claims may survive defendants' motion to dismiss only if plaintiffs have pled facts to show that defendants had actual knowledge that they were false at the time they were made. *See* 15 U.S.C. § 78u-5(c)(1)(B). As will be discussed below, the SAC does not include any such allegations pled with the required particularity.

First, plaintiffs allege that "according to a former BroadVision employee, a colleague informed him in later December 2000/early January 2001 that BroadVision was estimating sales/revenue for fiscal 2001 to be approximately $200 million annually-50% less than the sales BroadVision achieved in fiscal 2000." SAC ¶ 61. This allegation is wholly insufficient to give rise to an inference of actual knowledge. Plaintiffs do not allege any facts that suggest that the "colleague" would be in a position to know about defendants' estimates.

Next, they allege defendants knew that new customer demand was non-existent, that sales managers were not hitting their numbers, and that numerous BroadVision partners and customers had already announced they were facing a slowdown. SAC ¶¶ 63-65. At a sales meeting held in January 2001, management and employees expressed concern about the lack of new business, and lay-offs were discussed. Indeed, in February, 2001, BroadVision laid off or terminated approximately 250 employees. SAC ¶ 66. Again, the SAC lacks sufficient detail to create a strong inference that defendants *actually knew* their projections were false.

*SeeSplash II,* 160 F.Supp.2d at 1069 ("To the extent that [plaintiffs] rely upon allegations of false forward-looking statements, ... plaintiffs must plead, 'in great detail,' 'all the facts' forming the basis of their belief that defendants made the forward-looking statements with actual knowledge that they were false.").

Plaintiffs also allege that "[d]efendants had real-time information as to the Company's sales performance and prospects using Salesforce.com, a website through which BroadVision employees updated their sales information each week." Thus, argues plaintiffs, defendants knew or were reckless in not knowing that sales had plummeted and there were few deals in the pipeline. Once again plaintiffs offer no details: what did the reports on Salesforce.com say and when did they reflect that there were no sales? How often did defendants Bolton and Chen access the reports, if ever? *SeeSilicon Graphics,* 983 F.3d at 985 ("We would expect that a proper complaint which purports to rely on the existence of internal reports would contain at least some specifics from those reports as well as such facts as may indicate their reliability."). "In the absence of such specifics, [the Court] cannot ascertain whether there is any basis for the allegations that the officers had actual ... knowledge of [BroadVision's] problems that would cause their optimistic representations to the contrary to be consciously misleading. In other words, in the absence of such specifics, [the Court] cannot determine whether there is any basis for alleging that the officers knew that their statements were false at the time they were made-a required element in pleading fraud." *Id.* The other allegations concerning defendants "actual knowledge" that the projections were false similarly lack sufficient particularity to give rise to a strong inference of scienter.

D. Other Statements

*11 Plaintiffs challenge several other statements in the January 25, 2001 press release and conference call.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 31093589 (N.D.Cal.), Fed. Sec. L. Rep. P 92,238
**(Cite as: Not Reported in F.Supp.2d, 2002 WL 31093589)**

Page 11

1. Version 6

The January 25, 2001 press release stated that: "BroadVision One-To-One Enterprise Version 6 will be one of the only J2EE technology compatible e-business solution suites to also deliver comprehensive e-business applications, content management, personalization, analytics and wireless support from a single vendor ." SAC ¶ 38. In the conference call that followed the press release, Chen stated that "we entered into a strategic alliance with Accenture to jointly market and sell-implement our *J2EE-compliant* product...."). SAC ¶ 39 (emphasis in SAC). Plaintiffs contend that at the time Chen made the statement, he knew that Version 6.0 was not J2EE compliant. SAC ¶¶ 76-82.

