# TAB C



Not Reported in F.Supp.    Page 1
Not Reported in F.Supp., 1996 WL 19043 (S.D.N.Y.), Fed. Sec. L. Rep. P 99,043
**(Cite as: Not Reported in F.Supp., 1996 WL 19043)**

▷
Duncan v. Pencer
S.D.N.Y.,1996.

United States District Court, S.D. New York.
DeWaine A. DUNCAN, et al., Plaintiffs,
v.
Gerald PENCER, et al., Defendants.
No. 94 Civ. 0321(LAP).

Jan. 18, 1996.

### OPINION AND ORDER

PRESKA, District Judge:

*1 Plaintiff stock purchasers allege on behalf of a putative class that the offering corporation, ten of its officers and directors, and its accounting firm violated federal securities laws by reporting artificially inflated profits, earnings, and prospects for future business of the corporation. Defendants have moved to dismiss the complaint under Rules 12(b)(6) and 9(b) of the Federal Rules of Civil Procedure, and have moved to strike certain matters from the complaint under Rule 12(f) of the Federal Rules of Civil Procedure. Defendants' motions are granted in part and denied in part.

### BACKGROUND

According to Plaintiffs' Class Action Consolidated Complaint, as modified ("Compl." or "Complaint"), named Plaintiffs DeWaine A. Duncan, Regina S. Chavers, David F. Goldstein, Sylvia Goldstein, and Nelson S. Chase (collectively, "Duncan") purchased shares of common stock of defendant Cott Corporation ("Cott") between July 19, 1993 and January 18, 1994 (the "Class Period"). (Compl. ¶¶ 1, 13.) They seek to recover for their individual harms and those suffered by all persons who purchased shares of Cott's common stock during the Class Period. (*Id.* ¶ 1.)

Cott is a Canadian-based company that sells private label beverages and food products to retailers, primarily supermarket or discount warehouse chains.(*Id.* ¶¶ 1, 2.) The other defendants include Gerald Pencer ("G. Pencer"), Chief Executive Officer and Chairman of the Board of Cott; Samuel Pencer ("S. Pencer"), Senior Vice Chairman and Director of Cott; Heather Reisman ("Reisman"), President and Director of Cott; Fraser Latta ("Latta"), Vice Chairman, Chief Operating Officer, and Director of Cott; Paul Henderson ("Henderson"), Vice President-Financial and Director of Cott; David Goldman ("Goldman"), Securities Analyst at Oppenheimer & Co. until October 1993, and Vice President-Investor Relations and Corporate Spokesman of Cott thereafter; Serge Gouin ("Gouin"), Director of Cott; Stephen Halperin ("Halperin"), Director of Cott; Colin Adair ("Adair"), Director of Cott; and Issie Farber ("Farber"), Director of Cott (collectively, "Individual Defendants"). (*Id.* ¶ 15.)Duncan also has sued Coopers & Lybrand ("Coopers"), which provided auditing, accounting, consulting, and tax advisory services to Cott. (*Id.* ¶ 21.)

Duncan alleges that Cott, the Individual Defendants, and Coopers each directly participated in a scheme to deceive the investing public regarding Cott's markets, demand for Cott's products, and Cott's financial prospects. (*Id.* ¶ 30.)As a result, Cott's common stock sold at artificially inflated prices during the Class Period, reaching a high of over $37[FN1] in October 1993.(*Id.* ¶ 1.)

The scheme allegedly began on January 5, 1993, when Oppenheimer & Co. ("Oppenheimer") issued a securities analyst's report authored by Goldman (the "January 5 report"), who was employed by Oppenheimer at that time.[FN2](*Id.* ¶ 39.)Oppenheimer is a brokerage house that "followed" Cott and issued reports and made recommendations regarding Cott's common stock. (*Id.* ¶ 35.)Cott and its "top officers" provided the information used by Oppenheimer in preparing its reports, reviewed drafts of

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                    Page 2
Not Reported in F.Supp., 1996 WL 19043 (S.D.N.Y.), Fed. Sec. L. Rep. P 99,043
(Cite as: Not Reported in F.Supp., 1996 WL 19043)

the reports before they were released, and approved the contents of the reports.[FN3](*Id.* ¶ 37.)The January 5 report forecast fiscal year 1994 earnings per share of $.90, reflecting new contracts signed by Cott with customers in the United States and Canada during the few months prior to the report. (*Id.* ¶ 39.)Further, the January 5 report disagreed with analysts who concluded that "'Cott's shares are in for tougher sailing."' (*Id.*)

**\*2** On January 22, 1993, the Dow Jones News Wire reported an interview with G. Pencer and Latta discussing Cott's prospects outside of North America.(*Id.* ¶ 40.)G. Pencer referred to Cott's agreements with retailers in South Africa and Australia and identified South America and the Pacific Rim as "'potential areas to expand [Cott's] business in the future."' (*Id.*) Latta added that Cott's main focus, however, is the United States market, where Cott "'is the leading private label soft drink maker"' with its roughly "'1% share of the total U.S. soft-drink market."' (*Id.*) Latta further noted that recent signs of price competition are easing and that Cott, although it may issue some new equity in fiscal year 1994, does not have plans for any significant equity issues. (*Id.*)

Oppenheimer issued another report, also authored by Goldman, on January 26, 1993. (*Id.* ¶ 41.)It forecast fiscal years 1994, 1995, 1996, and 1997 earnings per share of $.95, $1.40, exceeding $2.00, and approaching $3.00, respectively. (*Id.*) Goldman expressly premised the fiscal years 1996 and 1997 figures on a belief that Cott would increase its market share in the United States to "'4% - 5% over the next two to three years."' (*Id.*)

By March 24, 1993, Oppenheimer increased its forecast for fiscal years 1994 and 1995 earnings per share to $.95 and $1.50, respectively. (*Id.* ¶ 43.)Goldman, who authored the report, noted that the increase did not even include several newly signed and pending contracts which Cott's management mentioned during "'the road show connected with the recent secondary offering of 1.2 million shares."'[FN4] (*Id.*) These contracts, according to the

report, "'could well lead to yet another substantial boost"' to Oppenheimer's estimates. (*Id.*)

Despite these laudatory comments, Cott's stock price declined in April 1993.(*Id.* ¶ 44.)Reisman commented on this decline in the April 20, 1993 edition of *The Financial Post* by stating that Cott has ""'met every projection the street has made and overperformed last year""' and is ""'on track with the projections analysts are making for the first quarter and the current fiscal year.""' (*Id.*) The price decline, according to Reisman, was due to analysts' attention to increased competition, not any ""'company reasons.""' (*Id.*)

On May 12, 1993, Morgan Stanley issued a research report stating that "'Cott is positioned for continued rapid growth through the remainder of the decade, we believe. We project a compound annual growth rate of 40% for revenue and 45% for earnings over the next five years."'(*Id.* ¶ 45.)

Cott reported its results for the first quarter fiscal year 1994, which ended May 1, 1993, on June 9, 1993. (*Id.* ¶ 46.)According to the same day's edition of *The Toronto Star,* Cott "'reported sharply higher profit and sales."' (*Id.*) Cott said profits "'surged to $5.75 million ... from $2.07 million ... a year earlier,"' and that sales "'more than doubled to $129.5 million from $51.1 million."' (*Id.*) Cott attributed most of the sales growth to ""'increased sales to United States based retailers,""' but also stated that "'Canadian soft drink sales for the first quarter were up 64 percent over first quarter of fiscal 1992."' (*Id.*)

**\*3** Shortly thereafter, Cott issued its first quarter fiscal year 1994 Report to Shareholders, which included a letter signed by G. Pencer on behalf of the board. (*Id.* ¶ 47.)This letter stated that net earnings were up compared with the similar period in 1992, and that sales "'continued to grow dramatically during the quarter,"' largely due to revenues from United States based retailers. (*Id.*) The letter referred to the addition of thirty-eight United States retail customers, "'of which only four had been cus-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                                    Page 3
Not Reported in F.Supp., 1996 WL 19043 (S.D.N.Y.), Fed. Sec. L. Rep. P 99,043
**(Cite as: Not Reported in F.Supp., 1996 WL 19043)**

tomers at the beginning of the previous fiscal year.'" (*Id.*) Cott's sales in Canada also "'remained exceptionally strong.'" (*Id.*)

On or about June 15, 1993, Cott filed its Form 20-F with the SEC (the "20-F"), which contained Cott's 1993 consolidated balance sheet, its 1993 consolidated statement of earnings, and Cooper's "clean" auditor's opinion, dated April 5, 1993. (*Id.* ¶ 48.)

Cott's consolidated balance sheet was signed by G. Pencer and Gouin on behalf of the board. (*Id.* ¶ 48(b).) It listed increases from January 25, 1992 to January 30, 1993 in accounts receivable, goodwill and trademarks, inventories, other assets, prepaid expenses, total assets, retained earnings, and shareholder equity. (*Id.*)

Cott's consolidated statement of earnings similarly listed increases from January 25, 1992 to January 30, 1993 in sales, earnings from operations, net earnings, earnings per common share, fully diluted earnings per common share, and selling, general and administrative expenses. (*Id.* ¶ 48(c).)

