# TAB D



Not Reported in F.Supp. Page 1
Not Reported in F.Supp., 1996 WL 88570 (S.D.N.Y.), Fed. Sec. L. Rep. P 99,101
(Cite as: Not Reported in F.Supp., 1996 WL 88570)

▷
Glickman v. Alexander & Alexander Services, Inc.
S.D.N.Y.,1996.

United States District Court, S.D. New York.
Harry GLICKMAN, on behalf of himself and, all others similarly situated, Plaintiffs,
v.
ALEXANDER & ALEXANDER SERVICES, INC. and Tinsley Irvin, Defendants.
No. 93 Civ. 7594 (LAP).

Feb. 29, 1996.

*OPINION AND ORDER*

PRESKA, District Judge:
*1 In this securities fraud action, plaintiff, on behalf of a putative class of similarly situated investors, alleges that he was injured by the fraudulent acts of the defendants in violation of Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) ("Section 10(b)"), under Rule 10b-5 promulgated thereunder by the Securities and Exchange Commission ("SEC"), 17 C.F.R. § 240.10b-5 (1994) ("Rule 10b-5"), and under Section 20(a) of the Securities Exchange Act ("the Act"), 15 U.S.C. § 78t(a). Defendants move to dismiss the Second Amended Class Action Complaint ("Second Complaint"), with prejudice to refiling, under Rule 12(b)(6) and Rule 9(b) of the Federal Rules of Civil Procedure. For the reasons stated below, the motion is granted and leave to replead is denied.

*BACKGROUND*

A. Alleged Factual Background

Taking all allegations as true, *see Luce v. Edelstein,* 802 F.2d 49, 52 (2d Cir. 1986), the facts of this matter are as follows. Plaintiff Harry Glickman ("Glickman") is a shareholder of defendant Alexander & Alexander Services, Inc. ("Alexander").[FN1] Alexander is a large insurance broker, with operations in over 80 countries, including retail and wholesale insurance brokering, risk management, and human resource and employee benefit consulting. (Second Amended Complaint ("Compl."), ¶¶ 20, 33). The Alexander Consulting Group ("ACG"), a wholly owned subsidiary of Alexander, operates Alexander's human resources division by providing consulting and advisory services in human resources, employee benefits, communications, and organizational effectiveness. (Compl., ¶ 20). Defendant Tinsley H. Irvin ("Irvin") became president of Alexander in the early 1980's. (Compl., ¶ 34). During the time period at issue ("Class Period"), which runs from May 1, 1991 to November 4, 1993 (Compl. ¶ 1), Irvin was President, Chief Executive Officer, and Chairman of the Board at Alexander. ACG accounted for 14%-16% of Alexander's revenues at this time. (Compl., ¶ 20).

Glickman blames Irvin for poor management, particularly for two unsuccessful transactions -- a merger with a British insurance broker and the sale of an underwriting management subsidiary -- which "began to have an increasingly negative effect on [Alexander's] financial results."(Compl., ¶¶ 35-37). Apparently in response to its "mounting losses," Alexander and Irvin "embarked upon a plan and scheme to falsely portray [sic] the financial condition of Alexander to [its] shareholders and the investing public."(Compl., ¶ 37).

Although Glickman devotes many paragraphs to describing and redescribing the allegedly fraudulent scheme, it is a simple one. (Compl., ¶ 3). The scheme revolves around ACG's accounting practices, which are said to violate Generally Accepted Accounting Principles ("GAAP"). During the relevant period, Alexander recognized revenues when they were "earned" -- as opposed to when the revenues are actually received. In that circumstance, GAAP requires the company to conduct "periodic

Case 3:07-cv-05545-SI    Document 33-5    Filed 05/05/2008    Page 3 of 17

Not Reported in F.Supp. Page 2
Not Reported in F.Supp., 1996 WL 88570 (S.D.N.Y.), Fed. Sec. L. Rep. P 99,101
(Cite as: Not Reported in F.Supp., 1996 WL 88570)

interim realizability reviews,"[FN2] (Compl., ¶ 39), to analyze the likelihood that unreceived, but recorded or expected, revenues will actually be received. (Compl., ¶¶ 3, 39). Interim reviews help ensure the company does not improperly recognize doubtful revenues and will therefore have adequate reserves and accurate reporting of revenue and earnings. Although ACG recorded as earned anticipated revenues from long-term contracts,

*2 *defendants did not conduct a single interim realizability review* to determine the amounts of revenues for billed and unbilled work in progress at ACG that were not likely to be collected and did not establish adequate reserves for uncollectible receivables during the entire two-and-a-half-year period complained of herein, all in direct violation of GAAP.

(Compl., ¶ 3) (emphasis added).

Glickman asserts that Alexander and Irvin knew or recklessly failed to know of this erroneous accounting practice at ACG, and, rather than correct it, fraudulently used it to their advantage. (Compl., ¶¶ 3, 39). When ACG's financials were incorporated into Alexander's own financial statements, the improperly accounted revenues falsely inflated Alexander's earnings and revenues, and Alexander failed to establish adequate reserves against revenues that were unlikely to be received. (Compl., ¶¶ 3, 39). In relying on ACG's accounting, the defendants made materially false or misleading statements and omissions of material facts concerning: revenues and earnings during the Class Period, ACG's performance, the adequacy of Alexander's internal accounting controls, and the future prospects of ACG and Alexander. (Compl., ¶¶ 2, 38).

These false or misleading statements and material omissions appeared in Alexander's quarterly and annual reports, as well as in internal and public press releases. (Compl., ¶ 40). The complaint identifies twenty-two such statements, (Compl., ¶ 42), and thereafter describes several in detail. (Compl., ¶¶ 48-77).

These statements and omissions "caused the prices at which the plaintiff and the members of the Class purchased shares of Alexander stock to be artificially inflated."(Compl., ¶ 7). Plaintiff measures his injury by the drop in the price of Alexander common stock from September 28, 1993 -- the day on which Alexander announced that it was reviewing ACG's accounting practices and financial statements and expected to issue a restatement,[FN3] and November 4, 1993 -- the day on which it announced the restatement for the fiscal years 1991 and 1992, and for the first two quarters of 1993. (Compl., ¶¶ 5-6, 81, 85). Between September 28th and November 4th, the price of Alexander's common stock dropped from $22.25 to $20.25, or two dollars a share. (Compl., ¶ 7).

The restatement reflected the following changes. For the 1991 fiscal year, consolidated operating revenues, stated at $1,369,400,000, were restated at $1,359,900,000. Net loss, stated at $12.6 million, was restated at $17.9 million (or from $0.31 to $0.44 per share). For the 1992 fiscal year, consolidated operating revenues, stated at $1,350,200,000, were restated at $1,342,800,000. Net loss, stated at $90.1 million, was restated at $94.1 million (or from $2.20 to $2.30 per share). For the first two quarters of 1993, consolidated operating revenues, stated at $322,800,000 and $335,600,000, were restated at $319,000,000 and $336,000,000. Net income, stated at $14.2 million and $11.9 million, was restated at $11.6 million and $11.7 million (or a change from $0.34 to $0.28 per share in the first quarter, and no change from $0.24 per share in the second quarter). These figures are found in paragraphs 44-46 of the complaint.

