# TAB G



Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 3030058 (N.D.Cal.)
(Cite as: Not Reported in F.Supp.2d, 2004 WL 3030058)

Page 1

**H**

In re ESS Technology, Inc. Securities Litigation
N.D.Cal.,2004.
Only the Westlaw citation is currently available.
United States District Court,N.D. California.
In re ESS TECHNOLOGY, INC. SECURITIES
LITIGATION
**No. C-02-04497 RMW.**

Dec. 1, 2004.

Luke O Brooks, Patrick J. Coughlin, Lionel Z.
Glancy, Michael M. Goldberg, John K. Grant,
Robert A. Jigarjian, William S. Lerach, Kevin Ruf,
David R. Scott, for Plaintiff(s).
Meredith N. Landy, for Defendant(s).

ORDER ON DEFENDANTS' MOTION TO DIS-
MISS PLAINTIFF'S SECOND AMENDED COM-
PLAINT AND STRIKE PORTIONS THEREOF

WHYTE, J.

[Re Docket No. 89]

*1 This Document Relates to: ALL ACTIONS.

Currently before the court is the motion by defend-
ants ESS Technology, Inc. ("ESST"), Robert L.
Blair ("Blair"), Patrick Ang ("Ang"), Frederick
S.L. Chan ("Chan"), and James Boyd ("Boyd")
(collectively "defendants") to dismiss lead plaintiff
Steve Bardack's ("Bardack" or "plaintiff") Second
Amended Complaint ("SAC") or to strike portions
thereof. Plaintiff opposes the motions. The motion
was heard on March 19, 2004. The court has read
the moving and responding papers and heard the ar-
gument of counsel. For the reasons set forth below,
the court denies the motion to dismiss Count I as to
defendants Blair, Boyd and ESST except as to al-
legations of fraud committed prior to February 27,
2002.[FN1] Those allegations are stricken and dis-
missed. The motion to dismiss Count I as to de-
fendants Ang and Chan and Count III as to defend-
ant Chan is granted. The motion to dismiss Count II

is denied as to all defendants.

> FN1. Defendants have not moved to strike
> claims on behalf of class members who
> purchased ESST shares after February 27,
> 2002.

I. BACKGROUND

A. General Nature of Case

This is a securities fraud action brought on behalf
of a proposed class of persons who purchased the
publicly-traded securities of ESST between the
dates of January 23, 2002 and September 12, 2002
("class period"). Plaintiff contends that certain
ESST officers and directors made false and mis-
leading statements concerning ESST's operations
and the prospects for the year 2002. Plaintiff al-
leges that in December 2001, ESST's founder, de-
fendant Chan, learned that one of ESST's competit-
ors, MediaTek, had developed a superior competing
chip that would be offered at approximately the
same price as ESST's chip, and that at least one of
ESST's largest customers, Shinco, intended to shift
its business to MediaTek. From this foundation,
plaintiff alleges that various statements made by
defendants between January 23, 2002 and Septem-
ber 12, 2002 with respect to ESST's financial out-
look were false and misleading.

B. Procedural Background

Plaintiff filed this securities fraud action on
September 13, 2002. On January 21, 2003, the court
appointed plaintiff Barrack to serve as lead plaintiff
for the proposed class. Barrack then filed an
amended complaint on February 6, 2003, which de-
fendants moved to dismiss. However, prior to the
noticed May 23, 2003 hearing on the motion, the
parties submitted a stipulation allowing plaintiff to
file an amended complaint and taking defendants'
motion off calendar.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                 Page 2
Not Reported in F.Supp.2d, 2004 WL 3030058 (N.D.Cal.)
**(Cite as: Not Reported in F.Supp.2d, 2004 WL 3030058)**

Plaintiff then filed a First Amended Complaint ("FAC"),[FN2] on May 20, 2003. The FAC alleged three causes of action: (1) violation of section 10 of the 1934 Act and Rule 10b-5 promulgated thereunder as against all defendants; (2) violation of section 20(a) of the 1934 Act against the individual defendants; and (3) violation of section 20A of the 1934 Act against defendant Chan. Defendants again moved to dismiss on June 18, 2003. On October 3, 2003 the court granted defendants' motion to dismiss with 30 days leave to amend the complaint.

> FN2. This was actually the second amended complaint filed by Barrack.

*2 On November 3, 2003 plaintiff filed a Second Amended Complaint ("SAC"). Defendants now move to dismiss the SAC.

C. Plaintiff's Allegations

Plaintiff alleges that starting on January 23, 2002 with ESST's announcement of fourth quarter results for 2001, and continuing through September 12, 2002 when ESST revised earnings and revenue downward, defendants misled investors by making a number of false and misleading statements designed to boost the price of the stock. SAC ¶¶ 22-37. One motivation for this purported scheme was the February 1, 2002 Secondary offering of 5.52 million shares of ESST stock, which raised $45 million for ESST at a price of $19.38 per share. SAC ¶ 21. According to plaintiff, negative news about the loss of a major customer, Shinco, was on the horizon, yet defendants failed to reveal such information. This omission allegedly kept the share price inflated, which gave defendants Chan, Boyd, and Blair an opportunity in the following months to take profits before the release of negative information.

