# TAB H



Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 31974384 (N.D.Cal.), Fed. Sec. L. Rep. P 92,246
**(Cite as: Not Reported in F.Supp.2d, 2002 WL 31974384)**

▶

In re Harmonic Inc.
N.D.Cal.,2002.

United States District Court,N.D. California.
In re HARMONIC INC. Securities Litigation.
**No. C-00-2287 PJH.**

Nov. 13, 2002.

Opinion

HAMILTON, J.
**\*1** This is a consolidated proposed class action alleging violation of the federal securities laws. Before the court are four motions to dismiss the second amended complaint, brought by 1) defendant Harmonic, Inc. ("Harmonic"); 2) individual Harmonic officer and director defendants Anthony J. Ley, Robin N. Dickson, Michael Yost, Kirk Flatow. Moshe Nazarathy, Floyd Kvamme, David Lane, Barry Lemieux, Michel Vaillaud, Baryn Futa, and Tom Lookabaugh; 3) defendant C-Cube Microsystems, Inc. ("C-Cube"); and 4) individual C-Cube officer and director defendants Alexandre Balkanski, Fred Brown, Richard Foreman, Donald McKinney, Umesh Padval, Donald T. Valentine, Walt Walczykowski, and Gregorio Reyes.

INTRODUCTION

The facts of the case are set forth in the court's order filed July 5, 2001. Briefly, Harmonic, which provides fiber optic systems to cable operators and develops and markets digital video equipment, merged with the DiviCom division of C-Cube Microsystems, Inc., on May 3, 2000.[FN1] The DiviCom division manufactured and sold products relating to transmission of digital video, audio, and data over satellite, wireless, and cable networks. During the period between January 19, 2000, and June 26, 2000, defendants made a number of statements regarding Harmonic's past financial performance and its future prospects, the latter with particular reference to the benefits expected to accrue from the merger with DiviCom.

FN1. After Harmonic acquired DiviCom from C-Cube ("old C-Cube"), C-Cube's remaining assets (its semiconductor business) were spun off into a new corporation, also known as C-Cube ("new C-Cube"), with most of the same officers and directors as old C-Cube, which ceased to exist. As part of the merger, old C-Cube shareholders received approximately one share of Harmonic stock for every two shares of old C-Cube stock.

For example, on January 19, 2000, in a joint Harmonic/C-Cube press release, Harmonic announced that its sales and revenues for 1999 were up substantially over sales and revenues for 1998. On March 30, 2000, Harmonic stated in its Form 10-K for fiscal year 1999 that it had increased shipments to AT & T during 1999. On April 19, 2000, defendants issued a joint press release announcing Harmonic's financial results for the first quarter of 2000, and stating that AT & T continued to be Harmonic's largest customer. As they had since the announcement of the merger in late October 1999, defendants also asserted in the April 19 press release that the acquisition of DiviCom would allow Harmonic to offer more complete solutions for cable operators and to expand its penetration into emerging broadband markets.

On April 24, 2000, the shareholders of old C-Cube and Harmonic voted to approve the acquisition of DiviCom by Harmonic. On the same day, C-Cube reported its revenues for the first quarter of 2000 in a press release. The press release indicated that the reported revenues related to C-Cube's semiconductor business only, and did not include revenue figures for DiviCom "[d]ue to the approval of the merger with Harmonic."On May 15, 2000; Harmonic reported in its Form 10-Q for the first quarter of

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 2
Not Reported in F.Supp.2d, 2002 WL 31974384 (N.D.Cal.), Fed. Sec. L. Rep. P 92,246
**(Cite as: Not Reported in F.Supp.2d, 2002 WL 31974384)**

2000 that sales to AT & T, which had historically been one of Harmonic's major customers, had declined since the fourth quarter of 1999, and that DiviCom's sales for the same period had been slower than predicted. The price of shares of Harmonic's stock fell significantly on May 16, 2000, and took a further downward turn on June 27, 2000, the day after Harmonic announced lower-than-expected earnings for the second quarter of 2000.

**\*2** Plaintiffs claim that the financial results reported for Harmonic and C-Cube prior to the merger were misleading because they failed to state (for Harmonic) that sales to AT & T were slowing and (for C-Cube) that DiviCom's business had slowed after the parties' initial (October 27, 1999) announcement of the merger. Plaintiffs assert claims on behalf of those who purchased or otherwise acquired shares in Harmonic between January 19, 2000, and June 26, 2000 (the proposed class period), or shares in C-Cube Microsystems, Inc. ("old C-Cube") between January 19, 2000, and May 3, 2000 (the proposed subclass period).[FN2]

> FN2. The named plaintiffs are Hans-Peter Wild ("Wild"), who purchased shares of Harmonic on the open market during the class period; Glynn Emerging Opportunity Fund, L.P., ("Glynn") which exchanged shares of C-Cube stock for Harmonic stock during the subclass period; Robert G. Knollenberg ("Knollenberg"), who purchased shares of Harmonic on the open market during the class period and exchanged shares of C-Cube stock for Harmonic stock during the subclass period; and Bruce Burns ("Burns"), who purchased shares of C-Cube stock on the open market during the subclass period.

Plaintiffs allege claims against both Harmonic and C-Cube defendants for violations of the 1934 Securities Exchange Act. They claim that all defendants made false or misleading statements, in violation of § 10(b) and Rule 10b-5, and allege controlling-person liability under § 20(a) of the 1934

Act against Harmonic, Ley,[FN3] C-Cube, and Balkanski.[FN4] Plaintiffs Glynn and Knollenberg allege that Harmonic, Ley, the Harmonic directors, C-Cube, Balkanski, and the C-Cube directors made false statements in the joint proxy statement in violation of § 14(a) and Rule 14(a)-9.

> FN3. Ley was Harmonic's CEO and Chairman of the Board during the proposed class period.

> FN4. Balkanski was President and CEO of old C-Cube during the portion of the class period immediately preceding the merger. Following the merger and spin-off of C-Cube's semi-conductor business, Balkanski served as a director of new C-Cube.

Plaintiffs Knollenberg and Glynn also allege claims against the Harmonic defendants for violating the 1933 Securities Act, asserting that Harmonic, Ley, and Harmonic directors Dickson, Nazerathy, Kvamme, Lane, Lemieux, and Vaillaud made false statements in the March 23, 2000, Registration Statement, in violation of § 11; and that Harmonic and Ley made false statements in the prospectus included in the March 23 Registration Statement, in violation of § 12(a)(2). They also allege claims against Harmonic and Ley as controlling persons, in violation of § 15 of the 1933 Act.

## DISCUSSION

### A. Legal Standards

1. Motions to dismiss under Federal Rule of Civil Procedure 12(b)(6).

A court should dismiss under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim only where it appears beyond doubt that plaintiff can prove no set of facts in support of the claim which would entitle the plaintiff to relief. *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                                Page 3
Not Reported in F.Supp.2d, 2002 WL 31974384 (N.D.Cal.), Fed. Sec. L. Rep. P 92,246
**(Cite as: Not Reported in F.Supp.2d, 2002 WL 31974384)**

(1957); *Williamson v. Gen'l Dynamics Corp.,* 208 F.3d 1144, 1149 (9th Cir.), *cert. denied,*531 U.S. 929, 121 S.Ct. 309, 148 L.Ed.2d 247 (2000). All allegations of material fact are taken as true and construed in the light most favorable to the nonmoving party. *Smith v. Jackson,* 84 F.3d 1213, 1217 (9th Cir.1996).

Review is limited to the contents of the complaint. *Allarcom Pay Television, Ltd. v. Gen. Instrument Corp.,* 69 F.3d 381, 385 (9th Cir.1995). When matters outside the pleading are presented to and not excluded by the court, a Rule 12(b)(6) motion is to be treated as one for summary judgment, and all parties shall be given opportunity to present all material made pertinent to such a motion by Rule 56. *See*Fed.R.Civ.P. 12(b). However, material that is properly presented to the court as part of the complaint may be considered as part of a motion to dismiss. *Lee v. City of Los Angeles,* 250 F.3d 668, 688-89 (9th Cir.2001). If a plaintiff fails to attach to the complaint the documents on which it is based, defendant may attach to a Rule 12(b)(6) motion the documents referred to in the complaint to show that they do not support plaintiff's claim. *Id.*

2. Federal Rule of Civil Procedure 9(b)

**\*3** Generally, plaintiffs in federal court are required to give a short, plain statement of the claim sufficient to put the defendants on notice.Fed.R.Civ.P. 8. In actions alleging fraud, however, "the circumstances constituting fraud or mistake shall be stated with particularity."Fed.R.Civ.P. 9(b). Under Rule 9(b), the complaint must allege specific facts regarding the fraudulent activity, such as the time, date, place, and content of the alleged fraudulent representation, how or why the representation was false or misleading, and in some cases, the identity of the person engaged in the fraud. *In re GlenFed Sec. Litig.,* 42 F.3d 1541, 1547-49 (9th Cir.1994). Because the plaintiff must set forth what is false or misleading about a particular statement, he must do more than simply allege the neutral facts necessary to identify the transaction; he must also explain

why the disputed statement was untrue or misleading at the time it was made. *Yourish v. California Amplifier,* 191 F.3d 983, 992-93 (9th Cir.1999).

