# TAB I

Westlaw.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2000 WL 33775286 (N.D.Cal.)
(Cite as: Not Reported in F.Supp.2d, 2000 WL 33775286)

Page 1

▷
In re HI/FN, Inc. Securities Litigation
N.D.Cal.,2000.
Only the Westlaw citation is currently available.
United States District Court, N.D. California.
In re HI/FN, INC. SECURITIES LITIGATION
No. C-99-4531 SI.

Aug. 9, 2000.

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS

ILLSTON, J.

*1 On August 4, 2000, this Court heard argument on defendants' motion to dismiss plaintiffs' First Amended Complaint. Having carefully considered the arguments of the parties and the papers submitted, the Court hereby DENIES defendants' motion to dismiss as to defendants Hi/fn and Farnham and GRANTS defendants' motion as to defendants Farnow, Walker, Whiting, Monsour and Harrah.

BACKGROUND

On October 8, 1999, plaintiffs filed this securities class action brought on behalf of all purchasers of common stock of Hi/fn, Inc. ("Hi/fn") between July 26, 1999 and October 7, 1999 ("the class period"). On March 17, 2000, plaintiffs filed their First Amended Complaint against Hi/fn. Plaintiffs also name as defendants Raymond J. Farnham ("Farnham"), Hi/fn's Chief Executive Officer and Chairman of the Board; Stephen A. Farnow ("Farnow"), Vice President of Operations; William Walker ("Walker"), Vice President of Finance and Chief Financial Officer; Douglas D. Whiting ("Whiting"), Chief Technology Officer; Robert A. Monsour ("Monsour"), Vice President of Marketing; and Robert C. Harrah ("Harrah"), Vice President of Sales (collectively, the "individual defendants"). Plaintiffs allege (1) violation of § 10(b) of the Securities and Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78a-7811, and Rule 10b-5 promulgated thereunder against all defendants, and (2) violations of § 20(a) of the Exchange Act against defendants Farnham and Hi/fn.

Hi/fn designs and markets semiconductor devices used to provide secure, high-bandwidth connections to the Internet and increased data storage. *See* First Amended Complaint ("FAC") ¶ 2. During all times relevant to this action, Hi/fn was dependent on two companies for 85% of its revenues: Quantum Corporation ("Quantum") and Lucent Technologies, Inc./Ascend Communications (hereinafter "Lucent").*Seeid.* ¶ 3. Plaintiffs allege that in June 1999, Hi/fn executives attended a meeting in which defendants learned that Lucent planned to "migrate Lucent's Ascend TNT product from a 48 port modem card to a 96 port card and eventually to a 256 port card," "which would result in a substantial reduction in Lucent's requirements for Hi/fn's 7711 (subsequently 7751) processor chips."*Id.* Plaintiffs assert that defendants Farnham, Farnow, Monsour, Whiting, and Walker attended a meeting at Lucent's offices where John Peebles, a Lucent sales representative, offered a presentation of Lucent's "technology roadmap." *Id.* ¶ 36.Meeting participants learned that Lucent planned to develop modem boards with as many as 256 modem ports per card by June 2000. *Seeid.*Moreover, plaintiffs state that defendants were "advised" that this migration would result in a 50% decrease in Lucent's needs for Hi/fn's chips by the end of 1999. *Seeid.*This decrease was expected, because Lucent's existing 48 modem port card incorporated four Hi/fn chips, while the new 96 port modem card would require only two Hi/fn chips. *Seeid.* ¶ 63(b). Although Hi/fn sales representatives were concerned about the effect of Lucent's proposed new product development and the potential that Lucent would require 50% fewer Hi/fn parts, Farnham and Harrah "remained upbeat." *Id.* ¶ 37.

*2 Plaintiffs also contend that "during the same time period," Hi/fn became aware that Quantum

Not Reported in F.Supp.2d                                                                                                    Page 2
Not Reported in F.Supp.2d, 2000 WL 33775286 (N.D.Cal.)
(Cite as: Not Reported in F.Supp.2d, 2000 WL 33775286)

and its subcontractor were overstocked in their inventory of Hi/fn products and therefore intended to reduce their orders. *Id.* ¶ 4. Plaintiffs further state that at a June 1999 sales meeting, sales staff "confronted Harrah" about Quantum's inventory build-up, and later sent e-mails to senior management regarding the issue. *Id.* ¶ 27. Moreover, Farnham attended a Monday sales meeting to reassure the sales staff "about Quantum's business and to minimize the inventory problem."*Id.* ¶ 27. Farnham and Harrah also "frequently checked the booking, billing and forecast reports" to remain updated about these issues. *Id.* Plaintiffs allege that on July 26, 1999, Farnham, Farnow, and Walker received by e-mail an internal memorandum outlining Quantum's planned and actual shipments of products incorporating Hi/fn chips and Quantum's current inventory, and showing that Quantum would inevitably decrease orders. *See id.* ¶¶ 4, 29. This memo analyzed Quantum's DLT/4000 and DLT/7000 tape drives, which were manufactured using Hi/fn's chips, and compared the number of DLT drives shipped by Quantum with the number of parts that Hi/fn had already sold to Quantum, to conclude that Quantum had an inventory excess. *See id.* ¶ 29. Additionally, other reports were distributed to the individual defendants, including Weekly Booking Reports, Weekly Backlog Reports, Weekly Sales Forecasts, Monthly Sales Forecasts Reports, Quarterly Sales Forecast Reports, and an MRP Report from Quantum's subcontractor. *See id.* ¶¶ 28, 32. Plaintiffs contend that, in July 1999, concerned by the potential for reduced orders, Harrah "went directly to Quantum" and "received confirmation" of the "massive and dangerous inventory build-up." *Id.* ¶ 30.

