# TAB L



Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 3445631 (N.D.Cal.)
(Cite as: Not Reported in F.Supp.2d, 2005 WL 3445631)

Page 1

C
In re Netopia, Inc., Securities Litigation
N.D.Cal.,2005.
Only the Westlaw citation is currently available.
United States District Court,N.D. California.
In re NETOPIA, INC., SECURITIES LITIGATION
No. C-04-03364 RMW.

Dec. 15, 2005.

Michael David Braun, Andrew M. Schatz, Jeffrey S. Nobel, Justin S. Kudler, Tricia Lynn McCormick, Stanley S. Mallison, Robert S. Green, Patrick J. Coughlin, Darren J. Robbins, William S. Lerach, Marc A. Topaz, Richard A. Maniskas, Tamara Skvirsky, Timothy J. Burke, Aaron L. Brody, Jules Brody, Tzivia Brody, for Plaintiffs.
Howard S. Caro, Michael Ethan Liftik, Sara B. Brody, Susan D. Resley, Walter F. Brown, Jamaar M. Boyd, for Defendants.

ORDER DENYING IN PART AND GRANTING IN PART DEFENDANTS' MOTION TO DISMISS OR STRIKE

WHYTE, J.
*1 THIS ORDER RELATES TO: ALL ACTIONS

[Re Docket Nos. 81, 82, 85, 90, 100, 102, 103]

Defendants Netopia, Inc., Alan Lefkof, and David Kadish move to dismiss or strike certain portions of the consolidated amended complaint.[FN1] Kadish additionally moves to dismiss all claims against him under Fed.R.Civ.P. 12(b)(6). For the reasons given below, the court denies the defendants' motions to dismiss except as to the § 10(b)(5) claim against defendant Kadish, grants the motion as to the § 10(b)(5) claim against defendant Kadish with twenty days leave to amend, grants the motion to strike the allegations in paragraphs twenty-two through thirty-one, and denies the motion to strike other allegations.

FN1. Defendants William Baker and Thomas Skoulis join this motion. Baker makes additional arguments why the motion should be granted; Skoulis does not.

I. BACKGROUND

Plaintiffs constitute a class of all those who purchased Netopia, Inc., common stock from November 6, 2003, to August 16, 2004. They allege that Netopia and four of its officers or former officers- Alan Lefkof, David Kadish, William Baker, and Thomas Skoulis-engaged in fraudulent accounting practices that inflated the price of Netopia stock. After these alleged accounting irregularities came to light, the price of Netopia stock fell, harming the plaintiffs. The current complaint alleges two causes of action: (1) violation of section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and related Rule 10b-5, 17 C.F.R. § 240.10b-5, against all defendants, and (2) violation of section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), against all defendants other than Netopia.

The complaint contains lengthy narratives about the defendants' alleged wrongdoing in three Netopia transactions or attempted transactions. The first occurrence, referred to by the parties as the "Chicago transaction," involved an agreement for Netopia to supply Interface Computer Communications, Inc., ("ICC") with computer products, which ICC would in turn sell to the Chicago public school system. The second occurrence, the "Philadelphia transaction," was similar: Netopia was to sell ICC $750,000 worth of products, which ICC would then sell to the Philadelphia public school system. In the third occurrence, the "Swisscom transaction," Netopia allegedly shipped a large quantity of products to Swisscom AG just before the end of a quarter, distorting the picture of Netopia's business that investors received.

