# TAB M



Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 24051280 (N.D.Cal.)
(Cite as: Not Reported in F.Supp.2d, 2003 WL 24051280)

Page 1

▷
In re Network Associates, Inc. II Securities Litigation
N.D.Cal.,2003.
Only the Westlaw citation is currently available.
United States District Court,N.D. California.
In re NETWORK ASSOCIATES, INC. II SECURITIES LITIGATION
No. C 00-CV-4849.

March 25, 2003.

Darren J. Robbins, Milberg Weiss Bershad Hynes & Lerach LLP, William S. Lerach, Lerach Coughlin Stoia Geller Rudman & Robbins LLP, Robert S. Gans, Bernstein Litowitz Berger & Grossmann LLP, San Diego, CA, Patrick J. Coughlin, Lerach Coughlin Stoia Geller Rudman & Robbins LLP, Frederick P. Furth, Michael P. Lehmann, The Furth Firm, San Francisco, CA, Alan R. Plutzik, Kathryn A. Schofield, Bramson Plutzik Mahler & Birkhaeuser LLP, Walnut Creek, CA, for Plaintiffs.
Boris Feldman, Nina F. Locker, Ellen H. Solomon, Wilson Sonsini Goodrich & Rosati, Paul H. Goldstein, Morrison & Foerster, Palo Alto, CA, Melvin R. Goldman, Morrison & Foerster, Stephen S. Mayne, Elizabeth A. Frohlich, Steefel Levitt & Weiss A Professional Corporation, San Francisco, CA, Jeffrey B. Rudman, Mary Jo Johnson, Hale and Dorr LLP, Boston, MA, Norman J. Blears, Howard S. Caro, Heller Ehrman White & McAuliffe, Menlo Park, CA, Daniel H. Bookin, O'Melveny & Myers LLP, Robert R. Pohls, Robert R. Pohls & Associates, C. Mark Humbert, Pohls & Humbert, Walnut Creek, CA, for Defendants.

ORDER GRANTING DEFENDANTS' MOTIONS TO DISMISS

JENKINS, J.

INTRODUCTION

*1 Before the Court are four motions to dismiss Teachers' Retirement System of Louisiana's ("Plaintiff" or "Lead Plaintiff") first amended consolidated complaint ("FACC") in the above-entitled class action. The motions are brought by Network Associates, Inc. ("NAI" or the "Company"),[FN1] William L. Larson ("Larson"), Prabhat K. Goyal ("Goyal"), and Terry Davis ("Davis")[FN2] pursuant to Federal Rule of Civil Procedure 12(b)(6) and the Private Securities Litigation Reform Act of 1995 ("Reform Act"), 15 U.S.C. § 78u-4, which added Section 21D to the Security Exchange Act of 1934 ("Exchange Act"). This motion requires the Court to determine whether Plaintiff's allegations meet the heightened pleading standard of the Reform Act. Having considered the briefing in this matter[FN3] and listened to arguments from the parties, the Court GRANTS Defendants' motions.

   FN1. For the purpose of this motion, NAI does not challenge the allegations pertaining solely to the Company's restatement of its 1999 and 2000 financials. See NAI Motion at 2:15-19. Thus, these claims remain despite the outcome of this motion.

   FN2. For ease of reference, the Court will refer to Larson, Goyal, and Davis collectively as the "Individual Defendants." Moreover, the Court will further refer to both NAI and the Individual Defendants collectively as "Defendants."

   FN3. Judicial notice is appropriate for SEC filings, press releases, and accounting rules as they are "capable of accurate and ready determination by resort to sources whose accuracy cannot be reasonably questioned."Fed.R.Evid. 201(b); see, e.g., Plevy v. Haggerty, 38 F.Supp.2d 816, 821 (C.D.Cal.1998) (taking judicial notice of SEC filings, press releases, analysts' reports, news articles, and stock prices); Urbanek v. United States, 731 F.2d 870, 873 n. 3 (Fed.Cir.1984) (taking judicial notice of accounting handbook). The Court

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 3:07-cv-05545-SI   Document 33-14   Filed 05/05/2008   Page 3 of 19

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 24051280 (N.D.Cal.)
(Cite as: Not Reported in F.Supp.2d, 2003 WL 24051280)

Page 2

may also consider documents outside the scope of the pleadings in support of a Rule 12(b)(6) motion to dismiss if the documents are referenced in plaintiff's complaint, are "central" to plaintiff's claim, and whose authenticity are not at issue. *See Lee v. City of Los Angeles*, 250 F.3d 668, 688 (9th Cir.2001) (finding that courts may consider documents which are not physically attached to the plaintiff's complaint if their authenticity is not contested and the complaint necessarily relies on them). Therefore, to the extent that any such documents are necessary to the Court's determination of this matter, they will be considered.

FACTUAL BACKGROUND

This matter involves eleven related class actions that have been consolidated for resolution before this Court [FN4] and captioned *In re Network Associates, Inc. II Securities Litigation*.

> FN4. The following cases have been consolidated with *Armour v. Network Assoc., Inc.*, the low-numbered lawsuit against NAI: *Wendell v. Network Assoc., Inc.*, C 01-0007; *Lukoff v. Network Assoc., Inc.*, C 01-0008; *Rizzuti v. Network Assoc., Inc.*, C 01-0860; *McDougal v. Network Assoc., Inc.*, C 01-0861; *539, Inc. v. Network Assoc., Inc.*, C 01-0599; *Novakovic v. Network Assoc., Inc.*, C 01-0831; *Iowa Bakers v. Network Assoc., Inc.*, C 01-0856; *Denigris v. Network Assoc., Inc.*, C 01-20170; *Lam v. Network Assoc., Inc.*, C 01-20183; *Morales v. Network Assoc., Inc.*, C 01-1575.

I. PARTIES

A. The Class and Lead Plaintiff

The Class consists of all persons who purchased NAI common stock on the open market between April 15, 1999 and December 26, 2000 (the "Class Period").[FN5] Lead Plaintiff is a public pension fund system organized for the benefit of current and retired teachers of the State of Louisiana. Plaintiff purchased 645,400 shares of NAI common stock during the class period and suffered damages as a result of Defendants' alleged securities laws violations. FACC ¶ 13.

> FN5. Excluded from the Class are "[Defendants]; members of the families of each of the Individual Defendants; any parent, subsidiary, affiliate, partner, officer, executive or director of [Defendants]; any entity in which any such excluded person has a controlling interest; and the legal representatives, heirs, successors and assigns of any such excluded person or entity."FACC ¶ 20.

B. Defendants

1. The Company

NAI is engaged in the business of manufacturing and marketing a variety of network security and network management products. *Id.* ¶ 26. The Company's two flagship products are its McAfee antivirus software and Sniffer network fault and performance management software product lines. *Id.*

NAI derives its revenue from (1) product licenses and (2) support and service. *Id.* ¶ 27. The Company's licensing revenue includes income from product licenses marketed indirectly through distributers and resellers, and directly to end-users located around the world. *Id.* Throughout the Class Period, product revenue accounted for approximately 70% of the Company's total revenue, while support and service revenue accounted for approximately 30% of the Company's revenue. *Id.* The majority of its revenue is derived from sales to end-users through intermediaries, including distributors and resellers. *Id.* ¶ 28.[FN6] Ingram Micro is the Company's largest distributor, accounting for more than 20% of NAI's revenue during the Class Period.

Case 3:07-cv-05545-SI    Document 33-14    Filed 05/05/2008    Page 4 of 19

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 24051280 (N.D.Cal.)
(Cite as: Not Reported in F.Supp.2d, 2003 WL 24051280)

Page 3

FN7

> FN6. NAI also markets its products to end-users through its North American Direct Sales Force and International Sales Force. FACC ¶ 28.

