# TAB N



Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 2125883 (N.D.Cal.)
(Cite as: Not Reported in F.Supp.2d, 2004 WL 2125883)

Page 1

C
In re Read-Rite Corp.
N.D.Cal.,2004.
Only the Westlaw citation is currently available.
United States District Court,N.D. California.
In re READ-RITE CORPORATION Securities Litigation
No. C-03-03148 RMW.

Sept. 22, 2004.

ORDER GRANTING MOTION TO DISMISS AMENDED COMPLAINT

WHYTE, J.

[Re Docket No. 42]

*1 This Document Relates To: ALL ACTIONS

Defendants Alan S. Lowe and Andrew C. Holcomb's motion to dismiss the amended complaint was heard on August 27, 2004. For the reasons set forth below, the court grants the motion with leave to amend.

I. BACKGROUND

This action is brought under §§ 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 of the Securities Exchange Commission, 17 C.F.R. § 240.10b-5. Plaintiffs brought this action on behalf of themselves and all persons who purchased the securities of Read-Rite Corporation ("Read-Rite") between October 30, 2001 and June 17, 2003. (Amended Compl. ("AC") ¶ 1.) Plaintiffs allege that during the purported class period defendants, as officers of Read-Rite, knowingly made or caused Read-Rite to make numerous false and misleading statements about the company's technical and production capacities, financial status, and competitive prospects. The following facts are taken from the complaint and assumed to be true for purposes of ruling on this motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6).

Read-Rite was one of the world's largest suppliers of recordings heads for use in disk drives. (AC ¶ 13.) Recording heads are miniature components that read and write information to and from a hard disk drive or other storage medium. (AC ¶ 25.) Read-Rite was headquartered in Fremont, California, and during the purported class period had facilities in California, Thailand and the Philippines. (*Id.*) Defendant Alan S. Lowe ("Lowe") was Read-Rite's President and Chief Executive Officer, as well as a Director. (AC ¶ 14.) Defendant Andrew C. Holcomb ("Holcomb") initially served as Vice President and General Counsel, and became Chief Financial Officer in May of 2002. (AC ¶ 15.) Read-Rite, which has filed for bankruptcy, is not named as a defendant in this action. (AC ¶ 1.)

From 2001 to 2003, Read-Rite designed, manufactured and marketed four generations of recording heads, known as the 20 gigabyte ("GB"), 40GB, 60GB and 80GB programs. In 2001, Read-Rite's 20GB program was very successful (AC ¶¶ 27-29), leaving the company poised as the market leader. Moving into 2002, Read-Rite began to transition into producing 40GB recording heads. In November of 2001, the company explained it was beginning to focus on ramping up to produce for its 40GB per platter programs and for the new 60 and 80 GB programs. (AC ¶ 26.) On October 30, 2001 (the start of the purported class period), Read-Rite reported that it had received and was shipping a large order from Western Digital for 40GB heads. However, the company later announced that technical challenges had prevented a smooth production ramp and limited the volume of 40GB heads it was able to ship. (AC ¶ 34.) Due to these technical challenges Read-Rite lost its status as a lead supplier of higher density drives. (*Id.*) Nevertheless, the majority of its fourth quarter revenue in 2002 was generated by sales of 40GB heads. (AC ¶ 54.)

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 3:07-cv-05545-SI   Document 33-15   Filed 05/05/2008   Page 3 of 8

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 2125883 (N.D.Cal.)
(Cite as: Not Reported in F.Supp.2d, 2004 WL 2125883)

Page 2

*2 Faced with ongoing problems with the 40GB heads, in mid-2002, Read-Rite began ramping production for 60 and 80GB heads. On September 9, 2002, it announced that it had received a large purchase order from Maxtor for head gimbal assemblies ("HGAs") supporting Maxtor's 60 and 80GB per platter programs. (AC ¶ 50.) However, as Read-Rite sought to obtain customer qualifications of the 60 and 80GB heads, it faced serious liquidity issues.

By the end of 2002, Read-Rite was forced to refinance existing obligations and obtain a $30 million credit facility from Tennenbaum Capital. (AC ¶ 61.) To further conserve cash, the company implemented a 3-week work furlough program. (AC ¶ 58.) Approximately sixty percent of its workforce was furloughed from December 16, 2002 until January 6, 2003. (*Id.*) Ultimately unable to overcome its liquidity issues, Read-Rite petitioned for bankruptcy on June 17, 2003 (the last day of the purported class period). (AC ¶ 68.) On that day the company admitted it had defaulted on an outstanding credit agreement, and its cash had declined 97%, falling from $126.7 million to $4.2 million during the purported class period. (AC ¶ 3.)

