# TAB P



Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2007 WL 760535 (N.D.Cal.)

**(Cite as: Not Reported in F.Supp.2d, 2007 WL 760535)**

Page 1

**H**

In re Silicon Storage Technology, Inc., Securities Litigation

N.D.Cal.,2007.

Only the Westlaw citation is currently available.

United States District Court,N.D. California.

In re SILICON STORAGE TECHNOLOGY, INC., SECURITIES LITIGATION.

No. C-05-0295 PJH.

March 9, 2007.

Patrick J. Coughlin, Azra Z. Mehdi, Lerach Coughlin Stoia Geller Rudman & Robbins LLP, Christopher T. Heffelfinger, Julie Juhyun Bai, Joseph J. Tabacco, Jr., Nicole LaVallee, Berman DeValerio Pease & Tabacco, P.C., San Francisco, CA, Darren J. Robbins, William S. Lerach, Lerach Coughlin Stoia Geller Rudman & Robbins LLP, San Diego, CA, Jason S. Cowart, Marc I. Gross, Stanley M. Grossman, Pomerantz Haudek Block Grossman & Gross LLP, New York, NY, Patrick V. Dahlstrom, Pomerantz Haudek Block Grossman & Gross LLP, Chicago, IL, for Plaintiffs.

Eunice Jooyoun Lee, Jonathan B. Gaskin, Robert P. Varian, Orrick Herrington & Sutcliffe LLP, San Francisco, CA, for Defendants.

**ORDER GRANTING MOTION TO DISMISS**

PHYLLIS J. HAMILTON, United States District Judge.

**\*1** Defendants' motion to dismiss the second amended complaint came on for hearing before this court on November 8, 2006. Defendants appeared by their counsel Robert P. Varian and Jonathan B. Gaskin, and plaintiffs appeared by their counsel Jason S. Cowart, Patrick V. Dahlstrom, and Julie Bai. At the hearing, the court ordered supplemental briefing, which was completed on November 22, 2006. Having read the parties' papers and carefully considered their arguments and the relevant legal authority, the court hereby GRANTS the motion.

**INTRODUCTION**

This is a proposed class action alleging violations of federal securities laws. Plaintiffs, seeking to represent a class consisting of all those who purchased shares of common stock in defendant Silicon Storage Technology, Inc. ("SST") from April 21, 2004, to December 20, 2004, allege that SST and four of its officers or former officers-President and Chief Executive Officer Bing Yeh ("Yeh"); Chief Operating Officer Yah Wen Hu ("Hu"); Chief Financial Officer Jack K. Lai ("Lai"); and Senior Vice President of Sales and Marketing Derek Best ("Best")-misled investors by overstating SST's inventory value and by making false statements about the company's sales prices.

Plaintiffs claim that defendants issued false reports in connection with SST's quarterly release of financial results for the first, second, and third quarters of 2004. Plaintiffs assert that they were harmed when the price of SST's stock fell by more than 22.5%, following an announcement by the company on December 20, 2004, that it would write down the value of its inventory by $20-25 million.

Plaintiffs allege claims for violation of § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5, against SST, Yeh, Hu, Lai, and Best; and for violation of § 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), against the four individual defendants.

On March 10, 2006, the court dismissed the consolidated amended complaint (CAC) for failure to state a claim, finding that plaintiffs had failed to allege either falsity or scienter with particularity. Plaintiffs filed the second amended complaint (SAC) on May 1, 2006. Defendants now seek an order dismissing the SAC for failure to state a claim.

**BACKGROUND**

SST is based in Sunnyvale, California, where it op-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                    Page 2
Not Reported in F.Supp.2d, 2007 WL 760535 (N.D.Cal.)
(Cite as: Not Reported in F.Supp.2d, 2007 WL 760535)

erates three major facilities. According to periodic reports filed with the Securities Exchange Commission, SST is a leading supplier of "flash memory" semiconductor devices for the digital consumer, including networking, wireless communications, and Internet computing markets. SST offers over 90 products based on its "Super-Flash" design and manufacturing process technology, and also licenses its technology to leading semiconductor companies for use in various applications. Revenue from the sale of these products contributed approximately 50% of the company's revenue during the proposed class period.

In its Form 10-K for 2003, filed in March 2004 (a month before the commencement of the class period), SST reported that it had experienced a "slow recovery" from previously depressed conditions, but that during the second half of 2003, "demand for our products increased sharply and we began to see improvements in the average selling prices of our products."The Form 10-K warned investors that SST's business was cyclical, with downturns characterized by "supply and demand imbalance," "weak product demand, excessive inventory, and accelerated declines of selling prices," and that despite generally positive trends, SST's business could be "harmed by industry-wide prolonged downturns" in the future."The 10-K also cautioned that customer demand was unpredictable, and that changes in average selling prices could result in a significant adjustment and could harm SST's financial results.

*2 In its Form 10-Q for 1Q 2004, filed with the SEC on May 7, 2004, SST reported that average selling prices had increased 16.1% over the previous quarter, and 23.6% over the first quarter of 2003. The company also noted that although the positive trends had continued through the first quarter, its business could be harmed by a reversal of those trends.

According to its Form 10-Q for 2Q 2004, filed on August 5, 2004, SST's product demand and pricing continued to improve. In its October 20, 2004, earnings release, however, SST reported that revenues, shipments, and average sales prices had declined, in part because "digital consumer shipments declined 14 per cent following [SST's] record shipments of nearly 70 million units" in 2Q04.

SST subsequently determined that a write-down of inventory would be required in the fourth quarter of 2004. On December 20, 2004, before the end of the fourth quarter, SST announced that it expected to "record an inventory charge of between $20 and $25 million for excess inventory and to write certain products down to their current estimated market values."SST indicated that "[t]he shortfall in revenue is primarily due to lower than expected demand across all segments and decreased average selling prices caused by industry-wide oversupply and increased competition."

Plaintiffs assert that "the truth began to emerge" after SST announced the inventory write-down. They allege that on the news of the planned write-down, the price of the company's shares, which had closed at $7.01 before the announcement, fell to a low of $5.43 the following day, a drop of 22.5%.

On March 31, 2005, SST filed its 2004 Form 10-K with the SEC. The 10-K included a report from SST's external auditor, PricewaterhouseCoopers, LLP. The auditor stated:

As of December 31, 2004, the Company did not maintain effective controls over accounting for and review of the valuation of inventory .... Specifically, the Company lacked sufficient controls over the writedown of inventory to its lower of cost or market.... This ... deficiency resulted in an audit adjustment to the 2004 consolidated financial statements related to the write-down of inventory to the lower of cost or market. Additionally, this deficiency could result in a material misstatement to the annual or interim consolidated financial statements that would not be prevented or detected.

SAC ¶ 123.

## DISCUSSION

Not Reported in F.Supp.2d

Page 3

Not Reported in F.Supp.2d, 2007 WL 760535 (N.D.Cal.)

**(Cite as: Not Reported in F.Supp.2d, 2007 WL 760535)**

A. Legal Standard

A court should dismiss under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim only where it appears beyond doubt that plaintiff can prove no set of facts in support of the claim which would entitle the plaintiff to relief. *Conley v. Gibson*, 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *Williamson v. Gen'l Dynamics Corp.*, 208 F.3d 1144, 1149 (9th Cir.2000). All allegations of material fact are taken as true and construed in the light most favorable to the nonmoving party. *Gompper v. VISX, Inc.*, 298 F.3d 893, 895 (9th Cir.2002).

**\*3** Review is generally limited to the contents of the complaint.*Allarcom Pay Television, Ltd. v. Gen. Instrument Corp.*, 69 F.3d 381, 385 (9th Cir.1995). However, material that is properly presented to the court as part of the complaint may be considered as part of a motion to dismiss. *Lee v. City of Los Angeles*, 250 F.3d 668, 688-89 (9th Cir.2001). If a plaintiff fails to attach to the complaint the documents on which it is based, defendant may attach to a Rule 12(b)(6) motion the documents referred to in the complaint to show that they do not support plaintiff's claim. *Id.* In addition, whether requested or not, the court may take judicial notice of facts that are capable of accurate and ready determination by resort to sources whose accuracy cannot be questioned. Fed.R.Evid. 201; *see also In re Silicon Graphics, Inc., Sec. Litig.*, 183 F.3d 970, 986 (9th Cir.1999).

B. Defendants' Motion to Dismiss

Defendants seek an order dismissing the SAC for failure to state a claim. They contend that the SAC fails to allege particularized facts showing that the alleged false and misleading statements were false when made, or that defendants knew they were false. Defendants also contend that the SAC fails to plead a claim of control-person liability, because it fails to allege a primary violation.

Section 10(b) of the Securities Exchange Act provides, in part, that it is unlawful "to use or employ in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe."15 U.S.C. § 78j(b).

SEC Rule 10b-5, promulgated under the authority of § 10(b), makes it unlawful for any person to use interstate commerce

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.

To plead securities fraud under Section 10(b) of the 1934 Act, plaintiffs must allege (1) a misstatement or omission (2) of material fact (3) made with scienter (4) on which plaintiffs relied (5) which proximately caused the plaintiffs' injury. *DSAM Global Value Fund v. Altris Software, Inc.*, 288 F.3d 385, 388 (9th Cir.2002). Similarly, the elements of a Rule 10b-5 claim are (1) a material misrepresentation (2) made with scienter (3) in connection with the purchase or sale of a security, (4) transaction and loss causation, and (5) economic loss. *In re Daou Sys., Inc., Sec. Litig.*, 411 F.3d 1006, 1014 (9th Cir.2005).

Under § 20(a) of the 1934 Act, joint and several liability can be imposed on persons who directly or indirectly control a violator of the securities laws. 15 U.S.C. § 78t(a). Violation of § 20(a) is predic-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2007 WL 760535 (N.D.Cal.)
(Cite as: Not Reported in F.Supp.2d, 2007 WL 760535)

ated on a primary violation under the 1934 Act. *Heliotrope Gen'l, Inc. v. Ford Motor Co.,* 189 F.3d 971, 978 (9th Cir.1999). Plaintiffs alleging a claim that individual defendants are "controlling persons" of a company must allege (1) a primary violation of federal securities law and (2) that the defendant exercised actual power or control over the primary violator. *No. 84 Employer-Teamster Joint Council Pension Trust Fund v. America West Holding Co.,* 320 F.3d 920, 945 (9th Cir.2003); *see also Howard v. Everex Sys., Inc.,* 228 F.3d 1057, 1065 (9th Cir.2000).

*\*4* Generally, the Federal Rules of Civil Procedure require that a plaintiff in federal court give a short, plain statement of the claim sufficient to put the defendant on notice. *See*Fed.R.Civ.P. 8(a). However, Rule 9 imposes a particularized pleading requirement on a plaintiff alleging fraud or any claim premised on fraud. *See*Fed.R.Civ.P. 9(b) (in actions alleging fraud, "the circumstances constituting fraud or mistake shall be stated with particularity").

Under Rule 9(b), the complaint must allege specific facts regarding the fraudulent activity, such as the time, date, place, and content of the alleged fraudulent representation, how or why the representation was false or misleading, and in some cases, the identity of the person engaged in the fraud. *In re GlenFed Sec. Litig.,* 42 F.3d 1541, 1547-49 (9th Cir.1994). Because the plaintiff must set forth what is false or misleading about a particular statement, he must do more than simply allege the neutral facts necessary to identify the transaction; he must also explain why the disputed statement was untrue or misleading at the time it was made. *Yourish v. California Amplifier,* 191 F.3d 983, 992-93 (9th Cir.1999).

This case is also controlled by the provisions of the Private Securities Litigation Reform Act ("PSLRA"), which was enacted by Congress in 1995 to establish uniform and stringent pleading requirements for securities fraud actions, and to put an end to the practice of pleading "fraud by hindsight." *In re Silicon Graphics,* 183 F.3d at 958. The

PSLRA heightened the pleading requirements in private securities fraud litigation by requiring that the complaint plead both falsity and scienter with particularity. *In re Vantive Corp. Sec. Litig.,* 283 F.3d 1079, 1084 (9th Cir.2002); *see also In re Daou,* 411 F.3d at 1014. If the complaint does not satisfy these pleading requirements, the court, upon motion of the defendant, must dismiss the complaint. 15 U.S.C. § 78u-4(b)(3)(A).

1. Falsity

Plaintiffs allege that throughout the proposed class period, defendants made false or misleading statements concerning SST's sales prices and the value of its inventory, which in turn caused the company's statements of gross profit, net income, and total assets to be materially misleading.

