# TAB Q



Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 1469654 (N.D.Cal.)
(Cite as: Not Reported in F.Supp.2d, 2006 WL 1469654)

Page 1

**H**

In re Tibco Software, Inc.

N.D.Cal.,2006.

Only the Westlaw citation is currently available.

United States District Court,N.D. California.

In re TIBCO SOFTWARE, INC. Securities Litiga-
tion.

No. C 05-2146 SBA.

May 25, 2006.

Douglas John Clark, Ignacio E. Salceda, Kyle An-
thony Wombolt, Wilson Sonsini Goodrich & Rosati
Professional Corporation, Palo Alto, CA, for Tibco
Software, Inc.

ORDER

SAUNDRA BROWN ARMSTRONG, J.

[Docket Nos. 39, 40]

*1 This Document Relates To: All Actions

This matter comes before the Court on Defendants'
Motion to Dismiss Consolidated Amended Com-
plaint and Request for Judicial Notice. Having read
and considered the arguments presented by the
parties in the papers submitted to the Court, the
Court finds this matter appropriate for resolution
without a hearing. The Court hereby GRANTS the
Motion to Dismiss and GRANTS the Request for
Judicial Notice.

BACKGROUND

A. Background Regarding the Parties

1. Tibco Software, Inc.

Defendant Tibco Software, Inc. (hereinafter
"TIBCO" or the "Company") is a Delaware corpor-
ation with its principal place of business in Palo

Alto, California. Consolidated Amended Compl.
("CAC") at ¶ 3. TIBCO is engaged in the develop-
ment and marketing of business services software
products that enable customers to collect, analyze,
and distribute "real-time" [FN1] information about
and within an organization. Id. TIBCO also offers
integration solutions products designed specifically
to assist with business consolidations following ac-
quisitions, mergers, or similar restructurings. Id.
The Company's products are sold individually or as
product "suites" and "complete solutions."

> FN1. The Company uses the term
> "real-time business" to describe doing
> business in such a way that organizations
> can use current information to execute
> their critical business processes and make
> smarter decisions. Thompson Decl. at Ex.
> 1 (FY05 Form 10-K).

TIBCO is a publicly traded company. As of the end
of fiscal year 2005, it had approximately
211,136,985 shares of common stock outstanding.
Thompson Decl. at Ex. 1 (FY05 Form 10-K). The
Company's financial year is not concurrent with the
calendar year. Id. Instead, it ends on the last day of
November of each calendar year and commences on
the first day of December for that calendar year. Id.
For example, its 2004 fiscal year end was Novem-
ber 30, 2004.

The Company has approximately 1,500 employees
in offices located throughout Europe, Africa, the
Pacific Rim, and the Americas. Id.

2. The Individual Defendants

At all times relevant to this action, Defendant
Vivek Y. Ranadivé ("Ranadivé") was the President,
Chief Executive Officer and Chairman of the Board
of Directors of the Company. Id. at ¶ 14.Defendant
Christopher G. O'Meara ("O'Meara") was, during
the relevant period, the Executive Vice President
and Chief Financial Officer ("CFO") of the Com-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 1469654 (N.D.Cal.)
**(Cite as: Not Reported in F.Supp.2d, 2006 WL 1469654)**

Page 2

pany. *Id.* at ¶ 15.O'Meara stepped down from the CFO position on October 11, 2005. Thompson Decl. at Ex. D.

Defendant Sydney Carey ("Carey") was, during the relevant period, the Vice President, Corporate Controller and Chief Accounting Officer of the Company. CAC at ¶ 16. From March 2002 to September 2003, defendant Rajesh U. Mashruwala ("Mashruwala") was the Executive Vice President, Office of the CEO. *Id.* at ¶ 17.Thereafter, Mashruwala served as the Company's Executive Vice President, Chief Operating Officer.[FN2] *Id.*

> FN2. Randavivé, O'Meara, Carey, and Mashruwala are collectively referred to herein as the "Individual Defendants."

3. Plaintiffs

Lead Plaintiffs ("Plaintiffs") Ralph Felton and Sathya Rajasubramanian are common stock holders who purchased the common stock of TIBCO during the relevant time period. *Id.* at ¶ 12.Plaintiffs purport to represent a class of purchasers of TIBCO stock between September 21, 2004 and March 1, 2005.*Id.* at ¶ 1, 12.

B. Background Regarding the Confidential Witnesses

**\*2** The allegations contained in the Consolidated Amended Complaint are based, in part, on certain information obtained from the following Confidential Witnesses:

(a) *Confidential Witness No. 1.* Confidential Witness No. 1 ("CW1") was a Managing Director of Channel Sales at TIBCO in Munich, Germany during most of the class period until early 2005. CAC at ¶ 25(a).

(b) *Confidential Witness No. 2.* Confidential Witness No. 2 ("CW2") was employed as TIBCO General Manager within the OEM sales channel in Austin, Texas from 2003 through 2004. *Id.* at ¶ 25(b).

(c) *Confidential Witness No. 3.* Confidential Witness No. 3 ("CW3") was a National Account Director at TIBCO in New York. He was employed by Staffware from 2001 to June 2004 and then by TIBCO from June 2004 through early 2005.*Id.* at ¶ 25(c).

(d) *Confidential Witness No. 4.* Confidential Witness No. 4 ("CW4") first worked as a Finance Director for the Staffware U.K. subsidiary from 1998 to June 2004. After June 2004, he worked as a Finance Director for TIBCO until mid-2005. Part of CW4's responsibilities included the compilation of balance sheets, profit and loss statements, and tracking assets and liabilities. CW4 was also responsible for reviewing the financials and interpreting the application of accounting rules before submitting the compiled financials to Staffware corporate. *Id.* at ¶ 25(d).

(e) *Confidential Witness No. 5.* Confidential Witness No. 5 ("CW5") was employed as the Senior Manager of IT Operations for TIBCO for over five years until mid-2005. *Id.* at ¶ 25(e).

(f) *Confidential Witness No. 6.* Confidential Witness No. 6 ("CW6") was employed by TIBCO as a Pre-Sales Consultant from early 2005 through the fall of 2005. CW6 was responsible for supporting TIBCO sales representatives by explaining TIBCO's products and their capabilities to prospective customers. According to CW6, TIBCO had a corporate training group at the Company's headquarters where CW6 was educated about TIBCO products and sales pitches.*Id.* at ¶ 25(f).

C. The Factual Allegations

On April 22, 2004, TIBCO announced that it would acquire Staffware, a European company located in the United Kingdom and provider of business process management ("BPM") solutions. *Id.* at ¶¶ 32-33; Thompson Decl. at Ex. E (April 23, 2004 Form 8-K). The Company stated that the acquisition would allow TIBCO to broaden its solutions

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 1469654 (N.D.Cal.)
(Cite as: Not Reported in F.Supp.2d, 2006 WL 1469654)

for automating and integrating business processes, and to increase its distribution capabilities through cross-selling of products into new geographies and an expanded customer base. Thompson Decl. at Ex. E. The Company cautioned investors, however, in the following manner regarding its expectations pertaining to the acquisition of Staffware:

This release contains forward-looking statements within the meaning of the "safe harbour" provisions of the United States securities laws. All statements other than statements of historical fact are statements that could be deemed forward-looking statements-including, without limitation, statements regarding (i) the ability of the acquisition to broaden TIBCO's solutions for automating and integrating business processes, (ii) the ability of the combined offering of the TIBCO platform and the Staffware's technology to provide an unparalleled solution to today's marketplace, (iii) the ability of the acquisition to create a larger software technology leader, (iv) the ability of TIBCO to deepen its industry expertise in finance, insurance, telecom and government sectors as a result of the acquisition, (v) the ability of the acquisition to increase TIBCO's distribution capabilities solutions, (vi) the continued development and support for Staffware's iProcess product and TIBCO's BusinessWorks Workflow products, (vii) the optimisation of Staffware's iProcess product to run with key TIBCO products, (viii) TIBCO's plan to continue to market, develop and maintain existing BPM and business integration products, (ix) TIBCO's plan to deliver a fully interoperable, unified suite in mid to late 2005 and (x) TIBCO's plan to provide an upgrade or migration path to current Staffware customers and the actual results could differ materially from what is envisaged by such forward-looking statements if TIBCO is unable to successfully integrate the Staffware's business after the acquisition, if TIBCO is unable to successfully develop, market and sell the Staffware business process management and workflow solutions or if the market for business integration solutions does develop and grow as is now expected. In addition, the acquisition may not occur or may not

occur in the time currently contemplated if the shareholders of Staffware do not accept the offer for their shares to TIBCO on the terms offered by TIBCO. TIBCO assumes no obligation to update the forward-looking statements included in this release.

*3 Thompson Decl. at Ex. E (emphasis added); *see also id.* at Ex. F.

On June 7, 2004, during the third fiscal quarter 2004 ("Q3 04"), TIBCO closed the acquisition of Staffware. *Id.* at ¶¶ 32-33.The total cost of the Staffware acquisition was approximately $237.1 million, comprised of $139.7 million in cash and the issuance of 10.9 million shares of TIBCO common stock, valued at $92.3 million. *Id.* TIBCO's acquisition of Staffware was the Company's first acquisition since 2002. *Id.* at ¶ 33.

In a Company release dated April 21, 2004, Ranadivé stated:

We believe business processes are rapidly becoming the most valuable corporate asset. This combination brings two best-in-class technologies together to more completely deliver value to customers investing in BPM solutions. The combination with Staffware will provide TIBCO with immediate additional reach into new and emerging markets including retail banking, insurance, public sector and telecommunications, as well as increased geographic presence within Europe and Asia Pacific. We believe that the combined companies can accelerate market momentum relative to market peers, and set a new standard for what is needed to effectively compete in the BPM market.

*Id.* at ¶ 35.

In the Form 10-Q for the second fiscal quarter of 2004 ("Q2 04"), filed on July 7, 2004, TIBCO warned that a number of factors relating to the Software acquisition could affect future operating results:

Any failure to successfully integrate Staffware's

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2006 WL 1469654 (N.D.Cal.)

(Cite as: Not Reported in F.Supp.2d, 2006 WL 1469654)

Page 4

business operations could adversely affect our financial results.

We intend to complete our acquisition of Staffware in the third quarter of fiscal 2004. We intend to integrate certain of our operations with those of Staffware to reduce the expenses of the combined company. If we are unable to integrate our operations with Staffware's operations in a timely manner, we may be unable to achieve the anticipated synergies. The challenges of integrating Staffware include, among other things:

• inconsistencies in standards, controls, procedures and policies, and compensation structures between TIBCO and Staffware;

• potential unknown liabilities associated with the acquired business and technology;

• demonstrating to our customers that the acquisition will not result in adverse changes in product offerings, customer service standards or business focus;

• coordinating and consolidating ongoing and future research and development efforts;

• unanticipated delays in or expenses related to the integration of operations;

• retaining and integrating key employees, as necessary, including members of Staffware's sales force;

• conducting adequate training of employees and modifying operating control standards in areas specific to U.S. corporations such as U.S. GAAP and requirements under the Sarbanes-Oxley Act of 2002 and the rules and regulations promulgated thereunder;

• costs and delays in implementing common systems and procedures, including financial accounting systems and customer information systems;

*4 • consolidating corporate and administrative infrastructure, particularly in light of Staffware's de-

centralized international corporate structure;

• identifying and eliminating redundant and underperforming operations and assets;

• using capital assets efficiently to develop the business of the combined company;

• minimizing the diversion of management's attention from ongoing business concerns;

• fluctuations in currency exchange rates;

• possible tax costs or inefficiencies associated with integrating the operations of the combined company; and

• international rules and regulations that may limit or complicate restructuring plans.

Thompson Decl. at Ex. G (Q2 04 Form 10-Q) (emphasis in original).

