# TAB R



H
In re Watchguard Securites Litigation
W.D.Wash.,2006.

United States District Court,W.D. Washington.
In re WATCHGUARD SECURITIES LITIGATION,
No. MASTER FILE C05-678J.

April 21, 2006.

Aelish M Baig, Lerach CoughlinStoia Geller, Rudman & Robbins (SF), San Francisco, CA, Lead Attorney, Attorney to be Noticed, for Dearborn Heights Act 345 Police & Fire Retirement System, (Plaintiff).
Juli Farris Desper, Keller Rohrback, Seattle, WA, Lead Attorney, Attorney to be Noticed, for Evelyn Perkins, (Plaintiff).
Dan Drachler, Zwerling Schachter & Zwerling, Seattle, WA, Lead Attorney, Attorney to be Noticed, for Steve Klein, (Petitioner).
Stephen M Knaster, Orrick Herrington & Sutcliffe (SF), San Francisco, CA, Lead Attorney, Attorney to be Noticed, for Watchguard Technologies Inc, (Defendant).
James N Kramer, Orrick Herrington & Sutcliffe (SF), San Francisco, CA, Lead Attorney, Attorney to be Noticed, for Watchguard Technologies Inc, (Defendant).
Elizabeth Ann Leland, Keller Rohrback, Seattle, WA, Lead Attorney, Attorney to be Noticed, for Evelyn Perkins, (Plaintiff).
Justin M Lichterman, Orrick Herrington & Sutcliffe (SF), San Francisco, CA, Lead Attorney, Attorney to be Noticed, for Watchguard Technologies Inc, (Defendant).
Azra Mehdi, Lerach CoughlinStoia Geller, Rudman & Robbins (SF), San Francisco, CA, Lead Attorney, Attorney to be Noticed, for Dearborn Heights Act 345 Police & Fire Retirement System, (Plaintiff).
Louis David Peterson, Hillis Clark Martin & Peterson, Seattle, WA, Lead Attorney, Attorney to be Noticed, for Watchguard Technologies Inc, (Defendant).
Lynn Lincoln Sarko, Keller Rohrback, Seattle, WA, Lead Attorney, Attorney to be Noticed, for Evelyn Perkins, (Plaintiff).
Michael D Torpey, Orrick Herrington & Sutcliffe (SF), San Francisco, CA, Lead Attorney, Attorney to be Noticed, for Watchguard Technologies Inc, (Defendant).
W Scott Zanzig, Hall ZanzigZulauf Claflin McEachern, Seattle, WA, Lead Attorney, Attorney to be Noticed, for Steven Neff, (Plaintiff).
Jay H Zulauf, Hall ZanzigZulauf Claflin McEachern, Seattle, WA, Lead Attorney, Attorney to be Noticed, for Steven Neff, (Plaintiff).

ORDER

ROBART, J.
*1 This Document Relates to: All Actions

I. INTRODUCTION

This matter comes before the court on Defendants' motion to dismiss (Dkt. # 39). The court has reviewed the parties' moving papers and supporting materials, and has heard from the parties at oral argument on April 20, 2006. For the reasons stated below, the court GRANTS Defendants' motion and DISMISSES Plaintiffs' complaint.

II. BACKGROUND

This putative class action concerns alleged securities fraud by Defendant WatchGuard Technologies, Inc. ("WatchGuard"). WatchGuard sells internet security products and services to small businesses. The putative class period ("class period") began on February 12, 2004 when WatchGuard allegedly began to misrepresent revenue-related information, and ended on March 15, 2005 with WatchGuard's disclosure that it would restate quarterly earnings statements for the first three quarters of 2004.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d  
Not Reported in F.Supp.2d, 2006 WL 2038656 (W.D.Wash.), Fed. Sec. L. Rep. P 93,868  
**(Cite as: Not Reported in F.Supp.2d, 2006 WL 2038656)**

Page 2

Although the court will often refer to Defendants collectively as "WatchGuard," Plaintiffs have also named four former and current officers and directors of WatchGuard as Defendants. Defendant Steven Moore was a WatchGuard director, its corporate secretary, and has served in several key positions. During the class period, he served as Executive Vice President of Strategic Operations. From December 2003 to July 1, 2004, he served as the interim Chief Executive Officer ("CEO"). Defendant Edward Borey is the chairman of WatchGuard's board of directors and the CEO, and has held both posts since joining the company on July 1, 2004. Defendant Michael McConnell served as WatchGuard's Chief Financial Officer ("CFO") from October 2000 to May 10, 2004. He continued to serve in senior management until June 2004. Defendant James Richman took over the CFO post from Mr. McConnell, and held the position until April 2005.

The central allegations of Plaintiffs' complaint are best understood in reverse chronological order. On March 15, 2005, the last day of the class period, WatchGuard issued a press release postponing a quarter-end and year-end earnings conference call scheduled for the next day. In the press release, Watchguard revealed that it had discovered "certain errors" during an audit of its 2004 results:

These errors pertained to the (i) inaccurate income statement classification of early pay incentive discounts taken by customers, (ii) under-accrual of customer rebate obligations, and (iii) timing of revenue recognition associated with specific products and services (resulting in an overstatement of product revenue and an understatement of deferred revenue).

