ROBERT P. VARIAN (SB No. 107459)
Email: rvarian@orrick.com
JONATHAN B. GASKIN (SB No. 203625)
Email: jgaskin@orrick.com
AMY M. ROSS (SB No. 215692)
Email: aross@orrick.com
DANIELLE P. VAN WERT (SB No. 218245)
Email: dvanwert@orrick.com
ERIN H. REDING (SB No. 252691)
Email: ereding@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
The Orrick Building
405 Howard Street
San Francisco, CA 94105-2669
Telephone:    (415) 773-5700
Facsimile:    (415) 773-5759

Attorneys for Defendants
FormFactor, Inc., Igor Y. Khandros, Ronald C. Foster,
Richard M. Freeman and Joseph Bronson

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| DANNY McCASLAND, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>FORMFACTOR, INC., IGOR Y. KHANDROS, RONALD C. FOSTER, RICHARD M. FREEMAN and JOSEPH BRONSON,<br><br>Defendants. | **Case No. 3:07-cv-05545-SI**<br><br>**(CONSOLIDATED)**<br><br><u>**CLASS ACTION**</u><br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' CONSOLIDATED AMENDED COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS**<br><br>Date:        July 18, 2008<br>Time:        9:00 A.M.<br>Judge:       Honorable Susan Illston<br>Courtroom:   10, 19th Floor |

OHS West:260423949.1

MEMO OF P&A ISO MOTION TO DISMISS
PLAINTIFFS' CAC FOR VIOLATIONS OF FEDERAL
SECURITIES LAWS - (CASE No. 3:07-CV-05545-SI)

1

# TABLE OF CONTENTS

2
**Page**

3   INTRODUCTION AND OVERVIEW ........................................................................ 1

4   SPECIAL RULES GOVERNING THIS MOTION .................................................... 4

5   ARGUMENT .............................................................................................................. 5

6       I.     The CAC Is An Impermissible Attempt To Plead Fraud By Hindsight ................ 5

7       II.    The CAC Lacks The Corroboration And Detail Necessary To Plead Falsity
8            Or Scienter .......................................................................................................... 6

9            A.     The CAC Levels Unbridled Accusations Of Fraud Against
                  FormFactor And The Individual Defendants ............................................ 7

10           B.     The CAC Employs A Pleading Formula That Underscores Fatal
11                  Defects ...................................................................................................... 7

12           C.     The CAC's Failure To Plead Particularized Facts As To Any
13                  Individual Defendant Is Fatal As To All Claims    .................................. 8

           D.     The "Confidential Witness" Allegations Are Wholly Unavailing .............. 9

14           E.     The CAC's Handful Of References To Reports And Meetings
15                  Underscores The Absence Of Particularized Facts .................................. 11

16           F.     Plaintiffs' Attempt To Allege Accounting Fraud Falls Far Short Of
17                  Legal Requirements ................................................................................ 12

18                1.     The CAC Fails To Allege Facts That Might Support The
                       Assertion That The Restatement Was The Result Of Fraud   ...... 13

19               2.     The Complaint Fails To Allege Falsity Or Scienter
20                     Regarding The Purported Misclassification Of "Scrap" As
                     Research And Development Expense ........................................... 14

21           G.    Plaintiffs Provide No Particularized Facts Regarding Harmony ............. 14

22       III.   Plaintiffs' Claims Must Also Be Dismissed For Failure To Allege A Strong
            Inference Of Scienter In Accordance With Tellabs and Gompper  .................. 16
23
           A.     Plaintiffs' Theory Of Fraud Is Implausible And Unreasonable
24                  When Viewed In Isolation   .................................................................. 17

25           B.     Any Inference of Fraud Is Overwhelmed By Nonculpable
26                  Inferences That Provide Independent Grounds for Dismissal .................. 20

               1.     It Is Obvious That The Restatement Is The Result Of Error
27                    And Not Fraud .......................................................................... 20

28

1

**TABLE OF CONTENTS**
(continued)

2

Page

3

2.    The Inference That FormFactor Underestimated Harmony
Challenges, And Was Too Optimistic In Assessing Its

4

Ability To Address Them, Is Compelling.......................................... 20

5

3.    FormFactor's Failure To Meet Financial Projections in Q3
and Q4 Was Due Primarily To Deteriorating Market

6

Conditions ......................................................................................... 21

7

4.    The Most That Plaintiffs Have Alleged Is Corporate
Mismanagement, Which Is Not Actionable Under The

8

Securities Laws     ................................................................... 22

9

IV.    Defendants' Stock Trading Patterns Affirmatively Refute Any Inference Of

10

Scienter......................................................................................................................... 23

11

A.    Ronald Foster's Trading Refutes An Inference Of Scienter .................... 24

12

B.    Joseph Bronson's Lone Sale Refutes Any Inference of Scienter.............. 25

13

C.    Igor Khandros's Trading Pattern Was Entirely Routine ......................... 26

14

V.    Plaintiffs Fail To Satisfy The Stringent Pleading Rules Applicable To
Forward-Looking Statements.................................................................................. 27

15

VI.    No Control Person Liability ................................................................................... 29

16

CONCLUSION............................................................................................................... 30

17

18

19

20

21

22

23

24

25

26

27

28

1

# TABLE OF AUTHORITIES

2

Page

3

## CASES

4

*Atlantic Gypsum Co. v. Lloyds Int'l Corp.*,
    753 F. Supp. 505 (S.D.N.Y. 1990)......................................................................... 17

5

*Blue Chip Stamps v. Manor Drug Stores*,
    421 U.S. 723 (1975) ............................................................................................. 4

6

*Bly-Magee v. California*,
    236 F.3d 1014 (9th Cir. 2001)............................................................................... 4

7

*Central Bank v. First Interstate Bank*,
    511 U.S. 164 (1994) ............................................................................................. 4

8

*Coble v. Broadvision Inc.*,
    2002 WL 31093589 (N.D. Cal. Sept. 11, 2002) .................................................. 9

9

*Colin v. Onyx Acceptance Corp.*,
    31 Fed. Appx. 359 (9th Cir. 2002)....................................................................... 23

10

11

*Duncan v. Pencer*,
    1996 WL 19043 (S.D.N.Y., Jan. 18 1996)........................................................... 17

12

*Employers Teamsters Local Nos. 175 & 505 Pension Trust Fund v. Clorox Co.*,
    353 F.3d 1125 (9th Cir 2004)................................................................................ 28

13

*Glickman v. Alexander*,
    1996 WL 88570 (S.D.N.Y. Feb. 29, 1996) ......................................................... 17

14

*Gompper v. VISX, Inc.*,
    298 F.3d 893 (9th Cir. 2002)......................................................................... passim

15

16

*Heliotrope General Inc., v. Ford Motor Co.*,
    189 F.3d 971 (9th Cir. 1999)................................................................................ 6

17

*Higginbotham v. Baxter Int'l. Inc.*,
    495 F.3d 753 (7th Cir. 2007)................................................................................ 9

18

*Holden v. Hagopian*,
    978 F.2d 1115 (9th Cir. 1992)............................................................................... 5

19

*In re Apple Computer Sec. Litig.*,
    886 F.2d 1109 (9th Cir. 1989)................................................................. 20, 23, 24

20

21

*In re Apple Computer, Inc.*,
    127 Fed. Appx. 296 (9th Cir. 2005) ..................................................................... 8

22

*In re Connetics Corp. Sec. Litig.*,
    ___ F. Supp. 2d ____, 2008 WL 269467 (N.D. Cal. Jan. 29, 2008)............................ passim

23

*In re Convergent Techs. Sec. Litig.*,
    948 F.2d 507 (9th Cir. 1991)........................................................................ 20, 23

24

*In re ESS Tech., Inc. Sec. Litig.*,
    2004 WL 3030058 (N.D. Cal. Dec. 1, 2004) ...................................................... 28

25

26

*In re GlenFed, Inc., Sec. Litig.*,
    11 F.3d 843 (9th Cir. 1993), *vacated on other grounds*,
    42 F.3d 1541 (9th Cir. 1994).......................................................................... 23

27

28

1

**TABLE OF AUTHORITIES**
(continued)

2

Page

3    *In re GlenFed, Inc. Sec. Litig.*,
      42 F.3d 1541 (9th Cir. 1994)...................................................................... 5, 6, 7, 23

4    *In re Hansen Natural Corp., Sec. Litig.*,
      527 F. Supp. 2d 1142 (C.D. Cal. 2007) ................................................. 13

5

6    *In re Harmonic Inc. Sec. Litig.*,
      163 F. Supp. 2d 1079, (N.D. Cal. 2001) ............................................... 23

7    *In re Harmonic Sec. Litig.*,
      2002 WL 31974384 (N.D. Cal. Nov. 13, 2002),
8      *aff'd in part, rev'd in part on other grounds*,
      152 Fed. Appx. 674 (9th Cir. 2005)...................................................... 8, 11

9    *In re HI/FN, Inc. Sec. Litig.*,
      2000 WL 33775286 (N.D. Cal. Aug. 9, 2000)..................................... 11

10   *In re Invision Techs., Inc. Sec. Litig.*,
       2006 WL 538752 (N.D. Cal. Jan. 24, 2006) ........................................ 13

11

12   *In re Juniper Networks, Inc. Sec. Litig.*,
      2004 WL 540910  (N.D. Cal. Mar. 11, 2004),
      *aff'd*, 158 Fed. Appx. 899 (9th Cir. 2005) ........................................ 2, 12, 14, 29

13   *In re Metawave Commc'n Corp. Sec. Litig.*,
      298 F. Supp. 2d 1056 (W.D. Wash. 2003) ............................................ 9

14

15   *In re Network Assoc., Inc. II Sec. Litig.*,
      2003 WL 24051280 (N.D. Cal. Mar. 25, 2003)................................... 10

16   *In re Nike, Inc. Sec. Litig.*,
      181 F. Supp. 2d 1160 (D. Or. 2002) ..................................................... 29

17   *In re Northpoint Commc'n Group, Inc. Sec. Litig.*,
      184 F. Supp. 2d 991 (N.D. Cal. 2001) ................................................. 11

18   *In re Pac. Gateway Exch., Inc. Sec. Litig.*,
      169 F. Supp 2d 1160 (N.D. Cal. 2001) ............................................ 12, 13

19

20   *In re Petsmart*, *Sec. Litig.*,
      61 F. Supp. 2d 982 (D. Ariz. 1999)...................................................... 24

21   *In re Read-Rite Corp.*,
      2004 WL 2125883 (N.D. Cal. Sept. 22, 2004) ................................... 11

22   *In re Silicon Graphics Inc. Sec. Litig.*,
      183 F.3d 970 (9th Cir. 1999).......................................................... *passim*

23

24   *In re Silicon Graphics, Inc. Sec. Litig.*,
      970 F. Supp. 746 (N.D. Cal. 1997) ...................................................... 11

25   *In re Silicon Storage Tech., Inc. Sec. Litig.*,
      2006 WL 648683 (N.D. Cal. Mar. 10, 2006)............................... 9, 10, 11

26   *In re Silicon Storage Tech., Inc. Sec. Litig.*,
      2007 WL 760535 (N.D. Cal. Mar. 9, 2007)........................................ 11

27   *In re Splash Tech. Holdings, Inc. Sec. Litig.*
      160 F. Supp. 2d 1059 (N.D. Cal. 2001) .............................................. 28

28

**TABLE OF AUTHORITIES**
(continued)

Page

*In re Stac Elec. Sec. Litig.*,
    89 F.3d 1399 (9th Cir. 1996)......................................................................... 4

