1  COUGHLIN STOIA GELLER
     RUDMAN & ROBBINS LLP
2  JEFFREY W. LAWRENCE (166806)
   SHIRLEY H. HUANG (206854)
3  100 Pine Street, Suite 2600
   San Francisco, CA 94111
4  Telephone: 415/288-4545
   415/288-4534 (fax)
5  jeffreyl@csgrr.com
   shuang@csgrr.com
6
   Lead Counsel for Plaintiffs
7
   [Additional counsel appear on signature page.]
8
                    UNITED STATES DISTRICT COURT
9
                   NORTHERN DISTRICT OF CALIFORNIA
10
11  DANNY McCASLAND, Individually and On  )   NO. C-07-05545-SI
    Behalf of All Others Similarly Situated,  )
                                          )
12                           Plaintiff,   )   **(Consolidated)**
                                          )
13        vs.                             )   <u>CLASS ACTION</u>
                                          )
14  FORMFACTOR, INC., et al.,             )   PLAINTIFFS' OMNIBUS OPPOSITION TO
                                          )   DEFENDANTS' MOTION TO DISMISS
15                           Defendants.  )   AND DEFENDANT RICHARD M.
                                          )   FREEMAN'S MOTION TO DISMISS
16  _____)   PLAINTIFFS' FIRST AMENDED
                                              COMPLAINT
17
                                              DATE:     July 25, 2008
18                                            TIME:     9:00 a.m.
                                              JUDGE:    The Honorable Susan Illston
19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ............................................................................................1

II.   STATEMENT OF FACTS ..............................................................................3

    A.   Defendants Knowingly Misrepresented FormFactor's Progress with Its Development and Ability to Manufacture Harmony Products .................5

    B.   FormFactor Suffered Chronic Yield Problems that Drastically Impeded Its Manufacturing Process.................................................................................6

    C.   FormFactor's Yield Problems Accumulated Worthless Scrap but the Senior Executives Overvalued the Inventory and Directed Lower-Rank Personnel to Count Obsolete Inventory as Research and Development Expense, Thereby Misstating the Company's Financials ........................7

    D.   Defendants Reaped Personal Gains from the Fraudulent Scheme..........9

    E.   The Relevant Truth About the Financial Conditions Concealed by the Scheme Begins to Come out ................................................................9

III.  STANDARD OF REVIEW ..........................................................................11

IV.   ARGUMENT ................................................................................................12

    A.   Plaintiffs Have Alleged with Particularity Material Violations of the Securities Laws .................................................................................12

        1.   Defendants' Omissions and False Statements About Its Ability to Manufacture Harmony Products Are Non-Forward Looking, Actionable Statements ..............................................................12

        2.   FormFactor's Restatement, Admission of Defective Internal Controls, and Corroborated Witness Accounts Establish that the Financial Statements Were False When Issued ........................18

        3.   All Defendants Are Liable for Group-Published Statements ...................21

    B.   Plaintiffs' Allegations Collectively Establish a Strong Inference .........................22

        1.   Given the Importance of Harmony to the Company and Defendants' Executive Positions Defendants Knew About the Chronic Poor Yields in Manufacturing that Impeded the Company's Ability to Ramp up Harmony ...............................23

        2.   The Confidential Witnesses Provide Reliable Information that Defendants Knew of Material Facts that Rendered Their Public Statements Materially False and Misleading When Made .......................26

        3.   The Company's Restatement Supports a Strong Inference .....................27

1

2

3

        4.      Defendants' Sarbanes-Oxley Certifications Stating that They Had
                Reviewed FormFactor's Internal Controls Admit Scienter .......................29

4

        5.      Defendants' Insider Trading Provides Further Coherence to the
                Collective Inferences of Scienter ................................................................32

5

6

    C.      The FAC Sufficiently Pleads Control Person Liability .........................................35

7

V.      CONCLUSION..................................................................................................................35

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

**TABLE OF AUTHORITIES**

2

Page

3

**CASES**

4

*Aldridge v. A.T. Cross Corp.*,
    284 F.3d 74 (1st. Cir. 2002)..........................................................................19, 20

5

*Barrie v. Intervoice*,
    397 F.3d 249 (5th Cir. 2005) .................................................................................13

6

*Brody v. Transitional Hosps. Corp.*,
    280 F.3d 997 (9th Cir. 2002) .................................................................................12

7

8

*Cent. Laborers' Pension Fund v. Integrated Elec. Servs. Inc.*,
    497 F.3d 546 (5th Cir. 2007).................................................................................30

9

*Commc'ns Workers of Am. Plan for Employees' Pensions v. CSK Auto Corp.*,
    525 F. Supp. 2d 1116 (D. Ariz. 2007) .............................................................12, 25

10

11

*Craftmatic Sec. Litig. v. Kraftsow*,
    890 F.2d 628 (3d Cir. 1989).................................................................................21

12

*Eminence Capital, L.L.C. v. Aspeon, Inc.*,
    316 F.3d 1048 (9th Cir. 2003) ...............................................................................35

13

14

*Fecht v. Price Co.*,
    70 F.3d 1078 (9th Cir. 1995) .................................................................................32

15

*Garfield v. NDC Health Corp.*,
    466 F.3d 1255 (11th Cir. 2006) .............................................................................30

16

17

*Gompper v. VISX, Inc.*,
    298 F.3d 893 (9th Cir. 2002) .................................................................................12

18

*Hanon v. Dataproducts Corp.*,
    976 F.2d 497 (9th Cir. 1992) .................................................................................12

19

20

*Hayley v. Parker*,
    No. SA CV 01-69 DOC (EEx), 2001 U.S. Dist. LEXIS 23255
    (C.D. Cal. Aug. 31, 2001)......................................................................................32

21

22

*Helwig v. Vencor, Inc.*,
    251 F.3d 540 (6th Cir. 2001) .................................................................................12

23

*Higginbotham v. Baxter Int'l, Inc.*
    495 F.3d 753 (7th Cir. 2007) ...........................................................................15, 28

24

25

*Howard v. Everex Sys. Inc.*,
    228 F.3d 1057 (9th Cir. 2000) ...............................................................................29

26

*Huddleston v. Herman & MacLean*,
    640 F.2d 534 (5th Cir. 1981), .................................................................................25

27

28

*In re Adaptive Broadband Sec. Litig.*,
   No. C 01-1092 SC, 2002 U.S. Dist. LEXIS 5887
   (N.D. Cal. Apr. 2, 2002) ..................................................................................31, 35

*In re Am. Italian Pasta Co. Sec. Litig.*,
   No. 05-0725-CV-W-ODS, 2006 U.S. Dist. LEXIS 40548
   (W.D. Mo. June 19, 2006) ...............................................................................31

*In re Apple Computer Sec. Litig.*,
   886 F. 2d 1109 (9th Cir. 1989) ...................................................................18, 25

*In re Bausch & Lomb, Inc. Sec. Litig.*,
   941 F. Supp. 1352 (W.D.N.Y. 1996) ..............................................................21

*In re BP Prudhoe Bay Royalty Trust Sec. Litig.*,
   No. C06-1505 MJP, 2007 U.S. Dist. LEXIS 83007
   (W.D. Wash. Oct. 26, 2007) .............................................................................21

*In re Cabletron Sys. Inc.*,
   311 F.3d 11 (1st Cir. 2002)..........................................................................16, 26

*In re Computer Assocs. Sec. Litig.*,
   75 F. Supp. 2d 68 (E.D.N.Y. 1999) ..................................................................20

*In re Connetics Corp. Sec. Litig.*,
   542 F. Supp. 2d 996, No. C 07-02940 SI, 2008 U.S. Dist. LEXIS 9634
   (N.D. Cal. Jan. 29, 2008) ............................................................................22, 30

*In re Convergent Techs. Sec. Litig.*,
   948 F.2d 507 (9th Cir. 1991) ...........................................................................25

*In re CV Therapeutics, Inc. Sec. Litig.*,
   No. C 03-03709 SI, 2004 U.S. Dist. LEXIS 17419
   (N.D. Cal. August 5, 2004) ..................................................................... *passim*

*In re Cylink Sec. Litig.*,
   178 F. Supp. 2d 1077 (N.D. Cal. 2001) ............................................................27

*In re Daou Sys.*,
   411 F.3d 1006 (9th Cir. 2005), *cert. denied*, 546 U.S. 1172 (2006)........................ *passim*

*In re GledFed., Inc. Sec. Litig.*,
   60 F.3d 591 (9th Cir. 1995) ..............................................................................21

*In re Hi/fn, Inc. Sec. Litig.*,
   No. C 99-4531 SI, 2000 U.S. Dist. LEXIS 11631
   (N.D. Cal. Aug. 9, 2000).......................................................................... *passim*

*In re InterMune, Inc. Sec. Litig.*,
   No. C 03-2954 SI, 2004 U.S. Dist. LEXIS 15382
   (N.D. Cal. July 30, 2004)............................................................................14, 18

*In re Irvine Sensor Corp. Sec. Litig.*,
    No. SA cv 02-159 GLT(MLGx), 2003 U.S. Dist. LEXIS 18397
    (C.D. Cal. Sept. 22, 2003) ........................................................................................22

*In re K-Tel Int'l, Inc. Sec. Litig.*,
    300 F.3d 881 (8th Cir. 2002) .....................................................................................12

*In re Lattice Semiconductor Corp. Sec. Litig.*,
    No. CV04-1255-AA, 2006 U.S. Dist. LEXIS 262
    (D. Or. Jan. 3, 2006) ..................................................................................................31

*In re McKesson HBOC, Inc. Sec. Litig.*,
    126 F. Supp. 2d 1248 (N.D. Cal. 2000) .....................................................................28

*In re Metawave Commc'ns Corp. Sec. Litig.*,
    298 F. Supp. 2d 1056 (W.D. Wash. 2003)..................................................................35

*In re MicroStrategy, Inc. Sec. Litig.*,
    115 F. Supp. 2d 620 (E.D. Va. 2000) .........................................................................34

*In re Omnivision Techs., Inc.*,
    No. C-04-2297 SC, 2005 U.S. Dist. LEXIS 16009
    (N.D. Cal. July 29, 2005) ...........................................................................................32

*In re ProQuest Sec. Litig.*,
    527 F. Supp. 2d 728 (E.D. Mich. 2007)......................................................................30

*In re Read-Rite Corp. Sec. Litig.*,
    335 F.3d 843 (9th Cir. 2003) .....................................................................................24

*In re Rent-Way Sec. Litig.*,
    209 F. Supp. 2d 493 (W.D. Pa. 2002)..........................................................................29

*In re Retek Inc.*,
    No. Civ. 024209, 2005 WL 1430296
    (D. Minn. Mar. 7, 2005)..............................................................................................33

*In re Secure Computing Corp. Sec. Litig.*,
    120 F. Supp. 2d 810 (N.D. Cal. 2000) ........................................................................21

*In re Secure Computing Corp. Sec. Litig.*,
    184 F. Supp 2d 980 (N.D. Cal. 2001) .........................................................................19

*In re SeeBeyond Techs. Corp. Sec. Litig.*,
    266 F. Supp 2d 1150 (C.D. Cal. 2003) ........................................................................32

*In re Silicon Graphics Sec. Litig.*,
    183 F.3d 970 (9th Cir. 1999) ...........................................................................26, 27, 33

*In re Silicon Graphics Sec. Litig.*,
    970 F. Supp. 746 (N.D. Cal. 1997) ......................................................................13, 33

*In re Sipex Corp. Sec. Litig.*,
  No. C 05-00392 WHA, 2005 U.S. Dist. LEXIS 30854
  (N.D. Cal. Nov. 17, 2005) ..........................................................................32

*In re SmarTalk Teleservices, Inc. Sec. Litig.*,
  124 F. Supp. 2d 527 (S.D. Ohio 2000) .........................................................13

*In re Worlds of Wonder Sec. Litig.*,
  35 F.3d 1407 (9th Cir. 1994) .......................................................................34

*LDK Solar Sec. Litig.*,
  No. C-07-05182 WHA, 2008 U.S. Dist. LEXIS 42425
  (N.D. Cal. May 29, 2008) ....................................................................... *passim*

*Lee v. City of Los Angeles*,
  250 F.3d 668 (9th Cir. 2001) .......................................................................29

*Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*,
  416 F.3d 940 (9th Cir. 2005) .......................................................................17

*Makor Issues & Rights, Ltd. v. Tellabs, Inc.*,
  513 F.3d 702 (7th Cir. 2008) ...................................................16, 23, 24, 26

*Makor Issues & Rights, Ltd. v. Tellabs, Inc.*,
  437 F.3d 588 (7th Cir. 2006) .......................................................................35

*Miller v. Material Scis. Corp.*,
  9 F. Supp. 2d 925 (N.D. Ill. 1998) ...............................................................29

*Nathenson v. Zonagen, Inc.*,
  267 F.3d 400 (5th Cir. 2001) .......................................................................24

*No. 84 Employer-Teamster Joint Council Pension Trust Fund
  v. Am. W. Holding Corp.*,
  320 F.3d 920 (9th Cir. 2003) ................................................................. *passim*

