# EXHIBIT C

Westlaw.

Slip Copy
Slip Copy, 2008 WL 2220600 (N.D.Cal.)
(Cite as: 2008 WL 2220600 (N.D.Cal.))

Page 1

In re FoxHollow Technologies, Inc., Securities Litigation
N.D.Cal.,2008.
Only the Westlaw citation is currently available.
United States District Court,N.D. California.
In re FOXHOLLOW TECHNOLOGIES, INC., SECURITIES LITIGATION
This Order Relates to: All Actions.
No. C 06-4595 PJH.

May 27, 2008.

Mark Cotten Molumphy, Joseph W. Cotchett, Kelly L. Sommerfeld, Cotchett, Pitre & Mccarthy, Burlingame CA, Bruce Lee Simon, Pearson, Simon, Soter, Warshaw & Penny, LLP, San Francisco, CA, Marshall N. Perkins, The World Trade Center, Baltimore, MD, Seth Adam Safier, Gutride Safier LLP, San Francisco, CA, for Plaintiffs.
Paula Lenore Blizzard, Robert Addy Vannest, Brook Dooley, Keker & Van Nest, L.L.P., San Francisco, CA, for Defendants.

## ORDER GRANTING MOTION TO DISMISS

PHYLLIS J. HAMILTON, District Judge.
*1 Defendants' motion to dismiss the first amended complaint came on for hearing before this court on January 23, 2008. Plaintiff appeared by his counsel Mark Molumphy, and defendants appeared by their counsel Paula Blizzard and Robert VanNest. Having read the parties' papers and carefully considered their arguments, and good cause appearing, the court hereby GRANTS the motion.

## INTRODUCTION

This is a proposed class action alleging violations of federal securities laws. Plaintiff Matthew Roberts seeks to represent a class of individuals who purchased shares of stock in defendant FoxHollow Technologies, Inc. ("FoxHollow" or "the Company"). The proposed class period extends from August 28, 2005, to January 26, 2006.

Plaintiff alleges that defendant John B. Simpson, M.D. ("Simpson"), who founded FoxHollow and took it public, attempted to persuade FoxHollow's officers and directors that the Company should acquire LuMend, Inc. ("LuMend"), a privately-held company also started by Simpson. Plaintiff asserts that when certain officers and directors refused to accede to Simpson's request, he forced three executives to resign or caused them to be terminated; and that after FoxHollow announced that the officers were leaving, the price of the Company's stock dropped.

Plaintiff alleges that in failing to reveal this internal management disagreement prior to the actual departures of the officers, Simpson and FoxHollow violated § 10(b) of the 1934 Securities Exchange Act, and Rule 10b-5 promulgated thereunder, and that Simpson also is liable under § 20(b) of the Act as a control person.

Defendants now seek an order dismissing the first amended complaint ("FAC") for failure to state a claim.

## BACKGROUND

A. Pre-Class Period Allegations

FoxHollow, which was based in Redwood City, California, was founded by Simpson in 1996.[FN1] Its sole product was "SilverHawk," a medical device used to treat peripheral artery disease ("PAD"), which results from the accumulation of plaque in arteries. Silverhawk is a catheter that is inserted inside a clogged artery. A spinning blade within the catheter cuts through and removes plaque. FAC ¶ 2.

> FN1. On October 11, 2007, FoxHollow merged with ev3, Inc., of which it is now a

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2008 WL 2220600 (N.D.Cal.)
(Cite as: 2008 WL 2220600 (N.D.Cal.))

wholly-owned subsidiary.

At the same time that Simpson founded FoxHollow, he formed LuMend .[FN2]LuMend had one primary product, "Frontrunner," also a catheter inserted into an artery to penetrate plaque blockages and treat PAD. Unlike SilverHawk, however, Frontrunner does not remove the plaque, but rather creates an opening so that other treatments can be used. FAC ¶¶ 3, 37.

> FN2. Simpson formed LuMend with his medical partner Matthew Selmon, M.D. ("Selmon"). FAC ¶ 36. Tomoaki Hinohara, M.D. ("Hinohara"), who practices with Simpson and Selmon in Redwood City, helped invent and develop the LuMend technology and is listed as a co-inventor on several patents issued to LuMend, or on patent applications made by LuMend. FAC ¶ 40. Both FoxHollow and LuMend were financially backed by Simpson, through DeNovo Ventures ("DeNovo"), a venture capital firm founded by Simpson and Richard Ferrari ("Ferrari") in Menlo Park in 2000. FAC ¶ 38.

In September 2004, Simpson began preparations to take FoxHollow public. At the time, the Company had eight executive officers, including Chief Executive Officer Robert Thomas ("Thomas"); Chief Financial Officer Matthew Ferguson ("Ferguson"); Chief Operating Officer David Martin ("Martin"); Vice-President of Sales William Hoffman ("Hoffman"); and Vice-President of Marketing Leslie Trigg ("Trigg").[FN3] The members of the Board of Directors were Simpson, Hinohara, Ferrari, Thomas, Ryan Drant ("Drant"), and Sanford Fitch ("Fitch"). The Company had 217 employees, and had just completed a move into a 61,000 square-foot facility in Redwood City. FAC ¶¶ 44-45.

> FN3. Also employed at FoxHollow in some capacity at this time was Douglas ("Duke") Rohlen ("Rohlen"). FoxHollow

disclosed to investors at the time of the initial public offering that Rohlen was Simpson's son-in-law, and that Ferguson was Rohlen's brother-in-law.

*2 On October 27, 2004, FoxHollow filed a Registration Statement and Prospectus to initiate its public offering. FoxHollow offered 4.5 million shares of its common stock at an initial price of $14.00 per share. FAC ¶ 46.

FoxHollow's SEC filings from the time of the Registration Statement through August 2005 reported increasing revenues as well as expansion of Company facilities and a growing workforce. Plaintiff alleges that the public filings and other public statements created a public impression that the Company was doing well and had top-rate management.

On December 6, 2004, FoxHollow filed its Form 10-Q for the third quarter of 2004, reporting net revenue of $11.6 million for 3Q04, compared with revenue of $650,000 for the 3Q03. Revenue for the first nine months of 2004 was $23.9 million, compared to $876,000 for the first nine months of 2003. FAC ¶ 47.

On February 14, 2005, FoxHollow filed a Form 8-K and issued a related press release, announcing its results for the fourth quarter of 2004. The Company announced revenue of $14.7 million for 4Q04, compared with $11.6 million for 3Q04. For the full year, FoxHollow reported net revenue of $38.6 million, compared to $2.6 million for 2003. FAC ¶ 48.

On March 28, 2005, FoxHollow filed its Form 10-K for 2004, which repeated the year-end results announced on February 14, 2005. The Company also announced that it had increased its staff to 244 employees, noting, "We believe our future success will depend on our ability to attract, hire and retain qualified personnel," and "We believe our employee relations are good."FAC ¶ 49.

On April 27, 2005, FoxHollow filed a Form 8-K and issued a related press release, announcing its

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2008 WL 2220600 (N.D.Cal.)
**(Cite as: 2008 WL 2220600 (N.D.Cal.))**

financial results for the first quarter of 2005. The Company announced that net revenue was $21.5 million, which represented a 46% increase over 4Q04 revenue ($14.7 million), and a 350% increase over 1 Q04 revenue ($4.8 million). Net loss for the quarter was $6.5 million, compared with a net loss of $7.5 million in 4Q04. The Company also indicated that it had 89 direct salespeople, compared with 69 as of 4Q04, and was on track to have about 125 direct sales professionals by the end of 2005. FAC ¶ 50.

Also on April 27, 2005, FoxHollow held an earnings conference call. Thomas, Rohlen, and Ferguson participated for FoxHollow, and other participants included analysts from J.P. Morgan, First Albany, Piper Jaffray, and Thomas Weisel Partners. After reporting on FoxHollow's results for 1 Q05, Thomas stated,

> We are executing our plan by growing our sales force, increasing capacity and implementing effective marketing and sales programs.... [W]e believe our story will only get better in the months and years ahead.... We believe we have the resources, technology, people and financials to realize our goals not only with our core business but in other exciting areas as well.

Thomas added that FoxHollow had a "team that is executing on every level imaginable."FAC ¶ 51.

**\*3** On April 29, 2005, FoxHollow filed its Schedule 14A Proxy Statement, [FN4] announcing the annual shareholder's meeting, and containing the Board's recommendation that Thomas and Hinohara be re-elected for new three-year terms on the Board. The Proxy Statement also set forth the Company's compensation plan for executive officers. FAC ¶ 53.

> FN4. Plaintiff alleges that the Proxy Statement was filed on May 16, 2005, *see* FAC ¶ 53, but the copy of the Proxy Statement posted on the SEC's website shows that the filing date was April 29, 2005.

As of the date the Proxy Statement was filed, FoxHollow's Compensation Committee consisted of Drant, Ferrari, and Hinohara. *Id.* The Compensation Committee reported that the major components of the compensation plan were base salary, plus cash bonuses, plus potential stock options. With respect to the cash bonuses, the Committee reported that it had met and approved a special bonus plan for three officers-the Chief Executive Officer, the Chief Operating Officer, and the Chief Financial Officer (at that time, Thomas, Martin, and Ferguson). This plan provided additional compensation conditioned on the achievement of revenue and performance goals. FAC ¶ 54.

The Compensation Committee approved an additional bonus for the same three officers, in the event that the revenue and performance goals were exceeded, and stated that stock options would be awarded to FoxHollow's executive officers and other employees, "both as a reward for past individual and corporate performance and as an incentive for future performance."*Id.* In addition, the compensation table reflected that Thomas, Martin, and Hoffman had received salary raises from the previous year, and that all three had received cash bonuses and stock option grants.[FN5]FAC ¶¶ 55-56.

> FN5. The Proxy Statement listed all FoxHollow's executive officers, and provided compensation details for the CEO and the other four most highly-paid executives. Thus, in addition to the details for Thomas, Martin, and Hoffman, the compensation table showed that Ferguson had received a salary increase, and that Ferguson and Trigg had received bonuses and stock option grants. There was no salary increase shown for Trigg because she was not a FoxHollow employee the previous year.

Plaintiff asserts that the Proxy Statement's description of the option grants as "longterm compensation," as well as the fact that the option grants had a ten-year term, provided a clear indicator to the public market that FoxHollow wanted to retain

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Thomas, Martin, and Hoffman "for a long term" and to provide all three with financial incentives to remain at FoxHollow. *Id.*

On May 13, 2005, FoxHollow filed its Form 10-Q for 1 Q05. Along with reporting the previously announced financial results, the Company stated, in the section headed "Factors Affecting Future Operating Results,"

> Our success largely depends on the skills, experience and efforts of our officers and other key employees. Any of our officers and other key employees may terminate their employment at any time. The loss of any of our senior management team could harm our business.... Failure to attract and retain personnel, particularly technical and sales and marketing personnel, would harm our ability to compete effectively and grow our business. The announcement of the loss of one of our key employees could negatively affect our stock price.

