# EXHIBIT F

Westlaw.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 2461151 (S.D.Cal.)
**(Cite as: Not Reported in F.Supp.2d, 2005 WL 2461151 (S.D.Cal.))**

Page 1

C
In re Ligand Pharmaceuticals, Inc. Securities Litigation
S.D.Cal.,2005.
Only the Westlaw citation is currently available.
United States District Court,S.D. California.
In re LIGAND PHARMACEUTICALS, INC. SECURITIES LITIGATION
No. 04CV1620DMS(LSP).

Sept. 27, 2005.

William F. Sullivan, Paul Hastings Janofsky & Walker LLP, San Diego, CA, for Ligand Pharmaceuticals, Inc. Securities Litigation.

ORDER (1) GRANTING MOTION TO DISMISS CONSOLIDATED CLASS ACTION COMPLAINT AND (2) GRANTING PLAINTIFFS LEAVE TO FILE A FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

SABRAW, J.

[Doc. No. 47]

*1 This Document Relates To: ALL ACTIONS

This matter comes before the Court on Defendants' motion to dismiss the Consolidated Class Action Complaint ("CAC"). Plaintiffs have filed an opposition to the motion and Defendants have filed a reply. The matter came on for hearing on September 9, 2005. Trevan Borum, Esq. and Kirk B. Hulett, Esq. appeared on behalf of Plaintiffs, and William F. Sullivan, Esq. and Christopher H. McGrath, Esq. appeared on behalf of Defendants. For the reasons set out below, the Court grants Defendants' motion, but grants Plaintiffs' request for leave to file a First Amended CAC.

I.

BACKGROUND

Gary Apostolov, William Davidson, Richard Fisher and Simon Del Rosario purchased securities of Ligand Pharmaceuticals, Inc. between March 3, 2004, and August 2, 2004 (the "Class Period"). They bring this action on behalf of themselves and all other persons and entities who purchased Ligand securities during the Class Period for violation of Section 10(b) of the Securities and Exchange Act ("the Exchange Act") and Rule 10(b)(5) promulgated thereunder against Defendants Ligand Pharmaceuticals, Inc., David E. Robinson and Paul V. Maier. Mr. Robinson is Ligand's President, Chief Executive Officer and Chairman of the Board. (CAC at ¶ 19.) Mr. Maier is Ligand's Senior Vice President and Chief Financial Officer. (*Id.* at 20.) Plaintiffs also seek to hold Defendants Robinson and Maier ("the Individual Defendants") liable under Section 20 of the Exchange Act.

Ligand discovers, develops and markets new drugs that address medical needs of patients in a variety of areas, including pain management. (*Id.* at ¶ 2.) Ligand's flagship product during the Class Period was AVINZA®, a once-daily treatment for chronic, moderate-to-severe pain. (*Id.*) AVINZA was developed by Elan Corporation PLC, which licensed the rights to Ligand in 1998. (*Id.* at ¶ 3.) The Food and Drug Administration approved AVINZA for sale in the United States in 2002. (*Id.*)

AVINZA's success depended primarily on obtaining approval for, and inclusion on, state Medicaid formularies. (*Id.* at ¶ 50.) The approval process varied between states, but generally required companies to submit bids to the states. (*Id.* at ¶¶ 58-59.) Those bids typically included an offer of rebates to the states, and the company offering the largest rebate often received preferred status on the formulary. (*Id.* at ¶ 54.)

To obtain those rebates, state Medicaid programs must submit rebate "utilization data" and invoices on a quarterly basis to each manufacturer. (*Id.* at ¶ 55.) The utilization data and invoice must identify

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                            Page 2
Not Reported in F.Supp.2d, 2005 WL 2461151 (S.D.Cal.)
**(Cite as: Not Reported in F.Supp.2d, 2005 WL 2461151 (S.D.Cal.))**

the number of units paid for by the state of each covered outpatient drug. (*Id.*) The manufacturer has thirty days from the receipt of a state invoice to pay the rebate unless the manufacturer disagrees with the units invoiced and the amount of the rebate, in which case the manufacturer may initiate a dispute resolution process. (*Id.*)

*2 AVINZA was eventually listed on forty-four state Medicaid formularies, and received preferred status on at least twelve programs. (*Id.* at ¶ 59.) By the end of 2003, AVINZA was Ligand's premier drug, accounting for two-thirds of Ligand's sales. (*Id.* at ¶ 3.)

On March 3, 2004, Ligand issued a press release on its financial results for 2003 and its projections for 2004. (Defs.' Req. for Judicial Notice, Ex. A.) FN1 In that press release, Defendant Maier stated: " 'We estimate that about 60-70% of AVINZA's fourth quarter sales of $32.0 million were covered by prescription demand across all segments (with the balance related to expanding retail pharmacy, wholesale, and chain distribution), and expect this percentage to increase further in 2004[.]" ' (*Id.*) Maier also stated: " 'We believe Ligand's net product sales will continue to accelerate in 2004, based on solid end-user demand for our in-line oncology products and the full year benefit of greatly increased sales and marketing capabilities and investments behind AVINZA[.]" ' (*Id.*) Ligand's forecast for 2004 was as follows:

> FN1. The Court takes judicial notice of this document pursuant to Federal Rule of Evidence 201. *See In re Homestore.com. Inc. Sec. Litig.,* 347 F.Supp.2d 814, 816-17 (C.D.Cal.2004) (stating court may take judicial notice of press releases).

- Total revenues between $240 and $265 million

- Net product sales between $210 and $230 million, with AVINZA product sales approximately two-thirds. AVINZA weekly retail Rx market share exiting December 2004 between 6-7%. Gross margin on overall product sales estimated at 79-81%

- Total operating expenses between $180 and $195 million (excluding cost of products sold but including co-promotion expenses)

- Full year operating income between $20 and $25 million

- Basic EPS of $.12 to $.19 per share.

(*Id.*) This press release also contained a section entitled, "Caution Regarding Forward-Looking Statements," which reads:
This news release contains certain forward-looking statements by Ligand that involve risks and uncertainties and reflect Ligand's judgment as of the date of this release. These statements include those related to the outlook for 2004 financial performance; revenue, product, sales and prescription demand growth; evolution of partner product assets; clinical survival data; AVINZA goals and market leader comparability; sales and marketing efforts; wholesaler purchases; managed care access; covered lives and Medicare/Medicaid reimbursement. Actual events or results may differ from Ligand's expectations. There can be no assurance that Ligand will achieve its outlook for 2004; increase revenues or margins or achieve future profitability; that the results from the periods discussed in this release will be indicative of results from future periods; that Ligand will receive any milestone payments for the discovery and/or development of any partner drugs; that results of any clinical study will be favorable or confirmed by later studies; that products under development by Ligand or any of its collaborative partners will receive marketing approval; that there will be a market for the drugs if successfully developed and thereafter approved; that collaborative or co-promotion arrangements will be successful or continued; that AVINZA or any of our oncology products will achieve expected sales or continue to grow. Additional information concerning these and other risk factors affecting Ligand's business can be found in prior press releases as well as in Ligand's public periodic filings with the Securities and Ex-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                           Page 3
Not Reported in F.Supp.2d, 2005 WL 2461151 (S.D.Cal.)
**(Cite as: Not Reported in F.Supp.2d, 2005 WL 2461151 (S.D.Cal.))**

change Commission, available via Ligand's web site at *http:// www.ligand.com.* Ligand disclaims any intent or obligation to update these forward-looking statements beyond the date of this release. This caution is made under the safe harbor provisions of the Private Securities Litigation Reform Act of 1995.

**\*3** (*Id.*)

On March 3, 2004, after issuance of this press release, Ligand held a conference call with interested parties. (*See* Defs.' Req. for Judicial Notice, Ex. B.) FN2 During that call, the interested parties were provided with an opportunity to ask questions of Defendants Robinson and Maier. One party asked Defendants if they were "starting to see the impact from California adding Avinza to the preferred list[.]" (*Id.*at p. 11.)In response, Defendant Robinson stated:

> FN2. The Court takes judicial notice of this document pursuant to Federal Rule of Evidence 201. *See Branch v. Tunnell,* 14 F.3d 449, 453 (9th Cir.1994) (stating court may take judicial notice of documents referenced in complaint in adjudicating motion to dismiss if authenticity of documents is not in dispute).

