# EXHIBIT I

Westlaw.

Slip Copy
Slip Copy, 2007 WL 2427980 (N.D.Cal.)
**(Cite as: 2007 WL 2427980 (N.D.Cal.))**

Page 1

▷

In re PMC-Sierra, Inc. Derivative Litigation
N.D.Cal.,2007.
Only the Westlaw citation is currently available.
United States District Court, N.D. California,
San Jose Division.
In re PMC-SIERRA, INC. DERIVATIVE LITIGATION.
This Document Relates To: All Actions.
Master File No. C 06-05330 RS.

Aug. 22, 2007.

Shawn A. Williams, Aelish Marie Baig, Maria V. Morris, Monique Winkler, Lerach Coughlin Stoia Geller Rudman & Robbins L.L.P., San Francisco, CA, Benny Copeline Goodman, III, Darren Jay Robbins, Travis E. Downs, III, William S. Lerach, Lerach Coughlin Stoia Geller Rudman & Robbins L.L.P., San Diego, CA, David Martin Goldstein, Law Offices of David M. Goldstein, Rancho Cucamonga, CA, for Plaintiffs.
Ellen Kinsley Brown, David Christopher Fortney, Latham & Watkins L.L.P., San Francisco, CA, Patrick Edward Gibbs, Latham & Watkins L.L.P., Menlo Park, CA, for Defendants.

**ORDER GRANTING MOTION TO DISMISS WITH LEAVE TO AMEND**

RICHARD SEEBORG, United States Magistrate Judge.

I. INTRODUCTION

*1 Stock option "back-dating" has received considerable public attention in the last few years, particularly in Silicon Valley, where the practice allegedly has been widespread in the technology sector. The Northern District of California has seen a wave of shareholder derivative suits relating to the subject, with the result that standards are beginning to emerge on the level of pleading particularity required to make a showing of "demand futility" in cases involving alleged back-dating. This order joins in the conclusion reached by other judges of this district that a plaintiff must do more than point to a number of option grants that appear "suspicious" when viewed against the performance of the stock in the following twenty days. Accordingly, the motion of nominal defendant PMC-Sierra, Inc. ("PMC") to dismiss for failure to make a litigation demand will be granted, with leave to amend.

II. BACKGROUND

The following facts are taken from the allegations of the complaint, which for purposes of this motion must be taken as true, or are otherwise matters as to which there appears to be no material disagreement. A stock option is a contractual right to purchase a specified number of shares at a specified price-the "exercise price" or "strike price." In its simplest form, a stock option granted to a company employee gives that employee a stake in the firm's future success, because the higher the *actual* price of the stock climbs, the more potential profit for the employee if he or she chooses to buy at the exercise price. When the exercise price is *lower* than the actual trading price of the stock, the option is said to be "in the money." When the exercise price is *higher* than the price at which the stock is trading, the option is "under water." Again, in their simplest form, stock options will typically be granted when the exercise price is *at* the market price as of the date of the grant, and such options are referred to as "at-the-money" options. See *In re CNET Networks, Inc.* 483 F.Supp.2d 947, 949 (N.D.Cal.2007) (discussing "The Mechanics of Stock-Options Backdating").

There would appear to be little incentive for a company ever to offer stock options that were "under water" on the grant date, whereas "in the money" options operate, in effect, as additional compensation for employee recipients. A company choosing to provide compensation in that manner, however,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy  
Slip Copy, 2007 WL 2427980 (N.D.Cal.)  
**(Cite as: 2007 WL 2427980 (N.D.Cal.))**

Page 2

must properly record it as an expense and account for any resulting tax consequences.

Taking this practice one step further, some companies are alleged to have "back-dated" stock option grants, such that they *appear* to have been made "at the money," but by virtue of a rise in the stock price between the purported grant date and the actual grant date, they are in fact "in the money" when granted. Were that to occur, the company would improperly avoid the impact of that expense on its bottom line as well as the tax liabilities that otherwise would result from granting "in the money" stock options.[FN1]

> FN1. Plaintiffs here take issue with the oft-repeated statement in the media that intentional backdating is not "necessarily" fraud, as long as any compensation expenses and tax consequences are appropriately accounted for and disclosed. The Court declines to venture an opinion as to whether there would be any legally acceptable *reason* under tax laws or otherwise to "back-date" an option grant knowingly, rather than simply granting an "in the money" option without back-dating and with full disclosure and proper accounting. For purposes of this motion, the Court is willing to presume that any intentional "back-dating" constitutes fraud. Unintentional "misdating," however, presents different issues, as discussed below.

