1   ROBERT P. VARIAN (SB No. 107459)
    *Email: rvarian@orrick.com*
2   JONATHAN B. GASKIN (SB No. 203625)
    *Email: jgaskin@orrick.com*
3   AMY M. ROSS (SB No. 215692)
    *Email: aross@orrick.com*
4   DANIELLE P. VAN WERT (SB No. 218245)
    *Email: dvanwert@orrick.com*
5   ERIN H. REDING (SB No. 252691)
    *Email: ereding@orrick.com*
6   ORRICK, HERRINGTON & SUTCLIFFE LLP
    The Orrick Building
7   405 Howard Street
    San Francisco, CA 94105-2669
8   Telephone:    (415) 773-5700
    Facsimile:    (415) 773-5759
9
    Attorneys for Defendants
10  FormFactor, Inc., Igor Y. Khandros, Ronald C. Foster,
    Richard M. Freeman and Joseph Bronson
11

12                  UNITED STATES DISTRICT COURT

13                 NORTHERN DISTRICT OF CALIFORNIA

14                    SAN FRANCISCO DIVISION

15

16  DANNY McCASLAND, Individually and On        **Case No.  3:07-cv-05545-SI**
    Behalf of All Others Similarly Situated,
17                                              **(CONSOLIDATED)**
                   Plaintiff,
18                                              **CLASS ACTION**
                                                _____
19         v.

20  FORMFACTOR, INC., IGOR Y.                   **REPLY MEMORANDUM OF**
    KHANDROS, RONALD C. FOSTER,                 **POINTS AND AUTHORITIES IN**
21  RICHARD M. FREEMAN and JOSEPH               **SUPPORT OF DEFENDANTS'**
    BRONSON,                                    **MOTION TO DISMISS PLAINTIFFS'**
22                                              **CONSOLIDATED AMENDED**
                   Defendants.                  **COMPLAINT FOR VIOLATIONS OF**
23                                              **FEDERAL SECURITIES LAWS**

24
                                                Date:        July 25, 2008
25                                              Time:        9:00 A.M.
                                                Judge:       Honorable Susan Illston
26                                              Courtroom:   10, 19th Floor

27

28

OHS West:260455823.2

REPLY MEMO OF P&A ISO MOTION TO DISMISS
PLAINTIFFS' CAC FOR VIOLATIONS OF FEDERAL
SECURITIES LAWS - (CASE No.  3:07-cv-05545-SI)

# TABLE OF CONTENTS

**Page**

INTRODUCTION ........................................................................................................ 1

ARGUMENT ............................................................................................................... 1

I.  The Opposition Underscores Plaintiffs' Failure To Plead The Detail And
    Corroboration Necessary To Avoid Dismissal ................................................ 1

    A.  The Opposition Disregards Controlling Law .......................................... 1

    B.  The Opposition Fails To Refute Defendants' Demonstration Regarding
        "Confidential Witnesses," Meetings and Reports .................................... 3

    C.  Plaintiffs' Attempt To Bolster Their Allegations Of Accounting Fraud
        Falls Far Short Of The Mark .................................................................. 4

        1.  Plaintiffs Fail To Address The Controlling Cases Cited In The
            Motion ........................................................................................ 4

        2.  The Existence Of A Restatement Provides No Basis For An
            Inference Of Fraud ...................................................................... 5

        3.  The CAC Alleges No Facts That Could Support An Inference Of
            Accounting Fraud ........................................................................ 6

            a.  The Nature Of The Restatement Refutes Any Suggestion
                That It Resulted From "Manipulation" ........................... 6

            b.  FormFactor Could Not Have "Hidden" Scrap Or Poor
                Yields By Manipulating Financial Statements ................ 7

            c.  Plaintiffs' Concession That R&D Expense Was Not
                Restated Demolishes Their Theory Of Fraud ................. 8

        4.  Plaintiffs' Assertions Regarding Internal Controls And Sarbanes-
            Oxley Certifications Provide No Basis For Alleging Securities
            Fraud .......................................................................................... 9

    D.  Plaintiffs Cannot Plead Falsity Or Scienter Regarding  Harmony ....... 10

        1.  Plaintiffs' Attempt To Use The Restatement As Support For Their
            Harmony Claims Falls Flat ........................................................ 10

        2.  Plaintiffs Mischaracterize Harmony And  FormFactor's Statements
            Regarding Harmony ................................................................... 11

        3.  Companies Are Not Required To Make Detailed Disclosures
            Regarding Operational Difficulties ............................................ 13

OHS West:260455823.2

i

REPLY MEMO OF P&A ISO MOTION TO DISMISS
PLAINTIFFS' CAC FOR VIOLATIONS OF FEDERAL
SECURITIES LAWS - (CASE No. 3:07-CV-05545-SI)

1

**TABLE OF CONTENTS**
**(continued)**

2

**Page**

3   II.   The Opposition Ignores Defendants' Demonstration That Dismissal Is Required

4         Under The Weighing Analysis Mandated By *Tellabs* And *Gompper* ............................ 13

          A.    The Opposition Miscasts Defendants' Argument And Seeks To Evade It   ........ 14

5

6         B.    The Arguments Plaintiffs Ignore Are Unrefuted And Decisive.......................... 14

7               1.    Plaintiffs' Theory Of Fraud Is Implausible And Unreasonable
                      When Viewed In Isolation ........................................................................ 14

8               2.    Any Inference Of Fraud Is Overwhelmed By Nonculpable
                      Inferences   ...................................................................................... 15

9   III.  The Opposition Fails To Undermine Defendants' Demonstration Regarding Stock

10        Sales ..................................................................................................................... 15

11        A.    Dr. Khandros' Trading Is Also Exculpatory ......................................................... 16

    IV.   The Opposition Fails To Undermine Defendants' Demonstration Regarding

12        Forward-Looking Statements   ........................................................................ 17

13  CONCLUSION .................................................................................................................... 17

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

# TABLE OF AUTHORITIES

2

**Page(s)**

3

## <u>CASES</u>

4

5
*Heliotrope General Inc., v. Ford Motor Co.,*
189 F.3d 971 (9th Cir. 1999) ................................................................................. 3

6
*In re Apple Computer, Inc.,*
7
127 Fed. Appx. 296 (9th Cir. 2005) ...................................................................... 2

8
*In re Autodesk, Inc. Sec. Litig.,*
132 F. Supp. 2d 833 (N.D. Cal. 2000) .................................................................. 2
9

10
*In re CNET Networks, Inc.,*
483 F. Supp. 2d 947 (N.D. Cal. 2007) .................................................................. 7

11
*In re Computer Assoc. Class Action Sec. Litig.,*
12
75 F. Supp. 2d 68 (1999) ....................................................................................... 5

13
*In re Connetics Corp. Sec. Litig.,*
542 F. Supp. 2d 996 (N.D. Cal. 2008) ........................................................ 4, 5, 13
14

15
*In re Convergent Tech. Sec. Litig.*
948 F.2d 507 (9th Cir. 1991) ............................................................................... 13

16
*In re Cornerstone Propane Partners L.P.,*
17
355 F. Supp. 2d 1069 (N.D. Cal. 2005) ................................................................ 7

18
*In re CV Therapeutics, Inc.,*
2004 WL 1753251 (N.D. Cal Aug. 5, 2004) ......................................................... 2
19

