ROBERT P. VARIAN (SB No. 107459)
Email: rvarian@orrick.com
JONATHAN B. GASKIN (SB No. 203625)
Email: jgaskin@orrick.com
AMY M. ROSS (SB No. 215692)
Email: aross@orrick.com
DANIELLE P. VAN WERT (SB No. 218245)
Email: dvanwert@orrick.com
ERIN H. REDING (SB No. 252691)
Email: ereding@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
The Orrick Building
405 Howard Street
San Francisco, CA 94105-2669
Telephone:    (415) 773-5700
Facsimile:    (415) 773-5759

Attorneys for Defendants
FormFactor, Inc., Igor Y. Khandros, Ronald C. Foster,
Richard M. Freeman and Joseph Bronson

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| DANNY McCASLAND, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>FORMFACTOR, INC., IGOR Y. KHANDROS, RONALD C. FOSTER, RICHARD M. FREEMAN and JOSEPH BRONSON,<br><br>Defendants. | **Case No. 3:07-cv-05545-SI**<br><br>**(CONSOLIDATED)**<br><br><u>**CLASS ACTION**</u><br><br>**[CORRECTED]**<br><br>**REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' CONSOLIDATED AMENDED COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS**<br><br>Date:         July 25, 2008<br>Time:         9:00 A.M.<br>Judge:        Honorable Susan Illston<br>Courtroom:    10, 19th Floor |

OHS West:260455823.2

REPLY MEMO OF P&A ISO MOTION TO DISMISS
PLAINTIFFS' CAC FOR VIOLATIONS OF FEDERAL
SECURITIES LAWS - (CASE NO. 3:07-cv-05545-SI)

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................................ 1

ARGUMENT ....................................................................................................................... 1

I.     The Opposition Underscores Plaintiffs' Failure To Plead The Detail And
Corroboration Necessary To Avoid Dismissal .......................................................... 1

     A.     The Opposition Disregards Controlling Law ..................................................... 1

     B.     The Opposition Fails To Refute Defendants' Demonstration Regarding
"Confidential Witnesses," Meetings and Reports ............................................... 3

     C.     Plaintiffs' Attempt To Bolster Their Allegations Of Accounting Fraud
Falls Far Short Of The Mark .............................................................................. 4

           1.     Plaintiffs Fail To Address The Controlling Cases Cited In The
Motion .................................................................................................... 4

           2.     The Existence Of A Restatement Provides No Basis For An
Inference Of Fraud ................................................................................. 5

           3.     The CAC Alleges No Facts That Could Support An Inference Of
Accounting Fraud ................................................................................... 6

                 a.     The Nature Of The Restatement Refutes Any Suggestion
That It Resulted From "Manipulation" ........................................ 6

                 b.     FormFactor Could Not Have "Hidden" Scrap Or Poor
Yields By Manipulating Financial Statements .............................. 7

                 c.     Plaintiffs' Concession That R&D Expense Was Not
Restated Demolishes Their Theory Of Fraud ............................... 8

           4.     Plaintiffs' Assertions Regarding Internal Controls And Sarbanes-
Oxley Certifications Provide No Basis For Alleging Securities
Fraud ..................................................................................................... 9

     D.     Plaintiffs Cannot Plead Falsity Or Scienter Regarding  Harmony ...................... 10

           1.     Plaintiffs' Attempt To Use The Restatement As Support For Their
Harmony Claims Falls Flat .................................................................... 10

           2.     Plaintiffs Mischaracterize Harmony And  FormFactor's Statements
Regarding Harmony ............................................................................... 11

           3.     Companies Are Not Required To Make Detailed Disclosures
Regarding Operational Difficulties ........................................................ 13

OHS West:260455823.2

i

REPLY MEMO OF P&A ISO MOTION TO DISMISS
PLAINTIFFS' CAC FOR VIOLATIONS OF FEDERAL
SECURITIES LAWS - (CASE No. 3:07-CV-05545-SI)

1

**TABLE OF CONTENTS**
**(continued)**

2
Page

3    II.    The Opposition Ignores Defendants' Demonstration That Dismissal Is Required
          Under The Weighing Analysis Mandated By *Tellabs* And *Gompper* ............................. 13

4

5          A.    The Opposition Miscasts Defendants' Argument And Seeks To Evade It   ........ 14

6          B.    The Arguments Plaintiffs Ignore Are Unrefuted And Decisive........................... 14

7                1.    Plaintiffs' Theory Of Fraud Is Implausible And Unreasonable
                       When Viewed In Isolation ........................................................................ 14

8                2.    Any Inference Of Fraud Is Overwhelmed By Nonculpable
                       Inferences   ................................................................................................ 15

9
     III.   The Opposition Fails To Undermine Defendants' Demonstration Regarding Stock
10          Sales ................................................................................................................................ 15

11          A.    Dr. Khandros' Trading Is Also Exculpatory ....................................................... 16

12   IV.    The Opposition Fails To Undermine Defendants' Demonstration Regarding
            Forward-Looking Statements   ......................................................................................... 17

13   CONCLUSION ........................................................................................................................ 17

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

# TABLE OF AUTHORITIES

2

Page(s)

3

## <u>CASES</u>

4

5

*Heliotrope General Inc., v. Ford Motor Co.,*
189 F.3d 971 (9th Cir. 1999) ..................................................................................... 3

6

*In re Apple Computer, Inc.,*
127 Fed. Appx. 296 (9th Cir. 2005) ........................................................................... 2

7

8

*In re Autodesk, Inc. Sec. Litig.,*
132 F. Supp. 2d 833 (N.D. Cal. 2000) ....................................................................... 2

9

10

*In re CNET Networks, Inc.,*
483 F. Supp. 2d 947 (N.D. Cal. 2007) ....................................................................... 7

11

*In re Computer Assoc. Class Action Sec. Litig.,*
75 F. Supp. 2d 68 (1999) ............................................................................................ 5

12

13

*In re Connetics Corp. Sec. Litig.,*
542 F. Supp. 2d 996 (N.D. Cal. 2008) .............................................................. 4, 5, 13

14

*In re Convergent Tech. Sec. Litig.*
948 F.2d 507 (9th Cir. 1991) .................................................................................... 13

15

16

*In re Cornerstone Propane Partners L.P.,*
355 F. Supp. 2d 1069 (N.D. Cal. 2005) ..................................................................... 7

17

18

*In re CV Therapeutics, Inc.,*
2004 WL 1753251 (N.D. Cal Aug. 5, 2004) .............................................................. 2

19

*In re Cylink Sec. Litig.,*
178 F. Supp. 2d 1077 (N.D. Cal. 2001) ..................................................................... 5

20

21

*In re FoxHollow Tech., Inc. Sec. Litig.,*
2008 WL 2220600 (N.D. Cal. May 27, 2008) ........................................................... 3

22

23

*In re GlenFed, Inc. Sec. Litig.,*
42 F.3d 1541 (9th Cir. 1994) ..................................................................................... 1

24

*In re Harmonic, Inc.,*
2002 WL 31974384 (N.D. Cal. Nov. 13, 2002),
*aff'd in part, rev'd in part, on other grounds*, 152 Fed. Appx. 674 (9th Cir.
2005) ........................................................................................................................... 4

25

26

27

*In re InterMune, Inc.,*
2004 WL 1737264 (N.D. Cal. July 30, 2004) ........................................................... 1

