# EXHIBIT B

LEXSEE 2008 U.S. DIST. LEXIS 52365

**LAURI S. BATWIN, ETC.; ET AL. v. OCCAM NETWORKS, INC.; ET AL.**

**Case No. CV 07-2750 CAS (SHx)**

**UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF
CALIFORNIA**

*2008 U.S. Dist. LEXIS 52365*

**July 1, 2008, Decided
July 1, 2008, Filed**

**COUNSEL:** [*1] Attorneys Present for Plaintiff: Not
Present.

Attorneys Present for Defendants: Not Present.

**JUDGES:** Honorable CHRISTINA A. SNYDER.

**OPINION BY:** CHRISTINA A. SNYDER

**OPINION**

Proceedings: (In Chambers): OCCAM DEFEN-
DANTS' MOTION TO DISMISS (filed 01/25/08)

(In Chambers): DEFENDANT PRICE
WATERHOUSECOOPERS, LLP'S MO-
TION TO DISMISS CONSOLIDATED
COMPLAINT (filed 1/25/08)

(In Chambers): DEFENDANT
SINGER LEWAK GREENBAUM &
GOLDSTEIN, LLP'S MOTION TO
DISMISS CONSOLIDATED COM-
PLAINT (filed 01/25/08)

(In Chambers): DEFENDANT
THOMAS WEISEL PARTNERS LLC'S
MOTION TO DISMISS PLAINTIFF'S
CONSOLIDATED COMPLAINT (filed
01/25/08)

(In Chambers): NVP DEFEN-
DANTS' MOTION TO DISMISS CON-
SOLIDATED COMPLAINT FOR VIO-
LATION OF FEDERAL SECURITIES
LAWS (filed 01/25/08)

(In Chambers): USVP DEFEN-
DANTS' MOTION TO DISMISS THE
CONSOLIDATED COMPLAINT FOR
SECURITIES LAWS (filed 01/30/08)

**I. INTRODUCTION**

On April 26, 2007, Lauri S. Batwin ("Batwin"), on
behalf of herself and all others similarly situated, filed a
complaint against defendants Robert L. Howard-
Anderson ("Howard-Anderson"), Christopher B. Farrell
("Farrell"), and Occam Networks, Inc. ("Occam"). On
July 30, 2007, the Court consolidated this action with
Benjamine v. Occam Networks, Inc., CV-07-3226 CAS
[*2] (SHx), designating NECA-IBEW Pension Fund
(The Decatur Plan) as lead plaintiff.

On November 16, 2007, plaintiff filed a consoli-
dated complaint against (1) Occam, Howard-Anderson,
Farrell, Howard Bailey ("Bailey"), Steven M. Krausz
("Krausz"), Robert B. Abbott ("Abbott"), Robert E. By-
lin ("Bylin"), Thomas E. Pardun ("Pardun"), Kenneth R.
Cole ("Cole"), and Brian Strom ("Strom") (collectively,
"the Occam defendants"); (2) PricewaterhouseCoopers
LLP ("PwC"); (3) Singer Lewak Greenbaum & Gold-
stein LLP ("Singer Lewak"); (4) Thomas Weisel Part-
ners, LLC ("Thomas Weisel"); (5) USVP5 and USVP7
(collectively, "the USVP defendants"); and (6) NVP VIII
and NVP-E VIII (collectively, "the NVP defendants"). [1]

1    The consolidated complaint erroneously
names U.S. Venture Partners as a party defendant
in place of the USVP defendants. See USVP
Defs' Motion 1 n.1.

It appears that the consolidated complaint er-
roneously names Norwest Venture Partners as a
party defendant in place of the NVP defendants.
NVP Defs' Motion v n.1.

Plaintiff sues on behalf of a putative class consisting of all persons and entities who purchased the common stock of Occam between April 29, 2004 and October 15, 2007, inclusive ("the Class [*3] Period"). Compl. P 1. Plaintiff alleges that on November 2, 2006, and February 1, 2007, it purchased Occam stock issued pursuant to the registration statement and prospectus filed with the Securities and Exchange Commission ("SEC") on October 13, 2006 and deemed effective on November 7, 2006. Id. PP 1, 30; see Declaration of Tricia L. McCormick in Support of Pl.'s Mot. to Consolidate Related Actions P 3, Ex. A [Certification of Named Plaintiff]. Plaintiff alleges that the Registration Statement and Prospectus and periodic reports filed with the SEC and other public statements made by Occam during the Class Period include false and misleading statements of material fact about Occam's earnings and results of operation. The defendants herein are Occam; its senior executives and directors; Occam's auditors during the Class Period; the lead underwriter in the offering; and two venture capital funds -- the USVP defendants and the NVP defendants (collectively, "the VC defendants") -- who, according to plaintiff, effectively controlled Occam's accounting practices and manipulated them for their personal benefit. Compl. P 1.

Plaintiff alleges the following claims: (1) violation of § 11 of the [*4] Securities Act of 1933 ("the Securities Act"), 15 U.S.C. § 77k, against all defendants except Bailey; (2) violation of § 15 of the Securities Act, 15 U.S.C. § 77o, against all defendants except Cole, Bailey, PwC, Singer Lewak, and Thomas Weisel; (3) violation of § 10(b) of the Securities Exchange Act of 1934 ("the Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5, against all defendants except Cole, Pardun, Strom, and Thomas Weisel; (4) violation of § 20A of the Exchange Act, 15 U.S.C. § 78t-1, against Howard-Anderson and the VC defendants; and (5) violation of § 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), against all defendants except Occam, Cole, Pardun, Strom, PwC, Singer Lewak, and Thomas Weisel. [2]

> 2 Although the fourth claim in the consolidated complaint is stated as arising under under § 20(a) of the Exchange Act, it appears that plaintiff intended that this claim be asserted under § 20A of the Exchange Act. See Compl. 1; Opp'n 39; NVP Defs' Motion 5; USVP Defs' Motion 23. The Court therefore considers this claim to be for alleged violations of § 20A of the Exchange Act.

On January 25, 2008, the Occam defendants, Singer Lewak, Thomas [*5] Weisel, PwC, and the NVP defendants filed respective motions to dismiss plaintiff's consolidated complaint. The USVP defendants filed a motion to dismiss on January 30, 2008. Plaintiff filed a con-solidated opposition memorandum to the motions to dismiss on March 25, 2008. Defendants filed their respective replies on April 24, 2008. [3]

> 3 The Occam defendants, the NVP defendants, the USVP defendants, and Singer Lewak each filed requests for judicial notice in connection with their respective motions to dismiss. Plaintiff filed a consolidated opposition to these requests for judicial notice on March 25, 2008. Defendants filed their respective replies thereto on April 24, 2008.
>
> The Court takes judicial notice of the content of all SEC filings provided to the Court as well as the fact that they were filed with the agency. However, the Court does not take judicial notice of the truth of the content of these filings. *Patel v. Parnes, 2008 U.S. Dist. LEXIS 46630, at *43-44 (C.D. Cal. 2008)* ("The truth of the content [of documents filed with the SEC], and the inferences properly drawn from them . . . is not a proper subject of judicial notice under *Rule 201*.") (citations omitted); *Troy Group, Inc. v. Tilson, 364 F. Supp. 2d 1149, 1152 (C.D. Cal. 2005)* [*6] ("SEC filings 'should be considered only for the purpose of determining what statements the documents contain, not to prove the truth of the documents' contents.") (quoting *Lovelace v. Software Spectrum, Inc., 78 F.3d 1015, 1018 (5th Cir. 1996)).*
>
> The Court also takes judicial notice of a letter, proffered by the Occam defendants, from the SEC Enforcement Division to counsel for the Occam defendants, dated November 13, 2007, indicating that the SEC would not be taking any enforcement action against Occam. This letter, the authenticity of which is not challenged, is properly the subject of judicial notice. See *Pension Benefit Guar. Corp. v. White Consol. Indus., 998 F.2d 1192, 1197 (3d Cir. 1993)* (noting that agency letter decisions are properly the subject of judicial notice). In accordance with the foregoing, the Court GRANTS defendants' requests for judicial notice.

The Court provided the parties with a tentative ruling on May 19, 2008, and heard oral argument on May 29, 2008. After carefully considering the arguments set forth by the parties, the Court finds and concludes as follows.

## II. PLAINTIFF'S ALLEGATIONS

### A. The Parties

Occam is a Delaware corporation with its principal offices [*7] in Santa Barbara, California. Compl. P 31. Occam develops, markets, and supports broadband access products designed to enable telecom service providers to offer bundled voice, video, and data services over copper and fiber optic networks. Id.

The USVP defendants are a consortium of venture capital companies and, throughout the Class Period, Occam's largest group of shareholders, at one point collectively holding 35% of Occam's stock. Id. P 44.

The NVP defendants are another consortium of venture capital companies. Id. P 45. During the Class Period, the NVP defendants comprised Occam's second largest group of shareholders, at one point owning more than 15% of Occam's stock. Id.

Defendant Howard-Anderson was President and Chief Executive Officer of Occam throughout the Class Period. Id. P 32. Defendant Farrell was Occam's Chief Financial Officer from January 2006 through the end of the Class Period. Id. P 33. Defendant Bailey was Occam's Chief Financial Officer from June 2002 to January 2006. Id. P 34.

Defendant Krausz served as an Occam director throughout the entirety of the Class Period. Id. P 35. He was Chairman of the Board of Directors and served on the Board's Audit Committee in 2004, [*8] 2005, and through May 2006. Id. Krausz was also a managing member, investor, and general partner of the USVP defendants. Id.

Defendant Abbott served as an Occam director throughout the entirety of the Class Period. Id. P 36. Abbott served on Occam's Audit Committee in 2004, 2005, and through May 2006. Id. Abbott was also an investor and general partner of the NVP defendants. Id.

Defendant Bylin served as an Occam director and member of the Board's Audit Committee from September 2004 through the end of the Class Period. Id. P 37. Defendant Pardun served as an Occam director from September 2004 through the end of the Class Period. Id. P 38. Defendant Cole served as an Occam director and member of the Board's Audit Committee from December 2004 through the end of the Class Period. Id. P 39. Defendant Strom served as an Occam director from May 2006, and member of the Board's Audit Committee through the end of the Class Period. Id. P 40.

PwC served as Occam's independent auditors prior to the Class Period until June 2005. Id. P 41. Singer Lewak served as Occam's independent auditors from June 28, 2005, through the end of the Class Period. Id. P 42.

Defendant Thomas Weisel acted as the lead underwriter [*9] of Occam's November 2006 public stock offering. Id. P 43.

**B. The Alleged Scheme to Drive Up Occam's Stock**

Plaintiff alleges that Occam issued large amounts of stock to several venture capital firms -- including the VC defendants -- and also gave these entities preferred voting stock and allowed them to desigante their general partners to serve on Occam's Board. Id. PP 57-58. Accordingly, Krausz and Abbott -- who plaintiff alleges control the USVP defendants and the NVP defendants, respectively were named to serve on the Board and on the Board's Audit Committee. Id. II 58. Plaintiff alleges that the VC defendants effectively controlled Occam by virtue of their ownership of Occam's stock and their membership on the Board. Id. PP 58, 60.

Plaintiff alleges that Krausz and Abbott -- and by extension, the VC defendants -- schemed to manipulate the price of Occam's stock in order to sell their shares for a profit. Id. P 61. To this end, and as part of the alleged scheme, in the first quarter of 2004, Occam began to prematurely recognize revenues in contravention of Generally Accepted Accounting Principles ("GAAP"). Id. P 63. Plaintiff alleges that Occam continued to recognize revenue prematurely [*10] in each quarter for the following three years. Id. P 65. Plaintiff alleges that defendants touted Occam's falsely inflated revenues in press releases and in financial reports in order to drive up the market price of Occam's stock. Id. P 78. Meanwhile, the VC defendants increased their ownership shares in Occam so that by January 2005, they collectively owned 68% of the outstanding shares of Occam's common stock. Id. P 80. According to plaintiff, the VC defendants desired to cause Occam to be listed on the NASDAQ National Market ("NASDAQ") because this would increase the price of Occam's stock, and assist in their plan to sell their shares for a profit. Id.

