**United States District Court**
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DANNY McCASLAND, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>FORMFACTOR INC., et al.<br><br>Defendants. | No. C 07-5545 SI<br><br>**ORDER GRANTING DEFENDANTS' MOTIONS TO DISMISS WITH LEAVE TO AMEND** |

On July 25, 2008, the Court heard argument on defendants' motions to dismiss plaintiffs' fist amended complaint. Having considered the arguments of counsel and the papers submitted, the Court hereby GRANTS defendants' motions, with leave to amend, for the reasons set out below.

**BACKGROUND**

This is a securities class action against FormFactor, Inc. and certain of its officers[1] under Rule 10b-5 and §§ 10(b) and 20(a) of the Securities Exchange Act of 1935 ("Exchange Act"). Lead plaintiff, the City of Monroe Employees' Retirement System, brings suit on behalf of all those who purchased or otherwise acquired the common stock of FormFactor between February 1, 2006 and February 5, 2008 ("class period").

FormFactor is a publicly traded company headquartered in Livermore, California that designs,

---

[1] The FormFactor officers named in the complaint include Igor Y. Khandros, CEO; Richard M. Freeman, Senior Vice President, Operations; Ronald C. Foster, CFO until his February 25, 2008 resignation; and Joseph Bronson, President until his January 5, 2007 resignation (collectively, "defendants").

manufactures and sells advanced wafer probe cards, which its customers – dynamic random access memory (DRAM), flash and microprocessor manufacturers – use to electrically test integrated circuits for semiconductor chips in the front end of the manufacturing process.

In April 2005, FormFactor introduced its new "Harmony" architecture for wafer probe cards, designed to reduce to one the "touchdowns," or numbers of times the card touched the chip while testing its functionality, thereby minimizing the risk of the card damaging the chip at contact. FormFactor intended Harmony to differentiate it from its competition. Thus, it was not only critical that FormFactor be able to actually deliver and execute Harmony's single-touchdown technology, but also that it be the first in the industry to market with such technology. The market reacted well to FormFactor's representations about Harmony's single-touchdown technology and its potential both for FormFactor's future revenue and for reshaping the integrated circuit test industry. Accordingly, during the period of April 19, 2005 to February 1, 2006, FormFactor's stock price rose 68%, climbing from $20.83 per share to $30.46.

On February 1, 2006, the first day of the class period, Bronson, Khandros and Foster held a conference call with securities analysts in which Foster stated:

> We have completed our first Harmony architecture probe card field trial, which began with an early adopter in the second half of '05. Product performance exceeded expectations. We expect to see significant revenues for our probe card based on Harmony platform in the second half of '06, with everything centered around 300 millimeter. Harmony will be the cornerstone of flash and then DRAM for the next several years.

Complaint ¶ 6, 85. Foster further represented, "All production processes are now fully functioning in our new facility,[2] with output and yields improving steadily" and "[FormFactor is] planning to have [Harmony NAND Flash] in place for volume production in the second half of '06." *Id.* ¶ 7, 86, 88. Upon this news, FormFactor's stock rose 21% in one day, from $30.46 per share to $36.95.

Plaintiffs' complaint alleges that defendants' February 1, 2006 representations were materially false and misleading, and that defendants knew the representations to be materially false and misleading at the time. Further, according to the complaint, defendants continued throughout the class period to

---

[2] By early 2006, FormFactor moved into a new manufacturing facility in Livermore, California, which was aimed to increase factory productivity, yields and on-time deliveries. *See* complaint ¶ 5.

2

issue similarly materially false and misleading statements in press releases and conference calls with security analysts – known by defendants to be materially false and misleading when issued – regarding FormFactor's business, operating and financial results, including representing that Harmony remained on track to be the industry's leading, single-touchdown wafer probe card. Plaintiffs contend that FormFactor struggled throughout the class period to effectively or efficiently manufacture its Harmony products, but issued these statements and engaged in an assortment of fraudulent schemes to represent otherwise to the market.[3] According to the complaint, defendants' materially false and misleading statements and information that FormFactor made publicly available about its financial and business prospects caused its stock to trade at artificially inflated prices during the class period, including a high of $49.45 per share on August 31, 2006.[4] Lead plaintiff and others similarly situated who purchased common stock at these prices relied on defendants' statements and were damaged thereby.

Plaintiffs' complaint alleges that, despite defendants' representations to the contrary, defendants knew but concealed from the investing public that they had "no reasonable basis for representing that [FormFactor's] production processes were fully functioning, with output and yields improving steadily," or that FormFactor would be able to produce Harmony probe cards "as promised." *Id.* ¶ 89(a). Plaintiffs further contend that defendants knew but failed to disclose publicly that, throughout the class period, FormFactor faced production constraints, namely chronic poor yields,[5] that impeded the actual production of Harmony products, including "FormFactor's ability to bring new products into volume production efficiently and in a timely manner," *Id.*; increased FormFactor's costs and expenses; caused

---

[3] Plaintiffs base many of the allegations in the complaint on the personal knowledge and statements of nine confidential witnesses (CWs) who worked at FormFactor during parts or all of the class period in various capacities related to production, operations, manufacturing, engineering, project management, accounting and financial analysis, and information technology. The information provided by the CWs is discussed in further detail below.

