1  COUGHLIN STOIA GELLER
       RUDMAN & ROBBINS LLP
2  JEFFREY W. LAWRENCE (166806)
   SHIRLEY H. HUANG (206854)
3  100 Pine Street, Suite 2600
   San Francisco, CA 94111
4  Telephone: 415/288-4545
   415/288-4534 (fax)
5  jeffreyl@csgrr.com
   shuang@csgrr.com
6
   Lead Counsel for Plaintiffs
7
   [Additional counsel appear on signature page.]
8
                    UNITED STATES DISTRICT COURT
9
                  NORTHERN DISTRICT OF CALIFORNIA
10
   DANNY McCASLAND, Individually and On  )  No. C-07-05545-SI
11 Behalf of All Others Similarly Situated, )
                                          )  **(Consolidated)**
12                        Plaintiff,       )
                                          )  CLASS ACTION
13      vs.                                )
                                          )  PLAINTIFFS' SECOND AMENDED
14 FORMFACTOR, INC., et al.,              )  COMPLAINT FOR VIOLATIONS OF
                                          )  FEDERAL SECURITIES LAWS
15                        Defendants.      )
                                          )
16 ─────────────────────────────────────  )  Demand for Jury Trial

17

18

19

20

21

22

23

24

25

26

27

28

**Page**

I.      INTRODUCTION ................................................................................................1

II.     JURISDICTION AND VENUE ......................................................................15

III.    PARTIES ..........................................................................................................15

IV.     PLAINTIFFS' CONFIDENTIAL WITNESSES.............................................17

V.      BACKGROUND ..............................................................................................23

VI.     DEFENDANTS KNOWINGLY AND RECKLESSLY ISSUED FALSE AND
        MISLEADING STATEMENTS DURING THE CLASS PERIOD .................27

        A.      False and Misleading Statements Made Concerning FormFactor's Ability
                to Develop and Ramp Up Harmony-Based Products ..............................27

                1.      Defendants Khandros, Foster and Bronson Falsely Represented
                        FormFactor's Development and Ramping of Harmony ...........27

                2.      Particularized Facts Demonstrating Falsity of the Statements Made
                        and Giving Rise to a Strong Inference that Defendants Khandros,
                        Foster and Bronson Knew that Statements Concerning the
                        Company's Development and Ramping Up of Harmony Were
                        False When Made .......................................................................28

        B.      False and Misleading Statements Made Concerning FormFactor's
                Progress with Development of Harmony and Its 1Q 2006 Results ......41

                1.      Defendants Khandros, Bronson and Foster Falsely Represented
                        that the Company's Execution of Harmony "Remained on Track"
                        and Its 1Q 2006 Operating and Financial Results ...................41

                2.      Particularized Facts Demonstrating Falsity of the Statements Made
                        and Giving Rise to Defendants Khandros, Bronson and Foster's
                        Scienter Concerning FormFactor's Development and Ramping of
                        Harmony and the Impact on the Company's Reported Financials
                        for 1Q 2006 Were False When Made .........................................44

        C.      False and Misleading Statements Made Concerning FormFactor's
                Progress with Harmony and Its 2Q 2006 Results ...................................52

                1.      Defendants Khandros, Bronson and Foster Falsely Represented
                        FormFactor's Progress with Harmony and Its 2Q 2006 Operating
                        and Financial Results ................................................................52

                2.      Particularized Facts Demonstrating Falsity of the Statements Made
                        and Giving Rise to Defendants Khandros, Bronson, and Foster's
                        Scienter Concerning FormFactor's Development and Ramping of
                        Harmony and the Impact on the Company's Reported Financials
                        for 2Q 2006 ...............................................................................55

        D.      False and Misleading Statements Made Concerning FormFactor's
                Progress with Harmony and Its 3Q 2006 Results ...................................59

1.   Defendants Khandros, Bronson and Foster Falsely Represented
     FormFactor's Progress with Harmony, Factory Capacity and Its 3Q
     2006 Operating and Financial Conditions ................................................59

2.   Particularized Facts Demonstrating Falsity of the Statements Made
     and Giving Rise to Defendants Khandros, Bronson and Foster's
     Scienter Concerning FormFactor's Development and Ramping Up
     of Harmony and the Impact on the Company's Reported Financials
     for 3Q 2006 ........................................................................................61

E.   False and Misleading Statements Made Concerning FormFactor's
     Progress with the Development and Ramping of Harmony Production and
     Its FY 2006 Results..........................................................................................64

     1.   Defendants Khandros and Foster Falsely Represented
          FormFactor's Progress with Harmony Factory Performance and Its
          FY 2006 Operating and Financial Results ................................................64

     2.   Particularized Facts Demonstrating Falsity of the Statements Made
          and Giving Rise to Defendants Khandros and Foster's Scienter
          Concerning FormFactor's Development and Ramping Up of
          Harmony and the Impact on the Company's Reported Financials
          for FY 2006 ........................................................................................67

F.   False and Misleading Statements Made Concerning FormFactor's
     Progress with Harmony, Ability to Ramp Up Harmony Production and Its
     1Q 2007 Results..........................................................................................70

     1.   Defendants Khandros and Foster Falsely Represented
          FormFactor's Progress with Harmony, Ability to Ramp Up
          Harmony Production and Its 1Q 2007 Financial and Operating
          Results........................................................................................70

     2.   Particularized Facts Demonstrating Falsity of the Statements Made
          and Giving Rise to Defendants Khandros and Foster's Scienter
          Concerning FormFactor's Progress with Harmony, Ability to
          Ramp Up Harmony and the Impact on the Company's Reported
          Financials for 1Q 2007........................................................................73

G.   False and Misleading Statements Made Concerning FormFactor's
     Progress with the Development and Ramping of Harmony Production and
     Its 2Q 2007 Results..........................................................................................76

     1.   Defendants Khandros and Foster Falsely Represented
          FormFactor's Progress with the Development and Ramping of
          Harmony and Its 2Q 2007 Financial and Operating Results ....................76

     2.   Particularized Facts Demonstrating Falsity of the Statements Made
          and Giving Rise to Defendants Khandros and Foster's Falsity and
          Scienter Concerning FormFactor's Progress with the Development
          and Ramping of Harmony and the Impact on the Company's
          Reported Financials for 2Q 2007........................................................79

VII.    THE TRUTH BEGINS TO EMERGE ................................................................82

    A.    Defendants Partially Disclosed the Problems with the Company's
          Inventory Valuation Practices While Continuing to Conceal the
          Company's Inability to Develop and Ramp Up Harmony Production .................82

    B.    Defendants Belatedly Disclosed the Company's Inability to Develop and
          Ramp Up Harmony Production as Promised and the Impact of the Failed
          Execution of Harmony on the Company's Operating and Financial Results ........88

VIII.   LOSS CAUSATION/ECONOMIC LOSS ........................................................93

IX.     COUNT I – For Violation of §10(b) of the 1934 Act and Rule 10b-5 Against All
        Defendants .....................................................................................................98

X.      COUNT II – For Violation of §20(a) of the 1934 Act Against All Defendants ...............99

XI.     NO SAFE HARBOR EXISTS FOR DEFENDANTS' STATEMENTS .........................99

XII.    CLASS ACTION ALLEGATIONS ..............................................................100

XIII.   PRAYER FOR RELIEF ..........................................................................101

XIV.    JURY DEMAND ..................................................................................101

## I.    INTRODUCTION

1.    This is a securities class action on behalf of all persons who purchased or otherwise acquired the common stock of FormFactor, Inc. ("FormFactor" or the "Company") between February 1, 2006 and February 5, 2008 (the "Class Period") against FormFactor and certain of its officers and/or directors for violations of the Securities Exchange Act of 1934 ("1934 Act").

2.    FormFactor designs, manufactures and sells advanced wafer probe cards, which are used by manufacturers to electrically test integrated circuits for semiconductor chips in the front end of the manufacturing process.  FormFactor's customers consist of dynamic random access memory (DRAM), Flash and microprocessor manufacturers who use the Company's products to test wafers. Each wafer probe card is a custom product that is specific to the chip and wafer design of the customer.  Due to the custom nature of probe card products and the nature of the semiconductor industry, FormFactor's revenue growth is driven in significant part by the number of new semiconductor designs that its customers develop, the technology transitions involved in these designs and the customers' production volumes.  In short, FormFactor operates in an industry characterized by short product life and rapid technological changes.

3.    Historically, the wafer probe card industry has been highly competitive.  In a wafer probe test, the ability to test an increasing number of dies on the wafer at the same time (also known as "parallelism") provides significant cost savings.   In particular, the benefit of increasing parallelism reduces the number of wafer probe test cells (wafer probers, test heads and testers), which translates to savings in capital expense and floor space.  In addition to increasing the number of dies on the wafer, there is also a huge benefit to reduce the number of "touchdowns" in the testing process.  A "touchdown" is the contact between the wafer probe card and the wafer, and a reduction in the number of touchdowns means a shorter lead time and testing process, thereby saving costs in the manufacturing process for the semiconductor customers.  Prior to the Class Period, the industry had just transitioned from nine touchdown to four touchdown probe cards, with the next shift from four touchdown to one touchdown probe cards.  In order to maintain its competitive edge, it was critical that FormFactor not only be able to deliver and execute the single touchdown technology, but be the front runner to develop and define the industry's transition to one touchdown probe cards, as

1    it had been during the transition from nine to four touchdowns.  Specifically, it was crucial for

2    FormFactor to be the first to market with the next generation of advanced single touchdown probe

3    cards so that the Company could have high visibility and dominate the industry by sweeping a

4    substantial market share upfront.  Particularly in the industry where the probe cards are customized

5    to each customer, once a customer finds a workable probe card, it would likely continue using that

6    supplier's products.  In short, the "first to market" advantages are key to the Company's future

7    success.

8        4.    In April 2005, FormFactor introduced its new proprietary "Harmony" architecture for

9    wafer probe cards.  The market caught the enthusiasm, noting that FormFactor's one touchdown

10   Harmony probe card could very well reshape the integrated circuit test industry.  The Company

11   represented that the Harmony architecture would address the significant challenges presented by the

12   future demands of single touchdown wafer probing and very high parallelism wafer test, and would

13   be the key building block for FormFactor's future generations of Flash, DRAM, wafer level burn-in

14   ("WLBI") and high frequency probing solutions.  In previous versions, a probe card had to touch the

15   computer chip several times to complete all the tests necessary to ensure a chip was functional.

16   FormFactor's four touchdown probe cards were already a huge advance over competitor cards that

17   required 16 to 32 touchdowns, but there was still the potential to damage the card each time the

18   probe card touched the chip.  By reducing the number of times the card touched the chip to just one,

19   it substantially removed that concern.  The market reacted to Harmony well – paying close attention

20   to FormFactor's development of Harmony products especially the Harmony technology purported to

21   revolutionize the wafer probe card industry by offering single touchdown probe cards.  In short,

22   Harmony was supposed to differentiate FormFactor from its competition, and FormFactor's growth

23   depended largely on the execution and delivery of Harmony products.

24       5.    Since 2005, as FormFactor tried to spend most of its effort in developing this new

25   technology, it also had to address its factory capacity issues to meet the strong demand for its probe

26   cards and the anticipated strong demand once Harmony products were ready to be rolled out.  By

27   early 2006, the Company moved into a new manufacturing facility in Livermore, California, which

28

PLAINTIFFS' SECOND AMENDED COMPLAINT - C-07-05545-SI          - 2 -

was aimed to increase factory productivity, yields and on-time deliveries.  In a February 1, 2006

press release (Ex. 7),[1] the Company quoted defendant Joseph Bronson ("Bronson") stating:

> "*We are pleased with the Company's results this quarter, as we made substantial progress ramping production at our new, industry-leading MEMS facility.*"[2]

6.    On the same day, the Company held a conference call with securities analysts hosted

by defendants Bronson, Igor Y. Khandros ("Khandros") and Ronald C. Foster ("Foster").  (Ex. 6)

During the call, defendant Bronson represented:

> *We have completed our first Harmony architecture probe card field trial, which began with an early adopter in the second half of '05.  Product performance exceeded expectations.  We expect to see significant revenues for our probe card based on Harmony platform in the second half of '06, with everything centering around 300 millimeter.  Harmony will be the cornerstone of flash and then DRAM for the next several years.*
>
> *              *       *       *
>
> We are planning an introduction this year of the first NAND flash-specific product, which is one touchdown 300 millimeter product based on our Harmony architecture.

7.    On the same conference call, defendants also represented that "*[a]ll production

processes are now fully functioning in our new facility, with output and yields improving steadily*"

and that "*we are planning to have [Harmony NAND Flash] in place for volume production in the

second half of '06*."  (Ex. 6)  Upon this positive news, FormFactor stock jumped over 21% in one

day, from $30.46 per share to $36.95 per share.  (Ex. 1)

8.    During the Class Period, defendants continued to issue materially false and

misleading statements regarding the Company's development and ramping of Harmony and its

business and financial results.  As a result of defendants' false statements and fraudulent scheme,

FormFactor stock traded at artificially inflated prices throughout the Class Period.  In June 2006, the

Company introduced the Harmony OneTouch probe card for 300-mm Flash memory production for

---

[1]    "Ex." refers to the exhibits attached to the Declaration of Shirley H. Huang in Support of Plaintiffs' Second Amended Complaint for Violations of Federal Securities Laws, filed herewith.

[2]    Here, as elsewhere, all emphasis is added unless otherwise noted.

PLAINTIFFS' SECOND AMENDED COMPLAINT - C-07-05545-SI          - 3 -

1    wafer probing.  Following that announcement, FormFactor's share price doubled by August 2006

2    from the beginning of the year, trading as high as $49.45 per share on August 31, 2006.

3        9.      The true facts, which were known by defendants but concealed from the investing

4    public during the Class Period, were that throughout the Class Period, the Company was scrambling

5    with the development of Harmony.  And to make the situation worse, the Company also suffered

6    severe production constraints that impeded the actual production of the Harmony products.  These

7    development and production issues significantly increased the Company's costs and expenses, and

8    raised the risk that customers with older generation products would seek alternative sources from the

9    Company's competitors or seek to renegotiate their contracts with FormFactor, placing serious

10   pressure on the Company's future revenue.

11       10.     Given the pressure to be "first to market" with the Harmony one touchdown

12   technology, senior management, including Chief Executive Officer ("CEO") Khandros, President

13   Bronson and Chief Financial Officer ("CFO") Foster, began to tell the market that the Company had

14   completed the "field trial" of Harmony in early 2006 and that it began to make initial volume

15   shipments starting mid-2006.  The truth, however, as defendants well knew, was that Harmony

16   remained in the early phase of development and continued in the development phase throughout the

17   Class Period.  In fact, according to a confidential witness ("CW") 14, a former New Product

18   Program Manager who was in periodic meetings with defendants Khandros, Bronson, Foster and

19   Senior Vice President of Operations Richard Freeman where the development of Harmony was

20   discussed, when defendants made these representations, Harmony was barely in the "Feasibility"

21   phase of the Company's "invention to market-share" ("IMS") development plan.  Defendants'

22   strategy was to be the "first to market" at all costs so that once a customer placed an order for

23   Harmony, even if it did not work, at least FormFactor would get the customer "on the hook," hoping

24   that FormFactor would be able to fix the problems in time before its competitors come out with

25   comparable technology, and that the Company would at least be portrayed as the forerunner in

26   developing this revolutionary single touchdown technology.

27       11.     To capture the "first to market" advantages, defendants and other members of senior

28   management decided to market Harmony even before it was fully developed, and to ship out

PLAINTIFFS' SECOND AMENDED COMPLAINT - C-07-05545-SI        - 4 -

1   Harmony probe cards knowing that the Harmony shipments would very likely be rejected – which

2   they were.  CW14 (former New Product Program Manager), CW9 (former Senior IT Director), CW7

3   (former Senior Engineering Technician), and CW11 (former Inventory Control Technician) all

4   confirm that FormFactor's Harmony shipments were returned to the Company shortly after they

5   were sent out.  Significantly, CW14 states that almost 100% of the Harmony shipments prior to

6   September 2007 were returned to the Company.  Another witness CW12 (former Senior Engineering

7   Technician) states that the "Dead on Arrival" rate for Harmony that had been shipped was

8   somewhere between 85% and 89% in late 2007.  Thus, while defendants were repeatedly making

9   representations that "we shipped Harmony" or that "we made our initial volume Harmony

10  shipments" throughout the Class Period, these statements were at best, misleading, because

11  defendants did not disclose that the Harmony shipments came right back as the Company had

12  expected.

13          12.     In addition to the lack of developmental progress, Harmony had additional problems.

14  On top of the pressure to deliver the Harmony products as defendants promised, FormFactor was

15  experiencing systematic poor yields in its manufacturing process, which, in turn, caused additional

16  problems and caused further delays in shipments to customers.  Several witnesses, including CW3

17  (former Senior Process Engineer), CW7 (former Senior Engineering Technician), and CW8 (former

18  Operator), indicate that the poor yields in the manufacturing process were chronic and widely known

19  among Company management, but the senior executives never publicly acknowledged them when

20  making projections or forecasts.  While the underlying poor yields had long been an issue at

21  FormFactor, the issues exponentially exploded as the Company tried to push out the Harmony

22  products that were much more complex (and not yet fully developed) than the Company's previous

23  products.  The chronic poor yields also led to the build-up of scrap, *i.e.*, excess and obsolete parts for

24  wafer probe cards.

25          13.     Unable to efficiently or effectively manufacture Harmony, and being plagued with

26  both poor quality and low yields, defendants were desperate to avoid disclosing these problems to

27  the market for fear that its customers would migrate to other probe card manufacturers.  Thus,

28  defendants were desperate to convince the market that FormFactor was both able to manufacture

1  Harmony and do so at significant gross margins in the process.  In addition to the devastating effect

2  that revealing Harmony's development stage would have, disclosure of poor yields or the results of

3  those yields (*i.e.*, obsolete inventory) would undermine the Company's ability to convince the

4  market that its Harmony product was viable, would be "first to market," and capture significant

5  market share of the probe card market.

6       14.     In order to conceal FormFactor's real development progress with Harmony and the

7  Company's overall manufacturing problems, defendants engaged in a scheme and artifice to defraud

8  and mislead the market about Harmony's development by (1) covering up its poor yields through the

9  overvaluation of FormFactor's inventory, hiding inventory expenses in Research and Development

10 ("R&D") (*i.e.*, treating worthless "scrap" – excess and obsolete inventory which resulted from the

11 poor manufacturing process as part of the Company's R&D), and (2) attempting to convince the

12 market that, even as the Company was disclosing that it had overvalued its inventory, FormFactor's

13 inability to deliver Harmony was from "capacity constraints" and not the true reason: that the

14 product was underdeveloped and had poor yields when it was able to be manufactured.

15      15.     As part of the scheme, defendants manipulated the Company's reported gross margin

16 by improperly accounting for excess and obsolete inventory as R&D costs instead of as cost of

17 revenues.  R&D costs are costs associated with activities that a company engages in aimed at the

18 discovery of new knowledge that can either lead to the development of new products or procedures

19 or to the improvement of existing products or procedures.  Only costs associated with these types of

20 activities should be classified as R&D costs.  R&D costs are required to be charged to expense when

21 incurred.   As part of the fraudulent scheme, defendants directed lower-ranked personnel to

22 improperly transfer the costs associated with scrap that accumulated from poor yields from

23 engineering and production from the manufacturing department to R&D.  Thereafter, the cost of

24 scrap was written off as R&D.  As corroborated by several witnesses, CW3 (former Senior Process

25 Engineer), CW6 (former Cost Financial Analyst), CW8 (former Operator in the fabrication process)

26 and CW9 (former Senior IT Director), the Company transferred scrap out of the engineering

27 department in order to avoid recognizing the costs as current period cost of revenues.  The R&D

28 group performed very limited testing, if any, on scrap inventory.  As a result, the costs associated

PLAINTIFFS' SECOND AMENDED COMPLAINT - C-07-05545-SI          - 6 -

1    with scrap did not qualify for R&D costs and should have been written off through the Company's

2    cost of revenues. This manipulation caused the Company's cost of revenues to be understated and

3    its gross margin to be overstated.

4          16.    To further the appearance that the Company was successfully ramping its Harmony

5    products, defendants manipulated the Company's reported financials by overstating the value of its

6    inventory and the related cost of revenue accounts in violation of the Generally Accepted

7    Accounting Principles ("GAAP"). Specifically, in order to inflate the price of FormFactor's stock,

8    defendants caused the Company to falsely report its results for 2006 and the first half of 2007

9    through improperly accounting for its inventory valuation and the related cost of revenue accounts.

10         17.    While defendants knew or were deliberately reckless in not knowing that the

11   Company was experiencing protracted Harmony development and ramp up issues, defendants took

12   advantage of the inflated stock price to unload their stock. Defendant Bronson sold 36.83% of his

13   FormFactor holdings, selling 25,000 shares for over $1 million in illicit insider trading proceeds, on

14   May 1, 2006, five days after the April 26, 2006 conference call in which he falsely represented the

15   Company's development of Harmony remained on track. Defendant Foster, the chief executive who

16   was responsible for inventory valuations, sold 19,800 shares, or 87.29%, of his FormFactor holdings,

17   pocketing $864,144 in insider trading proceeds between August 3, 2006 and June 15, 2007, all

18   during the periods when FormFactor's inventory was overstated and Harmony was nowhere near

19   ready to be sold as a manufactured product. While defendant Khandros had a 10b-5-1 plan, it

20   permitted trading only when the insiders are **not** in possession of material non-public information.

21   Thus, his sale of 723,079 shares, or 23.91%, of his FormFactor holdings for insider trading proceeds

22   of over $27.86 million is expressly excluded from 10b-5-1 protection and violates the securities

23   laws. The timing of his sale also furthers the strong inference of scienter: Khandros made 36

24   transactions between June 2007 and September 2007, all between $43.00 and $46.07 per share, for

25   insider trading proceeds of $4.77 million, right before the Company started disclosing the true

26   operating and financial conditions of the Company – all while in possession of material non-public

27   information.

28

18.    On October 24, 2007, the Company announced that adjustments to inventory valuations may be required with respect to periods prior to the third quarter ("3Q") 2007.  (Ex. 32) The Company stated in a press release:

*The Company is currently reviewing its historic practices with respect to inventory valuation in light of issues identified by the Company in the course of preparation of financial statements for the third quarter.  Based on the review to date management believes that adjustments to inventory valuations may be required with respect to periods prior to the third quarter of 2007.  These potential adjustments could change inventory, gross margin, operating margin and net income from the amounts previously reported for the affected periods.  The Company has not yet determined the magnitude of these adjustments or whether the adjustments will be reflected in the third quarter financial statements or in a restatement of the affected periods.*

19.    During the October 24, 2007 conference call, defendants Khandros and Foster told investors that the Company's production of Harmony was behind schedule due to "capacity constraints."  (Ex. 31)  In fact, given their knowledge that Harmony was not ready for manufacture and even when it was suffering poor yields, this was clearly false or at best, a misleading half-truth. Nevertheless, even these disclosures caused FormFactor's stock to decline $7.70 per share to close at $35.54 per share, a one-day plummet of nearly 20% on volume of 8.3 million shares – over eight times the average three-month volume.  The worst was yet to come as the Company was still concealing the other issues with its Harmony products and the impact they already had on FormFactor's business and financial results.

20.    On November 9, 2007, the Company announced its preliminary financial results for 3Q 2007.  (Ex. 33)  The Company also announced that it had substantially completed its review of its inventory valuation practices, as follows:

That review indicates that during fiscal 2006 and the first half of fiscal 2007 *the Company did not consistently follow its accounting policies for determining inventory valuation*.  As a result the Board of Directors determined on November 8, 2007 that the Company will restate its financial statements for the fiscal year ended December 30, 2006, for each of the fiscal quarters for that year, and for the fiscal quarters ended March 31 and June 30, 2007.

\*       \*       \*

The Company is evaluating management's report on internal controls contained in the Company's 2006 Form 10-K, and has determined that it is likely that it had a material weakness in internal controls over financial reporting as of December 30, 2006.

PLAINTIFFS' SECOND AMENDED COMPLAINT - C-07-05545-SI        - 8 -

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

As a result of the restatement, the Company's financial statements for the year ended December 30, 2006 contained in the Company's 2006 Form 10-K, and the financial statements contained in its Forms 10-Q for the quarters ended March 31, 2007 and June 30, 2007, should no longer be relied upon. Because of the time necessary to complete the restatement, the Company did not file its third quarter Form 10-Q when due on November 8, 2007.

21.    On November 11, 2007, as a result of FormFactor's improper accounting practices with respect to inventory, the Company filed its amended Forms 10-K and 10-Q and restated its financials for fiscal year ("FY") 2006, for the first quarter ("1Q") 2007 and the second quarter ("2Q") 2007. (Exs. 34-36) In the Company's 2006 restated Form 10-K, the Company again admitted that it "***did not consistently follow its accounting policies for valuing inventory resulting in material misstatement of inventory and cost of revenue***." FormFactor has now admitted that its previous financial statements were not fair presentations of FormFactor's results and were presented in violation of GAAP and Securities and Exchange Commission ("SEC") rules. This GAAP violation resulted in a material overstatement of FormFactor's inventory on its balance sheet during the Class Period. For FY 2006, 1Q 2007 and 2Q 2007, FormFactor's inventory was overstated by $5.9 million or 30.9%, by $5.3 million or 23.8% and by $1.6 million or 5.2%, respectively. For year end 2006 and 1Q 2007 and 2Q 2007, FormFactor's inventory was overstated by 30.9%, 23.8% and 5.2%, respectively. Additionally, this GAAP violation resulted in a material misstatement of FormFactor's cost of revenues, gross margin, net income and earnings per share ("EPS") during the Class Period.

22.    The following charts show the impact the inventory valuation issue had on FormFactor's reported financial results:

**Restatement**
(in thousands except for EPS)

|  | 1Q 06 | 2Q 06 | 3Q 06 | 4Q 06 | FY 06 | 1Q 07 | 2Q 07 |
|---|---|---|---|---|---|---|---|
| **As Originally Reported** | | | | | | | |
| Inventory | 21,098 | 24,057 | 26,317 | 24,778 | 24,778 | 27,460 | 32,004 |
| Provision for excess and obsolete inventory | 3,433 | 2,651 | 3,138 | 3,217 | 12,439 | 2,725 | 3,054 |
| Inventory provision as a % of revenue | 4.22% | 2.87% | 3.24% | 3.26% | 3.37% | 2.66% | 2.68% |
| | | | | | | | |
| **As Restated** | | | | | | | |
| Inventory | 20,041 | 21,885 | 23,059 | 18,926 | 18,962 | 22,190 | 30,439 |
| Provision for excess and obsolete inventory | 4,535 | 3,337 | 4,145 | 5,581 | 17,598 | 2,527 | 2,707 |
| Inventory provision as a % of revenue | 5.58% | 3.61% | 4.28% | 5.65% | 4.77% | 2.47% | 2.37% |
| | | | | | | | |
| **Adjustments** | | | | | | | |
| Overstatement in Inventory | (1,057) | (2,172) | (3,258) | (5,852) | (5,852) | (5,273) | (1,575) |
| **% of Inventory Overstatement** | **5.27%** | **9.92%** | **14.13%** | **30.92%** | **30.92%** | **23.76%** | **5.18%** |
| Provision for excess and obsolete inventory | (1,102) | (686) | (1,007) | (2,364) | (5,159) | 198 | 347 |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15



16    23.    Additionally, as a result of the Company's failure to properly account for its

17  inventory, the Company further failed to properly account for the amount of stock-based

18  compensation which should have been capitalized into inventory.  In the case of stock-based

19  compensation paid to employees who were engaged in the manufacturing process, the costs

20  associated with the stock-based compensation should be initially capitalized into inventory and later

21  recognized in the income statement as cost of revenues when the associated inventory is disposed of

22  or consumed.  Statement of Financial Accounting Standards ("SFAS") No. 123R, ¶5, *Share-Based*

23  *Payment*.  Certain fixed costs, such as labor and manufacturing overhead including stock-based

24  compensation, are allocated to inventory items based upon the value of the inventory produced in a

25  given period.  Defendants' failure to include these costs misstated FormFactor's inventory value and

26  the related cost of revenue accounts.

