Exhibit 30

# FORMFACTOR INC

Filing Type:  10-Q
Description:  N/A
Filing Date:  06/30/07

Ticker:  FORM
Cusip:  346375
State:  CA
Country:  US
Primary SIC:  3674
Primary Exchange:  NSD
Billing Cross Reference:
Date Printed:  01/17/08

# Table of Contents

*To jump to section, click on hypertexted page number*

## Filing Sections

Document ...................................................................................................................................................**1**
Base ...........................................................................................................................................................**1**
Cover Page.................................................................................................................................................**1**
Table of Contents .....................................................................................................................................**2**
Part I .........................................................................................................................................................**2**
Financial Statement Item .........................................................................................................................**3**
Financial Statements ................................................................................................................................**3**
Income Statement .....................................................................................................................................**3**
Balance Sheet ...........................................................................................................................................**3**
Cashflow Statement ..................................................................................................................................**4**
Financial Footnotes..................................................................................................................................**5**
Management Discussion ...........................................................................................................................**13**
Part II ........................................................................................................................................................**22**
Legal Proceedings.....................................................................................................................................**22**
Risk Factors ..............................................................................................................................................**22**
Submission to a Vote ................................................................................................................................**24**
Exhibits and Reports ................................................................................................................................**25**
List of Exhibits .........................................................................................................................................**25**
Signatures ..................................................................................................................................................**25**

## Exhibits

Exhibits......................................................................................................................................................**26**
Exhibit Index .............................................................................................................................................**26**
Material Contracts 10.01 ..........................................................................................................................**28**

UNITED STATES SECURITIES AND EXCHANGE
COMMISSION


Washington, D.C. 20549


Form 10-Q


(Mark one)

x       QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934
        For the quarterly period ended June 30, 2007
or
o       TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934
        For the transition period from            to


Commission file number: 000-50307


FormFactor, Inc.

(Exact name of registrant as specified in its charter)


DELAWARE                        13-3711155
(State or other jurisdiction of (I.R.S. Employer
incorporation or organization)  Identification No.)


7005 Southfront Road, Livermore, California 94551

(Address of principal executive offices, including zip code)


(925) 290-4000

(Registrant's telephone number, including area code)
--------------------------------------------------------------------------------

Indicate by check mark whether the registrant (1) has filed all reports
required to be filed by Section 13 or 15(d) of the Securities Exchange Act of
1934 during the preceding 12 months (or for such shorter period that the
registrant was required to file such reports), and (2) has been subject to such
filing requirements for the past 90 days.   Yes x  No o


Indicate by check mark whether the registrant is a large accelerated filer, an
accelerated filer, or a non-accelerated filer. See definition of "accelerated
filer and large accelerated filer" in Rule 12b-2 of the Exchange Act. (Check
one):

Large accelerated filer x Accelerated filer o Non-accelerated filer o

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).  Yes o  No x

As of July 28, 2007, 48,016,014 shares of the registrant's common stock, par value $0.001 per share, were outstanding.

--------------------------------------------------------------------------------
FORMFACTOR, INC.

FORM 10-Q FOR THE QUARTERLY PERIOD ENDED JUNE 30, 2007

INDEX

Part I.  Financial Information
Item 1.  Financial Statements:
         Unaudited Condensed Consolidated Statements of Income for the three and six months ended June 30, 2007 and July 1, 2006.
         Unaudited Condensed Consolidated Balance Sheets as of June 30, 2007 and December 30, 2006.
         Unaudited Condensed Consolidated Statements of Cash Flows for the six months ended June 30, 2007 and July 1, 2006.
         Notes to Unaudited Condensed Consolidated Financial Statements
Item 2.  Management's Discussion and Analysis of Financial Condition and Results of Operations
Item 3.  Quantitative and Qualitative Disclosures About Market Risk
Item 4.  Controls and Procedures
Part II. Other Information
Item 1.  Legal Proceedings
Item 1A. Risk Factors
Item 4.  Submission of Matters to a Vote of Security Holders
Item 6.  Exhibits
Signature
Exhibit Index

2

--------------------------------------------------------------------------------

PART I. FINANCIAL INFORMATION

Item 1. Financial Statements

FORMFACTOR, INC.

CONDENSED CONSOLIDATED STATEMENTS OF INCOME
(In thousands, except per share amounts)
(Unaudited)

| | Three Months Ended | | Six Months Ended | |
| --- | --- | --- | --- | --- |
| | June 30, 2007 | July 1, 2006 | June 30, 2007 | July 1, 2006 |
| Revenues | $ 114,124 | $ 92,433 | $ 216,395 | $ 173,763 |
| Cost of revenues | 53,663 | 43,707 | 102,230 | 84,207 |
| Gross margin | 60,461 | 48,726 | 114,165 | 89,556 |
| Operating expenses: | | | | |
| Research and development | 14,384 | 11,627 | 28,485 | 21,403 |
| Selling, general and administrative | 23,056 | 17,965 | 45,984 | 33,713 |
| Total operating expenses | 37,440 | 29,592 | 74,469 | 55,116 |
| Operating income | 23,021 | 19,134 | 39,696 | 34,440 |
| Interest income | 5,557 | 3,889 | 11,001 | 5,711 |
| Other income (expense), net | (61 ) | 327 | (181 ) | (14 ) |
| Income before income taxes | 28,517 | 23,350 | 50,516 | 40,137 |
| Provision for income taxes | 9,867 | 8,069 | 17,034 | 14,088 |
| Net income | $ 18,650 | $ 15,281 | $ 33,482 | $ 26,049 |
| Net income per share: | | | | |
| Basic | $ 0.39 | $ 0.33 | $ 0.70 | $ 0.60 |
| Diluted | $ 0.38 | $ 0.32 | $ 0.68 | $ 0.57 |
| Weighted-average number of shares used in per share calculations: | | | | |
| Basic | 47,893 | 45,920 | 47,639 | 43,730 |
| Diluted | 49,516 | 48,165 | 49,289 | 45,792 |

The accompanying notes are an integral part of these condensed consolidated
financial statements.

3

--------------------------------------------------------------------------------

FORMFACTOR, INC.

CONDENSED CONSOLIDATED BALANCE SHEETS
(In thousands, except share and per share amounts)
(Unaudited)

|  | June 30, 2007 | December 30, 2006 |
|---|---|---|
| ASSETS | | |
| Current assets: | | |
| Cash and cash equivalents | $ 286,610 | $ 284,131 |
| Marketable securities | 239,588 | 208,263 |
| Accounts receivable | 78,575 | 54,571 |
| Inventories | 32,004 | 24,778 |
| Deferred tax assets | 12,569 | 12,500 |
| Prepaid expenses and other current assets | 14,319 | 12,138 |
| Total current assets | 663,665 | 596,381 |
| Restricted cash | 2,250 | 2,250 |
| Property and equipment, net | 112,352 | 94,064 |
| Deferred tax assets | 6,913 | 4,689 |
| Other assets | 1,612 | 945 |
| Total assets | $ 786,792 | $ 698,329 |
| LIABILITIES AND STOCKHOLDERS' EQUITY | | |
| Current liabilities: | | |
| Accounts payable | $ 39,055 | $ 31,273 |
| Accrued liabilities | 27,498 | 28,334 |
| Income taxes payable | 5,316 | 8,264 |
| Deferred rent | 447 | 448 |
| Deferred revenue and customer advances | 6,371 | 7,273 |
| Total current liabilities | 78,687 | 75,592 |
| Long term income taxes payable | 11,239 | -- |
| Deferred rent and other long term liabilities | 5,435 | 5,125 |
| Total liabilities | 95,361 | 80,717 |
| Commitments and contingencies (Note 9) | | |
| Stockholders' equity: | | |
| Preferred Stock, $0.001 par value: | | |
| 10,000,000 shares authorized; no shares issued and outstanding at June 30, 2007 and December 30, 2006, respectively | -- | -- |
| Common stock, $0.001 par value: | | |
| 250,000,000 shares authorized; 47,993,399 and 46,861,334 shares issued and outstanding at June 30, 2007 and December 30, 2006, respectively | 48 | 47 |
| Additional paid-in capital | 545,545 | 504,709 |
| Accumulated other comprehensive loss | (744 ) | (244 ) |
| Retained earnings | 146,582 | 113,100 |
| Total stockholders' equity | 691,431 | 617,612 |
| Total liabilities and stockholders' equity | $ 786,792 | $ 698,329 |

The accompanying notes are an integral part of these condensed consolidated financial statements.

4

--------------------------------------------------------------------------------

FORMFACTOR, INC.

CONDENSED CONSOLIDATED STATEMENTS OF CASH FLOWS
(In thousands)
(Unaudited)

| | Six Months Ended | |
| --- | --- | --- |
| | June 30, 2007 | July 1, 2006 |
| Cash flows from operating activities: | | |
| Net income | $ 33,482 | $ 26,049 |
| Adjustments to reconcile net income to net cash provided by (used in) operating activities: | | |
| Depreciation and amortization | 12,616 | 10,436 |
| Stock-based compensation expense | 14,103 | 9,039 |
| Deferred income taxes | (2,307 ) | (2,013 ) |
| Excess tax benefits from equity based compensation plans | (5,470 ) | (6,559 ) |
| Provision for excess and obsolete inventories | 5,779 | 6,084 |
| Loss on disposal of equipment | 283 | 30 |
| Changes in assets and liabilities: | | |
| Accounts receivable | (24,004 ) | (909 ) |
| Inventories | (13,219 ) | (11,174 ) |
| Prepaid expenses and other current assets | (2,227 ) | (4,544 ) |
| Other assets | (499 ) | (294 ) |
| Accounts payable | 9,625 | 2,844 |
| Accrued liabilities | (2,491 ) | 4,956 |
| Income taxes payable | 15,132 | 5,881 |
| Deferred rent | 102 | (401 ) |
| Deferred revenues and customer advances | (902 ) | 1,910 |
| Net cash provided by operating activities | 40,003 | 41,335 |
| Cash flows from investing activities: | | |
| Acquisition of property and equipment | (30,641 ) | (18,605 ) |
| Purchase of marketable securities | (120,192 ) | (124,853 ) |
| Proceeds from maturities and sales of marketable securities | 87,718 | 143,774 |
| Net cash provided by (used in) investing activities | (63,115 ) | 316 |
| Cash flows from financing activities: | | |
| Proceeds from issuance of common stock | 20,112 | 190,826 |
| Excess tax benefits from equity based compensation plans | 5,470 | 6,559 |
| Net cash provided by financing activities | 25,582 | 197,385 |
| Effect of exchange rate changes on cash and cash equivalents | 9 | 85 |
| Net increase in cash and cash equivalents | 2,479 | 239,121 |
| Cash and cash equivalents, beginning of the period | 284,131 | 31,217 |
| Cash and cash equivalents, end of the period | $ 286,610 | $ 270,338 |
| Supplemental disclosure of significant non-cash investing activities: | | |
| Purchases of property and equipment through accounts payable and accrued liabilities | $      142 | $   1,868 |

The accompanying notes are an integral part of these condensed consolidated
financial statements.

5

--------------------------------------------------------------------------------

FORMFACTOR, INC.

NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS (Unaudited)

Note 1 -- Basis of Presentation

Basis of presentation. The accompanying unaudited condensed consolidated financial statements of FormFactor, Inc. and its subsidiaries (the "Company") have been prepared in accordance with accounting principles generally accepted in the United States of America and pursuant to the instructions to Form 10-Q and Article 10 of Regulation S-X of the Securities and Exchange Commission (the "SEC"). Accordingly, the interim financial statements do not include all of the information and footnotes required by generally accepted accounting principles for annual financial statements. In the opinion of management, all adjustments (consisting only of normal recurring adjustments) considered necessary for a fair statement have been included. Operating results for the three and six months ended June 30, 2007 are not necessarily indicative of the results that may be expected for the year ending December 29, 2007, or for any other period. The balance sheet at December 30, 2006 has been derived from the audited consolidated financial statements at that date but does not include all of the information and footnotes required by accounting principles generally accepted in the United States of America for complete financial statements. These financial statements and notes should be read with the consolidated financial statements and notes thereto for the year ended December 30, 2006 included in the Company's Annual Report on Form 10-K filed with the SEC.

Fiscal Year. The Company operates on a 52/53 week fiscal year, whereby the year ends on the Saturday nearest December 31. Fiscal year 2007 will end on December 29, 2007, and will consist of 52 weeks.

Note 2 -- Significant Accounting Policies

The Company's significant accounting policies are disclosed in the Company's Annual Report on Form 10-K for the year ended December 30, 2006. The Company adopted the provisions of Financial Accounting Standards Board ("FASB") Interpretation No. 48, "Accounting for Uncertainty in Income Taxes -- An Interpretation of FASB Statement No. 109," ("FIN 48") as of the first day of the first quarter of fiscal 2007.  The Company has not otherwise materially changed its significant accounting policies.

Income Taxes

The Company adopted FIN 48 on December 31, 2006, the first day of the first quarter of fiscal 2007.  FIN 48 prescribes a recognition threshold and measurement attribute for the financial statement recognition and measurement of a tax position taken or expected to be taken in a tax return that results in a tax benefit. Additionally, FIN 48 provides guidance on de-recognition, statement of operations classification of interest and penalties, accounting in interim periods, disclosure, and transition.  As a result of the implementation of FIN 48, the Company's tax assets and liabilities did not differ from the assets and liabilities before adoption therefore, the Company did not record any cumulative effect adjustment as of the adoption date.  See Note 8 - Income Taxes for additional information.

Note 3 -- Departure of Executive Officer

On January 30, 2007, the Company entered into a Separation Agreement and General Release (the "Separation Agreement") with its former President and member of Office of Chief Executive, Joseph R. Bronson, who resigned from the Company effective January 5, 2007. Mr. Bronson also resigned from the Board of Directors of the Company effective January 5, 2007.

In the first quarter of fiscal 2007, in conjunction with the Separation Agreement, the Company recorded a charge of approximately $1.8 million consisting primarily of a $400,000 severance payment and approximately $1.4 million in stock-based compensation resulting from the accelerated vesting of a portion of his unvested stock options and all of his remaining unvested restricted stock units.

Note 4 -- Inventories

Inventories are stated at the lower of cost (principally standard cost which approximates actual cost on a first-in, first-out basis) or market value. Adjustments for potential excess and obsolete inventory are made based on management's analysis of inventory levels and future sales forecasts.  Once the value is adjusted, the original cost of the Company's inventory less the

6

--------------------------------------------------------------------------------

related inventory write-down represents the new cost basis of such products. Reversal of these write-downs is recognized only when the related inventory has been scrapped or sold.

