IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DANNY McCASLAND, individually and on behalf of all others similarly situated,<br><br>    Plaintiffs,<br><br>  v.<br><br>FORMFACTOR INC., *et al.*,<br><br>    Defendants. | No. C 07-5545 SI<br><br>**ORDER GRANTING DEFENDANTS' MOTION TO DISMISS SECOND AMENDED COMPLAINT WITHOUT LEAVE TO AMEND** |

Now before the Court is defendants' motion to dismiss the second amended complaint. For the reasons set forth below, the Court GRANTS defendants' motion to dismiss without leave to amend.

**BACKGROUND**

This is a securities class action against FormFactor, Inc. and certain of its officers[1] under Rule 10b-5 and §§ 10(b) and 20(a) of the Securities Exchange Act of 1935 ("Exchange Act"). Lead plaintiff, the City of Monroe Employees' Retirement System, brings suit on behalf of all those who purchased or otherwise acquired the common stock of FormFactor between February 1, 2006 and February 5, 2008 ("class period"). FormFactor is a publicly traded company headquartered in Livermore, California that designs, manufactures and sells advanced wafer probe cards, which its customers – dynamic random access memory (DRAM), flash and microprocessor manufacturers – use to electrically test integrated

---

[1] The FormFactor officers named in the complaint include Igor Y. Khandros, CEO; Richard M. Freeman, Senior Vice President, Operations; Ronald C. Foster, CFO until his February 25, 2008 resignation; and Joseph Bronson, President until his January 5, 2007 resignation (collectively, "defendants").

circuits for semiconductor chips in the front end of the manufacturing process. Second Amended Compl. ("SAC") ¶ 2.

In April 2005, FormFactor introduced its new "Harmony" architecture for wafer probe cards, designed to reduce to one the "touchdowns," or numbers of times the card touched the chip while testing its functionality, thereby minimizing the risk of the card damaging the chip at contact. *Id*. ¶ 4. The SAC alleges that "Harmony was supposed to differentiate FormFactor from its competition, and FormFactor's growth depended largely on the execution and delivery of Harmony products." *Id*. The market reacted well to FormFactor's representations about Harmony's single-touchdown technology and its potential both for FormFactor's future revenue and for reshaping the integrated circuit test industry.

The gravamen of the complaint is that from February 2006 to February 2008, defendants made numerous misleading and false statements regarding the company's development and ramping of Harmony and its business and financial results. Plaintiffs allege that given the pressure to be "first to market" with the Harmony one touchdown technology, senior management "began to tell the market that the Company had completed the 'field trial' of Harmony in early 2006 and that it began to make initial volume shipments starting mid-2006." *Id*. ¶ 10. In reality, plaintiffs allege, "Harmony remained in the early phase of development and continued in the development phase throughout the Class Period." *Id*. The SAC alleges that "Defendants' strategy was to be the 'first to market' at all costs so that once a customer placed an order for Harmony, even if it did not work, at least FormFactor would get the customer 'on the hook,' hoping that FormFactor would be able to fix the problems in time before its competitors came out with comparable technology, and that the Company would at least be portrayed as the forerunner in developing this revolutionary single touchdown technology." *Id*. Plaintiffs allege that defendants decided to market Harmony before it was fully developed and to ship Harmony probe cards knowing that the shipments would likely be rejected, which they were. "Thus, while defendants were repeatedly making representations that 'we shipped Harmony' or that 'we made our initial volume Harmony shipments' throughout the Class Period, these statements were at best, misleading, because defendants did not disclose that the Harmony shipments came right back as the Company had expected." *Id*. ¶ 11.