Plaintiffs have pled sufficient facts to demonstrate that Version 6.0 was not J2EE compliant and that Chen knew it was not compliant. The press release, however, represented that Version 6.0 was J2EE compatible, not that it was J2EE compliant. Plaintiffs admit it was J2EE compatible. SAC ¶ 81. Thus, the issue is whether Chen's conference call "our J2EE-compliant product" statement is actionable. While plaintiffs are entitled to an inference that Chen knew the statement was false in light of the obvious falseness of the statement, the plaintiffs have not pled sufficient particularized facts to give rise to a *strong* inference that Chen made the "J2EE-compliant" comment with scienter, that is, that it was anything more than a misstatement. Despite the product's importance to BroadVision's business (according to plaintiffs), plaintiffs cannot identify any other time when anyone at BroadVision, including Chen, represented that the product was J2EE compliant. Given the lack of any other misstatements, it is equally-if not more-likely that the misstatement was inadvertent, as it is that it was intentional. Plaintiffs have accordingly not pled facts giving rise to a strong inference of scienter. *See Visx,* 298 F.3d at 897.

2. Headcount statements

During the conference call Bolton stated that "we expect a slight *increase in the average headcount* during Q1 of '01, we also expect the *resulting increase in compensation cost* will be offset by lower other costs in Q4." SAC ¶ 74. Plaintiffs claim the statement was knowingly false and that it was important because "it indicated that BroadVision, unlike its competitors, would be continuing to hire workers to meet increased demand." SAC ¶ 74. They allege that at a mid-January meeting, attended by Chen and Bolton, BroadVision management discussed lay-offs and that, in fact, on or about February 6, 8 and 28, 2001, BroadVision terminated between 250 and 400 of its 2,412 employees. SAC ¶ 75. They also claim that BroadVision implemented a hiring freeze in December/January 2001. SAC ¶ 75.

These allegations give rise to an inference of scienter given the temporal proximity to the statement and the lay-offs. They do not, however, give rise to a strong inference of scienter. First, no inference is warranted from the statement about the hiring freeze because plaintiffs do not provide any specifics. Once again plaintiffs merely allege that a "former employee" said there was a hiring freeze without any specifics; they do not even allege the "former employee" was an employee at the time of the alleged freeze, or how he or she would have knowledge of such a freeze.

*12 Second, the statement as to the discussion at the January Sales Kickoff Meeting is also entitled to little weight because plaintiffs do not even allege that the "former employee," who apparently advised plaintiffs that lay offs were discussed at the meeting, attended the meeting, let alone other details that suggest the allegation is reliable. SAC ¶ 75.

Third, the allegation as to BroadVision instructing employees in mid-February not to discuss the recent lay-offs is unaccompanied by any details, including the basis for the allegation.

Finally, and most importantly, Bolton did not rep-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

resent that BroadVision would increase its staffing, as one analyst reported; instead, he stated that BroadVision expected an increase in average headcount. At oral argument on the first motion to dismiss plaintiffs' counsel admitted that a company could fire workers and still see an increase in average headcount. Transcript of Feb. 22, 2002 Hearing at 8. Moreover, the statement was made in the context of a statement about operating expenses. Bolton was projecting operating expenses to be flat with 4Q 2000, even though the Company was expecting a slight increase in average headcount.

D. Statements about BroadVision's Business Condition and Outlook

Finally, plaintiffs allege that Chen made additional false statements on January 25, 2001, including that BroadVision has a "very, very, significant pipeline for customers." The allegations of scienter as to these statements are the same as those for the projections and they fail to sufficiently allege a strong inference of scienter for the same reasons.

CONCLUSION

For the foregoing reasons, plaintiffs have failed, again, to plead facts giving rise to a strong inference of scienter. As this case has been pending for more than a year and the Court has already granted plaintiffs leave to amend once before, and as the court specifically advised plaintiffs to include in their amended complaint "everything that you have that establishes scienter," defendants' motion to dismiss the federal claims is GRANTED without leave to amend. The Court declines to exercise supplemental jurisdiction of the new state law claims and instead hereby dismisses those claims without prejudice. *See Carnegie-Mellon Univ. v. Cohill,* 484 U.S. 343, 350 n. 7, 108 S.Ct. 614, 98 L.Ed.2d 720 (1988).

IT IS SO ORDERED.

N.D.Cal.,2002.

Coble v. Broadvision Inc.
Not Reported in F.Supp.2d, 2002 WL 31093589 (N.D.Cal.), Fed. Sec. L. Rep. P 92,238

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.