Coopers' opinion stated that it had audited Cott's consolidated financial statements and that, after applying Canadian generally accepted auditing standards and Canadian generally accepted accounting principles, they "'present fairly, in all material respects, the financial position of the corporation as of January 30, 1993 and January 25, 1992.'"(*Id.* ¶ 48(a).)

Duncan continues his description of the defendants' scheme by citing a letter signed by G. Pencer on behalf of the board, which Cott included in its 1993 Annual Report to Shareholders ("1993 Annual Report").(*Id.* ¶ 51.)The letter referred to the 1992-1993 year as one in which Cott "'surpassed our performance targets.'" (*Id.*) Cott performed well in increasing its sales to existing United States and Canadian customers, "'a leading indicator of corporate health.'"(*Id.*) Canadian sales "'were up by over 30%'" and "'U.S. sales increased to $160 million or 48% of total company revenues, up from

11% the previous year.'"(*Id.*) Despite this increase in United States sales, the letter refers to Cott's belief that continued opportunity "'is significant.'" (*Id.*) The letter continues by noting that "'we added significantly to the management and operational talent in the organization. Management capability was added in virtually all critical areas of the business.'"(*Id.*) Finally, the letter states that Cott "'will implement the technology and information infrastructure planned for in '92,'" "'will continue to grow in both existing markets and by prudently entering new markets,'" and has established various performance measures to guide Cott's progress and ensure that Cott can "'deliver quality earnings to our shareholders.'" (*Id.*)

**\*4** The 1993 Annual Report also contained "'[m]anagement's discussion and analysis of financial condition and results of operations.'"(*Id.* ¶ 52.)It discussed Cott's expectations of renewed and increased price competition, and Cott's beliefs that "'continued increases in unit sales volume, productivity improvements and raw material cost savings will more than offset the impact of any downward pressure on unit sales prices in fiscal 1994.'" (*Id.*)

On July 19, 1993, Cott held its annual shareholders meeting, which the Dow Jones News Wire reported on the same day. (*Id.* ¶ 54.)"'Pencer said the company is finalizing an arrangement with a U.S. wholesaler, which he declined to identify, to sell Cott's beverages in 5,000 stores.'" (*Id.*) According to Latta, "'"[g]rowth in Canada is expected to slow down"'" and Cott, therefore, "'will focus more on the U.S. for future growth.'" (*Id.*) In that regard, Latta said that Cott is "'"just starting to scratch the surface of our potential" in the U.S.'" (*Id.*)

The July 19, 1993 edition of *The Financial Post* also reported the annual shareholders meeting. (*Id.* ¶ 55.)It reported Cott's statement that its "'growth potential in the U.S. is still largely untapped even though it already supplies nearly 50 U.S. retailers including the largest, Wal-Mart Stores, Inc.'" (*Id.*)

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                    Page 4
Not Reported in F.Supp., 1996 WL 19043 (S.D.N.Y.), Fed. Sec. L. Rep. P 99,043
**(Cite as: Not Reported in F.Supp., 1996 WL 19043)**

A final report of the annual shareholders meeting was in the July 20, 1993 edition of *The Toronto Star*.(*Id.* ¶ 56.)In three years, according to the report, Cott had become "'North America's largest bottler of store brand soft drinks.'" (*Id.*) Reisman was quoted as saying: "'"This decade will see some real changing of the guard in the food development, manufacturing, marketing, distributing, and retailing chain,"'" and that "'"in the case of Cott, the market conditions are right to create and sustain unusual growth.'" (*Id.*) According to Latta, "'Cott's Canadian sales increased by 37 percent in fiscal 1992 and were up a further 64 percent in the first quarter of its current fiscal year.'" (*Id.*) Finally, the report discussed Cott's arrangements to "'supply about 48 U.S.-based retailers with private label soft drinks. This includes Wal-Mart, the leading U.S. mass merchandiser, as well as the Number 2, 3, and 4 grocery retailers in the U.S.'" (*Id.*)

On August 9, 1993, Cott completed a three million share public offering, [FN5] which was reported in the August 10, 1993 edition of *The Financial Post.*(*Id.* ¶ 58.)It reported analyst Goldman's comment that "'Cott's common share issue was greatly oversubscribed.'" (*Id.*) Instead of selling two million new common shares, Cott sold "'three million at US $31 apiece'" to "'enthusiastic investors.'" (*Id.*)

Cott issued its Report to Shareholders for the second quarter of fiscal year 1994 shortly after September 14, 1993, when Cott first reported these results.(*Id.* ¶¶ 59, 60.)This report included a letter, signed by G. Pencer on behalf of the board, which stated that both United States and Canadian revenues continue to grow, with net earnings for the second quarter up to $10,651,000 compared with $4,115,000 "'for the similar period in the prior year.'" (*Id.* ¶ 60.)United States revenues, according to the letter, are a function, in part, of new retailer programs launched by Cott, while virtually all of the growth in Canadian revenues is a function of "'increased sales with existing retailer customers.'" (*Id.*) In addition, "'[p]rogress continues to be made

outside of North America,'" and the "'interest level among consumers and retailers in high quality retailer branded products continues to gather great momentum leaving us very confident as to the continued success of Cott.'" (*Id.*)

*5 On September 17, 1993, Oppenheimer issued another research report on Cott authored by Goldman. (*Id.* ¶ 61.)It forecast fiscal years 1994 and 1995 earnings per share of $.51 and $.91, [FN6] respectively, and estimated Cott's "'longer term growth rate of at least 40% annually'" over the next five years. (*Id.*)

Similarly, Morgan Stanley issued a research report on Cott on October 15, 1993 which forecast fiscal years 1994 and 1995 earnings per share of $.50 and $.92, respectively. (*Id.* ¶ 63.)Morgan Stanley recommended the purchase of Cott shares because in its opinion, "'Cott's prospects have never looked better.'" (*Id.*)

In early November 1993, "Cott's top executives, including G. Pencer, Latta, Reisman and Henderson, met with institutional investors in New York City ... and indicated that Cott was continuing to sign new accounts in the U.S., that Cott's market share was continuing to grow in Canada, that they were very happy with Cott's profit performance and that pricing was relatively strong in the U.S."(*Id.* ¶ 64.)

On November 4, 1993, after reports of insider sales of Cott stock, *The Financial Times* quoted Goldman, now a Cott Vice President, as stating that the sales were "'"a reflection of how tight a ship we run here in terms of salaries,"'" and that "'"[t]hese people retain substantial holdings."'"(*Id.* ¶ 65.)

In the November 5, 1993 Dow Jones News Wire, Goldman commented on Cott's international business by stating that Cott sold in seven weeks in the Australian market what it expected to sell in the first year. (*Id.* ¶ 66.)

Oppenheimer, in another research report on Cott, dated November 12, 1993, stated that it is con-

Not Reported in F.Supp.                                                                                Page 5
Not Reported in F.Supp., 1996 WL 19043 (S.D.N.Y.), Fed. Sec. L. Rep. P 99,043
**(Cite as: Not Reported in F.Supp., 1996 WL 19043)**

vinced that "'Cott is poised to sustain three to five years of annual earnings growth exceeding 40% and that the stock remains attractively valued for purchase at current levels.'"(*Id.* ¶ 67.)

Duncan alleges that the defendants' scheme continued into December 1993 when Cott's stock prices declined due to news of intensifying price competition in the Canadian soft drink market. (*Id.* ¶ 68.)The December 1, 1993 Dow Jones News Wire, for example, quoted Latta as saying that Pepsi's and Coke's strategy had been attempted unsuccessfully in the past and was unsustainable. (*Id.*)*The Vancouver Sun,* on December 4, 1993, reported Reisman as stating that Cott "'continues to have great growth potential, particularly outside Canada.'" (*Id.*) Similarly, Morgan Stanley analyst Howard Penny said that Cott, in his opinion, was "'well armed to fight back against Coke and Pepsi.'" (*Id.*) Also in December 1993, "it was reported" that Goldman promised to deliver "''good news, in the form of earnings and new business developments.''" (*Id.* ¶ 69.)

On December 9, 1993, Cott reported its third quarter fiscal year 1994 results in a press release. (*Id.* ¶ 70) This release stated that Cott's "'net earnings for the third quarter ending October 30, 1993 rose 221 percent to $9.8 million,'" and that "'[e]arnings for the nine months were ... up 184 percent from $9.2 million ... last year.'" (*Id.*) Further, gross margins were up and, as G. Pencer noted, sales levels to most United States customers rose, and Cott added ten new accounts to its list of international customers, one of which marked Cott's entry into the European market. (*Id.*)

**\*6** Finally, later in December 1993, Cott issued its third quarter Report to Shareholders, which contained a letter signed by G. Pencer on behalf of the board. (*Id.* ¶ 71.)In the letter, G. Pencer stated that "'[g]ross profit margins for the third quarter were in line with the first two quarters and up 2.7% from the third quarter of the prior year.'" (*Id.*) The letter further discussed Cott's ten new accounts added during the third quarter. (*Id.*)

According to Duncan,

[t]he foregoing positive statements about Cott's financial performance, demand for Cott's products and its future business prospects were each false and misleading when issued. Those statements were each affirmatively false and also failed to disclose ... facts, which were necessary to make the statements made when they were made, not false and misleading.