B. Procedural Background

*3 The original complaint was filed on November 4, 1993, the same day that Alexander announced the restatement of its financial statements. After defendants moved to dismiss, plaintiff filed an amended complaint in lieu of responding on February 9, 1994. The first amended complaint dropped

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1996 WL 88570 (S.D.N.Y.), Fed. Sec. L. Rep. P 99,101
(Cite as: Not Reported in F.Supp., 1996 WL 88570)

Page 3

the negligent misrepresentation and common law fraud claims asserted in the original complaint. After a conference on March 10, 1994, at which the parties discussed alleged defects in the amended complaint, including Glickman's failure to state when he had purchased shares of Alexander stock, I directed the parties to discuss further whether another motion to dismiss would be filed or whether another amended complaint would be forthcoming. Following inquiries from chambers in October of 1994, the parties signed a stipulation allowing plaintiff to file a second amended complaint. Plaintiff so filed, and defendants thereafter moved to dismiss. Thus the present complaint is plaintiff's third attempt to plead a claim for relief.

C. Standard of Review

In deciding a motion to dismiss, it is incumbent upon the reviewing court to view the complaint in the light most favorable to the pleader. *See Scheuer v. Rhodes,* 416 U.S. 232, 237 (1974); *Yoder v. Orthomolecular Nutrition Inst., Inc.,* 751 F.2d 555, 562 (2d Cir. 1985). I must take all well-pleaded allegations as true, *see Haines v. Kerner,* 404 U.S. 519, 520-21 (1972); *Hertz Corp. v. City of New York,* 1 F.3d 121, 125 (2d Cir. 1993), *cert. denied,* 114 S. Ct. 1054 (1994), drawing all reasonable inferences in plaintiff's favor. *Scheuer,* 416 U.S. at 236. A complaint will survive a motion to dismiss "unless it appears beyond a doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957).

In deciding this motion, I may consider those documents attached to the complaint or incorporated by reference, *see Cortec Indust., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 47 (2d Cir. 1991) ("the complaint is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference"), *cert. denied sub. nom., Cortec Indust., Inc. v. Westinghouse Credit Corp.,* 503 U.S. 960 (1992); *accord, Cosmas v. Hassett,* 886 F.2d 8, 13 (2d Cir. 1989), as well as "public disclosure documents required to be filed with the SEC ... that bear on the adequacy of the disclosure,"*Kramer v. Time Warner, Inc.,* 937 F.2d 767, 774 (2d Cir. 1991).

*DISCUSSION*

I. Stating a Claim Under Section 10(b)

To state a claim under Section 10(b) and Rule 10b-5, a plaintiff must plead that

in connection with the purchase or sale of securities, the defendant, acting with scienter, made a false material representation or omitted to disclose material information and that plaintiff's reliance on defendant's action caused [plaintiff's] injury.

*Bloor v. Carro, Spanbock, Londin, Rodman & Fass,* 754 F.2d 57, 61 (2d Cir. 1985), *quoted in In re Time Warner Inc. Sec. Litig.,* 9 F.3d 259, 264 (2d Cir. 1993), *cert. denied, Ross v. ZVI Trading Corp.,* 114 S. Ct. 1397 (1994). Frequently, the most contentious element of this claim, as in this case, is the element of scienter. Establishing scienter requires proof of an "intent to deceive, manipulate, or defraud."*Ernst & Ernst v. Hochfelder,* 425 U.S. 185 (1976). Consequently, "§ 10(b) and Rule 10b-5 ... require proof of more than negligent nonfeasance."*Id.* at 215.Although the Supreme Court has not defined "more than negligent nonfeasance," the Court of Appeals has held that "[f]or 10(b)(5) purposes, scienter includes recklessness."*Breard v. Sachnoff & Weaver, Ltd.,* 941 F.2d 142, 144 (2d Cir. 1991); *accord Sirota v. Solitron Devices, Inc.,* 673 F.2d 566, 575 (2d Cir.) ("This court has held that proof of reckless conduct meets the requirement of scienter in a section 10(b) claim ....") (citation omitted), *cert. denied,*459 U.S. 838 and 908 (1982).

*4 Conclusory allegations, for scienter or any other element of the claim, will not suffice to withstand a motion to dismiss. *See Luce,* 802 F.2d at 54 ("Mere conclusory allegations to the effect that defendant's

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

conduct was fraudulent or in violation of 10b-5 are insufficient."). On the contrary, Glickman's claims must meet the heightened pleading requirements of Rule 9(b).Rule 9(b) states, in its entirety:

[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally.

Fed. R. Civ. P. 9(b).Rule 9(b) applies to fraud claims brought under § 10(b).*See, e.g., Ross v. Bolton,* 904 F.2d 819, 823 (2d Cir. 1990). To state a claim with the requisite particularity, a complaint must: (1) specify the allegedly fraudulent statements, (2) identify the speaker, (3) state when and where the statements were made, and (4) indicate why the statements were fraudulent. *See Acito v. IMERCA Group, Inc.,* 47 F.3d 47, 51 (2d Cir. 1995) (citing *Mills v. Polar Molecular Corp.,* 12 F.3d 1170, 1175 (2d Cir. 1993)).

Rule 9(b) executes a difficult balancing. On the one hand, a general averment, one which provides the defendant with a reasonable opportunity to frame a response, will satisfy Rule 9(b).*See Denny,* 576 F.2d at 469;*Tribune Co. v. Purcigliotti,* 869 F. Supp. 1076, 1088 (S.D.N.Y. 1994), *aff'd on other grounds sub. nom., Tribune Co. v. Abiola,* 66 F.3d 12 (2d Cir. 1995). In this respect, Rule 9(b) should be applied in tandem with Fed. R. Civ. P. 8. *See Ouakine v. MacFarlane,* 897 F.2d 75, 79 (2d Cir. 1990). On the other hand, the threefold purpose of the Rule 9(b) must be met: providing fair notice of plaintiff's claim, safeguarding a defendant's reputation against "improvident charges of wrongdoing," and protecting a defendant against a strike suit. *DiVittorio v. Equidyne Extractive Indust., Inc.,* 822 F.2d 1242, 1247 (2d Cir. 1987); *O'Brien v. National Property Analysts Partners,* 936 F.2d 674, 676 (2d Cir. 1991) (citations omitted). To promote these purposes, courts require plaintiffs to "allege facts that raise a strong inference of fraudulent intent."*Mills v. Polar Molecular Corp.,* 12 F.3d 1170, 1176 (2d Cir. 1993); *Wexner v. First Manhattan Co.,* 902 F.2d 169, 172 (2d Cir. 1990); *Cosmas v. Hassett,* 886 F.2d 8, 12-13 (2d Cir. 1989); *Beck v. Manufacturers Hanover Trust Co.,* 820 F.2d 46, 50 (2d Cir. 1987), *cert. denied,*484 U.S. 1005 (1988), *overruled on other grounds, United States v. Indelicato,* 865 F.2d 1370 (2d Cir.) (en banc), *cert. denied,*493 U.S. 811 (1989). Despite this rigorous standard, a plaintiff, as he has done here, may nevertheless base his allegations on information and belief when the facts are peculiarly within the defendants' knowledge. *See Wexner,* 902 F.2d at 172 (citing *Luce,* 802 F.2d 54 n.1). The Court of Appeals has noted, in well-cited language, that

*5 [t]his exception to the general rule must not be mistaken for license to base claims of fraud on speculation and conclusory allegations. Where pleading is permitted on information and belief, a complaint must adduce specific facts supporting a strong inference of fraud or it will not satisfy even a relaxed pleading standard.