Plaintiff's argument focuses in part on his allegation that ESST's management advised analysts at A.G. Edwards on September 9, 2002 that the third quarter was tracking as expected, just three days

before ESST announced that the third quarter revenues would be between $60 and $64 million, down from the previous estimate of $86 to $90 million, and that net earnings would be between $.13 and $.21 instead of between $.35 and $.38. SAC ¶ 35, Ex. 2. Plaintiff asserts that ESST knew before the September 9 report to A.G. Edwards that it would not meet earnings estimates because, in a conference call on October 23, 2002, Boyd, the Chief Financial Officer for ESST, admitted *"by the late part in August* it became obvious there was going to be a problem with the quarter."SAC Ex. 4 (emph.added).

D. Factual Background

Defendant ESST is a designer, developer, and marketer of highly-integrated digital processor chips used in multimedia applications. SAC ¶ 13. ESST chips are the primary processors driving digital video and audio players including DVD, video CD and MP3 players. *Id.* Defendant Chan is ESST's founder and chairman. Defendant Blair is ESST's president and chief executive officer. Defendant Boyd is ESST's chief financial officer, and defendant Ang is ESST's chief operating officer. SAC ¶¶ 14(a)-(d), 15. Plaintiff alleges that, with knowledge to the contrary as early as December 2001, defendant ESST made a number of positive statements in its filings and in conference calls during the January 23, 2002 to September 12, 2002 class period.

Plaintiff quotes heavily from numerous press releases and conference calls made by ESST during the class period and appears to allege that they were all intentional falsehoods. Defendants made upward adjustments to expected first and second quarter revenues in conference calls and press releases. The forecasts were met. Defendant ESST failed, however, to meet its expected third quarter revenue estimates, which ultimately resulted in a 30% drop in ESST's share price. The public statements with which plaintiff takes issue can be divided generally into the following categories: (1) misleading statements leading up to the Secondary offering (SAC

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 3030058 (N.D.Cal.)
(Cite as: Not Reported in F.Supp.2d, 2004 WL 3030058)

Page 3

¶¶ 21-22); (2) misleading statements regarding first quarter revenue and earnings (SAC ¶¶ 23-26); (3) misleading statements regarding second quarter revenue and earnings (SAC ¶¶ 27-28, 30); (4) misleading statements regarding third quarter revenue and earnings (SAC ¶¶ 29-30, 32-35); and (5) misleading statements about market share and competition (SAC ¶¶ 26-27, 31).

*3 During the class period, plaintiff claims that certain officers made optimistic forecasts, downplayed competitive pressures and potential customer defections, and predicted that ESST would continue to be the market leader in DVD chips. *See, e.g.,* SAC ¶¶ 26, 31.

A significant portion of plaintiff's allegations that defendants knowingly made misleading statements are based on information obtained from anonymous sources. The court first turns to the SAC's allegations with respect to the information provided by these unnamed witnesses. The court will then proceed to plaintiff's allegations concerning false statements made and finally to the allegations of scienter.

1. Information Provided By Confidential Witnesses

In an attempt to plead the requisite scienter, plaintiff presents information allegedly obtained from a number of confidential witnesses about defendants' knowledge of the MediaTek product and ESST's impending losses of sales.

a. Confidential Witness 1

Confidential Witness 1 ("CW1") voluntarily contacted plaintiff and "represented that he was involved in the preparation of ESST's financial results and had personal contact with Chan and defendant Blair."SAC ¶ 16(a). CW1 states:

that Chan learned in December 2001 from Steven Shen ("Shen") that MediaTek had developed a new DVD chip that combined the encoder function with the servo chip function, that the chip would be offered at the same price as a single ESST chip, resulting in a 50% price reduction and that four of ESST's largest customers, including Shinco, APEX, Chang Hong and TONIC intended to purchase the new chip and that Shinco had decided to shift at least 50% of its purchases [from ESST] to MediaTek.

*Id.* According to CW1, Chan assigned the company's Hong Kong director, Andy Ho, to confirm this information. Two days later, the Hong Kong director advised Chan that "ESST's customers intended to cut their purchases in six to twelve months."*Id.*

Chan then reportedly began looking to acquire a company with technology that could compete with MediaTek. Finally, CW1 "states that ESST reacted to the adverse information regarding the expected competition with MediaTek, by offering chips at lower prices to their existing customers so that the customers would stock-pile the DVD chips."*Id.*

Plaintiff provides no information about CW1's job title, tenure at ESST or job responsibilities. Although CW1 provides details about what Chan allegedly learned from Steven Shen about MediaTek's new DVD chip, and a potential shift in customer purchases in six to twelve months, plaintiff fails to state how CW1 came to learn of this information. Notably, plaintiff fails to establish a nexus between CW1's job responsibilities and his allegations, so there is no basis upon which to infer that CW1 had first hand knowledge of these events, or that he was basing his information on anything more than rumor. Further, CW1's allegations regarding customer purchase orders are vague as to what commitments those customers had actually made. Since the information from CW1 lacks meaningful detail and evidence of reliability, it fails to support a 'strong inference' of scienter. Even accepting the veracity and reliability of CW1's contentions, defendants' actions after learning of this competing chip do not suggest that defendants knew that ESST would not meet its earnings projec-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 3030058 (N.D.Cal.)
**(Cite as: Not Reported in F.Supp.2d, 2004 WL 3030058)**

Page 4

tions.