3. Claims under the 1933 Act

Under § 11(a) of the 1933 Securities Act, any purchaser of a security covered by a registration statement may sue based on material omissions or misrepresentations in that statement. 15 U.S.C. § 77k(a). Persons liable under § 11(a) are those who signed the registration statement, directors of or partners in the issuer, professionals who participated in the preparation of the registration statement, and underwriters of the security. *Id.* In order to plead a § 11(a) claim, a plaintiff must allege that the registration statement contained an omission or misrepresentation, and that the omission or misrepresentation was material-that is, that it would have misled a reasonable investor about the nature of his or her investment. *In re Stac Electronics Sec. Litig.,* 89 F.3d 1399, 1403-04 (9th Cir.1996), *cert. denied,*520 U.S. 1103, 117 S.Ct. 1105, 137 L.Ed.2d 308 (1997).

Section 12(a)(2) of the 1933 Act makes it unlawful for any person to use any instrumentality of interstate commerce to offer or sell securities by means of a prospectus or oral communication that includes "an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading."15 U.S.C. § 77l(a)(2). To establish liability under § 12(a)(2), plaintiffs must allege that the defendants actively solicited purchase of the securities for "their own financial motives." *In re Stratosphere Corp. Sec. Litig.,* 1 F.Supp.2d 1096, 1120 (D.Nev.1998) (citing *Pinter v. Dahl.* 486 U.S. 622, 646-48, 108 S.Ct. 2063, 100 L.Ed.2d 658 (1988)).

Section 15(a) imposes joint and several liability upon every person who controls any person liable under § 11 or § 12. 15 U.S.C. § 77o. Thus, violation of § 15 is predicated upon violation of § 11 or § 12.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                    Page 4
Not Reported in F.Supp.2d, 2002 WL 31974384 (N.D.Cal.), Fed. Sec. L. Rep. P 92,246
**(Cite as: Not Reported in F.Supp.2d, 2002 WL 31974384)**

To state a claim for control person liability under § 15, a plaintiff must allege that the individual defendants had the power to control or influence the company, and that the individual defendants were culpable participants in the company's alleged illegal activity. *Durham v. Kelly,* 810 F.2d 1500, 1503 (9th Cir.1987).

### 4. Claims under the 1934 Act

*\*4* Section 10(b) of the Securities Exchange Act of 1934 provides, in part, that it is unlawful "to use or employ in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe."15 U.S.C. § 78j(b).

Rule 10b-5 makes it unlawful for any person to use interstate commerce

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.

In order to state a claim under § 10(b) and Rule 10b-5, the plaintiff must allege 1) a misrepresentation or omission 2) of material fact 3) made with scienter 4) on which the plaintiff justifiably relied 5) that proximately caused the alleged loss. *Binder v. Gillespie,* 184 F.3d 1059, 1063 (9th Cir.1999), *cert. denied,*528 U.S. 1154, 120 S.Ct. 1158, 145 L.Ed.2d 1070 (2000). A presumption of reliance is

available to plaintiffs alleging violations of § 10(b) based primarily on omissions of material fact, but not in cases alleging significant misrepresentations in addition to omissions, or alleging only misrepresentations. *Id.* at 1063-64.[FN5]

> FN5. A presumption of reliance is also available in a "fraud on the market" case, where the plaintiff alleges that a defendant made material representations or omissions concerning a security that is actively traded in an "efficient market." *Id.* at 1064 (citing *Basic, Inc. v. Levinson,* 485 U.S. 224, 247, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988)).

Section 14(a) of the 1934 Act regulates the solicitation of proxies with respect to any security registered under the Act. "It shall be unlawful for any person ... in contravention of [SEC rules and regulations] ... to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security" registered pursuant to the Act. 15 U.S.C. § 78n(a). SEC Rule 14a-9, which was promulgated under § 14, provides that

No solicitation subject to this regulation shall be made by means of any proxy statement, form of proxy, notice of meeting or other communication, ... containing any statement, which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading ...

17 C.F.R. § 240.14a-9.

Under § 20(a) of the 1934 Act, joint and several liability can be imposed on persons who directly or indirectly control a violator of the securities laws. 15 U.S.C. § 78t(a). Violation of § 20(a) is predicated on a primary violation under the 1934 Act. *Heliotrope Gen., Inc. v. Ford Motor Co.,* 189 F.3d 971, 978 (9th Cir.2000). Plaintiffs alleging a claim that individual defendants are "controlling persons"

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 5
Not Reported in F.Supp.2d, 2002 WL 31974384 (N.D.Cal.), Fed. Sec. L. Rep. P 92,246
**(Cite as: Not Reported in F.Supp.2d, 2002 WL 31974384)**

of a company must allege 1) that the individual defendants had the power to control or influence the company, 2) that the individual defendants were culpable participants in the company's alleged illegal activity, and 3) that the company violated the federal securities laws. *Durham v. Kelly,* 810 F.2d at 1503-04;*see also Howard v. Everex Sys., Inc.,* 228 F.3d 1057, 1065 (9th Cir.2000).

5. The Private Securities Litigation Reform Act

**\*5** The Private Securities Litigation Reform Act ("PSLRA") was enacted by Congress in 1995 to establish uniform and stringent pleading requirements for securities fraud actions, and "to put an end to the practice of pleading 'fraud by hindsight.' " ' *In re Silicon Graphics Sec. Litig.,* 183 F.3d 970, 958 (9th Cir.1999). The PSLRA heightened the pleading requirements in private securities fraud litigation by requiring that the complaint plead both falsity and scienter with particularity. *In re Vantive Corp. Sec. Litig.,* 283 F.3d 1079, 1084 (9th Cir.2002). If the complaint does not satisfy these pleading requirements, the court, upon motion of the defendant, must dismiss the complaint. 15 U.S.C. § 78u-4(b)(3)(A).

Under the PSLRA-whether alleging that a defendant "made an untrue statement of a material fact" or alleging that a defendant "omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances in which they were made, not misleading"-the complaint must now 1) "specify each statement alleged to have been false or misleading," 2) specify "the reason or reasons why the statement is misleading," and, if an allegation regarding the statement or omission is made on information and belief, 3) "state with particularity all facts on which that belief is formed."15 U.S.C. § 78u-4(b)(1).[FN6] If the challenged statement is not false or misleading, it does not become actionable merely because it is incomplete. *In re Vantive,* 283 F.3d at 1085;*Brody v. Transitional Hosp. Corp.,* 280 F.3d 997, 1006 (9th Cir.2002).

FN6. Matters that are not alleged on personal knowledge are considered to be alleged on information and belief. *See In re Vantive,* 283 F.3d at 1085 n. 3.

In addition-whether alleging that a defendant "made an untrue statement of material fact" or alleging that a defendant "omitted to state a material fact"-the complaint must now, with respect to each alleged act or omission, "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."15 U.S.C. § 78u-4(b)(2). In the Ninth Circuit, the requirement that the facts must give rise to a "strong inference ... [of] the required state of mind" means, for claims under § 10(b) and Rule 10b-5, that the complaint must allege that the defendant made false or misleading statements either intentionally or with deliberate recklessness.*Ronconi v. Larkin,* 253 F.3d 423, 429 (9th Cir.2001); *In re Silicon Graphics,* 183 F.3d at 977. The "required state of mind" for claims under § 14(a) and Rule 14a-9 is negligence. *See In re McKesson HBOC, Inc. Sec. Litig.,* 126 F.Supp.2d 1248, 1267 (N.D.Cal.2000).

On a Rule 12(b)(6) motion to dismiss a complaint brought under the PSLRA, when considering whether plaintiffs have shown a strong inference of scienter, "the district court must consider *all* reasonable inferences to be drawn from the allegations, including inferences unfavorable to the plaintiffs."*Gompper v. VISX, Inc.,* 298 F.3d 893, 897 (9th Cir.2002) (noting the "inevitable tension ... between the customary latitude granted the plaintiff on a [12(b)(6) ] motion to dismiss ... and the heightened pleading standard set forth under the PSLRA). In other words, the court must consider all the allegations in their entirety in concluding whether, on balance, the complaint gives rise to the requisite inference of scienter. *Id.*

B. Defendants' Motions to Dismiss

**\*6** The basis of the second amended complaint (SAC) is the claim that defendants misrepresented

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                    Page 6
Not Reported in F.Supp.2d, 2002 WL 31974384 (N.D.Cal.), Fed. Sec. L. Rep. P 92,246
**(Cite as: Not Reported in F.Supp.2d, 2002 WL 31974384)**

the financial condition and/or performance of Harmonic and C-Cube's DiviCom division during the period leading up to the merger and for some weeks thereafter-specifically, by failing to state during the first quarter of fiscal year 2000 that AT & T's orders of Harmonic components were declining, and that DiviCom's business had slowed following the two companies' October 1999 announcement of the upcoming merger.