The complaint alleges that the realization that Hi/fn's two largest customers would soon reduce their orders "resulted in growing concerns among Hi/fn's increasingly troubled sales staff."*Id.* ¶ 5. Plaintiffs assert that these concerns were expressed at the Quarterly Sales Meeting held at the Pruneyard Hotel in Campbell, CA from August 2-5, 1999. At this meeting, Hi/fn's sales staff allegedly forecast revenues of $43 million for fiscal year 2000, a slight increase over the $41 million earned in fiscal year 1999. *See id.* ¶¶ 5, 32. Plaintiffs contend that Farnham, Hi/fn's Chief Executive Officer, angrily wrote over this forecast, replacing it with a $65 million projection, telling the sales staff that they needed to "make it happen." *Id.* ¶¶ 5, 32. Plaintiffs state that this projection was made without any actual market or demand analysis, and that the sales staff believed there was no way to exceed its original $43 million projection. *See id.* Moreover, on August 25, 1999, Farnham, Farnow, and Harrah received an "internal memorandum" discussing Quantum's continued inventory build-up and suggesting a reduction in shipments. *Id.* ¶ 33. However, plaintiffs assert that no action was taken. *See id.*

*3 The complaint alleges that the individual defendants, "because of their positions with the Company,""possessed the power and authority to control the contents of Hi/fn's quarterly and annual reports, press releases and presentations to securities analysts, money and portfolio managers and institutional investors" and were "provided with copies of the Company's reports and press releases."*Id.* ¶ 18. Moreover, plaintiffs contend that the individual defendants had "daily business dealings with one another"; attended periodic planning and outlook meetings, department meetings, weekly sales meeting (chaired by Harrah), and weekly executive meetings (including Harrah, Mark Bernman, Monsour, Walker, and Farnow, and Nique Waluk); and "were kept apprised of all material developments regarding the Company's business."*Id.* ¶ 21. Plaintiffs further state that "defendants kept a constant eye on Quantum and Lucent's inventory levels, had constant dialogue with [Quantum and Lucent] ..., and therefore closely monitored and kept informed regarding such matters...."*Id.* ¶ 22.

Plaintiffs assert that, despite knowledge of an impending shortfall in business, defendants made public statements assuring an optimistic outlook for Hi/fn. Specifically, plaintiffs state that on July 29, 1999, *The Wall Street Transcript* published an in-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d  
Not Reported in F.Supp.2d, 2000 WL 33775286 (N.D.Cal.)  
**(Cite as: Not Reported in F.Supp.2d, 2000 WL 33775286)**

Page 3

terview with CEO Farnham and Operations VP Walker. *See id.* ¶ 56. In that interview, Farnham stated that the

> networking market opportunity will double year-on-year between now and the year 2002.... [W]e expect it to more than double in 1999. The other point I would make is that there's a lot of consolidation going on within our customer base. I don't necessarily see that as a concern or a risk as long as we're ware of it and we position ourselves to take advantage of it. FAC ¶ 56.

Plaintiffs also contend that, on July 26, 1999, defendants Farnham and Walker informed analysts, among other things, that Hi/fn expected returns of $65 million in fiscal year 2000 and that Hi/fn's outlook beyond September 1999 was positive. *See id.* ¶ 53 Finally, on September 8, 1999, Farnham allegedly told a CNBC interviewer that the market for data storage (dominated by Quantum) would increase approximately 20% per year, and that the networking market (dominated by Lucent) would more than "double" yearly for "the next 3 to 4 years." *Id.* ¶¶ 6, 61. Moreover, plaintiffs assert that, equipped with information of an impending revenue decline, the individual defendants collectively sold 105,170 shares of Hi/fn stock at prices as high as $114.88 from July 28, 1999 to August 17, 1999. *See id.* ¶ 10. Defendants as a group received proceeds of over $10 million. *See id.*[FN1]

> FN1. Plaintiffs assert the following sales: (1) defendant Farnham, 0 of 0 shares; (2) defendant Farnow, 50,000 of 66,565 shares, at $94.86 for proceeds of $4,743,000; (3) defendant Monsour, 10,000 of 139,881 shares, at $114.88 for proceeds of $1,148,800; (4) defendant Walker, 15,000 of 39,844 shares, at $112.62 for proceeds of $1,689,300; (5) defendant Whiting, 30,000 of 342,314 shares, at $99.05 for proceeds of $2,971,500; and (6) defendant Harrah, 170 of 170 shares, at $108.63 for proceeds of $18,467. *See* Summary of Insider Selling, FAC ¶¶ 10, 38.