The Philadelphia transaction is, for the plaintiffs' action, the main event. Plaintiffs allege that in the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 3445631 (N.D.Cal.)
(Cite as: Not Reported in F.Supp.2d, 2005 WL 3445631)

Page 2

spring of 2003, Netopia began negotiating with ICC for Netopia to sell ICC software for the Philadelphia public schools. Consol. Am. Compl. ("CAC") ¶ 32. Peter Frankl was the Netopia salesman in charge of the Philadelphia transaction. *Id.* By September 2003, the individual defendants were aware that Frankl was possibly going to close a deal that would make the Philadelphia transaction worth at least $500,000. *Id.* ¶ 34.The Philadelphia school system did not have funds available for the purchase, though, meaning that the purchase would not take place before the end of the financial quarter on September 30, 2003. *Id.* ¶ 35.Lefkof and Skoulis thought the Philadelphia transaction would help Netopia meet Wall Street earnings estimates, so had Frankl negotiate a deal with ICC: ICC would give Netopia a purchase order for $750,400 worth of software, but the parties would orally agree that ICC had no obligation to pay Netopia until the Philadelphia schools ordered Netopia's software from ICC and paid ICC. *Id.* ¶¶ 35-45.Kadish drafted a purchase order for the transaction which contained no payment terms, although "Netopia's standard payment terms were 'net 30.' " *Id.* ¶¶ 42-43.

*2 This deal began to unravel almost immediately. Netopia's accounting department (apparently unaware of the oral contingency) sent ICC a letter asking ICC to confirm to KPMG LLP, Netopia's outside auditors, that ICC owed Netopia $750,400 for software. *Id.* ¶ 46.ICC responded by sending Frankl a letter confirming that ICC did not owe Netopia anything for the Philadelphia transaction until the Philadelphia school system ordered software from ICC and paid ICC for the software; Frankl received this letter on October 7, 2003.*Id.* ¶¶ 47-50.In late October, the Philadelphia school system made clear that it was not willing to purchase Netopia software anytime soon. *Id.* ¶¶ 51-52.KPMG learned that Netopia had not received the $750,400 and asked "Baker, Kadish and Lefkof about whether is was appropriate to recognize" revenue from the purchase order. *Id.* ¶ 54.

On November 5, 2003, Netopia reported its financial results for the quarter and financial year ending September 30, 2003. *Id.* ¶ 58.The $750,400 from the Philadelphia transaction was reported as income for the quarter and was the difference between Netopia reporting a net loss or net income for the quarter.*Id.* Netopia's stock price rose immediately afterwards. *Id.* ¶ 59.From November 10 and December 10, 2003, each of the individual defendants sold off hundreds of thousands of dollars worth of Netopia stock. *Id.* ¶ 64.

Netopia continued its efforts to get the Philadelphia school system to purchase software. *Id.* ¶¶ 65-66.In March 2004, Frankl and Skoulis tentatively brokered a deal whereby the Philadelphia schools would agree to purchase $375,000 worth of Netopia software, but Gateway Inc. would be added as a second middleman and take a 10 percent fee. *Id.* ¶ 66.Baker began asking ICC to start making payments since the sale was likely to go through. *Id.* ¶ 68-74.On April 27, 2004, ICC sent Baker and Frankl and e-mail reiterating that ICC's payments to Netopia were contingent on ICC being paid by the Philadelphia school system (and now Gateway), and that Netopia could expect a payment of around $300,000 in mid-June. *Id.* ¶ 75.In May 2004, Gateway received a purchase order from the Philadelphia school system for $375,000 worth of Netopia software. *Id.* ¶ 81.A month later, Gateway sent ICC a purchase order for the software in the amount of $337,500 .[FN2]*Id.*

> FN2. This amount represents the $375,000 price the Philadelphia school system was paying, less the 10 percent fee ($37,500) due to Gateway.