> FN7. No other customer accounted for more than 10% of the Company's total revenue during the Class Period. FACC ¶ 28.

2. Individual Defendants

Larson joined NAI in 1993. He served as the Company CEO and Chairman throughout the Class Period. The company announced Larson's termination on December 26, 2000. *Id.* ¶ 15(a).

Goyal joined NAI in 1996. *Id* ¶ 16(a). He served as the Company's CFO and Vice President of Financial Administration throughout the Class Period and was terminated in January 2001. *Id.* ¶ 16(a), (o).

*2 Davis joined NAI in 1998 as Director of Taxes, Corporate Controller, and Senior Vice President of Finance. In January 2001, he was named CFO of the Company, a position he held until April 2001. He continued as Controller and Senior Vice President of Finance until February 2002, when he left the Company. *Id.* ¶ 18(a).<sup>FN8</sup>

> FN8. The FACC also alleges misconduct by Peter Watkins, NAI's COO and President. *Id.* ¶ 17. However, Plaintiff voluntarily dismissed all claims against Watkins pursuant to Rule 41 of the Federal Rules of Civil Procedure.

II. ALLEGATIONS

The basis for the alleged Exchange Act violations is twofold. First, Plaintiff asserts that, throughout the Class Period, Defendants orchestrated and actively participated in the following improper accounting practices in violation of Generally Accepted Accounting Principals ("GAAP"): (1) recognizing "made orders" (*i.e.*, orders placed by distributors in the last hours of a quarter, with the understanding that the distributors would return the product in the subsequent quarter for a full refund) (*id.* ¶¶ 3, 50-62); (2) recognizing revenue based upon receipt of non-binding and revokable "letters of intent" from customers to purchase the Company's products (*id.* ¶¶ 3, 63-72); (3) recognizing revenue from sales to resellers without deducting cash rebates promised to the reseller in "side agreements" equal to as much as 50% of the contract amount (*id.* ¶¶ 3, 63-72); (4) "backdating revenue" (*i.e.*, holding quarters open for as much as three weeks for the purpose of allowing revenue to be recognized from sales completed after the end of the quarter (*id.* ¶¶ 3, 73-77); (5) recognizing revenue from the shipment of defective products to customers, without accruing sufficient reserves for product returns (*id.* ¶¶ 3, 78-86); and (6) recognizing revenue from "parking goods" for other vendors (*i.e.*, improperly recognizing revenues from substantial fees extracted from other vendors in exchange for NAI agreeing to issue purchase orders for products that it had no intention of purchasing).*Id.* ¶¶ 3, 87-89. Second, Plaintiff contends that, during the Class Period, Defendants disseminated false and misleading statements concerning NAI's operation and its future prospects.*Id.* ¶¶ 5-8, 104-138.

According to Plaintiff, the Individual Defendants orchestrated and directed the fraudulent scheme to artificially inflate the Company's net revenue and income during the Class Period through improper accounting practices mentioned above. *Id.* ¶¶ 15, 16, 18, 106, 109, 112, 116, 120, 125, 131, 138. To effectively conceal these improper revenue recognition practices, Larson and Goyal allegedly directed Davis to hide millions of dollars in marketing and sales expenses, rebate payments to distributors, and increases in sales return reserves in the Company's tax reserve account. *Id.* ¶¶ 4, 15, 16. At the behest of Larson and Goyal, Davis also allegedly made false entries to the Company's general ledgers and tax accounts. *Id.* ¶ 17.

Plaintiff contends that the Individual Defendants

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 3:07-cv-05545-SI   Document 33-14   Filed 05/05/2008   Page 5 of 19

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 24051280 (N.D.Cal.)
(Cite as: Not Reported in F.Supp.2d, 2003 WL 24051280)

Page 4

engaged in such conduct for the purpose of profiting from the McAfee.com initial public offering ("IPO") in December 1999. *Id.* ¶¶ 9, 15, 16, 168. In fiscal year ("FY") 1999, one month prior to the McAfee IPO, the Company granted Larson, Goyal (and former Defendant Watkins) options to purchase a total of 1,440,000 shares of McAfee.com common stock at an exercise price of $3.67 per share.[FN9] *Id.* ¶¶ 168. During the Class Period Larson's stock was valued at more than $25 million and Goyal's stock was valued at more than $11 million. *Id.* ¶¶ 15, 16. After the successful completion of the McAfee.com IPO, the Individual Defendants allegedly attempted to spin-off the Company's McAfee division in FY2000. *Id.* ¶ 170.[FN10]

> FN9. Larson was given the right to acquire 900,000 shares or 25% of the total option stock granted; Goyal was given the opportunity to purchase 360,000 shares or 10.3% of the total option stock granted. *See* FACC ¶¶ 15, 16, 168.

> FN10. To this end, Plaintiff alleges that the Defendants directed the Company to divide into four divisions in an effort to isolate and highlight McAfee's financial performance. FACC ¶ 170.

*3 According to Plaintiff, the scheme began to unravel when, in late September 2000, NAI executives, including Larson and Goyal, met with executives of Ingram Micro. *Id.* ¶ 140. At that meeting, Ingram Micro allegedly informed Defendants that it would not accept made orders during the fourth quarter of 2000 and would exercise its rights to return all of the made orders placed during the third quarter the same fiscal year. *Id.* ¶ 141. Thereafter, one of NAI's executives, Chris Peterson ("Peterson"), purportedly exclaimed "I don't know what we're going to do" for the fourth quarter of FY2000. Then, on September 30, 2000, before the fourth quarter began, Peterson allegedly told his staff during a conference call that NAI would "not hit its numbers" for the fourth quarter. *Id.* ¶ 141.

However, according to Plaintiff, NAI was unable to sustain the scheme and on December 26, 2000, it announced a net loss of $130 to $140 million on revenues of only $55 to $65 million for the fourth quarter of FY2000-far short of the expected $47 million in earnings on revenues of $242 million. *Id.* ¶ 144. Furthermore, the Company announced that for FY2000 it expected to report consolidated revenue in the range of $742 to 752 million and a net loss of between $84 and $94 million. *Id.* The Company explained its revised expectations by pointing to a shortfall in sales due to an accounting change that affected the way the Company recorded sales (*i.e.,* a change in the Company's revenue recognition policies). Specifically, the Company announced it would no longer recognize sales of products to the Company's distributors, prior to the distributors' sale of the product to the end-user. *Id.* The Company also announced that it was replacing Larson and Goyal (as well as former Defendant Watkins). *Id.* ¶ 149.

On December 27, 2000, the day after the Company's disclosure, the price of NAI's common stock closed at $4.56 per share-a 60% decline from the prior day's close and an 87% decline from its Class Period high of $37.19 per share. *Id.* ¶ 9. Three days after the disclosure, on December 29, 2000, Plaintiff filed a class action complaint ("original complaint"). On September 24, 2001, Plaintiff filed a Consolidated Complaint ("CC"). *Id.* ¶ 9. Subsequently, Defendants (with the exception of Davis who was not yet a party to the action) filed their first motion to dismiss.

On April 25, 2002, before the Court decided Defendants' first motion to dismiss, the Company announced that it had discovered "accounting inaccuracies in its 1999 and 2000 financial statements requiring the restatement" of those financial results. *Id.* ¶ 159. On May 17, 2002, the Company announced that it would restate its financials for fiscal years 1998, 1999, and 2000. *Id.* ¶ 162. Then, on June 28, 2002, the Company filed with the SEC reports on Form 10Q/A and 10-KA to restate its state-

Not Reported in F.Supp.2d                                                                              Page 5
Not Reported in F.Supp.2d, 2003 WL 24051280 (N.D.Cal.)
**(Cite as: Not Reported in F.Supp.2d, 2003 WL 24051280)**

ment of operations, statement of cash flows, and balance sheets for the fiscal years 1998, 1999 and 2000. *Id.* ¶ 165. The restatements revealed that NAI concealed more than $65 million in reductions to net revenue and more than $24 million in operating expenses, thereby overstating the Company's reported net income by more than $28 million throughout the Class period. *Id.* ¶ 5.