During the proposed class period, defendants individually or through Read-Rite made thirteen public statements which plaintiffs allege were false or misleading. In several instances, the company would issue quarterly earnings guidance and then a few weeks later issue another statement downgrading the earlier revenue projections. Several statements were made about the company's ongoing technical challenges but typically also contained optimistic projections about future technical goals. Read-Rite made several disclosures about its liquidity issues and the steps it hoped to take to solve these issues. Often, the company had to come back to the market and announce that it was unable to accomplish the goals set forth in prior statements. These announcements were frequently made within the same fiscal quarter.

Read-Rite stock began the purported class period trading at a high of $39.00 per share. (AC ¶ 2.) However, after repeated announcements that the company suffered from an ever-increasing revenue loss and consistently missed earnings targets, the share price plummeted. Prior to trading being halted upon announcement of bankruptcy, Read-Rite's stock traded at $0.57 per share. (AC ¶ 2.)

Plaintiffs contend the thirteen allegedly fraudulent statements had the effect of artificially inflating Read-Rite's share price, and were made in an effort to slow its rapid devaluation. Accordingly, plaintiffs brought this action on July 7, 2003.[FN1] Defendants now move to dismiss the amended complaint on the grounds that (1) under the Private Securities Litigation Reform Act ("PSLRA") plaintiffs have failed to sufficiently plead particular facts showing any of the challenged statements were false or made with scienter, and (2) any false statements, sufficiently pled, are protected under the PSLRA's safe harbor or the bespeaks caution doctrine. *See* 15 U.S.C. § 78u-4.

> FN1. An unrelated securities fraud action against Read-Rite was previously filed and dismissed. *See In re Read-Rite Corp.*, 335 F.3d 843 (9th Cir.2003). That action was based on different statements, made within an earlier time frame than those at issue here. *Id.* at 844.

## II. LEGAL STANDARDS

*3 The PSLRA mandates that a complaint in private securities fraud litigation plead with particularity both falsity and scienter. *In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1085 (9th Cir.2002). The purpose of this heightened pleading requirement is fundamentally to eliminate abusive securities litigation and specifically to end the practice of pleading "fraud by hindsight." *In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 988 (9th Cir.1999). A securities fraud complaint must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is

Case 3:07-cv-05545-SI   Document 33-15   Filed 05/05/2008   Page 4 of 8

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 2125883 (N.D.Cal.)
(Cite as: Not Reported in F.Supp.2d, 2004 WL 2125883)

Page 3

made on information and belief, the complaint shall state with particularity all facts on which that belief is formed."15 U.S.C. § 78u-4(b)(1). In addition, the complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."15 U.S.C. § 78u-4(b)(2). Typically, since "falsity and scienter in private securities fraud cases are generally strongly inferred from the same set of facts, [courts incorporate] the dual pleading requirements of 15 U.S.C. §§ 78u-4(b)(1) and (b)(2) into a single inquiry."*Ronconi*, 253 F.3d at 429.

"It is not sufficient simply to allege that a statement was false."*Ronconi*, 253 F.3d at 431;*seealsoIn re GlenFed, Inc. Sec. Litig.*, 42 F.3d 1541, 1552 (plaintiffs may not "merely proclaim in ... conclusory fashion that the defendants made false statements")."When alleging that particular statements were false or misleading, the complaint must make 'specific references to specific facts' as the basis for the falsity allegation."*In re Splash Tech. Holdings, Inc. Sec. Litig.*, 160 F.2d 1059, 1072 (N.D.Cal.2001) (quoting *Wenger v. Lumisys, Inc.*, 2 F.Supp.2d 1231, 1251 (N.D.Cal.1998)). The Ninth Circuit has interpreted the PSLRA's command that "a plaintiff plead all the 'facts' with 'particularity' to mean that a plaintiff must provide a list of all relevant circumstances in great detail."*Silicon Graphics*, 183 F.3d at 984. "Moreover, the complaint must allege that the 'true facts' arose prior to the allegedly misleading statement."*Splash*, 160 F.Supp.2d at 1072 (quoting *Wenger*, 2 F.Supp.2d at 1250)); *seealsoGlenFed*, 42 F.3d at 1548 ("no reason to assume that what is true at the moment plaintiff discovers it was also true at the moment of the alleged misrepresentation....").