Defendants contend that the SAC fails to allege falsity, because it includes no specifics showing that any of the alleged false statements were false when made, because the inventory valuations are self-serving fabrications, because the cost figures are vague and bear no relationship to the actual cost of SST's inventory, and because plaintiffs fail to plead facts showing that any of defendants' statements was actually false or misleading when made.

Under the PSLRA-whether alleging that a defendant "made an untrue statement of a material fact" or alleging that a defendant "omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances in which they were made, not misleading"-the complaint must specify each statement alleged to have been false or misleading, specify the reason or reasons why each such statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, state with particularity all facts on which that belief is formed. 15 U.S.C. § 78u-4(b)(1). If the challenged statement is not false or misleading, it does not become actionable merely because it is incomplete. *In re Vantive,* 283 F.3d at 1085;*Brody v. Transitional Hosp.*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 5
Not Reported in F.Supp.2d, 2007 WL 760535 (N.D.Cal.)
**(Cite as: Not Reported in F.Supp.2d, 2007 WL 760535)**

*Corp.,* 280 F.3d 997, 1006 (9th Cir.2002).

**\*5** In the SAC, plaintiffs allege that defendants made false or misleading statements regarding SST's sales prices and inventory valuation in connection with the release of SST's financial results for the first, second, and third quarters of 2004.

With regard to 1Q04, SST issued a press release on April 21, 2004 (the first day of the class period) stating that SST's inventory was worth $69.9 million at the end of 1Q04, and that SST's "average selling prices across all densities" had improved. SAC ¶ 77. Also on April 21, 2004, Yeh stated in a conference call that the most significant factor affecting SST's gross margin in 1Q04 was the "continued firming of our average selling prices across all densities," and that SST's blended average sales price "improved sequentially, roughly 10%, excluding product mix" during that period. SAC ¶ 78.

SST's Form 10-Q for 1Q04, filed May 6, 2004, repeated the statement that SST's inventory was worth $69.9 million as of the end of 1Q04; and indicated that the process by which inventory values were calculated was GAAP-compliant in that "[i]nventories are stated at the lower of cost ... or market value."SAC ¶ 80. Also in the 10-Q, Yeh and Lai certified that, to the best of their knowledge, the 10-Q did not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements therein not misleading.^FN1 SAC ¶ 81.

> FN1. This 302 Sarbanes-Oxley certification stated, in effect, that (a) the 10-Q did not contain any false or misleading statement with respect to the covered period; (b) the financial information in the 10-Q accurately represented SST's financial condition, results of operations, and cash flows for the covered period; (c) Yeh and Lai designed and maintained disclosure controls and evaluated the effectiveness of those disclosure controls; (d) Yeh and Lai

disclosed in the 10-Q any significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting; (e) Yeh and Lai disclosed any fraud that involved management or other employees with a significant role over financial reporting. SAC ¶ 81.

Plaintiffs allege that these statements concerning the 1Q04 financial results were false and misleading for three reasons. First, they assert that the value of SST's total inventory was overstated, because it was inflated by $3,890,000, and that SST's gross profit, income from operations, and cost of revenue were consequently understated. SAC ¶ 83. Second, they contend that SST's inventory was not stated at the lower of cost or market, and that Yeh's and Lai's certifications were made with deliberate recklessness. SAC ¶ 84. They also claim that SST's internal controls for inventory valuations were deliberately reckless insofar as they were designed to allow defendants to manipulate inventory values, and assert that defendants controlled the inventory valuation process so as to allow for various GAAP violations. *Id.* Third, they allege that the prices of SST's products were not "firming" or "improving," as reported, but were, in fact, decreasing. SAC ¶ 85. They claim that defendants' statements regarding SST's prices "led the market to believe that [SST] was immune from downward pricing pressure."SAC ¶ 89.

With regard to 2Q04, SST issued a press release on July 21, 2004, stating that SST's inventory was worth $91 million at the end of 2Q04, and that the company had experienced "firming" selling prices during 2Q04. SAC ¶ 90. SST's Form 10-Q for 2Q04, filed August 5, 2004, repeated the statement that SST's inventory was worth $91 million as of the end of 2Q04. SAC ¶ 91. The 10-Q indicated that the process by which inventory values were calculated was GAAP-compliant in that "[i]nventories are stated at the lower of cost ... or market value."SAC ¶ 92. Also in the 10-Q, Yeh and Lai certified that, to the best of their knowledge, the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                      Page 6
Not Reported in F.Supp.2d, 2007 WL 760535 (N.D.Cal.)
**(Cite as: Not Reported in F.Supp.2d, 2007 WL 760535)**

10-Q did not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements therein not misleading.[FN2] *Id.*

FN2. *See* n. 1, above.

*6 Plaintiffs allege that these statements concerning the 2Q04 financial results were false and misleading for three reasons. First, they assert that the value of SST's total inventory was overstated, because it was inflated by $2,701,000, and that SST's gross profit, income from operations, and cost of revenue were consequently understated. SAC ¶ 94. Second, they contend that inventory was not stated at the lower of cost or market, and that Yeh's and Lai's certifications were made with deliberate recklessness. SAC ¶ 95. They also claim that SST's internal controls for inventory valuations were deliberately reckless insofar as they were designed to allow defendants to manipulate inventory values, and assert that defendants controlled the inventory valuation process so as to allow for various GAAP violations. *Id.* Third, they allege that the prices of SST's products were not "firming," as reported, but were, in fact, decreasing. SAC ¶ 96.

With regard to 3Q04, SST issued a press release on October 20, 2004, stating that SST's inventory was worth $138,990,000 at the end of 3Q04. SAC ¶ 101. SST's Form 10-Q for 3Q04, filed November 15, 2004, repeated that statement. SAC ¶ 102. The 10-Q indicated that the process by which inventory values were calculated was GAAP-compliant in that "[i]nventories are stated at the lower of cost ... or market value."SAC ¶ 103. Also in the 10-Q, Yeh and Lai certified that, to the best of their knowledge, the 10-Q did not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements therein not misleading.[FN3] *Id.* When Lai was asked in an October 20, 2004, conference call whether SST would have to "take a write-down," Lai stated, "[W]e should be okay." SAC ¶ 108.

FN3. *See* n. 1, above.

Plaintiffs allege that these statements concerning the 3Q04 financial results were false and misleading for three reasons. First, they assert that the value of SST's total inventory was overstated, because it was inflated by $10,482,000, and that SST's gross profit, income from operations, and cost of revenue were consequently understated. SAC ¶ 105. Second, they contend that inventory was not stated at the lower of cost or market, and that Yeh's and Lai's certifications were made with deliberate recklessness. SAC ¶ 105. They also claim that SST's internal controls for inventory valuations were deliberately reckless insofar as they were designed to allow defendants to manipulate inventory values, and assert that defendants controlled the inventory valuation process so as to allow for various GAAP violations. *Id.* Third, with regard to Lai's statement during the October 20, 2004, conference call, plaintiffs suggest that the statement was misleading because SST did in fact take a write-down two months later. Plaintiffs claim that defendants knew or should have known that the actual market price of flash memory and the value SST was assigning to its inventory were growing further and further apart, and that an immediate write-down was required. SAC ¶ 109.

*7 In sum, the SAC alleges five categories of false statements: (1) statements regarding the value of SST's inventory, made in three SST press releases and in the 10-Qs for the first three quarters of 2004; (2) statements in the certifications signed by Yeh and Lai in the 10-Qs for the first three quarters of 2004, that SST's inventory was stated at the lower of cost or market value, and that inventory was stated in compliance with GAAP; (3) statements in the certifications signed by Yeh and Lai in the 10-Qs for the first three quarters of 2004, that all statements in the 10Qs were true; (4) statements in press releases relating to issuance of financial results for the first two quarters of 2004, and in one related conference call, that the sales prices of SST's products were "firming" or "improving;" and (5) statement that "we should be okay," made by Lai during the October 20, 2004, conference call, in re-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                     Page 7
Not Reported in F.Supp.2d, 2007 WL 760535 (N.D.Cal.)
**(Cite as: Not Reported in F.Supp.2d, 2007 WL 760535)**

sponse to a question regarding whether SST would take a write-down.

Plaintiffs support their assertions of falsity and scienter with allegations of information obtained from confidential witnesses, and with allegations that the individual defendants attended regularly-scheduled meetings at SST and reviewed certain reports.

In the CAC, plaintiffs alleged facts based on information obtained from six "informants," five of whom were "confidential informants." The court found that none of these informants could have had any relevant information regarding defendants' statements concerning inventory valuation or sales prices during the class period, because all six informants had left their employment at SST prior to the commencement of the proposed class period.

In the SAC, plaintiffs support their claims with allegations of facts obtained from 19 "confidential informants." *See* SAC ¶ 33. Of those 19 informants, ten (including the original five listed in the CAC) did not work at SST during the 8-month proposed class period (CI# 1-5, 10, 11, 13, 14, 16).[FN4] Six worked at SST throughout the class period (CI# 7, 8, 12, 15, 17, 19). Three worked at SST for a portion of the class period (CI # 6, through October 2004; CI # 9, through June 2004; and CI # 18, from May 2004 through the end of the class period). As with the CAC, the court does not consider any facts or information regarding events during the proposed class period which are attributed to the informants who were not present at SST during the proposed class period.

> FN4. Three of these (# 1, 10, and 11) worked at SST until April 2004, and so were present during 1Q04, the quarter that preceded the proposed class period.

In the CAC, plaintiffs referred generally to "reports" discussing excess inventory at SST, and to "monthly and quarterly meetings" where inventory valuation was discussed. However, in dismissing the CAC, the court found that plaintiffs had

failed to cite to any specific report, to mention any dates or contents of reports, or to allege the source of information about any reports, and also failed to provide any specifics regarding the defendants' alleged attendance at the meetings.

In the SAC, plaintiffs provide a list of 21 "Databases and Reports" generated at SST, and also state (for many of the databases and reports) which defendants and which informants and other SST employees had access to them. *See* SAC ¶ 38. Plaintiffs also provide a list of seven types of regularly scheduled meetings; state the general topic(s) of discussion at those meetings and identify some of the SST employees who attended. *See* SAC ¶ 39.

*8 For the most part, the allegations relating to the reports and databases provide no specific, particularized information that contradicts defendants' representations about SST's inventory values or sales prices. For example, plaintiffs allege that the "Work-in-Progress Access" database tracked inventory, but they provide no specifics about any products in SST's inventory or the costs or prices of those products. In addition, the only two "confidential informants" alleged to have had information about this database left their employment at SST well before the commencement of the proposed class period in April 2004: CI # 2 worked at SST until August 2002, and CI # 3 worked at SST until June 2003. *See* SAC ¶¶ 38(a), 33(b), (c).

Similarly, plaintiffs allege that the "Brainstorm" database was used to make six-month budget projections, and claim that unidentified "budgeting managers" and CI # 16 (who worked at SST until September 2003) had access to this database. However, they provide no connection between any information in this database and any alleged false or misleading statement at issue in the case. *See* SAC ¶ 38(d), 33(p).

Indeed, most of the allegations relating to the 19 databases provide only a vague description, unconnected to any other allegations in the SAC-*e.g.,* the "Discovery" database, allegedly used "in connec-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                          Page 8
Not Reported in F.Supp.2d, 2007 WL 760535 (N.D.Cal.)
**(Cite as: Not Reported in F.Supp.2d, 2007 WL 760535)**

tion with reviewing and quantifying commissions for North American sales representatives, SAC ¶ 38(g); the "EMTTD" database, which allegedly "tracked the movement of all materials" from SST destinations worldwide, SAC ¶ 38(h); the "Lot Space Tracking" database, which allegedly "functioned as an inventory tracking system, SAC ¶ 38(i); the monthly "Point of Sale" reports, which allegedly "provided details on the products [SST] sold to its customers, SAC ¶ 38(q); and the "Booking" reports, which allegedly provided information on what products were shipped to which customers," SAC ¶ 38(s).

The only reports or databases as to which the court was able to locate any mention following the list of "Databases and Reports" set forth in SAC ¶ 38, are the "Minimum Price" list, the "EFlash" database, the "Oracle ERP" database, and "Hu's Excel" database. However, plaintiffs refer to all four of these databases in their allegations of scienter. None of the information in the databases is used to support plaintiffs' claim that SST's prices were *not* "firming" or "improving," or the allegation that defendants overstated the value of SST's inventory.