On September 21, 2004, TIBCO published a release in *PR Newswire* that announced consensus-beating financial results for the fiscal third quarter of 2004, the period ending August 29, 2004 ("Q3 04"), as well as the adoption of a $50 million stock repurchase program. CAC at ¶ 38. For Q3 04, TIBCO reported total revenues of $105.9 million, and net income of $8.6 million or $0.04 per share, up from $2.7 million, which was two cents above the analysts' consensus earnings estimates for the quarter. *Id.* at ¶ 38. The press release also stated in part:

TIBCO Software Reports Third Quarter Financial Results; Announces Stock Repurchase Program

"Increasingly, companies are turning to TIBCO to obtain value from their existing assets, gain operational efficiencies and improve customer loyalty," said Vivek Ranadivé, Chairman and CEO of TIBCO Software. "Our third quarter performance reflects these trends and the commitment and contributions of both the TIBCO and Staffware organizations."

...

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 1469654 (N.D.Cal.)
(Cite as: Not Reported in F.Supp.2d, 2006 WL 1469654)

Stock Repurchase Program

TIBCO's Board of Directors has approved a two-year stock repurchase program pursuant to which TIBCO may repurchase up to $50 million of its outstanding common stock from time to time on the open market or through privately negotiated transactions.

*Id.* at ¶ 38.

Following the publication of TIBCO's Q3 04 release, defendants hosted a conference call for analysts and investors during which Ranadivé stated, in part, the following:

VIVEK RANADIVÉ: In summary, I want to leave you with three points. First, we are at the tipping point in the integration market, where the technology has received mainstream acceptance, and TIBCO has emerged as the clear winner. Second, we are better positioned today than at any time in our history. And third, while there is always room for improvement, I believe that we are executing well across all segments of our business.

...

VIVEK RANADIVÉ: Well, maybe people will start believing us that we are at the tipping point of this business right now, and our franchise is very strong. And we are executing well; Chris Larsen is doing a great job, and we have got a good pipeline, and we feel good about where things are.

*5 *Id.* at ¶ 39.

Additionally, during the same call, the following exchange occurred:

TIM KLASELL, ANALYST, THOMAS WEISEL PARTNERS: I wonder if you can give us a little bit of color on how Staffware did relative to plan, particularly in the license line.

VIVEK RANADIVÉ: We moved very quickly to offer a common storefront, and so we blended the sales quickly after the deal closed. And we had significant success with that, so we had a common offering to our customers ... we were offering essentially a blended product....

CHRIS O'MEARA: [I] think we are pleased with the performance of both-of the TIBCO and Staffware organizations.... I think what I would leave people with is the fact that both organizations did a really great job, in terms of staying focused and closing opportunities.

TIM KLASELL: And then I'll sort of take a derivative off that. Asia did particularly well; Europe was strong. Did you get leverage from the Staffware sales forces in those territories with the TIBCO products?

VIVEK RANADIVÉ: Not so much in Asia, but more in Europe. In Europe we absolutely did.

...

KASH RANGAN, ANALYST, WACHOVIA SECURITIES: Perhaps if you could give us an update on the integration with Staffware, both from a product perspective and sales perspective, maybe touch upon when you expect to get leverage in the product acquisitions here locally in the US, following what seems to be a good start in the UK?

VIVEK RANADIVÉ: We integrated at kind of a storefront level in Q3 and Q4. And then, next year we will have even more tight integration, in terms of sales management and all of that. And we are very pleased with the way that it has gone, and we are very pleased with-from all fronts, the way the customers have reacted. We have several wins where it was really a joint product that allowed us to have not only the win but the type of pricing that we ended up with. So that has all gone better than we had expected, and we are very happy with it.

*Id.* at ¶ 40.

On September 22, 2004, shares of TIBCO stock traded at $8.27 per share, up 10% from the prior

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 6
Not Reported in F.Supp.2d, 2006 WL 1469654 (N.D.Cal.)
**(Cite as: Not Reported in F.Supp.2d, 2006 WL 1469654)**

day's close of $7.51 per share, on a volume of over 14.23 million shares traded. *Id.*

Between September 24, 2004 and October 1, 2004, Mashruwala sold 30,000 shares of TIBCO stock, for combined proceeds of $257,560. *Id.* at ¶ 88.

On or about October 13, 2004, the Company filed with the SEC its Form 10-Q, reporting its financial results for Q3 04. *Id.* at ¶ 42.The Form 10-Q was signed by defendants O'Meara, as Executive Vice President, Finance and Chief Financial Officer, and Carey, as Corporate Controller and Chief Accounting Officer. *Id.* The Company's Q3 04 Form 10-Q described the Staffware acquisition in part, as follows:

In June 2004, we completed our acquisition of Staffware plc ("Staffware"), a provider of Business Process Management ("BPM") solutions that enable business to automate, refine and manage their processes. The addition of Staffware's BPM solution enables us to offer our combined customer base a more robust and expanded real-time business integration solution. The purchase price for Staffware exceeded the fair value of Staffware's net tangible and intangible assets acquired; as a result, we have recorded goodwill in connection with this transaction....

*6 *Id.* at 42.

In the Q3 04 Form 10-Q, the Company also described its system of internal financial, operational, and disclosure controls as follows:

ITEM 4. CONTROLS AND PROCEDURES

Evaluation of disclosure controls and procedures. We maintain 'disclosure controls and procedures,' as such term is defined in Rule 13a-15(e) under the Securities Exchange Act of 1934 (the 'Exchange Act'), that are designed to ensure that information required to be disclosed by us in reports that we file or submit under the Exchange Act is recorded, processed, summarized, and reported within the time periods specified in Securities and Exchange Com-

mission rules and forms, and that such information is accumulated and communicated to our management, including our Chief Executive Officer and Chief Financial Officer, as appropriate, to allow timely decisions regarding required disclosure....

Based on their evaluation as of the end of the period covered by this Quarterly Report on Form 10-Q, our Chief Executive Officer and Chief Financial Officer have concluded that, subject to the limitations noted above, our disclosure controls and procedures were effective to ensure that material information relating to us, including our consolidated subsidiaries, is made known to them by others within those entities, particularly during the period in 1 which this Quarterly Report on Form 10-Q was being prepared.

*Id.* at ¶ 43.

In the Form 10-Q, the Company also cautioned investors of the challenges it faced in integrating Staffware and the potential for difficulties that could adversely affect future financial results. Thompson Decl. at Ex. I (Q3 04 Form 10-Q).

Defendants Ranadivé and O'Meara certified the Q3 04 Form 10-Q as accurate and complete. CAC at ¶ 44. Defendants Ranadivé and O'Meara also certified, pursuant to 18 U.S.C. § 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that the Q3 04 Form 10-Q fully complied with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934 and that the information in the Form 10-Q presented, in all material respects, the financial condition and results of operations of the Company. *Id.* at ¶ 45.

On October 12, 2004, the Company published a press release announcing the $3.5 million acquisition of General Interface. *Id.* at ¶ 46.

Between October 21, 2004 and November 3, 2004, Mashruwala sold 45,000 shares of TIBCO stock, for combined proceeds of $563,214. *Id.* at ¶ 88.

On November 22, 2004, Bear Stearns raised the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 1469654 (N.D.Cal.)
(Cite as: Not Reported in F.Supp.2d, 2006 WL 1469654)

price target on TIBCO. *Id.* at ¶ 48.On December 13, 2004, Jefferies & Co. ("Jefferies") also raised its rating on TIBCO shares and issued a "Buy" rating. *Id.* at ¶ 49.Following the Jefferies upgrade, TIBCO's stock rose from $11.15 per share to approximately $11.90 per share. *Id.* at ¶ 50.

On December 22, 2004, TIBCO published a release announcing "record" results for the fourth fiscal quarter of 2004 ("Q4 04"). The release stated, in part:

*7 TIBCO Software Reports Record Fourth Quarter and Annual Financial Results

PALO ALTO, Calif., December 22, 2004-TIBCO Software Inc. (Nasdaq: TIBX), a leading enabler of real-time business and the world's largest independent business integration software company, today announced results for its fourth fiscal quarter and year ended November 30, 2004. Total revenues for the fourth quarter were $125.7 million. License revenues for the fourth quarter were $70.6 million. Fiscal year 2004 revenues were $387.2 million. Net income for the quarter calculated in accordance with accounting principles generally accepted in the United States was $18.2 million or $.08 per share on a fully diluted basis.

...

"During 2004, we capitalized on the beginning of a secular growth opportunity in the Integration market, increasing our market share of those segments in which we offer products and on the hard work and dedication of the people who work at TIBCO," said Vivek Ranadivé, Chairman and CEO of TIBCO Software. "The growth we are experiencing is further validation that our integration platform has gone from a 'nice to have' to a 'must have' for companies operating in the ever more competitive global marketplace."

*Id.* at ¶ 51.

Also on December 22, 2004, the Company hosted a conference call for analysts and investors during which the following was said:

With respect to Q4, we reported another solid quarter with total revenues growing 19 percent sequentially and 72 percent year-over-year to 125.7 million....

...

[W]e continued our track record of redefining the notion of integration by significantly expanding our solution range and adjustable market to new products such as business events released in Q4, and through our merger with Staffware, we've solidified our position as the leader in business process management and further increased our market footprint worldwide. We believe all of these events give us significant momentum as we head into 2005 and beyond.

...

We are in a very good position to capitalize on the secular growth opportunity ahead of us for the rest of this decade. This is what has me so very excited about TIBCO's growth potential.

[W]e are ... better positioned today than any time in our history.

*Id.* at ¶ 52.

When asked about the integration of Staffware, the following exchange took place:

JOHN DIFUCCI, ANALYST, BEAR STEARNS: Yes, thanks. And congratulations, guys. This looks-this looks pretty good. Looks better than pretty good. Quickly, a couple. I guess, on some of your newer products just-on-just want to understand how they're developing. One, Staffware, how the cross-selling's doing. Is it-it's still early,.but are you having any traction trying to cross-sell into your current customer base or traditional customer base with the Staffware products?

VIVEK RANADIVÉ: Yes, John, we fully integ-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 1469654 (N.D.Cal.)
(Cite as: Not Reported in F.Supp.2d, 2006 WL 1469654)

rated Staffware into-into the product set and into our sales organization. So we actually had good success with cross-selling.... So we're very, very excited about both opportunities-the cross-selling of Staffware, as well as business events.

*8 ...

DINO DIANA [ANALYST, UBS]: Okay. And just lastly, in terms of Staffware renewal rates, when should we start to see them really kicking in, in terms of getting deferred revenue back?

CHRIS O'MEARA: I think you'll see that-they, historically, had business cycles that led to a lot of license deals closing in the June and December time frame. So I think you'll see a lot of renewal activity in Q1-December, January time frame. They have their underlying license revenue weighted, due to a couple of specific periods during the year.

...

STERLING AUTY [ANALYST, JP MORGAN]: Okay. And then at the beginning of the Q & A session, I think somebody had asked your success level in possibly bringing the Staffware solution set to North America. Is that what's driving some of the growth in the-in the insurance sector? What is the opportunity to bring Staffware to North America.

VIVEK RANADIVÉ: It's huge. It's huge.

*Id.* at ¶ 53.

Additionally, during the call, defendant O'Meara issued positive guidance for the first fiscal quarter of 2005 ("Q1 05"), stating: "For Q1, we expect revenues in the range of 116 to 120 million, which represents year-over-year growth of between 56 and 60 percent."*Id.* at ¶ 54.However, the Company also warned investors that any forward-looking statements were "subject to [certain] risks and uncertainties."Thompson Decl. at Ex. L.