WatchGuard Ex. V; [FN1] ¶ 4.[FN2]

> FN1. All "WatchGuard Ex." citations refer to the exhibits attached to WatchGuard's request for judicial notice (Dkt.# 40). Documents to which Plaintiffs expressly refer in their complaint are incorporated by reference, and the court therefore treats them as part of the complaint. *In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 986 (9th Cir.1999). The court has relied only on the complaint and documents cited in the complaint (whose authenticity is not in dispute) in deciding this motion. The court's resolution of the instant motion therefore does not require it to take judicial notice of anything.

> FN2. The court will use the "¶" symbol when citing paragraphs within Plaintiffs' most recent consolidated complaint. (Dkt.# 34).

WatchGuard explained that correcting the first category of error, classification of customers' early pay incentive discounts, would reduce revenue and interest expenses by $509,000 over the first three quarters of 2004. *Id.* Because the classification error caused an offsetting overstatement of revenue and interest expense, the reclassification had no effect on net losses. WatchGuard admitted, however, that its classification of early pay incentive discounts violated generally accepted accounting principles ("GAAP"). *Id.*

*2 WatchGuard addressed the latter two categories of error together. Correcting those errors would result in a reduction of revenue of $1.8 million over the first three quarters of 2004, with a corresponding increase in net loss. *Id.* The company noted, however, that the corrections would lead to an increase in 2004 deferred revenue, which would result in approximately $1.2 million of "incremental service revenue" in 2005. *Id.*

Sixteen days after its March 15, 2005 press release, WatchGuard restated its earnings. Its 10-K form for 2004, which it filed with the Securities and Exchange Commission ("SEC") on March 31, 2005, provided restated quarterly results for each of the first three quarters of 2004. WatchGuard Ex. O at 128. The restatement's effects were substantially as WatchGuard had indicated in the press release. WatchGuard's net loss increased by $1,109,000 in

Case 3:07-cv-05545-SI   Document 33-19   Filed 05/05/2008   Page 4 of 13

Not Reported in F.Supp.2d                                                                                                    Page 3
Not Reported in F.Supp.2d, 2006 WL 2038656 (W.D.Wash.), Fed. Sec. L. Rep. P 93,868
(Cite as: Not Reported in F.Supp.2d, 2006 WL 2038656)

the first quarter, $311,000 in the second quarter, and $345,000 in the third quarter, for a cumulative effect of slightly less than the $1.8 million WatchGuard had estimated in the March 15, 2005 press release.[FN3]

> FN3. In summarizing the effect of the restatement, the court has compared consolidated financial statements from WatchGuard's quarterly forms 10-Q (WatchGuard Ex. C at 24, Ex. I at 55, Ex. J at 68) with the restated results in its 10-K. WatchGuard Ex. O at 128.

Predictably, WatchGuard's stock price dropped in the wake of its restatement announcement. ¶¶ 125-27. Plaintiffs purchased WatchGuard stock during the class period, and claim that they paid too much because WatchGuard's misstated earnings inflated the value of their stock.

Plaintiffs' securities fraud claim arises from four WatchGuard statements that preceded the March 15, 2005 restatement warning. Defendants made three of the statements in announcing or reporting quarterly results for the first three quarters of 2004. WatchGuard repeated each statement in substantially the same form in a press release, an earnings conference call, and later in a 10-Q form. Each 10-Q form contained certifications from WatchGuard's CEO and CFO required under Section 302 of the Sarbanes-Oxley Act. 15 U.S.C. § 7241.

The fourth statement (which is first chronologically) came in a press release announcing WatchGuard's results for the fourth quarter of 2003. This statement differs from the others in that Plaintiffs do not allege that WatchGuard misstated its earnings, but rather that it misled investors by revealing that it had released a new product, "Firebox X," and stating that "we believe that our new product and business strategy will drive revenue growth and a return to profitability in 2004."

III. DISCUSSION

A. Plaintiffs Must Satisfy a Heightened Pleading Standard.

WatchGuard contends that Plaintiffs have not pleaded a claim under Section 10(b) and Rule 10b-5 of the 1934 Exchange Act. 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5. The elements of a Rule 10b-5 claim are as follows: (1) a material misrepresentation or omission of fact, (2) scienter, (3) a connection with the purchase or sale of a security, (4) transaction and loss causation, and (5) economic loss. *In re Daou Systems, Inc. Sec. Litig.*, 411 F.3d 1006, 1014 (9th Cir.2005) (citing *Dura Pharms, Inc. v. Broudo*, 544 U.S. 336 (2005)).

*3 A Rule 10b-5 claim does not receive the traditional deference a court affords a complaint in resolving a motion to dismiss for failure to state a claim under Fed.R.Civ.P. 12(b)(6). A complaint alleging a Rule 10b-5 violation is subject not only to the heightened pleading requirements of Fed.R.Civ.P. 9(b), but also the pleading requirements of the Private Securities Litigation Reform Act ("PSLRA").*Daou*, 411 F.3d at 1014. Under Rule 9(b), the duty to plead with particularity applies only to "the circumstances constituting fraud or mistake," whereas general allegations will suffice to establish "[m]alice, intent, knowledge, and other condition of mind of a person...." Under the PSLRA, however, a plaintiff must "state with particularity facts giving rise to a *strong inference* that the defendant acted with the required state of mind," and must do so for "each act or omission alleged to violate" Rule 10b-5. 15 U.S.C. § 78u-4(b)(2) (emphasis added).