*In re Vantive Corp. Sec. Litig.*,
    283 F.3d 1079 (9th Cir. 2002)......................................................... 11, 26, 27

*In re Watchguard Sec. Litig.*,
    2006 WL 2038656 (W.D. Wash. Apr. 21, 2006) ..................................... 13

*Limantour v. Cray*,
    432 F. Supp. 2d 1129 (W.D. Wash. 2006) ............................................... 27

*Lipton v. Pathogenesis Corp.*,
    284 F.3d 1027 (9th Cir. 2002) ................................................................... 11

*Morgan v. AXT, Inc.*,
    2005 WL 2347125 (N.D. Cal. Sept. 23, 2005) ................................... 12, 13

*Nursing Home Pension Fund v. Oracle Corp.*,
    380 F.3d 1226 (9th Cir. 2004)................................................................... 10

*Osher v. JNI Corp.*,
    308 F. Supp. 2d 1168 (S.D. Cal. 2004), *aff'd in part, vacated in part on other*
    *grounds*, 183 Fed. Appx. 604 (9th Cir. 2006)........................................... 9

*Ronconi v. Larkin*,
    253 F.3d 423 (9th Cir. 2001)............................................................. *passim*

*Rudolph v. UTStarcom*,
    2008 WL 1734763 (N.D. Cal. Apr. 14, 2008) .................................. *passim*

*Santa Fe Indus., Inc. v. Green*,
    430 U.S. 462 (1977)................................................................................... 23

*Shields v. Citytrust Bancorp, Inc.*,
    25 F.3d 1124 (2d Cir. 1994)...................................................................... 17

*Tellabs, Inc. v. Makor Issues & Rights Ltd.*,
    551 U.S. ___, 127 S. Ct. 2499 (2007)............................................... *passim*

*Vess v. Ciba-Geigy Corp.*,
    317 F.3d 1097 (9th Cir. 2003)..................................................................... 4

*Wenger v. Lumisys, Inc.*,
    2 F. Supp. 2d 1231 (N.D. Cal. 1998) ................................................... 7, 24

*Wietschner v. Monterey Pasta Co.*,
    294 F. Supp. 2d 1102 (N.D. Cal. 2003) .............................................. 9, 27

**STATUTES**

15 U.S.C.
    Section 78u-4(b)(1) ................................................................................. 5, 8
    Section 78u-4(b)(2) ................................................................................. 8, 28
    Section 78u-5(c)(1)(A)(i) ........................................................................... 28
    Section 78u-5(c)(1)(B)(i) ........................................................................... 28
    Section 78u-5(I)(1)................................................................................ 5, 28

1

**TABLE OF AUTHORITIES**
(continued)

2

**Page**

3

**OTHER AUTHORITIES**

4

2 Moore's Federal Practice,
  § 12.34 [1][b] (3d ed. 2008) ................................................................................. 5

5

Joint Explanatory Statement of the Committee of Conference, H.R. Conf. Rep. No.
  369, 104th Cong., 1st Sess., at *31 (1995) ...................................................... 4

6

Private Securities Litigation Reform Act of 1995 ......................................... 1, 4, 8, 9

7

**RULES**

8

Federal Rules of Civil Procedure
  Rule 9(b) ...................................................................................... 4, 5, 8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MEMO OF P&A ISO MOTION TO DISMISS
PLAINTIFFS' CAC FOR VIOLATIONS OF FEDERAL
SECURITIES LAWS - (CASE No. 3:07-CV-05545-SI

1

## INTRODUCTION AND OVERVIEW

2      This action is a paradigm example of the opportunistic lawsuits Congress targeted for

3   dismissal in the Private Securities Litigation Reform Act of 1995 (the "Reform Act").  On

4   October 24, 2007 FormFactor announced that it was undertaking an internal review that might

5   affect its earnings, and that it continued to encounter difficulties in ramping production of its

6   Harmony product.[1]  Following a familiar pattern, plaintiffs filed a flurry of cookie-cutter

7   complaints seeking to exploit the resultant stock price decline, without bothering to undertake the

8   investigation contemplated by Rule 11.

9      The Consolidated Amended Complaint (the "CAC") filed after investigation reveals that

10   plaintiffs have come up with nothing of substance to support their claims.  Plaintiffs nevertheless

11   persist in accusing defendants of perpetrating a fraudulent scheme, making deliberately false

12   statements, manipulating the Company's financial statements, and engaging in what amounts to

13   criminal misconduct, in a supposed effort to deceive the market and reap illicit profits from

14   insider trading.

15      In most circles, one would expect the people making such accusations against a reputable

16   company and several highly-respected business executives to be able to back them up --

17   particularly when the law requires them to do so "in great detail."[2]  Anyone harboring such

18   expectations would be thoroughly disappointed by the CAC.

19      It is not just that the CAC falls short of the mark.  Although they are represented by highly

20   capable counsel, plaintiffs are unable to provide any of the particularized facts required by the

21   Reform Act and Ninth Circuit law to plead **either** falsity **or** scienter against **any** defendant.

22   Indeed, the CAC's charging allegations barely **mention** defendants by position or name.  That

23   glaring omission is fatal as to **all** claims because, as a matter of law, plaintiffs cannot state a claim

24

---

25   [1]   See Request for Judicial Notice ("RJN") filed herewith Ex. 1 at pp. 4-5 ("The manufacturing
      ramp on Harmony products are still behind current customer demand."  "[W]e discovered an
26   issue related to our inventory evaluation practices . . . [B]ecause our internal review is not yet
      complete, we decided that the prudent course of action was to make the more limited
27   announcement . . .").

28   [2]   *In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 974 (9th Cir. 1999).

1    against FormFactor unless they do so with respect to a specific officer or director who made a

2    specific misrepresentation with fraudulent intent.  In a sharp departure from the norm, the CAC

3    does not claim that any of the low-level employees that plaintiffs refer to as "confidential

4    witnesses" communicated or interacted with any of the defendants, or that anyone heard or read

5    anything that contradicts any public statement made by the Company or any individual.  Nor can

6    plaintiffs cite any internal report, memorandum, email or meeting that might support their

7    unbridled assertions of fraud.

8         Although plaintiffs claim that defendants perpetrated an illicit accounting scheme, the

9    CAC makes no pretense of alleging any of the specific facts to plead a Section 10(b) claim based

10   on accounting fraud. [3]  Plaintiffs are similarly unable to allege facts to support a claim that

11   FormFactor "promised" that its Harmony technology would achieve quick success, or failed to

12   disclose that it encountered delays in ramping large-scale production of commercial products.  To

13   the contrary, the CAC and the documents upon which it is based show clearly that FormFactor

14   both warned of the pertinent risks, and disclosed Harmony issues and setbacks as they arose.

15        Although this wholesale failure to plead either falsity or scienter with the requisite

16   particularity is dispositive, the CAC must **also** be dismissed because plaintiffs' allegations (even

17   if particularized) cannot establish a strong inference of fraudulent intent under the weighing

18   analysis mandated by *Tellabs, Inc. v. Makor Issues & Rights Ltd.*, 551 U.S. ___, 127 S. Ct. 2499

19   (2007) and *Gompper v. VISX, Inc.*, 298 F.3d 893 (9th Cir. 2002).  The CAC fails to allege facts

20   that would support a reasonable inference of scienter, much less one that is "cogent and

21   compelling."  Indeed, plaintiffs' allegations severely **undercut** such an inference, and any

22   inference of fraud would be overwhelmed by alternative explanations in any event.

23        The nature of the restatement that plaintiffs seek to recast as securities fraud eviscerates

24   any suggestion that defendants were engaged in a fraudulent scheme either to manipulate

25   FormFactor's financial statements, or to reap insider trading profits from the resultant stock price

26   ────────────

[3]   *See, e.g., In re Juniper Networks, Inc. Sec. Litig.*, 2004 WL 540910, at *2-3 (N.D. Cal.
      Mar. 11, 2004), *aff'd*, 158 Fed. Appx. 899 (9th Cir. 2005);  (Illston, J.); *In re Connetics Corp.*
27    *Sec. Litig.*, ___ F. Supp. 2d ____, 2008 WL 269467, at *12-13 (N.D. Cal. Jan. 29, 2008)
28    (Illston, J.)

MEMO OF P&A ISO MOTION TO DISMISS
PLAINTIFFS' CAC FOR VIOLATIONS OF FEDERAL
SECURITIES LAWS - (CASE No.  3:07-CV-05545-SI)

1    inflation.  Plaintiffs claim that defendants manipulated FormFactor's inventory valuations and

2    Research and Development ("R&D") expense to overstate the Company's earnings and gross

3    margins, but the scheme they allege would have had precisely the **opposite** effect during the key

4    period at issue.  If plaintiffs' unsupported assertions were correct, defendants would have cooked

5    the Company's books to **under**state earnings and gross margins.  Similarly, the CFO would have

6    directed a scheme to **de**flate the Company's stock price during the period in which he made most

7    of the sales plaintiffs claim were designed to profit from artificial inflation.

8         When competing inferences are added to the scales, a host of "nonculpable explanations

9    for defendants' conduct" tips the balance even **further** against an inference of scienter.  The

10   accounting scheme postulated in the CAC would have harmed, not benefited, the defendants, and

11   the restatement was **obviously** the result of an error by low-level employees -- not a devious

12   scheme hatched at the highest levels of the Company.  Plaintiffs' unsupported assertions that

13   FormFactor misclassified "scrap" as R&D expense are based on the erroneous premise that the

14   restatement reclassified such expenses, and are contradicted by the CAC's allegations regarding

15   the Harmony manufacturing ramp.

16        New product introductions by technology companies frequently falter, and the fact that

17   FormFactor encountered challenges in ramping large-scale production of its Harmony technology

18   provides no support for any inference of fraud.  FormFactor's repeated disclosure of the fact that

19   it was experiencing such difficulties further undercuts any such inference.  With the benefit of

20   hindsight one might conclude that defendants underestimated the scope of the problems they

21   faced, or misjudged their ability to fix them, but that conclusion is classically "nonculpable" in

22   the context of a claim for securities fraud.[4]  As the cases further recognize, the existence of

23   operational problems cannot be equated with knowledge of adverse financial impacts, and

24   companies routinely experience such difficulties and continue to perform in accordance with

25   earnings guidance.

26        Moreover, beyond the weighing analysis under *Tellabs* and *Gompper*, these various

27

28   [4]   *See, e.g., In re Connetics*, 2008 WL 269467, at *9.

MEMO OF P&A ISO MOTION TO DISMISS
PLAINTIFFS' CAC FOR VIOLATIONS OF FEDERAL
SECURITIES LAWS - (CASE No. 3:07-CV-05545-SI)

1  nonculpable inferences provide independent bases for dismissal.  The controlling case law makes

2  clear that accounting errors, undue optimism in the face of operational challenges, faulty

3  judgments, miscalculations and corporate mismanagement are not actionable under the securities

4  laws.

5  ## SPECIAL RULES GOVERNING THIS MOTION

6  This motion is governed by specialized rules that were adopted for the express purpose of

7  facilitating dismissal of cases like this one.  As Congress and the Supreme Court have

8  emphasized, securities class actions, "if not adequately contained, can be employed abusively to

9  impose substantial costs on companies and individuals whose conduct conforms to the law."