*Nursing Home Pension Fund, Local 144 v. Oracle Corp.*,
  380 F.3d 1226 (9th Cir. 2004) ...............................................12, 16, 24, 28

*Powers v. Eichen*,
  977 F. Supp. 1031 (S.D. Cal. 1997)..............................................................22

*Provenz v. Miller*,
  102 F.3d 1478 (9th Cir. 1996) .....................................................................28

*Schwartz v. Celestial Seasonings, Inc.*,
  124 F.3d 1246 (10th Cir. 1997) ...................................................................21

*Southland Sec. Corp. v. INSpire Ins. Solutions Inc.*,
  365 F.3d 353 (5th Cir. 2004) .......................................................................35

*Stransky v. Cummins Engine Co.*,
  51 F.3d 1329 (7th Cir. 1995) .......................................................................12

1

2

3    *Tellabs, Inc. v. Makor Issues & Rights, Ltd.,*
4          __ U.S. __, 127 S. Ct. 2499 (2007)........................................................... *passim*

*Winer Family Trust v. Queen,*
5          503 F.3d 319 (3rd Cir. 2007) ...........................................................30

6    *Wool v. Tandem Computers, Inc.,*
          818 F.2d 1433 (9th Cir. 1987) ...........................................................21
7
     *Zuckerman v. Smart Choice Auto. Group, Inc.,*
8          No. 6:99-cv-237-Orl-99A, 2000 U.S. Dist. LEXIS 14676
           (M.D. Fla. May 19, 2000) ...........................................................27
9
## STATUTES, RULES AND REGULATIONS
10
11   15 U.S.C.
           §78j(b)........................................................................3, 16, 19, 35
12         §78t(a).............................................................................35
           §78u-5(c) (l) and (i)(1)..................................................................14
13
     17 C.F.R.
14         §210.4-01(a)(1) ...........................................................19
           §240.10b-5 .............................................................12, 35
15
     Civil Local Rule
16         Rule 7-4(a)(4).........................................................................3
17
     Private Securities Litigation Reform Act of 1995 ........................................11, 21, 26
18
## SECONDARY AUTHORITIES
19
20   Financial Accounting Standards Board
           Accounting Research Bulletin No. 43 ...........................................20
21         Statements of Financial Accounting Concepts No. 2 ..........................29
           Statement of Financial Accounting Standards No. 151 ......................20
22
23

24

25

26

27

28

1

2

3
### STATEMENT OF THE ISSUES TO BE DECIDED

4
Pursuant to Civil L.R. 7-4, plaintiffs submit the following issues to be decided by the Court:

5
1.      Whether plaintiffs have sufficiently alleged actionable false statements concerning

6
FormFactor's key products to state a claim for violation of Section 10(b) of the 1934 Act;

7
2.      Whether plaintiffs have sufficiently alleged the material falsity of FormFactor's

8
reported financial results during the Class Period;

9

10
3.      Whether the facts alleged, taken collectively, raise a strong inference of scienter; and

11
4.      Whether plaintiffs have sufficiently alleged violation of Section 20(a).

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1    **I.    INTRODUCTION**

2         Studiously ignoring plaintiffs' detailed factual allegations, defendants cavalierly assert that

3    there is not claim stated.  Naturally: if one avoids looking at the facts you will not see them.[1]  The

4    FAC alleges a simple theory of fraud.  Defendants recognized that to be competitive in the DRAM

5    industry, FormFactor, Inc. ("FormFactor," or the "Company") needed to "not only be able to deliver

6    and execute the single touchdown technology, but be the front runner to develop and define the

7    industry's transition to one touchdown probe cards, as it had been during the transition from nine to

8    four touchdowns."  ¶1.  In 2005, FormFactor announced development of its new, proprietary

9    "Harmony" one touchdown[2] architecture for wafer probe cards – a new technology that could very

10    well reshape the integrated circuit test industry.  ¶4.  Since this was a revolutionary technology

11    change and FormFactor's future prospects depended on it, defendants tracked it, reported on its

12    progress to the market in virtually every conference call, and attempted to get Harmony into

13    production as soon as possible.  By February 1, 2006, defendants represented to the market, "We

14    have completed our first Harmony architecture probe card field trial . . . .  Product performance

15    exceeded expectations.  We expect to see significant revenues for our probe card based on Harmony

16    platform in the second half of '06 . . . .  Harmony will be the cornerstone of flash and then DRAM

17    for the next several years."  ¶6.  Harmony was then introduced to the market in June.

18         Unbeknownst to the public, while the first Harmony product was introduced to the market in

19    June 2006, FormFactor in fact could not ramp up Harmony volume production on a timely basis

20    because of the chronic poor yields that pre-existed but exploded during the Class Period.  ¶¶55-57.

21    Five of the nine confidential witnesses confirm that the chronic, protracted problems with

22    Harmony's manufacturing had existed since 2006.  ¶¶55-57.  In order to conceal FormFactor's

23    _____

24    [1]    In their motions, defendants erroneously identified plaintiffs' operative complaint as the
      Consolidated Amended Complaint ("CAC").  The operative complaint is titled Plaintiffs' First

25    Amended Complaint for Violations of Federal Securities Laws ("FAC").  All paragraph ("¶")
      references herein refer to the FAC.  The Class Period is February 1, 2006 to February 5, 2008.

26    [2]    A "touchdown" is the contact between the wafer probe card and the wafer, and a reduction in

27    the number of touchdowns means a shorter lead time and testing process, thereby saving costs in the
      manufacturing process for the semiconductor customers.  ¶3.

28

1  underlying manufacturing problems, defendants engaged in a fraud scheme to mislead investors by

2  hiding the Company's manufacturing issues and chronic poor yields and by overstating its inventory.

3       On February 5, 2008, almost three years after FormFactor introduced its Harmony

4  architecture for probe cards, defendants belatedly admitted to the market, "Due to the **protracted**

5  Harmony ramp issues we experienced in 2007, FormFactor was not the first full wafer contact probe

6  card company qualified at some DRAM suppliers.  This resulted in the loss of business . . . ."  ¶161.

7  Defendants further admitted the impact of the Company's inability to execute and deliver its new

8  products.  "Our new product ramp challenges with Harmony resulted in missed opportunities with a

9  few customers causing a major overall revenue shortfall in the quarter."  *Id*.  However, the

10 Company's Harmony ramp issues existed long before 2007, and defendants knew it.  Prior to the

11 Class Period, defendants knew that the Company had pre-existing material weakness in its internal

12 controls over financial reporting that had caused two restatements.  ¶¶43-44.  Rather than rectifying

13 the material weakness in the Company's controls, defendants took advantage of it to hide the

14 Company's ramp issues with Harmony, while making rosey representations throughout the Class

15 Period about Harmony and the Company's future growth based on Harmony, including "product

16 performance exceeded expectations," "all production processes are now fully functioning," and "the

17 factory is performing very well."  ¶¶85, 86, 107, 109, 130.

18      In addition to the Company's admissions, plaintiffs' nine confidential witnesses ("CW") who

19 are former FormFactor employees in the finance, operations, engineering and information

20 technology departments, tell a cohesive story that FormFactor suffered from chronic poor yields in

21 its manufacturing processes that exploded during the Class Period as the Company tried to ramp up

22 Harmony, and that defendants had knowledge of the problems.  According to these witnesses,

23 defendants Chief Executive Officer ("CEO") Igor Y. Khandros ("Khandros") and President Joseph

24 Bronson ("Bronson") visited the production floor to assess manufacturing issues.  Defendant Chief

25 Financial Officer ("CFO") Ronald C. Foster ("Foster") regularly prepared inventory valuation

26 reports – reports that were deliberately adjusted to overstate the Company's inventory by as high as

27 30% during the Class Period.  Defendant Senior Vice President of Operations Richard M. Freemen

28 ("Freeman") had the ultimate responsibility to deal with the massive scrap from failed yields on the

1  operations side.  *See generally* ¶¶53-75, 188.  In fact, given the magnitude of the accumulated scrap,

2  the Company had a special task force of personnel from finance, operations and IT departments to

3  work on a "scrap project," which involved "moving a few million dollars [of scrap] here and there"

4  on an on-going basis, according to CW9, who was part of this task force.  ¶71.

5          While defendants seek to avoid responsibility for their actions, their assertion that they were

6  not aware of Harmony's progress from its announcement in 2005 to its effective demise in 2008 is

7  simply not credible.  In addition to these interlocking accounts, defendants' scienter can also be

8  strongly inferred from defendants Khandros' and Foster's Sarbanes-Oxley ("SOX") certifications

9  "based on [their] knowledge," the Company's 2007 restatement and admissions of violations of

10  Generally Accepted Accounting Principles ("GAAP"), the Company's own accounting policies,

11  material weakness in internal controls, and the Company's suffering a major revenue shortfall "due

12  to the protracted Harmony ramp issues we experienced in 2007."  ¶¶14-16, 18, 20, 153-156, 160-

13  162, 172, 183-191, 200-201, 204-214.  Finally, defendants benefited from the scheme, pocketing

14  more than $29.76 million in insider trading proceeds and 526,340 shares in stock options.  ¶¶173-77.

15          Taken collectively, the FAC allegations support a compelling and cogent inference of

16  scienter to state a §10(b) claim.[3]  Defendants' motions should be denied.

17  **II.    STATEMENT OF FACTS[4]**

18          Defendant FormFactor designs, manufactures and sells advanced wafer probe cards which

19  are used by semiconductor manufacturers to electrically test integrated circuits.  The Company is

20  headquartered in Livermore, California, with operations in Europe, Asia and North America.  Since

21  June 2003, its stock has traded on the NASDAQ market under the symbol FORM.  ¶25.

22          In April 2005, FormFactor introduced its new, proprietary "Harmony" architecture for wafer

23  probe cards.  ¶¶4, 45.  In previous versions, a probe card had to touch the computer chip several

24  _____

25  [3]    Defendants do not dispute plaintiffs' pleading on reliance and loss causation.

26  [4]    Defendants accuse plaintiffs of submitting a factually insufficient complaint, yet defendants
   fail to provide any statement of the relevant facts, as required by Civil L. R. 7-4(a)(4), not even a

27  "succinct" summary.  Their excessive hyperbole should therefore be discounted as conclusory
   boiler-plate.

28

1   times to complete all the tests necessary to ensure a chip was functional.  By reducing the number of

2   times the card touched the chip – the "touchdown" – it substantially removed the concern that the

3   card would damage the chip during each testing contact.  *Id.*

4        In short, Harmony was supposed to differentiate FormFactor from its competition, and

5   FormFactor's growth depended largely on its delivery of Harmony products.  ¶4.  Based on

6   FormFactor's representations about its single touchdown technology and the great future revenue

7   potential from this technology across all semiconductor industries, the Company stock price jumped

8   from $20.83 to $37.60, almost 81%, between April 19, 2005 and February 2, 2006.  ¶49.  Thus, the

9   market reacted well to Harmony – believing that it could very well revolutionize and reshape the

10  integrated circuit test industry.  ¶¶4, 46-49.

11       On the first day of the Class Period, during a February 1, 2006 conference call with securities

12  analysts, defendants Bronson, Khandros and Foster falsely represented:

13          ***We have completed our first Harmony architecture probe card field trial,
        which began with an early adopter in the second half of '05.  Product performance
14      exceeded expectations.  We expect to see significant revenues for our probe card
        based on Harmony platform in the second half of '06, with everything centering
15      around 300 millimeter.  Harmony will be the cornerstone of flash and then DRAM
        for the next several years.***[5]  [¶¶6, 85.]

16

17       On the same conference call, defendants falsely represented that ***"[a]ll production processes

18  are now fully functioning in our new facility, with output and yields improving steadily"*** and that

19  "we are planning to have that [Harmony] in place for volume production in the second half of '06."

20  ¶7.  Upon this false positive news, FormFactor stock jumped over 21% in one day, from $30.46 per

21  share to $36.95 per share.  *Id.*  In June 2006, the Company introduced the Harmony OneTouch probe

22  card for 300-mm Flash memory product.  ¶8.  FormFactor's share price sky-rocketed, trading as high

23  as $49.45 per share on August 31, 2006.  *Id.*

24       During the Class Period, defendants continued to issue materially false and misleading

25  statements regarding the Company's business, operating and financial results.  ¶¶84-88, 90-96, 98-

26  ───────────────

27  [5]     Here, as elsewhere, all emphasis is added and citations and quotations omitted unless
    otherwise noted.

28

104, 107-112, 117-18, 121-24, 127-34, 137-143, 147-151.  As a result, FormFactor stock traded at artificially inflated prices throughout.  ¶¶219-229.

### A.   Defendants Knowingly Misrepresented FormFactor's Progress with Its Development and Ability to Manufacture Harmony Products

The true facts, which were known by defendants but concealed from the investing public, were that throughout the Class Period, the Company was scrambling with severe production constraints that impeded the actual production of the Harmony products.  ¶¶9, 53-75.  Several former FormFactor employees corroborate that even as FormFactor was receiving orders for the Harmony products after they were introduced to the market with assurances of accelerated production, its production was materially flawed and could not effectively manufacture Harmony.  ¶¶53-58.