The Company also stated
> We may acquire companies, products or technologies that we believe to be complementary to the present or future direction of our business. If we engage in such acquisitions, we may have difficulty integrating the acquired personnel, financials, operations, products, or technologies. Acquisitions may dilute our earnings per share, disrupt our ongoing business, distract our management and employees, and increase our expenses, which could harm our business....

*4 FAC ¶ 52.

On May 18, 2005, the Adaptive Business Leaders organization presented Thomas with its highest honor, the Platinum "ABBY" award, at the Seventh Annual Innovations in Healthcare event and awards ceremony. A news announcement of this award on PRNewswire on May 19, 2005, stated that Thomas was recognized for his work at FoxHollow, and that the Company had generated more than $40 million in revenue over the previous 12 months. FAC ¶ 57.

During the period between May 16, 2005, and May 26, 2005, FoxHollow's share price climbed from about $30 per share to $40 per share. FAC ¶ 58.

On June 20, 2005, FoxHollow filed a Form 8-K, and issued a press release announcing that Jeffrey Child had been added to FoxHollow's Board of Directors, filling a vacancy left by the resignation of Ferrari on June 17, 2005. Plaintiff asserts that Child was a "close friend and neighbor of Ferguson."FAC ¶ 59.

On July 27, 2005, FoxHollow filed a form 8-K, and issued a press release announcing its financial results for the second quarter of 2005, including revenue of $28.7 million, a 33% increase over revenue of $21.5 million in 1Q05, and a 283% increase over the 2Q04 revenue of $7.5 million. The net loss for the quarter was $3.4 million, compared with a net loss of $6.5 million in 1 Q05, and a net loss of $8.8 million in 2Q04. FAC ¶ 60.

Also on July 27, 2005, FoxHollow held an earnings conference call. Thomas, Rohlen, and Ferguson participated for FoxHollow, and other participants included analysts from J.P. Morgan, First Albany, Piper Jaffray, and William Blair. During the conference call, Thomas stated,

> An important piece of the FoxHollow infrastructure story is our people. We are continuing to add to our bench strength with the addition of management personnel in all areas of the Company. I want to take this opportunity to acknowledge the tremendous efforts of all of our employees throughout the organization, including operations, R & D, sales, marketing, IT, the critical and regulatory department, and our finance and administrative groups.

FAC ¶ 61.

On July 28, 2005, FoxHollow's stock price rose to an all-time high trading price of $55.20. On July 29, 2005, FoxHollow filed its Form 10-Q for 2Q05, which reported its financial results for the second

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2008 WL 2220600 (N.D.Cal.)
(Cite as: 2008 WL 2220600 (N.D.Cal.))

Page 5

quarter, including record revenue. FAC ¶ 62.

Plaintiff alleges that throughout the period from November 2004 through July 2005, as FoxHollow released information regarding increasing sales and revenue in the above-described public filings and statements, an internal conflict was brewing between Simpson and certain officers and directors of the Company.

Plaintiff asserts that in November 2004, Simpson asked FoxHollow's management to consider an acquisition of LuMend. Plaintiff alleges that FoxHollow's financial, sales, and marketing staff performed extensive due diligence and evaluation of LuMend over the next several months, and at some point concluded that an acquisition made no sense and could actually be damaging to FoxHollow's ongoing sales efforts. Plaintiff bases these allegations on information provided by "Executive Employee Witnesses 1, 2, and 3."[FN6] FAC ¶ 65.

> FN6. Apart from allegations pertaining to plaintiff personally, plaintiff alleges the facts pled in the FAC on information and belief, "based upon, *inter alia,* the investigation conducted by plaintiff's counsel."The investigation of counsel included a review of FoxHollow's financial condition, documents pertaining to FoxHollow and LuMend, regulatory filings, reports, analyst conference call transcripts, press releases, and media reports about the Company; and also included interviews with three "confidential witnesses," alleged to have been executive employees of FoxHollow during the relevant period. Plaintiff refers to these "confidential witnesses" as "Executive Employee Witnesses 1, 2, and 3."

*5 Plaintiff claims that certain of FoxHollow's executive officers, including Martin, Hoffman, and Trigg, informed Simpson and Thomas that an acquisition made no sense and that LuMend involved inferior technology. Plaintiff asserts that the only

two executive officers who were in favor of the acquisition were personally related to Simpson-Rohlen (Simpson's son-in-law) and Ferguson (Rohlen's brother-in-law). FAC ¶ 66.

Relying on information provided by Executive Employee Witness 1, plaintiff claims that Simpson and Thomas first attempted to "coerce" Martin and Hoffman, by offering each of them the opportunity to personally run LuMend. However, both rejected the offer. FAC ¶ 67.

Plaintiff asserts that Rohlen took Martin to lunch and "tried to convince him to comply with the Lu[M]end acquisition."When Martin refused, citing the "problems" with the LuMend deal, and asserting that Simpson had a conflict of interest in actively promoting the deal to FoxHollow management, Rohlen allegedly "asked in exasperation, 'What am I going to tell my father-in-law?' Martin replied, 'Tell him the truth.' " Thereafter, according to plaintiff, Simpson told Martin, "[Y]ou're never going to be CEO," which plaintiff characterizes as "an obvious threat." FAC ¶ 68.

Relying on information provided by Executive Employee Witness 2, plaintiff asserts that Rohlen also took Trigg aside to attempt to persuade her to sign on to the acquisition. Trigg, who had completed a marketing analysis of the proposed transaction, allegedly told Rohlen that LuMend's product was a bad product, that there were not enough revenues to justify the acquisition, and that Simpson's personal involvement created a conflict of interest. Plaintiff claims that Simpson then took Trigg aside and asked whether it was "you guys" (referring, according to plaintiff, to Martin, Hoffman, and Trigg) who were "running the company" (referring to their refusal to agree to the acquisition of LuMend), or whether it was Thomas. Simpson allegedly told Trigg, who was about to go out on maternity leave, that he was going to go forward with LuMend "with or without you." FAC ¶ 69.

Relying on information provided by Executive Employee Witness 3, plaintiff alleges that Simpson set

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2008 WL 2220600 (N.D.Cal.)
(Cite as: 2008 WL 2220600 (N.D.Cal.))

Page 6

up a meeting with Martin and Hoffman in a room at FoxHollow's headquarters, to discuss their refusal to agree to the acquisition of LuMend. Plaintiff asserts that before Martin arrived, Simpson asked Hoffman what he needed to do to convince Hoffman that LuMend was a worthwhile project. Hoffman replied that LuMend "would never work for FoxHollow's business model," and listed all the reasons. After Hoffman had finished, Simpson allegedly told him, over and over, "six or seven times, 'Not afraid of you Hoffman, Not afraid of you Hoffman.'" FAC ¶ 70 (punctuation as in original).

Relying on information provided by Executive Employee Witnesses 1 and 3, plaintiff also claims that at one point, Simpson cleaned out his desk and "stormed out of FoxHollow's offices, stating he was quitting." At a subsequent meeting, when Rohlen told Hoffman that Simpson had resigned from the Board, Hoffman allegedly replied, " '[Q]uick, lock the door.' " FAC ¶ 71.

B. Class Period Allegations

*6 On August 28, 2005, the start of the class period, Simpson allegedly told Thomas that the acquisition of LuMend would go forward, with or without the executive officers' consent; that the decision had been approved by the Board; that it was final and non-negotiable; and that executive team members would be asked to resign if they refused to go along with the acquisition. Simpson allegedly ordered that the transaction be closed by the end of the week. FAC ¶ 72.

Plaintiff asserts that because of "the public's perception about the state of affairs at FoxHollow," defendants had a duty to disclose this information-"an order by the Chairman to executive management to breach their fiduciary duty or else risk termination"-to the public market. FAC ¶ 72.

Plaintiff alleges that Simpson "had the power to issue and enforce his threat," because he was the Chairman of the Board, was serving as a paid "consultant" to the Company, and was FoxHollow's largest individual shareholder. Plaintiff claims that Simpson's "family members and close friends occupied positions on FoxHollow's executive management team and followed his directions." Plaintiff alleges that Simpson had "selected every member" of FoxHollow's Board, including his medical partner (Hinohara) who served on the Compensation Committee. FAC ¶ 73.

Plaintiff asserts, however, based on information obtained from Executive Employee Witnesses 1, 2, and 3, that Martin, Hoffman, and Trigg "refused to consent to Simpson's edict" and told Thomas they would not sign off on the LuMend transaction. Thus, according to plaintiff, in September 2005, Simpson was "forced" to sell LuMend to another entity. Plaintiff claims that over the following 90 days, Simpson orchestrated the removal of Thomas, Martin, and Hoffman. Trigg was not removed, according to plaintiff, because she was on maternity leave. FAC ¶ 74.

On October 26, 2005, FoxHollow filed a Form 8-K and issued a press release announcing its financial results for the third quarter of 2005. The Company reported revenue of $36.1 million, a 26% increase over the $28.7 million revenue for 2Q05, and a 212% increase over the $11.6 million revenue for 3Q04. Net loss for the quarter was $1.5 million, compared to a net loss of $3.4 million in 2Q05 and a net loss of $7.4 million in 3Q04. FAC ¶ 75.

Also on October 26, 2005, FoxHollow held an earnings conference call. Thomas, Rohlen, and Ferguson participated for FoxHollow, and analyst participants included analysts from J.P. Morgan, First Albany, Piper Jaffray, Morgan Stanley, and William Blair. After reporting on FoxHollow's successes, Thomas thanked and congratulated the "members of the FoxHollow team for their efforts and results," adding, "The performance over the past 2 years is nothing short of remarkable and we are all energized by the new Hawks that are coming in with the mindset of taking this opportunity to the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                          Page 7
Slip Copy, 2008 WL 2220600 (N.D.Cal.)
(Cite as: 2008 WL 2220600 (N.D.Cal.))

next level."A FoxHollow representative stated, "We couldn't be happier." FAC ¶ 76.

*7 On November 1, 2005, FoxHollow filed its Form 1-Q for 3Q05, reporting financial results for the quarter. FAC ¶ 77.

Based on information provided by Executive Employee Witnesses 1, 2, and 3, plaintiff alleges that on December 8, 2005, Martin, Hoffman, and Trigg were called to a meeting, and were interviewed individually by Board representatives about what they knew about Thomas and his interaction with Simpson regarding LuMend. FAC ¶ 78.

On Saturday, December 10, 2005, Martin, Rohlen, Ferguson, and Rod Steckel ("Steckel") were allegedly asked (not clear by whom) to attend a meeting at the Palo Alto offices of FoxHollow's corporate counsel. Certain Board members, including Fitch, Myrtle Potter, and Simpson also attended. Based on information provided by Executive Employee Witness 1, plaintiff asserts that Martin was informed that Thomas' departure from FoxHollow would be announced the following Monday, and that the Board was adopting a "leadership committee" composed of Martin, Rohlen, Ferguson, and Steckel to take over Thomas' responsibilities.

According to Executive Employee Witness 1, this committee was set up to "neutralize" the influence of Martin until such time as he, too, could be removed. Also at the December 10, 2005, meeting, Fitch allegedly confronted Martin with unfounded accusations about his performance as Chief Operating Officer, including allegations of "channel stuffing." FAC ¶ 79.