The short answer on California is it is probably too early to give any meaningful quantification. California is a little bit different than our Tennessee, Florida and now underway Texas Medicaid formulary experiences. Where we go on to a formulary exclusively as the only oral opiode [sic], then the response from the state is very quick and measurable and that certainly was the case in Florida, Tennessee and we hope will be the case in Texas which really began last week. California we have gone on in addition to all the other opiodes, so the effect is a growth curve over time. We do believe, we have certainly seen progress at the territory level, but it is too early to really be able to quantitate that. We do believe it will be an effect over all of 2004 principally rather than the kind of quick shot in the arm that Tennessee brought because of the very substantial conversion of patients that took place. So I wish we could be some more help. We will try to look at that and track it as we see California contribute this year in a more substantial way, but we really do not have anything quantitative there.
(*Id.*at p. 11-12.)

Another party asked Defendants if they expected inventory issues concerning AVINZA to "remain[ ] in the first quarter" or "to play out throughout the year?"(*Id.*at p. 26.)In response, Defendant Robinson reiterated Ligand's "product supply chain strategy[.]" (*Id.*) Specifically, he stated:

In year one, we are not overly concerned about six months of forward cover on average in the wholesalers. Year two which is 2004, we probably will see that come down three to four months and going into year three we will see it trend to an average that is more traditional for a retail product. This year we expect to stock fewer pharmacies than last year to meet patient demand, so the stresses on the system are becoming less. So that will slowly work its way down to where we would expect going forward inventories to be one to two months in the overall distribution, that is wholesalers, warehousing chains and second and third tier wholesalers. So I think that we see that as a natural progression and very healthy to make sure that Avinza does not have a lot of resistance because of supply chain issues. So that is pretty much how we are managing the overall product and I think we are right on target with that wrapping up last year. I think we highlighted out of full transparency that because you time a price increase January 1st for strategic reasons, you are always going to have some customers get a little bit ahead of your own plans. We managed it tightly, we I think kept the effects to reasonable both for good business and good inventory management reasons, but I think we have to say there is probably some effect that will take place in first quarter and then we will be back to normal trend lines.

**\*4** (*Id.*at p. 28-29.)

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d  
Not Reported in F.Supp.2d, 2005 WL 2461151 (S.D.Cal.)  
**(Cite as: Not Reported in F.Supp.2d, 2005 WL 2461151 (S.D.Cal.))**

Page 4

After issuance of the press release and the conference call on March 3, 2004, market analysts issued positive forecasts and "buy" recommendations for Ligand securities, and Ligand's stock price rose to $18.29 per share at the close of trading on March 3, 2004, from a price of $16.19 per share at the close of trading on March 2, 2004. (CAC at ¶¶ 97-102.)

Nearly ten days later on March 12, 2004, Ligand filed its annual Form 10-K with the Securities and Exchange Commission ("SEC"). In that document, Defendants stated, " 'We recognize revenue upon product delivery, *net allowances for returns, rebates, discounts and chargebacks.*' " (*Id.* at ¶ 103.) With respect to inventory returns of AVINZA, Defendants stated:

"Our policy for returns of AVINZA allows customers to return the product six months prior to and six months after expiration.... The level of actual returns can be influenced by a number of factors including the dating of product when shipped to the customer, *the amount of product subsequently shipped by the wholesale distributor to their customers,* pricing adjustments, and competing products. *In recording adjustments to sales for estimated returns, we consider each of these factors as well as historical return patterns of our products, independent reports of the level of our products in the distribution channel, and industry trends.* Actual product results may differ from our estimates."

(*Id.* at ¶ 104.) With respect to rebates, Defendants stated:
"We may provide rebates and/or chargebacks to our wholesaler distributors who sell to customers that have a purchasing contract with us, members of group purchasing organizations and managed care organizations who purchase our product through wholesalers and state agencies that administer certain government sponsored health programs. Such rebates and chargebacks are generally determined based on the volume of purchases or by reference to a specific price for a product. *We accrue for these liabilities when we record the product sale. The underlying accrual rates and related reserves are regularly reviewed and adjusted, if necessary, based on newly enacted legislation, changes in historical trends, significant new contracts or amendments to existing contracts.*"

(*Id.* at ¶ 105.)

On May 5, 2004, Ligand issued a press release on its financial results for the first quarter of 2004, and its projections for the remainder of the year. (*See* Defs.' Req. for Judicial Notice, Ex. D.) [FN3] In that press release, Ligand provided an "AVINZA Update," in which Defendant Maier stated:

> FN3. The Court takes judicial notice of this document pursuant to Federal Rule of Evidence 201. *See Homestore.com,* 347 F.Supp.2d at 816-17.

"AVINZA continued to grow solidly in the first quarter reflecting slowness in January/February and strong acceleration in March (a new monthly Rx record) following a robust fourth quarter 2003.... Total prescription increased 20% over the prior quarter (based on IMS NPA monthly data, which does not include institutional use in hospitals, Federal facilities and other non-retail outlets) reflecting continued solid growth. In addition, our weekly prescription market share of 4.0% for the last week of March 2004 was in line with our previously announced goal to achieve 6-7% weekly market share by December 2004. Monthly prescription market share increased from 3.1% for December 2003 to 3.5% for March 2004. Quarterly prescription market share increased from 2.7% in fourth quarter 2003 to 3.2% in first quarter 2004.

*5 We believe that expanding our sales force calls will result in further market penetration of the primary care physician segment and strengthen our foothold in the long-term care/hospice arena. Both activities are well underway in April. This sales initiative combined with continued strong specialty coverage provided Ligand and Organon with the best opportunity to accelerate AVINZA sales and

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 2461151 (S.D.Cal.)
(Cite as: Not Reported in F.Supp.2d, 2005 WL 2461151 (S.D.Cal.))

Page 5

its contribution to our shareholders[.]"

(*Id.*) Defendant Maier also explained:
"First quarter AVINZA sales were adversely impacted, as expected, by several wholesalers' strong fourth quarter purchases prior to the January 1, 2004, price increase; and by a near-term increase in Medicaid rebates (estimated at $2.5 million) resulting from significantly higher Medicaid prescriptions in several states where AVINZA obtained preferred formulary status and to a lesser extent by product returns from a few development stage batches with shorter than normal expiry dates (the latter two combined were estimated to be $4.0 million)[.]"

(*Id.*) Defendant Maier also issued the following statement on Ligand's financial outlook for 2004:
"We believe Ligand's net product sales will continue to accelerate in 2004, based on solid end-user demand for our in-line oncology products and full year benefit of greatly increased sales and marketing capabilities and investments behind AVINZA.... We continue to believe 2004 will be the transition year to a high growth, profitable biopharmaceutical business with tremendous strength of product assets to drive that growth going forward. For the year, Ligand reiterates its previous guidance, expecting:

- Total revenues between $240 and $265 million

- Net product sales between $210 and $230 million, with AVINZA product sales approximately two-thirds. AVINZA weekly retail Rx market share exiting December 2004 between 6-7%. Gross margin on overall product sales estimated at 79-81%

- Total operating expenses between $180 and $195 million (excluding cost of products sold but including co-promotion expenses)

- Full year operating income between $20 and $25 million

- Basic EPS of $.12 to $.19 per share.

- While the company expects full-year positive profits and EPS consistent with guidance for 2004, Ligand continues to expect first half losses and second half strong profits."

(*Id.*)

Following that press release, Defendants again held a conference call with interested parties. (*See* Defs.' Req. for Judicial Notice, Ex. E.) [FN4] Defendant Robinson offered opening remarks during the call, in which he stated:

> FN4. The Court takes judicial notice of this document pursuant to Federal Rule of Evidence 201. *See Branch,* 14 F.3d at 453.

We would note that first quarter AVINZA sales were adversely impacted, as we had expected and included in our last press release, by several wholesalers that had bought a little bit strongly in the fourth quarter of last year and prior to the price increase. There were two other events which impacted the reported sales.

We had a near-term surge in Medicaid rebates which were a phenomena of several Medicaid states where we obtained preferred formulary status and there was a much faster uptake, some of it in the fourth quarter and some of it in the first quarter, and that clearly had to result in a higher rate of rebates in the short term.