*2 Here, plaintiffs allege that defendants engaged in just such a scheme to grant back-dated PMC stock options to various employees between 1996 and 2006. Plaintiffs identify 25 specific dates during that time period on which options purportedly were granted and argue that circumstantial evidence suggests those grants were in fact issued at some unspecified later time. Plaintiffs contend each of the grants was dated "near or on the very day that PMC-Sierra stock hit its low price for the month" or "in advance of sharp stock price increases." Complaint, ¶ 89. As to most of the grants, plaintiffs allege that the stock price 20 days later would have resulted in extraordinarily good returns, often in the range of 20% or 30%. In several instances, however, plaintiffs omit the 20 day comparison or point to the price of the stock at some point in time *other* than 20 days after the stated grant date. See, e.g, Complaint ¶ 100 (16 days), ¶ 108 (no comparison), ¶ 117 (3 months). Plaintiffs do not purport to know when any of the options were *actually* granted. Their theory, in essence, is that the stated dates of the grants are too favorable to have been the product of chance, and therefore must have been selected with the benefit of hindsight.

### III. STANDARDS

Defendants' motion to dismiss "for failure to make litigation demand" purports to be brought under Rule 23.1 of the Federal Rules of Civil Procedure and "applicable Delaware law." See Notice of Motion and Motion, Docket No. 41 at 1:3-4. While Rule 23.1 and Delaware law are both highly pertinent to this motion, neither provide the *procedural* vehicle for considering whether the complaint should be dismissed.[FN2] Accordingly, despite defendants' choice not to label it as such, the motion will be deemed as having been brought under Rule 12(b)(6) of the Federal Rules of Civil Procedure. Such a motion tests the legal sufficiency of the claims alleged in the complaint. See *Parks Sch. of Business v. Symington,* 51 F.3d 1480, 1484 (9th Cir.1995). Dismissal under FRCP 12(b)(6) may be based either on the "lack of a cognizable legal theory" or on "the absence of sufficient facts alleged under a cognizable legal theory." *Balistreri v. Pacifica Police Dept.,* 901 F.2d 696, 699 (9th Cir.1988). Hence, the issue on a motion to dismiss for failure to state a claim is not whether the claimant will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims asserted. *Gilligan v. Jamco Development Corp.,* 108 F.3d 246, 249 (9th Cir.1997). When evaluating such a motion, the court must accept all material allegations in the complaint as true and construe them in the light

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

most favorable to the non-moving party. *Cahill v. Liberty Mut. Ins. Co.,* 80 F.3d 336, 340 (9th Cir.1996). At the same time, "conclusory allegations of law and unwarranted inferences are insufficient to defeat a motion to dismiss for failure to state a claim."*Epstein v. Washington Energy Co.,* 83 F.3d 1136, 1140 (9th Cir.1996).

> FN2.Rule 23.1 describes what a plaintiff "shall" plead "with particularity" in a derivative action, but does not independently authorize a motion to dismiss. Delaware law, by definition, does not govern federal court procedure.

*3 As noted, Rule 23.1 is also pertinent to this motion, because it provides that in derivative actions such as this, a plaintiff must, "allege with particularity the efforts, if any, made by the plaintiff to obtain the action the plaintiff desires from the directors [or] the reasons ... for not making the effort."Furthermore, the parties agree that because PMC is a Delaware corporation, the substantive law of Delaware governs as to the circumstances under which a derivative plaintiff may be excused from "making the effort" to obtain relief from the company's board of directors prior to bringing suit. The applicable Delaware standards are discussed further below, and in the Northern District cases cited and followed in this decision.