20
*In re Cylink Sec. Litig.,*
178 F. Supp. 2d 1077 (N.D. Cal. 2001) ................................................................ 5

21
*In re FoxHollow Tech., Inc. Sec. Litig.,*
22
2008 WL 2220600 (N.D. Cal. May 27, 2008) ...................................................... 3

23
*In re GlenFed, Inc. Sec. Litig.,*
42 F.3d 1541 (9th Cir. 1994) ................................................................................. 1
24

25
*In re Harmonic, Inc.,*
2002 WL 31974384 (N.D. Cal. Nov. 13, 2002),
*aff'd in part, rev'd in part, on other grounds*, 152 Fed. Appx. 674 (9th Cir.
26
2005) ...................................................................................................................... 4

27
*In re InterMune, Inc.,*
28
2004 WL 1737264 (N.D. Cal. July 30, 2004) ....................................................... 1

OHS West:260455823.2

iii

REPLY MEMO OF P&A ISO MOTION TO DISMISS
PLAINTIFFS' CAC FOR VIOLATIONS OF FEDERAL
SECURITIES LAWS - (CASE No. 3:07-CV-05545-SI)

1

2

**TABLE OF AUTHORITIES**
(continued)

Page(s)

3

4

*In re Invision Techs., Inc. Sec. Litig.,*
    2006 WL 538752 (N.D. Cal. Jan. 24, 2006) ........................................................ 10

5

6

*In re Juniper Networks, Inc. Sec. Litig.,*
    2004 WL 540910 (N.D. Cal. Mar. 11, 2004), *aff'd*, 158 Fed. Appx. 899
    (9th Cir. 2005) ........................................................................................... 1, 5

7

8

*In re LDK Solar Sec. Litig.,*
    2008 WL 2242185 (N.D. Cal. May 29, 2008) ...................................................... 4, 8

9

*In re Ligand Pharms., Inc. Sec. Litig.,*
    2005 WL 2461151 (S.D. Cal. Sept. 27, 2005) ........................................................ 2

10

11

*In re Northpoint Commc'n Group, Inc., Sec. Litig.,*
    184 F. Supp. 2d 991 (N.D. Cal. 2001) .................................................................. 4

12

13

*In re Pac. Gateway Exch., Inc. Sec. Litig.,*
    169 F. Supp. 2d 1160 (N.D. Cal. 2001) ................................................................ 5

14

*In re PMC-Sierra, Inc. Deriv. Litig.,*
    2007 WL 2427980 (N.D. Cal. Aug. 22, 2007).......................................................... 7

15

16

*In re Read-Rite Corp.,*
    335 F.3d 843 (9th Cir. 2003).............................................................................. 2

17

18

*In re Siebel Systems Inc., Sec. Litig.,*
    2005 WL 3555718 (N.D. Cal. Dec. 28, 2005) ...................................................... 13

19

*In re Silicon Graphics, Inc. Sec. Litig.,*
    183 F.3d 970 (9th Cir. 1999)........................................................................... 3,16

20

21

*In re Silicon Graphics, Inc. Sec. Litig.,*
    970 F. Supp. 746 (N.D. Cal. 1997) ....................................................................... 7

22

23

*In re Software Pub. Sec. Litig.,*
    1994 WL 261365 (N.D. Cal. Feb. 2, 1994) ............................................................ 1

24

*In re Splash Tech. Holdings, Inc. Sec. Litig.,*
    160 F. Supp. 2d 1059 (N.D. Cal. 2001) ................................................................. 2

25

26

*In re Syncor Intern. Corp. Sec. Litig.,*
    239 Fed. Appx. 318 (9th Cir. 2007)..................................................................... 15

27

*In re U.S. Aggregates, Inc. Sec. Litig.,*
    235 F. Supp. 2d 1063 (N.D. Cal. 2002) ............................................................. 5, 7

28

REPLY MEMO OF P&A ISO MOTION TO DISMISS
PLAINTIFFS' CAC FOR VIOLATIONS OF FEDERAL
SECURITIES LAWS - (CASE No. 3:07-CV-05545-SI)

1

**TABLE OF AUTHORITIES**
(continued)

2

Page(s)

3

*In re Vantive Corp. Sec. Litig.*,
    283 F.3d 1079 (9th Cir. 2002).................................................................................. 16

4

*In re Worlds of Wonder Sec. Litig.*,
    35 F.3d 1407 (9th Cir. 1994).................................................................................. 15

5

6

*Lipton v. Pathogenesis Corp.*,
    284 F.3d 1027 (9th Cir. 2002)............................................................................ 3, 15

7

*Ronconi v. Larkin*,
    253 F.3d 423 (9th Cir. 2001)......................................................................... 1, 3, 15, 16

8

9

*Rudolph v. UTStarcom*,
    _____F. Supp. 2d ____, 2008 WL 1734763 (N.D. Cal. Apr. 14, 2008)...................... 1, 5, 10

10

11

**STATUTES**

12

15 U.S.C.
    Section 78u-5 (I)(1)................................................................................................ 17

13

14

**RULES**

15

Federal Rules of Civil Procedure
    Rule 9(b) ............................................................................................................... 1

16

17

18

19

20

21

22

23

24

25

26

27

28

## INTRODUCTION

Plaintiffs' Opposition (the "Opposition" or "Opp.") does nothing to dislodge the showing set forth in Defendants' Motion to Dismiss ("Motion" or "MTD").  To the contrary, it underscores that dismissal is required <u>both</u> because the Consolidated Amended Complaint ("CAC") fails to allege either falsity or scienter with the requisite particularity, and because plaintiffs cannot possibly establish a strong inference of fraud under the weighing analysis mandated by *Tellabs* and *Gompper*.

## ARGUMENT

### I.    THE OPPOSITION UNDERSCORES PLAINTIFFS' FAILURE TO PLEAD THE DETAIL AND CORROBORATION NECESSARY TO AVOID DISMISSAL

#### A.    THE OPPOSITION DISREGARDS CONTROLLING LAW

The Opposition does not address, much less distinguish or refute, the dispositive law discussed at length in the Motion.  As defendants have shown (MTD pp. 2-5), plaintiffs cannot evade dismissal by serving up an undifferentiated "mosaic" of alleged facts. [1]  Nor can they point to the "totality of the circumstances" and claim that there must have been a fraud.

To the contrary, this Court and courts throughout the Ninth Circuit have repeatedly held that the Reform Act and Fed. R. Civ. P. 9(b) require plaintiffs to identify specific statements made by specific defendants, and to plead particularized facts showing how and why each such statement was materially false or misleading at the time it was made. [2]  To avoid dismissal the CAC must <u>also</u> plead highly particularized facts and corroborating details demonstrating that the specific defendants who made the identified statements did so with fraudulent intent. [3]

---

[1]  *See, e.g., In re Software Pub. Sec. Litig.*, 1994 WL 261365, at *3 (N.D. Cal. Feb. 2, 1994).

[2]  *See, e.g.,* MTD pp. 6-11; *In re GlenFed, Inc. Sec. Litig.*, 42 F.3d 1541, 1545 (9th Cir. 1994)110; *Ronconi v. Larkin*, 253 F.3d 423, 434 (9th Cir. 2001); *In re Juniper Networks, Inc. Sec. Litig.*, 2004 WL 540910, at *2-3 (N.D. Cal. Mar. 11, 2004) (Illston, J.), *aff'd*, 158 Fed. Appx. 899 (9th Cir. 2005).