28

OHS West:260455823.2                                    iii

REPLY MEMO OF P&A ISO MOTION TO DISMISS
PLAINTIFFS' CAC FOR VIOLATIONS OF FEDERAL
SECURITIES LAWS - (CASE NO. 3:07-CV-05545-SI)

1

**TABLE OF AUTHORITIES**
(continued)

2

Page(s)

3

*In re Invision Techs., Inc. Sec. Litig.*,

4

2006 WL 538752 (N.D. Cal. Jan. 24, 2006) ........................................................ 10

5

*In re Juniper Networks, Inc. Sec. Litig.*,
2004 WL 540910 (N.D. Cal. Mar. 11, 2004), *aff'd*, 158 Fed. Appx. 899

6

(9th Cir. 2005).................................................................................................... 1, 5

7

*In re LDK Solar Sec. Litig.*,
2008 WL 2242185 (N.D. Cal. May 29, 2008) .................................................. 4, 8

8

*In re Ligand Pharms., Inc. Sec. Litig.*,

9

2005 WL 2461151 (S.D. Cal. Sept. 27, 2005) ...................................................... 2

10

*In re Northpoint Commc'n Group, Inc., Sec. Litig.*,

11

184 F. Supp. 2d 991 (N.D. Cal. 2001) ................................................................... 4

12

*In re Pac. Gateway Exch., Inc. Sec. Litig.*,
169 F. Supp. 2d 1160 (N.D. Cal. 2001) ................................................................. 5

13

*In re PMC-Sierra, Inc. Deriv. Litig.*,

14

2007 WL 2427980 (N.D. Cal. Aug. 22, 2007)....................................................... 7

15

*In re Read-Rite Corp.*,

16

335 F.3d 843 (9th Cir. 2003).................................................................................. 2

17

*In re Siebel Systems Inc., Sec. Litig.*,
2005 WL 3555718 (N.D. Cal. Dec. 28, 2005) ..................................................... 13

18

*In re Silicon Graphics, Inc. Sec. Litig.*,

19

183 F.3d 970 (9th Cir. 1999)............................................................................. 3,16

20

*In re Silicon Graphics*, *Inc. Sec. Litig.*,

21

970 F. Supp. 746 (N.D. Cal. 1997) ........................................................................ 7

22

*In re Software Pub. Sec. Litig.*,
1994 WL 261365 (N.D. Cal. Feb. 2, 1994) ........................................................... 1

23

*In re Splash Tech. Holdings, Inc. Sec. Litig.*,

24

160 F. Supp. 2d 1059 (N.D. Cal. 2001) ................................................................. 2

25

*In re Syncor Intern. Corp. Sec. Litig.*,

26

239 Fed. Appx. 318 (9th Cir. 2007)...................................................................... 15

27

*In re U.S. Aggregates, Inc. Sec. Litig.*,
235 F. Supp. 2d 1063 (N.D. Cal. 2002) ............................................................. 5, 7

28

OHS West:260455823.2

- iv -

REPLY MEMO OF P&A ISO MOTION TO DISMISS
PLAINTIFFS' CAC FOR VIOLATIONS OF FEDERAL
SECURITIES LAWS - (CASE NO. 3:07-CV-05545-SI)

1

2

**TABLE OF AUTHORITIES**
**(continued)**

Page(s)

3

4

*In re Vantive Corp. Sec. Litig.*,
   283 F.3d 1079 (9th Cir. 2002)................................................................. 16

5

*In re Worlds of Wonder Sec. Litig.*,
   35 F.3d 1407 (9th Cir. 1994)................................................................. 15

6

7

*Lipton v. Pathogenesis Corp.*,
   284 F.3d 1027 (9th Cir. 2002).............................................................. 3, 15

8

9

*Ronconi v. Larkin*,
   253 F.3d 423 (9th Cir. 2001)......................................................... 1, 3, 15, 16

10

*Rudolph v. UTStarcom*,
   _____F. Supp. 2d ____, 2008 WL 1734763 (N.D. Cal. Apr. 14, 2008)...................... 1, 5, 10

11

12

**STATUTES**

13

15 U.S.C.
   Section 78u-5 (I)(1)................................................................. 17

14

**RULES**

15

16

Federal Rules of Civil Procedure
   Rule 9(b) ........................................................................ 1

17

18

19

20

21

22

23

24

25

26

27

28

## INTRODUCTION

Plaintiffs' Opposition (the "Opposition" or "Opp.") does nothing to dislodge the showing set forth in Defendants' Motion to Dismiss ("Motion" or "MTD").  To the contrary, it underscores that dismissal is required <u>both</u> because the Consolidated Amended Complaint ("CAC") fails to allege either falsity or scienter with the requisite particularity, and because plaintiffs cannot possibly establish a strong inference of fraud under the weighing analysis mandated by *Tellabs* and *Gompper*.

## ARGUMENT

### I.    THE OPPOSITION UNDERSCORES PLAINTIFFS' FAILURE TO PLEAD THE DETAIL AND CORROBORATION NECESSARY TO AVOID DISMISSAL

#### A.    THE OPPOSITION DISREGARDS CONTROLLING LAW

The Opposition does not address, much less distinguish or refute, the dispositive law discussed at length in the Motion.  As defendants have shown (MTD pp. 2-5), plaintiffs cannot evade dismissal by serving up an undifferentiated "mosaic" of alleged facts. [1]  Nor can they point to the "totality of the circumstances" and claim that there must have been a fraud.

To the contrary, this Court and courts throughout the Ninth Circuit have repeatedly held that the Reform Act and Fed. R. Civ. P. 9(b) require plaintiffs to identify specific statements made by specific defendants, and to plead particularized facts showing how and why each such statement was materially false or misleading at the time it was made. [2]  To avoid dismissal the CAC must <u>also</u> plead highly particularized facts and corroborating details demonstrating that the specific defendants who made the identified statements did so with fraudulent intent. [3]

---

[1]    *See, e.g., In re Software Pub. Sec. Litig.*, 1994 WL 261365, at *3 (N.D. Cal. Feb. 2, 1994).

[2]    *See, e.g.,* MTD pp. 6-11; *In re GlenFed, Inc. Sec. Litig.*, 42 F.3d 1541, 1545 (9th Cir. 1994)110; *Ronconi v. Larkin*, 253 F.3d 423, 434 (9th Cir. 2001); *In re Juniper Networks, Inc. Sec. Litig.*, 2004 WL 540910, at *2-3 (N.D. Cal. Mar. 11, 2004) (Illston, J.), *aff'd*, 158 Fed. Appx. 899 (9th Cir. 2005).

[3]    *See, e.g.,* MTD pp. 8-9; *Rudolph v. UTStarcom*, _____F. Supp. 2d ____, 2008 WL 1734763, at *7 (N.D. Cal. Apr. 14, 2008) (Illston, J.); *In re InterMune, Inc.*, 2004 WL 1737264, at *7 (N.D. Cal. July 30, 2004) (Illston, J.) (plaintiffs should state specific false or misleading statements, describe the circumstances of the statement in great detail, provide specific evidence of its falsity, and facts that strongly support scienter).

1   These bedrock rules are at the core of the Reform Act. The CAC does not come close to

2   satisfying them, and plaintiffs proceed as if the requirements did not exist.