On April 29, 2004 -- the date on which the Class Period begins -- Occam issued a press release stating that its earnings for the first quarter of 2004 were $ 1.7 million higher as compared with the same quarter in the previous year. Id. P 115. Occam repeated these financial results in a SEC Form 10-Q for the first quarter of 2004, filed with the SEC on May 17, 2004, and signed by Bailey. Id. P 117. Occam released press releases and filed Forms 10-Q with the SEC for the remaining three quarters of 2004, reporting strong revenue growth [*11] as compared with the previous year. Id. PP 120-21, 123-24, 126-27. Plaintiff alleges that the foregoing releases and filings falsely indicated that Occam's revenue growth was attributable solely to legitimate business operations, when in fact this reported growth was substantially the

result Occam's improper revenue recognition practices. Id. P 130.

In a March 25, 2005 auditor's report, which was included in Occam's SEC Form 10-K for fiscal year 2004, PwC represented that Occam's

> consolidated balance sheets and the related statements of operations, stockholders' equity (deficit) and cash flows present fairly, in all material respects, the financial position of Occam . . . at December 31, 2004 and 2003, and the results of their operations and their cash flows for each of the three years in the period ended December 31, 2004, in conformity with accounting principles generally accepted in the United States of America.

Id. P 200. Plaintiff alleges that this report was false and misleading and that it was not prepared in conformity with GAAP and SEC rules. Id. P 202.

Occam's SEC Form 10-K filing for fiscal year 2004 stated that

> Occam's management and independent registered public accounting [*12] firm identified internal control deficiencies that could be deemed to be 'material weaknesses' or 'significant deficiencies' if Section 404 of the Sarbanes-Oxley Act were currently applicable to Occam. . .
>
> Occam's identified control deficiencies relate to (i) the documentation, assessment, and testing of key controls over financial processes, including revenue recognition; (ii) limitations in financial staffing, with related inadequacies in segregation of duties; (iii) review of financial schedules; and (iv) the documentation and review of the basis of, support for, and considerations surrounding significant accounting estimates.

Id. P 81.

Additionally, Occam's SEC Form 8-K filed on June 28, 2005, reported that PwC advised the Audit Committee and Occam's management that it had noted "internal control deficiencies" related to the "failure to properly recognize revenue with respect to a certain contract recorded during the quarter ended June 30, 2005; and a . . . deficiency for the failure to properly classify deferred revenue within the financial statements during the quarter ended March 31, 2005." Id. P 82. Plaintiff alleges that defendants made no genuine attempt to correct these [*13] deficiencies. Id. P 83. Plaintiff alleges that instead, Occam dismissed PwC and retained Singer Lewak in its place. Id. P 84.

In a March 10, 2006 report, which was included in Occam's SEC Form 10-K/A for fiscal year 2005, Singer Lewak stated that its audit of Occam had concluded that Occam's consolidated financial statements "present fairly, in all material respects, the financial position of Occam . . . as of December 25, 2005, and the results of their operations and their cash flows for the year then ended in conformity with U.S. generally accepted accounting principles." Id. P 205. Plaintiff alleges that this report was false and misleading, and that it was not prepared in conformity with GAAP or SEC rules. Id. P 206.

On March 30, 2006, as defendants prepared for Occam's listing on NASDAQ, Occam filed its SEC Form 10-K for fiscal year 2005, in which it stated that its CEO and CFO had determined that Occam's internal disclosure controls and procedures were effective as of December 31, 2005. Id. P 90. The Form 10-K stated that Occam's management had ensured that Occam's financial statements were GAAP-compliant and that they had taken other steps to ensure that the company's disclosures [*14] were accurate, including forming a disclosure committee and developing more active managerial involvement in the preparation of SEC filings. Id. Additionally, the Form 10-K disclosed that Occam and Singer Lewak had identified internal control deficiencies relating to revenue recognition, among other things. Id.

Plaintiff alleges, however, that defendants had no intention of correcting these deficiencies and that Occam continued to recognize revenue prematurely throughout 2006. Id. P 91.

On May 19, 2006, Occam announced that it had filed a Registration Statement with the SEC in connection with a proposed secondary offering of its common stock and further indicated its intent to apply to list its common stock on NASDAQ. Id. P 92. At the same time, plaintiff alleges, Occam falsely claimed to have enjoyed impressive revenues. Id. P 93. According to plaintiff, Occam overstated its revenues for the second quarter of 2006 by $ 3.373 million, or 26%, meaning that its reported profit of $ 0.02 per share during that period was in fact a loss of $ 0.15 per share. Id.

Plaintiff alleges that because Krausz and Abbott were not "independent," they stepped down from the Audit Committee in May 2006, in [*15] order for Occam to be in compliance with NASDAQ listing requirements. Id. P 18.

On October 5, 2006, Occam announced that it had received approval to list its common shares on the NASDAQ. Occam's stock began trading on the NASDAQ on October 9, 2006. Id. P 94.

On October 13, 2006, Occam filed with the SEC an amendment to the Registration Statement on Form S-1/A that contained its financial statements for the periods ended March 26, 2006; June 25, 2006; and September 24, 2006. Id. P 158. The Registration Statement and the accompanying Prospectus incorporated the company's previously filed financial results, including those for fiscal years 2005 and 2005. Id. P 160. They also included unqualified auditor's reports from PwC and Singer Lewak, attesting to Occam's financial results for fiscal years 2004 and 2005, respectively. Id. P 195. Plaintiff alleges that both PwC and Singer Lewak gave their permission to Occam to include their reports in the Registered Statement. Id. P 235. Plaintiff further alleges that the Registered Statement and the auditors' reports included therein were false and misleading insofar as they conveyed the false impression that Occam's revenues derived from legitimate [*16] business operations, rather than from Occam's improper revenue recognition practices. Id. PP 160-61.

On November 7, 2006, Occam announced the closing of its public offering of 5,250,000 shares of its common stock at a price of $ 14.00 per share, of which 3,750,000 shares were sold by Occam and 1,500,000 shares were sold by Occam's shareholders. Id. P 96. Plaintiff alleges that Howard-Anderson, Krausz, and the VC defendants sold substantial portions of their shares on or about this time, thereby realizing profits of over $ 20 million. Id. PP 97-100. According to plaintiff, Howard-Anderson and Krausz sold all of their shares, in November 2006 and February 2007, respectively. Id. P 99. Additionally, while the VC defendants owned a combined 68% of Occam's outstanding voting stock as of December 31, 2005, after selling their shares in November 2006, they owned a combined 28% of the voting stock. Id. P 100. [4]

4    Plaintiff alleges that Howard-Anderson sold 15,000 shares on November 14, 2006, realizing $ 210,000 in proceeds. Plaintiff alleges that Krausz sold 2,570 shares on February 27, 2007, realizing $ 34,541 in proceeds.

Additionally, plaintiff alleges that the NVP defendants sold 320,000 [*17] shares and 128,000 shares on November 7 and 14, 2006, respectively, thereby realizing a total of $ 5,927,040.

Plaintiff also alleges that the USVP defendants sold 690,000 shares, 345,000 shares, and 276 shares on November 7, 2006, November 14, 2006, and February 21, 2007, respectively, thereby realizing total proceeds of $ 13,696,701. Compl. P 97.

## C. Occam's Stock Declines in 2007

Plaintiff alleges that by the end of 2006, defendants were concerned that their fraudulent revenue recognition practices would be discovered by auditors. Id. P 101. According to plaintiff, in order to "guide the market lower in their projections for the next quarter," Occam -- through CFO Farrell -- projected flat earnings for the first quarter of 2007. Id. PP 102-03. Plaintiff alleges that the day after Occam issued this projection, on February 2, 2007, the market price of its stock dropped 20%. Id. P 104. Then, on April 2, 2007, Occam disclosed that it would not file a timely SEC Form 10-K for its 2006 fiscal year because

> its Audit Committee is reviewing the Company's commitments to provide customers with software, hardware and software maintenance, connection with customers' purchases of the Company's network [*18] equipment. The Audit Committee is also considering whether these commitments impact revenue recognition and the adequacy of the Company's internal controls relating to the documentation of customer commitments as part of the terms and conditions of sale.

Id. P 105. The following day, the market price of Occam's shares fell again, from $ 11.10 per share to $ 8.51 per share -- a decline of approximately 23%. On April 17, 2007, Occam issued a press release announcing that it would not file its Form 10-K for 2006 by the 15-day extended filing deadline. A day later, Occam's shares declined once more, from $ 8.91 to $ 8.54 per share.

On October 16, 2007, Occam filed its Form 10-K for fiscal year 2006, which restated its financial results for the prior three fiscal years, including all of its quarterly and annual filings with the SEC. See Declaration of Crystal M. Gaudette ("Gaudette Decl.") P 1, Ex. 1 [Restatement]. According to plaintiff, the restatement indicates that defendants had caused Occam improperly to recognize $ 33 million in revenues over the course of the prior three years -- more than 27% of all revenues reported during that period. Id. P 110. Plaintiff alleges that Occam also [*19] acknowledged that its past internal control deficiencies had persisted up until that time. Id. Plaintiff alleges that Occam's revenues were overstated and that its losses were understated in nearly every quar-

ter in fiscal years 2004 and 2005, and in the first two quarters of 2006, as set forth in the table below:

(Amounts shown in thousands of dollars except percentages)

| Time Period | Overstated Revenues | Overstated Revenues Percentages | Understated Losses | Understated Loss Percentages |
|---|---|---|---|---|
| Q1-2004 | $ 804 | 33% | $ 413 | 9% |
| Q2-2004 | $ 1,018 | 47% | $ 235 | 4% |
| Q3-2004 | $ 1,159 | 35% | $ 404 | 11% |
| Q4-2004 | $ 1,909 | 42% | $ 617 | 21% |
| Q1-2005 | $ 312 | 5% | $ 184 | 7% |
| Q3-2005 | $ 347 | 3% | $ 151 | 5% |
| Q4-2005 | $ 864 | 7% | $ 484 | 1181% |
| Q1-2006 | $ 1,833 | 15% | $ 1,103 | 109% |
| Q2-2006 | $ 3,373 | 26% | $ 1,402 | 134% |

Id. P 168.

Plaintiff also proffers the following table to set forth the difference between Occam's reported financial results for fiscal years 2004, 2005, and 2006, on the one hand, and its financial results for these years, as restated, on the other:

(Amounts shown in thousands of dollars except percentages)

| | Year ended 12/26/04 | Year ended 12/25/05 | Year ended 12/31/06 | Total for three years preceding 12/31/06 |
|---|---|---|---|---|
| Total revenues as originally reported | $ 17,329 | $ 39,238 | $ 68,634 | $ 125,201 |
| Total revenues as restated | $ 12,441 | $ 39,597 | $ 68,203 | $ 120,241 |
| Overstated (understated) revenues | $ 4,888 | ($ 359) | $ 431 | $ 4,960 |
| Percent overstated (understated) revenues | 39% | (1%) | 1% | 4% |
| Net income (loss) as originally reported | ($ 14,989) | ($ 7,438) | $ 1,515 | ($ 20,912) |
| Net income (loss) as restated | ($ 16,658) | ($ 7,607) | $ 1,235 | ($ 23,030) |
| Overstated net income (understated net loss) | ($ 1,669) | ($ 169) | $ 280 | ($ 2,118) |
| Percent overstated net income (percent understated net loss) | (10%) | (2%) | 23% | (9%) |

Id. P 170.

Plaintiff [*20] further alleges that in reaction to this news, the market price of Occam's stock fell 32%, from $ 9.23 to $ 6.29 per share. Id. P 111. Plaintiff alleges that this course of conduct has damaged Occam's stock for the long term and that its shares currently trade in the vicinity of $ 3 per share, which is approximately the price at which Occam's shares traded prior to the Class Period. Id. P 114.