[4] On August 31, 2006, FormFactor introduced the Harmony OneTouch probe card for the 300-mm Flash memory product.

[5] Plaintiffs allege that although, throughout the class period, defendants attributed FormFactor's manufacturing constraints to capacity, customer integration or personnel issues, defendants knew but never disclosed to the public that the principal problem was systematic and chronic poor yields in the manufacturing process.

3

delay in customer shipments;[6] and created a risk that customers would seek alternative sources from competitors or endeavor to renegotiate existing contracts with FormFactor.

FormFactor's pervasive poor yields led to the build-up of "scrap," or obsolete parts for wafer probe cards, which plaintiffs allege that defendants covered up through the "practice of overstating inventory and improperly classifying" the scrap as a research and development (R&D) cost rather than as a cost of revenues,[7] "thereby not disclosing FormFactor's actual financial performance and true operating margins."[8] *Id.* ¶ 89(b). Defendants' accounting manipulations and violations of generally accepted accounting principles ("GAAP") both helped to conceal FormFactor's undisclosed production constraints and improperly manage FormFactor's earnings and reported financials so as to meet security analysts' expectations and create the image of FormFactor as engaging in extensive R&D to maintain its technical competitive edge in the industry.[9] As a result, FormFactor falsely reported its results for 2006 and the first half of 2007, including misstating reporting inventory, gross margin, operating margin and net income. FormFactor has since "restated its previously issued financial results due to these accounting violations" and is presently "in the process of completing its remediation plan to address the design of controls over inventory valuation." *Id.* ¶ 12.

As FormFactor experienced protracted but publicly undisclosed problems with ramping its Harmony products, plaintiffs allege that "defendants took advantage of the inflated stock price to unload their stock." *Id.* ¶ 13. The complaint contends that defendants' "illicit insider trading" consisted of Bronson selling 25,000 shares, or 36.83% of his holdings, for more than $1 million in proceeds; Foster

---

[6] Plaintiffs allege that though defendants assured the market of accelerated Harmony production, FormFactor shipped out merely 20% of Harmony orders on time during the class period. In December 2007, as a result the delays, Elpida Memory, Inc. ("Elpida"), FormFactor's main client in Japan, began considering alternative wafer probe cards from competitor Advantest Corp., which at that juncture, introduced a new DRAM probe card that was technologically competitive with Harmony, according to analysts reports. *See* complaint ¶¶ 19, 53-58.

[7] As the R&D group performed limited, if any testing on the scrap inventory, it did not qualify as an R&D cost and should not have been written off as such, plaintiffs contend.

[8] Specifically, defendants' fraudulent accounting practices caused the understatement of the cost of revenues and the overstatement of gross margin, plaintiffs' complaint alleges.

[9] In part, FormFactor's inadequate internal controls over inventory systems permitted defendants to engage in this practice, according to the complaint.

4

selling 19,800 shares, or 87.29% of his holdings, of $864,144 in proceeds; and Khandros selling 723,079 shares, or 23.91% of his holdings, for $27.86 million in proceeds.[10]

On October 24, 2007, FormFactor announced possible adjustments to inventory valuations for periods prior to the third quarter of 2007. In a conference call with security analysts on the same day, defendants disclosed for the first time that Harmony production was behind schedule, but attributed the delay to "capacity constraints," *Id.* ¶ 15, and represented that demand remained strong, without referencing FormFactor's underlying poor yields, plaintiffs contend. FormFactor's stock declined $7.70 per share in one day of trading, dropping nearly 20% from $43.24 per share to close at $35.54. On November 11, 2007, FormFactor filed amended Forms 10-K and 10-Q and restated its financials for the fiscal year of 2006 and the first two quarters of 2007.[11] Its restated Form 10-K represented that FormFactor "did not maintain effective controls over the valuation of inventory and the related cost of revenues accounts . . . [and] did not maintain effective controls to ensure that the estimation process to value inventory complied with [FormFactor's] accounting policies." *Id.* ¶ 18.

On February 5, 2008, in announcing its fiscal year of 2007 and fourth quarter of 2007 financial results, FormFactor disclosed what plaintiffs' complaint alleges defendants had known throughout the class period, namely that FormFactor had "severe operations issues in ramping up the production of Harmony, and was therefore unable to ship Harmony to customers, causing a decline in revenue and bookings." *Id.* ¶ 20. In a conference call held by Khandros, Bronson and Foster with security analysts, Khandros stated,

> [O]ur new product ramp challenges with Harmony resulted in missed opportunities with a few customers causing the majority of the overall revenue shortfall in the [fourth] quarter [of 2007]. . . . Due to the protracted Harmony ramp issues we experienced in 2007, FormFactor was not the first full wafer contractor probe card company qualified at some DRAM suppliers. This resulted in the loss of business in the fourth quarter . . . .

*Id.* ¶ 20, 161. As a result of lost DRAM market share "driven by DRAM industry weakness and

---

[10] Defendants were also rewarded with stock options during the class period: Khandros, 231,540 shares of stock options; Bronson, 94,220; Foster, 115,580; and Freeman, 85,000.