27    24.    The fact that FormFactor has restated its financial statements is an admission that the

28  financial results originally issued prior to and during the Class Period and its public statements

1 | regarding those results were materially false and misleading, the financial statements reported prior

2 | to and during the Class Period were incorrect based on information available to defendants at the

3 | time the results were originally reported, and the financial statements can no longer be relied upon as

4 | being accurate.

5 | 25.    In the restated Form 10-K, the Company also admitted to a material weakness in its

6 | financial reporting, such that "*[t]he Company did not maintain effective controls over the valuation*

7 | *of inventory and the related cost of revenues accounts.  Specifically, the Company did not*

8 | *maintain effective controls to ensure that the estimation process to value inventory complied with*

9 | *the Company's accounting policies*."   The Company also announced it was in the process of

10 | completing its remediation plan to address the design of controls over inventory valuation.

11 | 26.    In December 2007, while FormFactor was still scrambling to deal with all of the

12 | issues with its Harmony products, a competitor, Advantest Corporation ("Advantest"), introduced a

13 | DRAM probe card that would be competitive with FormFactor's single touchdown DRAM probe

14 | card.  Even worse, an analyst reported that Elpida Memory, Inc. ("Elpida"), FormFactor's largest

15 | customer, was evaluating Advantest's new DRAM probe cards.  On the news that FormFactor had

16 | lost its "first to market" edge, FormFactor's stock dropped over 12% from $38.87 per share to

17 | $33.90 per share, closing to six million shares traded in one day.  Another analyst immediately

18 | issued a report on December 10, 2007, noting: "We are particularly concerned over [FormFactor's]

19 | ability to deliver Harmony, as customers could seek alternative solutions or force potential price

20 | concessions due to delays in receiving product."  (Ex. 38)

21 | 27.    On February 5, 2008, FormFactor disclosed what defendants had known all along.

22 | FormFactor had severe operations issues in ramping up the production of Harmony, and was

23 | therefore unable to ship Harmony to customers, causing a decline in revenue, bookings and market

24 | share.   (Ex. 40)   The Company stated: **"*Due to the protracted Harmony ramp issues we*

25 | *experienced in 2007, FormFactor was not the first full wafer contactor probe card company*

26 | *qualified at some DRAM suppliers.  This resulted in the loss of business in the fourth quarter*."**

27 | The Company also announced a bleak outlook for 2008, including reducing the guidance for FY

28 | 2008 as a result of lost DRAM market share driven by DRAM industry weakness and Harmony

1    DRAM production issues.  Additionally, the Company announced that it would take a restructuring

2    charge of $4-$5 million in 2008 related to a cost-reduction plan, and would cut its workforce by 14%

3    globally.  Upon these disclosures, the market reacted with more than ten million shares traded in one

4    day, causing the stock to drop 11% on February 5, 2008, and another 9% on February 6, 2008,

5    closing at $21.06 per share.  The stock has been trading near $20.00 per share since then.

6        28.    On February 25, 2008, defendant Foster "resigned" as the CFO.  According to one of

7    plaintiffs' confidential witnesses (CW12), it was rumored that Foster was fired from his position as a

8    result of the investigation on various accounting issues.

9        29.    In the Company's Form 10-K filed on February 27, 2008 (Ex. 44),  the Company

10   belatedly admitted:

11       ***We have experienced and may experience in the future manufacturing delays and
         other inefficiencies in connection with the implementation of these improvements***
12       ***and customer qualifications of new processes,*** which could cause our operating
         results to decline.  ***We have also experienced*** and may continue to experience
13       ***difficulties in expanding our operations to manufacture our complex products in
         volume on time and at acceptable cost.  For example, while we have successfully***
14       ***qualified and delivered certain Harmony-based wafer probe cards to some of our
         customers and reduced manufacturing lead times, we are experiencing new***
15       ***product ramp challenges in connection with the manufacture of our Harmony
         architecture-based products, which has resulted in missed opportunities with***
16       ***customers.  As a further example, despite bringing on line our new manufacturing
         facility in early 2006, we experienced difficulties in fulfilling all of our customers'***
17       ***orders in a timely fashion.***  Any continued difficulties could cause additional
         product delivery delays and lost sales.
18
19       30.    On April 8, 2008, the Company revised its guidance for 1Q 2008 and announced

20   another global workforce cut by 12%.  On April 29, 2008, the Company disclosed the aftermath of

21   its mis-execution of the ramp up of Harmony, including quarterly revenue down by 45.5% from

22   fourth quarter ("4Q") 2007, and 35.8% down from 1Q 2007.  (Ex. 46)  During the conference call on

23   April 29, 2008, defendant Khandros admitted that the ramp up issues in 4Q 2007 and 1Q 2008

24   caused the misses in revenue, delivery deadlines and market share.  (Ex. 45)

25       31.    On June 3, 2008, the Company replaced defendant Khandros and appointed Mario

26   Ruscev ("Ruscev") as the new CEO.  During the July 30, 2008 conference call, the Company also

27   admitted Harmony manufacturing issues that resulted in large quantity of product returns post-Class

28

1    Period. (Ex. 48) In response to an analyst's question about product return issues due to overheating,

2    FormFactor's current CEO Ruscev responded:

> *I'll just go back a few quarters. Just to remind everybody, unfortunately, we had difficulty to manufacture this Harmony in 2007. There have been some very large activity done in late 2007 to solve this.* This had been solved, and basically this resulted in Q1 us shipping a pretty large amount of Harmony to our customer.

32.    The following chart illustrates how defendants' false and misleading statements and omissions caused the price of FormFactor securities to be inflated and how class members were damaged when the Company's relevant true financial condition began to be revealed to the market:



## II.    JURISDICTION AND VENUE

33.    Jurisdiction is conferred by §27 of the 1934 Act.  The claims asserted herein arise under §§10(b) and 20(a) of the 1934 Act and Securities and Exchange Commission ("SEC") Rule 10b-5.

34.    (a)    Venue is proper in this District pursuant to §27 of the 1934 Act.  Many of the false and misleading statements were made in or issued from this District.

(b)    FormFactor's principal executive offices are located at 7005 Southfront Road, Livermore, California.

## III.    PARTIES

35.    Lead Plaintiff, the City of Monroe Employees' Retirement System, purchased FormFactor common stock at artificially inflated prices during the Class Period and was damaged as a proximate result of defendants' fraudulent conduct.

36.    Defendant FormFactor designs, manufactures and sells advanced wafer probe cards, which are used by semiconductor manufacturers to electrically test integrated circuits.  The Company is headquartered in Livermore, California with operations in Europe, Asia and North America.  Since it became a public company in June 2003, its stock has traded on the NASDAQ market under the symbol FORM.

37.    Defendant Igor Y. Khandros ("Khandros") is, and at all relevant times was, Chief Executive Officer ("CEO") and a director of FormFactor.  According to the Company's Certificate of Incorporation filed with the State of Delaware, as the CEO, Khandros' powers and duties included:  "[t]o act as the general manager and, subject to the control of the Board of Directors, to have general supervision, direction and control of the business and affairs of the Corporation." (Ex. 2)  During the Class Period, Khandros sold 723,079 shares, or 23.91% of his FormFactor holdings, reaping over $27.86 million in insider trading proceeds at an average of $38.54 per share.  In 2006, Khandros received $2,488,137 in executive compensation, including $436,835 in salary, $127,548 in stock, $572,000 in non-equity compensation, $1,324,428 in option awards, and $27,326 in other incentive plan compensation.  For FY 2007, he received an 11% raise in base salary of $500,000.  During the Class Period, Khandros received 231,540 shares of option grants.  Khandros was replaced

PLAINTIFFS' SECOND AMENDED COMPLAINT - C-07-05545-SI        - 15 -

1    by Ruscev as the CEO in early June 2008.  Khandros is liable for statements made by him, all

2    statements made during the analyst conference calls which he participated, and all other group-

3    published statements made by FormFactor during the Class Period.

4          38.       Defendant Ronald C. Foster ("Foster") was, at all relevant times, Chief Financial

5    Officer ("CFO") of FormFactor.  During the Class Period, Foster sold 19,800 shares, or 82.29% of

6    his FormFactor holdings, pocketing $864,144 in insider trading proceeds, at an average of $43.64

7    per share.  In 2006, Foster received $1,055,134 in executive compensation, including $285,962 in

8    annual salary, $484,310 in option awards, $261,993 in non-equity awards, and $22,869 in other

9    incentive plan compensation.  For FY 2007, Foster received a 6.9% raise in base salary of $310,000.

10    He also received 115,580 shares of option grants during the Class Period.  Foster is liable for

11    statements made by him, all statements made during the analyst conference calls which he

12    participated, and all other group-published statements made by FormFactor during the Class Period.

13          39.       Defendant Joseph Bronson ("Bronson") served as the President of FormFactor at the

14    outset of the Class Period until he resigned on January 5, 2007.  According to the Company's

15    Certificate of Incorporation, as the President, Bronson had "the responsibility for the general

16    management the control of the business and affairs of the Corporation and the general supervision

17    and direction of all of the officers, employees and agents of the Corporation (other than the Chief

18    Executive Officer)." (Ex. 2)  During the Class Period, Bronson sold 25,000 shares, or 36.83% of his

19    FormFactor holdings, pocketing more than $1 million in insider trading proceeds.  In 2006, Bronson

20    received an executive compensation package of $2,442,780, including $400,020 in salary, $241,700

21    in stock, $1,210,645 in option awards, $523,515 in non-equity, and $66,900 in all other incentive

22    plan compensation.  Bronson is liable for statements made by him and all other group-published

23    statements made by FormFactor during the Class Period and prior to his departure.  Defendant

24    Bronson received 94,220 shares of option grants during the Class Period.

25          40.       Defendant Richard M. Freeman ("Freeman") has served as FormFactor's Senior Vice

26    President, Operations since September 2004.  In FY 2007, he received $330,000 in base salary.  He

27    also received 85,000 shares of option grants during the Class Period.  Freeman's executive

28    compensation information for FY 2006 is not publicly available.  Defendant Freeman is liable only

1   for §20(a) of the 1934 Act as a control person of FormFactor because he had the power and authority

2   to cause, and did cause, FormFactor to engage in wrongful conduct complained of herein.

3         41.    Defendants Khandros, Bronson and Foster because of their positions with the

4   Company, possessed the power and authority to control the contents of FormFactor's quarterly

5   reports, press releases and presentations to the market, including securities analysts, money and

6   portfolio managers and institutional investors.  They were provided with copies of the Company's

7   reports and press releases, alleged herein to be misleading, prior to or shortly after their issuance and

8   had the ability and opportunity to prevent their issuance or cause them to be corrected.  In addition to

9   their roles as CEO, President and CFO, defendants Khandros, Bronson and Foster were the chief

10  spokespersons for the Company.  In each of the Company's press releases issued and conference

11  calls hosted during the Class Period, defendants Khandros, Bronson and Foster were extensively

12  quoted discussing the Company's business and financial results.  Because of their positions within

13  the Company, and their access to material non-public information available to them but not to the

14  public, Khandros, Bronson and Foster knew that the adverse facts specified herein had not been

15  disclosed to and were being concealed from the public and that the positive representations being

16  made were then materially false and misleading.

17  **IV.    PLAINTIFFS' CONFIDENTIAL WITNESSES**

18        42.    Many of the allegations included herein are based on information provided by former

19  FormFactor employees referred to as confidential witnesses ("CW").  The information provided by

20  the former employees is reliable and credible because (1) each witness worked at FormFactor during

21  the Class Period, (2) each witness has personal knowledge of the information provided, (3) the

22  witness' job title, position and responsibilities show he/she has personal knowledge of the

23  information provided, (4) many of the witness accounts corroborate one another, and (5) the witness

24  accounts are corroborated by other information alleged herein.

25        43.    CW1 is a former FAB Coordinator and Administrative Assistant to FormFactor's

26  production manager prior to the Class Period until November 2006.  CW1 provided administrative

27  assistance to as many as five production managers who reported to defendant Khandros over the

28  course of CW1's employment at FormFactor's Livermore, California headquarters.  In that capacity,

1    CW1 had access to production-related data as CW1 was tasked with inputting data of various types

2    related to FAB production into presentations and reports utilized by the production manager to the

3    senior management at various periodic meetings.   Because of CW1's position and access to

4    production-related information, CW1 has knowledge about the production data available to the

5    FormFactor management, including the costs of inventory and inventory valuation.

6        44.    CW2 is a former Production Supervisor who worked at FormFactor in Livermore,

7    California during the Class Period until late December 2006.  As a Production Supervisor, CW2

8    oversaw one of three production shifts.  CW2's duties involved managing the production and testing

9    processes of FormFactor's probe cards just before the cards went into the final manufacturing

10   process in which ceramic components were mounted into the probe cards.  CW2 reported to the Vice

11   President of Manufacturing, Don Horst, who, in turn, reported to defendant Freeman.  CW2 attended

12   "Direction Meetings" in which Freeman attended to evaluate the status of manufacturing with

13   Production Supervisors and managers.   CW2 has knowledge about FormFactor's production

14   operations, including the ramping issues and production problems with the Harmony products, and

15   how scrap from the chronic low yields was transferred to R&D.

16       45.    CW3 is a former Senior Process Engineer who worked at FormFactor in Livermore,

17   California for over ten years prior to his/her departure in early 2007.  During the Class Period, CW3

18   reported to Vice President of New Product Development Saket Chada who also served on an interim

19   basis as Vice President of Process Engineering.  In that capacity, CW3 oversaw one out of about 15

20   total processes involved in manufacturing all of FormFactor's finished products.  CW3 was also

21   involved in the overall manufacturing and production process and other operations, including R&D.

22   Because of CW3's long history of employment with FormFactor, CW3 has knowledge about the

23   inner-workings of the Company in engineering and product development, including FormFactor's

24   obstacles in manufacturing Harmony, and the Company's improper accounting for transfer of scrap

25   from manufacturing to R&D.

26       46.    CW4 is a former Customer Project Manager who worked at FormFactor in

27   Livermore, California for six months, from mid-2007 until February 2008.  CW4 was one of the nine

28   or ten customer project managers who reported to the Director of Customer Project Management

PLAINTIFFS' SECOND AMENDED COMPLAINT - C-07-05545-SI        - 18 -

1   who, in turn, reported to Mete Bayyigit, a direct report under defendant Freeman.  In that capacity,

2   CW4's duties involved scheduling and planning production of FormFactor's products for Japanese

3   customers.  To do this, CW4 had access to the Company's global forecast system and extracted

4   information for forecasted future orders, noted the shipping dates for these orders and ensured that

5   the orders were placed in the production cycle so that they would be shipped by that time.  In the

6   course of the production cycle, CW4 communicated to FormFactor's personnel and customers in

7   Japan regarding the status of literally hundreds of products at any given time.  When there were

8   problems or delays in the production cycle, CW4 would coordinate with production personnel to see

9   if production of the order could be expedited to meet the shipping dates, especially if the sales

10  personnel in Japan indicated that the customer would not accept a later delivery date.  Because of

11  CW4's position and access to information and regular contacts with customers, CW4 has knowledge

12  concerning FormFactor's chronic yield problems that directly impacted the delivery of products,

13  including Harmony products to customers.

14        47.   CW5 worked at FormFactor as a Senior Cost Accountant for ten months, until

15  November 2007.  CW5 reported to Cost Accounting Manager Chris Krishna who reported to

16  Controller Greg Alcarez ("Alcarez") who reported to defendant Foster.   As a Senior Cost

17  Accountant, CW5's duties included the preparation of Bills of Material related to the production of

18  finished products.  According to CW5, a Bill of Material basically provides "a recipe" for a given

19  finished product in terms of the component inventory that go into producing a product.  Furthermore,

20  a Bill of Material includes "the material cost" of the components, as well as allocations of

21  "overhead" and "labor" to result in the final "finished good cost" of a particular item.  It was CW5's

22  duty to add the overhead and labor rates, in addition to the component parts, to the Bills of Material

23  in order to arrive at the final cost of the finished goods that would eventually be reported in the

24  Company's general ledger.  CW5 was responsible for the journal entries related to these matters,

25  and, thus, has knowledge of FormFactor's process for evaluating the cost of goods sold, including

26  knowledge of other participants who were involved in the valuation process.

27        48.   CW6 worked at FormFactor as a Senior Financial Analyst from early 2005 until April

28  2007.  CW6 initially reported to Cost Accounting Manager Mark Villani ("Villani"), and then

1   reported to Senior Manager of Financial Operations Keith Matsumoto after Villani's departure from

2   FormFactor.   CW6 also reported to Controller Alcarez.   As a Senior Financial Analyst, CW6

3   primarily involved cost accounting duties, which included preparing monthly "reporting packages"

4   that were reviewed by various personnel in the finance organization, including Villani and Alcarez.

5   CW6 was also responsible for, among other areas, "direct labor reporting" and calculating inventory

6   reserves.   Because of his/her position and his/her duties at FormFactor, CW6 has personal

7   knowledge of the financial reporting process at FormFactor, including the manual and labor

8   intensive Excel spreadsheets that were used in the financial reporting processes, which provided the

9   opportunity for the senior financial personnel to make manual adjustments.

10          49.   CW7 is a former Senior Engineering Technician who worked at FormFactor for four

11  years before the Class Period until February 6, 2008.   In that capacity, CW7's role involved

12  monitoring the yield of FormFactor's probe-head products during and after manufacturing.   CW7

13  confirms that FormFactor had yield problems that prevented the Company to timely deliver products

14  to customers.   CW7 indicates that the Company also had problems in terms of the quality of the final

15  products that it actually shipped to customers.

16          50.   CW8 is a former Operator who was involved in the fabrication process of

17  FormFactor's probe-head products for two years until September 2007. In that capacity, CW8

18  reported to Production Supervisor Rich Campson, and has personal knowledge of FormFactor's

19  production of the probe-heads that get attached to the probe cards during the manufacturing process.

20  CW8 has personal knowledge of the manufacturing processes at FormFactor, including some of the

21  production issues that caused shipment delays to customers.

22          51.   CW9 is a former Senior Information Technology ("IT") Director who worked at

23  FormFactor from mid-2006 through December 2007 who reported to Chief Information Officer

24  ("CIO") Richard Diamond ("Diamond") who, in turn, reported to defendant Bronson initially and

25  then to defendant Khandros after Bronson's departure.   As Senior IT Director, CW9 oversaw all

26  enterprise software applications and the associated supporting hardware necessary to support

27  FormFactor's operations.   CW9 confirms that when he/she joined the Company, it was in severe

28  need of upgrading and improving its IT systems, processes and controls because the Company's IT

1  systems to support myriad business operations were "absolutely primitive."  For instance, despite

2  having an Oracle Financials and Enterprise Resource Planning ("ERP") application and a so-called

3  PROMIS system (made by Brooks), the Company remained hugely reliant throughout December

4  2007 on utilizing a wide-array of Excel spreadsheets to handle various reporting functions related to

5  manufacturing, accounting, inventory control and finance.  Moreover, CW9 and Diamond were

6  brought in to correct issues in IT and implement new systems to bring the Company up to

7  contemporary standards, operating practices and Sarbanes-Oxley Act of 2002 ("Sarbanes-Oxley")

8  compliance required of a public company.  CW9 was also tasked with an on-going project to deal

9  with scrap, *i.e.* obsolete inventory accumulated from failed yields, throughout CW9's tenure at

10  FormFactor and, thus, has personal knowledge of the related matters concerning the scrap project.

11  52.  CW10 joined FormFactor's Quality Assurance ("QA") department in 2004 and

12  assumed the position of QA Probe Head Inspector in early 2006 until April 2008.  CW10's last

13  supervisor was Karen Reyes who, in turn, reported to Chuck Hillary, a QA manager.  As a QA Probe

14  Head Inspector, CW10 was responsible for inspecting completed probe cards, including Harmony

15  probe-heads, using a microscope.  This inspection process was the second to the last step in the

16  production of the probe cards.  As a QA Probe Head Inspector, CW10 has personal knowledge of

17  some of the quality problems with FormFactor's products, including Harmony-based products, from

18  FormFactor's manufacturing.

19  53.  CW11 worked as an Inventory Control Technician from May 2007 until July 2008.

20  In that capacity, CW11 reported to Logistics Manager Craig Henninger who worked under Mark

21  Lestochi and Nete Bayight.  As an Inventory Control Technician, CW11's responsibilities included

22  providing materials or parts to the Company's engineers and production lines after receiving requests

23  for parts or "pick lists" in e-mail format.  After receiving such requests, CW11 would obtain the

24  approval from Material Planners Tom Chappron and Sheila Rugaldo before pulling parts to get them

25  ready for pick-ups.  In the course of his/her employment at FormFactor, CW11 received part

26  requests or "pick lists" from production engineers, kitting, and assembly & test ("A&T") teams.  As

27  part of the Inventory Control team, CW11 also dealt with scrap materials from failed yields, and,

28

PLAINTIFFS' SECOND AMENDED COMPLAINT - C-07-05545-SI                - 21 -

1  thus, has personal knowledge of whether the scrap materials from manufacturing were used or

2  recycled.

3        54.  CW12 worked as a Senior Engineering Technician between early 2003 and mid-2008.

4  In 2006, CW12 worked in the Manufacturing Engineering department and reported to Manufacturing

5  Engineering Manager Tom Dozier who reported to Head of Manufacturing/Chief Technology

6  Officer Benjamin Eldridge.  In 2007, CW12 was part of the R&D department and reported to

7  Microelectromechanical Systems ("MEMS") R&D Technology Manager Mike Harburn.  Beginning

8  in 2005, CW12's responsibilities included providing support for the Harmony manufacturing line,

9  thus, CW12 has personal knowledge of the timing of the Company's development and ramping of

10  Harmony and the struggles that it faced in ramping Harmony-based products to market, including the

11  "DOA" (Dead on Arrival) rate for Harmony probe cards in late 2007.

12        55.  CW13 joined FormFactor in 2004 and worked as an Equipment Maintenance

13  Manager until February 2007.  In that capacity, CW13 initially reported to Director of Operations

14  Harrold Rust ("Rust"), and then defendant Freeman after Rust's departure from the Company.  As an

15  Equipment Maintenance Manager, CW13 was responsible for keeping the manufacturing lines

16  running, including equipment installations for a newly construed clean room for Harmony during the

17  Class Period.  CW13 has personal knowledge of the readiness of the Company's facilities to

18  manufacture Harmony.

19        56.  CW14 is a former Senior New Product Program Manager in FormFactor's Product

20  Development department from September 2005 through June 2008.  In that capacity, CW14 led

21  several cross-functional teams comprised of personnel from Marketing, Engineering, Finance and

22  Operations on the development of new products at FormFactor.  CW14 initially reported to Program

23  Management Office ("PMO") Manager Tim Cooper, and then to Dinesh Kalakkad who reported to

24  Chief Technical Officer ("CTO") Benjamin Eldridge ("Eldridge"), a direct report of Khandros.  In

25  early 2007 when FormFactor reorganized its business units, CW14 reported to Bruce Bolliger, Vice

26  President of Flash Marketing who reported to Khandros.  As a Senior New Product Program

27  Manager, CW14's tasks included developing manufacturing processes with acceptable yields,

28  determining process capabilities, as well as establishing the support infrastructure such as

PLAINTIFFS' SECOND AMENDED COMPLAINT - C-07-05545-SI      - 22 -

1    applications, set-up procedures and service processes.  His/her role involved leading the cross-

2    functional teams to take new product ideas from the FormFactor R&D group and develop plans to

3    manufacture, scale and eventually introduce into commercial sales the new products.  CW14 has

4    intimate detailed knowledge of the Company's actual progress with the development and ramping of

5    Harmony, which contrasted with the representations made by defendants.  In addition, because of

6    his/her involvement with the development of Harmony, and his/her extensive participation in

7    technical meetings with Khandros, Freeman and Bronson where problems with Harmony were

8    discussed, CW14 is directly aware of defendants' knowledge of Harmony's problems and their

9    involvement with the development of Harmony as well as the reasons why defendants prematurely

10   introduced Harmony to the market even before it had been fully developed.

11   **V.    BACKGROUND**

12          57.    FormFactor designs, manufactures and sells advanced wafer probe cards, which are

13   used by semiconductor manufacturers to electrically test integrated circuits.  Semiconductor

14   manufacturers use wafer probe cards to perform wafer probe tests on the whole semiconductor

15   wafer, prior to singulation, before the semiconductor manufacturing process.  After the fabrication of

16   a semiconductor wafer, the chips on the wafer are subject to a wafer probe test.  During the wafer

17   probe test, a wafer probe card is mounted in a prober, which is in turn connected electronically with

18   and tests individual chips on a wafer.  At the core of FormFactor's product offerings are its

19   proprietary technologies, including its patented MicroSpring and Harmony technologies.  In 2005,

20   FormFactor had 54% market share in advanced semiconductor wafer probe card technology.

21          58.    Historically, the wafer probe card industry has been highly competitive.  In a wafer

22   probe test, the ability to test an increasing number of dies on the wafer at the same time provides

23   significant cost savings.  In particular, the benefit of increasing parallelism reduces the number of

24   wafer probe test cells (wafer probers, test heads and testers), which translates to savings in capital

25   expense and floor space.  In addition to increasing the number of dies on the wafer, there is also a

26   huge benefit to reduce the number of "touchdowns" in the testing process.  A "touchdown" is the

27   contact between the wafer probe card and the wafer, and a reduction in the number of touchdowns

28   means a shorter lead time and testing process, thereby saving costs in the manufacturing process for

1    the semiconductor customers.  Prior to the Class Period, the industry had just transitioned from nine

2    touchdown to four touchdown probe cards, with the next shift from four touchdown to one

3    touchdown cards.

4          59.    Coinciding with the industry and the Company's next transition to the single

5    touchdown capability, FormFactor was also undergoing internal personnel changes to address the

6    material weaknesses in internal control over financial reporting.  Prior to the Class Period, on

7    November 22, 2004, the Company restated its financials for FY 2001 through FY 2004 because "a

8    material weakness in internal control over financial reporting exists."  In the prior restatements, the

9    material weakness was attributed to the Company having insufficient personnel resources and

10    technical accounting expertise within its accounting function.  The Company reported its prior

11    restatements as follows:

12            Amendment No. 1 to FormFactor's Annual Report on Form 10-K restated its
        financial results for fiscal years 2001, 2002 and 2003 to reflect a change in the
13            amortization schedule of deferred stock-based compensation recorded in connection
        with its June 2003 initial public offering and to reflect a portion of its stock-based
14            compensation amortization in cost of revenues.  This Amendment No. 2 to
        FormFactor's Annual Report of Form 10-K presents net income (loss) available to
15            common stockholders and restates its basic and diluted net income (loss) available to
        common stockholders per share for fiscal years 1999 through 2003 and its pro forma
16            net income (loss) calculation and the related per share amount disclosures under
        SFAS No. 123 "Accounting for Stock-based Compensation," but does not affect
17            FormFactor's reported net income, or its balance sheet or cash flow statements for
        any period.
18

19            Under applicable rules, management may not conclude that a company's
        internal control over financial reporting is effective if a material weakness exists.
20            Given the nature of the two restatements, FormFactor believes that the material
        weakness relates to insufficient personnel resources and technical accounting
21            expertise within its accounting function.  FormFactor believes that it has already
        taken substantial steps toward remediation of this material weakness and is taking
22            additional steps to cure the weakness.

23          60.    As a result of the restatements in late 2004, FormFactor hired defendant Foster as the

24    new CFO.  In the press release announcing Foster's employment, the Company highlighted Foster's

25    more than 25 years of experience in financial management and operations.