Inventories consisted of the following:

|  | June 30, 2007 | December 30, 2006 |
|---|---|---|
|  | (In thousands) |  |
| Raw materials | $ 16,347 | $ 11,975 |
| Work-in-progress | 11,301 | 10,465 |
| Finished goods | 4,356 | 2,338 |
|  | $ 32,004 | $ 24,778 |

Note 5 -- Warranty

The Company offers warranties on its products, other than certain evaluation and early adopter products that are sold without warranty, and records a liability for the estimated future costs associated with customer warranty claims, which is based upon historical experience and the Company's estimate of the level of future costs. Warranty costs are reflected in the consolidated income statement as a cost of revenues. A reconciliation of the changes in the Company's warranty liability (included in accrued liabilities) for the three and six months ended June 30, 2007 and July 1, 2006, respectively, follows:

|  | Three Months Ended | | Six Months Ended | |
|---|---|---|---|---|
|  | June 30, 2007 | July 1, 2006 | June 30, 2007 | July 1, 2006 |
|  | (In thousands) | | | |
| Warranty accrual beginning balance | $ 822 | $ 498 | $ 778 | $ 511 |
| Accrual for warranties issued during the period | 1,795 | 824 | 2,634 | 1,050 |
| Settlements made during the period | (1,477 ) | (310 ) | (2,272 ) | (549 ) |
| Warranty accrual ending balance | $ 1,140 | $ 1,012 | $ 1,140 | $ 1,012 |

Note 6 -- Stock-Based Compensation

The Company recorded stock-based compensation for the six months ended June 30, 2007 and July 1, 2006 as follows:

|  | Three Months Ended | | Six Months Ended | |
|---|---|---|---|---|
|  | June 30, 2007 | July 1, 2006 | June 30, 2007 | July 1, 2006 |
|  | (In thousands, except per share data) | | | |
| Stock-based compensation expense by type of award: |  |  |  |  |
| Employee stock options (1) | $ 5,844 | $ 4,208 | $ 11,439 | $ 8,477 |
| Employee stock purchase plan | 713 | 469 | 1,603 | 940 |
| Restricted stock units (2) | 32 | 92 | 848 | 184 |
| Net change in amounts capitalized as inventory | (165 ) | (102 ) | 213 | (562 ) |
| Total stock-based compensation | $ 6,424 | $ 4,667 | $ 14,103 | $ 9,039 |

--------------------------------------------------------------------------------

(1)      The six months ended June 30, 2007 includes approximately $575,000 in stock-based compensation resulting from the acceleration of the vesting of a portion of the Company's former President's stock options in conjunction with his Separation Agreement  (See Note 3 - Departure of Executive Officer).

(2)      The six months ended June 30, 2007 includes approximately $798,000 in stock-based compensation resulting from the acceleration of the Company's former President's remaining unvested restricted stock units in conjunction with his Separation Agreement  (See Note 3 - Departure of Executive Officer).

7

--------------------------------------------------------------------------------

Equity Incentive Plans

The Company has four incentive plans: 1996 Stock Option Plan, Incentive Option Plan and Management Incentive Option Plan (collectively, the "Plans") and 2002 Equity Incentive Plan ("2002 Plan"), which became effective in June 2002. As a result of the effectiveness of the 2002 Plan, the Company ceased granting any options under the Plans.

Stock Options

The following weighted average assumptions were used in the estimated grant-date fair value calculations using the Black-Scholes option pricing model for stock options for the three and six months ended June 30, 2007 and July 1, 2006, respectively:

|  | Three Months Ended | | Six Months Ended | |
|  | June 30, 2007 | July 1, 2006 | June 30, 2007 | July 1, 2006 |
|---|---|---|---|---|
| Stock Options: |  |  |  |  |
| Dividend yield | -- | -- | -- | -- |
| Expected volatility | 44.0 % | 50.2 % | 44.3 % | 49.9 % |
| Risk-free interest rate | 4.63 % | 4.98 % | 4.63 % | 4.91 % |
| Expected life (in years) | 4.70 | 4.70 | 4.71 | 4.82 |

Stock option activity under the Plans and the 2002 Plan is set forth below:

|  | Shares Available | Options Outstanding | Weighted- Average Exercise Price |
|---|---|---|---|
|  | (In thousands, except share and per share data) | | |
| Balances, December 30, 2006 | 3,390,293 | 7,118,946 | $ 24.39 |
| Additional shares reserved | 2,342,743 | -- | -- |
| Options granted | (1,314,418 ) | 1,314,418 | 41.82 |
| Options exercised | -- | (987,182 ) | 17.21 |
| Options forfeited | 403,926 | (403,926 ) | 31.02 |
| Balances, June 30, 2007 | 4,822,544 | 7,042,256 | $ 28.27 |

Restricted Stock Units

Restricted stock units are converted into shares of the Company's common stock upon vesting on a one-for-one basis. The vesting of restricted stock units is subject to the employee's continuing service to the Company. The cost of these awards is determined using the fair value of the Company's common stock on the date of the grant, and compensation cost is recognized over the vesting period. Restricted stock units generally vest over four years.

Activity of the restricted stock units under the 2002 Plan during the six months ended June 30, 2007 is set forth below:

|  | Units | Weighted Average Grant Date Fair Value |
|---|---|---|
| Restricted stock units at December 30, 2006 | 37,324 | $ 25.46 |
| Vested (1) | (28,824 ) | 26.02 |
| Restricted stock units at June 30, 2007 | 8,500 | $ 23.56 |

-------------------------------------------------------------------------------

(1)  In January 2007, 9,608 shares of the former President's restricted stock units vested.  The remaining 19,216 shares of restricted stock units vested on an accelerated basis under the Separation Agreement with the former President (See Note 3 - Departure of Executive Officer).

8

-------------------------------------------------------------------------------

Employee Stock Purchase Plan

The 2002 Employee Stock Purchase Plan (the "ESPP") provides that eligible employees may contribute up to 15% of their eligible earnings toward the semi-annual purchase of the Company's common stock. Under the ESPP, employees may purchase the Company's common stock through payroll deductions at a price equal to 85% of the lower of the fair market value at the beginning of the applicable offering period or at the end of each applicable purchase period. Each offering period has generally been two years in length, consisting of four six month purchase periods. Effective from February 1, 2007, the new offering periods under the ESPP are a 12 month fixed offering period commencing on February 1 of each calendar year and ending on January 31 of the subsequent calendar year, and a six month fixed offering period commencing on August 1 of each calendar year and ending on January 31 of the subsequent calendar year. The 12 month offering period consists of two six month purchase periods and the six month offering period consists of one six month purchase period. During the six months ended June 30, 2007 and July 1, 2006, 122,533 shares and 95,012 shares, respectively, were issued under the ESPP. As of June 30, 2007, the Company had $0.8 million of total unrecognized deferred stock-based compensation related to ESPP grants, which will be recognized over the weighted average period of 0.7 years. Compensation expense is calculated using the fair value of the employees' purchase rights under the Black-Scholes model.

Note 7 -- Net Income per Share

Basic net income per share is computed by dividing net income by the weighted-average number of common shares outstanding for the period. Diluted net income per share is computed giving effect to all potential dilutive common stock, including stock options, restricted stock units and common stock subject to repurchase.

A reconciliation of the numerator and denominator used in the calculation of basic and diluted net income per share follows (in thousands):

|  | Three Months Ended | | Six Months Ended | |
|  | June 30, 2007 | July 1, 2006 | June 30, 2007 | July 1, 2006 |
| Basic net income per share | | | | |
| Numerator: | | | | |
| Net income | $ 18,650 | $ 15,281 | $ 33,482 | $ 26,049 |
| Denominator: | | | | |
| Weighted-average common stock outstanding | 47,893 | 45,920 | 47,693 | 43,730 |
| Diluted net income per share | | | | |
| Numerator: | | | | |
| Net income | $ 18,650 | $ 15,281 | $ 33,482 | $ 26,049 |
| Denominator: | | | | |
| Weighted-average shares used in computing basic net income per share | 47,893 | 45,920 | 47,639 | 43,730 |
| Add: Dilutive potential common shares used in computing diluted net income per share | 1,623 | 2,245 | 1,650 | 2,062 |
| Weighted-average number of shares used in computing diluted net income per share | 49,516 | 48,165 | 49,289 | 45,792 |

The following outstanding options to purchase common stock were excluded from the computation of diluted net income per share as they had an antidilutive effect (in thousands):

|  | Three Months Ended | | Six Months Ended | |
|  | June 30, 2007 | July 1, 2006 | June 30, 2007 | July 1, 2006 |
| Options to purchase common stock | 3,080 | 1,720 | 2,749 | 2,013 |

Note 8 -- Income Taxes

On December 31, 2006, the Company adopted FIN 48. As a result of the implementation of FIN 48, the Company's tax assets and liabilities did not differ from the assets and liabilities before adoption, therefore, the Company did not record any adjustments as of the adoption date. In addition, consistent with the provisions of FIN 48, the Company reclassified $9.8

9

--------------------------------------------------------------------------------

million of income tax liabilities from current to non-current liabilities
because payment of cash is not anticipated within one year of the balance sheet
date and the Company is unable to make a reasonably reliable estimate when cash
settlement with a taxing authority will occur.  At the adoption date of
December 31, 2006, the Company had $16.7 million of total gross unrecognized
tax benefits. Of this total, $14.0 million (net of the federal benefit on state
issues) of unrecognized tax benefits would impact our effective tax rate if
recognized. At June 30, 2007, we added an additional $2.5 million gross
unrecognized tax benefit of which $2.3 million of unrecognized tax benefits
would impact our effective tax rate if recognized


The Company continues to recognize interest and penalties related to uncertain
tax positions in income tax expense.  Upon adoption the Company had
approximately $545,000 of accrued interest and $0 of penalties related to
uncertain tax positions.  As of June 30, 2007, the Company had approximately
$940,000 of accrued interest and $0 of penalties related to uncertain tax
positions.


The Company and its subsidiaries file income tax returns in the U.S. federal
jurisdiction, various states and non-U.S. jurisdictions.   The Company is no
longer subject to U.S. federal, state and local, or non-U.S. income tax
examinations by tax authorities for years prior to 2001.


The Company does not expect that the amounts of unrecognized tax benefits will
change significantly within the next 12 months.  Changes to the estimate would
be the result of audits or statute of limitation expirations, which are due to
expire but not anticipated to occur because we are scheduled for or currently
under audit by the relevant tax authorities in the U.S. and California.


Note 9 -- Commitments and Contingencies


Environmental Matters


The Company is subject to U.S. federal, state and local, and foreign
governmental laws and regulations relating to the protection of the
environment, including those governing the discharge of pollutants into the air
and water, the management and disposal of hazardous substances and wastes, the
clean-up of contaminated sites and the maintenance of a safe workplace. The
Company believes that it complies in all material respects with the
environmental laws and regulations that apply to the Company.  In fiscal 2006
and January 2007, the Company received a total of three notices from the City
of Livermore regarding violation of certain applicable discharge limits. For
each notice received, the Company promptly took appropriate steps to address
the violations noted. The Company is also implementing certain corrective
measures in consultation with the City of Livermore. In addition, the Company
and the City of Livermore are discussing the Company's purchase of additional
waste water discharge capacity, which the Company requires as a result of its
increased manufacturing capacity.  No provision has been made for loss from
environmental remediation liabilities associated with the Livermore sites,
because the Company believes that it is not probable that a liability has been
incurred as of June 30, 2007.


While the Company believes it is in compliance in all material respects with
the environmental laws and regulations that apply to the Company, in the future
the Company may receive additional environmental violation notices, and if
received, final resolution of the violations identified by these notices could
impact the Company's operations, which may adversely impact the Company's
operating results and cash flows.  New laws and regulations, stricter
enforcement of existing laws and regulations, the discovery of previously
unknown contamination at the Company's or others' sites or the imposition of
new cleanup requirements could  also adversely impact the Company's operations,
which may adversely impact its operating results and cash flows.


Legal Matters


From time to time, the Company may be subject to legal proceedings and claims
in the ordinary course of business. The Company was not involved in any
material legal proceedings, other than the patent litigation summarized below.
In the future, the Company may become a party to additional legal proceedings,
including proceedings designed to protect its intellectual property rights,
that require the Company to spend significant resources.


The Company is currently involved in certain patent-related litigation as part
of its ongoing efforts to protect the intellectual property embodied in its
proprietary technology, including its MicroSpring interconnect technology.
These litigations include two actions the Company filed in 2004 in Seoul
Southern District Court, located in Seoul, South Korea, against Phicom
Corporation, a Korean corporation, alleging infringement of the Company's
Korean Patent Nos. 252,457, entitled "Method of Fabricating Interconnections
Using Cantilever Elements and Sacrificial Substrates," 324,064, entitled


10

--------------------------------------------------------------------------------

"Contact Tip Structures for Microelectronic Interconnection Elements and Methods of Making Same", 278,342, entitled "Method of Altering the Orientation of Probe Elements in a Probe Card Assembly," and 399,210, entitled "Probe Card Assembly"; as well as two actions the Company filed in 2006 in Seoul Central District Court against Phicom alleging infringement of certain claims of the Company's Korean Patent No. 252,457, entitled "Method of Fabricating Interconnections Using Cantilever Elements and Sacrificial Substrates." These actions are all pending, except that the Seoul Central District Court has denied the Company's request for the issuance of preliminary injunctive relief in the Company's 2006 injunction action.

In response to the Company's infringement actions Phicom filed in the Korean Intellectual Property Office, or KIPO, invalidity actions challenging the validity of some or all of the claims of each of the Company's four patents at issue in the Seoul infringement actions. KIPO dismissed Phicom's challenges against all four of the patents-at-issue. Phicom appealed the dismissals of the challenges to the Korean Patent Court. The Korean Patent Court has issued rulings holding invalid certain claims of the Company's Korean Patent Nos. 278,342, 399,210, and 324,064, and also issued a ruling upholding the validity of the Company's Korean Patent No. 252,457. The Company has appealed the Patent Court invalidity rulings to the Korea Supreme Court and Phicom has appealed the Patent Court ruling upholding Korean Patent No. 252,457 patent to the Korea Supreme Court.