The SAC also alleges that the defendants knew but failed to disclose publicly that, throughout

2

the class period, FormFactor experienced systematic poor yields in the manufacturing process, which, in turn, caused additional problems and caused further delays in shipments to customers. *Id.* ¶ 12. The complaint alleges,

> In order to conceal FormFactor's real development progress with Harmony and the Company's overall manufacturing problems, defendants engaged in a scheme and artifice to defraud and mislead the market about Harmony's development by (1) covering up its poor yields through the overvaluation of FormFactor's inventory, hiding inventory expenses in Research and Development ("R&D") (*i.e.*, treating worthless "scrap" – excess and obsolete inventory which resulted from the poor manufacturing process – as part of the Company's R&D), and (2) attempting to convince the market that, even as the Company was disclosing that it had overvalued its inventory, FormFactor's inability to deliver Harmony was from "capacity constraints" and not the true reason: that the product was underdeveloped and had poor yields when it was able to be manufactured.

*Id.* ¶ 14. Plaintiffs allege that by improperly classifying scrap as an R&D cost, defendants manipulated the company's financials by understating the cost of revenue and overstating the company's gross margin. *Id.* ¶ 15. Plaintiffs also allege that "[t]o further the appearance that the Company was successfully ramping its Harmony products, defendants manipulated the Company's reported financials by overstating the value of its inventory and the related cost of revenue accounts in violation of the Generally Accepted Accounting Principles ("GAAP"). Specifically, in order to inflate the price of FormFactor's stock, defendants caused the Company to falsely report its results for 2006 and the first half of 2007 through improperly accounting for its inventory valuation and the related cost of revenue accounts." *Id.* ¶ 16.

As FormFactor experienced protracted but publicly undisclosed problems with ramping its Harmony products, plaintiffs allege that "defendants took advantage of the inflated stock price to unload their stock." *Id.* ¶ 17. The complaint alleges that defendants' "illicit insider trading" consisted of Bronson selling 25,000 shares, or 36.83% of his holdings, for more than $1 million in proceeds; Foster selling 19,800 shares, or 87.29% of his holdings,[2] for $864,144 in proceeds; and Khandros selling 723,079 shares, or 23.91% of his holdings, for $27.86 million in proceeds.[3]

---

[2] Defendants dispute the percentage calculation of Foster's sales. This factual dispute is irrelevant to resolving the present motion.

[3] Defendants were also rewarded with stock options during the class period: Khandros, 231,540 shares of stock options; Bronson, 94,220; Foster, 115,580; and Freeman, 85,000.

On October 24, 2007, FormFactor announced possible adjustments to inventory valuations for periods prior to the third quarter of 2007. *Id*. ¶ 18. In a conference call with security analysts on the same day, defendants disclosed for the first time that Harmony production was behind schedule, but attributed the delay to "capacity constraints," *Id.* ¶ 19, and represented that demand remained strong, without referencing FormFactor's underlying poor yields. FormFactor's stock declined $7.70 per share in one day of trading, dropping nearly 20% from $43.24 per share to close at $35.54. *Id*.

On November 11, 2007, FormFactor filed amended Forms 10-K and 10-Q and restated its financials for the fiscal year of 2006 and the first two quarters of 2007. *Id*. ¶ 21. In the company's 2006 restated Form 10-K, the company admitted that it "did not consistently follow its accounting policies for valuing inventory resulting in material misstatement of inventory and cost of revenue." *Id*. The GAAP violation resulted in a material overstatement of FormFactor's inventory on its balance sheet, and a material misstatement of the company's cost of revenues, gross margin, net income, and earnings per share ("EPS"). *Id.*

On February 5, 2008, FormFactor disclosed what plaintiffs' complaint alleges defendants had known throughout the class period, namely that FormFactor had "severe operations issues in ramping up the production of Harmony, and was therefore unable to ship Harmony to customers, causing a decline in revenue and bookings and market share." *Id.* ¶ 27. The company stated, "Due to the protracted Harmony ramp issues we experienced in 2007, FormFactor was not the first full wafer contractor probe card company qualified at some DRAM suppliers. This resulted in the loss of business in the fourth quarter." *Id.* As a result of lost DRAM market share "driven by DRAM industry weakness and Harmony DRAM production issues," FormFactor also announced a "bleak outlook for 2008." *Id.* FormFactor's stock dropped 11% on February 5, 2008 and another 9% on the following day, closing at $21.06 per share. *Id*. The stock has traded in the vicinity of $20.00 per share since then. *Id*.