(*Id.* ¶ 73.)As a result, Duncan commenced the instant action. In Count I, Duncan alleges that Cott and the Individual Defendants violated Section 10(b) of the Securities Exchange Act ("Exchange Act") of 1934 ("Section 10(b)"), 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5, promulgated thereunder ("Rule 10b-5").(*Id.* ¶¶ 80-85.)In Count II, Duncan alleges that G. Pencer, S. Pencer, Reisman, Latta, Gouin, Halperin, Adair, and Farber [FN7] violated Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a) ( "Section 20(a)").(*Id.* ¶¶ 86-88.)Finally, in Count III, Duncan alleges that Coopers violated Section 10(b) and Rule 10b-5. (*Id.* ¶¶ 89-95.)

Cott and the Individual Defendants have moved to dismiss Counts I and II under Rule 12(b)(6), for failing to state a claim upon which relief can be granted, and under Rule 9(b), for failing to plead fraud with sufficient particularity. Further, they have moved to strike portions of the Complaint under Rule 12(f), for containing immaterial, impertinent, or scandalous matter. Coopers has moved to dismiss Count III under Rule 12(b)(6) and Rule 9(b).

*DISCUSSION*

As the Court of Appeals has noted,

[c]ases of this sort present an inevitable tension between two powerful interests. On the one hand, there is the interest in deterring fraud in the securities markets and remedying it when it occurs....

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                    Page 6
Not Reported in F.Supp., 1996 WL 19043 (S.D.N.Y.), Fed. Sec. L. Rep. P 99,043
(Cite as: Not Reported in F.Supp., 1996 WL 19043)

On the other hand, there is the interest in deterring the use of the litigation process as a device for extracting undeserved settlements as the price of avoiding the extensive discovery costs that frequently ensue once a complaint survives dismissal, even though no recovery would occur if the suit were litigated to completion....[C]ourts must adjudicate the precise cases before them, striking the balance as best they can.

*In re Time Warner Inc. Sec. Litig.,* 9 F.3d 259, 263-64 (2d Cir. 1993), *cert. denied sub nom.Ross v. ZVI Trading Corp. Employee's Money Purchase Pension Plan,* 511U.S.1017, 114 S. Ct. 1397 (1994).

I. *Motions to Dismiss Section 10(b) Claim*[FN8]

To state a claim under Section 10(b), a plaintiff must plead that the defendant, with scienter, made a false material representation or omitted to disclose material information in connection with the purchase or sale of securities and that the plaintiff's reliance on the defendant's action caused the plaintiff's injury. *Acito v. IMCERA Group, Inc.,* 47 F.3d 47, 52 (2d Cir. 1995) (citing *Time Warner,* 9 F.3d at 264). The element of scienter requires proof of an "intent to deceive, manipulate, or defraud."*Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 193 (1976). Consequently, "§ 10(b) and Rule 10b-5 ... require proof of more than negligent nonfeasance."*Id.* at 215.Although the Supreme Court has refrained from defining what constitutes "more than negligent nonfeasance," *see id.* at 194 n.12 ("We need not address here the question whether, in some circumstances, reckless behavior is sufficient for civil liability under § 10(b) and Rule 10b-5."), the Court of Appeals has held that "[f]or Rule 10(b)(5) purposes, scienter includes recklessness,"*Breard v. Sachnoff & Weaver, Ltd.,* 941 F.2d 142, 144 (2d Cir. 1991); *accord Citibank, N.A. v. K-H Corp.,* 968 F.2d 1489, 1494 (2d Cir. 1992) (defining scienter as "an intent to deceive, manipulate or defraud, or possibly with reckless disregard"); *Sirota v. Solitron Devices, Inc.,* 673 F.2d

566, 575 (2d Cir.) ("This court has held that proof of reckless conduct meets the requirement of scienter in a section 10(b) claim...."") (citation omitted), *cert. denied,*459 U.S. 838 (1982).

*7 At the pleading stage, a court may dismiss a Section 10(b) claim under, *inter alia,*Rule 12(b)(6) or Rule 9(b).*See Shields v. Citytrust Bancorp, Inc.,* 25 F.3d 1124, 1127 (2d Cir. 1994) (holding that a Section 10(b) claim must satisfy the heightened pleading requirements of Rule 9(b)). When deciding a motion to dismiss under either rule, a court must accept as true the factual allegations of the complaint, and draw all inferences in favor of the pleader. *Mills v. Polar Molecular Corp.,* 12 F.3d 1170, 1174 (2d Cir. 1993)."'[T]he complaint is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference.'"*International Audiotext Network, Inc. v. American Tel. and Tel. Co.,* 62 F.3d 69, 72 (2d Cir. 1995) (quoting *Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 47 (2d Cir. 1991), *cert. denied sub nom.Cortec Indus., Inc. v. Westinghouse Credit Corp.,* 503 U.S. 960 (1992)). Dismissal is proper only when "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claims which would entitle him to relief."*Conley v. Gibson,* 355 U.S. 41, 45-46 (1957), *quoted in Cohen v. Koenig,* 25 F.3d 1168, 1172 (2d Cir. 1994).

In addition, Rule 9(b) imposes heightened pleading requirements. With respect to the circumstances of the fraud, Rule 9(b) requires that they be "stated with particularity." Fed. R. Civ. P. 9(b)."[T]he complaint must: (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent."*Mills,* 12 F.3d at 1175. With respect to the defendant's state of mind (*i.e.,* scienter), Rule 9(b) requires that facts alleged in the complaint give rise to a strong inference of fraudulent intent. *Acito,* 47 F.3d at 52. Although Rule 9(b) provides that "[m]alice, intent, knowledge, and oth-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                          Page 7
Not Reported in F.Supp., 1996 WL 19043 (S.D.N.Y.), Fed. Sec. L. Rep. P 99,043
(Cite as: Not Reported in F.Supp., 1996 WL 19043)

er condition of mind of a person may be averred generally,"Fed. R. Civ. P. 9(b); *see Cohen*, 25 F.3d at 1173 (holding that allegations of scienter do not require great specificity), this is not a "license to base claims of fraud on speculation and conclusory allegations,'" *Acito*, 47 F.3d at 52 (quoting *Wexner v. First Manhattan Co.*, 902 F.2d 169, 172 (2d Cir. 1990)). The plaintiff, therefore, must establish a strong inference of fraud by: (1) "'alleging facts to show that the defendants had both the motive and opportunity to commit fraud,'" or (2) "'alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness.'"*Acito*, 47 F.3d at 52 (quoting *Shields*, 25 F.3d at 1128). When the latter method is used, however, "the strength of the circumstantial allegations must be correspondingly greater."*Beck v. Manufacturers Hanover Trust Co.*, 820 F.2d 46, 50 (2d Cir. 1987), *cert. denied,*484 U.S. 1005 (1988), *overruled on other grounds, United States v. Indelicato*, 865 F.2d 1370 (2d Cir. 1989) (en banc). This inference requirement serves Rule 9(b)'s goals of providing the defendant with fair notice of the plaintiff's claim, safeguarding a defendant's reputation from improvident charges of wrongdoing, and protecting a defendant against strike suits.*Acito*, 47 F.3d at 52.

*8 According to Cott, the Individual Defendants, and Coopers, Duncan: (1) failed adequately to plead scienter, (2) alleged only secondary liability, which the United States Supreme Court held was not actionable in *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, -- U.S. --,114 S.Ct. 1439 (1994), and (3) failed to specify which statements were false, how they were false, and which particular defendant made each statement.

In addition, Cott and the Individual Defendants argue that Duncan: (1) failed adequately to plead entanglement with the securities analysts' reports, precluding these reports from providing a basis of Cott's and the Individual Defendants' liability, and (2) improperly based his allegations upon information and belief.

Coopers further asserts that, at most, Duncan

pleaded that Coopers acted negligently, which is not actionable under Section 10(b).*Ernst & Ernst*, 425 U.S. at 197.

### A. *Circumstances of the Alleged Fraud*

The Complaint identifies thirty statements, each of which was discussed above under the heading "Background," which allegedly provide the bases for Duncan's claims.[FN9] In addition to identifying the statements, Duncan identifies the speakers, when the statements were made, and, usually, where the statements were made. For twenty-seven of these statements, however, Duncan fails to state with particularity "why the statements were fraudulent." *Mills*, 12 F.3d at 1175. Instead, the Complaint states in a conclusory fashion that the "foregoing positive statements ... were each affirmatively false and also failed to disclose the following facts, which were necessary to make the statements made when they were made, not false and misleading."(Compl. ¶ 73.) The Complaint continues in paragraph 73, subsections (a) through (r), by summarily noting, in essence, that the various statements were false because the opposite was true.