*Id.* (citations omitted); *see Ouakine,* 897 F.2d at 81 (scienter sufficiently pleaded when "the allegations lie peculiarly within the opposing parties' knowledge and are accompanied by information that raises a strong inference of fraud"); *accord O'Brien,* 936 F.2d at 676 ("An ample factual basis must be supplied to support the charges.").

Although "great specificity" as to scienter is not required, *Connecticut Nat'l Bank v. Fluor Corp.,* 808 F.2d 957, 962 (2d Cir. 1987), plaintiffs must plead "circumstances that provide at least a minimal factual basis for their conclusory allegations of scienter."*Id., quoted in San Leandro Emergency Medical Group Profit Sharing Plan v. Philip Morris Co., Inc.,* 1996 WL 33050, *10 (2d Cir. January 25, 1996). This basis may be pleaded by either of two means: (1) alleging facts to show that defendants had both motive and opportunity to commit fraud, or (2) alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness. *See Acito,* 47 F.3d at 52;*Shields v. Citytrust Bancorp, Inc.,* 25 F.3d 1124, 1128 (2d Cir. 1994); *Time Warner,* 9 F.3d at 268-69. If the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1996 WL 88570 (S.D.N.Y.), Fed. Sec. L. Rep. P 99,101
(Cite as: Not Reported in F.Supp., 1996 WL 88570)

Page 5

latter means is used, "the strength of the circumstantial allegations must be correspondingly greater."*Beck,* 820 F.2d at 50.

Defendants do not base their motion on plaintiff's failure to plead with particularity the circumstances constituting fraud, as required by Rule 9(b). These particulars -- what false statements were made, when and where they were made, by whom, and why they are said to be false -- are clearly satisfied by the complaint. *See Acito,* 47 F.2d at 51;*Cosmas,* 886 F.2d at 11 (to satisfy Rule 9(b), complaint must "adequately specify the statements it claims were false or misleading, give particulars as to the respect in which plaintiff contends the statements were fraudulent, state when and where the statements were made, and identify those responsible for the statements"). Rather, Alexander and Irvin argue that plaintiff has failed to plead facts adequate to support a strong inference that they knew, or recklessly failed to know, that the statements were false. *See* Memorandum of Law in Support of Defendants' Motion to Dismiss ("Mem. in Support") at pp. 7-20. In opposition, Glickman has argued scienter on both grounds: motive and opportunity, and strong circumstantial evidence of recklessness or conscious misbehavior. *See* Plaintiff's Memorandum of Law in Opposition to Defendants' Motion to Dismiss the Second Amended Class Action Complaint ("Mem. in Opp.") at pp. 17-28. He succeeds on neither, having failed to plead facts sufficient to raise a strong inference of fraud. The complaint must therefore be dismissed for failure to plead a required element of the claim with the particularity required by Rule 9(b).

A. Motive and Opportunity

*6 To satisfy the scienter requirement by this method, both a motive and an opportunity to commit fraud must be pleaded. In *Shields v. Citytrust Bancorp Inc., supra,* the Court of Appeals defined these two elements as follows:

[m]otive would entail concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged. Opportunity entails the means and likely prospect of achieving concrete benefits by the means alleged.

*Shields,* 25 F.3d at 1130. Glickman alleges that Alexander and Irvin had two basic motives: to raise capital and to protect Irvin's financial interests.[FN4] (Compl., ¶¶ 12-14, 78-80); *see* Mem. in Opp., at 5, 12, 23-25. I cannot think of two broader, or in this case less substantiated, motives than "a desire to raise much needed capital" for the benefit of the institutional defendant, and, for the individual defendant, "a desire ... to preserve his financial interests and other benefits of his positions."Mem. in Opp. at 5. I find that plaintiff's "allegations of motive are of the generalized, commonplace nature that the courts within this circuit have found to provide an insufficient basis for an inference of scienter."*Grossman v. Texas Comm. Bancshares, Inc.,* 1995 WL 552744 (S.D.N.Y. 1995) (citations omitted).

In *Shields,* the Court wrote that "[i]n looking for a sufficient allegation of motive, we assume that the defendant is acting in his or her informed economic self-interest."*Shields,* 25 F.3d at 1130. Here, Glickman's nearly generic allegations are not bolstered by the premise that Alexander, suffering from Irvin's poor decision-making, had a legitimate need to improve its financial health. "[A]llegations of motives that are generally held by similarly positioned executives and companies are insufficient to sustain a claim under the securities laws."*Grossman,* 1995 WL 52744, at *11 (citing *In re Crystal Brands Sec. Litig.,* 862 F. Supp. 745, 749 (D. Conn. 1994) (alleged motives of maintaining good relations with suppliers, encouraging retailers to place orders, forestalling loan defaults, and protecting executives' positions held insufficient as pertaining to virtually any similarly situated company)); *see also Stepak v. Aetna Life and Casualty Co.,* 1994 WL 858045 *22, 1994 U.S. Dist. LEXIS 15559, *60 n.29 (D. Conn. 1994) (finding executive's alleged motive of maintaining his company's high bond rat-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 3:07-cv-05545-SI   Document 33-5   Filed 05/05/2008   Page 7 of 17

Not Reported in F.Supp.
Not Reported in F.Supp., 1996 WL 88570 (S.D.N.Y.), Fed. Sec. L. Rep. P 99,101
(Cite as: Not Reported in F.Supp., 1996 WL 88570)

Page 6

ing insufficient because a general economic interest); *Ferber v. Travelers Corp.*, 785 F. Supp 1101, 1107 (D. Conn. 1991) ("Incentive compensation can hardly be the basis on which an allegation of fraud is predicated. On a practical level, were the opposite true, the executives of virtually every corporation in the United States would be subject to fraud allegations."). Furthermore, because an executive's self-interest is often closely tied to improving the company's prospects, these are not completely independent motives. *See Grossman,* 1995 WL 552744, at *11 ("Every company's executives likely wish to report positive financial health so that the company can reap the varied benefits that flow from an image of financial stability.").

*7 When pleading motive, the Court of Appeals' warning in *Acito,*

[i]f scienter could be pleaded on that basis alone [plaintiffs' allegations that defendants were motivated to defraud the public in order to inflate the stock price and increase executive compensation], virtually every company in the United States that experiences a downturn in stock price would be forced to defend securities fraud actions,

*Acito,* 47 F.3d at 54, echoes its earlier warning in *Shields*:
[i]f motive could be pleaded by alleging the defendant's desire for continued employment, and opportunity by alleging the defendant's authority to speak for the company, the required showing of motive and opportunity would be no realistic check on aspersions of fraud, and mere misguided optimism would become actionable under the securities laws.

*Shields,* 25 F.3d at 1130.