### b. Confidential Witness 2

*4 Confidential Witness 2 ("CW2") was employed as a software engineer at ESST's corporate headquarters during the class period. SAC ¶ 16(b). CW2 "states that in December 2001, ESST implemented a plan to reduce its workforce in response to expected competitive pressures in 2002."*Id.* CW2 "recalls being told by his supervisor in December 2001 that ESST had some 'tough times ahead' and that one of ESST's competitors was 'going to kick the * * * * out of us." ' *Id.* CW2 also "recalls that during December 2001, Chan (who. typically made one or two business trips to Asia a quarter) increased the frequency of his trips to Asia in response to competitive problems and slipping business in the Far East and made a number of trips in December," ostensibly to meet with customers in Asia who were threatening to cut orders. *Id.*

CW2 apparently has no firsthand basis for this information but relies instead on an unnamed source.FN3Accordingly, the information fails to meaningfully support a 'strong inference' of scienter. Even accepting CW2's basis as adequate, CW2 merely describes pressure from competitors and ESST's efforts to maintain market share.

> FN3. CW2 also alleges a slowdown in demand in December 2001, a plan to reduce workforce, "tough times ahead," and vague statements about ESST competitors taking market share. SAC ¶ 16(b). All of these allegations come from other unnamed sources, and CW2 has no firsthand basis for making them.

### c. Confidential Witness 3

Confidential Witness 3 ("CW3") was employed as a senior software engineer during the class period and "confirms that ESST began laying off employees in December 2001."SAC ¶ 16(c). He does not provide a basis for his knowledge or his conclusion that the

layoffs were in response to competitive pressure from MediaTek's new DVD chip.

### d. Confidential Witness 4

Confidential Witness 4 ("CW4") was an employee in ESST's IT department during the class period and states "that beginning in late 2001 ESST was under considerable pressure to control costs" and that "ESST was threatened with losing some of its market share for its DVD chips."SAC ¶ 16(d).

CW4 provides no nexus between his job duties and his statement and no foundation upon which to conclude that the layoffs were in response to competitive pressures from MediaTek's new DVD chip or, more significantly, that the layoffs meant that defendants knew they could not produce and obtain the numbers represented.

### e. Confidential Witness 5

Confidential Witness 5 ("CW5") was a senior design engineer at ESST during the class period. CW5 states "that he had discussions with colleagues in April 2002 regarding the competitive threat presented by MediaTek and how this was resulting in ESST losing market share."SAC ¶ 16(e). CW5 also "recalls that ESST did not have a chip that could compete with MediaTek's new offering."*Id.* As a senior design engineer, CW5 would presumably have technical knowledge about MediaTek's new chip and how it compared with ESST's product. However, no foundation is offered as to his knowledge about ESST's market share.

### f. Confidential Witness 6

Confidential Witness 6 ("CW6") was an applications engineer at ESST during the class period and states that ESST started reducing employees in late 2001. SAC ¶ 16(f). In addition, CW6 attended a new DVD product demonstration in March 2001 and was told that a second session would be held in

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                              Page 5
Not Reported in F.Supp.2d, 2004 WL 3030058 (N.D.Cal.)
**(Cite as: Not Reported in F.Supp.2d, 2004 WL 3030058)**

July 2001. CW 6 states that this second session was canceled due to failure of the DVD product at the initial test stage. This allegation regarding the reason for the cancellation lacks a basis for first hand knowledge and provides no specifics about the product demonstration, or its significance to the development by ESST of an upgraded chip, or ESST's ability to compete with MediaTek or other competitors.

g. Confidential Witness 7

*5 Confidential Witness 7 ("CW7") was an employee at Shinco, one of ESST's customers who allegedly intended to transfer half of its ESST purchases to MediaTek. CW7 was a sales director during the class period and states that "he was responsible for sales of Shinco's DVD products and was familiar with Shinco's practices in dealing with suppliers."SAC ¶ 16(g). CW7 states that Shinco has started to shift to a new "system-on-a-chip" DVD chip in the first half of 2002. *Id.* CW7 further states that the design and production of DVD products is a six-to-eight month process as it requires considerable investment in research, development and testing, and opines that "Shinco would have advised ESST of the change to the new chip in late-2001."*Id.*

CW7 provides no basis for knowing first hand that Shinco's orders to ESST had decreased, or that ESST knew of Shinco's alleged plan to place fewer orders. Further, the allegation that Shinco "would have alerted ESST" in late 2001 of their shift to a new chip is speculative.

h. Confidential Witness 8

Confidential Witness 8 ("CW8") was an ESST chip production planner during the Class period, responsible for planning and placing wafer and chip orders with ESST's wafer and chip manufacturers.FN4SAC ¶ 16(h). During the first quarter of 2002, CW8 states that Patrick Yeto, ESST's Vice President of Operations (who reported

directly to Blair), directed the department to stop wafer and chip orders from these manufacturers as a result of MediaTek's competition. In August 2002, CW8 received an email from Yeto directing him to cut back production of certain DVD chips-representing over 30% of ESST's forecasted revenues-by 20% to 50%.

> FN4. Taiwan Semiconductor Manufacturing Company, United Microelectronics Corporation, Advanced Semiconductor Engineering, and Silterra.