1. The § 10(b) and Rule 10b-5 claims

a. The Harmonic motions

Plaintiffs claim that the Harmonic defendants made a number of false statements or misrepresentations during the period between January 19, 2000, and June 25, 2000. The misrepresentations were allegedly made by Ley and Dickson in three analysts conferences or meetings, and by Dickson in an on-line interview; and also appeared in one Harmonic press release; in eight joint Harmonic/C-Cube press releases; in seven analysts' reports issued following discussions between the analysts and Dickson, Ley, or unidentified Harmonic management; in Harmonic's 1999 Form 10-K and 1Q00 Form 10-Q; and in the Form S-R Registration Statement and joint proxy/prospectus, as follows:

1) a press release issued jointly by Harmonic and old C-Cube on January 19, 2000, stating that Harmonic had experienced a strong demand for its fiber optic products across a worldwide base of customers during the fourth quarter of 1999, and that the merger with DiviCom would double the size of the company and expand Harmonic's penetration into the broadband markets (SAC ¶¶ 54(a), 55(a));

2) the Registration Statement (including the joint proxy/prospectus) filed by Harmonic on March 23, 2000, providing Harmonic's revenue and earnings figures for the first three quarters of 1999, and comparing those figures to the figures for the first three quarters of 1998; and stating that any reduction of orders from a significant customer would harm the combined Harmonic/DiviCom business (SAC ¶¶ 58(a), 59);

3) statements made on March 28, 2000, possibly by Ley and Dickson, at a conference hosted by SG Cowen in Cannes, to the effect that Harmonic was seeing a strong demand from traditional operators, including AT & T; that AT & T's business was down from previous levels, but was still solid; and that the strong business trends that Harmonic had experienced over the previous year were continuing (SAC ¶ 60(a));

4) a report issued by SG Cowen analyst Carroll, repeating the March 28, 2000, statements possibly made by Ley or Dickson, to the *effect* that Harmonic management had stated that the strong business trends experienced by the company during the previous year were continuing, and that the company was seeing strong demand from traditional operators, including AT & T (SAC ¶ 60(a));

5) Harmonic's FY99 10-K, filed on March 30, 2000, stating that Harmonic expected that sales to AT & T and relatively few other customers would continue to account for a significant percentage of its net sales for the foreseeable future (SAC ¶ 61(a));

*7 6) a press release issued by Harmonic on April 3, 2000, stating that DiviCom had introduced new technology for processing data and video into one compressed stream (SAC ¶ 74);

7) a series of press releases issued jointly by Harmonic and C-Cube on April 3, 2000, April 12, 2000, April 13, 2000, and April 17, 2000 (alleged to be part of a "scheme to defraud" in violation of Rule 10b-5), stating that DiviCom had introduced new stream processing technology; that DiviCom and Geocast Network Systems, Inc ., would be working together to enable digital broadcasters to deliver both data and video content to personal computers; that DiviCom and Seachange International, Inc., would be working together to provide a method of inserting local advertisements into digit-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                    Page 7
Not Reported in F.Supp.2d, 2002 WL 31974384 (N.D.Cal.), Fed. Sec. L. Rep. P 92,246
**(Cite as: Not Reported in F.Supp.2d, 2002 WL 31974384)**

al cable channels; that DiviCom was being honored by Television Broadcast Magazine for its stream processing technology; and that the Guandong (China) Broadcast and Network Center had selected DiviCom to provide technology to be used in the expansion of the network's distribution system (SAC ¶¶ 72, 75-79);

8) a press release issued jointly by Harmonic and old C-Cube on April 19, 2000, stating that AT & T continued to be Harmonic's largest single customer, and that the merger with DiviCom would enable Harmonic to offer more complete solutions for cable operators and to expand its penetration into emerging broadband markets (SAC ¶¶ 62(a), 63(a));

9) statements allegedly made by either Ley or Dickson on April 27, 2000, at an analysts meeting in New York, to the effect that the DiviCom transaction would be neutral to slightly accretive; and that the acquisition of DiviCom would "create synergies" for Harmonic, combining Harmonic's products with DiviCom's encoding, interface, and multiplexing capabilities (SAC ¶ 66(a));

10) a report issued by analyst L.M. Harris of Josephthal on April 28, 2000, repeating the April 27, 2000, statements attributed to either Ley or Dickson (SAC ¶ 66(a));

11) a report issued by analyst Carroll of SG Cowen on May 4, 2000, based on Carroll's conversations with "Harmonic management," forecasting a 40% growth rate for the second quarter of 2000, with 2Q00 and FY00 earnings per share of $0.29 and $1.29 respectively; and stating that the DiviCom acquisition would have little impact on Harmonic's earnings (SAC ¶ 69);

12) a report issued by analyst Carroll of SG Cowen on May 9, 2000, based on statements made to Carroll by "Harmonic management, including Ley and Dickson," stating that business with AT & T continued to be strong, and containing a "strong buy" recommendation (SAC ¶ 70).

13) Harmonic's 1Q00 10-Q, filed on May 15, 2000, stating that domestic sales had increased 141% during the first quarter of 2000, primarily based on increased sales to AT & T and RCN (SAC ¶ 83(a));

14) a report issued on May 16, 2000, by CIBC, based on an alleged conversation with someone at Harmonic, stating that the DiviCom business had been slow in the first quarter of 2000, "driven by the general nature of large contracts from customers, which in turn causes quarter-to-quarter 'lumpiness' " and stating that Harmonic was optimistic about its ability to achieve 30-40% growth in 2000 (SAC ¶ 84);

*8 15) statements made by Dickson during an interview on WallStreet.com [FN7] on May 16, 2000, to the effect that the drop in the price of Harmonic's stock following the filing of its 1Q00 10-Q was a reflection of investor fear and uncertainty over the DiviCom acquisition; and stating the company's view that both DiviCom's business and Harmonic's business had a consistent growth rate, anticipated to be at around 35-40% (SAC ¶¶ 85, 86);

> FN7. As of the date of this order, Wall-Street.com is described as on-line "casino" and "sportsbook," publicly traded on the London Stock Exchange. See *http://www.wallstreet.com.*

16) a report issued by SG Cowen analyst Carroll on May 17, 2000, based on conversations with "Harmonic's management;" stating that the shortfall in DiviCom's growth for the first quarter of 2000 was likely due to merger-related disruptions and not indicative of a cyclical or secular issue within DiviCom's business (SAC ¶¶ 88(a));

17) a report issued by a Josephthal analyst on May 22, 2000, purporting to explain the reasons for the slowdown in DiviCom's growth in the first quarter of 2000 (SAC ¶ 90));

18) statements allegedly made by "Harmonic's management" to "select participants" at a CIBC

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 8
Not Reported in F.Supp.2d, 2002 WL 31974384 (N.D.Cal.), Fed. Sec. L. Rep. P 92,246
**(Cite as: Not Reported in F.Supp.2d, 2002 WL 31974384)**

Communications conference on June 12, 2000, to the effect that AT & T sales "lacked visibility," but that short-term targets (second quarter 2000) were still on track (SAC ¶ 92).[FN8]

> FN8. While the second amended complaint is a significant improvement over the first amended complaint, in terms of the clarity of the allegations, the court is still unable to determine the exact number of statements alleged to be misleading. In their motions to dismiss, the Harmonic defendants identify twelve alleged misrepresentations, some with subparts, all of which are referenced in the list set forth above.

Plaintiffs do not claim that any of these statements were false at the time they were made. Rather, they assert that defendants omitted to state material facts necessary in order to make the statements not misleading, in light of the circumstances in which they were made. The "facts" that plaintiffs claim were necessary to make the statements not misleading fall into two categories: facts about AT & T's current requirements for Harmonic products and future plans with regard to ordering such products, and facts about DiviCom's financial results in the fourth quarter of 1999 and first quarter of 2000. Plaintiffs claim that defendants knew that AT & T had been canceling and "pushing out" orders throughout 1999, that the record sales or shipments for the fourth quarter of 1999 essentially reflected AT & T's obligation to accept delivery of huge quantities of custom-built product that it could not cancel, and that AT & T was placing few new orders in 2000. Plaintiffs also assert that defendants knew that many of DiviCom's customers had withdrawn their orders after the announcement of the merger plans because they were concerned that the focus of DiviCom's development efforts would no longer be on the satellite products, but rather on the cable products, and that as a result, DiviCom's sales had started dropping at some point shortly thereafter.

Plaintiffs contend that the statements that Harmonic was seeing strong demand from traditional operat-ors such as AT & T, and that Harmonic's strong business trends were continuing-e.g., statements 1 through 5 and 12, above-were misleading because defendants did not include the information that AT & T was accepting product only because it could not cancel the orders, and was not expected to order a lot of product in the first quarter of 2000. Similarly, plaintiffs claim that any statement favorable to DiviCom or the prospects for the Harmonic/DiviCom merger-e.g., statements 1, 6 through 10, and 14 through 16, above-was misleading because defendants either failed to state that DiviCom's business was down, or presented DiviCom in a more positive light than was warranted under the circumstances. Defendants argue that the § 10(b) claims should be dismissed because plaintiffs fail to allege a misrepresentation with regard to either AT & T or DiviCom, fail to allege facts supporting the allegations made on information and belief, and fail to plead particularized facts giving rise to a strong inference of scienter, as required under the PSLRA.