Plaintiffs state that, on October 6, 1999, Hi/fn top executives attended a meeting at Hi/fn's Los Gatos office to discuss the fact that the company could not maintain its revenue forecast in light of expected reduced orders from its two major customers. *See id.* ¶ 7. Plaintiffs allege that at the conclusion of this meeting, defendant Walker, Hi/fn's Vice President of Finance and Chief Financial Officer, telephoned BancBoston Robertson Stephens and leaked information of the revenue shortfall to selected analysts. *See id.* Plaintiffs also contend that defendants held an October 7, 1999 conference call with "analysts, money and portfolio managers, Hi/fn shareholders, brokers, and stock traders." *ID.* ¶ 65. During this call, plaintiffs allege that Farnham and Walker conveyed that the information regarding Quantum and Lucent's orders was only recently learned. *See id.* "After word of the leak ... reached the market place," Hi/fn issued a press release and held a "conference call" regarding the shortfall. *Id.* ¶ 7. The information caused Hi/fn stock to decline from $104-3/4 at the close of trading on October 6, 1999 to $74 on October 7, 1999, and, after a temporary halt in trading, to a low of $37-3/4 at the close of trading on October 8, 1999. *See id.* ¶¶ 7, 64.

*4 Now before the Court is defendants' motion to dismiss plaintiffs' First Amended Complaint.

### LEGAL STANDARD

Under Federal Rule of Civil Procedure 12(b)(6), a district court must dismiss a complaint if it fails to state a claim upon which relief can be granted. The question presented by a motion to dismiss is not whether the plaintiff will prevail in the action, but whether the plaintiff is entitled to offer evidence in support of the claim. *See Scheuer v. Rhodes,* 416 U.S. 232, 236 (1974), *overruled on other grounds by Davis v. Scherer,* 468 U.S. 183, 104 S.Ct. 3012 (1984).

In answering this question, the Court must assume

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 3:07-cv-05545-SI   Document 33-10   Filed 05/05/2008   Page 5 of 13

Not Reported in F.Supp.2d                                                                                         Page 4
Not Reported in F.Supp.2d, 2000 WL 33775286 (N.D.Cal.)
**(Cite as: Not Reported in F.Supp.2d, 2000 WL 33775286)**

that the plaintiff's allegations are true and must draw all reasonable inferences in the plaintiff's favor. *See Usher v. City of Los Angeles,* 828 F.2d 556, 561 (9th Cir.1987). Even if the face of the pleadings suggests that the chance of recovery is remote, the Court must allow the plaintiff to develop the case at this stage of the proceedings. *SeeUnited States v. City of Redwood City,* 640 F.2d 963, 966 (9th Cir.1981).

If the Court dismisses the complaint, it must then decide whether to grant leave to amend. The Ninth Circuit has "repeatedly held that a district court should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts."*Lopez v. Smith,* 203 F.3d 1122, 1130 (9th Cir.2000) (citations and internal quotation marks omitted).

## DISCUSSION

Plaintiff alleges that three false statements were communicated to the public regarding defendant Hi/fn's projected revenue forecast. Specifically, plaintiffs contend that (1) a July 29, 1999 *Wall Street Transcript* article stated that defendant Farnham reported that the networking market would double yearly until the year 2002; (2) on July 26, 1999, defendants Farnham and Walker informed analysts that Hi/fn expected returns of $65 million in fiscal year 2000 and that Hi/fn's outlook beyond September 1999 was positive; and (3) on September 8, 1999, during a CNBC interview, defendant Farnham assured investors that the data storage industry would grow "in the 20% range per year" and that Hi/fn "expect[s] that for the next 3 or 4 years the networking piece of our business will more than double on a year-to-year basis."FAC ¶¶ 53, 56, 61. Plaintiffs contend that, because defendants had information that Hi/fn's business would not grow at the claimed rates, defendants made these statements with knowledge that they were false. Moreover, plaintiffs allege that defendants traded Hi/fn stock based on this undisclosed inside information. Plaintiffs assert that these actions violated § 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, and further that CEO/Chairman Farnham was a controlling person of Hi/fn creating liability under § 20(a) of the Exchange Act.[FN2]

> FN2. Section 10(b), codified at 15 U.S.C. § 78j(b), provides:
>
> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange...
>
> (b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.
>
> Rule 10b-5, codified at 17 C.F.R. § 240.10b-5, provides:
>
> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
>
> (a) To employ any device, scheme, or artifice to defraud,
>
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2000 WL 33775286 (N.D.Cal.)
**(Cite as: Not Reported in F.Supp.2d, 2000 WL 33775286)**

Page 5

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

Section 20(a), codified at 15 U.S.C. § 78t(a), states:

Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

A. Statements of Optimism

1. The Bespeaks Caution Doctrine

*5 Defendants assert that the disputed statements made by defendants fall within the scope of the "bespeaks caution" doctrine, because in Hi/fn's February, May, and June 1999 Forms 10-Q, defendants meaningfully and specifically warned the market of the company's high dependence on orders from Quantum and Lucent, and that a drop in those orders could result in damage to the company. Defendants argue that these risks need not be repeated in every optimistic statement set forth by the company.

Plaintiffs counter that this doctrine is inapplicable to the current action, because defendants are required to offer cautionary language with each forward-looking statement. Moreover, plaintiffs argue that defendants' disclosures in the Form 10-Q are "boilerplate disclaimers," because defendants failed to provide information regarding an *actual* reduction in orders.