Baker, meanwhile, was still pressing ICC to pay Netopia $750,000. *Id.* ¶ 82.ICC's president, David Andalcio, informed Frankl that it would send Netopia about $50,000 at the end of June. *Id.* ¶ 83.Lefkof, apparently expecting ICC to adhere to its earlier statement about paying in mid-June, had Imelda Farrell, Netopia's "Corporate Controller," send Andalcio a letter proposing that ICC pay Netopia $750,400 in installments from June 28,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 3:07-cv-05545-SI    Document 33-13    Filed 05/05/2008    Page 4 of 10

Not Reported in F.Supp.2d                                                                                                Page 3
Not Reported in F.Supp.2d, 2005 WL 3445631 (N.D.Cal.)
(Cite as: Not Reported in F.Supp.2d, 2005 WL 3445631)

2004, to September 15, 2004. *Id.* ¶¶ 84-87. The next day, June 18, 2004, Andalcio called Farrell, rejecting the proposed payment plan. *Id.* ¶ 88. "Kadish then came to Ms. Farrell's desk, stood over Ms. Farrell and put the phone to his ear as well, and whispered answers into Ms. Farrell's ear for her to say in response to Mr. Andalcio's remarks."*Id.* (Plaintiffs do not disclose the contents of this conversation.)

*3 A week later, Andalcio e-mailed Baker that Andalcio was uncomfortable with the situation and had sought the advice of legal counsel. *Id.* ¶ 91. Andalcio wrote that, on the advice of counsel, ICC would not make any payments on the old purchase order, and requested a new purchase order that reflected all terms of the agreement between ICC and Netopia. *Id.* On July 1, 2004, Kadish e-mailed Andalcio that Netopia was willing to accept $337,500 as settlement of all claims between them, and enclosed an agreement to that effect dated June 30, 2004. *Id.* ¶ 93. Kadish stated that if ICC did not sign and return the proposed agreement by the next day, the "offer to compromise" would "be deemed withdrawn." *Id*. Andalcio responded the next day that his legal counsel had advised him not to sign the proposed agreement because ICC had done nothing wrong. *Id.* ¶ 94.

On July 22, 2004, the audit committee of Netopia's board of directors announced that it was investigating Netopia's dealings with ICC. *Id.* ¶ 96. Two months later, KMPG resigned as Netopia's outside auditor and withdrew its support for Netopia's financial statements for the year ending September 30, 2003. *Id.* ¶ 111. Skoulis and Frankl were fired, and Baker was forced to resign. *Id.* ¶¶ 97-98.

## II. ANALYSIS

A. All defendants' motion to dismiss certain portions of the complaint

The defendants move to dismiss "allegations about the Chicago transaction, Swisscom, and certain loss causation allegations because they do not allege facts upon which a claim for relief can be based." Defendants have not moved to dismiss either cause of action, and neither the Chicago transaction nor the Swisscom transaction corresponds directly to either the plaintiffs' § 10(b) or § 20(a) causes of action. By its own terms, there does not appear to be any way to grant partial dismissal of a claim under Fed.R.Civ.P. 12(b)(6). The defendants have not presented the court with any case where a court has dismissed under Fed.R.Civ.P. 12(b)(6) only part of a complaint except individual causes of action, nor can the court find such a case. The plaintiffs conceded at oral argument that a motion to strike would be a more appropriate way to obtain the result they seek.

The court assumes that Fed.R.Civ.P. 12(b)(6)'s language "failure to state a claim" means the rule should not be used on subparts of claims; a cause of action either fails totally or remains in the complaint under Fed.R.Civ.P. 12(b)(6).*See* Charles Alan Wright & Arthur R. Miller, *Federal Pleading & Procedure* § 1358 (3d. ed.2004); *but see Drewett v. Aetna Cas. & Sur. Co.,* 405 F.Supp. 877, 878 (W.D.La.1975) (Fed.R.Civ.P.12(b)(6)"may be used to challenge the sufficiency of part of a pleading such as a single count or claim for relief."). The defendants do not claim that the plaintiffs' § 10(b) or § 20(a) causes of action are missing an essential element. The defendants' motion to dismiss allegations about the Chicago and Swisscom transactions are therefore denied.

*4 Defendants also move to dismiss allegations that drops in Netopia's stock price in January, February, and April 2004 stemmed from a September 30, 2003, overstatement of Netopia's financial condition. As these time periods also do not correspond to a particular cause of action, the court likewise denies this portion of the defendants' motion to dismiss. The court also declines to treat this motion to dismiss as one for summary judgment.