*4 Plaintiff filed its FACC on September 30, 2002. The Court now considers Defendants' most recent motions to dismiss.

LEGAL STANDARD

I. RULE 12(b)(6)

A Rule 12(b)(6) motion to dismiss tests the legal sufficiency of the claims asserted in the complaint. *Cahill v. Liberty Mutual Ins. Co.,* 80 F.3d 336, 337 (9th Cir.1996). Dismissal of an action pursuant to Rule 12(b)(6) is appropriate only where it "appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Levine v. Diamanthuset, Inc.,* 950 F.2d 1478, 1482 (9th Cir.1991). The Court will dismiss the complaint or any claim in it without leave to amend only if "it is absolutely clear that the deficiencies of the complaint could not be cured by amendment." *Noll v. Carlson,* 809 F.2d 1446, 1448 (9th Cir.1987).

In determining a motion to dismiss, the Court must assume all factual allegations to be true and must construe them in the light most favorable to the non-moving party. *See North Star Int'l v. Arizona Corp. Comm'n,* 720 F.2d 578, 580 (9th Cir.1983). However, the Court need not accept as true unreasonable inferences, unwarranted deductions of fact, or conclusory legal allegations cast in the form of factual allegations. *See Western Mining Council v. Watt,* 643 F.2d 618, 624 (9th Cir.1981). Further, the Court need not accept as true allegations that contradict facts that have been judicially noticed or by exhibit attached to a complaint. *See Sprewell v. Golden State Warriors,* 266 F.3d 979, 988-89 (9th Cir.2001).

In cases alleging violations of securities laws, motions to dismiss are subject to stricter standards because whether a statement or omission is misleading to potential investors "requires delicate assessments of the inferences a 'reasonable shareholder' would draw from a given set of facts and the significance of those inferences to him, and these assessments are peculiarly one for the trier of fact." *Fecht v. The Price Co.,* 70 F.3d 1078, 1080 (9th Cir.1995) (internal citations omitted). Thus, "only if the adequacy of the disclosure or the materiality of the statement is so obvious that reasonable minds could not differ are these issues appropriately resolved as a matter of law." *Id.* at 1081.

II. PLEADING STANDARDS

A. Rule 9(b)

Allegations of fraud must satisfy the requirements of Federal Rule of Civil Procedure 9(b) to survive a motion to dismiss. Rule 9(b) provides that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally." The intent of Rule 9(b) is to prevent the filing of a complaint as a pretext for the discovery of unknown wrongs. *See Semegen v. Weidner,* 780 F.2d 727, 731 (9th Cir.1985).

Rule 9(b) applies to actions brought under the federal securities laws. *See In re GlenFed, Inc., Sec. Litig.,* 42 F.3d 1541, 1544 (9th Cir.1994)(en banc). To comport with Rule 9(b), the complaint must allege the time, place and content of the alleged fraudulent representation or omission; the identity of the person engaged in the fraud; and also set forth the "circumstances indicating falseness" or "the manner in which [the] representations [or omissions at issue] were false and misleading." *Id.* at 1547-48. Thus, plaintiffs must provide an explan-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 3:07-cv-05545-SI   Document 33-14   Filed 05/05/2008   Page 7 of 19

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 24051280 (N.D.Cal.)
(Cite as: Not Reported in F.Supp.2d, 2003 WL 24051280)

Page 6

ation as to how an alleged statement or omission was false or misleading when made. *See id.* at 1548.

*5 The heightened pleading standard of Rule 9(b) is not an invitation to disregard the requirement of simplicity, directness, and clarity of Federal Rule of Civil Procedure 8. *See McHenry v. Renne,* 84 F.3d 1172, 1178 (9th Cir.1996). Every plaintiff filing a complaint in a federal district court must also prepare his complaint in conformity with Rule 8, which requires that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief" and that "each averment of a pleading shall be simple, concise and direct."*See*Fed. R. Civ. Pro. 8(a), (e).

B. Private Securities Litigation Reform Act ("Reform Act")

To survive a motion to dismiss, a complaint alleging fraud must meet the heightened pleading standards set forth in the Reform Act, in which Congress clarified and strengthened the particularity requirements of Rule 9(b) as applied in the context of federal securities class action lawsuits. *See Zeid v. Kimberley,* 973 F.Supp. 910, 914 (N.D.Cal.1997). Congress enacted the Reform Act to end the practice of pleading "fraud by hindsight." *In re Silicon Graphics, Inc., Sec. Litig.,* 183 F.3d 970, 988 (9th Cir.1999).

The Reform Act requires that a complaint in a securities fraud action specify each false and misleading statement and why each statement is false and misleading. *See*15 U.S.C. § 78u-4(b)(1)(B). If an allegation regarding a statement or omission is made on information and belief, the complaint must state with particularity the facts upon which the belief is formed. *See id.*It is not sufficient for a plaintiff's pleading to set forth a belief that certain unspecified sources will reveal, after appropriate discovery, facts that will validate the plaintiff's claim. *See Helitrope General, Inc. v. Ford Motor Co.,* 189 F.3d 971, 979 (9th Cir.1999)

Moreover, the complaint must set forth particular facts that give rise to a strong inference that the defendants acted with the required state of mind. *See*15 U.S.C. § 78u-4(b)(2). Finally, if the alleged materially false statement or omission is a "forward looking statement," the required level of scienter is actual knowledge and not recklessness. *See*15 U.S.C. § 78u-5(c). A complaint that fails to comply with any of these requirements must be dismissed. *See*15 U.S.C. § 78u-4(b)(3)(A).

ANALYSIS [FN11]

FN11. The Individual Defendants generally join NAI's motion. However, both Larson and Goyal submit additional briefing on the issue of scienter, and Davis submits additional briefing on the statute of limitations issue.

I. STATUTE OF LIMITATIONS

Before addressing the substance of the complaint, the Court must determine if any of the claims are time barred. Claims instituted pursuant to Section 10(b) and Rule 10b-5, "must be commenced within one year after the discovery of the facts constituting the violation and within three years after such violation."*Lampf, Pleva, Lipkind, Prupis, & Petigrow v. Gilbertson,* 510 U.S. 350, 364 (1991).

A. Expansion of the Class Period

1. One Year Limitations Period

Since *Lampf,* every circuit to address the issue of when "discovery" of the facts underlying the claim is deemed to have occurred has held that inquiry notice is the appropriate standard. *See Berry v. Valence Technology, Inc.,* 175 F.3d 699, 703-704 (9th Cir.1999) (holding that a magazine article questioning the general viability of a company was not sufficient to put investors on notice of the specific possibility of fraud). Although the Ninth Cir-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 3:07-cv-05545-SI    Document 33-14    Filed 05/05/2008    Page 8 of 19

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 24051280 (N.D.Cal.)
(Cite as: Not Reported in F.Supp.2d, 2003 WL 24051280)

Page 7

cuit has not formally decided the issue, it has indicated that, if it were to adopt an inquiry notice standard, it would adopt the standard outlined by the Tenth Circuit in *Sterlin v. Biomune Systems,* 154 F.3d 1191 (10th Cir.1998): "In *Sterlin'* s formulation, 'inquiry notice ... triggers an investor's duty to exercise reasonable diligence and ... the one-year statute of limitations period begins to run once the investor, in the exercise of reasonable diligence, should have discovered the facts underlying the alleged fraud.'" *See Berry* at 704 (citing *Sterlin,* 154 F.3d at 1201). Given the Ninth Circuit's comments in *Berry,* as well as the adoption of an inquiry notice standard in several other circuits, the Court will apply the standard outlined in *Sterlin* to the matter currently before the Court.