To plead scienter, under the PSLRA, "the complaint must allege that the defendant made false or misleading statements either intentionally or with deliberate recklessness or, if the challenged representation is a forward looking statement, with 'actual knowledge ... that the statement was false or misleading.' " *Vantive*, 283 F.3d at 1085 (quoting 15 U.S.C. § 78u-5(c)(1)(B)(i)). "To meet this pleading requirement, the complaint must contain allegations of specific 'contemporaneous statements or conditions' that demonstrate the defendants knew or were deliberately reckless of the false or misleading nature of the statements when made." *Ronconi*, 253 F.3d at 432 (citing *GlenFed*, 42 F.3d at 1548). "It is clearly insufficient for plaintiffs to say that a later, sobering revelation makes an earlier, cheerier statement a falsehood." *Yourish v. California Amplifier*, 191 F.3d 983, 997 (9th Cir.1999). "Honest optimism followed by disappointment is not the same as lying or misleading with deliberate recklessness." *Ronconi*, 253 F.3d at 432. However, "[a] later statement may suggest that a defendant had contemporaneous knowledge of the falsity of his statement, if the later statement directly contradicts or is inconsistent with the earlier statement." *In re Read-Rite Corp.*, 335 F.3d 843, 846 (9th Cir.2003). "[W]hen determining whether the plaintiffs have shown a strong inference of scienter, the court must consider all reasonable inferences to be drawn from the allegations, including inferences unfavorable to the plaintiffs." *Gompper v. VISX, Inc.*, 298 F.3d 893, 897 (9th Cir.2002).

### III. ANALYSIS

1. *Technical Challenges*

*4 On several occasions defendants caused Read-Rite to make announcements containing optimistic statements about the company's ability to overcome technical challenges in producing 40, 60, and 80GB products, or to increase revenue in the future.[FN2] Plaintiffs allege all of these statements were false or misleading for essentially the same reason: defendants knew the company could not overcome its technical challenges. Two examples illustrate plaintiffs' allegations.

> FN2. The technical challenges allegation of falsity primarily pertains to the statements set forth in the amended complaint

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 2125883 (N.D.Cal.)
(Cite as: Not Reported in F.Supp.2d, 2004 WL 2125883)

Page 4

at paragraphs 29, 32, 34, 36, 39, 43, 47, 54, 58, 63, 65, 67, and 68.

First, on January 30, 2002, in its 2002 first quarter report, Read-Rite acknowledged that "technical challenges prevented a smooth production ramp and limited the volume of 40GB heads the company was able to ship," yet it optimistically stated "the company believes it will resolve the technical issues in the second quarter."(AC ¶ 34.) Lowe added, "I expect to see a dramatic improvement in our execution going forward."(*Id.*) Plaintiffs contend it was false or misleading to promise dramatic improvement, when defendants knew through attendance at the War Room Meetings that the technical problems plaguing the 40GB platter product were continuing. (AC ¶ 35.)

Second, on October 30, 2002, Read-Rite issued its 2002 fourth quarter and year end results. That press release stated "going forward we have solid [40GB] products ... and we believe shipments of these programs will now continue in substantial volume."(AC ¶ 54.) Again plaintiffs allege defendants "had no well-founded basis for believing that the 40 GB platter problems had been resolved" when in fact "issues of clarity and clean, noise free signal continued to plague" the 40GB programs. (AC ¶ 55.)

To allege these statements are false, plaintiffs make essentially two dependent allegations: (1) the Read-Rite products perpetually suffered from insurmountable manufacturing problems and product defects; (2) defendants were aware of these defects based on their attendance at bi-weekly War Room Meetings. To be precise, plaintiffs allege:

What was known to defendants but not shared with the investing public is that Read-Rite had been experiencing significant problems in the manufacture of the 40 GB platters and thus was not able to meet orders for the 40 GB platters. The Individual Defendants knew about these problems through attendance at twice-weekly War Room Meetings at which on-going product defects such as clarity and strength of the recording head signal were repeatedly discussed.

(AC ¶ 31.) The only other substantive allegation explaining the War Room Meetings states: "[a]t the War Room Meetings, technical and manufacturing problems were discussed at length, including issues such as the strength and clarity of the signal in the component recording heads."(AC ¶ 5.)