Similarly, apart from providing details of "regularly scheduled meetings," plaintiffs plead no particularized facts obtained from those meetings which are also in conflict with defendants' representations regarding SST's financial results. Many of the allegations regarding meetings are based on statements by various "confidential informants" concerning pre-class period events. *See, e.g.,* SAC ¶ 224(b) (CI# 2 and 3 stated that SST's former CFO told employees at quarterly meetings in 2002 and 2003 that SST needed to write down inventory values); SAC ¶ 225 (CI # 4 stated there were numerous "red flags" regarding inventory at monthly meetings he/she attended through April 2003). Moreover, as discussed in more detail below, plaintiffs allege that SST employees complained at quarterly sales meetings that *market* prices (not SST's prices) were falling. *See* SAC 73(a), (b).

*9 In the order dismissing the CAC, the court found

that the complaint failed to allege falsity because it did not contain allegations of contemporaneous conditions or statements by defendants contradicting SST's statements regarding inventory valuations, and because it did not plead facts showing the specific reasons that the allegedly false statements were false when made. Defendants argue that the SAC suffers from the same defect, and fails to allege falsity because the plaintiffs plead no specific facts showing that defendants' statements were false or misleading, and because the SAC's "inventory valuations" are self-serving fabrications.

Defendants assert that the SAC is pled almost entirely on information and belief, and that with the exception of two "snippets" attributed to Yeh and Lai, and the notation that Yeh and Lai signed SST's Form 10-Qs, the SAC does not allege that any particular defendant made any of the statements at issue. Defendants also contend that the SAC fails to allege particularized facts showing how or why the statements at issue were false and misleading when made; and fails to allege any specifics regarding the dates, contents, authors, participants, or recipients of any contemporaneous meeting, memorandum, or report that might cast doubt on any supposed misstatement.

In response, plaintiffs argue that the statements regarding the valuation of inventory and SST's general business prospects were false when made because the market prices of flash memory were falling generally, and because the market value of SST's inventory was less than the cost of that inventory. Plaintiffs contend that the SAC alleges the amount of the overstatement of inventory value, and alleges new facts that establish that defendants' assertions that prices were rising in 1Q04 and 2Q04 were false, that defendants' inventory valuation in 3Q04 was false, and that SST's stated inventory values were inflated and were based on the false assumption that market values were rising.

*a. statements re valuation of inventory*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2007 WL 760535 (N.D.Cal.)
(Cite as: Not Reported in F.Supp.2d, 2007 WL 760535)

Defendants argue that the allegations that defendants overstated the value of SST's inventory fail to state a claim because plaintiffs plead no facts regarding the cost or price of any product in SST's inventory.

In the CAC, plaintiffs alleged that because the market prices of the products in SST's inventory had fallen below costs in 2004, the inventory values should have been properly written down to account for this decrease. In support, they asserted that the market price for various types of flash memory manufactured and sold by Intel and AMD had declined between April 2004 and December 2004, and that defendants knew or should have known that the prices of these products, which competed with SST's products, were falling. However, the CAC stated no facts regarding comparable products in SST's inventory or the cost or market price of those products. At the hearing on the motion to dismiss the CAC, plaintiffs' counsel essentially conceded that plaintiffs had no such information regarding the cost or market value of SST's products.

**\*10** The parties agree that GAAP requires that inventory be valued at the cost of producing it, unless and until its market price drops below cost. *See* ARB No. 43, Chap. 4, Statement 5. In the order dismissing the CAC, the court found that plaintiffs had failed to meet the pleading requirements of the PSLRA, in part because they alleged no facts regarding the products in SST's inventory, or the cost or market price of those products.

In addition, the court found that the allegations regarding the decline in prices for flash memory produced by Intel and AMD did not support the claim that defendants had made false statements regarding SST's financial results during the first three quarters of 2004, in part because the inventory charge was taken primarily on SST's 8-megabit and 16-megabit flash memory, while the Intel and AMD products referenced in the CAC were 4-, 8-, 16-, and 32-megabyte flash memory, products that did not compete with products sold by SST.

In the SAC, plaintiffs again assert that because the market prices of SST's inventory had fallen below costs in 2004, the inventory values should have been properly written down to account for this decrease. SAC ¶ 129. They allege generally that "competition was driving [SST's] flash memory prices down," claiming that throughout 2004, Intel "actively engaged in the flash memory market and increased its flash memory unit sales by lowering flash memory prices."SAC ¶ 53. Plaintiffs also assert that "it was well known" that Samsung, AMD, Fujitsu, Atmel, Winbond, Actrans, EON Silicon Solution (Taiwan), Macronix International Co. Ltd. (Taiwan), PMC Flash (San Jose, California), and AMIC (Taiwan) were also selling flash memory products that "competed with" products sold by SST. SAC ¶ 54.

Plaintiffs' only factual support for these allegations are the claims that certain unnamed SST employees (some of whom did not work at SST during the proposed class period) confirmed that Intel and the other companies mentioned above were competitors of SST, and that SST itself stated in its 2004 Form 10-K that products manufactured by these companies competed with SST's products. However, these allegations are no more adequate than the ones in the CAC, as they state no facts regarding the cost or market of the specific products manufactured by SST.

Plaintiffs claim, however, that the average cost and market values of SST's inventory can be calculated on a quarterly basis, using SST's public filings and generic market data obtained from Selantek, Inc. ("Selantek"), which plaintiffs identify as "a market research firm specializing in semiconductor market research (including pricing information)." SAC ¶ 56. Plaintiffs allege that based on these calculated values, the amounts by which SST allegedly overstated its inventory values and profits can be computed. SAC ¶ 133.

Plaintiffs first provide charts summarizing their claim of "key misstated data." SAC ¶¶ 134-135. They then set forth a convoluted and incomprehens-

Not Reported in F.Supp.2d                                                                    Page 10
Not Reported in F.Supp.2d, 2007 WL 760535 (N.D.Cal.)
**(Cite as: Not Reported in F.Supp.2d, 2007 WL 760535)**

ible "methodology" of calculating "average market values" and "average unit costs" of flash memory in SST's inventory, "actual inventory values," and "required allowances" for overvalued inventory in 1Q04, 2Q04, and 3Q04. *See* SAC ¶¶ 128-188. Plaintiffs' explanation of the "methodology" is particularly confusing because it requires the reader to jump back and forth between various paragraphs of the SAC.[FN5]

> FN5. District courts in the Ninth Circuit have repeatedly chastised plaintiffs for this kind of "puzzle-style" pleading. *See, e.g., In re Splash Tech. Holdings, Inc. Sec. Litig.,* 160 F.Supp.2d 1059, 1073-75 (N.D.Cal.2001).

**\*11** For example, SAC ¶ 141 purports to explain how to calculate "actual inventory value" and the "appropriate inventory allowance." SAC ¶ 141 refers in turn to SAC ¶¶ 161-163 and 145-147. In ¶¶ 161-163, in three sentences beginning with "[t]hus," plaintiffs purport to set forth the dollar amount of SST's "average unit cost for goods in inventory" in 1Q04, 2Q04, and 3Q04. "Thus" normally signals a conclusion. Accordingly, the court looks back to the beginning of the section containing ¶¶ 161-163-to ¶ 158-which refers in turn to the "average unit inventory cost" at the end of 2003 and 2004, set forth in ¶ 152 (referring to the "average unit cost of inventory" based on Selantek data), and ¶ 157 (referring to the "average unit inventory cost" at the end of 2004), based-as stated in ¶ 156-on the methodology discussed in ¶ 136 (the Selantek data).

Paragraph ¶ 141 also refers to ¶¶ 145-147 ("application of methodology to facts"). In that section, plaintiffs allege that the Selantek data "indicates that the average unit market value of flash memory densities sold by [SST]" fell from $2.03 in 4Q03 to $1.89 in 1Q04; then fell to $1.84 in 2Q04; and then fell to $1.76 in 3Q04. Nevertheless, despite all this verbiage, or perhaps because of it, the court can still find no clear explanation of how to calculate SST's "actual inventory value."

Compounding the confusion is plaintiffs' account of the actual "methodology." Plaintiffs first explain that they used the Selantek data to calculate the "average unit market value" of "finished flash memory" held in SST's inventory for 4Q03 and all four quarters of 2004. According to plaintiffs, they made this calculation using Selantek's "market value" data concerning "average sales prices" for sales of 2-, 4-, 8-, and 16-megabit products in "Asia" because 87% of SST's sales were of 2-, 4-, 8-, and 16-megabit products in "Asia." SAC ¶ 136.

Second, plaintiffs calculate the "average unit cost" of SST's inventory based on the percentage relationship between (i) the value of SST's finished and consigned goods held in inventory before an allowance was taken to account for excess and obsolete inventory and inventory where the price had fallen below cost, and (ii) the amount of the allowance actually taken to account for those "market realities." SAC ¶ 137. Plaintiffs claim that this percentage represents the amount by which SST's actual costs exceeded actual market values. SAC ¶ 138. Plaintiffs apply this percentage to the "average market value" of SST's flash data, as they calculated it based on the Selantek data, *see* SAC ¶ 136, to determine the "average unit cost" of flash memory in inventory as of year-end 2003 and 2004. SAC ¶ 139. They then compare the year-end 2003 "average unit costs" with the year-end 2004 "average unit costs," and then "ratably apportion [ ]" the decline in costs to each quarter's "average inventory unit costs." SAC ¶ 140.

**\*12** Third, plaintiffs calculate the "actual inventory value" and the "appropriate inventory allowance" in 1Q04, 2Q04, and 3Q04 by comparing the "average quarterly inventory unit costs," set forth in SAC ¶¶ 161-163, to SST's average quarterly inventory unit market values (based on the Selantek data) to determine the percentage by which SST's "actual inventory unit costs" exceeded "actual inventory market values" for each quarter. SAC ¶ 141. They then apply this percentage to the "quarterly value" of SST's finished and consigned goods held in in-

Not Reported in F.Supp.2d                                                                 Page 11
Not Reported in F.Supp.2d, 2007 WL 760535 (N.D.Cal.)
**(Cite as: Not Reported in F.Supp.2d, 2007 WL 760535)**

ventory, before any allowance was taken to account for excess and obsolete inventory and inventory written down to the lower of cost or market, to determine the inventory allowance that should have been taken. SAC ¶ 142.

Plaintiffs next explain that because SST did not report the portion of the inventory allowance that was taken to account for excess and obsolete inventory and inventory written down to the lower of cost or market, they (plaintiffs) have utilized the following calculation to figure this value: They add the "total inventory allowance value" (which includes allowance for excess and obsolete inventories, write-down of inventories and adverse purchase commitments) as stated in SST's 10-K for 2003, to the "provision for excess and obsolete inventories, write-downs of inventories and adverse purchase commitments" set forth in the 10-Q for the relevant quarter, and subtract the "total valuation adjustments to inventory" and the allowance for adverse purchase commitments set forth in the 10-Q for the relevant quarter. SAC ¶ 143. They then compare the value of the allowance they claim should have been taken to the calculated allowance that actually was taken. SAC ¶ 144.

After setting forth the above-described "methodology" in SAC ¶¶ 136-144, plaintiffs present the "application of [the] methodology to facts," in ¶¶ 145-184, as follows. First, again based on the generic Selantek data, they calculate that the "average unit market value" of flash memory densities sold by SST during 1Q04 fell from $2.03 in 4Q03 to $1.89 in 1Q04, a decrease of 6.9%; that the "average unit value" of flash memory densities sold by SST during 2Q04 was $1.84, a decrease of 2.58% from 1Q04; and that the "average unit value" of flash memory densities sold by SST during 3Q04 was $1.76, a decrease of 4.35% from 2Q04. SAC ¶¶ 145-147.

Second, they calculate the "average unit cost" of SST's inventory as of the end of 2003. They assert that based on the financial statements in SST's 2003 Form 10-K, SST had set aside $11,216,000 as an al-

lowance to account for the excess and obsolete inventory and inventory where carrying costs exceeded market value; and that as of the same time, the value of the finished and consigned goods held in inventory was $25,336,000 before any allowance had been taken to account for excess and obsolete inventory and inventory where the price had fallen below cost. SAC ¶¶ 149-150. Thus, plaintiffs allege, the total value of the finished goods and consigned inventory had been reduced by 44% due to market price declines ($11,216,000 divided by $23,336,000). SAC ¶ 150. In other words, they assert, the cost of finished and consigned goods held in inventory exceeded actual value by approximately 44%. *Id.*

*13 Plaintiffs claim that because SST's "average unit cost" of inventory exceeded its "average unit market value" of inventory by approximately 44%, and the average unit value of inventory was $2.03 (calculated based on the generic Selantek data), it is therefore reasonable to assume that the "average unit cost" of SST's inventory was $3.64 as of December 31, 2003. SAC ¶ 152.