On or about December 23, 2004, the Company approved over $2.2 million in performance-based bo-

nuses to the Company's senior-most executives. *Id.* at ¶ 58.Also on December 23, 2004, defendant Ranadivé appeared on a show called "Kudlow & Cramer" on CNBC and the following exchange took place:

JIM CRAMER, co-host:

All year on KUDLOW & CRAMER we have highlighted this stock. It has now doubled since we first talked about it. It's called TIBCO Software, and it is looking great. This is Vivek Ranadivé; he is TIBCO's CEO. Vivek, welcome back to the show.

Mr. VIVEK RANADIVÉ (TIBCO CEO): Hello.

CRAMER: A monster quarter. I want people to understand-now I saw you on a competitive network, and I felt that the guy-hey, I didn't think the guy did that good a job, but that's OK. But one of the things that he did was he did not give you a chance to talk about what TIBCO Software does. I'm gonna give that. You picked up some new clients, Lehman, Procter, Lockheed Martin. Tell me what you do for those companies.

Mr. RANADIVÉ: Well, it's really simple, Jim. What we allow companies to do is manage all of their assets at real time. Companies have assets: software, ERP systems, databases, factories. And our software brings it all together for the benefit of a company.

LARRY KUDLOW, co-host: Vivek, let me throw something out I haven't seen yet; I just thought of this. It looks like we're kind of in the beginning of a merger and acquisition wave, an M & A wave, lots of takeovers and consolidations. Now wouldn't that be right up TIBCO's alley? I mean, you can make these systems mesh and reintegrate for companies that are consolidating?

*9 Mr. RANADIVÉ: Absolutely. That represents huge opportunity for us. We allow you to quickly tie your systems together. In fact, if you speak to Gary Loveman at Harrah's, he's doing exactly that with our software.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                Page 9
Not Reported in F.Supp.2d, 2006 WL 1469654 (N.D.Cal.)
**(Cite as: Not Reported in F.Supp.2d, 2006 WL 1469654)**

*Id.* at ¶ 59.

By December 28, 2004, shares were trading at a high of $13.45 per share.*Id.* at ¶ 50.Between December 27, 2004 and December 30, 2004, defendant Mashruwala sold 50,000 shares of TIBCO stock, for combined proceeds of $645,890. *Id.* at ¶ 56.

On January 7, 2005, O'Meara sold 20,000 shares at a price of $12.57, for a total amount of $251,400. *Id.* at ¶ 88.

On January 21, 2005, *ComputerWire* issued a report regarding TIBCO and the Staffware integration. The ComputerWire report stated, in part, the following;

Tibco Software, Inc. said that it has completed the integration of the acquired Staffware personnel into its own sales and engineering organizations, and it also said that the founder, former chairman and CEO of Staffware, John O'Connell, is leaving Tibco's management team. Tibco said O'Connell will still act as a strategic consultant to the company, but he is said to be pursuing other non-executive director roles outside of Tibco. O'Connell is thought to have had a big hand in promoting the initial approach for business process management (BPM) company Staffware by Tibco in April 2004.

Tibco said in its latest quarterly report that it has made a number of headcount reductions related to the acquisition of Staffware-it set aside $3.2m to cover the liability incurred as a result of workforce reductions and the cancellation of marketing programs, but has thus far not said what the total headcount reduction came to.

*Id.* at ¶ 61.

On February 14, 2005, the Company published a release on *PR Newswire* announcing the following:

PALO ALTO, Calif., Feb. 14 / PRNewswire-FirstCall/-TIBCO Software Inc. (NASDAQ:TIBX), a leading enabler of real-time

business and the world's largest independent business integration software company, today announced that it achieved compliance with Section 404 of the Sarbanes-Oxley Act. Today TIBCO filed its Annual Report on Form 10-K with the Securities Exchange Commission containing its Management's Report on Internal Control over Financial Reporting. TIBCO management assessed the effectiveness of TIBCO's internal control over financial reporting and concluded that such controls were effective as of November 30, 2004.

TIBCO is one of the first companies required to test for Section 404 compliance due to its November 30 year end and is also one of the first to obtain Section 404 compliance. Section 404 of the Sarbanes-Oxley Act requires companies to establish and attest to an effective control structure for reporting financial results.

"TIBCO is pleased to have achieved Section 404 compliance-this is an affirmation of the integrity of TIBCO's financial statements, internal controls and systems," said Vivek Ranadivé, Chairman and CEO, TIBCO Software Inc. "This achievement is a testament to the hard work and determined efforts of the individuals involved on this project."

**\*10** *Id.* at ¶ 64.

Also on February 14, 2005, the Company filed its year-end Form 10-K financial report for fiscal year 2004 ("FY04"). The Form 10-K stated, in part:

On June 7, 2004, we acquired Staffware plc ("Staffware"), a provider of BPM solutions that enable businesses to automate, refine and manage their processes. The addition of Staffware's BPM solutions enabled us to offer our combined customer base an expanded real-time business integration solution, by making it easier for our customers to utilize their existing systems through real-time information exchange and automation and management of enterprise business processes regardless of where such processes reside. BPM enables companies to save time and money by driving costs and

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 10
Not Reported in F.Supp.2d, 2006 WL 1469654 (N.D.Cal.)
(Cite as: Not Reported in F.Supp.2d, 2006 WL 1469654)

time out of business processes (for example, redu-cing error rates or manual steps), while at the same time ensuring that business processes are compliant with internal procedures and external regulations. Our acquisition of Staffware also increased our dis-tribution capabilities through the cross-selling of products into new geographic regions, as well as an expanded customer and partner base.

*Id.* at ¶ 65.The FY04 Form 10-K was certified by defendant Ranadivé and O'Meara. *Id.* at ¶ 66.

On March 1, 2005, the Company announced that results for Q1 05, the period ending February 27, 2005, were below guidance. *Id.* at ¶ 69.Defendants also announced that weakness in Europe and delays in closing deals would result in non-GAAP earn-ings per share between $0.04 and $0.05, below ana-lysts' consensus mean of $0.08 earnings per share. *Id.* at ¶ 69.The Company's preliminary data showed that Q1 05 revenues would reach only between $100 to $102 million, as compared to the FirstCall consensus mean estimate of $119 million. *Id.* The Company stated that the "disappointing results were primarily due to lack of execution in certain geographic areas, particularly in Europe" as well as the fact that "several transactions were delayed near the end of the quarter."Thompson Decl. at Ex. M.

Also on March 1, 2005, the Company held a con-ference call, during which Ranadivé explained that "given the strength we were seeing in our business and pipeline coming into Q1 and as late as the first part of last week, I did not expect us to produce such disappointing results."*See* Thompson Decl. at Ex. N.

Ranadivé further explained:

Although we're still in the process of fully analyz-ing Q1, let me discuss with you what I do know today. First, we believe, at this point, the shortfall was primarily due to a lack of execution in certain geographic areas, most specifically Europe. In fact, every region through Europe came in significantly under forecast.... Unfortunately, the fundamental is-

sue was that the extent of the shortfall emerged only very late in the quarter, giving us little time to pursue other less-developed opportunities in our broader pipeline ...

*11 Secondly, we have several deals in both Europe and North America that were pushed out and did not close as planned ... they're still in our pipeline, and we still expect to close them over the coming quarters.

*Id.*

Ranadivé also stated that some of the problems were caused by the fact that he had been more fo-cused on helping the Company comply with Section 404 of the Sarbanes-Oxley Act during the quarter:

Finally, although hard to quantify, I must also cite my personal focus on achieving 404 compliance as part of the problem. As many CEOs would appreci-ate, my intense focus during the quarter on making sure we successfully achieved 404 compliance took some of my attention away from sales activities.... I was pleased to announce our success with this sev-eral weeks ago, but I let myself get too distracted by this and was not as involved as I usually am in various key deals until later in the quarter. This was entirely my mistake.

*Id.*

In the question-and-answer period of the confer-ence call, Ranadivé answered the following ques-tions:

JOHN DIFUCCI, ANALYST, BEAR STEARNS: [T]he way I understand it anyway, most of your country managers in Europe were previous Staffware people. Staffware, as I understand it, was on a calendar year previously. Now they are on a TIBCO quarter year, ending in February versus March ... I guess I'm trying to get a feel for how much of a miss is still there and how much of it could likely come into the next quarter ... because it sounds like Europe was the issue in every region in Europe, and again these were run by pretty much

Not Reported in F.Supp.2d                                                    Page 11
Not Reported in F.Supp.2d, 2006 WL 1469654 (N.D.Cal.)
**(Cite as: Not Reported in F.Supp.2d, 2006 WL 1469654)**

the Staffware organization ... I was wondering how much of an impact you think that had on finishing this quarter.

RANADIVÉ: Yes, we think this is a blip ... and you are absolutely right; we did have mingled management, and quite honestly, that led to some paralysis. There was an old TIBCO and a new TIBCO, and we had poor leadership. We're going to fix that ...

...

... there were differences in terms of the calendar year versus the quarter pressures, just in terms of even the process we apply to contracts, you know, the U.S. GAAP process being much more stringent, so there was a learning curve. You know, it just-they were paralyzed during that time. We came in at a fraction of the number that we were expected to come in at ...

*Id.*

Additionally, Ranadivé discussed TIBCO's failure to execute:

KATHERINE EGBERT, ANALYST, JEFFERIES & CO.: Do you think there is any component of demand in Europe being weak, or is it just simply execution on your part?

RANADIVÉ: We believe it's execution, Katherine. I don't think Europe has been particularly strong over the course of the last year, but we still managed to do okay over there. We don't think it got any worse, so we believe that the fault is ours; it was execution.

*Id.*

Ranadivé also discussed certain difficulties inherent in the transition from a European accounting system to an American system:

**\*12** ... Understand that they were a European company and what they consider to be revenue-they run on a yearly basis and we are on a quarterly basis,

the way that they looked at revenue under U.S. GAAP we wouldn't consider revenue. The point I'm making is, look, there were some cultural differences, there is some training to be done, and all of that combined with just 2 sets of people caused paralysis.

*Id.*

Ranadivé also stated that the disappointing financial results were not apparent until the end of the quarter:

STERLING AUTY, ANALYST, J.P. MORGAN: Okay, okay. Then last question would be-and I think somebody asked and I apologize if I am making you repeat it, but going into the quarter kind of pipeline coverage-you are comfortable with that right up to the end and it was just the close rate at the end?

RANADIVÉ: That is correct.

*Id.*

Finally, Ranadivé was asked to explain why the problems with Staffware did not show up until several quarters after the acquisition:

KATHERINE EGBERT, ANALYST, JEFFERIES & CO.: ... I'm just wondering why this is basically your third quarter of integration with Staffware. What is it about the management complex that showed up in the February quarter that wasn't there previously? Did it have anything to do with the end of the year?

RANADIVÉ: Well, you know, there were a variety of factors, Katherine, but Q1 is seasonally the tough quarter for us always, and we did have a number of changes that we had made that really-something during this quarter. So we had Staffware people running many of the regions. So you know basically it all came to a head this quarter and what we saw there was complete paralysis, which-you know before things were still a different, you know, before, they were still new and we were still very in-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 1469654 (N.D.Cal.)
(Cite as: Not Reported in F.Supp.2d, 2006 WL 1469654)

volved in it; I was involved, you know, I spent a lot of time in Europe and other senior members were involved, so you know, they were-this was the first quarter that we actually had the combined management fully functional."

*Id.*

On March 2, 2005, the Company's stock price declined, falling from a close of $8.90 per share in regular trading on March 1, 2005, to just above $7.00 the following day, on a high trading volume of over 52 million shares. *Id.* at ¶ 75. Also on March 2, 2005, *TheStreet.com* noted that TIBCO's stock had been falling for days before the Company's March 1, 2005 announcement. *Id.* at ¶ 76. On March 4, 2005, the same publication commented that the volume of shares traded, and the decline in stock price, immediately preceding the Q1 05 announcement was "suspicious." *Id.* at ¶ 79.