To satisfy the PSLRA in the context of a Rule 10b-5 allegation, a plaintiff must plead with particularity facts that create a "strong inference of, at a minimum, deliberate recklessness."*In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 977 (9th Cir.1999) (internal quotation omitted). Under Rule 10b-5, the required state of mind is "scienter," which the Supreme Court has defined as a "mental state embracing intent to deceive, manipulate, or defraud."*Id.* at 975 (quoting *Ernst & Ernst v. Hoch-*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 2038656 (W.D.Wash.), Fed. Sec. L. Rep. P 93,868
(Cite as: Not Reported in F.Supp.2d, 2006 WL 2038656)

Page 4

*felder,* 425 U.S. 185, 193-94 n. 12 (1976)). In holding that scienter requires at least "deliberate recklessness," the Ninth Circuit has expressly rejected the notion that pleading "simple recklessness" suffices. *Id.* at 977. Instead, a plaintiff seeking to overcome the PSLRA's pleading hurdle must allege "specific facts indicating no less than a degree of recklessness that strongly suggests actual intent."*Id.* at 979.

Finally, when determining if a complaint gives rise to a "strong inference" of scienter, the PSLRA requires a court to consider *"all* reasonable inferences to be drawn from the [plaintiff's] allegations, including inferences unfavorable to the plaintiffs."*Gompper v. Visx, Inc.,* 298 F.3d 893, 897 (9th Cir.2002) (emphasis in original). For a plaintiff pleading scienter, the PSLRA is the death knell for the "customary latitude" a court affords a complaint in considering a motion to dismiss under Rule 12(b)(6).*Id.* at 896 (noting that customary standard requires court to "accept plaintiff's allegations as true and construe them in the light most favorable to the plaintiff"); *see also Daou,* 411 F.3d at 1022 (reiterating *Gompper* ).

B. Plaintiffs Have Not Pleaded Facts Supporting a Strong Inference of Scienter.

The court begins its analysis by examining whether Plaintiffs have adequately pleaded scienter. Under the PSLRA, the Plaintiffs must plead facts that give rise to a strong inference of scienter as to each material misrepresentation that a Defendant is alleged to have made. *Ronconi v. Larkin,* 253 F.3d 423, 429 (9th Cir.2001). If Plaintiffs' scienter-related allegations "are not sufficiently particularized" or if "taken as a whole, they do not raise a 'strong inference" ' of knowing or deliberately reckless misstatements, the court must dismiss the complaint under Rule 12(b)(6).*Id.* To ensure that the court considers each particularized scienter-related allegation as well as the allegations "as a whole," the court will address each alleged misstatement, but will first examine Plaintiffs' broader scienter-related allegations.

1. To What Extent Do Plaintiffs' More General Allegations of Motive and Opportunity Support an Inference of Scienter?

*4 In addition to facts specific to each alleged misrepresentation, Plaintiffs have pleaded two sets of facts that bear on Defendants' intent to deceive or mislead. The court will consider these allegations first to give full context to its subsequent analysis of the specific misrepresentations.

a. All Defendants Were Eligible for Revenue-Based Bonuses.

Most of Defendants' alleged misrepresentations had the effect of inflating WatchGuard's revenues. Plaintiffs plead that each individual Defendant "was motivated to falsely portray WatchGuard's ... success in the market in order to become eligible for ... highly lucrative bonuses [that were] directly contingent on WatchGuard meeting certain financial goals." ¶ 88; *see also* ¶¶ 79, 97, 108. Plaintiffs plead minimal facts regarding each Defendant's bonus eligibility. ¶¶ 111-14.

That Defendants were eligible for financial performance-based bonuses is wholly unremarkable. A corporation that did not offer and pay such bonuses would be an anomaly. The court does not doubt that a corporate officer who stands to receive a revenue-based bonus has a motive to inflate revenue. Of course, every corporate officer has this motive. A complaint alleging deliberate misconduct must do more than state the truism that corporate officers receive more compensation when their companies perform better.[FN4]

> FN4. Although Plaintiffs allege that Defendants' misrepresentations inflated WatchGuard's stock price, there is no allegation that any Defendant bought or sold WatchGuard stock to capitalize on the higher price. Profitable insider trading dur-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 3:07-cv-05545-SI   Document 33-19   Filed 05/05/2008   Page 6 of 13

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 2038656 (W.D.Wash.), Fed. Sec. L. Rep. P 93,868
**(Cite as: Not Reported in F.Supp.2d, 2006 WL 2038656)**

Page 5

ing a class period can support an inference of scienter. *Silicon Graphics,* 183 F.3d at 986.

To support more than a marginal inference of culpable conduct, Plaintiffs would have to provide compelling answers to questions about WatchGuard's bonus program. Did any Defendant receive a revenue-based bonus of any kind during the class period? The complaint is silent. Did any Defendant receive a bonus that was remarkably large in light of prevailing corporate standards? The complaint is silent. As the court has noted, the alleged cumulative impact of Defendants' misrepresentations was to inflate WatchGuard's revenue by just under $2 million. Did any Defendant stand to receive a bonus for revenues that were overstated by $2 million that he would not have received otherwise? The complaint is silent. Did the $2-million difference in revenue have a potential to make a meaningful difference to any Defendant's compensation? The complaint is silent. Under these circumstances, Plaintiffs' allegations regarding Defendants' bonus eligibility create only a slight inference of scienter. *SeeSilicon Graphics,* 183 F.3d at 988 (noting that "evidence of mere motive and opportunity to commit fraud" is insufficient under the PSLRA").

b. The Defendants Worked at a "Small Company."