10  *Tellabs,* 127 S. Ct. at 2504.  The "exacting pleading requirements" set forth in the Reform Act

11  were enacted "as a check against" such abuses, and to limit the unique burdens[5] associated with

12  the reflexive filing of lawsuits against companies that suffer business setbacks and stock price

13  declines.[6]  *Id.*

14  Beyond the monetary burdens and management distraction, accusations of fraud can result

15  in "serious injury to reputation for which our legal system effectively offers no redress."  Conf.

16  Rep. at 41.  Congress specifically determined that Fed. R. Civ. P. 9(b) -- which was designed in

17  part to protect defendants from the "reputational" harm that comes from "being subject to fraud

18  charges"[7] -- provided insufficient protection in securities class actions.  *Id.*

19  These factors prompted Congress to rewrite the rules governing securities class actions by

20

---

21  [5]  As the Supreme Court explained before the Congressional findings of abuse that prompted the

22  Reform Act, "litigation under Rule 10b-5 presents a danger of vexatiousness **different in degree and in kind** from that which accompanies litigation in general."  *Central Bank v. First*

23  *Interstate Bank*, 511 U.S. 164, 189 (1994) (emphasis added); *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 739 (1975).

24  [6]  As noted in the Conference Report, the Reform Act was "prompted by significant evidence of

25  abuse in private securities lawsuits," including "the routine filing of lawsuits" when "there is a significant change in an issuer's stock price."  Joint Explanatory Statement of the Committee of

26  Conference, H.R. Conf. Rep. No. 369, 104th Cong., 1st Sess., at *31 (1995) ("Conf. Rep.").

27  [7]  *Bly-Magee v. California*, 236 F.3d 1014, 1018 (9th Cir. 2001); *In re Stac Elec. Sec. Litig*., 89

28  F.3d 1399, 1405 (9th Cir. 1996); *Vess v. Ciba-Geigy Corp*., 317 F.3d 1097, 1104 (9th Cir. 2003).

1  "erecting procedural barriers" designed "to reduce the volume of abusive federal securities

2  litigation." *Silicon Graphics*, 183 F.3d at 977. Thus, although the truth of well-pleaded[8]

3  allegations is assumed, assertions that fail to meet heightened pleading standards are disregarded.

4  [9] Nor are all reasonable inferences drawn in favor of plaintiffs, as is normally the case. Rather,

5  the Court must **weigh all competing** facts and inferences -- including those that are **un**favorable

6  to plaintiffs because they undercut or suggest alternatives to an inference of fraud. *See*, *e.g*.,

7  *Tellabs*, 127 S. Ct. at 2510; *Gompper*, 298 F.3d at 897.

8         Securities class actions must be dismissed if they fail to allege falsity in conformance with

9  legal requirements, **or** when "pleadings are not sufficiently particularized, **or** where, taken as a

10  whole, they do not raise a 'strong inference' that misleading statements were [made] knowingly

11  or [with] deliberate recklessness." *Ronconi v. Larkin*, 253 F.3d 423, 429 (9th Cir. 2001)

12  (emphasis added). The CAC's unprincipled attack on defendants and their reputations clears

13  **none** of these three hurdles, and runs afoul of the rule against pleading "fraud by hindsight."

14  <u>**ARGUMENT**</u>

15  **I.    THE CAC IS AN IMPERMISSIBLE ATTEMPT TO PLEAD**
16  **FRAUD BY HINDSIGHT**

17         "Congress enacted the [Reform Act] to put an end to the practice of pleading 'fraud by

---

18  [8]  The court need not accept the truth of bald assertions, subjective characterizations or legal
19       conclusions. *See*, *e.g*., *Holden v. Hagopian*, 978 F.2d 1115, 1121 (9th Cir. 1992); 2 Moore's
         Federal Practice, § 12.34 [1][b] (3d ed. 2008).

20  [9]  To allege falsity under the Reform Act, plaintiffs are required to (1) specify each statement
21       alleged to have been false or misleading, (2) specify the reasons why the statement is false or
         misleading, and, if the allegation is not made on personal knowledge, (3) state with
22       particularity all facts on which plaintiffs' belief is based. 15 U.S.C. § 78u-4(b)(1). Rule 9(b)
         reinforces these requirements by requiring plaintiffs to specify the time, date, location and
23       content of each statement claimed to have been false or misleading, and the reasons why the
         statement was false or misleading at the time it was made. *See In re GlenFed, Inc. Sec. Litig*.,
24       42 F.3d 1541, 1547-49 (9th Cir. 1994).

25       To allege scienter, plaintiffs must, at a minimum, "plead, in great detail, facts constituting
         deliberately reckless or conscious misconduct," and "no less than a degree of recklessness that
26       strongly suggests actual intent." *In re Silicon Graphics*, 183 F.3d at 974, 979, 983. For
         forward-looking statements plaintiffs must plead particularized facts giving rise to a strong
27       inference that the defendant acted with "actual knowledge . . . that the statement was false or
         misleading." 15 U.S.C. § 78u-5(c)(1)(B)(i); *In re Connetics*, 2008 WL 269467, at *7-8.
28

---

MEMO OF P&A ISO MOTION TO DISMISS
                                                           PLAINTIFFS' CAC FOR VIOLATIONS OF FEDERAL
                                                           SECURITIES LAWS - (CASE NO. 3:07-CV-05545-SI)

1    hindsight.'" *Silicon Graphics*, 183 F.3d at 988.  Accordingly, to distinguish their claims from the

2    retrospective allegations that typify stock drop cases -- and avoid dismissal -- plaintiffs are

3    required to plead highly particularized contemporaneous facts and corroborative details showing

4    that the alleged misstatements were both false and fraudulent at the time they were made.  *See,*

5    *e.g., Ronconi*, 253 F.3d  at 431, 434, 437.

6          The CAC attempts what the Reform Act forbids.  Plaintiffs seize upon a stock decline, and

7    use the 20/20 vision of hindsight to reverse-engineer an unsupported attempt to exploit this

8    decline.  As the Ninth Circuit warned before Congress enacted the Reform Act, business setbacks

9    do not imply securities fraud, because "there is no reason to assume that what is true at the

10   moment plaintiff discovers it was also true at the moment of the alleged misrepresentation."

11   *GlenFed*, 42 F.3d at 1548-49.  Plaintiffs fail to allege the particularized contemporaneous facts

12   necessary to fill this void, and further fail to allege a theory that -- even if particularized and

13   supported -- would give rise to the requisite strong inference of fraudulent intent.

14   ## II.    THE CAC LACKS THE CORROBORATION AND DETAIL NECESSARY
15   ##         TO PLEAD FALSITY OR SCIENTER

16         To avoid dismissal, plaintiffs must plead "countless specifics" and "corroborating details"

17   regarding the sources of information upon which they rely, including confidential witnesses,

18   meetings, and internal memoranda and reports.  *Silicon Graphics*, 183 F.3d at 984-85; *see*, *e.g.*,

19   *Heliotrope General Inc., v. Ford Motor Co.,* 189 F.3d 971, 979-80 (9th Cir. 1999); *Ronconi*, 253

20   F.3d at 432.  The CAC is devoid of details, specifics or contemporaneous evidence that might

21   show that any purported misstatement was false or materially misleading -- much less fraudulent

22   -- at the time it was made.

23         No "confidential witness" is alleged to have talked to any of the defendants, **or** to have

24   heard any statement made by any defendant, **or** to have attended any meeting with any defendant,

25   **or** to have either sent or received any report, memorandum or email to or from any of the

26   defendants.  Nor does the CAC identify with particularity any statement, internal report,

27   memorandum, email, meeting or other communication that suggests any defendant believed that

28   any of FormFactor's public statements might be false or misleading.

An examination of the CAC's ponderous allegations reveals a wholesale failure to plead **any** particularized facts with respect to falsity **or** scienter, as to **any** defendant. Rather, plaintiffs make generic accusations within the rubric of a discredited pleading formula designed to circumvent the "exacting pleading requirements" that Congress imposed "as a check against abusive litigation."[10]

## A. THE CAC LEVELS UNBRIDLED ACCUSATIONS OF FRAUD AGAINST FORMFACTOR AND THE INDIVIDUAL DEFENDANTS

Plaintiffs are not shy. They accuse FormFactor and its officers and directors of engaging in a "fraudulent scheme" that was specifically designed "to deceive the market," which purportedly continued until their "misrepresentations and fraudulent conduct could no longer be explained away, or concealed." CAC ¶ 219. See, e.g., CAC ¶ 83. The CAC repeatedly proclaims that the defendants "knew" that the supposed misstatements "were false and misleading at the time they were made" (e.g., CAC ¶¶ 89, 97, 105, 115, 126, 136, 144, 153), that defendants "manipulated" FormFactor's financial statements (e.g., CAC ¶ 192), and that the Company's CEO and CFO "knowingly certified" fraudulent financial statements (CAC ¶¶ 204, 206). Plaintiffs' inability to support these irresponsible accusations is stark.

## B. THE CAC EMPLOYS A PLEADING FORMULA THAT UNDERSCORES FATAL DEFECTS

Plaintiffs attempt to paper over their inability to satisfy heightened pleading requirements by employing a tactic disparagingly referred to as "puzzle pleading."[11] Unable to plead specific facts showing how and why individual statements were false and fraudulent at the time they were made, plaintiffs: (1) regurgitate an undifferentiated mass of public statements spanning the entire class period; and (2) use the same blanket paragraph[12] to assert that the statements were false and

---

[10] *Tellabs*, 127 S. Ct. at 2501.

[11] *See e.g., GlenFed*, 42 F.3d at 1553-54; *Wenger v. Lumisys, Inc.*, 2 F. Supp. 2d 1231, 1243-44 (N.D. Cal. 1998) ("In the context of securities class actions complaints, courts have repeatedly lamented plaintiffs' counsels' tendency to place the burden [ ] on the reader to sort out the statements and match them with the corresponding adverse facts to solve the 'puzzle' of interpreting Plaintiffs' claims.")

[12] See CAC ¶¶ 89, 97, 105, 115, 126, 136, 144 and 153.

1    fraudulent as to "defendants."  The CAC makes no attempt to identify specific statements or

2    "connect the dots" on falsity and scienter.  The same generic conclusions are mechanically

3    juxtaposed against the block quotes over and over -- whatever the statement may have been,

4    irrespective of the person who made the statement, and without regard to when it was made.

5        While this construct enables plaintiffs to generate an "impressive" volume of paper, it

6    does nothing to satisfy the Reform Act or Rule 9(b), which requires detailed pleading of the

7    specific reasons that a statement is false and fraudulent with respect to **each** statement, and **each**

8    defendant.  15 U.S.C. § 78u-4(b)(1) & (2); *see*, *e.g*., *In re Harmonic Inc.*, 2002 WL 31974384, at

9    \*10 (N.D. Cal. Nov. 13, 2002), *aff'd in part, rev'd in part on other grounds,* 152 Fed. Appx. 674

10    (9th Cir. 2005).[13]

11    ### C.    THE CAC'S FAILURE TO PLEAD PARTICULARIZED
12    FACTS AS TO ANY INDIVIDUAL DEFENDANT IS FATAL
      AS TO ALL CLAIMS

13        The CAC must be dismissed in its entirety because it fails to plead particularized facts as

14    to any individual, and the Ninth Circuit has squarely rejected the concept of "collective scienter"

15    attributed to the company as a whole.  As the court made unmistakably clear in *In re Apple*

16    *Computer, Inc*., 127 Fed. Appx. 296, 303 (9th Cir. 2005), to plead a Section 10(b) claim against

17    FormFactor, plaintiffs must establish that a particular defendant made a specific misstatement,

18    and plead facts showing that the defendant made the statement with fraudulent intent:

19        A corporation is deemed to have the requisite scienter for fraud
20        **only if the individual corporate officer making the statement
        has the requisite level of scienter** at the time that he or she makes
21        the statement.  We have **squarely rejected the concept of
        "collective scienter" ….**    (Emphasis added)

22    The CAC does not come close to alleging that any "individual corporate officer" made a

23    misstatement with "the requisite level of scienter."  *Id.*

24        The omnibus paragraph that purports to show that the "defendants knew that [the alleged

25    misstatements] were false and misleading at the time they were made" does not so much as

26    **mention** any defendant, either by name or by title.  See CAC ¶¶ 89, 97, 105, 115, 126, 144 &

27

---

28    [13]  See pp. 4-5, *supra*.