While the underlying poor yields had been pre-existing, the issues exploded exponentially as the Company tried to push out the Harmony products that were much more complex than the Company's previous products.  ¶10.  According to CW9, "Harmony was different because so much was riding on Harmony," while at the same time Harmony itself required significantly different and difficult engineering and manufacturing processes compared to FormFactor's other products.  ¶55. Harmony needed a wide-range of new and additional manufacturing and test equipment that the physical constraints of the Company's Livermore facility could not handle, including complex technical specifications with dimensions and tolerances measured in microns.  The production facility for Harmony had to be "extremely flat" and vibration-free so that "all the pins stay in the alignment and there was no twisting."  *Id.*  CW2, a former Production Supervisor, recalled that the Harmony product was still in its "initial Beta" stage as of the end of 2006, even though the Company had introduced the first Harmony product to the market in mid-2006.  *Id.*  CW2 states that development problems with Harmony, such as the board "flexing in the middle" and other matters, were still being resolved in December 2006.  *Id.*

CW4, a former Customer Project Manager who had access to the Company's scheduling and planning system and regular contacts with customers, stated that because the Company "couldn't control the yield," approximately 80% of the Harmony orders were missed prior to February 2008. ¶¶56, 58.  To CW4, who handled FormFactor's Japanese customers, its main client in Japan, Elpida

Memory Inc. ("Elpida"), was "very angry" at FormFactor's inability to deliver Harmony according to the shipment dates.  ¶58.  By the end of December 2007, there was a clear slowdown at FormFactor, which CW4 believed was a combination of the market and "our situation with Harmony."  *Id.*  In December 2007, Elpida considered alternative wafer probe cards from a competitor, Advantest Corp., ("Advantest") because FormFactor could not promptly deliver Harmony.  *Id.*

**B.      FormFactor Suffered Chronic Yield Problems that Drastically Impeded Its Manufacturing Process**

Under pressure to deliver Harmony products, the Company was experiencing systematic poor yields in manufacturing that caused further delay in shipments to customers.  ¶10.  Prior to and during the Class Period, FormFactor struggled to produce products because the "key processes" always yielded low.  ¶60.  Due to the unpredictable and unreliable yield rates, FormFactor essentially could not reasonably plan or project its output and delivery schedule, or truly determine the Company's real margins.  ¶63.  As such, problems arose when production schedules assumed unrealistically optimistic yields that did not materialize – which was inevitably the case.  ¶60.

While the Company attributed the manufacturing constraints to capacity, customer integration or personnel issues, the real underlying issue, according to several former employees, was the chronic poor yields in manufacturing, which was widely known by management, but never disclosed by the senior executives when making projections or forecasts.  ¶¶10, 56, 60.  CW3, a Senior Process Engineer, revealed that senior management knew about the low yields but "never allowed us to fix problems causing the low yields" because to do so would mean to shut down production altogether, which FormFactor "could not afford."  ¶60.  CW9, a former Senior IT director, indicates that once FormFactor received an order for one product, the Company "often started building two or three – and maybe a fourth and fifth – knowing that at least one will fail."  ¶63.  CW7, a Senior Engineering Technician, indicates that FormFactor constantly missed customer delivery dates because the pins on the probe-heads "constantly fell out."  ¶61.  CW8, a Technical Operator who worked on the FAB floor, indicates that the Company had a factor ratio of 25-50% in the nickel bath process of the manufacturing process alone.  ¶62.

1  Because of the pervasiveness and chronic occurrence of scrap accumulation, senior

2  management personally monitored the manufacturing process.  ¶64.  CW2, a former Production

3  Supervisor, and CW1, a former FAB Coordinator, both indicate that defendant Khandros visited the

4  production floor to assess FAB issues such as "components not staying together."  ¶64.  Defendant

5  Bronson visited the production floor as well to handle FAB issues.  *Id.*  Defendants Khandros,

6  Foster, Freeman and Bronson were apprised of the manufacturing issues through reports and

7  meetings prepared by the finance and operations departments.  ¶¶64-65.  According to CW1,

8  defendant Foster's office prepared an inventory report that contained thousands of line items,

9  reflecting the breakdown of the actual cost for each customized product.  ¶66.  The CFO's inventory

10  report was then utilized by CW1 in conjunction with the CFO's office to prepare a FAB status

11  report, which, in turn, was used by the Production Manager at the Friday weekly executives meeting,

12  attended by Khandros and other senior management.  ¶¶65-66.

13    C.    **FormFactor's Yield Problems Accumulated Worthless Scrap but the
          Senior Executives Overvalued the Inventory and Directed Lower-**
14          **Rank Personnel to Count Obsolete Inventory as Research and
          Development Expense, Thereby Misstating the Company's Financials**

15  The chronic poor yields also led to the build-up of scrap, *i.e.*, obsolete parts for wafer probe

16  cards.  ¶¶11, 68-75.  Because of pervasive and chronic scrap accumulation, FormFactor management

17  directed lower-ranked personnel to cover it up, using the Company's primitive, manual system to (1)

18  falsely overvalue FormFactor's scrap, and (2) shift some of scrap to Research and Development

19  ("R&D").  ¶¶9, 53, 63-75, 76-79, 210-220.

20  To create the appearance that the Company was successfully ramping its Harmony products,

21  defendants manipulated the Company's reported financials by improperly accounting for its

22  inventory valuation and the related cost of revenue accounts, misstating the Company's reported

23  inventory, gross margin, operating margin and net income for 2006 and the first half of 2007.  ¶¶12,

24  179-199.  CW6, a former Senior Financial Analyst who worked under the Company's controller,

25  confirms the chronic poor yields and the deliberate accounting manipulation to hide the accumulated

26  scrap.  Specifically, the inventory valuation numbers were adjusted by changing the inventory

27  reserves, and management "did something" with FormFactor's reported quarterly numbers because

28

1    the numbers differed from what CW6 knew to be the Company's actual results.  ¶¶72, 74, 75.[6]

2    CW5, the Senior Cost Accountant, states that the Company's auditors caught onto the Company's

3    manipulation of inventory valuations by September 2007, and started looking into the Company's

4    inventory reserve and other accounting matters that led to a restatement.

5         The lack of internal controls over inventory systems also permitted defendants to manipulate

6    the Company's reported gross margin by improperly accounting for scrap as R&D costs instead of as

7    cost of revenues.  ¶¶11, 192-199.  To be classified as R&D costs, the amounts must be associated

8    with activities that a company engages in aimed at the discovery of new knowledge, and must either

9    lead to the development of new products or procedures or to the improvement of existing products or

10   procedures, to be charged to expense when incurred. ¶¶11, 194, Defs. RJN, Ex. 6.[7]  CW3, CW6 and

11   CW9 provide corroboration that the Company allocated some of the scrap as R&D costs to avoid

12   recognizing the costs as current period cost of revenues.  ¶¶69-72.  CW3, a former Senior Process

13   Engineer who worked at FormFactor for 10 years prior to his departure in early 2007, states "it was

14   very common" and that the reason for the scrap transfer was to preserve margins so that

15   engineering/manufacturing "wouldn't look as bad."  ¶69.  CW6, a Senior Financial Analyst from

16   early 2005 until April 2007, states that defendant Foster would have known about the misallocation

17   of scrap to R&D because the amount was "substantial."  ¶70.  CW9, a former Senior IT Director

18   from mid-2006 through December 2007, states that defendant Freeman had the ultimate

19   responsibility for the scrap in the operations side.  *Id.*  The Company even had a task force consisting

20   of personnel from finance, operations and IT departments, including CW9, to work on a "scrap

21   project," which involved "moving a few million dollars [of scrap] here and there."  ¶71.  The scrap

22   project was on-going throughout CW9's tenure and is believed to be on-going to the present day.  *Id.*

23

24   _____

25   [6]    The FAC erroneously identified CW6 as a Senior Cost Accountant in ¶72.  The correct title

26   is Senior Financial Analyst, as identified in ¶37.

27   [7]    "Defs. RJN" refers to defendants' request for judicial notice in support of their motions to
     dismiss, filed May 5, 2008.

28

1   CW9 also states that FormFactor had been allocating certain amounts of the scrap to the COGS to

2   the orders that had nothing to do with where the scrap generated from.  *Id.*

3          By booking scrap as R&D, the Company understated its cost of revenues and overstated its

4   gross margin.  ¶¶11, 73.  By overstating R&D spending, defendants created the appearance that

5   FormFactor was engaging in extensive R&D in order to maintain its technical competitive edge.

6   ¶¶73, 199.  The Company's R&D expenses were $46.6 million for FY 2006, $28.3 million for FY

7   2005 and $20.6 million for FY 2004.  In truth, even though the Company has not restated R&D

8   costs, the actual R&D costs were far less than reported.  ¶73.  The Company's auditors also caught

9   onto the Company's manipulation of inventory valuations by September 2007, and started looking

10  into the Company's inventory reserve and other accounting matters that led to a restatement.  ¶81.

11         **D.     Defendants Reaped Personal Gains from the Fraudulent Scheme**

12         While concealing that the Company was experiencing protracted Harmony ramp issues,

13  defendants took advantage of the inflated stock price to unload their stock.  ¶¶13, 173.  Defendant

14  Bronson sold 36.83% of his FormFactor holdings, selling 25,000 shares for over $1 million.  ¶¶13,

15  175.  Defendant Foster sold 19,800 shares, or 87.29% of his FormFactor holdings, pocketing

16  $864,144 during the time frame that the Company admittedly overstated its inventory.  ¶¶13, 176.

17  Defendant Khandros sold 723,079 shares, or 23.91% of his FormFactor holdings, for insider trading

18  proceeds of over $27.86 million.  ¶¶13, 177.  He also timed his insider trades well by making 36

19  transactions between June and September 2007, all between $43.00 and $46.07 per share, for insider

20  trading proceeds of $4.77 million, right before the Company started disclosing the true operating and

21  financial conditions.  ¶13.  Additionally, defendants were rewarded with stock options during the

22  Class Period, with defendants Khandros, Bronson, Foster and Freeman receiving 231,540, 94,220,

23  115,580, and 85,000 shares of stock options, respectively, during the Class Period.  ¶¶26-29.

24         **E.     The Relevant Truth About the Financial Conditions Concealed by the
                    Scheme Begins to Come out**

25         On October 24, 2007, the Company announced that adjustments to inventory valuations may

26  be required for periods prior to 3Q07.  ¶14.  Defendants stated that production of Harmony was

27  behind schedule due to capacity constraints, but assured investors that demand for Harmony was still

28

strong, and made no reference to underlying poor yields.  ¶¶15, 149-150.  Upon these disclosures, FormFactor's stock declined $7.70 per share, or 20%, to close at $35.54 per share.  ¶15.  The worst was yet to come, as defendants were still concealing the real cause behind the Harmony ramping issues and the impact they already had on FormFactor's business and financial results.  *Id.*  On November 9, 2007, the Company announced that its review of its inventory valuation practices concluded that during fiscal 2006 and the first half of fiscal 2007, the Company "did not consistently follow its accounting policies for determining inventory valuation."  ¶¶16, 154.  Two days later, on November 11, 2007, the Company filed its amended Forms 10-K and 10-Q and restated its financials for FY06, 1Q07 and 2Q07.  ¶17.  In the 2006 restated Form 10-K, the Company again admitted that it "***did not consistently follow its accounting policies for valuing inventory resulting in material misstatement of inventory and cost of revenue.***"  *Id.*  For FY06, 1Q07 and 2Q07, FormFactor overstated inventory by $5.9 million or 30.9%, by $5.3 million or 23.8%, and by $1.6 million or 5.2%, respectively.  ¶¶17, 186-187.  Additionally, this GAAP violation resulted in a material misstatement of FormFactor's cost of revenues, gross margin, net income and earnings per share ("EPS") during the Class Period.  *Id.*  For 2006, FormFactor overstated net income of $3.6 million or 6.2%.  For the first half of 2007, FormFactor misstated net income by $2.8 million or 7.8%.  *Id.*

In the restated Form 10-K, the Company admitted material weaknesses in its financial reporting.  In their SOX certifications where they said they had evaluated the controls each quarter, defendants Khandros and Foster thereby admitted they knew the Company did not maintain effective controls to ensure that the estimation process to value inventory complied with the Company's accounting policies.  ¶¶18, 155, 204-207; *see* FAC, Ex. 1.  FormFactor also initiated a Management Plan for Remediation to address inventory valuation.  ¶156.

In December 2007, while FormFactor was still scrambling to ramp its Harmony products, Advantest introduced a competitive DRAM probe card which FormFactor's largest Harmony customer, Elpida, looked into.  ¶19.  On the news that FormFactor had lost its technological edge, FormFactor's stock price dropped 12% from $38.87 per share to $33.90.  *Id.*

On February 5, 2008, FormFactor disclosed what defendants had known all along.  ¶¶20, 160-162.  FormFactor had severe operations issues in ramping up the production of Harmony, and

1   was therefore unable to ship Harmony to customers, causing a decline in revenue and bookings.  *Id*.