On Monday, December 12, 2005, FoxHollow filed a Form 8-K and issued a press release entitled, "FoxHollow Technologies Announces Management Transition." FoxHollow reported that Thomas had informed the Board that he would be "retiring" as President and Chief Executive Officer, and resigning from the Board effective January 1, 2006. At this point, Thomas had worked at FoxHollow for

nearly eight years. FAC ¶ 80.

FoxHollow also announced that Simpson would become "interim" CEO, and that it was hiring a search firm to assist in the search for a new CEO. The press release quotes Simpson as saying,

> I have maintained a very active role with the Company and look forward to leading our outstanding group of senior management until we have named a replacement. We will be looking for a permanent chief executive officer who has extensive leadership experience and who can lead the Company through its next stage of growth.

FAC ¶ 80.

Plaintiff asserts that the 8-K and the press release were materially misleading, because Thomas was forced to resign, and because Simpson did not intend on "leading" the Company's present senior management, and did not view them as "outstanding." Rather, according to plaintiff, Simpson planned to replace Martin and Hoffman just a few weeks later, and had already embarked on a plan to force their removal, either voluntarily or involuntarily. FAC ¶ 81.

Plaintiff asserts that in response to FoxHollow's announcement, Herb Greenberg of Marketwatch stated, "There is more to the story."He also allegedly stated, "He's 44. At 44, you don't retire: You quit or you are fired."FAC ¶ 82. Piper Jaffray analyst Tom Gunderson allegedly stated, "There is a strong feeling of another shoe to drop in this story."FAC ¶ 83.

*8 Also on December 12, 2005, FoxHollow held a "management transition" conference call. Thomas, Ferguson, and Simpson participated for FoxHollow, along with analysts from J.P. Morgan, Piper Jaffray, Thomas Weisel, Stephens, Morgan Stanley, and Natexis. FAC ¶ 84.

In explaining the timing of the announcement, Simpson stated,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2008 WL 2220600 (N.D.Cal.)
(Cite as: 2008 WL 2220600 (N.D.Cal.))

Page 8

[I]t's perfectly logical that Boards and management will always be cognizant about the issues of succession and have an ongoing dialog about it. It was these kinds of discussions that led to more serious dialog with [Thomas] over the past several months about his own plans and intentions for the future. In addition, we recognize that it could be very difficult for us to conduct a meaningful search for a new CEO without facing the risk of a leak or inadvertent disclosure.

Transcript of December 12, 2005, conference call.

Before turning the call over to Thomas, Simpson stated that Thomas "leaves us in very good shape with a strong management team, an excellent market position, fueled by increasing adoption, a growing sales force, and a strategy to achieve continued growth in the future."He added, "We feel confident, based on our success and strong management team we have in place, that there will be no shortage of interested, highly-qualified candidates interested in this opportunity."*Id.*

Thomas stated that his immediate plans were to "reconnect with my family and friends, try to shave a stroke or two off my golf game, and pursue some personal interests."*Id.* When one analyst asked, in view of the fact that "right now the FoxHollow CEO gig is a pretty good place to be," why Thomas' "time was up and sort of what you've been thinking," Thomas responded,

Yeah. It's like I mentioned before, it's really for personal reasons. I really want to spend more time with my six-year-old daughter, as well as my wife, and do some of the things that I've put off for quite some time. As we also mentioned in the script, this is my third start-up in a row, and I've had to go really hard in each one, and at this point I just want to take a step back, and so aside from consulting for the Company, which is something I look forward to doing, I don't have any other plans.

*Id.*

At another point, in response to a question regarding whether there would be "some changes in emphasis going forward [at FoxHollow]," Thomas responded,

We also feel like the management team here is incredible. I think they've demonstrated that performance.... We don't see any major structural change in our strategy on a go-forward basis, and certainly once the new CEO is brought in, they'll be part of helping with the longer-term strategy, but our mission at this point is very clear, to make and sell more SilverHawks and help more patients .... So there is no short-term or medium-term plans to change the strategy at all. This is more about me wanting to take a step back but nothing to do with the Company and where we're going.

*\*9 Id.*

Plaintiff alleges that the comments made at the December 12, 2005, conference call were misleading, particularly the references to the "strong management team" and Thomas' claims that he was leaving FoxHollow for "personal reasons," and the statement that the dialogue with Thomas had been ongoing for "the past several months." Plaintiff asserts that Thomas did not resign for "personal" reasons unrelated to his work at FoxHollow, and claims that the plans had not been in the works for "the past several months." Rather, plaintiff alleges, "Simpson told Thomas that he would be replaced back [sic] if he didn't implement the LuMend acquisition back in August 2005, and Thomas had been forced to resign, i.e., fired."FAC ¶ 85.

Plaintiff asserts that "[j]ust days earlier, the Board had met with executive officers and interrogated them about Thomas and his role with LuMend" (apparently referring to the allegations in FAC ¶ 78). Plaintiff claims that Simpson did not actually believe he had a "strong management team," and alleges that Simpson's statement left a false impression that no further management changes were contemplated. Plaintiff asserts that Simpson planned to

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2008 WL 2220600 (N.D.Cal.)
(Cite as: 2008 WL 2220600 (N.D.Cal.))

Page 9

replace Martin and Hoffman just a few weeks later, and had already embarked on a plan to force their removal. FAC ¶ 85.

Plaintiff also alleges that Simpson failed to mention, during the December 12, 2005 conference call, that FoxHollow was in the process of negotiating a special "Separation Agreement" with Thomas. Plaintiff claims that based on the alleged "personal reasons" for his departure, Thomas stood to lose the right to exercise unvested options worth millions of dollars, and that under the Separation Agreement, many of Thomas' options would be immediately vested. FAC ¶ 86.

Plaintiff asserts, based on information provided by Executive Employee Witness 3, that "this money" (apparently referring to the options) was perceived by "others" as "hush money," to compel Thomas to keep quiet about the real reason for his dismissal. Thomas allegedly also agreed to a "No Competition" clause, requiring, according to plaintiff, that Thomas not "counsel or assist any attorneys or their clients in the presentation or prosecution of disputes, differences, grievances, claims, charges, or complaints" against FoxHollow or any of its officers or directors; and to a "Post-Termination Assistance" clause, requiring that he provide "information and assistance" to FoxHollow in connection with any "governmental investigation or litigation." FAC ¶ 86.

Plaintiff alleges that the sudden announcement of Thomas' departure was "devastating" to shareholders, as the price of FoxHollow's stock fell 15.5% on December 13, 2005, from $46.12 to $38.97. Plaintiff asserts that within one week, FoxHollow was trading below $31 per share, and had lost more than 1/3 of its market capitalization. FAC ¶ 87.

Plaintiff claims that this drop in the stock price was only tempered by Thomas' and Simpson's assurances that Thomas' departure was routine, and that the Company had confidence in the existing management team. Plaintiff cites analysts' reports stating, in essence, that any additional departures of

Company executives would be cause for alarm. *See* FAC ¶ 88.

**\*10** Plaintiff alleges that as of December 12, 2005, when Simpson reassured analysts that further management changes were not contemplated,[FN7] he had already made the decision to replace both Martin and Hoffman. Based on information obtained from Executive Employee Witness 3, plaintiff asserts that Ferguson and Rohlen stripped Hoffman of almost all his primary job responsibilities and started to phase him out as a manager in an effort to force his resignation.

> FN7. The transcript of the December 12, 2005, conference call does not reflect that Simpson stated that no further management changes were contemplated, but rather that he simply referred to the existing management team as "strong."

According to plaintiff, Hoffman was "no longer consulted on quarterly and annual guidance provided to analysts for revenue forecasts and sale professional hiring plans, which were his responsibility prior to August 2005." In addition, "FoxHollow discussed reducing sales compensation levels to the sales team, again bypassing Hoffman," and "Hoffman was no longer invited to market analysis meetings, which he presided over before." On January 11, 2006, Hoffman "angrily" submitted his letter of resignation. FAC ¶ 89.

Similarly, based on information obtained from Executive Employee Witness 1, as of December 10, 2005, Martin "was demoted by Simpson and the Board to a nominal position on a four-person 'leadership committee' along with Ferguson, Rohlen and Ron Steckel, and was stripped of substantive authority at the Company." Plaintiff asserts that Martin was suddenly "subject to accusations of wrongdoing by Board members, such as Sandy Fitch and Myrtle Potter, who had barely even spoken to Martin before." FAC ¶ 90.

On January 9, 2006, FoxHollow filed a Form 8-K

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2008 WL 2220600 (N.D.Cal.)
(Cite as: 2008 WL 2220600 (N.D.Cal.))

and issued a press release, announcing its preliminary financial results for 4Q05 and the full FY05, as well as providing guidance for the new fiscal year. The Form 8-K indicated that previous forecasts of revenue remained on course, but did not mention any management "transition." FAC ¶ 91.

In the press release, Simpson was quoted as saying,

> Our tremendous growth in 2005 and growth outlook for 2006 is based on our success in driving adoption from existing customers, as well as the significant increase of our customer base. Revenues for 2005 more than tripled from 2004. Our outlook for 2006 represents a more than 60 percent growth in year-over-year revenue.

FAC ¶ 91.

In a related conference call on the same date, Simpson reported that the Company had retained a search firm to assist with the search for a new chief executive officer. "While looking forward to the completion of the search process, we are confident in the abilities of the senior management team already in place."FAC ¶ 92.

On Thursday, January 26, 2006, the final day of the proposed class period, FoxHollow filed a Form 8-K and issued a press release, announcing that Martin was being replaced as Chief Operating Officer and Hoffman was being replaced as Vice-President of Sales. Rohlen was promoted to Vice President of Strategic Operations, and Ferguson remained as Chief Financial Officer. Simpson explained, "Based on the new strategic initiatives we announced earlier this month, it is appropriate to effect this transition at this time."FAC ¶ 94.

*11 Also on January 26, 2006, analysts at Piper Jaffray released a report concerning FoxHollow entitled, "Something Seems Amiss." The report stated,

> We recently upgraded [FoxHollow] on valuation, after its 33% decline due to the uncertainty of 2006 revenues and the sudden resignation of its

CEO. We are now inserting some caution on our short-term views. We have new worries related to additional management shakeups, possibly the VP of Sales and/or the COO. In our opinion, while neither would be a big loss fundamentally, we are left wondering why the news flow from [FoxHollow] is so uneven and what the underlying cause is for the potential management disruption.

> We have been tracking down rumors ... of management departures. We have not been able to confirm the rumors, but we are concerned by the lack of denial by management. In our opinion, true or not, the rumors are gaining enough substance to engender comment from the company.

> The uncertainty of "what's really wrong" can only be partially balanced by our channel checks that indicate a strong market for [FoxHollow's] products in 2006. We cannot assure investors that all is right inside the company; in our opinion, risk has increased.

FAC ¶ 95.

Plaintiff alleges that on this news, FoxHollow's share price fell 7%, the next day, January 27, 2006, and fell about 15% within three days, reaching a new yearly low of $23.35. FAC ¶ 96.