*6 We also had returns from the loss of a few development stage batches that we had distributed to the market. They were approved commercially, of course. They had shorter than normal expiration dates so we had some of those returns come back. That was the smaller portion of the total charge. Combined, it was about $4 million between those two events and so when we look at AVINZA overall for the quarter we are quite pleased with the overall results, and we believe that AVINZA is nicely on track for another strong growth year as we move through the second half of this year.

(*Id.* at p. 11.)

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d  Page 6
Not Reported in F.Supp.2d, 2005 WL 2461151 (S.D.Cal.)
**(Cite as: Not Reported in F.Supp.2d, 2005 WL 2461151 (S.D.Cal.))**

As in the March 3, 2004 conference call, the May 5, 2004 conference call was opened for questions from interested parties. One party asked if Defendants expected "further impact from Medicaid rebates being a little higher than [their] expectations and also it sounds like stale inventory issue[.]" (*Id.* at p. 15.) In response, Defendant Robinson stated:

The Medicaid rebate issue is an interesting one. We brought on board two or three new Medicaid contracts that were PDLs, that when you look at the history of PDLs that we have with AVINZA, there is a certain curve of adoption that comes from PDLs and then there is a rollout from the Medicaid customer to the private patient and so it is a physician adoption curve. What usually happens is that first they move their Medicaid patients and then they start bringing private patients on. That is why you do the Medicaid business. So, what happened with these and Tennessee is a classic example, there was quite a strong enforcement unusual in Medicaid states of the must convert the patients and very little or no prior authorization for any non-formulary product. Those are unusual disciplined activities of state Medicaid authorities and that caused the surge. That surge peaked in the first quarter of this year and in fact is a little bit down. So the short answer to your question, we have looked at each of those states and we do not expect a recurrence of that event. It was an event that was a much faster adoption than anyone would have expected from previous state histories and certainly only happened in two or three states. So we think that has peaked and have made the adjustments that are appropriate and should now benefit from in fact a surge in the private market business which would in fact shift the mix away from Medicaid and in fact improve our business mix going forward. So, as we view it, we have appropriately taken care of that issue and would not expect a repeat of that magnitude. You always get a little bit of fluctuation but nothing like that.

(*Id.* at p. 16-17.) The asking party then followed up by asking whether the Medicaid rebate charges were one-time events or a percentage, to which Defendant Robinson responded as follows:

What we do is we make provisions for Medicaid rebates in our ongoing accruals. What happens when you get a surge is you are above the expected level so there is a one-time component because you basically make adjustments for what you think that you need in the quarter to bring it to proper balance and so there is very definitely a one-time component to this that we think we have taken care of and that is why we characterized it as a surge. Otherwise, we are comfortable that the normal, historical rate of provisions that we have been using and will use in the future are appropriate.

*7 (*Id.* at p. 17.) In response to the issue of inventory returns, Defendant Robinson stated:

... typically when you go to market with a product you do not want to write off all your investment in development lots so you have development stage lots that were produced under GMP commercial conditions and they are approvable and releasable for commercial distribution but they often have shorter expiration dating. Since they are the first lots that you go to market with, you sometimes have where you are first distributing a product, some part of that which ultimately, because of the shorter dating comes back. We are in very good condition. We have two years of expiry dating on our normal commercial batches so we are in very good condition. This was simply cleaning up the last of the lots that made their way out there first and had little bit shorter dating. So, we are quite comfortable that we do not have dating or staleness issues with our normal commercial inventories. This just happened to be the final clean up. It is a relatively small part of the four million charge. Most of that was in fact the rebates and charges on Medicaid.

(*Id.* at p. 18-19.)

Another party to the conference call asked whether Ligand still had "some trade inventories out there that you still expect to be destocked so as we move

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 2461151 (S.D.Cal.)
(Cite as: Not Reported in F.Supp.2d, 2005 WL 2461151 (S.D.Cal.))

Page 7

forward, would you expect some quarters where your underlying demand is actually greater than your reported sales?"(*Id.*at p. 23.)In response, Defendant Robinson stated:

Well, I think our sense in relationship with the wholesalers who are really working with us wonderfully on AVINZA, our sense is where we are with inventories in the channel right now is pretty much where we want to be and the wholesalers are working with us quite nicely such that what we expect is the current level of inventories that we have will be largely sustained. You can always have some small fluctuations but the level of inventories we expect to be sustained. They will go down as volumes rise as months of inventory in the channel, but the absolute levels we believe are pretty much what is needed in the system right now, and so far our wholesaler partners are working with us on that.

(*Id.*at p. 23-24.)

Another party asked whether Ligand expected "AVINZA to be added to preferred drug lists and any more state Medicaids?"(*Id.*at p. 37.)Defendant Robinson responded:

I would say that we do not expect of the order of magnitude of Florida, Tennessee or Texas, those big Medicaid states that moved to preferred drug lists. We do not expect additional big PDL formulary additions this year. We expect the rollover of some of them that we put in place last year. We expect some smaller states. There is a small trend to preferred drug lists but then each preferred drug list is quite different. Some of them are not really preferred drug lists. They may have two or three different products so they are only preferred drug because one is not on. When we look at what is going on there, there are several states that are trying to move to some preferred drug lists. We do not expect major states to be added to that list that would produce the kind of surges that we have seen first quarter of this year and late fourth quarter of last year. So, yes. Probably a couple of smaller ones that we have participated in but nothing that we ex-

pect to dramatically change our mix the way that we saw in this quarter.

*8 (*Id.*at p. 37-38.)

On May 7, 2004, Defendants filed their quarterly Form 10-Q with the SEC. (*See* Defs.' Req. for Judicial Notice, Ex. F.) [FN5] In describing its first quarter results, Ligand stated:

> FN5. The Court takes judicial notice of this document pursuant to Federal Rule of Evidence 201. *See In re Syncor Int'l Corp. Sec. Litig.,* 327 F.Supp.2d 1149, 1156 (C.D.Cal.2004) (stating court may take judicial notice of SEC filings).

AVINZA sales were negatively impacted by a higher level of Medicaid prescriptions in states where 1) AVINZA® recently obtained preferred formulary status relative to competing products and 2) in states where AVINZA® recently came onto the state formulary but not in a preferred position. As a result, the provision for rebates in the first quarter of 2004 was increased by approximately $2.5 million and $0.5 million, respectively.AVINZA® sales in the first quarter of 2004 were also negatively impacted by approximately $1.0 million related to higher than estimated product
(*Id.*at p. 13.)

Plaintiffs allege the statements outlined above led investors to believe that the increase in Medicaid rebates and inventory returns for AVINZA were one-time events. That understanding proved to be mistaken, however, when on August 3, 2004, Ligand announced that Medicaid rebates and inventory returns of AVINZA continued to affect AVINZA sales in the second quarter of 2004, and hence Ligand's financial results.

Plaintiffs allege the statements outlined above were false and misleading because Defendants failed to disclose (1) they had no ability to track AVINZA inventory transfers between wholesalers and retailers, and (2) they had no ability to meaningfully pre-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d    Page 8
Not Reported in F.Supp.2d, 2005 WL 2461151 (S.D.Cal.)
**(Cite as: Not Reported in F.Supp.2d, 2005 WL 2461151 (S.D.Cal.))**

dict or accrue for Medicaid rebates. To support this allegation, Plaintiffs rely on a press release from Ligand dated August 3, 2004. In that press release, Defendant Maier stated that Ligand "better understood" the "AVINZA sales mix changes and geographic demand changes that have impacted net product sales in the first half of this year [.]" (CAC at ¶ 127.) Plaintiffs also rely on an August 3, 2004 conference call in which Defendant Robinson explained the discrepancy between Ligand's predictions for the second quarter of 2004 and the actual results. (*See* Defs.' Req. for Judicial Notice, Ex. 1.) FN6 Plaintiffs specifically rely on Defendant Robinson's statement that Ligand had "only two months of actual experienced data" when it did the first quarter rebates, (*id.* at p. 6), and that Ligand was entering into distribution service agreements with its wholesalers to acquire inventory information. (*Id.* at p. 8.)

> FN6. The Court takes judicial notice of this document pursuant to Federal Rule of Evidence 201. *See Branch,* 14 F.3d at 453.

At the close of trading on August 3, 2004, Ligand's share price fell almost forty percent, or $5.405 per share, to $8.175 per share. (CAC at ¶ 138.)