### IV. DISCUSSION

"Demand futility" may be pleaded adequately where a plaintiff alleges, "particularized facts creating a reasonable doubt that (1) the directors are disinterested and independent, or (2) the challenged transaction was otherwise the product of a valid exercise of business judgment."*In re Silicon Graphics, Inc. Sec. Litig.,* 183 F.3d 970, 989-90 (9th Cir.1999) (citing *Aronson v. Lewis,* 473 A.2d 805, 815 (Del.1984) for the two prong test; other citations omitted). Although the *Aronson* court used the conjunctive, later cases have treated the two prongs of the test as disjunctive. "If a derivative plaintiff can demonstrate a reasonable doubt as to the first or second prong of the *Aronson* test, then he has demonstrated that demand would have been futile."*Seminaris v. Landa,* 662 A.2d 1350, 1354 (Del.Ch.1995). Alternatively, "[w]here there is no conscious decision by directors to act or refrain from acting," Delaware courts inquire whether the complaint raises "a reasonable doubt that, as of the time the complaint is filed, the board of directors could have properly exercised its independent and disinterested business judgment in responding to a demand."*Rales v. Blasband,* 634 A.2d 927, 934 (Del.1993).

Here, plaintiffs have expressly alleged that 25 PMC option grants were, in fact, knowingly backdated. While the parties sharply dispute the adequacy of the complaint's allegations that a majority of the PMC board members knew or approved of any such backdating, there can be little dispute that any directors who did knowingly approve such practices would be deemed "interested" and disqualified from considering demands for action on the matters raised in this complaint. The threshold question remains, however, as to whether plaintiffs have adequately alleged that *any* intentional backdating took place, regardless of which, if any, board members had knowledge or approved of such actions. The fact that the complaint asserts intentional backdating as a factual matter is not controlling, Read as a whole, the complaint plainly shows that plaintiffs are relying on an *inference* that the specified option grants *may* have been knowingly backdated.

*4 Courts in this district uniformly have rejected the methodology by which plaintiffs are attempting to support that inference. See *In re Linear Tech. Corp. Derivative Litigation,* 2006 WL 3533024 (N.D.Cal. December 07, 2006); *In re CNET Networks, Inc.,* 483 F.Supp.2d 947 (N.D.Cal.2007); *In re Openwave Systems Inc. Shareholder Derivative Litigation,* 2007 WL 1456039 (N.D.Cal. May 17, 2007). As defendants point out, plaintiffs' selection of the 20 day period to evaluate the rise in stock price is arbitrary, and, standing alone, establishes

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2007 WL 2427980 (N.D.Cal.)
**(Cite as: 2007 WL 2427980 (N.D.Cal.))**

Page 4

very little.[FN3] Plaintiffs are not contending that the options were actually granted 20 days after the purported dates, indeed plaintiffs suggest that some grants may have been backdated by more than a year. Defendants have shown that in the case of many of the challenged grants, looking at the price of the stock 30 days after the purported grant date-a mere ten additional days-results in the rate of "return" plummeting. What is most apparent is that PMC's stock was highly volatile, and that over the years in issue, it was part of the "tech bubble" that saw a breathtaking rise in value followed by a collapse. While it therefore is perhaps not surprising that plaintiffs were able to identify numerous grants where the stock price was dramatically higher 20 days later, there is nothing magical about the number 20 that gives rise to a strong inference of likely backdating.[FN4]

> FN3. The fact that plaintiffs look to other time periods for some of the grants only compounds the arbitrary nature of the methodology.
>
> FN4. Defendants also point out that nine of the challenged grants were reported on Form 4s filed within two days of the grant date. Defendants assert that therefore those grants "could not have been 'backdated.' " As explained by the *Openwave* court, "backdating stock options by two days is still backdating," 2007 WL 1456039 at *7, so if the stock price rose in those two days there is still a possibility that these grants were backdated. The fact that these grants were backdated by no more than two days, however, renders the 20 day period used by plaintiffs even less probative.