[3]  *See, e.g.,* MTD pp. 8-9; *Rudolph v. UTStarcom*, _____F. Supp. 2d ____, 2008 WL 1734763, at *7 (N.D. Cal. Apr. 14, 2008) (Illston, J.); *In re InterMune, Inc.*, 2004 WL 1737264, at *7 (N.D. Cal. July 30, 2004) (Illston, J.) (plaintiffs should state specific false or misleading statements, describe the circumstances of the statement in great detail, provide specific evidence of its falsity, and facts that strongly support scienter).

1    These bedrock rules are at the core of the Reform Act.  The CAC does not come close to

2    satisfying them, and plaintiffs proceed as if the requirements did not exist.

3    Perhaps most importantly, the Opposition fails to acknowledge the fact that the "collective

4    scienter" theory relied upon in the CAC has been "squarely rejected" by the Ninth Circuit.  *See*

5    MTD pp. 8-9; *In re Apple Computer, Inc.*, 127 Fed. Appx. 296, 303 (9th Cir. 2005); *In re CV*

6    *Therapeutics, Inc.*, 2004 WL 1753251, at *10 (N.D. Cal Aug. 5, 2004) (Illston, J.) (citing

7    *Nordstrom, Inc. v. Chubb & Son, Inc.*, 54 F.3d 1424, 1435 (9th Cir. 1995)).  Plaintiffs are

8    required to plead scienter against an individual defendant under the rules outlined above in order

9    to state a claim against the corporation.  *Id.*  That is an impossible task for the CAC, which <u>barely</u>

10    <u>mentions</u> the individual defendants.

11    Plaintiffs' attempt to paper over this pivotal defect by invoking the "group pleading"

12    doctrine is similarly misconceived.  Even if group pleading applied (and it does not), the doctrine

13    would be unavailing.  As demonstrated at pages 3-4 of the Reply Brief filed in support of the

14    separate motion to dismiss on behalf of Richard Freeman, the doctrine deals with attribution of

15    statements, and cannot be employed as a substitute for particularized facts demonstrating that

16    statements were made with fraudulent intent.

17    Unable to deal with the controlling law, the Opposition falls back on arguments that

18    highlight the canyon separating the CAC from a viable pleading.  In addition to relying on

19    nonspecific allegations, collective scienter and group pleading, plaintiffs argue that they have

20    pled scienter based on defendants' corporate positions and "hands on" management style, and the

21    fact that a product that sustained production delays was "important" to the Company.  Those

22    arguments have been systematically rejected by our courts.[4]

23    _____

[4]    Plaintiffs cannot meet the Reform Act's stringent requirements for pleading scienter via
24    allegations regarding corporate positions because any corporate officer could be said to
possess the requisite knowledge by virtue of his or her position.  *See*, *e.g.*, *In re Autodesk, Inc.*
25    *Sec. Litig.*, 132 F. Supp. 2d 833, 844 (N.D. Cal. 2000); *In re Splash Tech. Holdings, Inc. Sec.*
*Litig.*, 160 F. Supp. 2d 1059, 1080 n.17 (N.D. Cal. 2001).
26
Nor can plaintiffs rely on the importance of a product to satisfy the specificity requirements of
27    the Reform Act.  *See*, *e.g.*, *In re Read-Rite Corp.*, 335 F.3d 843, 848 (9th Cir. 2003); *In re*
*Ligand Pharms., Inc. Sec. Litig.*, 2005 WL 2461151, at *15 (S.D. Cal. Sept. 27, 2005) (a
28    product's importance does not impute awareness of all possible problems to all defendants).

**B.    THE OPPOSITION FAILS TO REFUTE DEFENDANTS' DEMONSTRATION REGARDING "CONFIDENTIAL WITNESSES," MEETINGS AND REPORTS**

The Opposition does not dispute the rule that to avoid dismissal plaintiffs must plead "countless specifics" and "corroborating details" with respect to the sources of information upon which they rely -- including confidential witnesses ("CWs"), meetings, conversations and internal memoranda and reports.[5] Defendants demonstrated that the CAC alleges no such specifics or corroboration. MTD pp. 6-11. The MTD also pointed out the absence of any allegation that any CW interacted or communicated with any of the defendants, and that plaintiffs failed to allege that any defendant had any specific information from any source that contradicted any public statement made during the alleged class period. See MTD pp. 9-11. Although these conspicuous shortcomings were beaten like a drum, plaintiffs make no meaningful attempt to refute them.

Plaintiffs cannot contest the fact that the CAC hardly mentions defendants, either by title or name. See MTD pp. 8-9 & n.14; CAC ¶¶ 65-67. Nor can they challenge the fact that the purported witnesses referred to in the CAC are low-level employees who (i) did not communicate or interact with any defendant in any way, shape or form, and (ii) are not alleged to have heard or read anything that any defendant stated or wrote. See MTD pp. 10-11.[6] As defendants pointed out, only <u>four</u> paragraphs in the CAC so much as <u>refer to</u> meetings, documents or reports, and those references add nothing of substance. See MTD p. 9 & n. 14; CAC ¶¶ 65-67, 70. A plaintiff must detail "the sources of her information with respect to the reports, how she learned of the reports, who drafted them, [and] which officers received them," and provide "an adequate description of their contents." *Silicon Graphics*, 183 F.3d at 985; *accord Lipton v. Pathogenesis Corp.*, 284 F.3d 1027, 1036 (9th Cir. 2002). The CAC (¶¶ 65-67) makes no pretense of complying with these requirements. It merely refers generically to an "inventory valuation report," without providing dates, timeframes, sources or other basic information.

---

[5]    *See, e.g.*, *In re Silicon Graphics*, *Inc. Sec. Litig.*, 183 F.3d 970, 984-85 (9th Cir. 1999); *Heliotrope General Inc., v. Ford Motor Co.*, 189 F.3d 971, 979-80 (9th Cir. 1999); *Ronconi*, 253 F.3d at 432; *In re FoxHollow Tech., Inc. Sec. Litig.*, 2008 WL 2220600, at *23-24 (N.D. Cal. May 27, 2008).

[6]    *See In re FoxHollow*, 2008 WL 2220600, at *30 (dismissing complaint pleading CW allegations by executives who were not alleged to have been "in the room" when key meetings took place).

1    Most importantly, plaintiffs allege <u>nothing whatsoever</u> regarding the <u>contents</u> of the

2    nondescript report -- much less how it might support their accusations of fraud.  Paragraphs 65-67

3    and 70 of the CAC provide no details regarding any document, conversation or meeting, and no

4    specific information contradicting any public statement by any defendant.  *See*, *e.g.*, *In re*

5    *Harmonic, Inc.*, 2002 WL 31974384, at *11 (N.D. Cal. Nov. 13, 2002), *aff'd in part, rev'd in*

6    *part, on other grounds*, 152 Fed. Appx. 674 (9th Cir. 2005); *In re Northpoint Commc'n Group,*

7    *Inc., Sec. Litig.*, 184 F. Supp. 2d 991, 997 (N.D. Cal. 2001).[7]  Plaintiffs' reliance on the

8    conclusory assertion that on unspecified dates unspecified defendants "directed" unspecified

9    employees to hide manufacturing issues and manipulate FormFactor's accounting (see, e.g., Opp.