3   Perhaps most importantly, the Opposition fails to acknowledge the fact that the "collective

4   scienter" theory relied upon in the CAC has been "squarely rejected" by the Ninth Circuit. *See*

5   MTD pp. 8-9; *In re Apple Computer, Inc.*, 127 Fed. Appx. 296, 303 (9th Cir. 2005); *In re CV*

6   *Therapeutics, Inc.*, 2004 WL 1753251, at *10 (N.D. Cal Aug. 5, 2004) (Illston, J.) (citing

7   *Nordstrom, Inc. v. Chubb & Son, Inc.*, 54 F.3d 1424, 1435 (9th Cir. 1995)). Plaintiffs are

8   required to plead scienter against an individual defendant under the rules outlined above in order

9   to state a claim against the corporation. *Id.* That is an impossible task for the CAC, which <u>barely</u>

10  <u>mentions</u> the individual defendants.

11  Plaintiffs' attempt to paper over this pivotal defect by invoking the "group pleading"

12  doctrine is similarly misconceived. Even if group pleading applied (and it does not), the doctrine

13  would be unavailing. As demonstrated at pages 3-4 of the Reply Brief filed in support of the

14  separate motion to dismiss on behalf of Richard Freeman, the doctrine deals with attribution of

15  statements, and cannot be employed as a substitute for particularized facts demonstrating that

16  statements were made with fraudulent intent.

17  Unable to deal with the controlling law, the Opposition falls back on arguments that

18  highlight the canyon separating the CAC from a viable pleading. In addition to relying on

19  nonspecific allegations, collective scienter and group pleading, plaintiffs argue that they have

20  pled scienter based on defendants' corporate positions and "hands on" management style, and the

21  fact that a product that sustained production delays was "important" to the Company. Those

22  arguments have been systematically rejected by our courts.[4]

23

---

[4] Plaintiffs cannot meet the Reform Act's stringent requirements for pleading scienter via
24  allegations regarding corporate positions because any corporate officer could be said to
possess the requisite knowledge by virtue of his or her position. *See, e.g.*, *In re Autodesk, Inc.*
25  *Sec. Litig.*, 132 F. Supp. 2d 833, 844 (N.D. Cal. 2000); *In re Splash Tech. Holdings, Inc. Sec.*
*Litig.*, 160 F. Supp. 2d 1059, 1080 n.17 (N.D. Cal. 2001).
26
Nor can plaintiffs rely on the importance of a product to satisfy the specificity requirements of
27  the Reform Act. *See, e.g.*, *In re Read-Rite Corp.*, 335 F.3d 843, 848 (9th Cir. 2003); *In re*
*Ligand Pharms., Inc. Sec. Litig.*, 2005 WL 2461151, at *15 (S.D. Cal. Sept. 27, 2005) (a
28  product's importance does not impute awareness of all possible problems to all defendants).

---

2

**B.    THE OPPOSITION FAILS TO REFUTE DEFENDANTS' DEMONSTRATION REGARDING "CONFIDENTIAL WITNESSES," MEETINGS AND REPORTS**

The Opposition does not dispute the rule that to avoid dismissal plaintiffs must plead "countless specifics" and "corroborating details" with respect to the sources of information upon which they rely -- including confidential witnesses ("CWs"), meetings, conversations and internal memoranda and reports.[5]  Defendants demonstrated that the CAC alleges no such specifics or corroboration.  MTD pp. 6-11.  The MTD also pointed out the absence of any allegation that any CW interacted or communicated with any of the defendants, and that plaintiffs failed to allege that any defendant had any specific information from any source that contradicted any public statement made during the alleged class period.  See MTD pp. 9-11.  Although these conspicuous shortcomings were beaten like a drum, plaintiffs make no meaningful attempt to refute them.

Plaintiffs cannot contest the fact that the CAC hardly mentions defendants, either by title or name.  See MTD pp. 8-9 & n.14; CAC ¶¶ 65-67.  Nor can they challenge the fact that the purported witnesses referred to in the CAC are low-level employees who (i) did not communicate or interact with any defendant in any way, shape or form, and (ii) are not alleged to have heard or read anything that any defendant stated or wrote.  See MTD pp. 10-11.[6]  As defendants pointed out, only <u>four</u> paragraphs in the CAC so much as <u>refer to</u> meetings, documents or reports, and those references add nothing of substance.  See MTD p. 9 & n. 14; CAC ¶¶ 65-67, 70.  A plaintiff must detail "the sources of her information with respect to the reports, how she learned of the reports, who drafted them, [and] which officers received them," and provide "an adequate description of their contents."  *Silicon Graphics*, 183 F.3d at 985; *accord Lipton v. Pathogenesis Corp.*, 284 F.3d 1027, 1036 (9th Cir. 2002).  The CAC (¶¶ 65-67) makes no pretense of complying with these requirements.  It merely refers generically to an "inventory valuation report," without providing dates, timeframes, sources or other basic information.

---

[5]  *See, e.g.*, *In re Silicon Graphics*, *Inc. Sec. Litig.*, 183 F.3d 970, 984-85 (9th Cir. 1999); *Heliotrope General Inc., v. Ford Motor Co.*, 189 F.3d 971, 979-80 (9th Cir. 1999); *Ronconi*, 253 F.3d at 432; *In re FoxHollow Tech., Inc. Sec. Litig.*, 2008 WL 2220600, at *23-24 (N.D. Cal. May 27, 2008).

[6]  *See In re FoxHollow*, 2008 WL 2220600, at *30 (dismissing complaint pleading CW allegations by executives who were not alleged to have been "in the room" when key meetings took place).

---

1    Most importantly, plaintiffs allege <u>nothing whatsoever</u> regarding the <u>contents</u> of the

2    nondescript report -- much less how it might support their accusations of fraud.  Paragraphs 65-67

3    and 70 of the CAC provide no details regarding any document, conversation or meeting, and no

4    specific information contradicting any public statement by any defendant.  *See*, *e.g*., *In re*

5    *Harmonic, Inc.*, 2002 WL 31974384, at *11 (N.D. Cal. Nov. 13, 2002), *aff'd in part, rev'd in*

6    *part, on other grounds*, 152 Fed. Appx. 674 (9th Cir. 2005); *In re Northpoint Commc'n Group,*

7    *Inc., Sec. Litig*., 184 F. Supp. 2d 991, 997 (N.D. Cal. 2001).[7]  Plaintiffs' reliance on the

8    conclusory assertion that on unspecified dates unspecified defendants "directed" unspecified

9    employees to hide manufacturing issues and manipulate FormFactor's accounting (see, e.g., Opp.

10   p. 23; CAC ¶¶ 11, 70 & p. 23) is similarly unavailing.  This Court has soundly rejected attempts

11   to rely on such allegations, even when they are far more detailed than those at issue here.  *See In*

12   *re Connetics Corp. Sec. Litig.,* 542 F. Supp. 2d 996, 1008 (N.D. Cal. 2008).