## III. LEGAL STANDARD

A *Rule 12(b)(6)* motion tests the legal sufficiency of the claims asserted in a complaint. "While a complaint attacked by a *Rule 12(b)(6)* motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atlantic Corp. v. Twombly, 127 S. Ct. 1955, 1964-65 (2007)*. "[F]actual allegations must be enough to raise a right to relief above the speculative level." *Id. at 1965*.

In considering a motion pursuant to *Fed. R. Civ. P. 12(b)(6)*, a court must accept as true all material allegations in the complaint, as well as all reasonable inferences to be drawn from them. *Pareto v. F.D.I.C., 139 F.3d 696, 699 (9th Cir. 1998)*. [*21] The complaint must be read in the light most favorable to the nonmoving party. *Sprewell v. Golden State Warriors, 266 F.3d 979, 988 (9th Cir. 2001)*; *Parks Sch. of Bus., Inc. v. Symington, 51 F.3d 1480, 1484 (9th Cir. 1995)*. However, a court need not accept as true unreasonable inferences or conclusory legal allegations cast in the form of factual allegations. *Sprewell, 266 F.3d at 988*; *W. Mining Council v. Watt, 643 F.2d 618, 624 (9th Cir. 1981)*.

Dismissal pursuant to *Rule 12(b)(6)* is proper only where there is either a "lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory." *Balistreri v. Pacifica Police Dept., 901 F.2d 696, 699 (9th Cir. 1990)*.

Furthermore, unless a court converts a *Rule 12(b)(6)* motion into a motion for summary judgment, a court cannot consider material outside of the complaint (e.g., facts presented in briefs, affidavits, or discovery materials). *In re American Cont'l Corp./Lincoln Say. & Loan Sec. Litig., 102 F.3d 1524, 1537 (9th Cir. 1996)*, rev'd on other grounds sub nom. *Lexecon, Inc. v. Milberg Weiss Bershad Hynes & Lerach, 523 U.S. 26 (1998)*. A court may, however, consider exhibits submitted with or alleged [*22] in the complaint and matters that may be judicially noticed pursuant to *Federal Rule of Evidence 201*. *In re Silicon Graphics Inc. Sec. Litig., 183 F.3d 970, 986 (9th Cir. 1999)*; *Lee v. City of Los Angeles, 250 F.3d 668, 689 (9th Cir. 2001)*.

For all of these reasons, it is only under extraordinary circumstances that dismissal is proper under *Rule 12(b)(6)*. *United States v. City of Redwood City, 640 F.2d 963, 966 (9th Cir. 1981)*.

As a general rule, leave to amend a complaint which has been dismissed should be freely granted. *Fed. R. Civ. P. 15(a)*. However, leave to amend may be denied when "the court determines that the allegation of other facts consistent with the challenged pleading could not possibly cure the deficiency." *Schreiber Distrib. Co. v. Serv-Well Furniture Co., 806 F.2d 1393, 1401 (9th Cir. 1986)*; see *Lopez v. Smith, 203 F.3d 1122, 1127 (9th Cir. 2000)*.

## IV. DISCUSSION

### A. Section 10(b) Claims

Under § 10(b) of the Exchange Act, it is

> unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange . . . to use security . . . any manipulative or deceptive device [*23] or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

*15 U.S.C. § 78j*.

*Rule 10b-5*, promulgated thereunder, makes it unlawful to

> (a) To employ any device, scheme, or artifice to defraud,
>
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
>
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, "in connection with the purchase or sale of any security."

*17 CFR § 240.10b-5*.

Notwithstanding the relatively liberal pleading standards in federal courts, federal securities fraud suits are subject to the demanding pleading requirements of the Private Securities Litigation Reform Act ("PSLRA"). Enacted by Congress in 1995 to provide "protections to discourage frivolous [securities] litigation," H.R. Conf. Rep. No. 104-369, 104th Cong., 1st Sess. at 32 (Nov. 28, 1995), the PSLRA strengthened the already-heightened pleading requirements of *Fed. R. Civ. P. 9(b)* [*24] applicable to fraud-based claims. Under the PSLRA, private actions based on allegations of material misstatements or omissions must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 1.5 U.S.C. § 78u-4(b)(1). In addition, the PSLRA imposes strict requirements for pleading scienter in actions brought pursuant to Section 10(b) and *Rule 10b-5*, requiring that the complaint "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *15 U.S.C. § 78u-4(b)(2)*.

The Ninth Circuit, in interpreting the PSLRA, has held that "a private securities plaintiff proceeding under the [PSLRA] must plead, in great detail, facts that constitute strong circumstantial evidence of deliberately reckless or conscious misconduct." *In re Silicon Graphics Inc., 183 F.3d 970, 974 (9th Cir. 1999)*. In determining whether a plaintiff has sufficiently pled scienter, a court must consider "whether the total of plaintiffs' [*25] allegations, even though individually lacking, are sufficient to create a strong inference that defendants acted with deliberate or conscious recklessness." *Nursing Home Pension Fund, Local 144 v. Oracle Corp., 380 F.3d 1226, 1230 (9th Cir. 2004)* (quoting *No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am. W. Holding Corp., 320 F.3d 920, 938 (9th Cir. 2003))*.

Moreover, "[t]o determine whether the plaintiff has alleged facts that give rise to the requisite 'strong inference' of scienter, a court must consider plausible nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff." *Tellabs, Inc. v. Makor Issues & Rights, Ltd., 127 S.Ct. 2499, 2510 (2007)*. While the inference of scienter need not be irrefutable, it "must be more than merely 'reasonable' or 'permissible' -- it must be cogent and compelling, thus strong in light of other explanations." Id. In other words, "[a] complaint will survive . . . only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." Id.

Plaintiff alleges § 10(b) and *Rule 10b-5* claims against the following [*26] of the Occam defendants:

Occam, Howard-Anderson, Bailey, Farrell, Krausz, and Abbott. [5]

> 5 The complaint also designates Bylin as a defendant to plaintiff's § 10(b) claim. During oral argument on May 29, 2008, however, counsel for plaintiff stated that this was an error and that plaintiff did not intend to state a claim against Bylin under § 10(b).

Plaintiff also alleges § 10(b) and *Rule 10b-5* claims against PwC and Singer Lewak (collectively, "the Auditor defendants"), as well as the VC defendants.

**1. The Occam Defendants**

The Occam defendants argue that plaintiff's claims under section 10(b) should be dismissed because plaintiff has failed to plead with particularity facts giving rise to a strong inference that they acted with the required state of mind -- i.e. with intentionality or deliberate recklessness. See *15 U.S.C. § 78u-4(b)(2); Ronconi v. Larkin, 253 F.3d 423, 429 (9th Cir. 2001)*. Plaintiff responds that, viewed collectively, the allegations in the complaint are sufficient to establish the scienter element of its § 10(b) claims.

**a. Whether Plaintiff Has Pled Facts Demonstrating Krausz's and Abbott's Liability as Primary Violators of § 10(b)**

The Occam defendants argue that plaintiff's [*27] 10(b) claims against Krausz and Abbott fail because plaintiff has failed to plead that either defendant is responsible for making a false statement. In response, plaintiff relies primarily on the allegations that Krausz and Abbott signed Occam's Forms 10-K for fiscal years 2004 and 2005, in addition to the registration statement filed with the SEC in connection with Occam's 2006 public stock offering, all of which, plaintiff claims, contained material misrepresentations regarding the company's revenues.

The Occam defendants maintain that in the case of outside directors such as Krausz and Abbott, their signatures on allegedly false SEC filings are insufficient to give rise to a primary violation of § 10(b). The Occam defendants also argue that plaintiff's theory of liability fails because it rests on the group pleading doctrine, which many courts have concluded was abolished by the PSLRA. [6] See, e.g., *In re Amgen Sec. Litig., 2008 U.S. Dist. LEXIS 24611, at *57-58 (C.D. Cal. 2008)* (holding that the group pleading presumption does not apply after the passage of the PSLRA); In re Netopia, Inc. Sec. Litig., 2005 WL 3445631, at *5 (N.D. Cal. 2005); but see *In re Silicon Graphics, Inc. Sec. Litig., 970 F. Supp. 746, 759-60 (N.D. Cal. 1997)* [*28] (applying the doctrine after the passage of the PSLRA); *Pegasus Holdings*

*v. Veterinary Ctrs. of Am., Inc.*, 38 F. Supp. 2d 1158, 1165 (C.D. Cal. 1998) ("the non-speaking defendants may be held liable on a 'group pleading' theory . . ."); *In re PETsMART, Inc. Sec. Litig.*, 61 F. Supp. 2d 982, 997 (D. Ariz. 1999) ("the doctrine survives the PSLRA. . . "). The Supreme Court in Tellabs noted, but did not decide, this issue. *Tellabs*, 127 S. Ct. 2499, 2511 n.6.

> 6  "Under the group pleading doctrine, in drafting a complaint, plaintiffs may rely on a presumption that statements in prospectuses, registration statements, annual reports, press releases, or other 'group-published information,' are the collective work of those individuals with direct involvement in the day-to-day affairs of the company." *In re Silicon Graphics Sec. Litig.*, 970 F. Supp. 746, 759 (N.D. Cal. 1997) (quotations and citation omitted).

The Occam defendants principally rely on *In re Hansen Natural Corp. Sec. Litig.*, 527 F. Supp. 2d 1142, 1153 (C.D. Cal. 2007), in which the court held that the plaintiff had failed to set forth the defendants' alleged misstatements with the requisite particularity, even though they had signed [*29] allegedly false annual reports and a Form S-8, where there were no specific allegations that they participated in the preparation or dissemination of any allegedly false statements. See also *Wojtunik v. Kealy*, 394 F. Supp. 2d 1149, 1165 (D. Ariz. 2005) ("The Court agrees with those courts that have concluded that an outside director's signature on an SEC-required corporate document is not enough, in and of itself, to sufficiently plead a securities fraud claim against that director."); cf. *Stack v. Lobo*, 903 F. Supp. 1361, 1376 (N.D. Cal. 1995) (noting the limited application of the group pleading doctrine to outside directors, given that they not ordinarily involved in a corporation's day-to-day affairs, and stating that "an outside director does not become liable for the contents of a group published document merely by signing it.").

Unlike in In re Hansen, plaintiff alleges that Krausz and Abbott not only signed false SEC filings, but also used their positions on the Audit Committee to influence the content of these filings. According to plaintiff, they did this by causing the Audit Committee to dismiss PwC upon its unfavorable assessment of Occam's accounting practices and internal [*30] controls and by replacing PwC with a different auditor, Singer Lewak. Thus, in this case, Krausz and Abbott have a more direct connection to the alleged misrepresentations contained in the SEC filings than was the case in In re Hansen. Therefore, because plaintiff's § 10(b) claims against Krausz and Abbott do not depend entirely on the allegation that these defendants signed SEC filings, they are not premised on the group pleading doctrine.

**b. Scienter**

**i. Allegations Pertaining to the Officer Defendants' Roles in the Company**

With regard to the scienter element of its § 10(b) claims against the other Occam defendants, plaintiff first contends that Occam's senior management -- CEO Howard-Anderson, former CFO Bailey, and current CFO Farrell -- were heavily involved with Occam's sales group and with the company's procedures for determining the recognition of revenues. See Compl. P 66. Plaintiff argues that these facts show that these defendants knew of the company's faulty revenue recognition practices when they occurred or that they were deliberately reckless in failing to learn of these practices.

The Occam defendants respond that "[g]eneral allegations of defendants' 'hands-on' management [*31] style, their interaction with other officers and employees, their attendance at meetings, and their receipt of unspecified weekly or monthly reports are insufficient." *In re Daou Sys.*, 411 F.3d 1006, 1022 (9th Cir. 2005); Commc'ns Workers of Am. Plan for Employees' Pensions & Death Benefits v. CSK, 2007 WL 951968, at *4 (D. Ariz. 2007) ("general allegations concerning the Defendants' positions and access to information do not establish a strong inference that they acted with scienter.").