[11] In its restatement, FormFactor represented that it "did not consistently follow its accounting policies for valuing inventory resulting in material misstatement of inventory and cost of revenue," causing a material overstatement of inventory, cost of revenues, gross margin, net income and earnings per share. Complaint ¶ 17.

Harmony DRAM production issues," FormFactor also announced a "bleak outlook for 2008." *Id.* ¶ 20. FormFactor's stock dropped 11% on February 5, 2008 and another 9% on the following day, closing at $21.06 per share. The stock has traded in the vicinity of $20.00 per share since then.

Plaintiffs filed a complaint against defendants in this Court for violations of federal securities laws on October 31, 2007, subsequently amending the complaint on April 3, 2008. Now before the Court are defendants' motions – a motion filed by defendants collectively and a separate motion filed by Freeman – to dismiss plaintiffs' first amended complaint pursuant to Rules 12(b)(6) and 9(b) of the Federal Rules of Civil Procedure and the Private Securities Litigation Reform Act of 1995 ("PSLRA") on the grounds that the complaint fails to state a claim and fails to comply with Rule 9(b) and the PSLRA.

## LEGAL STANDARDS

### I. Rule 12(b)(6)

Under Federal Rule of Civil Procedure 12(b)(6), a district court must dismiss a complaint if it fails to state a claim upon which relief can be granted. The question presented by a motion to dismiss is not whether the plaintiff will prevail in the action, but whether the plaintiff is entitled to offer evidence in support of the claim. *See Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974), *overruled on other grounds by Davis v. Scherer*, 468 U.S. 183 (1984).

In answering this question, the Court must assume that the plaintiff's allegations are true and must draw all reasonable inferences in the plaintiff's favor. *See Usher v. City of Los Angeles*, 828 F.2d 556, 561 (9th Cir. 1987). Even if the face of the pleadings suggests that the chance of recovery is remote, the Court must allow the plaintiff to develop the case at this stage of the proceedings. *See United States v. City of Redwood City*, 640 F.2d 963, 966 (9th Cir. 1981). Dismissing a complaint for failure to state a claim is proper only "if it appears beyond doubt" that the plaintiff "can prove no set of facts which would entitle him to relief." *Vazquez v. Los Angeles County*, 487 F.3d 1246, 1249 (9th Cir. 2007) (internal quotation marks omitted).

If the Court dismisses the complaint, it must then decide whether to grant leave to amend. The Ninth Circuit has "repeatedly held that a district court should grant leave to amend even if no request

6

to amend the pleading was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts." *Lopez v. Smith*, 203 F.3d 1122, 1130 (9th Cir. 2000) (citations and internal quotation marks omitted).

## II.   Section 10(b) and Rule 10b-5

Section 10(b) of the Securities Exchange Act provides, in part, that it is unlawful "to use or employ in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe." 15 U.S.C. § 78j(b). Rule 10b-5 makes it unlawful for any person to use interstate commerce:

> (a) To employ any device, scheme, or artifice to defraud,
>
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
>
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.

In order to state a claim under § 10(b) and Rule 10b-5, the plaintiff must allege (1) a misrepresentation or omission (2) of material fact (3) made with scienter (4) on which the plaintiff justifiably relied (5) that proximately caused the alleged loss. *See Binder v. Gillespie*, 184 F.3d 1059, 1063 (9th Cir. 1999). Generally, plaintiffs in federal court are required to give a short, plain statement of the claim sufficient to put the defendants on notice. Federal Rules of Civil Procedure also require that "the circumstances constituting fraud or mistake shall be stated with particularity." Fed. R. Civ. P. 9(b).

## III.   Private Securities Litigation Reform Act (PSLRA)

The PSLRA was enacted as an amendment to the Exchange Act. *See In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 973 n.2 (9th Cir. 1999). Under the PSLRA:

> In any private action arising under his chapter under which the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind, the complaint

7

> shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind. 15 U.S.C. § 78u-4(b)(2).

The required state of mind is "at a minimum, deliberate recklessness." *In re Silicon Graphics*, 183 F.3 at 983. Scienter may be pled and proven by reference to circumstantial evidence. *See In re Peoplesoft Sec. Litig.*, No. C 99-0472, slip op. at 5 (May 26, 2000). However, when pleading on information and belief, a plaintiff must plead with "particularity" by "provid[ing] all facts forming the basis for [plaintiff's] belief in great detail." *In re Silicon Graphics*, 183 F.3d at 983; *see also* 15 U.S.C. § 78u-4(b)(1). This inquiry "is whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs,* 127 S.Ct. 2499, 2510 (2007). "More than merely reasonable or permissible," the inference of scienter "must be cogent and compelling, thus strong in light of other explanations," *Id.* (internal quotation marks omitted). Therefore, the PSLRA has strengthened the pleading requirements of Federal Rule of Civil Procedure 9(b).

## IV.     Rule 9(b)

Rule 9(b) of the Federal Rules of Civil Procedure requires that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally." Federal securities fraud claims, like common law fraud claims, are subject to the special pleading requirements of Rule 9(b). *Semegen v. Weidner*, 780 F.2d 727, 731 (9th Cir. 1985).