26          61.    In April 2005, FormFactor introduced its new proprietary "Harmony" architecture for

27    wafer probe cards.  The Company represented that the Harmony architecture would address the

28    significant challenges presented by the future demands of single touchdown wafer probing and very

1   high parallelism wafer test, and will be the key building block for FormFactor's future generations of

2   Flash, DRAM, WLBI and High Frequency probing solutions.    According to CW2, a former

3   Production Supervisor at FormFactor, while individual probe cards had as many as 15,000 micro-

4   springs, the Harmony product was supposed to combine as many as four individual probe cards into

5   a single board.  In short, Harmony was to offer semiconductor manufacturers a compact solution

6   with higher micro-spring density in single touchdown, thus shortening the lead time in the testing

7   process prior to manufacturing.  According to CW11, FormFactor treated Harmony as a "bread

8   winner" and that the Company was "betting" its future on Harmony.  According to CW14, the

9   former New Product Senior Program Manager, the 300-mm Harmony probe card was designed to

10  take four 100-mm probe-heads and mechanically affix them into a single large probe head by bolting

11  the individual probe-heads to a plate.  The idea was to simply combine four of them to create a

12  single touchdown probe card.  By contrast to FormFactor's multi-brick design, FormFactor's

13  competitors were developing single "monolithic" designs for their one touchdown probe cards which

14  utilized a single piece of ceramic.

15          62.    The market reacted to Harmony well, noting that the new Harmony products would

16  revolutionize the probe card industry and drive revenue growth in the years to come as the

17  semiconductor companies make the switch to the single touchdown testing process.  Following the

18  April 2005 announcement, several analysts upgraded FormFactor stock.  For example, Robert Maire

19  from Needham & Company, LLC ("Needham") issued a note on April 21, 2005, upgrading the

20  rating from a Hold to a Buy (Ex. 3):

21          **New Harmony Architecture Introduced** – FormFactor believes that the
        Harmony architecture will eventually enable it's [sic] customers to get 300-mm
22      wafers and beyond in a single touchdown.  The company expects to leverage this
        new architecture as the basis for it's [sic] two touchdown and one touchdown wafer
23      testing product, which it plans to introduce over the next few years.  This new
        evolutionary architecture will be the key building block of the company's future
24      DRAM, Flash, wafer-level burn-in, and high-frequency product platform.

25          63.    On July 15, 2005, Legg Mason Wood Walker, Inc. ("Legg Mason") initiated analyst

26  research coverage on FormFactor with a report entitled: "A Shiny Diamond in the Rough; Initiating

27  Coverage with Buy Rating."  (Ex. 4)  The report highlighted:

28

PLAINTIFFS' SECOND AMENDED COMPLAINT - C-07-05545-SI                            - 25 -

1

2

3

We are initiating coverage of FormFactor with a Buy rating on the shares, based primarily on what we view as its dominant market share position, strong execution capabilities and a market growth rate that is likely to exceed the industry's rate of growth.

*        *        *

4

5

6

7

8

We believe that the wafer probe card market that FormFactor participates in will outgrow the overall semiconductor capital equipment, and based on FormFactor's leadership position, this should translate to higher-than-industry growth rates for the company.  The basis behind this superior growth rate is the value-added that FormFactor's products provide in lowering cost of test ownership for chipmakers. The company's strong technology portfolio should allow the company to maintain its leadership position over the foreseeable future.

9

10

64.     On January 9, 2006, A. G. Edwards & Sons, Inc. ("Edwards") also initiated analyst research coverage with a Buy rating on FormFactor highlighting the impact of Harmony  (Ex. 5) :

11

12

13

14

15

**NAND Flash and Logic Markets**–FormFactor can use its leverage in DRAM to produce probe cards that will allow for greater parallelism in the fast growing NAND Flash market and the need for multi-DUT (device-under-test) in the logic market. . . . we see Worldwide NAND Flash Mb shipments are projected to grow 159% from 2005-2008.  With the company's Harmony OneTouch probe card for NAND flash that can test a complete wafer in one touchdown, is expected to ramp volume shipments starting in 2007.  FORM's logic products previously addressed only 10% of the logic market, but with its new wire bond flip-chip logic wafer probe card, they are able to address the remaining 90% that predominately uses conventional wafer probe cards.

16

17

18

19

20

21

22

65.     Indeed, based on FormFactor's representations about its development of the single touchdown technology and the great future revenue potential from the technology, the Company stock price jumped from $20.83 to $37.60, almost 81%, between April 19, 2005 to February 2, 2006, based on the exuberance created by defendants' representations about FormFactor's ability to develop, design, produce and ship its cutting edge single touchdown technology for wafer probe cards and the Company's ability to volume produce its Harmony line across all semiconductor industries based on this new technology.

23

24

25

26

27

66.     In March 2006, the Company also completed a follow-on offering for five million shares at $38.00 per share, which resulted in net proceeds of $182 million.  According to the Registration Statement, the net proceeds from the offering were intended to increase the Company's manufacturing capacity so that it could meet its anticipated strong demand once Harmony products were rolled out.

28

PLAINTIFFS' SECOND AMENDED COMPLAINT - C-07-05545-SI                                    - 26 -

1  **VI.    DEFENDANTS KNOWINGLY AND RECKLESSLY ISSUED FALSE AND**
       **MISLEADING STATEMENTS DURING THE CLASS PERIOD**

2

3      **A.    False and Misleading Statements Made Concerning FormFactor's**
             **Ability to Develop and Ramp Up Harmony-Based Products**

4              **1.    Defendants Khandros, Foster and Bronson Falsely**
                    **Represented FormFactor's Development and Ramping of**
5                    **Harmony**

6      67.    On February 1, 2006, the first day of the Class Period, the Company issued a press

7  release announcing its 4Q 2005 and FY 2005 results.  (Ex. 7)  In the press release, defendant

8  Bronson stated:

9          "*We are pleased with the Company's results this quarter, as we made substantial*
          *progress ramping production at our new, industry-leading MEMS facility*."

10

11     68.    On the same day, the Company held a conference call with analysts, hosted by

12 defendants Bronson, Khandros and Foster, to discuss its FY 2005 financial and operating results and

13 its progress with Harmony.  (Ex. 6)  During the conference call, defendant Bronson stated:

14         *We have completed our first Harmony architecture probe card field trial*,
          which began with an early adopter in the second half of '05.  *Product performance*
15         *exceeded expectations.  We expect to see significant revenues for our probe card*
          *based on Harmony platform in the second half of '06, with everything centering*
16         *around 300 millimeter.  Harmony will be the cornerstone of flash and then DRAM*
          *for the next several years.*

17                                    *        *        *

18         *With the ramp of our new facility, we are now in the planning stages for the next*
          *level of capacity to ensure we meet this large and growing demand*.

19

20     69.    On the same conference call, defendant Foster stated:

21         *Manufacturing has successfully transitioned through the most difficult phase of*
          *the production ramp.  All production processes are now fully functioning in our*
22         *new facility, with output and yields improving steadily.*

23     70.    Defendant Khandros also touted the Company's future growth depending on its

24 execution of Harmony.  He stated:

25         *It will be one touchdown 300 millimeter product based on Harmony that will*
          *incorporate other elements that will make it very competitive in many ways,*
26         *including leadtimes.*

27     71.    Defendant Foster also followed on and stated:

28

1    The thing I would add to that, what Igor is saying, is that **we are planning to**
2    **have that in place for volume production in the second half of '06.  And we are**
     **planning that into all our capacity activities.**

3          **2.      Particularized Facts Demonstrating Falsity of the Statements**
                      **Made and Giving Rise to a Strong Inference that Defendants**
4                     **Khandros, Foster and Bronson Knew that Statements**
                      **Concerning the Company's Development and Ramping Up of**
5                     **Harmony Were False When Made**

6          72.    FormFactor Marketed Harmony to the Market Before It Was Fully Developed.

7    Defendants Khandros, Foster and Bronson knew there was no reasonable basis for representing that

8    FormFactor's production processes were fully functioning in February 2006, that the Company had

9    completed its first Harmony probe card field trial, and that the Company would have the ability and

10   the capacity to volume produce the Harmony probe cards as promised.  According to CW3, who

11   worked at the Company for over ten years, FormFactor typically began selling products to customers

12   before the products were "fully developed."  This "marketing and selling before we built it"

13   approach persisted throughout the Class Period, including FormFactor's strategy for selling and

14   shipping its Harmony products.  This meant that when orders for the products came in, FormFactor

15   struggled to actually build the products and produce them in a timely fashion.

16         73.    CW14, the Senior Program Manager, who was involved with new product

17   development, recalls that in either January or February 2006, Khandros made comments in an

18   earnings conference call regarding Harmony's state of readiness, but at that time Harmony had not

19   yet cleared the Feasibility phase.  CW14 states that when Khandros and Bronson made the

20   statements in early 2006, Harmony was still "in the early stages of development."  More specifically,

21   CW14 states that FormFactor utilized an internal phased development plan known as "invention to

22   market-share" IMS.  (This term is also known as Product Life Cycle in some other semi-conductor

23   companies.)  In essence, IMS is comprised of discrete phases from the time an idea is conceived to

24   the idea actually resulting in a final product that can be reliably manufactured and is available for

25   sale.  At FormFactor, the first step is basic research on an idea which results in "a feasibility plan"

26   that is presented to senior management, including Khandros, Bronson, Freeman and Foster. This step

27   is the Feasibility phase.  As a matter of FormFactor's policy, in order to move on to the next phase,

28   signatory approval would have to be obtained from the senior vice presidents and above, including

PLAINTIFFS' SECOND AMENDED COMPLAINT - C-07-05545-SI          - 28 -

1  CFO Foster and Chief Operating Officer ("COO") Freeman.  CEO Khandros and President Bronson

2  participated in phase exit reviews but were not signatories for phase exits.  If approved, the next

3  phase is Product Development, which involves "heavy duty engineering" to determine how to

4  actually produce the product in commercial quantities, which includes creating necessary

5  documentation and processes.  The results of the Product Development phase are also reviewed by

6  senior management and, if approved, the product then goes into Pre-Production which involves

7  creating Alpha and Beta versions of the product that will be tested by customers.  Some of the

8  elements of this phase include looking for any process problems in anticipation of the product going

9  into full production.  If approved, the product then goes from Pre-Production to "Market-Share"

10  which is basically when "operations takes over."  CW14 said that, at FormFactor, the authority to

11  transfer a product, including Harmony, from Pre-Production to Market-Share was given by CTO

12  Freeman, CTO Eldridge and the vice president of sales.

13       74.    CW14 states that the day following the conference call, Makarand Shinde ("Shinde"),

14  the Program Manager who was in charge of the development of Harmony in 2005 and early 2006

15  (who had not heard the conference call at the time it took place), was shocked to learn what

16  Khandros had represented.  Around the same time, CW14 states that there was a large poster in the

17  Company's public area "Vinters II" posted close by Shinde's cubicle touting that Harmony was

18  available for sale but that Shinde would make remarks such as, "Really? We are?"

19       75.    Indeed, FormFactor never finished the IMS for the development of Harmony even

20  after the Class Period.  CW14, states that the senior executives decided to rush and ship Harmony

21  out to customers during the Feasibility phase, unlike FormFactor's other products where the Alpha

22  and Beta versions of the products were shipped to customers during the Pre-Production phase.  Prior

23  to this, FormFactor had never shipped a card to a customer during the Feasibility phase because there

24  was "too much risk" in doing so.  According to CW14, while the IMS for FormFactor's prior

25  products were generally between 12-15 months (with the Feasibility phase taking place

26  approximately 6-9 months), the Feasibility phase for Harmony alone took about three years and that

27  the Company, as of today, has not completed its formal IMS for Harmony.  CW14 states that the

28  reason why management decided to ship Harmony out to customers, knowing that they would very

1  likely be rejected, was to get the "first to market" advantages so that once a customer placed an order

2  for Harmony, even if it did not work, at least FormFactor would get the customer "on the hook" and

3  that it would increase the Company's visibility in the market among its competitors.  Approximately

4  in the middle of 2007, Harmony was finally approved to transition from the Feasibility phase to the

5  Product Development phase.  Internally at FormFactor, the development of the Harmony card is still

6  on-going.

7        76.    CW12, an Engineering Technician who worked in the Manufacturing Engineering

8  department in 2005 and 2006 and provided support for the Harmony manufacturing line, states that

9  even when the first Harmony probe card was "released to manufacturing" sometime in the middle of

10  2006, the manufacturing process for Harmony was not quite ready at that time or thereafter.  In fact,

11  the Company did not have all the manufacturing processes for Harmony "set up" or ready for

12  production.  Moreover, when CW12 transferred to the R&D department in 2007, R&D was still

13  working on the "dicing" project associated with the Harmony product, which involved "dicing" the

14  corners off the four probe cards in order to place them together into one Harmony probe card.  When

15  CW12 departed in April 2008, FormFactor was still developing the processes for the manufacturing

16  line for the production of Harmony probe cards.

17        77.    CW2, a Production Supervisor, states that the Harmony product was still in its initial

18  testing stage, and that it was still being developed as of the end of December 2006.  CW2 states that

19  there may have been development problems with Harmony such as the board "flexing in the middle"

20  and other matters, that were still being resolved as of December 2006.  Likewise, CW6, who left the

21  Company in April 2007 states that during CW6's tenure, Harmony was still in a "pretty preliminary

22  prototype" phase, although there may have been a couple prototypes developed by the R&D

23  department that had been sold to customers.

24        78.    Additional Indicia that Defendants Knew About the Real Progress and Problems with

25  Harmony at the Time They Were Making Rosy Representations About It.  Given the myriad of

26  problems with the development of the 300-mm Harmony probe card from the outset, there were at

27  least two types of regularly-held meetings in which Harmony matters were discussed beginning in

28  late 2005.  According to CW14, there was a bi-weekly meeting dedicated specifically to Harmony to

1    discuss the status of the project.  Based on CW14's occasional attendance at this bi-weekly meeting

2    and conversations with Shinde, the New Product Program Manager who was initially in charge of

3    Harmony, CW14 knew that the regular attendees included Shinde, Eldridge and Freeman.  Khandros

4    and Bronson were also occasional attendees at these meetings and were fully informed of the status

5    of the Harmony development.

6        79.    Additionally, there was also a monthly Executive Project Review ("EPR") meeting in

7    which the status of all of FormFactor's major products was discussed.  CW14 attended the monthly

8    meetings and from CW14's attendance knew that Harmony was discussed.  Both Bronson and

9    Khandros attended these monthly meetings, as did Ruscev later in 2008.  CW14 states that Khandros

10   knew about the Harmony development problems and "was directing some of the work" related to

11   Harmony, given that Khandros was "very strong technically" with a Ph.D. in a related-field.  For

12   example, CW14 recalls that Khandros directed that thermal testing be run on the Harmony products

13   early on in the development stage in 2006.  The minutes from the monthly EPR meetings, including

14   action items, were drafted by an attendee on a rotating basis.  The minutes, which detailed the

15   Company's real progress with the development of Harmony, were also distributed to the attendees in

16   an e-mail format and kept in the Company's FSLV 01 server.  The FSLV 01 server is also a

17   depository for all Harmony folders and is a shared file server that the senior management can access.

18       80.    CW14 also knew that Shinde attended other "semi-private, invitation only" meetings

19   with Khandros in which Shinde got "chewed out" by Khandros for various problems associated with

20   the Harmony project.  As the problems with Harmony dragged on and continued to escalate, CW14

21   was asked to work on Harmony as well in late 2006, which was still in the Feasibility phase at that

22   point.

23       81.    Defendants Misrepresented FormFactor's Ability to Ramp Up Harmony Production

24   Because of the Chronic Poor Yields that Plagued the Company's Manufacturing Processes.

25   Defendants Khandros, Foster and Bronson also knew that there was no reasonable basis for

26   representing that "all production processes are now fully functioning" because the Company suffered

27   chronic poor yields that impeded FormFactor's ability to bring new products into volume production

28   efficiently and in a timely manner.

82.    Even as FormFactor was beginning to receive orders for the Harmony products after they were prematurely introduced to the market, the Company faced other manufacturing constraints to get the products out.  In fact, the Company was experiencing poor yields in the production process that plagued its ability to manufacture and deliver products, including the Harmony products, to customers.  Several of plaintiffs' confidential witnesses confirm that the chronic low yields in the manufacturing process negatively affected FormFactor's ramp up of Harmony products.  CW1, the former FAB Coordinator who had access to production – related data, states that FormFactor frequently struggled to manufacture its products in time to meet customer demand.

83.    At the same time that defendants were touting to the market that the Company's "manufacturing has successfully transition through the most difficult phase of the production ramp" and that "all production processes are now fully functioning," the management assembled a task force in February/March 2006 to assess the situation relating to FormFactor's chronic poor yields.  This task force was formed at the direction of Bronson and under the supervision of Freeman.  This task force also included outside expert consultant James Cook ("Cook"), who was asked to diagnose the causes of the poor yields in the Company's manufacturing processes.  According to CW9, Bronson and Freeman hired Cook to determine the proportions of the scrap situation and to identify possible solutions to the situation.  In the course of the consulting engagement, Cook reported the findings to Freeman and other senior management.  Because some of Cook's recommendations would have had a downstream influence on applications that might ultimately develop into IT projects, CW9, as the Senior IT Director at the time, was informed regarding Cook's activities on the scrap project.  According to CW9, Cook was the first of a number of consultants brought on board to assess the Company's chronic yield issues.

84.    In the course of his consulting engagement, Cook told CW9 that FormFactor had accumulated years of scrap that had not been accounted for that probably did not have any value.  The scrap was not stored in a single location, but instead scattered in lockers and trays throughout Form Factor's facilities.  Cook's challenge had been that he could see what was reported in the PROMISE and original Oracle applications, as well as "piles of stuff" located throughout the facilities, without specifications as to what the "piles of stuff" were, where they came from, and what

1  was going to be done with them. One of Cook's tasks was to ascertain what needed to be allocated

2  as scrap.

3      85.    As a result of Cook's consulting work, FormFactor ended up implementing a major

4  Oracle application in 2007 to replace the old Oracle and PROMISE to keep track of cost accounting,

5  which resulted in the creation of a second task force for a cost-accounting project in September 2007

6  that coincided with the time the auditors were looking into the Company's inventory valuation

7  practices.

8      86.    The creation of the task force in February/March 2006 to diagnose the scrap

9  accumulation that resulted from the chronic poor yields is consistent with the accounts of other

10  witnesses who worked at FormFactor during the Class Period. Prior to and during the Class Period,

11  FormFactor struggled to produce and manufacture products because the "key processes" always

12  yielded low. Internally, the low yields were a big hurdle at all times at FormFactor and were well

13  known throughout the Company, but the underlying causes giving rise to the low yields were never

14  fixed. CW3, a Senior Process Engineer who had worked at FormFactor for over ten years until early

15  2007, explains that senior management knew about the low yields but "never allowed us to fix

16  problems causing the low yields" because to do so would mean that production would have to be

17  shut down, which FormFactor "could not afford." CW3 further states that although the low yields

18  represented chronic, persistent and well-known problems throughout CW3's tenure, FormFactor

19  never acknowledged the reality of the low yields when making production forecasts and other

20  projections regarding the deliverability of products to customers. As such, problems arose when

21  production schedules assumed unrealistically optimistic yields that did not materialize – which was

22  inevitably the case. Despite that the problems that associated poor yields were "widely known" to

23  Company insiders and had been problems for FormFactor at all times, FormFactor did not do

24  anything other than apply "band-aid" solutions to the yield problems, according to CW3.

25      87.    CW7, whose job during the Class Period was to monitor the yield during the

26  manufacturing process, states that one of the reasons for the poor yields was that the pins on the

27  probe-heads (which are mounted to the probe cards) constantly fell out. In his/her position as a

28  Senior Engineering Technician, CW7 was involved in determining why the pins fell out, but that as

PLAINTIFFS' SECOND AMENDED COMPLAINT - C-07-05545-SI        - 33 -

1   of the time of CW7's termination from FormFactor as part of the global workforce reduction in

2   February 2008, the exact reason why the pins fell out had not been determined, nor had a solution as

3   to how to prevent it been developed. CW7 indicates that the situation represented a manufacturing

4   "process problem" and involved the manner in which the pins were soldered to the probe-head. This

5   problem was one of the factors that resulted in FormFactor taking longer to produce certain products

6   and miss customer delivery dates.

7       88.   CW8, a Technical Operator who worked in the fabrication process for Form Factor's

8   probe-head products, also states that the yield problems involved in the manufacturing of probe-

9   heads contributed to shipment delays. For instance, at one point in the manufacturing process, the

10  probe cards went to the so-called "wire-band" stage in which gold springs were attached to the

11  probe-head. After the "wire-band" stage, they went on to the nickel-bath stage, which was where

12  CW8 worked along with eight other operators. The nickel-bath phase was fourth in the total of ten

13  phases for probe-head manufacturing. In this stage, the probe-heads were placed in a liquid nickel

14  bath for about two to four hours depending on the type of probe-head or probe card being processed.

15  The purpose of the nickel-bath was to harden the gold springs on the probe-head. CW8 states that in

16  the nickel-bath phase, it was not an infrequent occurrence that "a lot of bubbles" formed in the liquid

17  nickel when the probe-head was dipped into the nickel bath. Essentially, if bubbles occurred while

18  the probe-head was in the nickel bath, the probe-head could not be fixed or re-used. Instead, it was

19  necessary to start over "from square one" of the manufacturing process. In quantifying the number

20  of failures in the nickel-bath phase, CW8 estimates that in a given week, the nickel-bath phase

21  processed approximately 20 probe-heads, of which 10-15 probe-heads would be successfully

22  processed and FormFactor had a factor ratio of between 25%-50%. Moreover, CW8 states that if a

23  product failed in the nickel-bath process and had to be started over, it might be at least a day or two

24  before that same product was ready for the nickel bath, resulting in FormFactor being unable to

25  timely ship finished products to customers.

26      89.   CW10, a former QA Probe Head Inspector whose job was to inspect completed probe

27  cards by using microscopes, also states that in the QA process before the probe-heads are packaged,

28

PLAINTIFFS' SECOND AMENDED COMPLAINT - C-07-05545-SI          - 34 -

1  usually two out of the five inspected probe cards would be found defective, and that the defective

2  probe-heads were scrapped.  The same was true for Harmony probe cards that CW10 inspected.

3        90.    <u>Additional Evidence of Defendants' Actual Knowledge of the Chronic Manufacturing</u>

4  <u>Issues</u>.  Because of the pervasiveness and chronic occurrence of scrap accumulated from poor yields

5  in the manufacturing process, senior management also personally got involved in monitoring the

6  process.  CW2, a former Production Supervisor, was aware that Khandros went to the "production

7  floor" and interacted with the lower-ranking personnel to assess the status of manufacturing.  CW14,

8  a former FAB Coordinator, indicates that Khandros went to the FAB production department on a

9  fairly regular basis, often to conduct tours for visitors, but also "to crunch numbers" and handle

10  various issues in the FAB.  For instance, Khandros would get involved if there were quality issues,

11  such as "components not staying together."  As FormFactor grew, CW1 indicates that Khandros'

12  visits became less frequent as Bronson was brought in to deal with some issues previously handled

13  by Khandros.

14        91.    Moreover, in addition to the reports from the task force, senior management,

15  including Khandros, Foster, Freeman and Bronson, was also apprised of the manufacturing issues

16  through reports and meetings prepared by the finance and operations departments.  At the weekly

17  executives meeting, in which Khandros, Foster and other senior executives participated in, the

18  Production Manager presented a status report of the FAB production departments, including data on

19  general numbers for the FAB production department in terms of headcount, inventory levels and

20  production levels.  This status report was prepared for the Production Managers by CW1, in

21  conjunction with personnel from the CFO's office.  According to CW1, the status report also

22  reflected the manufacturing yields (*i.e.*, the actual, successfully finished goods in the manufacturing

23  process), as well as information regarding manufacturing "failures."  Specifically, the status reports

24  contained a line item or column called "Tip Attach Re-work" to reflect the items with problems that

25  were identified before the final AT&T phase and sent to the re-work group.  If the items could not be

26  fixed in the re-work group, those items were included in a line/column item and designated as

27  "Failures."  In this regard, according to CW1, throughout Cow's tenure, the amount of failures/scrap

28  was always "a major concern."  Senior management knew about the yield problems in part because

1   of the information reported in the Production Manager's periodic status report at the weekly

2   executives meeting, which CW1 prepared.  This meeting, which took place in the executive

3   conference room of the main FormFactor building, was held every Friday morning and lasted for

4   several hours.

5       92.    <u>The Motive and Scheme to Conceal Poor Manufacturing Yield Rates and the</u>

6   <u>Company's Inability to Ramp Up Harmony Production</u>.  Due to the unpredictable and unreliable

7   yield rates, FormFactor essentially could not reasonably plan or project its output and delivery

8   schedule, or truly determine the Company's real margins.  To conceal the Company's chronic poor

9   yields so that defendants could portray that the development of Harmony was on track as promised,

10  defendants devised a scheme to hide the manufacturing issues by overstating obsolete inventory and

11  improperly classifying obsolete inventory as R&D, and thereby not disclosing Form Factor's actual

12  financial performance and true operating margins.

13      93.    Gross margin represents a company's revenue for a period minus the associated cost

14  of revenues.  For a manufacturing type of company such as FormFactor, gross margin is a key

15  performance indicator of a company's operations.  It is a metric of profitability and is useful in

16  analyzing how efficiently a company is using its raw materials, labor and manufacturing-related

17  fixed assets to generate profit.

18      94.    R&D costs are costs associated with activities that a company engages in aimed at the

19  discovery of new knowledge that can either lead to the development of new products or procedures

20  or to the improvement of existing products or procedures.  Only costs associated with these types of

21  activities should be classified as R&D costs.  R&D costs are required to be charged to expense when

22  incurred.  A company is required to disclose in its financial statements the amount of R&D that it

23  charges to expense.  SOFAS No. 2, ¶¶8-14, *Accounting for Research and Development Costs*.

24      95.    R&D is important as it is one of the metrics investors consider as far as evaluating the

25  likelihood of future growth in a company.  While all expenses reduce reported income, R&D is

26  viewed differently than other expenses.  For a high-tech company such as FormFactor, R&D is

27  especially important for a company to be able to gain or maintain a competitive edge and succeed in

28  the industry.  Indeed, throughout the Class Period, the Company touted the importance of its R&D

spending on maintaining a competitive edge. The Company's 2006 Form 10-K (Ex. 24) provided in pertinent part the following concerning Form Factor's R&D spending:

Research, Development and Engineering

The semiconductor industry is subject to rapid technological change and new product introductions and enhancements. We believe that our continued commitment to research and development and our timely introduction of new and enhanced wafer probe test solutions and other technologies related to our Micro Spring interconnect technology are integral to maintaining our competitive position. We continue to invest considerable time and resources in creating structured processes for undertaking, tracking and completing our development projects, and plan to implement those developments into new product or technology offerings. We continue to allocate significant resources to these efforts and to use automation and information technology to provide additional efficiencies in our research and development activities.

We have historically devoted approximately 11% to 16% of our revenues to research and development programs. Research and development expenses were $46.6 million for fiscal 2006, $28.3 million for fiscal 2005, and $20.6 million for fiscal 2004.

96.     The 2006 Form 10-K further disclosed the following as a risk factor concerning the Company's business, financial conditions and results of operations:

*If we do not innovate and keep pace with technological developments in the semiconductor industry, our products might not be competitive and our revenues and operating results could suffer.*

97.     In order to preserve the Company's gross margins and make it appear as if the Company was adequately spending its resources on R&D, defendants caused FormFactor to improperly transfer the cost associated with scrap that accumulated because of the poor yields from engineering, which is a part of the manufacturing department, to the R&D department and, thereafter, treat the scrap as a R&D expense. According to GAAP, scrap material should have been treated as excess or obsolete inventory and written off through cost of revenues. SFAS No. 151, ¶2; Accounting Research Bulletin ("ARB") No. 43, Ch. 4, ¶¶1-6.

98.     The Company transferred the scrap out of the engineering department in order to improve its margins on product sales by reducing its current period cost of revenues expense. The scrap material transferred to R&D was derived from efforts to produce a product that was already being sold to customers and not related to the production of any new products. This transfer of costs was improper as it was not related to an actual R&D expenditure.

99.     By improperly transferring scrap inventory from the engineering department to the R&D department, FormFactor was able to (i) overstate its gross margin and, hence, make it appear that the Company was effectively managing its raw materials, and (ii) overstate its R&D spending and, hence, make it appear that the Company was engaging in extensive R&D in order to remain competitive in the high-tech semiconductor industry.