The Company has also initiated patent infringement litigation in the United States against certain third parties. In 2005, the Company filed a patent infringement lawsuit in the United States District Court for the District of Oregon against Phicom charging that it is willfully infringing four U.S. patents that cover key aspects of the Company's wafer probe cards--U.S. Patent Nos. 5,974,662, entitled "Method of Planarizing Tips of Probe Elements of a Probe Card Assembly", 6,246,247, entitled "Probe Card Assembly and Kit, and Methods of Using Same", 6,624,648, entitled "Probe Card Assembly" and 5,994,152, entitled "Fabricating Interconnects and Tips Using Sacrificial Substrates". In 2006, the Company also filed an amended complaint in the same Oregon District Court action that adds two additional patents to the litigation against Phicom--U.S. Patent Nos. 7,073,254, entitled "Method for Mounting a Plurality of Spring Contact Elements," and 6,615,485, entitled "Probe Card Assembly and Kit, And Methods of Making Same." Phicom has answered the complaint and the amended complaint by denying infringement, alleging defenses and asserting counterclaims seeking adjudications on the validity and enforceability of the Company's patents and whether Phicom is infringing the patents-in-issue. Also in 2006 the Company filed a patent infringement lawsuit in the United States District Court for the Northern District of California against Micronics Japan Co., Ltd. charging that it is willfully infringing four U.S. patents that cover key aspects of the Company's wafer probe cards--U.S. Patent Nos. 6,246,247, entitled "Probe Card Assembly and Kit, and Methods of Using Same", 6,624,648, entitled "Planarizer for a Semiconductor Contactor", 6,624,648, entitled "Probe Card Assembly" and 7,073,254, entitled "Method for Mounting a Plurality of Spring Contact Elements." Micronics Japan has answered the complaint by denying infringement, alleging defenses and asserting counterclaims seeking adjudications on the validity and enforceability of the Company's patents and whether Micronics Japan is infringing those patents.

Additionally, one or more third parties have initiated challenges in foreign patent offices against other of the Company's patents. These actions include proceedings filed in Korea against two of the Company's Korean patents and proceedings filed in Taiwan against four of the Company's Taiwan patents.

While the Company believes that it does not have a material monetary damages exposure in these various proceedings, it is possible the Company will incur material attorneys' fees in defending its intellectual property at issue in these challenges.

No provision has been made for patent-related litigation because the Company believes that it is not probable that a liability had been incurred as of June 30, 2007.

Indemnification Obligations

The Company from time to time in the ordinary course of its business enters into contractual arrangements with third parties that include indemnification obligations. Under these contractual arrangements, the Company has agreed to defend, indemnify and hold the third party harmless from and against certain losses. These arrangements may limit the time within which an indemnification claim can be made, the type of the claim and the total amount that the Company can be required to pay in connection with the indemnification obligation. In addition, the Company has entered into indemnification agreements with its directors and certain of its officers, and the Company's bylaws contain indemnification obligations in favor of the Company's directors, officers and agents. It is not possible to determine or reasonably estimate the maximum potential amount of future payments under these indemnification obligations due to the varying terms of such obligations, the history of prior indemnification claims and the unique facts and circumstances involved in each particular contractual arrangement and in each potential future claim for indemnification. The Company has not had any requests for indemnification under

11

--------------------------------------------------------------------------------

these arrangements. The Company has not recorded any liabilities for these indemnification arrangements on the Company's condensed consolidated balance sheet as of June 30, 2007.


Note 10 -- Stockholders' Equity


Comprehensive Income (Loss)


Comprehensive income (loss) includes foreign currency translation adjustments and unrealized gains (losses) on available-for-sale securities, the impact of which has been excluded from net income and reflected as components of stockholders' equity.


Components of comprehensive income were as follows:

|  | Three Months Ended | | Six Months Ended | |
|  | June 30, 2007 | July 1, 2006 | June 30, 2007 | July 1, 2006 |
|  | | (In thousands) | | |
| Net income | $ 18,650 | $ 15,281 | $ 33,482 | $ 26,049 |
| Change in unrealized gain (loss) on marketable securities | (534 ) | (240 ) | (437 ) | (523 ) |
| Cumulative translation adjustments | (66 ) | 113 | (63 ) | 75 |
| Comprehensive income | $ 18,050 | $ 15,154 | $ 32,982 | $ 25,601 |


Components of accumulated other comprehensive loss were as follows:

|  | June 30, 2007 | December 30, 2006 |
|  | (In thousands) | |
| Unrealized loss on marketable securities | $ (719 ) | $ (282 ) |
| Foreign currency translation adjustments | (25 ) | 38 |
| Accumulated other comprehensive loss | $ (744 ) | $ (244 ) |


Note 11 -- Derivative Financial Instruments


The Company purchases forward exchange contracts to hedge certain existing foreign currency exposures. These hedges do not qualify for hedge accounting treatment in accordance with the provisions of SFAS No. 133, "Accounting for Derivative Instruments and Hedging Activities." The Company recognizes gains or losses from the fluctuation in foreign exchange rates and the valuation of these hedge contracts in other expense. The Company does not use derivative financial instruments for trading or speculative purposes. As of June 30, 2007, the Company had one outstanding foreign exchange forward contract to sell 5,675,000,000 Japanese Yen on July 31, 2007 for $46,059,573 with a contract rate of 123.21. There were no unrealized gains or losses recorded at June 30, 2007.


Note 12 -- Recent Accounting Pronouncements


In May 2007, the FASB issued FASB Staff Position ("FSP") FIN No. 48-1, "Definition of "Settlement" in FASB Interpretation No. 48" ("FSP FIN No. 48-1"). FSP FIN No. 48-1 provides guidance on how a company should determine whether a tax position is effectively settled for the purpose of recognizing previously unrecognized tax benefits. FSP FIN No. 48-1 is effective upon initial adoption of FIN No. 48, which the Company adopted in the first quarter of fiscal 2007.


In February 2007, the FASB issued Statement of Financial Accounting Standards No. 159, "The Fair Value Option for Financial Assets and Financial Liabilities -- Including an Amendment of FASB Statement No. 115" which is effective for fiscal years beginning after November 15, 2007. This statement permits an entity to choose to measure many financial instruments and certain other items at fair value at specified election dates. Subsequent unrealized gains and losses on items for which the fair value option has been elected will be reported in earnings. The Company is currently evaluating the potential impact of this statement.


12

--------------------------------------------------------------------------------

In September 2006, the FASB issued SFAS No. 157, "Fair Value Measurements" ("SFAS No. 157"). SFAS No. 157 defines fair value, establishes a framework for measuring fair value in accordance with U.S. generally accepted accounting principles, and expands disclosures about fair value measurements. The changes to current practice resulting from the application of this statement relate to the definition of fair value, the methods used to measure fair value, and the expanded disclosures about fair value measurements. The provisions of this statement are to be applied prospectively as of the beginning of the fiscal year in which this statement is initially applied, with any transition adjustment recognized as a cumulative-effect adjustment to the opening balance of retained earnings. The provisions of SFAS No. 157 are effective for fiscal years beginning after November 15, 2007; therefore, the Company anticipates adopting this standard as of January 1, 2008.

Item 2. Management's Discussion and Analysis of Financial Condition and Results of Operations

Cautionary Statement Regarding Forward-Looking Statements

This Quarterly Report on Form 10-Q contains forward-looking statements within the meaning of the Securities Exchange Act of 1934 and the Securities Act of 1933, which are subject to risks, uncertainties and assumptions that are difficult to predict. The forward-looking statements include statements concerning, among other things, our business strategy, including anticipated trends and developments in and management plans for our business and the markets in which we operate, financial results, operating results, revenues, gross margin, operating expenses, products, projected costs and capital expenditures, research and development programs, sales and marketing initiatives, and competition. In some cases, you can identify these statements by forward-looking words such as "may," "might," "will," "could," "should," "expect," "plan," "anticipate," "believe," "estimate," "predict," "intend" and "continue," the negative or plural of these words and other comparable terminology.

The forward-looking statements are only predictions based on our current expectations and our projections about future events. All forward-looking statements included in this Quarterly Report are based upon information available to us as of the filing date of this Quarterly Report. You should not place undue reliance on these forward-looking statements. We undertake no obligation to update any of these statements for any reason. These forward-looking statements involve known and unknown risks, uncertainties and other factors that may cause our actual results, levels of activity, performance or achievements to differ materially from those expressed or implied by these statements. These factors include the matters discussed in the section titled "Risk Factors" in our Annual Report on Form 10-K for the year ended December 30, 2006, and in the section titled "Risk Factors" and elsewhere in this Quarterly Report. You should carefully consider the numerous risks and uncertainties described under these sections.

The following discussion and analysis should be read in conjunction with our condensed consolidated financial statements and the accompanying notes contained in this Quarterly Report. Unless expressly stated or the context otherwise requires, the terms "we," "our," "us" and "FormFactor" refer to FormFactor, Inc. and its subsidiaries.

Overview

We design, develop, manufacture, sell and support precision, high performance advanced semiconductor wafer probe cards. Semiconductor manufacturers use our wafer probe cards to perform wafer sort and test on the semiconductor die, or chips, on the whole semiconductor wafer, prior to singulation of the wafer into individual chips. During wafer probe test, a wafer probe card is mounted in a prober, which is in turn connected to a semiconductor tester, and the wafer probe card is used as an interface to connect electronically with and test individual chips on a wafer.  Our wafer probe cards are used by our customers in the front end of the semiconductor manufacturing process, as are our parametric or in-line probe cards, which are used in the front-end manufacturing process. At the core of our product offering are our proprietary technologies, including our MicroSpring interconnect technology and design processes. Our MicroSpring interconnect technology includes a resilient contact element manufactured at our production facilities in Livermore, California. We operate in a single industry segment and have derived our revenues primarily from the sale of wafer probe cards incorporating our MicroSpring interconnect technology.

We work closely with our customers to design, develop and manufacture custom wafer probe cards. Each wafer probe card is a custom product that is specific to the chip and wafer designs of the customer. Our customers, in turn, operate in the highly cyclical semiconductor industry and are subject to fluctuations in the demand for their products. Because of the nature of our customers and our business, our revenue growth is driven in significant part by the number of new semiconductor

13

--------------------------------------------------------------------------------

designs that our customers develop, the technology transitions involved in these designs and our customers' production volumes. In the past, this has resulted in our being subject to demand fluctuations that have resulted in significant variations of revenues, expenses and results of operations. We expect these fluctuations, and the resulting variations in our financial results, to continue in future periods.

Revenues.  We derive substantially all of our revenues from product sales of wafer probe cards. Wafer probe card sales, including service and non-recurring engineering revenue associated with wafer probe card sales, accounted for virtually all of our revenues in the first six months of fiscal 2007 and 2006. Revenues from licensing of our design and manufacturing technologies have historically been insignificant. Increases in revenues have resulted from increased demand for our existing products, the introduction of new, more complex products and the penetration of new markets. Revenues from our customers are subject to both quarterly, annual and other fluctuations due to design cycles, technology adoption rates and cyclicality of the different end markets into which our customers' products are sold.

Cost of Revenues.  Cost of revenues consists primarily of manufacturing materials, compensation and manufacturing-related overhead.  In addition, cost of revenues also includes costs related to the start up of our new manufacturing facility, which we completed in early 2006.  Our manufacturing operations rely upon a limited number of suppliers to provide key components and materials for our products, some of which are sole source. We order materials and supplies based on backlog and forecasted customer orders. Tooling and setup costs related to changing manufacturing lots at our suppliers are also included in the cost of revenues. We expense all warranty costs and inventory write-downs or write-offs as cost of revenues.

We design, manufacture and sell a fully custom product into the semiconductor test market, which is subject to significant variability and demand fluctuations. Our wafer probe cards are complex products that are custom to a specific chip design and must be delivered on relatively short lead-times as compared to our overall manufacturing process. As our advanced wafer probe cards are manufactured in low volumes and must be delivered on relatively short lead-times, it is not uncommon for us to acquire production materials and start certain production activities based on estimated production yields and forecasted demand prior to or in excess of actual demand for our wafer probe cards. We record an adjustment to our inventory valuation for estimated obsolete and non-saleable inventories equal to the difference between the cost of inventories and the estimated market value based upon assumptions about future demand. If actual market conditions are less favorable than those projected by management, additional inventory write downs would be required. Once established, the original cost of our inventory less the related inventory reserve represents the new cost basis of such products. Reversal of these write downs is recognized only when the related inventory has been scrapped or sold.

Research and Development.  Research and development expenses include expenses related to product development and design, engineering and material costs. Almost all research and development costs are expensed as incurred. We plan to continue to invest a significant amount in research and development activities to develop new technologies for current and new markets and new applications in the future, and to improve or advance existing technologies. We expect these expenses to scale with revenue growth.

Selling, General and Administrative.  Selling, general and administrative expenses include expenses related to sales, marketing, and administrative personnel, internal and outside sales representatives' commissions, market research and consulting, and other sales, marketing, and administrative activities. These expenses also include costs for enforcing our patent rights and regulatory compliance costs. We expect that selling expenses will increase as our revenues increase, and we expect that general and administrative expenses will increase in absolute dollars to support future revenue growth and our worldwide expansion.

Use of Estimates.  Our discussion and analysis of our financial condition and results of operations are based upon our unaudited condensed consolidated financial statements, which have been prepared in accordance with accounting principles generally accepted in the United States of America. The preparation of these financial statements requires us to make estimates and judgments that affect the reported amounts of assets, liabilities, revenues and expenses, and related disclosure of contingent assets and liabilities. On an on-going basis, we evaluate our estimates, including those related to uncollectible receivables, inventories, marketable securities, intangible assets, income taxes, warranty obligations, excess component and order cancellation costs, contingencies and litigation, and stock-based compensation.  Our estimates, which are based on historical experience and on various other assumptions believed to be reasonable under the circumstances, allow us to make judgments about the carrying values of assets and liabilities that are not readily apparent from other sources.