In October, November and December 2007, plaintiffs filed three class actions lawsuits against defendants for violations of federal securities laws. The cases were consolidated, and plaintiffs filed a consolidated amended complaint ("CAC") on April 3, 2008. In a 20 page order filed July 25, 2008, the Court dismissed the CAC on numerous grounds. The Court held that the CAC (which discussed 9 confidential witnesses) "does not allege the sort of detail or corroboration from other sources –

4

meetings, conversations, and internal memoranda and reports – to support the inference that any of the individual defendants actually believed FormFactor's public statements might be false or misleading at the time they were made.  Importantly, none of the CWs is alleged to have had any interaction or communication with any of the defendants, or to have provided any defendant with information, or to have heard or read any statement by any defendant, that contradicted or even cast doubt on a public statement made during the class period." Order at 13.  With regard to the purported accounting violations, the Court held

> [T]he complaint bases its pleading of accounting fraud on various grounds, including alleged GAAP violations, FormFactor's restatements of financial results, defendants' [Sarbanes-Oxley] certifications of FormFactor's financial reports, Foster's resignation as CFO on February 25, 2008, defendants' alleged improper accounting for scrap as R&D and FormFactor's purportedly weak internal controls. . . . these factual allegations are not of themselves cogent or compelling and fail to provide the requisite foundation and specificity to meet PSLRA pleading standards for accounting fraud.  This is because plaintiffs' allegations, considered individually or collectively, lack sufficient particularized facts to create the inference of scienter, namely that defendants knew or must have known of the facts relevant to the purported accounting violations at the time they took place.

Order at 15.  Plaintiffs filed a second amended complaint, which defendants have moved to dismiss as insufficient.

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 12(b)(6), a district court must dismiss a complaint if it fails to state a claim upon which relief can be granted.  "In undertaking this review, we will accept the plaintiffs' allegations as true and construe them in the light most favorable to plaintiffs, and will hold a dismissal inappropriate unless the plaintiffs' complaint fails to state a claim to relief that s plausible on its face." *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 989 (9th Cir. 2009) (internal citations and quotations omitted).  "At the pleading stage, a complaint stating claims under Section 10(b) [of the Securities Exchange Act of 1934] and [SEC] Rule 10b-5 must satisfy the dual pleading requirements of Federal Rule of Civil Procedure 9(b) and the PSLRA." *Id*. at 990.  After the PSLRA, a plaintiff must "plead with particularity both falsity and scienter." *Gompper v. VISX, Inc.*, 298 F.3d 893, 895 (9th Cir. 2002).

5

**DISCUSSION**

Defendants move to dismiss the SAC on numerous grounds. Defendants contend that plaintiffs have not cured any of the deficiencies identified by the Court in the previous order, such as the complaint's lack of corroboration and detail necessary to plead falsity and scienter. Defendants also contend that the complaint fails on grounds not reached in the previous order, including the failure to allege a strong inference of scienter in accordance with *Tellabs Inc. v. Makor Issues & Rights Ltd.*, 551 U.S.308, 127 S. Ct. 2499 (2007).

Plaintiffs contend that the SAC meets the pleadings requirements of the PSLRA. The SAC adds five confidential witnesses, the most important of whom is "CW14." Plaintiffs' opposition refers to CW14 as "the missing link" who "squarely addresses the Court's concern that 'none of the CWs is alleged to have any interaction or communication with any of the defendants' because he participated extensively in periodic meetings with defendants . . . where development of Harmony was discussed." Opposition 1-2.[4] CW14 was a former Senior New Product Program Manager in FormFactor's Product Development department from September 2005 through June 2008. SAC ¶ 56. CW14 led several cross-functional teams comprised of personnel from marketing, engineering, finance and operations on the development of new products at FormFactor. *Id*. The SAC alleges that "because of his/her involvement with the development of Harmony, and his/her extensive participation in technical meetings with [defendants] Khandros, Freeman and Bronson where problems with Harmony were discussed, CW14 is directly aware of defendants' knowledge of Harmony's problems and their involvement with the development of Harmony as well as the reasons why defendants prematurely introduced Harmony to the market even before it had been fully developed." *Id*.