For example, Duncan argues "[t]hat Cott's profit margins were not steady with or increasing over the prior year, but, in fact, due to continued and/or intensified downward pricing pressure, were actually declining, although this was being concealed by Cott by its improper accounting practices which inflated Cott's reported income."(*Id.* ¶ 73(c).) In similar fashion, the Complaint asserts "[t]hat market conditions for Cott were not right to create and sustain unusual growth as, in fact, market conditions were just the opposite, virtually assuring that Cott's business had already peaked and that Cott could not maintain the growth in profits that was being forecast by and for Cott."(*Id.* ¶ 73(i).) This technique of pleading "conclusory allegations of fraud [[[does] not satisfy the pleading requirements of Rule 9(b)."*Acito*, 47 F.3d at 53.

Only three of the thirty statements allege with suffi-

Not Reported in F.Supp.                                                                                                        Page 8
Not Reported in F.Supp., 1996 WL 19043 (S.D.N.Y.), Fed. Sec. L. Rep. P 99,043
(Cite as: Not Reported in F.Supp., 1996 WL 19043)

cient particularity the circumstances of the fraud. According to Duncan, all three statements were part of the 20-F. (Compl. ¶ 48.) The statements are: (1) Cott's 1993 audited consolidated balance sheet which was signed by G. Pencer and Gouin on behalf of the board and which listed Cott's accounts receivable, good-will and trademarks, inventories, other assets, prepaid expenses, total assets, retained earnings, and shareholders' equity for January 30, 1993 and January 25, 1992, (2) Cott's 1993 audited consolidated statement of earnings which listed Cott's sales, general and administrative selling expenses, earnings from operations, net earnings, earnings per common share, and fully diluted earnings per common share for January 30, 1993 and January 25, 1992, and [are] ... in accordance with Canadian generally accepted accounting principles.'"(*Id.* ¶ 48(a)-(c).) Unlike the other statements, however, the Complaint goes beyond identifying the statement, the speaker, and where and when the statement was made to take the next requisite step under Rule 9(b) and explain "why the statements were fraudulent." *Mills,* 12 F.3d at 1175.

*9 Duncan explains that Cott improperly recorded millions of dollars of compensation as goodwill, thus distorting Cott's financial status. (Compl. ¶ 50.) On or about November 27, 1991, Cott gave Latta compensation in the form of a 5% equity interest in Cott Beverages USA, Inc.[FN10] and gave Latta a right to put his 5% interest to Cott USA, Inc. for $2 million, exercisable after August 1, 1992. (*Id.* ¶ 50(a).) On June 2, 1992, Cott purchased 9.25% of the outstanding minority interest in Cott Beverages USA, Inc., including Latta's 5% interest, for 601,229 shares of Cott's common stock. (*Id.* ¶ 50(b).) Based on the market value of Cott's stock on May 29, 1992, Latta received roughly $13,227,000 in Canadian dollars. (*Id.*) Cott, the In-

dividual Defendants, and Coopers, according to Duncan, improperly recorded this payment as goodwill. (*Id.*) In this manner, Cott's earnings from operations and goodwill and trademarks were overstated by "at least $5 million [and] ... at least $7 million," respectively, and Cott's shareholders' equity was overstated by a "significant" amount. (*Id.*) Further, as a result of this improper accounting, Cott's expenses were "grossly understated." (*Id.*)

Coopers, the Individual Defendants, and Cott nevertheless argue that Duncan has failed to allege facts in the Complaint which give rise to a strong inference of scienter, which Rule 9(b) also requires. *Acito,* 47 F.3d at 53.

### B. *Coopers' Alleged Scienter*

Duncan argues that the Complaint sufficiently pleaded Coopers' scienter by alleging that Coopers had a business relationship with Cott and that Coopers violated generally accepted auditing standards ("GAAS") in so egregious a fashion (*viz.,* by issuing a "clean" opinion with respect to financial statements wherein Cott classified as an asset something that allegedly is clearly an expense) that it must have been at least reckless. I am not persuaded; Duncan has failed to allege facts which demonstrate that Coopers had the motive to commit fraud or facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness. *See Acito,* 74 F.3d at 52. Accordingly, Coopers' motion to dismiss is granted.

First, Duncan failed to articulate any motive for Coopers' allegedly fraudulent auditing practices. Even after drawing all inferences in favor of Duncan, *see Mills,* 12 F.3d at 1174, the only motive that emerges is insufficient to satisfy Rule 9(b)'s pleading requirements. Coopers, according to this motive, concealed Cott's poor financial position by providing a "clean" opinion in order to maintain its profitable business relationship with Cott and thereby continue to receive professional fees from Cott.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Although decisions in this Circuit conflict, I agree with those decisions holding that the receipt of professional fees is not a sufficient motive. In *Friedman v. Arizona World Nurseries Ltd. Partnership,* 730 F. Supp. 521, 532 (S.D.N.Y. 1990), *aff'd mem.,*927 F.2d 594 (2d Cir. 1991), the court held that financial gain from compensation for professional services is not a sufficient motive for purposes of pleading scienter. The court reasoned that to rule otherwise would "effectively abolish the requirement ... of pleading facts which support a strong inference of scienter" against professional defendants.*Id.* (citing *Wilson v. Saintine Exploration and Drilling Corp.,* 872 F.2d 1124 (2d Cir. 1989)); *see also DiLeo v. Ernst & Young,* 901 F.2d 624, 629 (7th Cir.) ("Fees for two years' audits could not approach the losses E & W would suffer from a perception that it would muffle a client's fraud."), *cert. denied,*498 U.S. 941 (1990). In a related context, the Court of Appeals also has confirmed that courts must meaningfully enforce the scienter requirement to further the goals of Rule 9(b).*See Acito,* 47 F.3d at 54 (holding that executive incentive compensation does not provide a sufficient motive in a Section 10(b) action because "[i]f scienter could be pleaded on that basis alone, virtually every company in the United States that experiences a downturn in stock price could be forced to defend securities fraud actions").

**\*10** I respectfully disagree, therefore, with those decisions holding that the receipt of professional fees provides a sufficient motive for pleading scienter. *See, e.g., In re Leslie Fay Cos., Inc. Sec. Litig.,* 835 F. Supp. 167, 174 (S.D.N.Y. 1993) (aligning itself with authorities holding that the existence of an accountant-client relationship is sufficient to demonstrate a motive to defraud). Such decisions, in addition to undermining the goals of Rule 9(b), reflect a benighted view of the accounting profession which is not warranted by anything alleged in this Complaint or in the common experience of the business community. I am not prepared to assume -- as Duncan would have me do -- that a Big Six (or, indeed, other) accounting firm like Coopers & Lybrand would knowingly condone a client's fraud in order to preserve a fee that, at best, is an infinitesimal portion of its annual revenues and, by doing so, jeopardize its reputation and license, as well as subject itself to potential damages literally tens of thousands of times as large as its fee and subject the partner involved to potential professional and financial extinction. Such action by certified public accountants would be economically irrational. As such, it makes no sense, *cf. Shields,* 25 F.3d at 1130 (articulating the "informed economic self-interest" standard), and no court should leap to this conclusion absent facts from which one could infer such manifestly economically irrational behavior by these professionals. The facts alleged here do not support this highly unlikely and counter-intuitive conclusion.

Second, Duncan failed to establish a strong inference of Coopers' scienter by the alternative method. The Complaint is devoid of any facts which constitute strong circumstantial evidence of Coopers' conscious misbehavior or recklessness. *See Acito,* 47 F.3d at 52. "Reckless conduct is, at the least, conduct which is 'highly unreasonable' and which represents 'an extreme departure from the standards of ordinary care ... to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it.'"*Rolf v. Blyth, Eastman Dillon & Co., Inc.,* 570 F.2d 38, 47 (2d Cir.), *cert. denied,*439 U.S. 1039 (1978) (quoting *Sanders v. John Nuveen & Co.,* 554 F.2d 790, 793 (7th Cir. 1977)), *quoted in Decker v. Massey-Ferguson, Ltd.,* 681 F.2d 111, 120-21 (2d Cir. 1982); *see In re Fischbach Corp. Sec. Litig.,* 1992 WL 8715, at \*7 (S.D.N.Y. Jan. 15, 1992) (referring to this definition of recklessness as "wilful blindness")."It must, in fact, approximate an actual intent to aid in the fraud being perpetrated by the audited company."*Decker,* 681 F.2d at 121;*see Healey v. Chelsea Resources, Ltd.,* 947 F.2d 611, 618 (2d Cir. 1991) (holding that Section 10(b) and Rule 10b-5 claims require proof of either scienter "or such recklessness as to amount to scienter").