These warnings are equally applicable here, and plaintiff does not cure the generic nature of the motives alleged by providing examples of how Alexander could use the "desperately needed" capital that it is motivated to raise, such as increasing its reported earnings and revenue, increasing its reserves, inducing institutional lenders to extend it credit, covering up "the declining financial condition of Alexander and Irvin's poor leadership," or deflecting criticism of management by analysts and shareholders. (Compl., ¶¶ 12-14); Plaintiff's Letter Brief, dated January 25, 1996, at p. 3. Breaking down a general motive into more specific, but equally unsubstantiated, submotives does nothing to fortify plaintiff's pleadings against this motion. For example, plaintiff alleges that raising capital would enable Alexander to induce lenders to extend it credit. Even if this were a sufficient basis from which to infer motive, plaintiff pleads not one example of credit being extended. *See San Leandro,* 1996 WL 33050 at *10 ("We do not agree that a company's desire to maintain a high bond or credit rating qualifies as sufficient motive for fraud ...."). Generalized allegations that defendants were overly optimistic in projecting Alexander's future prospects are equally unavailing. *See Decker v. Massey-Ferguson, Ltd.,* 681 F.2d 111, 117 (2d Cir. 1982) ('[E]conomic prognostication, though faulty, does not, without more, amount to fraud.") (internal quotation omitted).

The vague reasoning of plaintiff's motive pleadings, embarked upon without the benefit of factual support, is betrayed in the following passage in the complaint:

[t]hus, defendants were motivated to commit the fraudulent scheme alleged herein to enable Alexander to engage in such transactions in which it would receive compensation worth in excess of what was paid, so that Irvin could then increase the value of Alexander and attempt to use such advantageous transactions to help turn around the Company's declining financial condition and, in the process, preserve his job and the benefits derived therefrom.

*8 (Compl., ¶ 13). This elliptical argument typifies the complaint. Plaintiff points back to certain statements and conduct by the defendants as evidence of fraud, but is unable to plead the facts necessary to support that conclusion. Yet, because the underlying conduct is said to be fraudulent, any statement or act thereafter singled out is also said to be evid-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1996 WL 88570 (S.D.N.Y.), Fed. Sec. L. Rep. P 99,101
(Cite as: Not Reported in F.Supp., 1996 WL 88570)

Page 7

ence of, or motivation for, the fraud. The result is the following argumentation, which, if sufficient to show scienter, would make "the executives of virtually every corporation in the United States ... subject to fraud allegations."*Ferber,* 785 F. Supp. at 1107.

In regards to Irvin, it is only human nature to want to protect one's job and one's standing in the community and it is quite natural that rather than admit failure, defendants overstated revenues and concealed Alexander's accounting control and revenue collection problems in the hope that they could buy time to correct the problems. Unfortunately for Irvin, he got caught.

Mem. in Opp., at 25. Unfortunately for plaintiff, philosophizing about human nature does not raise the strong inference of fraud necessary under Rule 9(b) to plead a violation of § 10(b) of the Securities Exchange Act.

The cases offered in support of plaintiff's position are not persuasive here. *Turkish v. Kasenetz,* 27 F.3d 23, 28 (2d Cir. 1994), for example, is a civil RICO case, arising from a background of multiple state and federal litigations involving a cluster of family-owned real estate partnerships and corporations, a series of inter-vivos trusts, looting of the businesses -- through improper loans -- and trusts by a family member, and a fraudulently induced settlement of the original claims arising from this imbroglio. Applying Rule 9(b) to the civil RICO claims, the Court of Appeals found that the motive and opportunity did exist to show defendants' scienter in the fraudulent settlement. The motive was defendants' "desire to repay the loans and to end the earlier litigations," and was further manifest in their effort to conceal underpayments on the loan; the opportunity was a product of defendants' position as fiduciaries of the trusts and owners of controlling interests in the family business. *Id.* at 6. Similarly clear and direct facts supporting a finding of motive and opportunity are simply not pleaded in the present case.

Plaintiff also relies on *Cohen v. Koenig,* 25 F.3d 1168 (2d Cir. 1994). Unlike the present case, the allegation of fraud in *Cohen* arose from a single, discrete transaction: the purchase by defendants of the assets of plaintiffs' company. Also unlike the present case, the facts surrounding the transaction were pleaded in great detail. The sellers wanted cash for their company, buyers wanted to buy on credit. Eventually, persuaded by buyers' personal guarantees and representations of the financial health of their own company, sellers agreed to sell in part on credit. After closing, sellers learned that buyers' financial statements were inaccurate, overstating, among other things, their current assets, the value of their property and equipment, and their net income. Sellers asserted that when these misrepresentations were made, both in the financial statements and in negotiations, they were believed and relied upon in setting the terms of the transaction. Sellers alleged that buyers knew their misrepresentations were false, but made them with the intent to defraud sellers into, *inter alia,* extending credit on the sale.

*9 The Court of Appeals found that buyers' scienter was adequately pleaded to withstand a Rule 9(b) motion to dismiss. First, the Court found that "sufficient facts were pleaded to suggest that plaintiffs may be able to prove that defendants [who were officers, directors, and majority shareholders in their company] more likely than not knew that their financial representations were false."*Cohen,* 25 F.3d at 1174. Turning to motive and opportunity, the Court then found that "the amended complaint spelled out circumstances from which it could easily be inferred that the [purchasers] had a motive to make false representations."*Id.* Unlike the present case, the Court was able to derive a precise motive from a precise set of facts: because sellers wanted cash or a personal guarantee and purchasers wanted credit,

[i]t hardly requires a stretch of the imagination to infer that the would-be purchasers in such circumstances had a motive to paint a far rosier financial picture than actually existed in order to induce

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1996 WL 88570 (S.D.N.Y.), Fed. Sec. L. Rep. P 99,101
(Cite as: Not Reported in F.Supp., 1996 WL 88570)

Page 8

[sellers] to part with a sizable portion of their assets in exchange for a note.

*Id.*

1. The Acquisition and Preferred Placement

Although presented separately from the two motives discussed above, two transactions, under the heading "Defendants' Receipt of the Benefits of the Fraudulent Scheme," are pleaded as additional evidence of a motive to defraud. The first transaction is the announcement in July of 1993 that Alexander was going to acquire a majority interest in a Mexican insurance broker, funding the acquisition with stock and cash. (Compl., ¶ 78). There are two deficiencies in this pleading. One is that the acquisition was merely announced as a future deal -- there is no assertion that it ever in fact occurred, and there is no other reference in the sixty-one page complaint to the purchase. The second deficiency is that, according to Alexander's 1993 Form 10-K, the Mexican acquisition was paid for by cash and a note, not stock.[FN5] (*See* Affidavit of Robert M. Rosh, dated January 27, 1995, at Exh. B). Without more, the facts as pleaded do not adequately support the conclusion that defendants were able to engage in transactions "on highly favorable terms" because Alexander could finance its purchases with stock trading at "artificially inflated" prices. (Compl., ¶ 78).

The second transaction was a March, 1993 private placement of 2.3 million shares of convertible preferred stock, yielding net proceeds of $110.9 million. (Compl., ¶ 80). After identifying a transaction that is innocuous on its face, plaintiff asserts that it was defendants' false and misleading statements or material omissions which enabled Alexander to complete this offering and that disclosure of the underlying fraud prior to the placement would have made it "highly unlikely" that it would have been successful. (Compl., ¶ 80). Again, there is an absence of facts to connect the transaction described with the fraud alleged.