CW8 also states that ESST's weekly sales flash reports in August 2002 were actually decreasing rather than increasing, and these reports were submitted directly to Blair.

CW8's statement about stopping the purchase of wafers in the first quarter of 2002 provides little specific information (e.g. the status of existing inventory, length of stoppage, etc.). The alleged August direction to cut production by 20% to 50%, although lacking specifics about the circumstances, does tend to bolster other evidence that by August ESST knew it would not make its third quarter earning forecasts.

i. Confidential Witness 9

Confidential Witness 9 ("CW9") was an ESST Director of Sales responsible for supervising sales to DVD manufacturers in China during the class period. SAC ¶ 16(i). CW9 states that ESST knew by May 2002 that ESST was losing market share because of MediaTek's sales to ESST's customers, including Shinco.

j. Confidential Witness 10

Confidential Witness 10 ("CW10") was an ESST Senior Marketing Manager also responsible for sales to DVD manufacturers in China during the class period. SAC ¶ 16(j). CW10 states that ESST realized it was losing market share to MediaTek

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 3030058 (N.D.Cal.)
**(Cite as: Not Reported in F.Supp.2d, 2004 WL 3030058)**

Page 6

and Zoran Corporation by early 2002, and that this loss would negatively impact earnings. ESST allegedly had specific knowledge of loss of market share at Shinco, and a loss to MediaTek of about 20%. This information was allegedly conveyed to Lawrence Ko, a supervisor in ESST's China office.

k. Confidential Witness 11

*6 Confidential Witness 11 ("CW11") was employed as a manager of sales administration by ESST during the class period. CW11 "was aware that competition from MediaTek constituted a significant problem in the second half of 2001 and that in late 2001 ESST was aware of a significant loss of business due to MediaTek's product introductions of advanced DVD chips."SAC ¶ 16(k). ESST's development of a competing chip was allegedly six to eight months behind Blair's public representations. In light of these sales trends and customer migration, CW11 states that ESST's third quarter public revenue forecasts had "no meaningful basis."

Similar to plaintiff's allegations attributed to other confidential witnesses, the information allegedly obtained from CW9, CW10 and CW11 lack meaningful foundation, details and specificity. These allegations, even taken as true, do not support a strong inference that defendants were consciously making false and misleading statements before mid-2002 when other evidence suggests ESST recognized it would have an unfavorable third quarter.

l. Confidential Witness 12

Confidential Witness 12 ("CW12") was an area sales manager at ESST during the class period. CW12 states that ESST had two major design cycles each year, one starting in August for spring release, and the other in January for August release. SAC ¶ 16(l).

m. Confidential Witness 13

Confidential Witness 13 ("CW13"), an employee at Dynax Electronics during the class period, merely identifies Shen as the president of Dynax. SAC ¶ 16(m).

2. False Statements

During the Class period, plaintiff alleges that defendants made various false statements beginning with one made February 28, 2002 and continuing until the revelation of the truth on September 12, 2002. Specifically, plaintiff claims that defendants assured investors in March, April, May, June and July 2002 that ESST was not at risk of losing significant market share to competitors, including MediaTek, Inc., and that ESST would continue to report large revenue increases throughout 2002. Defendants stated on July 24, 2002 that ESST expected to report third quarter 2002 revenues of $86 to $90 million. In an August 8, 2002 ESST press release, defendants repeated their assurance that third quarter 2002 revenues would reach $86 to $90 million. One month later, on September 9, 2002, ESST assured financial analysts that the quarter was tracking according to expectations. On September 12, 2002, only three days after ESST management advised that the third quarter was on track, ESST publicly announced that third quarter revenues would miss defendants' public forecast of $86 to $90 million and that revenues would be between $60 and $64 million and that earnings per share would not be between $.35 and $.38 as previously estimated but between $.13 and $.21.

In an October 23, 2002 conference call, defendants admitted that in August 2002 they were aware that ESST was experiencing critical negative trends. During the October 23, 2002 conference call, defendant Blair stated that sales did not ramp as expected in mid-August and that the weak demand impacted all product lines and all geographies. Defendant Boyd admitted that "by the late part in August it became obvious there was going to be a problem with the quarter."(SAC ¶ 35, Ex. 4).

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 3030058 (N.D.Cal.)
(Cite as: Not Reported in F.Supp.2d, 2004 WL 3030058)

Page 7

3. Scienter

*7 Plaintiff claims that the information obtained from the confidential witnesses shows that defendants knew they were making false representations. Plaintiff further contends that ESST knew that it was facing a significant financial downturn before its secondary offering completed on February 1, 2002, and that defendants were motivated not to disclose that adverse information so that the offering would be successful. ESST obtained an infusion of $45 million from the offering. SAC ¶ 19. Plaintiff also alleges that the individual defendants were further motivated in their scheme to keep ESST's stock price inflated because they stood to gain by selling their own shares during or around the time of the offering.