### Statements about AT & T

**\*9** With regard to the statements that demand for Harmonic's products was "strong" during the fourth quarter of 1999 and that AT & T continued to be Harmonic's largest customer, plaintiffs allege no facts showing that such statements were misleading at the time they were made. Plaintiffs do not contend that the financial results reported by Harmonic for 1999 were inaccurate. Nor do they dispute that Harmonic's sales to AT & T increased substantially during that year or that AT & T was Harmonic's largest customer. Rather, plaintiffs suggest that these statements about historical financial performance were misleading because Harmonic did not disclose factors that might cause its performance to be different in the future, such as AT & T's alleged desire to cancel orders for custom products or alleged intention not to order as many Harmonic products in the future as it had in the past.

Plaintiffs' allegations are insufficient to state a claim of fraud under § 10(b) or Rule 10b-5 because

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                 Page 9
Not Reported in F.Supp.2d, 2002 WL 31974384 (N.D.Cal.), Fed. Sec. L. Rep. P 92,246
(Cite as: Not Reported in F.Supp.2d, 2002 WL 31974384)

the "undisclosed material facts" about AT & T are not alleged with the particularity required by the PSLRA. Plaintiffs assert, based on information provided by one of their confidential witnesses, that Harmonic "benefitted from large shipments of custom built components to AT & T which allowed Harmonic to report very favorable results."SAC ¶¶ 54(b); 61(b), 62(b), 83(b). Nevertheless, apart from the references to information obtained from various confidential witnesses, and generalized statements (in the paragraphs alleging scienter) concerning weekly order forecasts provided by AT & T to Yost and to Harmonic's Director of Materials, and concerning defendants' "monitoring of AT & T," plaintiffs provide no details about any specific order, or any specific weekly forecast, or about the alleged AT & T "backlog."

Further, plaintiffs fail to explain why information relating to the status of AT & T's upcoming orders renders the statements about Harmonic's 1999 performance materially misleading. Accurate statements of historical facts are not materially misleading, *In re Wells Fargo Sec. Litig.,* 12 F.3d 922, 930 (9th Cir.1993), *cert. denied,* 513 U.S. 917, 115 S.Ct. 295, 130 L.Ed.2d 209 (1994), and do not convey an implicit prediction that those events will continue in the future, *see In re Caere Corp. Sec. Litig.,* 837 F.Supp. 1054, 1058 (N.D.Cal.1993). Nor does disclosure of accurate historical data become misleading simply because less favorable future results might be predictable by the company. *In re Stac,* 89 F.3d at 1406;*see also In re Convergent Tech. Sec. Litig.,* 948 F.2d 507, 513 (9th Cir.1991) (historical reports do not imply any comparison between the rate of past and present growth). Thus, Harmonic had no duty to "state the 'fact' that future prospects [might] not be as bright as past performance."*In re VeriFone Sec. Litig.,* 11 F.3d 865, 869 (9th Cir.1993).

The statements allegedly made by the Harmonic defendants to the financial analysts, and the follow-up reports by those analysts repeating the same information, are inactionable for an additional reason:

it is impossible to tell from plaintiffs' allegations exactly which defendant is alleged to have communicated with which analyst. For example, in the allegations regarding the April 27, 2000, analysts conference, plaintiffs claim that either Ley *or* Dickson made the alleged misleading statements. SAC ¶ 66(a). In the allegations regarding the March 28, 2000, analysts conference, plaintiffs first assert that Ley *and* Dickson made the statements, but then add that even if Ley and Dickson did not personally make the statements, they were somewhere in the vicinity when the statements were made, and the statements can therefore be attributed to them because they did not make any attempt to correct the misleading impression created by the statements. SAC ¶ 60(a), (b).

*10 The "group-published" doctrine-under which plaintiffs alleging securities fraud based on claims of allegedly false and misleading statements in prospectuses, registration statements, annual reports, press releases, or other "group-published information" may rely on a presumption that such statements are the collective work of those individuals with direct involvement in the day-to-day affairs of the company, *In re GlenFed, Inc., Sec. Litig.,* 60 F.3d 591, 593 (9th Cir.1995) (citing *Wool v. Tandem Computers, Inc.,* 818 F.2d 1433, 1440 (9th Cir.1987))-does not apply to oral statements, such as those made in analysts meetings or conference calls. *In re Gupta Corp. Sec. Litig.,* 900 F.Supp. 1217, 1239 (N.D.Cal.1994). Nor does the group published doctrine apply to analysts reports, to the extent that the reports are based on information communicated orally in conference calls or elsewhere. *See id.* at 1240;*see also In re Network Equip. Tech., Inc., Litig.,* 762 F.Supp. 1359, 1367 (N.D.Cal.1991).

Thus, the allegations regarding statements not made by a particular defendant, or even, as described above, statements attributed to either Ley or Dickson, cannot provide the basis for a claim of securities fraud; nor can the analysts reports following up on such statements (reports issued March 28, 2000,

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 31974384 (N.D.Cal.), Fed. Sec. L. Rep. P 92,246
(Cite as: Not Reported in F.Supp.2d, 2002 WL 31974384)

Page 10

and April 28, 2000), or following up on statements made by unidentified "Harmonic management" (report issued May 4, 2000). Because plaintiffs fail to allege facts showing who made the statements, or to whom they were made or in what specific context, and do not "state with particularity all facts upon which [their] belief [that the statements were made by a particular person in a particular context] were formed,"15 U.S.C. § 78u-4(b)(1), these statements are not actionable under the PSLRA.

Moreover, to the extent that plaintiffs assert that the statements attributed to Ley, Dickson, "Harmonic management," or any of the Harmonic defendants-to the effect that "strong business trends" were continuing, and that the company was seeing "strong demand from traditional operators, including AT & T"-were misleading projections or forecasts because they failed to include information concerning the alleged declining sales to AT & T, the allegations in the second amended complaint are defective because plaintiffs fail to allege facts showing that the statements were unreasonable when made.FN9In other words, plaintiffs do not plead facts showing that defendants should have known that the status of AT & T's orders/sales was such that Harmonic was not continuing to experience a strong business trend.FN10

> FN9. "Strong" is a relative term. There is no dispute that AT & T was Harmonic's largest customer in 1999 and 2000, and plaintiffs do not provide any basis for measuring what was or was not a "strong demand" or a "strong business trend" in connection with the sales to AT & T or to any of Harmonic's other customers.

> FN10. This is apart from the fact that the statement that Harmonic was continuing to experience a "strong business trend" may be viewed as nothing more than an immaterial statement of corporate optimism. *See, e.g., In re Stratosphere Corp. Sec. Litig.,* 66 F.Supp.2d 1182, 1197-99 (D.Nev.1999); *In re Gupta,* 900 F.Supp. at

1235-37.

Finally, plaintiffs do not allege facts sufficient to create a strong inference of scienter. "Scienter" is defined as "a mental state embracing intent to deceive, manipulate, or defraud."*Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 193 n. 12, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976). Under the PSLRA, plaintiffs must state "specific facts indicating no less than a degree of recklessness that strongly suggests actual intent."*In re Silicon Graphics,* 183 F.3d at 979. "Reckless" conduct involves not merely simple, or even inexcusable negligence, but an "extreme departure from the standards of ordinary care," which presents a danger of misleading buyers or sellers and is either known to the defendant or is so obvious that the defendant must have been aware of it. *DSAM Global Value Fund v. Altris Software, Inc.,* 288 F.3d 385, 389 (9th Cir.2002) (citing *Hollinger v. Titan Capital Corp.,* 914 F.2d 1564, 1569-70 (9th Cir.1990), *cert. denied,*499 U.S. 976, 111 S.Ct. 1621, 113 L.Ed.2d 719 (1991)). Further, plaintiffs must allege facts giving rise to a strong inference that each individual defendant acted with scienter with regard to each act or omission alleged. *See*15 U.S.C. § 78u-4(b)(2).

*11 A plaintiff may establish scienter by means of circumstantial evidence, so long as the evidence meets the "strong inference" standard. *In re Silicon Graphics,* 183 F.3d at 986. For example, the plaintiff may allege "contemporaneous receipt of a report with information directly at odds with an alleged misrepresentation, the inference being that the conflicting data was timely read and remembered;" or "statements by witnesses that they told the actor the true facts before the false statement was made, the inference being that the actor heard and remembered the information, saw the discrepancy, and made the statement anyway."*In re Northpoint Communications Group, Inc., Sec. Litig.,* 184 F.Supp.2d 991, 997 (N.D.Cal.2001) (citation omitted).

In this case, plaintiffs attempt to show scienter based on a string of unsupported inferences.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                 Page 11
Not Reported in F.Supp.2d, 2002 WL 31974384 (N.D.Cal.), Fed. Sec. L. Rep. P 92,246
**(Cite as: Not Reported in F.Supp.2d, 2002 WL 31974384)**

Plaintiffs claim, first, that "[t]he Harmonic defendants monitored AT & T's inventory" via AT & T's weekly order forecasts; second, that, "as a result of [this] monitoring, each [Harmonic] defendant was aware that AT & T had been canceling and pushing out the scheduling of orders all throughout 1999" and that AT & T had an excessive inventory and backlog from its late-1999 purchases of Harmonic products; and third, that the Harmonic defendants therefore "knew [in early 2000] that AT & T's management of this inventory would result in a slowing of its purchases from Harmonic until this inventory was deployed by AT & T." SAC ¶ 62(c); *see also id.* ¶¶ 54(c), 61(c), 83(c), 102.