The judicially-created "bespeaks caution doctrine" provides a mechanism by which a court can rule as a matter of law (typically in a motion to dismiss for failure to state a cause of action or a motion for summary judgment) that defendants' forwardlooking representations contained enough cautionary language or risk disclosure to protect the defendant against claims of securities fraud.

*In re Worlds of Wonder Sec. Litig.,* 35 F.3d 1407, 1413 (9th Cir.1994) (*quoting* Donald C. Langevoort, Disclosures that "Bespeak Caution," 49 Bus.Law. 481, 482-83 (1994)). However, at this early stage the Court cannot conclude as a matter of law that defendants' July and September oral statements are protected by the general cautionary language found in defendants' SEC filing. Misleading oral statements are not protected by cautionary language "spread out among various documents." *Copperstone v. TSCI Corp.,* No. C 97-3495 SBA, slip op. at 20 (N.D.Cal. January 19, 1999) ("Courts are generally reluctant to hold that a forward-looking statement is protected by cautionary language contained in documents other than that which contains the forward-looking statement."); *see also Powers v. Eichen,* 977 F.Supp. 1031, 1043-44 (S.D.Cal.1997). Hi/fn disclosed that "future success will depend upon our ability to establish and maintain relationships with" a small number of customers. February, May, and August 1999 Form 10-Q, at 13, attached as Exhs. 2, 3, 4 to Declaration of Jennifer L. Cahill ("Cahill Decl.")."If these network equipment vendors do not incorporate our packet processors into their products, our business, financial condition and results could suffer."*Id.* Although Hi/fn's Form 10-Q warned of the risk of a reduction in orders, those statements do not speak directly to the allegedly false statements. Assuming as true plaintiffs' allegations of knowledge regarding the imminent reduction of orders from Hi/fn's two largest customer, this generalized potential risk had become a reality. This Court cannot conclude that a prior and generalized cautionary statement was adequate as a matter of law to protect defend-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 3:07-cv-05545-SI   Document 33-10   Filed 05/05/2008   Page 7 of 13

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2000 WL 33775286 (N.D.Cal.)
(Cite as: Not Reported in F.Supp.2d, 2000 WL 33775286)

Page 6

ants' later oral statements.

2. Puffery

*6 Defendants also argue that the disputed "general statements of optimism" are not actionable, because they constitute vague and ambiguous "puffery" and "corporate cheerleading." Defendants contend that plaintiffs may not "string" together alleged misrepresentations, but rather must address each allegedly false statement individually and assert why each statement is false. Defendants assert that plaintiffs have not done so. Finally, defendants contend that allegations of historical fact are not actionable. Plaintiffs respond that statements that refer to a company's operations, stock value, revenue forecasts, and other matters of importance to investors are in fact actionable when viewed in the context of other misleading statements or omissions.

"[P]rojections and general expressions of optimism may be actionable" under federal securities laws. *In re Apple Computer Sec. Litig.,* 886 F.2d 1109, 1113 (9th Cir.1989). A forecast may be actionable if any of the following factors are correct: (1) the statement is not genuinely believed, (2) there is not a reasonable foundation for the belief, or (3) the speaker is aware of undisclosed facts that tend to undermine the accuracy of the projection. See *id.* Plaintiffs concede that accurate statements of historical fact do not form a basis for liability under federal securities laws. However, assuming the truth of plaintiffs' allegations of knowledge of imminent reductions in orders from Hi/fn's customers, defendants either did not genuinely believe their alleged statements or were aware of undisclosed facts that tended to undermine the accuracy of their statements. See *In re Peoplesoft. Inc. Sec. Litig.,* C 99-0472 WHA, slip op. at 6 (N.D.Cal. May 26, 2000). Although plaintiffs do not list subsequent to each statement the reasons for their belief that the statement was false, it is apparent that plaintiffs have alleged falsity based on the previously detailed undisclosed information. Accordingly, the Court concludes that the forecasts of significant increases in Hi/fn's business and revenues were not mere puffery and can be actionable.

3. Duty to Make Predictions

Defendants also argue that Hi/fn was under no duty to predict with precision if and when Quantum and Lucent would reduce their orders. Rather defendants assert that Hi/fn was simply obligated to identify and notify of risks within its knowledge. Plaintiffs respond that, even if defendants were not obligated to make predictions about another company's business, defendants' argument is made irrelevant by the fact that defendants in fact made positive predictions about the doubling of its customers' businesses, and should therefore be required to disclose any change in those forecasts.

A company is not charged with the ability to know "to a certainty" the plans of another entity. *In re Stac Sec. Litig.,* 89 F.3d 1399,1407 (9th Cir.1996). Defendants argue that *In re Stac* supports the further proposition that here, even if Quantum and Lucent had informed defendants that they soon intended to significantly decrease their orders, Hi/fn "could not have known whether ... [they] would truly do so." *Id.*

*7 This argument would be closer to the mark if Hi/fn's management had made no statements at all concerning the strength of the market for its products. Since Hi/fn chose to make such statements, however, and since their actual statements are alleged to have been false and misleading, their duty to disclose becomes academic.