B. All defendants' motion to strike certain portions

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 3445631 (N.D.Cal.)
(Cite as: Not Reported in F.Supp.2d, 2005 WL 3445631)

Page 4

of the complaint

The defendants move, in the alternative, to strike the allegations relating to the Chicago and Swisscom transactions, as well as the January, February, and April 2004 price drops. A court may strike "any redundant, immaterial, impertinent, or scandalous matter."Fed.R.Civ.P. 12(f). Motions to strike "are disfavored by the courts, and should not be granted unless it is clear that the matter to be stricken can have no possible bearing upon the subject matter of the litigation."*Naton v. Bank of Cal.,* 72 F.R.D. 550, 551 n. 4 (N.D.Cal.1976). The defendants indicate they are concerned about the scope of discovery if the complaint is this sprawling; the court can imagine other reasons the defendants want less in the complaint, such as a desire to cut down on negative publicity associated with this lawsuit.

The Chicago transaction appears to have been completed by September 2002. *See* CAC ¶¶ 30-31. This is well over a year before the beginning of the class period (November 6, 2003). The four pages of allegations covering the Chicago transaction are immaterial under Fed.R.Civ.P 12(f) because they are not necessary for the plaintiffs to state their § 10(b) or § 20(a) causes of action. The presence of the Chicago transaction allegations in the CAC risks "delay[ ] and confusion of the issues."*See Fantasy, Inc. v. Fogerty,* 984 F.2d 1524, 1528 (9th Cir.1993). The court will grant the defendants' motion to strike the allegations concerning the Chicago transaction, paragraphs twenty-two through thirty-one of the CAC. Because, though, of the Chicago transaction's similarity to the Philadelphia transaction, aspects of the Chicago transaction may still be relevant to the plaintiffs' case.

The court will not strike the allegations concerning the Swisscom transaction or the price drops because they occurred during the class period.

C. Kadish's motion to dismiss all causes of action against him

Kadish moves to dismiss both causes of action against him.

1. The section 10(b) cause of action

"To state a claim under Section 10(b), 15 U.S.C. 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b5, [plaintiffs] must allege: (1) a misstatement or omission (2) of material fact (3) made with scienter (4) on which [plaintiffs] relied (5) which proximately caused their injury."*DSAM Global Value Fund v. Altris Software, Inc.,* 288 F .3d 385, 388 (9th Cir.2002). Securities fraud is subjected to a heightened pleading standard. First, allegations of securities fraud are subject to the particularity obligations imposed by Fed.R.Civ.P. 9(b).*GlenFed, Inc. Sec. Litig.,* 42 F.3d 1541, 1545 (9th Cir.1994).Fed.R.Civ.P. 9(b) provides that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition[s] of mind may be averred generally."Second, under the Private Securities Litigation Reform Act (the "Reform Act" or the "PSLRA"), Pub.L. No. 104-67, 202 Stat. 737 (1995) (*codified at*15 U.S.C. §§ 77k, 77l, 77z-1, 77z-2, 78a, 78j-1, 78t, 78u, 78u-4, 78u-5), a plaintiff alleging a § 10(b) claim must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed."15 U.S.C. § 78u-4(b)(1).

*5 Kadish claims the allegations that he violated § 10(b) contain two fatal defects: there is no allegation he made a false statement, and the allegations of scienter are inadequate. Plaintiffs claim they have met the heightened standard because the Ninth's Circuit group publication doctrine,[FN3] *see Wool v. Tandem Computers, Inc .,* 818 F.2d 1433, 1440 (9th Cir.1987), survived the Reform Act. In *Wool,* the Ninth Circuit held that "[i]n cases of cor-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 3445631 (N.D.Cal.)
(Cite as: Not Reported in F.Supp.2d, 2005 WL 3445631)