*6 In this case, NAI challenges the expansion of the Class Period backwards from July 19, 2000 to April 15, 1999 under the one year statute of limitations. It contends that Plaintiff "discovered" the facts underlying the claim as of December 29, 2000-the date Plaintiff filed its original complaint. NAI Motion at 7:8-8:22. Yet, this complaint was based solely on NAI's announcement, on December 26, 2000, of a net loss of $130 to $140 million for the *fourth quarter of FY2000.* FACC at ¶ 144. At that point, Plaintiff was only on notice that there might have been some revenue recognition improprieties during the original Class Period-July 19 to December 26, 2000. The December 2000 announcement cannot be considered inquiry notice that such improprieties dated back to April 15, 1999-the beginning of the current Class Period. *See Berry,* 175 F.3d at 705 (the event must be "sufficient to 'excite inquiry' into the possibility of fraudulent conduct"). It was not until April 25, 2002, when NAI announced that it would be restating it financials for 1999 and 2000, that Plaintiff was put on notice that such improprieties might stretch back as far as April 15, 1999. Moreover, in this case, there is no gap between notice and discovery because the latter announcement was made in the midst of the current litigation. Therefore, the expanded portion of the Class Period falls squarely within the statutory time frame.

2. Three Year Limitations Period and Relation Back

a) Claims

Moreover, NAI contends that any claims relating to statements made in NAI's Form 10-K for FY1998 ("1998 10-K")(dated April 15, 1999) are time barred because the document was released more than three years prior to the filing of Plaintiff's FACC on September 30, 2002. *See Lampf,* 510 U.S. at 364. Plaintiff counters that such claims relate back to the claims asserted in it's CC,[FN12] filed on September 24, 2001.

> FN12. It is actually unclear from Plaintiff's papers whether it is arguing that the claims relate back to the CC or the original complaint filed in December 2000. However, for purposes of Plaintiff's relation back argument, the new claims need only relate back to the CC.

Rule 15(c)(2) of the Federal Rules of Civil Procedure provides: "An amendment of a pleading relates back to the original pleading when ... the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth in the original pleading...." Rule 15(c) is liberally applied (*E.E. French & Sons, Inc. v. General Portland,* 885 F.2d 1392, 1396 (9th Cir.1989)); "[t]he basic inquiry is whether the opposing party has been put on notice about the claim or defense raised by the amended pleading." *S.E.C. v. Seaboard Corp.* 677 F.2d 1301, 1314 (9th Cir.1982).

Here, Plaintiff's CC and FACC consist of nearly identical causes of action based on a similar set of operative facts. The primary difference between the two pleadings is temporal rather than substantive; Plaintiff simply expands the Class Period backwards based on NAI's restatement of its financials for 1998, 1999, and 2000. Even NAI admits that there is a "strong nexus between the allegations contained in the [CC and the FACC]." NAI Motion at 8:9-10. Therefore, all of the claims in the FACC, including those based on 1998 10-K, relate back the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d    Page 8
Not Reported in F.Supp.2d, 2003 WL 24051280 (N.D.Cal.)
**(Cite as: Not Reported in F.Supp.2d, 2003 WL 24051280)**

CC-filed on September 24, 2001-and are well within the three-year statute of limitations.

b) New Class Members

*7 NAI also argues that the new class members do not share sufficiently similar interest with the members of the original class. *See In re Syntex Corp. Sec. Litig.*, 95 F.3d 922, 935 (9th Cir.1996) (an amendment adding a party plaintiff relates back to the original pleading only when "there is an identity of interests between the original and newly proposed plaintiff").[FN13] Specifically, they contend that (1) members of the original plaintiff class will seek to secure for themselves a higher percentage of any recovery for Defendants' alleged fraud, and (2) because the new class members purchased the stock at a higher average price than the original class members, there will be conflicting views about whether the purported inflation in NAI's stock price (and therefore class damages) should be calculated on an absolute or percentage basis. *See* Supplemental Brief at 3:6-23. These arguments fail for the following reasons.

> FN13. The party seeking to amend must also show that (1) the original complaint gave the defendant adequate notice of the claims of the newly proposed plaintiff, and (2) relation back does not unfairly prejudice the defendant. *In re Syntex Corp. Sec. Litig.*, 95 F.3d at 935. However, these additional factors are uncontested in this instance.

First, the claims of the new class members are based on the same underlying allegations as the original class members (*i.e.,* fraudulent accounting practices and misleading statements). More importantly, all of the claims are based on the same December 2000 disclosure and subsequent stock drop.*Compare Syntex*, 95 F.3d at 935 ("[t]he claims of the proposed plaintiffs are different because [they] bought stock at different values *and after different disclosures and statements were made by Defendants and analysts"* ) (emphasis added). In other words, the claims of the new class members are not based on the fallout from the financial restatements for 1998-2000. Therefore, the Court finds that the new class members share sufficiently similar interests with the original class members to allow relation back claims relating to NAI's 1998 10-K.[FN14]

> FN14. NIA also points out that the Court did not reexamine whether the Teachers' Retirement System of Louisiana is the appropriate lead plaintiff. *See* NAI's Supplemental Brief at 4:6-5:4. However, because the parties stipulated to Plaintiff's filing an amended complaint, the Court was never properly presented with this issue. Therefore, if Plaintiff wishes to challenge the adequacy of the current Lead Plaintiff, it may do so through a formal motion.

B. Defendant Davis

Defendant Davis, who is named as a defendant for the first time in FACC, submits additional briefing with respect to the statute of limitations issue. He contends that (1) all claims arising before September 30, 1999 are time barred; (2) and that Plaintiff fails to meet the standard for relation back under Rule 15(c).*See generally* Davis Reply. The parties agree that the resolution of both of these issues turns on a determination of whether the claims against Davis relate back to the CC.

The Supreme Court has identified four criteria which must be met in order for an amendment naming an additional party to relate back to the filing of the original pleading pursuant to rule 15(c):

(1) the basic claim must have arisen out of the conduct set forth in the original pleading; (2) the party to be brought in must have received such notice that it will not be prejudiced in maintaining its defense; (3) that party must or should have known that, but for a mistake concerning identity, the action would have been brought against it; and (4) the second and

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 3:07-cv-05545-SI    Document 33-14    Filed 05/05/2008    Page 10 of 19

Not Reported in F.Supp.2d                                                                                                Page 9
Not Reported in F.Supp.2d, 2003 WL 24051280 (N.D.Cal.)
**(Cite as: Not Reported in F.Supp.2d, 2003 WL 24051280)**

third requirements must have been fulfilled within the prescribed limitations period.

*8 *Shiavone v. Fortune,* 477 U.S. 21, 29, 106 S.Ct. 2379, 91 L.Ed.2d 18 (1986).

Here, there is no question that Plaintiff knew about Davis when it filed its CC. In fact, the CC specifically mentions Davis: "Goyal and ... Davis met with the CEO of Ramp Networks, Mahesh Veerina. During this meeting Veerina asked Goyal if Ramp Networks could ship $2 million in product to [NAI], which [NAI] could return to Ramp during the next quarter for a full refund."*Id.* ¶ 13(g). Relation back is only allowed for a mistake in identity, not liability. *See Louisiana-Pacific Corp. v. ASARCO, Inc.,* 5 F.3d 431, 434 (9th Cir.1993); *see also Powers v. Graff,* 148 F.3d 1223, 1228 (11th Cir.1998) (plaintiff sued company for securities fraud; the court rejected plaintiff's attempt to amend to add the officers and directors of the company after the statute of limitations had run because plaintiff knew the identities of the officers and directors when the original complaint was filed). Because Plaintiff knew Davis' identity when the CC was filed, the claims against him in the FACC cannot relate back.