The court finds the War Room Meeting allegations fail to plead falsity or scienter with adequate specificity. Plaintiffs do not allege precisely what was disclosed at these meetings, who disclosed it, or when each issue was disclosed. *See In re Silicon Graphics Inc. Sec. Litig.,* 183 F.3d 970, 984 (9th Cir.1999) (to allege communications informed defendants of facts rendering statements false, plaintiff must allege time, place, parties, and the sources from which information was gleaned about the communication). Moreover, plaintiffs fail to allege the existence of any contemporaneous documentary or testimonial evidence corroborating the nature or content of the War Room Meetings, and what defendants would have learned from their attendance at the meetings. *See Vantive,* 283 F.3d at 1088 (allegation defendants aware of falsity from attendance at management meetings deficient because plaintiffs failed to cite to any specific dates, content, or sources of information about the meetings or related reports). The few allegations describing the technical problems Read-Rite was facing, fail to specify the magnitude of such problems. Without at least an allegation of the magnitude or severity of the technical challenges existing at the time each statement was made, it cannot be inferred that defendants knew or should have known from attending the War Room Meetings that those problems could not be overcome.

*5 In addition, plaintiffs fail to even adequately allege the mere existence of manufacturing or product defects which Read-Rite would not be able to overcome. *See id.* at 1088-89 (allegation that defendant's products "all suffered from technological and performance shortcomings" found to be vague

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 2125883 (N.D.Cal.)
(Cite as: Not Reported in F.Supp.2d, 2004 WL 2125883)

Page 5

because no facts alleged to show how the imprecise deficiencies affected the product). Essentially, only one product defect is particularly described in the complaint.[FN3] That defect is "issues of clarity, [strength] and a clean, noise-free signal" in the 40, 60, and 80GB programs. No facts alleged show what about this particular defect is so technically challenging that it was false or misleading for Read-Rite to state it expected to resolve the problem. In other words, plaintiffs do not allege why defendants could not have believed that these defects were minor or solvable.

> FN3. The amended complaint contains no specific description of the alleged manufacturing defects. Consequently, that allegation is inadequately pled.

It is true that these technical problems did continue to plague Read-Rite, even after the company said it expected them to be resolved. However, this logic is nothing more than finding fraud by hindsight. The statements admitting that technical problems continued to hinder sales and production of the 40GB products, despite prior optimistic statements, do not rise to the level of directly contradictory or inconsistent statements from which falsity can be inferred. The court focuses primarily on Read-Rite's announcements that it believed the problems with the 40GB products were resolved, but later statements indicated technical challenges were still hindering 40GB platter production. Fraud cannot be inferred from these statements because there is no specific allegation that it was the exact same technical issue which the company said was almost resolved that later continued to plague 40GB production.

Therefore, the court finds every allegation of falsity premised upon the existence of insurmountable or ongoing technical challenges is pled with insufficient specificity.

*2. Liquidity Crisis*

Plaintiffs allege several of the statements defendants caused Read-Rite to make were false or misleading because they failed to disclose that the company was facing a "severe liquidity crisis." [FN4](AC ¶ 76.) For example, on September 9, 2002, Read-Rite announced that it received a purchase order from Maxtor Corporation for HGAs supporting 60 and 80GB programs, and that the company was "ramping production ... with volume shipments scheduled this month."(AC ¶ 50.) According to plaintiffs, "[w]hat was privately known to defendants is that Read-Rite lacked the capital or was otherwise unable to produce sufficient 60 and 80 GB platters to meet its commitments under the Maxtor program."(AC ¶ 51.)

> FN4. The liquidity crisis allegation of falsity primarily pertains to the statements set forth in the amended complaint at paragraphs 39, 41, 46, 47, 50, 53, 54, 58, 68, and 70.

No facts are alleged detailing Read-Rite's financial status at the time each of the challenged statements were made. For example, plaintiffs allege defendants knew that without a significant refinancing or infusion of capital," the company could no longer secure raw materials and would soon be out of business. (AC ¶ 52.) Absolutely no specific facts or evidence shows this was the case on September 9, 2002. Plaintiffs' allegations appear to be drawn solely from the fact that Read-Rite subsequently secured over $30 million in additional credit (AC ¶ 61), refinanced existing debt (AC ¶ 63), and eventually admitted to having a capital deficit (AC ¶ 70). However, the fact that Read-Rite sought additional financing in December 2002,[FN5] does not necessarily mean that at any previous point defendants knew the company would have insufficient capital to produce sufficient HGA or platters to meet commitments. It is equally plausible to infer from the facts alleged that defendants believed Read-Rite would be able to meet its production commitments since it was able to obtain a $30 million credit facility from Tennenbaum Capital. (AC

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 2125883 (N.D.Cal.)
(Cite as: Not Reported in F.Supp.2d, 2004 WL 2125883)

Page 6

¶ 61.) Further, there is no allegation that Read-Rite would not have been able to recover from the loss of revenue if it had been able to successfully fill the Maxtor orders. Therefore, any allegation of falsity premised upon an undisclosed liquidity crisis is inadequately pled.