Third, plaintiffs perform a similar calculation to come up with the "average unit cost" of SST's inventory as of the end of 2004. They conclude that the total value of the finished goods and consigned inventory before the allowance was taken ($98,294,000) had been reduced by 33% ($32,182,000-the amount of the allowance), and that the cost of the finished and consigned goods held in inventory therefore exceeded the actual value by approximately 33%. Taking Selantek's "average unit market value" of finished flash memory in SST's inventory at 4Q04-$1.84 and increasing by 33%, plaintiffs assert that it is reasonable to assume that the average unit cost of SST's inventory was $2.42 in 4Q04. SAC ¶¶ 153-157.

Next, using the "average unit cost" of inventory as of the end of 2003 ($3.64, per SAC ¶ 152), compared to the "average unit cost" of inventory at the end of 2004 ($2.42, per SAC ¶ 157), plaintiffs calculate that SST's unit costs of goods held in invent-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

ory declined by $1.22 per unit from December 31, 2003, to December 31, 2004. SAC ¶ 158. Plaintiffs then allocate that decrease across the four quarters of 2004, and calculate that SST's unit costs declined by approximately $0.30 per quarter. They deduct $0.30 each quarter, and come up with "average unit costs for goods held in inventory" of $3.34 for 1Q04; $3.03 for 2Q04; and $2.72 for 3Q04. SAC ¶¶ 160-163.

Plaintiffs assert that because the "average unit cost" of SST's inventory was $3.34 for 1Q04, and the "average unit market value" of such inventory was $1.89 for 1Q04 (per SAC ¶ 145, calculated based on the generic Selantek data), the "average unit inventory cost" exceeded the "average unit inventory market value" by 43%. SAC ¶ 164. Next, using the methodology described in SAC ¶¶ 136-144, plaintiffs calculate that the 1Q04 value of SST's finished and consigned goods held in inventory before an allowance was taken to account for excess and obsolete inventory was $31,199,000. SAC ¶ 165.

Plaintiffs claim that because the "average unit cost" exceeded the "average unit market value" by 43% during 1Q04-referring back to SAC ¶ 164-the required allowance should have been $13,544,000, or 43% of $31,199,000. SAC ¶ 166. However, according to plaintiffs, the "methodology" described in ¶¶ 136-144 produces a 1Q04 allowance to account for excess and obsolete inventory of $9,654,000. SAC ¶ 167. Thus, plaintiffs assert, defendants materially understated the 1Q04 allowance by $3,890,000, and overstated the value of the finished inventory by the same amount. SAC ¶ 168. In addition, plaintiffs claim, because the inventory value was overstated, the revenue, profit, and income from operations were also overstated. SAC ¶ 170.

**\*14** Plaintiffs perform similar calculations for 2Q04, *see* SAC ¶¶ 171-177, and 3Q04, *see* SAC ¶¶ 178-184. They conclude that the defendants materially understated the allowance for 2Q04 by $2,701,000, and overstated the inventory value by

the same amount for that period; and that defendants materially understated the allowance for 3Q04 by $10,482,000, and overstated the inventory value by the same amount for that period. Thus, according to plaintiffs, the $20-25 million write-down in inventory that SST announced on December 20, 2004, would have been approximately $17,073,000 less if defendants had not overstated the value of SST's inventory in statements of financial results for the first three quarters of 2004. SAC ¶¶ 185-188.

Defendants argue that the SAC should be dismissed because plaintiffs fail to plead facts showing that any of defendants' statements were false or misleading, and also fail to plead particularized, contemporaneous facts to support the alleged overvaluation of inventory. In particular, defendants assert that the SAC's "inventory valuations," described above, are self-serving fabrications. They contend that in order to allege that SST's inventory was overvalued, plaintiffs must provide specific information regarding both the cost and the market price of the company's products in inventory. They argue, however, that the SAC provides no information to show that the inventory was incorrectly valued- much less the required detailed information concerning the market price and the cost of specific inventory that plaintiffs claim should have been written down.

Defendants assert that the SAC does nothing to correct the deficiencies of the CAC, as the SAC does not claim that Selantek had any specific data on SST's prices or costs-just that Selantek based its conclusions on broad categories of data like "average selling price" of "low density flash memory" in "Asia" (citing SAC ¶ 57), and that plaintiffs used this generic data in order to calculate the "average unit market value" for finish flash memory held in SST's inventory (citing SAC ¶ 136). Defendants assert that the Selantek data is useless for purposes of alleging falsity in the present case, as it does not include any particularized information on SST's products, and does not

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2007 WL 760535 (N.D.Cal.)
(Cite as: Not Reported in F.Supp.2d, 2007 WL 760535)

even indicate that it included SST pricing data in its generic database.

Defendants also contend rather than using Selantek's already broad product categories-"less than 2Mb," ">2Mb up to 4Mb," and so forth, plaintiffs have combined all 16Mb and lower flash products, irrespective of end use or whether SST manufactures them, together into a single "low density" category (citing SAC ¶ 136). Defendants argue that plaintiffs improperly base all subsequent "calculations" and assertions on the inaccurate proposition that the "average pricing" in this "low density flash memory" category equals SST's inventory. Defendants contend that the result is an artificially lowered "average selling price" because of the inclusion of wholly inapplicable categories of pricing data.

*15 Similarly, defendants note, plaintiffs claim to have used Selantek data for "Asia," but that they have not clarified that "Asia" is not a market for which Selantek reports. According to defendants, Selantek reports for "China," "Japan," "Korea," "Asia Pacific," "US," "Rest of America," "Rest of the World," and so forth, but not for "Asia."

Defendants argue that plaintiffs' "cost" figures are equally baseless. They claim that the term "average unit cost of inventory" is a vague construct that cannot meet the requirements of the PSLRA. They also assert that plaintiffs incorrectly assumed, when calculating the total value of inventory by adding back the entire inventory reserve allowance,[FN6] that the *entire* reserve allowance relates to decline in market value, and completely ignored the allowance for excess and obsolete inventory (citing SAC ¶¶ 137, 138, 148-150). Defendants claim that including the entire allowance in this fashion prevents the process of calculating "average unit cost" and results in a falsely inflated market price decline and generates a bogus "need" for further reserve allocation provisions (citing SAC ¶¶ 153-188). According to defendants, without a proper calculation of all components of the inventory allowance, plaintiffs' "average" has no correlation to the actual cost of inventory.[FN7]

FN6. GAAP requires that, when a company is reporting inventory value, it must provide an "allowance" or "reserve," which must include the amount by which the inventory carrying value (recorded as assets) exceeds market value (either because the inventory is excess or obsolete or because cost exceeds market value). Any increase in such reserve must be accounted for as an expense, and charged against earnings in the "Statement of Operations." *See* SAC ¶ 130.

FN7. In the SAC, plaintiffs allege that SST's inventory allowance did not include reserves for raw materials or "work in process" because SST's manufacturing process rendered such reserves unnecessary. They claim that until the manufacturing process with respect to a given product was "finished," SST retained the ability to convert that product (flash memory) into one with another density. They assert that "[a]s a result, SST's allowance for excess/obsolete inventory and inventory where cost exceeded market value was based almost exclusively on the value of finished and consigned goods held in inventory and not the value of raw materials or work in process held in inventory."SAC ¶ 131.

In their motion to dismiss, defendants argue the 10-Qs for the first three quarters of 2004 clearly indicate that SST's inventory consisted of raw materials, work in process, *and* finished goods, and that the "raw materials" and "work in process" components each were larger than the "finished goods" component in the majority of quarters at issue, and there is therefore no basis for attributing the entire inventory reserve to finished goods. Defendants also claim that SST's inventory reserves were for *both* lower of "cost

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2007 WL 760535 (N.D.Cal.)
(Cite as: Not Reported in F.Supp.2d, 2007 WL 760535)

or market" *and* "excess and obsolete" inventory, and that SST's public filings clearly state that the inventory reserve included a large allowance for excess and obsolete inventory. They note that the SAC ignores the "excess and obsolete" component, treats the inventory reserve as if it consisted solely of lower of "cost or market," and attributes the entire reserve to finished goods.

Defendants assert that plaintiffs' decision to remove the "total valuation adjustments to inventory" amount from SST's inventory reserve allowance artificially understates the SST inventory reserve figures so plaintiffs can then complain that the reserve is too low. Defendants contend that plaintiffs incorporated all the pricing errors and distortions by basing all the calculations for SST specific costs on manipulated Selantek market pricing data.

In addition, defendants argue, plaintiffs equally apportioned the asserted $1.22 decline in average inventory cost across 2004 (referring to the $0.30 per quarter estimated decline in inventory costs, in SAC ¶¶ 140, 158-163). According to defendants, this methodology reversal results in the improper shuffling of the December 20 write-down into previous quarters. Defendants conclude that plaintiffs are, in effect, alleging that none of SST's inventory was being sold for a price greater than its cost, and that the average loss SST took on every sale was more than $1. Defendants argue that if that were the case, SST would have long since gone out of business, since, based on the nearly 70 million units shipped in 2Q04, SST would have lost some $83 million in that quarter alone.

In response, plaintiffs argue that the SAC adequately alleges that SST's prices were falling throughout the proposed class period, and also alleges the amount of the overstatement of inventory value. They dispute the assertion that the Selantek data is not reliable because it is not specific to SST's prices, arguing that SST's prices were equivalent to the prices of competitors as monitored by Selantek because flash memory sold by SST was a "commodity product." They assert that SST's prices were equivalent to market prices, because competitor prices were used to set SST's prices, and because SST's flash memory of a given density was in direct competition with flash memory of the same density sold by competitors.

**\*16** Plaintiffs also rely on a declaration from Jason S. Cowart, one of plaintiffs' attorneys. Attached to the Cowart Declaration is an exhibit entitled "Methodology," which purports to "further explain the methodology used in the ... SAC."Cowart states that this exhibit was developed with the assistance of plaintiffs' unidentified consultants, one of whom allegedly holds licenses as a CPA, a "Certified Value Advisor" and a "Certified Fraud Examiner," and who allegedly has expertise in business valuations, .and economic and financial analysis. Plaintiffs assert that they have thereby established that defendants overstated the value of SST's inventory by $3,890,000 in 1Q04 and by 2,701,000 in 2Q04.

Plaintiffs dispute defendants' argument that plaintiffs improperly calculated the total value of inventory by adding back the entire inventory reserve allowance. Plaintiffs argue that in order to calculate inventory cost, the methodology added the stated inventory value to (1) the allowance created for inventory that cost more to produce than its market value, and (2) the allowance created to account for inventory that had limited market value, because it was excess and obsolete. Plaintiffs claim that in this way, the SAC was able to determine the value of inventory-its cost-before any adjustment was made to account for the fact that the market value of that inventory had dropped below cost.

Plaintiffs argue that the allowance for excess and obsolete inventory and the allowance for the lower of cost or market are both designed to account for declining market values, and the inclusion of both when calculating cost was entirely appropriate. They dispute defendants' argument that the inventory allowances covered raw materials, work in pro-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2007 WL 760535 (N.D.Cal.)
(Cite as: Not Reported in F.Supp.2d, 2007 WL 760535)

cess, and finished goods, asserting that the confidential informants confirmed that while "finished goods" could not be converted into other products, "raw materials" and "work in process" could be. Thus, plaintiffs assert, declining market values had a much more direct and profound effect on "finished goods" held in inventory, and the fact that the inventory may have also contained the other two categories of materials is of no significance.

Plaintiffs argue that the methodology of calculating the inventory allowance on a quarterly basis was necessitated by the fact that SST did not report in specific line items, on a quarterly basis, the portion of the inventory allowance that was taken to account for excess and obsolete inventory, and inventory written down to the lower of cost or market. Plaintiffs claim that their methodology was the only way possible to come up with the inventory valuation.[FN8]

> FN8. Plaintiffs argue that the assumptions used in the methodology were necessitated by the fact that SST has "refused to disclose" the proprietary information that would allow "the public" to determine whether the company's inventory values were accurate. They suggest that their conclusions regarding the value of SST's inventory should be taken as true because defendants have offered no better way to analyze the inventory valuation, given the fact that SST "withheld this information from the market."

Plaintiffs maintain that the SAC adequately explains that the 1Q04 and 2Q04 inventory valuations were false statements because they were based on inflated market value assumptions; and that it also explains that defendants' assertions about the process used to value inventory were false because defendants knew they were using faulty assumptions as part of that process.

**\*17** Plaintiffs also contend that the SAC explains why the defendants' 3Q04 statements were false.

Plaintiffs claim that although defendants had been forced to admit by the end of 3Q04 that the average selling prices of their flash memory had declined, the SAC alleges that defendants had failed to account for those declining market values when they calculated the company's inventory value in the third quarter, rendering that inventory valuation false.