D. Procedural History

On May 25, 2005, plaintiff Lance Siegall ("Siegall") commenced a class action litigation against defendants TIBCO, Ranadive, O'Meara, Carey and Mashruwala for violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and Rule 10b-5 promulgated thereunder ("the *Siegall* complaint"). In the *Siegall* complaint, Siegall alleged, *inter alia*, that TIBCO and certain of its officers and directors violated the Exchange Act by publishing a series of materially false and misleading statements which Defendants knew, and/or deliberately disregarded, were false and materially misleading.

*13 On May 26, 2005, counsel for Siegall caused a notice to be published advising purchasers of TIBCO securities of (i) the pendency of the securities class action against Defendants; (ii) the claims asserted therein; (iii) the purported class period of the litigation, *i.e.* September 21, 2004 through March 1, 2005, inclusive; and (iv) the right of any member of the putative class to move the Court to

serve as lead plaintiff.

Subsequently, Ronald Bernheim ("Bernheim") and James J. Guzzetti ("Guzzetti") each filed separate class action complaints in this district, on May 31, 2005 and June 10, 2005, respectively, on behalf of themselves, and all those who purchased the securities of TIBCO between September 21, 2004 and March 1, 2005 (the *"Bernheim* complaint" and the *"Guzzetti* complaint"). The allegations in the two complaints were the same, namely, they alleged, *inter alia*, that TIBCO and certain of its officers and directors violated Sections 10(b) and 20(a) of the Exchange Act, and Rule 10b-5 promulgated thereunder, by publishing materially false and misleading statements.

On July 25, 2005, Fenton and Rajasubramanian filed a Motion for Consolidation and Appointment of Lead Plaintiff. No other members of the putative class filed motions requesting to be appointed as Lead Plaintiff. On July 26, 2005 this Court ordered that the *Siegall, Bernheim,* and *Guzzetti* cases be deemed related.

At the time the Motion for Consolidation and Appointment of Lead Plaintiff was filed, neither Fenton nor Rajasubramanian had complied with Civil Local Rule 3-7(c), which sets forth the filing and certification requirements that parties must observe in private securities actions brought in the Northern District of California. On September 13, 2005, Defendants filed a limited opposition to the Motion for Consolidation and Appointment of Lead Plaintiff, in which they stated that they did not oppose the consolidation of the above-referenced cases, but opposed the appointment of Fenton and Rajasubramanian as Lead Plaintiffs on the grounds that Fenton and Rajasubramanian had failed to comply with Civil Local Rule 3-7.

Consequently, on November 14, 2005, this Court ordered Fenton and Rajasubramanian to submit within ten (10) days of the Order amended certifications in compliance with Civil Local Rule 3-7(c). The Court also ordered Defendants to file any ob-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                 Page 13
Not Reported in F.Supp.2d, 2006 WL 1469654 (N.D.Cal.)
(Cite as: Not Reported in F.Supp.2d, 2006 WL 1469654)

jections within three days of the submission of the amended certifications. On November 23, 2005, Fenton and Rajasubramanian filed their amended certifications. No objections were filed.

On February 24, 2006, the Court granted the Motion for Consolidation and appointed Fenton and Rajasubramanian as Lead Plaintiffs.

On March 16, 2006, Lead Plaintiffs filed a Consolidated Amended Complaint. On April 17, 2006, Defendants filed the instant Motion to Dismiss.

### LEGAL STANDARD

A. Federal Rule of Civil Procedure 12(b)(6)

Under Federal Rule of Civil Procedure 12(b)(6), a motion to dismiss should be granted if it appears beyond a doubt that the plaintiff "can prove no set of facts in support of his claim which would entitle him to relief."*Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). For purposes of such a motion, the complaint is construed in a light most favorable to the plaintiff and all properly pleaded factual allegations are taken as true.*Jenkins v. McKeithen,* 395 U.S. 411, 421, 89 S.Ct. 1843, 23 L.Ed.2d 404 (1969); *Everest and Jennings, Inc. v. American Motorists Ins. Co.,* 23 F.3d 226, 228 (9th Cir.1994). All reasonable inferences are to be drawn in favor of the plaintiff. *In re Silicon Graphics Inc. Sec. Litig.,* 183 F.3d 970, 983 (9th Cir.1999). The court does not accept as true unreasonable inferences or conclusory legal allegations cast in the form of factual allegations.*Western Mining Council v. Watt,* 643 F.2d 618, 624 (9th Cir.1981); *see Miranda v. Clark County, Nev.,* 279 F.3d 1102, 1106 (9th Cir.2002).

*14 Although the court is generally confined to consideration of the allegations in the pleadings, when the complaint incorporates documents or alleges the contents of documents, and no party questions the authenticity of such documents, a court may also consider such documents when evaluating

the merits of a Rule 12(b)(6) motion. *See In re Stac Electronics Sec. Lit.,* 89 F.3d 1399, 1405 (9th Cir.1996).

When the complaint is dismissed for failure to state a claim, "leave to amend should be granted unless the court determines that the allegation of other facts consistent with the challenged pleading could not possibly cure the deficiency."*Schreiber Distrib. Co. v. Serv-Well Furniture Co.,* 806 F.2d 1393, 1401 (9th Cir.1986). The Court should consider factors such as "the presence or absence of undue delay, bad faith, dilatory motive, repeated failure to cure deficiencies by previous amendments, undue prejudice to the opposing party and futility of the proposed amendment."*Moore v. Kayport Package Express,* 885 F.2d 531, 538 (9th Cir.1989). Of these factors, prejudice to the opposing party is the most important. *See Jackson v. Bank of Hawaii,* 902 F.2d 1385, 1387 (9th Cir.1990) (citing *Zenith Radio Corp. v. Hazeltine Research, Inc.,* 401 U.S. 321, 330-31, 91 S.Ct. 795, 28 L.Ed.2d 77 (1971)). Leave to amend is properly denied "where the amendment would be futile."*DeSoto v. Yellow Freight Sys.,* 957 F.2d 655, 685 (9th Cir.1992).

B. Federal Rule of Civil Procedure 9(b)

Federal Rule of Civil Procedure 9(b) provides as follows:

In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally.

Fed.R.Civ.P. 9(b).

"[The Ninth Circuit] has interpreted Rule 9(b) to require that 'allegations of fraud are specific enough to give defendants notice of the particular misconduct which is alleged to constitute the fraud charged so that they can defend against the charge and not just deny that they have done anything wrong." ' *Neubronner v. Milken,* 6 F.3d 666, 671

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 1469654 (N.D.Cal.)
(Cite as: Not Reported in F.Supp.2d, 2006 WL 1469654)

(9th Cir.1993) (quoting *Semegen v. Weidner,* 780 F.2d 727, 731 (9th Cir.1985)). "The pleader must state the time, place, and specific content of the false representations as well as the identities of the parties to the misrepresentation." *Schreiber Distributing Co. v. Serv-Well Furniture Co.,* 806 F.2d 1393, 1401 (9th Cir.1986) (citing *Semegen,* 780 F.2d at 731).

C. Pleading Requirements in Securities Fraud Actions

Section 10(b) of the Exchange Act makes it unlawful "for any person ... to use or employ, in connection with the purchase or sale of any security ... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe[.]"15 U.S.C. § 78j(b).

Rule 10b-5, promulgated under the authority of Section 10(b), in turn, provides that "[i]t shall be unlawful for any person ... (a) To employ any device, scheme, or artifice to defraud, (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, or (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security."17 C.F.R. § 240.10b-5. Thus, the basic elements of a Rule 10b-5 claim are: (1) a material misrepresentation or omission of fact, (2) scienter, (3) a connection with the purchase or sale of a security, (4) transaction and loss causation, and (5) economic loss. *In re Daou Systems, Inc.* 411 F.3d 1006, 1014 (9th Cir.2005).

**\*15** In order to survive a motion to dismiss, a Section 10(b) claim must satisfy three pleading standards. First, it must meet the general requirements established by Federal Rule of Civil Procedure 8(a) that complaints give a short and plain statement of the claim. Second, it must conform with the particularity requirements of Rule 9(b).*Neubronner v. Milken,* 6 F.3d 666, 671 (9th Cir.1993) (quoting *Semegen,* 780 F.2d at 731). Third, it must satisfy the requirements of the Private Securities Litigation Reform Act ("PSLRA").

The PSLRA employs heightened pleading standards for claims brought under Section 10(b) and, similar to Rule 9(b), requires pleading with particularity for two elements in a Section 10(b) claim: (1) falsity and (2) scienter. *See Gompper v. VISX, Inc.,* 298 F.3d 893, 895 (9th Cir.2002) (citing *Ronconi v. Larkin,* 253 F.3d 423, 429 (9th Cir.2001))."If a plaintiff fails to plead either the alleged misleading statements or scienter with particularity, the court must dismiss the complaint."*Carol Gamble Trust 86 v. E-Rex, Inc.,* 84 Fed.Appx. 975, 977 (9th Cir.2004).

Thus, under both the PSLRA and Rule 9(b), a plaintiff must specify each statement alleged to have been misleading and the specific reason or reasons why such statement is misleading. *See* 15 U.S.C. § 78u-4(b)(1); Fed.R.Civ.P. 9(b). This is accomplished by identifying either (1) inconsistent contemporaneous statements; or (2) inconsistent contemporaneous information (such as an internal document) that was made by or available to the defendants. *In re Splash Technology Holdings, Inc. Sec. Litig.,* 2000 WL 1727377, \*13 (N.D.Cal.1997); *see also Nursing Home Pension Fund, Local 144 v. Oracle Corp.,* 380 F.3d 1226, 1230 (9th Cir.2004).

When dealing with allegations based on information and belief, and not plaintiff's personal knowledge, the PSLRA imposes further pleading requirements. Allegations are deemed to be held on information and belief, and thus subject to the particularity requirements, unless plaintiffs have personal knowledge of the facts. *In re Vantive Corp. Sec. Litig.,* 283 F.3d 1079, 1085 n. 3 (9th Cir.2002). Any allegation that is made on information and belief, must "state with particularity all facts on which that belief is formed."15 U.S.C. § 78u-4(b)(1)."Naming sources is unnecessary so long as the sources are described with sufficient

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                    Page 15
Not Reported in F.Supp.2d, 2006 WL 1469654 (N.D.Cal.)
**(Cite as: Not Reported in F.Supp.2d, 2006 WL 1469654)**

particularity to support the probability that a person in the position occupied by the source would possess the information alleged and the complaint contains adequate corroborating details."*Daou*, 411 F.3d at 1015 (citing *Nursing Home*, 380 F.3d at 1233). Therefore, to sufficiently plead falsity, a plaintiff must: (1) identify each alleged misstatement, and in the case of group published information, ascribe some authorship or control over the documents to the individual defendants; (2) state the reasons why the statement is misleading; and (3) in the case of confidential source information, supply an adequate factual basis to support the source's basis of knowledge with regard to the information provided. *See*15 U.S.C. § 78u-4(b)(1).

**\*16** With respect to scienter, the PSLRA also requires that the plaintiff "state with particularity facts giving rise to a strong inference that the defendant[s] acted with the required state of mind" for each alleged act or omission. 15 U.S.C. § 78u-4(b)(2). "Deliberate recklessness" is the required state of mind and will satisfy scienter if it "reflects some degree of intentional or conscious misconduct."*Nursing Home*, 380 F.3d at 1230 (citing *In re Silicon Graphics Sec. Litig.*, 183 F.3d 970, 977 (9th Cir.1999). A complaint will not survive if it just relies on generic allegations. *See Silicon Graphics*, 183 F.3d at 974, 985. To assess whether a plaintiff has sufficiently pled scienter, a court must consider "whether the total of plaintiff's allegations, even though individually lacking, are sufficient to create a strong inference that defendants acted with deliberate or conscious recklessness."*Nursing Home*, 380 F.3d at 1230. Additionally, a court must consider "all reasonable inferences, whether or not favorable to the plaintiff."*Id.* (citing *Gompper*, 298 F.3d at 897).