To support the inference that Defendants knew the truth about facts that they allegedly misrepresented, Plaintiffs rely in part on allegations that WatchGuard was a "small company." ¶ 17 ("As of March 30, 2005, WatchGuard had only 304 employees."). The court finds this allegation unhelpful. The court acknowledges that one may infer that certain critical corporate information is known to high-ranking officers. Neither the complaint nor Plaintiffs' response to the instant motion, however, provide any basis for the court to infer that the officers of a 300-person company know more or less than their counterparts at a 100-person or 1000-person company. Absent allegations that link a particular Defendant with particular knowledge, the court will not infer knowledge simply because WatchGuard is a "small company" (or even a "very small company," as Plaintiffs characterize WatchGuard in their opposition to this motion). Pltfs.' Opp'n at 4.

2. Does the Complaint Support a Strong Inference of Scienter in Defendants' Misstatements of WatchGuard's Financial Results?

*5 The court turns next to Defendants' specific misrepresentations, an analysis that begins with WatchGuard's earnings statements for the first three quarters of 2004. By restating those earnings, WatchGuard admitted that certain portions of its earnings statements were false. The question remains, however, whether the facts Plaintiffs have pleaded give rise to a strong inference that one or more Defendants were at least "deliberately reckless" in making the false statements.

a. Scienter in Misstatements About Interest Expenses

In each of the first three quarters of 2004, WatchGuard made errors that led to facially significant errors in its stated interest expenses. The complaint provides little information about these errors beyond a recitation of WatchGuard's disclosure at the end of the class period that previous financial statements included "inaccurate income statement classification of early pay incentive discounts taken by customers," and that the proper classification of those discounts was not as interest expense, but as a reduction in revenue. WatchGuard Ex. V. WatchGuard violated GAAP in recording early pay incentive discounts as interest expense. As one securities analyst wrote on the day following WatchGuard's restatement announcement, it is "difficult to understand how early pay incentives were recorded as interest expense...." ¶ 65. After WatchGuard corrected its classification error, interest expenses decreased from $169,000 to $8,000 in the first quarter, from $195,000 to $11,000 in the second quarter, and from $176,000 to $12,000 in the third

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 2038656 (W.D.Wash.), Fed. Sec. L. Rep. P 93,868
(Cite as: Not Reported in F.Supp.2d, 2006 WL 2038656)

Page 6

quarter. ¶ 61; *compare* WatchGuard Exs. C at 24, I at 55, J at 68, *with* Ex. O at 128.

The court has no difficulty concluding that WatchGuard made a blatant error in classifying early pay discounts, but it is another matter entirely to conclude that any Defendant did so with at least "deliberate recklessness." *SeeDSAM Global Value Fund v. Altris Software, Inc.,* 288 F.3d 385, 390 (9th Cir.2002) ( "[T]he mere publication of inaccurate accounting figures, or a failure to follow GAAP, without more, does not establish scienter."). Plaintiffs have not pleaded any facts explaining how or why any Defendant mis-classified interest expenses. The inference Plaintiffs urge is that no one would have made such a blatant error unless he was at least deliberately reckless. The court finds that inference weak when considered in context.

First, as WatchGuard admitted in the March 15, 2005 press release, it had been mis-classifying early pay incentive discounts since at least the beginning of 2002. WatchGuard Ex. V. Moreover, if its 10-Q forms are any indication, WatchGuard had been disclosing the faulty underpinnings of its mis-classification every quarter. *E.g.,* WatchGuard Ex. C at 29 (disclosing under "Interest Income and Interest Expense" heading that "[n]et interest expense primarily represents financing costs incurred due to term discounts taken by our customers."). Consistent disclosure of the erroneous premise that led to the repeated mis-classification is consistent with WatchGuard's ignorance of the error, not with any Defendant's intent to deceive or deliberate recklessness.

*6 Second, when a blatant error has been committed each quarter in open and notorious fashion for years, it is reasonable to infer that a Defendant who perpetuated the error did not do so deliberately. One can reasonably infer that WatchGuard's overstated interest expense calculations for the first three quarters of 2004 were in line with quarterly calculations for at least two years prior. *See,e.g.,* WatchGuard Ex. C. at 29 ("Interest expense remained comparable for both quarters ended March 31, 2003 and March 31, 2004."). Thus, there is little reason to expect that any Defendant would have noticed the interest expense figures in the first three quarters of 2004, much less that any Defendant acted with scienter in publishing them.

The court notes, moreover, that there is no allegation that any of the Defendants in this action were responsible for *initiating* the practice of mis-classifying early pay incentive discounts. At some point in 2002 or earlier, some person or persons associated with WatchGuard began the practice. The complaint, however, is silent as to who is responsible for the initial decision.

Third, the court must consider the obviousness of the mis-classification in light of its benefit to the Defendants. In making this comparison, the court does not suggest that the mis-classification of early pay incentive discounts was material or immaterial, but rather that an executive would consider the benefits of the mis-classification before authorizing it or deliberately turning a blind eye to it. The mis-classification was perhaps beneficial to WatchGuard in that it slightly inflated revenue. On the other hand, it did not alter WatchGuard's bottom line, because increases in interest expense exactly offset the increased revenue. The allegations support two competing inferences: that the Defendants deliberately ignored GAAP in blatant fashion while simultaneously disclosing facts revealing the GAAP violation, all for a modest increase in revenue with no impact on net profit or loss; or that the Defendants were merely negligent or grossly negligent in propagating an obvious GAAP error. The court has no difficulty choosing the latter inference as the stronger of the two.[FN5] Although the court could infer that Defendants' ignorance was negligent or even "inexcusably negligen[t]," it cannot infer that the error is "so obvious that [Defendants] must have been aware of it."*DSAM,* 288 F.3d at 389 (quoting *Hollinger v. Titan Capital Corp.,* 914 F.2d 1564, 1569 (9th Cir.1990)).