1    153.  It merely recites (eight times) a mantra of conclusory assertions directed at "defendants" in

2    the abstract.  Moreover, a perusal of the paragraphs cited in the mantra (CAC ¶¶ 53-67, 68-75,

3    76-79, 80-83, 210-20) shows that individual defendants are mentioned in only three of them, and

4    in a manner that adds nothing of substance.[14]

5
6    　　　　D.    THE "CONFIDENTIAL WITNESS" ALLEGATIONS ARE
                WHOLLY UNAVAILING

7    　　　　　There is a serious question whether attempting to plead scienter via allegations attributed

8    to anonymous sources is even viable in the wake of the Supreme Court's decision in *Tellabs*.  As

9    Judge Posner and the Seventh Circuit noted in *Higginbotham v. Baxter Int'l. Inc.*, 495 F.3d 753,

10   757 (7th Cir. 2007), the notion "that anonymous accusers can demonstrate that scienter is at least

11   as likely as any opposing inference one could draw from the facts alleged" is subject to doubt.

12   Accordingly, *Higginbotham* held that, at a minimum, confidential witness allegations must be

13   "discounted," and "[u]sually that discount will be steep."  The allegations in this case fall **far**

14   short of all standards -- before *Tellabs* and after, whether discounted or not.

15   　　　　　Allegations attributed to anonymous sources are subject to the same stringent standards

16   that govern all purported sources of information.  Because the Reform Act requires a detailed,

17   compelling and reliable demonstration that the statements at issue were fraudulent when made,

18   allegations derived from confidential witnesses are disregarded if they are vague, uncorroborated,

19   implausible or otherwise unreliable.[15]  Plaintiffs must demonstrate with particularity that the

20   alleged "witnesses" occupied a position indicating that they would possess the information

---

21   [14]  Paragraph 64 alleges that Khandros "went to the 'production floor' and interacted with the
22        lower-ranking personnel to assess the status of manufacturing" and would "get involved" in
         quality issues if necessary.  Paragraph 65 alleges that Khandros, Foster and Freeman were
23        "apprised" of unspecified "manufacturing issues" through unspecified reports and meetings.
         Paragraph 66 merely alleges that Foster was "responsible for disseminating a report to the
24        FAB production department," but again fails to provide any details regarding the report.

25   [15]  *See, e.g., In re Silicon Graphics Inc.*, 183 F.3d at 985; *In re Silicon Storage,* 2006 WL 648683,
26        at *10 (N.D. Cal. Mar. 10, 2006); *Osher v. JNI Corp*., 308 F. Supp. 2d 1168, 1178 (S.D. Cal.
         2004), *aff'd in part, vacated in part on other grounds*, 183 Fed. Appx. 604 (9th Cir. 2006);
27        *Wietschner v. Monterey Pasta Co.*, 294 F. Supp. 2d 1102, 1112 (N.D. Cal. 2003); *In re
         Metawave Commc'n Corp. Sec. Litig.,* 298 F. Supp. 2d 1056, 1068 (W.D. Wash. 2003); *Coble
28        v. Broadvision Inc.*, 2002 WL 31093589 (N.D. Cal. Sept. 11, 2002).

1   attributed to them.  *See, e.g., Nursing Home Pension Fund v. Oracle Corp.*, 380 F.3d 1226, 1233

2   (9th Cir. 2004).  The complaint must also allege how the witness came to learn of the information

3   attributed to him or her, whether the witness learned the information first-hand, and show how the

4   information is corroborated by other sources.[16]  In fact, this Court recently held that "[p]laintiffs

5   must reveal **all facts** about [the] witness that were material to the formation of their belief that the

6   witness' statement is accurate."  *Rudolph v. UTStarcom*, 2008 WL 1734763, at *7 (N.D. Cal. Apr.

7   14, 2008) (Illston, J.).

8          The CAC's confidential witness ("CW") allegations (see CAC ¶¶ 51-82) fail all of these

9   tests.  None of the "witnesses" is alleged to have been in a position to provide reliable

10  information, and the information attributed to them is of no consequence in any event.  Even with

11  the spin applied in the adversary process, the best plaintiffs can muster is amorphous speculation

12  from low-level employees who (1) did not interact with the individual defendants, and (2) clearly

13  have no personal knowledge regarding plaintiffs' assertions of falsity or scienter.  See CAC

14  ¶¶ 51-82.[17]  The lengths to which plaintiffs must reach in attempting to fill this conspicuous void

15  is typified by the CAC's citation of an "information technology director" to challenge

16  FormFactor's accounting for COGS (cost of goods sold) and R&D expense.  CAC ¶¶ 40, 71.

17         No CW is alleged to have reported to any of the defendants.  See CAC ¶¶ 31-40.  Indeed,

18  plaintiffs do not claim that any of the anonymous sources even spoke to any of the defendants.

19  Nor do plaintiffs allege that any CW attended any meeting with any defendant, or sent any report,

20  memorandum or email to any defendant, or received any report, memorandum or email from any

21  of the defendants.  Most importantly, no witness is alleged to have provided any defendant with

---

[16]  *See, e.g., In re Silicon Graphics,*  183 F.3d at 985; *In re Silicon Storage*, 2006 WL 648683, at *10; *In re Network Assoc., Inc. II Sec. Litig.*, 2003 WL 24051280, at *10 (N.D. Cal. Mar. 25, 2003).

[17]  Plaintiffs rely on a hodge-podge of assertions that have no meaningful connection with the defendants, or the knowledge or direct observations of the "witnesses."  See*, e.g.*, ¶ 55 (CW2 states that there "may have been" development products with Harmony), ¶ 58 (there was clearly "evidence of" a slowdown at FormFactor, which CW4 "believed" was a combination of the market and "our situation with Harmony"), ¶ 71 (CW9 "understood" that the Company "allocated some of the scrap to R&D expense"), and ¶ 75 (CW6 "was aware" that "management" "did something" with "FormFactor's reported quarterly numbers").

any information that contradicted any public statement made during the class period, or to have heard or read any statement by any defendant that cast doubt on any public statement. *See*, *e.g.*, *In re Harmonic,* 2002 WL 31974384, at *11; *In re Northpoint Commc'n Group, Inc. Sec. Litig.*, 184 F. Supp. 2d 991, 997 (N.D. Cal. 2001).

### E.   THE CAC'S HANDFUL OF REFERENCES TO REPORTS AND MEETINGS UNDERSCORES THE ABSENCE OF PARTICULARIZED FACTS

Although allegations regarding internal reports and meetings that purportedly contradict the public statements at issue are standard fare in plaintiffs' attempts to meet the pleading requirements of the Reform Act,[18] the CAC barely puts them on the menu. The handful of generic references to reports or meetings (CAC ¶¶ 65-67, 70) adds nothing to plaintiffs' attempts to plead falsity or scienter.

Because all companies generate masses of internal reports and hold innumerable meetings,[19] the requirements imposed by the Ninth Circuit in this area are particularly stringent. A plaintiff must detail "the sources of her information with respect to reports, how she learned of the reports, who drafted them, [and] which officers reviewed them," and provide "an adequate description of their contents" -- which are expected to include "countless specifics." *Silicon Graphics*, 183 F.3d at 985; *see*, *e.g.*, *Lipton v. Pathogenesis Corp.*, 284 F.3d 1027, 1036 (9th Cir. 2002). The same basic requirements apply to meetings and other interactions with officers or employees.[20] Plaintiffs have made no attempt to meet these elevated standards. See CAC ¶¶ 65-67, 70. Nor do they allege that any defendant received any "information directly at odds with an alleged misrepresentation."[21]

---

[18]  *See*, *e.g.*, *In re HI/FN, Inc. Sec. Litig.*, 2000 WL 33775286, at *8 (N.D. Cal. Aug. 9, 2000) (Illston, J.).

[19]  *In re Silicon Graphics, Inc. Sec. Litig.*, 970 F. Supp. 746, 767 (N.D. Cal. 1997).

[20]  *See*, *e.g.*, *In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1087-88 (9th Cir. 2002); *In re Read-Rite Corp.*, 2004 WL 2125883, at *4 (N.D. Cal. Sept. 22, 2004); *In re Silicon Storage*, 2006 WL 648683, at *11-12; *In re Silicon Storage Tech. Inc. Sec. Litig.*, 2007 WL 760535, at *7 (N.D. Cal. Mar. 9, 2007).

[21]  *In re Harmonic,* 2002 WL 31974384, at *11; *In re Northpoint Commc'n,* 184 F. Supp. 2d at 997.

---

F.    **PLAINTIFFS' ATTEMPT TO ALLEGE ACCOUNTING FRAUD
      FALLS FAR SHORT OF LEGAL REQUIREMENTS**

As this Court has emphasized, allegations of accounting fraud are "impermissibly imprecise" if they fail to provide the "'who, what, when, where and how' required by the PSLRA." *Juniper Networks,* 2004 WL 540910, at *3.

Plaintiffs are required to identify transactions and dollar amounts, and to provide specific information regarding the role that individual defendants allegedly played in connection with specific violations of GAAP:

> However, plaintiffs do not **identify any transaction by name or date, do not specify dollar amounts**, and generally fail to **provide** any **facts** to support their belief **that defendants were aware of** the alleged fraud. For example, they do not indicate **how or when each defendant became aware of** the allegedly improper accounting practices, nor **the extent of each defendant's contribution or involvement**.

*In re Pac. Gateway Exch., Inc. Sec. Litig*., 169 F. Supp 2d 1160, 1167 (N.D. Cal. 2001) (emphasis added). *Accord In re Connetics*, 2008 WL 269467, at *12-13. Moreover, these particularized facts must show both "that: (1) **specific** accounting decisions were improper; and (2) the defendants knew **specific facts** at the time that rendered their accounting decisions **fraudulent**." *Rudolph*, 2008 WL 1734763, at *6 (emphasis added); *accord Morgan v. AXT, Inc.*, 2005 WL 2347125, at *14 (N.D. Cal. Sept. 23, 2005).

The CAC's accounting allegations (CAC ¶¶ 59-83, 179-207) do not allege any of the requisite details, or plead any facts that could possibly support a strong inference of scienter on the part of any defendant. Rather than attempting to show how and why "specific accounting decisions were improper," and specific facts showing that those accounting determinations were fraudulent, plaintiffs take two broad tacks, neither of which goes anywhere. First, the CAC attempts to recast what was obviously an error by a handful of low-level employees as a cook-the-books fraud purportedly perpetrated by unidentified members of "senior management." See CAC ¶¶ 74-83, 183-191. Second, plaintiffs make a vague assertion that defendants engaged in a fraudulent scheme to misclassify "scrap" as R&D expense -- based on the mistaken premise that the restatement included R&D expense. See CAC ¶¶ 68-73, 192-199. To the extent that this

1    theory is even comprehensible, it is unsupported.