2   The Company stated: "*Due to the protracted Harmony ramp issues we experienced in 2007,*

3   *FormFactor was not the first full wafer contactor probe card company qualified at some DRAM*

4   *suppliers.  This resulted in the loss of business in the fourth quarter.*"  ¶¶20, 161.  The Company

5   also announced a bleak outlook for 2008, reducing the guidance for FY08 as a result of lost DRAM

6   market share driven not only by DRAM industry weakness, but also by Harmony DRAM production

7   issues.  The Company also announced that it would take a restructuring charge of $4-$5 million in

8   2008 and cut its workforce by 14% globally.  ¶20.[8]  Upon these disclosures, the Company's stock

9   price dropped 20%, closing at $21.06 per share on February 6, 2008. ¶¶20, 168.

10          On February 25, 2008, defendant Foster resigned as CFO.  ¶20.  On February 27, 2008,

11  FormFactor filed its FY07 Form 10-K admitting: "*we are continuing to experience the effects of*

12  *the new product execution challenges for our Harmony-based products that we experienced in*

13  *fiscal 2007, which have contributed to a more difficult competitive environment.*"  ¶172.

14  **III.    STANDARD OF REVIEW**

15          In considering a motion to dismiss, the court must accept plaintiffs' allegations as true.

16  *Tellabs, Inc. v. Makor Issues & Rights, Ltd*., __ U.S. __, 127 S. Ct. 2499, 2509 (2007).  The Private

17  Securities Litigation Reform Act of 1995 ("PSLRA") requires a complaint to "'plead with

18  particularity both falsity and scienter,'" which are generally strongly inferred from the same set of

19  facts.  *In re Daou Sys.*, 411 F.3d 1006, 1014 (9th Cir. 2005), *cert. denied*, 546 U.S. 1172 (2006).

20  Further, "courts must consider the complaint in its entirely . . . .  The inquiry . . . is whether **all** of the

21  facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any

22  individual allegation, scrutinized in isolation, meets that standard."  *Tellabs,* 127 S. Ct. at 2509

23  (emphasis in original).  A strong inference of scienter arises if, "[w]hen the allegations are accepted

24  as true and taken collectively," a reasonable person would "deem the inference of scienter at least as

25

26  _____

27  [8]       After the FAC was filed on April 3, 2008, the Company announced a further workforce
    reduction by 12% on April 8, 2008.

28

1   strong as any opposing inference[.]" *Id.* at 2511; *accord Daou*, 411 F.3d at 1022 (quoting *Nursing*

2   *Home Pension Fund, Local 144 v. Oracle Corp.*, 380 F.3d 1226, 1230 (9th Cir. 2004)).

3         In holding that "[t]he inference that the defendant acted with scienter need not be irrefutable,

4   *i.e.*, of the 'smoking gun' genre, or even the 'most plausible of competing inferences'" (*Tellabs*, 127

5   S. Ct. at 2510), the Supreme Court **lowered** the standard for pleading scienter in this Circuit. Where

6   previously, under *Gompper v. VISX, Inc*., 298 F.3d 893 (9th Cir. 2002), inferences supporting

7   scienter had to be **more** plausible than non-culpable inferences, now the inferences need only be

8   **equally** plausible. Under *Tellabs*, "a tie goes to the Plaintiff." *Commc'ns Workers of Am. Plan for*

9   *Employees' Pensions v. CSK Auto Corp*., 525 F. Supp. 2d 1116, 1120 (D. Ariz. 2007).

10  **IV.    ARGUMENT**

11      **A.    Plaintiffs Have Alleged with Particularity Material Violations of the Securities Laws**

12
13          **1.    Defendants' Omissions and False Statements About Its Ability to Manufacture Harmony Products Are Non-Forward Looking, Actionable Statements**

14
15        Rule 10b-5 "imposes a duty to disclose material facts that are necessary to make disclosed

16  statements, whether mandatory or volunteered, not misleading." *Hanon v. Dataproducts Corp.*, 976

17  F.2d 497, 504 (9th Cir. 1992). An omission is actionable if it creates "an impression of a state of

18  affairs that differs in a material way from the one that actually exists." *Brody v. Transitional Hosps.*

19  *Corp*., 280 F.3d 997, 1006 (9th Cir. 2002). Defendants acknowledge that they spoke about Harmony

20  in public statements. Defs. Mem. at 15, 27.[9] "If one speaks, he must speak the whole truth."

21  *Stransky v. Cummins Engine Co*., 51 F.3d 1329, 1331 (7th Cir. 1995); *In re K-Tel Int'l, Inc. Sec.*

22  *Litig*., 300 F.3d 881, 898 (8th Cir. 2002) ("the law requires 'an actor to provide complete and non-

23  misleading information with respect to the subjects on which he undertakes to speak'"); *Helwig v.*

24  *Vencor, Inc*., 251 F.3d 540, 561 (6th Cir. 2001) ("a company may choose silence or speech

25  elaborated by the factual basis as then known – but it may not choose half-truths").

26  _____

27  [9]     "Defs. Mem." refers to the memorandum in support of defendants' motion to dismiss, filed May 5, 2008.

28

1   The Complaint demonstrates that defendants failed to provide the whole truth regarding

2   FormFactor's development of and the underlying manufacturing obstacles with Harmony.  Even in

3   the last few quarters of the Class Period, as defendants tried to explain why the Company's volume

4   production of Harmony products was delayed, they attributed the delays to customer integration,

5   shortage in design personnel, and capacity constraints, without acknowledging the known fact that

6   Harmony volume production was delayed by severely poor yields in the manufacturing process.

7   ¶¶138, 140, 149-150.

8   On the first day of the Class Period, defendants Bronson, Foster and Khandros falsely told

9   investors of FormFactor's progress with Harmony during a conference call:[10]

> Product performance exceeded expectations.  We expect to see significant revenues
> for our probe card based on Harmony platform in the second half of '06, with
> everything centering around 300 millimeter.  [¶85.]

> Manufacturing has successfully transitioned through the most difficult phase of the
> production ramp.  All production processes are now fully functioning in our new
> facility, with output and yields improving steadily.  [¶86.]

14  During the July 27, 2006 press release and conference call, defendants Khandros, Foster and

15  Bronson falsely represented:

> We are very pleased with the performance of our manufacturing operations and
> continue to make ongoing productivity and efficiency improvements.  [¶99.]

> Our ability to manufacture custom probe cards in volume and keep pace with
> customer roadmaps will reinforce our industry leadership and allow us to
> successfully compete in the NAND Flash market and other one-touchdown, 300
> millimeter markets . . . .  [¶100.]

20  On the October 25, 2006 press release and conference call, defendants Khandros, Foster and

21  Bronson partially disclosed, but continued to conceal production delays:

> Factory capacity continued to ramp, as production efficiencies and yields increased
> in many segments of our manufacturing operations.  [¶107.]

---

[10]   Because defendants Bronson, Foster, and Khandros were all present during the
Company's conference calls, they were liable for all false statements made during those
conference calls either as the speaker, or by silent adoption of the false statements made.  *Barrie
v. Intervoice*, 397 F.3d 249, 262 (5th Cir. 2005) (where "one defendant knowingly uttered a false
statement and the other defendant knowingly failed to correct it, even if it is not alleged which
defendant spoke and which defendant failed to speak, the fraud is sufficiently pleaded as to each
defendant").  *See also In re Silicon Graphics Sec. Litig.*, 970 F. Supp. 746, 764 (N.D. Cal. 1997);
*In re SmarTalk Teleservices, Inc. Sec. Litig.*, 124 F. Supp. 2d 527, 543 (S.D. Ohio 2000).

1      We're making volume shipments for the fourth quarter, although less than previously
       anticipated as product development requirements and customer trials were completed
2      later than anticipated with our early adopter customers.  [¶108.]

3          During the April 25, 2007 conference call, defendants Khandros, Bronson and Foster again

4   touted the Company's progress with the Harmony product lines, and denied the Company's inability

5   to volume produce Harmony products when an analyst asked whether the lead times of developing

6   Harmony may be stretching out:

7      ***In fact, our factory cycle time and lead times have been improving.  In the last 12
       months, they have improved about 25%, and the factory is performing very well.***  It
8      is simply a matter of scheduled customer deliveries and what our customers are
       looking to have delivered within the quarter based upon what we can see.  [¶130.]
9
10         During the July 25, 2007 conference call, without disclosing the actual causes of the

11  production shipment delays, defendants Khandros and Foster continued to conceal the underlying

12  manufacturing problems and simply stated:

13     Our overall design capacity has been constrained due to an increase in new design
       demand and high design intensity associated with new product platforms and our
14     Harmony learning on various test platforms has continued.  [¶138.]

15     We have overall design constraints right now due to very, very high design demand
       in general.  And as you can see we're growing our business at a healthy chunk and
16     that puts significant pressure on design resources.  [¶140.]

17         All but a few of these representations concerning Harmony are not forward-looking as

18  defendants contend.  Defs. Mem. at 27.  Rather, they are statements of current condition – how

19  FormFactor was doing, as of the date the statements were made, specifically with respect to

20  FormFactor's development of and its capacity to manufacture Harmony products.  These statements

21  are not entitled to PSLRA's safe harbor protection.  *In re InterMune, Inc. Sec. Litig.*, No. C 03-2954

22  SI, 2004 U.S. Dist. LEXIS 15382, at *14 (N.D. Cal. July 30, 2004) (the safe harbor provision

23  protects only forward-looking statements which include "projection[s] of revenues . . . *future*

24  operations . . . *future* economic performance" (citing to 15 U.S.C. §78u-5(c) (l) and (i)(1)); *In re CV*

25  *Therapeutics, Inc. Sec. Litig*, No. C 03-03709 SI, 2004 U.S. Dist. LEXIS 17419, at *33-*34 (N.D.

26  Cal. August 5, 2004) (the safe harbor provision does not apply to statements of historical fact or

27  defendants' failure to disclose historical fact).

28

1    The falsity of these statements concerning the Company's ability to ramp up Harmony

2    production is corroborated by numerous confidential witnesses as well as the Company's belated

3    admission that the Company experienced "protracted Harmony ramp issues . . . in 2007." ¶¶53-75,

4    161. CW3, a veteran Senior Process Engineer who worked at FormFactor for over 10 years, said the

5    Company marketed Harmony products before they were fully developed. ¶54. CW2, a former

6    Production Supervisor, recalled that Harmony product was still in its "initial Beta" stage at the end

7    of 2006, even though the Company introduced it in summer 2006. ¶¶54-55. CW2, CW7, a former

8    Senior Engineering Technician, and CW9, a Senior IT Director, all corroborate that the Company

9    encountered technical difficulties in developing Harmony, such as the board "flexing in the middle,"

10   and that the probe-head pins were falling off, or ended up damaging the wafers that they were

11   designed to be testing. ¶¶55, 57, 61. CW7, whose job during the Class Period was to monitor the

12   yield during the manufacturing process, states that one of the reasons for the poor yields was that the

13   pins on the probe-heads (which are mounted to the probe cards) constantly fell out, but that the exact

14   reason why the pins fell out had not been determined by February 2008. ¶61. This problem was one

15   of the factors that resulted in FormFactor missing customer delivery dates. *Id.* CW8, a Technical

16   Operator who worked in the fabrication process for FormFactor's probe-head products, also stated

17   that the yield problems involved in the manufacturing of probe-heads contributed to shipment

18   delays. ¶62. In quantifying the number of failures in the nickel bath phase, CW8 estimates that

19   FormFactor had a factor ratio of between 25%-50%. *Id.*

20   CW1, a former FAB Coordinator who had access to the Company's production data, and

21   CW4, a former Customer Project Manager, who had access to the Company's scheduling and

22   planning production information, both confirm that FormFactor struggled to manufacture Harmony

23   products to meet demand. ¶56. CW4 estimated that 20% or less Harmony orders actually went out

24   on time. *Id.* These witness accounts, corroborated by FormFactor's own admission, provide

25   particularized details as to why the statements concerning Harmony were false when made. *Daou*,

26   411 F.3d at 1017-1022 (falsity adequately pled in part based on corroborated witness accounts).

27   Relying on Seventh Circuit Judge Easterbrook's decision in *Higginbotham v. Baxter Int'l,*

28   *Inc.* 495 F.3d 753, 757 (7th Cir. 2007), defendants challenge plaintiffs' allegations based on these

1    confidential witnesses.  Defs. Mem. at 9-11.  *Higginbotham* is not only wrongly decided because it

2    contravened the Supreme Court's directive that courts must "accept all factual allegations in the

3    complaint as true," *Tellabs*, 127 S. Ct. at 2509, the latest Seventh Circuit opinion in *Makor Issues &*

4    *Rights, Ltd. v. Tellabs, Inc. ("Tellabs II")*, 513 F.3d 702 (7th Cir. 2008) by Judge Posner, has also

5    distinguished and limited *Higginbotham* to its facts.  Significantly, defendants did not even cite to

6    the controlling authorities in this Circuit, permitting and upholding fraud allegations based on

7    corroborated, detailed witness accounts.  *Daou*, 411 F.3d at 1015-16 (numbering each witness and

8    describing job description and job responsibilities provides a "large degree of specificity" which

9    "'support[s] the probability that a person in the position occupied by the source would possess the

10   information alleged'"); *Nursing Home*, 380 F.3d at 1233-34 (same); *see also In re Cabletron Sys.,*

11   *Inc.*, 311 F.3d 11, 30 (1st Cir. 2002) (consistent witness accounts reinforce one another).