Plaintiff asserts that "after public revelation of FoxHollow's management 'transition' "-which plaintiff terms "the result of Simpson's undisclosed 'edict' to Company management to either agree to acquire LuMend or be terminated"-plaintiff and the members of the proposed class lost 50% of the value of their stock in just over one month. Plaintiff asserts that FoxHollow's stock never recovered from the revelation of this material misinformation, and continued trading at $25 per share despite record reported revenues. FAC ¶ 97. Plaintiff claims that FoxHollow announced at some unspecified "later" time that Simpson was changing his title from "interim" CEO to "permanent" CEO,[FN8] and that on the news that Simpson was remaining as CEO, the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2008 WL 2220600 (N.D.Cal.)
(Cite as: 2008 WL 2220600 (N.D.Cal.))

price of the stock dropped 10%. FAC ¶ 98.

> FN8. Simpson was named "interim" or "acting" CEO upon Thomas' departure from the Company. FoxHollow's public filings indicate that the Board subsequently voted to make Simpson the permanent CEO.

The first complaint in the present action was filed on July 28, 2006. On October 26, 2006, pursuant to stipulation, the court appointed Margaret Kovarik and Matthew Roberts to serve as co-lead plaintiffs. Plaintiffs filed the consolidated amended complaint ("CAC") on December 15, 2006, asserting claims under § 10(b) of the Exchange Act, and SEC Rule 10b-5, against Simpson, Ferguson, and FoxHollow, and also alleging a claim of control-person liability against Simpson and Ferguson.

On September 5, 2007, the court granted defendants' motion to dismiss the CAC, finding it "deficient in both scienter and falsity ."The dismissal was with leave to amend. The FAC was filed on October 19, 2007, by lead plaintiff Matthew Roberts.

## DISCUSSION

### A. Legal Standard

*12 A motion to dismiss under Rule 12(b)(6) tests for the legal sufficiency of the claims alleged in the complaint. *Ileto v. Glock, Inc.,* 349 F.3d 1191, 1199-1200 (9th Cir.2003). Although its review is generally limited to the contents of the complaint, the Court may consider documents referenced extensively in the complaint and documents that form the basis of a plaintiff's claim. *United States v. Ritchie,* 342 F.3d 903, 908-09 (9th Cir.2003); *see also No. 84 Employer-Teamster Joint Counsel Pension Trust Fund v. America West Holding Corp.,* 320 F.3d 920, 925 n. 2 (9th Cir.2003).

To survive a motion to dismiss for failure to state a claim, a complaint generally must satisfy the minimal notice pleading requirements of Federal Rule of Civil Procedure 8, which requires that the complaint include a "short and plain statement of the claim showing that the pleader is entitled to relief."Fed.R.Civ.P. 8(a)(2). Specific facts are unnecessary-the statement need only give the defendant "fair notice of the claim and the grounds upon which it rests."*Erickson v. Pardus,* --- U.S. ----, - ---, 127 S.Ct. 2197, 2200, 167 L.Ed.2d 1081 (2007) (citing *Bell Atlantic Corp. v. Twombly,* ---U.S. ----, ---- - ----, 127 S.Ct. 1955, 1964-65, 167 L.Ed.2d 929 (2007)).

The court "must accept as true all of the factual allegations contained in the complaint,"*id.* at 2200, but need not accept as true allegations that are legal conclusions, unwarranted deductions of fact or unreasonable inferences, *see Sprewell v. Golden State Warriors,* 266 F.3d 979, 988,*amended,*275 F.3d 1187 (9th Cir.2001). A plaintiff's obligation to provide the grounds of his entitlement to relief "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."*Bell Atlantic,* 127 S.Ct. at 1964-65 (citations and quotations omitted). Rather, the allegations in the complaint "must be enough to raise a right to relief above the speculative level."*Id.* at 1965.A motion to dismiss should be granted if the complaint fails to proffer enough facts to state a claim to relief that is plausible on its face. *See id.* at 1974.

Where a complaint includes allegations of fraud, however, Federal Rule of Civil Procedure 9(b) requires that falsity be pled with more specificity, including an account of the "time, place, and specific content of the false representations as well as the identities of the parties to the misrepresentations."*Swartz v. KPMG LLP,* 476 F.3d 756, 764 (9th Cir.2007) (citations omitted)."[A]llegations of fraud must be specific enough to give defendants notice of the particular misconduct which is alleged to constitute the fraud charged so that they can defend against the charge

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

and not just deny that they have done anything wrong."*Bly-Magee v. California,* 236 F.3d 1014, 1019 (9th Cir.2001) (citation and quotations omitted). In addition, the plaintiff must do more than simply allege the neutral facts necessary to identify the transaction; he must also explain why the disputed statement was untrue or misleading at the time it was made. *Yourish v. California Amplifier,* 191 F.3d 983, 992-93 (9th Cir.1999).

**\*13** In dismissing for failure to state a claim, "a district court should grant leave to amend even if no request to amend the pleadings was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts."*Doe v. United States,* 58 F.3d 494, 497 (9th Cir.1995) (citations omitted); *see also Swartz,* 476 F.3d at 765;*Eminence Capital, LLC v. Aspeon, Inc.,* 316 F.3d 1048, 1052 (9th Cir.2003).

B. Defendants' Motion to Dismiss

Defendants contend that the FAC differs very little, if at all, from the CAC. They assert that the FAC fails to allege, with specificity, any false or misleading statements or omissions; and that the FAC fails to plead particularized facts giving rise to a strong inference that defendants acted with the required state of mind. Defendants also contend that the FAC fails to plead a claim of control-person liability, because it fails to allege a primary viola- tion.

Section 10(b) of the Securities Exchange Act provides, in part, that it is unlawful "to use or employ in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe."15 U.S.C. § 78j(b).

SEC Rule 10b-5, promulgated under the authority of § 10(b), makes it unlawful for any person to use interstate commerce

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.

To plead securities fraud under § 10(b) of the 1934 Exchange Act, plaintiffs must allege (1) a misstatement or omission (2) of material fact (3) made with scienter (4) on which plaintiffs relied (5) which proximately caused the plaintiffs' injury. *DSAM Global Value Fund v. Altris Software, Inc.,* 288 F.3d 385, 388 (9th Cir.2002). Similarly, the elements of a Rule 10b-5 claim are (1) a material misrepresentation (2) made with scienter (3) in connection with the purchase or sale of a security, (4) transaction and loss causation, and (5) economic loss. *In re Daou Sys., Inc. Sec. Litig.,* 411 F.3d 1006, 1014 (9th Cir.2005).

This case is controlled by the provisions of the Private Securities Litigation Reform Act ("PSLRA"), which was enacted by Congress in 1995 to establish uniform and stringent pleading requirements for securities fraud actions, and to put an end to the practice of pleading "fraud by hindsight." *In re Silicon Graphics, Inc. Sec. Litig.,* 183 F.3d 970, 958 (9th Cir.1999). The PSLRA heightened the pleading requirements in private securities fraud litigation by requiring that the complaint plead both falsity and scienter with particularity. *In re Vantive Corp. Sec. Litig.,* 283 F.3d 1079, 1084 (9th Cir.2002); *see also In re Daou,* 411 F.3d at 1014. If the complaint does not satisfy these pleading requirements, the court, upon motion of the defendant, must dismiss the complaint. 15

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2008 WL 2220600 (N.D.Cal.)
**(Cite as: 2008 WL 2220600 (N.D.Cal.))**

Page 13

U.S.C. § 78u-4(b)(3)(A).

**\*14** Under § 20(a) of the Exchange Act, joint and several liability can be imposed on persons who directly or indirectly control a violator of the securities laws. 15 U.S.C. § 78t(a). Plaintiffs alleging a claim that individual defendants are "controlling persons" of a company must allege a primary violation under the 1934 Exchange Act, and must also allege that the defendant exercised actual power or control over the primary violator.*America West,* 320 F.3d at 945;*see also Howard v. Everex Sys., Inc.,* 228 F.3d 1057, 1065 (9th Cir.2000).

1. False or misleading statements or omissions

At the hearing on the previous motion to dismiss, plaintiff's counsel indicated that the CAC alleged fraudulent omissions-primarily that FoxHollow mislead investors by failing to disclose Simpson's "edict" to management-rather than false statements. The claims in the FAC are premised on the same theory, alleging, not that defendants' public statements were false, but that statements in public filings, in press releases, and in conference calls created an impression that the Company was doing well and had top-rate management, when in fact, relations among the executives were less than congenial, and Simpson was attempting to impose his will on the Company. Defendants argue that the FAC should be dismissed because plaintiff has not adequately alleged any actionable false or misleading statements or omissions.

Under the PSLRA-whether alleging that a defendant "made an untrue statement of a material fact" or alleging that a defendant "omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances in which they were made, not misleading"-the complaint must specify each statement alleged to have been false or misleading, specify the reason or reasons why each such statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, state with particu-

larity all facts on which that belief is formed. 15 U.S.C. § 78u-4(b)(1)."[V]ague claims about statements were false or misleading [and] how they were false" are subject to dismissal. *Falkowski v. Imation Corp.,* 309 F.3d 1123, 1133 (9th Cir.2002).

Defendants assert that plaintiff fails to satisfy these requirements, as he does not specify exactly which statements were misleading, and offers only vague assertions as to why FoxHollow's failure to disclose Simpson's alleged "edict" was misleading. Defendants contend that none of the pre-class-period statements cited by plaintiff created a duty to disclose the departures of Thomas, Martin, or Hoffman from FoxHollow prior to the time that defendants did in fact disclose the departures.[FN9]

> FN9. Defendants raise two additional issues, neither of which the court decides here. They contend that plaintiff has identified no actionable statements or omissions that are both within the class period and prior to plaintiff's last purchase of stock, on December 6, 2005. They also assert that plaintiff has at best stated a claim for mismanagement or breach of fiduciary duty, which, under *Santa Fe Industries, Inc. v. Green,* 430 U.S. 462, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977), is not actionable as a federal securities cause of action.

In opposition, plaintiff argues that defendants had a duty to disclose all material information regarding the retention of management, in view of the "false state of affairs publicly portrayed."Plaintiff claims that because defendants chose to speak about the "positive aspects" of FoxHollow's management, they were obligated to disclose the negative aspects as well.

a. Pre-class period statements

**\*15** Defendants argue that the pre-class period statements cited by plaintiff did not create a duty to report on any subsequent management discord or

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2008 WL 2220600 (N.D.Cal.)
(Cite as: 2008 WL 2220600 (N.D.Cal.))

Page 14

disharmony, or to disclose Simpson's alleged "edict" to management, as the securities laws do not impose an ongoing duty to update prior disclosures to make them complete.[FN10]

> FN10. Defendants also argue that the pre-class period statements are not actionable. In general, liability in a securities class action lawsuit cannot attach to statements made either before or after the class period. *See In re Seagate Tech. II Sec. Litig.,* 1995 WL 66841 at *4 (N.D.Cal., Feb.8, 1995). Nevertheless, the court has addressed defendants' other arguments regarding the pre-class period statements because those arguments extend to the class-period statements as well.