II.

*DISCUSSION*

Defendants move for dismissal of the CAC pursuant to the Private Securities Litigation Reform Act of 1995 ("PSLRA") and Federal Rules of Civil Procedure 9(b) and 12(b)(6). They argue Plaintiffs have failed to satisfy the PSLRA's heightened pleading standard for falsity and scienter, and Defendants' alleged misstatements are protected by the PSLRA's safe harbor provision and the "bespeaks caution" doctrine. Defendants also assert they cannot be held liable for the statements of third-party analysts. Absent any liability under Section 10(b) and Rule 10(b)(5), Defendants Robinson and Maier argue they cannot be held liable under Section 20. Plaintiffs dispute each of Defendants' arguments.

A. Section 10(b) and Rule 10(b)(5)

*9 Section 10(b) of the Exchange Act makes it unlawful:

[t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange ... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b). Rule 10(b)(5), promulgated under Section 10(b), provides:
It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

(a) To employ any device, scheme or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5. The basic elements of a claim under Section 10(b) and Rule 10b-5 thereunder are: "(1) a material misrepresentation or omission of fact, (2) scienter, (3) a connection with the purchase or sale of a security, (4) transaction and loss causation, and (5) economic loss."*In re Daou Systems, Inc. Sec. Litig.,* 411 F.3d 1006, 1014 (9th Cir.2005).

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                         Page 9
Not Reported in F.Supp.2d, 2005 WL 2461151 (S.D.Cal.)
**(Cite as: Not Reported in F.Supp.2d, 2005 WL 2461151 (S.D.Cal.))**

B. Dismissal Pursuant to the PSLRA

Unlike other legal claims subject to "the usually lenient requirement of federal rules pleading[,]" plaintiffs alleging a Section 10(b) claim must satisfy the heightened pleading standard set out in the PSLRA. *Ronconi v. Larkin,* 253 F.3d 423, 437 (9th Cir.2001). Pursuant to the PSLRA, a complaint alleging a Section 10(b) claim "shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed."15 U.S.C. § 78u-4(b)(1). In addition, "the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."15 U.S.C. § 78u-4(b)(2). If either of these requirements is not met, the court must dismiss the complaint. 15 U.S.C. § 78u-4(b)(3)(A).

*1.Misleading Statements*

To determine whether Plaintiffs have satisfied the PSLRA's heightened pleading standard, the Court looks to the CAC. In the CAC, Plaintiffs explain that Defendants made misleading statements in: (1) the March 3, 2004 press release, (2) the March 3, 2004 conference call, (3) the March 12, 2004 Form 10-K, (4) the May 5, 2004 press release, (5) the May 5, 2004 conference call, and (6) the May 7, 2004 Form 10-Q. According to the CAC, Defendants (1) set forth their financial projections for 2004 in the press releases, (2) discussed projected levels of AVINZA inventory in the March 3, 2004 conference call, (3) explained the benefits of adding AVINZA to certain Medicaid formularies in the March 3, 2004 conference call, (4) explained their business practices for recognizing revenue, estimating returns and accruing for rebates in the Form 10-K, and (5) explained the shortfall in AVINZA sales during the first quarter of 2004 in the May 5, 2004 press release and conference call and the 10-Q. With the exception of Defendants' statement explaining the benefits of adding AVINZA to Medicaid formularies, which is alleged to be false and misleading because Defendants failed to mention that inclusion on those formularies would result in the payment of rebates, all of these statements are alleged to be false and misleading because Defendants failed to mention they had no ability to track (1) AVINZA inventory transfers between wholesalers and retailers or (2) Medicaid rebates for AVINZA. These allegations satisfy the PSLRA's requirement that Plaintiffs "specify each statement alleged to have been misleading" and "the reason or reasons why the statement is misleading [.]"15 U.S.C. § 78u-4(b)(1).

*10 Plaintiffs have also satisfied the PSLRA's requirement for allegations made on information belief by stating with particularity all facts upon which their beliefs are formed. Here, Plaintiffs rely on statements issued by Defendants after the close of the Class Period to demonstrate that Defendants' previous statements were false or misleading.[FN7] However, these facts demonstrate that Plaintiffs' claims rely on a classic "fraud by hindsight" theory. *See In re SCB Computer Techs., Inc. Sec. Litig.,* 149 F.Supp.2d 334, 354-55 (W.D.Tenn.2001) (stating reliance on press release issued after close of class period was attempt to prove "fraud by hindsight.") This is one theory of liability Congress sought to eliminate when it passed the PSLRA, *see Daou,* 411 F.3d at 1021, and it is insufficient to state a Section 10(b) claim.[FN8]

> FN7. Plaintiffs also rely on confidential witness testimony to support their allegations of falsity. The Court discusses that evidence in detail in the context of determining whether Plaintiffs have sufficiently pleaded scienter. For the reasons discussed therein, this evidence also fails to support a showing of falsity.

> FN8. The Court is not persuaded by Plaintiffs' argument that "fraud by hind-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                    Page 10
Not Reported in F.Supp.2d, 2005 WL 2461151 (S.D.Cal.)
**(Cite as: Not Reported in F.Supp.2d, 2005 WL 2461151 (S.D.Cal.))**

sight" applies only to the issue of scienter, or that there is a distinct line between the issues of scienter and falsity. Indeed, because these issues "are generally strongly inferred from the same set of facts," courts "have incorporated the dual pleading requirements of 15 U.S.C. §§ 78u-4(b)(1) and (b)(2) into a single inquiry."*Ronconi,* 253 F.3d at 429.

*2.Scienter*

To satisfy the PSLRA's second pleading requirement, Plaintiffs must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind" with respect to each allegedly misleading statement. 15 U.S.C. § 78u-4(b)(2). The Supreme Court has defined the required state of mind for a Section 10(b) claim "as a 'mental state embracing intent to deceive, manipulate, or defraud.'"*In re Silicon Graphics Inc. Sec. Litig.,* 183 F.3d 970, 975 (9th Cir.1999) (quoting *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 193-94 n. 12, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976)). The Ninth Circuit has interpreted this language as requiring a private securities plaintiff proceeding under the PSLRA to "plead, in great detail, facts that constitute strong circumstantial evidence of deliberately reckless or conscious misconduct."*Id.* at 974. In determining whether the plaintiff has met that standard, the court must consider whether the plaintiff's allegations, individually and collectively, " 'are sufficient to create a strong inference that defendants acted with deliberate or conscious recklessness.'"*Nursing Home Pension Fund, Local 144 v. Oracle Corp.,* 380 F.3d 1226, 1230 (9th Cir.2004) (quoting *No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am. West Holding Corp.,* 320 F.3d 920, 938 (9th Cir.2003)).

As an initial matter, Plaintiffs assert they have met the pleading standard for scienter by alleging Defendants had no reasonable basis for their allegedly misleading statements. However, an allegation that a statement was issued without a reasonable basis goes to the falsity of the statement, not the defendant's state of mind. *See Provenz v. Miller,* 102 F.3d 1478, 1487 (9th Cir.1996) (stating projection is factual misstatement if "there is no reasonable basis for the belief"); *In re 2TheMart.com, Inc. Sec. Litig.,* 114 F.Supp.2d 955, 961 (N.D.Cal.2000) (explaining statement of belief is actionable is "there is no reasonable basis for the relief"). Accordingly, Plaintiffs' allegation that Defendants issued the relevant statements without a reasonable basis does not support a showing of scienter.

*11 Nevertheless, Plaintiffs argue their other allegations are sufficient to raise a strong inference of scienter. Specifically, Plaintiffs rely on the statements of several confidential witnesses, the individual Defendants' positions within the company, AVINZA's importance to the company, and Defendants' anticipated restatement of its earnings for 2003 and 2004 to raise the necessary inference of scienter.[FN9] Defendants assert these facts are insufficient to raise the necessary inference, Plaintiffs' group pleading allegations are inadequate, and the absence of any stock sales by the individual Defendants negates any inference of scienter.