Defendants further argue that plaintiffs have "cherry-picked" only those option grants that support their theory. Defendants are correct that it may be probative to look at all of the grants made during the time period in question to evaluate whether the number of grants made on very favorable dates is too high to be the product of chance. See *Openwave,* 2007 WL 1456039 at *7. Ultimately, however, plaintiffs are not to be faulted if they bring suit challenging such "cherry-picked" option grants as appear to have been the product of backdating. Defendants need not have backdated *all* options grants to face liability. See *CNET,* 483 F.Supp.2d at 961 (similarly rejecting contention that no backdating could have taken place if the lowest possible grant date had not been selected because, "[t]his argument is like giving a bank robber credit for leaving some cash in the vault."). Nevertheless, the present complaint, like that in *Openwave,* does not allege sufficient facts to support an inference of backdating, given that plaintiffs have not presented an adequate statistical analysis to negate the prospect that the favorable grant dates were merely fortuitous.

Plaintiffs cite *Ryan v. Gifford,* 918 A.2d 341 (Del.Ch.2007) to argue that their complaint is adequate under the Delaware law that governs demand futility. Like plaintiffs here, the *Ryan* plaintiffs looked to the returns on options over a 20 day period after the purported grant dates. As *Openwave* and other decisions in this district have recognized, however, the *Ryan* complaint was based on a more sophisticated analysis that, among other things, took into account *all* of the options granted during the time period in issue and compared option returns to annualized market returns. See 2007 WL 1456039 at *3, 5.[FN5]

> FN5. The *Ryan* plaintiffs relied on an analysis prepared by Merrill Lynch. *Ryan* does not appear to limit plaintiffs to any particular type of analysis or showing, but it does support the notion that plaintiffs must allege *something* more than has been alleged here. See also *In re Zoran Corp. Derivative Litigation,* 2007 WL 1650948 (N.D.Cal. June 05, 2007) (finding independent statistical analysis sufficient to show backdating).

*5 Plaintiffs also rely on two additional sets of allegations to support their contention that they have

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy  Page 5
Slip Copy, 2007 WL 2427980 (N.D.Cal.)
**(Cite as: 2007 WL 2427980 (N.D.Cal.))**

adequately shown backdating likely occurred. First, plaintiffs point to the fact that PMC conducted an internal investigation and publicly announced that it had determined that some stock options had been incorrectly dated. As a result, PMC had to restate its earnings, and the discrepancy was substantial. Thus, plaintiffs contend, PMC has effectively *admitted* backdating, and plaintiffs need not rely on mere inferences. The problem, as defendants point out, is that the internal investigation expressly concluded that there had been *no* intentional wrongdoing. See *CNET,* 483 F.Supp.2d at 956 ("[D]etermining the correct measurement date depends on the facts. This dependence can admit the possibility of innocent error-using an incorrect measurement date to price the options with no intent to find an advantageously low price.") Furthermore, plaintiffs have drawn no nexus between the option grants they are challenging in this action and PMC's "admission"-plaintiffs do not appear to be contending that these grants are necessarily the ones with which the internal investigation found fault. Thus, the fact that PMC has admitted it erroneously recorded some option grant dates does not create an inference that the challenged options were intentionally and fraudulently backdated.

Finally, plaintiffs point to allegations that PMC's accounting software was specially modified to allow option grant dates to be changed. Given that PMC admitted that some options had been incorrectly dated, the need or ability to make changes to grant dates is not necessarily sinister.[FN6] Accordingly, plaintiffs have failed to plead demand futility with adequate particularity and the complaint must be dismissed.

> FN6. The complaint contains no details as to when the software was modified, why the software is apparently marketed without that feature, how unusual it is for a company to seek the modification, or other such matters that possibly could make the conduct more suspicious.

## V. CONCLUSION

Defendants' motion to dismiss for failure to plead demand futility adequately is granted, with 20 days leave to amend. In view of this conclusion, the Court declines to address the other grounds for dismissal urged by defendants. The case management conference, currently scheduled for August 29, 2007, is hereby continued to October 31, 2007 at 2:30 p.m.

IT IS SO ORDERED.

N.D.Cal.,2007.
In re PMC-Sierra, Inc. Derivative Litigation
Slip Copy, 2007 WL 2427980 (N.D.Cal.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.