10   p. 23; CAC ¶¶ 11, 70 & p. 23) is similarly unavailing.  This Court has soundly rejected attempts

11   to rely on such allegations, even when they are far more detailed than those at issue here.  *See In*

12   *re Connetics Corp. Sec. Litig.,* 542 F. Supp. 2d 996, 1008 (N.D. Cal. 2008).

### C.    PLAINTIFFS' ATTEMPT TO BOLSTER THEIR ALLEGATIONS OF ACCOUNTING FRAUD FALLS FAR SHORT OF THE MARK

#### 1.    PLAINTIFFS FAIL TO ADDRESS THE CONTROLLING CASES CITED IN THE MOTION

16   The Opposition also ignores the well-settled law governing allegations of accounting

17   fraud.  See MTD pp. 12-18.  Impressionistic pleadings and references to the "totality of the

18   circumstances" do not cut it.  To provide the "'who, what, when, where and how' required by the

19   PSLRA," plaintiffs must <u>specifically identify</u> fraudulent transactions and dollar amounts, and

20   provide <u>specific information</u> regarding the role that <u>each</u> defendant allegedly played in connection

---

[7]    *In re LDK Solar Sec. Litig.,* 2008 WL 2242185 (N.D. Cal. May 29, 2008), discussed at length in the Opposition, is illuminating because it demonstrates what is required, and conspicuously absent here.  In that case, the company hired an expert for the specific purpose of investigating problems that were the subject of the complaint.  *Id.*, at *2.  The individual, who is referred to in the opinion as a "whistleblower," repeatedly communicated specific information to the CEO and the CFO that was directly contrary to the executives' public statements.  *Id.*, at *4.  The complaint further specified a multitude of detailed communications that the whistleblower had with senior management, including specific emails, phone calls and conferences, and included specific dates, names of recipients/attendees, and names of individuals involved.  *Id.*, at *7-15.  The CAC makes no pretense of pleading <u>any</u> such facts.

1    with the accounting fraud.[8]  Moreover, those particularized facts must demonstrate "that:

2    (i) [defendants knew that] specific accounting decisions were improper; and (ii) the defendants

3    knew specific facts at the time that rendered their accounting determinations fraudulent."

4    *Rudolph*, 2008 WL 1734763, at *6.

5        Plaintiffs do not -- and cannot -- challenge these well-established pleading requirements,

6    which are ignored in the Opposition.  The best they can do is suggest that they should be excused

7    from complying with them, because the information they hope will support their accusations is

8    within defendants' control.  Opp. pp. 20-21.  That appeal cannot be squared either with case law,

9    or with the core purposes of the Reform Act, which rewrote the rules to require plaintiffs to plead

10   highly particularized facts without resorting to discovery.  See MTD pp. 4-5.[9]

11           **2.    THE EXISTENCE OF A RESTATEMENT PROVIDES NO BASIS
12                   FOR AN INFERENCE OF FRAUD**

13       Plaintiffs' assertion that the fact of a restatement supports an inference of scienter (Opp.

14   pp. 27-28) collides with a mountain of controlling authority to the contrary.[10]  *In re Cylink Sec.*

15   *Litig.*, 178 F. Supp. 2d 1077 (N.D. Cal. 2001), the principal case relied upon in the Opposition,

16   provides no support for that remarkable position.  Indeed, the opinion states:  "[t]o be sure,

17   allegations of a failure to follow GAAP, standing alone, do <u>not</u> create a strong inference of

18   scienter."  *Id*. at 1082 (emphasis added).  The *Cylink* plaintiffs pled particularized facts regarding

19   _____

     8   *See, e.g., In re Juniper*, 2004 WL 540910, at *3; *In re Pac. Gateway Exch., Inc. Sec. Litig.*,
20       169 F. Supp. 2d 1160, 1167 (N.D. Cal. 2001); *In re Connetics,* 542 F. Supp. at 1011.

21   9   The cases relied on by plaintiffs do nothing to support their position, as all are outside the
         Ninth Circuit and at least one pre-dates the Reform Act.  As further proof that plaintiffs'
22       argument is off-the-mark, one of the cases relied on by plaintiffs states the <u>exact same</u> standard
         for pleading accounting fraud put forth by defendants in their MTD.  *See In re Computer*
23       *Assoc. Class Action Sec. Litig.,* 75 F. Supp. 2d 68, 72-73 (1999) (plaintiffs alleged "a number
         of statements made by defendants, detailing the who, what, where, when, and how of the
24       fraudulent statements . . .").

25   10  *See, e.g., Rudolph*, 2008 WL 1734763, at *6 ("The mere publication of inaccurate accounting
         figures, or a failure to follow GAAP, without more, does not establish scienter.") (internal
26       citations omitted); *In re Connetics*, 542 F. Supp. at 1012 (A restatement's acknowledgments
         of GAAP violations are not enough to show scienter); *In re U.S. Aggregates, Inc. Sec. Litig.*,
27       235 F. Supp. 2d 1063, 1073 (N.D. Cal. 2002) (GAAP violations and the resulting restatements
         did not raise a strong inference of scienter when plaintiffs failed to plead particularized
28       allegations suggesting defendants knew of violations.).

1  major GAAP violations, including dates of transactions, amounts of revenues and earnings

2  overstated, and the specific products and identities of those involved in individual transactions.

3  *Id.* at 1082.  That is precisely what the CAC <u>fails</u> to do.  See pp. 1-3 above; MTD pp. 12-13.

4          **3.    THE CAC ALLEGES NO FACTS THAT COULD SUPPORT**

5                **AN INFERENCE OF ACCOUNTING FRAUD**

6            **a.    THE NATURE OF THE RESTATEMENT REFUTES ANY**
              **SUGGESTION THAT IT RESULTED FROM "MANIPULATION"**

7          As defendants have shown (MTD pp. 2-3, 17-18), the nature of the restatement itself

8  shows clearly that it was not the product of a fraudulent scheme.  No one would "manipulate"

9  numbers to achieve such results, which run directly counter to plaintiffs' theory of fraud.  Among

10  other things, earnings and gross margins were <u>lower</u> than they should have been when plaintiffs

11  claim defendants were inflating them to reap insider trading profits, and costs of revenue were too

12  <u>high</u> when the CAC alleges they were <u>under</u>stated to hide Harmony manufacturing and low

13  yields.  Plaintiffs have nothing to say about these glaring contradictions -- which were clearly and

14  repeatedly explained in the MTD (pp. 17-19) -- because there is nothing they <u>can</u> say.  The fact

15  that the CAC's accusations fly in the face of the restatement plaintiffs seek to exploit is decisive;

16  and the Opposition's attempts to direct attention elsewhere are wholly unavailing.

17          Citing paragraph 81 of the CAC, plaintiffs proclaim that PwC "caught onto" the supposed

18  fraudulent scheme and forced the restatement.  Opp. pp. 8-9.  A review of paragraph 81 quickly

19  reveals that the CAC makes no such allegations.  Moreover, the fact that PwC was intimately

20  involved in the restatement, and concurred in the Audit Committee's conclusion that the

21  inventory valuation errors resulted from the failure of low-level employees to follow Company

22  procedures (see RJN, Ex. 2, p. 1), shows that PwC concluded that there <u>was no</u> such scheme.