**C.    PLAINTIFFS' ATTEMPT TO BOLSTER THEIR ALLEGATIONS OF ACCOUNTING FRAUD FALLS FAR SHORT OF THE MARK**

**1.    PLAINTIFFS FAIL TO ADDRESS THE CONTROLLING CASES CITED IN THE MOTION**

16   The Opposition also ignores the well-settled law governing allegations of accounting

17   fraud.  See MTD pp. 12-18.  Impressionistic pleadings and references to the "totality of the

18   circumstances" do not cut it.  To provide the "'who, what, when, where and how' required by the

19   PSLRA," plaintiffs must <u>specifically identify</u> fraudulent transactions and dollar amounts, and

20   provide <u>specific information</u> regarding the role that <u>each</u> defendant allegedly played in connection

---

[7]   *In re LDK Solar Sec. Litig.,* 2008 WL 2242185 (N.D. Cal. May 29, 2008), discussed at length in the Opposition, is illuminating because it demonstrates what is required, and conspicuously absent here.  In that case, the company hired an expert for the specific purpose of investigating problems that were the subject of the complaint.  *Id.*, at *2.  The individual, who is referred to in the opinion as a "whistleblower," repeatedly communicated specific information to the CEO and the CFO that was directly contrary to the executives' public statements.  *Id*., at *4.  The complaint further specified a multitude of detailed communications that the whistleblower had with senior management, including specific emails, phone calls and conferences, and included specific dates, names of recipients/attendees, and names of individuals involved.  *Id*., at *7-15.  The CAC makes no pretense of pleading <u>any</u> such facts.

OHS West:260455823.2                                          4

REPLY MEMO OF P&A ISO MOTION TO DISMISS
PLAINTIFFS' CAC FOR VIOLATIONS OF FEDERAL
SECURITIES LAWS - (CASE NO. 3:07-CV-05545-SI)

1    with the accounting fraud.[8]  Moreover, those particularized facts must demonstrate "that:

2    (i) [defendants knew that] specific accounting decisions were improper; and (ii) the defendants

3    knew specific facts at the time that rendered their accounting determinations fraudulent."

4    *Rudolph*, 2008 WL 1734763, at *6.

5          Plaintiffs do not -- and cannot -- challenge these well-established pleading requirements,

6    which are ignored in the Opposition.  The best they can do is suggest that they should be excused

7    from complying with them, because the information they hope will support their accusations is

8    within defendants' control.  Opp. pp. 20-21.  That appeal cannot be squared either with case law,

9    or with the core purposes of the Reform Act, which rewrote the rules to require plaintiffs to plead

10   highly particularized facts without resorting to discovery.  See MTD pp. 4-5. [9]

11          **2.    THE EXISTENCE OF A RESTATEMENT PROVIDES NO BASIS
              FOR AN INFERENCE OF FRAUD**

12

13          Plaintiffs' assertion that the fact of a restatement supports an inference of scienter (Opp.

14   pp. 27-28) collides with a mountain of controlling authority to the contrary.[10]  *In re Cylink Sec.*

15   *Litig.*, 178 F. Supp. 2d 1077 (N.D. Cal. 2001), the principal case relied upon in the Opposition,

16   provides no support for that remarkable position.  Indeed, the opinion states:  "[t]o be sure,

17   allegations of a failure to follow GAAP, standing alone, do <u>not</u> create a strong inference of

18   scienter."  *Id*. at 1082 (emphasis added).  The *Cylink* plaintiffs pled particularized facts regarding

19
20   [8]   *See, e.g., In re Juniper*, 2004 WL 540910, at *3; *In re Pac. Gateway Exch., Inc. Sec. Litig.*,
           169 F. Supp. 2d 1160, 1167 (N.D. Cal. 2001); *In re Connetics,* 542 F. Supp. at 1011.

21   [9]   The cases relied on by plaintiffs do nothing to support their position, as all are outside the
22         Ninth Circuit and at least one pre-dates the Reform Act.  As further proof that plaintiffs'
           argument is off-the-mark, one of the cases relied on by plaintiffs states the <u>exact same</u> standard
23         for pleading accounting fraud put forth by defendants in their MTD.  *See In re Computer*
           *Assoc. Class Action Sec. Litig.,* 75 F. Supp. 2d 68, 72-73 (1999) (plaintiffs alleged "a number
24         of statements made by defendants, detailing the who, what, where, when, and how of the
           fraudulent statements . . .").

25   [10]  *See, e.g., Rudolph*, 2008 WL 1734763, at *6 ("The mere publication of inaccurate accounting
26         figures, or a failure to follow GAAP, without more, does not establish scienter.") (internal
           citations omitted); *In re Connetics*, 542 F. Supp. at 1012 (A restatement's acknowledgements
           of GAAP violations are not enough to show scienter); *In re U.S. Aggregates, Inc. Sec. Litig.*,
27         235 F. Supp. 2d 1063, 1073 (N.D. Cal. 2002) (GAAP violations and the resulting restatements
           did not raise a strong inference of scienter when plaintiffs failed to plead particularized
28         allegations suggesting defendants knew of violations.).

major GAAP violations, including dates of transactions, amounts of revenues and earnings overstated, and the specific products and identities of those involved in individual transactions. *Id.* at 1082.  That is precisely what the CAC <u>fails</u> to do.  See pp. 1-3 above; MTD pp. 12-13.

### 3.    THE CAC ALLEGES NO FACTS THAT COULD SUPPORT AN INFERENCE OF ACCOUNTING FRAUD

#### a.    THE NATURE OF THE RESTATEMENT REFUTES ANY SUGGESTION THAT IT RESULTED FROM "MANIPULATION"

As defendants have shown (MTD pp. 2-3, 17-18), the nature of the restatement itself shows clearly that it was not the product of a fraudulent scheme.  No one would "manipulate" numbers to achieve such results, which run directly counter to plaintiffs' theory of fraud.  Among other things, earnings and gross margins were <u>lower</u> than they should have been when plaintiffs claim defendants were inflating them to reap insider trading profits, and costs of revenue were too <u>high</u> when the CAC alleges they were <u>under</u>stated to hide Harmony manufacturing and low yields.  Plaintiffs have nothing to say about these glaring contradictions -- which were clearly and repeatedly explained in the MTD (pp. 17-19) -- because there is nothing they <u>can</u> say.  The fact that the CAC's accusations fly in the face of the restatement plaintiffs seek to exploit is decisive; and the Opposition's attempts to direct attention elsewhere are wholly unavailing.

Citing paragraph 81 of the CAC, plaintiffs proclaim that PwC "caught onto" the supposed fraudulent scheme and forced the restatement.  Opp. pp. 8-9.  A review of paragraph 81 quickly reveals that the CAC makes no such allegations.  Moreover, the fact that PwC was intimately involved in the restatement, and concurred in the Audit Committee's conclusion that the inventory valuation errors resulted from the failure of low-level employees to follow Company procedures (see RJN, Ex. 2, p. 1), shows that PwC concluded that there <u>was no</u> such scheme.