Courts have required plaintiffs to do more than allege that defendants "had the requisite knowledge by virtue of their 'hands on' positions. . ." *In re Autodesk, Inc. Sec. Litig.*, 132 F. Supp. 2d 833, 843 (N.D. Cal. 2000). Otherwise, the requirement for specially pleading scienter would be eliminated "as any corporate officer could be said to possess the requisite knowledge by virtue of his or her position." Id.; *Weiss v. Amkor Tech., Inc.*, 527 F. Supp. 2d 938, 949 (D. Ariz. 2007). On the other hand, the court in In re Daou also indicated that a more specific account of top executives' involvement in the details of the company can help to create a strong inference of scienter in light of improper accounting [*32] reports. Id.; see also *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 987-89 (9th Cir. 2008) (given the dramatic effect of government stop-work orders on the company's revenues, the plaintiffs' allegations regarding the stop-work orders gave rise to a strong inference of scienter on the part of high-level managers responsible for the company's day-to-day operations who must have known of the stop-work orders by virtue of their roles in the company). With respect to the officer defendants -- Howard-Anderson, Bailey, and Farrell -- plaintiff has done more than simply set forth their corporate positions and duties. Plaintiff alleges not only that these defendants had access to information regarding the disconnect between Occam's actual revenues and those reported, but also that these individuals played an active role in moni-

toring and maximizing the company's reported quarterly revenues.

For example, plaintiff alleges that a confidential witness, a former regional sales director for Occam ("CW1"), stated, "I could make a call and get Bob Howard-Anderson to get on a plane and see a customer if it was a good account." *Id. P 67.* Plaintiff also alleges that a former Occam sales vice president [*33] ("CW2") stated that Howard-Anderson "was very much involved with customers. He is the kind of CEO who talks to the customers that they have, and jumps on a plane to go out and meet with customers. They knew him well and on an informal basis." *Id. P 69.* According to plaintiff, CW2 also stated that it was company policy to involve the CEO and CFO in any sales transaction worth more than $ 250,000, which included most of Occam's sales. *Id. P 70.*

Plaintiff also alleges that CW1 and CW2 detailed mechanisms used by Howard-Anderson, Bailey, and Farrell to keep track of the sales group's activities and the company's revenue on a weekly basis. These mechanisms included reports that provided information on contract closings and the number of units sold; weekly meetings involving the entire sales force, the CEO, and the CFO; the setting of sales goals and quotas for the sales group; and methods of determining compensation for salespersons that took into account each salesperson's "contributions, margins, revenue, and costs." *Id. PP 71-77.* According to plaintiff, CW2 also described a "high pressure" environment at Occam, cultivated by Howard-Anderson, Bailey, and other executives, which drove salespersons [*34] to make sales by the end of each quarter. *Id. P 68.* CW2 allegedly stated that Occam's salespersons were paid on a quarterly basis for orders that had been "booked" but not shipped. Id.

Moreover, as plaintiff argues, it is also pertinent that Occam at all relevant times, was a relatively small company, with 80 to 100 employees. Compl. P 65. Given Occam's relatively small size and plaintiff's allegations regarding the officer defendants' considerable involvement with the company's generation and reporting of revenues, plaintiff's allegations of scienter are persuasive. See *In re Commtouch Software Ltd. Sec. Litig., 2002 U.S. Dist. LEXIS 13742, at *27-28 (N.D. Cal. 2002)* (given the modest size of the company, top management, particularly the CEO and CFO, were likely to have been aware of accounting problems that led to a restatement of at least $ 500,000 in revenue for each of several transactions); *Nursing Home Pension Fund, Local 144 v. Oracle Corp., 380 F.3d 1226, 1234 (9th Cir. 2004)* ("It is reasonable to infer that the Oracle executives' detail-oriented management style led them to become aware of the allegedly improper revenue recognition of such significant magnitude that the company

[*35] would have missed its quarterly earnings projection but for the adjustments."). These allegations therefore tend to give rise to a strong inference of scienter on the part of Howard-Anderson, Bailey, and Farrell.

### ii. Allegations Regarding Violations of GAAP

Plaintiff contends that the circumstances of Occam's restatement, which, according to plaintiff, revealed significant violations of GAAP, occurring over a long period of time, supports a strong inference that defendants acted with scienter. See *In re Daou Sys., 411 F.3d 1006, 1016 (9th Cir. 2005)* ("Violations of GAAP standards can also provide evidence of scienter."); *Atlas v. Accredited Home Lenders Holding Co., 2008 U.S. Dist. LEXIS 3863, at *33 (S.D. Cal. 2008)* ("The sizable impact on Accredited's reported earnings of these alleged violations of GAAP . . . supports an inference of scienter."); *Tripp v. IndyMac BanCorp, Inc., 2007 U.S. Dist. LEXIS 95445, at *14 (C.D. Cal. 2007).*

Plaintiff points out that the restatement revealed that Occam had prematurely recognized approximately $ 9.3 million of revenue between fiscal years 2004 and 2006 from sales of products and. services that were unavailable at the time the revenue was originally [*36] recognized. Compl. P 182. The restatement also acknowledged that during this time period, Occam had prematurely recognized approximately $ 20.2 million of revenue for sales to value-added resellers where the resellers did not have the ability to pay Occam for these sales independent of payment to them by the end-user. Id. PP 190-91. In addition, the restatement noted during this same time period, Occam had prematurely recognized $ 2.3 million of revenue because the terms and conditions of certain shipments did not appropriately transfer title or risk of loss at the time of shipment; as well as an additional $ 1.1 million of revenue relating to errors in accounting for software and software maintenance, customer credits, and undelivered free product. Id. PP 192-93. Plaintiff argues that by prematurely recognizing revenue in these ways, Occam violated Statement of Position ("SOP") 97-2, Software Revenue Recognition, issued by the Accounting Standards Executive Committee of the AICPA; SEC Staff Accounting Bulletin ("SAB") 104; and SAB 101, all of which essentially provide that revenue is recognizable only when four criteria are met: (i) there is persuasive evidence of an arrangement, [*37] (ii) delivery has occurred, (iii) the vendor's fee is fixed or determinable, and (iv) collectibility is probable.

Although, as the Occam defendants note, "the mere publication of inaccurate accounting figures, or a failure to follow GAAP, without more, does not establish scienter," *In re Software Toolworks, Inc., 50 F.3d 615, 628 (9th Cir. 1994)*, this does not mean that the misapplication of accounting principles is irrelevant to the question

of scienter. This is particularly so where there are spe-
cific allegations of significant GAAP violations. See *In
re McKesson HBOC, Inc. Sec. Litig., 126 F. Supp. 2d
1248, 1273 (N.D. Cal. 2000)* ("When significant GAAP
violations are described with particularity in the com-
plaint, they may provide powerful indirect evidence of
scienter. After all, books do not cook themselves."); *In re
Impax Labs., Inc., Sec. Litig., 2007 U.S. Dist. LEXIS
52356, at \*24-25 (N.D. Cal. 2007).*

The Occam defendants argue that the GAAP viola-
tions at issue in this case were relatively minor because
for the entire three-year period restated, Occam reduced
its revenue by only 4% and because the revenue not re-
corded will simply be recorded later. However, this ar-
gument ignores [\*38] plaintiff's allegations that Occam
overstated its revenues for nearly every quarter between
the beginning of 2004 and the middle of 2006, at times
by over 30 and 40%. These significant violations of
GAAP, taking place over an extended period of time,
give rise to a strong inference of scienter. [7]

> 7 The Occam defendants further argue that be-
> cause the Audit Committee concluded that the re-
> statement did not result from fraud, "Plaintiff
> may not rely upon any aspect of the Audit Com-
> mittee's findings to support an inference of
> fraud." Citing *Weiss v. Amkor Tech., Inc., 527 F.
> Supp. 2d 938, 949 (D. Ariz. 2007)*; In re PMC-
> Sierra, Inc. Deriv. Litig., 20107 WL 2427980, at
> *5 (N.D. Cal. 2007). The cases to which they cite
> do not support this broad proposition, but instead,
> stand for the notion that the findings of a corpora-
> tion's internal investigation, standing alone, do
> not suffice to establish scienter, particularly
> where the investigation fails to uncover fraud.
> The Court therefore disagrees with Occam defen-
> dants' suggestion that the Court may not consider
> the Audit Committee's findings regarding the ex-
> tent to which Occam overstated its revenues and
> understated its losses during the Class [\*39] Pe-
> riod.

The Occam defendants also rely on an SEC
letter to counsel for the Occam defendants dated
November 13, 2007, in which the SEC indicates
that it does not intend to take any enforcement ac-
tion against Occam. Gaudette Decl. P 3, Ex. 3.
The Occam defendants contend that the SEC's
decision not to take enforcement action against
Occam supports the Audit Committee's conclu-
sion that the accounting errors were not the prod-
uct of fraud and undercuts any inference of sci-
enter. The Occam defendants cite no authority for
the proposition that the SEC's discretionary deci-
sion not to institute enforcement proceedings

should be taken into consideration in determining
whether a plaintiff's allegations as to scienter pass
muster under the PSLRA. Accordingly, the Court
does not find that the SEC's letter decision not to
proceed is relevant to the Court's scienter analy-
sis.

### iii. Allegations Involving Occam's Audits

Plaintiff further contends that scienter can be in-
ferred' from the allegations that PwC notified the other
defendants of Occam's internal control deficiencies as
early as Spring of 2005, and that, rather than correct
these deficiencies, the Occam defendants terminated
PwC and kept in place [\*40] the improper accounting
practices. Compl. PP 81-85.

The Occam defendants respond that the fact that Oc-
cam publicly disclosed internal control deficiencies in
2005 -- see id. PP 12, 81-82, 84, 90, 160 -- militates
against a, finding of scienter. They rely on In re Bear-
ingPoint, Inc. Sec. Litig., 2007 WL 2713906 (E.D. Va.
2007), in which the court observed that "truthful disclo-
sures of negative information 'militate against a finding
that defendants acted with a culpable state of mind.'" Id.
at \*8 (quoting *Ottman v. Hanger Orthopedic Group,
Inc., 353 F.3d 338, 348 (4th Cir. 2003)*). The Occam
defendants also cite to *In re Read-Rite Corp. Sec. Litig.,
115 F. Supp. 2d 1181 (N.D. Cal. 2000)*, where the court
rejected the plaintiffs' argument that comments attributed
to the company, apparently designed to dampen market
expectations, were misleading because they attempted to
justify the company's poor performance by referencing
costs and liabilities that had yet to be realized. *Id. at
1185.*

The Court is unpersuaded by the Occam defendants'
arguments. Plaintiff alleges that after PwC identified
certain internal control deficiencies relating to revenue
recognition, the Occam defendants falsely [\*41] repre-
sented that they had implemented measures to correct
these deficiencies and continued to recognize revenue
prematurely. Given these allegations, the initial disclo-
sure of the company's internal control deficiencies is not
a consideration that defeats any inference of scienter. On
the contrary, plaintiff's allegations indicate that although
internal control deficiencies relating to the recognition of
revenue had been brought to the attention of the Occam
defendants, they failed to correct these deficiencies until
several years later and after numerous financial disclo-
sures that overstated the company's quarterly and annual
revenues. These allegations give rise to a strong infer-
ence of scienter.

### iv. Allegedly Suspicious Stock Sales

Plaintiff also maintains that Howard-Anderson and
Krausz made suspicious stock sales which support a

strong inference of scienter. *In re Silicon Graphics Inc., 183 F.3d 970, 986 (9th Cir. 1999)* ("'unusual' or 'suspicious' stock sales by corporate insiders may constitute circumstantial evidence of scienter."). "[I]nsider trading is suspicious only when it is 'dramatically out of line with prior trading practices at times calcultaed to maximize the personal [*42] benefit from undisclosed insider information.'" Id. (quoting *In re Apple Computer Sec. Litig., 886 F.2d 1109, 1117 (9th Cir. 1989)).* A court must consider: (1) the amount and percentage of sales sold by insiders; (2) the timing of the sales; and (3) whether the sales were consistent with the insider's prior trading history. Id.