Rule 9(b) requires particularity in pleading the circumstances constituting fraud. This circuit has interpreted this requirement to mean that allegations of fraud must be specific enough to give defendants notice of "the particular misconduct which is alleged to constitute the fraud." *See id.* In the securities context, a plaintiff may aver scienter generally, but must state the "time, place, and content" of the alleged misrepresentations, and "an explanation as to why the statement or omission complained of was false or misleading." *In re GlenFed, Inc. Sec. Litig.*, 42 F.3d 1541,1547-48 (9th Cir. 1994)(en banc) (remanded to *In re GlenFed, Inc. Sec. Litig.*, 60 F.3d 591 (9th Cir. 1995).

8

## V. Controlling person liability

Under Section 20(a) of the Exchange Act, "[e]very person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person . . . unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action." 15 U.S.C. § 78t(a).

## VI. Request for judicial notice

Generally, when considering a motion to dismiss, a district court must consider only the facts stated in the plaintiffs' complaint, or in documents attached to the complaint as exhibits or incorporated into the complaint by reference. *See Branch v. Tunnell*, 14 F.3d 449, 453-54 (9th. Cir. 1994). Under certain circumstances, the court may also consider matters that are appropriate subjects of judicial notice under Fed. R. Evid. 201. *See Kramer v. Time Warner*, 937 F.2d 767, 773 (2d Cir. 1991). While the general rule is that "[m]atters outside the pleadings are not to be considered by a court in ruling on a 12(b)(6) motion to dismiss," in a securities action a court may also consider documents that the defendant has attached to its motion to dismiss either as exhibits or accompanied by a request for judicial notice. *Weiner v. Klais and Co., Inc.*, 108 F.3d 86, 88-89 (6th Cir. 1997). "In a securities fraud action, the court may take judicial notice of public records outside the pleadings, including SEC filings." *In re Nuko Information Sys., Inc. Sec. Litig.,* 199 F.R.D. 338, 341 (N.D. Cal. 2000) (citing *In re Silicon Graphics,* 183 F.3d at 986 and *MGIC Indem. Corp. v. Weisman,* 803 F.2d 500, 504 (9th Cir.1986)).

9

## DISCUSSION[12]

### I. Motion to dismiss section 10(b) and Rule 10b-5 claims

#### A. Fraud by hindsight

Defendants contend that the complaint should be dismissed outright because it amounts to an impermissible attempt to plead fraud by hindsight and seeks to contravene the PSLRA by "seiz[ing] upon a stock decline, and us[ing] the 20/20 vision of hindsight to reverse-engineer an unsupported attempt to exploit this decline." Def.'s Motion at 6. "Congress enacted the PSLRA to put an end to the practice of pleading fraud by hindsight." *Silicon Graphics*, 183 F.3d at 988 (internal quotations marks omitted); *see also In re GlenFed, Inc. Securities Litigation,* 42 F.3d 1541, 1549 (9th Cir. 1994) ("The fact that an allegedly fraudulent statement and a later statement are *different* does not necessarily amount to an explanation as to why the earlier statement was false. . . . [P]laintiff must set forth facts explaining why the difference between the earlier and the later statements is . . . the result of a falsehood."). Here, the complaint does not merit outright dismissal for pleading fraud by hindsight because it does not merely point out the differences between defendants' earlier, purportedly fraudulent statements and later statements. Instead, in an effort to explain why the earlier statements were false at the time they were made, the complaint uses the statements of nine CWs regarding the conditions at FormFactor at the time of defendants' alleged misstatements. Whether those descriptions, and the complaint generally, contain sufficient particularity and corroborating details under applicable pleading standards is addressed below.

#### B. Pleading format

Defendants correctly argue that, rather than pleading particular facts showing how and why individual statements were false and fraudulent at the time they were made, the complaint employs an impenetrable "puzzle-pleading" structure that lists an "undifferentiated mass of public statements" from throughout the class period, follows each set of statements with the "same blanket paragraph" to assert falsity and fraudulence and seldom refers with specificity to the individual defendants. Def's Motion

---

[12] As defendants do not contest plaintiffs' allegations regarding the reliance and causation elements of plaintiffs' Rule 10b-5 and § 10(b) claims, this order will not address them. This order addresses the other requisite elements of plaintiffs' claims, namely whether the complaint adequately pleads misrepresentations or omissions of material fact(s) made with scienter.

at 7-8. Indeed, the complaint is overly long (107 pages), challenging to follow because of its hodgepodge style and "often rambles through long stretches of material quoted from defendants' public statements (many of which seem innocuous enough even by plaintiffs' recounting) unpunctuated by any specific reasons for falsity - which, indeed, prove difficult to locate in the surrounding area." *GlenFed,* 42 F.3d at 1553-54 (internal quotation marks omitted). As the *GlenFed* court noted,

> This is, at the very least, poor draftsmanship. It is impossible to overlook the fact that the organization of the complaint often makes the nature of the fraud difficult to divine, and certainly makes the complaint difficult to respond to. . . . To say that the drafting is infelicitous puts matters too kindly. The complaint is cumbersome almost to the point of abusiveness. . . .