100.     As part of the fraudulent scheme, defendants knew about and directed lower-ranked personnel to improperly transfer the cost associated with scrap that accumulated from poor yields from engineering and production from the manufacturing department to R&D.  Thereafter, the cost of the scrap was written off as R&D.  As corroborated by several witnesses who worked at FormFactor, including CW3 (former Senior Process Engineer), CW6 (former Senior Cost Financial Analyst), CW8 (former Operator in the fabrication process) and CW9 (former Senior IT Director), the Company transferred the accumulated scrap from failed yields out of the engineering department in order to avoid recognizing the costs as current period cost of revenues.

101.     CW3 states that one way that FormFactor tried to preserve the margins of its finished goods was to shift over the cost of the scrap that accumulated because of the poor yields over to the R&D department and treat the scrap as a R&D expense.  CW3 states "it was very common" throughout CW3's tenure to make an inter-Company transfer of the scrap from engineering to R&D.  The reason for transferring the scrap over to R&D was so that engineering/manufacturing "wouldn't look as bad" because the scrap costs did not get factored into the cost of the finished goods.  While CW3 could not quantify the amounts of such scrap that were shifted over in this manner in any given quarter, the amounts involved were not insignificant since "those ceramic pieces are several thousand dollars a pop."  Moreover, according to the seasoned engineer CW3, the inability to derive consistent or good yields also meant that it was difficult for FormFactor to predict or truly determine "what were our real margins."  The poor and inconsistent yields presented a persistent and chronic problem that was never rectified.

102.     The R&D group did very limited testing, if any, for the transferred scrap from manufacturing to R&D.  It also meant that FormFactor's R&D expenditures were bigger, even though there was likely no, or very minimal, R&D work done on the transferred scrap.  According to

1  CW3, CW8 and CW10, witnesses who worked in FormFactor's manufacturing department during

2  the Class Period, because of the custom nature of FormFactor's products, the accumulated scrap

3  from failed yields could not be and was not re-used.  CW10, a Senior QA Probe Head Inspector,

4  states that the defective parts from the manufacturing process were scrapped.  CW3, a veteran Senior

5  Process Engineer, states there was likely only minimal actual R&D work done on the transferred

6  scrap.  CW8 states that the failed probe-heads from the nickel-bath stage could not be and were

7  never reused.  Instead the gold from the probe head was stripped from the failed probe-heads, and

8  then the failed probe-heads were scrapped.  CW3, CW8 and CW10's accounts are corroborated by

9  CW11 who joined FormFactor in May 2007 as an Inventory Control Technician who said that R&D

10  did not request and did not use scrap from manufacturing in the course of business.  As a result, the

11  costs associated with the scrap did not qualify for R&D costs and should have been written off

12  through the Company's cost of revenues.  This manipulation caused the Company's cost of revenues

13  to be understated and its gross margin to be overstated.

14      103.    Given the magnitude of the accumulated scrap from failed yields, the Company even

15  had a task force of personnel from the Finance, Operations and IT departments to work on a "scrap

16  project."  When CW9 joined FormFactor, he/she became the designated IT personnel tasked "to help

17  with scrap," which involved "moving a few million dollars [of scrap] here and there."  In fact,

18  throughout CW9's tenure, the scrap project was on-going.  CW9 also states that FormFactor had

19  been allocating certain amounts of the scrap to the cost-of-goods-sold ("COGS") for orders that had

20  nothing to do with the orders that had led to the accumulation of scrap in the first place.  According

21  to CW9, the scrap should have been distinguished from products that were being sold and that

22  FormFactor's allocation of the scrap to the COGS of other products was, at best, improper.  CW9

23  also understood that the Company allocated some of the scrap as a R&D expense.  Even though

24  CW9 no longer works at the Company, CW9 still keeps in contact with a current FormFactor finance

25  employee who told CW9 that the same scrap project is still going on to the present day.

26      104.    CW6, a former Senior Financial Analyst, also confirms the chronic poor yields and

27  the deliberate accounting manipulation to hide the accumulated scrap.  CW6 states that, from an

28  accounting standpoint, FormFactor tried to utilize a "standard costing" methodology notwithstanding

1   that their products were essentially all custom products.  As such, if there was scrap associated with

2   trying to produce a particular order, it should have been characterized as a "job cost," not a standard

3   cost nor a R&D expense.  CW6 confirms that FormFactor improperly allocated its scrap as R&D

4   expense because FormFactor's scrap was the result of its efforts to produce a product that is already

5   being sold to customers, and thus it was inappropriate to allocate the scrap to R&D.  Instead, under

6   GAAP, it should be counted as a part of COGS for that specific customer order.  According to CW6,

7   although the scrap cost still hit the bottom line, by allocating it to R&D, it improved the margins on

8   the product sales by reducing the cost of sales.  CW6 states that these improper allocations took

9   place on a "quarterly basis" during his/her tenure.

10          105.    CW6 states that the decision and directives to allocate scrap as an R&D expense were

11  "usually made in meetings with higher ups like Director of R&D and Director of Financial

12  Operations" on a quarterly basis.  CW6 indicates that Foster would have known about the

13  misallocation of scrap to R&D because the amount of scrap that FormFactor had was "substantial."

14  The Director of Financial Operations and other financial personnel who worked on the scrap

15  allocation also reported to Foster.  CW9 states that Freeman had the ultimate responsibility in

16  deciding how to treat scrap and the manner in which it was disposed of from the operations side.

17  Furthermore, the task force created in February/March 2006 was at the direction of Bronson and

18  under the supervision of Freeman, and thus, both Bronson and Freeman had intimate knowledge of

19  the poor yields and accumulation of scrap at FormFactor.

20          106.    Defendants also knew that the undisclosed production constraints would significantly

21  raise the risk that FormFactor's customers with older generation products would seek alternative

22  sources, such as the Company's competitors, or seek to renegotiate their contracts with FormFactor

23  placing serious pressure on the Company's future revenue.

24          107.    Loss causation.    Following the Company's representations concerning its

25  development of Harmony, the Company's stock jumped 20% in one day, with more than 4.6 million

26  shares traded in one day on February 2, 2006.

27

28

PLAINTIFFS' SECOND AMENDED COMPLAINT - C-07-05545-SI          - 40 -

108.   <u>Insider Trading</u>.  Between February 1, 2006 and April 17, 2006, defendant Khandros reported making 42 FormFactor stock transactions, selling 463,286 shares and pocketing $22,113,772 in insider trading proceeds.

**B.     False and Misleading Statements Made Concerning FormFactor's Progress with Development of Harmony and Its 1Q 2006 Results**

**1.     Defendants Khandros, Bronson and Foster Falsely Represented that the Company's Execution of Harmony "Remained on Track" and Its 1Q 2006 Operating and Financial Results**

109.   On April 26, 2006, FormFactor issued a press release announcing its 2006 First Quarter financial results:

> FormFactor, Inc. today announced its financial results for the first quarter of fiscal 2006. Quarterly revenues were a record $81.3 million, up 13% from $71.8 million in the fourth quarter of fiscal 2005, and up 60% from $50.9 million for the first quarter of fiscal 2005.
>
> "Following 34% revenue growth in 2005, we achieved record revenues based on solid operating performance as we successfully ramped our industry-leading MEMS facility," said Joseph Bronson, President of FormFactor.
>
> Net income for the first quarter of fiscal 2006 was $10.8 million or $0.25 per share on a fully diluted basis, which included $2.5 million or $0.05 of incremental FAS 123R stock option expense net of tax. This compares to $10.5 million or $0.25 per share on a fully diluted basis for the fourth quarter of fiscal year 2005, and $4.9 million or $0.12 per share on a fully diluted basis for the first quarter of fiscal 2005, both of which exclude incremental stock-based compensation from the adoption of FAS 123R. The effective tax rate for the first quarter of fiscal 2006 was 35.9% compared to 29.1% for the fourth quarter of fiscal 2005 impacting net income by $1.1 million or $0.03 per fully diluted share.

110.   During the April 26, 2006 conference call, defendants Bronson and Foster met with analysts and repeated the same financial information. (Ex. 8)  Moreover, defendant Bronson made representations about the development of the Harmony product:

> ***We remain on track to penetrate the NAND flash segment of the market with our 1 Touchdown and Harmony-based product architecture in the second half of 2006.***
>
> *          *          *
>
> ***We have designed our next-generation 1 Touchdown Harmony technology and cost structure specifically for the flash market***. . . . We believe this product positions us well to significantly impact and penetrate the NAND market, which will serve as a critical launch pad to our overall strategy of expanding our market share across all market segments.

111.    On the same conference call, defendant Foster made representations about the Company's gross margins and yield rates:

*GAAP gross margin for the quarter was 50.2% and 50.8% on a non-GAAP basis. . . .  Factory productivity and yield improvements enabled the revenue growth, which in turn lifted margins sequentially.*

\*        \*        \*

The first quarter of 2006 marked a milestone for the Company, as we continued to improve our manufacturing processes and increase productivity in the new factory.  These efforts reached an inflection point over the last few months, where we have begun to see benefits to production processes in the form of improved throughput, yields and on-time delivery, which we believe will result in financial leverage going forward.

112.    When asked about how FormFactor projected a growth of $200 million in the Flash market by 2009, defendant Bronson represented that Harmony would be a key driver of the Company's revenue growth:

That's all predicated on the introduction of our new product in NAND flash.  So, we expect to be able to achieve good market share performance with this product which we're going to introduce in the second half of 2006.  So, we recognize this is a very good market, and it's one that we presently have a low share.  *And with the transition to 300 mm, 1 Touchdown applications, our product offering is designed to address that need.*

\*        \*        \*

In NAND flash, we've had some reasonably good business with our NF 150.  That will provide some stream of revenue.  And we do expect to get some revenue out of the Harmony-based architecture in the second half of 2006.  But once again, these are two major drivers for revenue growth in 2007.

113.    In the Company's Form 10-Q for 1Q 2006, filed on May 11, 2006 (Ex. 10), the Company reported the same financial information.  Furthermore, the Company stated how it accounted for inventories, as follows:

Note 4 - Inventories

Inventories are stated at the lower of cost (principally standard cost which approximates actual cost on a first-in, first-out basis) or market value. The Company provides inventory provisions based on excess and obsolete inventories determined primarily by future demand forecasts.  The provision is measured as the difference between the cost of the inventory and market based upon assumptions about future demand and charged to the provision for inventory, which is a component of cost of sales.  At the point of the loss recognition, a new, lower cost basis for that inventory is established, and subsequent changes in facts and circumstances do not result in the restoration or increase in that newly established cost basis.

PLAINTIFFS' SECOND AMENDED COMPLAINT - C-07-05545-SI                                    - 42 -

Inventories consisted of the following:

| | April 1, 2006 (In thousands) | December 31, 2005 |
|---|---|---|
| Raw materials | $7,656 | $7,686 |
| Work-in-progress | 12,061 | 9,971 |
| Finished goods | 1,381 | 747 |
| | $21,098 | $18,404 |

114.    Additionally, the Company stated in its Form 10-Q for 1Q 2006 how it accounted for its cost of revenues, as follows:

> Cost of Revenues.  Cost of revenues consists primarily of manufacturing materials, payroll and manufacturing-related overhead.  In addition, cost of revenues also includes costs related to the start up of our new manufacturing facility.  . . . Tooling and setup costs related to changing manufacturing lots at our suppliers are also included in the costs of revenues.  We expense all warranty costs and inventory provisions or write-offs of inventory as cost of revenues.

> We record inventory write downs for estimated obsolete and non-saleable inventories equal to the difference between the cost of inventories and the estimated market value based upon assumptions about future demand and market conditions.  If actual market conditions are less favorable than those projected by management, additional inventory reserve would be required.  Once established, the original cost of our inventory less the related inventory reserve represents the new cost basis of such products.  Reversal of these reserves is recognized only when the related inventory has been scrapped or sold.

115.    Additionally, the Company stated in its Form 10-Q for 1Q 2006 its inventory write down policy, as follows:

> We write down inventory for obsolete or non-saleable inventories equal to the difference between the cost of inventories and the estimated market value based upon assumptions about future demand and market conditions. If actual market conditions are less favorable than those projected by management, additional inventory write downs would be required. Once established, the original cost of our inventory less the related inventory write downs represents the new cost basis of such products.

116.    In the Form 10-Q for 1Q 2006, the Company also stated the stock compensation amounts capitalized as inventory, without disclosing how or why the amounts were capitalized rather than expensed.  The Company also reported R&D expense of $9.776 million, without disclosing that R&D included scrap materials that resulted from the poor yields in the manufacturing process that should have been written-off as COGS.

117.    As an attachment to the Form 10-Q for 1Q 2006, defendants Khandros and Foster also provided Sarbanes-Oxley certifications, signed on May 11, 2006, attesting based on their knowledge that FormFactor's quarterly report "does not contain any untrue statement of a material

1    fact or omit to state a material fact necessary to make the statements made . . . not misleading," and

2    that the reported financial information "fairly present in all material respects the financial condition,"

3    and that they are "responsible for establishing and maintaining disclosure controls and procedures."

4    (Ex. 10 )

5            **2.    Particularized Facts Demonstrating Falsity of the Statements**
              **Made and Giving Rise to Defendants Khandros, Bronson and**
6            **Foster's Scienter Concerning FormFactor's Development and**
              **Ramping of Harmony and the Impact on the Company's**
7            **Reported Financials for 1Q 2006 Were False When Made**

8            118.    The statements made in ¶¶109-117 above concerning FormFactor's development of

9    Harmony "remained on track" and the Company's financial and business results for 1Q 2006 were

10   false and misleading, and defendants knew that they were false and misleading at the time they were

11   made.  As detailed above, FormFactor's development of Harmony was materially flawed such that

12   the Company marketed it before the Harmony architecture was fully developed and that the chronic

13   yield problems further exacerbated the Company's ability to ramp up the production of Harmony.

14   Because of the chronic yield issues, the Company essentially could not and did not reasonably

15   control and manage its production to meet customer delivery deadlines.

16           119.    As described above, as part of the scheme, defendants directed lower-ranked

17   personnel to improperly transfer the cost associated with scrap that accumulated from poor yields

18   from manufacturing to R&D.  This practice continued in 1Q 2006.

19           120.    In furtherance of the scheme, defendants further manipulated the inventory valuation

20   of the portion of that scrap that did not get transferred to R&D by overstating the value of obsolete

21   inventory.   Inventory pricing is based upon acquisition and production costs.   A company's

22   inventory costs represent the expenses related to labor, raw materials and manufacturing overhead

23   involved in its production process.  As goods are sold, the inventory costs associated with those

24   goods are matched against the revenue and included as costs of revenue and written off in the period

25   the revenue is recognized.  SFAS No. 151, ¶2, *Inventory Costs*; ARB No. 43, Chapter 4, ¶¶1-6,

26   *Inventory Costs*.

27           121.    The reported amount of inventory of a company's balance sheet is also registered to

28   reflect diminishment in value due to obsolescence or excess inventory relative to sales.  Excess or

1    obsolete inventory is to be written off as a current period charge in the period in which it occurs

2    through cost of revenues.  SFAS No. 151, ¶2; ARB No. 43, Chapter 4, ¶¶1-6.

3        122.    During the Class Period, FormFactor improperly accounted for its inventory valuation

4    by failing to timely write off excess and obsolete inventory.  This GAAP violation resulted in a

5    material overstatement of FormFactor's inventory on its balance sheet and a material misstatement

6    of its provision for excess and obsolete inventory on its income statement during the Class Period.

7    FormFactor has restated its financial statements to correct its improper accounting for excess and

8    obsolete inventory.

9        123.    As a consequence of the aforementioned practices, the Company's revenues and net

10    income were artificially inflated and reported financial results were in violation of GAAP.  For 1Q

11    2006, FormFactor restated its reported financials as follows:

| | Total Inventory | Cost of Revenue | Gross Margin | Stock-based comp included in GM | Gross Margin % | Net Income | Diluted EPS |
|---|---|---|---|---|---|---|---|
| Reported | 21,098 | 40,500 | 40,830 | 580 | 50.20% | 10,768 | $0.25 |
| Restated | 20,041 | 41,557 | 39,773 | 686 | 48.90% | 10,077 | $0.23 |

The Company overstated its total inventory by 5.27% and net income by 6.86% for 1Q 2006.  But

for defendants' deliberate improper reporting of inventory valuation, including counting overstated

obsolete inventory and misreporting its stock-based compensation to inventory, FormFactor would

have only achieved a gross margin of 48.90%, rather than 50.20%.

    124.    The fact that FormFactor has restated its financial statements is an admission that the

financial statements originally issued were false and that the misstatements of its income and assets

was material. Pursuant to GAAP, as set forth in Accounting Principles Board Opinion ("APB") No.

20, the type of restatement announced by FormFactor was to correct material errors in its previously

issued financial statements.  *See* APB No. 20, ¶¶7-13.  Moreover, SFAS No. 154, *Accounting*

*Changes and Error Corrections*, states: "Any error in the financial statements of a prior period

discovered subsequent to their issuance shall be reported as a prior-period adjustment by restating

the prior-period financial statements."  SFAS No. 154, ¶25.  Thus, GAAP provides that financial

1  statements should be restated in order to correct an error in previously issued financial statements.

2  FormFactor's restatement is due to an error with respect to accounting for inventory.  Thus, the

3  restatement is an admission by FormFactor that its previously issued financial results and its public

4  statements regarding those results were false.[3]

5      125.   The Company's Material Weakness in Internal Control Over Financial Reporting

6  Provided the Opportunity to Carry Out the Scheme.  Section 302 of Sarbanes-Oxley, SEC Rules

7  13a-14(a) and 15d-14(a) of the 1934 Act required Khandros as CEO and Foster as CFO to certify to

8  the SEC and investors both the fairness of the financial information in each quarterly and annual

9  report.  Defendants Khandros and Foster knowingly certified misleading and inaccurate financial

10  statements that were not in accordance with GAAP and SEC rules.  In accordance with §906 of

11  Sarbanes-Oxley and 18 U.S.C. §1350, Khandros and Foster were required to certify each periodic

12  report that included financial statements.  Their signed certifications falsely stated that:  (i) the report

13  fully complied with the requirements of §13(a) or §15(d) of the 1934 Act; and (ii) the information

14  contained in the report fairly presented, in all material respects, the financial condition and results of

15  operations of FormFactor.

16      126.   Defendants Khandros and Foster signed and filed the SEC certifications under SEC

17  Rules 13a-14(a)/15d-14(a) of the 1934 Act and §906 of Sarbanes-Oxley attesting to the accuracy and

18  truthfulness of the corresponding Forms 10-K and 10-Q for FormFactor.  At the time defendants

19

20  _____

21  [3]   The SEC has reiterated its position regarding restatements:

22  [T]he Commission often seeks to enter into evidence restated financial statements,
    and the documentation behind those restatements, in its securities fraud enforcement

23  actions in order, *inter alia, to prove the falsity and materiality of the original
    financial statements [and] to demonstrate that persons responsible for the original*

24  *misstatements acted with scienter*.

25  *In re Sunbeam Sec. Litig.*, No. 98-8258-Civ.-Middlebrooks, Brief of the United
    States Securities and Exchange Commission as *Amicus Curiae* Regarding

26  Defendants' Motions *In Limine* to Exclude Evidence of the Restatement and
    Restatement Report at 1 (S.D. Fla. Feb. 22, 2002).

27

28

PLAINTIFFS' SECOND AMENDED COMPLAINT - C-07-05545-SI          - 46 -

1  Khandros and Foster signed these certifications, they knew or recklessly disregarded that they were

2  false.

3      127.    In fact, at least four of plaintiffs' confidential witnesses, including two former

4  employees in the finance department (CW5 and CW6), one veteran engineer (CW3) and one former

5  Senior IT Director (CW9), describe FormFactor's systems as "primitive," manual and labor-

6  intensive and outdated for a publicly-traded company.

7      128.    CW5, who worked as a Senior Cost Accountant at FormFactor during the Class

8  Period, characterizes FormFactor's inventory accounting processes as "very hands on" and "time-

9  consuming," requiring "a lot of Excel spreadsheets" to the point of being "primitive."  According to

10  CW6, who had worked in FormFactor's finance department for over two years until April 2007 as a

11  Senior Financial Analyst, states that virtually every element of FormFactor's financial reporting was

12  handled on Excel spreadsheets.  CW6 also characterizes the reporting processes as "extremely

13  primitive," and that in his/her 20 years of finance experience, ten of those years have been in cost

14  accounting, FormFactor's accounting process were "ridiculous," particularly because it used a

15  standard costing methodology as well as the manual nature of FormFactor's finance and accounting

16  processes.

17      129.    CW9, the former Senior IT Director, also confirms that the Company did not have

18  any adequate systems in place.  By not having such automated and facilitating systems and

19  applications in place, the Company used "offline spreadsheets" to handle a wide array of operations.

20  CW9 states that while a company can certainly utilize Excel spreadsheets and function effectively,

21  FormFactor's problem was that they used so many spreadsheets which had "so many macros" that

22  understanding how various matters were calculated was extremely complicated.  For example, a

23  spreadsheet macro is basically "a code embedded" in the spreadsheet that performs a mathematical

24  function "to manipulate raw data" to derive certain results.  According to CW9, a great deal of data

25  utilized in the myriad of spreadsheets was derived from both the Oracle system and the PROMIS

26  system.  The Oracle system provided financial, manufacturing and inventory functions and the

27  PROMIS system was used for "management and control" and a number of inventory-related

28  functions, including FormFactor's "scrap inventory."

1    130.    Likewise, CW3, the former veteran engineer at FormFactor, characterizes virtually all

2    of FormFactor's systems, processes and controls as "inadequate" throughout CW3's tenure. The

3    inadequacies included no documentation of processes and procedures so that personnel in

4    manufacturing never seemed to perform their duties or accomplish specific tasks in a consistent

5    manner. This lack of consistency involved personnel at all levels of the manufacturing/production

6    process, including assemblers and engineers.

7    131.    As a result of the on-going scrap project that CW9 took part in (as described above),

8    and the findings from Cook's task force, FormFactor eventually created a separate task force in

9    September 2007 to work on the Company's cost accounting procedures. CW5 became aware in

10   approximately September/October 2007 that personnel from PricewaterhouseCoopers LLP had

11   begun working with Alcarez and others in evaluating inventory "reserve calculations" and other

12   accounting matters that led to the restatement.

13   132.    As later admitted by the Company in the restated Form 10-K, the Company in fact did

14   not have an adequate system in place to track and account for scrap, as the Company admitted that it

15   did not consistently follow its accounting policies for valuing inventory, resulting in material

16   overstatement of inventory and cost of revenue. The Company also admitted that it did not maintain

17   effective controls, and had a material weakness in its financial reporting. Moreover, as a remedial

18   measure and as a result of the restatement, the Company is now purportedly taking the following

19   steps to address its processes, as follows:

20   Management is in the process of completing its plan to remediate the material
     weakness. The remediation plan addresses the design of controls over inventory
21   valuation and is expected to include:

22   • Completion of analysis of changes in the level of excess and obsolete
     inventory by category;
23

24   • Review of analysis of changes in the level of excess and obsolete
     inventory by category;

25   • Separate re-performance of excess and obsolete inventory
     calculation; and
26

27   • Hiring personnel with requisite cost accounting experience and
     providing ongoing training and supervision.

28

PLAINTIFFS' SECOND AMENDED COMPLAINT - C-07-05545-SI         - 48 -

1    133.    <u>The Company's Lack of Internal Controls Also Constituted Violations of SEC</u>

2    <u>Regulations</u>.  Defendants were able to cause the Company to issue materially false and misleading

3    financial statements by means of circumventing and failing to establish and maintain adequate

4    internal accounting controls over financial reporting relating to its inventory valuation and

5    accounting for its cost of revenue.  Section 13(b)(2) of the 1934 Act states, in pertinent part, that

6    every reporting company must:

7                    (A)    make and keep books, records, and accounts, which, in reasonable
             detail, accurately and fairly reflect the transactions and dispositions of the assets of
8            the issuer;

9                    (B)    devise and maintain a system of internal accounting controls sufficient
             to provide reasonable assurances that –

10                                    *        *        *

11
                    (ii)    transactions are recorded as necessary . . . to permit
12           preparation of financial statements in conformity with [GAAP].

13    15 U.S.C. §78m(b)(2)(A)-(B).

14    134.    These provisions require an issuer to employ and supervise reliable personnel, to

15    maintain reasonable assurances that transactions are executed as authorized, to properly record

16    transactions on an issuer's books and, at reasonable intervals, to compare accounting records with

17    physical assets.  *SEC v. World-Wide Coin Invs., Ltd.*, 567 F. Supp. 724, 746 (N.D. Ga. 1983).

18    135.    Defendants caused FormFactor to violate §13(b)(2)(A) of the 1934 Act by failing to

19    maintain accurate records.  FormFactor's inaccurate and false records were not isolated or unique

20    instances because they were improperly maintained for multiple reporting periods.  Accordingly,

21    FormFactor violated §13(b)(2)(A) of the 1934 Act.

22    136.    In addition, defendants caused FormFactor to violate §13(b)(2)(B) of the 1934 Act by

23    failing to implement procedures reasonably designed to prevent accounting irregularities.

24    FormFactor failed to ensure that proper review and checks were in place to ensure that it was

25    recording and properly reporting accounting for its inventory valuation and its related cost of

26    revenue accounts.  In fact, despite knowing the true dismal state of the Company's lack of adequate

27    controls, defendants regularly issued quarterly financial statements throughout the Class Period,

28

PLAINTIFFS' SECOND AMENDED COMPLAINT - C-07-05545-SI        - 49 -

1    without ever disclosing the deficiencies in FormFactor's internal accounting controls and falsely

2    asserting that its financial statements complied with GAAP.

3         137.    During the Class Period, defendants caused the Company to make representations that

4    FormFactor's internal disclosure and accounting controls were designed to be effective.  These

5    representations were false as FormFactor's disclosure controls and procedures were not effective and

6    the Company's financial statements were not fairly presented in accordance with GAAP.  During the

7    Class Period, FormFactor violated §13(b)(2)(A) of the 1934 Act by failing to maintain adequate

8    internal controls in order to ensure that its financial statements were prepared in conformity with

9    GAAP and that its public filings were accurate.

10         138.    Due to the manual nature of the Company's financial accounting and reporting

11    processes and controls, ***the risk of human error and/or intentional manipulation was greatly***

12    ***increased*** than if the Company utilized an automated financial software system.  The Company has

13    now admitted that its disclosure controls and procedures through June 30, 2007 were inadequate.  In

14    FormFactor's restated Form 10-K/A filed on November 13, 2007 (Ex. 36), it stated in part:

15       Restatement of Previously Issued Financial Statements

16           In connection with the preparation of the consolidated financial statements as
         of and for the quarter ended September 29, 2007, an error was discovered in the
17       valuation of inventory and cost of revenues that affects the Company's financial
         statements for fiscal 2006 and the interim periods in fiscal 2007.  As a result, the
18       Company has restated its previously issued interim and annual consolidated financial
         statements for fiscal 2006 and interim financial statements for the first and second
19       quarters of fiscal 2007, as more fully described in Note 2,  Restatement of Financial
         Statements, included in this Form 10-K/A.  ***In reaching the conclusion that our***
20       ***disclosure controls and procedures and our internal control over financial***
         ***reporting were not effective as of December 30, 2006 (as more fully described***
21       ***below within Evaluation of Disclosure Controls and Procedures and***
         ***Management's Report on Internal Control over Financial Reporting),***
22       ***management considered, among other things, the control deficiency related to the***
         ***valuation of inventory and cost of revenues which resulted in the need to restate***
23       ***our previously issued financial statements for fiscal 2006 and the interim periods***
         ***in fiscal 2007.***
24
      Evaluation of Disclosure Controls and Procedures
25
          Our management, including our Chief Executive Officer and Chief Financial
26       Officer, evaluated the effectiveness of our "disclosure controls and procedures" as
         defined in Exchange Act Rule 13a-15(e) as of December 30, 2006 in connection with
27       the filing of this Annual Report on Form 10-K/A. Based on that evaluation, our Chief
         Executive Officer and Chief Financial Officer concluded that, as of December 30,
28       2006, in light of the material weakness described below, our disclosure controls and

procedures were not effective to ensure that information we are required to disclose in reports that we file or submit under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in rules and forms of the SEC and is accumulated and communicated to our management as appropriate to allow timely decisions regarding required disclosure.