14

--------------------------------------------------------------------------------

Results of Operations

The following table sets forth our operating results as a percentage of
revenues for the periods indicated:

|  | Three Months Ended | | Six Months Ended | |
|  | June 30, 2007 | July 1, 2006 | June 30, 2007 | July 1, 2006 |
| --- | --- | --- | --- | --- |
| Revenues | 100.0 % | 100.0 % | 100.0 % | 100.0 % |
| Cost of revenues | 47.0 | 47.3 | 47.2 | 48.5 |
| Gross margin | 53.0 | 52.7 | 52.8 | 51.5 |
| Operating expenses: | | | | |
| Research and development | 12.6 | 12.6 | 13.2 | 12.3 |
| Selling, general and administrative | 20.2 | 19.4 | 21.2 | 19.4 |
| Total operating expenses | 32.8 | 32.0 | 34.4 | 31.7 |
| Operating income | 20.2 | 20.7 | 18.4 | 19.8 |
| Interest income | 4.9 | 4.2 | 5.1 | 3.3 |
| Other income (expense), net | (0.1 ) | 0.4 | (0.1 ) | (0.0 ) |
| Income before income taxes | 25.0 | 25.3 | 23.4 | 23.1 |
| Provision for income taxes | 8.6 | 8.8 | 7.9 | 8.1 |
| Net income | 16.4 % | 16.5 % | 15.5 % | 15.0 % |

Three and Six Months Ended June 30, 2007 and July 1, 2006

Revenues

|  | Three Months Ended | | | Six Months Ended | | |
|  | June 30, 2007 | July 1, 2006 | % Change | June 30, 2007 | July 1, 2006 | % Change |
| --- | --- | --- | --- | --- | --- | --- |
|  | (In thousands, except percentages) | | | | | |
| Revenues by Market: | | | | | | |
| DRAM | $ 80,120 | $ 67,269 | 19.1 % | $ 155,608 | 133,245 | 16.8 % |
| Flash | 20,171 | 17,565 | 14.8 | 36,872 | 24,572 | 50.1 |
| Logic | 13,833 | 7,599 | 82.0 | 23,915 | 15,946 | 50.0 |
| Total revenues | $ 114,124 | $ 92,433 | 23.5 % | 216,395 | 173,763 | 24.5 % |

Revenues increased 23.5% and 24.5% in the three and six months ended June 30,
2007 compared with the three and six months ended July 1, 2006. Volume
increases resulting from strong market demand for our advanced wafer probe
cards continued in the second quarter of fiscal 2007 due to a variety of
factors, including bit and design growth as semiconductor manufacturers
transition to 70 nanometer nodes and 1 Gb devices, combined with strong growth
in the demand for NOR flash memory by mobile device manufacturers.

Our revenues for the three and six months ended June 30, 2007 were primarily
generated by sales of wafer probe cards to manufacturers of DRAM devices. The
increase was driven by accelerated tooling cycles for probe cards as a result
of our customers' continued migration to 70 nanometer nodes to reduce their
cost of test and improve productivity, and by demand for 1 Gb devices.  The
increase in DRAM revenues was also attributable to seasonal strength in the
mobile DRAM business due to increased demand for mobile and consumer
applications. Approximately 76% and 66% of our DRAM revenues for the three and
six months ended June 30, 2007 were derived from 80 nanometer and below
technology products compared to 8% and 6% for the three and six months ended
July 1, 2006.

Revenues from sales to flash memory device manufacturers increased mainly due
to increased demand for our NOR flash wafer probe cards by a significant
customer whose high-volume ramp resulted from the growing demand for consumer
applications which utilize multi-chip packages.  Semiconductors that are
integrated into multi-chip packages often benefit from increased wafer level
testing to validate device performance before packaging.

Revenues from manufacturers of logic devices increased primarily due to a key
customer's ongoing transition to advanced technology nodes in both chipset
application and high performance flip chip microprocessors which are used in
personal computer, gaming and graphics applications.

15

--------------------------------------------------------------------------------

Revenue by Geographic Region

The following table sets forth our revenues by geographic region for the periods indicated.

| | Three Months Ended | | | | Six Months Ended | | | |
| | June 30, 2007 | % of Revenues | July 1, 2006 | % of Revenues | June 30, 2007 | % of Revenues | July 1, 2006 | % of Revenues |
|---|---|---|---|---|---|---|---|---|
| | (In thousands, except percentages) | | | | | | | |
| Japan | $ 49,129 | 43.0 % | $ 24,748 | 26.8 % | $ 77,220 | 35.7 % | $ 49,376 | 28.4 % |
| Asia Pacific | 36,949 | 32.4 | 33,081 | 35.8 | 71,960 | 33.2 | 60,878 | 35.0 |
| North America | 23,865 | 20.9 | 27,712 | 30.0 | 51,245 | 23.7 | 50,062 | 28.8 |
| Europe | 4,181 | 3.7 | 6,892 | 7.4 | 15,970 | 7.4 | 13,447 | 7.8 |
| Total revenues | $ 114,124 | 100.0 % | $ 92,433 | 100.0 % | $ 216,395 | 100.0 % | $ 173,763 | 100.0 % |

Geographic revenue information is based on the location to which we send the customer invoices. For example, certain Korean customers purchase through their North American subsidiaries and accordingly, revenues derived from sales to such customers are reflected in North America revenues.

The increase in Japan revenues for the three and six months ended June 30, 2007 as compared to the same period in the prior year was primarily due to increased mobile RAM demand directly related to implementation of 70 nanometer tooling cycles combined with increased growth in our customer base in our NOR flash and logic business. The increase in Asia Pacific was primarily due to growth in our business with Taiwan and Korean customers and their continued push for advanced probe card technology.  The decrease in revenues in North America for the three months ended June 30, 2007 compared to the same period in the prior year was primarily driven by decreased demand for NAND flash partially offset by increased demand for wafer probe cards used to test chips for consumer and mobile products.  North American revenues increased slightly for the six months ended June 30, 2007 as compared to the same periods in the prior year as a result of demand for wafer probe cards used to test chips for consumer and mobile products.  The decrease in revenues in Europe for the three months ended June 30, 2007 was primarily due to the decreased demand for one manufacturer's DRAM devices while the increase for the six months ended June 30, 2007 resulted from increased sales to a manufacturer of DRAM devices in this region.

The following customers accounted for more than 10% of our revenues for the three and six months ended June 30, 2007 and July 1, 2006:

| | Three Months Ended | | Six Months Ended | |
| | June 30, 2007 | July 1, 2006 | June 30, 2007 | July 1, 2006 |
|---|---|---|---|---|
| Elpida Memory | 29.8 % | 18.8 % | 24.7 % | 22.5 % |
| Hynix Semiconductor | 10.2 | * | 12.1 | * |
| Intel Corporation | 13.4 | 10.4 | 12.6 | 10.6 |
| PowerChip Semiconductor | 11.7 | 15.2 | * | 17.3 |
| Spansion | 12.4 | * | * | * |
| Micron Technologies | * | 11.1 % | * | * |

-------------------------------------------------------------------------------
* Less than 10% of revenues.

16

-------------------------------------------------------------------------------

Gross Margin

|  | Three Months Ended | | Six Months Ended | |
|  | June 30, 2007 | July 1, 2006 | June 30, 2007 | July 1, 2006 |
|  | (In thousands, except percentages) | | | |
| Gross margin | $ 60,461 | $ 48,726 | $ 114,165 | $ 89,556 |
| % of revenues | 53.0 % | 52.7 % | 52.8 % | 51.5 % |

Gross margin increased for the three and six months ended June 30, 2007
compared with the three and six months ended July 1, 2006 due to increased
revenues and direct labor and indirect labor productivity improvement. The
labor productivity improvement was partially offset by an increase in material
and warranty cost arising from the introduction of new product technology into
manufacturing.  In addition, gross margin improved as a result of a lower
inventory provision, which decreased to $5.8 million, or 2.7% of revenues
compared to $6.0 million or 3.5% of revenues for the six months ended June 30,
2007 and July 1, 2006, respectively.  The lower inventory provision were
primarily due to cycle time reductions, increase in yields and improvement in
our order fulfillment process.  Stock-based compensation expense increased $0.3
million and $1.4 million for the three and six months ended June 30, 2007
compared to the same period in the prior year due primarily to increased
headcount.

Research and Development

|  | Three Months Ended | | Six Months Ended | |
|  | June 30, 2007 | July 1, 2006 | June 30, 2007 | July 1, 2006 |
|  | (In thousands, except percentages) | | | |
| Research and development | $ 14,384 | $ 11,627 | $ 28,485 | $ 21,403 |
| % of revenues | 12.6 % | 12.6 % | 13.2 % | 12.3 % |

Research and development expenses increased in absolute dollars for the three
and six months ended June 30, 2007 as compared to the same periods in the prior
year primarily due to an increase in personnel costs and new technology and
product development related costs.  For the three and six months ended June 30,
2007, personnel costs increased $1.2 million and $2.7 million, respectively,
due to increased headcount while expenses related to new technology and product
development increased $1.4 million and $4.0 million, respectively . In
addition, stock-based compensation also increased $0.2 million and $0.4 million
for the same periods as a result of increased headcount. We are continuing the
development of our next generation parallelism architecture and products, fine
pitch memory and logic products, advanced MicroSpring interconnect technology
and new process technologies. We are also making incremental investments in new
technologies and products as we focus on new market opportunities.

Selling, General and Administrative

|  | Three Months Ended | | Six Months Ended | |
|  | June 30, 2007 | July 1, 2006 | June 30, 2007 | July 1, 2006 |
|  | (In thousands, except percentages) | | | |
| Selling, general and administrative | $ 23,056 | $ 17,965 | $ 45,984 | $ 33,713 |
| % of revenues | 20.2 % | 19.4 % | 21.2 % | 19.4 % |

Selling, general and administrative expenses increased in absolute dollars for
the three and six months ended June 30, 2007 compared to the same periods in
the prior year primarily due to increases in expenses related to personnel,
facilities expansion, outside legal services and travel.  For the three and six
months ended June 30, 2007 personnel related costs increased by approximately
$1.4 million and $4.6 million, respectively, primarily due to increased
headcount.  Facilities expansion costs for the same period increased $0.2
million and $0.7 million, respectively, while combined travel, outside legal
services incurred for protecting our intellectual property portfolio, and other
expenses increased by approximately $2.1 million and $3.7 million,
respectively.  In addition, stock-based compensation expense also increased
$1.3 million and $3.2 million for the three and six months ended June 30, 2007
primarily due to increased headcount and the one-time modification charge
incurred during the first quarter of fiscal 2007 resulting from the accelerated
vesting of unvested stock options and restricted stock units in conjunction
with the severance agreement of the Company's former President.

17

--------------------------------------------------------------------------------

Interest Income and Other Income (Expense), Net

|  | Three Months Ended | | Six Months Ended | |
|  | June 30, 2007 | July 1, 2006 | June 30, 2007 | July 1, 2006 |
| --- | --- | --- | --- | --- |
|  | (In thousands, except percentages) | | | |
| Interest income | $ 5,557 | $ 3,889 | $ 11,001 | $ 5,711 |
| % of revenue | 4.9 % | 4.2 % | 5.1 % | 3.3 % |
| Other income (expense), net | $ (61 ) | $ 327 | $ (181 ) | $ (14 ) |
| % of revenues | (0.1 )% | 0.4 % | (0.1 )% | 0.0 % |

The increase in interest income for the three and six months ended June 30, 2007 was due to larger cash, cash equivalents and marketable securities balances and higher interest rates, resulting in higher interest income earned for the first half of fiscal 2007 as compared to the first half of fiscal 2006. Cash, cash equivalents, restricted cash and marketable securities increased to $528.4 million at June 30, 2007 compared with $432.9 million at July 1, 2006. Other income (expense), net for the three and six months ended June 30, 2007 and July 1, 2006 was mainly comprised of foreign currency gains (losses), primarily related to Japanese Yen.

Provision for Income Taxes

|  | Three Months Ended | | Six Months Ended | |
|  | June 30, 2007 | July 1, 2006 | June 30, 2007 | July 1, 2006 |
| --- | --- | --- | --- | --- |
|  | (In thousands, except percentages) | | | |
| Provision for income taxes | $ 9,867 | $ 8,069 | $ 17,034 | $ 14,088 |
| Effective tax rate | 34.6 % | 34.6 % | 33.7 % | 35.1 % |

Our effective tax rate was 34.6% and 33.7% for the three and six months ended June 30, 2007 compared to 34.6% and 35.1% for the three and six months ended July 1, 2006. The effective tax rate for the three months ended June 30, 2007 remained consistent with the same period in the prior year and decreased for the first half of fiscal 2007 compared to the first half of fiscal 2006 primarily due to the reinstatement of the federal research and development tax credit in December 2006 offset by the elimination of the Extraterritorial Income tax benefit which expired after December 2006.

We anticipate our effective rate for the remainder of 2007 to be approximately 39%, not including the effect of employee's disqualifying dispositions of stock based awards which are recognized in the quarter these dispositions occur. In the second half we will begin funding part of our research and development investments out of Singapore as we expand our operations there. We expect these investments by our Singapore subsidiary will generate losses for the remainder of the year. Generally, these losses could be carried forward and offset future Singapore taxable profits, but due to the favorable tax exempt status granted to us, these losses will not reduce future taxes. Therefore, these losses do not provide a current tax benefit to our tax provision.

Critical Accounting Policies and Estimates

For a description of the critical accounting policies that affect our more significant judgments and estimates used in the preparation of our condensed consolidated financial statements, refer to our Annual Report on Form 10-K for the year ended December 30, 2006. There have been no changes to our critical accounting policies since December 30, 2006, other than with respect to income taxes.

Accounting for Income Taxes. We adopted FIN 48 on December 31, 2006, the first day of the first quarter of fiscal 2007. FIN 48 prescribes a recognition threshold and measurement attribute for the financial statement recognition and measurement of a tax position taken or expected to be taken in a tax return that results in a tax benefit. Additionally, FIN 48 provides guidance on de-recognition, statement of operations classification of interest and penalties, accounting in interim periods, disclosure, and transition. As a result of the implementation of FIN 48, our tax assets and liabilities did not differ from the assets and liabilities before adoption therefore, we did not record any adjustments as of the adoption date. In addition, consistent with the provisions of FIN 48, we reclassified $9.8 million of income tax liabilities from current to non-current liabilities because payment of cash is not anticipated within one year of the balance sheet date and we are unable to make a reasonably reliable estimate when cash settlement with a taxing authority will occur. At the adoption date of December 31, 2006, we had $16.7 million of total gross unrecognized tax benefits, of which $14.0 million (net of the federal benefit on

18

--------------------------------------------------------------------------------

state issues) of unrecognized tax benefits would impact our effective tax rate if recognized. We continue to recognize interest and penalties related to uncertain tax positions in income tax expense.