Based upon CW14's information, the SAC alleges that "there were at least two types of regularly held meetings in which Harmony matters were discussed beginning in late 2005." *Id*. ¶ 78. The SAC contains the following information about these meetings and defendants' exposure to information about

---

[4] The SAC did not augment the allegations attributed to the original 9 CWs previously dismissed as inadequate. Plaintiffs' opposition implicitly concedes that the allegations based on new CWs 10-13 do not support an inference that any of the individual defendants actually believed FormFactor's public statements might be false or misleading at the time they were made, or that any defendant knew about the alleged accounting fraud scheme.

6

Harmony's problems:

> . . . According to CW14, there was a bi-weekly meeting dedicated specifically to Harmony to discuss the status of the project. Based on CW14's occasional attendance at this bi-weekly meeting and conversations with Shinde, the New Product Program Manager who was initially in charge of Harmony, CW14 knew that the regular attendees included Shinde, Eldridge and Freeman. Khandros and Bronson were also occasional attendees at these meetings and were fully informed of the status of the Harmony development.
>
> Additionally, there was also a monthly Executive Project Review ("EPR") meeting in which the status of all of FormFactor's major products was discussed. CW14 attended the monthly meetings and from CW14's attendance knew that Harmony was discussed. Both Bronson and Khandros attended these monthly meetings, as did Ruscev later in 2008. CW14 states that Khandros knew about the Harmony development problems and "was directing some of the work" related to Harmony, given that Khandros was "very strong technically" with a Ph.D. in a related-field. For example, CW14 recalls that Khandros directed that thermal testing be run on the Harmony products early on in the development stage in 2006. The minutes from the monthly EPR meetings, including action items, were drafted by an attendee on a rotating basis. The minutes, which detailed the Company's real progress with the development of Harmony, were also distributed to the attendees in an e-mail format and kept in the Company's FSLV 01 server. The FSLV 01 server is also a depository for all Harmony folders and is a shared file server that the senior management can access.
>
> CW14 also knew that Shinde attended other "semi-private, invitation only" meetings with Khandros in which Shinde got "chewed out" by Khandros for various problems associated with the Harmony project. As the problems with Harmony dragged on and continued to escalate, CW14 was asked to work on Harmony as well in late 2006, which was still in the Feasibility phase at that point.

*Id*. ¶¶ 78-80. Thus, the essence of CW14's information is that defendants knew about Harmony's production problems because they attended meetings at which Harmony was discussed, and they received and/or had available to them meeting minutes documenting the same.

However, the SAC does not allege that CW14, or any other CW, provided any *specific* information to defendants that contradicts any public statement made by defendants, or that any defendant received such information by an email, or internal memorandum or report. Nor does the SAC allege that any CW heard or read any specific private statement by a defendant that contradicted a public statement. Although CW14 attended numerous meetings at which Harmony was discussed, and is purportedly familiar with the minutes of the monthly EPR meetings, the SAC does not contain any detailed information that would support the SAC's claims of fraud. Instead, the SAC – as with the CAC – alleges that defendants continued to paint a rosy picture of Harmony's progress while defendants were generally aware of the manufacturing problems. Plaintiffs rely on *Berson v. Applied Signal Technology*,

7

527 F.3d 982 (9th Cir. 2008), and *South Ferry LP #2 v. Killinger*, 542 F.3d 776 (9th Cir. 2008). Both cases examine when a plaintiff may rely on the core-operations inference to plead scienter. The *South Ferry* court explained,

> Where a complaint relies on allegations that management had an important role in the company but does not contain additional detailed allegations about the defendants' actual exposure to information, it will usually fall short of the PSLRA standard. In such cases the inference that defendants had knowledge of the relevant facts will not be much stronger, if at all, than the inference that defendants remained unaware. As a general matter, "corporate management's general awareness of the day-to-day workings of the company's business does not establish scienter – at least absent some additional allegations of specific information conveyed to management and related to the fraud" or other allegations supporting scienter. *Metzler Inv. GmbH v. Corinthian Colleges, Inc.*, 534 F.3d 1068, 1087 (9th Cir. 2008) (concluding that the bare core operations inference fell short of the *Tellabs* standard).