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                       Page 10
Not Reported in F.Supp., 1996 WL 19043 (S.D.N.Y.), Fed. Sec. L. Rep. P 99,043
**(Cite as: Not Reported in F.Supp., 1996 WL 19043)**

Duncan argues that Coopers' gross violations of GAAS sufficiently pleaded recklessness, specifically that by issuing a "clean" opinion on the Cott financials that classify the payment to Latta as goodwill rather than as compensation, Coopers violated the basic and fundamental accounting principle that giving someone money is an expense, not an asset. This principle is so basic, according to Duncan, that Coopers could not have violated it without, at a minimum, being reckless. Despite the simplistic appeal of this argument, I disagree. "Without supporting allegations of fraudulent intent, violations of GAAP ... do not support a securities fraud claim."*In re General Elec. Sec. Litig.,* 1995 WL 590639, at *4 (S.D.N.Y. Oct. 4, 1995).FN11 To hold otherwise would obviate the scienter requirement. Plaintiffs would be able to satisfy this requirement merely by alleging that a particular statement was severely false. This result, by requiring theoretical considerations of how false is severely false and how great a departure from a particular auditing standard is a gross departure, would ignore the reality that scienter and falsity are distinct elements of a Section 10(b) claim. *See Acito,* 47 F.3d at 52.FN12

*11 The Complaint also makes conclusory allegations that "'Coopers knew or recklessly disregarded" accounting standards regarding "a reasonable basis" of support, "expression[s] of opinion," the fair presentation of financial position, "professional scepticism," "reliability," and compliance with GAAS and GAAP. (Compl. ¶¶ 91-93.) "[A]llegations concerning the violation of generalized accounting principles requiring adequacy and fairness of disclosure, a conservative approach, complete financial information, and understandable methods of reporting," however, do not satisfy the requirements of Rule 9(b).*Decker,* 681 F.2d at 120 (holding that generalized allegations that an accounting firm "'reviewed or recklessly failed to review'" certain data fail to plead actionable fraudulent conduct). Because the Complaint failed sufficiently to allege Coopers' scienter, Coopers' motion to dismiss is granted.

### C. *Individual Defendants' Alleged Scienter*

With respect to the Individual Defendants, Duncan argues that the Complaint adequately alleged scienter by articulating various motives for their fraudulent conduct and by pleading that the Individual Defendants held senior management positions. I disagree, and, accordingly, the Individual Defendants' motion to dismiss as to the Section 10(b) claim is granted with leave to replead.

According to the Complaint, the Individual Defendants allegedly engaged in their scheme: (1) to "protect and enhance their executive positions and the substantial compensation and prestige they obtained thereby," (2) to "inflate the reported profits of the Company in order to obtain larger payments under Cott's incentive bonus compensation plan and/or via discretionary individual performance bonuses," (3) to "enhance the value of their personal holdings and options," and then "sell shares of Cott common stock they owned or acquired ... at inflated prices," and (4) to "make public offerings of Cott stock at high prices to benefit Cott and its controlling shareholders."(Compl. ¶ 32.)

The first two motives fail to satisfy Rule 9(b) because "a plaintiff must do more than merely charge that executives aim to prolong the benefits of the positions they hold."*Shields,* 25 F.3d at 1130. An allegation that the Individual Defendants "were motivated to defraud the public because an inflated stock price would increase their compensation is without merit."*Acito,* 47 F.3d at 54 ("'[I]ncentive compensation can hardly be the basis on which an allegation of fraud is predicated.'" (quoting *Ferber v. Travelers Corp.,* 785 F. Supp. 1101, 1107 (D. Conn. 1991))).

The third motive similarly fails to comply with Rule 9(b). "Stock ownership," by itself, "does not provide sufficient motive to sustain the pleading burden under Rule 9(b)."*Shields,* 25 F.3d at 1131. Further, not all trading by insiders is sufficient to permit an inference of scienter; rather, only "unusual insider trading activity" will suffice.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                    Page 11
Not Reported in F.Supp., 1996 WL 19043 (S.D.N.Y.), Fed. Sec. L. Rep. P 99,043
**(Cite as: Not Reported in F.Supp.,1996 WL 19043)**

*Acito,* 47 F.3d at 54.

**\*12** In support of this motive, Duncan has alleged: (1) "G. Pencer sold at least 200,000 shares of Cott stock during 1993 for proceeds of $5.3 million," (2) "S. Pencer sold at least 174,000 shares of Cott stock during 1993 for proceeds of $4.6 million," (3) "Reisman sold at least 35,000 shares of Cott stock during 1993 for proceeds of $2.1 million," (4) "Latta sold at least 133,000 shares of Cott stock during late 1992 or in 1993 for proceeds of over $5 million," (5) "Henderson sold 34,700 shares of Cott stock during 1993 for proceeds of $1.1 million," (6) "Gouin sold at least 124,000 shares of Cott stock during late 1992 or 1993 for proceeds of $5.1 million," (7) "Halperin sold at least 25,000 shares of Cott stock during 1993 for proceeds of $1 million," (8) "Adair sold 54,000 shares of Cott stock during 1993 for proceeds of $2.6 million," and (9) "Farber sold 43,000 shares of Cott stock during 1993 for proceeds of $2.2 million."(Compl. ¶ 15.)

Duncan has failed to take his allegations one step further and demonstrate that these insiders' trades were unusual. His bare allegations of their trading fail to indicate, for example, how many shares the Individual Defendants retained after the sales. *See Acito,* 47 F.3d at 54 (holding that the "plaintiffs have failed to establish that Kennedy's stock sales were 'unusual,'" because, in part, "[t]he additional 30,000 shares that Kennedy sold in January represented less than 11% of his holdings"). In fact, the Complaint quotes Goldman as stating that despite some insider trading, the Individual Defendants "'"'retain substantial holdings.'"'" (Compl. ¶ 65.) Further, Duncan, who treats "the defendants as a collective group for the purposes of this Complaint,"(*id.* ¶ 16) does not allege that everyone in the group sold shares during the time when the Individual Defendants were making the statements of which Duncan complains.[FN13] *See Acito,* 47 F.3d at 54 (citing *In re Cypress Semiconductor Sec. Litig.,* Fed. Sec. L. Rep. (CCH) ¶ 97,060, at 94, 697, 1992 WL 394927, at \*2 (N.D. Cal. Sept. 23, 1992) for holding that "plaintiffs' claims that defendants

artificially inflated the company's share price so that they could sell their stock at a huge profit was undermined by the fact that one of the four defendants did not sell his stock during the class period"). Finally, Duncan alleges that Latta and Gouin may have sold their shares in late 1992, before any of the allegedly actionable statements were made, and Duncan does not specify when in 1993, relative to the Class Period, the other trading occurred. (Compl. ¶ 15.) The Complaint, therefore, fails adequately to allege that the Individual Defendants' insider trading was unusual within the meaning of *Acito.* 47 F.3d at 54.

The final motive which Duncan alleges, to "make public offerings of Cott stock at high prices to benefit Cott and its controlling shareholders," also fails to satisfy Rule 9(b)'s pleading requirements. (*Id.* ¶ 32.)Although *In re Time Warner Inc. Sec. Litig.,* 9 F.3d 259 (2d Cir. 1993), may appear to suggest otherwise, a careful analysis of that opinion demonstrates that this motive is insufficient as applied to the Individual Defendants. The plaintiffs in that case argued that the defendants, Time Warner, Inc. ("Time Warner") and four of its officers and directors, *id.* at 262, misrepresented the status of certain negotiations and withheld disclosure of Time Warner's consideration of a rights offering, thus violating Section 10(b).*Id.* at 269.Their motive, according to the plaintiff, was to maintain a high stock price prior to the announcement of a new rights offering, raise the needed capital at a higher rights offering price, and thereby issue fewer shares and lessen the dilutive effect of the new rights offering. *Id.* at 270.The Court of Appeals held that this motive theory was sufficient to withstand a motion to dismiss. *Id.*

**\*13** *Time Warner,* however, must be interpreted in light of the Court of Appeals' subsequent holding in *Shields.*In *Shields,* a shareholder of a bank brought a class action against the bank and two of its senior executives for concealing and misrepresenting the bank's financial condition in violation of Section 10(b).*Shields,* 25 F.3d at 1125. The Court, while as-

Not Reported in F.Supp.                                                                    Page 12
Not Reported in F.Supp., 1996 WL 19043 (S.D.N.Y.), Fed. Sec. L. Rep. P 99,043
(Cite as: Not Reported in F.Supp., 1996 WL 19043)

sessing the sufficiency of an alleged motive to commit fraud, held that "[i]n looking for a sufficient allegation of motive, we assume that the defendant is acting in his or her informed economic self-interest."*Shields,* 25 F.3d at 1130.