*10 The cases relied upon by plaintiff, in contrast, show a much closer relationship between the allegation of fraud and the transactions said to be the goal or purpose of the fraud. For example, the motive alleged in *Time Warner, supra,* was substantially more concrete and specific than the motive alleged here. Motivating Time Warner officers and directors, eager to raise capital to pay off the huge debt incurred by the merger of Time, Inc. and Warner Communications, was a desire to minimize the potential negative repercussions of a new stock offering, insofar as the offering "would dilute the ownership rights of existing shareholders, likely decrease dividends, and drive down the price of the stock."*Time Warner,* 9 F.3d at 267, 269. To decrease the offering's dilutive effect, fewer shares had to be issued. To issue fewer shares while still raising the needed capital, the shares had to be offered at a higher price. The higher price was made possible, allegedly, by both misrepresenting the status of negotiations with possible strategic partners who would infuse cash into the company and by delaying disclosure of the offering as an alternative means of raising the capital. *See id.* at 269-70. While the less attractive possibility of an offering was downplayed, the more glamorous possibility of a merger was "hyped." *Id.* at 268. The Court of Appeals found that the factual allegations in the complaint, regarding the misleading or false statements about possible strategic alliances and the subsequent material omissions regarding Time Warner's active consideration of a dilutive rights offering, were too closely tied, both logically and temporally, to the defendants' alleged motives to dismiss at the pleading stage. Even so, the question was a "close one," *id.* at 269, hinging in part on whether even a delayed announcement of the rights offering might not suffice to correct prior misleading statements about pending alliances and therefore drop the price of Time Warner shares. "In a case like the pending one, however, the issue is not whether the misleading aspect of the prior statement in fact lingered; it is only whether the plaintiffs can show that the defendants had a motive not to promptly correct the misleading aspect of the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 3:07-cv-05545-SI    Document 33-5    Filed 05/05/2008    Page 10 of 17

Not Reported in F.Supp.
Not Reported in F.Supp., 1996 WL 88570 (S.D.N.Y.), Fed. Sec. L. Rep. P 99,101
(Cite as: Not Reported in F.Supp., 1996 WL 88570)

Page 9

prior statement."*Id.* at 270-71. Defendants' motion to dismiss was denied because it could not "be determined from the pleadings [ ] whether, in this instance, the defendants acted to maintain the stock price at an artificially enhanced value in the hopes that it would not descend all the way to its 'true' value upon announcement of the fact -- consideration of the rights offering -- that rendered the prior statements misleading."*Id.* at 271.

Plaintiff also relies on my recent holding in *Duncan v. Pencer,* 1996 WL 19043, 1996 U.S. Dist. LEXIS 401 (S.D.N.Y. Jan. 18, 1996). Plaintiffs in *Duncan* alleged that Cott Corporation, its officers and directors, and its accounting firm "each directly participated in a scheme to deceive the investing public regarding Cott's markets, demand for Cott's products, and Cott's financial prospects."*Duncan,* 1996 WL 19043 at *1, 1996 LEXIS 401, at *3. Among other rulings, I denied Cott's motion to dismiss.

*11 Like Alexander, Cott was charged with "reporting artificially inflated profits, earnings and prospects for future business."*Id.* at *1, 1996 LEXIS 401 at *1. Unlike Alexander, however, Cott's alleged motives were closely supported by factual allegations. During the class period, Cott made two large public offerings which it hoped would raise the capital to fund, primarily, an expansion into U.S. markets. Misleading statements of Cott's continuing healthy financial status, consistently increasing earnings, and continuing healthy markets would have a direct and immediate impact on the price of Cott shares and would therefore provide a direct and immediate means of furthering its expansion goals. The class period in *Duncan* ran for six months, from July of 1993 to January of 1994. The alleged scheme began in January of 1993. The public offerings were made in March and August of 1993. The allegedly false or misleading statements, which were said to have propped up share prices for both offerings, were made throughout 1993. *See id.* at *1-5, 1996 LEXIS 401 at *2-16.

I am not convinced by plaintiff's efforts to align himself with the plaintiffs in *Time Warner* and *Duncan.*Plaintiffs in those cases point to a discrete and specific series of events flowing directly from a particular motive to raise a strong inference of fraud. The dilutive effect in *Time Warner* would be moderated by issuing fewer shares at a higher price; the nondisclosure of the rights offering took place over a five week period immediately preceding the offering. The expansion in *Duncan* would be fueled by offering overpriced shares; the overpricing was predicated on statements made during the year in which the offerings were made. In both cases, the alleged fraud is closely tied, logically and temporally, to the alleged motive. The same is not true in the present case. There is a factual vacuum in this complaint, not only between the alleged scheme and the generalized motives asserted, but between the scheme and the two more specifically pleaded transactions. It strains credibility to allege that Alexander, beginning in 1991, would misstate, or rather allow ACG to misstate, ACG's performance and prospects for the purpose of making a private placement of preferred stock and an otherwise unremarkable acquisition in 1993.[FN6] Certainly, there is nothing "unusual" about either transaction that would permit an inference of intentional wrongdoing. *See Acito,* 47 F.3d at 54. The connection between the alleged scheme and the motive for it is speculative, related only by the conjectural chain that Alexander decided two years in advance that it would make these transactions, but that it would make them on the strength of artificially inflated stock, and that to inflate the stock, it would adopt the financial statements of a subsidiary, themselves skewed by a failure to make "interim realizability reviews" in assessing the likelihood of payment for uncollected revenues nonetheless designated as "earned." *See Wexner,* 902 F.2d at 173 ("Clearly, an inference that the defendants knew their statements to be false cannot be based on allegations which are themselves speculative."). Alternatively, rather than the result of deliberate forethought, the connection between the alleged scheme and the later transactions may be more fortuitous. Alexander simply adopted the skewed ACG numbers,

Case 3:07-cv-05545-SI   Document 33-5   Filed 05/05/2008   Page 11 of 17

Not Reported in F.Supp.
Not Reported in F.Supp., 1996 WL 88570 (S.D.N.Y.), Fed. Sec. L. Rep. P 99,101
(Cite as: Not Reported in F.Supp., 1996 WL 88570)

Page 10

knowing they would have a salutary effect on its financial statements, and waited for the opportunity to take advantage of its inflated stock price. After all, the complaint never alleges that these transactions actually motivated defendants to engage in fraudulent conduct. Instead, these transactions fall under the vague heading of "benefits." The Mexican purchase, therefore, is alleged to be "a result of the fraudulent scheme" only because "defendants were able to enter into such transactions on highly favorable terms" once the price of Alexander stock was inflated. (Compl., ¶ 78). The placement of preferred stock, similarly, is just another example of how "defendants were again able to unjustly profit [sic] from their fraudulent scheme by successfully raising the millions of dollars needed to fund such reserves through the issuance and sale of securities to the public."(Compl., ¶ 80). Both examples suffer the same flaw: an absence of factual support for such conclusions as, "[d]efendants were also able to, and did, finance acquisitions and other corporate transactions by using stock, valued at the inflated stock prices, as consideration for such transactions. Thus defendants were motivated to commit the fraudulent scheme alleged herein ...." (Compl., ¶ 13). Here again, the complaint is reduced to the generic motive of increasing capital (for whatever purpose). Analyzing the complaint in either light, of generic motives or fortuitous benefits, it simply "fails to allege circumstances that give rise to a strong inference that the defendants knew the statements to be false."*Wexner*, 902 F.2d at 173.