Plaintiff also claims that defendants engaged in channel stuffing in order to meet fourth quarter results in December 2001, to complete the secondary offering on February 1, 2002, and to benefit Chan so he could sell $55 million of his shares. Channel stuffing "is the oversupply of distributors in one quarter to artificially inflate sales, which will then drop in the next quarter as distributors no longer make orders while depleting their excess supply."*Steckman v. Hart Brewing, Inc.*, 143 F.3d 1293, 1298 (9th Cir.1998)."[C]hannel stuffing claims may have some probative value insofar as the channel stuffing was done so as to artificially inflate income, but there may also be other legitimate reasons for attempting to achieve sales earlier."*Broudo v. Dura Pharms.*, 339 F.3d 933, 940 (9th Cir.2003); *see Greebel v. FTP Software, Inc.*, 194 F.3d 185, 203 (1st Cir.1999) (value of channel stuffing evidence weak, and does not support strong inference of scienter). Here, plaintiff fails to state with particularity the facts upon which the allegations of channel stuffing are based.

II. LEGAL STANDARD

To determine whether a private securities fraud complaint can survive dismissal under Federal Rule of Civil Procedure 12(b)(6), the court must determine whether particular facts in the complaint, taken as a whole, raise a strong inference that defendants intentionally or with deliberate recklessness made false or misleading statements to investors. *In Re Read-Rite*, 335 F.3d 843, 846 (9th Cir.2003); *Ronconi v. Larkin* 253 F.3d 423, 429 (9th Cir.2001)."In an effort to deter abusive and frivolous securities fraud claims, Congress enacted the PSLRA, which amended the 1934 Act and raised the pleading standards for private securities fraud claims."*No. 84 Employer-Teamster v. America West Holding* (*"America West"* ), 320 F.3d 920, 931 (9th Cir.2003) (citing *In re Silicon Graphics Inc. Sec. Litig.* (*"Silicon Graphics"* ), 183 F.3d 970, 973 (9th Cir.1999))."[P]laintiffs proceeding under the PSLRA can no longer aver intent in general terms of mere 'motive and opportunity' or 'recklessness,' but rather, must state specific facts indicating no less than a degree of recklessness that strongly suggests actual intent."*Silicon Graphics*, 183 F.3d at 979;*America West*, 320 F.3d 920 at 931 ("The PSLRA altered the pleading requirements for private litigants by requiring that a complaint plead with particularity both falsity and scienter."); *Ronconi*, 253 F.3d at 429 n. 6.

*8 To survive the higher pleading standards required by the PSLRA, the complaint must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which the belief is formed."15 U.S.C. § 78u-4(b)(1); *America West*, 320 F.3d at 931. The complaint must also "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."15 U.S.C. § 78u-4(b)(2). The dual pleading requirements of §§ 78u-4(b)(1) and (b)(2) are incorporated into a single inquiry, because falsity and scienter are generally inferred from the same set of facts. *Read-Rite Corp.*, 335 F.3d at 846;*Ronconi*, 253 F.3d at 429. If a plaintiff fails to plead either the alleged mislead-

Not Reported in F.Supp.2d                                                                Page 8
Not Reported in F.Supp.2d, 2004 WL 3030058 (N.D.Cal.)
**(Cite as: Not Reported in F.Supp.2d, 2004 WL 3030058)**

ing statements or scienter with particularity, his or her complaint must be dismissed. *See America West,* 320 F.3d at 931-32;§ 78u-4(b)(3)(A). Here, plaintiff relies on the statements of various confidential witnesses to establish falsity and, in large part, to show scienter. As discussed below, the pleading standard is met as to defendants Blair, Boyd and ESST except as to allegations of fraud prior to February 27, 2002.

The PSLRA provides a safe harbor from liability for certain forward-looking statements. Forward-looking statements contain "a projection of revenues, income, or earnings per share, management's plans or objectives for future operations, and a prediction of future economic performance."*In re Splash Tech. Holdings, Inc. Sec. Lit.,* 160 F.Supp.2d 1059, 1068 (N.D.Cal.2001); 15 U.S.C. § 78u-5(i)(1)(A)-(C). Assumptions underlying these statements are also forward-looking. *Id.;*15 U.S.C. § 78u-5(i)(1)(D). On the other hand, statements concerning historical or current facts are not forward-looking.*In re Splash,* 160 F.Supp.2d at 1068. For Safe Harbor protection under the PSLRA to apply, the forward-looking statements must either be: (1) accompanied by "meaningful cautionary statements identifying important factors that could cause actual results to differ materially;" or (2) must not be made with actual knowledge of falsity. *See*15 U.S.C. § 78u-5(c)(1)(A); 15 U.S.C. § 78u-4(b)(1)-(2).) "It is clearly insufficient for plaintiffs to say that a later, sobering revelation makes an earlier, cheerier statement a falsehood."*Yourish v. Cal. Amplifier,* 191 F.3d 983, 997 (9th Cir.1999).

"A present-tense statement can qualify as a forward-looking statement as long as the truth or falsity of the statement cannot be discerned until some point in time after the statement is made."*In re Splash,* 160 F.Supp. at 1067;*Harris v. Ivax Corporation,* 182 F.3d 799, 805 (11th Cir.1999), reh'g denied, 209 F.3d 1275 (11th Cir.2000) (classifying the statement "the challenges unique to this period in our history are now behind us" as forward-look-

ing)."Whether a statement qualifies for the safe harbor is an appropriate inquiry on a motion to dismiss."*In re Splash,* 160 F.Supp.2d at 1068;15 U.S.C. § 78u-5(e).