This string of inferences depends, in large part, on the allegations regarding the weekly reports from AT & T and Harmonic's MRP schedule. Plaintiffs assert that Harmonic prepared "Materials Requirements Plans" ("MRPs") based on information contained in "weekly order forecasts" provided by AT & T, but provide no specifics of any particular weekly report or MRP. The Ninth Circuit has emphasized that "a proper complaint which purports to rely on the existence of internal reports [will] contain at least some specifics from those reports as well as such facts as may indicate their reliability."*In re Silicon Graphics,* 183 F.3d at 985;*see also Lipton v. Pathogenesis Corp.,* 284 F.3d 3d 1027, 1035-36 (9th Cir.2002); *In re Vantive,* 283 F.3d at 1087-88. According to the Ninth Circuit, "[t]he reason for requiring such detail [is] that 'every sophisticated corporation uses some kind of internal reporting system reflecting earlier forecasts,' and that allowing a plaintiff 'to go forward with a case based on general allegations of "negative internal reports" would expose all those companies to securities litigation whenever their stock prices dropped." ' *In re Vantive,* 283 F.3d at 1088 (quoting *In re Silicon Graphics,* 183 F.3d at 988).

In this case, as discussed above, while plaintiffs offer lengthy conjecture about the significance of the internal reports, they provide no specifics of AT &

T's "weekly forecasts"-author, date prepared, contents-or even of Harmonic's own MRPs. While plaintiffs may have adequately alleged the *existence* of the AT & T forecasts and the Harmonic production schedules, they do not allege facts supporting the claim that defendants intentionally misled investors. They assert that "[t]he Harmonic defendants monitored AT & T's inventory and AT & T's use of Harmonic's products," but provide no facts to support that contention or the contention that each Harmonic defendant "was aware that AT & T had been canceling and pushing out the scheduling of orders all throughout 1999."[FN11] SAC ¶¶ 54(c), 61(c), 62(c), 83(c). Even more damaging to plaintiffs' claim is the lack of facts alleged to support the denouement of this string of inferences-that the Harmonic defendants "therefore knew" that AT & T would be slowing its purchases of Harmonic products until the backlogged inventory had been "deployed ." In short, plaintiffs fail to plead, in great detail, facts that constitute strong circumstantial evidence that any particular defendant made a single misleading statement either intentionally or with deliberate recklessness, as required by the PSLRA. *See Ronconi,* 253 F.3d at 429;*In re Silicon Graphics,* 183 F.3d at 974.

> FN11. Moreover, even had AT & T informed the Harmonic defendants of its business plans for 2000. Harmonic could not have known with certainty how much product AT & T would be ordering, or whether any reduction in orders would continue for a short time only, or indefinitely. *See In re Stac,* 89 F.3d at 1406-07.

### Statements about DiviCom

***12** Similarly, plaintiffs do not allege facts showing that the statements about DiviCom and the prospects for the upcoming merger with Harmonic lacked a reasonable basis when made. For example, they plead no facts showing that it was not reasonable to believe that Harmonic would double in size after the merger. Nor do they allege facts to support either the assertion that large numbers of Di-

Not Reported in F.Supp.2d                                                                Page 12
Not Reported in F.Supp.2d, 2002 WL 31974384 (N.D.Cal.), Fed. Sec. L. Rep. P 92,246
**(Cite as: Not Reported in F.Supp.2d, 2002 WL 31974384)**

viCom's customers had been diverted to DiviCom's competitors, or, more to the point (even if one assumes as true the claim that customers were diverted), that the merger of DiviCom with Harmonic would not be successful or produce the results anticipated by Harmonic.

The allegations in general lack the requisite particularity. Plaintiffs claim that DiviCom's sales began to drop in the first quarter of 2000, and then assert, in conclusory terms, that the Harmonic defendants "failed ... to disclose DiviCom's poor performance to the market, despite the fact that ... DiviCom's sales weakness had become 'common knowledge' among Harmonic management and employees well before the merger."SAC ¶ ¶ 59(e), 63(c), 65(c), 66(d), 87(b). The source of this information-that the weakness in DiviCom's sales was "common knowledge" among "Harmonic management" is alleged to be "former employees." *Id.* However, plaintiffs do not allege facts showing that these employees were in a position to know what was or was not known to Harmonic management. Nor do plaintiffs specify the amount by which DiviCom's sales declined, or quantify in any way the impact of the slowdown on DiviCom's business. Moreover, they plead no facts showing why a particular level of sales in the first quarter of 2000, the quarter before the merger was finalized, would necessarily have resulted in a fall in earnings for the combined company after the merger. They merely assert that the decline in sales was "common knowledge," and then claim that the financial statements in Harmonic's 1Q00 10-Q provide confirmation.

The allegations regarding scienter are even more insubstantial. Plaintiffs provide no facts showing that any particular defendant knew or was deliberately reckless in not knowing that the alleged decline in sales would continue after the merger. Scienter cannot be alleged on the basis of "common knowledge," because the PSLRA requires that plaintiffs allege the required state of mind as to each defendant. *See*15 U.S.C. § 78u-4(b)(2). Plaintiffs assert, in a conclusory fashion, that well before the filing of

Harmonic's 1Q00 10-Q, defendants knew or recklessly disregarded that DiviCom's sales were far below market expectations, and that the merger would not be "synergistic" or "accretive to its second quarter 2000 earnings" (as either Ley or Dickson had allegedly stated at the April 27, 2000, analysts meeting). However, the second amended complaint falls far short of alleging facts that create a strong inference of deliberate or conscious recklessness with regard to any Harmonic defendant.

**\*13** With regard to the claim that defendants misled investors by failing to publish DiviCom's financial results for 1999 and the first quarter of 2000 before the scheduled date of the merger, plaintiffs fail to allege facts showing either that any Harmonic defendant knew the details of DiviCom's sales and revenues, or that Harmonic was under a duty to publish these results prior to the time of the merger. Moreover, Harmonic had already announced, when it filed its Form S-4 in March 2000, that it would be combining DiviCom's operating results with its own only from the date of the merger, which occurred during the second quarter of 2000; and C-Cube had announced in December 1999 that it would be reporting DiviCom as a "discontinued operation" in 2000, prior to the merger.

*Sale of Harmonic stock as motive*

Plaintiffs also assert that the Harmonic defendants' knowledge of the adverse information affecting Harmonic and DiviCom is demonstrated by the fact that some defendants sold a significant portion of their Harmonic stock during the class period. They claim that these stock sales show that defendants had a motive to mislead investors. Insider trading may be considered as circumstantial evidence that a statement was false when made. *Ronconi,* 253 F.3d at 435. "If insiders owning much of a company's stock make rosy characterizations of company performance to the market while simultaneously selling off all their stock for no apparent reason, their sales may support inferences both that their rosy characterizations are false and that they knew

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                        Page 13
Not Reported in F.Supp.2d, 2002 WL 31974384 (N.D.Cal.), Fed. Sec. L. Rep. P 92,246
**(Cite as: Not Reported in F.Supp.2d, 2002 WL 31974384)**

it."*Id.* at 434-35. However, not all sales of stock by corporate insiders will create a strong inference of scienter.

There are innumerable legitimate reasons that an insider might choose to sell some or all of her shares in the company. *Id.* at 435. The Ninth Circuit's cases dealing with pleading insider trading to prove scienter require that a plaintiff allege "unusual" or "suspicious" stock sales. *Id.* Insider trading is suspicious only when it is "dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed inside information."*In re Silicon Graphics,* 183 F.3d at 986 (citation omitted). The relevant factors are the amount and percentage of shares sold by the insiders, the timing of the sales, and whether the sales were consistent with the trader's previous history. *Id.; see also Lipton,* 284 F.3d at 1037; *Ronconi,* 253 F.3d at 435.

In this case, plaintiffs do not allege facts showing that defendants' sale of stock was dramatically out of line with prior trading practices, or that the sales were calculated to maximize the personal benefit from the alleged undisclosed information. Plaintiffs simply argue that the stock sales were suspicious because certain defendants sold large blocks of their stock during the period immediately preceding the merger. According to the second amended complaint, however, the only Harmonic employees who sold stock during that period were Flatow and Yost. After *Silicon Graphics,* a plaintiff "can no longer aver intent in general terms of mere 'motive and opportunity,' or 'recklessness,' but rather, must state specific facts indicating no less than a degree of recklessness that strongly suggests actual intent."*In re Silicon Graphics,* 183 F.3d at 979. In a case such as this, where plaintiffs fail to allege falsity with particularity, and also provide insufficient facts to support a strong inference of intentional recklessness with regard to the alleged misleading statements, the fact that two of the defendants, neither of whom was the CEO or was alleged to have made misleading statements, sold a portion of their holdings is not sufficient to show scienter.FN12

> FN12. Moreover, only one of the Harmonic defendants-Yost-sold stock before the date of the merger. Another defendant-Flatow-sold stock between the date of the merger and the close of the class period, but plaintiffs have stated that they do not oppose the dismissal of the § 10(b) claim against Flatow. Five of the outside directors-Kvamme, Lane, Lemieux, Nazarathy, and Vaillaud-sold no stock. Nor did Ley or Dickson, respectively, the CEO and CFO of Harmonic, and the only defendants specifically identified as having made statements alleged to have been misleading.