In any event, the facts of *In re Stac* differ substantially from those at bar. In *Stac,* "the complaint basically alleged that Stac went public knowing, but without disclosing, that Microsoft was about to come out with a competitive product ... that would take away Stac's market ..." The Court noted, however, that the prospectus had "provided detailed disclosures concerning the risk of competition," including the possibility that Microsoft would incor-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 3:07-cv-05545-SI   Document 33-10   Filed 05/05/2008   Page 8 of 13

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2000 WL 33775286 (N.D.Cal.)
(Cite as: Not Reported in F.Supp.2d, 2000 WL 33775286)

Page 7

porate a competitive technology in its products. *Id.* at 1405-1406. Moreover, the actual release of Microsoft's competitive product was contingent, because Microsoft's product "was liable to violate [Stac's] patent, as borne out by the state judgment against Microsoft."*Id.* at 1407. Under these circumstances, the court found no obligation on Stac's part to forecast Mircosoft's intentions as a competitor.

Here, defendants in fact chose to make predictions, which predictions plaintiffs allege to be false and misleading. Further, the disputed disclosures relate not to predictions as to competitors' behavior, but to statements made by and about customers on whom the bulk of Hi/fn's sales depended. No previous disclosures provided specific information regarding actual inventory build-ups or new product developments by Hi/fn's customers. Accordingly, taking as true plaintiffs' allegations that defendants had information that the predictions they were making were in fact incorrect, plaintiffs have stated a claim for violation of defendant's duty to disclose material information.

B. Pleading Standards and Scienter

Defendants contend that the disputed statements are not actionable, because plaintiffs have failed to plead particular facts giving rise to a strong inference that defendants had actual knowledge at the time the statements were made that the statements were false. Moreover, defendants contend that plaintiffs, pleading on information and belief, have not met the standard for setting forth all facts upon which their belief is based.

Federal Rule of Civil Procedure 9(b) provides that

In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally. Fed.R.Civ.P. 9(b).

To comply with Rule 9(b) in a securities action, a plaintiff must allege the time, place, and content of the alleged fraud, as well as the "circumstances indicating falseness" or "the manner in which [the] representations [or omissions at issue] were false and misleading."*In re GlenFed Sec. Litig.,* 42 F.3d 1541, 1544 (9th Cir.1994) (en banc) (alterations in the original).

*8 The Private Securities Litigation Reform Act of 1995 (the "Reform Act" or the "PSLRA") was enacted as an amendment to the Exchange Act. *SeeIn re Silicon Graphics Inc. Sec. Litig.,* 183 F.3d 970, 973 n. 2 (9th Cir.1999). Under the Reform Act:

In any private action arising under his chapter under which the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind. 15 U.S.C. § 78u-4(b)(2).

The required state of mind is "at a minimum, deliberate recklessness." *In re Silicon Graphics,* 183 F.3 at 983. Scienter may be pled and proven by reference to circumstantial evidence. *SeeIn re Peoplesoft Sec. Litig.,* No. C 99-0472, slip op. at 5 (May 26, 2000). However, when pleading on information and belief, a plaintiff must plead with "particularity" by "provid[ing] all facts forming the basis for [plaintiff's] belief in great detail."*In re Silicon Graphics,* 183 F.3d at 983; *see also*15 U.S.C. § 78u-4(b)(1). Therefore, the Reform Act has strengthened the pleading requirements of Federal Rule of Civil Procedure 9(b).

1. Particularity of Allegations

Defendants assert that plaintiffs have not offered sufficient corroborating detail (such as specific factual data, names of authors, identities of sources, job titles) regarding the July 26, 1999 and August 25, 1999 memoranda. Defendants also contend that plaintiffs do not provide adequate information regarding either the June and August 1999 meetings

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2000 WL 33775286 (N.D.Cal.)
(Cite as: Not Reported in F.Supp.2d, 2000 WL 33775286)

Page 8

with Lucent and Quantum, or Hi/fn's sales meeting. Therefore, defendants contend that these assertions amount to bald allegations that are impossible to verify.

Plaintiffs contend that the complaint is "replete with detailed factual allegations," regarding internal memoranda and meetings through which defendants learned of Quantum and Lucent's plans to reduce orders. Plaintiffs assert that information concerning the documents and meetings, including formats, dates, attendees, and recipients, is sufficient to meet the pleading requirements.

The Court finds that plaintiffs' factual allegations have been pled with particularity sufficient to satisfy the requirements of the Reform Act. Plaintiffs plead facts far beyond the facts offered in *In re Silicon Graphics Sec. Litig.*, Plaintiffs do not merely state that they have

alleged the foregoing based upon the investigation of their counsel, which included a review of SGI's SEC filings, securities analysts reports and advisories about the Company, press releases issued by the Company, media reports about the Company and discussions with consultants, and believe that substantial evidentiary support will exist for the allegations [ ] after a reasonable opportunity for discovery.