Page 5

porate fraud where the false or misleading information is conveyed in prospectuses, registration statements, annual reports, press releases, or other 'group-published information,' it is reasonable to presume that these are the collective actions of the officers. Under such circumstances, a plaintiff fulfills the particularity requirement of Rule 9(b) by pleading the misrepresentations with particularity and where possible the roles of the individual defendants in the misrepresentations."*Id.* (citations omitted). The Ninth Circuit has yet to address the issue of whether the group-published information doctrine survives the Reform Act, and other courts are divided on the question.[FN4] *See Southland Sec. Corp. v. INSpire Ins. Solutions, Inc.,* 365 F.3d 353, 364 (5th Cir.2004).

> FN3. This doctrine is also referred to as the "group pleading doctrine." *See In re Oxford Health Plans, Inc.,* 187 F.R.D. 133, 142 (S.D.N.Y.1999).
>
> FN4. It appears that in no case from the Northern District of California has the Reform Act been found to have abrogated the group-published information doctrine, though few have analyzed the issue extensively. *See In re Adaptive Broadband Sec. Litig.,* 2002 U.S. Dist. LEXIS 5887, *52-53 (N.D.Cal.2002) (Conti, J.) ("[T]he doctrine has not been specifically abrogated, and is still good law in this Circuit."); *In re Secure Computing Corp. Sec. Litig.,* 120 F.Supp.2d 810, 821 (N.D.Cal.2000) (Wilken, J.) ("[T]he majority of the district courts in the Ninth Circuit that have addressed the issue have concluded that the group published information presumption survives the PSLRA"); *In re Network Associates, Inc., Sec. Litig.,* 2000 WL 33376577, *13 (N.D.Cal.2000) (Alsup, J.) (finding that allegations against defendants do not satisfy even the group-published information doctrine and dismissing for failure to state a claim).

This court feels that the better view is that the Reform Act precludes reliance on the group-published information doctrine in this case. As noted in *Glen-Fed,*Fed.R.Civ.P. 9(b) and the Reform Act constitute separate pleading hurdles in securities fraud cases. Pleading group-published information may still satisfy "the particularity requirement of Rule 9(b)," but it does not satisfy the more rigorous requirements of 15 U.S.C. § 78u-4(b)(1). One district court noted that

the continued vitality of the judicially created group-published doctrine is suspect since the PSLRA specifically requires that the untrue statements or omissions be set forth with particularity as to "the defendant" and that scienter be plead in regards to "each act or omission" sufficient to give "rise to a strong inference that *the defendant* acted with the required state of mind."15 U.S.C. § 78u-4(b) (emphasis added). To permit a judicial presumption as to particularity simply cannot be reconciled with the statutory mandate that plaintiffs must plead specific facts as to each act or omission by the defendant.

*Allison v. Brooktree Corp.,* 999 F.Supp. 1342, 1350 (S.D.Cal.1998).

According to the plaintiffs, paragraphs 100 and 129 of the CAC contain allegations that Kadish made false statements. Opp'n at 26-27. This paragraph from the CAC is representative of what plaintiffs claim sufficiently pleads Kadish violated § 10(b):

On April 19, 2004, after the close of trading in the market, Netopia issued a press release (the "April Press Release"). The April Press Release (which listed Defendant Baker as the "contact" person and quoted Defendant Lefkof), *inter alia,* reported a net loss for the second fiscal quarter of $1.6 million, or a loss of $0.07 per share and "trade receivables, net" of $15.185 million. Each of the Individual Defendants directly participated in the drafting of the April Press Release. On April 19, 2004, following the issuance of the April Press Release, Defendants Lefkof and Baker conducted a conference call (the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 3445631 (N.D.Cal.)
(Cite as: Not Reported in F.Supp.2d, 2005 WL 3445631)

Page 6

"April Conference Call") with securities analysts and investors, in which Defendants, *inter alia*, represented the net income, revenue and accounts receivable results reported in the April Press Release. Each of the Individual Defendants participated in the drafting of the prepared remarks stated at the outset of the April Conference Call.