Therefore, the claims against Davis arising prior to September 30, 1999 are barred by *Lampf*'s three year limitations period, and the claims arising during the original class period (July 19, to December 26, 2000) are barred by the one year limitations period. However, those claims arising after September 30, 1999 but before July 19, 2000 fall within the limitations period and are not barred.

II. PLEADING REQUIREMENTS UNDER THE REFORM ACT

Under the Reform Act, a private securities plaintiff must "state with particularity all facts that give rise to a 'strong inference' of the required state of mind."*In re Silicon Graphics Inc. Sec. Litig.,* 183 F.3d 970, 983 (9th Cir.1999) (emphasis added); *see also* 15 U.S.C. § 78u-4(b)(2)."In order to create a strong inference of the required state of mind, [a plaintiff] must state with particularity facts demonstrating deliberate recklessness. In order to plead 'with particularity,' [a plaintiff] must provide all the facts forming the basis of her belief in great detail."*Id.*[FN15]

> FN15. Plaintiff does not profess to have personal knowledge of the allegations it asserts; hence, the FACC is presumed to be pled on "information and belief." *See In re Autodesk, Inc. Sec. Litig.,* 132 F.Supp.2d 833, 839 (N.D.Cal.2000) ("allegations of misrepresentation not made on personal knowledge are presumed to have been made on information and belief").

Plaintiff contends that Defendants made "false and misleading statements" and engaged in "deceptive practices" in violation of section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b),[FN16] and Securities and Exchange Commission ("Exchange Commission") Rule 10b-5, 17 C.F.R. § 240.10b-5.[FN17] FACC ¶¶ 175-181.[FN18]

> FN16. Section 10(b) of the Exchange Act provides: "It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange ... [t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange ... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors."

> FN17. Exchange Commission Rule 10b-5 provides: "It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facil-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 3:07-cv-05545-SI    Document 33-14    Filed 05/05/2008    Page 11 of 19

Not Reported in F.Supp.2d  
Not Reported in F.Supp.2d, 2003 WL 24051280 (N.D.Cal.)  
(Cite as: Not Reported in F.Supp.2d, 2003 WL 24051280)

Page 10

ity of any national securities exchange, (a) To employ any device, scheme, or artifice to defraud, (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security."

FN18. Plaintiff also contends that the Individual Defendants violated Rule 20(a) of the Exchange Act, 15 U.S.C. 78t, because they directly or indirectly controlled NAI and "had the power and authority to cause the Company to engage" in the alleged "wrongful conduct." *See* FACC ¶¶ 181-183 (there are two paragraphs labeled 181). Section 20(a) of the Exchange Act provides: "Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action."In order to plead a claim under 20(a), the plaintiff must allege "(1) that a 'primary violation' of Rule 10b-5 or other provision was committed and (2) that each defendant 'directly or indirectly' controlled the violator."*See In re Cylink Sec. Litig.*, 178 F.Supp.2d 1077, 1089 (N.D.Cal.2001). The Individual Defendants do not contest that they were in control of NAI during the Class Period.

A. Pleading with Particularity

1. False Statements

On April 25, 2002, NAI announced that it had discovered "accounting inaccuracies in its 1999 and 2000 financial statements requiring the restatement" of those financial results. *Id.* ¶ 159.The Company reported that it was "conducting an internal investigation under the direction of the Audit Committee of its Board of Directors to determine the scope and magnitude of these inaccuracies."*Id.* On May 17, 2002, the Company announced that its Audit Committee had completed its internal investigation and as a result the Company would be forced to restate its statement of operations and balance sheet for fiscal years 1998, 1999 and 2000. *Id.* ¶ 162.

*9 On or about June 28, 2002, the Company filed with the SEC reports on Form 10Q/A and 10-KA to restate its statement of operations, statement of cash flow, and balance sheet for fiscal years 1998, 1999, and 2000. The Company announced in a press release that the restatements reflected "the findings of the Company's internal accounting investigations conducted under the direction of [NAI's] Audit Committee."*Id.* ¶ 165.Specifically, the Company's restatement revealed that NAI concealed more than $65 million in reductions to net revenue and more than $24 million in operating expenses, thereby overstating the Company's reported net income by more than $28 million throughout the Class Period. FACC ¶ 5; *see also* FACC ¶¶ 34-38 (detailing the results of the restatements).[FN19]

FN19. Plaintiff also offers confidential witness accounts which, according to Plaintiff, provide detail concerning the Company's falsified financial results. *See* FACC ¶¶ 39-49. These accounts state that the Individual Defendants acted purposefully to hide expenses and reductions in revenue, even going so far as to falsify financial results. However, these confidential witness accounts are not pled with sufficient particularity (*see* analysis below).

Defendants do not-nor could they-contest that these allegations are pled with sufficient particularly; the

Case 3:07-cv-05545-SI   Document 33-14   Filed 05/05/2008   Page 12 of 19

Not Reported in F.Supp.2d                                                                      Page 11
Not Reported in F.Supp.2d, 2003 WL 24051280 (N.D.Cal.)
**(Cite as: Not Reported in F.Supp.2d, 2003 WL 24051280)**

restatements are public record. However, it cannot be assumed, based solely on these restatements, that Defendants engaged in all of the fraudulent revenue recognition practices alleged by Plaintiff. These allegations must be analyzed separately.

2. Improper Revenue Recognition Practices

a) Confidential Witnesses

Aside from the financial restatements, Plaintiff's claims of specific accounting fraud are based solely on the accounts of confidential witnesses. However, these accounts fall short of pleading standard mandated by the Reform Act.

To begin, Plaintiff fails to offer any specific information about the nature of the confidential witnesses' employment with the Company or the basis of these witnesses' knowledge. Plaintiff simply lists the confidential witness by job title (*i.e.*, "A former Regional Manager") and then proceeds to recite the witnesses' account. For example, the FACC states: "A former Vice President of Managed Services stated that during the Class Period, Larson would hold 'high-level Business Review' meetings in the final week of each quarter, attended by the Individual Defendants, and if the Company was short of its forecasted revenues, defendant Larson would direct the sales force to enter into 'bogus deals' with Ingram Micro...." FACC ¶ 51. This account does not state, with any specificity, facts relating to the nature and scope of the witnesses' position with the company, *e.g.*, (1) how long did he/she work for the Company; (2) what did his/her position entail; (3) in which division of the Company did he/she work; (4) to whom did he/she report? Nor does it describe how the confidential witness became privy to such information-did he/she attend the meetings in question or did a third-party inform him/her of Larson's alleged statements? Other confidential witness testimony is described in a similarly vague fashion.FN20 Confidential witness accounts of this nature are insufficient to support a claim under the Reform Act. *See In re Northpoint Communications Group, Inc. Sec. Litig.,* 184 F.Supp.2d 991, 1000 (N.D.Cal.2001) (granting a motion to dismiss where "the complaint [did] not discuss what the specific duties of [the] individuals were or how they came to learn of the information they provide in the complaint"); *see also Burger v. Ludwick,* 2000 WL 1262646 at *5-7 (N.D.Cal.2000) (listing the names of the former employees and their experiences does not meet "the particularity or the strong inference requirements of the [Reform Act] and [*Silicon Graphics* ] in order to make a sustainable cause of action"); *Coble v. Broadvision,* 2002 WL 31093589 at *6 (N.D.Cal.2002) (finding allegations silent as to the basis of the witnesses' knowledge are "entitled to little weight").