> FN5. In paragraph 61 of the amended complaint plaintiffs allege defendants obtained the credit from Tennenbaum Capital in December 2003, but the remainder of the allegations convince the court this was a typographical error and that December 2002 was intended.

3. *CAPEX*

*6 On April 30, 2002, during a conference call to analysts, Holcomb stated "On capex, [we] have purchased most of the capital we'll need for the next couple of generations of products."(AC ¶ 41.) Plaintiffs allege this was false or misleading because Read-Rite refinanced existing loans less than four months later, and obtained a $30 million capital infusion less than eight months later. (AC ¶ 42.) However, "capex" or "capital expenditure" means "[an] outlay of money to acquire or improve capital assets such as buildings and machinery."John Downes & Jordan Elliot Goodman, *Barron's Dictionary of Finance and Investment Terms* (5th ed.1998). As plaintiffs allege, Read-Rite needed funds to purchase raw materials to fill the Maxtor orders.FN6 (AC ¶ 52.) Purchasing raw materials is not a capital expenditure. Therefore, under the equally plausible scenario that Read-Rite sought the refinancing and capital infusion to purchase raw materials, Holcomb's statement that the company had acquired all of the funding needed for capital expenditures is not false or misleading. *C.f.Ronconi,* 253 F .3d at 432 (allegations failed to create an inference of fraud where statement not necessarily inconsistent with underlying true facts).

> FN6. In fact, plaintiffs do not even allege that Read-Rite made capital expenditures with the additional capital obtained in December 2002.

4. *GAAP Violations*

Plaintiffs allege defendants falsely reported Read-Rite's income by issuing financial statements that failed to comply with Generally Accepted Accounting Principles ("GAAP"). (AC ¶¶ 77-85.) According to plaintiffs, defendants caused Read-Rite to violate GAAP by failing to take an inventory charge and real estate write-down at the appropriate time. (AC ¶ 77.) On July 31, 2002 the company announced third quarter results which varied widely from guidance issued on June 24, 2002. The company explained the difference was the result of a $16.7 million inventory charge, and a $6.8 million asset write-down for the company's real estate in the Phillippines. (AC ¶ 47.)

Plaintiffs argue that the fact Read-Rite restated its 2003 second quarter results alone constitutes an admission by defendants that the company's financial statements were false or misleading. However, "it is well established that GAAP violations, without more, do not establish scienter, even if those GAAP violations were deliberate."*In re Nuko Information Systems, Inc. Sec. Litig.,* 199 F.R.D. 338, 344 (N.D.Cal.2000). The complaint offers nothing more than an allegation of GAAP violations. No explanation for why the inventory or real estate was written down is provided. Plaintiffs merely state that they were overvalued. Further, no specific facts or contemporaneous evidence indicate how or why defendants would have known the inventory or real estate was overstated at any time prior to the June 24, 2002 guidance (the last public statement prior to the write-down announcement). As a result, the facts surrounding the alleged GAAP violations do not give rise to a strong inference that defendants acted with intentional or deliberate recklessness.

5. *Leave to Amend*

*7 Although defendants argue that plaintiffs' complaint is devoid of particularized facts, and no facts

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 2125883 (N.D.Cal.)
**(Cite as: Not Reported in F.Supp.2d, 2004 WL 2125883)**

Page 7

were articulated at the hearing, leave to amend is granted. Though the court has some sympathy for defendants argument, it is not convinced plaintiff should be denied the opportunity to attempt to plead more facts.

### IV. ORDER

For the foregoing reasons, the court finds the amended complaint fails to adequately allege the falsity of the challenged statements and scienter with the requisite particularity. Therefore, the court grants defendants' motion to dismiss the first amended complaint for failure to state a claim without prejudice. Plaintiffs are granted 30 days leave to file a second amended complaint, calculated from the date of this order.

N.D.Cal.,2004.
In re Read-Rite Corp.
Not Reported in F.Supp.2d, 2004 WL 2125883 (N.D.Cal.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.