The court finds that the SAC fails to state a claim with regard to SST's inventory valuation, because plaintiffs fail to provide particularized information regarding the relationship between the cost and market prices of specific SST products. The Selantek data is based on general market sectors, not, in this case, on SST's products, markets, values, and so forth. This generic Selantek data cannot substitute for facts regarding the SST's costs and prices. Nor can conclusory assertions that all flash memory products are "commodities," and that all prices are essentially the same across the entire industry, substitute for particularized facts supporting the claim that defendants falsely reported the value of SST's inventory in 1Q04, 2Q04, and 3Q04.

In addition, the court is persuaded by defendants' argument that if the SAC's numbers for market prices and carrying costs were correct, SST would have sold all of its products for far below cost, and sustained massive losses on all such sales. However, the SAC does not allege accounting irregularities in SST's audited financial statements, and those statements show a profit of $127 million in 2004. It is also illogical, as defendants note, for plaintiffs to claim that SST dramatically increased its production in late 2004, knowing that the inventory could only be sold at a fraction of production costs.

*b. certification by Yeh and Lai that inventory was stated at lower of cost or market value, and in compliance with GAAP*

Plaintiffs allege that Yeh and Lai made false or misleading statements when they certified in the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 16
Not Reported in F.Supp.2d, 2007 WL 760535 (N.D.Cal.)
**(Cite as: Not Reported in F.Supp.2d, 2007 WL 760535)**

10-Qs for the first three quarters of 2004 that SST's inventory was stated at the lower of cost or market value, and in compliance with GAAP. The adequacy of this allegation with regard to inventory valuation is completely dependent on the adequacy of the allegation, discussed above, that defendants overstated the value of SST's inventory. The court has already found that the SAC fails to allege particularized facts supporting the claim that the statements regarding inventory valuation were false or misleading.

Moreover, with regard to both the statement regarding inventory valuations and the statement regarding compliance with GAAP, the court notes that there is nothing in either the 1934 Securities Exchange Act or the Sarbanes-Oxley Act and implementing regulations that authorizes plaintiffs to base a claim for securities fraud on an alleged misstatement in a Sarbanes-Oxley certification.

While some courts have held that allegations of false Sarbanes-Oxley certifications may give rise to an inference of scienter, *see, e.g., In re Lattice Semiconductor Corp. Sec. Litig.,* 2006 WL 538756 (D.Or., Jan.3, 2006) at *17-18, others have held that they do not, except in limited circumstances, *see Garfield v. NDC Health Corp.,* 466 F.3d 1255, 1265-66 (11th Cir.2006) (plain meaning of language contained in Sarbanes-Oxley Act does not indicate any intent to change the requirements for pleading scienter set forth in the PSLRA; Sarbanes-Oxley certification is probative of scienter only if person signing certification was severely reckless in certifying accuracy of financial statements); *see also In re Watchguard Sec. Litig.,* 2006 WL 2038656 (W.D.Wash., April 21, 2006) at *9-10. However, this court has not located-nor have plaintiffs cited-any case holding that a statement in a Sarbanes-Oxley certification that financial statements comply with GAAP is independently actionable under § 10(b) or Rule 10b-5, as opposed to simply providing a basis for an inference of scienter.

*c. certification by Yeh and Lai that all statements in SST's 10-Q's were true*

**\*18** Plaintiffs allege that Yeh and Lai made false or misleading statements when they certified that all statements in the 10-Qs for the first three quarters of 2004 were true. Plaintiffs claim that these statements were false because the statements regarding inventory valuation were false. For the reasons stated above, in the discussion of the certification regarding inventory valuations and compliance with GAAP, the court finds that the SAC fails to state a claim as to these statements.

*d. statements that SST's selling prices were "firming" or "improving"*

Plaintiffs allege that the statements in the April 21, 2004, press release and conference call, and in the July 21, 2004, press release, that SST's selling prices were "firming" or "improving" were false when made.

Defendants argue that the SAC alleges no particularized facts that refute defendants statements regarding selling prices in 1Q04 and 2Q04. Defendants contend that at most, the SAC alleges that a handful of "confidential informants" believed that unspecified prices on unspecified products declined at unspecified times in the years following 2002. Defendants contend that this is insufficient to plead falsity under the PSLRA.

Plaintiffs allege, based on information obtained from various "confidential informants," that participants at meetings held during 1Q04 and 2Q04 discussed the fact that SST's prices were falling. However, the SAC does not identify any of SST's more than 90 products and provides no information regarding the price at which any particular product was sold at any particular time.

Instead, plaintiffs rely instead on the generic industry data obtained from Selantek. As discussed above with regard to the inventory valuations, however, the Selantek data is not based on any in-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2007 WL 760535 (N.D.Cal.)
(Cite as: Not Reported in F.Supp.2d, 2007 WL 760535)

formation regarding SST's prices. Moreover, it classifies products in broad, irrelevant categories such as "less than 2Mb," ">2Mb up to 4Mb," and so forth; large geographic regions such as "China," "Europe," and "Rest of the World" (but not "Asia"); and for each category and region, provides only general average prices rather than product-specific information.

Plaintiffs assert that CI# 3, 13, and 16 all stated that flash memory products, including those manufactured by SST, are "commodity products," and that products of the same densities are generally priced the same. SAC ¶ 40. They also claim that CI# 2 and 13 stated that SST's products shared the same market as products of the same density manufactured by the SST's competitors. SAC ¶ 41. However, none of these "confidential informants" worked at SST during the proposed class period, and plaintiffs do not allege facts sufficient to "support the probability that a person in the position occupied by the [confidential] source would possess the information alleged."*Nursing Home Pension Fund, Local 144 v. Oracle Corp.,* 380 F.3d 1226, 1233 (9th Cir.2004).

CI # 2 worked at SST until August 2002 as a "inventory control analyst" who tracked inventory and received inventory shipments, and then until June 2003 as a "document control specialist" who analyzed and reviewed internal documents, including documents regarding inventory. SAC ¶ 33(b). CI # 3 worked at SST through 2000 as a "production control manager" who managed off-shore test houses and developed forecasts that corresponded with inventory goals, and then until June 2003 as a "senior business planner" who tracked shipments of flash memory products. SAC ¶ 33(c). CI # 13 worked at SST through March 2003 as a "regional sales director" who was responsible for selling SST products to customers on the East Coast of the U.S. and in Canada. SAC ¶ 33(m). CI # 16 was Vice President of North American sales from 2000 through September 2003. SAC ¶ 33(p). Plaintiffs allege no facts showing that CI# 2 and 3, each of whom left SST in June 2003, or that CI #

13, who left SST in March 2003, or that CI # 16, who left SST in September 2003, possessed any knowledge about SST's costs or prices during the proposed class period, or was qualified to state authoritatively that SST's products were essentially fungible "commodities."

**\*19** The court finds that the Selantek data-consisting of generic averages across uncounted products through vague geographic areas-provides insufficient support for the allegations that SST's prices were falling, or even that the prices of products identical to those manufactured and sold by SST were falling in the same geographical area where SST was selling its products. In short, for the reasons discussed above with regard to the inventory valuations, the Selantek data does not support the claim that SST's prices were falling throughout the class period.

Plaintiffs also assert that the 1Q04 and 2Q04 statements were false when made based on the claim that numerous "confidential informants" observed that SST's prices were falling. The court finds, however, that the allegations of complaints by SST employees at sales meetings is too vague and non-descript to provide support for a claim that the prices for SST's products were falling. The sole support for this assertion in the SAC is statements from eight individuals (CI# 6, 7, 8, 10, 14, 15, 16, and 17). However, with the possible exception of CI # 17, none of these informants appear to have occupied positions at SST during the relevant period that would have provided them with personal knowledge of the sales prices or market value of SST's products.

CI # 6's duties consisted primarily of allocating commissions for SST sales representatives. SAC ¶¶ 33(f), 64. CI # 6 is not alleged to have been involved in any aspect of SST's process of determining individual product prices or costs.

CI # 7 worked in SST's IT Department, in which capacity he/she helped maintain the technical functionality of SST's various software systems. SAC ¶

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2007 WL 760535 (N.D.Cal.)
(Cite as: Not Reported in F.Supp.2d, 2007 WL 760535)

Page 18

33(g). He/she was responsible for ensuring that the databases worked properly, but the SAC does not allege that this informant had any input into the data or even any independent knowledge or understanding of the information the databases contained.

CI # 8 was a "senior operations planner," who tracked raw materials and finished goods. SAC ¶ 33(h). He/she "received sales forecasts from the business unit managers," and attended planning meetings and sales meetings. *Id.* The SAC does not allege that this informant had any specific knowledge of sales prices of all of SST's products.

CI # 10 was a "cost-account manager" who worked at SST only through April 2004. He/she was "involved in inventory valuation." He/she met with Yeh and Hu regularly to "review inventory cost numbers, and met with "the controller and three business unit directors" monthly to discuss "inventory costs and market prices. SAC ¶ 33(j). However, CI # 10 is alleged to have said only that "products, including the 16-megabit flash products, were sold at below cost." SAC ¶ 68. There is no allegation that CI # 10 said that prices of all SST's products were falling throughout the class period, or that he/she had any specific information regarding any specific SST products at any specific point in time.

*20 CI # 14 was Senior Sales Director of Asia Pacific North, but worked at SST only until June 2003. SAC ¶ 33(n). CI # 16 was VP of North American sales, until September 2003. SAC ¶ 33(p). They are both alleged to have stated that the prices of SST's "flash memory products" fell from 2001 levels during the time they were working at the company. SAC ¶ 69. However, this allegation cannot be used to support a claim that SST's prices were falling during the class period.

CI # 15 was a "product engineer" who reported to the director of product engineering. He/she tested finished products and first-runs of engineering materials received at SST from product fabricators. SAC ¶ 33(o). He/she stated that he was asked to "speed up the testing process" at some point during the period of 2002 through 2004 because "prices were going down." SAC ¶ 70. This allegation does not provide particularized support for the allegation that defendants falsely stated that prices were "firming" or "improving" during 1Q04 and 2Q04.

CI # 17 worked at SST from 1999 through the end of the class period, in the "segment marketing group." In that capacity, he/she was responsible for "quoting and negotiating prices to customers."SAC ¶ 33(q). According to plaintiffs, CI # 17 stated that "prices dropped dramatically at [SST] and across the industry" throughout the class period, because of a "decrease in demand." SAC ¶ 66. This allegation might provide weak support for plaintiffs' general claim that SST's prices were falling during the class period, except for the fact that it is contradicted by the allegations in SAC ¶¶ 73-74, where plaintiffs allege that SST's competitors' prices were falling and that Best refused to allow SST's products to be sold below a certain level.

A further problem is that the SAC routinely mixes up allegations regarding SST's prices with allegations regarding industry prices. Plaintiffs allege that the individual defendants falsely stated that SST's prices were "firming" or that SST's average selling prices were improving, and that Hu set SST's prices. There is no allegation, however, that SST's prices were actually lower than Hu's mandatory minimum (the level below which he allegedly instructed SST's employees that SST's prices could not drop). At most, the SAC alleges that Hu was negligent for insisting on maintaining the higher sales prices in the face of falling industry prices. To state a claim for misrepresentation, plaintiffs would have to allege particularized facts indicating that SST's prices were falling at a time when defendants were publicly stating that the prices were "firming" or "improving." But there are no such facts pled in the SAC.

*e. statement by Lai that "we should be okay"*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                Page 19
Not Reported in F.Supp.2d, 2007 WL 760535 (N.D.Cal.)
(Cite as: Not Reported in F.Supp.2d, 2007 WL 760535)

During the October 20, 2004, conference call, Lai stated, in response to a question about inventory, "The inventory increase actually is primarily due to the 8-meg because 8-meg are the sales in Q2 was very high, and that Q3 actually have drop in sales for 8-meg products so we build up inventory primarily due to the 8-meg products."An analyst for C.E. Unterberg, Towbin then asked, "And how confident are you that you won't have to take a write-down, and will you be able to sell this 8-meg inventory in Q-4?"To this, Lai responded, "For 8-meg products we are doing very well in terms of production and the ramp up's primarily at Grace at a cost structure is still very, very good, and also we are now using that capacity actually to produce 16 and 32 so that our costs at this moment still look okay. There's not too much OCM consideration at this moment so we should be okay."