*ANALYSIS*

I. Defendants' Request for Judicial Notice

As a preliminary matter, Defendants have requested

that the Court take judicial notice of the following documents, each of which is attached to the Declaration of Reginald S. Thompson ("Thompson Declaration"):

(a) excerpts from TIBCO's Form 10-K for fiscal year 2005, filed with the SEC on February 10, 2006;

(b) excerpts from TIBCO's 2005 Revised Proxy Statement on Schedule 14A, filed with the SEC on March 18, 2005;

(c) a TIBCO Form 8-K and the press release attached thereto, filed with the SEC on October 17, 2005;

(d) a TIBCO Form 8-K and the press release attached thereto, filed with the SEC on April 23, 2004;

(e) a TIBCO Form 8-K and the press release attached thereto, filed with the SEC on June 17, 2004;

(f) excerpts from TIBCO's Form 10-Q for the quarter ended May 30, 2004, filed with the SEC on July 7, 2004;

(g) a TIBCO Form 8-K and the press release attached thereto, filed with the SEC on September 21, 2004;

(h) excerpts from TIBCO's Form 10-Q for the quarter ended August 29, 2004, filed with the SEC on October 13, 2004;

(i) a TIBCO Form 8-K and the press release attached thereto, filed with the SEC on December 22, 2004;

(j) excerpts from TIBCO's Form 10-K for fiscal year 2004, filed with the SEC on February 14, 2005;

(k) a TIBCO Form 8-K and the press release attached thereto, filed with the SEC on March 1, 2005;

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                        Page 16
Not Reported in F.Supp.2d, 2006 WL 1469654 (N.D.Cal.)
**(Cite as: Not Reported in F.Supp.2d, 2006 WL 1469654)**

(l) several Forms 4 filed with the SEC on behalf of Mashruwala between September 21, 2004 and March 1, 2005;

(m) several Forms 4 filed with the SEC on behalf of Mashruwala between September 2003 and March 2004;

(n) excerpts from TIBCO's Form 10-Q for the quarter ended February 27, 2005, filed with the SEC on April 8, 2005;

(o) a TIBCO Form 8-K and the press release attached thereto, filed with the SEC on March 24, 2005;

**\*17** (p) the transcript of TIBCO's quarterly earnings conference call regarding its results for the quarter and fiscal year ended November 30, 2004;

(q) the transcript of TIBCO's quarterly earnings conference call regarding its preliminary results for the quarter ended February 27, 2005; and

(r) a January 21, 2005 *Computer Wire* article entitled "TIBCO Says Staffware Personnel Integration Complete."

The Court finds that judicial notice is proper for the following reasons. First, pursuant to Federal Rule of Evidence 201, documents alleged in a complaint and essential to a plaintiff's allegations may be judicially noticed. *See Branch v. Tunnell,* 14 F.3d 449, 454 (9th Cir.1994); *Steckman v. Hart Brewing, Inc.* 143 F.3d 1293, 1295 (9th Cir.1998). A court may also take judicial notice of documents on which allegations in the complaint necessarily rely, even if not expressly referenced in the complaint, provided that the authenticity of those documents are not in dispute. *In re Autodesk, Inc. Sec. Litig.,* 132 F.Supp.2d 833, 837-38 (N.D.Cal.2000). Additionally, a court may take judicial notice of Forms 4 filed with the SEC, which are deemed incorporated by reference into a complaint when a plaintiff's allegations rely on a defendant's stock sales. *Silicon Graphics,* 183 F.3d at 986. Further, Plaintiffs do not oppose the taking of judicial notice of any of

the aforementioned documents. Accordingly, the Court hereby GRANTS Defendants' Request for Judicial Notice.

## II. Defendants' Motion to Dismiss

In Defendants' Motion to Dismiss, Defendants argue that the Consolidated Amended Complaint should be dismissed because: (1) Plaintiffs have not plead sufficient facts to establish the element of scienter; (2) Plaintiffs have not alleged an adequate factual basis for their claims; and (3) Plaintiffs have not alleged any actionable false statements. Defendants also urge the Court to reject the "group pleading" standard and therefore dismiss the claims against Mashruwala. Additionally, Defendants ask the Court to dismiss Plaintiffs' Section 20(a) claim on the grounds that Plaintiffs have failed to establish a Section 10(b) violation and/or have otherwise failed to allege that Mashruwala and Carey had the requisite power to control TIBCO, either directly or indirectly.

## A. Scienter

Defendants correctly assert that Plaintiffs have failed to allege scienter with the requisite particularity. To satisfy the PSLRA, Plaintiffs must state with particularity facts giving rise to a *strong* inference that either Defendants knew, at the time that certain forward-looking statements were made, that the statements were false, or, with respect to historical statements, that Defendants acted in a conscious and reckless manner. *See* 15 U.S.C. § 78u-4(b)(2); *Silicon Graphics,* 183 F.3d at 974. In reviewing the sufficiency of the complaint, the Court must consider "all reasonable inferences to be drawn from the allegations, including inferences unfavorable to the plaintiffs." *Gompper,* 298 F.3d at 897. Thus, to survive dismissal, a strong inference of scienter must be "the most plausible of competing inferences." *Id.*

**\*18** Here, the Company-and defendant Ranadivé in particular-specifically stated that the disappointing

Not Reported in F.Supp.2d                                                                           Page 17
Not Reported in F.Supp.2d, 2006 WL 1469654 (N.D.Cal.)
**(Cite as: Not Reported in F.Supp.2d, 2006 WL 1469654)**

Q1 05 results were *not* known until the week immediately preceding the close of the quarter, after any of the allegedly false or misleading statements were made. *See* Thompson Decl. at Ex. N ("[G]iven the strength we were seeing in our business and pipeline coming into Q1 and as late as the first part of last week, I did not expect us to produce such disappointing results."). Defendant Ranadivé further explained that he was not as focused on sales activities during the first quarter of fiscal year 2005 because he was involved in the Company's efforts to comply with the Sarbanes-Oxley Act. *Id.* at Ex. N ("As many CEOs would appreciate, my intense focus during the quarter on making sure we successfully achieved 404 compliance took some of my attention away from sales activities.... I was pleased to announce our success with this several weeks ago, but I let myself get too distracted by this and was not as involved as I usually am in various key deals until later in the quarter."). From these statements, the Court may reasonably infer that Defendants may not have been aware of the extent of the Company's problems until after the purportedly false statements were made. As such, Plaintiffs must allege facts that overcome Defendants' proffered reasons for the discrepancy in the actual Q1 05 results and the previous statements made by the Company. Plaintiffs have failed to do so.

For example, Plaintiffs rely heavily on allegations that merely show that Defendants "must have known" about certain unspecified "adverse undisclosed information" because of their positions with the Company. *See* CAC at ¶¶ 19, 71, 73, 86-87. However, in the Ninth Circuit, such allegations are insufficient to establish a strong showing of scienter as a matter of law and Plaintiffs' citation to a non-binding district court case outside of this circuit does not alter this conclusion. *See In re Read-Rite Corp. Sec. Litig.,* 115 F.Supp.2d 1181, 1183 (N.D.Cal.2000), *aff'd,* 335 F.3d 843 (9th Cir.2003).

Plaintiffs' confidential witnesses also fail to provide information that would suggest that Defendants

either knew that the false statements being made were false *when made* or that they were acting in a deliberately reckless manner. In fact, the only information attributed to CW3, who is a former National Account Director working out of the New York office, is that Ranadivé and Mashruwala were *generally*"responsible for the planning and execution of TIBCO's integration of Staffware after its acquisition."*Id.* at ¶ 71.CW3 also asserts in a vague and conclusory manner that the "issues with executing sales" were "attributable to the Staffware acquisition."[FN3] *Id.* As to CW5, a Senior Manager of IT Operations during the relevant period, Plaintiffs allege that he contends that it was "known internally" that the failure to complete some Staffware-related deals contributed to the Q1 05 earnings shortfall.*Id.* at ¶ 71.CW5 also contends that Defendants' "knowledge" of "the connection between the Staffware acquisition and TIBCO's Q1 05 earnings miss" is "corroborated" by the fact that Ranadivé "blamed Staffware for the miss." *Id.* at ¶ 71.The insufficiency of these allegations is readily apparent; Plaintiffs utterly fail to provide information showing who specifically knew the information, how they knew it, what information was known, and when it was known.[FN4]In light of the fact that defendant Ranadivé has stated that he did not know that the Company was going to "miss" until the week before the close of the quarter, and has provided plausible reasons as to why he was not aware of this fact, neither CW3 nor CW5's allegations assist Plaintiffs in meeting the stringent pleading requirements regarding scienter. Further, even if this information were enough to establish scienter for Ranadivé and Mashruwala, which it is not, it provides *no* information pertaining to O'Meara or Carey's knowledge or intent.

> FN3. Elsewhere in the Consolidated Amended Complaint, Plaintiffs allege that CW3 "confirmed that after the Staffware acquisition until December 2004, Staffware and TIBCO remained separate for sales purposes."CAC at ¶ 90. CW1 also states that he did not sell Staffware

Not Reported in F.Supp.2d                                                                                      Page 18
Not Reported in F.Supp.2d, 2006 WL 1469654 (N.D.Cal.)
(Cite as: Not Reported in F.Supp.2d, 2006 WL 1469654)

products until December 2004. *Id.* However, Plaintiffs fails to demonstrate how any of these statements relate to Defendants' knowledge or intent to deceive the marketplace.

FN4. CW5's information pertaining to whether Staffware's email had been integrated is completely irrelevant. CAC at ¶ 74. Plaintiffs have not alleged any facts showing how the integration of Staffware's email had any material effect, if any, on the Company's quarterly results.

*19 The information provided by CW2, CW4, and CW6 is similarly deficient. CW2, who was a TIBCO General Manager within the OEM sales channel in Austin, Texas from 2003 through 2004, states only that Ranadivé was "personally involved in major sales transactions" and that "each quarter, TIBCO seemed to be reliant on a large sales deal that would be finalized by Ranadivé."CAC at ¶ 72. Based on this information, Plaintiffs ask the Court to conclude that "defendant Ranadivé (among others), was continually apprised of, and involved in, all significant sales deals and, therefore, knew about the sales issues caused by the Staffware acquisition and its incomplete and/or unsuccessful intergration."*Id.* However, CW2's allegations are not inconsistent with the Company's proffered reasons for belatedly realizing that the Company was going to miss its numbers for the first quarter; in fact, defendant Ranadivé specifically stated that the reason why the Company failed to meet expectations was due to the fact that he was *not* as involved in sales activities as he had been in prior quarters. As such, CW2, who was employed only through 2004 and therefore was not at the Company during the months preceding the close of the first quarter of 2005, provides very little clarity-if any-as to Ranadivé's knowledge, or lack thereof, during the critical period. And, again, the information provided by CW2 fails to speak to O'Meara, Carey, or Mashruwala's involvement in the alleged fraud at all.

As to CW4, a former Staffware/TIBCO Finance Director and the only confidential witness to supply any information pertaining to Carey, Plaintiffs only vaguely contend that CW4 has stated that Carey was "responsible for, and directed, the financial accounting integration of the two companies,""visited Staffware headquarters in London frequently," and "spoke with Staffware personnel about the integration of Staffware into TIBCO."CAC at ¶ 73. CW4 also contends that "TIBCO handled the Staffware acquisition horribly, and that there were difficulties with the integration, including a major culture clash between the two companies."*Id.* Plaintiffs fail to allege, however, whether the "difficulties" with the integration are the same "difficulties" that caused the Q1 05 results, whether Carey knew that these "difficulties" were going to affect the Company's financial results and, if so, *when* Carey became aware of this information. Finally, with respect to CW6, who was a Pre-Sales Consultant at TIBCO from early 2005 through the fall of 2005, Plaintiffs allege only that CW6 was trained to "pitch" TIBCO and Staffware products together, that the products did not, in fact, work together, and that the Company was in the process of trying to make the products compatible. *Id.* at ¶ 92.The information provided by CW6 does not appear to support Plaintiffs' securities fraud theory because CW6 appears to have *started* working at the Company at the end of the class period and at the time, or after, the "truth" was purportedly "revealed"; in any event, CW6's information is not clearly linked to any knowledge or fraudulent intent of any of the named Defendants.