> FN5. Although Plaintiffs urge the court to treat a GAAP violation as evidence of sci-

Case 3:07-cv-05545-SI   Document 33-19   Filed 05/05/2008   Page 8 of 13

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 2038656 (W.D.Wash.), Fed. Sec. L. Rep. P 93,868
(Cite as: Not Reported in F.Supp.2d, 2006 WL 2038656)

Page 7

enter, the pleadings here demonstrate that even blatant violations of GAAP disclosed on at least a quarterly basis can go unnoticed by everyone in the market for years. This suggests that a GAAP violation by itself neither supports nor undermines an inference of scienter.

The court finds that the facts surrounding the misclassification of early pay incentive discounts, coupled with the general allegations regarding Defendants' motive and opportunity to mislead, do not give rise to a strong inference of at least deliberate recklessness. A plethora of unfavorable adjectives leap to mind to describe WatchGuard's misclassification of interest expense, but "deliberate" is not one of them. Plaintiffs therefore have not pleaded a Rule 10b-5 claim based on misrepresentations regarding WatchGuard's early pay incentive discounts.

b. Scienter in Statements About Revenue Recognition

*7 The remainder of WatchGuard's restatement press release focused on revenue recognition practices. WatchGuard's published revenue recognition policy during the class period was as follows:

Revenues from products are generally recognized upon delivery if persuasive evidence of an arrangement exists, collection is probable, the fee is fixed or determinable, and vendor-specific objective evidence of fair value for undelivered elements of the arrangement has been established. While we generally recognize product revenues upon shipment, revenues from some distribution arrangements where the distributor has unlimited stock return and rotation rights are not recognized until the distributors sell the products to their customers.

WatchGuard Ex. O at 117; ¶ 58. WatchGuard's stated policy is, according to the complaint, consistent with GAAP, which provides similar guidelines for revenue recognition on sales of products. ¶¶ 48-49.

Despite WatchGuard's stated policy, the company acknowledged at the end of the class period that it had improperly recognized revenue in two ways: by understating the accrual of customer rebate obligations and by improperly timing revenue recognition associated with contingent product sales. WatchGuard Ex. V. There is no question, at least on the pleadings, that WatchGuard's pre-restatement revenue recognition practices violated GAAP. As with WatchGuard's admitted errors in classifying interest expenses, however, there is a gap between Defendants' admission that they erroneously reported earnings and a "strong inference" that they were at least deliberately reckless.

To bridge the gap, Plaintiffs rely on an unnamed witness ("UW") who worked as a WatchGuard sales employee and national account manager from November 2000 through December 2004.[FN6] ¶ 29. UW states that there were "longstanding problems" with WatchGuard's revenue recognition, and that it was "not uncommon for WatchGuard to call the Company's small to mid-sized distributors shortly before quarter-end to request that they place orders essentially to meet WatchGuard's projected sales." ¶¶ 29, 50. WatchGuard would give those customers a right to return products they ordered, and the customer would order more product than they needed. Id. UW states that the "flurry" of end-of-quarter sales with broad return or rebate rights led to numerous problems. ¶ 52. Some customers claimed rebates even before they received an invoice, while others claimed excessive rebates. Because of these problems, UW asserts that WatchGuard's rebate reserve calculations were "sheer guesswork ." ¶ 55. These practices resulted in inflated quarterly revenues, because the stated revenues did not reflect the reduction in revenue associated with contingent sales.

> FN6. While the PSLRA permits a plaintiff to rely on an unidentified witness, Defendants contend that the complaint does not provide enough identifying information

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 3:07-cv-05545-SI    Document 33-19    Filed 05/05/2008    Page 9 of 13

Not Reported in F.Supp.2d                                                                                                     Page 8
Not Reported in F.Supp.2d, 2006 WL 2038656 (W.D.Wash.), Fed. Sec. L. Rep. P 93,868
**(Cite as: Not Reported in F.Supp.2d, 2006 WL 2038656)**

about UW. In light of the court's disposition of this motion, it need not reach this contention.

In addition, UW alleges that WatchGuard improperly accounted for returned merchandise. WatchGuard allowed returned products to accumulate in warehouses without accounting for them, and WatchGuard intentionally delayed the processing of end-of-quarter returns. ¶¶ 30, 51 (citing a "de facto policy" of processing returns in the quarter after receipt, if at all). WatchGuard poorly managed its computerized log of returned merchandise. ¶ 51. These practices resulted in inflated quarterly revenues, because the stated revenues did not reflect the reduction in revenue associated with returned merchandise.

*8 Plaintiffs' allegations reveal problems in revenue recognition, but they do not show that any Defendant knew about those problems or was deliberately reckless in avoiding such knowledge before reporting quarterly earnings. UW does not point a finger at any individual Defendant. UW does not allege that any Defendant directed anyone to improperly recognize revenue on contingent sales. UW does not allege that any Defendant directed anyone to delay the processing of returned merchandise. UW does not allege that any Defendant encouraged customers to order excess product with the knowledge that the product would be returned. Indeed, UW admits that WatchGuard tried to "incentivize customers to keep and sell the additional products which they had accepted as a result of WatchGuard's attempts to hit end-of-quarter numbers." ¶ 53. As Plaintiffs' counsel admitted during oral argument, there is nothing wrong with offering discounts to encourage end-of-quarter sales. To raise an inference of scienter, Plaintiffs would have to plead that a Defendant was culpably aware of or responsible for efforts to improperly record revenue from such sales.