2        **1.    THE CAC FAILS TO ALLEGE FACTS THAT MIGHT SUPPORT
             THE ASSERTION THAT THE RESTATEMENT WAS THE RESULT
3            OF FRAUD**

4        As the restatement disclosures upon which plaintiffs rely ***themselves*** make clear, the

5    restatement resulted from the failure of rank-and-file employees to follow company procedures in

6    valuing inventory and senior management was unaware of the problem.  RJN Ex. 2 at p. 1 ("The

7    Company's review indicates that the failure to adhere consistently to Company accounting

8    policies for inventory valuation was limited to a small number of employees.  The Audit

9    Committee of the Board of Directors has determined that senior management was not aware of

10   the noncompliance.").

11       Plaintiffs do not -- and cannot -- allege any facts that might cast doubt on these

12   conclusions.  Nor does the CAC allege that any of the defendants was involved in the problematic

13   inventory valuation practice, or even knew of the practice -- much less that defendants knew

14   specific facts at the time that rendered their accounting determinations fraudulent.  *See, e.g.,* CAC

15   ¶¶74-83, 183-191; *In re Pac. Gateway Exch.*, 169 F. Supp. 2d at 1167 (plaintiffs must allege

16   detailed facts showing "how [and] when each defendant became aware of the allegedly improper

17   accounting practices, [and] the extent of each defendant's contribution or involvement"); *In re*

18   *Connetics*, 2008 WL 269467, at *12; *Rudolph*, 2008 WL 1734763, at *6. [22]

19   _____

20   [22]  Plaintiffs' allegations regarding FormFactor's Sarbanes-Oxley 302 certifications (¶¶ 89(g),
         208–18) are similarly unavailing.  Section 302 provides no independent basis for pleading
21       scienter.  *See, e.g., Morgan,* 2005 WL 2347125, at *15; *In re Hansen Natural Corp., Sec.*
         *Litig.*, 527 F. Supp. 2d 1142, 1158 (C.D. Cal. 2007); *In re Watchguard Sec. Litig.,* 2006
22       WL 2038656, at *9-11 (W.D. Wash. Apr. 21, 2006); *In re Invision Techs., Inc. Sec. Litig.*,
         2006 WL 538752, at *7 n. 3 (N.D. Cal. Jan. 24, 2006).  Indeed, this Court recently recognized
23       that "the signing of quarterly certificates of financial statements mandated by the Sarbanes-
         Oxley Act does not, without more, support an inference of scienter."  *Rudolph*, 2008 WL
24       1734763, at *6.

25       **Even if** the certifications <u>did</u> provide an independent basis for alleging securities fraud, the
         CAC's failure to plead particularized facts, (discussed in Sections IIA-F above), and separate
26       failure to plead a strong inference under *Tellabs* and *Gompper* (discussed in Section III below)
         would require dismissal of those claims.  As FormFactor noted in its SEC filings, "the design
27       of any control systems must reflect the fact that there are resource constraints, and the benefits
28       of all controls must be considered relative to their costs.  Because of the inherent limitations in

1

2

### 2.    THE COMPLAINT FAILS TO ALLEGE FALSITY OR SCIENTER REGARDING THE PURPORTED MISCLASSIFICATION OF "SCRAP" AS RESEARCH AND DEVELOPMENT EXPENSE

3

4

5

6

7

Contrary to suggestions that permeate plaintiffs' allegations (see CAC ¶¶ 68-73, 192-201), R&D expenses were not restated by FormFactor.  R&D expenses were identical before and after the restatement.  Nothing previously classified as R&D was moved out of that category.[23] Moreover, plaintiffs do not -- and cannot -- allege that it is improper to include "scrap" within the category of R&D expense.  See RJN Ex. 6 at ¶ 9.

8

9

10

11

12

13

14

15

16

17

Plaintiffs further fail to plead specific particularized facts regarding the purported misclassification of scrap as R&D expense.  See CAC ¶¶ 68-73.  The CAC does not allege where, when or how often the purportedly improper practice occurred.  It does not attempt to quantify the amount of scrap inventory that was allegedly accounted for as R&D expense, or attempt to compare that amount to the appropriate classification, or attempt to explain why some portion was misclassified.  Plaintiffs make no effort to specify the scrap material, other than to generally refer to "ceramic pieces" (CAC ¶ 69), and do not even state whether that scrap material was a by-product of Harmony or some other FormFactor product.  Nor does the CAC provide any alleged facts demonstrating that any defendant knew of the supposed violation or played any role in connection with it.

18

19

20

As this Court stated in *Juniper Networks*, "the allegations, although lengthy, simply fail to provide the foundation and specificity required by the Reform Act, and thus fail to plead either falsity or scienter with the required factual precision."  2004 WL 540910, at *3.

21

22

### G.    PLAINTIFFS PROVIDE NO PARTICULARIZED FACTS REGARDING HARMONY

23

24

In a phrase that is indiscriminately repeated eight times, the CAC asserts that "defendants knew there was no reasonable basis for representing that [FormFactor's] production processes

25

26

27

all control systems, no evaluation of controls can provide absolute assurance all control issues … within our company have been detected.  These inherent limitations include the realities that judgments and decision-making can be faulty and that breakdowns can occur because of simple error or mistake."  RJN Ex. 3 at p. 47

28

[23]  RJN Ex. 4 at p. 8, Ex. 5 at p. 8, Ex. 2 at p. 46.

1    were fully functioning, with output and yields improving steadily, and that the Company would

2    be able to have the ability and the capacity to volume produce Harmony probe cards as

3    promised." CAC ¶¶ 89(a), 97(a), 105(a), 115(a), 126(a), 136(a), 144(a) and 153(a).  These

4    allegations lack any semblance of the precision and detail necessary to avoid dismissal.

5    Plaintiffs fail to cite conversations, reports, memoranda, emails or meetings that might

6    support this conclusory refrain, and make no effort to allege specific facts as to any individual

7    defendant.  While that defect is fatal, it is unmistakably clear that, contrary to plaintiffs'

8    assertions, FormFactor:  (1) made no promises; (2) repeatedly warned of the risks associated with

9    new products in general, and Harmony in particular; and (3) consistently disclosed issues and

10   delays as they were encountered.

11   Far from making "promises," FormFactor repeatedly cautioned that commercialization of

12   Harmony, and other new products, entailed layers of challenges and risks.  During the October

13   24, 2007 Earnings Call, Dr. Khandros informed the audience that  "there are no [two] ways to say

14   it; we are finding ramping Harmony more difficult than anticipated" and "[w]e will be working

15   on Harmony manufacturing ramp in Q4 and Q1, most likely."  RJN Ex. 1 at pp. 10, 14.  Such

16   challenges and risks were discussed in public SEC filings as well.[24]

17   FormFactor made numerous real-time disclosures regarding development and

18   manufacturing issues with its Harmony products.  The block quotes reprinted in the CAC note,

19   for example, that on October 25, 2006 FormFactor disclosed that shipments of Harmony products

20   were "less than previously anticipated as product development requirements and customer trials

21   were completed later than anticipated."  CAC ¶ 108.  Just a few months later, on January 31,

22   2007, FormFactor emphasized that "it took us longer than anticipated to reach volume shipments

23   of our Harmony NAND Flash product."  CAC ¶ 118.  On July 25, 2007, the Company explained

24

25   [24]  See *e.g.*, RJN Ex. 7 at p. 13 ("If we are unable to successfully ramp production of our
     Harmony architecture-based probe card products, our business may be materially adversely
     affected" and "[w]e have experienced and may continue to experience difficulties in the
26   manufacturing ramp of the production of our Harmony architecture-based products.");
     RJN Ex. 8 at p. 22 ("We also need to successfully qualify and introduce into commercial
27   volume our DRAM and flash wafer probe card products incorporating our Harmony
     architecture.").
28

1   although it had "made progress in the development and qualification of our NAND Harmony

2   OneTouch product this quarter," the "high design intensity associated with new product platforms

3   and our Harmony learning on various test platforms has continued," and "qualification efforts

4   with additional customers have been slower than expected." *Id.*, ¶¶ 138, 139.  On October 24,

5   2007, the Company explained that FormFactor had found it more difficult than planned to ramp

6   Harmony to volume production, which is limiting our ability to meet increasing full wafer

7   contactor demand."  RJN Ex. 1 at p. 7.

8          Given these various warnings, cautions and disclosures (and many others), it is not

9   surprising that an analyst report issued within hours of the February 5, 2008 call on which

10  plaintiffs allege FormFactor came clean regarding problems with Harmony, stated that the

11  company "**once again** noted that it was experiencing manufacturing issues."  CAC ¶ 169

12  (emphasis added).  Other analysts made similar observations.[25]

13  **III.    PLAINTIFFS' CLAIMS MUST ALSO BE DISMISSED FOR FAILURE TO
14            ALLEGE A STRONG INFERENCE OF SCIENTER IN ACCORDANCE
          WITH *TELLABS* AND *GOMPPER***

15         Although the CAC must be dismissed because it fails to allege facts that are particularized

16  and reliable enough to support a strong inference of fraud, plaintiffs' allegations also fail the

17  strong inference test on grounds that are unrelated to particularity.  As the Supreme Court

18  recently held in *Tellabs*, and as this Court recently recognized, an inference of scienter "must be

19  more than merely 'reasonable,'" it "must be cogent and compelling."  127 S. Ct. 2499, 2510.

20  *Rudolph*, 2008 WL 1734763, at *5 (citations omitted).  Moreover, it is not sufficient that the

21  inference is cogent and compelling standing alone, it must be "strong in light of **other**

22  explanations."  *Id.*  (emphasis added).  Because the strong inference assessment is "inherently

23  comparative," a court must consider plausible **non**culpable explanations for the defendants'

24  conduct, as well as the inferences favoring the plaintiff."  *Rudolph*, 2008 WL 1734763, at *5

25

26  ───────────────
    [25]  See also RJN Ex. 9 at p. 1 (FormFactor "acknowledged some share loss with one major
27        customer as a result of **continued** issues with [ ] Harmony . . .); RJN Ex. 10 at p. 5 ("[I]t is
        becoming clear that FORM's **chronic** issues with [ ] Harmony have lead to meaningful market
28        share loss.").

1    (citations omitted).  *See*, *e.g.*, *Gompper,* 298 F.3d at 897 (courts must consider all inferences,

2    including inferences that favor defendants).

3        Plaintiffs' fraud allegations are unreasonable and implausible -- not "cogent and

4    compelling" -- when viewed in isolation.  Indeed, they affirmatively refute any inference of fraud.

5    When all inferences are weighed together as part of the comparative analysis discussed in *Tellabs*,

6    "the nonculpable explanations for defendants' conduct **far** outweigh any inference of scienter.

### A.    PLAINTIFFS' THEORY OF FRAUD IS IMPLAUSIBLE AND UNREASONABLE WHEN VIEWED IN ISOLATION

9        It is self-evident that irrational or illogical allegations cannot support an inference that is

10   "cogent," "compelling" or "strong."  As the Ninth Circuit noted in *Silicon Graphics*, the Reform

11   Act's requirements cannot be satisfied by facts giving rise to an inference that is merely

12   "reasonable."  183 F.3d at 985.  Even prior to the Reform Act's imposition of the strong inference

13   mandate, courts routinely dismissed Section 10(b) claims because they were based on allegations

14   that were unreasonable or irrational. [26]  The CAC collides head-on with this authority.  Plaintiffs'

15   theory of fraud is riddled with nonsensical, self-contradictory and economically irrational

16   allegations.