12        Here, the information provided by plaintiffs' confidential witnesses is reliable and credible

13   because: (1) each witness worked at FormFactor during the Class Period; (2) each witness has

14   personal knowledge of the information provided; (3) the witness' job title, position and

15   responsibilities show he/she has personal knowledge of the information provided; (4) many of the

16   witness accounts corroborate one another; and (5) the witness accounts are corroborated by other

17   information alleged therein.  ¶¶31-40.  Plaintiffs' witnesses should be credited, not discounted.

18   *Daou*, 411 F.3d at 1015-16; *Nursing Home*, 380 F.3d at 1233-34.

19        Recently in *LDK Solar Sec. Litig.*, No. C-07-05182 WHA, 2008 U.S. Dist. LEXIS 42425,

20   (N.D. Cal. May 29, 2008), Judge Alsup upheld a Section 10(b) securities fraud complaint that

21   centered on a scheme to overstate a company's inventory by counting worthless scrap as current

22   inventory in order to manipulate the reported financials.  The facts of that case mirror the

23   circumstances here, including that the LDK defendants had motive to inflate inventory as it is central

24   to LDK's operations, and that they took advantage of LDK's pre-existing shoddy internal controls to

25   carry out the scheme.  The instant case presents additional compelling facts not present in *LDK*,

26   including an internal investigation that led to the Company's admission that its own accounting

27   policies were not properly followed (whereas LDK's internal investigation concluded that LDK

28   properly accounted for its inventory), nine contemporaneous witnesses who worked at FormFactor

1    during the Class Period (whereas *LDK* relied on one former employee), a restatement resulted from

2    inventory overstatement (no restatement in *LDK*), and the Company's admission of "protracted

3    Harmony ramp issues" (LDK did not make any admission).  Though not identical, the collective

4    facts here, like those in *LDK,* add up to a case of securities fraud.

5          Defendants quibble that FormFactor made numerous disclosures regarding development and

6    manufacturing issues with its Harmony products.  Defs. Mem. at 15-16.  The purported warnings

7    from the Company, however, are the same type of boilerplate that this Court rejected in *Hi/fn* and *CV*

8    *Therapeutics.*  None of these purported disclosures touched upon the real underlying reasons that

9    were causing delays in Harmony shipments to customers, or why it took FormFactor longer than

10   anticipated to reach volume shipments of Harmony.  *In re Hi/fn*, *Inc. Sec. Litig.*, No. C 99-4531 SI,

11   2000 U.S. Dist. LEXIS 11631, at *14-*16 (N.D. Cal. Aug. 9, 2000) (boilerplate disclaimers that do

12   not speak directly to the false statements made and where the generalized potential risk warned had

13   become a reality are not protected by the bespeaks caution doctrine).  As one analyst noted at the

14   February 5, 2008 conference call, "Obviously the issues with Harmony seem like they were not

15   really capacity related, so it was not a shortage of your capacity as I think you were suggesting last

16   call."  ¶164.  Another analyst stated, "some of that sounds like it was due to your own inability to

17   actually build the product."  ¶165.  Another issued a report that "What we found as a major surprise

18   was the continued missteps in its Harmony ramp . . . .  In our opinion, there appears to be new issues

19   that pop up every quarter related to Harmony (two quarters ago it was customer integration, last

20   quarter capacity constraints, this quarter, manufacturing issues), and more importantly, no solution to

21   these problems . . . ."  ¶169.  Even the two analyst reports submitted by defendants suggest that

22   defendants disclosures were inadequate, as one analyst reported, "As feared, issues with Harmony

23   have had less to do with supply-side dynamics . . . as suggested by management when it guided

24   below Street consensus for Q4 (back in October '07).  Now . . . it is becoming clear that ***FORM's***

25   ***chronic issues with its 300mm, full-contact wafer probe card, Harmony***, have led to meaningful

26   market share loss."  Defs. RJN, Ex. 10.  In any event, whether or not the risk warnings were

27   sufficient to subject them to the safe harbor protection is a factual question that should not be

28   decided at the pleading stage.  *Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*, 416 F.3d 940,

1   946-48 (9th Cir. 2005) (the bespeaks caution doctrine does not apply to statements of historical fact

2   and its application is not to be decided as a matter of law).

3          As to the few forward-looking statements alleged, none are protected by the safe harbor

4   because defendants made the material misrepresentations with actual knowledge that they were false

5   and misleading. [11] *No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am. W. Holding*

6   *Corp.*, 320 F.3d 920, 937 n.15 (9th Cir. 2003) ("it is arguable that a strong inference of actual

7   knowledge has been raised, thus, excepting these statements from the safe harbor rule together");

8   *LDK*, 2008 U.S. Dist. LEXIS 42425, at *44-*45 ("it does not matter whether or not the statements

9   were forward-looking or were accompanied by meaningful cautionary statements" when defendants

10  had actual knowledge).

11         Finally, defendants' statements concerning Harmony are not puffery.  As this court held,

12  "'Projections and general expressions of optimism may be actionable'" under federal securities laws.

13  *Hi/fn*, 2000 U.S. Dist. LEXIS 11631, at *17, citing *In re Apple Computer Sec. Litig.*, 886 F. 2d 1109,

14  1113 (9th Cir. 1989); *Intermune*, 2004 U.S. Dist. LEXIS 15382, at *11 (citing same).

15             **2.      FormFactor's Restatement, Admission of Defective Internal**
                         **Controls, and Corroborated Witness Accounts Establish that**
16                       **the Financial Statements Were False When Issued**

17         The FAC pleads the falsity of FormFactor's financial results reported in statements to the

18  market via press releases, conference calls, and SEC filings.  ¶¶84, 86, 90, 93-96, 101-104, 107-112,

19  117-118, 121-124, 127-128, 131-134, 137-139, 141-143, 147, 151, and 154-156.  The reported

20  results were materially false and misleading because: (1) the Company improperly accounted for its

21  inventory valuation and the related costs of revenue accounts in violation of GAAP, causing its

22  inventory to be overstated, and its gross margin and net income to be misstated (¶183); (2) the

23  Company has restated its FY06 and 1Q07 and 2Q07 financial statements, admitting to the falsity of

24  the financial results originally reported (¶¶200-201); (3) defendants concealed the complete

25

26  ───────────────────
    [11]     Defendants' February 1, 2006 statements, "we expect to see significant revenues" and "we
27  are planning to have that in place for volume production in the second half of '06" can be interpreted
    as forward-looking.  ¶¶85, 88.

28

1  breakdown of the Company's financial reporting controls, causing FormFactor to report materially

2  inflated financial results in violation of GAAP, SEC rules and the Company's internal accounting

3  policies (¶¶ 76-83, 208-18); and (4) defendants manipulated the Company's gross margin by

4  improperly accounting for excess and obsolete inventory as R&D costs instead of as cost of revenue,

5  in violation of GAAP (¶¶192, 202-207). Multiple violations of GAAP provide strong circumstantial

6  evidence of scienter. *Daou*, 411 F.3d at 1016. SEC Regulation S-X, 17 C.F.R. §210.4-01(a)(1)

7  (financial statements not prepared in accordance with GAAP are presumed to be misleading).

8  Violations of a company's own revenue recognition policies also satisfy falsity and scienter. *Id.*

9      Defendants claim that plaintiffs' allegations concerning the misclassification of "scrap" as

10  R&D expense are based on the mistaken premise that the restatement included R&D expense. Defs.

11  Mem. at 12. Plaintiffs made no such assumption. In fact, the FAC is clear on the items restated.

12  ¶¶183-191 (showing that inventory was consistently overstated by as much as 30.92% during the

13  Class Period). R&D was clearly not restated and plaintiffs did not allege as such. That R&D was

14  not restated is not dispositive that the numbers were not false.[12] The reported R&D numbers were

15  false and misleading, despite the Company not restating them. *Aldridge*, 284 F.3d at 83 (restatement

16  not required to state a §10(b) claim, "[t]o hold otherwise would shift to accountants the

17  responsibility that belongs to the courts"); *LDK*, 2008 U.S. Dist. LEXIS 42425, at *31 ("[T]he lack

18  of a restatement did not mean that LDK only engaged in legitimate conduct."); *Daou*, 411 F.3d at

19  1006 (upholding §10(b) claim based on false financial statements without restatement); *In re Secure

20  Computing Corp. Sec. Litig.*, 184 F. Supp 2d 980 (N.D. Cal. 2001) (same).

21      Defendants are also wrong that plaintiffs do not – and cannot – allege that it is improper to

22  include "scrap" within the category of R&D expense. Defs. Mem. at 14. To the contrary, that is

23  

_____

24  [12]      Moreover, the fact that R&D was not restated may explain why it is possible that the
25  inventory valuation throughout the restated period was overstated, but the bottom line, *i.e.*, gross
    margin and net income, actually improved in 1Q07 and 2Q07, as the Company could have moved
26  scrap into R&D to avoid hitting the bottom line. This is consistent with plaintiffs' allegations of
    fraud. At the pleading stage, plaintiffs are not required to plead specific numbers of the restatement
27  to establish falsity. *Aldridge v. A.T. Cross Corp.*, 284 F.3d 74, 83 (1st. Cir. 2002); *LDK*, 2008 U.S.
    Dist. LEXIS 42425, at *31.

28

1 precisely what plaintiffs allege. *See generally* ¶¶192-199. Specifically, plaintiffs allege that in order

2 to preserve the Company's gross margins and make it appear as if the Company was adequately

3 spending its resources on R&D, defendants caused FormFactor to improperly transfer the cost

4 associated with scrap as an R&D expense. According to GAAP, scrap material should have been

5 treated as excess or obsolete inventory and written off through cost of revenues. SFAS No. 151, ¶2;

6 ARB No. 43, Ch. 4, ¶¶1-6. ¶197. Plaintiffs also allege that "[t]he scrap material transferred to R&D

7 was derived from efforts to produce a product that was already being sold to customers and not

8 related to the production of any new products." ¶¶69-73, 198. At least four confidential witnesses

9 corroborated that FormFactor was counting worthless scrap as R&D expense to avoid having poor

10 yields impacting the Company's financial bottom line. ¶¶69-72. CW3, the veteran Senior Process

11 Engineer, stated that "it was very common" for the deliberate transfer so that the

12 engineering/manufacturing "wouldn't look as bad." ¶69. According to CW3 and CW8, because of

13 the custom nature of FormFactor's products, the accumulated scrap from failed yields could not be

14 and was not re-used. *Id.* CW6, a Senior Financial Analyst, also confirmed the deliberate accounting

15 manipulation to hide the accumulated scrap. ¶72. Given the magnitude of the accumulated scrap,

16 the Company even had a task force of personnel from finance, operations and IT departments,

17 including CW9, to work on a "scrap project," which involved "moving a few million dollars [of

18 scrap] here and there." All of this, collectively, demonstrates that the reported R&D costs were

19 false, despite the lack of restatement. *Aldridge*, 284 F.3d at 83.

20       Defendants are also wrong that plaintiffs have to specify the amount that the R&D was

21 overstated to state a viable claim at this juncture. Defs. Mem. at 14. In *Computer Associates*, the

22 court held that "[u]nknown specifics, such as the exact amount the earnings have been overstated,

23 are not fatal in this case. Plaintiffs allege such a widespread fraudulent practice, that if true, would

24 have a huge net effect in error as to the company's overall figures and is the type of information

25 peculiarly within the defendants' control." *In re Computer Assocs. Sec. Litig.*, 75 F. Supp. 2d 68, 73

26 (E.D.N.Y. 1999). Moreover, given that the Company has admitted to its materially ineffective

27 internal controls, plaintiffs cannot possibly plead the precise amount that the R&D was overstated

28 when the Company itself might not even have the capability to do so because of its deliberate

1    inventory control deficiencies.  *See also In re Bausch & Lomb, Inc. Sec. Litig.*, 941 F. Supp. 1352,

2    1361 (W.D.N.Y. 1996) ("Since many of these facts lie particularly within defendants' knowledge,

3    plaintiffs cannot reasonably be expected to be able to state at this stage exactly when and how

4    defendants learned that B&L's sales figures were being overstated."); *Craftmatic Sec. Litig. v.*

5    *Kraftsow*, 890 F.2d 628, 645 (3d Cir. 1989) ("Particularly in cases of corporate fraud, plaintiffs

6    cannot be expected to have personal knowledge of the details of corporate internal affairs.").

7                    **3.        All Defendants Are Liable for Group-Published Statements**

8            The misrepresentations alleged in the Company's press releases and SEC filings are also

9    attributable to all defendants under the group pleading doctrine.  *In re GledFed., Inc. Sec. Litig.*, 60

10   F.3d 591, 593 (9th Cir. 1995); *Wool v. Tandem Computers, Inc.*, 818 F.2d 1433, 1440 (9th Cir.

11   1987); *Schwartz v. Celestial Seasonings, Inc.*, 124 F.3d 1246, 1254 (10th Cir. 1997).  "Although the

12   Ninth Circuit has yet to determine whether the group pleading doctrine survived the PSLRA, a

13   majority of district courts within the Ninth Circuit which have ruled on the issue have concluded that

14   it does."  *In re BP Prudhoe Bay Royalty Trust Sec. Litig.*, No. C06-1505 MJP, 2007 U.S. Dist.