Plaintiffs allege that the statements cited from the April 27 and July 27, 2005 conference calls; the statements cited from the Form 10-K for 2004, and the Form 10-Qs for 1Q05 and 2Q05; and the statements cited from the April 29, 2005 Proxy Statement were misleading because "the public market and industry analysts were uniformly led to believe that FoxHollow's Board was entirely satisfied with the performance of its executive team, including Thomas ..." FAC ¶ 64. Plaintiff claims that this public perception was mistaken "[b]eginning in August 2005." *Id.*

The statements cited from the April 27, 2005 conference call, are the following, made by Thomas:

"We are executing on our plan by growing our sales force, increasing capacity and implementing effective marketing and sales programs."

"At the same time, we are running the company to ensure that we achieve managed growth and drive the company toward profitability ."

"As a result, we believe our story will only get better in the months and years ahead."

"The challenge we face is not one of creating a market, but rather executing on the opportunities in front of us."

"We believe we have the resources, technology, people, and financials to realize our goals not only with our core business but in other exciting areas as well."

The statements cited from the July 27, 2005 conference call are the following, made by Thomas:

"An important piece of the FoxHollow infrastructure story is our people."

"We are continuing to add to our bench strength with the addition of management personnel in all areas of the Company."

"I want to take this opportunity to acknowledge the tremendous efforts of all our employees throughout the organization, including operations, R & D, sales, marketing, IT, the critical and regulatory department, and our finance and administrative groups."

The statements cited from the 2004 Form 10-K are the following:

"We believe that our future success will depend on our continued ability to attract, hire and retain qualified personnel."

"[W]e believe our employee relations are good."

The statements cited from the 10-Qs appear under "Factors Affecting Future Operating Results," and include the following:

"Our success largely depends on the skills, experience and efforts of our officers and other key employees."

"The loss of any of our senior management team could harm our business."[FN11]

> FN11. Similar statements appear in the discussion of risk factors in the 2004 Form 10-K.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2008 WL 2220600 (N.D.Cal.)
(Cite as: 2008 WL 2220600 (N.D.Cal.))

Page 15

The statements cited from the April 29, 2005 Proxy Statement are statements from the "Report of the Compensation Committee," detailing the compensation program for executive officers, and include the following:

**\*16** "The Compensation Committee's overall executive compensation philosophy is to ... [p]rovide competitive levels of total compensation to attract and retain executives who are critical to FoxHollow's long-term success."

"The major components of executive compensation are base salary, cash bonus, and potential long-term compensation through stock options."

"In December 2004, the Compensation Committee met and approved a bonus plan for the Chief Executive Officer [Thomas], Chief Operating Officer [Martin] and Chief Financial Officer [Ferguson]."

"Stock options are granted to FoxHollow's executive officers and other employees both as a reward for past individual and corporate performance and as an incentive for future performance" (under heading "Long Term Incentives").

Plaintiff asserts that as of August 28, 2005-the date that Simpson allegedly told Thomas that the LuMend acquisition would go forward, with or without the executive officers' approval; that the decision was final and non-negotiable; and that executive team members would be asked to resign if they refused to go along with the LuMend acquisition-the above statements became misleading and that defendants had a duty to disclose to the public market that Simpson had ordered executive management to "breach their fiduciary duty or else risk termination."FAC ¶ 72.

To be actionable, a statement must be misleading. "Silence, absent a duty to disclose, is not misleading under Rule 10b-5."*Basic v. Levinson,* 485 U.S. at 239 n. 17. There is no obligation to disclose information that is not material. *Id.* at 238.There is no obligation to disclose even material information

simply because it exists. *See Chiarella v. United States,* 445 U.S. 222, 235, 100 S.Ct. 1108, 63 L.Ed.2d 348 (1980) (duty to disclose does not arise from mere possession of nonpublic market information). If a challenged statement is not false or misleading, it does not become actionable merely because it is incomplete. *In re Vantive,* 283 F.3d at 1085;*Brody v. Transitional Hosp. Corp.,* 280 F.3d 997, 1006 (9th Cir.2002).

In general, issuers of securities are required to disclose material facts as mandated by SEC regulations, which do not impose a "continuous disclosure requirement," *see Gallagher v. Abbott Labs.,* 269 F.3d 806, 808-09 (7th Cir.2001), or when they are trading in their own securities, *see McCormick v. Fund American Cos.,* 26 F.3d 869, 875-76 (9th Cir.1994).

Apart from that, a duty to disclose generally arises only where necessary to correct a prior statement that remains viable in the market and which, "at the time made, the company believed to be true, but as revealed by subsequently discovered information actually was not."*In re Verity, Inc. Sec. Litig.,* 2000 WL 1175580 at \*4 (N.D.Cal., Aug.11, 2000) (quoting *Burlington Coat Factory Sec. Litig.,* 114 F.3d 1410, 1431 (3rd Cir.1997)). This duty is otherwise known as the "duty to correct." *Id.; see also Stransky v. Cummins Engine Co.,* 51 F.3d 1329, 1331 (7th Cir.1995)).

**\*17** In the present case, plaintiff does not allege that defendants made any statement that remained viable in the market and which was inaccurate at the time it was made, such that a duty to correct would arise. In particular, plaintiff does not allege that defendants made any statements regarding the long-term employment of any specific individual at FoxHollow; in fact, the Company repeatedly stated in public filings that employment at FoxHollow was "at will."

Rather than a duty to correct, plaintiff appears to be asserting a "duty to update." The duty to update "concerns statements that although reasonable at

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

the time made, become misleading when viewed in the context of subsequent events." *In re Verity,* 2000 WL 1175580 at *5 (quoting *Burlington Coat,* 114 F.3d at 1431). Plaintiff contends that defendants' pre-class period statements became misleading at the point that Simpson allegedly issued his "edict" to Thomas, and that defendants were therefore required to disclose the existence of the discord among the FoxHollow executives.

Courts (which do not include the Ninth Circuit) that have recognized the "duty to update" theory have also indicated that there is no duty to update vague statements of optimism or expressions of opinion, and no need to update when the original statement was not forward-looking and does not contain some factual representation that remains "alive" in the minds of investors as a continuing representation, or if the original statements are for some other reason not material. *See, e.g., In re Int'l Bus. Machines Corporate Sec. Litig.* 163 F.3d 102, 110 (2nd Cir.1998).

Here, defendants argue that the pre-class period statements in the conference calls and public filings were either vague statements of corporate optimism, or were forward-looking statements protected by the PSLRA's safe-harbor provision, and thus created no duty to update. As for the statements in the Proxy Statement regarding executive compensation, defendants contend that those were simply part of a larger statement of FoxHollow's general employment and compensation policy, not a statement to investors that FoxHollow intended to retain any particular employee for the long term.

i. Statements of corporate optimism

Defendants assert that the cited statements regarding FoxHollow's workforce were largely vague statements of corporate optimism. In general, vague and unspecific assertions of corporate optimism or statements of mere puffing cannot state an actionable claim of fraud. *See Glen Holly Entm't, Inc. v. Tektronix, Inc.,* 352 F.3d 367, 379 (9th Cir.2003).

Such statements are typically not actionable under federal securities laws because "they are considered immaterial and discounted by the market" and because "reasonable investors do not consider 'soft' statements or loose predictions important in making investment decisions." *In re Copper Mountain Sec. Litig.,* 311 F.Supp.2d 857, 868 (N.D.Cal.2004) (citing *Wenger v. Lumisys, Inc.,* 2 F.Supp.2d 1231, 1245 (N.D.Cal.1998)); *see also In re Leapfrog Enters., Inc. Sec. Litig.,* 527 F .Supp.2d 1033, 1049-51 (N.D.Cal.2007); *In re Wet Seal, Inc. Sec. Litig.,* 518 F.Supp.2d 1148, 1168-69 (C.D.Cal.2007).

**\*18** The court finds that statements such as "[W]e believe our story will only get better in the months and years ahead," and "We believe we have the resources, technology, people and financial to realize our goals not only with our core business but in other exciting areas as well," and "An important piece of the FoxHollow infrastructure is our people," and "I want to take the opportunity to acknowledge the tremendous efforts of all our employees throughout the organization, including operations, R & D, sales, marketing, IT, the critical and regulatory department, and our finance and administrative groups," are soft statements or loose predictions that do not give rise to a securities fraud cause of action.

These vague and highly general statements did not mention any employee by name, and there is nothing in the cited excerpts that is sufficiently specific to have created an "impression" that became false upon Simpson's alleged threat to purge senior management if the LuMend deal did not go through. No rational investor would conclude from such statements of corporate optimism as those quoted by plaintiff that FoxHollow intended to retain Thomas, Martin, and Hoffman for the long term.

Nor, in general, would the risk disclosure statements cited by plaintiff have reasonably led anyone to conclude that FoxHollow intended to retain management. Instead, the statements convey the opposite impression-that FoxHollow's management was

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

subject to change, that personnel might be replaced, and that investors should be aware of that possibility.

ii. Forward-looking statements

Defendants argue that to the extent that the cited statements in the April 27 and June 27, 2005 conference calls and in the SEC filings in March-July 2005 can be considered anything other than vague statements of corporate optimism, they are forward-looking statements that are protected under the PSLRA's safe-harbor provision.

The PSLRA carves out a safe harbor for forward-looking statements that prove false if the statement "is identified as a forward-looking statement and is accompanied by meaningful cautionary statements identifying important factors that could cause results to differ materially from those in the forward-looking statements."15 U.S.C. § 78u-5(c)(1)(A)(i).

Forward-looking statements include statements containing a projection of revenues, income, or earnings per share; management's plans or objectives for future operations; or a prediction of future economic performance-as well as any statement of the assumptions underlying or relating to those sorts of statements. 15 U.S.C. § 78u-5(i)(1)(A)-(D). Statements concerning historical or current facts are not forward-looking. *In re Applied Signal Tech., Inc. Sec. Litig.,* 2006 WL 1050174 at *13 (N.D.Cal., Feb.8, 2006). Nor is there any duty to update forward-looking statements. *See*15 U.S.C. § 78u-5(d) ( "Nothing in this section shall impose a duty to update a forward-looking statement.")

**\*19** Here, to the extent that any of the pre-class period statements are sufficiently specific that they cannot properly be considered vague statements of corporate optimism, the court finds that they are forward-looking statements protected by the safe-harbor provision.

Plaintiff claims that statements such as "[w]e believe we have the resources, technology, people,

and financial to realize our goals,""[o]ur success largely depends on the skills, experience and efforts of our officers and other key employees," and "[t]he loss of any of our senior management team could harm our business," as well as references to "the tremendous efforts of all our employees throughout the organization," created an impression that the Company planned to retain its senior executives for the long term.

These statements, as plaintiff cites them in the context of the FAC, are all forward-looking statements because plaintiff claims that they suggested or implied that the Company would retain its executives in the future. Because the statements were accompanied by "meaningful cautionary statements identifying important factors that could cause results to differ materially from those in the forward-looking statements," they are protected under the PSLRA's safe-harbor provision.

FoxHollow stated in the Form 10-K for fiscal year 2004 and in its quarterly filings for 2005 that "[f]orward-looking statements are inherently subject to risks and uncertainties, some of which cannot be predicted or quantified," and explained that the risks included those listed under "Factors Affecting Future Operating Results." The Company indicated that in some cases, forward-looking statements could be identified by terminology such as "may," "will," "should," "could," "expect," "plan," "anticipate," "believe," "estimate," "predict," "intend," "potential," [or] "continue," adding that [t]hese statements are only predictions. Actual events or results may differ materially." Those cautionary statements were incorporated by reference in the conference calls.