> FN9. Although Plaintiffs raise Defendants' anticipated restatement of earnings as a fact bearing on Defendants' scienter in their opposition brief, they do not allege this fact in the CAC. Accordingly, the Court declines to address that fact here, and specifically declines to consider it in determining whether Plaintiffs' have raised a strong inference of scienter.

a.Confidential Witnesses

In light of the PSLRA's heightened pleading standard, plaintiffs relying on confidential witnesses to raise an inference of scienter must meet certain requirements. First, plaintiffs must describe each confidential witness " 'with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged.'"*Daou,* 411 F.3d at 1015 (quoting *Nursing Home,* 380 F.3d at 1233) (internal quota-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 2461151 (S.D.Cal.)
**(Cite as: Not Reported in F.Supp.2d, 2005 WL 2461151 (S.D.Cal.))**

Page 11

tion marks omitted). However, the plaintiffs " 'need not name their sources as long as the latter facts provide an adequate basis for believing that the defendants' statements were false.' " *Id.* (quoting *Novak v. Kasaks,* 216 F.3d 300, 314 (2d Cir.2000)). If the plaintiffs adequately describe the confidential witness, the court then proceeds to a determination of the witness' reliability by evaluating " 'the level of detail provided by the confidential sources, the corroborative nature of the other facts alleged (including from other sources), the coherence and plausibility of the allegations, the number of sources, the reliability of the sources, and similar indicia.' " *Id.* (quoting *In re Cabletron Sys., Inc.,* 311 F.3d 11, 29-30 (1st Cir.2002)).

*i. Medicaid Rebates*

In this case, Plaintiffs rely on Confidential Witnesses Four and Five to raise an inference of scienter with regard to Medicaid rebates. Plaintiffs specifically rely on these witnesses to support their allegation that Defendants were unable to accurately track Medicaid rebates during the Class Period. (*See* CAC at ¶¶ 66-71.)

Witness Four ("W-4") "worked as a Director of National Accounts at Organon for 26 years until leaving the company in mid-2004. W-4 worked closely with Ligand in the co-promotion of AVINZA and was charged with enlisting AVINZA on formulary lists."(*Id.* at ¶ 57.) W-4 provides general information about the Medicaid rebate process, and Ligand's process in particular. (*Id.* at ¶¶ 66-71.) W-4 could have obtained general information about the Medicaid rebate process as the Director of National Accounts at Organon, which would satisfy the PSLRA's specificity requirements as to that information. However, it is improbable W-4 obtained information about Ligand's ability to track Medicaid rebates. In promoting AVINZA and enlisting AVINZA on the Medicaid formularies, W-4 may have obtained some knowledge about AVINZA and the terms for listing AVINZA on Medicaid formularies, but there is no evidence W-4 had any specific information about Ligand's ability to track Medicaid rebates for AVINZA. Accordingly, Plaintiffs have failed to satisfy the PSLRA's specificity requirements for W-4 as to Ligand's ability to track Medicaid rebates.

*12 Plaintiffs have satisfied the specificity requirements, however, for Witness Five ("W-5"). Plaintiffs allege W-5 worked at Ligand during the Class Period in sales management, and specifically worked with AVINZA. (*Id.* at ¶ 72.) Plaintiffs state "W-5 was aware that during the Class Period Medicaid rebates were much greater than what defendants predicted or set their accruals. W-5 stated that defendants did not have enough 'historical data' to be in a position to accurately predict Medicaid rebates during the Class Period."(*Id.*) Given W-5's credentials, it is probable W-5 would have some knowledge of the amount of Medicaid rebates Ligand was paying during the Class Period. Furthermore, having worked at Ligand for five years, W-5 could have obtained some knowledge about the historical data available to the Company.

Standing alone, however, these facts do not demonstrate that Ligand was unable to track Medicaid rebates during the Class Period, or that Defendants were aware of Ligand's inability to do so. W-5 merely confirms what Ligand publicly stated in its press releases, conference calls and SEC filings, namely, that Medicaid rebates were greater than expected, and Ligand did not have enough historical data to accurately predict the amount of Medicaid rebates for the second quarter of 2004. Neither of these facts provides any insight into what Defendants knew at the time the allegedly misleading statements were made, or that they specifically knew about an inability to predict Medicaid rebates. W-5, therefore, does not raise a strong inference that Defendants acted with deliberate or conscious recklessness in issuing the allegedly misleading statements.

*ii. Inventory Returns*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d  
Not Reported in F.Supp.2d, 2005 WL 2461151 (S.D.Cal.)  
**(Cite as: Not Reported in F.Supp.2d, 2005 WL 2461151 (S.D.Cal.))**

Page 12

Turning to the issue of inventory returns, Plaintiffs rely on six confidential witnesses to raise an inference of scienter: Witnesses One, Two, Four, Five, Six and Seven. Specifically, Plaintiffs rely on these witnesses to support their allegation that Defendants had no ability to track lots of AVINZA between wholesalers and retailers. (*Id.* at ¶ 73.)

Witness One ("W-1") is identified as "a former Ligand Regulatory Affairs manager from the mid-1990s through 2003 who was partly responsible for obtaining FDA approval for AVINZA[.]" (*Id.* at ¶ 36.) According to Plaintiffs, W-1 confirms:

that Ligand did not have an inventory tracking system in place during the Class Period that monitored what batches had been sold, maintained or scheduled for return by Ligand's wholesalers. Indeed, W-1 stated that during the Class Period, Ligand did not have any agreements in place with its wholesalers to track AVINZA inventory. W-1 stated "wholesalers would be responsible" for where AVINZA goes after it arrives at their warehouse-"once [AVINZA] leaves a wholesaler you don't know where it goes [and] Ligand can't track who [a wholesaler] sells to."

(*Id.* at ¶ 74.) However, Plaintiffs fail to explain how W-1, whose employment with Ligand ended in 2003, obtained information about Ligand's inventory tracking system during the Class Period. Furthermore, W-1's direct statements appear to reflect Ligand's general inventory tracking system, not a specific tracking system for AVINZA. Accordingly, Plaintiffs have not satisfied the PSLRA's specificity requirements for W-1.

*13 Witness Two ("W-2") is described as "a former salesperson from April 2002 to January 2004 at Ligand's South Carolina, Western North Carolina and Coastal Georgia territories[.]" (*Id.* at ¶ 37.) W-2 sold AVINZA between July and December 2002. (*Id.* at ¶ 81.) According to Plaintiffs, W-2:

stated that with respect to transfers of AVINZA between the Company and wholesalers, 'headquarters would know where everything was going.' He specifically recalled that with respect to transfers of oncology drugs to wholesalers, headquarters tracked them 'to a specific vial within a batch number' and he had 'every reason to believe that this was the same for AVINZA.' W-2 further recalled that Ligand made attempts to view step 3 of the distribution chain-sales between retailers and end users. Specifically, W-2 recalls that the company 'hired a third party to track [quarterly] prescription sales' so they could get a 'snapshot fairly quickly.'

(*Id.* at ¶¶ 80-81.) As a salesperson for Ligand, W-2 could have obtained the information described above. Thus, Plaintiffs have satisfied the PSLRA's specificity requirement as to W-2.

However, the information provided by W-2 is of minimal relevance to this case. As with W-1, W-2's employment with Ligand ended in January 2004, two months before the start of the Class Period. Furthermore, W-2 provides information about steps one and three of the distribution process, whereas Plaintiffs complain about step two. W-2 does not assist in showing anything about Ligand's ability, or purported inability, to track inventory at step two of the distribution process. Nor does W-2 provide any insight into what Defendants knew at the time the allegedly misleading statements were made. Thus, although Plaintiffs have satisfied the PSLRA's specificity requirement with respect to W-2, W-2 does not raise an inference that Defendants acted with deliberate or conscious recklessness.

The next witness Plaintiffs rely on in connection with the issue of Medicaid rebates is W-4. W-4 states Ligand had a liberal return policy for AVINZA "to make the drug more attractive to wholesalers." (*Id.*) That policy allowed wholesalers to return AVINZA to Ligand if it "was not 'moving well [.]' " (*Id.*) W-4 would appear to have personal knowledge of these facts as a result of working with Ligand to promote AVINZA and enlist it on the Medicaid formularies.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 2461151 (S.D.Cal.)
**(Cite as: Not Reported in F.Supp.2d, 2005 WL 2461151 (S.D.Cal.))**

Page 13

As with W-2, however, W-4's knowledge of Ligand's return policies for AVINZA does not directly address whether Ligand had the ability to track inventory returns for AVINZA at step two of the distribution process. More importantly, W-4 does not address what Defendants knew at the time the allegedly misleading statements were made. Like W-2, W-4's knowledge is confined to step one, which concerns transfers of AVINZA between Ligand and its wholesalers. W-4 fails to provide any information concerning step two, which is the transfer of AVINZA from wholesalers to retailers, and the basis for Plaintiffs' claim. Accordingly, W-4's statements, standing alone, do not raise an inference that Defendants acted with deliberate or conscious recklessness.