23          The Opposition's attempt to rely on the Audit Committee's conclusion that FormFactor

24  failed to follow certain accounting policies (Opp. p. 29), but reject the concomitant conclusion

25  that the failure occurred at a low level without the knowledge of FormFactor's management, is

26  similarly baseless.  Plaintiffs have pled no facts to contradict the conclusion they seek to jettison,

27  which is fatal because Ninth Circuit law requires them to plead such facts "in great detail."  Nor

28

6

can they simultaneously embrace the portions of the statement they like and reject the balance: "Plaintiffs are not entitled to pick and choose which of defendants' statements in public documents favor them and have all others ignored." *In re CNET Networks, Inc.*, 483 F. Supp. 2d 947, 966 (N.D. Cal. 2007).[11]

Ronald Foster's resignation as CFO does not provide an iota of support for plaintiffs' assertions of fraud.[12] That is particularly true because, in contrast to many recent cases, the independent investigation that preceded his departure concluded that he did <u>not</u> engage in any wrongdoing. See RJN Ex. 2, p. 1.

### b. FORMFACTOR COULD NOT HAVE "HIDDEN" SCRAP OR POOR YIELDS BY MANIPULATING FINANCIAL STATEMENTS

Plaintiffs' claims of accounting fraud are also fundamentally insupportable because they are founded upon nonsequitur. The Opposition repeatedly asserts that because defendants wanted to "create the appearance that the Company was successfully ramping its Harmony products," they engaged in "deliberate accounting manipulation to hide accumulated scrap" by falsifying inventory and R&D accounts. Opp. p. 7.[13] That assertion is a non-starter. FormFactor could not have "hidden" scrap by manipulating its financial statements -- whether by falsifying inventory and R&D accounts or otherwise -- even if it wanted to do so.[14]

FormFactor could not "create the appearance" of a successful Harmony ramp by

---

[11] *Accord In re PMC-Sierra, Inc. Deriv. Litig.*, 2007 WL 2427980, at *5 (N.D. Cal. Aug. 22, 2007) (plaintiffs could not rely on accuracy of internal investigation finding that certain stock options had been incorrectly dated, while discounting portion of investigation expressly concluding that there had been no intentional wrongdoing); *In re Silicon Graphics, Inc., Sec. Litig.*, 970 F. Supp. 746, 758-59 (N.D. Cal. 1997), *aff'd*, 183 F.3d 970 (9th Cir. 1999) (plaintiffs, having relied on sections of defendants' SEC filings in their arguments, could not object when defendants referred to the same information in their defense.).

[12] *See, e.g., In re US Aggregates,* 235 F. Supp. 2d at 1073-74 (allegations of personnel changes – including the termination of the CFO – in the wake of a business set-back provided no basis for alleging fraud); *In re Cornerstone Propane Partners L.P.*, 355 F. Supp. 2d 1069, 1092-93 (N.D. Cal. 2005) ("[m]ost major stock losses are often accompanied by management departures, and it would be unwise for courts to penalize directors for these decisions.").

[13] See, *e.g.*, Opp. pp. 1-2, 7-9, 19, 20, 26, 28; CAC ¶¶ 12, 17, 68, 69, 72, 89, 97, 105, 115, 126, 136, 144, 179-199.

[14] Moreover, as demonstrated in the Motion, it is proper to include "scrap" within the category of R&D expense under certain conditions. See MTD p. 14; RJN Ex. 6 at ¶ 9.

---

1    manipulating its accounting.  No one would look to FormFactor's financial statements to learn

2    how much scrap was being generated or make judgments about the Harmony ramp.  Any such

3    endeavor would be fruitless in any event.  Scrap is not listed, quantified or described in the

4    Company's financial statements.[15]  The inventory and R&D expense items that purportedly

5    served as the instruments of concealment convey <u>no information whatsoever</u> regarding scrap or

6    manufacturing yields.[16]  Those dots simply do not connect.

7         Nor is there any basis for plaintiffs' attempt to equate lower inventory valuations with

8    lower manufacturing yields.  Indeed, the <u>opposite</u> is often true:  <u>higher</u> yields frequently result in

9    inventory write-offs and <u>lower</u> inventory valuations.  As FormFactor explained in the earnings

10   call transcripts quoted in the CAC, the Company orders custom components that must be written

11   off as excess or obsolete inventory if manufacturing yields are <u>better</u> than projected.[17]

12              c.    PLAINTIFFS' CONCESSION THAT R&D EXPENSE WAS NOT
                      RESTATED DEMOLISHES THEIR THEORY OF FRAUD

13

14        Plaintiffs' concession that R&D expense was not affected by the restatement strikes

15   another fatal blow to the CAC.  Although plaintiffs now deny ever suggesting that R&D expense

16   was part of the restatement, the CAC tells a different story.  The devastation of their claims is

17   inescapable in any event.

18   _____

19   [15]  In sharp contrast to the facts presented in the *LDK Solar* case mistakenly relied on by
         plaintiffs, scrap was an inconsequential part of FormFactor's business and would be of no
20       interest to investors.  The scrap described in *LDK Solar* "was key to the company's overall
         value," and "critical to LDK's success," because it was the resource from which the company
21       manufactured its products.  2008 WL 2242185, at *3, 15.  LDK <u>purchased</u> scrap materials
         containing polysilicon, which was the key ingredient in the solar panels that accounted for all
22       of its sales.  *Id.*, at *2-*4.  Accordingly, the amount of polysilicon scrap held in LDK's
         inventory was a critical asset reported on its balance sheet.  *Id.*  The scrap referred to in the
23       CAC is not an asset, not the key to FormFactor's value, and not critical to its success.

24   [16]  See RJN Ex. 2 at pp. 57-58, 62-63.

25   [17]  "We then have to value this inventory each quarter in light of anticipated customer demand,
         factory yields… and other factors.  It's actually a complex, multi-variable process, and in fact,
26       <u>better factory yields can end up generating unused and potentially un-needed material</u> in our
         custom environment. . . ."  See RJN Ex. 1 at p. 8 (emphasis added); *see also* RJN Ex. 33 at
27       pp. 10-11 ("[A]s a result of strong factory productivity… in a custom product marketplace,
         strong yields will outrun the planning yields we used to purchase materials.  And when that
28       happens, you can have <u>higher inventory write-offs</u>") (emphasis added).

1    The core of plaintiffs' overreaching accusations is that defendants overstated R&D

2    expenditures by transferring obsolete and excess inventory to R&D (purportedly to hide Harmony

3    manufacturing problems and the accumulation of scrap). According to allegations repeated

4    throughout the CAC, [18] overstatement of R&D expense and the inventory valuation errors are two

5    sides of the same coin: Inventory was misstated <u>because</u> scrap was transferred to R&D.

6    Overstatement of R&D expense is thus the mechanism through which plaintiffs claim

7    defendants perpetrated securities fraud. If plaintiffs' allegations were well-founded, R&D

8    expense would <u>necessarily</u> have been overstated, and would <u>necessarily</u> have been an integral part

9    of the restatement. Indeed, the CAC alleges both that this two-sided "scheme" was exposed in

10   the restatement, [19] and that inventory numbers (along with gross margins, cost of revenue and

11   earnings) were restated because obsolete inventory was improperly counted as R&D expense.[20]

12   Forced to acknowledge that the restatement had nothing to do with R&D expense -- and

13   that nothing "improperly transferred" to R&D was moved back to inventory -- plaintiffs are

14   reduced to arguing that the absence of a restatement of R&D expense "is not dispositive that the

15   numbers were not false." Opp. p 19. That feeble assertion misses the point. Plaintiffs posited

16   inflation of R&D expense as the keystone of their fraud claims, and it has fallen out of the arch.