The Opposition's attempt to rely on the Audit Committee's conclusion that FormFactor failed to follow certain accounting policies (Opp. p. 29), but reject the concomitant conclusion that the failure occurred at a low level without the knowledge of FormFactor's management, is similarly baseless.  Plaintiffs have pled no facts to contradict the conclusion they seek to jettison, which is fatal because Ninth Circuit law requires them to plead such facts "in great detail."  Nor

REPLY MEMO OF P&A ISO MOTION TO DISMISS PLAINTIFFS' CAC FOR VIOLATIONS OF FEDERAL SECURITIES LAWS - (CASE No. 3:07-CV-05545-SI)

1   can they simultaneously embrace the portions of the statement they like and reject the balance:

2   "Plaintiffs are not entitled to pick and choose which of defendants' statements in public

3   documents favor them and have all others ignored." *In re CNET Networks, Inc.*, 483 F. Supp. 2d

4   947, 966 (N.D. Cal. 2007).[11]

5          Ronald Foster's resignation as CFO does not provide an iota of support for plaintiffs'

6   assertions of fraud.[12]  That is particularly true because, in contrast to many recent cases, the

7   independent investigation that preceded his departure concluded that he did <u>not</u> engage in any

8   wrongdoing.  See RJN Ex. 2, p. 1.

9                         **b.    FORMFACTOR COULD NOT HAVE "HIDDEN" SCRAP OR
                                POOR YIELDS BY MANIPULATING FINANCIAL STATEMENTS**

10

11         Plaintiffs' claims of accounting fraud are also fundamentally insupportable because they

12  are founded upon nonsequitur.  The Opposition repeatedly asserts that because defendants wanted

13  to "create the appearance that the Company was successfully ramping its Harmony products,"

14  they engaged in "deliberate accounting manipulation to hide accumulated scrap" by falsifying

15  inventory and R&D accounts.  Opp. p. 7.[13]  That assertion is a non-starter.  FormFactor could not

16  have "hidden" scrap by manipulating its financial statements -- whether by falsifying inventory

17  and R&D accounts or otherwise -- even if it wanted to do so.[14]

18         FormFactor could not "create the appearance" of a successful Harmony ramp by

19  _____

[11]  *Accord In re PMC-Sierra, Inc. Deriv. Litig.*, 2007 WL 2427980, at *5 (N.D. Cal. Aug. 22,

20   2007) (plaintiffs could not rely on accuracy of internal investigation finding that certain stock
     options had been incorrectly dated, while discounting portion of investigation expressly

21   concluding that there had been no intentional wrongdoing); *In re Silicon Graphics, Inc., Sec.
     Litig.*, 970 F. Supp. 746, 758-59 (N.D. Cal. 1997), *aff'd*, 183 F.3d 970 (9th Cir. 1999)

22   (plaintiffs, having relied on sections of defendants' SEC filings in their arguments, could not
     object when defendants referred to the same information in their defense.).

23  [12]  *See, e.g., In re US Aggregates,* 235 F. Supp. 2d at 1073-74 (allegations of personnel changes –

24   including the termination of the CFO – in the wake of a business set-back provided no basis
     for alleging fraud); *In re Cornerstone Propane Partners L.P.*, 355 F. Supp. 2d 1069, 1092-93

25   (N.D. Cal. 2005) ("[m]ost major stock losses are often accompanied by management
     departures, and it would be unwise for courts to penalize directors for these decisions.").

26  [13]  See, *e.g.*, Opp. pp. 1-2, 7-9, 19, 20, 26, 28; CAC ¶¶ 12, 17, 68, 69, 72, 89, 97, 105, 115, 126,

27   136, 144, 179-199.

[14]  Moreover, as demonstrated in the Motion, it is proper to include "scrap" within the category of
28   R&D expense under certain conditions.  See MTD p. 14; RJN Ex. 6 at ¶ 9.

1    manipulating its accounting.  No one would look to FormFactor's financial statements to learn

2    how much scrap was being generated or make judgments about the Harmony ramp.  Any such

3    endeavor would be fruitless in any event.  Scrap is not listed, quantified or described in the

4    Company's financial statements.[15]  The inventory and R&D expense items that purportedly

5    served as the instruments of concealment convey <u>no information whatsoever</u> regarding scrap or

6    manufacturing yields.[16]  Those dots simply do not connect.

7            Nor is there any basis for plaintiffs' attempt to equate lower inventory valuations with

8    lower manufacturing yields.  Indeed, the <u>opposite</u> is often true:  <u>higher</u> yields frequently result in

9    inventory write-offs and <u>lower</u> inventory valuations.  As FormFactor explained in the earnings

10   call transcripts quoted in the CAC, the Company orders custom components that must be written

11   off as excess or obsolete inventory if manufacturing yields are <u>better</u> than projected.[17]

12                          c.      PLAINTIFFS' CONCESSION THAT R&D EXPENSE WAS NOT
13                                  RESTATED DEMOLISHES THEIR THEORY OF FRAUD

14           Plaintiffs' concession that R&D expense was not affected by the restatement strikes

15   another fatal blow to the CAC.  Although plaintiffs now deny ever suggesting that R&D expense

16   was part of the restatement, the CAC tells a different story.  The devastation of their claims is

17   inescapable in any event.

18   

19   [15]  In sharp contrast to the facts presented in the *LDK Solar* case mistakenly relied on by
        plaintiffs, scrap was an inconsequential part of FormFactor's business and would be of no
20      interest to investors.  The scrap described in *LDK Solar* "was key to the company's overall
        value," and "critical to LDK's success," because it was the resource from which the company
21      manufactured its products.  2008 WL 2242185, at *3, 15.  LDK <u>purchased</u> scrap materials
        containing polysilicon, which was the key ingredient in the solar panels that accounted for all
22      of its sales.  *Id*., at *2-*4.  Accordingly, the amount of polysilicon scrap held in LDK's
        inventory was a critical asset reported on its balance sheet.  *Id*.  The scrap referred to in the
23      CAC is not an asset, not the key to FormFactor's value, and not critical to its success.

24   [16]  See RJN Ex. 2 at pp. 57-58, 62-63.

25   [17]  "We then have to value this inventory each quarter in light of anticipated customer demand,
        factory yields… and other factors.  It's actually a complex, multi-variable process, and in fact,
26      <u>better factory yields can end up generating unused and potentially un-needed material</u> in our
        custom environment. . . ."  See RJN Ex. 1 at p. 8 (emphasis added); *see also* RJN Ex. 33 at
27      pp. 10-11 ("[A]s a result of strong factory productivity… in a custom product marketplace,
        strong yields will outrun the planning yields we used to purchase materials.  And when that
28      happens, you can have <u>higher inventory write-offs</u>") (emphasis added).

1    The core of plaintiffs' overreaching accusations is that defendants overstated R&D

2    expenditures by transferring obsolete and excess inventory to R&D (purportedly to hide Harmony

3    manufacturing problems and the accumulation of scrap).  According to allegations repeated

4    throughout the CAC, [18] overstatement of R&D expense and the inventory valuation errors are two

5    sides of the same coin:  Inventory was misstated <u>because</u> scrap was transferred to R&D.

6    Overstatement of R&D expense is thus the mechanism through which plaintiffs claim

7    defendants perpetrated securities fraud.  If plaintiffs' allegations were well-founded, R&D

8    expense would <u>necessarily</u> have been overstated, and would <u>necessarily</u> have been an integral part

9    of the restatement.  Indeed, the CAC alleges both that this two-sided "scheme" was exposed in

10    the restatement, [19] and that inventory numbers (along with gross margins, cost of revenue and

11    earnings) were restated because obsolete inventory was improperly counted as R&D expense.[20]

12    Forced to acknowledge that the restatement had nothing to do with R&D expense -- and

13    that nothing "improperly transferred" to R&D was moved back to inventory -- plaintiffs are

14    reduced to arguing that the absence of a restatement of R&D expense "is not dispositive that the

15    numbers were not false."  Opp. p 19.  That feeble assertion misses the point.  Plaintiffs posited

16    inflation of R&D expense as the keystone of their fraud claims, and it has fallen out of the arch.