Here, plaintiff contends that the amount and percentages sold by Howard-Anderson common stock in Occam that they owned. Plaintiff argues that the timing of the sales is also suspicious because Howard-Anderson sold his shares around the time that defendants' revenue recognition scheme ended, and because Krausz sold his shares only two months before Occam announced that it would not file a timely SEC Form 10-K for fiscal year 2006. Plaintiff further maintains that these stock sales were out of line with these defendants' previous trading histories because neither defendant had sold any shares in the preceding four and one-half years. See *No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am. W. Holding Corp., 320 F.3d 920, 938 (9th Cir. 2003)* (the defendants' prior trading history indicated that their sales during the class period were unusual and suspicious [*43] where none of them had sold stocks during the twenty months preceding the class period or during the four months following the class period).

The Occam defendants dispute that these sales of stock were suspicious. They argue that the fact that only two of the individual defendants -- Howard-Anderson and Krausz -- sold their stock militates against a finding that these sales were suspicious. Additionally, they argue that these sales were not suspicious because only 18% of the total shares owned collectively by the Occam defendants and the VC defendants were sold during the Class Period. See Claudette Decl. P 13, Exs. 9-12.

As to Krausz, the Occam defendants argue that his sale of stock was only for 2,750 shares, which yielded proceeds of $ 34,541. The Occam defendants contend that such a "*de minimis*" sale by an outside director does not raise an inference of scienter.

As to Howard-Anderson, the Occam defendants maintain that plaintiff's argument that he sold all of his stock improperly ignores the fact that Howard-Anderson possessed and retained considerable vested stock options. *In re Silicon Graphics Sec. Litig., 183 F.3d 970, 986-87 (9th Cir. 1999)* ("a sale involving a significant portion [*44] of an insider's actual shares, but only a small por-

tion of his shares and options combined, is less suspicious than were the insider to hold no options."). They argue that taking into account Howard-Anderson's vested stock options, he sold only 7% of his holdings during the Class Period, and that this is not suspicious. Gaudette Decl. P 14, Exs. 9, 12.

On balance, however, the Court concludes that for the purposes of determining whether plaintiff has pled sufficiently the Occam defendants' scienter, these stock sales are suspicious. Although Krausz sold his stock after Occam's stock had begun to decline, he did so before the restatement. The timing of the sale and the allegation that Krausz had not sold any shares for at least the prior several years lends credence to plaintiff's argument that Krausz was aware that a restatement was forthcoming. Likewise, the timing and the circumstances of Howard-Anderson's sale of his shares are suspicious. Even if Howard-Anderson sold a small percentage of his holdings, this sale is suspect based on plaintiff's allegations that the sale occurred only a few months before Occam first projected flat revenues. This projection was allegedly part of an [*45] effort to "condition the market" to the restatement, the issuance of which, according to plaintiff, triggered the steep decline of Occam's stock. Therefore, these sales give rise to an inference of scienter as to Krausz and Howard-Anderson.

**v. Conclusion**

Viewing plaintiff's allegations in combination, the Court finds that they give rise to a strong inference of scienter as to Occam, Howard-Anderson, Farrell, Bailey, Krausz, and Abbott. [8]

8    The scienter of the individual defendants, as directors and officers of Occam, is imputed to Occam. See *Nordstrom, Inc. v. Chubb & Son, Inc., 54 F.3d 1424, 1435 (9th Cir. 1995).*

**c. Whether Plaintiff Has Pled Reliance During the Period in Which Occam Was Traded on the Over-the-Counter Market**

The Occam defendants contend that the Court must dismiss the § 10(b) claims of all purported class members who purchased Occam stock between April 29, 2004, and October 9, 2006, during which time Occam was traded on the over-the-counter market ("OTC market"), because plaintiff has not adequately pled reliance as to these class members. [9] The Occam defendants contend that the OTC market was not an efficient market, and therefore plaintiff is not entitled to the presumption [*46] of reliance that usually applies in a fraud-on-the-market securities class action. [10]

9  Singer Lewak raises an identical argument in its motion, which the Court considers as part of the analysis herein.

10  As the Supreme Court has explained, "[t]he fraud on the market theory is based on the hypothesis that, in an open and developed securities market, the price of a company's stock is determined by available material information regarding the company and its business. Misleading statements will therefore defraud purchasers of stock even if the purchasers do not directly rely on the misstatements. The causal connection between the defendants' fraud and the plaintiffs' purchase of stock in such a case is no less significant than in a case of direct reliance on misrepresentations." *Basic Inc. v. Levinson, 485 U.S. 224, 241-42 (1988).* Moreover, "the presumption of reliance is available only where a plaintiff alleges that a defendant made material representations or omissions concerning a security that is actively traded in an 'efficient market,' thereby establishing a 'fraud on the market.'" *Binder v. Gillespie, 184 F.3d 1059, 1064 (9th Cir. 1999).*

The Court declines to decide at this time [*47] the scope of the Class Period, which is a matter better decided on an evidentiary record in conjunction with plaintiff's motion for class certification.

### d. Conclusion

For the foregoing reasons, the Court DENIES the Occam defendants' motion to dismiss plaintiff's § 10(b) claims.

### 2. The VC Defendants

As the VC defendants argue, plaintiff points to no deceptive act -- either a misstatement, omission, or some other form of deceptive conduct -- engaged in by them, much less one that was communicated to the public. See *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc., 128 S.Ct. 761, 769 (2008)* (where the defendants had no duty to disclose information, and their deceptive acts were not communicated to the public, the plaintiff could not show reliance upon any of the defendants' actions, such that its § 10(b) claim failed). Unlike the Occam defendants, there is no allegation that either the USVP defendants or the NVP defendants signed any of Occam's disclosure statements or directly participated in the issuance of public statements regarding Occam's financial performance during the Class Period. Instead, plaintiff's § 10(b) claims against the VC defendants appear to rest on the conduct [*48] of Krausz and Abbott, who are alleged to have served as general partners for the USVP defendants and the NVP defendants, respectively. However, plaintiff fails to set forth a basis upon which the VC defendants might be held liable for the misrepresentations of these individual defendants. Merely alleging that Krausz and Abbott control the VC defendants does not suffice.

*No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am. W. Holding Corp., 320 F.3d 920 (9th Cir. 2003)*, lends support to plaintiff's position that the VC defendants may be held liable under § 10(b) even in the absence of a deceptive act on their part. In America West, two shareholder defendants argued, as the VC defendants do here, that they were not liable under § 10(b) because the plaintiffs had failed to plead their involvement in the alleged fraud. America West, 320 F.3d at 937. The court noted that *Rule 10b-5* prohibits any person directly or indirectly "to employ any device, scheme, or artifice to defraud . . . in connection with the purchase or sale of any security." Id. (quoting *17 C.F.R. § 240.10b-5*). Relying on *United States v. O'Hagan, 521 U.S. 642, 652 (1997)*, in which the court stated that insider [*49] trading constitutes a "deceptive device" under § 10(b) "because a relationship of trust and confidence exists between the shareholders of a corporation and those insiders who have obtained confidential information by reason of their position with that corporation," the court held that the plaintiffs had adequately pled the defendants' participation in a "deceptive device" based on the plaintiffs' insider trading allegations. America West, F.3d at 937.

America West, however, did not address the Supreme Court's holding in *Cent. Bank, N.A. v. First Interstate Bank, N.A., 511 U.S. 164 (1994)*, that § 10(b) "prohibits only the making of a material misstatement (or omission) or the commission of a manipulative act," such that this statute does not provide for liability for aiders and abetters. Id. at 178; superseded in part by statute, *15 U.S.C. § 78t(e)* (providing for aiding and abetting liability in the context of actions brought by the SEC only). <sup>11</sup> Likewise, in Stoneridge, the Supreme Court recently stated that "[r]eliance by the plaintiff upon the defendant's deceptive acts is an essential element of the § 10(b) private cause of action," and it refused to hold liable defendants whose [*50] allegedly deceptive acts were not communicated to the public. *Stoneridge, 128 S.Ct. at 769.* At the same time, America West has been criticized for failing to support its reasoning that insider trading may give rise to liability under § 10(b) in connection with a misrepresentation claim -- as distinct from an insider trading claim under § 10(b) -- where the defendant is not alleged to have made or contributed to the alleged misrepresentation. *In re Nextcard, Inc. Sec. Litig., 2005 U.S. Dist. LEXIS 9234, at *14-16 (N.D. Cal. 2005).*

11   In this context, "manipulative" is a term of art that "refers generally to practices such as wash sales, matched orders, or rigged prices, that are intended to mislead investors by artificially affecting market activity." *Santa Fe Indus., Inc. v. Green, 430 U.S. 462, 467-77 (1977).*

In this case, plaintiff's § 10(b) claims relate primarily to defendants' alleged misrepresentations in connection with Occam's financial performance. Accordingly, the Court follows Central Bank and Stoneridge and concludes that plaintiff's failure to point to a deceptive act on the part of the VC defendants forecloses liability under § 10(b). Id. at *16 (following Central Bank and [*51] holding that "§ 10(b) misrepresentation/omission claims cannot be maintained against defendants who neither make nor contribute to the drafting of the allegedly misleading statements despite the seemingly contrary holding of America West."). Because this defect disposes of plaintiff's § 10(b) claims against the VC defendants, the Court does not reach the VC defendants' further argument that plaintiff has failed to allege allegations giving rise to a strong inference of scienter as to them. In accordance with the foregoing, the Court GRANTS the VC defendants' motions to dismiss plaintiff's § 10(b) claims, with leave to amend.

### 3. The Auditor Defendants

The Auditor defendants argue that plaintiff's. § 10(b) claims against them must be dismissed because plaintiff's has failed to plead scienter. Plaintiff argues that it has set forth sufficient allegations to establish a strong inference that the Auditor defendants were deliberately reckless in issuing auditor's reports containing false and misleading statements in connection with Occam's financial statements.

First, plaintiff argues that the size of the restatement and the degree to which Occam's revenue recognition practices violated GAAP [*52] contribute to a strong inference of scienter. See *In re Daou Sys., 411 F.3d 1006, 1016 (9th Cir. 2005); Atlas v. Accredited Home Lenders Holding Co., 2008 U.S. Dist. LEXIS 3863, at *33 (S.D. Cal. 2008).*

Second, plaintiff contends that the Auditor defendants' audits failed to comply with GAAP in that they ignored indications that Occam had engaged in improper revenue recognition practices and that Occam's internal controls relating to accounting and revenue reporting were weak. Compl. P 211. Plaintiff argues that PwC knew of these problems in 2005, as demonstrated by Occam's SEC Form 10-K for fiscal year 2004, in which Occam disclosed that PwC had identified deficiencies with its internal controls relating to, *inter alia*, revenue recognition. Plaintiff further contends that PwC informed

Singer Lewak of these problems when Singer Lewak was employed as Occam's auditor. [12] Id. P 1210.

12   Plaintiff further contends that the Auditor defendants ignored certain "risk factors" set forth in Statement on Auditing Standards ("SAS") 99 that should have prompted them to conduct additional inquiries. However, plaintiff does not specifically identify which risk factors applied to Occam. See Opp'n 24.