*Id.* In remanding the case, the *GlenFed* court suggested that the district court should require, "as a matter of prudent case management, that plaintiffs streamline and reorganize the complaint before allowing it to serve as the document controlling discovery, or, indeed, before requiring defendants to file an answer." *Id.* As in *GlenFed*, the complaint here contravenes applicable pleading standards by juxtaposing the same series of generic conclusions against each set of block quotes, without differentiation or specificity.[13] To conform with Rule 9(b) and the PSLRA, this circuit has found that plaintiffs must state "with particularity" facts giving rise to "a strong inference of, at a minimum, deliberate or conscious recklessness," *Silicon Graphics,* 183 F.3d at 979, and in pleading falsity, plaintiffs must "aver with particularity the circumstances constituting the fraud," *GlenFed, Inc.,* 42 F.3d at 1545 (9th Cir.1993). *See also In Apple Computer, Inc.*, 127 Fed. Appx. 296, 303 (9th Cir. 2005) (rejecting the concept of "collective scienter" and holding that a corporation is deemed to have the requisite scienter for fraud only if the individual corporate officer making the statement has the requisite level of scienter at the time of the statement); *In re Syncor Intern. Corp. Secur. Litig.*, 327 F.Supp.2d 1149, 1171-1172 (C.D. Cal. 2004) ("An assumption of scienter because of a defendant's position does not plead facts in great detail, nor create a strong inference of deliberate recklessness. As such, the individual defendants cannot be liable for the false statements found in the complaint on a group-

---

[13] For example, the complaint's block-quote conclusions include, "The statements . . . were false and misleading, and defendants knew that they were false and misleading at the time they were made . . . ," complaint ¶¶ 89; and "[D]efendants knew there was no reasonable basis for representing that [FormFactor's] production processes were fully functioning, with output and yields improving steadily, and that [FormFactor] would be able to have the ability and the capacity to volume produce Harmony probe cards as promised," *id.* ¶ 89(a).

11

pleading theory."). Accordingly, for each allegedly false or misleading statement, plaintiffs must specify the statement, describe the circumstances under which it occurred, identify the person making the statement, state why the statement was false when made, and plead facts that give rise to a strong inference of recklessness and strongly suggest scienter.[14]

### C. Confidential witnesses (CWs)

The parties dispute whether plaintiffs have met the Ninth Circuit's standard for the sufficiency and reliability of the CWs, whose observations form the core of plaintiffs' complaint. Defendants contend that none of the CWs is alleged to have been in a position to provide reliable information, and the information attributed to them is of no consequence because none of them interacted with the individual defendants.[15] The *Silicon Graphics* court held that plaintiffs may rely on anonymous sources for information, so long as they plead substantial, material specific facts and corroborating details when, as here, allegations are based on non-public information. *Silicon Graphics,* 183 F.3d at 985; *see also Nursing Home Pension Fund, Local 144 v. Oracle Corp.*, 380 F.3d 1224, 1233 (9th Cir. 2004) (holding it unnecessary to name sources provided that the sources are described "with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged" and the complaint contains "adequate corroborating details.") (citations and internal quotation marks omitted); *In re Secure Computing Corp. Sec. Litig.*, 120 F. Supp. 2d 810, 817 (N.D. Cal. 2000) (holding that plaintiffs must reveal all facts about confidential witnesses material to the formation of the belief that the witnesses' statements are accurate).

Here, plaintiffs provide a large degree of detail in describing the CWs on which they rely. For each of the nine CWs, the complaint endeavors to document the years of employment, the job title, the person to whom the individual CW reported, a description of duties, and the specific, personal

---

[14] Thus, plaintiffs cannot satisfy the applicable pleading requirements by alleging, for example, that the individual defendants "possessed the power and authority to control the contents of FormFactor's quarterly reports, press releases and presentations to the market," or that they "were provided with copies" of such documents and "had the ability and opportunity to prevent their issuance or cause them to be corrected." Complaint ¶ 30.

[15] Defendants contend that none of the CWs is alleged to have attended any meetings or communicated with any of the defendants, or heard any statement made by any of the defendants.

12

knowledge of the CW that is pertinent to the allegations of the complaint, including how the CW learned of the information. *See* complaint ¶¶ 32-40.[16] However, the complaint does not supply adequate corroborating details to provide sufficient indicia of reliability. As defendants correctly argue, the basic problem is that the complaint does not allege the sort of detail or corroboration from other sources – meetings, conversations, and internal memoranda and reports[17] – to support the inference that any of the individual defendants actually believed FormFactor's public statements might be false or misleading at the time they were made. Importantly, none of the CWs is alleged to have had any interaction or communication with any of the defendants, or to have provided any defendant with information, or to have heard or read any statement by any defendant, that contradicted or even cast doubt on a public statement made during the class period. *See In re Northpoint Commc'ns Group, Inc. Secur. Litig.*, 184 F.Supp.2d 991, 997 (N.D.Cal.2001).[18] The observations of the CWs do not provide an adequate basis for believing that the defendants made false statements, and knowingly so. *See Nursing Home,* 380 F.3d at 1015. Nor do the CWs provide an adequate basis for believing plaintiffs' conclusory assertion that, on "unspecified dates unspecified defendants 'directed' unspecified employees to hide manufacturing issues and manipulate FormFactor's accounting,"[19] Def.'s Reply at 4. *Cf. In re LDK Solar Sec. Litig.*,