Notwithstanding the material weakness, the restated annual and interim financial statements fairly present, in all material respects, the financial condition, results of operations and cash flows of the Company as of and for the periods presented in accordance with generally accepted accounting principles.

Management's Report on Internal Control over Financial Reporting (Restated)

Our management is responsible for establishing and maintaining adequate internal control over financial reporting as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act. Our management, with the participation of our Chief Executive Officer and Chief Financial Officer, evaluates the effectiveness of our internal control over financial reporting. This evaluation is based on the framework established in *Internal Control—Integrated Framework*, issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO).

A material weakness is a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the company's annual or interim financial statements will not be prevented or detected on a timely basis.

The Company identified the following material weakness in internal control over financial reporting as of December 30, 2006. ***The Company did not maintain effective controls over the valuation of inventory and the related cost of revenues accounts. Specifically, the Company did not maintain effective controls to ensure that the estimation process to value inventory complied with the Company's accounting policies. This control deficiency resulted in the restatement of the Company's annual and interim financial statements for 2006 and interim financial statements for the first and second quarters of 2007***. Additionally, this control deficiency could result in a misstatement of the inventory and cost of revenues accounts that would result in a material misstatement of the Company's financial statements that would not be prevented or detected.

***In the Company's original filing of its 2006 Annual Report on Form 10-K, management concluded that the Company maintained effective internal control over financial reporting as of December 30, 2006. However, in connection with the restatement discussed in Note 2 to the consolidated financial statements, management subsequently concluded that the material weakness in internal control over financial reporting described above existed as of December 30, 2006. As a result of the material weakness, management has concluded that the Company did not maintain effective internal control over financial reporting as of December 30, 2006 based upon the criteria set forth in Internal Control – Integrated Framework issued by the COSO. Accordingly, management has restated its report on internal control over financial reporting.***

139.    The Company made substantially similar admissions concerning its internal controls in its amended Forms 10-Q for 1Q 2007 and 2Q 2007, filed on November 13, 2007. The material weakness persisted thereafter throughout the end of FY 2007. In the Company's 2007 Form 10-K,

1  filed on February 27, 2008, FormFactor disclosed that the Company had not maintained effective

2  controls over the valuation of inventory and the related cost of revenue accounts as of December 29,

3  2007.

4        140.  <u>Loss causation</u>.  Defendants' representations that the Company's development of

5  Harmony "remained on track" continued to inflate the FormFactor stock price, as it continued to

6  trade between high $30.00's and low $40.00's.  (Ex. 1)

7        141.  <u>Insider trading</u>.  Five days after defendants made false rosy representations about

8  FormFactor's development of Harmony while knowing the development of Harmony was still

9  plagued with problems, defendant Bronson rushed to sell 25,000 shares of his FormFactor stock at

10 $41.33 per share, representing 36.83% of his FormFactor holdings, totaling $1.033,250 in proceeds.

11       142.  On June 6, 2006, the Company introduced its Harmony based OneTouch probe card

12 used in 300-mm Flash memory production.  (Ex. 11)

13 **C.    False and Misleading Statements Made Concerning FormFactor's**
      **Progress with Harmony and Its 2Q 2006 Results**

14
      **1.    Defendants Khandros, Bronson and Foster Falsely**
15         **Represented FormFactor's Progress with Harmony and Its**
        **2Q 2006 Operating and Financial Results**
16

17       143.  On July 27, 2006, the Company issued a press release announcing its 2Q 2006

  financial and operating results.  (Ex. 13)  The press release stated in part:
18

19     Joseph Bronson, President of FormFactor.  ***"We are very pleased with the***
    ***performance of our manufacturing operations and continue to make ongoing***
20     ***productivity and efficiency improvements***."

21     Net income for the second quarter of fiscal 2006 was $15.3 million or $0.32
    per share on a fully diluted basis, which included $2.8 million or $0.06 per share of
22     incremental FAS 123R stock option expense net of tax. This compares to $10.8
    million or $0.25 per share on a fully diluted basis for the first quarter of fiscal 2006,
23     which included $2.5 million or $0.05 [per share] of incremental FAS 123R stock
    option expense net of tax. Net income for the second quarter of fiscal 2005 was $5.0
24     million or $0.12 per share on a fully diluted basis, which was excluded incremental
    stock-based compensation expense from the adoption of FAS 123R.

25                           *    *    *

26       "***Key to our growth strategy is our ongoing focus on R&D, where our***
    ***pipeline remains stronger than ever***," said Igor Khandros, CEO of FormFactor.
27     "***Innovative new products, manufacturing execution and world-wide infrastructure***
    ***put FormFactor in a unique position to enable the ongoing reduction in the cost of***
28     ***wafer test for our customers and for continuing long-term growth***."

PLAINTIFFS' SECOND AMENDED COMPLAINT - C-07-05545-SI        - 52 -

144.    On the July 27, 2006 conference call, defendants Bronson, Foster and Khandros met

with the analysts and repeated the same financial information.  (Ex. 12)  Defendant Bronson also

commented on FormFactor's delivery of Harmony products:

> *We made a key new product announcement this quarter, including our Harmony one-touchdown, 300 millimeter Flash product in June.*
>
> *              *       *        *
>
> We expect the next major growth driver of our NAND business to come from our newly-announced 300-millimeter Harmony one-touchdown wafer probe solution, which we introduced in June.  This product will redefine productivity for Flash testing as our Harmony architecture enables high uptime, faster setup and rapid repair.  It is based on the new NAND-specific spring technology designed for short cycle time and low maintenance.  *Our development of this product continued this quarter as we shipped our first one-touchdown, 300-millimeter Harmony NAND product.*
>
> We also had major design wins in NAND Flash for 200-millimeter, one-touchdown testing for which we expect volume orders in the fourth quarter. . . .  *Our ability to manufacture custom probe cards in volume and keep pace with customer roadmaps will reinforce our industry leadership and allow us to successfully compete in the NAND Flash market and other one-touchdown, 300 millimeter markets*, such as DRAM and wafer-level burn-in, where we've already begun development of derivative Harmony 300-millimeter products.

145.    On the same conference call, defendant Foster also stated:

> Although Q3 is experiencing healthy design momentum, Flash revenue will likely be down from the second quarter.  *Meaningful revenue growth will come in the fourth quarter and beyond as we move our one-touchdown product in volume shipments*.

146.    On August 9, 2006, the Company filed its Form 10-Q for 2Q 2006, and reported the

same financial information.  Additionally, the Company stated how it accounted for inventories, as

follows:

> Note 4 – Inventories
>
> Inventories are stated at the lower of cost (principally standard cost which approximates actual cost on a first-in, first-out basis) or market value. The Company provides inventory provisions based on excess and obsolete inventories determined primarily by future demand forecasts.  The provision is measured as the difference between the cost of the inventory and market based upon assumptions about future demand and charged to the provision for inventory, which is a component of cost of revenues.  At the point of the loss recognition, a new, lower cost basis for that inventory is established, and subsequent changes in facts and circumstances do not result in the restoration or increase in that newly established cost basis.
>
> Inventories consisted of the following:

|  | July 1, 2006 (In thousands) | December 31, 2005 |
|---|---|---|
| Raw materials | $8,598 | $7,686 |
| Work-in-progress | 11,379 | 9,971 |
| Finished goods | 4,080 | 747 |
|  | $24,057 | $18,404 |

147.    Additionally, the Company stated in its Form 10-Q for 2Q 2006 (Ex. 14) how it accounted for its cost of revenues, as follows:

> Cost of Revenues.  Cost of revenues consists primarily of manufacturing materials, payroll and manufacturing-related overhead.  In addition, cost of revenues also includes costs related to the start up of our new manufacturing facility.  Our manufacturing operations rely upon a limited number of suppliers to provide key components and materials for our products, some of which are a sole source. . . . Tooling and setup costs related to changing manufacturing lots at our suppliers are also included in the cost of revenues.  We expense all warranty costs and inventory provisions or write-offs of inventory as cost of revenues.
>
> We record inventory write downs for estimated obsolete and non-saleable inventories equal to the difference between the cost of inventories and the conditions.  If actual market conditions are less favorable than those projected by management, additional inventory reserve would be required.  Once established, the original cost of our inventory less the related inventory reserve represents the new cost basis of such products.  Reversal of these reserves is recognized only when the related inventory has been scrapped or sold.

148.    In the Form 10-Q for 2Q 2006, the Company also stated the stock compensation amounts capitalized as inventory, without disclosing how or why the amounts were capitalized rather than expensed.  The Form 10-Q also reported an R&D expense of $11,627 million, without disclosing that the reported R&D included scrap materials that resulted from the poor yields in the manufacturing process that should have been written-off as COGS.

149.    As an attachment to the Form 10-Q for 2Q 2006, defendants Khandros and Foster also provided Sarbanes-Oxley certifications, signed on August 9, 2006, attesting based on their knowledge that FormFactor's quarterly report "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made . . . not misleading," and that the reported financial information "fairly present in all material respects the financial condition," and that they are "responsible for establishing and maintaining disclosure controls and procedures." (Ex. 14 )

1
2
3

**2.    Particularized Facts Demonstrating Falsity of the Statements Made and Giving Rise to Defendants Khandros, Bronson, and Foster's Scienter Concerning FormFactor's Development and Ramping of Harmony and the Impact on the Company's Reported Financials for 2Q 2006**

4    150.    The statements made in ¶¶143-149 above concerning FormFactor's development of

5    Harmony, the Company's financial and business results for 2Q 2006 and its manufacturing

6    capabilities, were false and misleading, and defendants knew that they were false and misleading at

7    the time they were made.  As detailed above, FormFactor's development of Harmony was materially

8    flawed such that the Company marketed it before the Harmony architecture was fully developed, and

9    that the chronic yield problems further exacerbated the Company's ability to ramp up the production

10   of Harmony.  Thus, while FormFactor's first probe card was "introduced" to the market in June

11   2006, the reality was that the Company was nowhere close to being able to produce and ship the

12   Harmony probe card to any customer as of that time.

13   151.    According to CW14, shortly after FormFactor shipped the first trial Harmony 300-

14   mm probe cards to a customer (which CW14 believes was PowerChip), the Company realized that

15   Harmony suffered from thermal expansion which meant that Harmony could not test within the

16   required 20 micron range.   The problem was exacerbated because of Harmony's four brick

17   architecture which resulted in "differential thermal expansion" due to the pressure exerted on the

18   probe cards not being entirely uniform for each of the bricks (a problem that did not occur with

19   monolithic designs).   In essence, the degree of thermal expansion was different for each brick

20   because of the different pressure exerted on the bricks.  Thus, by mid-2006, senior management

21   knew that the differential thermal expansion was "a huge problem" for FormFactor with the 300-mm

22   Harmony probe card.  CW14 indicates that PowerChip's reaction to the problems it experienced with

23   the first Harmony products it received was along the lines of, "you missed the pads," meaning that

24   Harmony could not align properly with PowerChip's wafers.   FormFactor assigned engineering

25   teams to troubleshoot the Harmony products that PowerChip had received.  By September 2006,

26   PowerChip had placed orders with a FormFactor competitor because FormFactor could not resolve

27   the issue on time.  According to CW14, the differential thermal expansion problems at issue with the

28   Harmony products that were shipped to PowerChip were "just the tip of the iceberg" and that the

1    Harmony products had "a myriad of problems . . . huge technical issues" that immediately began to

2    surface.

3        152.    Also by mid-2006, based on the discussions from the bi-weekly Harmony meetings

4    and the monthly EPR meetings that CW14 and defendants participated in, senior management knew

5    that Harmony was extremely difficult to assemble and required "expert assembly."  CW14 recalls

6    that the first 300-mm Harmony probe card was shipped to PowerChip later than had originally been

7    projected because of assembly problems.  CW14 states that the first 300-mm Harmony probe cards

8    shipped to customers took huge engineering resources to assemble and were actually made by

9    "engineering teams" that had put the devices together and taken them apart multiple times before

10   arriving at a finished product.  CW14 states that even after all the parts necessary to produce a 300-

11   mm Harmony probe card were assembled, it typically took anywhere from six to nine weeks to

12   produce a finished product, while the "stated lead times" to customers for delivery was 13 weeks.  In

13   fact, CW14 approximates that it was only around August 2007 that production of the Harmony

14   products was actually transferred over to FormFactor's production group for volume production.

15       153.    According to CW9, who joined FormFactor in mid-2006, FormFactor's problems

16   with Harmony were highly visible.  "Harmony was different because so much was riding on

17   Harmony," while at the same time Harmony required significantly different and difficult engineering

18   and manufacturing processes compared to FormFactor's other products.  Harmony needed a wide-

19   range of new and additional manufacturing and test equipment, and the physical constraints of the

20   Company's Livermore, California, facility represented a problem in this regard.  For instance, the

21   technical specifications for Harmony were much more complex with dimensions and tolerances

22   measured in microns.  The location in which Harmony was made had to be "extremely flat" and

23   vibration-free so that "all the pins stay in the alignment and there was no twisting."

24       154.    CW12, who worked in manufacturing engineering as a planarization technician to

25   support the manufacturing line in 2006, estimates that only one of five Harmony probe cards put

26   through the manufacturing line was a working probe card, and that even this one working probe card

27   required some re-work  CW14, the New Product Program Manager, states that the yield rate on the

28   probe head for Harmony was 50%, and the mechanical pieces yield rate for Harmony was 25%.  By

1    comparison, the failed rates for FormFactor's PH150 was in the 80% range, with 100% factor ratio

2    for the mechanical pieces.

3        155.    According to CW14 who attended monthly EPR meetings with Khandros, Bronson,

4    and Freeman, because the senior management decided to ship Harmony product to its customer

5    while Harmony was still in the Feasibility phase, defendants knew that there was a high likelihood

6    that the Harmony product shipped out would be returned.  In fact, according to CW14, prior to

7    September 2007, 100% of Harmony shipments were returned to the Company for re-work, and that

8    the Company even had a group of engineers whose job was to "re-work" the returned Harmony

9    products.  This group of "re-work" engineers reported to Vice President of Services Engineering

10   Tom Ho, who initially reported to Bronson, and then to Khandros after Bronson departed from the

11   Company.  This "re-work" group either repaired the damaged Harmony probe cards at customer

12   sites, or re-built them if the Harmony probe cards were returned to the Company.

13       156.    Moreover, because of the chronic yield issues, the Company essentially could not and

14   did not reasonably control and manage its production to meet customer delivery deadlines.  As a

15   general practice for this Company, the likelihood of a product failing during the fabrication process

16   necessitated building more than what was actually ordered in order to meet a customer's required

17   delivery date.  For instance, CW9 who joined the Company in mid-2006, indicates that once

18   FormFactor received an order for one product, the Company "often started building two or three –

19   and maybe a fourth and fifth – knowing that at least one will fail."  As detailed above, as part of the

20   scheme, defendants directed lower-ranked personnel to improperly transfer the cost associated with

21   scrap that accumulated from poor yields from manufacturing to R&D.

22       157.    In furtherance of the scheme, defendants manipulated the inventory valuation of the

23   portion of that scrap that did not get transferred to R&D by overstating the value of obsolete

24   inventory.  As later acknowledged by the Company's restatement, the Company's revenues and net

25   income were artificially inflated and reported financial results were in violation of GAAP.  For 2Q

26   2006, FormFactor restated its reported financials as follows:

27

| | Total Inventory | Cost of Revenue | Gross Margin | Stock-based comp included in GM | Gross Margin % | Net Income | Diluted EPS |
|---|---|---|---|---|---|---|---|

28

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Reported | 24,057 | 43,707 | 48,726 | 958 | 52.71% | 15,281 | $0.32 |
| Restated | 21,885 | 44,822 | 47,611 | 1,056 | 51.51% | 14,557 | $0.30 |

The Company overstated its total inventory by 9.92% and net income by 4.97% for 2Q 2006. But for defendants' deliberate improper reporting of inventory valuation, including overstating obsolete inventory and misreporting its stock-based compensation to inventory, FormFactor would have only achieved a gross margin of 51.51%, rather than 52.71%.

158.    As an attachment to the Form 10-Q for 2Q 2006, defendants Khandros and Foster also provided Sarbanes-Oxley certifications, signed on August 9, 2006, attesting based on their knowledge, that FormFactor's quarterly report "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made . . . not misleading," and that the reported financial information "fairly present in all material respects the financial condition," and that they are "responsible for establishing and maintaining disclosure controls and procedures." (Ex. 14 )  These certifications were knowingly false for the reasons set forth in ¶¶125-139.

159.    <u>Loss causation</u>.  Following the July 27, 2006 conference call and the issuance of the Form 10-Q for 2Q 2006, based on the representations made by defendants regarding the Harmony products and the expected revenue growth expected from Harmony, FormFactor's stock price jumped over 16%, from $35.40 per share to $42.25 per share, in one trading day, with more than 2.8 million shares in trading volume. (Ex. 1) While FormFactor's stock jumped from $37.48 per share to $49.45 per share between July 26, 2007 to August 30, 2007, a 24.4% increase, by comparison the NASDAQ increased 5.29% while the Russell 2000 Technology Index ("Russell Index") increased 6.83% during the same time frame.

160.    <u>Insider trading</u>.  While possessing material non-public insider information, defendant Khandros sold 20,000 shares of his FormFactor stock on August 30, 2006, at $49.00 per share, for insider trading proceeds of $980,000.  Between August 3, 2006 and October 4, 2006, while the inventory was overstated by 9.92%, defendant Foster disposed 5,400 shares of his FormFactor stock at no less than $43.00 per share, for insider trading proceeds of $241,794.

161.    <u>Loss causation</u>.  On September 20, 2006, following the disclosures regarding a competitor's announcement that the demand for advanced probe cards in the NAND and DRAM

1    industries may not be as strong as previously projected, FormFactor's stock price took a hit,

2    dropping over $5.00 per share in one day, 11.195%, and closing at $41.09 per share.    By

3    comparison, the NASDAQ and the Russell Index dropped only .672% and 1.52%, respectively, on

4    the same day.

5        **D.    False and Misleading Statements Made Concerning FormFactor's
             Progress with Harmony and Its 3Q 2006 Results**

6

7            **1.    Defendants Khandros, Bronson and Foster Falsely
                 Represented FormFactor's Progress with Harmony, Factory
                 Capacity and Its 3Q 2006 Operating and Financial Conditions**

8

9            162.    On October 25, 2006, the Company issued a press release announcing its 3Q 2006

10    financial results.  (Ex. 17)  The press release stated in part:

11            FormFactor, Inc. today announced its financial results for the third quarter of
         fiscal 2006, ended September 30, 2006. Quarterly revenues were $96.8 million, up
         5% from $92.4 million in the second quarter of fiscal 2006, and up 55% from $62.4
12       million in the third quarter of fiscal 2005. . . .  Demand for advanced probe cards in
         the third quarter continued to reflect the ongoing trends in the market including
13       customers ramping production for memory and logic, the transition to advanced
         nodes, and the ongoing need for higher parallelism in wafer test, said Joseph
14       Bronson, President of FormFactor. ***Factory capacity continued to ramp, as
         production efficiencies and yields increased in many segments of our***
15       ***manufacturing operations.***  Net income for the third quarter of fiscal 2006 was
         $15.8 million or $0.33 per share on a fully diluted basis, which included $3.9 million
16       or $0.08 per share of incremental FAS 123R stock option expense, net of tax.

17            163.    During the October 25, 2006 conference call (Ex. 16), which defendants Bronson,

18    Foster and Khandros hosted, in addition to repeating the same financial information, defendant

19    Bronson stated:

20            We began to penetrate the NAND Flash market with initial shipments of our
         Harmony one-touchdown Flash product. ***We're making volume shipments for the***
21       ***fourth quarter, although less than previously anticipated as product development***
         ***requirements and customer trials were completed later than anticipated with our***
22       ***early adopter customers.***

23                            *       *       *

24       ***We introduced our breakthrough Harmony OneTouch NAND Flash product this***
         ***summer.  Since then, we have begun the integration activities with multiple testers***
25       ***in the market with shipments of both our 200 millimeter and 300 millimeter one-***
         ***touchdown products to early adopting customers.***
26
                            *       *       *
27

28       ***We're making initial volume shipments of our Harmony OneTouch NAND Flash***
         ***product in Q4.***

PLAINTIFFS' SECOND AMENDED COMPLAINT - C-07-05545-SI                    - 59 -

164.    During the same conference call, defendant Foster stated:

> *The good news is the factory is performing very well.  And as we adjust the planning yields back in line with that, we will get our inventory write-offs improved and we will get the full benefit through the whole factory process of better yields.*

165.    On November 7, 2006, the Company filed its Form 10-Q for 3Q 2006 and repeated the same financial information.  (Ex. 18)  Moreover, the Company stated how it valued inventories, as follows:

Note 4 – Inventories

Inventories are stated at the lower of cost (principally standard cost which approximates actual cost on a first-in, first-out basis) or market value.  The Company provides inventory provisions based on excess and obsolete inventories determined primarily by future demand forecasts.  The provision is measured as the difference between the cost of the inventory and market based upon assumptions about future demand and charged to the provision for inventory, which is a component of cost of revenues.  At the point of the loss recognition, a new, lower cost basis for that inventory is established, and subsequent changes in facts and circumstances do not result in the restoration or increase in that newly established cost basis.

Inventories consisted of the following:

|  | September 30, 2006 (In thousands) | December 31, 2005 |
| --- | --- | --- |
| Raw materials | $10,640 | $7,686 |
| Work-in-progress | 12,563 | 9,971 |
| Finished goods | 3,114 | 747 |
|  | $26,317 | $18,404 |

166.    Additionally, the Company stated in its Form 10-Q for 3Q 2006 how it accounted for its cost of revenues, as follows:

Cost of Revenues.  Cost of revenues consists primarily of manufacturing materials, payroll and manufacturing-related overhead.  Our manufacturing operations rely upon a limited number of suppliers to provide key components and materials for our products, some of which are a sole source. . . . Tooling and setup costs related to changing manufacturing lots at our suppliers are also included in the cost of revenues.  We expense all warranty costs and inventory write downs or write-offs as cost of revenues.

We record inventory write downs for estimated obsolete and non-saleable inventories equal to the difference between the cost of inventories and the conditions.  If actual market conditions are less favorable than those projected by management, additional inventory write downs would be required.  Once established, the original cost of our inventory less the related inventory write downs represents the new cost basis of such products.  Reversal of these reserves is recognized only when the related inventory has been scrapped or sold.

1   167. Additionally, the Company also stated the stock compensation amounts capitalized as

2 inventory without explaining how and why it was capitalized.  Moreover, the Company also reported

3 a R&D expense of $11,994, or 12.4% of the revenue, without disclosing that the reported R&D

4 included scrap materials that resulted from the poor yields in the manufacturing process that should

5 have been written-off as COGS.

6   168. As an attachment to the Form 10-Q for 3Q 2006, defendants Khandros and Foster

7 also provided Sarbanes-Oxley certifications, signed on November 7, 2006, attesting based on their

8 knowledge, that FormFactor's quarterly report "does not contain any untrue statement of a material

9 fact or omit to state a material fact necessary to make the statements made . . . not misleading," and

10 that the reported financial information "fairly present in all material respects the financial condition,"

11 and that they are "responsible for establishing and maintaining disclosure controls and procedures."

12 (Ex. 18 )

13   169. <u>Loss causation</u>.  Following the October 25, 2006 earnings release and conference call

14 with the Company's disclosure that its volume shipments for NAND Flash market did not occur

15 during 3Q 2006 as previously promised, FormFactor's shares dropped over 9%, from $42.91 per

16 share to $38.95 per share, with four million shares traded in a single day.  By comparison, the

17 Russell Index increased 1.564% and the NASDAQ increased .955%.  FormFactor's stock price

18 remained mainly below $40.00 per share the next few months as the market closely watched

19 FormFactor's development and bookings for Harmony products.  (Ex. 1)  Analysts took note of the

20 market reaction to FormFactor's ability to ramp up and volume ship its Harmony products, and

21 several analysts recommended investors to hold on to the stock, pending FormFactor's ability to

22 demonstrate that its Harmony products can, in fact, generate revenue for the Company.

23    **2.** **Particularized Facts Demonstrating Falsity of the Statements**
       **Made and Giving Rise to Defendants Khandros, Bronson and**

24       **Foster's Scienter Concerning FormFactor's Development and**
       **Ramping Up of Harmony and the Impact on the Company's**

25       **Reported Financials for 3Q 2006**

26   170. The statements made in ¶¶162-168 above concerning FormFactor's initial volume

27 shipment of Harmony, financial and operating results for 3Q 2006 and its production efficiencies and

28 factory capacity were false and misleading, and defendants knew that they were false and misleading

1  at the time they were made.  As detailed above, FormFactor's development of Harmony was

2  materially flawed such that the Company marketed it to the customers before the Harmony

3  architecture was fully developed, and that the chronic yield problems further exacerbated the

4  Company's ability to ramp up the production of Harmony.  Because of the chronic yield issues, the

5  Company essentially could not and did not reasonably control and manage its production to meet

6  customer delivery deadlines.

7         171.    While defendants made rosy representations about the Company making initial

8  volume shipments to customers, they failed to disclose that the initial shipments were returned to the

9  Company due to thermal expansion and other technical issues.  By the time defendants were making

10  rosy statements about Harmony in October 2006, they already knew the myriad of technical

11  problems associated with Harmony were still being resolved, and that the very few Harmony

12  shipments that went out of the Feasibility phase to customers were returned within a few weeks of

13  shipping them out, and in some cases, almost immediately.  According to CW14, the thermal

14  expansion problems were still not resolved as of the time CW14 left the Company in April 2008.

15         172.    As part of the scheme to hide problems with the development of Harmony and the

16  poor manufacturing yields from Harmony and their products, defendants directed lower-ranked

17  personnel to improperly transfer the cost associated with scrap that accumulated from poor yields

18  from manufacturing to R&D.

19         173.    In furtherance of the scheme, defendants manipulated the inventory valuation of the

20  portion of that scrap that did not get transferred to R&D by overstating the value of obsolete

21  inventory.  As a consequence, the Company's revenues and net income were artificially inflated and

22  reported financial results were in violation of GAAP.  For 3Q 2006, FormFactor restated its reported

23  financials as follows:

|          | Total Inventory | Cost of Revenue | Gross Margin | Stock-based comp included in GM | Gross Margin % | Net Income | Diluted EPS |
|----------|-----------------|-----------------|--------------|---------------------------------|----------------|------------|-------------|
| Reported | 26,317          | 46,492          | 50,265       | 1,197                           | 51.95%         | 15,819     | $0.33       |
| Restated | 23,059          | 47,578          | 49,179       | 1,294                           | 50.83%         | 15,126     | $0.31       |

1    The Company overstated its total inventory by 14.13% and net income by 6.86% for 3Q 2006. But

2    for defendants' deliberate improper reporting of inventory valuation, including counting obsolete

3    inventory as R&D expense and misreporting its stock-based compensation to inventory, FormFactor

4    would have only achieved a gross margin of 50.83%, rather than 51.95%.

5           174.   As an attachment to the Form 10-Q for 3Q 2006, defendants Khandros and Foster

6    also provided Sarbanes-Oxley certifications, signed on November 7, 2006, attesting based on their

7    knowledge, that FormFactor's quarterly report "does not contain any untrue statement of a material

8    fact or omit to state a material fact necessary to make the statements made . . . not misleading," and

9    that the reported financial information "fairly present in all material respects the financial condition,"

10   and that they are "responsible for establishing and maintaining disclosure controls and procedures."

11   (Ex. 18 )  These certifications were knowingly false for the reasons set forth in ¶¶125-139.

12          175.   On December 5, 2006, Mehdi Hosseini, an analyst from FBR Research,

13   recommended that investors wait to buy FormFactor's stock (Ex. 19):

14          First, we remain a bit concerned about the overall bookings in 4Q06, which could
            have a spill over impact into 1Q07. Specifically, although DRAM related bookings
15          are still expected to rebound in 4Q06, we remain a bit concerned about the traction in
            NAND Flash and whether FORM has been able to secure volume orders for its new
16          Harmony probe card . . . .  Secondly, given the uncertainties associated with
            bookings while the company is adding additional manufacturing capacity, we are
17          also equally concerned about the overall fixed cost and its adverse impact on gross
            margins.