As part of the process of preparing our consolidated financial statements, we are required to estimate our income taxes. This process involves estimating our actual current tax liability together with assessing temporary differences that may result in deferred tax assets. Management judgment is required in determining any valuation allowance recorded against our net deferred tax assets. Any such valuation allowance would be based on our estimates of income and the period over which our deferred tax assets would be recoverable. While management has considered taxable income and ongoing prudent and feasible tax planning strategies in assessing the need for a valuation allowance, if we were to determine that we would not be able to realize all or part of our net deferred tax assets in the future, an adjustment to the deferred tax assets would result in additional income tax expense in such period.

Given our increasing levels of profitability, we concluded that it is more likely than not that we will be able to realize all of our U.S. deferred tax assets.  For the deferred tax asset resulting from non-U.S. net operating losses we have concluded that it is more likely than not that this asset will not be utilized and therefore, we have recorded a full valuation allowance for those deferred tax assets.

We calculate our current and deferred tax provision based on estimates and assumptions that could differ from the actual results reflected in income tax returns filed. Differences between our tax provision and tax return may occur and such adjustments are recorded when identified.

The amount of income taxes we pay is subject to ongoing audits by federal, state and foreign tax authorities which might result in proposed assessments. Our estimate for the potential outcome for any uncertain tax issue is judgmental in nature. However, we believe we have adequately provided for any reasonable foreseeable outcome related to those matters. Our future results may include favorable or unfavorable adjustments to our estimated tax liabilities in the period the assessments are made or resolved or when statutes of limitation on potential assessments expire.

Liquidity and Capital Resources

As of June 30, 2007, we had $526.2 million in cash, cash equivalents and marketable securities compared to $492.4 million as of December 30, 2006.

Net cash provided by operating activities was $40.0 million and $41.3 million for the six months ended June 30, 2007 and July 1, 2006, respectively. Net cash provided by operating activities decreased as a result of an increase in accounts receivable and inventory balances as well as the impact of non-cash items, primarily depreciation and amortization expense, deferred income taxes and stock-based compensation.  Increases in accrued income tax payable and accounts payable also contributed to the overall decrease in net cash provided by operating activities.

Accounts receivable increased by $24.0 million for the six months ended June 30, 2007 compared with $0.9 million for the six months ended July 1, 2006, respectively, due to an increase in worldwide sales and timing of shipments to customers. Our days sales outstanding from receivables, or DSO, improved to 41 days at June 30, 2007 compared to 44 days at July 1, 2006, respectively.

Inventories increased $13.2 million and $11.2 million for the six months ended June 30, 2007 and July 1, 2006, respectively. The increase in inventories was a result of increased volume in business and the expected strong demand for our products in the third quarter of fiscal 2007.

Net cash used in investing activities was $63.1 million for the six months ended June 30, 2007 compared with net cash provided by investing activities of $0.3 million for the six months ended July 1, 2006.  Capital expenditures were $30.6 million for the six months ended June 30, 2007 and $18.6 million for the six months ended July 1, 2006. Cash used in the acquisition of property and equipment resulted primarily from capital expenditures in support of factory capacity, service center and information technology system upgrades, and new product technology.  In addition, the decrease in purchases and increase in sales and maturities of marketable securities contributed to net cash used in investing activities for the six months ended June 30, 2007.

We expect capital expenditures for fiscal 2007 to increase from our target of 12% of revenues to a range of 13% to 14% of revenues.  This increase is expected to continue into fiscal 2008, depending on our revenue growth, primarily as a result of the expansion of our manufacturing operations in Singapore and the related building design, construction and equipment costs that we expect to incur.  In the third quarter of fiscal 2007, we signed a 30-year prepaid land lease offer for our Singapore manufacturing facility.  We are moving forward with the design and construction of our new facility.  The land lease is classified as an operating lease and the prepayment of approximately $7.0 million will be amortized over the term of the land lease.

19

--------------------------------------------------------------------------------

Net cash provided by financing activities was $25.6 million for the six months ended June 30, 2007 compared with $197.4 million for the six months ended July 1, 2006. Net cash provided by financing activities for the six months ended June 30, 2007 was primarily attributable to $17.0 million of net proceeds from the exercise of stock options and $3.1 million received from the January 2007 ESPP purchase.  Net cash provided by financing activities for the six months ended July 1, 2006 was mainly due to $182.0 million of net proceeds received from an equity follow-on offering completed in March 2006 as well as $7.1 million of net proceeds received from the exercise of employee stock options combined with proceeds from the January 2006 ESPP purchase. Tax benefits related to the exercise of stock options during the six months ended June 30, 2007 were $5.5 million compared to $6.6 million for the six months ended July 1, 2006.

We believe that cash generated from operations, together with the liquidity provided by our existing cash, cash equivalents and marketable securities, will be sufficient to meet our anticipated cash needs for at least the next 12 months. Our future capital requirements will depend on many factors, including the timing and extent of spending to support product development efforts, the expansion of sales and marketing activities, the cost of increasing manufacturing capacity to meet projected demand, including our expansion plans in Singapore and the requirements of any potential investments in, or acquisitions of, complementary businesses, products or technologies that we may enter into in the future.  Depending upon our future capital requirements, we may  seek additional equity or debt financing. Additional funds may not be available on terms favorable to us or at all.

Contractual Commitments

Income Taxes.  As of June 30, 2007, our unrecognized tax benefits amounted to $16.2 million and are classified as deferred and other long-term tax liabilities on our condensed consolidated balance sheets.  As of June 30, 2007, the settlement period for our income tax liabilities cannot be determined, however it is not expected to be due within the next twelve months.

Off-Balance Sheet Arrangements

As part of our ongoing business, we do not participate in transactions that generate relationships with unconsolidated entities or financial partnerships, such as entities often referred to as structured finance or special purpose entities, which would have been established for the purpose of facilitating off-balance sheet arrangements or other contractually narrow or limited purposes. As of June 30, 2007 we are not involved in any such off-balance sheet arrangements.

Recent Accounting Pronouncements

In May 2007, the FASB issued FASB Staff Position ("FSP") FIN No. 48-1, "Definition of "Settlement" in FASB Interpretation No. 48" ("FSP FIN No. 48-1"). FSP FIN No. 48-1 provides guidance on how a company should determine whether a tax position is effectively settled for the purpose of recognizing previously unrecognized tax benefits. FSP FIN No. 48-1 is effective upon initial adoption of FIN No. 48, which we adopted in the first quarter of fiscal 2007.  See Note 8 -- Income Taxes of the Notes to Unaudited Condensed Consolidated Financial Statements for additional information.

In February 2007, the FASB issued Statement of Financial Accounting Standards No. 159, "The Fair Value Option for Financial Assets and Financial Liabilities -- Including an Amendment of FASB Statement No. 115" which is effective for fiscal years beginning after November 15, 2007. This statement permits an entity to choose to measure many financial instruments and certain other items at fair value at specified election dates. Subsequent unrealized gains and losses on items for which the fair value option has been elected will be reported in earnings. We are currently evaluating the potential impact of this statement.

In September 2006, the FASB issued SFAS No. 157, "Fair Value Measurements" ("SFAS No. 157"). SFAS No. 157 defines fair value, establishes a framework for measuring fair value in accordance with generally accepted accounting principles, and expands disclosures about fair value measurements.  The changes to current practice resulting from the application of this statement relate to the definition of fair value, the methods used to measure fair value, and the expanded disclosures about fair value measurements. The provisions of this statement are to be applied prospectively as of the beginning of the fiscal year in which this statement is initially applied, with any transition adjustment recognized as a cumulative-effect adjustment to the opening balance of retained earnings. The provisions of SFAS No. 157 are effective for the fiscal years beginning after November 15, 2007; therefore, we anticipate adopting this standard as of January 1, 2008.

20

--------------------------------------------------------------------------------

Item 3. Quantitative and Qualitative Disclosures About Market Risk

Our investment portfolio includes fixed-income securities with a fair value of approximately $240 million at June 30, 2007. These securities are subject to interest rate risk and will decline in value if interest rates increase.  While an increase in interest rates reduces the fair value of the investment portfolio, we will not realize the losses in the condensed consolidated statement of income unless the individual fixed-income securities are sold prior to recovery or the loss is determined to be other-than-temporarily impaired.

We conduct certain operations in foreign currencies. We enter into currency forward exchange contracts to hedge a portion of, but not all, existing foreign currency denominated amounts.  Gains and losses on these contracts are generally recognized in income.  Because the effect of movements in currency exchange rates on the currency forward exchange contracts generally offsets the related effect on the underlying items being hedged, these financial instruments are not expected to subject us to risks that would otherwise result from changes in currency exchange rates.  We do not use derivative financial instruments for trading or speculative purposes. Net foreign currency gains and losses were not material for the three and six months ended June 30, 2007 and July 1, 2006.

Item 4. Controls and Procedures

Evaluation of Disclosure Controls and Procedures

Our management, including our Chief Executive Officer and Chief Financial Officer, conducted an evaluation as of June 30, 2007 of the effectiveness of our "disclosure controls and procedures" as defined in the Exchange Act Rule 13a-15(e).  Based on that evaluation, our Chief Executive Officer and Chief Financial Officer concluded that as of June 30, 2007, our disclosure controls and procedures were effective to ensure that information we are required to disclose in reports that we file or submit under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in rules and forms of the SEC, and is accumulated and communicated to our management as appropriate to allow timely decisions regarding required disclosure.

Changes in Internal Control Over Financial Reporting

Our management, including our Chief Executive Officer and Chief Financial Officer, conducted an evaluation of our "internal control over financial reporting" as defined in Exchange Act Rule 13a-15(f) to determine whether any changes in our internal control over financial reporting occurred during the second quarter of fiscal 2007 that materially affected, or are reasonably likely to materially affect, our internal control over financial reporting. Based on that evaluation, there have been no such changes in our internal control over financial reporting during the second quarter of fiscal 2007.

Limitations on the Effectiveness of Controls

Control systems, no matter how well designed and operated, can provide only reasonable, not absolute, assurance that the control systems' objectives are being met. Further, the design of any control systems must reflect the fact that there are resource constraints, and the benefits of all controls must be considered relative to their costs. Because of the inherent limitations in all control systems, no evaluation of controls can provide absolute assurance that all control issues and instances of fraud, if any, within our company have been detected. These inherent limitations include the realities that judgments in decision-making can be faulty and that breakdowns can occur because of simple error or mistake. Control systems can also be circumvented by the individual acts of some persons, by collusion of two or more people, or by management override of the controls. The design of any system of controls is based in part on certain assumptions about the likelihood of future events, and there can be no assurance that any design will succeed in achieving its stated goals under all potential future conditions. Over time, controls may become inadequate because of changes in conditions or deterioration in the degree of compliance with policies or procedures.

21

--------------------------------------------------------------------------------

CEO and CFO Certifications

We have attached as exhibits to this Quarterly Report on Form 10-Q the certifications of our Chief Executive Officer and Chief Financial Officer, which are required in accordance with the Exchange Act. We recommend that this Item 4 be read in conjunction with the certifications for a more complete understanding of the subject matter presented.

PART II. OTHER INFORMATION

Item 1. Legal Proceedings

The information relating to "Legal Matters" set forth under Note 9 - Commitments and Contingencies of the Notes to Unaudited Condensed Consolidated Financial Statements of this Form 10-Q is incorporated herein by reference.

Item 1A. Risk Factors

In addition to the other information in this Quarterly Report on Form 10-Q, you should carefully consider the risk factors discussed in our Annual Report on Form 10-K for the year ended December 30, 2006 and the updated risk factors set forth below in evaluating FormFactor and our business. If any of the identified risks actually occur, our business, financial condition and results of operations could suffer. Accordingly, the trading price of our common stock would likely decline and you may lose all or part of your investment in our common stock. The risks and uncertainties described in our Annual Report on Form 10-K and below are not the only ones we face. Additional risks that we currently do not know about or that we currently believe to be immaterial may also impair our business operations.

We disclosed the risk factors below in our Annual Report on Form 10-K for the year ended December 30, 2006. We have updated these risk factors to reflect changes for the second quarter of fiscal 2007.

If demand for our products in the memory device and flip chip logic device markets declines or fails to grow as we anticipate, our revenues could decline.

We derive substantially all of our revenues from wafer probe cards that we sell to manufacturers of DRAM memory devices and manufacturers of microprocessor, chipset and other logic devices. In the microprocessor, chipset and other logic device markets, our products are primarily used for devices employing flip chip packaging, which are commonly referred to as flip chip logic devices. For the three months ended June 30, 2007 and July 1, 2006, sales to manufacturers of DRAM devices accounted for 70.2% and 72.8%, respectively, of our revenues, sales to manufacturers of logic devices accounted for 12.1% and 8.2%, respectively, of our revenues, and sales to manufacturers of flash memory devices accounted for 17.7% and 19.0%, respectively, of our revenues. For the six months ended June 30, 2007 and July 1, 2006, sales to manufacturers of DRAM devices accounted for 71.9% and 76.7%, respectively, of our revenues, sales to manufacturers of logic devices accounted for 11.1% and 9.2%, respectively, of our revenues, and sales  to manufacturers of flash memory devices accounted for 17.0% and 14.1%, respectively. Therefore, our success depends in part upon the continued acceptance of our products within these markets and our ability to continue to develop and introduce new products on a timely basis for these markets. In particular, to continue to grow our business, we need to further penetrate the flash memory market and to gain additional market share with manufacturers in this market.  We also need to successfully qualify and introduce into commercial volume our DRAM and flash wafer probe card products incorporating our Harmony architecture.  To the extent that we are unable to do so, or if we are not able to deliver timely our products, our revenues and business operations could be adversely impacted and our ability to grow could suffer. If chip manufacturers fail to make architecture, node or technology transitions as we anticipate, or if anticipated or announced transitions are delayed, it could adversely impact our revenues and operating results.

A substantial portion of these semiconductor devices is sold to manufacturers of personal computers and computer-related products and to manufacturers of personal electronic devices. Both the personal computer market and the personal electronic devices market have historically been characterized by significant fluctuations in demand and continuous efforts to reduce costs, which in turn have affected the demand for and price of memory devices and microprocessors. The personal computer market and the personal electronic devices market might not grow in the future at historical rates or at all and design activity in those markets might decrease, which could negatively affect our revenues and operating results.

22

--------------------------------------------------------------------------------

We derive a substantial portion of our revenues from a small number of customers, and our revenues could decline significantly if any major customer cancels, reduces or delays a purchase of our products.