*South Ferry*, 542 F.3d at 784-85.

The *South Ferry* court noted that in an "exceedingly rare category of cases," such as *Berson v. Applied Signal Technology*, the core operations inference alone may raise the strong inference required by the PSLRA. In *Berson*, the defendants allegedly failed to disclose "stop-work orders" from the company's largest customers even though those orders had a "devastating effect on the corporation's revenue." *Berson*, 527 F.3d at 987. The *Berson* plaintiffs did not allege particular facts indicating that the two individual defendants actually knew about the stop-work orders, and instead inferred knowledge based on the defendants' high level positions in this company. The *Berson* court found the complaint's allegations sufficient: "Yancey and Doyle were directly responsible for Applied Signal's day-to-day operations, so it is hard to believe that they would not have known about stop-work orders that allegedly halted tens of millions of dollars of the company's work." *Id*. at 988. In addition, the complaint alleged that the defendants did actually know about the largest stop-work order two weeks after the allegedly misleading statements because the stop-work order was disclosed in an SEC filing. *Id*. at 988 n.5.

Here, plaintiffs have not shown that this case fits within the unusual circumstances of *Berson*. Thus, under *South Ferry*, in addition to alleging that management had an important role in the company, the complaint must "contain additional detailed allegations about the defendants' actual exposure to information." *South Ferry*, 542 F.3d at 784. Although plaintiffs now have 14 confidential witnesses, the complaint still does not (1) identify any specific information that was either received or communicated by any defendant, that (2) contradicts any public statement at the time it was made. The

SAC does not meet the standard enunciated in *South Ferry*.

## II. Strong inference of scienter/*Tellabs*

Defendants also contend that the SAC should be dismissed under the weighing analysis mandated by *Tellabs*. The PSLRA requires that a plaintiff "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). In *Tellabs*, the Supreme Court held that a court evaluating a complaint's allegations of scienter:

> [M]ust engage in a comparative evaluation; it must consider, not only inferences urged by the plaintiff . . . but also competing inferences rationally drawn from the facts alleged. An inference of fraudulent intent may be plausible, yet less cogent than other, nonculpable explanations for the defendant's conduct. To qualify as "strong" within the intendment of [the PSLRA], we hold, an inference of scienter must be more than merely plausible or reasonable – it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent.

127 S. Ct. at 2504-05. "[C]ourts must consider the complaint in its entirety . . . [and inquire] whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Id*. at 2509 (emphasis in original).

Defendants contend that under the *Tellabs* weighing analysis, plaintiffs' theory of fraud is implausible, and not cogent and compelling. The Court agrees. There are several fundamental problems with plaintiffs' theory of the alleged fraud and accounting cover-up. Plaintiffs claim that the accounting fraud (misclassifying "scrap" as R&D) is "inextricably intertwined with and designed to cover up the Harmony development and manufacturing problems." Opposition at 23:16-17; *see* SAC ¶ 14 ("In order to conceal FormFactor's real development progress with Harmony . . . defendants engaged in a scheme and artifice to defraud and mislead the market about Harmony's development by . . . covering up its poor yields through the overvaluation of FormFactor's inventory, hiding inventory expenses in Research and Development . . . ."); *see also id*. ¶¶ 15, 16, 92, 191 and 212. However, when FormFactor restated its financial results, the company adjusted "inventory" but *did not* change the R&D numbers. It is undisputed that the R&D expenses were identical before and after the restatement, and nothing previously classified as R&D was moved out of that category. If, as plaintiffs allege, scrap was improperly classified as R&D instead of inventory, the R&D numbers should have been restated. Neither the SAC nor plaintiffs' opposition provide any sensible explanation for the fact that the R&D