In *Time Warner,* the officers and directors had an economic self-interest which the Individual Defendants lack. The *Time Warner* officers and directors did not desire merely to benefit the issuing corporation and its controlling shareholders, as Duncan has alleged; they wanted to avoid the dilutive effect of a rights offering. As the Court of Appeals explained, the rights offering "would dilute the ownership rights of existing shareholders, likely decrease dividends, and drive down the price of the stock."*Time Warner,* 9 F.3d at 267. The defendant officers and directors, presumably shareholders of Time Warner, were motivated to raise the needed capital by issuing fewer shares in the rights offering at an inflated price, thus issuing fewer shares, and thus lessening the dilutive effect. *Id.* at 270.In the instant case, the Complaint fails to explain how the desire to "benefit Cott and its controlling shareholders" is in the informed economic self-interest of the Individual Defendants. The Complaint does not support, expressly or inferentially, any economic interests of the Individual Defendants beyond those which, as previously discussed, the Court of Appeals has specifically rejected.[FN14]This last motive, therefore, is insufficient to create a strong inference of the Individual Defendants' fraudulent intent.[FN15]

Duncan also has failed to establish a strong inference of the Individual Defendants' scienter by the second method. The Complaint is devoid of any facts which constitute strong circumstantial evidence of the Individual Defendants' conscious misbehavior or recklessness. *See Acito,* 47 F.3d at 52. Instead, the Complaint states in conclusory fashion, for example, that "the defendants knew or recklessly disregarded that those public statements, and those of securities analysts for which the Company is responsible, were false and misleading when

made and were inflating the market price of Cott's stock."[FN16](Compl. ¶ 22.) Allegations such as these are "'so broad and conclusory as to be meaningless.'"*Shields,* 25 F.3d at 1129 (making this statement with reference to the plaintiff's comments "that Defendants 'knew but concealed' some things, or 'knew or were reckless in not knowing' other things" (citation omitted)); *accord Decker,* 681 F.2d at 121 ("[C]onclusory allegations of fraudulent conduct are insufficient without specific allegations of fact.").

**\*14** Duncan also asserts that allegations of the Individual Defendants' senior management positions are sufficient to plead conscious misbehavior or recklessness. In other words, due to their positions with Cott and access to inside information, they must have known of the falsity of Cott's consolidated 1993 financial statements contained in the 20-F filed with the SEC. As the Court of Appeals stated in the context of relying on executive incentive compensation as a motive, "[i]f scienter could be pleaded on that basis alone, virtually every company in the United States that experiences a downturn in stock price could be forced to defend securities fraud actions."*Acito,* 47 F.3d at 54. Duncan would totally thwart the scienter requirements of Section 10(b) and Rule 9(b) if he could satisfy them by simply listing the Individual Defendants' job titles in the Complaint. Accordingly, the Individual Defendants' motion to dismiss as to the Section 10(b) claim is granted. In order to give Duncan the opportunity to replead with respect to the Individual Defendants, if he can consistent with Rule 11, leave to replead is granted as to the Individual Defendants.

### D. *Cott's Alleged Scienter*

As against Cott, however, the Complaint does allege facts which give rise to a strong inference of scienter. The Complaint alleges that Cott engaged in its fraudulent conduct (*i.e.,* making the false statements contained in the 20-F "[i]n an effort to ... keep Cott's stock price high and complete two

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                          Page 13
Not Reported in F.Supp., 1996 WL 19043 (S.D.N.Y.), Fed. Sec. L. Rep. P 99,043
**(Cite as: Not Reported in F.Supp., 1996 WL 19043)**

large public offerings of Cott stock in the spring and fall of 1993."(Compl. ¶ 1.) "[I]f Cott's stock price could be driven higher, then Cott could sell large amounts of its stock to the public at prices vastly in excess of Cott's book value -- providing monies to fund its expansion and providing capital to the Company at high per share prices."(*Id.* ¶ 3.) The Complaint further alleges that "[o]n August 9, 1993, Cott completed a 3 million share public offering at $31 per share."(*Id.* ¶ 58.)[FN17]

Applying this motive to Cott, unlike the Individual Defendants, is supported by both *Time Warner* and *Shields.*Selling more shares for more money in the public offering was in Cott's "informed economic self-interest." *Shields,* 25 F.3d at 1130. Doing so would permit Cott to receive additional capital to fund its expansion and otherwise satisfy its financial needs. Accordingly, this motive theory is sufficient to withstand a motion to dismiss. *See Time Warner,* 9 F.3d at 270.

Cott also argues, however, that Duncan's Section 10(b) claim is improperly based on information and belief. According to the Complaint, "[p]laintiffs ... allege upon information and belief (based upon the investigation made by plaintiffs' attorneys), except as to paragraph 13 which is alleged on knowledge,FN18 as follows."(Compl. at 1.)

"Allegations of fraud cannot ordinarily be based upon 'information and belief.'"*Luce v. Edelstein,* 802 F.2d 49, 54 n.1 (2d Cir. 1986) (quoting *Schlick v. Penn-Dixie Cement Corp.,* 507 F.2d 374, 379 (2d Cir. 1974), *cert. denied,*421 U.S. 976 (1975)). The rationale for this general rule is that these allegations "usually do not satisfy the degree of particularity required by Fed. R. Civ. P. 9(b)."*Schlick,* 507 F.2d at 379. When matters are peculiarly within the opposing party's knowledge, however, Rule 9(b) permits "information and belief" allegations if they are "accompanied by a statement of facts upon which the belief is founded."*Luce,* 802 F.2d at 54 n.1.

*15 Duncan's allegations regarding Cott's 20-F con-

tain matters peculiarly within Cott's knowledge. They address the calculation of the figures in Cott's 1993 consolidated financial statements, the details of Cott's payment to Latta of $7,150,000 (Canadian dollars), and Cott's scienter in making the statements at issue. Further, Duncan has coupled his allegations of wrongdoing with the facts upon which his beliefs are founded. As discussed earlier, the Complaint states the particular facts supporting Duncan's assertion that Cott falsely recorded the payment to Latta as goodwill, rather than as compensation, and that Cott had a motive to make the false statements regarding its financial status. The Complaint, therefore, complies with Rule 9(b)'s requirements for "information and belief" allegations, and, accordingly, Cott's motion to dismiss is denied.FN19

## II. *Motions to Dismiss Section 20(a) Claim*

Because Duncan adequately pleaded a Section 10(b) cause of action against Cott, I must address Duncan's allegation that G. Pencer, S. Pencer, Reisman, Latta, Gouin, Halperin, Adair, and Farber ("Section 20(a) Defendants") violated Exchange Act Section 20(a) as controlling persons of Cott.FN20According to Section 20(a),

Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a) (1981). The Section 20(a) Defendants argue that Duncan was required, and failed, to plead facts demonstrating both their culpable conduct and their control over Cott.

### A. *Scienter or Culpable Conduct*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                  Page 14
Not Reported in F.Supp., 1996 WL 19043 (S.D.N.Y.), Fed. Sec. L. Rep. P 99,043
**(Cite as: Not Reported in F.Supp., 1996 WL 19043)**

The requirement, if any, that a plaintiff allege the defendant's scienter or culpable conduct for a Section 20(a) claim is a subject of controversy in this Circuit. At the core of this debate lie three Court of Appeals opinions. In *Lanza,* the Court of Appeals, *en banc,* addressed a corporate director's ("Director") liability to persons ("Purchasers") who owned all the shares of another corporation and who were exchanging them for shares of the Director's corporate employer. Further, the Director did not know that other officers and directors of his employer had engaged in fraud against the Purchasers, the Director did not participate in the negotiation of the sale, did not make any representations regarding the sale, and had no knowledge of the negotiation, and the securities purchased were exempt under a private offering exemption.*Lanza v. Drexel & Co.,* 479 F.2d 1277, 1279, 1298 (2d Cir. 1973). The issue, according to the Court, was whether the Director owed a "duty to such [P] urchaser to inquire into all statements, oral and documentary, made to the stockholders of [the other corporation] in connection with the transaction before voting to authorize the contract formalizing the sale."*Id.* at 1279.The plaintiffs sued under Section 10(b), Rule 10b-5, common law fraud, a prima facie tort theory, and Securities Act of 1933 Section 17(a), 15 U.S.C. § 77q(a) (1970).*Lanza,* 479 F.2d at 1280.

**\*16** In this context, the Court held that imposing a "duty to convey [[[material information] upon directors under Rule 10b-5 would be to ... nullify the control section of the 1934 Act-Section 20."*Id.* at 1299.

The intent of Congress in adding this section, passed at the same time as the amendment to Section 15 of the 1933 Act, was obviously to impose liability only on those directors who fall within its definition of control and who are in some meaningful sense culpable participants in the fraud perpetrated by controlled persons.