*12 In *Time Warner* and *Duncan*, the fraud as alleged was also *necessary* to realize *important* corporate goals. In this case, plaintiff has pleaded no facts to show that the acquisition and placement were of any importance (particularly such importance that planning was undertaken two years in advance to use unlawful methods to achieve these goals) or to show that the underlying fraud was in any way necessary to either transaction. The Court of Appeals has defined motive as "entail[ing] concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged."*Shields,* 25 F.3d at 1130. I interpret this definition as requiring some coherent nexus between the alleged fraudulent conduct and its alleged purpose. Even in the most favorable light, there is no such nexus evident on the face of this complaint.

Instead, plaintiff seems simply to have scoured the period during which Alexander admits to having incorporated ACG's faulty accounting, searching for any transaction to label as a motive for, or "benefit" of, engaging in this fraudulent conduct. But all corporate errors are not the product of intentional fraud or recklessness. In the absence of a factual nexus, nothing in the complaint justifies identifying the two transactions named in the complaint over any other transactions which occurred during the Class Period. I reject the implicit assertion, created by plaintiff's failure to allege a factual basis, that *any* corporate activity during the Class Period is tainted with, and evidence of, the fraud allegedly undertaken at that time. Again, plaintiff is left with only the generalized motives of increasing capital and preserving executive benefits, motives whose reach would encompass virtually any corporate transaction occurring thereafter.

My conclusion that these allegations, taken as a whole, are inadequate rests not only on the lack of a logical or temporal connection between the alleged fraud and the alleged motives, but on the lack of a reasonable economic nexus as well. Plaintiff focuses on the artificially inflated value of Alexander stock as the cause of his injury. During the Class Period, Alexander was a billion-dollar corporation, albeit one that suffered significant losses. Plaintiff asserts that this billion-dollar corporation engaged in a scheme through which, by allowing one of its three subsidiaries to forego "interim realizability reviews," it could overstate its consolidated operating revenues by only 0.7% in 1991 and by 0.6% in 1992. (Compl., ¶¶ 44-45). In the first quarter of 1993 this scheme allowed Alexander to overstate its consolidated operating revenues by 1.2%. In the second quarter, somehow, revenues were *under-*

Case 3:07-cv-05545-SI    Document 33-5    Filed 05/05/2008    Page 12 of 17

Not Reported in F.Supp.
Not Reported in F.Supp., 1996 WL 88570 (S.D.N.Y.), Fed. Sec. L. Rep. P 99,101
(Cite as: Not Reported in F.Supp., 1996 WL 88570)

Page 11

stated.(Compl., ¶ 46). Not only are these differences minute, but their overall effect was not to create the appearance of great gains, but to reduce slightly Alexander's reported *losses*.[FN7] It is hard to see how the fruit of this kind of fraud contributed to raising capital for Alexander or to increasing Irvin's job security. The results are hardly typical of the allegations commonly found to state a claim. *See, e.g., Sirota* (a jury could properly infer intent from, *inter alia,* misrepresentations which showed reported earnings increase in consecutive years by 100%, 50%, 33.3%, and 20%, coupled with a gross misrepresentation of inventory). The benefits which this slight scheme helped Alexander realize -- the preferred placement and the Mexican acquisition -- pale when compared to the risks to Alexander and Irvin of engaging in securities fraud. It is difficult to conclude that the scheme as alleged serves defendants' "informed economic self-interest." *Shields,* 25 F.3d at 1130;*cf. Duncan,* 1996 WL 19043 *10, 1996 LEXIS 401, *33 (describing as "economically irrational" the assumption that an accounting firm would engage in fraud to preserve a fee that represented "an infinitesimal percentage of its annual revenues," jeopardized its reputation and license, and exposed it to extensive potential damages); *Atlantic Gypsum Co. v. Lloyds Int'l Corp.,* 753 F. Supp. 505, 514 (S.D.N.Y. 1990) ("Plaintiffs' view of the facts defies reason, and therefore does not yield a reasonable inference of fraudulent intent.")

**\*13** Unlike the pleadings in *Cohen, supra,* which "hardly require[d] a stretch of the imagination" to infer motive, the speculative and fact-shy pleadings of the present complaint "simply demand[] too strenuous an exertion of the imagination."*Sabarese v. First Nat'l Investment Corp.,* 1994 WL 573320, *3 (S.D.N.Y. Oct. 18, 1994).

Plaintiffs in *Sabarese,* shareholders in a public company, sued under § 10(b) and common law to recover losses sustained in a failed tender offer. Approached by plaintiffs to finance and broker the offering, Kidder Peabody & Co. ("Kidder") advised that the offer should be lead by a third party, not by a former officer and director of the company. An investment corporation ("FNIC") was then called in to lead the offering. FNIC was to buy the company's shares and offer them through Kidder. The sale of shares was negotiated between plaintiffs and FNIC, and the shares were deposited into FNIC's Kidder account. Payment, in the form of FNIC notes, was to be made to plaintiffs thereafter. Kidder was not involved in the transaction other than to make the tender offer. In the meantime, FNIC made large withdrawals from its Kidder account, as well as a no-margin stock purchase, which were collateralized by the plaintiffs' shares. Before the tender offer took place, and pursuant to a customer agreement between Kidder and FNIC, Kidder sold over $1 million of plaintiffs' stock from FNIC's account to cover its margin debt. After FNIC defaulted on the notes held by plaintiffs, FNIC removed the remaining assets from its Kidder account.

Plaintiffs alleged that Kidder made certain false representations to plaintiffs about FNIC's financial position and its own role in making the tender offer in order to lure plaintiffs into transferring their shares into FNIC's Kidder account. *Id.* at 3. To support the conclusion that Kidder's conduct was fraudulent, plaintiffs offered only that Kidder had allowed FNIC to use plaintiffs' shares as collateral, then sold them to erase FNIC's debt. I rejected this argument, finding then, as I find now, an absence of a logical nexus between the alleged motive and the alleged fraud. Plaintiffs failed to allege facts, such as an existing or anticipated debt in FNIC's account, showing that Kidder had an incentive to lure plaintiffs' shares there as an offset. I therefore dismissed the complaint, ruling that:

[t]o ask me to infer -- without any supporting evidence -- that Kidder anticipated that there would one day be a margin debit in FNIC's account for which collateral would be needed simply demands too strenuous an exertion of the imagination.

*Id.* The same lack of factual support in the present complaint demands the same result.

Considered paragraph by paragraph, or as a whole, plaintiff's allegations of motive fall short of Rule 9(b)'s pleading requirements. Leaving aside that the complaint does not allege that the Mexican acquisition was completed, that the record reflects that that acquisition was made through cash and notes, that there is no factual assertion linking the alleged fraud to the price of the preferred stock placement, the complaint does not allege facts supporting a strong inference of fraud with respect to Alexander. Similarly, plaintiff's allegation that Irvin acted to protect his position and financial benefits is insufficient to support a strong inference of fraud with respect to him.[FN8]

B. Recklessness or Conscious Misconduct

*14 As an alternative to alleging facts to show that defendants had both motive and opportunity to commit fraud, a complaint may allege facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness. *See Acito,* 47 F.3d at 52. If the latter method is used, "the strength of the circumstantial allegations must be correspondingly greater."*Beck,* 820 F.2d at 50;*Tribune,* 869 F. Supp. at 1091. Plaintiff, having failed to allege sufficient factual support to show motive, has also failed to allege sufficient factual support to show that defendants acted recklessly or engaged in intentional wrongdoing.