## III. ANALYSIS

**A. Section 10(b) of the 1934 Act and Rule 10(b)(5) Promulgated Thereunder**

**\*9** Plaintiff's SAC lists several statements made by defendants, in particular several financial projections for the third quarter of 2002, which are forward-looking. SAC ¶¶ 25-31. For example, plaintiffs cite defendants' press release dated June 24, 2002, which updates guidance for the third quarter, stating that "ESS expects third quarter revenue and earnings to exceed previous guidance."*Id.* at ¶ 29.Other examples include a press release dated July 24, 2002 where defendants state, "We believe we will maintain our leadership position in the areas of new products, features and services.... With these new product introductions, we believe we can continue to lead the high growth market for digital home entertainment products...."*Id.* at ¶ 30.This same press release reiterates defendants' estimate of revenues of $86 to $90 million with earnings per share o $.35 t0 $.38 for the third quarter.*Id.* at ¶ 30.Plaintiff's complaint also cites a July 24, 2002 conference call, during which defendants' CEO stated, "I think we will remain the dominant supplier at Shinco...."*Id.* at ¶ 31.Each of these statements involve predictions about economic performance, the truth or falsity of which could not be discerned until some point after it was made. Similarly, the veracity of statements in paragraphs 25 through 28 about future trends and performance issued with first and second quarter results could not be determined until some point after the statements were made. Consequently, these statements are forward-looking, and protected by the PSLRA Safe Harbor provisions if they were accompanied by either meaningful cautionary statements, or the defendants had no actual knowledge of their falsity.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 3030058 (N.D.Cal.)
(Cite as: Not Reported in F.Supp.2d, 2004 WL 3030058)

Page 9

"Cautionary statements must, within context, be meaningful; boilerplate, generalized warnings do not suffice to balance specific predictions."*In re Clorox Co. Sec. Litig.*, 238 F.Supp.2d 1139, 1142 (N.D.Cal.2002). In *Clorox* the plaintiffs claimed that during an April 22, 1999 conference call Clorox materially misrepresented the financial health of one of its companies. *Id.* at 1144.The court found that the challenged statements were forward-looking because a Clorox representative "began the conference call by asserting that some of her statements would be forward-looking, and a prediction about future events is self-evidently a forward-looking statement."*Id.* at 1145.The court also found the representative made meaningful cautionary statements when she "began the call by disclaiming certainty, and referred listeners to additional cautions in Clorox's June 30, 1998, Form 10K filing. That filing contained additional, albeit general, statements about the potential difficulties Clorox might face and the potential problems with the merger."*Id.* The court found that these "cautions provide the requisite contextual warnings for the Safe Harbor provision ... to apply."*Id.*

Defendants' warnings in the instant case are almost identical to those presented by Clorox. Plaintiff claims that defendant made misleading statements in several press releases. However, each of these press releases warn that the matters discussed in each respective press release include forward-looking statements. The releases also disclaim certainty and direct readers to defendants' SEC filings (Form 10-K and Form 10-Q). ESST's Form 10-K for 2001 includes an extensive discussion about increased pricing pressures, strong competition from competitors with significant competitive advantages, and concerns about sales being concentrated with relatively few distributors and customers. That the 2001 Form 10-K predates the 2002 press releases does not affect its applicability to statements made in 2002. The *Clorox* court relied on Clorox's 1998 Form 10-K even though the challenged statements were made in April 1999. Consequently, it is permissible to rely on defendants' 2001 10-K to

provide meaningful cautionary statements for the challenged press releases made in 2002. ESST's press releases, therefore, contain sufficient meaningful cautionary language related to its forward-looking statements in the releases to protect ESST under the PSLRA's Safe Harbor provisions.

*10 In addition, the evidence does not support the allegation that defendants had actual knowledge of the falsity of their statements until sometime in mid-2002. Plaintiff relies on the information obtained from the anonymous sources. "Reliance on confidential witnesses is not *per se* improper under the PSLRA, notwithstanding its requirement that a plaintiff plead 'all facts' when making allegations based on information and belief."*In re Northpoint Communications Group, Inc., Sec. Litig.*, 221 F.Supp.2d 1090, 1097 (N.D.Cal.2002) (*"Northpoint II"*) (citing *In re McKesson HBOC, Inc., Sec. Litig.*, 126 F.Supp.2d at 1271. "To contribute meaningfully toward a 'strong inference' of scienter, however, allegations attributed to unnamed sources must be accompanied by enough particularized detail to support a reasonable conviction in the informant's basis of knowledge."*Northpoint II*, 221 F.Supp.2d at 1097 (citations omitted); *In re U.S. Aggregates, Inc. Securities Litigation*, 235 F.Supp.2d 1063, 1075 (N.D.Cal.2002). Such detail should include each witness' job title, tenure, and a description of his or her responsibilities while at the company, as this "background detail allows for a better evaluation of each witness' basis of knowledge."*Id.* Further, when such allegations must prove a "strong inference" of scienter, a basis for establishing first hand knowledge, rather than secondhand rumor, is required. *See id.* at 1098.Witnesses must also state how they came to learn of the information provided. *Northpoint I*, 184 F.Supp.2d at 1000. Here, plaintiff relies on confidential sources but fails in the main to provide the particularized information that would permit a reasonable conviction that defendants knew their forward looking statements were false when made. At most, the sources suggest that ESST faced competitive pressures, made efforts to contain costs, and

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 3030058 (N.D.Cal.)
(Cite as: Not Reported in F.Supp.2d, 2004 WL 3030058)

may have learned sometime in mid-August 2002 that their estimates for the third quarter were not going to be met. They do not permit a strong inference that defendants knew before mid-2002 that their revenue and earning estimates could not be met or that their competitive advantage could not be maintained.