b. The C-Cube motions

*14 Plaintiffs allege that the C-Cube defendants made false or misleading statements in seven joint press releases (also referenced above); in the joint proxy/prospectus, filed March 24, 2000; and in a press release issued on April 24, 2000 (the day the shareholders of the two companies approved the merger), announcing C-Cube's earnings for the first quarter of 2000:

1) a press release issued jointly by Harmonic and old C-Cube on January 19, 2000, stating that "the combination [of Harmonic] with DiviCom will double the size of [Harmonic]," and that the parties expected that "DiviCom's strengths in digital compression and [Harmonic's] strengths in fiber optics will significantly enhance Harmonic's position in the broadband market" (SAC ¶ 55(a);

2) the March 23, 2000, Registration Statement, which included the joint proxy/prospectus, stating that the loss of, or reduction in orders from, any significant customer would have a negative effect on the combined business of Harmonic/DiviCom after the merger (SAC ¶ 58(a));

3) five press releases issued jointly by Harmonic

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                      Page 14
Not Reported in F.Supp.2d, 2002 WL 31974384 (N.D.Cal.), Fed. Sec. L. Rep. P 92,246
(Cite as: Not Reported in F.Supp.2d, 2002 WL 31974384)

and old C-Cube between April 3, 2000, and April 17, 2000 (alleged to be part of a "scheme to defraud" in violation of Rule 10b-5), stating that DiviCom had introduced new stream processing technology; that DiviCom and Geocast Network Systems, Inc., would be working together to enable digital broadcasters to deliver both data and video content to personal computers; that DiviCom and Seachange International, Inc., would be working together to provide a method of inserting local advertisements into digital cable channels; that DiviCom was being honored by Television Broadcast Magazine for its stream processing technology; and that the Guandong (China) Broadcast and Network Center had selected DiviCom to provide technology to be used in the expansion of the network's distribution system (SAC ¶¶ 72, 75-79);

4) a press release issued jointly by Harmonic and old C-Cube on April 19, 2000, stating that the merger with DiviCom would enable Harmonic to offer more complete solutions for cable operators and to expand its penetration into emerging broadband markets (SAC ¶ 63(a)); and

5) a press release issued by old C-Cube on April 24, 2000, reporting that its shareholders had approved the merger of DiviCom with Harmonic, and releasing 1Q00 earnings (but noting that the reported revenues were for the semiconductor division only, and that C-Cube's reported financials would reflect Divi-Com as discontinued operations) (SAC ¶ 65(a)).[FN13]

> FN13. As with the statements attributed to the Harmonic defendants, the court is not certain of the exact number of allegedly misleading statements that plaintiffs attribute to the C-Cube defendants. The second amended complaint identifies some statements as misleading, but quotes other statements and leaves it up to the reader to determine whether those statements are alleged to have been misleading. For example plaintiffs allege that immediately after the Registration Statement was filed

on March 23, 2000, "defendants embarked upon a course of conduct which operated as a fraudulent scheme to convince the shareholders and investors that DiviCom was actually a valuable business that was experiencing strong demand for its products and that the merger and spin off was in the best interests of all shareholders."SAC ¶ 72. They then assert that "in furtherance of that scheme," defendants issued "a 'blitzkrieg' of positive press releases," including, in April 2000, alone, six joint press releases each announcing DiviCom business wins. *Id.* The next paragraph alleges, "In this regard, on 3/27/00 C-Cube issued a press release announcing the filing of the Registration Statement and Joint Proxy Statement for a special meeting of the shareholders. *Id.* ¶ 73.In the six paragraphs immediately following this statement are descriptions of six press releases, *see id.* ¶¶ 73-79, announcing new products or cooperative business relationships with other digital technology companies. Following those allegations is the statement that "[t]his barrage of company news and announcements of new business was designed to distract the market from the true condition of DiviCom."*Id.* ¶ 81.Plaintiffs do not claim that any of the statements quoted in ¶¶ 73 and 75-79 were false, and do not explain whether some, all, a few, or none of them are alleged to have been misleading. Needless to say, pleading "a scheme to defraud" with the particularity required under the PSLRA necessitates more than allegations that a company made true statements about its business in an attempt to "distract the market."

Again, as with the Harmonic defendants, plaintiffs do not allege that the C-Cube defendants made any statement that was false. Instead, they contend that certain positive statements made by defendants dur-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 15
Not Reported in F.Supp.2d, 2002 WL 31974384 (N.D.Cal.), Fed. Sec. L. Rep. P 92,246
**(Cite as: Not Reported in F.Supp.2d, 2002 WL 31974384)**

ing the proposed class period, concerning DiviCom or the Harmonic-DiviCom merger, were materially misleading because they failed to state that DiviCom's sales had slowed shortly after the announcement of the merger. Plaintiffs assert that the information about this slow-down in sales was necessary to make the positive statements about the merger and the statements about DiviCom's products and business alliances not misleading.

**\*15** Plaintiffs allege that Tanberg, one of DiviCom's competitors, implemented a strategy in the first quarter of 2000 to increase its market share by "fanning the flames of worry" among DiviCom's satellite customers. Plaintiffs claim this action on information they obtained from their "Confidential Witness # 1" ("CW # 1") a former C-Cube employee. According to this unidentified source, Tanberg spread rumors that Harmonic intended, after the merger, to remove DiviCom from the satellite market and focus DiviCom's resources on cable products. Plaintiffs claim that DiviCom's largest customers "took Tanberg's 'bait'' ' and immediately began withdrawing orders from DiviCom and placing them with DiviCom's competitors, including Tanberg.

Plaintiffs allege that by April 24, 2000, the date that C-Cube released its earnings report for the first quarter of 2000 (the April 24 press release), defendants knew that DiviCom's revenues were flat and that its net income had declined by 50% from the first quarter of 1999. Plaintiffs claim that this information would have been material to the total mix of information in the marketplace about Harmonic, C-Cube, and the merger, but that rather than reveal it before the merger, defendants withheld the information until May 15, 2000, some 12 days after the merger had been finalized. Plaintiffs assert that the C-Cube defendants were motivated to conceal this information because "[t]hey were about to successfully dump a troubled business and were able to unload their C-Cube shares at an artificially inflated price prior to having those shares diluted by Harmonic stock, which would include the troubled DiviCom business."SAC ¶¶ 65(c).

The allegations in the second amended complaint regarding the C-Cube defendants are insufficient to state a claim under § 10(b) or Rule 10b-5 for two reasons. First, plaintiffs fail to plead fraud with particularity, as required by the PSLRA. They do not allege sufficient facts to support their claims, and, in particular, for matters that are alleged on information and belief, they do not state the facts upon which they base such belief. They do not plead, with specificity, contemporaneous facts showing that the challenged statements were misleading when made. More striking is the complete absence of any facts supporting a strong inference that the C-Cube defendants acted with deliberate recklessness. Second, the premise underlying their claim-that the C-Cube defendants had a duty to disclose DiviCom's financial results before they did-is unsupported by law.

In the July 5, 2001, order dismissing the first amended complaint, the court found that plaintiffs had failed to plead, with particularity, all facts supporting their claim that defendants had made false or misleading statements. The court discussed the deficiencies of the first amended complaint at some length, supporting its discussion with numerous examples (intended to be illustrative only). In the second amended complaint, plaintiffs have addressed some of the deficiencies and have pled additional facts, but still fail to allege facts with sufficient particularity to state a claim under the PSLRA.

**\*16** For example, plaintiffs allege that after Harmonic and C-Cube announced the merger in late October 1999, DiviCom's largest customers, including DirecTV, LookTV, and EchoStar, "openly expressed serious concern" that the focus of DiviCom's development would move from satellite products to cable products, and that those customers then cancelled their orders with DiviCom. SAC ¶¶ 59(c), 63(c), 66(e), 87(b). Plaintiffs claim that they obtained this information from the unidentified former C-Cube employee, CW # 1, the same source

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                 Page 16
Not Reported in F.Supp.2d, 2002 WL 31974384 (N.D.Cal.), Fed. Sec. L. Rep. P 92,246
**(Cite as: Not Reported in F.Supp.2d, 2002 WL 31974384)**

that allegedly provided the information concerning the rumors spread by C-Cube's competitor, Tanberg. According to plaintiffs, CW # 1 was employed in C-Cube's public relations department, and had some involvement with the issuance of C-Cube's press releases.

Plaintiffs do not state, however, how CW # 1 obtained his or her information, and do not provide sufficient details about CW # 1 to enable the court to determine whether the information from this unidentified former employee should be considered reliable.[FN14] Moreover, plaintiffs do not provide any information about DiviCom's sales, specify which purchase orders were withdrawn or the amount of the allegedly canceled orders, identify the individuals who expressed "serious concern" on behalf of DirecTV, LookTV, and EchoStar, or identify the C-Cube or DiviCom employees who communicated with these DiviCom customers.