*In re Silicon Graphics Sec. Litig.*, 183 F.3d at 985. Nor do plaintiffs simply offer a laundry list of reports to which defendants had access. Rather, plaintiffs provide details of specific memoranda, the particular defendants who received them, the date on which defendants received the memoranda, the format in which the memoranda were conveyed (i.e. electronic mail), and the information contained in those memoranda. Plaintiffs also describe specific meetings between defendants and Hi/fn's sales staff. Plaintiffs provide the dates of the meetings, locations, the particular defendants who attended, and the information conveyed. Plaintiffs further allege a meeting between defendants and a Lucent sales representative. Accordingly, unlike the allegations in *Darlarne Partners, Ltd. v. Synch Research, Inc.*, No. SA CV 97-877 AHS, slip op. at 9 (C.D.Cal. Jan. 31, 2000), these facts do not constitute a "bald allegation" of the existence of reports or the occurrence of meetings. *See also Copperstone v. TSCI Corp.*, C 97-3495 SBA, slip op. at (N.D. Jan. 19, 1999) ("Without referencing ... any particular conversations ... which would demonstrate the falsity or misleading nature of the statements when made, there can be no sustainable allegation of recklessness or conscious behavior.") Therefore, the Court finds that plaintiffs' factual allegations satisfy the particularity requirements of the Reform Act.

2. Quantum Allegations

*9 Defendants argue that plaintiffs have not pled contemporaneous facts giving rise to a strong inference that defendant Farnham was aware that the disputed statements were false when he made them. Although the complaint asserts that the July 26, 1999 memorandum stated that Quantum had an excess of inventory and that slowdown would be "inevitable," defendants assert that this allegation is not pled with sufficient particularity. Defendant contends that plaintiffs must offer the actual contents of the document, the memorandum's author, the amount of excess inventory, and like information.

Defendants also assert that the alleged meeting between Harrah and Quantum must be stated with greater detail, including who attended, what was said, and when the meeting occurred. Moreover, defendants contend that plaintiffs have failed to offer an explanation for why Quantum continued to order Hi/fn chips through September 1999, if Quantum was aware of an inventory build-up three months earlier. Finally, defendants argue that the $65 million forecast offered by Farnham represented no more than the normal "tug of war" between a company's CEO and sales staff.

Plaintiffs counter that they have pled facts giving

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 3:07-cv-05545-SI   Document 33-10   Filed 05/05/2008   Page 10 of 13

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2000 WL 33775286 (N.D.Cal.)
(Cite as: Not Reported in F.Supp.2d, 2000 WL 33775286)

Page 9

rise to a strong inference of fraud, in detail more comprehensive and specific than that provided in the cases cited by defendants. Plaintiffs argue that, taking the allegations of meetings and internal reports as true, a strong inference of actual knowledge of falsity arises.

The PSLRA requires that plaintiffs plead facts giving rise to a "strong inference of scienter." *See* 15 U.S.C. § 78u-4(b)(2); *In re Silicon Graphics Sec. Litig.*, 183 F.3d at 985 (concluding that the PSLRA rejected the Second Circuit's "less stringent" interpretation of the "strong inference" pleading standard). Here, for purposes of a motion to dismiss the complaint for failure to state a claim, plaintiffs have done so. Unlike *In re FVC.Com Sec. Litig.*, No. C 99-1815 CRB, slip op. at 6 (N.D.Cal. Feb. 14, 2000), for example, plaintiffs do not simply allege that Hi/fn was somehow advised of Quantum's inventory build-up. Rather plaintiffs allege both specific oral communications between Quantum and defendant Harrah in June 1999, and that an internal memorandum circulated among particular defendants on July 26, 1999 that warned of Quantum's over-inventory. The allegations concerning Quantum are consistent with the particularity suggested by the court in *In re Oak Technology Sec. Litig.*, 1997 WL 448168 at * 5 (N.D.Cal. Aug. 1, 1997) (adequate pleading would include when defendant was informed of customer's anticipated change in purchasing pattern, when the change took place and the approximate amount of the change).

Therefore, the Court concludes that plaintiffs' complaint sets forth facts sufficient to give rise to a strong inference of scienter as to Quantum.[FN3]

> FN3. Defendants also complain that some of plaintiffs' allegations of meetings and internal reports resemble a laundry list of unparticularized documents. While this is true, the complaint does not rely on the lists alone, but rather incorporates as well the specific information discussed above. The complaint's identification of specific documents and meetings through which defendants gained knowledge of negative information before that material was released to the public provides sufficient corroborative detail to obviate the need for further identification of sources at the initial pleading stage.

3. Lucent Allegations

Defendants contend that plaintiffs' allegations regarding Lucent do not give rise to an inference of the required state of mind, for essentially the same reasons as were set out concerning Quantum. Defendants argue that plaintiffs do not provide adequate information regarding when or how Hi/fn learned that Lucent would cut orders, or whether Hi/fn itself had predicted such a reduction. Defendants also assert that the June 1999 discussions between Hi/fn and Lucent are not pled with adequate specificity. Plaintiffs contend that the complaints' allegations are sufficiently particular to infer the existence of scienter.

*10 For the same reasons as are set out above, the Court concludes that the pleading is sufficient to survive a motion to dismiss. The First Amended Complaint includes details regarding the timing of the Hi/fn-Lucent meeting, the meeting's attendees, the particulars of Lucent's product migration, and the fact that defendants were aware of the negative financial consequences to Hi/fn of Lucent's new technology roadmap. These factual allegations are sufficient to meet the PSLRA's pleading standard and to give rise to a strong inference that defendants were aware that their statements and market projections were inaccurate.