*6 CAC ¶ 100(e); *see also id.* ¶¶ 100(a)-(d), 129.Such allegations do not, under the Reform Act, sufficiently plead that Kadish made a false statement, as the plaintiffs cannot rely on the group-published information doctrine. Plaintiffs therefore have not stated a § 10(b) claim against Kadish because the CAC does not contain an adequate allegation that he made a false statement.

Furthermore, the allegations that Kadish acted with scienter are also defective. The Reform Act sets a high standard for pleading scienter:

In any private action arising under this chapter in which the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.

15 U.S.C.A. § 78u-4(b)(2). The Ninth Circuit has held that the required state of mind in securities fraud cases is "deliberately reckless or conscious misconduct," and that allegations of "mere motive and opportunity" are insufficient. *In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 974 (9th Cir.1999).

Plaintiffs' allegations do not create "a strong inference" Kadish was aware that ICC did not owe Netopia $750,400 before the last alleged misstatements of April 19, 2004.[FN5] Anything Kadish knew after that date (roughly paragraph seventy-one of the factual section of the CAC and thereafter) is not directly relevant to Kadish's scienter. Kadish claims that the allegations in the CAC support an inference that he was unaware of the fraud of Lefkof, Baker, Skoulis, and Frankl. Mot. at 19. The court agrees that the CAC is not inconsistent with the theory that Kadish was unaware of the fraud; the CAC therefore does not "give rise to a strong inference that" Kadish was aware of the fraud.

> FN5. The statements alleged to be actionable under § 10(b) occurred on November 5, 2003; December 19, 2003; January 20, 2004; February 17, 2004; and April 19, 2004. CAC ¶ 100.

Plaintiffs have alleged that in September 2003, Kadish drafted a $750,400 purchase order for the Philadelphia transaction and e-mailed it to other Netopia employees with the message "Here is the form of PO we will receive."CAC ¶ 43. This draft purchase order contained no payment terms, although plaintiffs allege that "Netopia's standard payment terms were 'net 30.' " *Id.* ¶¶ 42-43.Plaintiffs also claim they have alleged that Kadish was involved in the cover-up of the true nature of the Philadelphia transaction. Opp'n at 29. This is doubtful. The complaint contains an allegation that Skoulis told Frankl to tell Andalcio that " 'everyone knows' (*i.e.*, Lefkof, Kadish and Baker)" that the Philadelphia transaction contained a hidden contingency. CAC ¶ 46. This falls far short of creating a strong inference that Kadish actually knew of the contingency; plaintiffs have merely alleged that somebody told somebody else to tell yet a third person that Kadish knew. Likewise, in April 2004 that "Kadish [was] becoming extremely concerned about the fact that Netopia was still carrying the $750,400 as part of its reported accounts receivables," *id.* ¶ 67, that Kadish sought to have ICC "enter into a payment plan" for the $750,400, *id.* ¶ 68, or that Kadish was making things difficult for Baker, *id.* ¶ 71, are not inconsistent with the theory that Kadish was unaware of the contingency and trying to ensure Netopia was paid $750,400 Kadish believed ICC owed.

*7 Kadish whispering into the ear of Farrell while she spoke to Andalcio is certainly suspicious, but

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 3:07-cv-05545-SI   Document 33-13   Filed 05/05/2008   Page 8 of 10

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 3445631 (N.D.Cal.)
(Cite as: Not Reported in F.Supp.2d, 2005 WL 3445631)

Page 7

plaintiffs do not provide the substance of Kadish's instructions to Farrell. Plus, this call occurred on June 18, 2004, after the last alleged misstatement on April 19, 2004.