> FN20. In another example, the FACC states: "A former Inside Sales Representative and a former Regional Manager explained that as a general rule, the Company's sales force was required to obtain purchase orders from the end-users and place those orders with resellers, which in turn would place a purchase order with the Company."FACC ¶ 64. Further, the FACC provides: "A former Vice President of Manager Services explained in detail that Defendants caused the Company to improperly recognize revenues reflecting substantial fees extracted from other vendors in exchange for [NAI] agreeing to issue purchase orders for products that [NAI] had no intention of purchasing."*Id.* ¶ 87.Again, Plaintiff offers no specific information about these witnesses or the basis of their knowledge.

*10 Moreover, Plaintiff does not distinguish between and among confidential witnesses (*i.e.*, confidential witness 1, confidential witness 2, etc.), so that the Court can determine which confidential witness is alleging which facts. *Compare, e.g., Northpoint Communications Group* (refers to confidential witnesses by job title and specific number); *Autodesk* (same). Rather, Plaintiff simply

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 3:07-cv-05545-SI   Document 33-14   Filed 05/05/2008   Page 13 of 19

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 24051280 (N.D.Cal.)
(Cite as: Not Reported in F.Supp.2d, 2003 WL 24051280)

Page 12

refers to each confidential witness by job title only (*i.e.,* "a former District Account Manager"). Thus, it is unclear, for example, whether the "former District Account Manager" referenced in paragraph 15(h) is the same person as the "former District Account Manager" discussed in paragraphs 16(j), 50, and 50-56 (total of 15 references). *See also* FACC ¶¶ 15(g), 15(k), 63, 65-66, 71-73, 76 (fourteen references to "a former Corporate Controller" and "a former Controller"); FACC ¶¶ 15(j), 16(h), 64, 71-72, 75, 78, 81-84, 86 (thirteen references to "a former Regional Manager").

In sum, the ambiguous nature with which the confidential witnesses and the basis of their knowledge are described does not comport with the heightened pleading standards under the Reform Act. Thus, even assuming the actual assertion made by the confidential witnesses are pled with sufficient particularity, the Court would still be required to grant the motion to dismiss based on the above analysis above. However, for the sake of completeness, the Court will briefly address Plaintiff's allegations of accounting fraud.

b) Specific Revenue Recognition Practices Alleged to be Improper

GAAP are the conventions, rules, and procedures that constitute the professional standards of the accounting profession. *See Marksman Partners, L.P. v. Chantal Pharm. Corp.,* 927 F.Supp. 1297, 1304 (C.D.Cal.1996). As such, recognition of revenues in violation of GAAP can constitute a false or misleading statement of material fact that gives rise to an action for securities fraud. *See generally id.* However, the failure to follow GAAP is not, in and of itself, sufficient to establish a violation of the Exchange Act. *See In re Software Toolworks, Inc., Sec. Litig.,* 50 F.3d 615, 627-28 (9th Cir.1994).

To plead financial fraud for improper revenue recognition, Plaintiff must allege "particular transactions where revenues were improperly recorded, including the names of customers, the terms of specific transactions, when the transactions occurred, and the approximate amount of the fraudulent transactions." *In re Oak Technology Sec. Litig.,* 1997 WL 448168 at *8 (N.D.Cal.1997); *see also In re McKesson HBOC, Inc., Sec. Litig.,* 126 F.Supp.2d 1248, 1273 (N.D.Cal.2000) (stating that the plaintiffs should provide "such basic details as the approximate amount by which revenues and earnings were overstated ... the products involved in the contingent transactions ... the dates of any of the transactions ... or ... the identities of any of the customers or [company] employees involved in the transactions") (internal citation and quotation omitted).

*11 Here, Plaintiff alleges Defendant engaged in six forms of revenue recognition which it asserts violate GAAP and establish, for pleading purposes, affirmative fraud: (1) recognizing "made orders" (*i.e.,* orders placed by distributors in the last hours of a quarter, with the understanding that the distributors would return the products in the subsequent quarter for a full refund) (*see id.* ¶¶ 3, 50-62); (2) recognizing revenue based upon receipt of non-binding and revokable "letters of intent" from customers to purchase the Company's products (*id.* ¶¶ 3, 63-72); (3) recognizing revenue from sales to resellers without deducting cash rebates promised to the reseller in "side agreements" equal to as much as 50% of the contract amount (*id.* ¶¶ 3, 63-72); (4) "backdating revenue" (*i.e.,* holding quarters open for as much as three weeks for the purpose of allowing revenue to be recognized from sales completed after the end of the quarter (*id.* ¶¶ 3, 73-77); (5) recognizing revenue from the shipment of defective products to customers, without accruing sufficient reserves for product returns (*id.* ¶¶ 3, 78-86); and (6) recognizing revenue from "parking goods" for other vendors (*i.e.,* improperly recognizing revenues from substantial fees extracted from other vendors in exchange for NAI agreeing to issue purchase orders for products that it had no intention of purchasing). *Id.* ¶¶ 3, 87-89. The Court will address each of these allegations in turn.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 24051280 (N.D.Cal.)
(Cite as: Not Reported in F.Supp.2d, 2003 WL 24051280)

Page 13

Made Orders. In its FACC, Plaintiff alleges: "[A]t the end of each quarter during the Class Period, Larson ... directed defendant Goyal to arrange for the Company's largest distributor, Ingram Micro, to issue purchase orders for hundreds of Network Associates' products in the last hours of the quarter, in an effort to meet revenue and earnings targets, and with the knowledge that Ingram Micro would return these products for a full refund in the following quarter."*Id.* ¶ 15(h). NAI argues that Plaintiff's claims are not sufficient to state a claim for improper revenue recognition.[FN21]

> FN21. NAI does not, however, argue that such allegations are pled with insufficient detail.

First, NAI contends that these claims cannot be considered sufficiently particularized because they are internally inconsistent. Throughout the FACC, Plaintiff offers several confidential witness accounts describing the magnitude of the alleged made order scheme in general terms which are not exactly consistent with on another. *See, e.g., id.* ¶¶ 51 (" 'bogus orders' typically consisted of hundreds of purchase orders from Ingram Micro that together represented as much as $50,000,000-$75,000,000 in quarterly revenue"); 53 (NAI "would receive five to ten 'big invoices' from Ingram Micro for 'Made Orders' commutatively worth in excess of $10,000,000"). However, NAI offers no support for the proposition that all confidential witnesses have to state the exact same facts. More importantly, Plaintiff does offer some concrete examples of situations in which made orders were placed. *See, e.g., id.* ¶¶ 54 (describing a specific made order in the third quarter of 1999 involving Ingram Micro and McBride & Associates); 57 (describing in detail a made order in the third quarter of 2000 involving Ingram Micro). Thus, Plaintiff's claims with regard to made orders are pled with sufficient particularly.

*12 However, NAI also points to the fact that Plaintiff never actually alleges that Ingram Micro returned *all* of the made orders it allegedly placed.*Id.* ¶¶ 54, 59, 60.Moreover, even assuming all of the goods were returned, the proper inquiry, in terms of determining whether NAI improperly recognized revenue, is whether the Company's reserves were sufficient to cover such returns. The FACC is silent on this point and thus inadequate. *See Ree v. Pinckert,* No. C 99-0562 MMC at 15 (N.D.Cal.2000) ("even if plaintiffs showed that the 'deals' involved rights of return, plaintiffs fail to allege with specificity that defendant did not properly reserve for returns").