**\*21** Defendants argue that plaintiffs cannot state a claim with regard to Lai's statement because it was made in response to a question during a conference call. Defendants also assert that plaintiffs have improperly characterized the statement "we should be okay"-which defendants assert is at most an inactionable statement of corporate optimism-as meaning "no 4Q04 write-down will be necessary."

Plaintiffs, however, assert that Lai's statement was false because he was asked during 4Q04 whether SST would need to take a write-down, and 4Q04 was when the writedown was taken. They also claim that Lai was well aware from CI # 18 that the inventory reserve was too low.

Projections and general statements of optimism may trigger liability under Rule 10b-5. *In re Apple Computer Sec. Litig.,* 886 F.2d 1109, 1113 (9th Cir.1989). A statement of optimism contains at least three implicit factual assertions: (1) that the statement was genuinely believed by the person making it; (2) that there was a reasonable basis for the statement; and (3) that the speaker was not aware of any undisclosed facts tending to seriously undermine the accuracy of the statement. *Id.* Such statements are actionable under Rule 10b-5 to the

extent that one of these implied factual assertions was inaccurate. *Id.*

However, courts have routinely held that vague or amorphous statements of optimism and "puffing" about a company or a product are not actionable. *See, e.g., In re Stratosphere Corp. Sec. Litig.,* 66 F.Supp.2d 1182, 1197-99 (D.Nev.1999); *Wenger v. Lumisys, Inc.,* 2 F.Supp.2d 1231, 1245 (N.D.Cal.1998); *In re Gupta Corp. Sec. Litig.,* 900 F.Supp. 1217, 1236 (N.D.Cal.1994)."Statements that fall within the rule tend to use terms that are not measurable and not tethered to facts that a reasonable person would deem important to a securities investment decision."*In re Ligand Pharms., Inc. Sec. Litig.,* 2005 WL 2461151, at *19 (S.D.Cal., Sept.27, 2005) (citation and quotation omitted). Such vague statements cannot be said to "have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available."*TSC Indus., Inc. v. Northway, Inc.,* 426 U.S. 438, 449, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976) (citation omitted).

In this case, the statement of opinion, "we should be okay," is too vague and amorphous to provide any reasonable investor with a basis for making an investment decision. In addition, plaintiffs plead no facts showing that Lai's opinion was not believed at the time he expressed it, and do not assert that anyone told Lai anything about inventory reserves. Plaintiffs allege that CI # 18 "had responsibility for calculating preliminary inventory reserves for submission to Lai" during 3Q04, and that CI # 18 stated that he/she "calculated that a 'substantial' inventory reserve of about $30-40 million was necessary."SAC ¶ 226. As defendants note, however, plaintiffs do not allege that CI # 18 actually communicated his preliminary reserve to Lai or to any defendant. Moreover, to the extent that the quoted exchange between Lai and the analyst is clear, the transcript suggests that the reason Lai said SST should be "okay" was based on his assessment that the ramp-up of production of 8mg products was "at a cost structure [that] is still very, very good."

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2007 WL 760535 (N.D.Cal.)
(Cite as: Not Reported in F.Supp.2d, 2007 WL 760535)

## 2. Scienter

**\*22** In the order dismissing the CAC, the court found that plaintiffs had failed to allege particularized facts showing that defendants acted with knowledge or deliberate recklessness. In the SAC, plaintiffs assert that defendants knew or should have known that "prices" were declining throughout the class period, for four reasons. Plaintiffs allege that defendants were actively involved in monitoring and establishing SST's product pricing during 2004; that the decline in SST's prices was discussed in meetings that defendants attended; that defendants took steps that demonstrated their awareness that SST's prices were falling; and that employees in the sales and marketing groups talked openly about the fact that Hu's "price mark-ups" did not reflect market prices. SAC ¶¶ 71-75.

Plaintiffs assert further that defendants' reckless or intentional conduct with regard to inventory valuation is shown by three additional facts-that defendants controlled the inventory valuation process; that defendants were specifically told that the inventory needed to be written down during the class period; and that defendants established internal controls that ensured that there would be no proper oversight regarding inventory valuation. SAC ¶¶ 192-238.

Under the PSLRA, whether alleging that a defendant "made an untrue statement of material fact" or alleging that a defendant "omitted to state a material fact," the complaint must, with respect to each alleged act or omission, "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."15 U.S.C. § 78u-4(b)(2). In the Ninth Circuit, the required state of mind is "deliberate or conscious recklessness." *In re Silicon Graphics,* 183 F.3d at 979. Mere motive and opportunity are not enough. *Id.* Because falsity and scienter in securities fraud cases may be inferred from the same set of facts, the Ninth Circuit frequently incorporates the falsity and scienter requirements into a single inquiry. *See*

*America West,* 320 F.3d at 932.

On a Rule 12(b)(6) motion to dismiss a complaint brought under the PSLRA, when considering whether plaintiffs have shown a strong inference of scienter, "the district court must consider *all* reasonable inferences to be drawn from the allegations, including inferences unfavorable to the plaintiffs."*Gompper,* 298 F.3d at 897 (also noting tension between customary latitude granted plaintiff on a Rule 12(b)(6) motion to dismiss and heightened pleading standard set forth under the PSLRA). In other words, the court must consider all the allegations in their entirety in concluding whether, on balance, the complaint gives rise to the requisite inference of scienter.*Id.*

Defendants argue that plaintiffs have failed to allege particularized facts establishing a strong inference of scienter. They assert that the SAC does not allege that any of the confidential informants reported that any defendant ever stated that SST's inventory valuations were false; or that any document, database, or report confirmed that the valuations were false. In addition, they contend that plaintiffs do not allege that any defendant made, wrote, read, or heard any contemporaneous statement that specifically contradicted any of SST's inventory valuations, financial statements, or any other statement that plaintiffs now claim was false. Defendants argue that at most, plaintiffs allege corporate mismanagement, negligence, or overly optimistic business judgment-not actionable securities fraud-as the court previously found in the order dismissing the CAC.

### a. defendants' alleged involvement in monitoring and establishing SST's product prices during 2004

**\*23** Plaintiffs assert that CI# 13, 14, and 16 had information regarding Hu's and Yeh's involvement in setting prices in 2003, before the commencement of the class period. SAC ¶ 72(c)-(e). Plaintiffs also claim that "a number of former employees" confirmed that defendants were actively involved in es-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2007 WL 760535 (N.D.Cal.)
(Cite as: Not Reported in F.Supp.2d, 2007 WL 760535)

tablishing SST's product prices in 2004. SAC ¶ 72. According to CI # 7, Hu determined price margins and maintained pricing information, and had the final say in determining product prices during the proposed class period. SAC ¶ 72(a). Plaintiffs claim that "any price quote below segment marketing price required approval from the segment marketing group," and "[a]ny price quote below the business unit's mark up price required approval from the business unit group."SAC ¶ 72(b).

Plaintiffs allege that CI # 7 also stated that SST had a "structure" whereby Yeh's authorization was required if a sales person intended to quote a price below cost, and that 30% of all product sold in 2004 was sold below Hu's prices and required approval. SAC ¶ 72(b). CI # 7 was aware of this "structure" because it implemented the "EFlash" system. *Id.* The "EFlash" database was a "pre-sales automated system that automated [SST's] pricing process and showed [SST] prices offered to customers."SAC ¶ 38(e). It had 12 "modules," and SST primarily used two of those-the "Request for Quotes" or "RFQ" module, and the "Price Guideline applications" module. *Id.* Plaintiffs claim that the "Price Guideline applications" system "fed the pricing structures accessed by the RFQ system, and that CI# 7 and 16 both reported that Yeh and Hu had access to the RFQ system. *Id.* According to CI # 7, the "E-Flash" system automatically sent e-mails to the appropriate department for approvals when a price quote fell below specific levels. SAC ¶ 72(b).

These allegations do not support plaintiffs' claim that defendants made false and misleading statements with either knowledge or deliberate recklessness. At most, they establish that Hu and Yeh had knowledge of SST's product prices. Hu was SST's Chief Operating Officer, and Yeh was the company's Chief Executive Officer in 2004. It is not surprising that they may have been involved in monitoring and establishing SST's product prices during that period.

*b. discussion of prices of SST's products at meetings attended by defendants*

Plaintiffs assert that "declining prices" were specifically discussed at sales meetings by the individual defendants. According to CI # 7, SST's "product prices" started to fall in 2002 and continued to fall throughout 2004, and SST's sales force raised concerns about falling market prices at the April 2004 sales meeting. SAC ¶¶ 65, 73(a). CI # 6 is alleged to have stated that declining market prices were discussed at the January and April 2004 quarterly sales meetings. SAC ¶ 73(b). Plaintiffs contend that these allegations show that SST's prices were falling during the proposed class period, and that defendants were aware that the prices were falling.

**\*24** Those sections of the SAC do not, however, support plaintiffs' claims. In SAC ¶ 73(a), plaintiffs allege that sales and marketing personnel "complained that market prices were falling" in April 2004, and "continued to raise concerns about falling [market] prices" in August 2004. SAC ¶ 65 alleges that SST's prices "fell in Asia during 2004 in order for [SST] to compete with its competitors' prices," but this allegation conflicts with the claims in SAC ¶ 73 that in January and April 2004, "the U.S. market was being driven down and prices were falling such that [SST] 'couldn't compete anymore' with Asian prices."While discussion of SST's sales prices would not have been at all unusual in the context of an SST sales meeting, the focus of the "discussions" among the unidentified SST employees, as reported by plaintiffs in the SAC, appears to have been on declining *market* prices, and the impact of those declining prices on SST's business.

*c. steps taken by defendants which demonstrated their awareness that prices were falling*

Plaintiffs claim that defendants took certain steps that demonstrated their awareness that "prices" were falling. Plaintiffs assert that, according to CI # 6, Best set a "Minimum Price" list in 1Q04.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2007 WL 760535 (N.D.Cal.)
(Cite as: Not Reported in F.Supp.2d, 2007 WL 760535)

Plaintiffs describe the "Minimum Price" list as an Excel spreadsheet that contained all of SST's products and prices worldwide. SAC ¶ 74(a). The data in the "Minimum Price" list was allegedly compiled by Best, who distributed the list to all sales representatives and sales staff via e-mail. SAC ¶ 38(p). It was also given to accounting staff. SAC ¶ 74(a).

Best allegedly advised the sales force that if they sold products at prices below those on the list, they would receive lower commissions. SAC ¶ 74(a). According to CI # 6, this was the first time Best or any executive had done this. CI # 6 stated further that, there was pressure at the January and April 2004 quarterly meetings to keep prices at a certain level;" and that, other than Best, no one at the January and April 2004 quarterly meetings expressed the view that prices were going up. SAC ¶ 74(b).

Again, these allegations do not indicate an awareness on defendants' part that SST's prices were falling. The sales meeting at which this subject was allegedly discussed was the meeting at which Best, the VP of Sales and Marketing, stated that prices were increasing. *See* SAC ¶¶ 73(b), 74(b). Even if the SAC alleged that there were discussions of declining prices on specific products or in specific densities of memory at the meetings-which it does not-the fact that Best, alleged to have had first-hand knowledge of the prices at issue, expressed a contrary view negates any suggestion of fraud.

### d. employees' discussions of Hu's "mark-ups"

Plaintiffs allege that according to CI # 7, the "sales and marketing groups" talked openly about how Hu's internal mark-ups "did not reflect market prices, which were lower."SAC ¶ 75. This allegation, which basically consists of hearsay and innuendo, does not support plaintiffs' claim that defendants made false statements about SST's prices and inventory values with knowledge or deliberate recklessness.

### e. defendants' control of inventory valuation process

**\*25** Plaintiffs assert that in addition to knowing that prices were falling in 2004, defendants also controlled the inventory valuation process, as shown by the facts (i) that defendants set the "price assumptions" that were used in valuing inventory; (ii) that Hu set the cost assumptions that were used in valuing inventory; (iii) that defendants set the reported inventory values; and (iv) that defendants manipulated SST's inventory control system.

First, plaintiffs allege that defendants set the "price assumptions" that were used in valuing inventory. SAC ¶¶ 193-196. They assert that according to CI # 2, the finance department was excluded from final pricing determinations through at least June 2003, and Hu told the cost accountants what prices to use for the products-regardless of actual prices-when valuing inventory. According to CI # 2, Hu's prices were "arbitrary." SAC ¶ 196. This allegation, by an informant who left SST in 2003, does not create a strong inference of scienter with regard to statements made during the proposed class period.

Second, plaintiffs assert that Hu set the "cost assumptions" that were used in valuing inventory. SAC ¶¶ 197-202. They allege that CI # 10 stated that, prior to the proposed class period, Hu assigned cost figures for each SST product for the purpose of valuing inventory, and that these costs were set based on Hu's "personal discussions with vendors." SAC ¶ 198.