*20 Plaintiffs' allegations regarding certain Individual Defendants' stock sales also fall short of meeting the required pleading standard, even when considered together with all of the rest of the allegations in the Consolidated Amended Complaint. First, the only persons alleged to have sold any stock during the purported class period are defendants Mashruwala and O'Meara.[FN5] Ranadivé-who is the person alleged to have the greatest access to "inside" information regarding the Staffware integ-

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 1469654 (N.D.Cal.)
(Cite as: Not Reported in F.Supp.2d, 2006 WL 1469654)

ration-did not sell any stock during the relevant period, despite the fact that he holds more than *14 million* TIBCO shares and vested options. *See* Thompson Decl. at Ex. C. Carey, the Corporate Controller and Chief Accounting Officer, also did not sell any stock.

> FN5. The Consolidated Amended Complaint also alleges that certain other "insiders"-*i.e.* Murry Rode (Executive Vice President) and William Hughes (General Counsel)-sold stock during the relevant period. However, as this Court has noted on a prior occasion, when there are no allegations in the complaint pertaining to these other persons-and specifically, no allegations showing that the other "insiders" possessed non-public adverse information-such factual allegations are irrelevant. As such, these allegations have not been considered. *In re Splash,* 160 F.Supp.2d at 1082 n. 22.

Further, as stated by the Ninth Circuit, "not every sale of stock by a corporate insider shows that the share price is about to decline," and as such, a plaintiff must allege "unusual" or "suspicious" stock sales. *Ronconi v. Larkin,* 253 F.3d 423, 435 (9th Cir.2001)."[I]nsider trading is suspicious only when it is 'dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed inside information." ' *Id.* There are three factors relevant to this analysis: (1) the amount and percentage of shares sold by insiders; (2) the timing of the sales; and (3) whether the sales were consistent with the insider's prior trading history. *Id.* Here, Defendants have shown that O'Meara and Mashruwala are alleged to have sold only 2.3% and 17.2% of their class period holdings for total proceeds of $251,000 and $1.3 million, respectively. *See* Mot. at 22. While Plaintiffs are correct that there is no "bright line test" as to the amount or percentage of stock that must be sold to constitute a "suspicious amount," courts within this district have consistently declined

to categorize stock sales similar to the ones alleged in the instant case as "suspicious." *In re Netflix, Inc. Sec. Litig.,* 2005 WL 1562858, at *8 (N.D.Cal.2005) (sales of 7.5% of holdings for $12 million in proceeds, 1% of holdings for $135,000 in proceeds, and 15.7% for $2 million in proceeds not suspicious); *The Wu Group v. Synopsys, Inc.,* 2005 WL 1926626, at *10 (N.D.Cal.2005) (sales of 6% of holdings for $7 million in proceeds and 38% of holdings for $2.9 million in proceeds not suspicious).

Moreover, the timing of O'Meara's stock sales is not necessarily suspicious because it coincided with TIBCO's announcement of its fourth quarter and year-end fiscal results. As the Ninth Circuit has noted, "[o]fficers of publicly traded companies commonly make stock transactions following the public release of quarterly earnings and related financial disclosures."*Lipton v. PathoGenesis Corp.,* 284 F.3d 1027, 1037 (9th Cir.2002). Thus, the fact that O'Meara sold a small portion of his total holdings following the positive announcement of TIBCO's year-end and fourth quarter earnings does not support a strong inference of scienter. *Id.* Further, the fact that O'Meara was only one of two Individual Defendants to sell his stock during the class period actually *negates* a finding that the Defendants were engaged in fraud. *Id.* Again, as the Ninth Circuit has repeatedly held, the well-timed sales of one or two defendants' stock does not support the strong inference required by the PSLRA when the rest of the equally knowledgeable defendants act in a way *inconsistent* with the inference that the favorable characterizations of the company's affairs were known to be false when made. *Ronconi,* 253 F.3d at 436. Further, the 125,000 shares of stock that Mashruwala sold during the class period were not "dramatically out of line" with the 121,000 shares of stock he sold between September 2003 and March 2004, the same time period in the preceding year. *See* Thompson Decl. at Ex. Q. As such, the stock sales identified in the Consolidated Amended Complaint neither establish the requisite element of scienter nor bolster

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                      Page 20
Not Reported in F.Supp.2d, 2006 WL 1469654 (N.D.Cal.)
**(Cite as: Not Reported in F.Supp.2d, 2006 WL 1469654)**

Plaintiffs' other scienter allegations.

**\*21** Plaintiffs also rely on other additional facts in order to plead scienter, such as: (1) the fact that $2.2 million in bonuses were distributed to senior executives in December 2004; and (2) the fact that TIBCO authorized a $50 million stock buy-back plan at the beginning of the class period.[FN6] These additional facts, even when considered in the aggregate, do not support Plaintiffs' case. First, quite tellingly, Plaintiffs do not identify a *single* Ninth Circuit or Northern District of California case in their Opposition brief that supports their assertion that any of these factors are legally relevant to establishing scienter. In fact, with respect to the executive bonuses, Plaintiffs *concede* that allegations concerning incentive compensation are insufficient as a matter of law to plead scienter. *See* Opp. at 23-24; *see also In re Autodesk, Inc. Sec. Litig.*, 132 F.Supp.2d 833, 845 (N.D.Cal.2000). Further, while Plaintiffs clearly allege that the bonuses were tied to the year-end results for fiscal year 2004, Plaintiffs do not allege any facts showing that the fiscal year 2004 results were misstated or otherwise inaccurate. As to the stock buy-back plan, Plaintiffs fail to respond to the authorities Defendants cited in their Motion showing that stock repurchase programs actually *negate* a finding of scienter. *See, e.g., Matthews v. Centex Telemanagement, Inc.*, 1994 WL 269734, at \*8 (N.D.Cal.1994) ("It would have made no sense to purchase that stock if defendants knew the prices to be inflated.").

> FN6. Plaintiffs also point to the fact that TIBCO acquired General Interface during the class period, but utterly fail to explain-in any way-how this creates a strong inference of scienter. As Defendants point out, General Interface was purchased for $3.5 million in cash and no stock was used in the acquisition. *See* Thompson Decl. at Ex. K. Plaintiffs' argument that "defendants would not have obtained support for that acquisition from investors and analysts unless they believed that TIBCO's acquisition

of Staffware had already proceeded smoothly and was substantially complete" is mere speculation unsupported by any factual allegations in the Consolidated Amended Complaint. *See* Reply at 13:15-21; Thompson Decl. at Ex. K.

In sum, the Ninth Circuit has clearly held that "[i]n order to show a strong inference of deliberate recklessness, plaintiffs must state facts that come closer to demonstrating intent, as opposed to mere motive and opportunity."*Silicon Graphics,* 183 F.3d at 974. Here, even when all of the factual allegations are considered together, Plaintiffs have not even shown that Defendants were *motivated* to commit fraud, much less that they acted with deliberate or reckless intent. This failure, alone, merits dismissal of the Consolidated Amended Complaint.

**B. Factual Bases for Consolidated Amended Complaint**

Defendants have also shown that the Consolidated Amended Complaint is deficient because its lacks sufficiently credible, reliable bases for its allegations. The PSLRA requires "that a plaintiff must provide, *in great detail,* all relevant facts forming the basis for her belief."*In re Silicon Graphics,* 183 F.3d at 984-85 (emphasis added). In their Opposition brief, Plaintiffs correctly note that the basis for a securities complaint "can come from any number of sources, including SEC filings, regulatory filings and reports, securities analysts' reports, advisories about the Company, press releases, and other public statements issued by the Company, *so long as they indicate defendants committed fraud.*"Opp. at 7 (emphasis added). The only sources that Plaintiffs have identified, however, which purport to show that the Company's statements were false when made, *or* that the Defendants acted with the requisite intent, are Plaintiffs' confidential witnesses. The allegations pertaining to the confidential sources, however, fall short of the standard set forth in *Daou Systems. Id.* at 1015.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                          Page 21
Not Reported in F.Supp.2d, 2006 WL 1469654 (N.D.Cal.)
(Cite as: Not Reported in F.Supp.2d, 2006 WL 1469654)

**\*22** For example, in addition to the deficiencies already set forth above with regard to the confidential witnesses' statements regarding the Individual Defendants' knowledge, motive, or intent, Plaintiffs have not alleged sufficient facts showing that the confidential witnesses are reliable sources for establishing falsity. In particular, Plaintiffs have not alleged that any of the confidential witnesses took part in any decision-making processes at TIBCO. Plaintiffs also fail to state where two of the witnesses worked, and, with respect to the other four witnesses, admit that they worked outside of the Company's headquarters in Palo Alto, where all of the Individual Defendants are located. *See California Public Employees' Retirement System v. Chubb Corp.,* 394 F.3d 126, 148 (3rd Cir.2004) (finding allegations unreliable where "[p]laintiffs heavily rely on former employees who worked in Chubb's local branch offices for information concerning" company-wide decisions made by senior management).

Moreover, as Defendants point out in their Motion, the descriptions of the duties performed by most of the witnesses do not satisfactorily demonstrate that the witnesses would know the information that is ascribed to them. *See, e.g., In re Business Objects S.A. Sec. Litig.,* 2005 WL 1787860, at \*6 (N.D.Cal.2005) (rejecting allegations where "the Amended Complaint provides no more than the job title of the confidential witnesses ... and fail[s] to provide any other detail regarding his or her job description and responsibilities"). For instance, Plaintiffs do not make clear to whom the witnesses reported or who reported to them. *See, e.g., Daou Systems,* 411 F.3d at 1016 (in assessing witness' reliability court should consider whether plaintiffs have alleged witness' direct reports as well as to whom the witness reported). As to CW3, who is described as a "Staffware/TIBCO National Account Director in New York ... responsible for sales of Staffware product that were used globally," CAC ¶ 25(c), Plaintiffs do not allege any facts showing whether CW3 was involved in TIBCO's forecasting or integration processes or even had contact with

the Individual Defendants. *See, e.g., In re Silicon Storage Technology, Inc. Sec. Litig.,* 2006 WL 648683, at \*14 (N.D.Cal.2006) (holding allegations insufficient where "[p]laintiffs describe th[e] informant's duties only briefly, without any indication of what is meant by 'production control' or 'tracking shipments and inventory' "). Similarly, the job descriptions provided for CW4 and CW6 do not indicate whether those witnesses had any specific knowledge regarding the Staffware acquisition or TIBCO's forecasting process.

Thus, due to these noted deficiencies in the Consolidated Amended Complaint, Plaintiffs' reliance on *Novak v. Kasaks,* 216 F.3d 300, 312-13 (2nd Cir.2000) is misplaced. In contrast to the instant case, the *Novak* complaint identified numerous *documentary sources* which provided *specific* facts concerning the company's significant write-off of inventory following the class period, which supported the plaintiffs' contention that the inventory was seriously overvalued at the time the purportedly misleading statements were made. *Id.* Again, Plaintiffs have not identified any such documentary sources here.