With respect to recognition of revenue from contingent sales, UW's allegations do not show a policy of deliberately recognizing contingent revenue too soon, but rather that WatchGuard had no system that could properly account for contingent revenue. If Plaintiffs had pleaded facts showing that any Defendant approved of, knew about, or was deliberately reckless toward the faults in WatchGuard's revenue recognition system, they would have made at least some progress toward an inference of deliberate recklessness. No such allegations are present.

Lacking any specific information that connects any Defendant to the revenue recognition problems, Plaintiffs fall back to their "small company" allegations. As the court has already noted, however, WatchGuard's employment of "only" 300 people does not support the inference that its executives are aware of or deliberately reckless about every decision that every employee made. Without more particularized allegations, the court cannot infer that Defendants knew about or were deliberately reckless with respect to WatchGuard's improper revenue recognition.

To the extent that UW's allegations reveal anything about what WatchGuard knew of the problems UW identified, they reveal a concern for addressing the problems. In August 2004, an unnamed representative of "the Company" asked UW to undertake "the unwieldy task of addressing the issues surrounding returned product tracking." ¶ 30. UW does not say whether the unnamed representative was a Defendant or acting at a Defendant's behest. UW does not allege that he or she was asked to cover up any problems he or she discovered during the investigation. UW does not reveal the results of the investigation. UW does not state whether he or she reported those results to anyone, much less to a Defendant. If UW had identified problems, then reported them in a way that would reach one of the Defendants, and Defendants had ignored the problems or suppressed the results of the investigation, the court would expect to see such allegations in the complaint. There are none. At most, the court can infer that a person or persons at WatchGuard improperly accounted for rebate-contingent sales and returned merchandise. UW's allegations do not raise a strong

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 3:07-cv-05545-SI   Document 33-19   Filed 05/05/2008   Page 10 of 13

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 2038656 (W.D.Wash.), Fed. Sec. L. Rep. P 93,868
(Cite as: Not Reported in F.Supp.2d, 2006 WL 2038656)

Page 9

inference that any Defendant was aware of or culpably responsible for those decisions.

*9 For these reasons, Plaintiffs fail to satisfy the PSLRA's requirements for pleading scienter as to WatchGuard's misstated earnings in 2004. Lacking any basis to infer that any Defendant knew of the revenue recognition problems that led to those misstatements, there is no basis for a "strong inference" that any Defendant knew the statements were false or was deliberately reckless as to their falsity.

c. Scienter Regarding Defendants' Sarbanes-Oxley Certifications

In addition to the misstatements of revenue in the first three quarters of 2004, Plaintiffs contend that WatchGuard's quarterly Sarbanes-Oxley certifications are actionable misstatements. Accompanying each quarterly earnings statement that WatchGuard submitted to the SEC were two identical certifications that its CFO and CEO signed. ¶ 82 (Mr. Moore and Mr. McConnell certifying first quarter results); ¶ 91 (Mr. Borey and Mr. Richman certifying second quarter results); ¶ 102 (same for third quarter results).[FN7] Each certifying Defendant averred that the attached filing contained no untrue or misleading statements and contained accurate financial information. S-O Cert. ¶¶ 2-3. Each certifying Defendant also stated that he was responsible for maintaining adequate disclosure controls, and that he had maintained such controls or had disclosed any weakness in WatchGuard's control structure that was likely to materially affect its financial reporting. S-O Cert. ¶¶ 4-5.

> FN7. Despite Plaintiffs' assertion at oral argument, Defendants' Sarbanes-Oxley certifications are not part of the record. Plaintiffs have included excerpts from the certifications in their complaint, but the court finds the complete certifications more useful. The court has reviewed the relevant certifications on SEC's "Edgar" website. They are identical in all relevant respects to the format disclosed in the Code of Federal Regulations. 17 C.F.R. §§ 228.601, 229.601. The court has relied on these certifications, which it will cite as "S-O Cert."

What impact a Sarbanes-Oxley certification has on a 10b-5 claim is a relatively novel question. Plaintiffs argue that the certifications demonstrate scienter because the certifying Defendants either knew about WatchGuard's revenue recognition problems as a result of the accounting controls that they certified were in existence, or that Defendants were "deliberately reckless in not obtaining the information or conducting the investigations described in their certifications prior to publishing the false financial statements." ¶ 86. In addition, Plaintiffs argue that the Sarbanes-Oxley certifications are themselves false statements on which to base a 10b-5 claim. ¶¶ 83-85.