17       *First*, the CAC effectively alleges that defendants schemed to **under**state earnings and

18   gross margins, but **over**state the cost of revenue during 2007 -- a key period in which the

19   Company was working on the Harmony ramp and, according to plaintiffs, generating abundant

20   scrap that was misclassified as R&D expense.  Plaintiffs' allegations on this point epitomize the

21   irrational contortions underlying their attempt to plead a viable claim.

22       The CAC asserts that defendants engaged "in a fraudulent scheme to deceive the

23   market"[27] by "manipulating the Company's reported inventory, cost of revenue, gross margins

---

[26] *See, e.g., Shields v. Citytrust Bancorp, Inc.,* 25 F.3d 1124, 1130 (2d Cir. 1994); *Atlantic Gypsum Co. v. Lloyds Int'l Corp.*, 753 F. Supp. 505, 514 (S.D.N.Y. 1990) (a scienter theory that defies economic reason does not yield a reasonable inference of fraudulent intent); *Duncan v. Pencer*, 1996 WL 19043, at *10 (S.D.N.Y. Jan. 18 1996) (no inference of scienter because claims were "economically irrational"); *Glickman v. Alexander*, 1996 WL 88570, at *12 (S.D.N.Y. Feb. 29, 1996) (dismissal granted because it was difficult to conclude that the scheme as alleged served defendant's informed economic self-interests).

[27] See, *e.g.,* CAC ¶ 219.

1   and net income."[28]  In so doing, plaintiffs repeatedly accuse defendants of "managing earnings,"[29]

2   and push gross margins to center stage:  "For a manufacturing type of company, such as

3   FormFactor, gross margin is a key performance indicator of a company's operations.  It is a

4   leading metric of profitability ...."  CAC ¶ 193.  The keystone of this hypothesis is that

5   defendants "manipulated the Company's reported gross margin by improperly accounting for

6   excess and obsolete inventory as R&D costs," and thereby "caused the Company's cost of

7   revenues to be understated and its gross margin to be overstated."  *Id.;* ¶ 192.

8         It would be irrational, to put it mildly, for defendants to have engaged in a "fraudulent

9   scheme" to "deceive the market" by "managing earnings" so that they were **less** than they should

10  have been.  Nor would it have been very clever to have fraudulently manipulated inventory and

11  R&D costs to **reduce** gross margins, particularly when gross margins are a "key performance

12  indicator" and "leading metric of profitability."  Although plaintiffs either do not understand this

13  point, or are attempting to evade it, that is precisely what the CAC alleges.

14        While earnings were overstated and cost of revenues understated in 2006, the reverse was

15  true in 2007 -- when the CAC (¶ 59) claims the poor yields that supposedly drove FormFactor to

16  misclassify scrap as R&D expense "exponentially exploded."  See CAC ¶¶ 16, 126(h), 136(h) and

17  144(h).  Moreover, the numbers in 2007 were **more un**favorable to FormFactor than they were

18  favorable in 2006.  *Id.*[30]  The theory that defendants concocted a scheme to achieve such results is

19  preposterous, not cogent nor compelling.

20        Plaintiffs' attempt to portray FormFactor as a company crippled by manufacturing failures

21  and "chronic low yields" throughout the class period (see *e.g.*, CAC ¶¶ 59, 89(a), 97(a), 103(a),

22  115(a), 126(a), 136(a) and 144(a)) flies in the face of the Company's record revenue and earnings

23

---

24  [28]  See, *e.g.,* CAC ¶ 220.

25  [29]  See, *e.g.,* CAC ¶¶ 89(e), 97(e), 105(e), 115(e), 126(e), 136(e), 144(e) and 153(e).

26  [30]  According to the restatement that plaintiffs seek to exploit, the cost of revenue per quarter
    overstated by an average of $1,463 in 2006, in 2007, FormFactor overstated its cost of revenue
27  per quarter by $2,128.  CAC ¶¶ 126(h), 136(h) and 144(h).  Net income per quarter was
    overstated by an average of $893 in 2006, but understated by an average of $1,416 in 2007.
28  *Id.*

1    growth, and consistent achievement of earnings guidance, throughout the same period. The CAC

2    alleges that "[d]ue to the unpredictable and unreliable yield rates, FormFactor essentially could

3    not reasonably plan or project its output and delivery schedule." CAC ¶ 63. The CAC's block

4    quotes and sources upon which plaintiffs rely tell a radically different story. They confirm that,

5    contrary to plaintiffs' self-serving assertions, the Company delivered FormFactor record revenues

6    and earnings growth for 11 straight quarters.[31] See RJN Exs. 11-21. Plaintiffs' allegations on this

7    key point are, again, illogical and self-contradictory. [32]

8         As is discussed in Section D below, the CAC's assertion that defendants manipulated

9    FormFactor's earnings and gross margins so they could reap insider trading profits from the

10   resultant inflation in FormFactor's stock price is similarly irrational. The nature, timing and

11   extent of the sales refutes, rather than supports, any inference of fraudulent intent. Indeed, most

12   of the stock sales by CFO Ron Foster -- who would have been at the vortex of the purported

13   accounting fraud -- were made during the period in which the CAC has defendants "scheming" to

14   understate earnings and hence deflate the Company's stock price.

15        **B.    ANY INFERENCE OF FRAUD IS OVERWHELMED BY NONCULPABLE INFERENCES THAT PROVIDE INDEPENDENT GROUNDS FOR DISMISSAL**

16

17        Plaintiffs' attempt to plead facts giving rise to a cogent, compelling and strong inference

---

18   [31] See, *e.g.*, CAC ¶ 138 ("FormFactor delivered another record quarter with revenue bookings
     and operating performance all reaching historic highs); RJN Ex. 22 at pp. 5-7 ("Revenues for
19   the second quarter increased for the tenth consecutive time and reached record levels . . . Q2
     performance exceeded our expectations"), RJN Ex. 1 at p. 6 ("Revenues for the third quarter
20   increased for the eleventh consecutive time, reaching record levels at $125.3 million, up 10%
     over the second quarter of 2007 and 29% over the third quarter of 2006.").
21

22   [32] Plaintiffs' assertion that FormFactor was engaged in a fraudulent scheme to misclassify scrap
     materials as R&D expense is similarly untenable. The CAC hypothesizes that defendants
23   engaged in this purported deception because they were "desperate" to conceal Harmony
     product issues from customers. CAC ¶ 51. FormFactor's customers, however, are
24   sophisticated entities that thoroughly test and qualify the customized probe cards in their own
     manufacturing facilities before using them in production. RJN Ex. 22 at p. 4, RJN Ex. 35 at
25   pp. 3-4. They do not use the fine print of FormFactor's financial statements to make product
     evaluations. Plaintiffs' claim this supposed scheme intensified during the first half of 2007,
26   when Harmony issues emerged (see CAC ¶¶ 59, 53, 51), amplifies and compounds this defect.
     As noted above, this assertion is eviscerated by the fact that, during this same period of time,
27   gross margins were understated and the cost of revenue was overstated by an average of
     $2,138. CAC, ¶¶ 136(h) and 144(h).
28

---

1   of fraudulent intent is **further** undermined by facts and inferences that point away from fraud and

2   invoke additional case law.  Each of these "nonculpable" inferences is far more compelling than

3   an inference of fraud.  Beyond the weighing analysis, the fact that the setbacks plaintiffs strain to

4   characterize as fraud were attributable to errors, problems relating to the introduction of a new

5   technology, undue optimism, market forces, **at most**, corporate mismanagement, provide separate

6   and independent grounds for dismissal.

### 1.    IT IS OBVIOUS THAT THE RESTATEMENT IS THE RESULT OF ERROR AND NOT FRAUD

As discussed above, the notion that the individual defendants concocted a bizarre and self-

destructive scheme to manipulate FormFactor's financial statements is fundamentally irrational.

The inference is that the restatement was the result of an error by low-level, rank-and-file

employees to follow the Company's inventory valuation procedures -- as the Company concluded

after conducting an independent investigation[33] -- is far more "cogent and compelling" than any

inference of fraud.  As demonstrated at pages 12-14 above, the CAC fails to allege facts that

might cast doubt on that conclusion, which is obvious from the nature of the restatement itself.

### 2.    THE INFERENCE THAT FORMFACTOR UNDERESTIMATED HARMONY CHALLENGES, AND WAS TOO OPTIMISTIC IN ASSESSING ITS ABILITY TO ADDRESS THEM, IS COMPELLING

The law recognizes that the development of technologically sophisticated products will

run into snags.  *See, e.g., In re Apple Computer Sec. Litig.,* 886 F.2d 1109, 1115 (9th Cir. 1989);

*In re Convergent Techs. Sec. Litig.,* 948 F.2d 507, 516 (9th Cir. 1991).  Moreover, corporate

managers are entitled -- and expected -- to be optimistic (not gloomy or fearful) in addressing and

describing the issues and challenges they face.

Companies frequently make statements "in the optimistic belief" that development issues

do not present insurmountable barriers, "confident" that they "can overcome the problems."  *See*

*In re Connectics*, 2008 WL 269467, at *9.  The fact that hindsight may show that they

---

[33]   See RJN Ex. 2 at p. 1 ("The Company's review indicates that the failure to adhere consistently to the Company's accounting policies for inventory valuation was limited to a small number of employees.  The Audit Committee of the Board of Directors has determined that senior management was not aware of the noncompliance.")

MEMO OF P&A ISO MOTION TO DISMISS
PLAINTIFFS' CAC FOR VIOLATIONS OF FEDERAL
SECURITIES LAWS - (CASE NO. 3:07-CV-05545-SI)

1    "underestimated the severity of such problems" provides no basis for alleging securities fraud.

2    *Id.*  "[E]ven if a company knows that a problem exists, it could still honestly and in good faith

3    report that the company will continue to perform as expected."  *Id.*  (quoting *In re CBT Group*

4    *PLC Sec. Litig.*, 1999 WL 1249287, at *3 (N.D. Cal. July 21, 1999).  *See also Ronconi*, 253 F.3d

5    at 432 ("[h]onest optimism followed by disappointment is not the same as lying or misleading

6    with deliberate recklessness.").

7         "Problems and difficulties are the daily work of business people."  *Ronconi*, 253 F.3d at

8    434.  FormFactor had a long track record of overcoming the problems inherent in the

9    commercialization of complex technologies, and continuing "to perform as expected."  For eleven

10   straight quarters (the bulk of the alleged class period), the Company demonstrated its ability to

11   develop, improve, produce and ship sophisticated, high-technology products, and in each of these

12   quarters exceeded its prior quarter revenue and meet its guidance predictions.  See RJN Exs. 11-

13   21.  It is, therefore, not surprising that FormFactor had confidence in its ability to deal with the

14   challenges presented by Harmony.  The fact that hindsight suggests overconfidence is not

15   securities fraud.  The fact that FormFactor regularly disclosed that it was confronting challenges

16   and experiencing delays (see pages 14-16 above) further reinforces this "nonculpable" inference.

17              **3.    FORMFACTOR'S FAILURE TO MEET FINANCIAL PROJECTIONS**
                     **IN Q3 AND Q4 WAS DUE PRIMARILY**
18                   **TO DETERIORATING MARKET CONDITIONS**

19        In an effort to attribute FormFactor's entire Q3 and Q4 2007 shortfall to "conceal[ing]

20   problems with Harmony," plaintiffs virtually ignore the Company's explicit and repeated

21   discussion of deteriorating market conditions that occurred in late 2007.  In their prepared

22   remarks during the February 5, 2008 conference call, Dr. Khandros, Mr. Ruscev (the Company's

23   new President) and Mr. Foster, collectively mentioned the "deteriorating markets," "weakening

24   market conditions," "extraordinary conditions in our business," "market challenges" and

25   "challenging times," repeatedly.[34]

26        Nor was FormFactor alone in feeling the effects of "weakening market conditions" in its

27   _____

28   [34] RJN Ex. 22 at pp. 3, 5-7.