15   LEXIS 83007, at *1, *20-*22 (W.D. Wash. Oct. 26, 2007); *In re Secure Computing Corp. Sec.*

16   *Litig.*, 120 F. Supp. 2d 810, 821-22 (N.D. Cal. 2000); *CV Therapeutics*, 2004 U.S. Dist. LEXIS

17   17419, at *29-*30.

18           As the FAC details, defendants Khandros, Foster, Bronson and Freeman, because of their

19   positions with the Company, possessed the power and authority to control the contents of

20   FormFactor's quarterly reports, press releases and presentations to the market, including securities

21   analysts, money and portfolio managers and institutional investors.  ¶30.  They were provided with

22   copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly

23   after their issuance and had the ability and opportunity to prevent their issuance or cause them to be

24   corrected.  *Id*.  In addition to their roles as CEO, President and CFO, defendants Khandros, Bronson

25   and Foster were the chief spokespersons for the Company.  ¶¶30, 84-88, 90-92, 98-101, 107-109,

26   117-118, 127-130, 137-140, 147-151, 160-162.  In each of the Company's press releases issued and

27   conference calls hosted during the Class Period, defendants Khandros, Bronson and Foster were

28   extensively quoted discussing the Company's business and financial results.  *Id*.

1    Freeman separately contends that the group pleading doctrine does not apply, citing *Tellabs*.

2    Freeman Mem. at 1-2.[13]  The Supreme Court did not address the group publication doctrine since it

3    was not an issue for appeal.  *Tellabs*, 127 S. Ct. at 2508-509.  While Freeman is not liable for any

4    oral statements, he is liable for group-published statements especially given his knowledge of the

5    problems that plagued the Company's manufacturing process and the impact that they had on the

6    Company's operations and financials, and his ability to influence the contents of the statements made

7    in the Company's SEC filings and press releases.  ¶¶30, 70.  *See In re Irvine Sensor Corp. Sec.*

8    *Litig.*, No. SA cv 02-159 GLT(MLGx), 2003 U.S. Dist. LEXIS 18397, at *7-*8 (C.D. Cal. Sept. 22,

9    2003) (top officers liable under group-published doctrine where defendants misrepresented the

10   company's development progress of key product); *Powers v. Eichen*, 977 F. Supp. 1031, 1041(S.D.

11   Cal. 1997) (holding senior vice presidents liable under the group-public information doctrine).

12       **B.    Plaintiffs' Allegations Collectively Establish a Strong Inference**

13       Defendants claim that "plaintiffs theory of fraud is implausible and unreasonable **'when**

14   **viewed in isolation.'**"  Defs. Mem. at 17.  The fatal error with defendants' position is that the

15   Supreme Court and the Ninth Circuit are clear that plaintiffs' allegations must be considered **in**

16   **totality**.  *Tellabs*, 127 S. Ct. at 2509 ("The inquiry is . . . whether **all** of the facts alleged, taken

17   collectively, give rise to a strong inference of scienter, not whether any individual allegations,

18   scrutinized in isolation, meets that standard.") (emphasis in original).  *In re Connetics Corp. Sec.*

19   *Litig.*, 542 F. Supp. 2d 996, No. C 07-02940 SI, 2008 U.S. Dist. LEXIS 9634, at *43-*44, (N.D. Cal.

20   Jan. 29, 2008) (citing *Tellabs*, 127 S. Ct. at 2509).

21       Taken collectively, the facts in this case clearly give rise to a strong inference of scienter,

22   including: (1) the Company's admissions concerning its lack of adequate internal controls and its

23   "protracted Harmony ramp issues" that were never disclosed during the Class Period; (2) reliable

24   and independent confidential sources corroborating that FormFactor had severe yield issues plaguing

25   its manufacturing processes, and that the severe yield issues impeded the Company's development of

26

27   [13]    "Freeman Mem." refers to the memorandum in support of defendant Freeman's motion to
     dismiss, filed May 5, 2008.

28

Harmony; (3) defendants knew and/or directed FormFactor employees to hide the manufacturing issues through accounting manipulation and through "project scrap" - an inter-departmental project to shift million of dollars around each quarter; (4) the Company's two restatements prior to the Class Period due to material weakness in internal controls, and its financial restatement during the Class Period, admitting that it consistently overstated its inventory for at least 6 quarters; (5) defendants Khandros and Foster signed SOX certifications attesting that they checked controls each quarter and thereby admit they knew about the improper accounting and knew that the internal controls they attested to were inadequate; (6) defendants' massive insider trades, including defendants Bronson, Foster, and Khandros selling 36.83%, 87.29% and 23.91% of their stock holdings during the Class Period, respectively; (7) defendant Foster's resignation and other key finance personnel's termination from the Company; and (8) the initiation of a Management Remediation Plan to address the material weaknesses in the Company's internal controls.

> **1. Given the Importance of Harmony to the Company and Defendants' Executive Positions Defendants Knew About the Chronic Poor Yields in Manufacturing that Impeded the Company's Ability to Ramp up Harmony**

Considered with the particularized allegations from corroborating sources that show defendants knew about and participated in the fraudulent scheme, defendants' knowledge is also reasonably inferred from their positions at the Company and the nature of the improprieties. *Tellabs II*, 513 F.3d at 710-711.

Here, defendants put much emphasis on the Company's ability to manufacture and deliver Harmony products. The press releases, SEC filings, and conference call transcripts submitted by defendants as part of Defs. RJN reflect that Harmony and the Company's ability to deliver Harmony to the market were highlighted throughout the Class Period. *See* Defs. RJN, Exs. 1, 2-5, 7-8, 14-21, 23, 27-30, 33-34. Indeed, in every single conference call with the analysts during the Class Period, defendants Khandros, Foster and Bronson put much emphasis on FormFactor's development of and ability to deliver Harmony. *Id.* As the Seventh Circuit recently explained, "it is exceedingly unlikely" that defendants' false statements concerning a company's most important products were based on merely careless mistakes, rather than an intent to deceive or a reckless indifference at the

1  management level.  "That no member of the company's senior management who was involved in

2  authorizing or making public statements about the demand for the [company's key products] knew

3  that they were false is very hard to credit, and no plausible story has yet been told by the defendants

4  that might dispel our incredulity."  *Tellabs II*, 513 F.3d at 709.  Defendant Khandros' position is akin

5  to that of defendants in *Tellabs*.  "And at the top of the corporate pyramid sat Notebaert, the CEO.

6  The 5500 and the 6500 were his company's key products.  Almost all the false statements that we

7  quoted emanated directly from him.  Is it conceivable that he was unaware of the problems of his

8  company's two major products and merely repeating lies fed to him by other executives of the

9  company?  It is conceivable, yes but it is exceedingly unlikely."  *Id.* at 711.[14]

10      The core business inference is equally applicable to defendants Foster and Bronson who

11  spoke so highly of the Company's development of Harmony, and defendant Freeman whose job as

12  the Senior Vice President of Operations was to build and ramp the new Harmony products.  *LDK*,

13  2008 U.S. Dist. LEXIS 42425, at *44 (where the amount of inventory was critical to the company's

14  success, it could be reasonably and strongly inferred that the responsible officers "were aware of

15  major discrepancies in how much inventory was being reported to the public and how much was

16  actually present"); *In re Read-Rite Corp. Sec. Litig.*, 335 F.3d 843, 848-49 (9th Cir. 2003) (core

17  business allegations can be combined with other particularized facts to plead "strong" inference of

18  scienter); *Nursing Home*, 380 F.3d at 1234 (reasonable inference that hands-on managers knew

19  about accounting improprieties when considered with other allegations).  *See also Nathenson v.*

20  *Zonagen, Inc.*, 267 F.3d 400, 424-25 (5th Cir. 2001) (defendants' positions coupled with the fact that

21  the company's future prospects are substantially dependent on the key product support an inference

22  of scienter).  Applying the competing inference analysis under *Tellabs*, Judge Alsup recently

23

24  [14]    Defendants assert that FormFactor's Q307 and Q407 revenue shortfall was due primarily to
      deteriorating market conditions, not the fraud alleged. Defs. Mem. 21-22. Plaintiffs acknowledge

25  and allege that part of the shortfall was due to market downturn (¶¶58, 160-167), but also allege that
      FormFactors's stock price was more severely affected by the Company's inability to deliver

26  Harmony.  (*Id.*)  Indeed, two analyst reports submitted by defendants support plaintiffs' allegations,
      noting "expectations were low – most anticipating a guide down. But the outlook was far worse,"

27  and *[I]t is becoming clear that FORM's chronic issues with its 300mm, full contact wafer probe
      card, Harmony, had led to meaningful market share loss."*  Defs. RJN, Exs. 9-10.

28

1    reiterated the core business inference in *LDK*, holding that, "The widespread problems at [the

2    company] may have resulted from poor management, but it appears equally plausible that

3    [defendants] possessed the deliberate recklessness or fraudulent intent necessary for scienter in this

4    circuit."  2008 U.S. Dist. LEXIS 42425, at *35-*36, citing *CSK*, 525 F. Supp. 2d at 1124-25.

5        The FAC specifies the defendants' access to material non-public information: Defendants

6    Khandros and Bronson had access to and did visit the FAB floor to assess the manufacturing issues

7    and thus, had first-hand knowledge of severity and magnitude of manufacturing problems.  ¶¶64.

8    Defendant Freeman had the ultimate responsibility from the operations side to deal with scrap from

9    failed yields (¶70), while defendant Foster prepared the inventory valuation report from various

10   Excel spreadsheets, which permitted manual manipulation of inventory valuation.  ¶66.  Moreover,

11   each of them had access to the Company's FAB status report prepared by the FAB Production

12   Manager's assistant, CW1, in collaboration with defendant Foster's office, and distributed to senior

13   management at the weekly Friday meetings.  ¶¶66-67.  The allegations showing defendants'

14   knowledge confirm the reasonableness of the core business inference.

15       Defendants suggest that defendants simply underestimated Harmony challenges and were too

16   optimistic in assessing the Company's ability to address them.  Defs. Mem. at 20-21.

17   Overconfidence in the face of known adverse information can amount to a case of securities fraud

18   when defendants knowingly make optimistic statements while not sufficiently disclosing the material

19   known facts.  In *Apple*, the Ninth Circuit held, "There is a difference between knowing that any

20   product-in-development may run into a few snags, and knowing that a particular product has already

21   developed problems so significant as to require months of delay."  886 F.2d at 1115; *In re

22   Convergent Techs. Sec. Litig.*, 948 F.2d 507, 515 (9th Cir. 1991) (citing *Apple*, noting that "The Fifth

23   Circuit niftily expressed the same principle when noted: To warn that the untoward may occur when

24   the even is contingent is prudent; to caution that it is only possible for the unfavorable events to

25   happen when they have already occurred is deceit.  *Huddleston v. Herman & MacLean*, 640 F.2d

26   534, 544 (5th Cir. 1981), *rev'd in part on other grounds*, 459 U.S. 375 . . . (1983).").

27

28

1

      **2.**     **The Confidential Witnesses Provide Reliable Information that Defendants Knew of Material Facts that Rendered Their Public Statements Materially False and Misleading When Made**

2

3

      In *Daou*, 411 F.3d 1015, the Ninth Circuit stated that "[s]o long as plaintiffs reveal with

4

particularity the sources of their information, the complaint will survive under the PSLRA." *See*

5

*also Tellabs II*, 513 F.3d at 712; *Cabletron*, 311 F.3d at 28-31.

6

      Several witnesses who worked at FormFactor corroborated the magnitude of the Company's

7

chronic low yields and defendants' knowledge of the underlying manufacturing issues that prevented

8

FormFactor to timely ramp up Harmony production.  CW1, a former FAB Coordinator and

9

Administrative Assistant to FormFactor's production manager, had access to production-related

10

financial data and served as the liaison between the production manager and the CFO's office.

11

CW2, a former Production Supervisor who oversaw one of the three production shifts until late

12

2006, was in a position to know of the chronic poor yields and the problems underlying the

13

Company's production of Harmony products because of his daily responsibility overseeing the

14

production process.  Both CW1 and CW2 state that defendant Khandros visited the production floor

15

and interacted with the lower-ranking personnel to assess manufacturing status, "to crunch numbers"

16

and to handle various issues in the FAB, such as "components not staying together."  ¶64.  CW1

17

states that defendant Bronson dealt with FAB issues as well.  *Id.*

18

      CW3, a Senior Process Engineer who had worked at FormFactor for over ten years until

19

early 2007, explains that senior management knew about the low yields but "never allowed us to fix

20

problems causing the low yields" because to do so would mean to shut down production altogether,

21

which FormFactor "could not afford."  ¶¶34, 60.  CW9, a former Senior IT Director, was specifically

22

assigned to the task force dealing with the "scrap project" which involved "shifting millions of

23

dollars" each quarter to hide the failed yields.  He stated that defendant Freeman had the ultimate

24

responsibility for scrap from the operations side.  ¶¶40, 70-71.