With specific regard to employment and retention of employees at FoxHollow, FoxHollow cautioned, as early as the August 27, 2004 Registration Statement and Prospectus, that the Company's success "largely depends on the skills, experience and efforts" of its officers and key employees.

Any of our officers and other key employees may

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2008 WL 2220600 (N.D.Cal.)
(Cite as: 2008 WL 2220600 (N.D.Cal.))

Page 18

terminate their employment at any time. The loss of any of our senior management team could harm our business. Our ability to retain our skilled labor force and our success in attracting and hiring new skilled employees will be a critical factor in determining whether we will be successful in the future. We may not be able to meet our future hiring needs or retain existing personnel. We will face particularly significant challenges and risks in hiring, training, managing and retaining engineering and sales and marketing employees. Failure to attract and retain personnel, particularly technical and sales and marketing personnel, would harm our ability to compete effectively and grow our business. The announcement of the loss of one of our key employees could negatively affect our stock price.

**\*20** Similarly, the Company's emphasis in the "Factors Affecting Future Operating Results" in the quarterly filings was on the fact that one of the variables that "could negatively affect the stock price" in the future was any potential "announcement of the loss of one of our key employees," which was a possibility given that "[w]e may not be able to ... retain existing personnel," and that "[a]ny of our officers and other key employees may terminate their employment at any time."

Plaintiff argues that FoxHollow's cautionary statements should be viewed as "boilerplate," not sufficiently substantive and not tailored to the Company's specific future projections, estimates, or opinions. That argument is without merit in the present case, as the statements that plaintiff claims publicly communicated FoxHollow's intention to retain Thomas, Martin, and Hoffman actually did no such thing. And to the extent that any such statement did create any future expectation, the Company's risk disclosures were more than adequate to create a safe harbor under the PSLRA.

iii. Statements of compensation policy

Finally, as to the statements in the April 29, 2005 Proxy Statement, defendants argue that the "overall executive compensation philosophy" to "attract and retain executives who are critical to FoxHollow's long-term success" was simply a statement of Fox-Hollow's general intent, and not a clear statement to investors that FoxHollow intended to retain any particular employee for the long term. Indeed, defendants note, the Proxy Statement clearly stated that "[e]mployment at our company is at will."

Defendants also argue that the Proxy Statement's discussion of stock options, and the reference to certain options as "long-term compensation," was not an indicator that FoxHollow intended to retain Thomas, Martin, and Hoffman for the long term. Defendants assert that FoxHollow was required by the SEC during that period to report stock options as "long-term compensation," as it did.

In response, plaintiff does not contend that the disclosures in the Proxy Statement were false. Instead, he claims that the disclosures created an ongoing duty to report the possibility that certain executives might be fired or depart the Company, and that because the Proxy Statement reported the option grants as "long term" compensation, FoxHollow had in effect represented to investors that this compensation would "insure" the long-term employment of its managerial workforce.

The court finds that the statements regarding Fox-Hollow's compensation policy were far too general to have created a clear impression that the Company intended to retain any specific employee for a stated period of time.[FN12] The Proxy Statement did not guarantee or even suggest that any particular employee would be employed at FoxHollow for the long term, and did not represent that option grants were issued to specific employees to induce those employees to remain at the Company for a stated period of time. It is not reasonable to conclude that FoxHollow's compensation disclosures gave "a clear indicator to the public market that FoxHollow wanted to retain Thomas, Martin, and Hoffman for a long term" as plaintiff claims.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2008 WL 2220600 (N.D.Cal.)
(Cite as: 2008 WL 2220600 (N.D.Cal.))

Page 19

FN12. The fact that the stock options had a 10-year term is similarly unremarkable.

**\*21** FoxHollow accurately reported executive compensation, as required under SEC regulations, which included the requirement that certain stock options be reported as "long-term compensation." It was not FoxHollow's choice to describe the option grants as "long-term compensation," and the use of that language in the public statements indicates nothing about defendants' intention with regard to FoxHollow's employees. Furthermore, the Proxy Statement reported this "long-term compensation" as "potential," and clearly stated, "Employment at our company is at will," and that any of FoxHollow's employees could lose their employment at any time. No reasonable investor would interpret these compensation disclosures as a guarantee that FoxHollow would retain certain, specified executives for the long term.

**b. Class-period statements**

Plaintiff alleges that defendants made misleading statements in the October 26, 2005 conference call; in the Form 8-K filed on December 12, 2005, and in the conference call of that same date; and in the January 9, 2006 Form 8-K, and accompanying press release and conference call.

Plaintiff asserts that the following statements made by Thomas during the October 26, 2005 conference call were misleading:

"We'd also like to thank and congratulate all the members of the FoxHollow team for their efforts and results."

"The performance over the past 2 years is nothing short of remarkable and we are all energized by the new Hawks that are coming in with the mindset of taking this opportunity to the next level."

"[The team has just done remarkable things here with regard to this last quarter and if you look back over the past two years, what we've done for reven-

ue growth, gross margin growth and now our first profitable quarter,] we couldn't be happier."

Plaintiff claims that these statements were misleading because defendants did not reveal the internal management disputes regarding Simpson's "edict" concerning the LuMend acquisition, and did not disclose Simpson's alleged plan to fire Thomas, Martin, and Hoffman. Plaintiff also asserts that the Form 8-K filed on October 26, 2005 did not mention Simpson's decision to terminate FoxHollow's executive management, but does not specifically claim that the 8-K was misleading.

Plaintiff alleges further that the Form 8-K filed on December 12, 2005, and the press release issued on the same date were misleading because Thomas did not "retire" or leave the company voluntarily, but rather was "fired" or was forced to resign; and also because Simpson did not intend on "leading" the Company's present senior management, and did not view them as "outstanding."

Plaintiff also cites various snippets from the December 12, 2005 conference call, and asserts that those statements were misleading, including the following:

"We feel confident, based on our success and the strong management team we have in place, that there will be no shortage of interested, highly-qualified candidates interested in [the position as President and CEO]." (Statement by Simpson).

**\*22** "[Thomas] leaves us in very good shape with a strong management team ...." (Statement by Simpson).

"We also feel like the management team here is incredible."(Statement by Thomas).

Various statements by Thomas emphasizing that he was leaving FoxHollow "for personal reasons"-to spend more time with his family, to "take a step back," to "reconnect with family and friends."

Finally, plaintiff refers to the January 9, 2006,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2008 WL 2220600 (N.D.Cal.)
(Cite as: 2008 WL 2220600 (N.D.Cal.))

Form 8-K, which indicated that previous forecasts of revenue remained on course, but did not mention any management "transition." Plaintiff cites the following statements from the press release that accompanied the Form 8-K:

"Our tremendous growth in 2005 and growth outlook for 2006 is based on our success in driving adoption from existing customers, as well as the significant increase of our customer base."

"Revenues for 2005 more than tripled from 2004."

"Our outlook for 2006 represents a more than 60 per cent growth in yearover-year revenue."

Plaintiff also cites the following statement made by Simpson at a related conference call on the same date, with reference to the search for a new CEO:

"While looking forward to the completion of the search process, we are confident in the abilities of the senior management team already in place."

Plaintiff asserts that the statements cited above were misleading-particularly the references to the "strong management team" in the December 12, 2005 conference call-because Simpson did not believe FoxHollow had a "strong management team," and in fact planned to replace Martin and Hoffman within a few weeks.

Defendants argue that under *Brody,* they were under no obligation to disclose that certain executives were leaving FoxHollow before the dates of the actual departures, because they had never stated publicly that those individuals would *not* be leaving the Company.

In *Brody,* the Ninth Circuit considered whether the plaintiffs had adequately alleged that statements made by the defendants in two press releases were misleading. The defendant THC had announced a plan to buy back $25 million worth of shares from stockholders. A third party subsequently made a written offer to purchase THC at a greater price per share. A month later, THC issued a press release describing the progress and extent of its stock repurchase program, but did not mention the third-party's purchase offer or any other company's interest in purchasing THC.

The plaintiffs argued that in order for a statement not to be misleading, once a disclosure is made, there is a duty to make it complete and accurate. The Ninth Circuit responded that "[t]his proposition has no support in the case law," and held that the securities laws prohibit "only misleading and untrue statements, not statements that are incomplete."*Brody,* 280 F.3d at 1006. The court added, "To be actionable under the securities laws, an omission must be misleading; in other words, it must affirmatively create an impression of a state of affairs that differs in a material way from the one that actually exists."*Id.*

**\*23** The Ninth Circuit found that the public was not misled by THC's failure to disclose the purchase offer because THC never conveyed to the public that a merger or acquisition would *not* occur. *Id.* at 1006-07.The court observed that if the press release had affirmatively intimated that no merger was imminent, "it may well have been misleading," but the actual press release neither stated nor implied anything about a merger. *Id.*

The plaintiffs also claimed that a second press release was misleading because it stated that the company had received "expressions of interest" from potential acquirers, when in fact it had received actual proposals from three different parties. The court noted that a "proposal" is an "expression of interest," and found that the press release had included sufficient information to communicate that these expressions of interest were more than preliminary inquiries. More importantly, the court found that the press release did not give the impression that the company had not received actual proposals from three parties, or otherwise mislead readers about the stage of the negotiations. *Id.*

Similarly, in the present case, defendants never stated publicly that Thomas, Martin, Hoffman, or

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

any particular employee would not be leaving the Company in the foreseeable future. FoxHollow's public filings plainly disclosed that all employment at FoxHollow was "at will," and that one of the "Factors Affecting Future Operating Results" was the possibility that FoxHollow might lose some of its senior executives.

The public statements acknowledging the efforts of FoxHollow's employees, and emphasizing that "people" were an important piece of FoxHollow's infrastructure, did not mislead investors into believing that any specific employee would work at Fox-Hollow in perpetuity, because defendants never indicated that any specific employee was essential to FoxHollow's continued operation or profitability. Thus, defendants did not have a duty to disclose the hypothetical possibility that some of the senior executives might at some point be leaving the Company, before such an event had occurred.

Moreover, a publicly-traded company is not obligated to disclose every detail of its internal financial plans or business strategy. *See Heliotrope General, Inc. v. Ford Motor Co.,* 189 F.3d 971, 980 (9th Cir.1999) (defendants had no duty to disclose internal financial projections regarding the expected dollar values of tax costs and benefits, the date on which the tax-strategy benefits were expected to be outweighed by its costs, or the date on which a merger was most likely); *Hanon v. Dataproducts Corp.,* 976 F.2d 497, 504 (9th Cir.1992) (no disclosure required when event is contingent or speculative in nature); *In re Convergent Techs. Sec. Litig.,* 948 F.2d 507, 516 (9th Cir.1991) (no duty to disclose internal projections or progress in implementing new mechanization structure)).

Here, the determination whether FoxHollow should acquire LuMend was part of the Company's internal business strategy, as was the decision whether to retain any particular at-will employee. Defendants were not required to disclose the details of those internal discussions because such disclosure was not necessary to correct a prior false statement.