*14 Next, Plaintiffs rely on W-5. According to Plaintiffs, W-5 "confirmed that defendants received 'industry standard zip-code level sales' data provided by a third party (i.e., IMS). W-5 revealed, however, that the IMS data only showed defendants 'how many dollars of any specific drug were sold within a zip code neighborhood.'" (Id. at ¶ 83.) As a sales management employee for Ligand during the Class Period, W-5 could have possessed this information. Again, however, this information does not support Plaintiffs' allegation that Defendants had no ability to track inventory returns from wholesalers to retailers, and it does not raise an inference that Defendants acted with deliberate or conscious recklessness.

The next witness Plaintiffs rely on is Witness Six ("W-6"). W-6 "was the manager of 'IT operations' of Cardinal Health's Specially Pharmaceutical Division (SPD) in Winchester, Kentucky during the Class Period. W-6 stated that he possessed detailed knowledge of Cardinal's working relationships with drug manufacturers including Ligand."(Id. at ¶ 75.) W-6 provides factual information about Cardinal Health's inventory tracking system and its information-sharing practices with wholesalers like Ligand. (Id. at ¶ 76-76.) Although the exact nature of W-6's IT experience is unknown, it is reasonably probable he would have some knowledge about Cardinal Health's business practices. Therefore, Plaintiffs have satisfied the PSLRA's specificity requirement for W-6.

As with the witnesses discussed above, however, W-6 fails to provide any evidence relevant to Defendants' ability to track inventory returns of AVINZA between wholesalers and retailers. Indeed, there is no alleged foundation for W-6 to testify as to any aspect of Defendants' operations. Therefore, W-6 does not support Plaintiffs' scienter allegations.

The final witness Plaintiffs rely on to support their claim concerning inventory returns is Witness Seven ("W-7"). W-7 is identified as "a former sales rep for Ligand in Alabama, Mississippi and Florida from late-1997 through mid-2003[.]" (Id. at ¶ 85.) "W-7 stated that Ligand bought 'script data' from a company like 'Early View' to see which physicians were prescribing what category of medicine."(Id.) Although Plaintiffs have satisfied the specificity requirements for W-7 for this evidence, W-7, like the other witnesses, does not support Plaintiffs' scienter allegations.

b.Defendants' Positions at Ligand

In addition to relying on confidential witnesses, Plaintiffs rely upon the individual Defendants' positions in the company to establish scienter. Plaintiffs rely on *In re Peoplesoft, Inc. Sec. Litig.*, No. C 99-00472 WHA, 2000 U.S. Dist. LEXIS 10953 (N.D.Cal. May 25, 2000), an unpublished decision from the Northern District of California, to support their argument that Defendants' positions in the company support an inference of scienter. The Ninth Circuit, however, has not looked so favorably upon such allegations. *See Daou,* 411 F.3d at 1022. In *Daou,* the court stated allegations of defendants' " 'hands-on' management style, their interaction with other officers and employees, their attendance at meetings, and their receipt of unspecified weekly or monthly reports" were insufficient to establish

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 3:07-cv-05545-SI   Document 44-7   Filed 06/24/2008   Page 15 of 20

Not Reported in F.Supp.2d                                                                                                  Page 14
Not Reported in F.Supp.2d, 2005 WL 2461151 (S.D.Cal.)
**(Cite as: Not Reported in F.Supp.2d, 2005 WL 2461151 (S.D.Cal.))**

scienter. *Id.* (quoting *In re Vantive Corp. Sec. Litig.,* 283 F.3d 1079, 1087 (9th Cir.2002)). Thus, contrary to Plaintiffs' suggestion, the individual Defendants' positions within the company do not, in themselves, raise an inference of deliberate or conscious recklessness.

c. AVINZA's Importance to Ligand

*15 The next fact Plaintiffs rely on to raise an inference of scienter is AVINZA's importance to Ligand. Defendants do not contest this fact, but argue it is insufficient to raise an inference of scienter.

Courts have "inferred that facts critical to a business's core operation or an important transaction are known to a company's key officers." *In re Northpoint Communications Group, Inc. Sec. Litig.,* 184 F.Supp.2d 991, 998 (N.D.Cal.2001) (citing *Peoplesoft,* 2000 WL 1737936 at *3). *See also In re Sears. Roebuck and Co. Sec. Litig.,* 291 F.Supp.2d 722, 727 (N.D.Ill.2003) (citing *Stavros v. Exelon Corp.,* 266 F.Supp.2d 833, 850 (N.D.Ill.2003)). Here, Plaintiffs allege that AVINZA was critical to Ligand's success, therefore the Court should infer that Defendants were aware of Ligand's inability to track Medicaid rebates and inventory returns for AVINZA. The problem with Plaintiffs' argument, however, is there is no allegation that the ability to track Medicaid rebates and inventory returns was critical either to the success of AVINZA, in particular, or Ligand, in general. Ligand's ability to perform those tasks may have been important in *calculating* AVINZA's success, but there is no allegation, and no evidence, that Ligand's ability to perform these tasks would have contributed to AVINZA's *actual* success, or that of Ligand. Accordingly, this Court declines to infer that because AVINZA was crucial to Ligand's success, Defendants were aware of Ligand's alleged inability to track Medicaid rebates or inventory returns.

d. Group Pleading Allegations

In addition to attacking the evidence discussed above, Defendants argue Plaintiffs' group pleading allegations do not satisfy the PSLRA's pleading requirements for scienter. Plaintiffs do not address this argument, despite including a group pleading allegation in the CAC. (*See* CAC at ¶ 23.)

The group pleading doctrine is a judicial creation that predates the PSLRA. *Southland Sec. Corp. v. Inspire Ins. Solutions, Inc.,* 365 F.3d 353, 363 (5th Cir.2004). In its broadest form, it "allows unattributed corporate statements to be charged to one or more individual defendants based solely on their corporate titles." *Id.* Although some courts have found the group pleading doctrine survived the PSLRA, other courts, including this one, have found the PSLRA effectively abolished the group pleading doctrine. *Id.* at 364 (citations omitted). *See also In re Immune Response Sec. Litig.,* 375 F.Supp.2d 983, 1028-31 (S.D.Cal.2005) (rejecting plaintiffs' reliance on group pleading doctrine). Those courts found the group pleading doctrine was inconsistent with the PSLRA's heightened pleading standards, especially its standard for scienter. *Southland,* 365 F.3d at 364-65; *Immune Response,* 375 F.Supp.2d at 1030. This Court agrees with that reasoning, and thus it will not consider whether Plaintiffs' group pleading allegations are sufficient to raise an inference of scienter.

*16 Absent reliance on the group pleading doctrine, Plaintiffs are left with the testimony of certain confidential witnesses, Defendants' positions in the Company, and AVINZA's importance to the Company to raise a strong inference that Defendants acted with deliberate or conscious recklessness.[FN10] As discussed above, none of these facts, individually, meets the PSLRA's heightened pleading standard.

> FN10. Defendants assert the absence of any stock sales on their behalf during the Class Period, and Defendant Robinson's purchase of shares during the Class Period, negates any showing of scienter. Because Plaintiffs do not rely on Defendants' trading activities to raise an inference of sci-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 3:07-cv-05545-SI   Document 44-7   Filed 06/24/2008   Page 16 of 20

Not Reported in F.Supp.2d                                                                          Page 15
Not Reported in F.Supp.2d, 2005 WL 2461151 (S.D.Cal.)
**(Cite as: Not Reported in F.Supp.2d, 2005 WL 2461151 (S.D.Cal.))**

enter in this case, and because the evidence in the CAC does not raise a sufficient inference of scienter, the Court declines to address whether Defendants transactions in Ligand securities, or lack thereof, negates any inference of scienter.