### 4. PLAINTIFFS' ASSERTIONS REGARDING INTERNAL CONTROLS AND SARBANES-OXLEY CERTIFICATIONS PROVIDE NO BASIS FOR ALLEGING SECURITIES FRAUD

19   Plaintiffs' reliance on Sarbanes-Oxley certifications is similarly unfounded. Opp. pp. 29-

20   30. Ninth Circuit courts, including this Court, have repeatedly rejected attempts to plead scienter

[18] See, *e.g.,* CAC ¶¶ 11, 51, 68-74, 89, 97, 105, 115, 126, 136; Opp. pp. 7-9, 19-21. Plaintiffs assert that "defendants caused FormFactor to improperly transfer the cost associated with scrap as an R&D expense," and that the "scrap material should have been treated as excess or obsolete inventory and written off through the cost of revenues." Opp. p. 20.

[19] See, *e.g.,* CAC ¶ 83 ("as a result of the fraudulent scheme, the Company restated its inventory, gross margin, operating margin and net income for FY 2006, 1Q 2007 and 2Q 2007").

[20] In describing the impacts of the restatement the CAC alleges, for example: "But for defendants' deliberate improper reporting of their inventory valuation, <u>including counting of obsolete inventory as "R&D expense</u> . . . FormFactor would have only achieved a gross margin of 51.51% [the restated number], rather than 52.7% [the number reported prior to the restatement]." CAC ¶ 105(h) & (i) (emphasis added); see also CAC ¶¶ 97(h) & (i); 115(h) & (i); 126 (h) & (i).

1   based upon internal control weaknesses and SOX certifications.  *See, e.g., In re Invision Techs.,*

2   *Inc. Sec. Litig.,* 2006 WL 538752, at *7, n.3 (N.D. Cal. Jan. 24, 2006); *Rudolph*, 2008 WL

3   1734763, at *6; MTD p. 13, n. 22.

4         Confronted with that reality, the Opposition (pp. 18-19, 31-32) seeks refuge in rhetoric

5   that has no foundation in the CAC.  Plaintiffs conjure up "a complete breakdown" in

6   FormFactor's internal controls, but no such breakdown is alleged in the CAC.  Indeed, the

7   Opposition's newfound assertion is directly contradicted by the SEC filings upon which plaintiffs

8   rely, which refer to a narrow issue confined to a distinct part of the Company's operations.  The

9   Opposition's proclamations (p. 30) of "repeated restatements" and "ongoing manipulations," and

10   claims that the restatement was "based on the same material weakness" that existed prior to the

11   class period are also baseless.  The single allegation cited as support for this assertion (CAC

12   ¶ 43), provides no support whatsoever.  It refers to a minor restatement related to "a change in the

13   amortization schedule of stock-based compensation."  The follow-on that defendants "took

14   advantage of" that "pre-existing material weakness" "to hide the Company's ramp issues with

15   Harmony" (Opp. p. 2) is similarly untethered from the pleading at issue.

16       **D.**    **PLAINTIFFS CANNOT PLEAD FALSITY OR SCIENTER**

17           **REGARDING HARMONY**

18           **1.**    **PLAINTIFFS' ATTEMPT TO USE THE RESTATEMENT AS**
               **SUPPORT FOR THEIR HARMONY CLAIMS FALLS FLAT**

19         As explained at pages 6-8 above, plaintiffs' untoward attempt to connect the restatement

20   to Harmony fails on multiple grounds.  No one would examine FormFactor's financial statements

21   to assess progress in ramping a new product, and the R&D and inventory accounts provide no

22   information regarding scrap or manufacturing yields in any event.  Plaintiffs now concede, as

23   they must, that the restatement did not affect R&D expense, the account plaintiffs claim was used

24   to "hide" Harmony ramp problems.[21]  Moreover, the flow of the restated numbers runs directly

25   contrary to plaintiffs' fraud hypothesis.  According to the restatement, and the allegations of the

26   CAC, cost of revenue numbers reported by FormFactor were under stated during the period in

27   _____

28   [21]  See pp. 8-9 above.

1   which plaintiffs claim scrap and yield problems were "increasing exponentially."[22]  Far from

2   providing support, the restatement thus <u>refutes</u> plaintiffs' accusations regarding Harmony.

3                       **2.    PLAINTIFFS MISCHARACTERIZE HARMONY AND**
                            **FORMFACTOR'S STATEMENTS REGARDING HARMONY**
4

5           Contrary to the impression conveyed by the Opposition and CAC, FormFactor sold

6   hundreds of millions of dollars worth of products during the alleged class period, and Harmony

7   was a small piece of the pie.  Indeed, Harmony was not "introduced to the market" until June

8   2006, and then only in a small portion of FormFactor's business.[23]  Although someone reading

9   the CAC might think FormFactor should be renamed "The Harmony Company," the CAC, and

10  documents upon which it is based, show that FormFactor had 11 consecutive quarters of record

11  revenues and earnings (through Q3 2007) with no substantial contribution from Harmony.[24]

12          Delays in the Harmony ramp contributed to the interruption of that record, but, as the

13  documents underlying the CAC make unmistakably clear -- and as the Company explained in

14  statements that plaintiffs steadfastly ignore (see MTD pp. 21-22) -- deteriorating market

15  conditions were the primary cause.  Moreover, contrary to plaintiffs' assertion (Opp. p. 3),

16  Harmony has met no "demise"; shipments are in fact increasing substantially.[25]

17          Defendants have demonstrated in detail that plaintiffs' various pronouncements that

18  FormFactor "promised" large volumes of Harmony probe cards,[26] and "falsely represented that

19  the Company was doing well in ramping up its Harmony development and production,"[27] are

20  refuted by the documents cited in the CAC.  In sharp contrast to plaintiffs' characterizations,

21  those documents show that FormFactor provided investors with a steady stream of real-time

22  disclosures regarding problems and delays in manufacturing, qualifying and commercializing

23

24  _____
    [22]  See pp. 6 above; MTD pp. 17-19.

25  [23]  Opp. p. 1; Supplemental Request for Judicial Notice ("Supp. RJN") Ex. 1 at p. 3, Ex. 2 at p. 3.
    [24]  See MTD pp. 18-19 & n. 31.
26  [25]  Supp. RJN Ex. 4 at pp. 3-4, 11.

27  [26]  See, *e.g*., CAC ¶¶ 89(a), 97(a), 105(a), 115(a), 126(a), 136(a), 144(a).
    [27]  CAC ¶ 220.
28

1    Harmony products.  MTD pp. 15-16 & note 24.[28]

2         Plaintiffs do not undertake the impossible task of challenging that demonstration; they

3    simply ignore it.  Their abject refusal to deal with what defendants <u>actually said</u> is typified by the

4    Opposition's (p. 15) characterization of FormFactor's February 5, 2008 statements as a "belated

5    admission" of difficulties regarding Harmony.