### 4.    PLAINTIFFS' ASSERTIONS REGARDING INTERNAL CONTROLS AND SARBANES-OXLEY CERTIFICATIONS PROVIDE NO BASIS FOR ALLEGING SECURITIES FRAUD

19    Plaintiffs' reliance on Sarbanes-Oxley certifications is similarly unfounded.  Opp. pp. 29-

20    30.  Ninth Circuit courts, including this Court, have repeatedly rejected attempts to plead scienter

---

[18]   See, *e.g.,* CAC ¶¶ 11, 51, 68-74, 89, 97, 105, 115, 126, 136; Opp. pp. 7-9, 19-21.  Plaintiffs assert that "defendants caused FormFactor to improperly transfer the cost associated with scrap as an R&D expense," and that the "scrap material should have been treated as excess or obsolete inventory and written off through the cost of revenues."  Opp. p. 20.

[19]   See, *e.g.,* CAC ¶ 83 ("as a result of the fraudulent scheme, the Company restated its inventory, gross margin, operating margin and net income for FY 2006, 1Q 2007 and 2Q 2007").

[20]   In describing the impacts of the restatement the CAC alleges, for example:  "But for defendants' deliberate improper reporting of their inventory valuation, <u>including counting of obsolete inventory as "R&D expense</u> . . . FormFactor would have only achieved a gross margin of 51.51% [the restated number], rather than 52.7% [the number reported prior to the restatement]."  CAC ¶ 105(h) & (i) (emphasis added); see also CAC ¶¶ 97(h) & (i); 115(h) & (i); 126 (h) & (i).

1   based upon internal control weaknesses and SOX certifications. *See, e.g., In re Invision Techs.,*

2   *Inc. Sec. Litig.,* 2006 WL 538752, at *7, n.3 (N.D. Cal. Jan. 24, 2006); *Rudolph,* 2008 WL

3   1734763, at *6; MTD p. 13, n. 22.

4          Confronted with that reality, the Opposition (pp. 18-19, 31-32) seeks refuge in rhetoric

5   that has no foundation in the CAC.  Plaintiffs conjure up "a complete breakdown" in

6   FormFactor's internal controls, but no such breakdown is alleged in the CAC.  Indeed, the

7   Opposition's newfound assertion is directly contradicted by the SEC filings upon which plaintiffs

8   rely, which refer to a narrow issue confined to a distinct part of the Company's operations.  The

9   Opposition's proclamations (p. 30) of "repeated restatements" and "ongoing manipulations," and

10  claims that the restatement was "based on the same material weakness" that existed prior to the

11  class period are also baseless.  The single allegation cited as support for this assertion (CAC

12  ¶ 43), provides no support whatsoever.  It refers to a minor restatement related to "a change in the

13  amortization schedule of stock-based compensation."  The follow-on that defendants "took

14  advantage of" that "pre-existing material weakness" "to hide the Company's ramp issues with

15  Harmony" (Opp. p. 2) is similarly untethered from the pleading at issue.

16      **D.**   **PLAINTIFFS CANNOT PLEAD FALSITY OR SCIENTER**
17           **REGARDING  HARMONY**

18        **1.**   **PLAINTIFFS' ATTEMPT TO USE THE RESTATEMENT AS**
           **SUPPORT FOR THEIR HARMONY CLAIMS FALLS FLAT**

19          As explained at pages 6-8 above, plaintiffs' untoward attempt to connect the restatement

20  to Harmony fails on multiple grounds.  No one would examine FormFactor's financial statements

21  to assess progress in ramping a new product, and the R&D and inventory accounts provide no

22  information regarding scrap or manufacturing yields in any event.  Plaintiffs now concede, as

23  they must, that the restatement did not affect R&D expense, the account plaintiffs claim was used

24  to "hide" Harmony ramp problems and decrease the cost of revenues.[21]  Moreover, the flow of the

25  restated numbers runs directly contrary to plaintiffs' fraud hypothesis.  According to the

26  restatement, and the allegations of the CAC, cost of revenue numbers reported by FormFactor

27  

28  [21]  See pp. 8-9 above.

were <u>over</u>stated during the period in which plaintiffs claim scrap and yield problems were "increasing exponentially."[22]  Far from providing support, the restatement thus <u>refutes</u> plaintiffs' accusations regarding Harmony.

### 2.    PLAINTIFFS MISCHARACTERIZE HARMONY AND FORMFACTOR'S STATEMENTS REGARDING HARMONY

Contrary to the impression conveyed by the Opposition and CAC, FormFactor sold hundreds of millions of dollars worth of products during the alleged class period, and Harmony was a small piece of the pie.  Indeed, Harmony was not "introduced to the market" until June 2006, and then only in a small portion of FormFactor's business.[23]  Although someone reading the CAC might think FormFactor should be renamed "The Harmony Company," the CAC, and documents upon which it is based, show that FormFactor had 11 consecutive quarters of record revenues and earnings (through Q3 2007) with no substantial contribution from Harmony.[24]

Delays in the Harmony ramp contributed to the interruption of that record, but, as the documents underlying the CAC make unmistakably clear -- and as the Company explained in statements that plaintiffs steadfastly ignore (see MTD pp. 21-22) -- deteriorating market conditions were the primary cause.  Moreover, contrary to plaintiffs' assertion (Opp. p. 3), Harmony has met no "demise"; shipments are in fact increasing substantially.[25]

Defendants have demonstrated in detail that plaintiffs' various pronouncements that FormFactor "promised" large volumes of Harmony probe cards,[26] and "falsely represented that the Company was doing well in ramping up its Harmony development and production,"[27] are refuted by the documents cited in the CAC.  In sharp contrast to plaintiffs' characterizations, those documents show that FormFactor provided investors with a steady stream of real-time disclosures regarding problems and delays in manufacturing, qualifying and commercializing

---

[22]  See pp. 6 above; MTD pp. 17-19.

[23]  Opp. p. 1; Supplemental Request for Judicial Notice ("Supp. RJN") Ex. 1 at p. 3, Ex. 2 at p. 3.

[24]  See MTD pp. 18-19 & n. 31.

[25]  Supp. RJN Ex. 4 at pp. 3-4, 11.

[26]  See, e.g., CAC ¶¶ 89(a), 97(a), 105(a), 115(a), 126(a), 136(a), 144(a).

[27]  CAC ¶ 220.

1    Harmony products.  MTD pp. 15-16 & note 24.[28]

2            Plaintiffs do not undertake the impossible task of challenging that demonstration; they

3    simply ignore it.  Their abject refusal to deal with what defendants <u>actually said</u> is typified by the

4    Opposition's (p. 15) characterization of FormFactor's February 5, 2008 statements as a "belated

5    admission" of difficulties regarding Harmony.