Third, [*53] plaintiff contends that the Auditor defendants encountered numerous "red flags" that should have suggested the possibility that fraud was afoot and should have prompted them to undertake further inquiries. [13] Plaintiff maintains that these red flags were that (1) Occam was a small, under-funded company that required constant infusions of capital investments in order to continue as a going concern; (2) Occam had never earned a profit; (3) Occam competed in the competitive telecommunications industry, which had been plagued by recent, high-profile accounting scandals; (4) most of Occam's directors would not have been considered "independent" under the standards used by the SEC and in major stock markets; (5) two of Occam's Audit Committee members -- Krausz and Abbott -- had serious conflicts of interest; (6) Occam was not required to satisfy the requirements imposed upon publicly traded companies under the Sarbanes-Oxley Act 2002; (7) PwC had raised concerns in 2003 and 2004 that Occam may not be able to continue as a "going concern;" (8) PwC identified weaknesses with Occam's internal controls as they related to Occam's revenue recognition and reporting practices; and (9) the size and [*54] recurring nature of Occam's improper revenue recognition of revenue made their improper accounting practices obvious. *Id. P 216.*

13   "'Red flags' are those facts which come to the attention of an auditor which would place a reasonable auditor on notice that the audited company was engaged in wrongdoing to the detriment of its investors." In *Re Sunterra Corp. Sec. Litig., 199 F. Supp. 2d 1308, 1333 (M.D. Fla. 2002);* In re AOL Time Warner Sec. & "ERISA" *Litig., 381 F. Supp. 2d 192, 240 n.51 (S.D.N.Y. 2004).*

Based on the foregoing allegations, plaintiff argues that it has adequately pled the existence of a strong inference of scienter with regard to the Auditor defendants. See *In re Suprema Specialties, Inc. Sec. Litig., 438 F.3d 256, 279-80 (3d Cir. 2006)* ("At the pleading stage, courts have recognized that allegations of [generally accepted auditing standards] violations, coupled with allegations that significant 'red flags' were ignored, can suffice to withstand a motion to dismiss."); In re AOL Time Warner Sec. & "ERISA" *Litig., 381 F. Supp. 2d 192, 240*

*(S.D.N.Y. 2004)* ("Allegations of 'red flags,' when coupled with allegations of GAAP and [generally accepted auditing standards] violations, are [*55] sufficient to support a strong inference of scienter.").

As the Auditor defendants note, plaintiff must do more than plead that they conducted a negligent audit. The Ninth Circuit has stated,

> the mere publication of inaccurate accounting figures, or a failure to follow GAAP, without more, does not establish scienter. Rather, scienter requires more than a misapplication of accounting principles. The plaintiff must prove that the accounting practices were so deficient that the audit amounted to no audit at all, or an egregious refusal to see the obvious, or to investigate the doubtful, or that the accounting judgments which were made were such that no reasonable accountant would have made the same decisions if confronted with the same facts.

*DSAM Global Value Fund v. Altris Software, Inc., 288 F.3d 385, 390 (9th Cir. 2002).*

The Auditor defendants add that scienter cannot stand solely on allegations regarding the magnitude of the fraud. *Reiger v. Price Waterhouse Coopers LLP, 117 F. Supp. 2d 1003, 1013 (S.D. Cal. 2000)* ("a court should not infer an independent accountants's scienter based solely on the magnitude of its client's fraud. Rather, magnitude of fraud supports an inference of scienter [*56] only when the plaintiff pleads specific and detailed facts showing that the magnitude either enhanced the suspiciousness of specifically identified transactions, or made the overall fraud glaringly conspicuous."). The Auditor defendants also object that plaintiff's allegations regarding scienter are conclusory and nonspecific.

The Court agrees with the Auditor defendants that the red flags identified by plaintiff are far too generic to support a strong inference of scienter. As the Auditor defendants point out, most of these purported red flags are simply a function of Occam's status as a small, poorly-funded company; they do not, standing alone, suggest the existence of fraud. Without more, plaintiff's allegations do not demonstrate that the Auditor defendants' allegedly false and misleading representations with regard to Occam's financial reports were something more than the product of negligence.

Furthermore, plaintiff's contention that the Auditor defendants "turned a blind eye" to the accounting problems at Occam, is belied by allegations in the complaint

that both PwC and Singer Lewak identified and informed Occam's management of internal control deficiencies relating to revenue [*57] recognition. See Compl. PP 82, 90. Moreover, plaintiff's allegations that PwC was dismissed as Occam's auditor because it provided an unfavorable assessment of Occam's accounting and revenue recognition practices militates against an inference of scienter with regard to this defendant. The allegations in the complaint simply do not give rise to a "cogent and compelling" inference that is strong in relation to other reasonable explanations that the Auditor defendants were deliberately reckless in evaluating Occam's financial condition. *Tellabs, Inc. v. Makor Issues & Rights, Ltd., 127 S.Ct. 2499, 2510 (2007).* Accordingly, the Court GRANTS the Auditor defendants' motions to dismiss the § 10(b) claims against them, with leave to amend.

## B. Section 11 Claims

*Section 11* provides that if a registration statement for a security contains an untrue statement of material fact or omits a material fact, any person acquiring such security may sue certain individuals, including every person who signed the registration statement, every underwriter, and every person who was a director of the entity issuing the registration statement. *15 U.S.C. § 77k.* To state a *§ 11* claim, a plaintiff must allege that [*58] "(1) that the registration statement contained an omission or misrepresentation, and (2) that the omission or misrepresentation was material, that is, it would have misled a reasonable investor about the nature of his or her investment." *In re Stac Elecs. Sec. Litig., 89 F.3d 1399, 1403-04 (9th Cir. 1996)* (quotations and citation omitted). Plaintiff's § 11 claims are alleged against Occam, Howard-Anderson, Farrell, Krausz, Abbott, Bylin, Pardun, Cole, and Strom, each of whom signed the Amended Registration Statement on Form S-1/A filed with the SEC on October 13, 2006, in connection with Occam's secondary offering. Compl. PP 32-33, 35-40. Plaintiff also alleges that the VC defendants violated § 11 because each of them acted as an "issuer" or a "partner" within the meaning of the section. Plaintiff also alleges § 11 claims against the Auditor defendants and Thomas Weisel.

Although § 11 is a strict liability statute and does not require proof of fraud, and therefore, is not governed by the heightened pleading standards of the PSLRA, *Falkowski v. Imation Corp., 309 F.3d 1123, 1133-34 (9th Cir. 2002),* a plaintiff may be required to comply with *Fed. R. Civ. P. 9(b)*'s particularity requirements [*59] if the complaint "sounds in fraud." *In re Daou Sys., 411 F.3d 1006, 1027 (9th Cir. 2005).* Additionally, a court should "strip" from the *§ 11* claim any allegations of fraud that are inadequately pled under *Rule 9(b),* and then examine the remaining allegations to determine

whether they state a claim. Id. However, where the allegations underling the *§ 11* rest on a "wholesale adoption" of inadequately pled securities fraud allegations, the court may dismiss the *§ 11* claim altogether. Id.

### 1. The Occam Defendants

Plaintiff's § 11 claims against Occam, Howard-Anderson, Farrell, Krausz, and Abbott rests on a wholesale adoption of the fraud allegations raised in its § 10(b) claims against these defendants. Therefore, *Rule 9(b)*'s heightened pleading standard applies. However, for the same reasons that plaintiff has adequately pled scienter with respect to these defendants, plaintiff's *§ 11* claims are pled with adequate specificity to satisfy *Rule 9(b)*.

On the other hand, the complaint devotes comparatively little attention to Bylin, Pardun, Cole, and Strom, alleging only that these individuals were Occam directors and members of the Audit Committee, and that they signed Occam's financial disclosures. [*60] Although plaintiff appears to allege that these defendants participated in the alleged scheme to inflate Occam's stock price, the allegations regarding these defendants lack the specificity required by *Rule 9(b)*.

Accordingly, the Court DENIES the Occam defendants' motion to dismiss plaintiff's § 11 claims against Occam, Howard-Anderson, Farrell, Krausz, and Abbott. However, the Court GRANTS the Occam defendants' motion to dismiss plaintiff's § 11 claims with respect to Bylin, Pardun, Cole, and Strom.

### 2. The VC Defendants

Only the following defendants may be sued under § 11:

(1) every person who signed the registration statement;

(2) every person who was a director of (or person performing similar functions) or partner in, the issuer at the time of the filing of the part of the registration statement with respect to which his liability is asserted;

(3) every person who, with his consent, is named in the registration statement as being or about to become a director, person performing similar functions, or partner;

(4) every accountant, engineer, or appraiser, or any person whose profession gives authority to a statement made by him, who has with his consent been named as having prepared or [*61] certi-

fied any part of the registration statement, or as having prepared or certified any report or valuation which is used in connection with the registration statement, with respect to the statement, in such registration statement, report, or valuation, which purports to have been prepared or certified by him;

(5) every underwriter with respect to such security.

*15 U.S.C. § 77k(a).*

The VC defendants argue that plaintiff's § 11 claims against them must be dismissed because they do not fall into any of the foregoing categories of persons potentially liable under § 11.

Plaintiff responds that each of the VC defendants is liable as an "issuer" within the meaning of *§ 11.* Plaintiff contends that under the 1933 Act, an "issuer" is defined as "every person who issues or proposes to issue any security . . ." *15 U.S.C. § 77b(a)(4).* Plaintiff contends that the VC defendants are issuers because they sold nearly 1.5 million shares during Occam's secondary offering, thereby issuing stock in this offering. However, plaintiff cites no authority for the proposition that the VC defendants may be sued as issuers under this theory. Moreover, it has been observed that "[b]y its clear language, *Section 11* [*62] limits liability to *signatory* issuers, officers and directors, underwriters and auditors." *In re Am. Bank Note Holographics Sec. Litig., 93 F. Supp. 2d 424, 437 (S.D.N.Y. 2000)* (emphasis supplied). The VC defendants did not sign the Registration Statement, and therefore, they may not be sued as issuers under § 11. See id.; see also *In re Activision Sec. Litig., 621 F. Supp. 415, 424 (N.D. Cal. 1985)* ("The selling shareholders do not participate in the distribution process by merely selling their shares to the underwriter. In their capacity as selling shareholders they do not participate in the registration statement process. On these facts no purpose is served in holding them liable under § 11.").

Next, plaintiff contends that each of the VC defendants may be held liable as a "partner" in Occam under § 11. Plaintiff relies on the complaint's allegations that the USVP defendants and the NVP defendants controlled Krausz and Abbott, respectively, and that these individuals signed the Registration Statement. Again, plaintiff cites no authority for the proposition that such allegations as these suffice to qualify an entity as a "partner" that maybe held liable under § 11. Moreover, plaintiff [*63] offers no argument in support of such a sweeping extension of § 11 liability. See *Versyss, Inc. v. Coopers & Lybrand, 982 F.2d 653, 657 (1st Cir. 1992)* ("Section

11 . . . is remarkably stringent where it applies, readily imposing liability on ancillary parties to the registration statement . . . Its very stringency suggests that, whatever the usual rule about construing remedial securities legislation broadly . . . some care should be taken before section 11 is extended beyond its normal reading.").

Finally, plaintiff argues that the VC defendants are liable under § 11 on a theory of *respondeat superior*. Even if this doctrine were applicable in this case, however, because plaintiff has not alleged that Krausz and Abbott violated § 11 while acting as agents for the VC defendants, there is no basis for holding the VC defendants liable on this theory.

Because plaintiff has not set forth a basis for holding the VC defendants liable under § 11, the Court GRANTS the VC defendants' motions to dismiss these claims, with leave to amend. [14]

> 14   The Court does not reach the VC defendants' further argument that plaintiff has failed to plead its *§ 11* claims against them with the particularity required [*64] under *Rule 9(b)*.

### 3. The Auditor Defendants

#### a. Materiality

The Auditor defendants contend that plaintiff's § 11 claims must be dismissed for failure to adequately plead materiality. For an omitted fact or misstatement to be material, "there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988).

The Registration Statement at issue in this case incorporated (1) Occam's financial statements for the periods ended March 26, 2006, June 25, 2006, and September 24; 2006, and (2) Occam's previously-filed financial results, including those for fiscal years 2004 and 2005. Compl. PP 158-60. PwC certified Occam's financial results for fiscal year 2004, and Singer Lewak certified the financial results for fiscal year 2005. Compl. PP 160, 235; Declaration of Angela L. Dunning in Support of NVP Defendants' Motion, P 5, Ex. B at 113, 115-16 [Registration Statement]. The financial results for the first three quarters of 2006 were unaudited. Registration Statement 143-57.