---

[16] The CWs include a (1) former FAB coordinator and administrative assistant to FormFactor's production manager until November 2006; (2) a former production supervisor until December 2006; (3) a former senior process engineer until early 2007; (4) a former customer project manager from mid-2007 until February 2008; (5) a senior cost accountant until November 2007; (6) a senior financial analyst until April 2007; (7) a senior engineering technician until February 2008; (8) a former operator in the fabrication process of probe-head products until September 2007; and (9) a former senior information technology director from mid-2006 until December 2007. *See* complaint ¶ 32-40.

[17] The complaint makes several, generic references to meetings, documents or reports, *see, e.g.*, complaint ¶ 65-67, 70, but these references do not contain the requisite detail or corroboration, nor do they overcome the absence of any interaction with any of the individual defendants.

[18] "Such evidence might include contemporaneous receipt of a report with information directly at odds with an alleged misrepresentation, the inference being that the conflicting data was timely read and remembered; and statements by witnesses that they told the actor the true facts before the false statement was made, the inference being that the actor heard and remembered the information, saw the discrepancy, and made the statement anyway." *Northpoint*, 184 F. Supp 2d at 997 (internal quotation marks omitted).

[19] *See, e.g.*, complaint ¶ 11, 70.

13

2008 WL 2242185 *7-15 (N.D. Cal. May 29, 2008).[20]

### D.     Accounting fraud

Defendants correctly contend that plaintiffs' allegations of accounting fraud are "impermissibly imprecise," because the complaint lacks the requisite details that the PSLRA requires and does not include sufficient facts to support a strong inference of scienter on the part of any individual defendant. *In re Juniper Networks, Inc.*, 2004 WL 540910 *3 (N.D. Cal. March 11, 2004) (internal quotation marks omitted); *see also In re Pac. Gateway Exch., Inc. Sec. Litig.*, 169 F. Supp 2d 1160. 1167 (N.D. Cal 2001) (holding that plaintiffs must identify transactions and dollar amounts, and specific facts to support their belief that defendants were aware of the alleged fraud, including how or when each defendant became aware and the extent of each defendant's involvement). "'[T]he mere publication of inaccurate accounting figures, or a failure to follow GAAP, without more, does not establish scienter.'" *DSAM Global Value Fund v. Altris Software, Inc.*, 288 F.3d 385, 390 (9th Cir. 2002) (quoting *In re Software Toolworks Inc.*, 50 F.3d 615, 627 (9th Cir. 1994)); *see also Hockey v. Medheker*, 30 F. Supp. 2d 1209, 1224 (N.D. Cal. 1998) ("Merely alleging that fraudulent accounting practices have occurred, without more, does not create a strong inference of scienter."). "Rather, to plead fraudulent intent based on GAAP violations, plaintiffs must allege facts showing that: (1) specific accounting decisions were improper; and (2) the defendants knew specific facts at the time that rendered their accounting determinations fraudulent." *Morgan v. AXT, Inc.*, 2005 WL 2347125 *14 (N.D. Cal. Sept. 23, 2005) (citing *DSAM Global Value Fund*, 288 F.3d at 390-391). Similarly, the signing of quarterly certifications of financial statements mandated by the Sarbanes-Oxley Act (SOX) does not, without more, support an inference of scienter. *See In re Hypercom Corp. Sec. Litig.*, 2006 WL 1836181 *11 (D. Ariz. July 5, 2006) ("However, an incorrect [SOX] certification does not, by itself, create a strong

---

[20] In *LDK*, Judge Alsup held that the "whistleblower" central to the revelations of the complaint possessed sufficient context and access to critical information to make him reasonably reliable and his conclusions about the inner workings of the company non-speculative where the complaint specified numerous, detailed communications that the whistleblower had with senior management, including specific emails, phone calls and conferences, including specific dates, and names of recipients/attendees and individuals involved. *See LDK*, 2008 WL 2242185 *7-15.

14

inference of scienter."); *In re Invision Techs., Inc. Sec. Litig.*, 2006 WL 538752 *7 n.3 (N.D. Cal. Jan. 24, 2006); *In re Watchguard Sec. Litig.*, 2006 WL 2038656 *11 (W.D. Wash. April 21, 2006); *Morgan v. AXT, Inc.*, 2005 WL 2347125 *15 (N.D. Cal. Sept. 23, 2005). Further, personnel changes happening in the aftermath of business setbacks or stock losses, without more specific allegations, do not give rise to an inference of scienter. *See, e.g., In re US Aggregates*, 235 F. Supp. 2d 1063, 1074 (N.D. Cal 2002) (holding that, absent more particularized facts, a CFO's termination subsequent to a restatement of earning and a loan default could have been reasonably related to corporation's poor financial performance); *In re Cornerstone Propane Partners L.P.*, 355 F. Supp. 2d 1069, 1092-93 ("[N]otable departures are not in and of themselves evidence of scienter. Most major stock losses are often accompanied by management departures . . .").