18                                    *        *        *

19
            Although we are comfortable with our 4Q06 DRAM & Logic related
20          bookings expectations, we remain a bit concerned about any shortfall to our Flash,
            particularly NAND Flash, related bookings.

21
            176.   On January 29, 2007, FormFactor announced that it expanded its Harmony line with
22
     the introduction of its Harmony XP probe card for the DRAM market.  (Ex. 20)  In the press release,
23
     defendant Khandros stated:
24
            "Now, we're bringing the same benefits associated with our Harmony system-level
25          approach to advanced 300-mm DRAM manufacturing."

26

27

28

1    **E.    False and Misleading Statements Made Concerning FormFactor's**
      **Progress with the Development and Ramping of Harmony Production**
2    **and Its FY 2006 Results**

3            **1.    Defendants Khandros and Foster Falsely Represented**
                    **FormFactor's Progress with Harmony Factory Performance**
4                   **and Its FY 2006 Operating and Financial Results**

5        177.    On January 31, 2007, the Company issued a press release announcing its 4Q 2006 and

6    year end 2006 financial results.  (Ex. 23)  The press release stated in part:

7            FormFactor, Inc. today announced its financial results for the fourth quarter
        and fiscal year 2006, ended December 30, 2006.  Quarterly revenues were $98.7
8       million, up 2% from $96.8 million in the third quarter of fiscal 2006, and up 37%
        from $71.8 million in the fourth quarter of fiscal 2005. Revenues for the fiscal year
9       ended December 30, 2006 were $369.2 million, up 55% from $237.5 million in fiscal
        year 2005.
10
            Net income for the fourth quarter of fiscal 2006 was $18.9 million or $0.39
11      per share on a fully diluted basis, which included $4.6 million or $0.09 per share of
        incremental FAS 123R stock option expense, net of tax. This compares to $15.8
12      million or $0.33 per share on a fully diluted basis for the third quarter of fiscal 2006,
        which included $3.9 million or $0.08 per share of incremental FAS 123R stock
13      option expense, net of tax. Net income for the fourth quarter of fiscal 2005 was $10.5
        million or $0.25 per share on a fully diluted basis, which was prior to the adoption of
14      FAS 123R.

15          Net income for fiscal year 2006 was $60.8 million or $1.29 per share on a
        fully diluted basis, which included $13.6 million, or $0.29 per share of incremental
16      FAS 123R stock option expense, net of tax, compared to $30.2 million or $0.73 per
        share on a fully diluted basis for fiscal year 2005.
17
         178.    During the conference call with analysts on January 31, 2007 (Ex. 21), which
18
     defendants Khandros and Foster hosted, defendant Khandros stated:
19
            ***Operationally, our factory performance vastly improved, as we increased on-time***
20      ***deliveries and reduced lead-times, culminating in better customer satisfaction and***
        ***as a result, setting the stage for expanded business relationships with existing and***
21      ***new customers.***

22                              *        *        *

23          Most significantly, it took us longer than anticipated to reach volume shipments of
        our Harmony NAND Flash product.  Although currently, our product ramp is
24      tracking with the migration plans of the early adopting customers.

25                              *        *        *

26          Qualifications of our Harmony OneTouch NAND Flash product continued in
        the quarter with three customers, and ***we began volume shipments to one early***
27      ***adopter***.

28

Designed specifically for the cost – sensitive or productivity-focused test environment of the NAND market, ***our Harmony OneTouch NAND product is exhibiting key differentiated performance results*** and early qualifications in 200 and 300-millimeter applications by providing our customers with higher uptime, faster setup, shorter lead-times, lower cost of maintenance, and as always high-quality electrical performance. To date, the NAND market has had less complex test requirements than DRAM market, as NAND speeds increase and electrical characteristics and probing precision become more important over time. ***Harmony OneTouch is well-positioned to additionally differentiate and become the high-volume product of choice at NAND market leaders.***

179.    Also on January 31, 2007, FormFactor announced that Hynix Semiconductor, Inc. ("Hynix") had placed a multi-million dollar order for FormFactor's Harmony OneTouch probe cards for Flash memory production. (Ex. 22) The probe cards, which would be shipped to Hynix starting 1Q 2007, would be used in the testing of Hynix's latest generation 60-mm NAND Flash wafers. According to Hynix, FormFactor was chosen from among several probe card suppliers for this volume order due to the high quality, performance and reliability of its advanced wafer probe card solutions.

180.    <u>Loss causation</u>.  The market reacted to the positive news on January 31, 2007, concerning the multi-million dollar order for FormFactor's Harmony OneTouch probe card and FormFactor's 4Q 2006 financial results, with FormFactor's stock jumping close to 9.8% in one day, closing at $44.65 per share with a trading volume close to 3.7 million shares.  (Ex. 1)  By comparison, the Russell Index rose 1.289% and the NASDAQ rose .181%.

181.    On February 26, 2007, the Company filed its Form 10-K for FY 2006.  (Ex. 24)  In addition to repeating the same financial information in the Form 10-K, the Company stated:

In 2006, we delivered our first one touchdown NAND flash probe cards incorporating our proprietary "Harmony" architecture for wafer probe cards.  Our Harmony architecture addresses some of the significant challenges presented by the future demands of single touchdown wafer probing and very high parallelism wafer test, and we believe will be a key building block for our future generations of large area array flash, DRAM, wafer level burn-in and high frequency probing solutions.

182.    Moreover, the Company's Form 10-K for FY 2006 disclosed its inventory valuations policies, as follows:

We record an adjustment to our inventory valuation for estimated obsolete and non-saleable inventories equal to the difference between the cost of inventories and the estimated market value based upon assumptions about future demand and market conditions.  If actual market conditions are less favorable than those projected by management, additional inventory write down would be required.  Once established,

1    the original cost of our inventory less the related inventory reserve represents the
     new cost basis of such products.  Reversal of these write downs is recognized only
2    when the related inventory has been scrapped or sold.

3                                    *        *        *

4          Inventory Valuation.   We state our inventories at the lower of cost
     (principally standard cost which approximates actual cost on a first in, first out basis)
5    or market.   We record adjustments to our inventory valuation for estimated
     obsolescence or non-saleable inventories equal to the difference between the cost of
6    inventories and the estimated market value based upon assumptions about future
     demand and market conditions.  If actual market conditions are less favorable than
7    those projected by management, additional inventory reserves may be required.
     Inventory write downs once established are not reversed until the related inventory
8    has been scrapped or sold.

9    183.    The Company's Form 10-K also disclosed its R&D for FY 2006, as follows:

10   Research, Development and Engineering

11         The semiconductor industry is subject to rapid technological change and new
     product introductions and enhancements. We believe that our continued commitment
12   to research and development and our timely introduction of new and enhanced wafer
     probe test solutions and other technologies related to our MicroSpring interconnect
13   technology are integral to maintaining our competitive position. We continue to
     invest considerable time and resources in creating structured processes for
14   undertaking, tracking and completing our development projects, and plan to
     implement those developments into new product or technology offerings. We
15   continue to allocate significant resources to these efforts and to use automation and
     information technology to provide additional efficiencies in our research and
16   development activities.

17         We have historically devoted approximately 11% to 16% of our revenues to
     research and development programs. Research and development expenses were
18   $46.6 million for fiscal 2006, $28.3 million for fiscal 2005, and $20.6 million for
     fiscal 2004.
19
           Our research and development activities, including our product engineering
20   activities, are directed by individuals with significant expertise and industry
     experience.
21
     184.    Additionally, the Company's Form 10-K for FY 2006 stated how its cost of revenues
22
     was derived:
23
           Cost of Revenues. Cost of revenues consists primarily of manufacturing
24   materials, payroll and manufacturing-related overhead. In addition, cost of revenues
     also includes costs related to the start up of our new manufacturing facility, which
25   was completed in early 2006. . . .  We order materials and supplies based on backlog
     and forecasted customer orders. Tooling and setup costs related to changing
26   manufacturing lots at our suppliers are also included in the cost of revenues.  We
     expense all warranty costs and inventory provisions or write-offs of inventory as cost
27   of revenues.

28

     PLAINTIFFS' SECOND AMENDED COMPLAINT - C-07-05545-SI                        - 66 -

We design, manufacture and sell a fully custom product into the semiconductor test market, which is subject to significant variability and demand fluctuations.  Our wafer probe cards are complex products that are custom to a specific chip design and must be delivered on relatively short lead-times as compared to our overall manufacturing process.  As our advanced wafer probe cards are manufactured in low volumes and must be delivered on relatively short lead-times, it is not uncommon for us to acquire production materials and start certain production activities based on estimated production yields and forecasted demand prior to or in excess of actual demand for our wafer probe cards. ***We record an adjustment to our inventory valuation for estimated obsolete and non-saleable inventories equal to the difference between the cost of inventories and the estimated market value based upon assumptions about future demand and market conditions***.  If actual market conditions are less favorable than those projected by management, additional inventory write down would be required.  Once established, the original cost of our inventory less the related inventory reserve represents the new cost basis of such products.  Reversal of these write downs is recognized only when the related inventory has been scrapped or sold.

185.    As attachments to the Form 10-K for FY 2006, defendants Khandros and Foster and the directors of FormFactor signed the Form 10-K.  Defendants Khandros and Foster also provided certifications pursuant to 15 U.S.C. §7241, as adopted pursuant to §302 of Sarbanes-Oxley, attesting based on their knowledge, that FormFactor's annual report "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made . . . not misleading," and that the reported financial information "fairly present in all material respects the financial condition," and that they are "responsible for establishing and maintaining disclosure controls and procedures."  (Ex. 24 )

186.    <u>Loss causation</u>.  Following the Company's filing of the Form 10-K reporting the Company's financial and business results for FY 2006, FormFactor's stock continued to trade at inflated levels above $40.00 per share, reaching as high as $47.78 per share on March 21, 2007.  (Ex. 1)

**2.    Particularized Facts Demonstrating Falsity of the Statements Made and Giving Rise to Defendants Khandros and Foster's Scienter Concerning FormFactor's Development and Ramping Up of Harmony and the Impact on the Company's Reported Financials for FY 2006**

187.    The statements made in ¶¶177-178, 181-185 above concerning FormFactor's development and ability to ramp up Harmony production and the Company's financial and operating results for 4Q 2006 and FY 2006 were false and misleading, and defendants knew that they were false and misleading at the time they were made.  As detailed above, FormFactor's development of

1    Harmony was materially flawed such that the Company marketed it to the customers before the

2    Harmony architecture was fully developed, and that the chronic yield problems further exacerbated

3    the Company's ability to ramp up the production of Harmony.  Because of the chronic yield issues,

4    the Company essentially could not and did not reasonably control and manage its production to meet

5    customer delivery deadlines.

6        188.    By early 2007, management knew that FormFactor was at an extreme disadvantage in

7    the single touchdown probe card market because not only were its competitors starting to come out

8    with comparable technology, its competitors' products were significantly cheaper and their probe

9    cards did not have the assembly and heating problems of the Harmony products.  The competitors

10   could also deliver the advanced probe cards much faster than FormFactor could.  Given these

11   circumstances, it was not a difficult decision for a customer to go with a competitor of FormFactor

12   and, indeed, according to CW14, this "happened a lot."  While FormFactor had been trying to get the

13   cost out of the Harmony probe card, it was not able to do so given that the high cost of producing

14   Harmony fundamentally derived from the labor required to make the product, particularly because of

15   the process to assemble four probe cards into one Harmony probe card.

16       189.    According to CW14, given the escalating sense of crisis with the development and

17   production of Harmony, in February 2007, Khandros mandated Freeman to "own" and "fix"

18   Harmony and assemble a team, including CW14, to address Harmony.  Starting in February 2007,

19   this team met twice a day to discuss Harmony issues – once in the morning and then in the evening.

20   According to CW14, Freeman believed that Harmony was "a disaster" and did not want to get

21   involved but was directed by Khandros to fix it.  During these meetings, problems and issues with

22   Harmony were frankly and openly discussed.  The substance of these meetings was memorialized

23   into minutes by Freeman's assistant Dan Kisner.  CW14 states the minutes of the meetings were

24   distributed via e-mail based on  Freeman's decision as to who should receive the information, and

25   that sometimes the minutes were distributed to  Khandros.

26       190.    As part of the scheme to hide the real development of Harmony and the Company's

27   manufacturing capabilities, defendants continued to ship Harmony products to customers, even

28   though the products were still in the Feasibility phase.  By early 2007, FormFactor decided to

1   determine the production volume for Harmony.  The manufacturing yield for Harmony was worse

2   than the Company's already low yield rate overall.  According to CW14, the initial rejection of

3   Harmony probe cards took place during the manufacturing process and was due to a poor

4   manufacturing yield.  The individual probe-heads that were part of the Harmony card went through

5   the usual manufacturing process, just like any other of FormFactor probe-heads.  Once the individual

6   probe-heads were built, the engineering team assembled them into a Harmony probe card.  The

7   estimated manufacturing yield for the Harmony probe-heads was approximately 50% and

8   approximately 25% for the mechanical pieces, such as stiffeners, frames and springs, that went into a

9   Harmony probe card.  In comparison, FormFactor's manufacturing yield for a pH150 probe head

10  was 80% for the probe-heads and nearly 100% for the mechanical pieces.  According to CW14,

11  although all Harmony probe cards at that time were built by the engineering team in very low

12  quantities, the cards were shipped to customers as "production volume cards."

13       191.    Given the poor yields from Harmony and general probe-head production, senior

14  management continued to direct lower-ranked personnel to improperly transfer the cost associated

15  with scrap that accumulated from poor yields from manufacturing to R&D.  The scrap project that

16  CW9 took part in continued, while the Company started to upgrade its Oracle application, in early

17  2007 in part as a result of consultant Cook's recommendations in dealing with scrap accumulation.

18       192.    In furtherance of the scheme, defendants manipulated the inventory valuation of the

19  portion of that scrap that did not get transferred to R&D by overstating the value of obsolete

20  inventory.  The Company's revenues and net income were artificially inflated and reported financial

21  results were in violation of GAAP.  For 4Q 2006, FormFactor restated its reported financials as

22  follows:

|  | Total Inventory | Cost of Revenue | Gross Margin | Stock-based comp included in GM | Gross Margin % | Net Income | Diluted EPS |
|---|---|---|---|---|---|---|---|
| Reported | 24,778 | 47,536 | 51,157 | 1,165 | 51.83% | 18,920 | $0.39 |
| Restated | 18,926 | 50,130 | 48,563 | 1,245 | 49.21% | 17,456 | $0.36 |

For FY 2006, the Company restated its financials as follows:

|  | Total Inventory | Cost of Revenue | Gross Margin | Stock-based comp | Gross Margin | Net Income | Diluted EPS |
|---|---|---|---|---|---|---|---|

PLAINTIFFS' SECOND AMENDED COMPLAINT - C-07-05545-SI                                    - 69 -

| | | | | included in GM | % | | |
|---|---|---|---|---|---|---|---|
| Reported | 24,778 | 178,235 | 190,978 | 3,900 | 51.73% | 60,788 | $1.29 |
| Restated | 18,926 | 184,087 | 185,126 | 4,281 | 50.14% | 57,216 | $1.21 |

The Company overstated its total inventory by 30.92% and net income by 8.39% for 4Q 2006, and by 30.92% in total inventory and 6.24% in net income for FY 2006. But for defendants' deliberate improper reporting of inventory valuation, including counting obsolete inventory as R&D expense and misreporting its stock-based compensation to inventory, FormFactor would have only achieved a gross margin of 50.14%, rather than 51.73%, in FY 2006.

193. As an attachment to the Form 10-K for FY 2006, defendants Khandros and Foster also provided Sarbanes-Oxley certifications, signed on February 26, 2007, attesting based on their knowledge, that FormFactor's quarterly report "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made . . . not misleading," and that the reported financial information "fairly present in all material respects the financial condition," and that they are "responsible for establishing and maintaining disclosure controls and procedures." (Ex. 24 ) These certifications were knowingly false for the reasons set forth in ¶¶125-139.

194. <u>Insider trading</u>. Between February 1, 2007 and April 2, 2007, while possessing material non-public information, defendant Foster made three transactions by disposing of more than 10,800 shares of FormFactor stock at no less than $43.00 per share, pocketing $467,500 in insider trading proceeds.

**F.    False and Misleading Statements Made Concerning FormFactor's Progress with Harmony, Ability to Ramp Up Harmony Production and Its 1Q 2007 Results**

   **1.    Defendants Khandros and Foster Falsely Represented FormFactor's Progress with Harmony, Ability to Ramp Up Harmony Production and Its 1Q 2007 Financial and Operating Results**

195. On April 25, 2007, the Company issued a press release entitled: "FormFactor Announces First Quarter 2007 Financial Results." (Ex. 26) The press release stated in part:

> FormFactor, Inc. today announced its financial results for the first quarter of fiscal 2007. Quarterly revenues were a record $102.3 million, up 26% from $81.3 million in the first quarter of fiscal 2006, and up 4% from $98.7 million in the fourth quarter of fiscal 2006.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Net income for the first quarter of fiscal 2007 was $14.8 million or $0.30 per share on a fully diluted basis, which included $5.2 million or $0.11 per share of stock-based compensation expense, net of tax. This compares to $18.9 million or $0.39 per share on a fully diluted basis for the fourth quarter of fiscal 2006, which included $4.8 million or $0.10 per share of stock-based compensation expense, net of tax. Net income for the first quarter of fiscal 2006 was $10.8 million or $0.25 per share on a fully diluted basis, which included $2.8 million or $0.06 per share of stock-based compensation expense, net of tax.

196.    During the Company's conference call on April 25, 2007, which defendants Khandros and Foster hosted (Ex. 25), defendant Khandros stated:

As the leader in the DRAM market, FormFactor is moving the industry to fewer touchdowns in high-yield, offering the industry the lowest cost of test. . . . We're also seeing more complex test requirements driven by more challenging device designs. . . . ***FormFactor is uniquely capable of addressing this fundamental and increasingly complex customer requirement.***

\*        \*        \*

***We are currently in qualifications and expect volume shipments in second half '07 for both [DRAM XP and PH 150 XP] product platforms.***

\*        \*        \*

***Development and qualification of our NAND Harmony OneTouch product continued in the quarter, though we did not make the progress we had hoped.***

\*        \*        \*

We are continuously investing in the Harmony Flash area to accelerate resolution of the issues and complete customer quotes. ***Our target with Harmony Flash products is to significantly exceed the performance and value proposition of other products in the NAND market. We believe our Harmony OneTouch designed for high productivity, serviceability and technology scalability will afford FormFactor success in gaining revenue share in this market.***

\*        \*        \*

***We're very pleased with the Company's performance of record revenues, expanded manufacturing capability and continued development on the breadth of the product portfolio that has set the stage for a successful 2007.***

197.    On the same conference call, defendant Foster also commented on the reported gross margin at 52.5%. He stated: "[h]igher factory utilization and productivity increases contributed to this improvement."

198.    When another analyst asked: "Is there some concern here in terms of leadtimes maybe stretching out, some growing pains that you are experiencing with some of the infrastructure growth you are seeing?" Defendant Foster replied:

No, **we don't have any leadtime stretching out issues.  In fact, our factory cycle time and leadtimes have been improving.**  In the last 12 months, they have improved about 25%, and the factory is performing very well.  **It is simply a matter of scheduled customer deliveries and what our customers are looking to have delivered within the quarter based upon what we can see.**  And, as you know, we have some visibility, but it is always somewhat limited because we book and turn 60% of our business in a quarter.  And that means that we get visibility of it as we go through the quarter.

199.    <u>Insider trading</u>.    Within a week of making rosy representations concerning FormFactor's improving yield rates and the ability to ramp up Harmony production, defendant Foster again sold 1,800 shares of his FormFactor stock for $43.00 per share, pocketing more than $77,400 on May 2, 2007.

200.    On May 7, 2007, the Company filed its Form 10-Q for 1Q 2007.  (Ex. 27)  Moreover, the Company stated how it valued inventories, as follows:

Note 4 - Inventories

Inventories are stated at the lower of cost (principally standard cost which approximates actual cost on a first-in, first-out basis) or market value.  Adjustments for potential excess and obsolete inventory are made based on management's analysis of inventory levels and future sales forecasts.  Once the value is adjusted, the original cost of the Company's inventory less the related inventory write-down represents the new cost basis of such products.  Reversal of these write-downs is recognized only when the related inventory has been scrapped or sold.

Inventories consisted of the following:

|  | March 31, 2007 (In thousands) | December 30, 2006 |
|---|---|---|
| Raw materials | $13,628 | $11,975 |
| Work-in-progress | 10,866 | 10,465 |
| Finished goods | 2,969 | 2,338 |
|  | $27,463 | $24,778 |

201.    Additionally, the Company stated in its Form 10-Q for 1Q 2007 how it accounted for its cost of revenues, as follows:

Cost of Revenues.  Cost of revenues consists primarily of manufacturing materials, payroll and manufacturing-related overhead.  In addition, cost of revenues also includes costs related to the start up of our new manufacturing facility, which we completed in early 2006.  Our manufacturing operations rely upon a limited number of suppliers to provide key components and materials for our products, some of which are sole source. . . . Tooling and setup costs related to changing manufacturing lots at our suppliers are also included in the cost of revenues.  We expense all warranty costs and inventory write-downs or write-offs as cost of revenues.

We record an adjustment to our inventory valuation for estimated obsolete and non-saleable inventories equal to the difference between the cost of inventories and the estimated market valve based upon assumptions about future demands and market conditions.  If actual market conditions are less favorable than those projected by management, additional inventory write downs would be required.  Once established, the original cost of our inventory less the related reserve represents the new cost basis of such products.  Reversal of these write downs is recognized only when the related inventory has been scrapped or sold.

202.     With respect to R&D, the Company reported $14.102 million, without disclosing that R&D included scrap materials that resulted from the poor yields in the manufacturing process that should have been written-off as COGS.

203.     As an attachment to the Form 10-Q for 1Q 2007, defendants Khandros and Foster also provided Sarbanes-Oxley certifications, signed on May 7, 2007, attesting based on their knowledge that FormFactor's quarterly report "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made . . . not misleading," and that the reported financial information "fairly present in all material respects the financial condition," and that they are "responsible for establishing and maintaining disclosure controls and procedures." (Ex. 27 )

204.     <u>Loss causation</u>.  Following the April 25, 2007 press release, conference call and the issuance of the Company's Form 10-Q for 1Q 2007, the stock price remained inflated at over $40.00 per share, while FormFactor continued to conceal the true operation and financial conditions of the Company.  (Ex. 1)

**2.     Particularized Facts Demonstrating Falsity of the Statements Made and Giving Rise to Defendants Khandros and Foster's Scienter Concerning FormFactor's Progress with Harmony, Ability to Ramp Up Harmony and the Impact on the Company's Reported Financials for 1Q 2007**

205.     The statements made in ¶¶195-198, 200-203 above concerning FormFactor's development and ramping up of Harmony and the Company's financial and operating results for 1Q 2007 were false and misleading, and defendants knew that they were false and misleading at the time they were made.

206.     According to CW11 who joined FormFactor in May 2007 as an Inventory Control Technician whose job was to provide inventory parts to manufacturing, the "pick lists" for Harmony

1   parts were always "emergency requests," often accompanied by statements such as "we need [the

2   parts] now" to replace defective or failed parts. CW11 understood that these Harmony part failures

3   were random and were not attributable to any particular part or phase in the manufacturing process.

4          207.    When CW10, a former Senior QA Probe Head Inspector, started inspecting Harmony

5   probe cards sometimes in 2007, approximately two out of the five inspected cards did not pass

6   inspection. According to CW14, the New Product Program Manager who was part of defendant

7   Freeman's team working on Harmony on a daily bases by this point, the yield rate for Harmony

8   continued to be 25% for the mechanical pieces and 50% overall.

9          208.    Moreover, according to several witnesses, even with the Harmony products that did

10  not fail in the manufacturing processes, the Harmony products were returned to FormFactor shortly

11  after they were shipped to customers. CW11, a former Inventory Control Technician, states that

12  Harmony failed at the customers' sites after it had already been assembled, tested, inspected by QA

13  and shipped to customers. According to CW11, Sanmina was one of the customers who returned

14  Harmony probe-heads due to failures. According to CW14, almost all Harmony shipments to

15  customers prior to September 2007 were returned. Similarly, CW7, a former Senior Engineering

16  Technician, indicates that even if the finished products "looked good" (*i.e.*, all of the parts were

17  correctly assembled), they lacked the quality necessary for them to work. CW7 also states that some

18  parts were falling off at the customers' sites and subsequently returned to the Company.

19         209.    CW9, a former Senior IT Director, also corroborates that even though FormFactor did

20  manage to get a few Harmony products out the door during 2007, the products had problems in the

21  field once they were received by customers. In fact, according to CW9, some of the Harmony

22  products ended up damaging the wafers they were designed to be testing. The problem with

23  Harmony continued even after the end of the Class Period. On July 23, 2008, an analyst from

24  Oppenheimer downgraded FormFactor's stock, noting widespread heating issues for both DRAM

25  and NAND Harmony probe cards had cropped up in the field "en masse" with the Company's

26  Harmony product line "necessitating a new product cycle," resulting in incremental warranty costs

27  and "further share loss." (Ex. 47) FormFactor's current CEO even acknowledged in the Company's

28

1  July 30, 2008 conference call that the massive product returns were due to "difficulty to

2  manufacture" Harmony in 2007. (Ex. 48)

3      210.    Also by 2007, FormFactor realized that even if it could make Harmony work, the cost

4  of doing so would be detrimental to the Company's operations and business. According to CW14,

5  FormFactor's older products, such as the pH150, which typically sold for $200,000, were very

6  profitable with gross margins of 54%-55%. With Harmony, it was definitely the case that with the

7  first Harmony products that FormFactor sold, "we were shipping money," as the Company was

8  actually losing money. For example, if FormFactor can command pricing for Harmony of

9  approximately $300,000, the gross margins would be only in the 30%-35% range. However,

10  according to CW14, major customers like Samsung and Hynix had refused to pay the prices for

11  Harmony that FormFactor wanted to charge, and that the margins on the sales to these key customers

12  were as low as in 0%-5% range. Given the low margins on Harmony, CW14 states that

13  FormFactor's overall gross margins would shrink as the Company ships more Harmony products.

14  According to CW14, who was present at meetings in which Harmony's poor margins were

15  discussed, defendant Khandros was also present at those meetings and commented that "there's no

16  way we can sell Harmony" given the low margins.

17      211.    Defendant Foster was also aware of the impact of Harmony on the Company's overall

18  gross margins. There were two representatives from the finance department assigned to the

19  Harmony project, Stan Finkelstein ("Finkelstein") and Sonny Parvia ("Parvia"). Parvia reported to

20  Finkelstein, who reported to defendant Foster. According to CW14, Finkelstein and Parvia were

21  responsible for determining Harmony's gross margins, which they did using component costs set

22  forth in the bill of materials and then adding labor rates and other cost factors.

23      212.    Moreover, FormFactor continued to suffer poor yields and that its chronic yield

24  problems further exacerbated the Company's ability to ramp up the production of Harmony.

25  Because of the chronic yield issues, the Company essentially could not and did not reasonably

26  control and manage its production to meet customer delivery deadlines. As detailed above, as part of

27  the scheme, defendants directed lower-ranked personnel to improperly transfer the cost associated

28  with scrap that accumulated from poor yields from manufacturing to R&D. CW11, the former

1  Inventory Control Technician whose job was to monitor physical inventory, states that throughout

2  his/her employment, he/she had never seen any requests from R&D for parts that had been allocated

3  as scrap parts from other departments; nor did he/she ever deliver any of the scrap parts from

4  manufacturing to R&D.