A relatively small number of customers has accounted for a significant portion of our revenues in any particular period. Five customers accounted for 77.5% of our revenues for the three months ended June 30, 2007 and three customers accounted for 49.4% of our revenues for the six months ended June 30, 2007. In the three and six months ended July 1, 2006, four customers accounted for 55.5% and 58.9% of our revenues, respectively. Our ten largest customers accounted for 92.2% and 92.7%, respectively, of our revenues in the three and six months ended June 30, 2007 and 87.5% and 88.7%, respectively of our revenues in the three and six months ended July 1, 2006. We anticipate that sales of our products to a relatively small number of customers will continue to account for a significant portion of our revenues. The cancellation or deferral of even a small number of purchases of our products could cause our revenues to decline in any particular quarter. A number of factors could cause customers to cancel or defer orders, including manufacturing delays, interruptions to our customers' operations due to fire, natural disasters or other events, or a downturn in the semiconductor industry. Our customers could cease purchasing our products with short or no notice to us or fail to pay all or part of an invoice. In some situations, our customers might be able to cancel orders without a significant penalty. In addition, consolidation in the semiconductor industry, particularly among manufacturers of DRAM, could reduce our customer base and lead to lost or delayed sales and reduced demand for our wafer probe cards. Industry consolidation also could result in pricing pressures as larger DRAM manufacturers could have sufficient bargaining power to demand reduced prices and favorable nonstandard terms. Additionally, certain customers may not want to rely entirely or substantially on a single wafer probe card supplier and, as a result, such customers could reduce their purchases of our wafer probe cards.

Because we conduct some of our business internationally, we are subject to operational, economic, financial and political risks abroad.

Sales of our products to customers outside the United States have accounted for an important part of our revenues. Our international sales as a percentage of our revenues were 79.1% and 76.3%, respectively, for the three and six months ended June 30, 2007 and 70.0% and 71.2%, respectively for the three and six months ended July 1, 2006. Additionally, certain of our Korean customers purchase through their North American subsidiaries. In the future, we expect international sales, particularly in Europe, Japan, South Korea and Taiwan, to continue to account for a significant percentage of our revenues. Accordingly, we will be subject to risks and challenges that we would not otherwise face if we conducted our business only in the United States. These risks and challenges include:

.               compliance with a wide variety of foreign laws and regulations;

.               legal uncertainties regarding taxes, tariffs, quotas, export controls, export licenses and other trade barriers;

.               political and economic instability in, or foreign conflicts that involve or affect, the countries of our customers;

.               difficulties in collecting accounts receivable and longer accounts receivable payment cycles;

.               difficulties in staffing and managing personnel, distributors and representatives;

.               reduced protection for intellectual property rights in some countries;

.               currency exchange rate fluctuations, which could affect the value of our assets denominated in local currency, as well as the price of our products relative to locally produced products;

.               seasonal fluctuations in purchasing patterns in other countries; and

.               fluctuations in freight rates and transportation disruptions.

Any of these factors could harm our existing international operations and business or impair our ability to continue expanding into international markets.

23

--------------------------------------------------------------------------------

We may not obtain the tax and other benefits that we anticipate through the expansion of our manufacturing operations into Singapore, which could negatively impact our operating results.

We have intiated the first phase of our company's global manufacturing expansion in Singapore. Our decision to build back-end assembly and test followed by front-end wafer manufacturing in Singapore is primarily based upon the tax and other benefits that we believe are obtainable by operating in that country. These benefits include favorable tax exempt status granted by the Singapore government, subject to meeting certain conditions, as well as lower qualified technical personnel labor costs. However, if we do not fulfill the conditions for our granted tax status for any reason, we may not obtain the full tax benefits, the tax benefits could lapse and any future tax benefits that we may seek may not be granted. Consequently, our effective corporate income tax rate may not decrease as we expect but instead, may remain approximately the same or increase. In addition, the other benefits of operating in Singapore may not materialize. The inability to obtain the anticipated tax and other benefits through our Singapore expansion could negatively impact our operating results.

Item 4.  Submission of Matters to a Vote of Security Holders

We held our 2007 Annual Meeting of Stockholders on May 17, 2007 at our corporate headquarters at 7005 Southfront Road, Livermore, California  94551. At the meeting, our stockholders voted on the following two proposals and cast their votes as follows to approve such proposals:

Proposal 1: To elect the following nominees as the three Class I directors to our board of directors, each to serve on our board of directors until his successor has been elected and qualified or until his earlier death, resignation or removal:

| Nominee | For | Withheld |
|---|---|---|
| Dr. Thomas J. Campbell | 31,237,340 | 14,297,131 |
| Dr. Igor Y. Khandros | 45,067,351 | 467,120 |
| Lothar Maier | 45,066,297 | 468,174 |

Our board of directors consists of seven members and is divided into three classes - Class I, II and III. Each director is elected for a three-year term of office, with one class of directors being elected at each annual meeting of stockholders.

Proposal 2: To ratify the selection of PricewaterhouseCoopers LLP as our independent registered public accounting firm for the fiscal year ending December 29, 2007:

| For | Against | Abstain | Broker Non-Votes |
|---|---|---|---|
| 45,519,180 | 13,181 | 2,110 | 0 |

24

--------------------------------------------------------------------------------

Item 6. Exhibits

The following exhibits are filed herewith:

| Exhibit Number | Exhibit Description | Incorporated by Reference | | | Filed Herewith |
|---|---|---|---|---|---|
| | | Form | Date | Number | |
| 10.01+ | 2002 Employee Stock Purchase Plan, as amended | | | | X |
| 31.01 | Certification of Chief Executive Officer pursuant to 15 U.S.C. Section 7241, as adopted pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 | | | | X |
| 31.02 | Certification of Chief Financial Officer pursuant to 15 U.S.C. Section 7241, as adopted pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 | | | | X |
| 32.01* | Certification of Chief Executive Officer and Chief Financial Officer pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 | | | | X |

--------------------------------------------------------------------------------

*       This exhibit shall not be deemed "filed" for purposes of Section 18 of the Securities Exchange Act of 1934 or otherwise subject to the liabilities of that section, nor shall it be deemed incorporated by reference in any filing under the Securities Act of 1933 or the Securities Exchange Act of 1934, whether made before or after the date hereof and irrespective of any general incorporation language in any filings.

+       Indicates a management contract or compensatory plan or arrangement.

25

--------------------------------------------------------------------------------

SIGNATURE

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.


                    FORMFACTOR, INC.
                    By: /s/ RON C. FOSTER
                        Ron C. Foster
                        Chief Financial Officer
                        (Principal Financial Officer and
                        Duly Authorized Officer)
August 6, 2007


26

--------------------------------------------------------------------------------

EXHIBIT INDEX

| Exhibit Number | Exhibit Description | Incorporated by Reference Form | Date | Number | Filed Herewith |
|---|---|---|---|---|---|
| 10.01+ | 2002 Employee Stock Purchase Plan, as amended | | | | X |
| 31.01 | Certification of Chief Executive Officer pursuant to 15 U.S.C. Section 7241, as adopted pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 | | | | X |
| 31.02 | Certification of Chief Financial Officer pursuant to 15 U.S.C. Section 7241, as adopted pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 | | | | X |
| 32.01* | Certification of Chief Executive Officer and Chief Financial Officer pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 | | | | X |

--------------------------------------------------------------------------------
*       This exhibit shall not be deemed "filed" for purposes of Section 18 of the Securities Exchange Act of 1934 or otherwise subject to the liabilities of that section, nor shall it be deemed incorporated by reference in any filing under the Securities Act of 1933 or the Securities Exchange Act of 1934, whether made before or after the date hereof and irrespective of any general incorporation language in any filings.


+       Indicates a management contract or compensatory plan or arrangement.


27

--------------------------------------------------------------------------------

EXHIBIT 10.01

FORMFACTOR, INC.

2002 EMPLOYEE STOCK PURCHASE PLAN

As Adopted April 18, 2002

As Amended December 14, 2006

1.        Establishment of Plan.  FormFactor, Inc. (the "Company")
proposes to grant options for purchase of the Company's Common Stock to
eligible employees of the Company and its Participating Subsidiaries (as
hereinafter defined) pursuant to this Employee Stock Purchase Plan (this
"Plan").  For purposes of this Plan, "Parent Corporation" and "Subsidiary"
shall have the same meanings as "parent corporation" and "subsidiary
corporation" in Sections 424(e) and 424(f), respectively, of the Internal
Revenue Code of 1986, as amended (the "Code").  "Participating Subsidiaries"
are Parent Corporations or Sub-sidiaries that the Board of Directors of the
Company (the "Board") designates from time to time as corporations that shall
participate in this Plan.  The Company intends this Plan to qualify as an
"employee stock purchase plan" under Section 423 of the Code (including any
amendments to or replacements of such Section), and this Plan shall be so
construed.  Any term not expressly defined in this Plan but defined for
purposes of Section 423 of the Code shall have the same definition herein.  A
total of 2,000,000 shares of the Company's Common Stock is reserved for
issuance under this Plan.  In addition, on each January 1, the aggregate number
of shares of the Company's Common Stock reserved for issuance under the Plan
shall be increased automatically by a number of shares equal to 1% of the total
number of outstanding shares of the Company Common Stock on the immediately
preceding December 31; provided,that the Board or the Committee may in its sole
discretion reduce the amount of the increase in any particular year; and,
provided further, that the aggregate number of shares issued over the term of
this Plan shall not exceed 20,000,000 shares.  Such number shall be subject to
adjustments effected in accordance with Section 14 of this Plan.

2.        Purpose.  The purpose of this Plan is to provide eligible
employees of the Company and Participating Subsidiaries with a convenient means
of acquiring an equity interest in the Company through payroll deductions, to
enhance such employees' sense of participation in the affairs of the Company
and Participating Subsidiaries, and to provide an incentive for continued
employment.

3.        Administration.  This Plan shall be administered by the
Compensation Committee of the Board (the "Committee").  Subject to the
provisions of this Plan and the limitations of Section 423 of the Code or any
successor provision in the Code, or limitations imposed by other taxing
jurisdictions, as applicable, all questions of interpretation or application of
this Plan shall be determined by the Committee and its decisions shall be final
and binding upon all partici-pants.  Members of the Committee shall receive no
compensation for their services in connection with the administration of this
Plan, other than standard fees as established from time to time by the Board
for services rendered by Board members serving on Board committees.  All
expenses incurred in connection with the administration of this Plan shall be
paid by the Company.

4.        Eligibility.  Any employee of the Company or the Participating
Subsidiaries is eligible to participate in an Offering Period (as hereinafter

defined) under this Plan except the following:

(a) employees who are not employed by the Company or a Participating Subsidiary prior to the beginning of such Offering Period or prior to such other time period as specified by the Committee, except that employees who are employed on the Effective Date of the Registration Statement filed by the Company with the Securities and Exchange Commission ("SEC") under the Securities Act of 1933, as amended (the "Securities Act") registering the initial public offering of the Company's Common Stock shall be eligible to participate in the first Offering Period under the Plan;

(b) employees who are customarily employed for twenty (20) hours or less per week;

--------------------------------------------------------------------------------
(c) employees who are customarily employed for five (5) months or less in a calendar year;

(d) employees who, together with any other person whose stock would be attributed to such employee pursuant to Section 424(d) of the Code, own stock or hold options to purchase stock possessing five percent (5%) or more of the total combined voting power or value of all classes of stock of the Company or any of its Participating Subsidiaries or who, as a result of being granted an option under this Plan with respect to such Offering Period, would own stock or hold options to purchase stock possessing five percent (5%) or more of the total combined voting power or value of all classes of stock of the Company or any of its Participating Subsidiaries; and

(e) individuals who provide services to the Company or any of its Participating Subsidiaries as independent contractors who are reclassified as common law employees for any reason except for federal income and employment tax purposes.

5.          Offering Periods.  The offering periods of this Plan (each, an "Offering Period") beginning on and after February 1, 2007 shall consist of the following: (i) an Offering Period of twelve (12) months fixed duration commencing on February 1 of each calendar year and ending on January 31 of the subsequent calendar year and (ii) an Offering Period of six (6) months fixed duration commencing on August 1 of each calendar year and ending on January 31 of the subsequent calendar year; provided, however, that

(a) with respect to participants who entered into this Plan on the Offering Date (as defined below) of August 1, 2006, the Offering Period shall be of twenty-four (24) months fixed duration commencing on August 1, 2006 and ending on July 31, 2008 (the "August 2006 Offering Period"), unless an Early Termination Event (as defined below) shall have occurred;

(b) with respect to participants who entered into this Plan on the Offering Date of February 1, 2006, the Offering Period shall be of twenty-four (24) months fixed duration commencing on February 1, 2006 and ending on January 31, 2008 (the "February 2006 Offering Period"), unless an Early Termination Event shall have occurred;

(c) with respect to participants who entered into this Plan on the Offering Date of August 1, 2005, the Offering Period shall be of twenty-four (24) months fixed duration commencing on August 1, 2005 and ending on July 31, 2007 (the "August 2005 Offering Period"), unless an Early Termination Event shall have occurred;

(d) with respect to participants who entered into this Plan on the Offering Date of February 1, 2005, the Offering Period shall be of twenty-four (24) months fixed duration commencing on February 1, 2005 and ending on January 31, 2007 (the "February 2005 Offering Period");

(e)  with respect to participants who entered into this Plan prior to the Offering Date of February 1, 2005 (other than as set forth in subsection (f) below), the Offering Periods shall be of twenty-four (24) months duration commencing on February 1 and August 1 of each year and ending on January 31 and July 31 of each year; and

(f) the first such Offering Period shall commence on the date on which the registration statement filed by the Company with the SEC under the Securities Act registering the initial public offering of the Company's Common Stock is declared effective by the SEC (the "First Offering Date") and shall end on July 31, 2004 (the "First Offering Period").

Each Offering Period of twelve (12) months fixed duration commencing on and after February 1, 2007 shall consist of two (2) six month purchase periods during which payroll deductions of the participants are accumulated under this Plan (individually, a "Purchase Period"), and each Offering Period of six (6) months fixed duration shall consist of one (1) six month Purchase Period.  Each Offering Period that commenced before February 1, 2007 shall consist of four (4) six month Purchase Periods, unless an Early Termination Event shall have occurred.  The First Offering Period shall consist of no more than five and no fewer than three Purchase Periods, any of which may be greater or less than six months as determined by the Committee.  The first business day of each Offering Period is referred to as the "Offering Date".  The last business day of each Purchase Period is referred to as the "Purchase Date".  The Committee shall have the power to change the Offering Dates, the Purchase Dates and the duration of Offering Periods or Purchase Periods without stockholder approval if such change is announced prior to the relevant Offering Period or prior to such other time period as specified by the Committee.