9

1  numbers were unchanged. Instead, plaintiffs' response is to conclusorily assert that "Plaintiffs do not
2  allege that R&D was restated – nor does it have to be for plaintiffs to plead a case of fraud," along with
3  a citation to *Aldridge v. A.T. Cross Corporation*, 284 F.3d 72 (1st Cir. 2002). *See* Opposition at 24:20-
4  21. However, *Aldridge* only stands for the proposition that the absence of a restatement does not *per*
5  *se* negate an inference of scienter. *See Aldridge*, 284 F.3d at 83 ("[T]he fact that the financial statements
6  for the year in question were not restated does not end Aldridge's case when he has otherwise met the
7  pleading requirements of the PSLRA."). Here, where the numbers in a financial restatement run directly
8  counter to the plaintiffs' theory of fraud, the inference of scienter is not plausible or reasonable.

9        Second, plaintiff's fraud theory depends on defendants' deliberate understatement of the costs
10 of revenue and overstatement of gross margins. However, during two quarters during the class period
11 (1Q07 and 2Q07) FormFactor overstated – not understated – the cost of revenues, thus understating –
12 not overstating – its gross margins. These facts are inconsistent with plaintiffs' theory of fraud.
13 Relatedly, plaintiffs allege that during this same time period FormFactor was generating abundant scrap
14 that was misclassified as an R&D expense. Again, if plaintiffs were correct that FormFactor was
15 transferring scrap to R&D in order to remove it from the cost of revenues, thus improperly lowering the
16 cost of revenues and improperly inflating gross margins, the cost of revenues would have been
17 understated – not overstated -- during this time period. Neither the SAC nor the opposition advance
18 any persuasive theory of how understating gross margins and earnings could have been part of
19 defendants' fraudulent scheme. Another logical problem with plaintiffs' fraud theory is that a number
20 of defendants' challenged stock trades occurred during 1Q07 and 2Q07, when the revenue costs were
21 overstated and thus the gross margins were understated and presumably a time when the stock price
22 would be negatively affected by such reporting.[5] Indeed, CFO Ronald Foster, who would have been a
23 central figure in the accounting fraud alleged in the SAC, made the majority of his sales during 1Q07
24 and 2Q07.

25       Under the circumstances of this case, the comparative evaluation required by *Tellabs* does not

---

27 [5] In the previous order granting defendants' motion to dismiss the CAC, the Court held that
28 defendants' stock trades during the class period did not provide circumstantial evidence of scienter because, as a group, they maintained 88.5% of their holdings.

produce the "strong inference" of scienter called for by the PSLRA. *Tellabs* requires that "an inference of scienter must be more than merely plausible or reasonable – it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." That simply cannot be said here, given the factual and logical inconsistencies in the fraud theories asserted.

### III. Leave to amend

"[T]he district court's discretion to deny leave to amend is particularly broad where plaintiff has previously amended the complaint." *In re Read-Rite Corp.*, 335 F.3d 843, 845 (9th Cir. 2003) (internal quotations and citation omitted). Although plaintiffs request leave to amend, they do not identify any additional facts that they could allege to cure the deficiencies identified in this order or the previous order. Moreover, because some of the problems with the complaint are logical ones that go to the core of plaintiffs' theory of the alleged fraud, it is the Court's view that amendment would be futile. Accordingly, the Court DENIES leave to amend.

### CONCLUSION

For the foregoing reasons, the Court GRANTS defendants' motion to dismiss the second amended complaint without leave to amend. (Docket No. 61). The Court DENIES defendants' motion to strike Exhibit A to the Huang Declaration. (Docket No. 75). The Court GRANTS IN PART AND DENIES IN PART defendants' second request for judicial notice; to the extent plaintiffs have objected to the request for judicial notice, the Court does not take judicial notice of these documents. (Docket No. 62). The parties' dispute over these documents is irrelevant to the disposition of the present motion because the Court has not relied on any of these documents to resolve the motion to dismiss.

**IT IS SO ORDERED.**

Dated: July 14, 2009

SUSAN ILLSTON
United States District Judge

11