*Id.*

In *Gordon,* decided by the Court of Appeals in

1974, the Court addressed an action brought by a purchaser of securities against the issuer, the salesman, and the salesman's brokerage firm. *Gordon v. Burr,* 506 F.2d 1080, 1081 (2d Cir. 1974). After citing *Lanza,* the Court held that

[w]e fail to find in the record support for a finding that [the brokerage firm] had knowledge of the fraudulent representations [made by the other defendants] or in any meaningful sense culpably participated in them. We conclude that the district court required [the brokerage firm] to vindicate its good faith after a lesser showing by Gordon of [the brokerage firm's] culpability than § 20(a) demands.

*Id.* at 1086.

The Court of Appeals addressed Section 20(a) again in 1980. In *Marbury,* a purchaser of stock sued his broker and his broker's employer for losses sustained due to the broker's false representations that he was a "'lawfully licensed registered representative,' authorized to transact buy and sell orders" on behalf of the brokerage firm. *Marbury Management, Inc. v. Kohn,* 629 F.2d 705, 707 (2d Cir.), *cert. denied sub nom.Wood Walker & Co. v. Marbury Management, Inc.,* 449 U.S. 1011 (1980). The Court affirmed the trial court's disposition of the aiding and abetting claim against the brokerage firm, but held that the trial court erred by not determining whether the brokerage firm was liable as a controlling person or under a respondeat superior theory. *Id.* at 711.Further, the Court held that Section 20(a) does not affect the availability of a respondeat superior claim, for Section 20(a) was not intended to "narrow the remedies of the customers of brokerage houses."*Id.* at 716.

In its discussion of Section 20(a), the Court stated that

[w]hile the precise standard of supervision required of broker-dealers to make good the good faith defense of Section 20(a) is uncertain, where, as in the present case, the erring salesman completes the transactions through the employing brokerage

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

house and the brokerage house receives a commission on the transaction, the burden of proving good faith is shifted to the brokerage house, and requires it to show at least that it has not been negligent in supervision, and that it has maintained and enforced a reasonable and proper system of supervision and internal control over sales personnel.

*Id.* (citations omitted).

**\*17** These three Court of Appeals' decisions have resulted in two schools of thought regarding a plaintiff's requirement, if any, to allege the defendant's scienter or culpable conduct under Section 20(a). One school relies on *Marbury* to hold that Section 20(a) requires the plaintiff to allege only control, not scienter or culpable conduct. *E.g., Food and Allied Serv. Trades Dep't, AFL-CIO v. Millfeld Trading Co., Inc.,* 841 F. Supp. 1386, 1390 (S.D.N.Y. 1994), *cited with approval in Neubauer v. Eva-Health USA, Inc.,* 158 F.R.D. 281, 284 (S.D.N.Y. 1994). The other school relies on *Lanza* and *Gordon* to hold that a plaintiff must allege both control and either scienter or culpable conduct. *E.g., Robbins v. Moore Medical Corp.,* 788 F. Supp. 179, 188 (S.D.N.Y. 1992), *cited with approval in Komanoff v. Mabon, Nugent & Co.,* 884 F. Supp. 848, 859 (S.D.N.Y. 1995); *In re Par Pharmaceutical, Inc. Sec. Litig.,* 733 F. Supp. 668, 679 (S.D.N.Y. 1990); *Hemming v. Alfin Fragrances, Inc.,* 690 F. Supp. 239, 245 (S.D.N.Y. 1988).

I hold with the former group that a plaintiff does not have to allege scienter or culpable participation to withstand a motion to dismiss a Section 20(a) claim. First, I do not interpret *Lanza* as addressing the burdens of pleading and proving a Section 20(a) claim. Instead, it provides a general statement of congressional intent that liability not be imposed absent meaningful culpable participation. *See Lanza,* 479 F.2d at 1299. This congressional intent, however, is furthered whether the plaintiff has to prove the defendant's culpability, or whether the defendant may avoid liability by proving good faith or the absence of culpable participation.

Second, although *Gordon* suggests that the burden of proving good faith does not shift to the defendant until the plaintiff makes a sufficient showing of the defendant's culpability, *see Gordon,* 506 F.2d at 1086, I do not interpret *Marbury* to hold the same, and *Marbury* provides a more recent statement of the Court of Appeals' standard.

Third, I interpret *Marbury,* as Judge Pollack did in *Moss v. Morgan Stanley Inc.,* 553 F. Supp. 1347, 1357-58 (S.D.N.Y.), *aff'd,* 719 F.2d 5 (2d Cir. 1983), *cert. denied sub nom. Moss v. Newman,* 465 U.S. 1025 (1984), as holding that the plaintiff makes out a prima facie case of Section 20(a) liability by showing control. At that point, of course, the burden shifts to the defendant to prove good faith. In *Marbury,* the burden-shifting occurred because the record demonstrated that "the erring salesman completes the transactions through the employing brokerage house and the brokerage house receives a commission." *Marbury,* 629 F.2d at 716. The facts which triggered the burden-shifting, in other words, were facts probative of control, not of culpability. *See Food and Allied Serv.,* 841 F. Supp. at 1390 (aligning itself with the line of cases, based on *Marbury,* which hold that a prima facie case of controlling person liability requires only an allegation of control status, not one of scienter or culpable participation); *Moss,* 553 F. Supp. at 1357-58 (interpreting *Marbury* as allowing a "plaintiff to make out a prima facie case of [Section 20(a) liability against an employer] by a showing that the employee," who committed the primary violation, "acted in the scope of his employment"). Further, *Marbury* cites *Gordon* in this regard only to support the *Marbury* Court's articulation of a defendant's burden of proof under the good faith defense, rather than to support a requirement that the plaintiff allege culpability. *Marbury,* 629 F.2d at 716.

**\*18** Fourth, "'it would seem imprudent to construct a pleading requirement that demands that plaintiffs anticipate and negate an alleged controlling person's good faith defense by pleading detailed facts

Not Reported in F.Supp.                                                                    Page 16
Not Reported in F.Supp., 1996 WL 19043 (S.D.N.Y.), Fed. Sec. L. Rep. P 99,043
**(Cite as: Not Reported in F.Supp., 1996 WL 19043)**

to show the controller's culpability.'"*Food and Allied Serv.,* 841 F. Supp. at 1390 (quoting *Terra Resources I v. Burgin,* 664 F. Supp. 82, 88 (S.D.N.Y. 1987)).

### B. *Control*

Even if allegations of control are sufficient for a Section 20(a) claim, the Section 20(a) Defendants also argue that Duncan failed to plead sufficient facts to establish their control over Cott. Although not defined in the Exchange Act, the SEC has defined control as "the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a [violator], whether through the ownership of voting securities, by contract, or otherwise."17 C.F.R. § 240.12b-2 (1995), *quoted by Food and Allied Serv.,* 841 F. Supp. at 1391.

The Complaint alleges that the Section 20(a) Defendants, due to their stock ownership, positions with Cott, and "access to material non-public information about the Company," were controlling persons of Cott "within the meaning of § 20 of the Exchange Act."(Compl. ¶ 15(a), (b), (d), (e), (h)-(k).) Further, they

"had access to the adverse non-public information about [Cott's] ... finances, products, markets and present and future business prospects via access to internal corporate documents (including the Company's operating plan, budget and forecast and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management and Board of Directors' meetings and committees thereof and via reports and other information provided to them in connection therewith."

(*Id.* ¶ 15(a), (b), (d)-(k).)[FN21] Finally, Duncan alleges that G. Pencer and Gouin signed, on behalf of the board, Cott's consolidated balance sheet, which was part of the 20-F. (*Id.* ¶ 48(b).)

I hold that these allegations of control are sufficient

at the pleading stage. A Section 20(a) claim does not implicate Rule 9(b)'s heightened pleading requirements, because it does not require an averment of fraud.[FN22]*Neubauer,* 158 F.R.D. at 284-85. Duncan, therefore, has sufficiently pleaded that the Section 20(a) Defendants possessed, directly or indirectly, the power to direct or cause the direction of the management and policies of Cott. *See id.* at 285 (holding that the allegation that a defendant "served as corporate secretary in our view is sufficient at this pleading stage"); *Food and Allied Serv.,* 841 F. Supp. at 1391 (holding, while assessing the pleading requirements for control status, that the individual defendants' positions as "Treasurer, Chief Financial Officer, and Secretary" of the defendant company "strongly suggest that each of them possessed the power to direct the management and policies" of the violating company); *Robbins,* 788 F. Supp. at 189 (holding that allegations that "each individual defendant signed at least one of the allegedly fraudulent documents" were "sufficient at the pleading stage under § 20(a)"). Accordingly, the Section 20(a) Defendants' motion to dismiss is denied.

### III. *Motion to Strike*

**\*19** The motion of Cott and the Individual Defendants to strike a portion of paragraph 4 of the Complaint, addressing G. Pencer's prior involvement with Financial Trust Company, as irrelevant and prejudicial is denied. The material is not on its face "redundant, immaterial, impertinent, or scandalous," and cannot be said to be so at this stage of the proceedings. *See*Fed. R. Civ. P. 12(f). This does not, of course, speak to admissibility.