Plaintiff's assertions in this regard are purely conclusory and rely in whole on Irvin's position as CEO of Alexander (Compl., ¶ 23), rather than on any conduct allegedly undertaken by him. Again, plaintiff's pleading technique is to create a broadly sketched picture of fraud in hindsight. First, Irvin's "access," even his "unfettered access," (Compl., ¶ 9), to Alexander's records is an inadequate basis for scienter, one which would expose virtually any CEO, by virtue of his or her position alone, to liability. *See Duncan,* 1996 WL 19043 at *6, 1996 LEXIS U.S. Dist. Lexis at *45. Pleading Irvin's position is particularly unavailing in light of the fact that Irvin does not oversee the daily operations of ACG, which is an independently operated subsidiary. Second, the "red flags" pointed to by plaintiff -- that some ACG officers and employees received performance-based compensation and that there was a market downturn in human resources consulting during the Class Period, (Compl., ¶ 11) -- also provide an insufficient factual basis. *See In re General Electric Sec. Litig.,* 1995 WL 590639 (S.D.N.Y. October 4, 1995) (dismissing claim alleging that subsidiary's reporting to parent should have put parent on notice of false profits scheme). In *General Electric,* Judge Keenan found that the various "red flags" alleged were insufficient even to plead motive and that "[t]he mere fact that GE's financial reporting was inaccurate does not establish scienter."*Id.* at *3."Additionally, the red flags might have been warnings to [the subsidiary's] internal auditors or to any outside accountants, but that does not constitute intentional, knowing or reckless activity on [the parent's] part."*Id.* at *4. Furthermore, there is nothing so obvious or unavoidable about a subsidiary's failure to carry out "interim realizability reviews" to indicate that a parent company would have to know of, or recklessly disregard, that failure. *See id.* at *4 ("Without supporting allegations of fraudulent intent, violations of GAAP and SEC regulations do not support a securities fraud claim.") (citations omitted). Third, plaintiff's repeated assertions that defendants "knew or recklessly failed to know" that a fraudulent scheme was afoot are "so broad and conclusory as to be meaningless."*Shields,* 25 F.3d at 1129. These assertions fail in every instance to connect the underlying set of facts concerning ACG's inaccurate reporting to any conscious misconduct or recklessness approximating fraud.

*15 None of these deficiencies is cured by pointing to the fact that Alexander, at the end of the Class Period, publicly recognized that it had adopted financial statements from ACG based on erroneous accounting practices and restated its financials. Intentional misconduct or recklessness cannot be presumed from a parent's reliance on its subsidiary's internal controls. As pleaded, Alexander's restate-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1996 WL 88570 (S.D.N.Y.), Fed. Sec. L. Rep. P 99,101
**(Cite as: Not Reported in F.Supp., 1996 WL 88570)**

Page 13

ment may reflect negligence or mismanagement but it does not raise a strong inference of fraud.[FN9] *See Decker,* 681 F.2d at 115 ("It is well established by now that section 10(b) was not designed to regulate corporate mismanagement nor to prohibit conduct which does not involve manipulation or deception.") (citations omitted); *Shields,* 25 F.3d at 1129 ("The pleading strongly suggests that the defendants should have been more alert and skeptical, but nothing alleged indicates that management was promoting a fraud."); *O'Brien,* 740 F. Supp. at 281 ("Similarly, the alleged failure of Price Waterhouse to investigate the factual representations made to it by the other defendants -- the so-called 'assumptions' -- does not create a strong inference of scienter."); *General Electric,* 1995 WL 590639, at *4 ("[The subsidiary] had its own internal control mechanisms and [the parent] had a right to rely on [the subsidiary] to monitor its own financial reporting. To so rely is not evidence of recklessness. It is evidence of mismanagement at most and mismanagement is not necessarily securities fraud.").

II. Section 20(a) Claim

I have found that plaintiff has failed to state a primary violation of the securities laws under § 10(b). Plaintiff has also asserted a claim against Irvin under § 20(a) of the Securities Act, 15 U.S.C. § 78t(a). Without a primary violation, however, there can be no secondary, or derivative, violation under § 20(a), which creates liability for "controlling persons." *See* § 20(a), 15 U.S.C. § 78t(a) (a controlling person shall be liable "to the same extent as such controlled person"); *see Shields,* 25 F.3d at 1132;*Komanoff v. Mabon, Nugent & Co.,* 884 F. Supp. 848, 859 (S.D.N.Y. 1995); *Brown v. Hutton Group,* 795 F. Supp. 1317, 1324 (S.D.N.Y. 1992) (stating the "axiomatic proposition that it is impossible to state a claim for secondary liability under Section 20 without first stating a claim for some primary violation of the security laws on the part of the controlled party"); *see generally Lanza v. Drexel & Co.,* 479 F.2d 1277, 1299 (2d Cir. 1973) (liability attaches under § 20(a) when there is a primary violation, control of the primary violator, and culpable participation by the defendant). Therefore, plaintiff's § 20(a) claim is also dismissed.

III. Dismissed without Leave to Amend

Plaintiff has requested, in the event I should grant defendants' motion, an opportunity to replead. Generally, leave to amend should be freely given. *See*Fed. R. Civ. P. 15(a) ("leave [to amend] shall be freely given when justice so requires"); *Acito,* 47 F.3d at 55. This is especially true when dismissal is based on Rule 9(b).*Id.* Nevertheless, the decision lies within the discretion of the trial judge, and leave may be denied with good reason. *Id.*

*16 Repleading would yield plaintiff's fourth complaint. This action was commenced in November of 1993. A second complaint was filed in February of 1994. The third complaint was not filed until January of 1995. In the intervening fourteen months, plaintiff was made aware, both at conferences before me and, presumably, through discussions with defendants' counsel and review of the defendants' initial motion to dismiss, of the deficiencies in his pleadings, including the critical element of scienter. *See Denny,* 576 F.2d at 471 (dismissing with prejudice to replead when plaintiff, put on notice by the trial judge, was "not unaware of the deficiencies of his complaint when he first amended it"). Plaintiff has not been rushed, nor denied multiple opportunities to assert his claim. Judging from plaintiff's successive pleadings, and from oral argument, I see no reason to hold out hope that a fourth complaint will allege scienter with any more particularity and, therefore, find that leave to amend would be futile. *Id.;Shields,* 25 F.3d at 1132;*see San Leandro Emergency Medical Group Profit Sharing Plan v. Phillip Morris Companies, Inc.,* 1996 WL 33050, *12 (2d Cir. 1996) (finding no abuse of discretion when district court denied leave to replead a second time in absence of evidence that plaintiff could cure complaint's deficiencies). The interests of justice require that leave to amend be denied. Plaintiff's

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp. Page 14
Not Reported in F.Supp., 1996 WL 88570 (S.D.N.Y.), Fed. Sec. L. Rep. P 99,101
**(Cite as: Not Reported in F.Supp., 1996 WL 88570)**

second amended complaint is dismissed with prejudice.