Plaintiff also points to certain sales of ESST shares by defendants Blair, Boyd and Chan as showing scienter. Blair sold 5000 shares at $18.85 per share on January 23, 2002, 5000 shares on January 24, 2002 at $19.60 per share, 20,000 shares on March 7, 2002 at $25.00 per share and 20,000 shares on March 11, 2002 at $25.01. The total revenue received for these shares was $1,289,200 (29% of his holdings). It appears that Blair's sales were disclosed pursuant to a pre-planned trading program established in December 2001. Request J. Notice Ex. U. Defendant Chan sold 2,300,000 shares on February 6, 2002 at $18.22 per share and 720,000 shares on March 11, 2002 at $18.22 for total revenue of $13,118,400 (22% of his holdings). Defendant Boyd sold 20,000 shares on May 7, 2002 at $25.78 per share for total revenue of $515,600 (29% of his shares). Defendant Ang, ESST's Executive Vice President and Chief Operating Officer ("COO"), made no sales. The timing and amounts of these sales do not suggest that defendants were scheming to keep the price of ESST shares up while they unloaded part of their holdings. Sales took place before the first alleged misleading statement and before there is convincing evidence that defendants recognized that the third quarter would be down from expectations. Further, although the revenue realized from the sales was significant, the percentage of holdings sold do not suggest an attempt to unload a majority of their shares.

*11 "Insider stock sales are not inherently suspicious...."*In re Vantive*, 283 F.3d at 1092. For stock sales to be probative of scienter, insider trading must be "dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed inside

*In re Silicon Graphics*, 183 F.3d at 986., quoting *In re Apple Computer Sec. Litig.*, 886 F.2d 1109, 1117 (9th Cir.1989). The factors to consider when evaluating the probity of insider stock sales are: (1) the amount and percentage of shares sold by the insider; (2) the timing of the sales; (3) whether the sales were consistent with the insider's prior trading history.*In re Silicon Graphics*, 183 F.3d at 986. Each factor should be considered, while none is dispositive. *See In re Vantive*, 283 F.3d at 1092-93 (sale of 74% of shares, while suspicious, did not raise a strong inference of scienter where remaining factors did not raise suspicion). Here, the timing of the individual defendants' insider trading does not support an inference of scienter. Nor does the percentage of shares sold. *See, e.g., Ronconi*, 253 F.3d at 435 (amount sold by CEO and CFO not suspicious where they sold 10% and 17%, respectively, of shares and options.); *cf. America West*, 320 F.3d at 939 (amount suspicious where nine individual defendants all sold between 88% and 100% of holdings).

Plaintiff argues that three statements made by Boyd and Blair are not forward-looking. Specifically, plaintiff cites a September 9, 2002 meeting between those defendants and A.G. Edwards wherein defendants stated: (1) the third quarter was progressing as expected, (2) that third quarter pricing trends continued to play out as expected without material variance, and (3) the third quarter was tracking as expected. Opp. at 8.[FN5] Plaintiff is correct that these are not forward-looking statements, because their truth or falsity could be determined at the time they were made. *See Harris v. Ivax Corp.*, 183 F.3d 799, 866 (11th Cir.1999) (explaining that observed facts such as "prices have continued to decline" do not constitute assumptions and are not forward-looking statements). Thus, the question is whether the Second Amended Complaint pleads sufficient facts showing defendants were deliberately or consciously reckless when making the three statements. *See No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 931 (9th Cir.2003) ( "In this Circuit the re-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                      Page 11
Not Reported in F.Supp.2d, 2004 WL 3030058 (N.D.Cal.)
(Cite as: Not Reported in F.Supp.2d, 2004 WL 3030058)

quired state of mind [under the PSLRA] is one of 'deliberate or conscious recklessness.' "). The court concludes that it does.

> FN5. The statements made during this interview became the basis of a subsequent A.G. Edwards analyst report which stated, "We had the opportunity to meet with management of ESS Technology yesterday[.] The following are the more salient points from our meeting: Business Update-Pricing trends continue to play out as expected, with no material variance either positively or negatively.... Q3 appears to be tracking according to expectations."SAC ¶ 35, Ex. 2.

The facts showing that there is a strong inference that defendants knew before September 12, 2002 that the third quarter revenues and earnings were "not tracking according to expectations" include: (1) the admission by Blair on October 23, 2002 that "by the late part in August it became obvious there was going to be a problem with the [third] quarter;" (2) the temporal proximity between the September 9, 2002 statement that ESST would meet its estimates and the September 12, 2002 disclosure that ESST would miss its forecast by $26 million; and (3) the e-mail from Yeto to CW8 directing a cutback of certain DVD chips representing over 30% of ESST's forecasted revenues by 20%.