> FN14. Reliance on an unidentified "confidential witness" is not per se improper under the PSLRA. *See McKesson,* 126 F.Supp.2d at 1271. While it is possible that plaintiffs in a suit brought under the PSLRA may plead particularized facts that include information obtained from an unidentified source, they should, at a minimum, describe how they gained the relevant information from the source; and what form the information took-whether it was written or oral; whether it consisted of recollections or contemporaneous descriptions, vague hints or detailed explanations. *See In re Network Assocs., Inc., Sec. Litig.,* 2000 WL 33376577 at *11 (N.D.Cal., Sept.5, 2000). In other words, they should provide sufficient facts about the source to provide some indicia of reliability, such as the specific duties of the individuals, and how they came to acquire the information. *See, e.g., In re Northpoint,* 184 F.Supp. at 999.

Plaintiffs claim that the result of this alleged slow-down in sales was "severely reduced morale at DiviCom, followed by massive attrition in DiviCom's sales department."*Id.* This information also originated with CW # 1 (apparently not employed in sales), but plaintiffs do not explain how CW # 1 obtained this information. Nor do they provide any facts about DiviCom's sales department, about the employees who left the company, or about how these departures of members of the sales force might have impacted DiviCom's sales. None of the facts alleged supports plaintiffs' claim that the statements in the press releases, concerning the anticipated benefits of the Harmonic/C-Cube merger, were misleading when made.

Plaintiffs also claim that Balkanski stated at some point "shortly after the announcement" that the merger would "never work." *Id.* Plaintiffs do not state how they know that Balkanski said this, or even where or to whom he said it. They provide no meaningful factual context for the statement, and do not explain why such a statement provides a reason that any of the statements attributed to the C-Cube defendants were misleading at the time they were made. Similarly, plaintiffs repeat the remark allegedly made by Beaver, Harmonic's Director of Purchasing, to the effect that Harmonic's purchase of DiviCom was "ludicrous," but they do not explain why an expression of opinion, in a stray comment by a Harmonic employee, provides a reason that true statements made by the C-Cube defendants were misleading at the time they were made.

**\*17** Plaintiffs contend that the April 24, 2000, press release was misleading because C-Cube knew that DiviCom's sales for the first quarter of 2000 were lower than they had been previously, but did not report DiviCom's financial results until May 15, 2000, in C-Cube's Form 10-Q for 1999. However, the April 24 press release reported that DiviCom's income for the quarter was $1.5 million, and the loss on C-Cube's disposal of DiviCom was $7.3 million, for a net loss of $5.8 million. These are the same figures that C-C-Cube reported in the May 15, 2000, 1Q00 10-Q. The April 24 press release stated

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                      Page 17
Not Reported in F.Supp.2d, 2002 WL 31974384 (N.D.Cal.), Fed. Sec. L. Rep. P 92,246
**(Cite as: Not Reported in F.Supp.2d, 2002 WL 31974384)**

that the merger with Harmonic had been approved, that C-Cube was reporting full financial results for the semiconductor division only, and that it was reporting financial results for DiviCom as "discontinued operations." Plaintiffs do not allege that any of these statements were false, and fail to allege with specificity that defendants failed to include any particular information that was necessary to make the statements not misleading.

Plaintiffs also contend that the "hypothetical warning" in the joint proxy/prospectus, that the loss of any key customer could have a negative effect on the combined business of Harmonic/DiviCom after the merger, was misleading because C-Cube did not state that DiviCom had already lost orders or customers. Plaintiffs support this claim with the allegations about the rumors allegedly spread by DiviCom's competitor, Tanberg. However, these allegations are not pled with specificity. Plaintiffs do not state how they learned that Tanberg was spreading these rumors; which customers withdrew their orders from DiviCom, when the orders were withdrawn, what the amount of the orders was, or how any of this affected DiviCom's business prospects.

The allegations relating to defendants' state of mind are equally thin. For example, plaintiffs do not explain why any of the defendants knew or should have known that the alleged cancellation of orders by satellite TV companies would have a negative impact on the merger or on Harmonic's sales after the merger. Nor do they explain what information any particular defendant had about DiviCom's sales or its sales department, about the reasons that any sales employees might have left the company, or about the morale in any DiviCom department. They do not indicate which defendants knew about Balkanski's statement, or explain any of those defendants learned about it. Nor do they state whether the C-Cube defendants knew about Beaver's statement, and if so, how they learned of it.

Instead, plaintiffs rely primarily on the theory that the the C-Cube defendants' sale of C-Cube stock during the class period shows that they were motiv-

ated to defraud investors.[FN15] Plaintiffs claim that the exercise of stock options and the sale of the underlying shares by defendants Brown, Foreman, Futa, Lookabaugh, McKinney, Padval, Reyes, Valentine, and Walczykowski shows their knowledge of the "adverse information" allegedly affecting Harmonic and DiviCom. Plaintiffs claim that these defendants sale of C-Cube stock shows unusual and suspicious trading patterns because defendants sold no shares during the five months preceding the class period.

> FN15. To the extent that plaintiffs allege that the C-Cube defendants were motivated by a desire to complete the merger, rather than simply a desire to personally profit from the sale of stock, the court notes that scienter cannot be inferred merely from the fact that defendants are attempting to conclude a merger or other legitimate business transaction. *See Lipton,* 284 F.3d at 1038 ("If scienter could be pleaded merely by alleging that officers and directors possess motive and opportunity to enhance a company's business prospects, virtually every company in the United States that experiences a downturn in stock price could be forced to defend securities fraud actions."(quotation and citation omitted)).

**\*18** As stated above, in the discussion of the Harmonic motions, insider trading may be considered as circumstantial evidence that a statement was false when made. *Ronconi,* 253 F.3d at 435. However, in interpreting the heightened pleading standards under the PSLRA, the Ninth Circuit had held that allegations of motive and opportunity, standing alone, are not sufficient to create a strong inference of deliberate recklessness. *See Howard,* 228 F.3d at 1063. In this case, plaintiffs not only fail to allege falsity with particularity, they also plead little in the way of facts supporting a strong inference of scienter. Thus, the sale of stock by the C-Cube defendants, which plaintiffs do not allege was in any way improper under the laws regulating

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                      Page 18
Not Reported in F.Supp.2d, 2002 WL 31974384 (N.D.Cal.), Fed. Sec. L. Rep. P 92,246
**(Cite as: Not Reported in F.Supp.2d, 2002 WL 31974384)**

the sale of stock by insiders, and which was not objectively unreasonable given that the C-Cube employees were required by the terms of the merger to exercise their options, is not sufficient in itself to meet the requirements of the PSLRA.

Finally, plaintiffs have not alleged facts supporting their claim that the C-Cube defendants had a duty to release the financial results for DiviCom earlier than they did. Silence, absent a duty to disclose, is not misleading under Rule 10b-5. *Basic,* 479 U.S. at 239 n. 17. There is no obligation to disclose material information simply because it exists. Issuers of securities are required to disclose material facts as mandated by SEC regulations, which do not impose a "continuous disclosure requirement," *see Gallagher v. Abbott Labs.,* 269 F.3d 806, 808-09 (7th Cir.2001), or when they are trading in their own securities, *see McCormick v. Fund American Cos.,* 26 F.3d 869, 875-76 (9th Cir.1994). Apart from that, a duty to disclose generally arises only where necessary to correct a prior statement that remains viable in the market and was inaccurate at the time it was made. This duty is otherwise known as the "duty to correct." *See In re Verity, Inc., Sec. Litig.,* 2000 WL 1175580 at *4 (N.D.Cal., Aug.11, 2000) (citing *Burlington Coat Factory Sec. Litig.,* 114 F.3d 1410, 1431 (3rd Cir.1997); *Stransky v. Cummins Engine Co.,* 51 F.3d 1329, 1331 (7th Cir.1995).

The Ninth Circuit's recent decision in *Brody* is instructive. In that case, the court considered whether plaintiffs had adequately alleged that statements made by the defendants in two press releases were misleading. The court noted that Rule 10b-5, by its terms, prohibits only misleading and untrue statements, not statements that are incomplete. *Brody,* 280 F.3d at 1006 ("Rule 10b-5 [does not contain] a freestanding completeness requirement"). The court emphasized that to be actionable under the securities laws, an omission must be misleading-"it must affirmatively create an impression of a state of affairs that differs in a material way from the one that actually exists"-and that to survive a motion to dis-

miss under the PSLRA, the complaint "must specify the reason or reasons why the statements ... were misleading or untrue, not simply why the statements were incomplete." *Id.*

*19 The court in *Brody* distinguished statements that are incomplete or do not include all relevant facts, but are nonetheless not misleading, from statements that affirmatively create a misleading impression. For example, the plaintiffs in *Brody* had alleged that a press release issued by the defendant corporation was misleading because it provided information about the company's stock repurchase program but did not include information about the possible takeover of the company. The court observed that if the press release had affirmatively intimated that no merger was imminent, "it may well have been misleading," but the actual press release neither stated nor implied anything about a merger. *Id.* The plaintiffs had also alleged that a second press release was misleading because it stated that the company had received "expressions of interest" from potential acquirers, when in fact it had received actual proposals from three different parties. The court found that this statement was not misleading because a "proposal" is an "expression of interest," and the press release had included sufficient information to communicate that these expressions of interest were more than preliminary inquiries. More importantly, the court found that the press release did not give the impression that the company had *not* received actual proposals from three parties, or otherwise mislead readers about the stage of the negotiations. *Id.* at 1006-07.