4. Stock Sales

Defendants argue that the alleged stock sales do not give rise to an inference of fraud, because stock sales per se are not evidence of intent. The individual defendants contend that their stock sales were not suspicious, because the sales occurred "long" before the end of the class period. Defend-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2000 WL 33775286 (N.D.Cal.)
(Cite as: Not Reported in F.Supp.2d, 2000 WL 33775286)

Page 10

ants also argue that the stock was not sold at the time it was sold in order to maximize personal benefit, but rather because the officers and directors were "locked up" and could not sell Hi/fn stock between March to July 1999.

Plaintiffs respond that the timing of defendants' stock sales may be probative of scienter. While the stock was sold seven weeks before the ultimate public release of information regarding the decrease in orders, it was also just two weeks after defendants found out that Hi/fn's customers would decrease orders and that the $65 million projection was therefore unattainable. Plaintiffs argue that this is circumstantial evidence that defendants knew that their statements were false.

Although "stock sales alone cannot create a strong inference of scienter," *Wenger v. Lumisys* 2 F.Supp.2d 1231, 1251 (N.D.Cal.1998), trading in unusual or "suspicious amounts or at suspicious times is probative of" scienter. *In re Silicon Graphics*, 183 F.3d at 987 (quoting *In re Apple Computer Sec. Litig.*, 886 F.2d 1109, 1117 (9th Cir.1989)). Relevant factors in determining whether sales are suspicious include (1) the amount and percentage of shares sold, (2) the timing of the sales, and (3) whether the sales were consistent with a past pattern of trading or other circumstances. *See In re Silicon Graphics*, 183 F.3d at 986.

The Court concludes that the facts stated by plaintiffs may be probative of scienter, given the allegations in this complaint. The facts here are unlike those in *In re Read-Rite Corp. Sec. Litig.*, No. C 98-20434 JF, slip op. at 3 (N.D.Cal. March 1, 2000), where plaintiffs' primary evidence to support scienter was stock sales which had occurred "many months"-over four and one-half months-prior to defendants' public disclosure of negative information. Here, defendants' sales occurred in July and August, while the disclosure occurred in October, and the sales were made near the time that plaintiffs allege that misrepresentations about Hi/fn's financial future were made to the market. Therefore, although defendants assert that adequate explanation exists for the timing of their stock sales, the Court concludes that plaintiffs' allegations present questions of fact as to those explanations, which are not best resolved on a motion to dismiss. Nor is the amount of stock sold, either in absolute numbers or in percentages, so low as to deprive the sales of any probative value.[FN4]

> FN4. Defendants argue that, as a group, defendants retained nearly 80% of their holdings and vested options (selling 118,170 shares for $10 million) and that defendant Farnham sold no stock, rendering the sales insignificant. Plaintiffs allege that defendant Farnow sold 50,000 of 66,565 shares; defendant Monsour sold 10,000 of 139,881 shares; defendant Walker sold 15,000 of 39,844 shares; defendant Whiting sold 30,000 of 342,314 shares; and defendant Harrah sold 170 of 170 shares. *See* FAC ¶¶ 10, 38. Defendant Farnham owned no Hi/fn stock. *See id.* Thus defendants collectively sold over 20% of their shares, but defendant Farnow sold over 75% of his shares, defendant Walker sold nearly 40% of his shares, and defendant Harrah parted with 100% of his shares. While not dispositive, these sales, collectively and individually, are sufficient to provide some evidentiary support for plaintiffs' allegations of scienter.

C. Statements to Analysts

*11 Defendants contend that plaintiffs may not hold Hi/fn liable for the reports of investment analysts because the complaint does not allege facts sufficient to show that Hi/fn put its "imprimatur" on the statements. Moreover, defendants argue that plaintiffs do not provide detailed facts regarding what information Farnham and Walker gave to the analysts and when the information was provided. Plaintiffs respond that they need not plead that defendants Farnham and Walker were "entangled" with analyst reports, because the complaint alleges that defendants directly communicated false and

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                           Page 11
Not Reported in F.Supp.2d, 2000 WL 33775286 (N.D.Cal.)
**(Cite as: Not Reported in F.Supp.2d, 2000 WL 33775286)**

misleading statements for which they are directly liable under Rule 10b-5. Plaintiffs also contend that they have provided sufficient information regarding defendants' communications with the analysts. The Court agrees with plaintiffs. Plaintiffs provide a detailed list of statements that defendants were alleged to have transmitted specifically on July 26, 1999. Therefore, the complaint pleads particular facts regarding what statements were made by defendants Farnham and Walker and when.[FN5]

> FN5. Defendants also contend that plaintiffs may not allege paraphrased statements, but rather must offer the actual words spoken. However, plaintiffs have alleged misleading statements which are neither "amorphous" nor "vague and impressionistic." *Copperstone v. TSCI Corp.*, No. C 97-3495 SBA, slip op. at 13 (N.D.Cal. Jan. 19, 1999) ("paraphrased statements are not per se invalid); *Wenger v. Lumisys* 2 F.Supp.2d 1231, 1246-47 (N.D.Cal.1998).