Kadish's stock sales alone are inadequate to create a strong inference that Kadish acted with scienter. Kadish's late 2003 stock sales were made after Netopia had released favorable financial information; as the Ninth Circuit has noted, corporate officers often sell stock after such announcements. *Lipton v. Pathogenesis Corp.,* 284 F.3d 1027, 1037 (9th Cir.2002). Plaintiffs make much of the fact that Kadish did not sell any stock for the forty-four months preceding his late 2003 sales. Opp'n at 29. As Kadish points out, selling stock shortly after the announcement that Netopia had its first positive-income quarter since mid-2000 is not inherently suspicious. *See* Mot. at 22. "Although unusual or suspicious stock sales by corporate insiders may constitute circumstantial evidence of scienter, insider trading is suspicious only when it is dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed inside information."*Silicon Graphics,* 183 F.3d at 986. While his sale of 63 percent of his Netopia holdings in late 2003 is "dramatically out of line with [his] prior trading practices," the preceding forty-four months in which Kadish sold no stock largely corresponds with a period in which Netopia reported net losses each quarter. Therefore, in light of the lack of allegations showing Kadish had "undisclosed inside information," Kadish's sales are not necessarily suspicious.

Finally, plaintiffs allege that Kadish's temporary assignment as the salesman for the Swisscom account in late 2003 [FN6] creates a strong inference that Kadish was aware of misstatements related to the Swisscom transaction. Plaintiffs allege that Netopia shipped "millions of dollars" worth of software to Swisscom via boat "in the final days of December 2003."CAC ¶ 116. Accounting rules apparently dictated that Netopia recognize the revenue from the boat shipments as soon as they were sent, which was in December 2003. *See id.* ¶ 116.Plaintiffs nonetheless claim that recognizing such revenue in December 2003 distorted Netopia's financial picture, because Swisscom would need that much less product in the next quarter. Opp'n at 28-29. Plaintiffs, however, do not allege anything other than Lefkof appointed Kadish to manage the Swisscom account; there is no allegation that Kadish ordered the timing or method of the shipment, or was even aware software was shipped to Swisscom. This is insufficient under the Reform Act to show Kadish acted with the requisite scienter.

> FN6. Plaintiffs refer to the quarter ending December 31, 2003, as "the first quarter of 2004," CAC ¶ 117, which appears to comport with Netopia's financial year-end of September 30, *see id.* ¶ 58.Plaintiffs thus seem to allege that the firing of Karl-Heinz Mumm and the assignment of Kadish to the Swisscom account occurred "in the early part of" October, November, and December 2003. *See id.* ¶ 177.

Even though the plaintiffs' pleading of Kadish's scienter is inadequate when considered piecemeal, the court must also consider "whether the total of plaintiffs' allegations, even though individually lacking, are sufficient to create a strong inference that defendants acted with deliberate or conscious recklessness."*Lipton,* 284 F.3d at 1038. Considering the allegations of the CAC against Kadish as a whole, the court is compelled to decide that plaintiffs have not created a strong inference that Kadish acted with scienter. The drafting of the purchase order and the whispering into Farrell's ear are particularly suspicious, but significant details are omitted from the pleading of these actions. That many of Kadish's alleged actions are consistent with either Kadish being part of a conspiracy with the other defendants or Kadish working against the conspiracy prevents a *strong* inference from being drawn either way. As plaintiffs have not created a strong inference Kadish acted with scienter, the § 10(b) claim against him must be dismissed.[FN7]

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 3:07-cv-05545-SI   Document 33-13   Filed 05/05/2008   Page 9 of 10

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 3445631 (N.D.Cal.)
(Cite as: Not Reported in F.Supp.2d, 2005 WL 3445631)

Page 8

FN7. Plaintiffs did not raise allegations that Kadish engaged in insider trading in violation of Rule 12b-5 until their opposition to Kadish's motion to dismiss. *See* Opp'n at 27-28. Plaintiffs cannot add an insider trading claim in such a manner, and the court will not consider it further in connection with the current motion.