Letters of Intent and Side Agreements. The FACC states that 'throughout the Class Period, the company recognized revenue on agreements with end-users that were based on contingent, non-binding and revokable Letters of Intent."*Id.* ¶ 63.The FACC further states that "the Company recognized the full amount of the purchase order in revenue, despite the fact that as much as 50% of this revenue would be rebated to the seller in the subsequent quarter."*Id.* ¶ 68.

However, the FACC overwhelmingly discusses letters of intent and side agreements in general terms. *See, e.g., id.* ¶¶ 66 ("a former Inside Sales Representative, a former Corporate Account Manager and a former Account Executive confirmed that the use of the Letters of Intent to recognize revenue was so common at [NAI] that the Company developed its own Letter of Intent 'template' to provide as a substitute for a binding and enforceable end-user purchase order") 70 ("throughout the Class Period, the Individual Defendants instructed [NAI's] sales manages to enter orders based on Letters of Intent from end users ..."). In fact, Plaintiff offers only one example of a single customer issuing a revocable letter of intent: "A former Regional Account Manager identified Compuware as one of the Company's resellers that issued Letters of Intent."*Id.* ¶ 65.However, even this example does not offer any specific information about the transactions (*e.g.,* dates and terms of the transaction). This is inadequate under the Reform Act. *See Oak Technology,* 1997 WL 448168 at *8.

Backdating Revenue (*i.e.,* Holding Quarters Open).

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 24051280 (N.D.Cal.)
(Cite as: Not Reported in F.Supp.2d, 2003 WL 24051280)

Page 14

Plaintiff further contends that "the Company improperly recognized revenue in a particular quarter, even though the actual sales were not completed and the prerequisite for revenue recognition in conformity with GAAP had not been satisfied until the subsequent quarter."FACC ¶ 73.

Although most of the claims relating to backdating are stated general, Plaintiff does offer specific examples of when and how long the second and third quarters of FY2000 were held open. For example, the FACC states: "[T]he second quarter of fiscal 2000 was held open until at least 10:00 a.m. on the first day of the third quarter of fiscal 2000...."*Id.* ¶ 76.The same paragraph also states that "the third quarter of fiscal 2000 was kept open until as late as, if not later than, October 6, 2000, despite the fact that the Company publically reported to investors that the third quarter of fiscal 2000 had closed on September 30, 2000."However, Plaintiff fails to make any allegations relating to specific transactions that occurred during these periods. Thus, these claims are also insufficient to state a claim under the pleading requirements of the Reform Act.

*13 Defective Products. Plaintiff alleges that "the Company inflated its revenues throughout fiscal 2000 by selling the E100 product to customers that the defendants knew was defective and would be returned."*Id.* ¶ 78.NAI challenges the sufficiency of this claim on the ground that Plaintiff does not provide any detail to support such an allegation. NAI Motion at 18:20-19:10. In its FACC, Plaintiff alleges that: (1) the E100 was defective (*id.* ¶¶ 79-80); (2) Defendants knew about the problem and anticipated returns (*id.* ¶¶ 81-82, 85); (3) Defendants continued to push the product (*id.* ¶¶ 83-84); and (4) that hundreds of E100s were returned (*id.* ¶¶ 85-86). However, Plaintiff does not offer any details about specific transactions involving E100s (*i.e.,* who purchased the product; how many units were purchased; and what the terms of the agreements were?). Therefore, Plaintiff fails to state a claim based on the sale of the allegedly defective E100 product.

Parking Goods. Finally, Plaintiff alleges that "the Company improperly recognized revenues reflecting substantial fees extracted from other vendors in exchange for [NAI's] agreeing to issue purchase orders for products that [it] had no intention of purchasing."*Id.* ¶ 87.For example, Plaintiff alleges that, in August 2000, a third party called Ramp Networks and asked NAI whether it could ship $2 million in product to NAI, which NAI could return the following quarter for a full refund. *Id.* at ¶ 87.Plaintiff contends that Goyal assented to the request, but demanded a fee of $500,000 to park the inventory. *Id.* at 89.This, according to Plaintiff, is a violation of GAAP. However, even assuming Goyal's actions represent a GAAP violation, the $500,000 allegedly received represents less than 0.21% of NAI's third quarter 2000 revenues of $226.2 million. This amount is immaterial and therefore insufficient to state a claim under the Exchange Act. *See Greebel v. FTP Software, Inc.,* 194 F.3d 185, 206 (1st Cir.1999) ("[a]t best, plaintiffs' additional evidence supports an inference that [the company] improperly recognized from $416,000 to $1.55 million in revenue in the third quarter of 1995. Because [the company] reported overall revenue during the quarter of $37.1 million, these transactions do not support a strong inference of scienter."). Thus, Plaintiff also fails to state a claim for improper revenue recognition in this regard.

In sum, Plaintiff has failed to state a claim with regard to any of the alleged fraudulent accounting practices.

B. Scienter

Scienter is a "mental state embracing intent to deceive, manipulate or defraud."*Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 194 n. 12, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976). Scienter may be established in a number of ways, employing both direct and circumstantial evidence. *See Provenz v. Miller,* 95 F.3d 1376, 1388 (9th Cir.1996). One way to establish scienter is to show motive and opportunity. *See In re Wells Fargo Sec. Litig.,* 12 F.3d 922, 931 (9th

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 3:07-cv-05545-SI    Document 33-14    Filed 05/05/2008    Page 16 of 19

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 24051280 (N.D.Cal.)
(Cite as: Not Reported in F.Supp.2d, 2003 WL 24051280)

Page 15

Cir.1993). Another is to provide evidence of reckless or deliberate behavior.*Hollinger v. Titan Capital Corp.*, 914 F.2d 1564, 1569-70 (9th Cir.1990)

*14 As previously mentioned, "in order to create a strong inference of [scienter, a plaintiff] must state with particularity facts demonstrating deliberate recklessness."*Silicon Graphics*, 183 F.3d at 983. In evaluating whether a plaintiff has pled facts giving rise to a strong inference of fraudulent intent, "the court must consider *all* reasonable inferences to be drawn from the allegations, including inferences unfavorable to the plaintiffs."*See Gompper v. VISX, Inc.*, 298 F.3d 893, 897 (9th Cir.2002).FN22

> FN22. Both Larson and Goyal submit additional briefing on the issue of scienter.

Plaintiff argues that scienter is demonstrated by: (1) the financial restatements for fiscal years 1998, 1999, and 2000 (FACC ¶ 167); (2) the Individual Defendants' motivation to profit from the McAfee.com IPO (*id.* ¶¶ 168-169); and (3) the Individual Defendants' attempt to spin-off the Company's MacAfee division (*id.* ¶¶ 170-172).FN23 The Court will address each of these contentions in turn.

> FN23. Plaintiff also argues that scienter is illustrated through the accounts of the confidential witnesses. However, the Court has already determined that these claims are not pled with the requisite specificity.

1. Financial Restatements FN24

> FN24. NAI "concedes ... the sufficiency of plaintiff's section 10(b) claims arising from the tax restatement...." NAI Reply at 9, n. 5.

The Individual Defendants do not-nor could they-contest that they were control persons within the meaning of section 20(a) of the Exchange Act; each of them held high level positions within the Company.FN25 *See In re Adaptive Broadband Sec. Litig.*, 2002 WL 989478, *19 (N.D.Cal.2002) ("the fact that the named individual defendants held important positions in the company is sufficient at the pleadings stage" to state a claim that a defendant was a control person under section 20(a) of the Exchange Act). Nor can they contest the materiality of the financial restatements.

> FN25. Larson was the CEO and Board Chairman, Goyal was the CFO and Vice President of Financial Administration, and Davis held a number of high-level finance positions with the Company. FACC ¶¶ 15-17.