SST's "Oracle ERP" database was allegedly designed to track inventory, and contained information regarding inventory cost, purchase and sale data, costs, and raw material data. SAC ¶¶ 38(b). Plaintiffs assert that numerous employees at SST had access to the "Oracle ERP" system-some of whom worked at SST during the proposed class period, and some of whom did not. *Id.* Plaintiffs claim that, according to CI # 7, the "costs" listed in this database were not accurate because Hu turned off the "auto updates for costs in the implementa-

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2007 WL 760535 (N.D.Cal.)
(Cite as: Not Reported in F.Supp.2d, 2007 WL 760535)

tion phase," SAC ¶¶ 197, 200; and that according to CI# 1 and 7, Hu "maintained his own Excel inventory reports to track inventory, costs, and prices," SAC ¶¶ 38(c), 200. Plaintiffs claim that Hu set cost figures for each SST product based on his personal discussions with vendors, and that he used those costs to calculate inventory. SAC ¶¶ 198-199. Plaintiffs assert that "very few employees outside of Hu had access to these Excel spreadsheets."SAC ¶ 38(c). According to CI # 7, "costs were a mystery; only Yaw Wen [Hu] knows."SAC ¶ 200. CI # 7 also reportedly stated that Lai reviewed Hu's Excel spreadsheets. SAC ¶ 210.

According to CI # 7, SST's "Oracle ERP" database required that a cost figure be input into the system in order to produce bills of materials that were used to produce SST's products, but Hu used "dummy costs" for entry "in the system," which were "derived from his personal conversations with [SST's] vendors and tracked on his personal Excel spreadsheet."SAC ¶ 199. CI # 16-the VP of North American sales between 2000 and 2003, well before the proposed class period-claimed that he was "denied full access" to SST's cost figures. SAC ¶ 202.

*26 The claim that Hu kept a "secret" spreadsheet that was used to override SST's "official" databases is attributed primarily to CI # 7, described as a "senior business-systems analyst in the IT department throughout the entire Class Period," who reported to Chi Yin, VP of IT and Global Communication. SAC ¶ 33(g). CI # 7 is alleged to have worked as "a lead designer for the corporate data warehouse projects in 2003 and 2004," who "designed packages to extract, transform, and load data from Oracle ERP."*Id.* Plaintiffs do not allege, however, that CI # 7 played any role in the determination of inventory values, or SST's accounting or finance functions, even in operations. The statements by CI # 7 therefore do not provide strong support for this claim, because plaintiffs do not plead particularized facts showing that CI # 7 was familiar with the contents of the alleged secret database.

Moreover, the allegations in the SAC regarding "Hu's Excel" spreadsheet are contradictory, as it is not possible that Hu kept the spreadsheets "secret" from employees, as plaintiffs claim, and that the spreadsheets and their contents were also "talked about openly" throughout the sales and marketing departments, as plaintiffs also claim. In addition, the same defendants who supposedly used the "secret" spreadsheets to inflate SST's stock price-Yeh, Hu, Lai, and Best-lost millions by purchasing stock and retaining their holdings in SST. This is the opposite result that one would expect from defendants who were privy to secret adverse information.

Third, plaintiffs assert that defendants set the "reported inventory values." SAC ¶¶ 203-211. According to CI # # 1, 2, 3, 4, and 19, Hu and Yeh maintained and exercised total control over the final inventory values, to the exclusion of the finance and accounting groups. SAC ¶ 203. CI # 1 stated that Yeh and Hu were very "hands-on in terms of running the company," that they "called all the shots;" and that "other people down the chain did not have much of a say" regarding valuation of inventory. SAC ¶ 206. CI # 3 stated that Yeh and Hu made the final valuation decisions through at least mid-2003. CI # 4 stated that while the accounting department assigned initial dollar value to SST's products, the final figures were determined by Yeh and the CFO. SAC ¶ 205. CI # 4 also stated that, at least through 2Q03, Yeh, Hu, and "the VPs" looked at the inventory numbers "very, very carefully." SAC ¶ 207. CI # 14 described Yeh as "the ultimate decision-maker with regard to inventory values" in 2003. SAC ¶ 211. CI # 19, SST's former controller, stated that his/her group did not value the inventory. SAC ¶ 204.

The statements from these "confidential informants" are vague and conclusory, and contain no details about specific products or specific prices. In addition, as repeatedly noted above, many of the informants ceased working at SST well before the

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2007 WL 760535 (N.D.Cal.)
(Cite as: Not Reported in F.Supp.2d, 2007 WL 760535)

class period began. The only informants who were at SST during the class period do not add sufficient particularized information to plaintiffs' allegations of scienter. For example, CI # 19, SST's Controller, who allegedly stated that Hu and Yeh maintained total control over inventory during the proposed class period, to the exclusion of the finance and accounting group, would certainly have known about a fraud if there had been one. However, CI # 19 is cited only as having access to the "Oracle ERP" database, SAC ¶ 38(b), as opining that Lai was not qualified to act as CFO, SAC ¶ 231, and as stating that Hu and Yeh controlled inventory, SAC ¶ 203-204, but not as saying anything substantive in connection with any alleged fraud at SST.

*27 Fourth, plaintiffs assert that defendants did not have an adequate system for managing SST's inventory, and that they "manipulated" the inventory control system. SAC ¶¶ 212-223. CI # 12 stated that SST did not have global standards for reporting inventory during the proposed class period, and there was a lot of uncertainty about what was in the inventory. SAC ¶ 217. CI# 1 and 13 stated that SST had a "poor system for managing and monitoring its inventory," and "could never tell where parts were, how many [they] had, what status they were."SAC. ¶ 218. CI# 7, 9, and 16 commented about SST's lack of a centralized inventory system.

CI # 1 claims that several employees told Hu and Yeh prior to the class period that Hu's inventory figures did not reflect the figures in the "Oracle ERP" database, but that Yeh and Hu refused to accept the information contained in the "Oracle ERP" database. SAC ¶ 214. Plaintiffs allege that when defendants were informed that Hu's values were inconsistent with information contained in SST's "Oracle ERP" database, they instructed employees to adjust the company's official figures to reflect Hu's inventory levels and values. SAC ¶¶ 214-215. CI # 7 stated that those adjustments continued throughout 2004.

Plaintiffs also claim that defendants manipulated the inventory values by "prevent[ing] the complete integration of the EFlash system."SAC ¶ 216. According to CI # 7, he/she and other IT staff attempted to automate the RFQ system in 2004, but they were "specifically told" that the EFlash system should not be implemented "at Yah Wen's level," and were "instructed" to stop the integration at the business unit level. Id. According to plaintiffs, "this meant that [SST's] pricing system would not be integrated with [its] vendor systems because Hu spoke with vendors and maintained the vendor data concerning costs."Id. Plaintiffs claim that if the system had been fully integrated with cost information from the vendor system, "the prices could have been adjusted according to cost fluctuations."Id.

The allegations relating to inventory management prior to the class period do not show defendants' scienter with regard to statements made during the class period. The statements regarding the alleged "adjustments" and the "EFlash" database are conclusory and vague, as they do not state information that informed defendants that Hu's values were inconsistent with information in the "Oracle ERP" database, or which employees were instructed to adjust the official figures; and do not specify a single SST product or an exact time period. Thus, these allegations do not provide direct, particularized support for the claim that defendants acted with conscious or deliberate recklessness.

*f. defendants' awareness that inventory need to be written down*

Plaintiffs assert that defendants were specifically told that the inventory needed to be written down during the class period. Plaintiffs allege that CI # 7 stated that the need to write down two or three product lines due to excess inventory was specifically discussed during the quarterly management meetings in late 2003 and 2004, and that at some point in 2004, "they" discussed the excess inventory and the need to sell inventory at below cost. SAC ¶ 224(a). Plaintiffs also allege that CI# 1, 2, 3, 4, 9, 12, 16, and 18 reported discussions, in one form or another, regarding the need to write down

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2007 WL 760535 (N.D.Cal.)
(Cite as: Not Reported in F.Supp.2d, 2007 WL 760535)

inventory. SAC ¶¶ 224(b), 225, 227, 228.

**\*28** The allegations based on statements by CI # 7 are too vague and conclusory to provide support for plaintiffs' claim that defendants knew that inventory needed to be written down before it was. According to the SAC, the quarterly management meetings were attended by 70 to 80 managers, as well as most marketing and sales staff. SAC ¶ 39(c). However, plaintiffs do not say when the meeting or meetings described by CI # 7 were held, do not say who made the statement that two or three product lines needed to be written down, and do not say who discussed excess inventory or the need to sell below cost.

The allegations based on statements by the other listed "confidential informants" are either irrelevant (as to CI# 1, 2, 3, 4, and 16, who had all left SST before the beginning of the class period), or are vague and conclusory (as to CI# 9 and 12, who are alleged to have "recalled that Thiemer warned management about the need to write down excess inventory and defective products," without saying when this occurred, which products were at issue, or which members of "management" were warned).

The allegation that CI # 18 stated that he/she had calculated that a "substantial" preliminary inventory reserve of $40-50 million was necessary, SAC ¶ 226, does not support the claim that defendants knew that the inventory needed to be written down during the class period. Plaintiffs do not allege that CI # 18 ever told anyone anything about the reserve. Moreover, even if the SAC alleged facts regarding the supposed $30-40 million estimate, a statement about a "preliminary" inventory reserve is speculative insofar as any final reserve is concerned.

*g. defendants' establishment of internal controls with no proper oversight*

Plaintiffs allege that defendants established the internal controls in order to ensure that there would

be no proper scrutiny of their actions regarding inventory valuation. SAC ¶¶ 229-238. Plaintiffs claim that the fact that Best, Hu, and Yeh controlled the inventory valuation process, but were trained in engineering and not in accounting or finance, shows that defendants acted with deliberate recklessness. SAC ¶ 229. Plaintiffs assert that by giving "unqualified" people the authority to make, approve, and review determinations regarding inventory valuations, defendants established a process with no oversight. SAC ¶ 230.

Plaintiffs allege that "numerous employees," including CI# 6 and 19, stated that they did not believe Lai was qualified to act as the company's CFO, and suggest that the fact that SST announced in April 2005 that it was replacing Lai shows that Lai was unqualified. SAC ¶ 231. Plaintiffs also assert that none of the members of the Audit Committee had an accounting background or was a "financial expert." SAC ¶¶ 233.

Plaintiffs allege that CI # 2 stated that the company lacked a VP of Quality Assurance prior to June 2003; that CI # 16-who left SST in September 2003-stated that he/she did not receive data necessary to calculate commissions for the sales force; and that CI # 6-a marketing director until October 2004-claimed he/she was not permitted access to general pricing information for sales to Asia. SAC ¶ 235, 237.

**\*29** These allegations do not support plaintiffs' claims that defendants made false statements knowingly or with deliberate recklessness. At most, the claims that the individual defendants lacked the education or training to make financial decisions might establish corporate mismanagement or negligence.

For all the reasons discussed above, plaintiffs' allegations are insufficient to establish that defendants made false or misleading statements with the requisite state of mind. Aside from the individual allegations, the court considers "whether the total of plaintiffs' allegations, even though individually

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2007 WL 760535 (N.D.Cal.)
(Cite as: Not Reported in F.Supp.2d, 2007 WL 760535)

lacking, are sufficient to create a strong inference that defendants acted with deliberate or conscious recklessness."*Lipton v. Pathogenesis Corp.,* 284 F.3d 1027, 1038 (9th Cir.2002). When considered together in their entirety, defendants' allegations remain insufficient.[FN9] The court finds that plaintiffs have failed to plead facts sufficient to raise a strong inference that defendants made false or misleading statements with knowledge of their falsity or with deliberate recklessness.

> FN9. The SAC contains additional allegations, not specifically pled as creating a strong inference of scienter, that might nonetheless be interpreted as bearing on scienter. Plaintiffs assert, for example, that "several company insiders took advantage of their knowledge" that the stock price was going to decline when the company "revealed the truth about the value of its inventory."SAC ¶ 111. However, only outside director Isao Nojima and Senior VP Yasushi Chikamagi are alleged to have sold their stock during the proposed class period. Neither Nojima nor Chikamagi is a defendant in this action, and neither is alleged to have made any of the allegedly false and misleading statements. *See In re Silicon Graphics,* 183 F.3d at 988 (finding no inference of scienter, in part, because Senior VP who sold stock did not make any of allegedly misleading statements). On the other hand, the defendants who *are* alleged to have made false and misleading statements sold no stock during the proposed class period, and appear to have suffered significant losses (based on the decline in the value of SST's stock). Hu and Lai even purchased stock at prices that plaintiffs claim was inflated by their own fraud. Thus, the sale of stock by the two outsiders does not give rise to a strong inference of deliberate recklessness.