C. Falsity

**\*23** Plaintiffs have also failed to sufficiently establish falsity. In order to establish falsity, Plaintiffs must identify "each statement alleged to have been misleading" and state "the reason or reasons why the statement is misleading."15 U.S.C. § 78u-4(b)(1). They must also allege, with particularity, "contemporaneous statements or conditions" that are "inconsistent" with the challenged statement so as to demonstrate that it was false when made. *In re Read-Rite Corp. Sec. Litig.,* 335 F.3d 843, 846, 848 (9th Cir.2003); *Ronconi,* 253 F.3d at 433-34.

In the Consolidated Amended Complaint, Plaintiffs identify four types of allegedly false statements: (1) statements describing the anticipated benefits from the TIBCO/Staffware merger; (2) statements relat-

Not Reported in F.Supp.2d                                                                      Page 22
Not Reported in F.Supp.2d, 2006 WL 1469654 (N.D.Cal.)
**(Cite as: Not Reported in F.Supp.2d, 2006 WL 1469654)**

ing to the integration of Staffware; (3) certifications of TIBCO's financial statements and a press release announcing its compliance with the Sarbanes-Oxley Act; and (4) TIBCO's Q1 05 revenue forecast.

### 1. Alleged Benefits of the TIBCO/Staffware Merger

With respect to the Company's statements pertaining to the alleged benefits of the TIBCO/Staffware merger, Plaintiffs challenge the following statements: (i) statements that TIBCO's Q3 04 and Q4 04 financial results reflected contributions from Staffware, CAC ¶¶ 38, 51; (ii) statements to the effect that TIBCO had gained sales leverage in Europe as a result of the merger, CAC at ¶ 40; (iii) a statement that TIBCO was, at the close of Q3 04, in a "better position ... than at any time in [its] history," CAC at ¶ 39; and (iv) statements to the effect that the addition of Staffware allowed TIBCO to offer an expanded product/solution to an expanded customer base, CAC at ¶¶ 42, 65. [FN7]

> FN7. The Consolidated Amended Complaint also refers to several statements made by analysts. *See* CAC ¶¶ 40, 48-50, 53, 55, 78, 87. However, as Defendants correctly point out, Plaintiffs never allege that the analysts' statements were false, that there was a flow of information between the Defendants and the analysts, *or* that Defendants ever adopted the analysts' statements as their own. As such, Plaintiffs cannot rely on these statements to establish securities fraud. *See Copperstone,* 1999 WL 33295869, at *7-8. However, the statements published in *Computer Wire* discussed more fully below quote directly from the Company and are therefore clearly statements made by the Company. They are therefore actionable. *See Nursing Home,* 380 F.3d at 1234.

However, Plaintiffs do not identify any allegations in the Consolidated Amended Complaint that actu-ally support their contention that TIBCO's Q3 04 and Q4 04 financial results did *not* reflect contributions from both TIBCO and Staffware. Further, Plaintiffs do not specifically contest the accuracy of the results for those quarters and, instead, readily admit that TIBCO's Q3 04 and Q4 04 results exceeded expectations. CAC at ¶¶ 38, 51-52. Plaintiffs also do not identify any facts demonstrating that the Staffware acquisition did not create sales leverage in Europe, or that it did not allow TIBCO to offer an expanded product to an expanded customer base. In fact, with respect to the latter, Plaintiffs cite only to CW6's allegation that the products did not "work together." However, CW6's belief that the products did not "work together" is not necessarily inconsistent with the Company's assertion that the Staffware acquisition allowed TIBCO to offer a broader product solution to an expanded customer base.

### 2. Integration of Staffware

Plaintiffs's allegations intended to show the falsity of statements relating to the integration of Staffware are also unavailing. The purportedly false statements regarding integration are: (i) a statement by Ranadivé during the Q3 04 conference call that TIBCO moved quickly to blend the two sales organizations and offered a common "storefront," CAC ¶ 40; (ii) a statement by Ranadivé on the Q4 04 conference call that Staffware was "fully integrated" into the product set and sales organization, CAC at ¶ 53; and (iii) a statement in a January 21, 2005 *ComputerWire* report that TIBCO had completed the integration of Staffware personnel into the TIBCO sales organization, CAC at ¶ 61.

**\*24** To show that these statements were false, Plaintiffs rely on the allegations of CW1, CW3 and CW5. *See* CAC at ¶¶ 71-74. CW5, however, was an IT Operations Manager, and is not described as being personally knowledgeable about the Company's *sales* efforts, only whether the Company's *email* was fully operational. CAC at ¶¶ 71, 74. Further, as Defendants point out, CW3's contention that

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 1469654 (N.D.Cal.)
(Cite as: Not Reported in F.Supp.2d, 2006 WL 1469654)

TIBCO and Staffware remained separate for sales purposes until December 2004 is entirely consistent with Ranadivé's statement, in December 22, 2004, that the integration of the sales organization had just been completed. Similarly, CW1's statement that "his commission structure" did not include any Staffware products until December 2004 is also consistent with Ranadivé's statement and therefore does not clearly demonstrate that it was false. Nor do the Company's Q1 05 disclosures regarding a certain "paralysis" of the sales team late in the first quarter indicate that the statements in the January 21, 2005 *ComputerWire* article were false when made. In fact, the Q1 05 disclosures suggest that the Company did not know that there would be problems until *after* the sales personnel were combined. *See* Thompson Decl. at Ex N ("So you know basically it all came to a head this quarter and what we saw there was complete paralysis, which-you know *before things were still a different,* you know, *before, they were still new* and we were still very involved in it; I was involved, you know, I spent a lot of time in Europe and other senior members were involved, so you know, they were-*this was the first quarter that we actually had the combined management fully functional."*) (emphasis added).

3. Certifications regarding Financial Compliance

Plaintiffs have also failed to sufficiently allege that certain financial statement certifications made by Ranadivé and O'Meara, as well as the press release announcing TIBCO's compliance with the Sarbane-Oxley Act, were false. In their Motion, Defendants correctly point out that there are *no* allegations in the Consolidated Amended Complaint demonstrating the falsity of any of the Company's certifications. In their Opposition, Plaintiffs respond by arguing that the financial certifications "omitted" the "material fact" that TIBCO lacked sufficient internal controls because Ranadivé admitted that "Staffware's revenue recognition policies did not conform to the standards of GAAP."However, in making this assertion, Plaintiffs grossly mischaracterize Ranadivé's statements regarding Staffware

and its revenue recognition policies. The statements Ranadivé made during the March 1, 2005 conference call pertaining to GAAP were as follows:

• "[T]here were differences in terms of the calendar year versus the quarter pressures, just in terms of even the process we apply to contracts, you know, the U.S. GAAP process being much more stringent, so there was a learning curve."

**\*25** • Understand that they were a European company and what they consider to be revenue-they run on a yearly basis and we are on a quarterly basis, the way that they looked at revenue under U.S. GAAP we wouldn't consider revenue. The point I'm making is, look, there were some cultural differences, there is some training to be done ..."

Thompson Decl. at Ex. N. These statements do not, in any way, even suggest that TIBCO lacked "internal controls" or was improperly recognizing revenue. Moreover, Plaintiffs fail to adequately address the fact that TIBCO's independent auditors, PricewaterhouseCoopers, *confirmed* that "the Company maintained, in all material respects, effective internal control over financial reporting[.]"*Id.* at Ex. K. Accordingly, Plaintiffs have failed to state a claim based on the certifications and the statements regarding Sarbanes-Oxley compliance. *See Morgan v. AXT, Inc.,* 2005 WL 2347125, at *15 (N.D.Cal.2005) (dismissing action because plaintiff had not alleged particularized facts supporting his claim that Sarbanes-Oxley certifications were false); *In re InVision Techs., Sec. Litig.,* 2006 WL 538752, at *6 (N.D.Cal.2006) (same).

4. Q1 05 Revenue Forecast

Plaintiffs have also failed to demonstrated the falsity of the December 22, 2004 Q1 05 revenue forecast. Plaintiffs only vaguely contend that there were certain unspecified "difficulties with sales in Europe" and that the forecast had "no reasonable basis" and was "wholly unrealistic and unattainable." Significantly, Plaintiffs fail to identify any

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 24
Not Reported in F.Supp.2d, 2006 WL 1469654 (N.D.Cal.)
(Cite as: Not Reported in F.Supp.2d, 2006 WL 1469654)

*contemporaneous* information or documents showing that O'Meara's forecast was *false* at the time it was made. For example, while CW3 alleges that there were "execution" issues with sales in Europe, CW3 does not specify *what* those execution issues were, *when* they occurred, *when* they were *known*, and *who* knew about them. The information provided by CW5-who states only that "it was known internally at the Company that the failure to complete some Staffware-related sales deals contributed to the Q1 05 earnings shortfall"-is even more deficient. Indeed, the Company readily admitted that the failure to complete some Staffware-related sales deals contributed to the earning shortfall; Plaintiffs have not set forth any particularized allegations, however, showing that the Company knew in December 2004 that the "problems" with Staffware meant that these deals definitely would *not* close.

More importantly, Defendants have also shown that the statements made by O'Meara and Ranadivé during the December 22, 2004 conference call pertaining to the Q1 05 revenue forecast and the Company's outlook for the first quarter of fiscal year 2005 were forward-looking statements that are not actionable as a matter of law. The PSLRA carves out a safe harbor from liability for forward-looking statements that prove false if the statement "is identified as a forward-looking statement and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement."15 U.S.C. § 78u-5(c)(1)(A)(i); *Harris v. Ivax Corp.,* 182 F.3d 799, 803 (11th Cir.1999). The purpose behind this safe harbor is to encourage the disclosure of forward-looking information. H.R. Conf. Rep. No. 104-369, 104th Cong. 1st Sess., at 53 (1995). Whether a statement qualifies for the safe harbor is an appropriate inquiry on a motion to dismiss. 15 U.S.C. 78u-5(e).

**\*26** A forward-looking statement includes a statement containing a projection of revenues, income, or earnings per share, management's plans or ob-

jectives for future operations, and a prediction of future economic performance. 15 U.S.C. § 78u-5(i)(1)(A)-(C). In addition, any statement of "the assumptions underlying or relating to" these sorts of statements fall within the meaning of a forward-looking statement. 15 U.S.C. § 78u-5(i)(1)(D). Although statements concerning historical or current facts are not forward-looking, a present-tense statement can qualify as a forward-looking statement as long as the truth or falsity of the statement cannot be discerned until some point in time after the statement is made. *See Harris,* 182 F.3d at 805;*Gross v. Medaphis Corp.,* 977 F.Supp. 1463, 1473 (N.D.Ga.1997); *In re Valujet, Inc. Sec. Litig.,* 984 F.Supp. 1472, 1479 (N.D.Ga.1997). Oral statements are also protected by the safe harbor provision if the speaker refers to warnings in a "readily available document." 15 U.S.C. § 78u-5(c)(1)(A). So long as the safe harbor requirements are met, liability cannot exist as a matter of law, regardless of the mind of the person making the statement. *Employers Teamsters Local Nos. 175 and 505 Pension Trust Fund v. Clorox,* 353 F.3d 1125, 1133 (9th Cir.2004).

Here, the following statements qualify as forward-looking under the safe-harbor provision: (1) that Staffware would see "a lot of renewal activity in [the] Q1-December, January time frame," CAC at ¶ 53; (2) that TIBCO's opportunity to bring Staffware to North America was "huge," CAC at ¶ 53; and (3) that Staffware "expect[ed] revenues in the range of 116 to 120 million" in Q1, CAC at ¶ 54. These statements clearly pertain to projected revenues, management's plans or objectives for future operations, and/or predictions regarding future economic performance. 15 U.S.C. § 78u-5(i)(1)(A)-(C).