Neither of Plaintiffs' arguments goes as far as they would like. Plaintiffs have little choice but to allege that the Sarbanes-Oxley certifications were false statements. Among other things, the certifications state that the attached financial statements contain no "untrue statement[s] of a material fact." S-O Cert. ¶ 2. If that statement were true, the Plaintiffs would have no case. Plaintiffs are in a poor position, therefore, to allege that the Defendants' certification that (to paraphrase) "nothing in the attached financial statement is false" is culpably false, but that the portion that attests (paraphrasing again) that "I have ensured that WatchGuard has adequate financial controls" is true. It would be an unusual defendant who fraudulently misstated earnings, fraudulently denied a misstatement in his Sarbanes-Oxley certification, but then truthfully admitted in the same certification that he had oversight of the financial controls which gave him the knowledge that made his misstatement fraudulent. The court must infer that a defendant who would be at least deliberately reckless in stating corporate earnings would be at least deliberately reckless in certifying those earnings under Sarbanes-Oxley. In such

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 3:07-cv-05545-SI  Document 33-19  Filed 05/05/2008  Page 11 of 13

Not Reported in F.Supp.2d                                                                                           Page 10
Not Reported in F.Supp.2d, 2006 WL 2038656 (W.D.Wash.), Fed. Sec. L. Rep. P 93,868
(Cite as: Not Reported in F.Supp.2d, 2006 WL 2038656)

circumstances, therefore, the presence of a Sarbanes-Oxley certification adds little to the mix of allegations that establish scienter.

*10 In a case like this one, however, where the court finds no strong inference that any Defendant was at least deliberately reckless in issuing corporate earnings statements, the court has no basis for a strong inference that the Sarbanes-Oxley certifications are culpably false. In this case, there is no question (at least on the pleadings) that each certifying Defendant made a false statement when he signed a certification stating that no material fact in the attached earnings report was untrue. In searching for an inference that any Defendant was at least deliberately reckless in making that statement, the court would simply repeat its prior analysis of Defendants' intent in issuing the underlying financial statements. The court therefore cannot find a basis for a strong inference of scienter.

The court travels the same circular path when considering the effect of the certification that WatchGuard had adequate financial reporting controls. If that certification is false, the court's analysis of whether it is culpably false is a rerun of its analysis of whether the underlying financial statements were culpably false. The court cannot infer that the statement is true (an inference that would lend substantial strength to an inference of scienter), because the court has already found that there is no basis for a strong inference that any Defendant was aware of (or deliberately reckless regarding) inadequate financial controls.

The court is aware of only one other court that has considered the interplay between the Sarbanes-Oxley Act and the PSLRA in evaluating scienter in a 10b-5 claim. In that case, *In re Lattice Semiconductor Corp. Sec. Litig.*, No. 04-1255-AA, 2006 U.S. Dist. LEXIS 262 (D.Or. Jan. 3, 2006), the court considered facts similar to those before this court.[FN8] The defendant corporation restated three quarters worth of earnings after admitting that it had improperly recognized contingent sales as revenue. *Id.* at *19-23. The *Lattice* court concluded that

"the Sarbanes-Oxley certifications give rise to an inference of scienter...."*Id.* at *50. It did so, however, under markedly different circumstances. The plaintiffs in *Lattice* pleaded that a particular individual had improperly changed accounting journal entries in order to artificially inflate revenue. *Id.* at *24-25. In common parlance, they pleaded that he "cooked the books." The plaintiffs also pleaded, based on information from several unidentified witnesses, that the book cooker had an "excellent relationship" with upper management, and was unable to act without approval from either the CEO or CFO. *Id.* at *25-27. In light of those pleadings, the *Lattice* court found that the CEO and CFO's Sarbanes-Oxley certifications showed scienter, because they showed that they either knew of the book cooking or knew that their financial controls were inadequate. *Id.* at *50. As the court has already discussed, however, Plaintiffs in this matter have not pleaded any connection between WatchGuard's accounting inadequacies and the Defendants. These Plaintiffs have alleged merely that because WatchGuard was a "small company," the Defendants must have known about the improprieties. The court has already found this allegation insufficient to support a strong inference of scienter.

> FN8. The court notes that current counsel for the WatchGuard Plaintiffs were also counsel for the *Lattice* plaintiffs.

*11 The court finds that, in this case, Defendants' Sarbanes-Oxley certifications are inadequate to support a strong inference of scienter. Plaintiffs contend that Congress passed the Sarbanes-Oxley Act to prevent certifying corporate officers from invoking a "head-in-the-sand" defense to 10b-5 allegations. Accepting Plaintiffs' view of congressional intent for the present, the court nonetheless finds that the Sarbanes-Oxley Act does not doom these Defendants. Although the passage of Sarbanes-Oxley may make it somewhat more reasonable to infer that a certifying Defendant whose head is in the sand is being deliberately reckless, it does not transform the PSLRA's requirement of falsity-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 3:07-cv-05545-SI   Document 33-19   Filed 05/05/2008   Page 12 of 13

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 2038656 (W.D.Wash.), Fed. Sec. L. Rep. P 93,868
(Cite as: Not Reported in F.Supp.2d, 2006 WL 2038656)

Page 11

plus-scienter into a requirement of falsity-plus-a-Sarbanes-Oxley-certification. A defendant whose head is in the sand with respect to corporate earnings likely has his head in the sand with respect to his Sarbanes-Oxley certification as well. Because the PSLRA places the burden on Plaintiffs to plead facts giving rise to a "strong inference" that a defendant's head was above the sand, or was at least deliberately recklessly buried in the sand, its defendant-friendly provisions trump the plaintiff-friendly Sarbanes-Oxley Act, at least in this case.