1  business niche.  Indeed, the FormFactor competitor cited prominently in the CAC (¶¶ 157-58),

2  Advantest, suffered the same basic setbacks in the same period.  It, too, announced that its

3  "business environment was extremely difficult,"[35]  and suffered the same late 2007/early 2008

4  stock price decline as FormFactor[36] -- because it was also a victim of deteriorating conditions, not

5  because it committed fraud.

6
7  ### 4.    THE MOST THAT PLAINTIFFS HAVE ALLEGED IS CORPORATE MISMANAGEMENT, WHICH IS NOT ACTIONABLE UNDER THE SECURITIES LAWS

8          Stripped of conclusions and rhetoric, the gravamen of plaintiffs' non-accounting

9  allegations is that FormFactor did a poor job in managing certain manufacturing issues with its

10 new Harmony technology, and provided overly optimistic financial forecasts in light of these

11 difficulties.  See, e.g., CAC ¶¶ 53, 56, 59, 60.[37]  At most, one might conclude in hindsight that

12 FormFactor could have done a better job in supervising employees who were responsible for

13 inventory valuation, and in managing problems encountered in ramping production of its

14 Harmony technology.  That inference is far more cogent and compelling than plaintiffs'

15 unsupported inference of fraud.

16

17 _____

18 [35]  Advantest announced on January 29, 2008 that "[w]ith respect to Advantest's operating
   environment in the third quarter… remained uncertain."  RJN Ex. 24 at p. 3  Advantest further
19 noted that "…in the semiconductor related markets, [there has been] a substantial decline in
   the price of DRAM semiconductors due to the deterioration of the supply and demand balance
20 in the semiconductor market…  accordingly, Advantest's business environment was extremely
   difficult."  Id.

21 [36]  On June 1, 2007, FormFactor's stock closed at $40.42 per share.  RJN Ex. 25.  On the same
22 day, Advantest's stock closed at $43.14 per share. RJN Ex. 26  However, over the course of
   the next eight months, the market conditions effected both companies in the same way (despite
23 Advantest's December 6, 2007 launch of its DRAM probe card) (CAC ¶ 157).  By February 5,
   2008, FormFactor's stock closed at $23.19 per share and Advantest's stock closed at $22.09
24 per share.  RJN Exs. 25 and 26.

25 [37]  Furthermore, plaintiffs allege that "primitive" "manual" internal controls "permitted the
   Defendants to hide the ramping issues with Harmony and manipulate the Company's Reported
26 Financials."  CAC at p. 29.  Notably, plaintiffs do **not** allege that any defendant **actually used**
27 any "outdated" control system to "hide" anything.  Outdated control systems are not inherently
   fraudulent, and, if anything, plaintiffs' allegations on this point are more consistent with error
28 or mismanagement -- not fraud.

1    As this Court has recognized in a similar context,[38] the most compelling inference to be

2    drawn from plaintiffs' assertions is that FormFactor was slow to recognize the full extent of the

3    problems it faced, and that the implementation of solutions proved more difficult than anticipated.

4    *See Connetics*, 2008 WL 269467, at *9.  The addition of conclusory accusations adds nothing to

5    the analysis.

6    Moreover, under settled law allegations of "faulty management practices," "weak internal

7    controls," "fiduciary misconduct" and "internal mismanagement" do not make out a claim of

8    securities fraud, even when they result in statements that turn out to be inaccurate.  *In re GlenFed*,

9    *Inc., Sec. Litig.,* 11 F.3d 843, 848-49 (9th Cir. 1993), *vacated on other grounds*, 42 F.3d 1541

10   (9th Cir. 1994).[39]

11   ## IV.  DEFENDANTS' STOCK TRADING PATTERNS AFFIRMATIVELY REFUTE
12   ANY INFERENCE OF SCIENTER

13   Stock sales provide circumstantial evidence of scienter only when they are "dramatically

14   out of line with prior trading practices at times calculated to maximize the personal benefit from

15   undisclosed inside information."  *In re Silicon Graphics,* 183 F.3d at 986.  In this case, stock sales

16   by officers and directors point decisively **away from** an inference of fraudulent intent. [40]

17

---

18   [38]   *In re Connetics*, 2008 WL 269467, at *9.

19   [39]   *See*, *e.g*., *Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 479 (1977) ("Congress by § 10(b) did
20   not seek to regulate transactions which constitute no more than internal corporate
     mismanagement") (internal citations omitted); *Colin v. Onyx Acceptance Corp*., 31 Fed. Appx.
21   359, 361 (9th Cir. 2002) ("Section 10(b)…does not embrace causes of action for breach of
     fiduciary duties or corporate mismanagement.").  It is a given that the development of
22   sophisticated products will run into snags.  *See*, *e.g*., *In re Apple Computer*, 886 F.2d at 1115;
     *In re Convergent*, 948 F.2d at 516.  As *Ronconi* observed, such "[p]roblems and difficulties are
23   the daily work of business people," and "[c]alling executives bad managers, or bad forecasters,
     does not plead fraud."  253 F.3d at 434, 437.

24   [40]   Moreover, plaintiffs' allegations are facially inadequate because they do not enable the Court
25   to view the stock sales in context, in order to determine whether they are so unusual or
     suspicious as to support a strong inference of fraudulent intent.  *See, e.g. In re Harmonic Inc.*
26   *Sec. Litig.,* 163 F. Supp. 2d 1079, n. 13 (N.D. Cal. 2001).  Plaintiffs' abdication of their burden
     to allege sufficient context to show unusual or suspicious insider trading is a threshold defect
27   that would justify the Court's exclusion of the CAC's trading allegations from the scienter
28   analysis.  *See, e.g*., *Ronconi*, 253 F.3d at 436-37.

1    FormFactor's officers and directors, as a group, maintained 88% of their holdings[41] during

2    the class period.  Compare RJN Exs. 27 and 28.  By retaining 3,520,865 shares, the insiders –

3    who allegedly disseminated false information to artificially inflate the stock price and knew that

4    the bottom would drop out of their stock holdings –  "lost" $99,957,357.[42]  Similarly, the

5    individual defendants collectively retained 3,110,971, or 88.5%, of the holdings they held at the

6    outset of the alleged class period, and consequently "lost" $88,320,466.  Compare RJN Ex. 28 to

7    RJN Exs. 27, 29 and 30.

8        The only rational inference to be drawn from such losses is that defendants, contrary to

9    plaintiffs' unsupported accusations, were not engaged in a fraudulent scheme to inflate

10   FormFactor's stock price or reap profits from such purported inflation.  Courts have recognized

11   that in situations where, as in this case, defendants have retained vastly more shares than were

12   sold, "the resulting aggregate loss will defeat an inference of fraud."  *In re Petsmart*, *Inc.*, *Sec.*

13   *Litig.*, 61 F. Supp. 2d 982, 1000 (D. Ariz. 1999).[43]   An examination of each defendant's

14   individual trading is equally "exculpatory."

15
16   **A.    RONALD FOSTER'S TRADING REFUTES AN
         INFERENCE OF SCIENTER**

17       As noted above, FormFactor CFO Ronald Foster, who would have been central to the

18   supposed fraud, made the majority of his stock sales during the period in which, according to the

19   CAC, he would have been manipulating the Company's financial statements to ***under*state** the

20
21   [41]   The Ninth Circuit has long maintained that correct measure of an insider's ownership is both
         the shares and vested options to purchase shares held by the insider.  *See In re Silicon*
22        *Graphics,* 183 F.3d at 986-87.  All figures included in this section are derived from
         FormFactor's Proxy Statements and Forms 4 filed with the SEC.

23   [42]   The insiders' potential loss was calculated by multiplying the difference ($28.39) between the
         share price at the class period high ($49.45) and the closing price the day after the end of the
24        alleged class period ($21.06) by the holdings each officer and director retained.

25   [43]   *Accord In re Silicon Graphics*, 183 F.3d at 986; *In re Apple Computer*, 886 F.2d at 1117
         (allegations that defendants collectively sold about 80% of their Apple stock holdings valued
26        at roughly $84 million taken in context of "overall pattern of conduct" was not probative of
         bad faith and scienter); *Wenger*, 2 F. Supp. 2d at 1251 (stock sales did not establish an
27        inference of scienter where officers sold up to 73% of their holdings, yet, as a group, retained
         majority of their shares).

28

key metrics driving its stock price.  Plaintiffs allege in the CAC (¶ 76) that 73% of Foster's

modest sales -- 9,000 shares out of total sales of 14,400 -- were made during a period in which he

would have been "scheming" to **lower** FormFactor's stock price by understating earnings and

gross margins.  Rather than inflating the stock price to facilitate illicit insider profits, the

fraudulent scheme asserted in the CAC has the CFO manipulating the Company's financials to

**de**flate the stock price and **de**crease profit on stock sales.  Plaintiffs' freewheeling accusations of

fraud are not merely self-contradictory and irrational, they affirmatively refute any inference of

scienter.

Moreover, contrary to plaintiffs' claims, Mr. Foster's sales of 19,800[44] shares did not

comprise 82.29% of his holdings.[45]  He merely sold 17.1% of just the *increase* in his holdings

during the class period:

| OPTIONS GRANTED | SHARES SOLD | INCREASE IN HOLDINGS | PERCENTAGE OF INCREASE SOLD | PERCENTAGE OF INCREASE RETAINED |
|---|---|---|---|---|
| 115,580 | 19,800 | 95,780 | 17.1% | 82.9% |

Indeed, Mr. Foster's trading activity left him with an **increase** of 95,780 shares by the end

of the class period, or 480% more shares than he sold (115,580 vs. 19,800).  It is inconceivable

that anyone could infer that he believed, much less knew, that FormFactor's share price was

inflated and would drop.

## B.    JOSEPH BRONSON'S LONE SALE REFUTES ANY INFERENCE OF SCIENTER

Rather than being timed to exploit the fraudulent scheme alleged in the CAC,

Mr. Bronson's only sale was made **one year and nine months** before the February 5, 2008 date

on which plaintiffs claim "defendants' fraud was revealed."  CAC ¶¶ 174, 175.  Furthermore,

---

[44]  See CAC ¶ 27 (noting that Mr. Foster sold 19,800 shares during the class period and received 115,580 option grants during the same period).

[45]  Plaintiffs' calculation of the 82.29% number lacks any supporting documentation and is clearly contradicted by their own allegations and the judicially noticeable public filings.  See CAC ¶ 27 and RJN Ex. 28.

1  Bronson's single sale of 25,000 shares on May 1, 2006, occurred after he was granted 94,220

2  additional shares (CAC ¶ 28), which means that, rather than suspiciously selling off his holdings

3  during the purportedly inflated class period, he effectively **increased** his ownership by 69,220

4  shares:

| OPTIONS GRANTED | SHARES SOLD | INCREASE IN HOLDINGS | PERCENTAGE OF HOLDINGS SOLD | PERCENTAGE OF HOLDINGS RETAINED |
|---|---|---|---|---|
| 94,220 | 25,000 | 69,220 | 17% | 83% |

Even prior to this increase, Mr. Bronson's sale only comprised 17% of the 145,779 shares

he held at the time[46] -- an amount consistently found to be non-suspicious.  *See*, *e.g.*, *In re Silicon*

*Graphics,* 183 F.3d at 987; *In re Vantive,* 283 F.3d at 1094 (sales of less than 17% found *de*

*minimis*); RJN Ex. 27.