25

      Defendants claim that plaintiffs do not plead specifics from internal reports or meetings.

26

Defs. Mem. at 6, 11.  The FAC provides the necessary information detailing "the sources of her

27

information with respect to the reports, how she learned of the reports, who drafted them, [and]

28

which officers reviewed them," and provide "an adequate description of their contents."  *In re*

1   *Silicon Graphics Sec. Litig.*, 183 F.3d 970, 985 (9th Cir. 1999). The FAC details the contents of the

2   CFO's inventory report which was derived from spreadsheets from numerous sources throughout the

3   Company. ¶66. The spreadsheet reports reflected "the headcount, the production costs, and the

4   materials that were needed," such as specific equipment (in addition to a separate report showing

5   component costs). *Id.* This inventory valuation report from the CFO's office was voluminous –

6   more than 100 pages generated by the Company's Oracle system – containing thousands of line

7   items, each identified a specific product and the "actual cost" for each item, based on the customized

8   nature of FormFactor's products. *Id.* According to CW1, who served as the intermediary between

9   the FAB production office and the CFO's office, defendant Foster had been responsible for

10  overseeing inventory valuation and disseminating an inventory valuation report to the FAB

11  production department. *Id.* The FAC further details how this inventory valuation report was used

12  internally at FormFactor to keep the senior executives apprised of the Company's inventory

13  valuation and FAB manufacturing issues. The Production Manager derived information from the

14  CFO's inventory valuation report to generate a FAB status report or presentation to the management

15  at the weekly executives meeting, attended by defendant Khandros and other senior management.

16  ¶67. Because CW1's role in preparing this FAB status report, CW1 knew that the FAB status report

17  included data on general numbers for the FAB production department in terms of headcount,

18  inventory levels and production levels. *Id.* The production-related data was also used at the monthly

19  meeting in which the Production Manager reported to "the general populace" of Company

20  employees regarding the performance of the FAB production departments. *Id.*

21          **3.      The Company's Restatement Supports a Strong Inference**

22          The restatement of FormFactor's financials also supports an inference of scienter. *In re*

23  *Cylink Sec. Litig.*, 178 F. Supp. 2d 1077, 1084 (N.D. Cal. 2001) ("the mere fact that the statements

24  were restated at all supports such an inference [of scienter]"); *Zuckerman v. Smart Choice Auto.*

25  *Group, Inc.*, No. 6:99-cv-237-Orl-99A, 2000 U.S. Dist. LEXIS 14676, at *15-*19 (M.D. Fla. May

26  19, 2000) (scienter established due to red flags and magnitude of restatement). Indeed, the SEC

27

28

1  often seeks to enter into evidence restated financial statements to demonstrate that persons

2  responsible for the original misstatements acted with scienter.  *See* Huang Decl., Ex. G. [15]

3        The nature of the restatement is telling.  Defendants were motivated to overstate inventory in

4  order to conceal the underlying poor yields in manufacturing, thus allowing defendants to cover up

5  the Company's ability to ramp up Harmony products.  The material weakness in the Company's

6  internal controls provided the opportunity for defendants to carry out the scheme.  While motive and

7  opportunity alone are not enough, they can be powerful pieces of evidence when coupled with

8  restatement, insider trading, and corroborated witness accounts.  *Nursing Home,* 380 F.3d at 1234;

9  *Daou,* 411 F.3d at 1024.  The percentage of the inventory overstatement, ranging from 5.27% to as

10  high as 30.92% for the restated periods further support an inference of scienter.  *See Higginbotham*,

11  495 F.3d at 759 (noting a 5% change as a rule-of-thumb approach to what is quantitatively

12  "material").

13        Moreover, the Company has admitted that it improperly overstated its inventory valuation in

14  violation of the Company's publicly reported revenue recognition policy and numerous GAAP

15  provisions.  ¶¶200-201.  *Provenz v. Miller*, 102 F.3d 1478, 1486 (9th Cir. 1996) (scienter properly

16  inferred where defendants violated GAAP and company's own accounting policies); *In re McKesson*

17  *HBOC, Inc. Sec. Litig.*, 126 F. Supp. 2d 1248, 1273 (N.D. Cal. 2000) ("[W]hen significant GAAP

18  violations are described with particularity in the complaint, they may provide powerful indirect

19  evidence of scienter.  After all, books do not cook themselves.").

20        Defendants argue that plaintiffs' theory of fraud is irrational because defendants essentially

21  understated earnings and gross margins, and overstated the cost of revenue during 2007.  Defs. Mem.

22  at 17.  However, that FormFactor's bottom line actually improved two out of the six quarters restated

23  is not inconsistent with plaintiffs' allegations of fraud, particularly in light of the Company's shoddy

24  internal controls and the fact that the Company manipulated its financials by (1) overvaluing

25  inventory (which was restated), and (2) shifting cost of revenue to R&D (which was not restated).

26  _____

27  [15]     "Huang Decl." refers to the declaration of Shirley H. Huang in support hereof, filed herewith.

28

1    Defendants do not and cannot dispute that understating financial results is still a violation of GAAP

2    and distorts the Company's overall financial picture.  It raises "questions about the reliability and

3    integrity of information and those results and will probably be self-defeating in the long run." FASB,

4    Statements of Financial Accounting, Concepts, No. 2, ¶96.  Moreover, because of the primitive

5    internal controls at FormFactor, the restated financial results might not be accurate.

6           Finally, defendants try to cast the restatement as the result of the failure of rank-and-file

7    employees to follow Company procedures, claiming that the audit committee of the Board of

8    Directors of FormFactor has determined that senior management was not aware of the non-

9    compliance.  Defs. Mem. 13.  Judge Alsup has precisely rejected this in *LDK*.  "[O]fficers and

10   directors are not exonerated when their own audit committee finds nothing wrong in the company's

11   accounting practices.  To rule otherwise would create a huge fox-guards-the-chicken-house loophole

12   in our private securities law enforcement." *LDK*, 2008 U.S. Dist. LEXIS 42425, at *32.  At the

13   pleading stage, defendants' interjection of self-serving facts is not proper.  *Lee v. City of Los*

14   *Angeles*, 250 F.3d 668, 668-90 (9th Cir. 2001).  Defendants are improperly attempting to dispute the

15   facts when "[a]ll allegations of material fact made in the complaint are taken as true and construed in

16   the light most favorable to the plaintiff."  *Am. W.*, 320 F.3d at 931; *Daou*, 411 F.3d at 1013.

17                           **4.      Defendants' Sarbanes-Oxley Certifications Stating that They**
                                  **Had Reviewed FormFactor's Internal Controls Admit Scienter**
18
19          The SOX certifications signed quarterly by defendants Khandros and Foster provide further

20   compelling support for an indicia of scienter.  ¶¶204-207.[16]  Even before SOX certifications were

21   required, the Ninth Circuit in *Howard v. Everex Sys. Inc.*, 228 F.3d 1057, 1061 (9th Cir. 2000), held

22   that "when a corporate officer signs a document on behalf of the corporation, that signature will be

23   rendered meaningless unless the officer believes that the statements in the document are true."  The

24   _____

25   [16]     Plaintiffs also allege that the SOX certifications were false when made.  ¶¶204, 208-218.
     *See, e.g.*, *In re Rent-Way Sec. Litig.*, 209 F. Supp. 2d 493, 508-09, 516-18 (W.D. Pa. 2002)
26   (upholding claims based on concealment of defects in internal accounting systems and controls);
     *Miller v. Material Scis. Corp.*, 9 F. Supp. 2d 925, 927-29 (N.D. Ill. 1998) (Where defendants were
27   responsible for statements claiming existence of adequate internal controls, they were at least
     reckless in failing to discover false journal entries made by corporate controller.).
28

1    certification requirements were expressly intended to prevent top executives from using a "head in

2    the sand" defense to actions for securities fraud committed on their watch.  *In re ProQuest Sec.*

3    *Litig.*, 527 F. Supp. 2d 728, 743 (E.D. Mich. 2007).

4            While a few circuits have criticized pleading a securities fraud case based on SOX

5    certification as the sole basis, plaintiffs do not contend that defendants Khandros and Foster's SOX

6    certifications, standing alone, raise a strong inference of scienter.  *See Garfield v. NDC Health*

7    *Corp.*, 466 F.3d 1255, 1266-67 (11th Cir. 2006); *Cent. Laborers' Pension Fund v. Integrated Elec.*

8    *Servs. Inc.*, 497 F.3d 546, 552 (5th Cir. 2007).  Rather, the facts of this case warrant a finding that

9    defendants Khandros' and Foster's certifications further support a compelling inference of scienter,

10   particularly in light of their repeated attestations that the Company's results presented in the SEC

11   filings were accurate "based on our knowledge" and "based on our most recent evaluation of internal

12   control of financial reporting."  FAC, Exs. 1-3; Huang Decl., Exs. B-F.[17]  Defendant Foster was

13   specifically hired in late 2004 to address the Company's internal control deficiencies.  ¶44.  It would

14   be unbelievable that defendants did not know about the material weakness in the Company's internal

15   controls when the Company had already restated its financial statements twice prior to the Class

16   Period.  ¶43.  Worse yet, the Company had to restate again in November 2007 based on the same

17   material weakness that existed pre-Class Period, admitting essentially that it did not consistently

18   follow its accounting policies for valuing inventory, resulting in material misstatement of inventory

19   and cost of revenue.  ¶¶82-83, 155, 183-191.  The repeated restatements and the magnitude of the

20   on-going manipulations of overvaluing inventory and treating scrap as R&D constitute the "glaring

21   accounting irregularities" and "red flags" that even other Circuits recognize to hold the person

22   signing the certification at least "severely reckless" in certifying the financial statements.  *Garfield*,

23   466 F.3d at 1266-67; *Cent. Laborers'*, 497 F.3d at 552; *Winer Family Trust v. Queen*, 503 F.3d 319,

24   334 (3rd Cir. 2007).

25   _____

26   [17]    Plaintiffs hereby submit defendants Khandros' and Foster's quarterly SOX certifications as
        Exhibits B-F to Huang Decl.  These certifications are referenced in ¶204 of the FAC and plaintiffs
27   hereby request the Court take judicial notice of the certifications.  *Connetics*, 2008 U.S. Dist. LEXIS
        9634, at *12.
28

1  The inferences of scienter flowing from the SOX certifications here are strengthened by

2  witness accounts and defendants' admission that the restatement resulted from deficiencies in

3  FormFactor's control procedures.  CW5, a former Senior Cost Accountant, and CW6, a former

4  Senior Financial Analyst, both characterized FormFactor's inventory accounting processes and

5  financial reporting processes as "primitive."  ¶77.  CW9, the former Senior IT Director who was

6  brought in to implement systems complying with SOX, also confirms that the Company did not have

7  any adequate systems in place which permitted manipulation of raw data.  ¶¶40, 78.  CW3, the

8  former veteran engineer at FormFactor, also characterizes virtually all of FormFactor's systems,

9  processes and controls as "inadequate," including no documentation of processes and procedures in

10 the manufacturing/production process.  ¶79.  Indeed, courts within this Circuit have reached the

11 same finding.  *In re Lattice Semiconductor Corp. Sec. Litig.*, No. CV04-1255-AA, 2006 U.S. Dist.

12 LEXIS 262, at *37, *45-*51 (D. Or. Jan. 3, 2006) (SOX certifications provide evidence either that

13 defendants knew about the accounting impropriety, or, alternatively, knew that the controls they

14 attested to were inadequate); *In re Am. Italian Pasta Co. Sec. Litig.*, No. 05-0725-CV-W-ODS, 2006

15 U.S. Dist. LEXIS 40548, at *21 (W.D. Mo. June 19, 2006) (By signing the Sarbanes-Oxley

16 certifications, defendants "indicated he had reviewed and was familiar with the underlying facts

17 giving rise to those documents . . . .").

18 Moreover, that the Company is now purportedly taking remediation steps to address the

19 design of controls over inventory valuation suggests that the Company did not have these internal

20 control measures in place during the Class Period.  ¶82.  Defendant Foster and Controller Alcarez

21 also resigned from or left the Company since the restatement.  ¶¶83, 200.  *In re Adaptive Broadband*

22 *Sec. Litig.*, No. C 01-1092 SC, 2002 U.S. Dist. LEXIS 5887, at *42-*43 (N.D. Cal. Apr. 2, 2002)

23 (resignations and replacement of CFO as financials were being restated and as company was

24 conducting its own internal investigation add one more piece to the scienter puzzle).  As Judge Alsup

25 explained, such reforms considered with the restatement, resignations of Foster and other key

26 financial personnel and the Company's own admissions support a strong inference of scienter:

27            This was strong medicine.  Such house-cleaning and reforms do not follow
           innocent mistakes.  Rather, they customarily, even if not invariably, follow systemic
28            and fraudulent abuse of internal financial controls.  These circumstances, combined

1    with the announcement of the impending restatement establish a strong inference that
2    the company itself believes that fraud led to materially misleading financials for the
     period in question.  This seems even clearer in light of the probability that CEO
3    Walid Maghribi's resignation was forced, coming as it did only days before the
     commencement of the internal legal and accounting investigation.