*24 Plaintiff submits that *Brody* is not applicable, and argues that the facts of the present case are similar to the facts in *New Jersey v. Sprint Corp.,* 2004 WL 1960130 (D.Kan., Sept.3, 2004). In that case, two Sprint executives-William Esrey (Chairman and Chief Executive Officer) and Ronald LeMay (President and Chief Operations Officer)-received stock options, some of which they exercised in 1999 and 2000. In an attempt to avoid paying taxes on their aggregate taxable gain of $287 million, Esrey and LeMay purchased certain tax shelters from Ernst & Young.

In September 2000, the Internal Revenue Service issued a notice indicating its view that tax shelters similar to the ones Ernst & Young had sold Esrey and LeMay were invalid. Although neither executive took any steps to satisfy his tax liabilities, both disclosed the problem to Sprint's Board of Directors in late 2000. In December 2000, Sprint and Ernst & Young approached the SEC for guidance as to whether Sprint could void the option exercises, thereby nullifying the tax liability. The SEC advised Sprint that doing so would result in a loss of the tax deductions Sprint had taken upon the options exercises, and that Sprint would have to restate its earnings, refile its tax returns, and pay back taxes, at a time when its cash was limited. *Id.* at *2.

However, rather than disclose these facts to investors, defendants allegedly "boasted" about the expected continued employment of Esrey and LeMay. A Proxy Statement filed on March 15, 2001 stated that Sprint had entered into new employment contracts with Esrey and LeMay, each dated February 26, 2001, designed to insure their long-term employment with Sprint, to provide competitive compensation, and to link their compensation to shareholder value.*Id.* at *3.

In late 2001, Esrey and LeMay applied for and received amnesty from the IRS with regard to any penalties, although they were still on the line for the taxes owed. By this time, however, Esrey and LeMay could not sell their shares to cover their potential tax liability because the stock price had de-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

clined dramatically. During 2002, Sprint's Board of Directors held over 20 meetings devoted to discussing the tax problem faced by Esrey and LeMay. Nevertheless, Sprint continued to tout the long-term employment prospects of Esrey and LeMay in its public statements. *Id.* at *3-4.

In June 2002, Sprint's Board learned that the IRS had begun formally investigating Esrey and LeMay in connection with their use of the tax shelters. The Board sought legal advice, and in October 2002, counsel recommended that Esrey and LeMay be dismissed. During this time, the Board also had an executive search firm searching for a new CEO. Nevertheless, the defendants still did not disclose to the public any information regarding the tax problems faced by Esrey and LeMay. On January 29, 2003, the *Wall Street Journal* reported that Esrey and LeMay were leaving Sprint. In response to the news, the stock price fell considerably. *Id.* at *4.

*25 The plaintiffs filed suit, alleging that the statement concerning the long-term employment of Esrey and LeMay, without any reference to the tax shelters and the problems this situation posed for Sprint, was misleading because it was clearly predictable that Sprint was going to lose Esrey and LeMay as a result of the tax avoidance problem. The defendants argued that they had no duty to disclose information about the tax shelter situation because plaintiffs had not alleged that the termination of Esrey and LeMay was under "active and serious consideration" before Sprint was required to disclose the information.

The court disagreed with defendants, finding that a reasonable inference could be drawn from the allegations of the complaint that tax liabilities in excess of $100 million would likely force Esrey and LeMay into "financial ruin," but that this argument could not be resolved on a Rule 12(b)(6) motion. *Id.* at *7. The court also discounted defendants' argument that they had no duty to disclose the possible or likely termination of Esrey and LeMay because Sprint's statements concerning the employment contracts did not foreclose the possibility that

the two executives might later be terminated. The court found that the statement that the employment contracts were "designed to insure" the long-term employment of Esrey and LeMay could reasonably be read to convey the message that, at least in Sprint's view, the long-term employment of Esrey and LeMay was certain. *Id.* at *8.

Plaintiff argues that in the present case, FoxHollow "repeatedly highlighted the value of its senior management and long term compensation packages intended to keep them at the company," and also "stressed to investors that its future success depended on the retention of management which the [C]ompany sought to retain."Plaintiff contends that the Proxy Statement "even included a summary compensation table for its senior executives," which indicated that Thomas, Martin, and Hoffman had received raises, bonuses, and stock options, and that FoxHollow viewed the options as "long-term compensation" designed to ensure the long-term employment of its management.

Plaintiff claims that because FoxHollow described the stock options as "Long Term Compensation Awards," the Company obviously viewed them as "long-term compensation" designed to ensure the long-term employment of its management. Thus, according to plaintiff, defendants' statements "reasonably led" investors to conclude that FoxHollow desired and intended to retain management and had no intention of terminating senior management. Plaintiff asserts that FoxHollow's decision not to disclose the alleged plan to purge management constituted a material omission.

The court finds, however, that the facts of the present case are distinguishable. In *Sprint,* the company specifically represented that the employment contracts were intended to "insure" the "long-term employment" of Esrey and LeMay, and the court found that this statement could have reasonably led an investor to conclude that the termination of the two executives' employment was not an option from Sprint's viewpoint. In this case, by contrast, the statements involved nothing more that general

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2008 WL 2220600 (N.D.Cal.)
**(Cite as: 2008 WL 2220600 (N.D.Cal.))**

praise for the workforce and some unexceptional compensation disclosures. No one at FoxHollow ever said that the Company intended to "insure" the long-term employment of Thomas, Martin, or Hoffman. Rather, the Company repeatedly said that all its employees were "at will" and could leave at any time.[FN13]

> FN13. Moreover, as noted above, Thomas, Martin and Hoffman were not the only executives who received raises and bonuses; and FoxHollow's compensation policy provided for the issuance of stock option grants to other FoxHollow employees, as well as to executive officers.

*26 As with the pre-class period statements, plaintiff has identified no statements in the October 26, 2005, conference call that created a duty to disclose Simpson's "edict" to management. It is common for a company to make general statements praising its workforce and noting the importance of its employees to its performance. The statements "We couldn't be happier," and "[W]e are all energized by the new Hawks that are coming in with the mindset of taking this opportunity to the next level," are nothing more than vague and unspecific assertions of corporate optimism. General positive statements do not give rise to a duty to disclose the details of internal corporate disputes. *See Kane v. Madge Networks N.V.,* 2000 WL 33208116 at *9 (N.D.Cal., May 26, 2000).

Nor has plaintiff alleged facts to support the claims based on the December 12, 2005, and January 9, 2005, statements. With regard to the assertion that the December 12, 2005, statements were misleading because they omitted to say that Thomas had been "forced to resign" for failing to "implement the LuMend acquisition back in August 2005," plaintiff has alleged no facts showing that Simpson *did* fire Thomas, or that he in fact had the power to do so. Indeed, as to the latter point, the court commented at the hearing on the motion to dismiss the CAC that plaintiffs had not explained how Simpson had the power to fire a chief executive officer on his

own. The FAC has not remedied this deficiency.

The statement of January 9, 2005, that "[w]e are confident in the abilities of the senior management already in place," did not name any specific employee, and is far too general and vague to support a federal securities claim. No reasonable investor would conclude, on the basis of such a general statement of optimism and praise, that FoxHollow would not make *any* management personnel changes in the future.

The FAC alleges, without factual detail, that a close relationship existed between Simpson and FoxHollow's directors. These allegations do not show, however, that Simpson controlled the Board of Directors, or that he, himself, could fire Thomas. Based on the facts alleged in the FAC, it is equally plausible that Thomas decided to quit because he no longer wished to work with Simpson, as it is that Simpson engineered Thomas' "firing."

Moreover, if it were true that Simpson controlled the Board, he would have had no need for Martin, Hoffman, or Trigg to "sign off" on the LuMend transaction. None of those three was a Board member, and the FAC alleges no facts showing that they played even the smallest role in any decision by the Board to approve or reject the LuMend transaction. Either Simpson controlled the Board and therefore did not need Martin, Hoffman, or Trigg to "sign off" on the LuMend transaction, or Simpson did not control the Board, and therefore lacked the power to fire Thomas.

Plaintiff alleges that Simpson told Thomas on August 28, 2005, that if the LuMend transaction was not closed "by the end of the week," he would ask for his resignation and that Simpson "had the power to issue and enforce this threat." Yet, the transaction was *not* closed within one week, and there is no allegation that Thomas was asked to resign at that time. Even after another entity purchased LuMend, Thomas continued to serve as CEO, for several months. Based on the allegations in the FAC, it is reasonable to conclude that Simpson did not have

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2008 WL 2220600 (N.D.Cal.)
(Cite as: 2008 WL 2220600 (N.D.Cal.))

Page 24

sufficient control of the Board to force an acquisition of LuMend, because the acquisition never went forward. Thus, there is no basis upon which to conclude that Simpson had the ability unilaterally to fire Thomas.

2. Scienter.

**\*27** Defendants contend that the FAC fails to meet the heightened standard for pleading the required state of mind for a claim under § 10(b) and Rule 10b-5. Under the PSLRA, whether alleging that a defendant "made an untrue statement of material fact" or alleging that a defendant "omitted to state a material fact," the complaint must, with respect to each alleged act or omission, "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."15 U.S.C. § 78u-4(b)(2).

In the Ninth Circuit, the required state of mind is "deliberate or conscious recklessness." *In re Silicon Graphics,* 183 F.3d at 979. Mere motive and opportunity are not enough. *Id.* Because falsity and scienter in securities fraud cases may be inferred from the same set of facts, the Ninth Circuit frequently incorporates the falsity and scienter requirements into a single inquiry. *See America West,* 320 F.3d at 932.

On a Rule 12(b)(6) motion to dismiss, when considering whether plaintiffs have shown a strong inference of scienter, "the district court must consider all reasonable inferences to be drawn from the allegations, including inferences unfavorable to the plaintiffs."*Gompper v. VISX, Inc.,* 298 F.3d 893, 897 (9th Cir.2002) (noting tension between customary latitude granted plaintiff on a Rule 12(b)(6) motion to dismiss and heightened pleading standard set forth under the PSLRA). Put another way, "a court must consider plausible nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff."*Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* ---U.S. ----, ----, 127 S.Ct. 2499, 2510, 168 L.Ed.2d 179 (2007).

In short, the court must consider all the allegations in their entirety in concluding whether, on balance, the complaint gives rise to the requisite inference of scienter. *Gompper,* 298 F.3d at 897;*see also Tellabs,* 127 S.Ct. at 2509 (the inquiry "is whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation scrutinized in isolation, meets that standard"). The inference of scienter

> must be more than merely "reasonable" or "permissible"-it must be cogent and compelling, thus strong in light of other explanations. A complaint will survive ... only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged.

*Tellabs,* 127 S.Ct. at 2510.

Because falsity and scienter in private securities fraud cases are generally inferred from the same set of facts, courts generally incorporate the dual pleading requirements of 15 U.S.C. §§ 78u-4(b) (1) and (b)(2) into a single inquiry. *Ronconi v. Larkin,* 253 F.3d 423, 429 (9th Cir.2001); *see also In re Read-Rite Corp.,* 335 F.3d 843, 846 (9th Cir.2003).