Nor do these facts, taken together, satisfy "the stringent pleading standard of *Silicon Graphics.*"*Lipton v. Pathogenesis Corp.,* 284 F.3d 1027, 1038 (9th Cir.2002). On the issue of Defendants' inability to track Medicaid rebates, Plaintiffs have merely explained the Medicaid rebate process, and pleaded that Defendants paid more Medicaid rebates than expected and had no historical data upon which to make predictions about Medicaid rebates. All of this information was available to investors, and it does not shed any light on Defendants' state of mind at the time the allegedly misleading statements were made. As for inventory returns, Plaintiffs' allegations evidence Defendants' tracking capabilities at steps one and three, and that Ligand had a liberal return policy for AVINZA. There are simply no facts in the CAC from which this Court could infer that Defendants knew they had an inability to track either Medicaid rebates or inventory returns for AVINZA during the Class Period. In sum, Plaintiffs have failed to "state with particularity facts giving rise to a strong inference" that Defendants acted with deliberate or conscious recklessness in making the allegedly misleading statements at issue in this case.

C. Dismissal Pursuant to Federal Rule of Civil Procedure 12(b)(6)[FN11]

> FN11. Defendants also move for dismissal pursuant to Federal Rule of Civil Procedure 9(b), which requires allegations of fraud be pleaded with particularity. Fed.R.Civ.P. 9(b). This pleading requirement is the same as that set out in the PSLRA, therefore, the Court does not separately address whether Plaintiffs have satisfied Rule 9(b).

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) tests the sufficiency of the complaint. *Navarro v. Block,* 250 F.3d 729, 732 (9th Cir.2001). Dismissal of a claim under this Rule is appropriate only where "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."*Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *Navarro,* 250 F.3d at 732. Dismissal is warranted under Rule 12(b)(6) where the complaint lacks a cognizable legal theory. *Robertson v. Dean Witter Reynolds, Inc.,* 749 F.2d 530, 533-34 (9th Cir.1984). Alternatively, a complaint may be dismissed where it presents a cognizable legal theory yet fails to plead essential facts under that theory.*Robertson,* 749 F.2d at 534.

In reviewing a motion to dismiss under Rule 12(b)(6), the court must assume the truth of all factual allegations and must construe them in the light most favorable to the nonmoving party. *Cahill v. Liberty Mut. Ins. Co.,* 80 F.3d 336, 337-38 (9th Cir.1996). However, legal conclusions need not be taken as true merely because they are cast in the form of factual allegations.*Roberts v. Carrothers,* 812 F.2d 1173, 1177 (9th Cir.1987); *Western Mining Council v. Watt,* 643 F.2d 618, 624 (9th Cir.1981). When ruling on a motion to dismiss, the court may consider the facts alleged in the complaint, documents attached to the complaint, documents relied upon but not attached to the complaint when authenticity is not contested, and matters of which the court takes judicial notice. *Parrino v. FHP, Inc.,* 146 F.3d 699, 705-06 (9th Cir.1998); *Branch,* 14 F.3d at 453-54;*MGIC Indem. Co. v. Weisman,* 803 F.2d 500, 504 (9th Cir.1986).

A. Safe Harbor Provision [FN12]

> FN12. The Ninth Circuit has stated the safe harbor provision codified the judicially-created bespeaks caution doctrine. *Employers Teamsters Local Nos. 175 and 505 Pension Trust Fund v. Clorox Co.,* 353 F.3d 1125, 1132 (9th Cir.2004). Accordingly, the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                          Page 16
Not Reported in F.Supp.2d, 2005 WL 2461151 (S.D.Cal.)
**(Cite as: Not Reported in F.Supp.2d, 2005 WL 2461151 (S.D.Cal.))**

Court will not separately address whether Defendants' statements are protected by the bespeaks caution doctrine. *See In re Copper Mountain Sec. Litig.,* 311 F.Supp.2d 857, 876 (N.D.Cal.2004) (finding it appropriate to consider safe harbor provision and bespeaks caution doctrine simultaneously).

*17 The PSLRA's "safe harbor" provision provides that forward-looking statements cannot be the basis of liability under the Securities Act or the Exchange Act if: (1) the statement is identified as forward-looking and is accompanied by sufficient cautionary statements; or (2) the person who made the forward-looking statement did so without actual knowledge that the statement was false or misleading. 15 U.S.C. § 78u-5(c)(1)(A); 15 U.S.C. § 78u-5(c)(1)(B). The safe harbor provision protects both written and oral forward-looking statements. *See* 15 U.S.C. § 78u-5(c)(1)-(2).

Under the safe harbor provision, a "forward-looking statement" includes, among other things, "a statement containing a projection of revenues, income (including income loss), earnings (including earnings loss) per share, capital expenditures, dividends, capital structure, or other financial items; ... [or] a statement of future economic performance...." 15 U.S.C. § 78u-5(I)(1). Any statements of the assumptions underlying or relating to these types of statements fall within the meaning of a forward-looking statement. *Copper Mountain,* 311 F.Supp.2d at 880. In addition, a present-tense statement may qualify as forward-looking "if the truth or falsity of the statement cannot be discerned until some point in time after the statement is made." *Id.*

With respect to the definition of "cautionary language," "the cautionary warning ought to be precise and relate directly to the forward-looking statements at issue." *Copper Mountain,* 311 F.Supp. at 882 (citing *Provenz,* 102 F.3d at 1493). However, the PSLRA does not require a listing of all factors that might make the results different from those forecasted. Instead, the warning must only mention important factors of similar significance to those actually realized. *Id.*

Here, Defendants argue that the statements in question were forward-looking, and they were accompanied by sufficient cautionary language. Plaintiffs dispute those assertions, and also argue the Court should not address this issue at the pleading stage.

As an initial matter, the Court rejects Plaintiffs' request to defer ruling on whether the alleged misstatements are protected by the safe harbor provision. None of the cases cited by Plaintiffs states the issue is inappropriate for determination at the pleading stage, and indeed, one of their cases clearly states the opposite. *See Asher v. Baxter Int'l Inc.,* 377 F.3d 727, 728 (7th Cir.2004) ("The PSLRA creates rules that judges must enforce at the outset of the litigation[.]") *See also In re Seebeyond Techs. Corp. Sec. Litig.,* 266 F.Supp.2d 1150, 1167 n. 9 (C.D.Cal.2003) (rejecting contention that safe harbor provision involves questions of fact and is thus inappropriate for determination on motion to dismiss); *Immune Response,* 375 F.Supp.2d at 1033-36 (addressing safe harbor provision at pleading stage); *In re NTL, Inc. Sec. Litig.,* 347 F.Supp.2d 15, 35 (S.D.N.Y.2004) (same). Accordingly, the Court will address the merits of Defendants' argument.

*1.March 3, 2004 Press Release*

*18 The allegedly misleading statements in Defendants' March 3, 2004 press release concern Defendants' projections for 2004. (*See* CAC at ¶ 96a.) These statements clearly fall within the PSLRA's definition of forward-looking statements. *See* 15 U.S.C. § 78u-5(I)(1).

Plaintiffs argue, however, that these statements were not accompanied by sufficient cautionary language. To qualify for protection under the PSLRA's safe harbor provision, cautionary language must "identify[ ] important factors that could cause actu-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 2461151 (S.D.Cal.)
**(Cite as: Not Reported in F.Supp.2d, 2005 WL 2461151 (S.D.Cal.))**

Page 17

al results to differ materially from those in the forward-looking statement[.]"15 U.S.C. § 77z-2(c)(1)(A)(I)."[B]oiler plate language warning that investments are risky or general language not pointing to specific risks is insufficient to constitute a meaningful cautionary warning."*Copper Mountain,* 311 F.Supp.2d 857, 882 (N.D.Cal.2004) (citing *In re Splash Tech. Holdings, Inc. Sec. Litig.,*2000 U.S. Dist. LEXIS 15369, *29 (N.D.Cal. Sep. 20, 2000)).