6         More than three months before the "belated admission" that FormFactor was encountering

7    difficulties in ramping Harmony to volume production, and after a series of <u>previous</u> disclosures,

8    FormFactor stated:  (i) that it was experiencing "Harmony production ramp constraints," (ii) that

9    the Company had thus far been unsuccessful in reaching a "high-volume production phase,"

10   (iii) that FormFactor was finding it "more difficult than planned to ramp Harmony into volume

11   production," (iv) that "a lot of hard work" would be required to ramp Harmony, and (v) that the

12   problems and delays were having adverse impacts on bookings and financial performance.[29]

13        In response to an analyst's questions CEO Khandros stated (on October 24, 2007):

14   "Right, so there are no two ways to say it; we are finding ramping Harmony more difficult than

15   anticipated."[30]  When another analyst noted that -- as FormFactor had disclosed on prior

16   occasions -- efforts to ramp Harmony had been the subject of delays, Dr. Khandros responded:

17   "You are correct; we are finding it more difficult to do."[31]  Dr. Khandros further explained that,

18   although other FormFactor products provided alternatives to Harmony, delays in the Harmony

19   ramp meant that some DRAM business "will go elsewhere."[32]

20        The Opposition attempts to dismiss these specific and unambiguous disclosures (and

21   numerous others) as "boilerplate" "risk warnings," and then changes the subject to "safe harbor

22   protection."  Opp. p. 17.  Plaintiffs also take statements about the ramp of a new <u>factory</u> (long

23   before FormFactor was manufacturing Harmony products) and miscast them as statements about

24

---

25   [28]  RJN Exs. 1, 22, 23, 33, 34, 35, 36; Supp. RJN Ex. 3.

     [29]  RJN Ex. 1 at pp. 6, 7, 8, 10, 13, 14, 15, 16.

26   [30]  *Id*. p. 10.

27   [31]  *Id*. pp. 15-16.

28   [32]  *Id.* pp. 13-14.

1    Harmony.[33]

2        3.    **COMPANIES ARE NOT REQUIRED TO MAKE DETAILED**
3             **DISCLOSURES REGARDING OPERATIONAL DIFFICULTIES**

4            Although FormFactor provided numerous disclosures and updates, it is clear that

5    companies are under no obligation to provide investors with operational details about the

6    development and production of a new product.[34]  Moreover, as defendants have shown (MTD

7    pp. 20-21), companies are entitled, and expected, to be optimistic when discussing the

8    development of new products -- even when the products run into difficulties.  *See, e.g., In re*

9    *Connetics*, 542 F. Supp. 2d at 1008.  The fact that hindsight shows that management may have

10   "underestimated the severity of such [developmental] problems," or was too optimistic in its

11   product assessments, does not constitute securities fraud.  *Id.*

12           These principles apply with special force to high-technology products, which are often on

13   the cutting edge of industry innovation and subject to set-backs and delays.  *See, e.g.*, *In re Siebel*

14   *Systems Inc., Sec. Litig.*, 2005 WL 3555718, at *4 (N.D. Cal. Dec. 28, 2005).  Plaintiffs cannot

15   plead scienter on the theory that, because a new product was important, defendants would have

16   kept themselves apprised of the details regarding its development.  *Id.*

17   **II.    THE OPPOSITION IGNORES DEFENDANTS' DEMONSTRATION THAT**
18           **DISMISSAL IS REQUIRED UNDER THE WEIGHING ANALYSIS**
             **MANDATED BY *TELLABS* AND *GOMPPER***

19           As defendants have shown, the weighing analysis mandated under *Tellabs* and *Gompper*

20   provides a separate and independently dispositive ground upon which the CAC must be

21   dismissed.  MTD pp. 16-23.  Even if plaintiffs had pled falsity and scienter with the requisite

22

23   [33]  The statements (Opp. p. 13) that "manufacturing had transitioned through the most difficult
     phase of the production ramp," "with output and yields improving steadily," have nothing to
24   do with Harmony.  They were made on February 1, 2006 (the first day of the alleged class
     period), (i) nearly six months before Harmony was "introduced to the market" in June 2006
25   (Opp. p. 1), (ii) long before there was a Harmony ramp, and (iii) during a period in which
     FormFactor was manufacturing other products -- not Harmony.

26   [34]  *See, e.g., In re Convergent Tech. Sec. Litig.*, 948 F.2d 507, 516 (9th Cir. 1991) (rejecting
27   plaintiff's contention that the Company had to "disclose [every detail about the] progress of
     efforts to implement new mechanization structure" and holding that "generalized statements of
28   risk" were sufficient.).

particularity (instead of missing by a mile), dismissal would be appropriate because:  (i) their theory of fraud is irrational, not cogent and compelling, before competing inferences are taken into account, and (ii) any inference of fraud is overwhelmed by competing nonculpable inferences.  Plaintiffs misconstrue defendants' argument, and fail to refute the showing on <u>either</u> of these points.

## A.    THE OPPOSITION MISCASTS DEFENDANTS' ARGUMENT AND SEEKS TO EVADE IT

Rather than dealing forthrightly with arguments they cannot answer, plaintiffs miscast defendants' position as contending that the CAC's "individual allegations" must be considered in isolation when the Court evaluates scienter.  Opp. p. 22.  Having created that strawman, plaintiffs label it a "fatal error," and take a pass on the arguments <u>actually</u> made in the motion to dismiss. Defendants contend -- and have shown -- that plaintiffs' theory of fraud (not individual allegations) is not cogent or compelling when viewed in isolation, i.e., before competing explanations are added to the mix.  Defendants have further shown that the addition of nonculpable explanations, each of which is more cogent and compelling than any inference of fraud, tips the scienter balance even further.

## B.    THE ARGUMENTS PLAINTIFFS IGNORE ARE UNREFUTED AND DECISIVE

### 1.    PLAINTIFFS' THEORY OF FRAUD IS IMPLAUSIBLE AND UNREASONABLE WHEN VIEWED IN ISOLATION

Plaintiffs' theory of fraud is dead on arrival when viewed in isolation, before alternative explanations are added to the scales.  Among other things, plaintiffs' hypothesis has CFO Foster manipulating FormFactor's financial statements to <u>def</u>late the stock price at the time of his sales. See MTD pp. 17-19.  Plaintiffs thus in effect allege that the CFO and CEO engaged in a scheme to victimize themselves by <u>under</u>stating earnings.  In addition, as explained above, the CAC's theory of fraud is predicated on a nonsequitur, on a restatement that contradicts its key assertions, and on a scenario in which the "manipulated" numbers are running in the wrong direction.[35]

---

[35]  The restatement of earnings, gross margins and costs of revenue run directly contrary to the CAC's allegations regarding the Harmony ramp, manufacturing problems and the accumulation of scrap that plaintiffs claim were misclassified as R&D expense.  See MTD pp. 17-19.  The fact that it would have been impossible for FormFactor to have "hidden" scrap and

## 2.    ANY INFERENCE OF FRAUD IS OVERWHELMED BY NONCULPABLE INFERENCES

Although plaintiffs' abject failure to allege a coherent and compelling theory of fraud renders further analysis unnecessary, it is <u>also</u> clear that the theory articulated in the CAC is overwhelmed by <u>multiple</u> nonculpable inferences that are far more coherent and compelling.  See MTD pp. 19-23.  Among other things, the nature and scope of the restatement make clear that it resulted from errors, not "manipulation."  The inferences that FormFactor underestimated Harmony challenges, or mismanaged certain aspects of the Harmony development ramp are plainly more compelling than any inference that defendants engaged in a complex scheme to commit securities fraud.  Plaintiffs make no attempt to dispute defendants' detailed showing regarding nonculpable inferences, which is decisive.