6            More than three months before the "belated admission" that FormFactor was encountering

7    difficulties in ramping Harmony to volume production, and after a series of <u>previous</u> disclosures,

8    FormFactor stated:  (i) that it was experiencing "Harmony production ramp constraints," (ii) that

9    the Company had thus far been unsuccessful in reaching a "high-volume production phase,"

10   (iii) that FormFactor was finding it "more difficult than planned to ramp Harmony into volume

11   production," (iv) that "a lot of hard work" would be required to ramp Harmony, and (v) that the

12   problems and delays were having adverse impacts on bookings and financial performance.[29]

13           In response to an analyst's questions CEO Khandros stated (on October 24, 2007):

14   "Right, so there are no two ways to say it; we are finding ramping Harmony more difficult than

15   anticipated."[30]  When another analyst noted that -- as FormFactor had disclosed on prior

16   occasions -- efforts to ramp Harmony had been the subject of delays, Dr. Khandros responded:

17   "You are correct; we are finding it more difficult to do."[31]  Dr. Khandros further explained that,

18   although other FormFactor products provided alternatives to Harmony, delays in the Harmony

19   ramp meant that some DRAM business "will go elsewhere."[32]

20           The Opposition attempts to dismiss these specific and unambiguous disclosures (and

21   numerous others) as "boilerplate" "risk warnings," and then changes the subject to "safe harbor

22   protection."  Opp. p. 17.  Plaintiffs also take statements about the ramp of a new <u>factory</u> (long

23   before FormFactor was manufacturing Harmony products) and miscast them as statements about

24   _____

25   [28]  RJN Exs. 1, 22, 23, 33, 34, 35, 36; Supp. RJN Ex. 3.

     [29]  RJN Ex. 1 at pp. 6, 7, 8, 10, 13, 14, 15, 16.

26   [30]  *Id*. p. 10.

27   [31]  *Id*. pp. 15-16.

28   [32]  *Id.* pp. 13-14.

1    Harmony.[33]

2    ### 3.    COMPANIES ARE NOT REQUIRED TO MAKE DETAILED
3    DISCLOSURES REGARDING OPERATIONAL DIFFICULTIES

4    Although FormFactor provided numerous disclosures and updates, it is clear that

5    companies are under no obligation to provide investors with operational details about the

6    development and production of a new product.[34]  Moreover, as defendants have shown (MTD

7    pp. 20-21), companies are entitled, and expected, to be optimistic when discussing the

8    development of new products -- even when the products run into difficulties.  *See, e.g., In re*

9    *Connetics*, 542 F. Supp. 2d at 1008.  The fact that hindsight shows that management may have

10    "underestimated the severity of such [developmental] problems," or was too optimistic in its

11    product assessments, does not constitute securities fraud.  *Id.*

12    These principles apply with special force to high-technology products, which are often on

13    the cutting edge of industry innovation and subject to set-backs and delays.  *See, e.g.*, *In re Siebel*

14    *Systems Inc., Sec. Litig.*, 2005 WL 3555718, at *4 (N.D. Cal. Dec. 28, 2005).  Plaintiffs cannot

15    plead scienter on the theory that, because a new product was important, defendants would have

16    kept themselves apprised of the details regarding its development.  *Id.*

17    ### II.    THE OPPOSITION IGNORES DEFENDANTS' DEMONSTRATION THAT
18    DISMISSAL IS REQUIRED UNDER THE WEIGHING ANALYSIS
19    MANDATED BY *TELLABS* AND *GOMPPER*

19    As defendants have shown, the weighing analysis mandated under *Tellabs* and *Gompper*

20    provides a separate and independently dispositive ground upon which the CAC must be

21    dismissed.  MTD pp. 16-23.  Even if plaintiffs had pled falsity and scienter with the requisite

22    

---

23    [33]   The statements (Opp. p. 13) that "manufacturing had transitioned through the most difficult
phase of the production ramp," "with output and yields improving steadily," have nothing to
24    do with Harmony.  They were made on February 1, 2006 (the first day of the alleged class
period), (i) nearly six months before Harmony was "introduced to the market" in June 2006
25    (Opp. p. 1), (ii) long before there was a Harmony ramp, and (iii) during a period in which
FormFactor was manufacturing <u>other</u> products -- not Harmony.

26    [34]   *See, e.g., In re Convergent Tech. Sec. Litig.*, 948 F.2d 507, 516 (9th Cir. 1991) (rejecting
27    plaintiff's contention that the Company had to "disclose [every detail about the] progress of
efforts to implement new mechanization structure" and holding that "generalized statements of
28    risk" were sufficient.).

---

1  particularity (instead of missing by a mile), dismissal would be appropriate because:  (i) their

2  theory of fraud is irrational, not cogent and compelling, before competing inferences are taken

3  into account, and (ii) any inference of fraud is overwhelmed by competing nonculpable

4  inferences.  Plaintiffs misconstrue defendants' argument, and fail to refute the showing on <u>either</u>

5  of these points.

### A.    THE OPPOSITION MISCASTS DEFENDANTS' ARGUMENT AND SEEKS TO EVADE IT

Rather than dealing forthrightly with arguments they cannot answer, plaintiffs miscast
defendants' position as contending that the CAC's "individual allegations" must be considered in
isolation when the Court evaluates scienter.  Opp. p. 22.  Having created that strawman, plaintiffs
label it a "fatal error," and take a pass on the arguments <u>actually</u> made in the Motion.
Defendants contend -- and have shown -- that plaintiffs' theory of fraud (not individual
allegations) is not cogent or compelling when viewed in isolation, i.e., before competing
explanations are added to the mix.  Defendants have further shown that the addition of
nonculpable explanations, each of which is more cogent and compelling than any inference of
fraud, tips the scienter balance even further.

### B.    THE ARGUMENTS PLAINTIFFS IGNORE ARE UNREFUTED AND DECISIVE

#### 1.    PLAINTIFFS' THEORY OF FRAUD IS IMPLAUSIBLE AND UNREASONABLE WHEN VIEWED IN ISOLATION

Plaintiffs' theory of fraud is dead on arrival when viewed in isolation, before alternative
explanations are added to the scales.  Among other things, plaintiffs' hypothesis has CFO Foster
manipulating FormFactor's financial statements to <u>de</u>flate the stock price at the time of his sales.
See MTD pp. 17-19.  Plaintiffs thus in effect allege that the CFO and CEO engaged in a scheme
to victimize themselves by <u>under</u>stating earnings.  In addition, as explained above, the CAC's
theory of fraud is predicated on a nonsequitur, on a restatement that contradicts its key assertions,
and on a scenario in which the "manipulated" numbers are running in the wrong direction.[35]

---

[35] The restatement of earnings, gross margins and costs of revenue run directly contrary to the
CAC's allegations regarding the Harmony ramp, manufacturing problems and the
accumulation of scrap that plaintiffs claim were misclassified as R&D expense.  See MTD pp.
17-19.  The fact that it would have been impossible for FormFactor to have "hidden" scrap and

1

## 2.    ANY INFERENCE OF FRAUD IS OVERWHELMED BY NONCULPABLE INFERENCES

2

3       Although plaintiffs' abject failure to allege a coherent and compelling theory of fraud

4   renders further analysis unnecessary, it is <u>also</u> clear that the theory articulated in the CAC is

5   overwhelmed by <u>multiple</u> nonculpable inferences that are far more coherent and compelling.  See

6   MTD pp. 19-23.  Among other things, the nature and scope of the restatement make clear that it

7   resulted from errors, not "manipulation."  The inferences that FormFactor underestimated

8   Harmony challenges, or mismanaged certain aspects of the Harmony development ramp are

9   plainly more compelling than any inference that defendants engaged in a complex scheme to

10  commit securities fraud.  Plaintiffs make no attempt to dispute defendants' detailed showing

11  regarding nonculpable inferences, which is decisive.