PwC argues that although it certified [*65] the Registration Statement's reported financial results for fiscal year 2004, which overstated Occam's revenues by $ 4.798 million, this was not a material misrepresentation. PwC points out that plaintiff alleges that it purchased Occam shares nearly two years after the last period au-

dited by PwC. PwC argues that because Occam's restated revenues for 2005 and 2006 were very close to those reported in the Registration Statement, no reasonable investor would have relied on the misstated revenue figures from 2004 in deciding to purchase Occam's stock in connection with the November 2006 offering. PwC contends that this is especially so because Occam's reported cumulative losses for 2004 and 2005 were nearly identical to the restated cumulative losses for these two years. Furthermore, PwC argues that, if anything, Occam's stock would have been more attractive to investors had they known that Occam's revenues for fiscal year 2004 were overstated because, in this case, the company's revenue growth would have appeared more impressive between 2004 and 2006.

Plaintiff's § 11 claims against Singer Lewak are based upon alleged misstatements in the Registration Statement's 2005 and 2006 financial [*66] statements. Compl. P 235. Singer Lewak argues that any misstatement of Occam's 2005 revenues is immaterial because the difference between the revenue reported and the revenue restated is *de minimis*. [15] In fact, Singer Lewak points out, the Registration Statement *understated* revenues for 2005. Singer Lewak further argues that it cannot be liable for misstatements in connection with the Registration Statement's financial statements for the first three quarters of 2006 because these quarters are expressly "unaudited" and Singer Lewak made no representations in connection with these financial statements. See *Monroe v. Hughes*, 31 F.3d 772, 774 (9th Cir. 1994) (stating that an auditor may only be held liable under § 11 as to those portions of the registration statement that purport to have been prepared or certified by the auditor).

> 15   The Registration Statement reported revenues of $ 39.238 million for the year ended December 25, 2005. Compl. P 170. The restated revenue amount for that period is $ 39.597 million. Id.

Except as to the 2006 unaudited quarterly financial statements, these arguments are unpersuasive. To begin with, the materiality of a statement is a mixed question of fact and [*67] law that requires "delicate assessments of the inferences a 'reasonable shareholder' would draw from a given set of facts and the significance of those inferences to him, and these assessments are peculiarly ones for the trier of fact." *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976); *In re Metro. Sec. Litig.*, 532 F. Supp. 2d 1260, 1290 (E.D. Wash. 2007). "Accordingly, judicial determination of materiality is only appropriate where 'reasonable minds could not differ' on the statement's import." Id. (quoting *In re Heritage Bond Litig.*, 289 F. Supp. 2d 1132, 1146 (C.D. Cal. 2003)).

Singer Lewak's report in connection with the Registration Statement concludes that the Registration Statement's financial statements "present fairly, in all material respects, the financial position of Occam . . . as of December 25, 2005, and the results of their operations and their cash flows for the year then ended in conformity with U.S. generally accepted accounting principles." Registration Statement 115. Likewise, PwC's report concludes that the financial disclosures in the Registration Statement "present fairly, in all material respects, the financial position of Occam . . . at December [*68] 26, 2004, and the results of their operations and their cash flows for each of the two years in the period ended December 26, 2004, in conformity with accounting principles generally accepted in the United States of America." *Id.* 116. PwC's report includes a "going concern" qualification. Id.

Neither of the Auditor defendants' reports includes a qualification that the year-end revenue totals for 2004 and 2005 are partially comprised of revenues that were prematurely recognized on a quarterly basis. Plaintiff alleges that upon the disclosure of these revenue recognition practices, the market reacted swiftly, and Occam's stock plummeted. Under these circumstances, the Court is unable to conclude that reasonable minds could not differ as to the significance of certifying Occam's revenues without disclosing Occam's underlying revenue recognition practices. [16] Therefore, the issue of materiality is inappropriate for resolution on a motion to dismiss.

16    Moreover, the Court is not persuaded by PwC's contention that reasonable minds could not differ in concluding that Occam's restatement of its 2004 revenues is immaterial. It has been observed that a company's income trend over a number years [*69] can be important to investors. *In re Metro Sec. Litig., 532 F. Supp. 2d at 1290.*

**b. Rule 9(b)**

Singer Lewak argues that plaintiff's *§ 11* claim against it sounds in fraud because plaintiff effectively alleges that it was involved in a fraudulent scheme to drive up Occam's share prices. Accordingly, Singer Lewak contends that the heightened pleading standard of *Rule 9(b)* applies. Singer Lewak further contends that plaintiff's allegations are too conclusory and general to satisfy the *Rule 9(b)*, such that this claim must be dismissed. Specifically, Singer Lewak maintains that the complaint alleges no more than that it had access to information regarding Occam, that Singer Lewak committed certain GAAP violations, and ignored numerous "red flags."

To begin with, to plead liability under *§ 11*, plaintiff need not allege that Singer Lewak engaged in fraud. Instead, plaintiff need only allege the existence of a material misrepresentation or omission in the Registration Statement. In any event, even if plaintiff intends to proceed against Singer Lewak solely on the theory that it violated *§ 11* as part of a fraudulent scheme, plaintiff's allegations pass muster under *Rule 9(b)*.

Although the Court concludes [*70] herein that plaintiff has failed to set forth allegations giving rise to a strong inference that the Auditor defendants acted with scienter within the meaning of § 10(b), *Rule 9(b)'s* pleading standard is less demanding. Here, the complaint sets forth in detail which statements made by the Auditor defendants were false and why. These allegations are sufficient to satisfy *Rule 9(b)'s* requirements. See *In re Immune Response Sec. Litig., 375 F. Supp. 2d 983, 1038 (S.D. Cal. 2005)* (allegations that the defendants filed a materially inaccurate and misleading prospectus and registration statement, along with alleged details regarding the contents of the statement and the reasons why it was false met the requirements of *Rule 9(b)* and sufficed to state a claim under *§ 11*); *In re Nat'l Golf Props. Sec. Litig., 2003 U.S. Dist. LEXIS 4321, at *13-14 (C.D. Cal. 2003)* ("the Ninth Circuit requires that in addition to the time, place and content of an alleged misrepresentation, plaintiffs must 'set forth what is false or misleading about a statement and why it is false.'") (quoting *In re Glenfeld Sec. Litig., 42 F.3d 1541, 1545-46 (9th Cir. 1994)).*

Accordingly, the Court DENIES the Auditor defendants' [*71] motions to dismiss plaintiff's § 11 claims against them.

**4. Thomas Weisel**

Thomas Weisel argues that the sole claim against them, for violating *§ 11*, must be dismissed because plaintiff has failed to plead this claim with the particularity required by *Rule 9(b)*. Plaintiff responds that, as to Thomas Weisel, the heightened pleading standard of *Rule 9(b)* does not apply because plaintiff's *§ 11* claim against this defendant does not sound in fraud.

Thomas Weisel, Occam's lead underwriter in connection with the secondary offering, is mentioned in only two paragraphs in the 105-page complaint. Compl. PP 43, 236. Neither of these paragraphs alleges that Thomas Weisel engaged in any fraudulent activity. Instead, the complaint alleges merely that Thomas Weisel, acting as Occam's lead underwriter, "issued, caused to be issued, and participated in the issuance of the materially false and misleading Registration Statement." *Id.* PP 43, 236.

Thomas Weisel contends, however, that throughout the complaint plaintiff uses the word "defendants" to refer to all of the defendants, including Thomas Weisel.

Thus, Thomas Weisel maintains, plaintiff's *§ 11* claim against Thomas Weisel stems from its alleged involvement [*72] in the fraudulent scheme, such that *Rule 9(b)*'s pleading standard is triggered.

The Court is unpersuaded by this argument. Given that there are fifteen separate named defendants in this action, the use of the word "defendants" throughout the complaint must be understood in context. Because Thomas Weisel is mentioned only twice in the complaint, with no hint of an allegation that it participated in any fraudulent conduct, Thomas Weisel's reading that plaintiff's § 1.1 claim against it sounds in fraud is not persuasive. Furthermore, during oral argument, plaintiff's counsel stated that plaintiff does not proceed against Thomas Weisel on the theory that it engaged in fraudulent conduct.

Thomas Weisel further alleges that plaintiff's *§ 11* claim fails under *Rule 8* as well. Because plaintiff's allegations put Thomas Weisel on fair notice of the basis for its *§ 11* claim, Thomas Weisel's argument lacks merit. Accordingly, the Court DENIES Thomas Weisel's motion to dismiss. However, the Court directs that plaintiff amend its complaint to clearly reflect that its *§ 11* claim is not predicated on any allegation that Thomas Weisel engaged in fraudulent conduct.

## C. Control Person Liability Under *§ 15* [*73] and *§ 20(a)*

Section 20(a) of the 1934 Act provides:

[e]very person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person . . . is liable unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

*15 U.S.C. § 78t(a).*

*Section 15* of the 1933 Act provides:

[e]very person who, by or through stock ownership, agency, or otherwise . . . controls any person liable under sections [11 or 12] of this title, shall also be liable jointly and severally with and to the same extent as such controlled person . . . unless the controlling person had no knowledge of or reasonable ground to believe in the existence of the facts by reason of which the liability of the controlled person is alleged to exist.

*15 U.S.C. § 77o.*

The standard for establishing control liability under *§§ 15* and *20(a)* is the same. *Hollinger v. Titan Capital Corp., 914 F.2d 1564, 1578 (9th Cir. 1990).* For both statutes, plaintiff must prove: "(1) a primary violation of federal [*74] securities laws . . .; and (2) that the defendant exercised actual power or control over the primary violator." *Howard v. Everex Systems, Inc., 228 F.3d 1057, 1065 (9th Cir. 2000); In re Surebeam Corp. Sec. Litig., 2004 U.S. Dist. LEXIS 26951, at *71 (S.D. Cal. 2004).* "Plaintiff need not show that the defendant was a culpable participant in the violation, but defendant may assert a 'good faith' defense." *Howard, 228 F.3d at 1065.* Thus, "to establish the liability of a controlling person, the plaintiff does not have the burden of establishing that person's scienter distinct from the controlled corporation's scienter." *Arthur Children's Trust v. Keim, 994 F.2d 1390, 1398 (1993).* Additionally, a claim under these sections must be pleaded in accordance with *Fed. R. Civ. P. 8(a)(2)*, requiring that the plaintiff provide a "short and plain statement of the claim showing that the pleader is entitled to relief." *Pension Comm. of the Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC, 446 F. Supp. 2d 163, 190 (S.D.N.Y.)* (2006) (claim under *§ 20(a)* must be pleaded in accordance with *Rule 8(a)*); *In re Initial Pub. Offering Sec. Litig., 241 F. Supp. 2d 281, 352 (S.D.N.Y. 2003)* ("*Section 15* [*75] claims need only be pleaded under *Rule 8*; a defendant is only entitled to notice that she allegedly controlled an entity that violated *Section 11*."). [17]

17   At oral argument counsel for the NVP defendants argued that the standard for pleading control person liability under *§ 20(a)* is in fact the heightened pleading standard of *Rule 9(b)* and the PSLRA, relying on In re Splash Tech. Holdings, Inc. Sec. Litig., 2000 WL 1727377, at *25 (N.D. Cal. 2000), and In re Oak Tech. Sec. Litig., 1997 WL 448168, at *14 (N.D. Cal. 1997). Although Oak Tech. required that the "control relationship" be pled with particularity, in accordance with *Rule 9(b)*, it did not explain the basis for this requirement. Oak Tech., 1997 WL 448168, at *14. Splash Tech. relied entirely on Oak Tech. in requiring that the control relationship be pled with particularity. Splash Tech., 2000 WL 1727377, at *25.

The Court respectfully declines to follow these two decisions, and instead finds persuasive

those cases that have reasoned that a *§ 20(a)* claim need not be pled in accordance with *Rule 9(b)* or the PSLRA because scienter and fraud are not elements of such a claim. See In re Initial Pub. Offering, 241 F. Supp. 2d at 396 [*76] ("Neither the PSLRA (because scienter is not an essential element), nor *Rule 9(b)* (because fraud is not an essential element), apply to a *Section 20(a)* claim."); see also *Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc., 2005 U.S. Dist. LEXIS 19506, at *32 n.95 (S.D.N.Y. 2005)* ("the majority of recent decisions hold that claims under *Section 20(a)* are subject only to the pleading standards of *Rule 8(a)*."); see also *Hollinger v. Titan Capital Corp., 914 F.2d 1564, 1575 (9th Cir. 1990)* (en banc) (stating that § 20(a) "premises liability solely on the control relationship, subject to the good faith defense," and holding that a showing of "culpable participation" is not required to establish that a broker-dealer was a controlling person); *In re WorldCom, Inc. Sec. Litig., 2005 U.S. Dist. LEXIS 4193, at *42 (S.D.N.Y. 2005)* ("To read a scienter requirement into the prima facie case for a Section 20(a) claim would unreasonably strain the plain language of a clearly written provision.").