Here, the complaint bases its pleading of accounting fraud on various grounds, including alleged GAAP violations, FormFactor's restatements of financial results, defendants' SOX certifications of FormFactor's financial reports, Foster's resignation as CFO on February 25, 2008, defendants' alleged improper accounting for scrap as R&D and FormFactor's purportedly weak internal controls. However, as shown in the cases cited above, these factual allegations are not of themselves cogent or compelling, *see, e.g.*, *DSAM Global Value Fund*, 288 F.3d at 390-391, and fail to provide the requisite "foundation and specificity" to meet PSLRA pleading standards for accounting fraud, *Juniper Networks*, 2004 WL 540910 *3. This is because plaintiffs' allegations, considered individually or collectively, lack sufficient particularized facts to create the inference of scienter, namely that defendants knew or must have known of the facts relevant to the purported accounting violations at the time they took place.[21] *See, e.g., Cornerstone Propane Partners*, 355 F. Supp. 2d at 1091 (internal quotation marks omitted)

---

[21] For example, CW6, a former senior financial analyst, states conclusorily that the unspecified numbers he/she originally reported for an "inventory valuation report" on an unspecified date were adjusted, "I know it happened. I know they were adjusted." Complaint ¶ 74. CW6 further states conclusively that he/she was "aware" that "management did something" with the reported quarterly numbers because those numbers differed from what CW6 "knew" to be the actual results. *Id.* ¶ 75 (internal quotation marks omitted). In another example, the complaint states, "Because of the pervasiveness and chronic occurrence of scrap accumulation from poor yields in the manufacturing process, FormFactor management *knew* about scrap accumulation but *directed* lower-ranked personnel to cover it up," *Id.* ¶ 70 (emphases added), but fails to provide specifics as to where, when and how often, or quantifying to what degree the allegedly improper practice took place, as well as which FormFactor product(s) were involved.

("In order to distinguish deliberate recklessness from ordinary carelessness, allegations of GAAP violations must be augmented by facts that shed light on the mental state of defendants, rather than conclusory allegations that defendant must have known of the accounting failures due to the degree of departure from established accounting principles."). The complaint's assertions are too vague and conclusory, fail to "shed light on the mental state of defendants," *id.*, and, as discussed above, too often refers to defendants (or even FormFactor senior management) collectively, without further differentiation or individuation (including the roles played by the individual defendants), or specification of the facts that individual defendants knew (or must have known) at the time of their accounting determinations that indicate the deliberate recklessness involved such determinations. *See Pac. Gateway Exch.*, 169 F. Supp. 2d at 1167 (holding that plaintiffs must allege detailed "how [and] when each defendant became aware of the allegedly improper accounting practices, [and] the extent of each defendant's contribution or involvement . . .").

### F.     Defendants' stock sales

The parties dispute whether the patterns of defendants' stock trades during the class period provide circumstantial evidence of scienter. The *Silicon Graphics* court held that this is only the case where the sales are "dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed inside information." 183 F. 3d at 986.[22] The correct measure of an insider's ownership is both the shares and vested options to purchase shares held the insider. *Id.* at 986-987. Under this measure, defendants' stock trades during the class period do not provide circumstantial evidence of scienter because, as a group, they maintained 88.5% of their holdings, or 3,110,971 shares.[23] *See In re Apple Computer*, 886 F. 2d at 1117 (defendants' trades not probative of

---

[22] "Among the relevant factors to consider are: (1) the amount and percentage of shares sold by insiders; (2) the timing of the sales; and (3) whether the sales were consistent with the insider's prior trading history." *Silicon Graphics*, 183 F. 3d at 986.

[23] The Court takes judicial notice of FormFactor's proxy statements and Forms 4 filed with the SEC, *see* RJN, Exs. 27, 28, which form the basis for these figures, as submitted by defendants. *See Silicon Graphics*, 183 F. 3d at 986 (holding that a court may consider SEC filings on which the complaint relies).

scienter where, as a group, they sold nearly 80% of their holdings). For example, Foster made a single sale of 25,000 shares on May 1, 2006, which was early in the class period and comprised merely 17% of the 145,779 shares he held at the time.[24] Further, Khondros' sales of 723,079 during the class period were in line with his sales in two prior, comparable periods – 848,371 from February 1, 2004 to January 31, 2006 and 900,000 from August 1, 2003 to January 31, 2004 – and all of Khandros' sales were made pursuant to previously planned trades that were memorialized in 10b5-1 trading plans. *See* RJN, Ex. 29.[25] Accordingly, the Court finds defendants' stock trades do not provide circumstantial evidence supporting the inference of fraud.

In conclusion, the § 10(b) and Rule 10b-5 claims in plaintiffs' complaint, taken as a whole, fail to state the requisite particular facts to give rise a strong enough inference of securities fraud to meet the heightened pleading requirements of the PSLRA. The Court GRANTS defendants' motion to dismiss these claims.[26]

**II.    Motion to dismiss section 20(a) claim**

As plaintiffs have not adequately alleged a primary violation of federal securities laws, the Court also GRANTS defendants' motion to dismiss plaintiffs' claim for control person liability under § 20(a).