5        213.  In furtherance of the scheme, defendants further manipulated the inventory valuation

6  of the portion of that scrap that did not get transferred to R&D by overstating the value of obsolete

7  inventory.  The Company's revenues and net income were artificially inflated and reported financial

8  results were in violation of GAAP.  For 1Q 2007, FormFactor restated its reported financials by

9  admitting that the Company overstated its total inventory by 23.76%, from originally reported at

10 $27,463 million to $22,190 million as restated.

11       214.  As an attachment to the Form 10-Q for 1Q 2007, defendants Khandros and Foster

12 also provided Sarbanes-Oxley certifications, signed on April 25, 2007, attesting based on their

13 knowledge, that FormFactor's quarterly report "does not contain any untrue statement of a material

14 fact or omit to state a material fact necessary to make the statements made . . . not misleading," and

15 that the reported financial information "fairly present in all material respects the financial condition,"

16 and that they are "responsible for establishing and maintaining disclosure controls and procedures."

17 (Ex. 25 )  These certifications were knowingly false for the reasons set forth in ¶¶125-139.

18       215.  <u>Insider trading</u>.  On June 15, and June 18, 2007, while possessing material non-public

19 insider information, defendant Khandros sold 11,400 shares of his FormFactor stock at $43.00 per

20 share, pocketing $490,000 in insider trading proceeds.  Likewise, defendant Foster sold 1,800 shares

21 of FormFactor stock at $43.00 per share on June 15, 2007, pocketing another $77,400 in insider

22 trading proceeds.

23     **G.**    **False and Misleading Statements Made Concerning FormFactor's Progress with the Development and Ramping of Harmony Production**

24               **and Its 2Q 2007 Results**

25         **1.**    **Defendants Khandros and Foster Falsely Represented FormFactor's Progress with the Development and Ramping of**

26                   **Harmony and Its 2Q 2007 Financial and Operating Results**

27       216.  On July 25, 2007, the Company issued a press release entitled: "FormFactor, Inc.

28 Announces Second Quarter 2007 Financial Results."  (Ex. 29)  The press release stated in part:

FormFactor, Inc. today announced its financial results for the second quarter of fiscal year 2007, ended June 30, 2007. Quarterly revenues were a record $114.1 million, up 12% from $102.3 million in the first quarter of fiscal 2007, and up 24% from $92.4 million in the second quarter of fiscal 2006.

Net income for the second quarter of fiscal 2007 was $18.6 million or $0.38 per share on a fully diluted basis, which included $4.2 million or $0.08 per share of stock-based compensation, net of tax. This compares to $14.8 million or $0.30 per share on a fully diluted basis for the first quarter of fiscal 2007, which included $5.2 million or $0.11 per share of stock-based compensation, net of tax. Net income for the second quarter of fiscal 2006 was $15.3 million or $0.32 per share on a fully diluted basis, which included $3.1 million or $0.06 per share of stock-based compensation, net of tax.

217.    During the conference call on July 25, 2007, defendants Khandros and Foster met with analysts.  (Ex. 28)  Defendant Khandros stated:

*We improved our production performance by reducing lead times and continuing to invest in new technology and product development.*  Market demand for DRAM remains strong in the second quarter driven by DRAM bit growth, the ongoing transition to 70 nanometers and 1 gigabit driven by Vista and seasonal strength in the mobile business.

*            *            *

*We made progress in the development and qualification of our NAND Harmony OneTouch product this quarter. . . .*

*Our overall design capacity has been constrained due to an increase in new design demand and high design intensity associated with new product platforms and our Harmony learning on various test platforms has continued.*

*            *            *

*Our overall outlook for 2007 market for advanced wafer probe cards remains unchanged from the view we provided in January.*  The advanced probe card market remains on track to grow with a robust 25% in 2007 compared to roughly flat growth expected for the entire semiconductor [category] an [sic] industry.

*            *            *

We are very pleased with the Company's achievement of record revenue and profitability, expand the factory capability and continued new product development.

218.    During the conference call, defendant Foster stated:

While we did receive some revenue from our NAND Harmony OneTouch product in the quarter, overall NAND revenue declined.  Production shipments and qualification at additional sites continued with one customer while qualification efforts with additional customers have been slower than expected. *The differentiating capability of our Harmony platform has been demonstrated in production and qualification trials and we remain confident that we can penetrate additional customers as we progress in our qualification activities*.

219.    Moreover, defendant Khandros represented that the NAND Flash Harmony product was seeing high demand, and that the Company faced design capacity challenges:

We have overall design constraints right now due to very, very high design demand in general.  And as you can see we're growing our business at a healthy chunk and that puts significant pressure on design resources.

220.    On August 7, 2007, the Company filed its Form 10-Q for 2Q 2007, and repeated the same financial information.  (Ex. 30)  The Company stated its inventory valuation policies, as follows:

Note 4 – Inventories

Inventories are stated at the lower of cost (principally standard cost which approximates actual cost on a first-in, first-out basis) or market value. Adjustments for potential excess and obsolete inventory are made based on management's analysis of inventory levels and future sales forecasts. Once the value is adjusted, the original cost of the Company's inventory less the related inventory write-down represents the new cost basis of such products. Reversal of these write-downs is recognized only when the related inventory has been scrapped or sold.

Inventories consisted of the following:

|  | June 30, 2007 (In thousands) | December 30, 2006 |
| --- | --- | --- |
| Raw materials | $16,347 | $11,975 |
| Work-in-progress | 11,301 | 10,465 |
| Finished goods | 4,356 | 2,338 |
|  | $32,004 | $24,778 |

221.    The Company also stated its cost of revenues as follows:

Cost of Revenues. Cost of revenues consists primarily of manufacturing materials, compensation and manufacturing-related overhead. In addition, cost of revenues also includes costs related to the start up of our new manufacturing facility, which we completed in early 2006. Our manufacturing operations rely upon a limited number of suppliers to provide key components and materials for our products, some of which are sole source. We order materials and supplies based on backlog and forecasted customer orders. Tooling and setup costs related to changing manufacturing lots at our suppliers are also included in the cost of revenues. We expense all warranty costs and inventory write-downs or write-offs as cost of revenues.

We design, manufacture and sell a fully custom product into the semiconductor test market, which is subject to significant variability and demand fluctuations.  Our wafer probe cards are complex products that are custom to a specific chip design and must be delivered on relatively short lead-times as compared to our overall manufacturing process.  As our advanced wafer probe cards are manufactured in low volumes and must be delivered on relatively short lead-times, it is not uncommon for us to acquire production materials and start certain production activities based on estimated production yields and forecasted demand prior to or in

PLAINTIFFS' SECOND AMENDED COMPLAINT - C-07-05545-SI                              - 78 -

excess of actual demand for our wafer probe cards.  We record an adjustment to our inventory valuation for estimated obsolete and non-saleable inventories equal to the difference between the cost of inventories and the estimated market value based upon assumptions about future demand.  If actual market conditions are less favorable than those projected by management, additional inventory write downs would be required.  Once established, the original cost of our inventory less the related inventory reserve represents the new cost basis of such products.  Reversal of these write downs is recognized only when the related inventory has been scrapped or sold.

222.    Additionally, the Company reported its R&D at $14,102 million, without disclosing that R&D included scrap materials that resulted from the poor yields in the manufacturing process that should have been written-off as COGS.

223.    As attachments to the Form 10-Q for 2Q 2007, defendants Khandros and Foster also provided Sarbanes-Oxley certifications, signed on August 7, 2007, attesting based on their knowledge that FormFactor's quarterly report "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made . . . not misleading," and that the reported financial information "fairly present in all material respects the financial condition," and that they are "responsible for establishing and maintaining disclosure controls and procedures." (Ex. 30 )

**2.    Particularized Facts Demonstrating Falsity of the Statements Made and Giving Rise to Defendants Khandros and Foster's Falsity and Scienter Concerning FormFactor's Progress with the Development and Ramping of Harmony and the Impact on the Company's Reported Financials for 2Q 2007**

224.    The statements made in ¶¶216-223 above concerning FormFactor's development of Harmony and the Company's financial and business results for 2Q 2007 were false and misleading, and defendants knew that they were false and misleading at the time they were made.

225.    As detailed above, FormFactor's development of Harmony was materially flawed such that the Company marketed it to the customers before the Harmony architecture was fully developed, and that the chronic yield problems further exacerbated the Company's ability to ramp up the production of Harmony.  In fact, CW14 recalls that at one meeting in the summer of 2007, defendant Khandros "chewed out Ben [Eldridge]" and shouted that Eldridge should "build Harmony yourself to find the problems."  Because of the underlying development issues with Harmony and the chronic yield issues as described above, the Company essentially could not and did not

1  reasonably control and manage its production to meet customer delivery deadlines.  Thus, while

2  defendants alluded to the shortage in "design capacity," defendants did not disclose the development

3  and manufacturing problems that the Company was facing to build Harmony and that the Harmony

4  shipments that were sent out were almost uniformly rejected and that the Company was still trying to

5  resolve all these issues.  Thus, defendants' statement that "our overall design capacity has been

6  contrained" is at best a half-true statement because it creates the impression that the Company

7  already had a production manufacturing process set up and that it was a matter of increasing its

8  design capacity when in fact it was still srambling in the Feasibility phase, barely moving onto Pre-

9  Production of the Company's IMS in mid-2007, according to CW14.

10       226.    Indeed, while defendants attributed the manufacturing constraints to capacity or

11  personnel issues (*i.e.*, shortage of design personnel), the real underlying issue was, in fact, the

12  development of Harmony and the manufacturing process itself, which the Company did not disclose.

13  CW4, a former Customer Project Manager who started working at FormFactor in mid-2007,

14  confirms that, due to the slowness of the production process, "a lot of Harmony shipments" were

15  missed.  Based on CW4's access to the Company's scheduling and planning system and his/her

16  regular contacts with customers, CW4 estimates that 20% or less of Harmony orders actually went

17  out on time, while the rest of them were shipped late.  CW4, who had to deal with customers when

18  there was a shipment delay, indicates that the Company "couldn't control the yield" for their

19  products and therefore could not fulfill customer shipping dates.  CW4 also stated that during 2007

20  and early 2008, FormFactor consistently experienced problems with timely producing and shipping

21  the Harmony probe cards, including late shipments to its largest customer Elpida in Japan.

22       227.    According to CW4, Elpida was FormFactor's primary customer in Japan for

23  Harmony and Elpida was definitely "very angry" at FormFactor's inability to deliver Harmony

24  according to shipment dates.  The problems continued throughout the year.  By the end of December

25  2007, there was clearly evidence of a slowdown at FormFactor, which CW4 believes was a

26  combination of the market and "our situation with Harmony."  Indeed, in early December 2007,

27  because FormFactor was unable to deliver the Harmony products required by Elpida, an analyst

28

PLAINTIFFS' SECOND AMENDED COMPLAINT - C-07-05545-SI          - 80 -

1 reported that Elpida considered alternative wafer probe cards from FormFactor's competitor,

2 Advantest.

3    228.    As part of the scheme to hide the problems associated with the development of

4 Harmony and the manufacturing processes, defendants continued to direct lower-ranked personnel to

5 improperly transfer the cost associated with scrap that accumulated from poor yields from

6 manufacturing to R&D.

7    229.    In furtherance of the scheme, defendants further manipulated the inventory valuation

8 of the portion of that scrap that did not get transferred to R&D by overstating the value of obsolete

9 inventory.  The Company's revenues and net income were artificially inflated and reported financial

10 results were in violation of GAAP.  For 2Q 2007, FormFactor overstated its total inventory by

11 5.18% and restated its total inventory from $32,004 million to $30,429.

12    230.    As an attachment to the Form 10-Q for 2Q 2007, defendants Khandros and Foster

13 also provided Sarbanes-Oxley certifications, signed on August 6, 2007, attesting based on their

14 knowledge, that FormFactor's quarterly report "does not contain any untrue statement of a material

15 fact or omit to state a material fact necessary to make the statements made . . . not misleading," and

16 that the reported financial information "fairly present in all material respects the financial condition,"

17 and that they are "responsible for establishing and maintaining disclosure controls and procedures."

18 (Ex. 30 )  These certifications were knowingly false for the reasons set forth in ¶¶125-139.

19    231.    Loss causation.    Following the issuance of the financial results for 2Q 2007,

20 FormFactor's stock price rose to more than $40.00 per share, reaching as high as $47.47 per share on

21 September 19, 2007.  The stock continued to trade at an inflated price until the Company disclosed

22 the intent to restate on October 24, 2007.  (Ex. 1)

23    232.    Insider trading.  In August and September 2007 alone, defendant Khandros rushed to

24 make 33 insider trading transactions, disposing of more than 85,050 shares, at no less than $45.11

25 per share, pocketing more than $3.84 million in insider proceeds within weeks of the Company's

26 disclosures about the true operating and financial conditions of the Company.

27

28

1    **VII.    THE TRUTH BEGINS TO EMERGE**

2    **A.    Defendants Partially Disclosed the Problems with the Company's**
        **Inventory Valuation Practices While Continuing to Conceal the**
3        **Company's Inability to Develop and Ramp Up Harmony Production**

4        233.    After the close of the market on October 24, 2007, the Company issued a press

5    release announcing accounting issues with respect to its pre-3Q 2007 results entitled: "FormFactor,

6    Inc. Announces Record Revenue Quarter of $125.3 Million, Up 29% Year Over Year."  (Ex. 32)

7    The press release stated in part:

8            FormFactor, Inc. today announced revenue for the third quarter of fiscal year
        2007, ended September 29, 2007.

9
                                *        *        *

10
            The Company said that it is unable at this time to release further income
11        statement data with respect to the third quarter. ***The Company is currently reviewing***
        ***its historic practices with respect to inventory valuation in light of issues identified***
12        ***by the Company in the course of preparation of financial statements for the third***
        ***quarter. Based on the review to date management believes that adjustments to***
13        ***inventory valuations may be required with respect to periods prior to the third***
        ***quarter of 2007. These potential adjustments could change inventory, gross***
14        ***margin, operating margin and net income from the amounts previously reported***
        ***for the affected periods***. The Company has not yet determined the magnitude of
15        these adjustments or whether the adjustments will be reflected in the third quarter
        financial statements or in a restatement of the affected periods. The Company
16        believes, however, that its third quarter operating margin and net income per share,
        without giving effect to adjustments in respect of prior periods, should be not less
17        than the 20.5%-21% and $0.38-$0.40 per share, respectively, provided as
        management guidance in the Q2 earnings call conducted on July 25, 2007.

18
        234.    During the October 24, 2007 conference call, defendant Foster discussed why the
19
    Company had not issued its full customary financial information.  (Ex. 31)  He stated:
20
            As we were closing the books for the third quarter, we discovered an issue related to
21        our inventory evaluation practices.  It appears that in certain prior periods, in the
        current fiscal year and prior years, the approach followed for evaluating inventory
22        and establishing valuation reserves was inconsistent with our accounting policies.

23            In our business, where every product is custom for each customer's design,
        most of our inventory consists of custom parts.  We have a comprehensive process
24        for assessing the value of that inventory in light of projected customer demand.  The
        failure to follow that process could mean that the previously-recorded inventory
25        values would need to be adjusted up or down, with flow-through impacts on gross
        margin, operating margin, and net income.

26
                                *        *        *
27
        Once we have determined the periods affected and the magnitude of the potential
28        adjustments to inventory, gross margin, operating margin, and net income from the

PLAINTIFFS' SECOND AMENDED COMPLAINT - C-07-05545-SI                    - 82 -

1    amounts previously reported, we will know whether we can simply do a one-time
2    catch-up adjustment in our third quarter numbers, or whether a restatement of prior
     periods will be required.

3         Going forward, we will apply lessons learned in this review.  We are taking a
     fresh look at our inventory evaluation process to ensure inventories are appropriately
4    valued, and we will make the appropriate modifications to our procedures and
     compliance processes.

5    235.    Even as the Company was disclosing its overstatement of inventory, defendants

6    continued to mask the underlying problems in the development of Harmony, and the manufacturing

7    processes and the impact that they had on the Company's ability to volume produce Harmony

8    products.  Indeed, from the outset of the conference call, defendant Khandros continued to boast

9    FormFactor's performance. He stated:

10        The market for advanced probe cards continued strong in the third quarter,
11    with DRAM once again leading the way.  FormFactor's growth was driving by the
     record high DRAM, Flash and known good die businesses, as we continue to meet
12    the mission-critical needs of our customers.

13                          *      *      *

14        We experienced higher than expected demand for our DRAM Harmony XP
     full wafer contactor product, which offers superior test cost benefit. . . .  Having
15    shipped Harmony XP to 3 customers, initial results demonstrated superior industry-
     leading wafer-testing capability.

16                          *      *      *

17    We have already received additional production orders for DRAM Harmony.

18    With respect to Harmony production ramp constraints, in response to an analyst's question regarding

19    guidance, defendant Khandros acknowledged that "*we're guiding almost flat quarter-over-quarter,*

20    *and the difference is the Harmony DRAM is behind what we then thought it would be today*."

21    However, defendants continued to cover up the underlying poor yields by characterizing the

22    Company's inability to volume produce as a capacity issue:

23        *As we continue to make strides in the qualification of our Harmony*
24    *product, the volume ramp is not keeping pace with the combined strong demand*
     *for DRAM and NAND Harmony.  In order to meet this demand, we made a*
25    *decision during the third quarter to add more production capacity for assembly and*
     *testing of Harmony cards, including clean room space, equipment and personnel.*

26    236.    Defendant Foster also commented:

27    As Igor commented, *demand for full wafer contractors to support the ramp of our*
28    *Harmony DRAM and Flash products is exceeding our production capacity.  We*

PLAINTIFFS' SECOND AMENDED COMPLAINT - C-07-05545-SI                          - 83 -

*plan to double Harmony capacity in the first quarter of 2008. We expect the continuing Harmony production ramp to meet the demand in the second quarter of 2008.*

\*　　　\*　　　\*

As already mentioned, *we have found it more difficult than planned to ramp Harmony to volume production, which is limiting our ability to meet increasing fully water contractor demand.* Consequently, we have put more capacity in place sooner than planned to support the volume ramp.

237.    In response to an analyst's inquiry regarding how FormFactor's inventory valuation slipped through the cracks for so long, defendant Foster acknowledged:

So what I can tell you is that the problems (inaudible) relate to the valuation of the inventory. There's no issue with the units or count; it's the valuation of the reserve methodology related to the custom nature of our product. And we have not made any changes to our policy. We're validating that our policy has been applied properly in the past.

238.    <u>Loss causation</u>. Upon these disclosures, FormFactor's stock dropped from $43.24 per share to $35.54 per share in one day, more than 17.8% in one day and down 28% from its Class Period high, with its trading volume increased by more than nine times. (Ex.1) The October 24, 2007 disclosures, however, only partially revealed the true financial and operating conditions of FormFactor as the Company continued to conceal the development and production issues with Harmony – one of the key revenue drivers for the Company.

239.    The true facts, which were known by defendants but still concealed from the investing public, were that while acknowledging that the Company's inventory valuation practices were being reviewed, defendants still failed to disclose known trends and uncertainties by not disclosing that the Company continued to scramble to address the assembly, thermal expansion, and other technical issues with Harmony, and that the Company's chronic poor yields that impeded FormFactor's ability to bring new products into volume production efficiently and in a timely manner. Defendants also failed to disclose their practice of overvaluing inventory and improperly classifying obsolete inventory as R&D, and, thereby, not disclosing FormFactor's actual financial performance and true operating margins:

(a)    The partial disclosures also concealed the impact on the Company's on-going operations and financial results given the Company's inability to volume produce Harmony probe

1  cards as represented to the market.  Specifically, defendants also knew but did not disclose that the

2  production constraints would significantly raise the risk that FormFactor's customers with older

3  generation products would seek alternative sources such as the Company's competitors or seek to

4  renegotiate their contracts with FormFactor placing serious pressure on the Company's future

5  revenue;

6           (b)    In late 2007, CW12 was told by A&T Supervisor Sal Diaz who attended

7  production meetings that the "Dead on Arrival" ("DOA") rate for Harmony probe cards that had

8  been shipped to customers was somewhere between 85% and 89%.  This high DOA rate was a "hot"

9  issue which management knew about and spent much of its effort to address it.  In fact, even after

10  the Class Period, FormFactor's new CEO admitted that the Company suffered massive product

11  returns due to the fact that "we had difficulty to manufacture this Harmony in 2007."  (Ex. 48);

12           (c)    As FormFactor later admitted, the Company lost its market share and

13  competitive edge because FormFactor was not the first full wafer contractor probe card company

14  qualified at some DRAM suppliers "***due to the protracted Harmony ramp issues we experienced in***

15  ***2007***" and that as many as 36% of the DRAM customers have delayed or canceled probe cards from

16  FormFactor due to the Company's inability to execute and deliver Harmony.  In the July 30, 2008

17  conference call, the current CEO finally acknowledged that the massive Harmony returns were due

18  to the difficulty in manufacturing Harmony in 2007.  (Ex. 48)

19           240.    On November 9, 2007, FormFactor announced its preliminary 3Q 2007 results and its

20  intention to restate historical financial statements in light of revised inventory valuation estimates.

21  The Company disclosed, as follows:

22           The Company also announced that it has substantially completed its review of
         its historical practices with respect to inventory valuation.  That review indicates that
23           during fiscal 2006 and the first half of fiscal 2007 the Company ***did not consistently***
         ***follow its accounting policies for determining inventory valuation***.  As a result the
24           Board of Directors determined on November 8, 2007 that the Company will restate
         its financial statements for the fiscal year ended December 30, 2006, for each of the
25           fiscal quarters for that year, and for the fiscal quarters ended March 31 and June 30,
         2007.
26
27           Based on the work done to date, the Company estimates the effect of the
         restatement will be to change GAAP net income per share on a fully diluted basis
28           from $1.29 to $1.21 for the fiscal year ended December 30, 2006, from $0.30 to

$0.31 for the fiscal quarter ended March 31, 2007, and from $0.38 to $0.43 for the fiscal quarter ended June 30, 2007.

*    *    *

The Company is evaluating management's report on internal controls contained in the Company's 2006 Form 10-K, and has determined that it is likely that it had a material weakness in internal controls over financial reporting as of December 30, 2006.

As a result of the restatement, the Company's financial statements for the year ended December 30, 2006 contained in the Company's 2006 Form 10-K, and the financial statements contained in its Forms 10-Q for the quarters ended March 31, 2007 and June 30, 2007, should no longer be relied upon. Because of the time necessary to complete the restatement, the Company did not file its third quarter Form 10-Q when due on November 8, 2007. The Company intends to file amendments to the reports indicated above together with its third quarter fiscal 2007 Form 10-Q later this month.

241. On November 13, 2007, the Company filed its Form 10K/A for FY 2006 (Ex. 36), Form 10-Q/A for 1Q 2007 (Ex. 34), and Form 10-Q/A for 2Q 2007 (Ex. 35) to reflect the restatement. In the restated Form 10-K/A, the Company also admitted to a material weakness in its financial reporting, as follows:

A material weakness is a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the company's annual or interim financial statements will not be prevented or detected on a timely basis.

The Company identified the following material weakness in internal control over financial reporting as of December 30, 2006. The Company did not maintain effective controls over the valuation of inventory and the related cost of revenues accounts. ***Specifically, the Company did not maintain effective controls to ensure that the estimation process to value inventory complied with the Company's accounting policies.*** This control deficiency resulted in the restatement of the Company's annual and interim financial statements for 2006 and interim financial statements for the first and second quarters of 2007. ***Additionally, this control deficiency could result in a misstatement of the inventory and cost of revenues accounts that would result in a material misstatement of the Company's financial statements that would not be prevented or detected.***

In the Company's original filing of its 2006 Annual Report on Form 10-K, management concluded that the Company maintained effective internal control over financial reporting as of December 30, 2006. However, in connection with the restatement discussed in Note 2 to the consolidated financial statements, management subsequently concluded that the material weakness in internal control over financial reporting described above existed as of December 30, 2006. As a result of the material weakness, management has concluded that the Company did not maintain effective internal control over financial reporting as of December 30, 2006 based upon the criteria set forth in Internal Control-Integrated Framework issued by the COSO. Accordingly, management has restated its report on internal control over financial reporting.

242.    In the restated Form 10-K/A, FormFactor also stated the "Management's Plan for Remediation," as follows:

> Management is in the process of completing its plan to remediate the material weakness. The remediation plan addresses the design of controls over inventory valuation and is expected to include:

- Completion of analysis of changes in the level of excess and obsolete inventory by category;

- Review of analysis of changes in the level of excess and obsolete inventory by category;

- Separate re-performance of excess and obsolete inventory calculation; and

- Hiring personnel with requisite cost accounting experience and providing ongoing training and supervision.

243.    <u>Loss causation</u>.  On December 6, 2007, FormFactor's competitor, Advantest, a DRAM test supplier, introduced a DRAM probe card that would be competitive with FormFactor's probe card.  Investors rushed to sell FormFactor stock, causing a 9% drop in stock price within a day, from $38.87 per share to $33.90 per share, with more than 13%, or almost six million shares, of FormFactor's stock sold.

244.    On the next day, December 7, 2007, Douglas G. Reid ("Reid"), an analyst with Thomas Weisel Partners, issued an analyst report that FormFactor could face increased margin pressure in 2008.  (Ex. 37)  Reid further noted that checks at a recent Semicon Japan trade show found that Advantest had an advanced probe card under evaluation at Elpida, a chipmaker which accounted for 27% of FormFactor's 3Q 2007 revenue.  According to Reid, Advantest planned to price its product 20% below FormFactor's comparable offering.  The same analyst also noted that another FormFactor rival, Micronics Japan Company Ltd., known as MJC, asserted that FormFactor had been engaging in aggressive price cutting.

245.    Investors remained concerned over FormFactor's near-term execution issues, especially the Company's technical and engineering issues related to its Harmony product release (both DRAM and NAND Flash).  An analyst from Stifel Nicolaus ("Stifel") issued a report on December 10, 2007, noting: "We are particularly concerned over the company's ability to deliver

1  Harmony, as customers could seek alternative solutions or force potential price concessions due to

2  delays in receiving product."  (Ex. 38)

3      **B.    Defendants Belatedly Disclosed the Company's Inability to Develop
            and Ramp Up Harmony Production as Promised and the Impact of
4           the Failed Execution of Harmony on the Company's Operating and
            Financial Results**

5

6      246.    On February 5, 2008, the Company announced its 4Q 2007 and FY 2007 financial

7  results.  (Ex. 40)  In the Company's press release, defendants stated:

8      *"Market conditions, particularly in DRAM, began to deteriorate into Q4 and that
       weakness has continued in Q1," said Igor Khandros, CEO of FormFactor.  "In
       light of this, we are taking actions to restructure the company to better align with
9      the market environment."*

10         The company announced a cost reduction plan that will include reducing its
       global workforce by approximately 14%.  FormFactor expects to record charges in
11     the range of $4.0-$5.0 million related to the cost reduction plan, with the majority of
       the charges being recorded in the first quarter of fiscal 2008.

12     247.    During the conference call on February 5, 2008 (Ex. 39), which defendants Khandros

13  and Foster hosted, defendant Khandros stated:

14

15         The year ended on a challenging note for FormFactor with fourth quarter
       revenues decreasing 4% sequentially to $120.5 million. The slower fourth quarter
16     was largely due to the weakening market conditions and the early execution issues
       associated with Harmony DRAM.  . . . *However, our new product ramp challenges
       with Harmony resulted in missed opportunities with a few customers causing the
17     majority of the overall revenue shortfall in the quarter. We made significant
       progress in the manufacturing readiness of our Harmony DRAM product during
18     the quarter having reduced lead times by 30% and shipped volume orders of this
       product to several customers.*

19
                              *        *        *
20
           *Due primarily to the market conditions as well as the delay in the Harmony
21     RAM, FormFactor's DRAM bookings declined significantly. Our focus going
       forward has shifted to demand generation side of the equation as we work to
22     regain our loss position with DRAM customers who could not wait for our
       Harmony products.* Although we have made significant progress in manufacturing
23     our Harmony product, the precise timing of the market recovery is still uncertain.
       The competitive pressure we're experiencing is in the lower end wafer contact
24     applications which is affecting pricing and margins in the near-term. For more
       complex high-end applications, we believe our products are differentiated, able to
25     work in a wide temperature range in the smallest test size and pitch with the highest
       pin count in the industry.