2

--------------------------------------------------------------------------
Each of the following events shall be deemed an "Early Termination Event" for the purposes of this Plan:

(i)          in the event that the Fair Market Value on any Offering Date through February 1, 2008 is lower than the Fair Market Value on the first Offering Date for the August 2006 Offering Period, then immediately prior to such Offering Date, the Company shall terminate the August 2006 Offering Period and automatically enroll any participants in the August 2006 Offering Period into the immediately subsequent Offering Period pursuant to this Plan;

(ii)         in the event that the Fair Market Value on any Offering Date through August 1, 2007 is lower than the Fair Market Value on the first Offering Date for the February 2006 Offering Period, then immediately prior to such Offering Date, the Company shall terminate the February 2006 Offering Period and automatically enroll any participants in the February 2006 Offering Period into the immediately subsequent Offering Period pursuant to this Plan; and

(iii)        in the event that the Fair Market Value on any Offering Date through February 1, 2007 is lower than the Fair Market Value on the first Offering Date for the August 2005 Offering Period, then immediately prior to

such Offering Date, the Company shall terminate the August 2005 Offering Period and automatically enroll any participants in the August 2005 Offering Period into the immediately subsequent Offering Period pursuant to this Plan.

In the event that an Early Termination Event has not occurred with respect to any participant in the August 2006 Offering Period, the February 2006 Offering Period and/or the August 2005 Offering Period, then upon the expiration of the respective Offering Period of such participant in accordance with subsections (a), (b) and (c) above, as applicable, the Company shall automatically enroll such participant into the immediately subsequent Offering Period pursuant to this Plan.

6.           Participation in this Plan.  Eligible employees may become participants in an Offering Period under this Plan on the Offering Date after satisfying the eligibility requirements by delivering a subscription agreement to the Company prior to such Offering Date, or such other time period as specified by the Committee, or as provided by Section 5 above; provided, however, that all eligible employees employed on or before the First Offering Date will be automatically enrolled in the First Offering Period.  An eligible employee can participate in only one Offering Period at a time. Notwithstanding the foregoing, (i) an eligible employee may elect to decrease the number of shares of Common Stock that such employee would otherwise be permitted to purchase pursuant to Section 7 below for the First Offering Period and/or purchase shares of Common Stock for the First Offering Period through payroll deductions by delivering a subscription agreement to the Company within thirty (30) days following the First Offering Date after the filing of an effective registration statement pursuant to Form S-8 and (ii) the Committee may set a later time for filing the subscription agreement authorizing payroll deduc-tions for all eligible employees with respect to a given Offering Period. Except as provided above with respect to the First Offering Period, an eligible employee who does not deliver a subscription agreement to the Company after becoming eligible to participate in an Offering Period shall not participate in such Offering Period or any subsequent Offering Period unless such employee enrolls in this Plan by filing a subscription agreement with the Company prior to such Offering Period, or such other time period as specified by the Committee.  Once an employee becomes a participant in an Offering Period by filing a subscription agreement, such employee will automatically participate in the Offering Period commencing immediately following the last day of the prior Offering Period unless the employee withdraws or is deemed to withdraw from this Plan or terminates further participation in the Offering Period as set forth in Section 11 below.  Such participant is not required to file any additional subscription agreement in order to continue participation in this Plan.

3

--------------------------------------------------------------------------------
7.           Grant of Option on Enrollment.  Enrollment by an eligible employee in this Plan with respect to an Offering Period will constitute the grant (as of the Offering Date) by the Company to such employee of an option to purchase on the Purchase Date up to that number of shares of Common Stock of the Company determined by a fraction, the numerator of which is the amount accumulated in such employee's payroll deduction account during such Purchase Period and the denominator of which is the lower of (i) eighty-five percent (85%) of the fair market value of a share of the Company's Common Stock on the Offering Date (but in no event less than the par value of a share of the Company's Common Stock), or (ii) eighty-five percent (85%) of the fair market value of a share of the Company's Common Stock on the Purchase Date (but in no event less than the par value of a share of the Company's Common Stock), provided, however, that for each Purchase Period within the First Offering Period the numerator shall be fifteen percent (15%) of the eligible employee's compensation for such Purchase Period and provided, further, that the number of shares of the Company's Common Stock subject to any option granted pursuant to

this Plan shall not exceed the lesser of (x) the maximum number of shares set by the Committee pursuant to Section 10(c) below with respect to the applicable Purchase Date, or (y) the maximum number of shares which may be purchased pursuant to Section 10(b) below with respect to the applicable Purchase Date. The fair market value of a share of the Company's Common Stock shall be determined as provided in Section 8 below.

8.        Purchase Price.  The purchase price per share at which a share of Common Stock will be sold in any Offering Period shall be eighty-five percent (85%) of the lesser of:

(a)  The fair market value on the Offering Date; or

(b)  The fair market value on the Purchase Date.

The term "fair market value" means, as of any date, the value of a share of the Company's Common Stock determined as follows:

(a)  if such Common Stock is then quoted on the Nasdaq Global Market, its closing price on the Nasdaq Global Market on the date of determination as reported in The Wall Street Journal;

(b)  if such Common Stock is publicly traded and is then listed on a national securities exchange, its closing price on the date of determination on the principal national securities exchange on which the Common Stock is listed or admitted to trading as reported in The Wall Street Journal; or

(c)  if such Common Stock is publicly traded but is not quoted on the Nasdaq Global Market nor listed or admitted to trading on a national securities exchange, the average of the closing bid and asked prices on the date of determination as reported in The Wall Street Journal.

Notwithstanding the foregoing, for purposes of the First Offering Date, fair market value shall be the price per share at which shares of the Company's Common Stock are initially offered for sale to the public by the Company's underwriters in the initial public offering of the Company's Common Stock pursuant to a registration statement filed with the SEC under the Securities Act.

9.        Payment Of Purchase Price; Changes In Payroll Deductions; Issuance Of Shares.

(a)  The purchase price of the shares is accumulated by regular payroll deductions made during each Offering Period, provided, however, that for the First Offering Period the purchase price of the shares shall be paid by the eligible employee in cash on each Purchase Date within the First Offering Period unless the eligible employee elects to purchase such shares through payroll deductions after the filing of an effective Form S-8 registration statement pursuant to the second sentence of Section 6 above within thirty (30) days following the First Offering Period.  The deductions are made as a percentage of the participant's compensation in one percent (1%) increments not less than one percent (1%), nor greater than fifteen percent (15%) or such lower limit set by the Committee.  Compensation shall mean all W-2 cash compensation, including, but not limited to, base salary, wages, commissions, overtime, shift premiums, plus draws against commissions, provided, however, that for purposes of determining a participant's compensation, any election by

such participant to reduce his or her regular cash

4

--------------------------------------------------------------------------------
remuneration under Sections 125 or 401(k) of the Code shall be treated as if
the participant did not make such election.  Payroll deductions shall commence
on the first payday of the Offering Period and shall continue to the end of the
Offering Period unless sooner altered or terminated as provided in this Plan.


(b)    (i)  For any Offering Periods that commenced before February 1, 2007
(including the August 2006 Offering Period, the February 2006 Offering Period,
the August 2005 Offering Period and the February 2005 Offering Period), the
following provision is operative:  A participant may increase or decrease the
rate of payroll deductions during an Offering Period by filing with the Company
a new authorization for payroll deductions, in which case the new rate shall
become effective for the next payroll period commencing after the Company's
receipt of the authorization and shall continue unless changed as described
below.  Such change in the rate of payroll deductions may be made at any time
during an Offering Period, but not more than one (1) change may be made
effective during any Purchase Period.  A participant may increase or decrease
the rate of payroll deductions for any subsequent Offering Period by filing
with the Company a new authorization for payroll deductions prior to the
beginning of such Offering Period, or such other time period as specified by
the Committee.


(ii)  For any Offering Periods commencing from and after February 1, 2007, the
following provision is operative:  A participant may not increase the rate of
payroll deductions at any time during an Offering Period.  A participant may
decrease the rate of payroll deductions during an Offering Period by filing
with the Company a new authorization for payroll deductions, in which case the
new rate shall become effective as soon as practicable commencing after the
Company's receipt of the authorization and shall continue unless changed as
described below.  Such decrease in the rate of payroll deductions may be made
at any time during an Offering Period, but not more than one (1) change may be
made effective during any Purchase Period.  A participant may increase or
decrease the rate of payroll deductions for any subsequent Offering Period by
filing with the Company a new authorization for payroll deductions prior to the
beginning of such Offering Period, or such other time period as specified by
the Committee.


(c)  A participant may reduce his or her payroll deduction percentage to zero
during an Offering Period by filing with the Company a request for cessation of
payroll deductions.  A participant may make only one change, if allowable,
whether a suspension, decrease or increase, during any Purchase Period.  Such
reduction shall be effective beginning as soon as practicable after the
Company's receipt of the request and no further payroll deductions will be made
for the duration of the Offering Period.  Payroll deductions credited to the
participant's account prior to the effective date of the request shall be used
to purchase shares of Common Stock of the Company in accordance with Section
(e) below.  A participant may not resume making payroll deductions during the
Offering Period in which he or she reduced his or her payroll deductions to
zero.


(d)  All payroll deductions made for a participant are credited to his or her
account under this Plan and are deposited with the general funds of the
Company.  No interest accrues on the payroll deductions.  All payroll
deductions received or held by the Company may be used by the Company for any
corporate purpose, and the Company shall not be obligated to segregate such
payroll deductions.

(e)  On each Purchase Date, so long as this Plan remains in effect and provided that the participant has not submitted a signed and completed withdrawal form before that date which notifies the Company that the participant wishes to withdraw from that Offering Period under this Plan and have all payroll deductions accumulated in the account maintained on behalf of the participant as of that date returned to the participant, the Company shall apply the funds then in the participant's account to the purchase of whole shares of Common Stock reserved under the option granted to such participant with respect to the Offering Period to the extent that such option is exercisable on the Purchase Date.  The purchase price per share shall be as specified in Section 8 of this Plan.  Any cash remaining in a participant's account after such purchase of shares shall be refunded to such participant in cash, without interest; provided, however that any amount remaining in such participant's account on a Purchase Date which is less than the amount necessary to purchase a full share of Common Stock of the Company shall be carried forward, without inter-est, into the next Purchase Period or Offering Period, as the case may be.  In the event that this Plan has been over-sub-scribed, all funds not used to purchase shares on the Purchase Date shall be returned to the participant, without interest.  No Common Stock shall be purchased on a Purchase Date on behalf of any employee whose participation in this Plan has terminated prior to such Purchase Date.

5

--------------------------------------------------------------------------------
(f)  As promptly as practicable after the Purchase Date, the Company shall issue shares for the participant's benefit representing the shares purchased upon exercise of his or her option.


(g)  During a participant's lifetime, his or her option to purchase shares hereunder is exercisable only by him or her.  The participant will have no interest or voting right in shares covered by his or her option until such option has been exercised.


10.        Limitations on Shares to be Purchased.


(a)  No participant shall be entitled to purchase stock under this Plan at a rate which, when aggregated with his or her rights to purchase stock under all other employee stock purchase plans of the Company or any Subsidiary, exceeds $25,000 in fair market value, determined as of the Offering Date (or such other limit as may be imposed by the Code) for each calendar year in which the employee participates in this Plan.  The Company shall automatically suspend the payroll deductions of any participant as necessary to enforce such limit provided that when the Company automatically resumes such payroll deductions, the Company must apply the rate in effect immediately prior to such suspension.


(b)  No more than two hundred percent (200%) of the number of shares determined by using eighty-five percent (85%) of the fair market value of a share of the Company's Common Stock on the Offering Date as the denominator may be purchased by a participant on any single Purchase Date.


(c)  No participant shall be entitled to purchase more than the Maximum Share Amount (as defined below) on any single Purchase Date.  Prior to the commencement of any Offering Period or prior to such time period as specified by the Committee, the Committee may, in its sole discretion, set a maximum number of shares which may be purchased by any employee at any single Purchase Date (hereinafter the "Maximum Share Amount").  Until otherwise determined by the Committee, there shall be no Maximum Share Amount.  In no event shall the Maximum Share Amount exceed the amounts permitted under Section 10(b) above.

If a new Maximum Share Amount is set, then all participants must be notified of
such Maximum Share Amount prior to the commencement of the next Offering
Period.  The Maximum Share Amount shall continue to apply with respect to all
succeeding Purchase Dates and Offering Periods unless revised by the Committee
as set forth above.

(d)  If the number of shares to be purchased on a Purchase Date by all
employees participating in this Plan exceeds the number of shares then
available for issuance under this Plan, then the Company will make a pro rata
allocation of the remaining shares in as uniform a manner as shall be
reasonably practicable and as the Committee shall determine to be equitable.
In such event, the Company shall give written notice of such reduction of the
num-ber of shares to be purchased under a participant's option to each
participant affected.

(e)  Any payroll deductions accumulated in a participant's account which are
not used to purchase stock due to the limitations in this Section 10 shall be
returned to the participant as soon as practicable after the end of the
applicable Purchase Period, without interest.

11.         Withdrawal.

(a)  Each participant may withdraw from an Offering Period under this Plan by
signing and delivering to the Company a written notice to that effect on a form
provided for such purpose.  Such withdrawal may be elected at any time prior to
the end of an Offering Period, or such other time period as specified by the
Committee.

(b)  Upon withdrawal from this Plan, the accumulated payroll deductions shall
be returned to the withdrawn participant, without interest, and his or her
interest in this Plan shall terminate.  In the event a participant vol-untarily
elects to withdraw from this Plan, he or she may not resume his or her
participation in this Plan during the same Offering Period, but he or she may
participate in any Offering Period under this Plan which commences on a date
subsequent to such withdrawal by filing a new authorization for payroll
deductions in the same manner as set forth in Section 6 above for initial
participation in this Plan.