### CONCLUSION

Coopers' motion to dismiss is GRANTED. The motion of G. Pencer, S. Pencer, Reisman, Latta, Henderson, Goldman, Gouin, Halperin, Adair, and Farber to dismiss is GRANTED as to the Section 10(b) claim with leave to replead within twenty

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                    Page 17
Not Reported in F.Supp., 1996 WL 19043 (S.D.N.Y.), Fed. Sec. L. Rep. P 99,043
**(Cite as: Not Reported in F.Supp., 1996 WL 19043)**

days hereof. Cott's motion to dismiss is DENIED. The motion of G. Pencer, S. Pencer, Reisman, Latta, Gouin, Halperin, Adair, and Farber to dismiss is DENIED as to the Section 20(a) claim. The motion of Cott, G. Pencer, S. Pencer, Reisman, Latta, Henderson, Goldman, Gouin, Halperin, Adair, and Farber to strike is DENIED.

FN1. Although Duncan's Complaint frequently fails to specify whether the financial figures are in Canadian or United States dollars, this distinction is of no import on the present motion.

FN2. Cott did not hire Goldman as its Vice President until October 7, 1993. (Compl. ¶ 62.)

FN3. Duncan makes the same allegations with respect to Morgan Stanley's reports, which will be discussed below.

FN4. On March 2, 1993, Cott sold 1.2 million shares of its stock for $29.25 per share in an underwritten public offering led by Oppenheimer. (*Id.* ¶ 42.)"Cott's top officers participated in a 'road show' presentation ... where they presented very positive information regarding Cott's business, its products, and its future business prospects."(*Id.*)

FN5. As with the March 2, 1993 public offering (*id.* ¶ 42), Duncan alleged that "Cott's top officers participated in a 'road show' presentation in several U.S. cities ... where they presented very positive information regarding" Cott. (*Id.* ¶ 58.)

FN6. This figure was adjusted for the 2-for-1 stock split on July 30, 1993, which left Cott with 58.4 million shares outstanding. (*Id.* ¶¶ 57, 61.)

FN7. The only Individual Defendants omitted from Count II are Henderson and Goldman.

FN8. Counts I and III of the Complaint allege that Cott, the Individual Defendants, and Coopers violated Section 10(b) and Rule 10b-5. Although a private plaintiff may bring suit against violators of Section 10(b), a "private plaintiff may not bring a 10b-5 suit against a defendant for acts not prohibited by the text of § 10(b)."*Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.,* 511U.S.164, 114 S.Ct. 1439, 1446 (1994). I will, therefore, address Duncan's Section 10(b) and Rule 10b-5 claims as one claim brought solely under Section 10(b).

FN9. The only other potential references to statements in the sixty-nine-page Complaint fail to satisfy any of the requirements for pleading the circumstances of fraud. *See Mills,* 12 F.3d at 1175.

For example, the Complaint alleges that: (1) "Cott officials made specific representations to reassure the financial markets of the 'quality' of the earnings," (compl. ¶ 4) (2) "Cott insiders" did not "accurately report Cott's true financial performance or make accurate and timely disclosure of the problems adversely affecting its business,"(*id.* ¶ 6) (3) "Defendants used their communications to analysts to assure them that Cott's business was strong,"(*id.* ¶ 34) and (4) "[p]rior to and during the Class Period, it was the Company's practice to have its top officers and key members of Cott's management team communicate regularly with securities analysts at the firms ... on a regular basis to discuss ... the Company's prospects, its products, operating results, anticipated revenues and to provide detailed guidance."(*Id.* ¶ 36.)

FN10. Cott Beverages USA, Inc. was a subsidiary of Cott USA Corp., which was,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                    Page 18
Not Reported in F.Supp., 1996 WL 19043 (S.D.N.Y.), Fed. Sec. L. Rep. P 99,043
**(Cite as: Not Reported in F.Supp., 1996 WL 19043)**

in turn, a wholly-owned subsidiary of Cott acquired by Cott for $1500 in May of 1991. (Compl. ¶ 50(a).)

FN11. Duncan cites to *In re Frank B. Hall & Co., Inc., Sec. Litig.,* 693 F. Supp. 1460 (S.D.N.Y. 1988) to argue otherwise. This argument, however, is erroneous. Although the court in *Hall* stated that "Touche Ross's failure to observe [accounting industry standards] may by treated by a jury as some evidence of fraud or reckless disregard,"*id.* at 1465, the court did not hold that this evidence, by itself, was sufficient to find recklessness. Further, to the extent that *Hall* conflicts with *General Electric,* I note that *Hall* does not cite one authority, persuasive or binding, in support of its proposition. *Id.* at 1465.

FN12. Although it may be possible to posit a departure from professional standards so great as to convince a court that the auditors or other professionals intended to "deceive, manipulate, or defraud," *Ernst & Ernst,* 425 U.S. at 193, not that they simply failed to perform their job well, the Complaint is devoid of facts which suggest a state of mind consistent with such malfeasance.

Further, I express no opinion on whether a sufficiently pleaded pattern of violating basic accounting principles could constitute strong circumstantial evidence of conscious misbehavior or recklessness. As one court stated in an analogous situation,

[i]n cases where small accounting errors only ripple through the corporate books, a court may conclude, at times even on the face of the complaint, that an accountant's failure to discover his client's fraud was not sufficiently reckless to sustain a 10b-5 claim. On the other hand,

when tidal waves of accounting fraud are alleged, it may be determined that the accountant's failure to discover his client's fraud raises an inference of scienter on the face of the pleadings.

*Leslie Fay,* 835 F. Supp. at 175. The Complaint does not allege a pattern of accounting violations by Coopers and, therefore, I will not address this issue herein.

FN13. Duncan does not allege that Goldman sold any shares. (*Id.* ¶ 15(g).)

FN14. The Court of Appeals has applied Rule 9(b)'s scienter requirement to reject allegations that executive defendants desire to prolong the benefits of their positions, *Shields,* 25 F.3d at 1130, desire to increase their incentive-based compensation, *Acito,* 47 F.3d at 54, own stock, *Shields,* 25 F.3d at 1131, or have engaged in trading not shown to be unusual, *Acito,* 47 F.3d at 54.

FN15. Duncan cites *In re Regeneron Pharmaceuticals Sec. Litig.,* No. 94 Civ. 1785 (CLB) (S.D.N.Y. Mar. 10, 1995), to support his assertion that the Individual Defendants' desire to increase the selling price of Cott shares at a public offering is a sufficient motive for Rule 9(b). Although the court held that this motive was sufficient at the summary judgment stage, the summary judgment evidence included a statement by one of the defendant officers that "'he wanted to get the stock price up so that REGEN could do an offering.'"*Id.* at 15.No such allegations exist in the instant action. Further, to the extent that *Regeneron* is inconsistent with *Shields'* "economic self-interest" test, *Regeneron* is contrary to the law of this Circuit.

FN16. Similarly, paragraph 30 of the Com-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                    Page 19
Not Reported in F.Supp., 1996 WL 19043 (S.D.N.Y.), Fed. Sec. L. Rep. P 99,043
**(Cite as: Not Reported in F.Supp., 1996 WL 19043)**

plaint concludes that "[e]ach of the defendants is liable as a direct participant in, and participant in a scheme with respect to the wrongs complained of herein."Paragraph 31 continues by stating that "[t]hey falsely presented the Company's current and future business prospects and prolonged the illusion of Cott's continued earnings growth."As a final illustration of Duncan's conclusory allegations, paragraph 73 states that "the stock continues even now to sell at artificially inflated prices due to defendants' continuing denials, misrepresentations and concealments and Cott's continued reports of artificially inflated net income and earnings per share."

FN17. Although a public offering occurred on March 2, 1993, that cannot establish Cott's motive for subsequently making the statements contained in the 20-F filed with the SEC on June 15, 1993.

FN18. Paragraph 13 describes only the timing and amount of the named plaintiffs' purchases of Cott's stock.

FN19. In light of my holding that statements in *Cott's* 20-F provide the basis for Duncan's Section 10(b) claim against *Cott,* I also reject Cott's generalized contention that Duncan's Complaint alleges only secondary liability and, therefore, is insufficient under *Central Bank.*

FN20. This list includes all of the Individual Defendants except for Henderson and Goldman.

FN21. Because Duncan restates this allegation with respect to all of the Individual Defendants, even Henderson and Goldman, who are not Section 20(a) Defendants, it is not clear whether Duncan intended it to allege control status. I must, however, draw all inferences in favor of Duncan, *see Mills,* 12 F.3d at 1174, and, therefore, will apply this allegation as one regarding control status.

FN22. I recognize, however, that decisions requiring a plaintiff to plead the defendant's culpable participation do apply Rule 9(b) to a Section 20(a) claim. *E.g., In re Par Pharmaceutical,* 733 F. Supp. at 681.

S.D.N.Y.,1996.
Duncan v. Pencer
Not Reported in F.Supp., 1996 WL 19043 (S.D.N.Y.), Fed. Sec. L. Rep. P 99,043

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.