*CONCLUSION*

Defendants' motion to dismiss is granted. The Clerk of the Court shall mark this action closed.

SO ORDERED:

FN1. Defendants complain that Glickman fails to specify when and at what price Glickman purchased Alexander stock. See Mem. in Support at 20. Glickman alleges only that he "purchased 4,000 shares of Alexander common stock ... during the class period."(Compl., ¶ 19). As to the date of purchase, plaintiff's assertions place him safely within the applicable statute of limitations. See *Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson*, 501 U.S. 350 (1991) (the one year from discovery and three years from the fraud periods of § 9(e) of the Act apply to § 10(b) claims as well); *In re Colonial Ltd. Partnership Litig.*, 854 F. Supp. 64 (D. Conn. 1994) (explaining and applying *Lampf's* one-year/three-year rule). More troubling is the vagueness with which injury to the plaintiff is pleaded. The complaint asserts that, as a result of Alexander's initial announcement on September 18, 1993 that it was reviewing ACG's accounting practices and expected to restate its financial statements and its subsequent announcement of the actual restated financials, "the price of Alexander's common stock declined from $22.25 per share to $20.25 per share."There is no indication, however, of how plaintiffs arrived at these per share figures. It is therefore impossible to match the alleged injury (purchasing shares at inflated prices (Compl., ¶ 2)) to the Class Period. Plaintiff does allege that on January 14, 1992, eight-and-a-half months into the Class Period, Alexander shares rose to $22.25. But he also alleges that shares closed at $23 on July 27, 1992, and that that price represented "only the third highest trading price since very early on in the Class Period."(Compl., ¶ 65). On April 27, 1993, the price was as high as $25. (Compl., ¶ 76). Why these higher figures are not reflected in the alleged injury, although they are expressly tied by the plaintiff to allegedly false or misleading statements or material omissions, is unclear. Nowhere in the complaint does it allege when Alexander common stock sold at the $20.25 per share figure.

FN2. The complaint supports the assertion that failure to conduct "interim realizability reviews" against anticipated earnings violates GAAP by reference to six Accounting Principles Board opinions and four Statements of Financial Accounting Standards. (Compl., ¶ 40(a)-(j)).

FN3. Plaintiff implies that ACG's improper practices were discovered only because a new officer assumed control of ACG. "Almost immediately after the new head of ACG assumed his position, he discovered numerous accounting irregularities and improper practices by ACG ...." (Compl., ¶ 4). Leaving aside the fact that the complaint enumerates only the one irregularity (failure to undertake the interim realizability reviews), it should be noted that, according to the complaint, Alexander announced that it was reviewing ACG's financial statements *before* naming a new head of that unit. (Compl., ¶ 82).

FN4. Plaintiff asserts that defendants "had *several motives* to falsely portray the Company's financial condition -- including: (a) a desire to raise much needed capital during the Class Period by inducing lenders to extend credit to the Company and inducing

Case 3:07-cv-05545-SI   Document 33-5   Filed 05/05/2008   Page 16 of 17

Not Reported in F.Supp.
Not Reported in F.Supp., 1996 WL 88570 (S.D.N.Y.), Fed. Sec. L. Rep. P 99,101
(Cite as: Not Reported in F.Supp., 1996 WL 88570)

Page 15

investors to purchase securities of Alexander to be used to, *inter alia,* [sic] establish and increase reserves for a substantial amount of contingent liabilities, pay down corporate debt, and finance corporate transactions, such as acquisitions, to assist defendant's attempts to reverse the Company's deteriorating financial conditions; and (b) a desire to delay Irvin's likely termination by covering up the Company's true financial condition so that Irvin could attempt to reverse the Company's misfortunes and preserve his financial interests and other benefits of his position."Mem. in Opp., at 5. Although plaintiff in his complaint ostensibly sets out eight separate motives, (Compl., ¶ 25), each of the eight merely finds a different way to articulate one or the other of these two loosely constructed motives.

FN5. Plaintiff acknowledges that, "defendants *may* be right that the Alexander stock was not directly used in the acquisition."Mem. in Opp. at 24 n. 16. Rather than let that concession be, however, plaintiff attempts to regain lost ground by arguing, without any factual support, that "the cash that was used was obtained through stock sales and the seller was induced to accept notes from Alexander based, in part, upon misrepresentations."*Id.* Speculative stretches such as these seriously undermine plaintiff's position. Although the complaint does not refer expressly to the 1993 Form 10-K, it does refer to Alexander's reports for the first two quarters of 1993, during which period the acquisition occurred. I consider the 1993 Form 10-K as a "public disclosure document [ [ []] required to be filed with the SEC ... that bear[s] on the adequacy of the disclosure,"*Kramer v. Time Warner,* 937 F.2d at 774, although such consideration is not necessary to my decision in light of the first deficiency regarding the acquisition noted in the text.

FN6. Certainly, a stronger inference of fraud may be raised when the fraudulent acts occur simultaneously with, or closely precede, the realization of their purpose. This is not to suggest that a securities fraud cannot be conceived, and even executed, years before its benefits are realized. This is only to find that in the present circumstances, there are no facts that support a "strong inference" that this is what occurred.

FN7. Alexander's restated net loss for 1991 was $17.9 million, or $0.44 per share, up from the originally reported $12.6 million, or $0.31 per share. In 1992, restated net loss was $94.1 million, or $2.30 per share, up from $90.1 million, or $2.20 per share. (Compl., ¶¶ 44-45).

FN8. Having found motive to be inadequately pleaded, I will make no further findings on this method of pleading scienter. I only note that plaintiff's apparent reliance on Irvin's access to Alexander's records and the authority of his office, see Mem. in Opp., at 4-5; (Compl., ¶¶ 12, 23), to establish opportunity seems at odds with the Court of Appeals ruling in *Shields,* 25 F.3d at 1130 (opportunity "entails the means and the likely prospect of achieving concrete benefits by the means alleged" and is not pleaded "by alleging the defendant's authority to speak for the company").*But see San Leandro Emergency Medical Group Profit Sharing Plan v. Phillip Morris Companies, Inc.,* 1996 WL 33050, *10 (2d Cir. 1996) (finding "no doubt" that individual defendants, holding "the highest positions of authority within the company" had the opportunity to manipulate the company's stock price).

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp. Page 16
Not Reported in F.Supp., 1996 WL 88570 (S.D.N.Y.), Fed. Sec. L. Rep. P 99,101
**(Cite as: Not Reported in F.Supp., 1996 WL 88570)**

> FN9. Plaintiffs assert that various "'red flags' ... would have alerted a reasonable CEO or other corporate officer that [Alexander's] revenues and earnings were being overstated," and "would have caused a reasonably prudent CEO or corporate officer with the professional skill and experience of Mr. Irvin, to have wanted to, and to have attempted to, assure himself [ [that ACG's figures were accurate, it internal controls sufficient, and its reserves adequate] prior to consolidating ACG's reported revenues and earnings."(Compl., ¶ 11). This is the crux of plaintiff's allegations, yet it clearly speaks to a duty of care or a negligence standard rather than to fraud.

S.D.N.Y.,1996.
Glickman v. Alexander & Alexander Services, Inc.
Not Reported in F.Supp., 1996 WL 88570 (S.D.N.Y.), Fed. Sec. L. Rep. P 99,101

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.