*12 The temporal proximity between the September 9 assurance and the September 12 announcement that third quarter revenues would be $26 million short is not in itself enough to satisfy the requirements of Rule 9(b). However, it certainly bolsters the allegations that defendants knew their positive statements on September 9 were false when made. *See Yourish v. California Amplifier,* 191 F.3d 983, 997 (9th Cir.1999).

The court, in determining whether plaintiff has sufficiently alleged scienter, can properly consider the total of the allegations made by plaintiff.

In assessing whether Plaintiffs have sufficiently pled scienter, we must consider whether the total of plaintiffs' allegations, even though individually lacking, are sufficient to create a strong inference that defendants acted with deliberate or conscious recklessness. In determining whether a strong inference of scienter exists, we must consider all reasonable inferences, whether or not favorable to the plaintiff.

*Nursing Home Pension Fund, Local 144 v. Oracle Corp.,* 380 F.3d 1226, 1230 (9th Cir.2004).

Defendants Ang and Chang submit that plaintiff has failed to allege that they made or participated in any of the allegedly misleading statements. Plaintiff counters the SAC is sufficient to hold them in the case pursuant to the "group-published" doctrine because of their positions at ESST. Although the law is not settled as to the effect of the PSLRA on the "group-published" doctrine, it appears that "[i]n order to satisfy the stringent pleading requirements of the PSLRA, a complaint seeking to attribute information published by an organization to an individual defendant should state, with particularity, facts indicating that the individual defendant was directly involved in the preparation of the allegedly misleading statements."*In re Lockheed Martin Corp. Securities Litigation,* 272 F.Supp.2d 928, 936 (C.D.Cal.2002). Plaintiff has failed to do this with respect to defendants Ang and Chang. Therefore, the motion to dismiss Count I as to them is granted.

B. Section 20(a) of the 1934 Securities Act (Control Liability)

Plaintiff contends that by reason of their executive and managerial positions with ESST the individual defendants had the power and authority to cause ESST to engage in the wrongful conduct alleged. Neither side's briefing addresses the control liability question. However,

[i]n order to prove a prima facie case under Section 20(a), a plaintiff must prove: (1) a primary viola-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 3030058 (N.D.Cal.)
(Cite as: Not Reported in F.Supp.2d, 2004 WL 3030058)

Page 12

tion of federal securities law and (2) that the defendant exercised actual power or control over the primary violator. In order to make out a prima facie case, it is not necessary to show actual participation or the exercise of power; however, a defendant is entitled to a good faith defense if he can show no scienter and an effective lack of participation.

Whether the defendant is a controlling person is an intensely factual question, involving scrutiny of the defendant's participation in the day-to-day affairs of the corporation and the defendant's power to control corporate actions. "Control" is defined in the regulations as "the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise."

*13 *No. 84 Employer-Teamster Joint Council Pension Trust Fund v. America West Holding Corp.,* 320 F.3d 920, 945 (9th Cir.2003) (internal citations omitted). In light of the significant and responsible positions of Chan and Ang, a factual question exists as to whether they were controlling persons.

C. Section 20A of the 1934 Act

Under Section 20A of the 1934 Securities Act,

[a]ny person who violates any provision of this title or the rules and regulations thereunder by purchasing or selling a security while in possession of material, nonpublic information shall be liable ... to any person who, contemporaneously with the ... sale of securities that are the subject of such violation, has purchased ... of the same class.

Plaintiff contends that Chan's sales in on February 6, 2002 and February 19, 2002 violated Section 20A. However, the SAC does not show that Chan had material nonpublic information in February 2002. Therefore, Count III is dismissed.

D. Leave to amend

Leave to amend is to be freely granted when justice so requires. *See*FED. R. CIV. P. 15(a); *Lopez v. Smith,* 203 F.3d 1122, 1127 (9th Cir.2000) (leave to amend should be granted unless the district court "determines that the pleading could not possibly be cured by the allegation of other facts"). Plaintiff has filed three amended complaints. Because plaintiff has had ample opportunity to plead a viable complaint, leave to amend is denied. "[T]he purpose of the PSLRA would be frustrated if district courts were required to allow repeated amendments to complaints filed under the PSLRA."*Miller v. Champion Enterprises Inc.,* 346 F.3d 660, 692 (9th Cir.2003); *see Lipton,* 284 F.3d at 1039 (where basic facts alleged and analyzed, and plaintiff cannot cure flaws in pleading, dismissal with prejudice proper); *Silicon Graphics,* 183 F.3d at 991 (denying leave to amend where defects in pleadings not curable by amendment).

IV. ORDER

For the foregoing reasons, it is hereby ordered that the motion to dismiss Count I as to defendants Blair, Boyd and ESST is denied except as to allegations pleading fraud prior to February 27, 2002. Those allegations are stricken and dismissed. The motion to dismiss Count I as to defendants Ang and Chan and Count III as to defendant Chan is granted. The motion to dismiss to Count II is denied as to all defendants.

Counsel are responsible for distributing copies of this document to co-counsel that have not registered for e-filing under the court's CM/ECF program.

N.D.Cal.,2004.
In re ESS Technology, Inc. Securities Litigation
Not Reported in F.Supp.2d, 2004 WL 3030058 (N.D.Cal.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.