In this case, the essence of plaintiffs' claim against the C-Cube defendants is that it was deceptive for C-Cube to delay releasing DiviCom's financial results for the first quarter of 2000 until after the date of the merger.[FN16] They claim that information about DiviCom's earnings would have been material to any investor acquiring C-Cube stock during the subclass period, or exchanging C-Cube stock for Harmonic stock in connection with the merger,

Not Reported in F.Supp.2d                                                                    Page 19
Not Reported in F.Supp.2d, 2002 WL 31974384 (N.D.Cal.), Fed. Sec. L. Rep. P 92,246
**(Cite as: Not Reported in F.Supp.2d, 2002 WL 31974384)**

and assert that defendants misled investors by failing to publicly report that information before the date of the merger. Plaintiffs do not argue that the C-Cube defendants failed to disclose this information in violation of some SEC reporting requirement. Instead, they contend that the information should have been disclosed in order to make certain statements not misleading-the statements in the January 19, 2000, and April 19, 2000, joint press releases regarding the prospective benefits of the merger; the "hypothetical warning" in the March 23, 2000, Registration Statement that loss of any significant customer would have a negative effect on the combined Harmonic/DiviCom business after the merger; the statements in five joint press releases issued between April 3, 2000, and April 17, 2000, regarding DiviCom's products and business arrangements with other companies; and the April 24, 2000, press release releasing C-Cube's earnings for the first quarter of 2000. None of these statements was misleading, however, because none created a false impression with regard to DiviCom's earnings for the first quarter. Moreover, plaintiffs do not allege facts supporting their claim that defendants were aware of DiviCom's financial results in advance of the date the shareholders voted.

> FN16. C-Cube did not release financials for DiviCom for the fourth quarter of 1999, having stated in its Form 10-12G, filed with the SEC on December 29, 1999, that it would be reporting DiviCom as discontinued operations in its annual report. However, plaintiffs do not allege that C-Cube acted improperly in not reporting DiviCom's 4Q99 revenues in C-Cube's historical financial statements for FY99. C-Cube was required by applicable accounting rules to report DiviCom's results as discontinued operations. *See* Accounting Principles Board Opinion No. 30 ("operations of a segment that has or will be discontinued should be reported separately as a component of income"). As stated above, C-Cube announced in December 1999 that

it would be reporting DiviCom's financial results as discontinued operations after the merger had been finalized.

2. the § 14(a) and Rule 14a-9 claims

**\*20** Plaintiffs Glynn and Knollenberg allege that the Ley, Balkanski, and the directors of Harmonic and old C-Cube made false or misleading statements in the proxy solicitations that were distributed to subclass members who held Harmonic or old C-Cube stock on April 24, 2000, and still held those shares as of the day following the completion of the merger (May 3, 2000). Plaintiffs contend that the joint proxy was misleading in three ways. First, plaintiffs claim that the Harmonic and C-Cube directors misled investors when they stated that the merger was "in the best interests of" the shareholders and recommended to the shareholders that they approve the merger of DiviCom and Harmonic, because defendants knew that DiviCom sales were slipping precipitously prior to the merger.

The statement that the merger was "in the best interests of" the shareholders is an expression of opinion. *See In re McKesson*, 126 F.Supp.2d at 1265. To state a claim based on an expression of opinion, plaintiffs must allege particularized facts FN17 showing that the opinion was both subjectively and objectively false. *Id.; see also Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1095-96, 111 S.Ct. 2749, 115 L.Ed.2d 929 (1991). Here, plaintiffs do not allege particularized facts showing either that the directors did not sincerely hold the opinion that the merger was in the best interests of the shareholders, or that the merger was not, in fact, in the best interest of the shareholders as of March 23, 2000. Plaintiffs simply assert that, according to two unidentified former employees, DiviCom's sales began to drop shortly after the announcement of the merger in late October 1999. However, they do not explain how that fact translates into a determination that the merger was not in the best interests of the shareholders, let alone allege facts showing that the directors did not believe that the merger was advisable at they time they

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                    Page 20
Not Reported in F.Supp.2d, 2002 WL 31974384 (N.D.Cal.), Fed. Sec. L. Rep. P 92,246
**(Cite as: Not Reported in F.Supp.2d, 2002 WL 31974384)**

made the recommendation to the shareholders.

> FN17. The PSLRA pleading requirements apply to claims brought under § 14(a) and Rule 14a-9. Thus, as with claims under § 10 and Rule 10b-5, plaintiffs must not only specify each statement alleged to have been misleading and state the reason or reasons each such statement was misleading, but, for allegations made on information and belief, must also state with particularity all facts on which that belief is formed. 15 U.S.C. § 78u-4(b)(1).

Plaintiffs also assert that the statements in the joint proxy/prospectus regarding Harmonic's financial performance during the previous two years (comparing the growth in revenues and earnings for the nine months ending October 1, 1999, to the nine months ending October 2, 1998) were misleading because defendants knew that Harmonic's largest customer, AT & T, would not be buying as much Harmonic product in the future as it had in the past. The joint proxy/prospectus also incorporated by reference Harmonic's Form 10-Qs for the first three quarters of 1000, and plaintiffs assert that these public filings "misleadingly continued to reflect positive growth trends."

Finally, plaintiffs allege that the joint proxy/prospectus also contained misleading "hypothetical warnings" about the concentration of DiviCom's customer base and the negative effect that the loss of a key customer would have on the Harmonic/DiviCom business following the merger. Plaintiffs claim that these "hypothetical warnings" were misleading because at the time the joint proxy/prospectus was filed, defendants were aware that DiviCom's performance was down from its previous levels.

3. The § 11 and § 12(a)(2) claims

**\*21** The claims under the 1933 Act are alleged by plaintiffs Glynn and Knollenberg against the Har-

monic defendants only. Reiterating the allegations that the Harmonic defendants omitted to state in the Registration Statement dated March 23, 2000, and in the prospectus (which was included as part of the Registration Statement), that AT & T's orders of Harmonic were down and that DiviCom's sales had slowed after the October 1999 announcement of the Harmonic-DiviCom merger, plaintiffs allege that the Harmonic defendants violated §§ 11 and 12(a)(2) of the 1933 Act. Specifically, plaintiffs allege that Harmonic's March 23, 2000, Registration Statement "misleadingly highlighted Harmonic's explosive growth in revenue and earnings," SAC ¶ 144; that Harmonic's quarterly reports for the first three quarters of 1999, incorporated within the Registration Statement, "misleadingly continued to reflect positive growth trends," SAC ¶ 145; that the Registration Statement included a "hypothetical warning" that a reduction of orders from AT & T would harm Harmonic's business, and "misleadingly omitted to state that AT & T had already drastically reduced its orders to Harmonic, SAC ¶ 146; that the Registration Statement included a "misleading hypothetical warning" regarding the negative effect that a loss of a key customer would have on DiviCom's business, but omitted to state that product orders had already begun to drop, SAC ¶ 147.

In the July 5, 2001, order dismissing the first amended complaint ("the consolidated amended complaint"), the court found that Rule 9(b) applied to the §§ 11 and 12(a) claims because, as in *In re Stac,* "the gravamen of the complaint is plainly fraud and no effort is made to show any other basis for the claims" (citing *In re Stac,* 89 F.3d at 1405 n. 2). Notwithstanding plaintiffs' disclaimer in the second amended complaint that the §§ 11 and 12(a)(2) claims are not based upon fraud, SAC ¶ ¶ 141, 154, the court finds under the facts alleged, these causes of action do plainly sound in fraud. The court finds further that plaintiffs fail to state a claim under § 11 or 12(a)(2) because they do not allege fraud with particularity as required by Rule 9(b).*See In re GlenFed,* 42 F.3d at 1547-49. Fi-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 21
Not Reported in F.Supp.2d, 2002 WL 31974384 (N.D.Cal.), Fed. Sec. L. Rep. P 92,246
**(Cite as: Not Reported in F.Supp.2d, 2002 WL 31974384)**

nally, because plaintiffs fail to plead a primary violation, the § 15(a) claim must be dismissed as well.

### CONCLUSION

In accordance with the foregoing, the court hereby GRANTS defendants' motions to dismiss.[FN18] In dismissing the first amended complaint, the court granted leave to amend, and included comprehensive instructions. Plaintiffs then filed their second amended complaint. As detailed above, the second amended complaint does not comply with the requirements of Rule 9(b) and the Private Securities Litigation Reform Act. The court finds that the dismissal should be with prejudice. Plaintiffs fail to allege that defendants made any statements that were false or misleading at the time they were made and it does not appear that the complaint can be saved by any amendment. *See Desaigoudar v. Meyercord,* 223 F.3d 1020, 1026 (9th Cir.2000).

> FN18. Having found that plaintiffs have not adequately alleged claims under § 10(b), Rule 10b-5, § 14(a) or Rule 14a-9 against the C-Cube defendants, the court finds it unnecessary to address the arguments in the motion to dismiss filed by C-Cube Microsystems, Inc.

**\*22** This order fully adjudicates the motions listed at Nos. 91, 93, 97, and 98 on the clerk's docket for this case, and terminates the action and any pending motions.

IT IS SO ORDERED.

N.D.Cal.,2002.
In re Harmonic Inc.
Not Reported in F.Supp.2d, 2002 WL 31974384 (N.D.Cal.), Fed. Sec. L. Rep. P 92,246

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.