D. Liability of Individual Defendants Under § 10(b)

Finally, defendants argue that the individual defendants must be dismissed, because other than Farnham, none of the individual defendants made any actionable statements or omissions for which they could be liable pursuant to § 10(b) of the Exchange Act. Defendants argue that plaintiffs' allegations of a scheme is simply an attempt to circumvent this rule. Defendants also contend that the "group published information" doctrine, which provides that a company's top management is collectively responsible for a company's written statements, did not survive the Reform Act and, even if it did, does not apply to oral statements. Finally, defendants assert that plaintiffs have failed to allege that they traded contemporaneously with defendants and therefore have not adequately stated a claim for insider trading under § 10(b).

Plaintiffs counter that Hi/fn executives are in fact subject to the "group-publishing" presumption. Moreover, plaintiffs argue that defendants' sale of stock constitutes a deceptive act for purposes of § 10(b).

The Court agrees with defendants that no claim has been stated against any individual defendant except Farnham.

1. Scheme to Defraud

Because each defendant must meet "all the requirements for primary liability under Rule 10b-5," no cause of action for aiding and abetting a § 10(b) violation may be stated. *Central Bank of Denver v. First Interstate Bank of Denver,* 511 U.S. 164, 191, 114 S.Ct. 1439, 1455 (1994). Moreover, "scheme" allegations have been rejected as inconsistent with *Central Bank's* prohibition of "conspiracy" pleading. *SeeIn re Gupta Corp. Sec. Litig.,* 900 F.Supp. 1217, 1243-44 (N.D.Cal.1994); *In re Oak Tech Sec. Litig.,* 1997 WL 448168, at *9-10 (N.D.Cal. Aug. 1, 1997); *Stack v. Lobo,* 1995 WL 241448 (N.D.Cal. Apr. 20, 1995). Accordingly, plaintiffs' allegations of a scheme to defraud by individual defendants who are not alleged to have made statements do not support a claim for violation of § 10(b).

2. Group Published Information

*12 "Group published information" is information contained in documents such as prospectuses, SEC filings, annual reports, and press releases. *Wool v. Tandem Computers, Inc.,* 818 F.2d 1433, 1440 (9th Cir.1987); *see alsoGaylinn v. 3Com Corp.,* No. C 99-2185 MMC, slip op. at 14 (N.D. Cal. June 9, 2000). Such documents are presumed to constitute the collective actions of a company's officers. *Seeid.;In re GlenFed. Inc. Sec. Litig.,* 60 F.3d 591, 593 (9th Cir.1995). Defendants argue that the doctrine did not survive the Reform Act, but the Ninth Circuit has not addressed this issue and other district courts within the Circuit have upheld the doctrine's continued application. *SeeIn re Secure Computing Corp. Sec. Litig.,* No. C 99-1927 CW, slip op. at 24 (N.D. Cal. June 14, 2000) (citing cases).

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2000 WL 33775286 (N.D.Cal.)
(Cite as: Not Reported in F.Supp.2d, 2000 WL 33775286)

Page 12

In any event, however, the "doctrine does not apply to oral communications."*Gaylinn v. 3Com Corp.,* at 14, citing *Allison v. Brooktree Corp.,* 999 F.Supp. 1342, 1350 (S.D.Cal.1998). The essence of plaintiffs' claim in this case is that defendant Hi/fn, through defendant Farnham, made misleading positive statements at a time when they knew these statements to be false. As to these statements, the group published doctrine is insufficient to impose liability on the other individual defendants. Plaintiffs also allege that the August 1999 Form 10-Q and the July 26, 1999 press release are subject to the doctrine, but standing alone these documents are insufficient to meet the stringent pleading standards of the Reform Act and do not state claims for § 10(b) liability against the individual defendants other than Farnham.

3. Insider Trading Allegations

The Supreme Court has held that an insider's trading in the securities of his corporation on the basis of material, nonpublic information "qualifies as a 'deceptive device' under § 10(b)."*United States v. O'Hagan,* 521 U.S. 642, 651-52, 117 S.Ct. 2199, 2207 (1997) (quoting*Chiarella v. United States,* 445 U.S. 222, 228, 100 S.Ct. 1108, 1114 (1980)). However, the Ninth Circuit has concluded that "the scope of liability for insider trading claims under section 10(b) and Rule 10b-5 is confined to persons who traded contemporaneously with the insider ... [and] must be pleaded with particularity under Rule 9(b)."*Neubronner v. Milken,* 6 F.3d 666, 670 (9th Cir.1993). Plaintiffs have not pled contemporaneous trades.

The Court agrees with defendants that plaintiffs' allegations concerning stock sales by the individual defendants are inadequate to meet the pleading standards, for purposes of establishing individual violations of § 10(b).

CONCLUSION

For the foregoing reasons, the Court DENIES defendants' motion to dismiss as against defendants Hi/fn and Farnham; and GRANTS defendants' motion as to defendants Farnow, Walker, Whiting, Monsour and Harrah.

IT IS SO ORDERED.

N.D.Cal.,2000.
In re HI/FN, Inc. Securities Litigation
Not Reported in F.Supp.2d, 2000 WL 33775286 (N.D.Cal.)

END OF DOCUMENT