2. The section 20(a) cause of action

**\*8** Under § 20(a) of the Exchange Act,

Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a). The Ninth Circuit has held that "[i]n order to prove a prima facie case under § 20(a), plaintiff must prove: (1) a primary violation of federal securities laws ... and (2) that the defendant exercised actual power or control over the primary violator."*Howard v. Everex Sys., Inc.,* 228 F.3d 1057, 1065 (2000). Whether a defendant such as Kadish "is a controlling person is an intensely factual question, involving scrutiny of the defendant's participation in the day-to-day affairs of the corporation and the defendant's power to control corporate actions."*Kaplan v. Rose,* 49 F.3d 1363, 1382 (9th Cir.1994) (internal quotation marks and citations omitted)."[I]n order to make out a prima facie case, it is not necessary to show actual participation or the exercise of actual power; however, a defendant is entitled to a good faith defense if he can show no scienter and an effective lack of participation."*Howard,* 228 F.3d at 1065. The defendant bears the burden of proving he "acted in good faith and did not directly or indirectly induce the violations."*Id.*

Here, plaintiffs have made out a *prima facie* case for a § 20(a) violation by Kadish. The first element is met: Defendants do not challenge that the CAC contains an adequately-stated claim for a § 10(b) violation by Skoulis. The second element is also met: Plaintiffs allege that Skoulis reported to Kadish. CAC ¶ 11. Kadish bears the burden proving good faith, which he cannot meet solely with the ambiguous allegations of the CAC.

D. Plaintiffs' request for leave to amend their complaint

Plaintiffs request leave to amend their complaint if any portion of defendants' motion is granted. The court will grant this request. However, the Ninth Circuit has noted that complaints in securities fraud cases can be needlessly verbose. Expressing frustration with one 113-page complaint, the Ninth Circuit stated that

To say that the drafting is infelicitous puts matters too kindly. The complaint is cumbersome almost to the point of abusiveness. We see nothing to prevent the district court, on remand, from requiring, as a matter of prudent case management, that plaintiffs streamline and reorganize the complaint before allowing it to serve as the document controlling discovery, or, indeed, before requiring defendants to file an answer. Complaints fashioned as this one is are an unwelcome and wholly unnecessary strain on defendants and on the court system.

**\*9** *In re GlenFed, Inc. Sec. Litig.,* 42 F.3d 1541, 1554 (9th Cir.1994) (*en banc*). This court has similar feelings regarding the plaintiffs' fifty-page complaint, and understands the defendants' attempt to prune the complaint down to a manageable size through their motion to dismiss or strike. The complaint is needlessly cumbersome; plaintiffs do not need anywhere near fifty pages to state two causes of action against five defendants, even under the heightened pleading standards of the Reform Act.

In their opposition to the defendants' motion to dis-

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 3445631 (N.D.Cal.)
**(Cite as: Not Reported in F.Supp.2d, 2005 WL 3445631)**

Page 9

miss or strike, the plaintiffs filed a thirty-two-page memorandum of points and authorities. Ten of these pages are a summary of the factual allegations of the complaint. *See* Opp'n at 4-14. This ten-page summary appears to the court to be a much more useful version of the complaint, and shows that the plaintiffs can present the complaint in a shorter form. "[A]s a matter of prudent case management," the court will order plaintiffs to file a streamlined version of their complaint which does not exceed thirty-five pages within twenty days of the date of this order. Plaintiffs may include in their complaint amended allegations against defendant Kadish.

### III. ORDER

For the foregoing reasons, the court

(1) grants Kadish's motion to dismiss the § 10(b) cause of action against him with twenty days leave to amend;

(2) grants the defendants' motion to strike paragraphs twenty-two through thirty-one of the CAC;

(3) otherwise denies the defendants' motion to dismiss or strike; and

(4) orders plaintiffs to file a streamlined version of their complaint not exceeding thirty-five pages within twenty days of the date of this order.

N.D.Cal.,2005.
In re Netopia, Inc., Securities Litigation
Not Reported in F.Supp.2d, 2005 WL 3445631 (N.D.Cal.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.