However, the mere fact that NAI restated its financials for these years is not enough to create the necessary strong inference of scienter. *See Northpoint Communications Group*, 184 F.Supp.2d at 1998 ("[w]ith accounting fraud ... the necessary scienter is in general not established merely by the publication of inaccurate accounting figures, or failure to follow generally accepted accounting principles. More is needed.") (citing *In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1426 (9th Cir.1994)); *see also In re U.S. Aggregates, Inc. Sec. Litig.*,2002 U.S. Dist. LEXIS 23853 at *11 (N.D.Cal.2002) ("the restatement of earnings that resulted, in part, because of these alleged GAAP violations do not raise a strong inference of scienter because there are no particularized allegations suggesting Defendants knew of these violations"). Nor is it sufficient for Plaintiff to allege the documents evidencing the inaccurate financial statements were approved and signed by defendants Larson and Goyal" and approved by defendant Davis (*see, e.g.*, FACC ¶¶ 105, 115, 130). Plaintiff must show that the signing of these statements was "highly unreasonable" and constituted "an extreme departure from standards of ordinary care...."*Hollinger*, 914 F.2d at 1570. Plaintiff's allegations fail to meet this standard; thus, the Court cannot find that the Individual Defendants acted with the requisite scienter.FN26

> FN26. In *In re McKesson HBOC, Inc., Securities Litigation*, 126 F.Supp.2d 1248 (N.D.Cal.2000), plaintiff's scienter allega-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 3:07-cv-05545-SI    Document 33-14    Filed 05/05/2008    Page 17 of 19

Not Reported in F.Supp.2d                                                                                           Page 16
Not Reported in F.Supp.2d, 2003 WL 24051280 (N.D.Cal.)
(Cite as: Not Reported in F.Supp.2d, 2003 WL 24051280)

tions regarding the former executives passed muster, not only because there was a series of earnings restatements, but also because the complaint alleged admissions by the company that the former executives had knowingly participated in the improper inflation of revenues. *Id.* at 1273-6. In *McKesson,* the allegations were supported by the accounts of confidential witnesses, which the court found to be sufficiently detailed. *See id.* at 1271. In this case, the accounts of confidential witnesses are not pled with sufficient particularity.

2. McAfee.com IPO

*15 Plaintiff also argues that the "Individual Defendants' scienter is ... evidenced by their motivation to profit from the McAfee.com IPO...." FACC ¶ 168. In support of this contention, Plaintiff points to the fact that, in FY1999, months prior to the McAfee IPO, the Company granted Larson, Goyal (and former Defendant Watkins) options to purchase a total of 1,440,000 shares of McAfee.com common stock at an exercise price of $3.67 per share.[FN27] *Id.* ¶¶ 168. During the Class Period Larson's stock was valued at more than $25 million and Goyal's stock was valued at more than $11 million. *Id* ¶¶ 15(n), 16(n).

> FN27. Larson was given the right to acquire 900,000 shares or 25% of the total options granted; Goyal was given the opportunity to purchase 360,000 shares or 10.3% of the total options granted. *See* FAC ¶¶ 15(n), 16(n), 168. There are no allegation that Davis was ever given any stock options.

In determining when the sale of stock is suspicious or unusual in the context of insider trading, Courts consider: "(1) the amount and percentage of shares sold by insiders; (2) the timing of the sales; and (3) whether the sales were consistent with the insider's prior trading history."*Riconi v. Larkin,* 253 F.3d 423, 435 (9th Cir.2001). Here, there are no allegations in the FACC that Goyal or Larson sold any stock during the Class Period or on any other occasion. However, in its motion, NAI admits that Larson sold 300,000 shares of stock in 1999 (15.5% of his total exercisable holdings), and another 300,000 shares in 2000 (14.5% of his total exercisable holdings).

Here, Larson's sale of a relatively small percentage of his stock is not sufficient to raise suspicion. *See id.*(CEO's sale of 10% and 17% of stock not suspicious). In addition, there are no allegations that these sales were out of line with Larson's previous stock activity. In fact, the sales themselves are consistent from year-to-year. *See In re Nike, Inc. Sec. Litig.,* 181 F.Supp.2d 1160, 1169 (D.Ore.2002) (stock sales "not out of line with prior practices" not suspicious). Therefore, the McAfee.com IPO and related stock options do not indicate scienter on the part of the Individual Defendants.

3. McAfee Spin-Off

Plaintiff also contends that the Individual Defendants directed the Company to divide into four divisions in an effort to isolate and highlight McAfee's financial performance. FACC ¶ 170. However, Plaintiff does not offer any additional evidence that the Company actually intended to spin-off the McAfee division or how such a spin-off would be profitable to the Individual Defendants.[FN28] Thus, Plaintiff's allegation relating to the alleged spin-off of the McAfee division is not sufficient to state a claim that the Individual Defendants acted with the requisite mind state.

> FN28. Plaintiff contends that the Individual Defendants wanted to duplicate their success with the McAfee.com IPO. *See* FACC ¶ 170. However, there is no indication that the Individual Defendants were granted any stock options related to this alleged spin-off of the McAfee division.

CONCLUSION

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 3:07-cv-05545-SI    Document 33-14    Filed 05/05/2008    Page 18 of 19

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 24051280 (N.D.Cal.)
(Cite as: Not Reported in F.Supp.2d, 2003 WL 24051280)

Page 17

For the reasons stated above, Defendants' motions are GRANTED. The only claims that remain are those against NAI based on the financial restatements for fiscal years 1998, 1999, and 2000.

IT IS SO ORDERED.

## * * CERTIFICATE OF SERVICE * *

I, the undersigned, hereby certify that I am an employee in the Office of the Clerk, U.S. District Court, Northern District of California.

That on March 26, 2003, I SERVED a true and correct copy(ies) of the attached, by placing said copy(ies) in a postage paid envelope addressed to the person(s) hereinafter listed, by depositing said envelope in the U.S. Mail, or by placing said copy(ies) into an inter-office delivery receptacle located in the Clerk's office.

*16 Patrick J. Coughlin, Esq.

Milberg Weiss Bershad Hynes & Lerach LLP

100 Pine Street

Ste 2600

San Francisco, CA 94111

William S. Lerach, Esq.

Milberg Weiss Bershad Hynes & Lerach LLP

401 B Street

Suite 1700

San Diego, CA 92101

Boris Feldman, Esq.

Wilson Sonsini Goodrich & Rosati

650 Page Mill Road

Palo Alto, CA 94304-1050

Paul H. Goldstein, Esq.

Morrison & Foerster

755 Page Mill Rd

Palo Alto, CA 94304-1018

Darryl P. Rains, Esq.

Morrison & Foerster LLP

425 Market St

San Francisco, CA 94105-2482

Elizabeth A. Frohlich, Esq.

Steefel Levitt & Weiss

One Embarcadero Center

30th Floor

San Francisco, CA 94111

Mary Jo Johnson, Esq.

Halle and Dorr LLP

60 State Street

Boston, MA 02109

Robert S. Gans, Esq.

Bernstein Litowitz Berger & Grossmann LLP

12730 High Bluff Drive

Suite 100

San Diego, CA 92130

Alan R. Plutzik, Esq.

Bramson Plutzik Mahler & Birkhaeuser LLP

2125 Oak Grove Road, Suite 120

Walnut Creek, CA 94598

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 24051280 (N.D.Cal.)
(Cite as: Not Reported in F.Supp.2d, 2003 WL 24051280)

Page 18

Daniel H. Bookin, Esq.

O'Melveny & Myers LLP

Embarcadero Center West

275 Battery Street

Ste 2500

San Francisco, CA 94111-3305

N.D.Cal.,2003.
In re Network Associates, Inc. II Securities Litigation
Not Reported in F.Supp.2d, 2003 WL 24051280 (N.D.Cal.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.