In the allegations of Q304 false and mis-

leading statements, plaintiffs refer to SST's acquisition of G-Plus, although they do not allege that this business transaction reflects defendants' scienter. *See* SAC ¶ 100. In any event, the court previously found in the order dismissing the CAC that the G-Plus acquisition was "an example of the type of routine activity and generic motive that cannot serve as a basis for alleged securities fraud."Similarly, the reference in the SAC to the Sarbanes-Oxley 404 statement in SST's 2004 10-K regarding internal control "deficiencies" that "could" result in future financial statement inaccuracies, *see* SAC ¶¶ 123, 125, does not support the allegations of scienter, and the court previously so ruled.

Finally, the SAC alleges under "Additional Falsity Allegations" that defendants violated various provisions of GAAP. SAC ¶¶ 189-191. While allegations of GAAP violations may support a claim for securities fraud, a general allegation that the practices at issue resulted in a GAAP violation is not a sufficiently particular claim of misrepresentation. *See In re Daou,* 411 F.3d at 1016. Here, other than the claim that defendants failed to state inventory as the lesser of cost or market value, plaintiffs allege no facts tied specifically to any asserted GAAP violation. Moreover, to the extent that plaintiffs intend to plead fraudulent intent based on GAAP violations, they must allege facts showing (1) that specific accounting decisions were improper, and (2) that defendants knew specific facts at the time that rendered their accounting determinations fraudulent. *DSAM,* 288 F.3d at 390-91;*In re Software Toolworks Inc.,* 50 F.3d 615, 627-28 (9th Cir.1994). For the reasons previously stated in the order dismissing

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2007 WL 760535 (N.D.Cal.)
(Cite as: Not Reported in F.Supp.2d, 2007 WL 760535)

the CAC, the court finds that plaintiffs' allegations of GAAP violations do not give rise to a strong inference of deliberate recklessness.

### 3. Control Person Liability

Defendants argue that the § 20 claims must be dismissed because plaintiffs have failed to state a claim of primary liability. The court finds that the § 20 claim must be dismissed, for the reason stated by defendants. *See In re VeriFone Sec. Litig.,* 11 F.3d 865, 872 (9th Cir.1993).

### C. Request for Judicial Notice

Defendants submitted a request that the court take judicial notice of certain documents filed by SST with the SEC, as well as the company's press releases, conference call transcripts, audit opinions, and stock prices.

Plaintiffs do not oppose the court taking judicial notice of the existence of these documents, but object that the request is improper to the extent that defendants seek to have the court take judicial notice of the truth of the contents of the documents, based merely on the existence of the documents.

The objections are OVERRULED, as the court has not relied on any of the disputed material in reaching a decision in the present motion.

### D. Leave to Amend

Dismissal without leave to amend is improper unless it is clear that the complaint could not be saved by any amendment. *See Gompper,* 298 F.3d at 898 (9th Cir.2002). Futility of amendment may be shown by the plaintiff's failure to plead additional facts when given the opportunity. *See In re Vantive,* 283 F.3d 1098.

The court dismissed the CAC in the present case, in part, because plaintiffs failed to plead particularized facts showing that defendants' statements regarding SST's prices and inventory valuations were false or misleading. The court granted leave to amend to correct this deficiency. In amending the complaint, plaintiffs added allegations regarding meetings, databases and reports, along with information obtained from "confidential informants," and generic industry data supplied by a market research company.

**\*30** As noted above, however, the majority of the allegations regarding meetings, databases, and reports are not directly connected to the allegations that defendants made false and misleading statements. Similarly, the allegations regarding the "confidential informants" do not establish that the statements regarding SST's prices and inventory valuations were false at the time they were made. Were these the only problems with the SAC, the court might grant leave to amend. But a more serious problem is plaintiffs' reliance on generic data from Selantek as the source of their "facts" regarding the alleged falsity of defendants' statements regarding SST's prices and inventory valuations.

The court raised this issue at the hearing, and requested additional briefing regarding whether the use of generic data obtained from a market consultant satisfies the requirements of the PSLRA and *Silicon Graphics,* and regarding how the reliability of such material should be assessed by the court. The court has considered the parties' responses in evaluating whether leave to amend is appropriate.

There is authority for the proposition that a plaintiff in a securities fraud action controlled by the requirements of the PSLRA can support its allegations of falsity with facts provided by an expert. In *Nursing Home,* a case alleging false reporting of revenue and misrepresentations regarding sales projections by the Oracle defendants, the Ninth Circuit found that documents relating to the billing and payment histories of Oracle's customers, obtained by plaintiffs and analyzed by their financial expert, appeared to establish improper revenue adjustment. *Nursing Home,* 380 F.3d at 1233-34. The court noted that the plaintiff's expert, a former financial

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2007 WL 760535 (N.D.Cal.)
(Cite as: Not Reported in F.Supp.2d, 2007 WL 760535)

analyst for a recovery, audit, and cost-containment firm, who had reviewed the billing and payment histories of some of Oracle's customers and spoken with Oracle employees regarding customer payments, had provided specific and detailed reporting of the statements of the Oracle employees. *Id.* at 1233.

Adopting the standard articulated in the Second Circuit's decision in *Novak v. Kasaks*, 216 F.3d 300 (2d Cir.2000), the Ninth Circuit concluded that the complaint had described "the witnesses" (including plaintiff's financial expert) "with sufficient particularity to establish that they were in a position to know Oracle's accounting practices."*Nursing Home*, 380 F.3d at 1233 (citing *Novak*, 216 F.3d at 314). The court added, however, that what was even more important was that "the documents themselves appear to establish improper revenue adjustment" (referring to the documents analyzed by the financial expert).*Id.* Subsequently, in *In re Daou*, the Ninth Circuit confirmed the use of the *Novak* analysis in considering allegations of information obtained from the more typical "confidential witness." *In re Daou*, 411 F.3d at 1015.

Accordingly, based on *Nursing Home* and *In re Daou*, it appears that district courts can consider allegations of data and information obtained from "experts"-but also that such factual allegations are subject to the same standard applied to evaluate facts alleged to have originated with any "confidential informant" (or other witness).[FN10]

> FN10. On the other hand, it is well-established that courts should not consider an expert or other affidavit submitted in support of a Rule 12(b)(6) motion to dismiss, unless the parties have agreed that the motion will be treated as a motion for summary judgment. *See, e.g., Branch v. Tunnell*, 14 F.3d 449, 453 (9th Cir.1994), *overruled on other grounds by Galbraith v. County of Santa Clara*, 307 F.3d 1119 (9th Cir.2002). This rule applies even where the

affidavit is attached as an exhibit to the complaint. *See DeMarco v. Depotech Corp.*, 149 F.Supp.2d 1212, 1220-22 (S.D.Cal.2001).

**\*31** It is not clear, however, that the particularity requirements of the PSLRA allow a plaintiff to base its factual assertions on generic market data provided by an industry consultant. Plaintiffs have provided no persuasive authority in support of their argument that courts have allowed "expert" opinion in the form of generic market data-without more-as factual support for claims of securities fraud brought under the PSLRA.

Plaintiffs argue that the generic Selantek data is reliable because it corroborates the statements from the confidential witnesses that SST's prices were falling during the class period. They claim that the data corroborates those statements because their "methodology"-based on that same generic data-shows what the actual valuation of SST's inventory should have been. Other than *Nursing Home* and *In re Daou*, however, the only opinion cited by plaintiffs or defendants that discusses factual allegations in a securities fraud complaint based on information obtained by the plaintiffs from an expert is *In re Textainer Partnership Sec. Litig.*, 2006 WL 1328851 (N.D.Cal., May 15, 2006)(*"Textainer II"*).[FN11]

> FN11. The *Textainer* court issued four opinions on defendants' successive motions to dismiss: *In re Textainer*, 2005 WL 3801596 (N.D.Cal., Dec.12, 2005) (*"Textainer I"); In re Textainer*, 2006 WL 1328851 (N.D.Cal., May 15, 2006) (*"Textainer II"); In re Textainer*, 2006 WL 3247425 (N.D.Cal., August 10, 2006)(*"Textainer III"*); and *In re Textainer*, 2007 WL 108320 (N.D.Cal., Jan.10, 2007)(*"Textainer IV"* ).

The *Textainer* action involved a claim that the defendant limited partnerships had entered into an agreement for the sale of a fleet of used shipping

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                 Page 29
Not Reported in F.Supp.2d, 2007 WL 760535 (N.D.Cal.)
(Cite as: Not Reported in F.Supp.2d, 2007 WL 760535)

containers, subject to the approval of more than 50% of the limited partnership units in each of the partnerships. In connection with their solicitation of the approval of the limited partners to the sale, defendants issued proxy statements stating that the general partners believed the sale was "fair to and in the best interests of" the limited partners.

In the complaint, plaintiffs alleged that that statement was false because the price of shipping containers had increased 18-20% between the time the defendants agreed on a price and the date the proxy statements were issued. Thus, according to plaintiffs, the supposedly "fair" deal was actually at a price considerably below the prevailing market price and was therefore not in the best interests of the limited partners. The court dismissed the complaint, in part because plaintiffs had not alleged facts supporting the claim that the alleged price increase applied to the particular types of containers owned by the Textainer partnerships. *Textainer I*, 2006 WL 1328851 at *8.

In the amended complaint, plaintiffs supported their claim regarding the increase in prices with information allegedly obtained from an industry consultant, who had performed an analysis based on industry literature. The court dismissed the complaint, granted leave to amend, again dismissed the complaint, and again granted leave to amend. In the final order of dismissal, the court found that while plaintiffs had adequately alleged the factual basis for a contention that the prices of new containers had increased 18-20% during the relevant period, they had not alleged facts showing an increase in the prices of used containers during the same period. *Textainer IV*, 2007 WL 108320 at *6-8. In other words, they had not alleged facts supporting the claim that the alleged price increase applied to the particular types of containers owned by the Textainer partnerships.

*32 Here, the problem is two-fold. First, the SAC does not plead sufficient facts about Selantek to show that the company was likely to possess the information alleged.[FN12] Second, the Selantek data is

not based on information about SST's selling prices-or on information about products identical to those being manufactured and sold by SST, in the exact geographic area where SST was selling its products-but rather on generic market data not tied to SST in any way, other than the general industry connection.

> FN12. The court in *Textainer* found a similar problem, but the plaintiffs apparently remedied it to the court's satisfaction by identifying the consultant and providing information regarding the consultant's qualifications, and also by alleging facts regarding the factual content of the sources and information on which the consultant had relied. *See Textainer IV*, 2007 WL 108320 at *5-8.

In addition, unlike the situation in *Nursing Home* or *Novak*, there are no allegations of specific documents or statements by other witnesses that corroborate the generic Selantek data. There are allegations, based on information from the "confidential witnesses," that "market prices" were falling, with vague references to "Asian" prices, but none of those allegations provide details about specific products manufactured by SST.

Plaintiffs previously conceded that they do not have any information about SST's costs or prices. The court gave plaintiffs an opportunity to amend the complaint to allege facts supporting their claims that defendants falsely stated that SST's prices were "firming" or "improving" in 1Q04 and 2Q04, and overstated the value of SST's inventory when releasing financial results for 1Q04, 2Q04, and 3Q04.

However, while the SAC is long, with many allegations that appear irrelevant to the claims asserted-such as the allegations of information obtained from "confidential informants" who had left their employment at SST long before the commencement of the proposed class period; and the allegations of reports/databases of the kind that would be routinely prepared by any company, but which do

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2007 WL 760535 (N.D.Cal.)
**(Cite as: Not Reported in F.Supp.2d, 2007 WL 760535)**

Page 30

not contain any information that contradicts the alleged false and misleading statements-the allegations are not sufficiently particularized to satisfy the requirements of the PSLRA. Accordingly, based on plaintiffs' concessions that they do not have any details about SST's prices or costs, and that the Selantek data does not incorporate any SST pricing data in its generic database, the court finds that further amendment would be futile.

## CONCLUSION

In accordance with the foregoing, the court finds that the second amended complaint must be DISMISSED. The dismissal is WITH PREJUDICE.

**IT IS SO ORDERED.**

N.D.Cal.,2007.
In re Silicon Storage Technology, Inc., Securities Litigation
Not Reported in F.Supp.2d, 2007 WL 760535 (N.D.Cal.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.