Additionally, all of these statements were accompanied by the appropriate cautionary language. First, the conference call itself was preceded by cautionary language. *See* Thompson Decl. at Ex. L. In fact, the warning at the outset of the call noted that the call would include forward-looking statements, specified the types of such statements, cau-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 1469654 (N.D.Cal.)
(Cite as: Not Reported in F.Supp.2d, 2006 WL 1469654)

tioned that actual results could differ, and directed listeners to the sections of TIBCO's most recent Forms 10-K and 10-Q that would provide further information regarding the relevant risk factors. *Id.* Further, in the press release included in the Form 8-K issued on December 22, 2004, the Company warned:

This release contains forward-looking statements within the meaning of the "safe harbor" provisions of the federal securities laws, including, without limitation, statements regarding the growth of the Integration market, TIBCO's increased market share and the demand for TIBCO's integration platform. Actual results could differ materially from such forward-looking statements if demand for TIBCO's products and services or economic conditions affecting the market for TIBCO's products and services fluctuate, if TIBCO is unable to successfully compete with existing or new competitors or if TIBCO cannot successfully execute its growth plans. Additional information regarding potential risks is provided in TIBCO's filings with the SEC, including its most recent Annual Report on Form 10-K and its Form 10-Q for the quarter ended August 29, 2004. TIBCO assumes no obligation to update the forward-looking statements included in this release.

**\*27** Thompson Decl. at Ex. J. In the Form 10-Q for the quarter ended August 29, 2004, which was referenced in the December 22, 2004 Form 8-K, the Company disclosed that *"Any failure to successfully integrate Staffware's business operations could adversely affect our financial results."* See Thompson Decl. at Ex. I. Some of the "challenges" the Company identified in the Form 10-Q with respect to the integration of Staffware were: (1) inconsistencies in standards, controls, procedures and policies, and compensation structures between TIBCO and Staffware; (2) unanticipated delays in or expenses related to the integration of operations; (3) conducting adequate training of employees and modifying operating control standards in areas specific to U.S. corporations such as U.S. GAAP and

requirements under the Sarbanes-Oxley Act of 2002 and the rules and regulations promulgated thereunder; (4) costs and delays in implementing common systems and procedures, including financial accounting systems and customer information systems; (5) consolidating corporate and administrative infrastructure, particularly in light of Staffware's decentralized international corporate structure; and (6) minimizing the diversion of management's attention from ongoing business concerns. *Id.* Indeed, the public was repeatedly warned about the risks associated with the Staffware acquisition. *See, e.g.* Thompson Decl. at Ex. E ("[A]ctual results could differ materially from what is envisaged by such forward looking statements if TIBCO is unable to successfully integrate the [*sic* ] Staffware's business after the acquisition"); *id.* at Ex. F ("Actual results could differ materially from such forward looking statements if ... TIBCO is unable to successfully integrate Staffware and its products"); *id* . at Ex. G ("Any failure to successfully integrate Staffware's business operations could adversely affect our financial results").

Given the complete and thorough nature of the Company's disclosures regarding the risks associated with the acquisition of Staffware, and its potential affect on future revenues, Plaintiffs have not successfully established that the Company's cautionary statements "lacked meaning" or were not "specific" enough. Accordingly, the Court concludes that the statements identified as "false" in paragraphs 53 through 54 of the Consolidated Amended Complaint are immune from liability under the safe harbor provision of the PSLRA.[FN8]

> FN8. Defendants have also demonstrated that the statements contained in paragraphs 53 and 54, as well as similar remarks identified in paragraphs 39 and 40 of the Consolidated Amended Complaint, are not material because they are general statements of corporate optimism. *See Grossman,* 120 F.3d at 1121-22 (finding immaterial statements that (i) company was moving rap-

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 1469654 (N.D.Cal.)
(Cite as: Not Reported in F.Supp.2d, 2006 WL 1469654)

idly to integrate sales force of the two companies; (ii) company had achieved "substantial success" in integrating the sales forces of the two companies; (iii) merger presented a "compelling set of opportunities"; and (iv) company would "leverage[e] ... combined knowledge" from the merger). Plaintiffs' argument that the instant case somehow differs from *Grossman* merely because TIBCO purported to have expertise in assisting customers with business integration is without merit. Although TIBCO is in the business of selling software that allows companies to integrate information from two different companies, Plaintiffs have not persuasively shown that the Company held itself out as being an error-proof "expert" in mergers and acquisitions.

D. Group Pleading

Defendants also argue that the claims against Mashruwala must be dismissed because Mashruwala is not alleged to have made any of the challenged statements. In support of this, Defendants point to the fact that the Fifth Circuit has expressly rejected the "group pleading doctrine" FN9 as contrary to the PSLRA. *Southland Sec. Corp. v. INSpire Ins. Solutions, Inc.,* 365 F.3d 353, 363-65 (5th Cir.2004) (holding that PSLRA abolished group pleading) and *Financial Acquisition Partners L.P. v. Blackwell,* 440 F.3d 278, 285 (5th Cir.2006) (same). Following this precedent, courts in this district are increasingly finding that the group pleading doctrine is contrary to the PSLRA. *See In re Nextcard, Inc. Sec. Litig.,* 2006 WL 708663, at *3 (N.D.Cal.2006) (Fogel, J.) ("This Court adopts the reasoning of the decisions concluding that the group published pleading doctrine is no longer is viable after the PSLRA."); *In re Netopia, Inc., Sec. Litig.,* 2005 WL 3445631, at *6 (N.D.Cal.2005) (Whyte, J.) ("[P]laintiffs cannot rely on the group-published information doctrine.").

FN9. Under the "group pleading doctrine,"

a plaintiff may satisfy the pleading requirements through reliance upon a presumption that the allegedly false and misleading "group published information" complained of is the collective action of officers and directors. *In re GlenFed, Inc. Sec. Litig.,* 60 F.3d 591, 593 (9th Cir.1995). In such a case, a plaintiff satisfies Rule 9(b)"by pleading the misrepresentations with particularity and where possible the roles of the individual defendants in the misrepresentations."*Id .; see also In re Cornerstone Propane Partners, L.P. Sec. Litig.,*2005 U.S. Dist. LEXIS 21469 (N.D.Cal.2005).

*28 Plaintiffs, on the other hand, argue that the Court should not follow the Fifth Circuit precedent because the Fifth Circuit never adopted the group pleading doctrine, even before the PSLRA. While this is somewhat persuasive, Plaintiffs do not identify any recent Northern District of California cases that support their position. The most recent case cited in Plaintiffs' brief is from 2002. As Defendants correctly note, the more recent authorities expressly support Defendants' assertion that Plaintiffs cannot state a claim against Mashruwala by relying on the group pleading doctrine.

However the Court need not make this determination in the instant case because, here, the Court finds that Plaintiffs have not satisfied the requirements of the group pleading doctrine. Even under the group pleading doctrine, Plaintiffs still have to satisfy the particularity requirements of the PSLRA. *Copperstone,* 1999 WL 33295869, at *16. Specifically, Plaintiffs must plead that the officer was directly involved not only in the day-to-day affairs of the company in general but also in the preparation of its allegedly misleading statements in particular. *See In re ESS Tech., Inc. Sec. Litig.,* 2004 WL 3030058, at *12 (N.D.Cal.2004) (Plaintiffs must "state, with particularity, facts indicating that the individual defendant was directly involved in the preparation of the allegedly misleading statements."). Here, Plaintiffs have failed to provide any

Not Reported in F.Supp.2d                                                    Page 27
Not Reported in F.Supp.2d, 2006 WL 1469654 (N.D.Cal.)
(Cite as: Not Reported in F.Supp.2d, 2006 WL 1469654)

particulars regarding Mashruwala's involvement in preparing any of the challenged statements. Instead, the Consolidated Amended Complaint makes only conclusory allegations that "defendants were involved in drafting, producing, reviewing and/or disseminating the false and misleading statements," and that they "participated in drafting, preparation and/or approval of the various public and shareholder and investor reports."*See* CAC ¶¶ 20, 22. Further, the group pleading does not apply to oral remarks made by others. Thus, even if Plaintiffs had alleged particular facts demonstrating that Mashruwala was involved in the preparation of the challenged written statements, their claims still fail to the extent that they are seeking to recover for the challenged oral statements made by Ranadivé and O'Meara. Accordingly, in addition to the reasons set forth above, the Section 10(b) claim against Mashruwala is DISMISSED.

### E. Liability Under § 20(a) of the Exchange Act

Finally, Plaintiffs have failed to adequately plead their second cause of action, which is brought under Section 20(a) of the Exchange Act. To establish "control person" liability under Section 20(a) of the Exchange Act, Plaintiff must show that a primary violation of Section 10(b) or Rule 10b-5 was committed and that each individual defendant "directly or indirectly" controlled the violator. *See Paracor Finance, Inc. v. General Electric Capital,* 96 F.3d 1151, 1161 (9th Cir.1996). Since Plaintiffs have not stated a viable Section 10(b) claim, Plaintiffs' claim under Section 20(a) of the Exchange Act necessarily fails. Additionally, with respect to Mashruwala and Carey, Plaintiffs have failed to allege any facts showing that either defendant had the requisite power to control TIBCO, either directly or indirectly. Accordingly, the entire Consolidated Amended Complaint is DISMISSED.

### F. Leave to Amend

*29 As a final matter, the Court notes that Defend-

ants ask the Court to dismiss the Consolidated Amended Complaint without leave to amend, noting that: (1) the stock drop which led to this suit was over fourteen months ago; (2) Plaintiffs have already been given an opportunity to amend the initial complaints by filing the Consolidated Amended Complaint; (3) the Opposition offers no new facts; and (4) Plaintiffs have not requested leave to amend, much less explained how amendment would cure the defects in their case. Defendants' arguments are well taken. However, notwithstanding the fact that Plaintiffs have been given a prior opportunity to amend and have neither requested nor explained how further amendments will cure the defects that Defendants have identified, the Court will grant Plaintiffs one final opportunity to amend their complaint if they can do so in good faith. However, given the fact that this case has been pending for over a year, the information necessary to amend the complaint should be readily available to Plaintiffs. As such, Plaintiffs must file the amended complaint within twenty (20) days of the filing date of this Order.

### CONCLUSION

IT IS HEREBY ORDERED THAT Defendants' Request for Judicial Notice [Docket No. 40] is GRANTED.

IT IS FURTHER ORDERED THAT Defendants' Motion to Dismiss [Docket No. 399] is GRANTED WITH LEAVE TO AMEND. Plaintiffs are hereby granted leave to filed an amended complaint no later than twenty (20) days of the filing date of the Court's Order *only if* they can allege, in good faith, an adequate factual basis for their allegations and can allege specific facts supporting all of the required elements of their causes of action with respect to each named defendant.

IT IS FURTHER ORDERED THAT Defendants shall respond to the amended complaint within twenty-five (25) days after it is filed. If Defendants file any motions directed at the consolidated com-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 1469654 (N.D.Cal.)
**(Cite as: Not Reported in F.Supp.2d, 2006 WL 1469654)**

plaint, the motion(s) must be noticed for the *first* available hearing date following the applicable notice period. Any opposition or reply briefs must be filed by the deadlines set forth in Civil Local Rule 7-3. The parties may *not* alter the deadlines set forth herein without first seeking leave of Court and demonstrating the existence of good cause.

IT IS FURTHER ORDERED THAT the Case Management Conference, initially scheduled for May 23, 2006 is CONTINUED to *September 20, 2006 at 2:30 p.m.* The parties shall *meet and confer* prior to the conference and shall prepare a joint Case Management Conference Statement which shall be filed no later than ten (10) days prior to the Case Management Conference. The Case Management Conference Statement shall specifically set forth the parties' proposed schedule for class certification discovery and for the briefing and hearing of the motion for class certification. Lead Counsel shall be responsible for filing the statement as well as for arranging the conference call. All parties shall be on the line and shall call (510) 637-3559 at the above indicated date and time.

**\*30** IT IS SO ORDERED.

N.D.Cal.,2006.
In re Tibco Software, Inc.
Not Reported in F.Supp.2d, 2006 WL 1469654 (N.D.Cal.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.