3. Scienter Regarding Firebox X Statements

The only remaining allegedly actionable misstatement is a quote from Mr. Moore in a press release accompanying a 2003 quarterly earnings report. On February 9, 2004, a few months before Defendants began to misstate their financial results, WatchGuard issued a press release touting a new product, "Firebox X." WatchGuard Ex. Q at 141. The press release quoted Mr. Moore, who was WatchGuard's CEO at the time, as he extolled the virtues of the new product. He called Firebox X a "major technological and strategic leap forward for WatchGuard," and claimed that customers' responses to the product had been "overwhelmingly positive." *Id.*

Plaintiffs do not allege that Mr. Moore's optimistic statements regarding Firebox X are actionable misrepresentations, nor could they. *See,e.g.,Daou,* 411 F.3d at 1021 (noting that PSRLA's "safe harbor" provisions for forward-looking statements protect defendants who make "overly optimistic" sales projections). Instead, Plaintiffs rely on Mr. Moore's statement that "we believe that our new product and business strategy will drive revenue growth and a return to profitability in 2004."WatchGuard Ex. Q at 141. According to Plaintiffs, this statement is false or misleading because "[D]efendants admitted accounting manipulations were driving WatchGuard's revenue growth and profitability, not its new product." ¶ 78. Plaintiffs ask the court to infer that Mr. Moore knew or was deliberately reckless in February 2004 about the faulty accounting that WatchGuard disclosed in its restatement over a year later, and knew that WatchGuard was incapable of growing without the faulty accounting. Plaintiffs have pleaded no facts that would permit the court to make this inference. *SeeRonconi,* 253 F.3d at 432 ("Honest optimism followed by disappointment is not the same as lying or misleading with deliberate recklessness."). For the same reasons that the court has concluded that there is no strong inference that other Defendants acted with scienter in later earnings misstatements, the court concludes that Mr. Moore lacked scienter when he reported that Firebox X would drive WatchGuard's future growth.

4. A Restatement is Not Always a Violation of Rule 10b-5.

*12 To conclude its analysis of scienter, the court notes that corporate restatements of earnings are commonplace. There can be little doubt that the investing public would prefer that corporations correct their errors rather than suppressing them. When restatements occur, they are at least superficially attractive candidates for investors (and lawyers) alleging violations of Rule 10b-5. A restatement will, in almost every case, carry an admission that the company misstated material facts.

Despite the admission of falsity that ordinarily accompanies a restatement, nothing in any statute, reported case, or other authority transforms a restatement of earnings into securities fraud. Corporate officers make mistakes. If the market is efficient, it will punish corporations whose mistakes are too frequent or too egregious. Securities fraud, however, requires much more than a mistake-it requires a misstatement that was either intentional or deliberately reckless. Under the PSLRA, a plaintiff cannot even plead a violation of Rule 10b-5 without allegations that support a strong inference of intent or deliberate recklessness. Plaintiffs offer little more than WatchGuard's restatement and their insistence that Defendants must have known of the accounting problems underlying the restatement. Because Plaintiffs have failed to support the neces-

Case 3:07-cv-05545-SI   Document 33-19   Filed 05/05/2008   Page 13 of 13

Not Reported in F.Supp.2d                                                                Page 12
Not Reported in F.Supp.2d, 2006 WL 2038656 (W.D.Wash.), Fed. Sec. L. Rep. P 93,868
(Cite as: Not Reported in F.Supp.2d, 2006 WL 2038656)

sary "strong inference" of at least deliberately reckless conduct, they have no remedy in this court.

C. The Court Must Also Dismiss Plaintiffs' Control Person Liability Claim.

Section 20(a) of the 1934 Exchange Act attaches joint and several liability to every person who directly or indirectly controls a person who violates Rule 10b-5. 15 U.S.C. § 78t(a). Although Plaintiffs have pleaded a Section 20(a) claim against all Defendants, the claim cannot stand absent a properly pleaded violation of Rule 10b-5. *Paracor Fin., Inc. v. GE Capital Corp.*, 96 F.3d 1151, 1161 (9th Cir.1996). For that reason, the court dismisses Plaintiffs' Section 20(a) claim.

D. The Court Grants Plaintiffs Leave to Amend Their Complaint.

Having decided that Plaintiffs' complaint does not state a claim, the court must now decide whether to permit Plaintiffs to amend their complaint. The court must grant leave to amend if it finds that an amendment to the complaint could cure the deficiencies that led to its dismissal. *Gompper*, 298 F.3d at 898.

At oral argument, counsel indicated that their investigation of accounting improprieties has revealed additional information. In light of these representations, the court will permit Plaintiffs to amend their complaint.

IV. CONCLUSION

For the reasons stated above, the court GRANTS Defendants' motion to dismiss (Dkt.# 39), and grants Plaintiffs leave to amend. Plaintiffs shall file an amended complaint no later than May 8, 2006. The amended complaint shall be in "redlined" format or another format that allows the court to identify which allegations are new. The court urges Plaintiffs to consider paring any allegations that they are unable to substantially strengthen in the amended complaint.

*13 The court notes appreciatively that counsel appear to have worked cooperatively on scheduling issues, and so will not impose a briefing schedule for a second motion to dismiss. By May 12, 2006, the parties shall either file a stipulated briefing schedule, or shall arrange a telephone conference with the court to develop a briefing schedule. The parties shall focus their pleadings in connection with a second motion to dismiss solely on scienter. The briefing currently before the court is sufficient to address other elements of Plaintiffs' claims.

W.D.Wash.,2006.
In re Watchguard Securites Litigation
Not Reported in F.Supp.2d, 2006 WL 2038656 (W.D.Wash.), Fed. Sec. L. Rep. P 93,868

END OF DOCUMENT