### C.    IGOR KHANDROS'S TRADING PATTERN WAS ENTIRELY ROUTINE

Dr. Khandros' stock sales are also the **opposite** of suspicious and unusual.  Rather than

supporting plaintiffs' efforts to impute scienter, the context (shown in the chart below[47]) shows

that he sold fewer shares while the stock was allegedly inflated than in all previous similar time

periods:

| 2 Year Period | Purported Class Period: 2/1/06-2/4/08 | Prior Period: 2/1/04-1/31/06 | Previous Period: 8/1/03-1/31/04 |
|---|---|---|---|
| Sales | 723,079 Shares | 848,371 Shares | 900,000 Shares |

More importantly, all of Dr. Khandros' stock sales were made pursuant to pre-planned

trades memorialized in 10b5-1 trading plans.[48]  See RJN Ex. 29.  Such pre-set plans undermine

[46]  Plaintiffs' contention that Mr. Bronson's sales comprised 36.83% of his holdings is demonstrably incorrect, as FormFactor's 2006 Proxy indisputably lists his April 1, 2006 holdings as 145,779, not the 67,887 inexplicably used by plaintiffs.  Compare RJN Ex. 27 to CAC ¶ 175.

[47]  The chart is constructed from information contained in Dr. Khandros' Forms 4.  RJN Ex. 29.

[48]  The 723,079 sold shares attributed to Dr. Khandros include 703,079 shares sold by his spouse and a revocable trust, each of which organized the sales via a 10b5-1 trading plan long prior to

MEMO OF P&A ISO MOTION TO DISMISS PLAINTIFFS' CAC FOR VIOLATIONS OF FEDERAL SECURITIES LAWS - (CASE No. 3:07-CV-05545-SI)

1    any allegations that the trades were suspicious. *See*, *e.g., Wietschner*, 294 F. Supp. 2d. at 1117

2    (10b5-1 plans raise inference in favor of defendants); *Limantour v. Cray*, 432 F. Supp. 2d 1129,

3    1151, n.9 (W.D. Wash. 2006) (sales pursuant to 10b5-1 trading plans show that the sales were not

4    suspicious).[49]

### V.    PLAINTIFFS FAIL TO SATISFY THE STRINGENT PLEADING RULES APPLICABLE TO FORWARD-LOOKING STATEMENTS

7         Virtually all non-accounting statements at issue are forward looking, and concern

8    financial projections[50] and Harmony.[51]  All such statements are subject to procedural barriers

9    even more rigorous than those discussed above.  Most importantly, plaintiffs must plead

10   particularized facts establishing a strong inference of actual knowledge of falsity.  "Deliberate

11   recklessness" evincing an "intention 'to deceive manipulate, or defraud'"[52] is not sufficient.

12        The CAC's (1) failure to plead falsity with the requisite particularity, (2) failure to plead

13   detailed reliable and corroborated facts regarding scienter, and (3) failure to plead facts that give

14   rise to a strong inference of fraudulent intent under the weighing analysis mandated by *Tellabs*

15   and *Gompper*, each compel dismissal of all forward-looking statements without further analysis.

16   Application of the "actual knowledge" standard, and the Reform Act's separate provisions

17   ─────────────────

18   the start of the purported class period.  Dr. Khandros' one 20,000 direct sale was likewise predetermined via a 10b5-1 plan.  See RJN Exs. 31, 32 and RJN Ex. 29.

19   [49]  Moreover, Dr. Khandros' sales were made not at the peak of the market, but at an average price of $38.54 – $11.00 below the market peak.  The Ninth Circuit has long concluded that when insiders miss the boat [that] dramatically, their sales do not support an inference of scienter.  *See, e.g., Ronconi*, 253 F.3d at 435.  Furthermore, Dr. Khandros sold only 21% of his holdings -- an amount far lower than those found to be non-probative in the Ninth Circuit.  *See In re Silicon Graphics*, 183 F.3d at 987-88 (dismissing claims even where officer sold 75.3% of holdings); *In re Vantive*, 283 F.3d at 1093 (dismissing claim where Chairman sold 74% of his holdings); *Ronconi*, 253 F.3d at 435-36 (dismissing claims where multiple officers sold 69% or more of their total holdings and one office sold as much as 75.3% of holdings).  Dr. Khandros' entirely consistent, pre-planned sales left him with holdings of 2,709,612 shares and personal paper losses of more than $76 million.

25   [50]  See CAC ¶¶ 84-88, 90, 91, 93-96, 99-101, 103, 104, 107-12, 117, 122-24, 127, 128, 131-34, 137-39, 141-143.

26   [51]  See CAC ¶¶ 85, 91, 92, 98, 100, 104, 108, 116, 118, 121, 128-30, 138, 140.

27   [52]  *Silicon Graphics*, 183 F.3d at 983; *Tellabs*, 127 S. Ct. at 2504 (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 194 & n. 12 (1976)).

1   regarding meaningful cautionary language, provide additional grounds for dismissal.

2       A defendant cannot be liable for forward-looking statements that are "accompanied by

3   meaningful cautionary statements identifying important factors that could cause actual results to

4   differ materially from those in the forward-looking statement." 15 U.S.C. §§ 78u-4(b)(2), 78u-

5   5(c)(1)(A)(i) and 78u-5(c)(1)(B)(i). Even in the absence of such cautionary language, however,

6   plaintiffs must plead facts showing that, at the time the forward-looking statement was made, the

7   speaker had actual knowledge that it was false. 15 U.S.C. § 78u-4(b)(2); § 78u-5(c)(1)(B)(i).

8   The CAC stumbles on both prongs.

9       Beyond financial projections, which are by definition forward looking, the Reform Act's

10  Safe Harbor protects statements of the future plans and objectives of management, as well as the

11  assumptions underlying or relating to any such statements. 15 U.S.C. § 78u-5(I)(1). Statements

12  phrased in the present tense are deemed forward-looking for purposes of the Reform Act if their

13  verification depends in whole or in part on future events.[53]

14      FormFactor repeatedly warned of the risks that could cause it to miss financial projections

15  or delay product introductions. The Company specifically cautioned that earnings and financial

16  performance could be adversely affected by competition,[54] customer preferences,[55] changes in

17  market conditions,[56] and manufacturing glitches or delays.[57] These warnings and cautions were

18  communicated throughout FormFactor's SEC filings, and on "analyst calls."[58] They support

19  dismissal of claims based on forward-looking statements under the Reform Act's Safe Harbor

20  provisions, and pursuant to the bespeaks caution doctrine. *See*, *e.g.*, *Employers Teamsters Local*

---

[53] *See*, *e.g.*, *In re ESS Tech., Inc. Sec. Litig.*, 2004 WL 3030058, at *8 (N.D. Cal. Dec. 1, 2004) (quoting *Harris v. Ivax Corp.*, 182 F.3d 799, 805-06 (11th Cir. 1999), *reh'g denied en banc*, 209 F.3d 1275 (11th Cir. 2000)); *In re Splash Tech. Holdings, Inc. Sec. Litig.*, 160 F. Supp. 2d 1059, 1067-68 (N.D. Cal. 2001).

[54] See, *e.g.*, RJN Ex. 4 at pp. 24, 25; RJN Ex. 2 at pp. 11, 12; RJN Ex. 3 at pp. 11-13, 18.

[55] See, *e.g.*, RJN Ex. 4 at p. 25; RJN Ex. 2 at pp. 10-11, 19; RJN Ex. 3 at pp. 10, 15, 19.

[56] See, *e.g.*, RJN Ex. 4 at p. 25; RJN Ex. 2 at p. 12; RJN Ex. 3 at p. 11.

[57] See, *e.g.*, RJN Ex. 2 at pp. 4, 11-13, 19; RJN Ex. 3 at pp. 11-13, 15, 18.

[58] See, *e.g.*, RJN Ex. 33 at p. 4; RJN Ex. 34 at p. 3; RJN Ex. 35 at p. 4; RJN Ex. 22 at p. 14; RJN Ex. 1 at pp. 4, 7; RJN Ex. 36 at p. 5; RJN Ex. 23 at p. 3.

1 | *Nos. 175 & 505 Pension Trust Fund v. Clorox Co.*, 353 F.3d 1125, 1131 (9th Cir 2004).

2       Even in the absence of detailed warnings and cautionary language, the claims plaintiffs

3 base on forward-looking statements fail because the CAC cannot demonstrate that any defendant

4 had actual knowledge that any statement was false (assuming plaintiffs had pled sufficient facts

5 regarding falsity, which they have not).  Plaintiffs cannot rely on the conclusory assertions and

6 speculation that provide the "factual basis" for the CAC.  *See*, *e.g.*, *Juniper Networks,* 2004 WL

7 540910, at *3.  They must plead highly particularized facts establishing a strong inference that the

8 forward-looking guidance was actually known to be false when it was given.  *Id.*

9       Plaintiffs offer **no** facts that might show that any defendant believed the Harmony

10 challenges were insurmountable, or that the Company's efforts to overcome such challenges were

11 doomed to failure.  As this Court has noted, "even if a company knows that a problem exists, it

12 could still honestly and in good faith report that the company will continue to perform as

13 expected.  Management simply may have been confident that they could overcome the problems

14 or merely underestimated the severity of such problems."  *In re Connetics*, 2008 WL 269467,

15 at *9 (quoting *In re CBT Group*, 1999 WL 1249287, at *3).

16       Equally important, plaintiffs make no attempt to plead facts that might show that any

17 defendant believed that the operational difficulties FormFactor encountered with Harmony would

18 have specified adverse financial consequences.  *See*, *e.g.*, *Ronconi*, 253 F.3d at 423; *In re Nike,*

19 *Inc. Sec. Litig.*, 181 F. Supp. 2d 1160, 1168-69 (D. Or. 2002). As the *Nike* court emphasized in

20 dismissing a complaint that was pled with far more specificity than the CAC:  "Even if upper

21 management fully understood the extent of the manufacturing problem, plaintiffs are asking me to

22 take a large leap:  that Nike **also** fully understood the impact of the problem on its earnings per

23 share."  181 F. Supp. 2d at 1168-69 (emphasis added).  As is demonstrated at length above, the

24 CAC pleads no facts that might justify such a "large leap" in this case.  See pp. 6-16, *supra*.

25 ## VI.  <u>NO CONTROL PERSON LIABILITY</u>

26       Plaintiffs' failure to allege sufficient facts to support a claim for primary liability under

27 Section 10(b) requires dismissal of their control person claims under Section 20(a), and the CAC

28

1    fails to allege facts that would establish control person liability in any event.

2                                    **CONCLUSION**

3          The CAC suffers from a myriad of defects that are both fatal and irremediable.  It should

4    be dismissed with prejudice.

5    Dated: May 5, 2008                    ROBERT P. VARIAN
                                           JONATHAN B. GASKIN
6                                          AMY M. ROSS
                                           DANIELLE P. VAN WERT
7                                          ERIN H. REDING

8                                          ORRICK, HERRINGTON & SUTCLIFFE LLP

9

10                                    _____*/s/ Robert P. Varian*_____
                                           Robert P. Varian
11                                     Attorneys for Defendants
                                 FormFactor, Inc., Igor Y. Khandros, Ronald C. Foster,
12                                  Richard M. Freeman and Joseph Bronson

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28