4   *In re Sipex Corp. Sec. Litig.*, No. C 05-00392 WHA, 2005 U.S. Dist. LEXIS 30854, at *3-*4 (N.D.

5   Cal. Nov. 17, 2005).

6           **5.      Defendants' Insider Trading Provides Further Coherence to the
                       Collective Inferences of Scienter**

7

8           Defendants Khandros, Foster and Bronson sold at least 767,879 shares and pocketed more

9   than $29.76 million in illicit insider trades.  ¶173.  Bronson sold 36.83% of his FormFactor holdings,

10  selling 25,000 shares for over $1 million in illicit insider trading proceeds.  ¶¶13, 175.  Foster sold

11  19,800 shares, or 87.29% of his FormFactor holdings, pocketing $864,144 in insider trading

12  proceeds.  ¶¶13, 176. Khandros sold 723,079 shares, or 23.91% of his FormFactor holdings for

13  insider trading proceeds of over $27.86 million. ¶¶13, 177.  He also timed his insider trades well by

14  making 36 transactions between June and September 2007, all between $43.00 and $46.07 per share,

15  for insider trading proceeds of $4.77 million, right before the Company started disclosing the true

16  operating and financial conditions of the Company.  ¶13.

17          Courts in this circuit have held that sales of lesser amounts or percentages support a strong

18  inference of fraud.  *See, e.g.*, *Fecht v. Price Co.*, 70 F.3d 1078, 1084 (9th Cir. 1995) (sales of $1.6

19  million by two insiders unusually suspicious); *In re SeeBeyond Techs. Corp. Sec. Litig.*, 266 F. Supp

20  2d 1150, 1168-69 (C.D. Cal. 2003) (selling 7.6% of stock holdings added to scienter inference);

21  *Hayley v. Parker*, No. SA CV 01-69 DOC (EEx), 2001 U.S. Dist. LEXIS 23255, at *1, *16-*17

22  (C.D. Cal. Aug. 31, 2001) (disposing 11% of stock holdings supported scienter inference); *In re*

23  *Omnivision Techs., Inc.*, No. C-04-2297 SC, 2005 U.S. Dist. LEXIS 16009, at *1, *14-*15 (N.D.

24  Cal. July 29, 2005) (selling 18% of stock holdings raised scienter inference); *Hi/fn*, 2000 U.S. Dist.

25  LEXIS 11631, at *30 n.4 (despite defendants retaining 80% of their holdings, that five defendants

26  individually sold 0%, 20%, 40%, 75% and 100%, is sufficient to provide support for scienter).

27          Defendants contend that the options granted to defendants Foster and Bronson should be

28  counted as part of their stock holding, regardless of whether those options were exercisable or

1     exercised. Defs. Mem. at 25-26. No case law supports this kind of calculation. Defendants cited

2     none. In fact, even *Silicon Graphics* only considered "vested options" as part of the insider trading

3     analysis. *Silicon Graphics*, 183 F.3d at 986-87 (considering "exercisable options" represent the

4     owner's trading potential). Under these cases, even if the Court looks at defendants' insider trades

5     based on their proffer that Foster and Bronson sold 17.1% of their total increased holdings, the

6     percentage supports an inference of scienter.

7        Defendants argue that 73% of Foster's sales, 9,000 shares out of total sales of 14,400, were

8     made during a period in which earnings and gross margins were understated, and thus refute any

9     inference of fraud. Defs. Mem. at 25. Not so. Defendant Foster's trades all took place between

10    August 2006 and June 2007, when the Company overstated its inventory. ¶¶176, 188. At the peak,

11    when the Company overstated its inventory by as much as 30.92% in 4Q06 and 23.76% in 1Q07,

12    Foster dumped 12,600 shares (out of 19,800 total disposed during the Class Period), for no less than

13    $43.00 per share. ¶176. The timing of his sale is suspicious.

14       Khandros concedes he disposed 23.91% of his stock holding during the Class Period, but

15    argues that all of his stock sales were made pursuant to pre-planned trades in 10b5-1 trading plans.

16    Defs. Mem. at 26. Defendants' attempt to offer facts not alleged in the FAC at the pleading stage is

17    improper. *Hi/fn*, 2000 U.S. Dist. LEXIS 11631, at *30 (concluding that plaintiffs' allegations

18    present questions of fact as to the timing of stock sale, despite defendants' explanation, which are

19    not best resolved on a motion to dismiss); *In re Retek Inc.*, No. Civ. 024209, 2005 WL 1430296, at

20    *7 (D. Minn. Mar. 7, 2005) (rejecting to take judicial notice of any trading information beyond that

21    alleged within the four corners of the pleading). Even if there had been such a plan, it does not

22    explain why Khandros made 32 transactions in September and October 2007 alone, at no less than

23    $43 per share, before the Company started to leak out bad news. ¶177. The timing of these trades is

24    highly suspect. *Hi/fn*, 2000 U.S. Dist. LEXIS 11631, at *30 (insider selling right before disclosure

25    of bad news and near the time that misrepresentations were made raises an inference of scienter).

26    *See Am. W.*, 320 F.3d at 938-40 (timing of sales which give rise to a maximization of personal

27    benefit is strong circumstantial evidence of scienter).

28

1    Finally, defendants absurdly claim insiders actually "lost" over $99 million by retaining some

2    of their shares. Defs. Mem. at 24. Defendants are wrong. First, defendants mistakenly assume that

3    the only motive probative of scienter is the motive to "cash out" fully by divesting themselves of

4    their stake in the Company. Defendants may have sold part of their stock to cushion loss, but

5    retained stock to control the Company. *In re MicroStrategy, Inc. Sec. Litig.*, 115 F. Supp. 2d 620

6    (E.D. Va. 2000). Furthermore, as *MicroStrategy* put it, "an insider may not always trade all his

7    shares in the company for which he possesses the inside information; the trader may hold on to a

8    portion of his shares to hedge against the unforeseen or to obscure the insider trading from the SEC."

9    *Id.* at 647 (citing *In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1427 (9th Cir. 1994)). Moreover,

10   defendants' calculation of damages is grossly inflated[18] and wrongly assumes that defendants and the

11   insiders had acquired their shares during the Class Period and paid for their shares at the market

12   price. As defendants' Forms 4 reflect, the cost that defendants paid for their FormFactor stock was

13   the exercise price much below the market price.[19] Thus, defendants' purported loss, if any, is the

14   difference between what they paid for in exercising their stock options and the price of the stock

15   after the inflation had been removed. As such, even after the stock price drop at the end of the Class

16   Period, defendants still have a net gain, not loss.

17   The Ninth Circuit has recognized that the incentive for executives to receive stock options

18   can provide an additional evidence of scienter. *Am. W.,* 320 F.3d at 944 (Defendants "were

19   motivated to inflate America West's financial results and stock prices because their eligibility for

20   stock options and executive bonuses were based principally on the company's financial

21   performance."). Where a large portion of each defendants' compensation package was tied to and

22   dependent upon FormFactor's reported financial results and the performance of the Company's stock

23   price, defendants' stock options further support scienter. ¶178.

24   _____

25   [18]    Using defendants' formula for calculating damages, plaintiffs as a Class would suffer billions
26   in damages.

27   [19]    For example, defendant Bronson's Forms 4 reflect that he had acquired FormFactor shares
     pre-Class Period for $6.50 per share. Defs. RJN, Ex. 30.

28

1    Defendant Freeman additionally moved to dismiss on the ground that he did not make any

2  stock sale during the Class Period.  *See* Freeman Mem. at 3.  Freeman's lack of insider trading alone

3  is not dispositive, as the Supreme Court recognized, "While it is true that motive can be a relevant

4  consideration, and personal financial gain may weigh heavily in favor of a scienter inference, ***we***

5  ***agree with*** the Seventh Circuit that the absence of a motive allegation is not fatal."  *Tellabs*, 127 S.

6  Ct. at 2511, citing *Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 437 F.3d 588, 601 (7th Cir. 2006);

7  *Am. W.*, 320 F.3d at 944 ("The lack of stock sales is not dispositive as to scienter.").

8        **C.    The FAC Sufficiently Pleads Control Person Liability**

9        Section 20(a) of the Securities Exchange Act of 1934 establishes liability for actors who

10  "control" any person liable under the Act.  15 U.S.C. §78t(a).  Plaintiffs have sufficiently pled

11  violations of §10(b) and Rule 10b-5 against the individual defendants.  Such allegations are

12  sufficient to state control person liability against FormFactor.  *See Southland Sec. Corp. v. INSpire*

13  *Ins. Solutions Inc.*, 365 F.3d 353, 383 (5th Cir. 2004) (a corporation can have §20(a) liability for the

14  primary violations of its employees).  Further, "[a]t the motion to dismiss stage, general allegations

15  concerning an individual defendant's title and responsibilities are sufficient to establish control."  *In*

16  *re Metawave Commc'ns Corp. Sec. Litig.*, 298 F. Supp. 2d 1056, 1087 (W.D. Wash. 2003) (citing

17  *Adaptive*, 2002 U.S. Dist. LEXIS 5887, at *58-*59.  The analysis as to whether an individual is a

18  control-person is "an intensely factual question" not to be decided at the pleading stage.  *CV*

19  *Therapeutics*, 2004 U.S. Dist. LEXIS 17419, at *36, quoting *Am. W.*, 320 F.3d at 945.

20  **V.    CONCLUSION**

21        For the above reasons, defendants' motions to dismiss should be denied.  If any part of

22  defendants' motions is granted, plaintiffs respectfully request leave to amend.  *Eminence Capital,*

23  *L.L.C. v. Aspeon, Inc.*, 316 F.3d 1048, 1051 (9th Cir. 2003) (leave to amend liberally granted).

24

25  DATED:  June 4, 2008                    COUGHLIN STOIA GELLER
                                              RUDMAN & ROBBINS LLP
26                                         JEFFREY W. LAWRENCE
                                           SHIRLEY H. HUANG
27
                                           _____
28                                              s/ Shirley H. Huang
                                           SHIRLEY H. HUANG

1

2          100 Pine Street, Suite 2600
           San Francisco, CA  94111
3          Telephone:  415/288-4545
           415/288-4534 (fax)

4          Lead Counsel for Plaintiffs

5          SULLIVAN, WARD, ASHER & PATTON, P.C.
           CYNTHIA J. BILLINGS
6          25800 Northwestern Highway
           1000 Maccabees Center
7          Southfield, MI  48075-1000
           Telephone:  248/746-0700
8          248/746-2760 (fax)

9          Additional Counsel for Plaintiff

10

11   T:\CasesSF\FormFactor\BRF00051325.doc

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

<u>CERTIFICATE OF SERVICE</u>

2      I hereby certify that on June 4, 2008, I electronically filed the foregoing with the Clerk of the

3  Court using the CM/ECF system which will send notification of such filing to the e-mail addresses

4  denoted on the attached Electronic Mail Notice List, and I hereby certify that I have mailed the

5  foregoing document or paper via the United States Postal Service to the non-CM/ECF participants

6  indicated on the attached Manual Notice List.

7      I further certify that I caused this document to be forwarded to the following designated

8  Internet site at:  http://securities.csgrr.com/.

9      I certify under penalty of perjury under the laws of the United States of America that the

10  foregoing is true and correct.  Executed on June 4, 2008.

11

12
                                       s/ Shirley H. Huang
                                   SHIRLEY H. HUANG

13                                 COUGHLIN STOIA GELLER
14                                   RUDMAN & ROBBINS LLP
                                 100 Pine Street, 26th Floor
15                               San Francisco, CA  94111
                                 Telephone:  415/288-4545
16                               415/288-4534 (fax)

17                               E-mail:shirleyh@csgrr.com

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS – C-07-05545-SI

# Mailing Information for a Case 3:07-cv-05545-SI

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Ramzi Abadou**
  ramzia@csgrr.com,debh@csgrr.com

- **Shirley H. Huang**
  shirleyh@csgrr.com

- **Jeffrey W. Lawrence**
  jeffreyl@csgrr.com,e_file_sf@csgrr.com,e_file_sd@csgrr.com,GDarwish@csgrr.com

- **Alan R Plutzik**
  aplutzik@bramsonplutzik.com

- **Darren Jay Robbins**
  e_file_sd@csgrr.com

- **Arthur L. Shingler , III**
  ashingler@scott-scott.com,ssawyer@scott-scott.com

- **Robert P. Varian**
  rvarian@orrick.com,bclarke@orrick.com

- **Shawn A. Williams**
  shawnw@csgrr.com,travisd@csgrr.com,moniquew@csgrr.com,e_file_sf@csgrr.com,cwood@csgrr.com,e_file_sc

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

```
Catherine J Kowalewski
Lerach Coughlin et al LLP
655 W Broadway #1900
San Diego, CA 92101

David C. Walton
Lerach Coughlin Stoia Geller Rudman & Robbins LLP
655 West Broadway
Suite 1900
San Diego, CA 92101-3301
```