Defendants argue that because the FAC fails to allege particular facts that demonstrate that defendants made any statements that were materially misleading at the time they were made, the FAC also fails to strongly suggest actual intent to make misleading statements. Defendants contend that the FAC adds no new allegations creating an inference of scienter, noting that plaintiff pleads the same "Additional Scienter Allegations" as in the CAC.

**\*28** In addition, defendants argue that the new allegations regarding purported statements by three anonymous "Executive Employee Witnesses" do not raise an inference of scienter. Defendants assert that these statements describe isolated instances of management disharmony and provide no evidence that defendants intentionally made misleading statements or omissions.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2008 WL 2220600 (N.D.Cal.)
(Cite as: 2008 WL 2220600 (N.D.Cal.))

Moreover, defendants argue, even if these allegations were relevant, they would still be insufficient to raise a strong inference, because allegations relying on information provided by unidentified "witnesses" must identify each such witness' job duties and responsibilities, and must provide corroborating information sufficient to support a reasonable conviction in the informant's basis of knowledge and how each informant came to learn of the information attributed to him or her. Defendants argue that the FAC does not even come close to meeting this standard, as plaintiff omits all identifying information regarding his confidential sources.

Defendants contend that plaintiff not only fails to plead facts raising a strong inference of scienter, but also fails to even plead particular facts supporting his version of events. Defendants note that at the September 6, 2007, hearing on the motion to dismiss the CAC, the court observed that plaintiff had not alleged any facts showing how Simpson was able to "fire" Thomas, or even that Thomas had been fired.

Defendants assert further that plaintiff provides no support for the allegation that the alleged refusal of Martin, Hoffman, and Trigg to "sign off" on the LuMend transaction had any effect on the proposed merger. Defendants contend that plaintiff pleads no facts suggesting that the LuMend transaction (a proposed corporate merger) depended on the consent of any of these executives, none of whom were members of FoxHollow's Board of Directors. Defendants note that plaintiff does not allege that any of these executives made any presentations to the Board regarding LuMend, or played any role whatsoever in approving the acquisition of LuMend.

Finally, defendants argue that the court should infer a lack of scienter from the fact that defendants retained the vast majority of their FoxHollow shares during the class period. Specifically, defendants contend that the court should infer from Simpson's minimal stock sales during the class period that he lacked the intent that plaintiff ascribes to him.

Defendants contend that the facts here strongly support an inference that defendants did not think there any material information was being withheld, as Simpson sold only 5% of his FoxHollow shares during the proposed class period. They argue that if defendants had engaged in a fraud on the market, one would expect to see substantially greater sales during the period that FoxHollow's shares were allegedly overvalued. Instead, Simpson held onto 95% of his shares during that time.

In opposition, plaintiff contends that the FAC adequately alleges that defendants acted with scienter, and asserts that the FAC added over 30 new paragraphs alleging Simpson's knowing misconduct, and added further detail and particularity to other paragraphs.[FN14]

> FN14. Plaintiff asserts that FAC ¶¶ 7, 9-11, 51, 53-56, 61, 64, 66-74, 76, 78, 79, 81, 82, 84-86, and 88-90 are the new paragraphs, and that ¶ ¶ 12-14, 47-49, 50, 65, and 75 have added detail. Apart from citing these 39 paragraphs, plaintiff does not explain how the allegations differ from those in the CAC. The court notes that the "Statement of Facts" in the FAC begins with ¶ 35, and runs to ¶ 98. However, the portion of the "Facts" section pertaining to the class period does not begin until ¶ 72. Any addition of new particularized facts to the portions of the complaint that relate to pre-class-period allegations has no bearing on whether plaintiff has stated a claim under the Exchange Act.

**\*29** Plaintiff also takes issue with defendants' assertion that the FAC merely "repeats" the claim that Simpson "had the power to issue and enforce his threat" to fire Thomas, without alleging how Simpson would have been able to fire Simpson on his own. Plaintiff asserts that the FAC alleges that Simpson had been intimately involved with FoxHollow from its inception, having founded the Company in 1996, having served on the Board of Directors from 1996 to the present, having served

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2008 WL 2220600 (N.D.Cal.)
(Cite as: 2008 WL 2220600 (N.D.Cal.))

Page 26

as President from 1996 to 1997, having served as a paid consultant from 2004 to 2005, and having served as CEO from January 2005 to the present; that at the time Simpson made his "threat" to the Board of Directors, he was serving as Chairman of the Board and was FoxHollow's largest individual shareholder; [FN15] that Simpson had "selected every member of FoxHollow's Board of Directors," appointing "family members and close friends" to the position; [FN16] and that Simpson, as Chairman of the Board, plainly had the ability to "orchestrate[ ] the removal of Thomas, Martin, and Hoffman," as alleged in the FAC.

> FN15. According to FoxHollow's April 29, 2005, proxy statement, Simpson owned 7,926,706 shares, or 34.4%, of the Company's stock. By the time of the April 28, 2006, proxy statement, he owned 5,973,355 shares, or 24%, of the Company's stock.

> FN16. The FAC alleges in ¶ 73 that Simpson's "family members and close friends occupied positions on FoxHollow's executive management team and followed his directions," and that Simpson "selected every member of FoxHollow's Board of Directors."FAC ¶ 73. The FAC does *not* allege that Simpson "appointed family members and close friends" to the Board. Moreover, apart from asserting that Simpson had ties to Rohlen, his son-in-law, and to Ferguson, Rohlen's brother-in-law-neither of whom is alleged to have been a member of the Board of Directors-plaintiff does not identify any other "family members and close friends."

With regard to defendants' arguments concerning the confidential witnesses, plaintiff asserts that the FAC pleads sufficient facts to support the probability those witnesses possessed the information alleged. Plaintiff contends that because the confidential witness were not only employees, but also executive officers of FoxHollow, they had direct know-ledge of the Company's operations, its consideration of LuMend, the Board conversations with executive staff and executive management termination decisions and disclosures. Indeed, according to plaintiff, these witnesses were "parties" to the conversations described in the FAC, and therefore provided reliable information regarding what transpired at FoxHollow.

Plaintiff contends that the FAC establishes scienter by showing that Simpson intentionally or recklessly concealed material information from the investing public. Plaintiff asserts that a strong inference arises that information was intentionally concealed by Simpson because it was *his* decision to "purge" management. Plaintiff also argues that the fact that Simpson sold only a small percentage of his stock during the class period is not dispositive in determining scienter. Plaintiff contends that Simpson's motive was his "vindictive desire to purge key management who opposed him," not to make profits from insider trading.

The court finds that plaintiff has not alleged facts creating a strong inference of scienter. As an initial matter, the FAC fails to allege particularized facts that demonstrate that defendants made any statements that were misleading at the time they were made, or that they omitted to state any material fact necessary to make statements not misleading. The cited public statements never rise beyond the level of general remarks in praise of the Company's workforce, and the additional allegations from the confidential witnesses reflect nothing more than internal discord regarding the proposed LuMend transaction.

*30 Moreover, the allegations based on information from the confidential witnesses do not meet the standard followed by the Ninth Circuit. In pleading fraud under the PSLRA, plaintiffs may rely on anonymous sources for information, so long as they plead "corroborating details" when allegations are based on non-public information. *In re Silicon Graphics,* 183 F.3d at 985;*see also In re SeeBeyond Techs. Corp. Sec. Litig.,* 266 F.Supp.2d 1150, 1159

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

(C.D.Cal.2003).

"[P]ersonal sources of information relied upon in a complaint should be 'described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged.'"*Nursing Home Pension Fund, Local 144 v. Oracle Corp.,* 380 F.3d 1226, 1233 (9th Cir.2004) (quoting *Novak v. Kasaks,* 216 F.3d 300, 314 (2nd Cir.2000)); *see also In re Daou,* 411 F.3d at 1015. When plaintiffs rely on facts beyond the information provided by the confidential witnesses, they need not name their sources as long as the additional facts provide an adequate basis for believing that the defendants' statements were false. *Nursing Home,* 380 F.3d at 1015.

As noted above, plaintiff asserts that Executive Employee Witnesses 1, 2, and 3 had "direct knowledge" of FoxHollow's operations, the Company's consideration of LuMend, Board conversations with executive staff members about LuMend and FoxHollow's CEO Robert Thomas, and executive management termination decisions and disclosures. However, apart from asserting that these witnesses had "direct knowledge" of general subject areas, plaintiff provides no details about these witnesses confirming that they were in a position to know what plaintiff claims they knew.

Plaintiff argues that these witnesses should be considered reliable simply by virtue of the fact that they were "executives." But there are no corroborating details pled in the FAC that provide any indicia of reliability. For example, while plaintiff argues in his opposition that the statements from the confidential witnesses were based on their own personal knowledge, the FAC omits any statement confirming that a particular witness actually was present in the room when the meetings described were taking place.

In any event, even with the allegations of facts attributed to these witnesses added to the mix, plaintiff still fails to state a claim for securities fraud. The statements attributed to the confidential witnesses simply confirm that Simpson disagreed with certain FoxHollow executive officers regarding the proposed acquisition of LuMend. The statements do not support a strong inference of the required mental state.

Finally, under the circumstances presented here, the fact that Simpson retained most of his stock militates against an inference of scienter. It is true, as plaintiff asserts, that scienter can be established even if a particular defendant did not sell stock during the class period. *See America West,* 320 F.3d at 944. In this case, however, plaintiff claims that "Simpson's motive was his vindictive desire to purge key management who opposed him, not insider trading profits."Pltf's Opp. at 24 n. 2.

*31 Thus, if Simpson had no motive to keep the price of the stock high, but wanted only to retaliate against certain executives, he had no intent to defraud shareholders and plaintiff can't state a claim for securities fraud. *See, e.g., In re Wet Seal,* 518 F.Supp.2d at 1177-78 (lack of tangible personal benefits from alleged scheme weighs against inference of scienter), and cases cited therein. The fact that Simpson sold little stock during the class period simply reinforces the inference that he lacked the requisite state of mind.

Because plaintiff has not established that defendants had any duty to disclose the internal dispute over the proposed LuMend acquisition, including any squabbles between Simpson and Thomas, Simpson and Martin, Simpson and Hoffman, or Simpson and Trigg; and because plaintiff fails to allege facts sufficient to create a strong inference of scienter, the court finds that the motion to dismiss must be GRANTED.[FN17]

FN17. The § 20(a) claim is dismissed because plaintiff has not stated a claim for primary liability. *Heliotrope,* 189 F.3d at 978.

## CONCLUSION

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2008 WL 2220600 (N.D.Cal.)
**(Cite as: 2008 WL 2220600 (N.D.Cal.))**

In accordance with the foregoing, the motion to dismiss is GRANTED. The court previously put plaintiff on notice of the defects in the CAC, and the FAC is similarly inadequate in alleging both falsity and scienter. Because the court finds that further amendment would be futile, the dismissal is WITH PREJUDICE.

**IT IS SO ORDERED.**

N.D.Cal.,2008.
In re FoxHollow Technologies, Inc., Securities Litigation
Slip Copy, 2008 WL 2220600 (N.D.Cal.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.