Here, Plaintiffs assert the cautionary language is insufficient because it simply warns that actual results may differ from estimates. However, the press release does more than that. (*See* Defs.' Req. for Judicial Notice, Ex. A.) As required by the statute, it also "identif[ies] important factors that could cause actual results to differ materially from those in the forward-looking statement[.]"15 U.S.C. § 77z-2(c)(1)(A)(I). Among those factors are: (1) the receipt of milestone payments, (2) the results of clinical studies, (3) marketing approval for Ligand's products, and (4) the existence of a market for Ligand's new drugs. (*See* Defs.' Req. for Judicial Notice, Ex. A.) Although there is no specific mention of Medicaid rebates or inventory returns for AVINZA, "the PSLRA does not require a listing of *all* factors that might make the results different from those forecasted."*Copper Mountain,* 311 F.Supp.2d at 882. Indeed, all that is required is that the factors be of "similar significance to those actually realized."*Id.* (citations omitted) (emphasis in original). The factors identified in the March 3, 2004 press release meet that standard, and thus Defendants' statements therein are protected by the safe harbor provision.

*2.May 5, 2004 Press Release*

In the May 5, 2004 press release, Plaintiffs complain about Defendants' explanation for the adverse impact to AVINZA sales in the first quarter of 2004 and Defendants' general explanation of AVINZA sales for the first quarter of 2004. (*See* CAC at ¶¶ 109, 115.) These two statements are historical, and thus are not protected by the safe harbor provision.

However, Plaintiffs also complaint about two other statements in the May 5, 2004 press release concerning Defendants' projections for AVINZA and Defendants' general projections for 2004. (*Id.* at ¶¶ 115, 116.) These statements are forward-looking, and they were accompanied by cautionary language similar to that found in the March 3, 2004 press release. (*Compare* Defs.' Req. for Judicial Notice, Ex. D *with* Defs.' Req. for Judicial Notice, Ex. A.) Accordingly, these statements are protected by the safe harbor provision.

*3.May 5, 2004 Conference Call*

*19 Plaintiffs complain about five statements made during the May 5, 2004 conference call. The first statement was part of Defendant Robinson's opening remarks, and it explained the shortfall in AVINZA sales for the first quarter of 2004. (*See* Defs.' Req. for Judicial Notice, Ex. E; CAC at ¶ 110.) This statement was historical, and thus it is not protected by the safe harbor provision.

However, the four other statements from the May 5, 2004 conference call were made in response to questions about Defendants' expectations for the future. (*See* Defs.' Req. for Judicial Notice, Ex. E.) These statements are forward-looking. *See In re Kindred Healthcare, Inc. Sec. Litig.,* 299 F.Supp.2d 724, 737 (W.D.Ky.2004) (finding statements related to management's expectations for future operations are "inherently forward-looking statements under the PSLRA.")

Defendants assert Defendant Maier's statements that Ligand expected losses for the first half of the year and that Ligand wanted "to stay focussed [sic] on the year and not so much on a quarterly basis[,]" (Defs.' Req. for Judicial Notice, Ex. E), are sufficiently cautionary to fall within the safe harbor provision. Neither of those statements, however, identifies any factors that could cause results to differ, nor do either of the statements relate directly to the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d  
Not Reported in F.Supp.2d, 2005 WL 2461151 (S.D.Cal.)  
**(Cite as: Not Reported in F.Supp.2d, 2005 WL 2461151 (S.D.Cal.))**

Page 18

forward-looking statements at issue. Accordingly, these statements are not protected by the safe harbor provision.

*4. Form 10-Q*

The next statement alleged to fall under the safe harbor provision is found in Defendants' May 7, 2004 Form 10-Q. (*See* CAC at ¶ 117.) This statement was made in the context of reporting Ligand's operating results for the first quarter of 2004, and thus it is not a forward-looking statement entitled to protection under the safe harbor provision.

In sum, the following statements are protected by the PSLRA's safe harbor provision: (1) Defendants' statements in the March 3, 2004 press release, and (2) Defendants' statements identified in paragraphs 115 and 116 of the CAC, which were issued in the May 5, 2004 press release.[FN13]

> FN13. Defendants do not specifically argue the statements issued in the March 3, 2004 conference call are entitled to protection under the safe harbor provision. Therefore, the Court does not consider whether those statements are protected. Furthermore, although Defendants identify Exhibit C to their request for judicial notice as the March 12, 2004 10-K at issue in this case, Exhibit C is actually Ligand's Form 10-K filed on March 21, 2003. Accordingly, the Court is unable to determine whether the statements made in the 2004 10-K are entitled to protection under the safe harbor provision.

B. "Puffery"

In addition to arguing their statements are protected by the safe harbor provision, Defendants assert their statements are not actionable because they were mere "puffery." The "mere puffery" rule precludes liability for vague, generalized and unspecific assertions of corporate optimism. *In re Cornerstone Propane Partners, L.P. Sec. Litig.,* 355 F.Supp.2d 1069, 1087 (N.D.Cal.2005)."Statements that fall within the rule tend to use terms that are not measurable and not tethered to facts that 'a reasonable person would deem important to a securities investment decision.'"*Id.* (quoting *City of Monroe Employees Retirement Sys. v. Bridgestone Corp.,* 387 F.3d 468, 489 (6 th Cir.2004)). The puffery rule does have boundaries, however. *Id.*"The Ninth Circuit has defined the point at which a projection of optimism becomes an actionable, 'factual' misstatement under section 10(b), namely, when '(1) the statement is not actually believed, (2) there is no reasonable basis for the belief, or (3) the speaker is aware of undisclosed facts tending seriously to undermine the statement's accuracy.'"*Id.* (quoting *Kaplan v. Rose,* 49 F.3d 1363, 1375 (9th Cir.1994)).

*20 Turning to the statements at issue in this case,[FN14] the Court finds those statements are not subject to the puffery rule. The statements in the March 3, 2004 conference call and four of the statements in the May 5, 2004 conference call, (*see* CAC at ¶¶ 111-114), are not generalized statements of corporate optimism, but are responses to specific questions posed during the conference calls. (*See* Defs.' Req. for Judicial Notice, Exs. B, E.) Similarly, the statements in the May 5, 2004 press release, one of the statements in the May 5, 2004 conference call, (*see* CAC at ¶ 110), and the statement in the Form 10-Q are neither general nor optimistic. (*See* Defs.' Req. for Judicial Notice, Exs. D-F.) Rather, they are specifically addressed to the shortfall in AVINZA sales during the first quarter of 2004. Accordingly, the Court rejects Defendants' argument that their statements do not give rise to liability under the PSLRA pursuant to the puffery rule.[FN15]

> FN14. The Court does not address whether the statements in the March 3, 2004 press release or two of the statements in the May 5, 2004 press release fall under the puffery rule because those statements are protected by the safe harbor provision. The Court

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d  Page 19
Not Reported in F.Supp.2d, 2005 WL 2461151 (S.D.Cal.)
**(Cite as: Not Reported in F.Supp.2d, 2005 WL 2461151 (S.D.Cal.))**

also declines to address whether the statements in the Form 10-K constitute "mere puffery" for the reason stated in Footnote 13.

FN15. Defendants also argue they cannot be held liable for the statements of third-party analysts. Although there may be situations in which defendants may be held liable under Section 10(b) for the statements of third parties, it appears Plaintiffs are not seeking to hold Defendants liable for such statements in this case. (*See* Pls.' Mem. of P. & A. in Opp'n to Mot. to Dismiss at 23, lines 15-1.) Accordingly, the Court does not address that argument.

### III.

### CONCLUSION

For these reasons, the Court GRANTS Defendants' motion to dismiss Plaintiffs' claim under Section 10(b) and Rule 10(b)(5).[FN16] Plaintiffs, however, are granted leave to file a First Amended CAC that addresses the pleading deficiencies set forth in this Order. Plaintiffs are advised that any further failure to comply with pleading requirements for their claims will result in dismissal without leave to amend. Plaintiffs' First Amended CAC must be filed within thirty days of the date this Order is stamped "Filed."

FN16. In the absence of a 10(b) claim, there can be no liability under Section 20. *See Heliotrope General, Inc. v. Ford Motor Co.*, 189 F.3d 971, 978 (9th Cir.1999) ("To be liable under section 20(a), the defendants must be liable under another section of the Exchange Act.") Therefore, the Court dismisses that claim as well.

IT IS SO ORDERED.

S.D.Cal.,2005.
In re Ligand Pharmaceuticals, Inc. Securities Litigation
Not Reported in F.Supp.2d, 2005 WL 2461151 (S.D.Cal.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.