## III.   THE OPPOSITION FAILS TO UNDERMINE DEFENDANTS' DEMONSTRATION REGARDING STOCK SALES

Although unusual or suspicious trading activity may raise an inference of scienter, insider trading activity that is <u>not</u> unusual, or  "misses the boat" on advantageous timing, supports the opposite inference: the insiders <u>lacked</u> scienter.[36]  As already demonstrated, the defendants retained more than 88% of their shares, and sold relatively small amounts consistent with their prior trades, at times removed from the period highs, and incurred drastically larger losses than plaintiffs.  *See* MTD pp. 23-26; *In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1424-52 (9th Cir. 1994).

Plaintiffs' claim that Mr. Foster sold 87.29% of his holdings is similarly baseless.[37]

---

low yields in the publicly reported numbers for R&D and inventory, and the fact that R&D expenses were not restated (see pp. 6-9 above), hammer two more nails into the coffin.

[36] See MTD pp. 23-24; *see, e.g., Ronconi*, 253 F.3d at 435.  Likewise, the Ninth Circuit has consistently dismissed the probative value of allegations regarding routine business incentives such as stock-based compensation.  *In re Syncor Intern. Corp. Sec. Litig.*, 239 Fed. Appx. 318, 321 (9th Cir. 2007) ("Stock-based bonuses are common and have limited probative value as to scienter").  *See also*, *Lipton*, 284 F.3d at 1038.

[37] At most, Mr. Foster's eight sales cumulatively equal 25% of Mr. Foster's aggregate holdings at the time of his last sale (19,800 of 78,861 shares) and represent only 17.5% of his aggregate holdings during the entirety of the alleged class period (19,800 out of 113,039 shares).  See RJN Ex. 28; Supp. RJN Ex. 5.  Although these percentages are irrelevant in light of Mr. Foster's practice of drastically <u>increasing</u> his holdings, they also fall short of levels courts in

1    FormFactor's CFO in fact tripled his holdings during the purported class period.  CAC ¶ 27;

2    MTD p. 25.  From 2006 to 2007, Mr. Foster increased his holdings of shares and <u>vested</u> options

3    from 33,015 to 64,461 -- despite his sales.  See RJN Ex. 27; Supp. RJN Ex. 5.  From 2007 to

4    early 2008, Foster further increased his holdings to 102,832 shares and vested options.  RJN

5    Ex. 28.  Moreover, the fact that nearly 75% of his sales occurred during a period in which

6    FormFactor's gross margins and earnings were <u>under</u>stated, not inflated, affirmatively refutes any

7    inference of fraud.  See MTD pp. 24-25.

8         Moreover, plaintiffs do not, and cannot, dispute the fact that Mr. Bronson made a single

9    sale of 25,000 shares on May 1, 2006, <u>twenty-one months</u> before the alleged revelation of the

10   supposed fraud on February 5, 2008.  CAC ¶¶ 174, 175.  FormFactor's 2006 proxy conclusively

11   demonstrates that the sale encompassed 17% (not 36.83%) of the 145,779 shares and vested

12   options he held on that date.  See RJN Ex. 27.  During the alleged class period FormFactor's

13   stock price was higher than the price at which Mr. Bronson sold his stock on 141 subsequent

14   days.  See MTD pp. 25-26.  These facts further refute plaintiffs' accusations of insider trading and

15   fraud.

16   **A.    <u>D<small>R</small>. K<small>HANDROS</small>' T<small>RADING</small> I<small>S</small> A<small>LSO</small> E<small>XCULPATORY</small></u>**

17        Dr. Khandros' stock sales were made entirely pursuant to a pre-existing, pre-set trading

18   plan, and thus could not reflect his contemporaneous mental state.[38]  MTD pp. 26-27.  Even if

19   they had <u>not</u> been made pursuant to a 10b5-1 plan, Khandros' sales would provide no support for

20   any inference of fraud because they plainly are not suspicious in timing or amount.

21        During the two years covered by the alleged class period, Dr. Khandros' sales were

22   slightly lower than in prior periods during which plaintiffs level no accusations of insider trading

23   or securities fraud, and accounted for less than 24% of his holdings.  See CAC ¶ 175; MTD p. 26.

24   *See, e.g., In re Vantive*, 283 F.3d at 1094 ("It is not inherently alarming or unusual that an insider

25   _____

26        this Circuit find probative of scienter.  MTD pp. 24, 26; *Ronconi* 253 F. 3d at 435-36; *In re*
         *Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1092-93 (9th Cir. 2002).

27   [38] Plaintiffs' attempt to exclude exculpatory facts from publicly-disclosed documents such as Dr.
         Khandros' 10b5-1 plans is contrary to controlling case law.  *See, e.g., Silicon Graphics,* 183

28       F.3d at 986 (taking proper judicial notice of Forms 4 filed with the SEC).

1  might sell a quarter of his holdings over the course of 15 months, particularly in a volatile

2  industry.").  Moreover, the sales were made at an average price of $11 below the class period

3  high.  See RJN Ex. 25.[39]

4  **IV.     THE OPPOSITION FAILS TO UNDERMINE DEFENDANTS' DEMONSTRATION
5            REGARDING FORWARD-LOOKING STATEMENTS**

6          As demonstrated above and in the MTD, dismissal of the CAC does not turn on the

7  characterization of any statement as forward-looking.  Plaintiffs' allegations fall far short of the

8  mark under the rigorous standards applicable to all statements.

9          Moreover, the Opposition does not, and cannot, dispute the fact that FormFactor's

10 financial projections, including the future plans and objectives of management and the

11 assumptions underlying or relating to such statements, are forward-looking as defined in the

12 Reform Act.  See 15 U.S.C. 78u-5 (I)(1); MTD p. 28.  Furthermore, although the Opposition

13 devotes a great deal of effort (pp. 12-14) to the proposition that statements regarding Harmony

14 were not forward-looking, statements phrased in the present tense are deemed forward-looking if

15 their verification depends in whole or in part on future events.  See MTD p. 28.  Because

16 Harmony was in a state of ongoing development during the class period, most of the statements at

17 issue fall into that category.

18                                    **CONCLUSION**

19         For all of the foregoing reasons, the CAC should be dismissed with prejudice.

20 Dated: June 24, 2008                    ORRICK, HERRINGTON & SUTCLIFFE LLP

21

22                                        _/s/ Robert P. Varian_
                                           Robert P. Varian
23                                       Attorneys for Defendants
                                FormFactor, Inc., Igor Y. Khandros, Ronald C. Foster,
24                                Richard M. Freeman and Joseph Bronson

25

26 [39]  The contention that Dr. Khandros made 32 trades in September and October of 2007 is also
   misleading.  Dr. Khandros' September 17, 2007 trade was executed in 30 separate transactions
27 of as little as 100 shares -- leaving just 3 actual trades, which is neither suspicious nor unusual.
   Compare Opp. p. 33 to CAC ¶177.  Further, these 3 trades comprised less than 10% of his
28 period sales -- exactly what one would expect from a two month slice of a two year period.