12  ### III.   THE OPPOSITION FAILS TO UNDERMINE DEFENDANTS' DEMONSTRATION REGARDING STOCK SALES

13      Although unusual or suspicious trading activity may raise an inference of scienter, insider

14  trading activity that is <u>not</u> unusual, or  "misses the boat" on advantageous timing, supports the

15  opposite inference: the insiders <u>lacked</u> scienter.[36]  As already demonstrated, the defendants

16  retained more than 88% of their shares, and sold relatively small amounts consistent with their

17  prior trades, at times removed from the period highs, and incurred drastically larger losses than

18  plaintiffs.  *See* MTD pp. 23-26; *In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1424-52 (9th

19  Cir. 1994).

20      Plaintiffs' claim that Mr. Foster sold 87.29% of his holdings is similarly baseless.[37]

21

22      low yields in the publicly reported numbers for R&D and inventory, and the fact that R&D expenses were not restated (see pp. 6-9 above), hammer two more nails into the coffin.

23  [36]  See MTD pp. 23-24; *see, e.g., Ronconi*, 253 F.3d at 435.  Likewise, the Ninth Circuit has
24  consistently dismissed the probative value of allegations regarding routine business incentives
    such as stock-based compensation.  *In re Syncor Intern. Corp. Sec. Litig.*, 239 Fed. Appx. 318,
25  321 (9th Cir. 2007) ("Stock-based bonuses are common and have limited probative value as to
    scienter").  *See also, Lipton*, 284 F.3d at 1038.

26  [37]  At most, Mr. Foster's eight sales cumulatively equal 25% of Mr. Foster's aggregate holdings
    at the time of his last sale (19,800 of 78,861 shares) and represent only 17.5% of his aggregate
27  holdings during the entirety of the alleged class period (19,800 out of 113,039 shares).  See
    RJN Ex. 28; Supp. RJN Ex. 5.  Although these percentages are irrelevant in light of Mr.
28  Foster's practice of drastically <u>increasing</u> his holdings, they also fall short of levels courts in

1   FormFactor's CFO in fact tripled his holdings during the purported class period.  CAC ¶ 27;

2   MTD p. 25.  From 2006 to 2007, Mr. Foster increased his holdings of shares and <u>vested</u> options

3   from 33,015 to 64,461 -- despite his sales.  See RJN Ex. 27; Supp. RJN Ex. 5.  From 2007 to

4   early 2008, Foster further increased his holdings to 102,832 shares and vested options.  RJN

5   Ex. 28.  Moreover, the fact that nearly 75% of his sales occurred during a period in which

6   FormFactor's gross margins and earnings were <u>under</u>stated, not inflated, affirmatively refutes any

7   inference of fraud.  See MTD pp. 24-25.

8           The Opposition does not, and cannot, dispute the fact that Mr. Bronson made a single sale

9   of 25,000 shares on May 1, 2006, <u>twenty-one months</u> before the alleged revelation of the

10  supposed fraud on February 5, 2008.  CAC ¶¶ 174, 175.  FormFactor's 2006 proxy conclusively

11  demonstrates that the sale encompassed 17% (not 36.83%) of the 145,779 shares and vested

12  options he held on that date.  See RJN Ex. 27.  During the alleged class period FormFactor's

13  stock price was higher than the price at which Mr. Bronson sold his stock on 141 subsequent

14  days.  See MTD pp. 25-26.  These facts further refute plaintiffs' accusations of insider trading and

15  fraud.

16          **A.    <u>DR. KHANDROS' TRADING IS ALSO EXCULPATORY</u>**

17          Dr. Khandros' stock sales were made entirely pursuant to a pre-existing, pre-set trading

18  plan, and thus could not reflect his contemporaneous mental state.[38]  MTD pp. 26-27.  Even if

19  they had <u>not</u> been made pursuant to a 10b5-1 plan, Khandros' sales would provide no support for

20  any inference of fraud because they plainly are not suspicious in timing or amount.

21          During the two years covered by the alleged class period, Dr. Khandros' sales were

22  slightly lower than in prior periods during which plaintiffs level no accusations of insider trading

23  or securities fraud, and accounted for less than 24% of his holdings.  See CAC ¶ 175; MTD p. 26.

24  *See, e.g., In re Vantive*, 283 F.3d at 1094 ("It is not inherently alarming or unusual that an insider

25  _____

26          this Circuit find probative of scienter.  MTD pp. 24, 26; *Ronconi* 253 F. 3d at 435-36; *In re*
        *Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1092-93 (9th Cir. 2002).

27  [38] Plaintiffs' attempt to exclude exculpatory facts from publicly-disclosed documents such as Dr.
        Khandros' 10b5-1 plans is contrary to controlling case law.  *See, e.g., Silicon Graphics,* 183

28      F.3d at 986 (taking proper judicial notice of Forms 4 filed with the SEC).

might sell a quarter of his holdings over the course of 15 months, particularly in a volatile industry."). Moreover, the sales were made at an average price of $11 below the class period high. See RJN Ex. 25.[39]

## IV. THE OPPOSITION FAILS TO UNDERMINE DEFENDANTS' DEMONSTRATION REGARDING FORWARD-LOOKING STATEMENTS

As demonstrated above and in the MTD, dismissal of the CAC does not turn on the characterization of any statement as forward-looking. Plaintiffs' allegations fall far short of the mark under the rigorous standards applicable to all statements.

Moreover, the Opposition does not, and cannot, dispute the fact that FormFactor's financial projections, including the future plans and objectives of management and the assumptions underlying or relating to such statements, are forward-looking as defined in the Reform Act. See 15 U.S.C. 78u-5 (I)(1); MTD p. 28. Furthermore, although the Opposition devotes a great deal of effort (pp. 12-14) to the proposition that statements regarding Harmony were not forward-looking, statements phrased in the present tense are deemed forward-looking if their verification depends in whole or in part on future events. See MTD p. 28. Because Harmony was in a state of ongoing development during the class period, most of the statements at issue fall into that category.

## CONCLUSION

For all of the foregoing reasons, the CAC should be dismissed with prejudice.

Dated: June 24, 2008                    ORRICK, HERRINGTON & SUTCLIFFE LLP


                                        _/s/ Robert P. Varian_
                                        Robert P. Varian
                                        Attorneys for Defendants
                                        FormFactor, Inc., Igor Y. Khandros, Ronald C. Foster,
                                        Richard M. Freeman and Joseph Bronson

---

[39] The contention that Dr. Khandros made 32 trades in September and October of 2007 is also misleading. Dr. Khandros' September 17, 2007 trade was executed in 30 separate transactions of as little as 100 shares -- leaving just 3 actual trades, which is neither suspicious nor unusual. Compare Opp. p. 33 to CAC ¶177. Further, these 3 trades comprised less than 10% of his period sales -- exactly what one would expect from a two month slice of a two year period.

REPLY MEMO OF P&A ISO MOTION TO DISMISS PLAINTIFFS' CAC FOR VIOLATIONS OF FEDERAL SECURITIES LAWS - (CASE No. 3:07-CV-05545-SI)