The determination of who is a controlling person is "an intensely factual question, involving scrutiny of the defendant's participation in the day-to-day affairs of the corporation and the defendant's [*77] power to control corporate actions." *Howard, 228 F.3d at 1065.* "The traditional indicia of control are: having a prior lending relationship, owning stock in the target company, or having a seat on the board." *In re Surebeam, 2004 U.S. Dist. LEXIS 26951, at *72.*

**1. The Occam Defendants**

Assuming *arguendo* that plaintiff has alleged a sufficient basis for Occam's liability under § 10(b) and § 11, the Occam defendants do not dispute that Howard-Anderson, Farrell, and Bailey may be held liable as control persons of Occam under § 20(a) or *§ 15*, as applicable. They argue, however, that plaintiff's *§ 20(a)* claims against Krausz, Abbott, and Bylin, and its *§ 15* claims against Krausz, Abbott, Bylin, Pardun, Cole, and Strom, must be dismissed for failure to plead sufficiently that these individuals are control persons of Occam.

Plaintiff alleges that Krausz and Abbott controlled the Audit Committee until they stepped down from their positions on the Committee in May 2006. Compl. P 46. In this capacity, plaintiff alleges, Krausz and Abbott were able to direct Occam's policies relating to accounting and auditing during the Class Period. Id. Plaintiff argues that based on this control of the Audit Committee,

[*78] Krausz and Abbott were primarily responsible for the firing of PwC and the retention of Singer Lewak in its place. These allegations are sufficient to establish a prima facie case of control person liability with regard to Krausz and Abbott. See *In re Nature's Sunshine Prods. Sec. Litig., 486 F. Supp. 2d 1301, 1314 (D. Utah 2007)* (the plaintiffs adequately pled control person liability based on allegations that one defendant, as the chairman of the company's audit committee, had power to direct the management and policies of the company related to accounting and auditing).

However, plaintiff offers no argument for why Bylin, Pardun, Cole, and Strom are liable under *§ 15* or *§ 20(a)*, as applicable. In the complaint, plaintiff does no more than allege that these defendants are directors, who served on the Audit Committee, and who signed Occam's SEC filings. Such allegations do not offer any indication that these defendants were involved in the day-to-day affairs of Occam, and therefore, they do not present a basis for control liability against these defendants. See *Keim, 994 F.2d at 1396* ("A director is not automatically liable 'as a controlling person."). For this reason, plaintiff's *§ 15* [*79] and *§ 20(a)* claims against these defendants must be dismissed.

Accordingly, the Court GRANTS the Occam defendants' motion to dismiss plaintiff's *§ 20(a)* claim against Bylin, with leave to amend. The Court further GRANTS the Occam defendants' motion to dismiss plaintiff's *§ 15* claims against Bylin, Pardun, Cole, and Strom, with leave to amend. However, the Court DENIES the Occam defendants' motion to dismiss plaintiff's *§ 20(a)* and *§ 15* claims against Howard-Anderson, Farrell, Bailey, Krausz, and Abbott.

**2. The VC Defendants**

Plaintiff makes two arguments for the VC defendants' liability under *§ 20(a)* and *§ 15*. First, plaintiff argues that the VC defendants controlled Krausz and Abbott, both of whom violated § 10(b) and § 11. Second, plaintiff argues that they controlled Occam -- by virtue of their collective ownership of the majority of Occam's shares -- which also violated § 10(b) and § 11.

The VC defendants contend that they cannot be held liable as control persons under either *§ 15* or section *§ 20(a)* because plaintiff has failed to set forth allegations that they have exercised "a significant degree of day-to-day operational control, amounting to the power to dictate another party's [*80] conduct or operations." *In re McKesson HBOC, Inc. Sec. Litig., 126 F. Supp. 2d 1248, 1277 (N.D. Cal. 2000)* (quoting *In re ZZZZ Best Sec. Litig., 864 F. Supp. 960, 970 (C.D. Cal. 1994)*).

The Court concludes, however, that plaintiff has adequately pled its claims of control person liability un-

der § 20(a) and § 15 against the VC defendants. Plaintiff's allegations that the VC defendants' majority stake in Occam enabled them to control decisions such as Occam's auditing and revenue recognition practices place the VC defendants on adequate notice as to the basis for its claims against them. Moreover, plaintiff's allegations that the VC defendants controlled Krausz and Abbott for the purposes of managing their investment in Occam, when coupled with the predicate violations of § 10(b) and § 11, are themselves sufficient to plead the VC defendants' liability under § 20(a) and § 15. Compl. PP 35, 36; *Pension Comm. of the Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC, 446 F. Supp. 2d 163, 190 (S.D.N.Y. 2006)* ("Naked allegations of control . . . will typically suffice to put a defendant on notice of the claims against her.") (citing *In re Initial Public Offering Sec. Litig., 241 F. Supp. 2d at 352*).

Therefore, [*81] the Court DENIES the VC defendants' motions to dismiss plaintiff's control person claims under *§ 20(a)* and *§ 15*.

**D. Section 20A Claims**

Plaintiff alleges claims under § 20A of the Exchange Act against Howard-Anderson and the VC defendants. Section 20A of the 1934 Act governs liability to contemporaneous traders for insider trading. *15 U.S.C. § 78t-1(a)*. It provides in pertinent part as follows:

[a]ny person who violates any provision of this title . . . or the rules or regulations thereunder by purchasing or selling a security while in possession of material, nonpublic information shall be liable in an action in any court of competent jurisdiction to any person who, contemporaneously with the . . . sale of securities that is the subject of such violation, has purchased . . . securities of the same class.

Id.

To allege a claim under § 20A plaintiff must plead that it traded contemporaneously with an insider. *Neubronner v. Milken, 6 F.3d 666, 970 (9th Cir. 1993)*. Moreover, because contemporaneous trading is a "circumstance constituting fraud," *Rule 9(b)*'s particularity requirement applies to a claim for insider trading under § 20A. Id.

The Occam defendants contend that plaintiff's § 20A claim [*82] against Howard-Anderson must be dismissed because plaintiff has failed to allege that he knew

of material, non-public information when he sold Occam stock. Because the Court herein concludes that plaintiff has alleged scienter with respect to its § 10(b) claim against Howard-Anderson, the Occam defendants' argument lacks merit.

Nonetheless, plaintiff has failed to state a claim under § 20A because plaintiff has not pled that it purchased Occam's securities contemporaneously with any alleged insider's sale of Occam stock. Because its initial purchases of Occam stock, on November 2, 2006, preceded Howard-Anderson's and the VC defendants' sales of Occam stock on November 7 and 14, 2006, those trades by plaintiff were not contemporaneous with any alleged insider's sales. See *Alfus v. Pyramid Tech. Corp., 745 F. Supp. 1511, 1522 (N.D. Cal. 1990)* (for a plaintiff's trade to have been contemporaneous, it must have occurred after the wrongful insider transaction). Plaintiff's next purchase of Occam stock, on February 1, 2007, was also not contemporaneous with any sale of Occam stock on the part of Howard-Anderson or the VC defendants because it occurred too long after these defendants sold [*83] their Occam stock in November 2006, and because it preceded the USVP defendants' sale of Occam stock on February 21, 2007. Id. ("the contemporaneous requirement has been deemed not met if plaintiff's trade occurred more than a few days apart from defendants' transactions."). [18]

18 Batwin, who is not a named plaintiff on the consolidated complaint, has already certified to this Court that she purchased Occam stock on February 15, 2006 -- a day after Howard-Anderson and the VC defendants sold their Occam stock. See Declaration of Lori S. Brodi in Support of Batwin's Mot. to Consolidate Related Cases and to Be Appointed Lead Pl. P 2, Ex. 1; see *In re Applied Micro Circuits Corp. Sec. Litig., 2003 U.S. Dist. LEXIS 14492, at *15-17 (S.D. Cal. 2003)* (declining to hold that the plaintiffs' purchases of shares two days after the defendants sold their shares were not "contemporaneous" as a matter of law). However, because Batwin is not a named plaintiff on the consolidated complaint, plaintiff may not assert a § 20A claim that is predicated on her trades of Occam stock. See *In re Flag Telecom Holdings, LTD., 308 F. Supp. 2d 249, 257 (S.D.N.Y. 2004)* ("a party named 'lead plaintiff' under the [*84] PSLRA need not have standing to sue on each individual claim asserted in the complaint so long as other named plaintiffs have standing to pursue the claims at issue.").

Plaintiff's § 20A claims against the VC defendants are also deficient because plaintiff has not alleged a

predicate violation of the Exchange Act. First, the Court concludes herein that plaintiff has not pled a § 10(b) claim against either of the VC defendants, such that this claim may not serve as a predicate violation. Second, although at least one court has held that a claim for control person liability under § 20(a) may serve as a predicate violation for the purposes of § 20A, this is so only where the claim for control person liability relates to insider trading. See *In re Refco, Inc. Sec. Litig., 503 F. Supp. 2d 611, 664-66 (S.D.N.Y. 2007).* Here, plaintiff's § 20(a) claims against the VC defendants relate to the conduct of Occam, Krausz, and Abbott, and none of these defendants are alleged to have engaged in insider trading.

Because of these deficiencies, the Court GRANTS the Occam defendants' and the VC defendants' motions to dismiss plaintiff's claims under § 20A, with leave to amend.

## V. CONCLUSION

In accordance [*85] with the foregoing, the Court finds and concludes as follows:

(1) The Court DENIES the Occam defendants' motion to dismiss plaintiff's § 10(b) claims.

(2) The Court DENIES the Occam defendants' motion to dismiss plaintiff's § 11 claims against Occam, Howard-Anderson, Farrell, Krausz, and Abbott. The Court GRANTS the Occam defendants' motion to dismiss plaintiff's § 11 claims with respect to Bylin, Pardun, Cole, and Strom.

(3) The Court GRANTS the Occam defendants' motion to dismiss plaintiff's *§ 20(a)* claim against Bylin, with leave to amend. The Court further GRANTS the Occam defendants' motion to dismiss plaintiff's *§ 15*

claims against Bylin, Pardun, Cole, and Strom, with leave to amend. The Court DENIES the Occam defendants' motion to dismiss plaintiff's *§ 20(a)* and *§ 15* claims against Howard-Anderson, Farrell, Bailey, Krausz, and Abbott.

(4) The Court GRANTS the Occam defendants' motion to dismiss plaintiff's § 20A claim against Howard-Anderson, with leave to amend.

(5) The Court GRANTS the VC defendants' motions to dismiss plaintiff's § 10(b) claims, with leave to amend.

(6) The Court GRANTS the VC defendants' motions to dismiss the plaintiff's § 11 claims, with leave to amend.

(7) The [*86] Court DENIES the VC defendants' motions to dismiss plaintiff's control, person claims under *§ 20(a)* and *§ 15.*

(8) The Court GRANTS the VC defendants' motions to dismiss plaintiff's claims under § 20A, with leave to amend.

(9) The Court GRANTS the Auditor defendants' motions to dismiss the § 10(b) claims, with leave to amend.

(10) The Court DENIES the Auditor defendants' motions to dismiss plaintiff's § 11 claims.

(11) The Court DENIES Thomas Weisel's motion to dismiss plaintiff's § 11 claim. However, the Court directs that plaintiff amend its complaint to clearly reflect that its § 11 claim is not predicated on any allegation that Thomas Weisel engaged in fraudulent conduct.

IT IS SO ORDERED.