---

[24] Figures based on the 2006 proxy statement filed with the SEC. *See* RJN, Ex. 28.

[25] The Court takes judicial notice of this document as it is the type of document for which its accuracy cannot be reasonably questioned.

[26] As the Court grants defendants' motion to dismiss for the reasons set forth above, the Court does not reach the disputed questions of (1) whether plaintiffs' theory is "cogent and compelling," *Tellabs*, 127 S. Ct. at 2510, before consideration of competing inferences and (2) whether under the *Tellabs* weighing analysis, nonculpable explanations for defendants' conduct outweigh competing inferences of scienter. Nor does the Court reach the disputed question of whether defendants' non-accounting statements at issue are forward looking and, if so, whether they are protected under more rigorous procedural barriers of the PSLRA's safe-harbor provision.

*See Lipton v. Pathogenesis Corp.*, 284 F.3d 1027, 1035 n.15 (9th Cir. 2002) ("[T]o prevail on their claims for violations of § 20(a) . . . plaintiffs must first allege a violation of § 10(b) or Rule 10b-5.").[27]

### III.    Freeman's separate motion for dismissal

Separately, Freeman moves to dismiss plaintiffs' claims against him on the additional ground that plaintiffs do not allege that Freeman made a purported misstatement or signed any of Formfactor's SEC filings, nor do plaintiffs allege any particularized facts that Freeman participated in preparing any purportedly false statement to which the complaint refers.[28] Plaintiffs do not dispute Freeman's separate grounds for moving to dismiss plaintiffs' claims against him. Though plaintiffs suggest that the non-oral statements in question can be attributed to Freeman through the so-called "group-pleading doctrine," which is a means of linking an individual to corporate statements, courts in this circuit[29] indicate that the have held that this doctrine is no longer viable in light of the PSLRA's heightened pleading standards requiring plaintiffs to allege particularized facts regarding individual defendants. *See, e.g., In re NextCard, Inc. Sec. Litig.*, 2006 WL 708663 *3 (N.D. Cal. Mar. 20, 2006); *In re Silicon Storage*, 2006 WL 648683 *22 (N.D. Cal Mar. 10, 2006). Irrespective of whether the "group-pleading doctrine" is still viable, as noted above, the PSLRA requires, with regard to each false or misleading statement or material omission, that the complaint "state with particularity facts giving rise to a strong inference that *the defendant* acted with the required state of mind." *In re Silicon Storage*, 2006 WL 648683 *22 (quoting 15 U.S.C. § 78u-4(b)(2)) (internal quotation marks omitted) (emphasis in original). Though the complaint provides general, conclusory statements regarding Freeman's role at FormFactor, it does not plead particularized facts describing Freeman's direct involvement in the daily affairs of FormFactor

---

[27] In the alternative, plaintiffs fail to present much beyond the theory that the individual defendants violated federal securities laws because they had the power and authority to control information released to the public by virtue of their position. Therefore, plaintiffs fail to plead specific facts upon which a fact finder could reasonably conclude that the individual defendants violated federal securities laws. *See Wool v. Tandem Computers, Inc.*, 818 F.2d 1433, 1440 (9th Cir. 1987).

[28] Additionally, defendants point out that Freeman sold no FormFactor stock during the class period, maintaining all of his 157,615 shares of common stock.

[29] The Ninth Circuit has yet to take up this issue.

18

or suggesting why he should be considered part of the group responsible for preparing of any of the non-oral statements in question. Lastly, even if Freeman did participate in preparing any of the non-oral statements in question (and the complaint were to properly make this allegation), the complaint pleads no facts that would demonstrate Freeman's state of mind and give rise to the strong inference that he acted with scienter. For these reasons, the Court GRANTS Freeman's separate motion to dismiss plaintiffs' claims against him.

## VI.     Requests for judicial notice

In defendants' original RJN, defendants ask the Court to take notice of 36 documents, which include transcripts of conference calls with security analysts, FormFactor's SEC filings and earnings press releases, security analyst reports and daily stock price summary charts. In defendants' supplemental RJN, defendants ask the Court to take notice of five documents, which include one FormFactor SEC filing, two FormFactor earnings press releases and two financial industry conference transcripts. As all of these documents are either relied on in the complaint (whether or not they are expressly incorporated) or they are the types of documents for which the authenticity cannot be reasonably questioned, the Court GRANTS defendants' requests. The Court acknowledges that the parties dispute the truth of some of the facts and statements contained within some of these documents and does not take judicial notice of the truth of the contents that are in dispute.

**CONCLUSION**

For the foregoing reasons and for good cause shown, the Court hereby GRANTS defendants' motions to dismiss plaintiffs' complaint [Docket Nos. 26, 30]. Should plaintiffs wish to do so, they may file an amended complaint no later than August 22, 2008.

**IT IS SO ORDERED.**

Dated:  July 25, 2008

SUSAN ILLSTON
United States District Judge