26
                              *        *        *
27
           *Due to the protracted Harmony ramp issues we experienced in 2007,
28     FormFactor was not the first full wafer contactor probe card company qualified at*

PLAINTIFFS' SECOND AMENDED COMPLAINT - C-07-05545-SI                    - 88 -

*some DRAM suppliers. This resulted in the loss of business in the fourth quarter which we believe the competition picked up at lower end DRAM applications.*

\*       \*       \*

Our products and technology are on the leading-edge and though we have experienced significant difficulties with our Harmony product ramp, we have learned invaluable lessons and will be a much stronger company for it.

248.    During the same conference call, defendant Foster stated:

Fourth quarter bookings were unexpectedly weak at $93.9 million, a decrease of 25% over the third quarter and an increase of only 3% over the same period last year. *Although Flash and SoC bookings were up sequentially, DRAM bookings dropped 36% as some customers have delayed or canceled the purchases of probe cards to deal with severe margin problems*.

249.    Analysts on the conference call were skeptical of defendants' explanations. Jim Covello, from Goldman Sachs, immediately questioned whether the reduced guidance was a reflection of FormFactor's business versus the DRAM industry overall.  In response, defendant Khandros conceded that at least a third of the reduction in guidance for DRAM was attributed to FormFactor's Harmony introduction problems.

250.    Another analyst Timothy Arcuri from Citigroup, outright questioned:

Obviously the issues with Harmony seem like they were not really capacity related, so it was not a shortage of your capacity as I think you were suggesting last call. It seems like the issue was more or is more product specific with maybe an architectural or a technical issue with the actual product. . . .  Because I know last quarter, you were saying you did not have enough capacity, but it sounds like it was a product-specific issue.

251.    Analyst Arcuri further inquired:

[T]here has been a lot of concerns about the competitive gap between your product and other folks' product narrowing.  However, *some of that sounds like it was due to your own inability to actually build the product*.

252.    Analyst Patrick Ho ("Ho") of Stifel outright asked for clarification with Harmony. He asked:

I guess going back into just looking back at some of the previous quarters, you mentioned that there were production capacity constraints. I think one quarter before that, there were customer integration issues. Have all of the engineering issues been resolved, or is this something that could still linger over the next couple of quarters?

\*       \*       \*

[I]s the incremental gain going to come from the market turnaround or your execution on the Harmony?

PLAINTIFFS' SECOND AMENDED COMPLAINT - C-07-05545-SI                                    - 89 -

253.  <u>Loss causation</u>.  Upon these announcements, FormFactor's stock price dropped 25% in after market hours, from $23.19 per share to $17.50 per share, closing at $21.06 per share at the end of February 6, 2008.  (Ex. 1)  The stock price continued to drop, trading below $20.00 per share following the February 5, 2008 announcement, and has not rebounded since.

254.  Several analysts expressed that they were surprised by the Company's latest announcements.  Ho of Stifel, commenting on the situation at FormFactor as "a total train wreck," and issued a report on February 6, 2008 entitled: "The Harmony 'House' is Crumbling . . . Can it be Rebuilt?"  (Ex. 43):

> Based on management's discussion and its outlook for the March quarter, we believe the situation with Harmony is significantly worse than we anticipated and it is now at a critical point where we believe the company's vision for long term outperformance could be dramatically altered.

> *     *     *

> **Investment Conclusion – It's Not Just the Market but Serious Self Evaluation is Needed, Maintain Hold Rating**:  When we lowered out estimates ahead of earnings (see our note, *FormFactor:  First Step is Getting the House in Order; Lowering Estimates, Maintain Hold, January 22, 2008*), we expected the company to experience some near term weakness in its core DRAM probe card business, but noted that the key for the company's growth still depended on getting its "house in order," particularly in terms of the ramp of its new Harmony product.  Based on management's discussion and its outlook for the March quarter, *we believe the situation with Harmony is significantly worse than we anticipated and it is now at a critical point where we believe the company's vision for long term outperformance could be dramatically altered*.  The company once again noted that it was experiencing manufacturing issues (following last quarter's capacity constraint reason and before that, customer integration problems) and that this was the cause for not only share loss but a decline in near term revenues.  Although the near term problems are exacerbated by a weak DRAM market, we are increasingly concerned that these Harmony issues will have long term negative implications for: 1) pricing, 2) margins, 3) revenues and 4) competitive positioning.  While these ramifications will not be apparent immediately, in our opinion, there is significant risk to the company's long term growth model.  *In addition to the problems related to Harmony, after several quarters of management's commentary about these "issues" we admittedly have a low level of confidence in management's credibility and its ability to correct whatever it is that is hindering its volume ramp*.  We expect the stock to be under severe pressure in Wednesday trading (down 25%+ in Tuesday after market hours).  While we have deep concerns over the company's fundamentals (and its ability to recover at this point), we will maintain our Hold rating based solely on valuation (2.0x cash per share at the close; 1.5x in after hours).  We would generally avoid the name until we believe that there is some prospect that the company has these Harmony issues under control.

> *     *     *

1

Ramp of Harmony (of Lack Thereof) is the Crux of the Problem:  What we
found as a major surprise was the continued missteps in its Harmony ramp, which we
2    believe is a larger contributor to the weak outlook than the company detailed on its
conference call. . . . In our opinion, there appears to be new issues that pop up every
3    quarter related to Harmony (two quarters ago it was customer integration, last quarter
capacity constraints, this quarter, manufacturing issues), and more importantly, no
4    solution to these problems. . . . [w]e believe the difficulties in the ramp of its
Harmony product is a larger contributor to the company's outlook than
5    management's view (management cited that its weak outlook was 2/3rd related to the
market and 1/3rd related to Harmony).  We believe that this issue (and its resolution)
6    will be the crux for the company for both the near term and its long term growth
strategy.

7

255.    Gary Hsueh, an analyst at Oppenheimer, also reported (Ex. 41):

8

As feared, issues with Harmony have had less to do with supply-side dynamics (*i.e.*
9    capacity shortages created by unexpected manufacturing issues) as suggested by
management when it guided below Street consensus for Q4 (back in Oct. '07). Now,
10    with a slight miss ($120M) to Q4 revenue expectation of $123-$125M, and
extremely grim outlook for Q1 ($70-$80M), ***it is becoming clear that FORM's***
11    ***chronic issues with its 300mm, full-contact wafer probe card, Harmony, have led***
***to meaningful market share loss***. . . .    However, our checks suggest that
12    manifestation of share loss is not entirely in the rear-view mirror for FORM:
industry data points indicate FORM's supply contract with its largest customer,
13    Elpida (20-30% of revenue in '07), expires at the end of March '08, opening the door
for Mirconics Japan Corp. (MJC, 6871, ¥3,300) to sign on/gain share as a second-
14    source supplier to FORM.

15    To compound FORM-specific issues transitioning over to its Harmony platform, the
memory industry, specifically DRAM, is facing numerous issues that are hampering
16    Y/Y growth in wafer probe card growth.

17                                             *        *        *

18    In light of the dismaying guidance for Q1 (March), we are chopping our
FY08 estimate on FORM down to $0.67 from $1.60 previously.  At this point, our
19    revenue forecast calls for a 15% Y/Y decline, despite management's comment that it
sees the advanced wafer probe card market outgrowing the broader semiconductor
20    industry. . . .  Given uncertainty regarding FORM's share in '08, we find it prudent to
model a 15% Y/Y decline in revenue in '08, vs. +19% previously.

21

256.    Raj Seth, an analyst from Cowen and Company, also issued a report entitled: "Huge
22
miss - much worse than anyone dared guess"  (Ex. 42):
23

FORM missed badly last night and left many questions unanswered.  The stock will
24    likely get killed.  FORM missed Q4 (no pre-announcement?) and guided Q1 revs
40% below expectations. . . .   FORM blamed "unusual/horrible" conditions in
25    DRAM (70% of revs) for the outlook but acknowledged some shares loss with one
major customer as a result of continued issues with their Harmony next gen DRAM
26    probe card. . . .  Barring a bounce off the bottom, FORM looks to be dead money till
they show evidence of renewed growth.  After hours, the stock was indicated around
27    1.5x cash ($18)!  No reason to downgrade here but make no mistake, we think few
should bother ST till [sic] until we get better clarity on what's happened.

28

1    257.    On February 25, 2008, the Company announced that defendant Foster "resigned" as

2    the CFO. According to CW12, it was rumored that Foster was fired from his position as a result of

3    the accounting issues that were investigated.

4    258.    On February 27, 2008, FormFactor filed its Form 10-K for FY 2007. (Ex. 44) The

5    Company belatedly admitted:

6    > In addition, while we have successfully qualified and delivered certain Harmony
   > architecture-based wafer probe cards that are being used by some of our customers in

7    > commercial volume for testing semiconductor devices and reduced manufacturing
   > lead times, *we are continuing to experience the effects of the new product*

8    > *execution challenges for our Harmony-based products that we experienced in*
   > *fiscal 2007, which have contributed to a more difficult competitive environment.*

9    > To better align our company with the market environment, we announced on
   > February 5, 2008 our commitment to implement a cost reduction plan that will

10   > include reducing our global workforce by approximately 14%.

11   259.    Additionally, the Form 10-K further admitted:

12   > If we are unable to manufacture our products efficiently, our operating results could
   > suffer.

13

   > We have also experienced and may continue to experience difficulties in expanding
14   > our operations to manufacture our complex products in volume on time and at
   > acceptable cost. For example, while we have successfully qualified and delivered

15   > certain Harmony-based wafer probe cards to some of our customers and reduced
   > manufacturing lead times, we are experiencing new product ramp challenges in

16   > connection with the manufacture of our Harmony architecture-based products, which
   > as resulted in missed opportunities with customers. As a further example, despite

17   > brining on line our new manufacturing facility in early 2006, we experienced
   > difficulties in fulfilling all of our customers' orders in a timely fashion. Any

18   > continued difficulties could cause additional product delivery.

19   260.    During the Company's April 29, 2008 conference call, the Company disclosed the

20   aftermath of its mis-execution of the ramp up of Harmony. (Ex. 45) Defendant Khandros admitted:

21   > [I]n Q4 and Q1, most of our focus was to make sure that we can solve all the of ramp
   > issues and the product can be shipped. When this is achieved, we will end up with a

22   > product which is not fully optimized on the cost, and now we're working pretty
   > heartily on that to optimize the cost structure.

23

24   261.    During the July 30, 2008 conference call, the Company also admitted to Harmony

   manufacturing issues that resulted in a large quantity of product returns post-Class Period. (Ex. 48)
25
   In response to an analyst's question about product return issues due to overheating, FormFactor's
26
   current CEO Ruscev responded:
27

28   > I'll just go back a few quarters. Just to remind everybody, unfortunately, we had
   > difficulty to manufacture this Harmony in 2007. There have been some very large

PLAINTIFFS' SECOND AMENDED COMPLAINT - C-07-05545-SI            - 92 -

1    activity done in late 2007 to solve it.  This had been solved, and basically this
2    resulted in Q1 us shipping a pretty large amount of Harmony to our customer.

## VIII.    LOSS CAUSATION/ECONOMIC LOSS

262.    During the Class Period, as detailed above, defendants engaged in a fraudulent

scheme to deceive the market. The scheme included a course of conduct that artificially inflated

FormFactor's stock price and operated as a fraud or deceit on Class Period purchasers of FormFactor

securities by misrepresenting the Company's current operations, business success and future

business prospects.  Later, however, when defendants' prior misrepresentations and fraudulent

conduct could no longer be explained away, or concealed, some, but not all, of FormFactor's true

condition began to be revealed to the market.  FormFactor's stock price declined and the amount of

artificial inflation also began to come out of the Company's stock price.  As a result, class members

who purchased FormFactor stock during the Class Period suffered economic loss, *i.e.*, damages,

under the federal securities laws.

263.    Defendants' false and misleading statements and omissions caused and maintained

the artificial inflation in FormFactor's stock price throughout the Class Period.  As explained above,

defendants falsely represented that the Company was doing well in the development and ramping up

its Harmony development and production when they knew that the Company was having severe

development and production issues, including the inability to manufacture and deliver volume

Harmony products on time.  As explained above, defendants falsely represented that FormFactor

would expect significant revenue growth by selling Harmony products when they knew there were

undisclosed problems with the development of Harmony at every stage that delayed their production,

including chronic and persistent poor yields that led to delaying volume production and shipment to

customers, and accumulation of worthless scrap that increased the operating margin and cost of

revenue.  As alleged above, defendants also falsely represented FormFactor's reported financials,

including improperly accounting for inventory valuation.  They also knew FormFactor was not

counting scrap from the failed yields as obsolete inventory, not writing off obsolete inventory as

COGS and, thus, manipulating the Company's reported inventory, cost of revenue, gross margin and

net income.  As detailed above, during the Class Period, defendants caused FormFactor to report

1    materially false and misleading financial results and falsely represented that the Company's financial

2    reporting controls were effective when in fact there were numerous material weaknesses in all

3    aspects of the Company's operations that were causing FormFactor to report false and misleading

4    financial results.  Defendants' false and misleading statements and omissions had the intended effect

5    and caused FormFactor's stock to trade at artificially inflated prices throughout the Class Period,

6    reaching as high as $49.45 per share.

7        264.    In February 2006, upon the Company's announcement that it had a stellar record in

8    2005 and anticipated a greater year in 2006 with the ramp up of the Harmony products with the

9    volume production for the first Harmony probe card in the second half of 2006, the market flocked

10   to buy FormFactor shares, causing the stock to jump over 20% in one-day volume.  By comparison,

11   the NASDAQ and the Russell Index dropped 1.255% and .980%, respectively, on the same day.

12       265.    On June 6, 2006, the Company introduced its Harmony based OneTouch probe card

13   used in 300-mm Flash memory production.  On July 27, 2006, the Company issued a press release

14   entitled: "FormFactor, Inc. Announces 2006 Second Quarter Financial Results; Record Quarterly

15   Revenues of $92.4 Million, Up 77% Year Over Year."  (Ex. 13)  Following the July 27, 2006

16   conference call and the issuance of Form 10-Q for 2Q 2006, based on the representations made by

17   defendants regarding the Harmony products and the expected revenue growth expected from

18   Harmony, FormFactor's stock price jumped over 16%, from $35.40 per share to $42.25 per share, in

19   one trading day, with more than 2.8 million shares in trading volume.  Analysts highlighted

20   FormFactor's purported strong competitive edge, including its technology leadership and new

21   product offerings, including the Harmony line that would address the Flash memory market by

22   offering one-touchdown testing capability.  *See, e.g*, Needham's August 21, 2006 analyst report.

23   (Ex. 15)  The stock continued to trade at over $40.00 per share, with a Class Period high of $49.45

24   per share on August 30, 2006.  While FormFactor's stock jumped from $37.48 per share to $49.45

25   per share between July 26, 2007 and August 30, 2007, a 24.2% increase, by comparison the

26   NASDAQ increased 5.29% while the Russell Index increased 6.83% during the same time frame.

27       266.    On September 20, 2006, following the disclosures regarding a competitor's

28   announcement that the short term demand for advanced probe cards in the NAND and DRAM

1  industries may not be as strong as previously projected and increasing competitive evaluations at

2  major probe card customers, FormFactor's stock price took a hit, dropping over $5.00 per share in

3  one day, 11.195%, and closing at $41.09 per share.  By comparison, the NASDAQ and the Russell

4  Index dropped only .672% and 1.52%, respectively, on the same day.

5        267.    The next month, following an October 25, 2006 earnings release and conference call

6  with the Company's disclosure that its volume shipments for NAND Flash market did not occur

7  during 3Q 2006 as previously promised, FormFactor's shares dropped another 9% from $42.91 per

8  share to $38.95 per share, and four million shares were traded in a single day.  By comparison, the

9  NASDAQ increased .955% while the Russell Index increased 1.564% on the same day.

10  FormFactor's stock price remained mainly below $40.00 per share the next few months as the

11  market closely watched FormFactor's development and bookings for Harmony products.  Analysts

12  took note of the market's reaction to FormFactor's ability to ramp up and volume ship its Harmony

13  products, and several analysts recommended investors to hold on the stock, pending FormFactor's

14  ability to demonstrate that its Harmony products could, in fact, generate revenue for the Company.

15  Indeed, several analysts cautioned investors to take a "wait-and-see" attitude, pending FormFactor's

16  actual delivery of the Harmony product that it had promised.

17        268.    On January 31, 2007, in addition to releasing its 4Q 2006 and FY 2006 financial

18  results, FormFactor announced during a conference call that it started volume shipping its Harmony

19  NAND Flash product to customers.  The Company also issued a separate press release announcing

20  that Hynix placed a multi-million dollar order for FormFactor's Harmony OneTouch probe cards for

21  Flash memory production, to be shipped to Hynix starting in 1Q 2007.  According to the press

22  release, FormFactor was chosen from among several probe card suppliers for this volume order due

23  to the high quality, performance and reliability of FormFactor's advanced wafer probe card

24  solutions.  The announcement concerning the Hynix order removed some of the concerns that the

25  market had regarding whether FormFactor was capable of actually delivering a Harmony product.

26  The market reacted with more than 3.7 million shares exchanged in trading volume and with a 9.8%

27  jump in stock price in one day, closing at $44.65 per share on February 1, 2007.  The stock

28

1  continued to trade at an inflated price of over $40.00 per share for the next few months, and hovered

2  between $37.72 per share and $47.47 per share between February and October 24, 2007.

3      269.    On October 24, 2007, defendants were forced to publicly disclose that FormFactor

4  would be restating its financial statements, causing its stock to drop to $35.54 per share.  As a direct

5  result of defendants' admissions and the public revelations regarding the truth about FormFactor's

6  misstatement of its financial results, including its overvaluation of inventory and its actual business

7  prospects going forward, FormFactor's stock price plummeted 20%, falling from $46.72 per share

8  on October 2, 2007 to $35.54 per share on October 25, 2007 – a drop of $11.18 per share.  This drop

9  began to remove the inflation from FormFactor's stock price, causing real economic loss to investors

10  who had purchased the stock during the Class Period.

11      270.    On February 5, 2008, the Company announced its 4Q 2007 and FY 2007 financial

12  results, which widely missed its previous guidance.  The Company also gave a bleak guidance for

13  FY 2008, as a result of lost DRAM market share driven by DRAM industry weakness and Harmony

14  DRAM production issues.  Specially, the Company belatedly disclosed during the February 5, 2008

15  conference call that "our new product ramp challenges with Harmony resulted in missed

16  opportunities with a few customers causing the majority of the overall revenue shortfall in the

17  quarter. . . .  Due primarily to the market conditions as well as the delay in the Harmony RAM,

18  FormFactor's RAM bookings declined significantly.  Our focus going forward has shifted to demand

19  generation side of the equation as we work to regain our loss position with DRAM customers who

20  could not wait for our Harmony products." (Ex. 39)  The Company finally acknowledged that its

21  problems were related to its longstanding manufacturing problems.  "Due to the protracted Harmony

22  ramp issues we experienced in 2007, FormFactor was not the first full wafer contactor probe card

23  company qualified at some DRAM suppliers.  This resulted in the loss of business in the fourth

24  quarter which we believe the competition picked up at lower end DRAM applications."  *Id.*  The

25  Company announced a cost reduction plan to cut its global workforce by approximately 14%.

26  FormFactor also announced that it would record charges in the range of $4-$5 million related to the

27  cost reduction plan, with the majority of the charges being recorded in 1Q 2008.  Upon these

28  announcements, FormFactor's stock price dropped 11.59%, from $26.23 per share to close on

1   February 5, 2008 at $23.19 per share, and continued to drop to $17.50 per share in the after market

2   hours.  The stock dropped another 9% the next day and closed at $21.06 per share at the end of

3   February 6, 2008.  The stock price continued to drop, trading below $20.00 per share following the

4   February 5, 2008 announcement, and has not rebounded since.  By comparison, the NASDAQ

5   dropped only 4.409% and the Russell Index dropped 5.87% during the February 5-6, 2008 time

6   frame.

7         271.    These partial disclosures on October 24, 2007 and February 5, 2008, caused

8   FormFactor's stock price to decline significantly more than the changes in the NASDAQ and the

9   Russell Index.  As a result, the price declines following the partial disclosures provide a measure of

10  class members' economic losses.

11        272.    The declines in FormFactor's stock price following the partial disclosures compared

12  to the changes in the NASDAQ and the Russell Index negate any inference the losses suffered by

13  class members were caused by changed market or industry conditions or Company – specific facts

14  unrelated to defendants' fraudulent conduct. The following chart illustrates the changes in

15  FormFactor's stock price during the Class Period compared to the NASDAQ and the Russell Index:

16

17

18

19

20

21

22

23

24

25

26

27

28



IX.  **COUNT I – For Violation of §10(b) of the 1934 Act and Rule 10b-5 Against All Defendants**

273.    Plaintiffs incorporate ¶¶1-272 by reference.

274.    During the Class Period, defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

275.    Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

(a)     employed devices, schemes and artifices to defraud;

(b)     made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

1      (c)    engaged in acts, practices and a course of business that operated as a fraud or

2  deceit upon plaintiffs and others similarly situated in connection with their purchases of FormFactor

3  common stock during the Class Period.

4      276.    Plaintiffs and the class have suffered damages in that, in reliance on the integrity of

5  the market, they paid artificially inflated prices for FormFactor common stock.  Plaintiffs and the

6  class would not have purchased FormFactor common stock at the prices they paid, or at all, if they

7  had been aware that the market prices had been artificially and falsely inflated by defendants'

8  misleading statements.

9  **X.    COUNT II – For Violation of §20(a) of the 1934 Act Against All Defendants**

10      277.    Plaintiffs incorporate ¶¶1-272 by reference.

11      278.    The individual defendants acted as controlling persons of FormFactor within the

12  meaning of §20(a) of the 1934 Act.  By reason of their positions with the Company, and their

13  ownership of FormFactor stock, the individual defendants had the power and authority to cause

14  FormFactor to engage in the wrongful conduct complained of herein.  FormFactor controlled the

15  individual defendants and all of its employees.  By reason of such conduct, all defendants are liable

16  pursuant to §20(a) of the 1934 Act.

17  **XI.    NO SAFE HARBOR EXISTS FOR DEFENDANTS' STATEMENTS**

18      279.    The statutory safe harbor provided for forward-looking statements under certain

19  circumstances does not apply to any of the allegedly false statements pleaded in this complaint.  The

20  specific statements pleaded herein either were not identified as "forward-looking statements" when

21  made or were not accompanied by meaningful cautionary statements identifying important factors

22  that could cause actual results to differ materially from those in the purportedly forward-looking

23  statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-

24  looking statements pleaded herein, defendants are liable for those false forward-looking statements

25  because at the time each of those forward-looking statements were made, the particular speaker

26  knew that the forward-looking statements were false, and/or the forward-looking statements were

27  authorized and/or approved by an executive officer of FormFactor who knew that those statements

28  were false when made.

1    **XII.    CLASS ACTION ALLEGATIONS**

2        280.    Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules

3    of Civil Procedure on behalf of all persons who purchased or otherwise acquired FormFactor

4    common stock during the Class Period (the "Class").  Excluded from the Class are defendants.

5        281.    The members of the Class are so numerous that joinder of all members is

6    impracticable.  The disposition of their claims in a class action will provide substantial benefits to

7    the parties and the Court.  FormFactor has more than 48 million shares of stock outstanding, owned

8    by hundreds if not thousands of persons.

9        282.    There is a well-defined community of interest in the questions of law and fact

10    involved in this case.  Questions of law and fact common to the members of the Class which

11    predominate over questions which may affect individual Class members include:

12                (a)    whether the 1934 Act was violated by defendants;

13                (b)    whether defendants omitted and/or misrepresented material facts;

14                (c)    whether defendants' statements omitted material facts necessary to make the

15    statements made, in light of the circumstances under which they were made, not misleading;

16                (d)    whether defendants knew or deliberately disregarded that their statements

17    were false and misleading;

18                (e)    whether the price of FormFactor's common stock was artificially inflated; and

19                (f)    the extent of damages sustained by Class members and the appropriate

20    measure of damages.

21        283.    Plaintiffs' claims are typical of those of the Class because plaintiffs and the Class

22    sustained damages from defendants' wrongful conduct.

23        284.    Plaintiffs will adequately protect the interests of the Class and have retained counsel

24    who are experienced in class action securities litigation.  Plaintiffs have no interests which conflict

25    with those of the Class.

26        285.    A class action is superior to other available methods for the fair and efficient

27    adjudication of this controversy.

28

PLAINTIFFS' SECOND AMENDED COMPLAINT - C-07-05545-SI                    - 100 -

1    **XIII.    PRAYER FOR RELIEF**

2         WHEREFORE, plaintiffs pray for judgment as follows:

3         A.    Declaring this action to be a proper class action pursuant to Fed. R. Civ. P. 23;

4         B.    Awarding plaintiffs and the members of the Class damages, including interest;

5         C.    Awarding plaintiffs reasonable costs and attorneys' fees; and

6         D.    Awarding such equitable/injunctive or other relief as the Court may deem just and

7    proper.

8    **XIV.    JURY DEMAND**

9         Plaintiffs demand a trial by jury.

10   DATED:  August 22, 2008              COUGHLIN STOIA GELLER
                                             RUDMAN & ROBBINS LLP
11                                        JEFFREY W. LAWRENCE
                                          SHIRLEY H. HUANG
12

13
                                          _____
14                                                  /s/
                                               SHIRLEY H. HUANG
15
                                          100 Pine Street, Suite 2600
16                                        San Francisco, CA  94111
                                          Telephone:  415/288-4545
17                                        415/288-4534 (fax)

18                                        Lead Counsel for Plaintiffs

19                                        SULLIVAN, WARD, ASHER & PATTON, P.C.
                                          CYNTHIA J. BILLINGS
20                                        25800 Northwestern Highway
                                          1000 Maccabees Center
21                                        Southfield, MI  48075-1000
                                          Telephone:  248/746-0700
22                                        248/746-2760 (fax)

23                                        Additional Counsel for Plaintiff

24

25   T:\CasesSF\FormFactor\CPT00052997_SAC.doc

26

27

28

1

<u>CERTIFICATE OF SERVICE</u>

2

      I hereby certify that on August 22, 2008, I electronically filed the foregoing with the Clerk of

3

the Court using the CM/ECF system which will send notification of such filing to the e-mail

4

addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I have

5

mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF

6

participants indicated on the attached Manual Notice List.

7

      I certify under penalty of perjury under the laws of the United States of America that the

8

foregoing is true and correct. Executed on August 22, 2008.

9

10

                      /s/
              SHIRLEY H. HUANG

11

12

        COUGHLIN STOIA GELLER
            RUDMAN & ROBBINS LLP

13

        100 Pine Street, 26th Floor
        San Francisco, CA  94111

14

        Telephone:  415/288-4545
        415/288-4534 (fax)

15

16

        E-mail:ShirleyH@csgrr.com

17

18

19

20

21

22

23

24

25

26

27

28

# Mailing Information for a Case 3:07-cv-05545-SI

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Ramzi Abadou**
  ramzia@csgrr.com,debh@csgrr.com

- **Shirley H. Huang**
  shirleyh@csgrr.com

- **Jeffrey W. Lawrence**
  jeffreyl@csgrr.com,e_file_sf@csgrr.com,e_file_sd@csgrr.com,GDarwish@csgrr.com

- **Alan R Plutzik**
  aplutzik@bramsonplutzik.com

- **Darren Jay Robbins**
  e_file_sd@csgrr.com

- **Arthur L. Shingler , III**
  ashingler@scott-scott.com,ssawyer@scott-scott.com

- **Robert P. Varian**
  rvarian@orrick.com,bclarke@orrick.com

- **Shawn A. Williams**
  shawnw@csgrr.com,travisd@csgrr.com,e_file_sf@csgrr.com,cwood@csgrr.com,e_file_sd@csgrr.com,aelishb@csgrr.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

```
Catherine J Kowalewski
Lerach Coughlin et al LLP
655 W Broadway #1900
San Diego, CA 92101

David C. Walton
Lerach Coughlin Stoia Geller Rudman & Robbins LLP
655 West Broadway
Suite 1900
San Diego, CA 92101-3301
```