6

--------------------------------------------------------------------------------
(c)  If the Fair Market Value on the first day of the current Offering Period
in which a participant is enrolled is higher than the Fair Market Value on the
first day of any subsequent Offering Period, the Company will automatically
enroll such participant in the subsequent Offering Period.  Any funds
accumulated in a participant's account prior to the first day of such
subsequent Offering Period will be applied to the purchase of shares on the
Purchase Date immediately prior to the first day of such subsequent Offering
Period, if any.

(d)  Section 11(c) of this Plan shall not apply to any Offering Period from and
after February 1, 2007.

12.         Termination of Employment.  Termination of a participant's
employment for any reason, including retirement, death or the failure of a
participant to remain an eligible employee of the Company or of a Participating
Subsidiary, immediately terminates his or her participation in this Plan.  In
such event, the payroll deductions credited to the participant's account will

be returned to him or her or, in the case of his or her death, to his or her legal representative, without interest.  For purposes of this Section 12, an employee will not be deemed to have termi-nated employment or failed to remain in the continuous employ of the Company or of a Participating Subsidiary in the case of sick leave, military leave, or any other leave of absence approved by the Board; provided that such leave is for a period of not more than ninety (90) days or reemployment upon the expiration of such leave is guaranteed by con-tract or statute.

13.      Return of Payroll Deductions.  In the event a participant's interest in this Plan is terminated by withdrawal, termination of employment or otherwise, or in the event this Plan is terminated by the Board, the Company shall deliver to the participant all payroll deductions credited to such participant's account.  No interest shall accrue on the payroll deductions of a participant in this Plan.

14.      Capital Changes.  Subject to any required action by the stockholders of the Company, the number of shares of Common Stock covered by each option under this Plan which has not yet been exercised and the number of shares of Common Stock which have been authorized for issuance under this Plan but have not yet been placed under option (collectively, the "Reserves"), as well as the price per share of Common Stock covered by each option under this Plan which has not yet been exercised, shall be proportionately adjusted for any increase or decrease in the number of issued and outstanding shares of Common Stock of the Company resulting from a stock split or the pay-ment of a stock dividend (but only on the Common Stock) or any other increase or decrease in the number of issued and outstanding shares of Common Stock effected without receipt of any consideration by the Company; provided, however, that conversion of any convertible securities of the Company shall not be deemed to have been "effected without receipt of consideration".  Such adjustment shall be made by the Committee, whose determination shall be final, binding and conclusive. Except as expressly provided herein, no issue by the Company of shares of stock of any class, or securities convertible into shares of stock of any class, shall affect, and no adjustment by reason thereof shall be made with respect to, the number or price of shares of Common Stock subject to an option.

In the event of the proposed dissolution or liquidation of the Company, the Offering Period will terminate immediately prior to the consummation of such proposed action, unless otherwise provided by the Committee.  The Committee may, in the exercise of its sole discretion in such instances, declare that this Plan shall terminate as of a date fixed by the Committee and give each participant the right to purchase shares under this Plan prior to such termination.  In the event of (i) a merger or consolidation in which the Company is not the surviving corporation (other than a merger or consolidation with a wholly-owned subsidiary, a reincorporation of the Company in a different jurisdiction, or other transaction in which there is no substantial change in the stockholders of the Company or their relative stock holdings and the options under this Plan are assumed, converted or replaced by the successor corporation, which assumption will be binding on all participants), (ii) a merger in which the Company is the surviving corporation but after which the stockholders of the Company immediately prior to such merger (other than any stockholder that merges, or which owns or controls another corporation that merges, with the Company in such merger) cease to own their shares or other equity interest in the Company, (iii) the sale of all or substantially all of the assets of the Company or (iv) the acquisition, sale, or transfer of more than 50% of the outstanding shares of the Company by tender offer or similar transaction, the Plan will continue with regard to Offering Periods that commenced prior to the closing of the proposed transaction and shares will be purchased based on the Fair Market Value of the surviving corporation's stock on each Purchase Date, unless otherwise provided by the Committee.

7

--------------------------------------------------------------------------------
The Committee may, if it so determines in the exercise of its sole discretion,
also make provision for adjusting the Reserves, as well as the price per share
of Common Stock covered by each outstanding option, in the event that the
Company effects one or more reorganizations, recapitalizations, rights
offerings or other increases or reductions of shares of its outstanding Common
Stock, or in the event of the Company being consolidated with or merged into
any other corporation.


15.        Nonassignability.  Neither payroll deductions credited to a
participant's account nor any rights with regard to the exercise of an option
or to receive shares under this Plan may be assigned, transferred, pledged or
otherwise disposed of in any way (other than by will, the laws of descent and
distribution or as provided in Section 22 below) by the participant.  Any such
attempt at assignment, transfer, pledge or other disposition shall be void and
without effect.


16.        Reports.  Individual accounts will be maintained for each
participant in this Plan.  Each participant shall receive promptly after the
end of each Purchase Period a report of his or her account setting forth the
total payroll deductions accumulated, the number of shares purchased, the per
share price thereof and the remaining cash balance, if any, carried forward to
the next Purchase Period or Offering Period, as the case may be.


17.        Notice of Disposition.  Each participant shall notify the Company
in writing if the participant disposes of any of the shares purchased in any
Offering Period pursuant to this Plan if such disposition occurs within two (2)
years from the Offering Date or within one (1) year from the Purchase Date on
which such shares were purchased (the "Notice Period").  The Company may, at
any time during the Notice Period, place a legend or legends on any certificate
representing shares acquired pursuant to this Plan requesting the Company's
transfer agent to notify the Company of any transfer of the shares.  The
obligation of the participant to provide such notice shall continue
notwithstanding the placement of any such legend on the certificates.


18.        No Rights to Continued Employment.  Neither this Plan nor the
grant of any option hereunder shall confer any right on any employee to remain
in the employ of the Company or any Participating Subsidiary, or restrict the
right of the Company or any Participating Subsidiary to terminate such
employee's employment.


19.        Equal Rights And Privileges.  All eligible employees shall have
equal rights and privileges with respect to this Plan so that this Plan
qualifies as an "employee stock purchase plan" within the meaning of Section
423 or any successor provision of the Code and the related regulations.  Any
provision of this Plan which is inconsistent with Section 423 or any successor
provision of the Code shall, without further act or amendment by the Company,
the Committee or the Board, be reformed to comply with the requirements of
Section 423.  This Section 19 shall take precedence over all other provisions
in this Plan.


20.        Notices.  All notices or other communications by a participant to
the Company under or in connection with this Plan shall be deemed to have been
duly given when received in the form specified by the Company at the location,
or by the person, designated by the Company for the receipt thereof.


21.        Term; Stockholder Approval.  After this Plan is adopted by the
Board, this Plan will become effective on the First Offering Date (as defined

above).  This Plan shall be approved by the stockholders of the Company, in any manner permitted by applicable corporate law, within twelve (12) months before or after the date this Plan is adopted by the Board.  No purchase of shares pursuant to this Plan shall occur prior to such stock-holder approval.  This Plan shall continue until the earlier to occur of (a) termination of this Plan by the Board (which termination may be effected by the Board at any time), (b) issuance of all of the shares of Common Stock reserved for issuance under this Plan, or (c) ten (10) years from the adoption of this Plan by the Board.

22.        Designation of Beneficiary.

(a)  A participant may file a written designation of a beneficiary who is to receive any shares and cash, if any, from the participant's account under this Plan in the event of such participant's death subsequent to the end of a Purchase Period but prior to delivery to him of such shares and cash.  In addition, a participant may file a

8

--------------------------------------------------------------------------------

written designation of a beneficiary who is to receive any cash from the participant's account under this Plan in the event of such participant's death prior to a Purchase Date.

(b)  Such designation of beneficiary may be changed by the participant at any time by written notice.  In the event of the death of a participant and in the absence of a beneficiary validly designated under this Plan who is living at the time of such participant's death, the Company shall deliver such shares or cash to the executor or admin-istrator of the estate of the participant, or if no such executor or administrator has been appointed (to the knowledge of the Company), the Company, in its discretion, may deliver such shares or cash to the spouse or to any one or more dependents or relatives of the participant, or if no spouse, dependent or relative is known to the Company, then to such other person as the Company may designate.

23.        Conditions Upon Issuance of Shares; Limitation on Sale of Shares. Shares shall not be issued with respect to an option unless the exercise of such option and the issuance and delivery of such shares pursuant thereto shall comply with all applicable provisions of law, domestic or foreign, including, without limitation, the Securities Act, the Securities Exchange Act of 1934, as amended, the rules and regulations promulgated thereunder, and the requirements of any stock exchange or automated quotation system upon which the shares may then be listed, and shall be further subject to the approval of counsel for the Company with respect to such compliance.

24.        Applicable Law.  The Plan shall be governed by the substantive laws (excluding the conflict of laws rules) of the State of California.

25.        Amendment or Termination of this Plan.  The Board may at any time amend, terminate or extend the term of this Plan, except that any such termination cannot affect options previously granted under this Plan, nor may any amendment make any change in an option previously granted which would adversely affect the right of any par-ticipant, nor may any amendment be made without approval of the stockholders of the Company obtained in accor-dance with Section 21 above within twelve (12) months of the adoption of such amendment (or earlier if required by Section 21) if such amendment would:

(a)  increase the number of shares that may be issued under this Plan; or

(b)  change the designation of the employees (or class of employees) eligible for participation in this Plan.

Notwithstanding the foregoing, the Board may make such amendments to the Plan as the Board determines to be advisable, if the continuation of the Plan or any Offering Period would result in financial accounting treatment for the Plan that is different from the financial accounting treatment in effect on the date this Plan is adopted by the Board.

9

--------------------------------------------------------------------------------

EXHIBIT 31.01

CERTIFICATION OF CHIEF EXECUTIVE OFFICER
PURSUANT TO 15 U.S.C. SECTION 7241, AS
ADOPTED PURSUANT TO SECTION 302 OF THE SARBANES-OXLEY ACT OF 2002

I, Igor Y. Khandros, certify that:

1.         I have reviewed the quarterly report on Form 10-Q of
FormFactor, Inc., a Delaware corporation, for the period ended June 30, 2007,
as filed with the Securities and Exchange Commission;

2.         Based on my knowledge, the quarterly report does not contain
any untrue statement of a material fact or omit to state a material fact
necessary to make the statements made, in light of the circumstances under
which such statements were made, not misleading with respect to the period
covered by the quarterly report;

3.         Based on my knowledge, the financial statements, and other
financial information included in the quarterly report, fairly present in all
material respects the financial condition, results of operations and cash flows
of the registrant as of, and for, the periods presented in the quarterly report;

4.         The registrant's other certifying officer and I are
responsible for establishing and maintaining disclosure controls and procedures
(as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control
over financial reporting (as defined in Exchange Act Rules 13a-15(f) and
15d-15(f)) for the registrant and have:

(a) Designed such disclosure controls and procedures, or caused such disclosure
controls and procedures to be designed under our supervision, to ensure that
material information relating to the registrant, including its consolidated
subsidiaries, is made known to us by others within those entities, particularly
during the period in which the quarterly report is being prepared;

(b) Designed such internal control over financial reporting, or caused such
internal control over financial reporting to be designed under our supervision,
to provide reasonable assurance regarding the reliability of financial
reporting and the preparation of financial statements for external purposes in
accordance with generally accepted accounting principles;

(c) Evaluated the effectiveness of the registrant's disclosure controls and
procedures and presented in the quarterly report our conclusions about the
effectiveness of the disclosure controls and procedures, as of the end of the
period covered by the quarterly report based on such evaluation; and

(d) Disclosed in the quarterly report any change in the registrant's internal
control over financial reporting that occurred during the registrant's most
recent fiscal quarter that has materially affected, or is reasonably likely to
materially affect, the registrant's internal control over financial reporting;
and

5.         The registrant's other certifying officer and I have
disclosed, based on our most recent evaluation of internal control over
financial reporting, to the registrant's auditors and the audit committee of
the registrant's board of directors:

(a) All significant deficiencies and material weaknesses in the design or
operation of internal control over financial reporting which are reasonably
likely to adversely affect the registrant's ability to record, process,
summarize and report financial information; and

(b) Any fraud, whether or not material, that involves management or other
employees who have a significant role in the registrant's internal control over
financial reporting.

Date: August 6, 2007 /s/ IGOR Y. KHANDROS
                      Igor Y. Khandros
                      Chief Executive Officer

--------------------------------------------------------------------------------

EXHIBIT 31.02

CERTIFICATION OF CHIEF FINANCIAL OFFICER
PURSUANT TO 15 U.S.C. SECTION 7241,
AS ADOPTED PURSUANT TO SECTION 302 OF THE SARBANES-OXLEY ACT OF 2002

I, Ronald C. Foster, certify that:

1.          I have reviewed the quarterly report on Form 10-Q of FormFactor, Inc., a Delaware corporation, for the period ended June 30, 2007, as filed with the Securities and Exchange Commission;

2.          Based on my knowledge, the quarterly report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by the quarterly report;

3.          Based on my knowledge, the financial statements, and other financial information included in the quarterly report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in the quarterly report;

4.          The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

(a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which the quarterly report is being prepared;

(b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in the quarterly report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by the quarterly report based on such evaluation; and

(d) Disclosed in the quarterly report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.          The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors:

(a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: August 6, 2007 /s/ RONALD C. FOSTER
                      Ronald C. Foster
                      Chief Financial Officer

--------------------------------------------------------------------------------

EXHIBIT 32.01

CERTIFICATION OF
CHIEF EXECUTIVE OFFICER AND CHIEF FINANCIAL OFFICER
PURSUANT TO 18 U.S.C. SECTION 1350,
AS ADOPTED PURSUANT TO SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002


In connection with the quarterly report on Form 10-Q of FormFactor, Inc., a
Delaware corporation, for the period ended June 30, 2007, as filed with the
Securities and Exchange Commission, each of the undersigned officers of
FormFactor, Inc. certifies pursuant to 18 U.S.C. Section 1350, as adopted
pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that, to his
respective knowledge:


(1)        the quarterly report fully complies with the requirements of
Section 13(a) or 15(d) of the Securities Exchange Act of 1934, as amended; and


(2)        the information contained in the quarterly report fairly presents,
in all material respects, the financial condition and results of operations of
FormFactor, Inc. for the periods presented therein.


Date: August 6, 2007 /s/ IGOR Y. KHANDROS
                      Igor Y. Khandros
                      Chief Executive Officer
Date: August 6, 2007 /s/ RONALD C. FOSTER
                      Ronald C. Foster
                      Chief Financial Officer


--------------------------------------------------------------------------------